MICHAEL W. BIEN – 096891
VAN SWEARINGEN – 259809
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:     (415) 433-6830
Facsimile:      (415) 433-7104
Email:            mbien@rbgg.com
                      vswearingen@rbgg.com
                      agourse@rbgg.com
                      axu@rbgg.com

KELIANG (CLAY) ZHU – 305509
DEHENG LAW OFFICES PC
7901 Stoneridge Drive #208
Pleasanton, California  94588
Telephone:     (925) 399-5856
Facsimile:      (925) 397-1976
Email:            czhu@dehengsv.com

ANGUS F. NI (admitted *Pro Hac Vice*)
AFN LAW PLLC
502 Second Avenue, Suite 1400
Seattle, Washington  98104
Telephone:     (773) 543-3223
Email:            angus@afnlegal.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| U.S. WECHAT USERS ALLIANCE, CHIHUO INC., BRENT COULTER, FANGYI DUAN, JINNENG BAO, ELAINE PENG, and XIAO ZHANG,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, and WILBUR ROSS, in his official capacity as Secretary of Commerce,<br><br>Defendants. | Case No. 3:20-cv-05910-LB<br><br>**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Judge:   Hon. Laurel Beeler<br>Date:     September 17, 2020<br>Time:    9:30 a.m.<br>Crtrm.:  Remote<br><br>Trial Date:      None Set |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION ................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................ 2

INTRODUCTION ................................................................................................................. 2

STATEMENT OF FACTS .................................................................................................... 5

    A.    WeChat Is the Dominant App Among Chinese-Speaking Persons in the World .................................................................................................... 5

    B.    WeChat Is an Essential Form of Communication for Chinese-Speaking Persons in the United States ..................................................... 6

    C.    Plaintiffs Rely on WeChat for Family, Social, Civic, Charitable, Political, and Religious Engagement ................................................................. 8

    D.    Executive Order 13943 Appears to Ban All WeChat Transactions ............. 10

    E.    Neither the President nor His Administration Has Presented Evidence of a Bona Fide National Security Threat from Plaintiffs' Use of WeChat .......................................................................................................... 12

    F.    The Executive Order's Timing Suggests That It Was Issued Not for a Bona Fide National Security Reason But Instead to Further the President's Political Campaign By Inciting Anti-Asian Sentiment ............. 13

ARGUMENT ....................................................................................................................... 14

I.     A PRELIMINARY INJUNCTION IS WARRANTED IN THIS CASE ................. 14

    A.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims That the Executive Order Violates the Constitution and That the President's Action Is *Ultra Vires* .................................................................................... 15

           1.    The Executive Order is Unconstitutionally Vague and Violates Due Process Under the First and Fifth Amendments ........................ 16

                  (a)    The Executive Order Does Not Inform Regulated Parties of What Actions It Prohibits ....................................... 17

                  (b)    The Lack of Definitions of Key Terms In the Executive Order Will Lead to Selective and Discriminatory Enforcement ............................................................................ 19

           2.    The Executive Order Constitutes an Exceptionally Debilitating Burden on Speech and Is Unconstitutionally Overbroad ................. 21

                  (a)    The Executive Order is Overbroad and Facially Invalid ........ 21

(b)    The Executive Order Cannot Withstand Either Strict or
Intermediate Scrutiny ............................................................. 25

3.    The Executive Order is an Unlawful Content-Based Restriction
That Is Not Narrowly Tailored to Serve Compelling State
Interests ................................................................................... 29

4.    Plaintiffs are Likely to Succeed on the Merits of Their Claim
That Executive Order 13943 is *Ultra Vires* ......................... 31

(a)    Congress Has Expressly Forbidden the President from
Enacting a Sweeping Prohibition Like the One in
Executive Order 13943.......................................... 32

(b)    The Constitution Does Not Provide the President with
Freestanding Authority to Ban the Use of WeChat ............... 33

B.    Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Injunctive
Relief ...................................................................................................... 35

1.    Plaintiffs Are Currently Suffering Irreparable Injury Resulting
from the Substantial Uncertainty Caused by the Executive
Order's Unclear Terms and Its Broad and Undefined Scope............. 35

2.    Plaintiffs' Constitutional Injury Itself Qualifies As Irreparable
Injury ...................................................................................... 37

C.    The Balance of Hardships and the Public Interest Weigh Heavily In
Plaintiffs' Favor.................................................................................... 38

D.    The Court Should Waive Bond .................................................................... 40

CONCLUSION........................................................................................................... 40

# TABLE OF AUTHORITIES

**Page**

## <u>CASES</u>

*Ariz. Dream Act Coal. v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014) ............................................................. 35

*Ashcroft v. American Civil Liberties Union*,
   535 U.S. 564 (2002) ................................................................. 29, 38

*Associated Press v. Otter*,
   682 F.3d 821 (9th Cir.2012) ............................................................ 37

*Backpage.com, LLC v. Dart*,
   807 F.3d 229 (7th Cir. 2015) ........................................................... 16

*Baggett v. Bullitt*,
   377 U.S. 360 (1964) ..................................................................... 20

*Barahona-Gomez v. Reno*,
   167 F.3d 1228 (9th Cir. 1999), *supplemented*, 236 F.3d 1115 (9th Cir. 2001).. 15, 40

*Bd. of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.*,
   482 U.S. 569 (1987) ......................................................... 2, 20, 21, 25

*Berger v. City of Seattle*,
   569 F.3d 1029 (9th Cir. 2009) ...................................................... 30, 31

*Brockett v. Spokane Arcades, Inc.*,
   472 U.S. 491 (1985) ..................................................................... 21

*Caraccioli v. Facebook, Inc.*,
   167 F. Supp. 3d 1056 (N.D. Cal. 2016), *aff'd*, 700 F. App'x 588 (9th Cir.
   2017) .................................................................................. 31

*Chamber of Commerce v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) .......................................................... 32

*Citizens United v. Fed. Election Comm'n*,
   558 U.S. 310 (2010) ................................................................. 25, 29

*City and County of San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) ........................................................... 3

*City of Ladue v. Gilleo*,
   512 U.S. 43 (1994) .................................................................. 16, 28

*Clinton v. City of New York*,
   524 U.S. 417 (1998) ..................................................................... 33

*Coates v. City of Cincinnati*,
   402 U.S. 611 (1971) ..................................................................... 18

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES

*Connally v. General Constr. Co.*,
    269 U.S. 385 (1926) ........................................................................................ 18

*Ctr. for Food Safety v. Vilsack*,
    636 F.3d 1166 (9th Cir. 2011) ...................................................................... 35

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981) ........................................................................................ 34

*Doe #1 v. Trump*,
    957 F.3d 1050 (9th Cir. 2020) ................................................................. 31, 33

*Doe v. Harris*,
    772 F.3d 563 (9th Cir. 2014) ........................................................................ 15

*Doe v. Trump*,
    418 F. Supp. 3d 573 (D. Or. 2019) ................................................................ 3

*Drakes Bay Oyster Co. v. Jewell*,
    747 F.3d 1073 (9th Cir. 2014) ...................................................................... 38

*E. Bay Sanctuary Covenant v. Barr*,
    964 F.3d 832 (9th Cir. 2020) ........................................................................ 38

*East Bay Sanctuary Covenant v. Trump*,
    950 F.3d 1242 (9th Cir. 2020) .................................................................. 3, 39

*Elrod v. Burns*,
    427 U.S. 347 (1976) ........................................................................................ 37

*F.C.C. v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) .............................................................................. 2, 17, 18

*Frisby v. Schultz*,
    487 U.S. 474 (1988) ........................................................................................ 26

*Gentile v. State Bar of Nevada*,
    501 U.S. 1030 (1991) .......................................................................... 18, 19, 20

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ........................................................................................ 16

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006) ........................................................................................ 34

*Hedges v. Obama*,
    890 F. Supp. 2d 424 (S.D.N.Y. 2012), *vacated on standing grounds*, 724
    F.3d 170 (2d Cir. 2013) ........................................................................... 18, 19

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) ........................................................................ 15

*Hirabayashi v. United States*,
    320 U.S. 81 (1943) .......................................................................................... 26

*Jorgensen v. Cassiday,*
    320 F.3d 906 (9th Cir. 2003) ............................................................................. 40

*Klein v. City of San Clemente,*
    584 F.3d 1196 (9th Cir. 2009) ..................................................................... 15, 27

*Kolender v. Lawson,*
    461 U.S. 352 (1983) ............................................................................................ 20

*Korematsu v. United States,*
    323 U.S. 214 (1944), *abrogated by Trump v. Hawaii*, 138 S. Ct. 2392 (2018) ....... 26

*Langdon v. Google, Inc.,*
    474 F. Supp. 2d 622 (D. Del. 2007) .................................................................... 31

*Leiva-Perez v. Holder,*
    640 F.3d 962 (9th Cir. 2011) (*per curiam*).......................................................... 15

*Lewis v. City of New Orleans,*
    415 U.S. 130 (1974) (Powell, J., concurring)...................................................... 20

*Martin v. City of Struthers,*
    319 U.S. 141 (1943) ............................................................................................ 16

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ........................................................................................ 2, 39

*McCullen v. Coakley,*
    573 U.S. 464 (2014) ............................................................................................ 26

*McIntyre v. Ohio Elections Comm'n,*
    514 U.S. 334 (1995) ............................................................................................ 23

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012) ......................................................................... 37, 39

*Nat'l Endowment for the Arts v. Finley,*
    524 U.S. 569 (1998) ............................................................................................ 16

*Nyabwa v. FaceBook,*
    Case No. 17-CV-06064, 2018 WL 585467 (S.D. Tex. Jan. 26, 2018).................... 31

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.,*
    475 U.S. 1 (1986) ................................................................................................ 39

*Packingham v. North Carolina,*
    137 S. Ct. 1730 (2017)..................................................................................passim

*Prager Univ. v. Google LLC,*
    No. 17-CV-06064, 2018 WL 1471939 (N.D. Cal. Mar. 26, 2018), *aff'd*, 951
    F.3d 991 (9th Cir. 2020) ..................................................................................... 31

*Reed v. Town of Gilbert, Ariz.,*
    576 U.S. 155 (2015) ............................................................................................ 29

*Reno v. Am. Civil Liberties Union*,
 521 U.S. 844 (1997) ........................................................... 2, 18, 22

*Rodriguez v. Robbins*,
 715 F.3d 1127 (9th Cir. 2013) ................................................... 37

*S.O.C. v. County of Clark*,
 152 F.3d 1136 (9th Cir. 1998) ................................................... 27

*Sammartano v. First Judicial Dist. Court, in & for Cty. of Carson City*,
 303 F.3d 959 (9th Cir. 2002), *abrogated on other grounds as recognized in*
 *Amalgamated Transit Union Local 1015 v. Spokane Transit Auth.*, 929 F.3d
 643 (9th Cir. 2019) ................................................................ 39

*Sierra Club v. Trump*,
 963 F.3d 874 (9th Cir. 2020) ................................................... 3, 32

*Thalheimer v. City of San Diego*,
 645 F.3d 1109 (9th Cir. 2011), *overruled on other grounds by Bd. of*
 *Trustees of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195 (9th
 Cir. 2019).......................................................................... 15

*Trump v. Hawaii*,
 138 S. Ct. 2392 (2018)........................................................ 26, 34

*United States v. Stevens*,
 559 U.S. 460 (2010) .............................................................. 29

*Ward v. Rock Against Racism*,
 491 U.S. 781 (1989) ............................................................ 26, 28

*Warsoldier v. Woodford*,
 418 F.3d 989 (9th Cir.2005) ..................................................... 37

*Washington v. Trump*,
 847 F.3d 1151 (9th Cir. 2017) ................................................... 37

*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008) ................................................................ 15

*Youngstown Sheet & Tube Co. v. Sawyer*,
 343 U.S. 579 (1952) ........................................................ 31, 33, 34

## CONSTITUTIONS

U.S. Const. art. I, § 8, cl. 3 ........................................................ 33

## STATUTES

3 U.S.C. § 301................................................................... 3

42 U.S.C. §§ 2000bb, *et seq.* .............................................................................................. 23

50 U.S.C. § 1622 ............................................................................................................ 10

50 U.S.C. § 1631 .............................................................................................................. 3

50 U.S.C. § 1701 ............................................................................................................ 32

50 U.S.C. § 1702 ....................................................................................................... 32, 33

50 U.S.C. § 1705 ....................................................................................................... 11, 18

50 U.S.C. §§ 1601 *et seq.* ............................................................................................... 3

**REGULATIONS**

84 Fed. Reg. 22689 (May 15, 2019) ............................................................................ 10, 17

85 Fed. Reg. 29321 (May 13, 2020) ................................................................................. 10

85 Fed. Reg. 48637 (August 6, 2019) ............................................................................... 10

85 Fed. Reg. 48641 (August 6, 2020) .......................................................................... 10, 17

**RULES**

Fed. R. Civ. P. 65 ............................................................................................................ 40

**OTHER AUTHORITIES**

Congressional Research Service Rpt. No. R45618, *The International Emergency Economic Powers Act: Origins, Evolution, and Use* (July 14, 2020) ...................... 32

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on September 17, 2020, at 9:30 a.m. or as soon thereafter as the matter may be heard, pursuant to Federal Rule of Civil Procedure 65 and Northern District of California Local Rules 7-2 and L.R. 65-2, Plaintiffs U.S. WeChat Users Alliance, Chihuo, Inc., Brent Coulter, Fangyi Duan, Jinneng Bao, Elaine Peng, and Xiao Zhang will and hereby do move this Court for an Order Granting Preliminary Injunctive Relief as follows:

1.      To enjoin Defendants, and each of them, from enforcing the August 6, 2020 Executive Order Number 13943 to directly or indirectly prohibit or limit any use of WeChat in the United States by Plaintiffs and persons like them;

2.      To enjoin Defendants, and each of them, from seeking to impose civil or criminal penalties under 50 U.S.C. § 1705 for any alleged violation of the Executive Order based on any conduct that occurs (i) before the Secretary of Commerce promulgates a definition of "transactions" under the Executive Order, or (ii) within 60 days after the Secretary promulgates that definition; and

3.      Such other and further relief as this Court deems just and appropriate.

This motion is based upon this Notice of Motion and Motion for Preliminary Injunction; the Declarations of Ying Cao, Brent Coulter, Fangyi Duan, Jinneng Bao, Elaine Peng, Xiao Zhang, Russell M. Jeung, Wanning Sun, Alex Alben, Spencer Cohen, Erwin Chemerinsky, and Michael W. Bien; the Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction; and the Proposed Order Granting Preliminary Injunction, all filed herewith; and all papers and pleadings on file in this action, and such other pleadings, oral argument and/or documentary evidence as may come before the Court upon the hearing of this matter.  Pursuant to Federal Rule of Civil Procedure 65(a) and Northern District of California Local Rules 7-2 and 65-2, Plaintiffs respectfully request that this Court issue the Proposed Order Granting Preliminary Injunctive Relief.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Just three years ago, the Supreme Court invalidated a North Carolina statute that sought to ban registered sex offenders within the state from accessing social media websites, finding that the statute "enact[ed] a prohibition unprecedented in the scope of First Amendment speech it burdens." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017). On August 6, 2020, President Trump issued an executive order far more burdensome, apparently prohibiting *millions* of WeChat users in the United States— including Plaintiffs—from using the most popular social media space for Chinese speakers in the world. The executive order "is the equivalent of a complete ban of a newspaper, a TV channel, or a website …. [I]t is unprecedented in the modern history of this country." Declaration of Erwin Chemerinsky ("Chemerinsky Decl.") ¶ 5. Wholesale bans such as this are facially overbroad and unconstitutional. *Bd. of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 575, 577 (1987).

Citing national security concerns, Executive Order 13943 (the "EO") prohibits what appears to be all users of WeChat by anyone within the United States, as well as by "U.S. persons" outside the United States. The EO provides that "any transaction that is related to WeChat by any person" will be "prohibited beginning 45 days after the date of this order," or September 20, 2020. The EO fails to define or otherwise explain what "transactions" are prohibited, and threatens Plaintiffs and other WeChat users in the United States with up to 20 years in prison and $1 million in criminal penalties for violating the EO. Such vagueness violates fundamental tenets of the First and Fifth Amendments requiring laws to be sufficiently definite so that the common person can know whether she is on the right or wrong side of the law. *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *Mathews v. Eldridge*, 424 U.S. 319, 348-49 (1976).

In a sad twist of irony, the EO criminalizes speech irrespective of content or the speaker's intent in violation of the First Amendment, *see Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871–72 (1997), all while boasting that it is meant to protect Chinese

citizens "enjoying the benefits of a free society for the first time in their lives."

Attempting to justify itself, the EO asserts that WeChat's routine data collection "threatens to allow the Chinese Communist Party access to Americans' personal and proprietary information," but ignores that such data collection is undertaken by every social media company in the world.  The government has failed to provide—in the EO itself or elsewhere—any public evidence to support the contention that popular use of WeChat in the United States compromises national security.  To the contrary, numerous statements by the President immediately preceding issuance of the EO strongly suggest that there is no *bona fide* national security concern regarding WeChat, but instead that the directive is motivated by a desire to incite anti-Chinese animus in exchange for political points.

The EO cites both the International Emergency Economic Powers Act ("IEEPA") and "the Constitution" as ostensible sources of the President's authority to ban the use of WeChat.[1]  But neither the IEEPA nor the Constitution provide the President with such authority.  In fact, the IEEPA expressly *forbids* the President from unilaterally enacting such a broad prohibition that trenches on First Amendment communications.  Thus, like numerous other executive orders and proclamations issued in recent years, the EO unlawfully exceeds the President's authority.  *See, e.g.*, *Sierra Club v. Trump*, 963 F.3d 874 (9th Cir. 2020); *California v. Trump*, 963 F.3d 926 (9th Cir. 2020); *East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242 (9th Cir. 2020); *City & County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018); *Doe v. Trump*, 418 F. Supp. 3d 573 (D. Or. 2019).

Plaintiffs rely on WeChat as the primary and often exclusive means to communicate with family members as well as friends in both China and the United States.  Plaintiffs use

---

[1] The EO also cites the National Emergency Act ("NEA"), 50 U.S.C. §§ 1601 *et seq.*, and 3 U.S.C. § 301—but neither of these purports to authorize the specific content of the EO. The NEA in fact specifically provides that "[w]hen the President declares a national emergency, no powers or authorities made available by statute for use in the event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act."  50 U.S.C. § 1631.

WeChat to run businesses and non-profit organizations, practice their religion, receive news, organize for political causes, contribute to charities, and maintain social bonds. WeChat is so integral to Chinese and Chinese Americans' lives that users compare WeChat to the "air" they breathe; others use the metaphor of "losing a limb" if WeChat were no longer available.  Declaration of Wanning Sun ("Sun Decl.") ¶ 13.  As the COVID-19 pandemic has physically separated humans across the globe, WeChat has become even more essential for maintaining contact, and has served as a significant conduit for elected officials and the government to communicate with citizens and U.S. residents, including about critical public safety announcements.  *See* Declaration of Michael Bien ("Bien Decl.") ¶¶ 20, 36-37 & Exs. S, II- QQ.

The EO has already harmed Plaintiffs, who currently face the prospect of choosing between maintaining their cherished connections or being criminally prosecuted.  Plaintiffs have been forced to spend their limited time, energy, and resources researching alternative public spaces, only to learn that there are no substitutes.  This is because WeChat is the only social media network with such high levels of participation by the global Chinese diaspora.  The same people, religious events, news sources, business opportunities, and social connections—generating an irreplaceable "network effect"—are simply not available elsewhere.

Never before—not even during wartime—has such a broad ban on speech been contemplated by the government.  Chemerinsky Decl. ¶ 5.  The EO fundamentally restricts a primary news source relied upon by Chinese people in America.  This is tantamount to barring access to cable television channels like Telemundo (a Spanish-language television network) or Al Jazeera (an Arabic news and media network), or shutting down El Diario Nueva York (the largest and oldest Spanish-language daily newspaper in the United States).  But the EO does far more than that, as it also bars a primary vehicle for individual dissemination of, and public comment upon, issues of public interest within the Chinese community in the United States; it also effectively closes the doors to churches, temples, and cultural centers serving people of a common religion, heritage, and culture.

1    As set forth in the Proposed Order filed herewith, Plaintiffs respectfully ask that the

2  Court preliminarily enjoin Defendants from enforcing the EO to prohibit or limit any use

3  of WeChat in the United States by Plaintiffs and persons like them, and to preclude civil or

4  criminal penalties for any violation of the EO until 60 days after a definition of

5  "transactions" under the EO has been publicly promulgated.

6                                    **STATEMENT OF FACTS**

7    **A.    WeChat Is the Dominant App Among Chinese-Speaking Persons in the
         World**

8

9    WeChat is a mobile telephone application ("app") developed by the Chinese

10  company Tencent Holdings Ltd. ("Tencent"), and launched in January 2011.  Sun Decl.

11  ¶ 13.  WeChat is a multi-purpose messaging, social media, productivity, and utility mobile

12  app that combines many of the functions of Facebook, Twitter, WhatsApp, Instagram, and

13  PayPal, with additional e-payment, e-commerce, and e-lifestyle features.  *Id.* ¶ 16; *see also*

14  Declaration of Ying Cao ("Cao Decl.") ¶ 8.  It has been called a "super-sticky" all-in-one

15  app and mega platform, and a digital "Swiss army knife" for modern life.  Sun Decl. ¶ 16;

16  *see also* Declaration of Spencer Cohen ("Cohen Decl.") ¶ 15; Cao Decl. ¶ 10.  WeChat has

17  a very powerful network effect that draws users to a social network found nowhere else,

18  and it is so useful and deeply integrated into users' daily lives that users have become

19  reliant on it for a variety of tasks and functions.  Cao Decl. ¶¶ 10-11; Cohen Decl. ¶¶ 4-5,

20  15.

21    By 2018 WeChat had garnered over a billion active monthly users, more than 100

22  million of whom were outside China.  Sun Decl. ¶ 13.  As of August 2020, there are more

23  than 1.2 billion active WeChat messenger accounts worldwide, including approximately 19

24  million regular users in the United States.  *Id.*; Bien Decl. ¶ 40 & Ex. TT.  WeChat is thus

25  central to the interpersonal and public communication practices of Chinese migrants, both

26  in the United States and across the globe, so much so that it is very difficult to imagine

27  what their everyday communication would be like without the platform.  Sun Decl. ¶ 13;

28  *see also* Cao Decl. ¶¶ 11, 15.  The COVID-19 pandemic, which has exponentially

increased dependence on internet-based communications for uncountable daily activities, has made President Trump's threat of a total ban on WeChat use in the United States even more frightening and harmful to plaintiffs.  *See* Declaration of Jinneng Bao ("Bao Decl.") ¶ 10; Cao Decl. ¶¶ 18-20; Declaration of Elaine Peng ("Peng Decl.") ¶ 14.

### B.    WeChat Is an Essential Form of Communication for Chinese-Speaking Persons in the United States

The launch of WeChat revolutionized the ways in which Chinese and Chinese American people in the United States socialize, work, and consume products and information.  Sun Decl. ¶ 17.  Not only is WeChat critical to individual users in their everyday communication with families, relatives, and friends, but it also enables them to connect personally and professionally with other members of Chinese communities in China and around the world.  *Id.*; *see also* Cao Decl. ¶ 16.  WeChat users can join myriad WeChat discussion groups, with each such group capped at 500 people.  Sun Decl. ¶ 17.  These semi-private forums allow Chinese-American users to both maintain and grow their existing networks in relation to their line of business, professional activities, political interests, and place of origin.  *Id.*  As a result, the networks established and grown within WeChat, as well as the business platforms either provided by WeChat or allowed to operate within its ecosystem, are essential underpinnings to the survival and success of Chinese-American businesses.  *Id.*; Cao Decl. ¶ 18.  For small U.S. businesses that cater primarily to a Chinese-speaking clientele, WeChat has become a primary source of revenue.  Cao Decl. ¶ 19.  Large U.S. businesses, including Walmart, also rely on WeChat to market their products in China.  *See* Bien Decl. ¶ 24 & Ex. W.

WeChat is pivotal to the everyday media and cultural lives of Chinese-Americans. Sun Decl. ¶ 18.  It is estimated that 60% of the approximately 2.5 million foreign-born Chinese and 40% of the more than 5 million Chinese in the United States are of limited English proficiency.  Declaration of Russell M. Jeung ("Jeung Decl.") ¶ 25; Bien Decl. ¶¶ 38-39 & Exs. RR, SS.  Thus, a large proportion of the Chinese population in the United States cannot access English social media platforms and require WeChat for their

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND AUTHORITIES

communications.  Jeung Decl. ¶ 25; *see also* Cao Decl. ¶ 17.  Because a significant proportion of Chinese migrants now living in the United States do not have English language proficiency, accessing news and information provided by Chinese-language community media in the United States is vital to their identity and well-being in their host country.  Sun Decl. ¶ 18.

As WeChat has emerged as the omnipresent platform in Chinese lives, WeChat Subscription Accounts ("WSAs") have become critical sources of news and information, primarily because the majority of digital Chinese-language media and content providers in the United States adopt WSAs as their key platform for delivering content.  *Id.* ¶ 19.  A WeChat user who subscribes to a WSA receives automatic notifications, and can subsequently re-post WSA articles to everyone in their WeChat Groups, and on Moments (similar to Facebook's "wall").  *Id.* ¶ 25.  Importantly, the different users brought together by US-focused WSAs are not only Chinese speakers and businesses, but also local US businesses, corporate entities, and public bodies.  *Id.* ¶ 27.

WeChat plays an important role in Chinese immigrants' political integration within the United States.  *Id.* ¶ 29.  WeChat became a major political platform for debating political issues and advocating for specific agendas during the current and previous presidential election campaigns.  *Id.*  It was effectively used to garner support for President Trump among Chinese-American voters during the 2016 presidential campaign.  *Id.*  WeChat enabled conservative voices to amplify their volume and reach, especially on a range of hot-button issues such as … undocumented immigration.  *Id.*

WeChat is a vital space for broad civic engagement and civic dialogue within Chinese-American communities.  *Id.* ¶ 31.  Other social media cannot replace WeChat, because (1) they are not equally accessible to users who only speak and read Chinese; (2) they do not offer the much-needed cultural and practical interface with China; (3) they require a very different set of cultural practices, digital skills, language competence, and user habits; and (4) they are more likely to be culturally alienating than culturally enabling.  *Id.* ¶ 15, 32.  As a predominantly Chinese-language users' platform, WeChat gives

1   Chinese-American citizens and other users access to Chinese-language news and

2   information that is otherwise unavailable.  *Id.* ¶ 15.  Government entities use WeChat for

3   two-way communications of important information with their constituents, including

4   public safety information related to the pandemic.  Bien Decl. ¶¶ 20, 35-37 & Exs. S, HH-

5   QQ.  WeChat also provides the space and the means for religious groups to organize for

6   prayer, for community activities, and for actual study and services during the pandemic.

7   *See* Bao Decl. ¶¶ 10-11; Bien Decl. ¶ 18-19 & Exs. Q, R.

8          **C.**        **Plaintiffs Rely on WeChat for Family, Social, Civic, Charitable,**

                     **Political, and Religious Engagement**

9

10        Plaintiffs Fangyi Duan, Elaine Peng, Xiao Zhang, Brent Coulter, and Jinneng Bao,

11   are individuals who reside in the United States and regularly use WeChat.  Declaration of

12   Fangyi Duan ("Duan Decl.") ¶¶ 3, 5-20, 28; Peng Decl. ¶¶ 7-16, 23; Declaration of Xiao

13   Zhang ("Zhang Decl.") ¶¶ 3-12; Declaration of Brent Coulter ("Coulter Decl.") ¶¶ 2, 6-10;

14   Bao Decl. ¶¶ 2, 5, 7-11.  Each uses WeChat for professional reasons; some even run

15   businesses and non-profit groups on WeChat.  Duan Decl. ¶¶ 1, 6; Coulter Decl. ¶¶ 8-9;

16   Zhang Decl. ¶¶ 7-8; Peng Decl. ¶ 9; Bao Decl. ¶ 8.  Several plaintiffs use WeChat to obtain

17   news and facilitate discussions relating to local, state, and national politics.  Duan Decl.

18   ¶ 28; Peng Decl. ¶¶ 7-8; Zhang Decl. ¶ 7.

19        Plaintiffs Duan and Bao frequently communicate with their parents using WeChat.

20   Duan Decl. ¶ 28; Bao Decl. ¶ 7.  It has become several plaintiffs' primary and often

21   exclusive means for regularly communicating with family members as well as friends in

22   both China and the United States.  Peng Decl. ¶ 7; Zhang Decl. ¶ 7; Coulter Decl. ¶¶ 4, 6-

23   7, 9; Bao Decl. ¶ 7.

24        Plaintiff Bao and his fellow congregants at the New Life Chinese Alliance Church

25   in New York use WeChat to study the Bible, share religious and life experiences, and post

26   information about the Church's events.  Bao Decl. ¶¶ 10-11.  Due to the recent COVID-19

27   pandemic, Mr. Bao is unable to physically attend mass, so he and his fellow church

28   members use WeChat for Bible study every Friday and Sunday night.  *Id.* ¶ 11.

1     Plaintiff Peng founded the nonprofit Mental Health Association for Chinese

2 Communities ("MHACC"); she relies on WeChat as MHACC's primary communications

3 tool to provide mental health education services and "to reduce public prejudice against

4 mental illness, decrease stigma among caregivers, promote mental health and provide

5 mental health programs and peer support to the underserved Chinese community."  Peng

6 Decl. ¶¶ 4, 6, 9.  MHACC's 400-plus members use WeChat to share their experiences and

7 organize to support one another, as well as to host lectures, share mental health resources,

8 provide lessons, engage in group discussions, and fundraise.  *Id.* ¶¶ 11-13, 27.

9     Plaintiff Xiao Zhang founded Hita Education Foundation ("Hita Foundation"), to

10 benefit disadvantaged students attending high school in her hometown in China.  Zhang

11 Decl. ¶ 5.  WeChat is her primary means for fundraising, issuing monthly grants to

12 students, receiving student updates, and sharing news about Hita Foundation's charitable

13 work.  *Id.* ¶¶ 9-11.

14    Plaintiff Chihuo Inc. provides "digital marketing and advertising services to clients

15 in the food, travel, technology and lifestyle services industries."  Duan Decl. ¶¶ 1, 6.

16 Chihuo Inc. is a leading content provider within Chinese communities in the United States,

17 with over 740,000 active followers on its WeChat homepages.  *Id.* ¶¶ 8, 16.  Approxi-

18 mately 70% of its $2,500,000 annual revenue is generated from providing services on

19 WeChat.  *Id.* ¶ 20.

20    Plaintiff U.S. WeChat Users Alliance ("USWUA") was founded to respond to the

21 EO "and to protect the lawful interests of average, everyday WeChat users in the United

22 States."  Cao Decl. ¶ 4.  USWUA is not associated with WeChat, Tencent, or any of its

23 entities and does not represent the interests of, nor is it affiliated with, any political party,

24 government, or governmental entity.  *Id.* ¶¶ 5-6.  The sole mission of USWUA, which is

25 funded through publicly raised donations, "is to protect the lawful interests of WeChat

26 users in the United States."  *Id.* ¶ 7.

27 / / /

28 / / /

**D.      Executive Order 13943 Appears to Ban All WeChat Transactions**

On August 6, 2020, President Trump issued the EO, titled "Addressing the Threat Posed by WeChat, and Taking Additional Steps to Address the National Emergency with Respect to the Information and Communications Technology and Services Supply Chain." Bien Decl. ¶ 2 & Ex. A; 85 Fed. Reg. 48641 (Aug. 6, 2020).  The EO states that WeChat "automatically captures vast swaths of information from its users," and that the data collected by WeChat "threatens to allow the Chinese Communist Party access to Americans' personal and proprietary information."  *Id.*  According to the EO, the data collected by WeChat also "captures the personal and proprietary information of Chinese nationals visiting the United States, thereby allowing the Chinese Communist Party a mechanism for keeping tabs on Chinese citizens who may be enjoying the benefits of a free society for the first time in their lives."  *Id.*

The EO asserts that the "threat" posed by WeChat is "similar to" the threat posed by other Chinese-owned technology companies, such as TikTok, against which the President also took action pursuant to his purported emergency powers under the International Emergency Economic Powers Act ("IEEPA").  Bien Decl. ¶ 4 & Ex. C; 85 Fed. Reg. 48637 (Aug. 6, 2020).  The executive orders regulating WeChat and TikTok—both issued on the same day—rely on powers purportedly made available by the national emergency declared in May 2019 in Executive Order 13873, which did not even refer to China.  Bien Decl. ¶ 3 & Ex. B; 84 Fed. Reg. 22689 (May 15, 2019).[2]

Section 1(a) of the WeChat EO states that "any transaction that is related to WeChat by any person" will be "prohibited beginning 45 days after the date of this order[.]"  Bien Decl. ¶ 2 & Ex. A; 85 Fed. Reg. 48641 (August 6, 2020).  Section 1(a) further prohibits,

_____

[2] Under the National Emergencies Act, this national emergency would have terminated automatically after one year unless the President renewed it before that termination.  *See* 50 U.S.C. § 1622(d).  President Trump extended Executive Order 13873 for another year on May 13, 2020.  *See* 85 Fed. Reg. 29321 (May 13, 2020).  In his notice of the extension, the President provided no explanation for why the national emergency "must continue" other than a conclusory assertion that the threat identified in his original emergency declaration "continues to pose an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."  *Id.*

beginning 45 days from the date of the Order, transactions with WeChat's parent company Tencent and any subsidiaries of Tencent that are "identified by the Secretary of Commerce[.]" *Id.* Section 2(a) states that "[a]ny transaction … that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate the prohibition set forth in this order is prohibited." *Id.* Section 2(b) further prohibits "[a]ny conspiracy formed to violate any of the prohibitions set forth in this order." *Id.*

Two other sections of the EO contemplate further action by the Secretary of Commerce: Section 1(c) directs the Secretary, within 45 days of August 6, to "identify the transactions subject to subsection [1](a)." *Id.* Section 5 authorizes (but does not require) the Secretary to "take such actions, including adopting rules and regulations, and to employ all powers granted to me by IEEPA as may be necessary to implement this order." *Id.*

Section 3 purports to strip persons subject to the prohibitions in Sections 1(a) and 2 of any right to notice of the specific conduct being prohibited. *Id.* In an attempt to justify this section of the EO, the President cites the ability of unidentified persons or entities to transfer funds or other assets instantaneously using WeChat, which would purportedly "render those measures [to be taken by the Secretary of Commerce] ineffectual."

Under the EO, WeChat users who engage in a prohibited transaction may be prosecuted under the IEEPA, which provides for **civil penalties of $250,000 or twice the amount of transaction, and criminal penalties of up to $1 million plus 20 years in prison**. 50 U.S.C. § 1705(b)-(c).

By its terms, the EO applies not only to WeChat and its parent company Tencent, but also to the millions of American individuals, groups, businesses, organizations, churches, and government agencies that use WeChat every day to communicate, learn, speak, read, publish, organize, advertise, run a business, and meet friends and family in their personal, professional and business lives. While "transaction" is not defined in the EO, the EO does make clear that it applies to "any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction

1   within the United States (including foreign branches), or any person in the United States."

2   *Id.*   "[E]ntity" is defined to mean "a government or instrumentality of such government,

3   partnership, association, trust, venture, corporation, group, subgroup, or other organization,

4   including an international organization."  *Id.*

5   ### E.   Neither the President nor His Administration Has Presented Evidence of a Bona Fide National Security Threat from Plaintiffs' Use of WeChat

6

7          The EO attempts to substantiate the threat posed by WeChat with assertions that do

8   not establish bona fide national security threats.  The EO states that WeChat's routine user

9   data collection "threatens to allow" the Chinese Communist Party access to users personal

10  and proprietary information, and substantiates that claim by stating:  "For example, in

11  March 2019, a researcher reportedly discovered a Chinese database containing billions of

12  WeChat messages sent from users in not only China but also the United States, Taiwan,

13  South Korea, and Australia."  Bien Decl. ¶ 2 & Ex. A.  But reporting concerning that

14  March 2019 discovery suggests that the discovered materials consisted of teenagers' chat

15  messages from numerous different apps, including WeChat, and that the database was

16  exposed because a Chinese internet service provider, ChinaNet Online, did not adequately

17  set up a firewall to protect this data.  *Id*. ¶ 42 & Ex. VV.  Third-party data breaches of

18  customer's personal and private information—however serious—are unfortunately routine,

19  and it is unclear how this instance of such a data breach could pose a national security

20  threat.

21         The EO asserts that "WeChat, like TikTok, also *reportedly* censors content that the

22  Chinese Communist Party deems politically sensitive and *may* also be used for

23  disinformation campaigns that benefit the Chinese Communist Party."  Bien Decl. ¶ 2 &

24  Ex. A (emphasis added).  As discussed in Argument section I(A)(3) *infra*, the content on

25  WeChat—like the content on all social media platforms—is moderated as disclosed by the

26  app's Terms and Conditions and as agreed to by its user base who have "opted-in" to the

27  platform's content curation.

28

The EO's statement that "[t]hese risks have led other countries, including Australia and India, to begin restricting or banning the use of WeChat" appears inaccurate.  India banned WeChat at the same time it banned 58 other Chinese apps, which was widely interpreted as retaliation against China for a military dispute along their common border. Bien Decl. ¶¶ 43-44 & Exs. WW, XX .  In contrast to the EO's ban, Australia concluded that a country-wide ban was not warranted on national security grounds and placed restrictions as to WeChat only on employees of its national defense agency; indeed, even the Australian Prime Minister used his own WeChat account to communicate with constituents after implementation of the agency-specific restriction.  Bien Decl. ¶¶ 45-47 & Ex. YY, ZZ, AAA.  Notably, no country in the European Union, which has more wide-reaching and protective consumer privacy laws than the United States, has banned or otherwise placed restrictions on the use of WeChat.

**F.      The Executive Order's Timing Suggests That It Was Issued Not for a Bona Fide National Security Reason But Instead to Further the President's Political Campaign By Inciting Anti-Asian Sentiment**

Immediately before and shortly after he issued the EO, the President incited anti-Chinese sentiment to bolster his reelection campaign.  For example on August 11, 2020, five days after he issued EO 13943, the President told an interviewer that "[i]f I don't win the election, China will own the United States.  You're going to have to learn to speak Chinese."  *Id.* ¶ 6-7 & Exs. E & F.  On numerous occasions, the President has mocked the accents of prominent Asian leaders and of Chinese and Asian-Americans.  *Id.* ¶ 10 & Exs. B & C.  When asked by a reporter about unemployment insurance for workers impacted by the COVID-19 pandemic, President Trump responded:  "The fact is, people don't like saying it—they know it's true:  It's China's fault.  Okay?"  *Id.* ¶ 8 & Ex. G.

President Trump made numerous anti-Chinese statements in the context of blaming the COVID-19 pandemic on China, and has repeatedly and intentionally referred to the virus that causes COVID-19 as the "China virus," "the Wuhan virus," "China Flu," and "Kung-Flu."  Bien Decl. ¶¶ 9-16 & Exs. H-M.  Facing criticism that these word choices were racist and unfairly subjected Chinese people—including Chinese Americans—to

1   anger and hatred, the White House spokesperson has defended President Trump's

2   dangerous and incendiary language.  *Id.* ¶ 16 & Ex. O.  The Anti-Defamation League

3   reported an increasing number of hate crimes, including racial slurs, spitting on, and

4   physical assaults against Asian-Americans in the United States following the President's

5   use of these terms, and warned that "[s]tatements by public officials referring to

6   COVID-19 as the 'Chinese virus,' 'Kung Flu' or 'Wuhan Flu' may be exacerbating the

7   scapegoating and targeting of the [Asian American and Pacific Islander] community."  *Id.*

8   ¶ 17 & Ex. P.  Stop AAPI Hate (a project of Chinese for Affirmative Action, the Asian

9   Pacific Policy and Planning Council, and San Francisco State University Asian American

10  Studies), has reported a clear correlation between President Trump's statements and tweets

11  and the rise in anti-Asian racism during the COVID-19 pandemic.  Jeung Decl. ¶¶ 18-20.

12  A July 20, 2020 academic study concluded that the rise in the animosity directed at Asians

13  "'is stronger on days when the connection between the disease and Asians is more salient,

14  as proxied by President Trump's tweets mentioning China and COVID-19 at the same

15  time.'"  *Id.* ¶ 21.

16        The current incitement "of racism against Asian Americans fits a pattern that has

17  been repeated in American history."  *See id.* ¶¶ 7-17.  In times of epidemic, economic

18  downturn, and war, "Asian Americans have been cast as the Yellow Peril, that is, threats

19  from the East to come and dominate the West."  *Id.* ¶ 7.

20                          **ARGUMENT**

21  **I.     A PRELIMINARY INJUNCTION IS WARRANTED IN THIS CASE**

22        Plaintiffs here easily meet the standard for a preliminary injunction.  As

23  demonstrated below, Plaintiffs are likely to succeed on the merits of their claims that the

24  EO is unlawful; there can be no doubt that Plaintiffs have and will continue to suffer

25  irreparable injury from the EO; and the balance of equities plainly favors preserving the

26  status quo while this case is litigated.

27        "A preliminary injunction is not a preliminary adjudication on the merits, but a

28  device for preserving the status quo and preventing the irreparable loss of rights before

1   judgment." *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1234 (9th Cir. 1999),

2   *supplemented*, 236 F.3d 1115 (9th Cir. 2001).  In seeking a preliminary injunction, a

3   plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer

4   irreparable harm in the absence of preliminary relief, that the balance of equities tips in his

5   favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council,*

6   *Inc.*, 555 U.S. 7, 20 (2008).

7          Under the Ninth Circuit's "sliding scale" approach, "the elements of the preliminary

8   injunction test are balanced, so that a stronger showing of one element may offset a weaker

9   showing of another."  *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017) (internal

10  quotation marks and citation omitted).  To grant preliminary injunctive relief, a court must

11  only find that "a certain threshold showing [has been] made on each factor."  *Leiva-Perez*

12  *v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (*per curiam*).

13         Because this case arises in the First Amendment context, much of the burden at the

14  preliminary injunction stage is on the government, not plaintiffs:  "[I]n the First

15  Amendment context, the moving party bears the initial burden of making a colorable claim

16  that its First Amendment rights have been infringed, or are threatened with

17  infringement … at which point the burden shifts to the government to justify the

18  restriction."  *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011),

19  *overruled on other grounds by Bd. of Trustees of Glazing Health & Welfare Tr. v.*

20  *Chambers*, 941 F.3d 1195 (9th Cir. 2019); *see also Doe v. Harris*, 772 F.3d 563, 570 (9th

21  Cir. 2014) (internal quotation marks and citation omitted); *Klein v. City of San Clemente*,

22  584 F.3d 1196, 1201 (9th Cir. 2009) ("[w]hile [the Plaintiff] has the general burden of

23  establishing the elements necessary to obtain injunctive relief, [the Government] has the

24  burden of justifying the restriction on speech.").

25     **A.**     **Plaintiffs Are Likely to Succeed on the Merits of Their Claims That the**
          **Executive Order Violates the Constitution and That the President's**
26          **Action Is *Ultra Vires***

27         The scope and breadth of the EO and the threatened direct intrusion on First

28  Amendment protected freedoms is unprecedented in American law.  Chemerinsky Decl.

¶ 5.  Never before has the government so blatantly attempted to suppress speech by shutting down the most commonly used mode of communication and publication within a distinct community defined by a common language, culture, ethnicity, and national origin. WeChat is not just a digital public space where Chinese people gather; for Chinese people—including U.S. citizens and lawful residents of Chinese descent—WeChat is the Internet.

Far less restrictive measures by the government to stop communication within a defined community or using a specific medium or method have been struck down by the U.S. Supreme Court and other courts across this country.  These have included, among many others, a North Carolina law that prohibited convicted sex offenders from using any social media, *see Packingham*, 137 S. Ct. at 1734-38; a campaign to starve an online forum for sex-related classified ads of its business, *see Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) (holding operator was entitled to preliminary injunction); a municipal ban on lawn signs—an "unusually cheap and convenient" means of expression, *see City of Ladue v. Gilleo*, 512 U.S. 43, 54-57 (1994); and a local ordinance that prohibited door-to-door solicitation, *see Martin v. City of Struthers*, 319 U.S. 141, 149 (1943) (ordinance found "invalid because in conflict with the freedom of speech and press").  If these prior attempts to silence speech were found to be invalid, the Court certainly cannot permit the EO—a measure especially targeted at silencing and punishing a minority's primary means of communication and expression—to stand.

## 1.    The Executive Order is Unconstitutionally Vague and Violates Due Process Under the First and Fifth Amendments

"The First and Fifth Amendments protect speakers 'from arbitrary and discriminatory enforcement of vague standards' in laws and regulations." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1998).  "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  The two due process concerns arising out of the void for vagueness doctrine are that "first, … regulated parties should

know what is required of them so they may act accordingly; [and] second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *F.C.C.*, 567 U.S. at 253. These concerns are heightened in the First Amendment arena: "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253-54.

(a)     **The Executive Order Does Not Inform Regulated Parties of What Actions It Prohibits**

The EO vaguely prohibits "any transaction that is related to WeChat" by any person or related to any property, *see* 85 Fed. Reg. at 48,641, and thereby provides Plaintiffs no clear understanding of which actions are barred. Bien Decl. ¶ 3 & Ex. A; 85 Fed. Reg. 48641 (Aug. 6, 2020). It is not clear what the word "transaction" means in this context. EO 13943 does not define the term. And while the President's emergency declaration in EO 13873 does offer a definition of "transaction," this definition—"any acquisition, importation, transfer, installation, dealing in, or use of any information and communications technology or service (transaction) by any person"—is so broad that it obscures more than it illuminates. 84 Fed. Reg. 22689 (May 15, 2019). Experts in the field are equally flummoxed by the vagueness of the EO and can do little more than speculate about what it actually prohibits. *See, e.g.*, Cao Decl.¶¶ 2, 21; Chemerinsky Decl. ¶ 4; Alben Decl. ¶ 5; Bien Decl.¶¶ 27-28 & Ex. Z. In light of this extraordinary confusion, Plaintiffs are justifiably fearful that their ordinary usage of the app will be prohibited. Bao Decl. ¶ 15; Cao Decl. ¶ 22; Duan Decl. ¶ 23; Peng Decl. ¶ 20; Zhang Decl. ¶ 15. Plaintiff Peng, for example, has read the EO and does not know if she is engaging in a "transaction that is related to WeChat" if she logs onto the app, sends a message to members of her mental health nonprofit group, or initiates a voice or video call. Peng Decl. ¶¶ 18, 20. Similarly, other plaintiffs are uncertain whether WeChat can still be used in the United States after the EO takes effect on September 20, 2020 and what uses of the app will violate the EO and potentially subject them to criminal penalties. *See* Bao Decl. ¶ 15; Cao Decl. ¶ 22; Duan Decl. ¶ 23; Zhang Decl. ¶ 15. WeChat users everywhere have expressed

fear and confusion about what the "Trump WeChat Ban" actually means, and lawyers and experts are in agreement that it is impossible to know what the EO prohibits.  Chemerinsky Decl. ¶ 4; Alben Decl. ¶¶ 4-5; Cohen Decl. ¶ 4; Bien Decl. ¶ 27-28 & Exs. Z, AA.

 "A statute which either forbids or requires the doing of an act in terms so vague that [people] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential [tenet] of due process of law"  *F.C.C.*, 567 U.S. at 253 (*quoting Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)); *see also Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (holding that an ordinance was unconstitutionally vague because it prescribed an unascertainable standard in violation of due process, in which "men of common intelligence must necessarily guess at its meaning.").  By simply prohibiting "any transaction that is related to WeChat," the EO fails to provide notice to Plaintiffs of "what is required of them so they may act accordingly."  *F.C.C.*, 567 U.S. at 253; *see also Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1051 (1991) ("The fact that Gentile was found in violation of the Rules after studying them and making a conscious effort at compliance demonstrates that Rule 177 creates a trap for the wary as well as the unwary."); *Hedges v. Obama*, 890 F. Supp. 2d 424, 452 (S.D.N.Y. 2012) (granting a permanent injunction in part because "each plaintiff testified credibly that he or she had read the statute and did not understand its scope and, in particular, whether his/her activities would fall within that scope."), *vacated on standing grounds*, 724 F.3d 170 (2d Cir. 2013).

 Concern about vagueness is heightened even more with laws that provide for criminal penalties.  Courts have rejected laws that trench on First Amendment rights and that provide for criminal sanctions, explaining that such laws lead to an 'obvious chilling effect on free speech' because the possibility of those penalties "may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images."  *Reno*, 521 U.S. at 872.  Violation of the EO or attendant regulations is punishable by a fine of up to $1 million and imprisonment of up to twenty years.  *See* 50 U.S.C. § 1705(b)-(c).  Such high stakes coerce Plaintiffs into silencing themselves,

1  demonstrating that the vagueness of the EO violates Plaintiffs' due process and First

2  Amendment rights.  *See Hedges*, 890 F. Supp. 2d at 426.

3       By not providing notice to Plaintiffs of what actions are prohibited under the EO,

4  Defendants violate Plaintiffs' rights to due process under the law—and in so doing chill

5  First Amendment expressive activity.

6       **(b)**    **The Lack of Definitions of Key Terms In the Executive Order Will Lead to Selective and Discriminatory Enforcement**

7

8       The EO will become effective on September 20, 2020 regardless of whether the

9  Secretary of Commerce issues any clarifying regulations before that date.  The vagueness

10  of the EO, especially when tied to the lack of any clear guidance from the Department of

11  Commerce, means that there is a high likelihood of selective and discriminatory

12  enforcement of the EO, and in particular in penalizing purportedly prohibited

13  "transaction[s]."  *See* EO, Section 1(a) and 1(c).

14       Crucially, the EO provides no reassurance that the Department of Commerce will

15  clarify the scope of a prohibited "transaction that is related to WeChat *prior* to when the

16  EO will take effect.  Section 1(a) of the EO states that 45 days after its issuance on

17  August 6, 2020, "any transaction that is related to WeChat by any person, or with respect

18  to any property … as identified by the [Secretary of Commerce] under section 1(c)" shall

19  be prohibited.  But Section 1(c) of the EO requires the Secretary of Commerce to identify

20  prohibited transactions only on the same day as the EO takes effect; and Section 3 of the

21  EO explicitly states that "there need be no prior notice of an identification made pursuant

22  to section 1(c) of" the EO—which suggests that the Secretary may not ever publicly

23  release whatever interpretive guidance he develops under section 1(c). This process thus

24  leaves substantial and extremely opaque discretion for defining prohibited transactions in

25  the hands of those responsible for enforcing the EO.

26       Courts have rejected overly vague laws similar to the EO precisely because of "the

27  need to eliminate the impermissible risk of discriminatory enforcement." *Gentile*, 501

28  U.S. at 1051.  Actual evidence of such discriminatory enforcement is not necessary:  "The

1   question is not whether discriminatory enforcement occurred here …, but whether the Rule

2   is so imprecise that discriminatory enforcement is a real possibility." *Id.*; *see also*

3   *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (stating that "the more important aspect of

4   [Fifth Amendment] vagueness doctrine "'is not actual notice, but the … requirement that a

5   legislature establish minimal guidelines to govern law enforcement.'") (internal citations

6   and quotations omitted).

7          In *Board of Airport Commissioners of City of Los Angeles v. Jews for Jesus, Inc.*,

8   plaintiffs brought suit challenging a resolution banning all "First Amendment activities"

9   within the Central Terminal area of the Los Angeles International Airport.  482 U.S. at

10  574.  The Supreme Court rejected any limiting construction for the resolution, stating that

11  "the result of this vague limiting construction would be to give LAX officials alone the

12  power to decide in the first instance whether a given activity is airport related.  Such a law

13  that 'confers on police a virtually unrestrained power to arrest and charge persons with a

14  violation' of the resolution is unconstitutional because '[t]he opportunity for abuse,

15  especially where a statute has received a virtually open-ended interpretation, is self-

16  evident.'"  *Id.* at 576 (quoting *Lewis v. City of New Orleans*, 415 U.S. 130, 135–136

17  (1974) (Powell, J., concurring)).

18         Here, the gaps in the essential language of the EO leave wide interpretive

19  discretion, and nothing less than "extensive adjudications, under the impact of a variety of

20  factual situations, would bring [the law] within the bounds of permissible constitutional

21  certainty."  *Baggett v. Bullitt*, 377 U.S. 360, 378 (1964) (striking down state's loyalty oath

22  because of the statute's ambiguity about prohibited activities).  But any such adjudications

23  will likely occur at the expense of people like Plaintiffs in the Chinese community, as

24  President Trump's established history of anti-Chinese rhetoric indicates that enforcement

25  of the EO, and in particular penalization of purportedly prohibited "transaction[s]" will be

26  discriminatory and fueled by racial animus.  *See* Jeung Decl. ¶¶ 18-24; Bien Decl. ¶¶ 6-17.

27  / / /

28  / / /

1   Any attempt to capitalize on the vagueness of the EO and selectively enforce it against the

2   Chinese community is clearly unconstitutional and in violation of the Equal Protection

3   clause.[3]

### 2.     The Executive Order Constitutes an Exceptionally Debilitating Burden on Speech and Is Unconstitutionally Overbroad

6       The EO apparently bans Plaintiffs from using WeChat, which is where they

7   exercise an innumerable number of First Amendment activities.  Even if the government's

8   concerns about national security and privacy concerns are legitimate, this outright

9   prohibition of Plaintiffs' individual use of WeChat is unquestionably overbroad and cannot

10  be justified.

### (a)     The Executive Order is Overbroad and Facially Invalid

12      "Under the First Amendment overbreadth doctrine, an individual whose own speech

13  or conduct may be prohibited is permitted to challenge a statute on its face 'because it also

14  threatens others not before the court—those who desire to engage in legally protected

15  expression but who may refrain from doing so rather than risk prosecution or undertake to

16  have the law declared partially invalid.'"  *Bd. of Airport Comm'rs*, 482 U.S. at 574

17  (*quoting Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503 (1985)).

18      In *Packingham*, 137 S. Ct. at 1732, the Supreme Court described the essential role

19  of social media in our modern world, serving as a place where people go "to gain access to

20  information and communicate with one another about it on any subject that might come to

21  mind."  *Id.* at 1737.  Through access to social media, a private citizen can access "perhaps

22  the most powerful mechanisms available … to make his or her voice heard," allowing him

23  or her to "become a town crier with a voice that resonates farther than it could from any

24  soapbox."  *Id.* (internal citations and quotation marks omitted).  "In short, social media

26  ---

[3] *See also* Complaint for Declaratory and Injunctive Relief (Aug. 21, 2020), ECF No. 1 at
27  26-27 (second claim for relief pursuant to Equal Protection Clause); Chemerinsky Decl.
¶ 6 ("The public evidence gathered in the Complaint also strongly suggests that the
28  Executive Order is motivated by anti-Chinese animus, which suggests that the Executive
Order violates the Equal Protection Clause of the Fifth Amendment.").

1  users employ these websites to engage in a wide array of protected First Amendment

2  activity on topics 'as diverse as human thought.'" *Id.* at 1735-36 (quoting *Reno*, 521 U.S.

3  at 870). *See also Reno*, 521 U.S. at 874 (recognizing that "[a]dults have a constitutional

4  right to receive and to address to one another" through online channels, and "[t]hat burden

5  on adult speech is unacceptable if less restrictive alternatives would be at least as effective

6  in achieving the legitimate purpose that the statute was enacted to serve.").

7       Nearly everything that happens on WeChat is protected First Amendment activity.

8  For members of the Chinese community, WeChat is the dominant method used to

9  communicate with Chinese speakers throughout the world.  Without access to WeChat,

10  users in the United States will be cut off from their cultural community in the U.S. and lose

11  the main line of communication they have with their family and friends in China and

12  elsewhere in the world.  Sun Decl. ¶¶ 33-34; Bao Decl. ¶¶ 7, 10; Cao Decl. ¶ 17; Coulter

13  Decl. ¶ 7; Duan Decl. ¶ 28; Peng Decl. ¶¶ 7, 14; Zhang Decl. ¶ 7.  WeChat users including

14  Plaintiffs engage in a multitude of protected First Amendment activities on the app,

15  including but not limited to religious worship and fellowship, social movements and

16  organization, political campaigns, communicating with the government, and employment.

17  Bao Decl. ¶¶ 8-11; Cao Decl. ¶¶ 11, 15-18; Coulter Decl. ¶¶ 8-9; Duan Decl. ¶¶ 9-20; Peng

18  Decl. ¶¶ 8-16; Zhang Decl. ¶¶ 7-12.  Simply put, access to WeChat is indispensable for full

19  participation in the virtual community of the Chinese diaspora—it is truly the digital town

20  square where the Chinese community can gather.  *See* Sun Decl. ¶ 13.

21       For Chinese-Americans who practice a religion, WeChat is a critical place to

22  engage in, organize, and publicize religious and cultural practices.  Churches with

23  primarily Chinese congregations, such as Plaintiff Bao's church, use WeChat groups to

24  discuss church activities, meet for Bible study, and share religious and life experiences.

25  Bao Decl. ¶ 10.  Due to the COVID-19 pandemic, Plaintiff Bao's regular in-person Bible

26  / / /

27  / / /

28  / / /

study classes have been suspended and he now attends those classes exclusively through WeChat.[4]  *Id.* at ¶¶ 10-11.

Speech related to social and political movements and organization are also in "the core of the protection afforded by the First Amendment."  *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995).  In the United States, WeChat is an integral way for members of the Chinese community to organize around political causes.  Sun Decl. ¶¶ 29-31; Cao Decl. ¶ 25.  For instance, many WeChat groups were used to organize, campaign, and raise funds in the 2016 presidential election, and users in the United States have similarly used WeChat to support candidates in the 2020 presidential election cycle.  Sun Decl. ¶ 29-31.  Plaintiff Peng is an active member of several WeChat groups that discuss issues pertaining to the U.S. 2020 election and publish information on how to become a registered voter.  Peng Decl. ¶ 8.  Asian-Americans who organized to oppose a Democrat-backed ballot initiative in California, which would have reversed the state's ban on race-conscious admissions, did so primarily through WeChat.  Bien Decl. ¶ 33 & Ex. FF.  In San Francisco, the Mayor and other politicians as well as grassroots leaders use WeChat as "a major communication tool within the monolingual Chinese community, particularly in one of the city's most cherished neighborhoods:  Chinatown."  Bien Decl. ¶ 20 & Ex. S.  In the Southern Californian cities of San Gabriel and Alhambra the official use of WeChat is extensive.  Bien Decl. ¶¶ 35-37 & Exs. HH-QQ.

WeChat users also frequently use the app in a professional capacity to connect with colleagues, customers, and the resources necessary for their jobs.  Plaintiff Coulter is a recent law school graduate with professional interests in U.S.-China law and business.  Coulter Decl. ¶¶ 3, 8.  Without WeChat, Plaintiff Coulter has no way to maintain the professional network of contacts that he has built in China, nor a way to collaborate with

---

[4] The EO places a substantial burden on Plaintiffs' ability to practice their religion and to gather, organize and associate for religious, cultural and political purposes.  *See* Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb, *et seq.*; *see also* Complaint for Declaratory and Injunctive Relief (Aug. 21, 2020), ECF No. 1 at 31 (seventh claim for relief pursuant to RFRA).

1  those contacts on professional projects, such as his contributions to an annual white paper

2  by the American Chamber of Commerce.  Coulter Decl. ¶ 8.  Plaintiff Bao is a small

3  business owner and uses WeChat to communicate with his employees, partners, vendors,

4  and customers—the majority of whom speak Chinese.  Bao Decl. ¶¶ 4, 8.  Further, many

5  businesses owned or catering to the Chinese-American community in the United States

6  rely on WeChat for their operations.  For instance, many Chinese restaurants in the United

7  States rely on WeChat to advertise and promote their business, solicit and process orders,

8  and manage customer relationships.  Cao Decl. ¶ 18.  Other small businesses, such as

9  Plaintiff Chihuo, Inc. provide their services almost exclusively through WeChat.  Duan

10  Decl. ¶ 10.  American businesses exporting goods and services to the Chinese market,

11  from Hollywood studios distributing blockbusters to American farmers selling soy beans

12  and wheat, depend on WeChat every day.  *See* Cohen Decl. ¶¶ 10-11, 13; Bien Decl. ¶ 25

13  & Ex. X.

14        WeChat is the only social media communications and payment platform that the

15  Chinese community can use to communicate in the Internet age.  In the United States, the

16  vast majority of the Chinese-speaking population is on WeChat, creating network effects

17  that encourage others to join and participate lest they be cut off from family, friends, and

18  business circles.  Sun Decl. ¶¶ 13-15, 17, 18.  WeChat is irreplaceable because no other

19  app has anywhere near the same number of users and engagement among the Chinese-

20  speaking community in the United States.  *See* Sun Decl. ¶ 13; Cao Decl. ¶¶ 12, 15-20.

21  Therefore, if the EO is enforced to prohibit individual users, such as Plaintiffs, from using

22  the app, it effectively serves to ban Chinese-speaking people within the United States from

23  any meaningful social media interactions within their chosen community and with the rest

24  of the world.

25        The EO's prohibition on WeChat is as expansive and indiscriminate as the

26  restrictions at issue in *Packingham* and *Board of Airport Commissioners of Los Angeles*.

27  As in *Packingham*, the EO is a sweeping law that prohibits Plaintiffs from accessing the

28  only social media network that is available to members of the community—thereby cutting

1   off their access to "principal sources for knowing current events, checking ads for

2   employment, speaking and listening in the modern public square, and otherwise exploring

3   the vast realms of human thought and knowledge." *Packingham*, 137 S. Ct. at 1737.

4   Similar to *Board of Airport Commissioners of Los Angeles*, the EO is overbroad on its

5   face—prohibiting "any transaction that is related to WeChat"—and contains no apparent

6   saving or narrowing construction that would limit its reach into protected First Amendment

7   activities. *See Bd. of Airport Comm'rs*, 482 U.S. at 575.  The EO prevents Plaintiffs from

8   accessing the only meaningful social media platform available to them, and "no

9   conceivable governmental interest would justify such an absolute prohibition of speech."

10  *Id.*

11         Even if the EO were in furtherance of an important government interest, and the

12  Court concludes that some restriction of WeChat is necessary, a complete ban on WeChat

13  is not a proportionate or appropriate response.  *See* Alben Decl. ¶ 7.

14             **(b)      The Executive Order Cannot Withstand Either Strict or
                         Intermediate Scrutiny**

15

16         Even if the Court does not find that the EO is overbroad and facially invalid, it

17  should consider the extent to which the EO targets the speech of members of the Chinese

18  community and subject such a law to close judicial scrutiny.  Courts reject laws that

19  "disfavor certain subjects or viewpoints" while not restricting the speech of the population

20  at large, on the ground that "the Government may commit a constitutional wrong when by

21  law it identifies certain preferred speakers." *Citizens United v. Fed. Election Comm'n*, 558

22  U.S. 310, 340 (2010).

23         Here, the EO—a restriction that only affects social media usage by the Chinese

24  community—is precisely the type of law that is "taking the right to speak from some and

25  giving it to others," thereby "[depriving] the disadvantaged person or class of the right to

26  use speech to strive to establish worth, standing, and respect for the speaker's voice." *Id.*

27  at 340-41.  Laws that distinguish people based on their national origin or race are subject

28  to strict scrutiny.  "Distinctions between citizens solely because of their ancestry are by

their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943).  The EO speculates about how WeChat *may* pose a risk to national security but provides no evidence to support this understanding.  The Government's invocation of nebulous national security concerns cannot again be found sufficient to justify blanket exclusions that are actually based on national origin.  *See Korematsu v. United States*, 323 U.S. 214 (1944), *abrogated by Trump v. Hawaii*, 138 S. Ct. 2392 (2018).

However, even if the EO were to be analyzed as a time, place, or manner restriction under intermediate scrutiny, it would still be unable to pass constitutional muster.  Such a law can only be upheld if it is "narrowly tailored to serve a significant governmental interest" and "leave[s] open ample alternative channels for communication." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (citations and internal quotation marks omitted).  To demonstrate that the law is narrowly tailored, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014).  The EO fails each and every prong of this analysis, as it prohibits the Chinese community from engaging in all meaningful social media activity when there are less restrictive ways to achieve the government's policy goals.

In prohibiting all transactions related to WeChat, the EO is a complete ban on the default social media platform used by members of the Chinese community and thus burdens far more speech than is necessary.  "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy.  A complete ban can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (internal citations omitted).  A law is not narrowly tailored if "a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 800.

Here, the EO speculates about the risks that WeChat *may* pose to national security, but neither it nor Executive Order 13873—the Executive Order declaring a national

emergency with respect to "Securing the Information and Communications Technology and Services Supply Chain" on which this EO relies—provide any actual evidence of that threat, or even a clear explanation of what that threat even is.  And because the purpose of the EO is so vague, it cannot be narrowly tailored to meet that purpose.  The wording of the EO makes it unclear whether the government intends to regulate the speech of the user base of WeChat—and thus to inhibit a tremendous amount of First Amendment expressive activity—or if the government is primarily concerned with privacy violations and transfers of personally identifiable information between companies or countries.  *See* Alben Decl. ¶ 7.  If the EO intended to guard against potential privacy violations or data breaches, it could have clearly identified the harm that the government intended to guard against and more precisely defined what is meant by a prohibited transaction.  *Id.*  The EO suggests that users of WeChat might be harmed if their personal data was collected by the Chinese Community Party, yet the EO does not describe the scenarios under which such data would be collected.  *Id.*  Further, the EO does not prohibit specific activities, such as unauthorized data transfers or surveillance, which would allegedly result in collection of personal data. *Id.*  And the EO does not explain how a ban on use of WeChat—rather than a public information campaign to ensure that users of the system knew of this risk—would not suffice.

At the preliminary injunction stage, the burden lies with the Government to prove that proposed restrictions on speech are necessary.  *See Klein*, 584 F.3d at 1201 (stating that "[w]hile [the Plaintiff] has the general burden of establishing the elements necessary to obtain injunctive relief, [the Government] has the burden of justifying the restriction on speech.").  Here, given Plaintiffs' argument and related evidence that the EO is void as vague, overbroad, and unconstitutional regardless of the applicable level of scrutiny, it is now Defendants' burden to prove why such an expansive restriction on speech—targeted towards people within the Chinese community—is necessary.  *See also S.O.C. v. County of Clark*, 152 F.3d 1136, 1146 (9th Cir. 1998) (holding that plaintiffs demonstrated probable success on the merits because county did not meet its burden of demonstrating that its

1   content-based ordinance was the least restrictive means to further a compelling interest).

2       Importantly, even if the government does demonstrate to the Court that the EO

3   serves a significant governmental interest, it must also show that it is narrowly tailored,

4   and that any restriction in First Amendment activities still leaves available "ample

5   alternative channels" for Plaintiffs. *Ward*, 491 U.S. at 791. Here, if the EO is enforced to

6   prevent Plaintiffs and other individuals from using WeChat in their day-to-day lives, the

7   government will "completely foreclose[] a venerable means of communication that is both

8   unique and important." *City of Ladue*, 512 U.S. at 54.

9       In *Ladue*, the Supreme Court struck down a municipal ban on lawn signs and

10  expressed its unwillingness to foreclose an entire medium to First Amendment expression

11  based on inadequate alternative channels for communication. *Id.* at 55-56. The Court

12  noted that "[s]igns that react to a local happening or express a view on a controversial issue

13  both reflect and animate change in the life of a community." *Id.* at 54. Further,

14  "residential signs [had] long been an important and distinct medium of expression." *Id.* at

15  55. As "an unusually cheap and convenient form of communication," the lawn signs had

16  "no practical substitute"—especially for people with limited means. *Id.* at 57.

17      For Plaintiffs and others within the Chinese community, there are innumerable

18  reasons why there simply is no "alternative channel" to WeChat. *See generally* Sun Decl.

19  ¶¶ 12-34; *see also* Cohen Decl. ¶ 15. WeChat is particularly indispensable for Chinese

20  immigrants to the United States who need to stay connected with their families "back

21  home," at a time when national borders are mostly closed, and transnational mobility is

22  significantly reduced. *Id.* at ¶ 28. In order to communicate within networks of people

23  located in China and immigrant Chinese communities within the U.S., Plaintiffs need to

24  continue using WeChat rather than mainstream Western social media platforms such as

25  Facebook, WhatsApp, and Twitter, because all of these platforms are inaccessible in

26  China. *Id.* at ¶¶ 14-15; *see also* Cohen Decl. ¶ 4. Other methods of communication, such

27  as other apps, email, or long-distance phone cards, are costly, inconvenient, and/or do not

28  accommodate nimble communication. *See* Peng Decl. ¶¶ 23, 26; Coulter Decl. ¶¶ 11-12.

As a predominantly Chinese-language users' platform, WeChat gives Chinese-Americans and other users access to Chinese-language news and information that is "of particular concern to their lives" and otherwise unavailable.  Sun Decl. ¶ 28; *see also* Cohen Decl. ¶ 8; 15.

The EO clearly targets Chinese-language speakers and attempts to silence the speech occurring within their communities and should therefore be subject to close judicial scrutiny.  However, even if the EO were subject to intermediate scrutiny, Defendants cannot meet their burden to explain why such an expansive restriction on speech wielded only within the Chinese community is necessary to meet their ambiguous policy goals.

### 3.     The Executive Order is an Unlawful Content-Based Restriction That Is Not Narrowly Tailored to Serve Compelling State Interests

The EO is also unconstitutional as a content-based restriction that singles out content on WeChat, created and distributed by people in the Chinese community, for differential treatment.  "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).  "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  *Id.*  "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *United States v. Stevens*, 559 U.S. 460, 468 (2010) (internal quotation marks omitted, citing *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002)).

The EO is a restriction that discriminates against content made by and for the Chinese community and therefore cannot withstand the applicable strict scrutiny review. Directed only towards WeChat, an app predominantly comprised of the viewpoints, interests, and beliefs of the majority-Chinese community, the EO is clearly a means to control content.  *See Citizens United*, 558 U.S. at 340 ("Speech restrictions based on the

identity of the speaker are all too often simply a means to control content.").  As a law with "the underlying purpose" of "suppress[ing] particular ideas" or "singl[ing] out particular content for differential treatment," the EO is undeniably a content-based restriction, enacted with the purpose of silencing the Chinese community that gathers on WeChat. *Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009) (*en banc*) (invalidating rule allowing street performers to passively, but not actively solicit donations as a content-based restriction).

The content on each social media platform, including WeChat, is the totality of its self-selecting user base, what those people choose to read and share on the platform, and the way that such companies moderate or curate their platforms.  The combination of these factors leads to distinct content on each social media platform.  For instance, people post about promotions and new ventures on LinkedIn, understanding that the platform is used primarily for professional networking.  Facebook has been criticized for its unwillingness to fact-check political advertisements or statements made by politicians, with some critics arguing that the company profits from the spread of misinformation.  *See* Bien Decl. ¶ 23 & Ex. V.  Twitter moderates its platform by deemphasizing, rather than removing, potentially offensive content.  *Id.* at ¶ 22 & Ex. U.  Instagram uses proprietary algorithms that formulate personalized feeds for their users based on their specific browsing interests—providing access to an endless loop of goofy golden retrievers or viral dance videos, depending on a user's history of likes and follows.  *See id.* at ¶ 21 & Ex. T.  So, too, does WeChat occupy a specific role in the universe of social media platforms.  The content available on WeChat is completely intertwined with Chinese language, culture, and its people, serving as a bridge, a gathering place, and a community within and of the global Chinese diaspora and, as relevant here, the Chinese community in America.  *See generally*, Sun Decl. ¶¶ 12-34.

Social media providers such as WeChat are "private entities" who "make decisions about whether and how to regulate content" that they offer on their platforms.  *Prager Univ. v. Google LLC*, No. 17-CV-06064, 2018 WL 1471939, at *8 (N.D. Cal. Mar. 26,

2018) (referring to YouTube's video-sharing social media website), *aff'd*, 951 F.3d 991 (9th Cir. 2020).  Because they are not government actors, social media providers are permitted to make determinations about what content is appropriate to include on their platforms without being subject to First Amendment violations.  *See, e.g.*, *Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056, 1064 (N.D. Cal. 2016) ("Facebook's Terms of Service place restrictions on users behavior [but] … do not create affirmative obligations") (internal quotation marks omitted), *aff'd*, 700 F. App'x 588 (9th Cir. 2017); *Nyabwa v. FaceBook,* Case No. 17-CV-06064, 2018 WL 585467 (S.D. Tex. Jan. 26, 2018) (plaintiff could not state a private cause of action against Facebook for a First Amendment violation); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 631 (D. Del. 2007) (stating that Google is "not subject to constitutional free speech guarantees").  In a similar vein, WeChat determines what content is appropriate for its audiences and its platform and makes necessary disclosures to its users.  *See* Bien Decl. ¶¶ 30-31 & Exs. CC, DD.

The government cannot be permitted to censor the content created and distributed by Chinese people simply because it may disagree with how WeChat moderates its platform.  The WeChat platform is built on the spread of ideas and content created and distributed by its primarily Chinese-speaking users.  In prohibiting WeChat, the EO is "suppress[ing] particular ideas" and "singl[ing] out particular content for differential treatment."  *See Berger*, 569 F.3d at 1051.  This unprecedented prohibition is not the least restrictive method to accomplish any governmental interest and cannot withstand the rigors of strict scrutiny.

### 4. Plaintiffs are Likely to Succeed on the Merits of Their Claim That Executive Order 13943 is *Ultra Vires*

The President's authority to issue an executive order "must stem either from an act of Congress or from the Constitution itself."  *Doe #1 v. Trump*, 957 F.3d 1050, 1062 (9th Cir. 2020) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)).  Where neither a congressional statute nor the U.S. Constitution authorizes the President's order, a plaintiff injured by that order may bring an equitable *ultra vires* action to enjoin

the President's unlawful conduct.  *See, e.g.*, *Sierra Club*, 963 F.3d at 890-92; *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996).

><b>(a)</b>      <b>Congress Has Expressly Forbidden the President from Enacting a Sweeping Prohibition Like the One in Executive Order 13943</b>

Congress enacted the IEEPA in 1977 to limit the expansive emergency powers available to the President under the 1917 Trading with the Enemy Act ("TWEA").  In response to concerns that the TWEA had given the President "dictatorial powers that he could have used without any restraint by Congress," Congress made the TWEA applicable only during wartime and established a new statutory framework under the IEEPA to govern the President's use of emergency powers during peacetime.  *See* Bien Decl. ¶ 34 & Ex. GG (Congressional Research Service Rpt. No. R45618, *The International Emergency Economic Powers Act: Origins, Evolution, and Use*, at 7 (July 14, 2020)).

Under the IEEPA framework, Congress grants the President limited emergency powers that can be used only when the President declares a national emergency with regard to an "unusual and extraordinary threat, which has its source in whole or in substantial part outside the United States[.]"  50 U.S.C. § 1701(a).  The IEEPA explicitly limits the emergency powers it authorizes:  Section 1702(b) of the IEEPA states that "[t]he authority granted to the President by [Section 1702(a)] does not include the authority to regulate or prohibit, directly or indirectly …:

>(1) any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value;
>
>(2) donations … of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering …;
>
>(3) the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials …; [or]
>
>(4) any transactions ordinarily incident to travel to or from any country[.]"

/ / /

1      The EO is in direct and irreconcilable conflict with these limits on the President's

2   authority.  By prohibiting all users of WeChat in the United States or by United States

3   persons traveling abroad, the Order necessarily prohibits the very communications,

4   donations, information, and transactions ordinarily incident to travel that are expressly

5   protected from such prohibition under 50 U.S.C. § 1702(b)(1)-(4).

6      The President's failure to include express exemptions for these statutorily protected

7   uses of WeChat is a fatal flaw in the EO, and cannot be cured given that the primary

8   purposes of WeChat include personal communications and the international exchange of

9   information.  *See, e.g.*, *Doe #1*, 957 F.3d at 1062 (concluding that a presidential

10   proclamation "contravene[d] the well-settled principle that the President's powers are

11   executive, not legislative, in nature" because it failed to specify that certain immigrants

12   whom Congress exempted from the Immigration and Nationality Act's "public charge"

13   exclusion would also be exempted from the proclamation's requirement that all family-

14   sponsored immigrants obtain health insurance before entering the United States).

15          **(b)      The Constitution Does Not Provide the President with
                Freestanding Authority to Ban the Use of WeChat**

16

17      Nor does the U.S. Constitution provide independent authorization for the

18   President's unilateral prohibition on the use of WeChat.  The Constitution grants the power

19   "[t]o regulate Commerce with foreign Nations, and among the several states" to Congress,

20   not to the President.  *See* U.S. Const. art. I, § 8.  While Congress may delegate this power

21   to the President under certain conditions—as it has done in the IEEPA—the President is

22   bound by whatever limits Congress sets on the President's exercise of that power.  *Cf.*

23   *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the

24   Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

25      To be sure, courts often construe the President's authority broadly in the context of

26   both foreign affairs and national emergencies—but only where the President's actions are

27   not "incompatible with the expressed or implied will of Congress."  *Youngstown*, 343 U.S.

28   at 637 (Jackson, J., concurring); *see also Doe #1*, 957 F.3d at 1062 (finding the

1   government unlikely to succeed on merits of contention that President had inherent

2   authority to issue immigration-related presidential proclamation that "directly

3   contradict[ed]" the Immigration and Nationality Act ("INA")).

4          The Supreme Court has long held that the scope of the President's independent

5   authority in the realm of foreign affairs and national emergencies is expansive *where*

6   *Congress has consented* to the President's exercise of broad unilateral powers.  In

7   *Dames & Moore v. Regan*, for example, the Court explained that executive actions taken

8   "pursuant to an express or implied authorization from Congress" are presumptively valid,

9   and held that Section 1702(a)(1)(B) of the IEEPA provided "specific congressional

10  authorization" for a regulation that nullified the plaintiff's prejudgment attachment on the

11  property of an Iranian entity.  453 U.S. 654, 668-71, 674 (1981).  More recently, the Court

12  held in *Trump v. Hawaii* that the President had the authority to impose temporary

13  restrictions on immigration that extend beyond the enumerated restrictions in the INA—

14  but only because the applicable section of the INA "exudes deference to the President in

15  every clause" and because President's temporary restrictions "comport[ed] with the

16  remaining textual limits" elsewhere in the statute.  138 S. Ct. at 2408-09.  The Court has

17  repeatedly confirmed that the President does *not* have the authority to defy validly enacted

18  statutory limits on his authority.  *See, e.g.*, *Dames & Moore*, 453 U.S. at 669 (explaining

19  that "when the President acts in contravention of the will of Congress, 'his power is at its

20  lowest ebb,' and the Court can sustain his actions 'only by disabling Congress from acting

21  on the subject'") (quoting *Youngstown*, 343 U.S. at 637-38); *Hamdan v. Rumsfeld*, 548

22  U.S. 557, 593, n.23 (2006) ("Whether or not the President has independent power, absent

23  congressional authorization, to convene military commissions, he may not disregard

24  limitations that Congress has, in proper exercise of its own war powers, placed on his

25  powers.").

26         Because the EO clearly exceeds the powers conferred upon the President by both

27  the IEEPA and the United States Constitution, it is *ultra vires* and Defendants should be

28  enjoined from enforcing it.

### B.     Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Injunctive Relief

Plaintiff "must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction." *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) (citation omitted and emphasis in original).  This factor focuses on "whether the harm to Plaintiffs [i]s irreparable," rather than "the severity of the harm."  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).  Here, Plaintiffs have already suffered, and will continue to suffer, irreparable harm from the EO.

#### 1.     Plaintiffs Are Currently Suffering Irreparable Injury Resulting from the Substantial Uncertainty Caused by the Executive Order's Unclear Terms and Its Broad and Undefined Scope

Plaintiffs are aware of the EO and have responded to news of the ban with a mixture of confusion, anxiety, fear, and even panic.  Peng Decl. ¶¶ 17-20; Zhang Decl. ¶¶ 13, 15-16; Coulter Decl. ¶¶ 10-11; Bao Decl. ¶¶ 12-13, 15; Cao Decl. ¶¶ 21-22; Duan Decl. ¶¶ 21, 23; Sun Decl. ¶¶ 33-34.  Plaintiffs have spent an enormous amount of time researching the possible scope of coverage of the EO.  Cao Decl. ¶ 22; Duan Decl. ¶ 21; Peng Decl. ¶¶ 17, 25; Zhang Decl. ¶ 13; Bao Decl. ¶ 12.  Despite this effort, Plaintiffs do not fully understand which of their uses of WeChat, if any, will be prohibited by the EO.  Duan Decl. ¶¶ 21, 23;  Peng Decl. ¶¶ 18-20; Zhang Decl. ¶¶ 13, 15; Bao Decl. ¶ 15.

Uncertainty and fear of being subject to criminal prosecution and/or civil penalties for merely using WeChat has caused confusion, anxiety, and fear among Plaintiffs.  Cao Decl. ¶ 22; Duan Decl. ¶ 23; Peng Decl. ¶ 20; Zhang Decl. ¶¶ 15, 20; Bao Decl. ¶ 15.

The EO has also left Plaintiffs in constant fear of becoming disconnected from families and friends in the United States and China as well as of being cut off from political discussions, campaign participation, religious events, and other social and cultural events.  Peng Decl. ¶ 23; Duan Decl. ¶ 28; Zhang Decl. ¶¶ 16, 18, 19; Coulter Decl. ¶¶ 9-12; Bao Decl. ¶ 16.  The emotional and psychological trauma caused by being cut off from one's entire social network has left Plaintiffs feeling worried, anxious, concerned, adversely affected, and in fear.  Peng Decl. ¶¶ 22-23; Duan Decl. ¶ 28; Zhang Decl. ¶¶ 18-

19; Coulter Decl. ¶¶ 9-10; Bao Decl. ¶¶ 16-17.

For example, Plaintiff Zhang worries that she "will no longer be able to run my Foundation to support students from poor families." Zhang Decl. ¶ 16. Plaintiff Peng is concerned that her mental health support services group, MHACC, "will not be able to serve its current users with much needed mental health services," and that she "will lose contact with the providers, care recipients, and family members with whom [she is] in regular contact." Peng Decl. ¶ 22. It will be "extremely difficult" for Plaintiff Bao and his fellow church members to continue their Bible studies, and he fears that he "will lose connections with my church members as well as numerous other contacts on WeChat." Bao Decl. ¶ 16.

Banning WeChat means effectively cutting off the primary means of Plaintiffs' communication with their business-related contacts, including customers and employees. Cao Decl. ¶ 23; Coulter Decl. ¶¶ 10-11; Bao Decl. ¶ 16. Some of Plaintiff Chihuo Inc.'s clients have already stopped working with the company because of the EO, which has resulted in an approximate 30% decrease in average monthly revenue (amounting to approximately $40,000 to $50,000 in lost revenue). Duan Decl. ¶ 25. Morale is low at the company, where the owner has "great anxiety" that her business will not survive and employees are worried about pay cuts and job losses. Duan Decl. ¶¶ 25-26, 29. Plaintiff Zhang will no longer be able to use WeChat to communicate with colleagues at her workplace, a Fortune 500 oil and gas company. Zhang Decl. ¶¶ 4, 7.

Plaintiffs have been forced to spend their limited time, energy, and resources researching other U.S. based social media platform options, but since WeChat is the most popular social media among the global Chinese population, many have found that there is no effective substitute to WeChat. Duan Decl. ¶¶ 29-30; Peng Decl. ¶¶ 24-26, 28; Zhang Decl. ¶¶ 19-20, 22-23; Coulter Decl. ¶ 11; Bao Decl. ¶ 17.

Plaintiffs store important information on WeChat and have no means of transferring that data other than to manually search, identify, and then type out or copy and paste such data onto other applications, a process that is time-consuming, labor-intensive, and mind-

1    numbing.  Cao Decl. ¶ 23; Duan Decl. ¶ 32; Peng Decl. ¶¶ 29-30; Zhang Decl. ¶¶ 21-22;

2    Coulter Decl. ¶ 12.  Most of this information will simply be lost forever if Plaintiffs cannot

3    use WeChat.  Peng Decl. ¶ 30; Duan Decl. ¶ 32.

4         Although many of the EO's terms are vague and uncertain, this much is clear:  the

5    broad prohibitions in Sections 1(a) and 2(a)-(b) will take effect on September 20, 2020,

6    and will alter Plaintiffs' legal rights and obligations from that day forward—regardless of

7    whether or when the Secretary of Commerce takes the additional steps contemplated

8    elsewhere in the Order.  It is therefore highly likely that Plaintiffs will continue to suffer

9    these irreparable harms even if the Secretary of Commerce provides further information

10   about specific transactions that are prohibited by the Order.  Absent an injunction targeting

11   the Order itself, such additional information will have little or no effect on Plaintiffs'

12   formal legal rights and obligations with regard to WeChat.

### 2.      Plaintiffs' Constitutional Injury Itself Qualifies As Irreparable Injury

15        Irreparable injury would be present here even absent the detailed and specific

16   showing by Plaintiffs above:  The Ninth Circuit has repeatedly held that "the deprivation

17   of constitutional rights" alone "'unquestionably constitutes irreparable injury.'"  *Melendres*

18   *v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation marks and citations

19   omitted); *Rodriguez v. Robbins*, 715 F.3d 1127, 1144 (9th Cir. 2013).  Where an executive

20   action causes constitutional injuries, injunctive relief is appropriate.  *See Washington v.*

21   *Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (refusing to stay a preliminary injunction on

22   Executive Order 13769 and reaffirming that a "deprivation of constitutional rights

23   unquestionably constitutes irreparable injury").

24        "[T]he loss of First Amendment freedoms, for even minimal periods of time,

25   unquestionably constitutes irreparable injury."  *Associated Press v. Otter*, 682 F.3d 821,

26   826 (9th Cir.2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  A "colorable First

27   Amendment claim" is "irreparable injury sufficient to merit the grant of relief."

28   *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir.2005) (internal quotation marks

1   omitted).  "If the underlying constitutional question is close … we should uphold the

2   injunction and remand for trial on the merits."  *Ashcroft v. Am. Civil Liberties Union*, 542

3   U.S. at 664–65.  The EO unquestionably deprives Plaintiffs of their First and Fifth

4   Amendment rights, and therefore constitutes irreparable harm.

5       **C.     The Balance of Hardships and the Public Interest Weigh Heavily In
             Plaintiffs' Favor**

6

7       The final two *Winter* factors—the balance of equities and consideration of the

8   public interest—merge "[w]hen the government is a party."  *E. Bay Sanctuary Covenant v.*

9   *Barr*, 964 F.3d 832, 845 (9th Cir. 2020); *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073,

10  1092 (9th Cir. 2014) (same).

11      The balance of hardships here tips sharply in Plaintiffs' favor.  The EO is an

12  unprecedented ban on speech, association, and religion in the United States, directed

13  against a distinct group that shares common Chinese language, ancestry, and culture.  *See*

14  Chemerinsky Decl. ¶ 6.  It is akin to shutting down a major newspaper or closing all parks

15  accessed by Chinese and Chinese American communities across this nation.  *Id.* ¶ 5.

16  Plaintiffs suffer great anxiety about their abilities to maintain communication with their

17  families, friends, professional contacts, religious providers, news sources, and those with

18  whom they engage in civic, political, and social discussions.  Bao Decl. ¶¶ 7, 10-11;  Cao

19  Decl. ¶¶ 17-20; Coulter Decl. ¶¶ 7-9; Duan Decl. ¶¶ 26-28; Peng Decl. ¶¶ 7-16; Zhang

20  Decl. ¶ 7.  All have expended resources responding to the EO by seeking out alternatives

21  and anticipatorily trying to mitigate the harm of being cut off from WeChat.  Bao Decl.

22  ¶ 17;  Cao Decl. ¶ 23; Coulter Decl. ¶¶ 11-12; Duan Decl. ¶¶ 29-33; Peng Decl. ¶¶ 28-32;

23  Zhang Decl. ¶¶ 20-23.  Absent relief from the Court, Plaintiffs will continue to worry that

24  their daily habits will subject them to severe criminal and civil punishments, which can be

25  enforced against Plaintiffs beginning September 20, 2020.

26      Any asserted hardships related to "imminent" national security threats are undercut

27  by the President's own 15-month delay between the issuance of Executive Order 13873 in

28  May 2019 and Executive Order 13943 in August 2020.  And the 45-day compliance period

between the issuance of this EO in August and its enforcement on September 20 further suggests that the gravity of the national security threat here is not weighty at all. Neither the President nor his Administration has presented any evidence establishing the threat posed by WeChat "transactions" in the weeks following the issuance of the EO. Further undercutting the notion of extant threats, recent news reports indicate that the Administration has been working deals to allow major American companies including Apple and Starbucks to continue using WeChat in China. Bien Decl. ¶ 24 & Ex. W. It is unlikely that there are any substantial costs to be suffered by the government in allowing Plaintiffs and others like them a reasonable amount of time to be notified of what acts are illegal before being punished for such activity.

The Ninth Circuit has emphasized that "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (internal quotation marks omitted); *see also Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) ("The constitutional guarantee of free speech serves significant societal interests .... By protecting those who wish to enter the marketplace of ideas from government attack, the First Amendment protects the public's interest in receiving information.") (quotation marks and citations omitted); *Sammartano v. First Judicial Dist. Court, in & for Cty. of Carson City*, 303 F.3d 959, 974 (9th Cir. 2002), *abrogated on other grounds as recognized in Amalgamated Transit Union Local 1015 v. Spokane Transit Auth.*, 929 F.3d 643, 652 (9th Cir. 2019) ("Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles"). There are also strong public interests ensuring that ordinary citizens are able to understand the scope of conduct that could subject them to substantial criminal and civil penalties, *Mathews*, 424 U.S. at 335, 348-49, and in "ensuring that statutes enacted by [the public's] representatives are not imperiled by executive fiat," *East Bay Sanctuary Covenant v. Trump*, 950 F.3d at 1281 (internal quotation marks and citations omitted). And clearly, the public interest would be well served by eliminating, rather than perpetuating, discrimination by a government entity on the basis of race,

1   ethnicity, nationality, national origin, and alienage.

2       **D.**    **The Court Should Waive Bond**

3       Plaintiffs request that the Court waive the security requirement for preliminary

4   injunctive relief under Federal Rule of Civil Procedure 65(c). Rule 65(c) invests the

5   district court "with discretion as to the amount of security required, *if any*," and courts may

6   require no bond where, as is true here, there is no likelihood of harm to defendant from

7   enjoining its conduct. *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (emphasis

8   in the original) (quoting *Barahona–Gomez v. Reno*, 167 F.3d at 1237).

9                                  **CONCLUSION**

10      For the reasons set forth above, Plaintiffs respectfully request that this Court issue

11  the Proposed Order for Preliminary Injunctive Relief, filed herewith.

12

13  DATED: August 28, 2020          Respectfully submitted,

14                             ROSEN BIEN GALVAN & GRUNFELD LLP

15                             By: */s/ Michael W. Bien*

16                                Michael W. Bien

17                             Attorneys for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28