MICHAEL W. BIEN – Cal. Bar No. 096891
VAN SWEARINGEN – Cal. Bar No. 259809
ALEXANDER GOURSE – Cal. Bar No. 321631
AMY XU – Cal. Bar No. 330707
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:	(415) 433-6830
Facsimile:	(415) 433-7104
Email:	mbien@rbgg.com
	vswearingen@rbgg.com
	agourse@rbgg.com
	axu@rbgg.com

KELIANG (CLAY) ZHU – Cal. Bar No. 305509
DEHENG LAW OFFICES PC
7901 Stoneridge Drive #208
Pleasanton, California 94588
Telephone:	(925) 399-5856
Facsimile:	(925) 397-1976
Email:	czhu@dehengsv.com

ANGUS F. NI – Wash. Bar No. 53828*
AFN LAW PLLC
502 Second Avenue, Suite 1400
Seattle, Washington 98104
Telephone:	(773) 543-3223
Email:	angus@afnlegal.com
* *Pro Hac Vice* application forthcoming

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| U.S. WECHAT USERS ALLIANCE, CHIHUO INC., BRENT COULTER, FANGYI DUAN, JINNENG BAO, ELAINE PENG, and XIAO ZHANG,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, and WILBUR ROSS, in his official capacity as Secretary of Commerce,<br><br>Defendants. | Case No. 3:20-cv-05910-LB<br><br>**DECLARATION OF ALEX ALBEN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge: Hon. Laurel Beeler<br><br>Date: September 17, 2020<br>Time: 9:30 a.m.<br>Crtrm.: Remote<br><br>Trial Date:   None Set |

Case No. 3:20-cv-05910-LB

DECLARATION OF ALEX ALBEN

[3602865.3]

I, Alex Alben, declare:

1. I am a Lecturer of Law at the UCLA School of Law, where I teach *Internet Law, Media & Society*. I served as Washington State's first Chief Privacy Officer from 2015 to 2019 and also was the first chief privacy officer at RealNetworks, Inc., a Seattle-based Internet company. I have testified before the U.S. House, Senate, and Copyright Office on media issues resulting from the growth of the Internet and online networks. My curriculum vitae is attached hereto as **Exhibit A**. I have personal knowledge of the matters stated herein, and if called as a witness I could and would testify competently to them. I make this declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

2. Since serving as a lawyer and privacy officer for pioneering Internet companies, I have observed the growth of networks that are powered by popular user applications. In both the private and public sectors, I have developed applications that allow users to research privacy issues and to manage their personal collections of audio and video content. I represented the technology industry both in the Digital Media Association and in the Secure Digital Music Initiative, a group of technology and content companies seeking to develop secure Digital Rights Management Standards. I am the author of "Analog Days: How Technology Rewrote our Future," Zeppo Press (2012) and over the past three years have authored three law review articles relevant to the subject matter of this case: "Privacy, Freedom, and Technology—Or How did we Get Into This Mess?" in Seattle University Law Review, Volume 42, Spring 2019 Number 3; "Reasonable Zones of Privacy—The Supreme Court's Struggle to Find Clarity in the American Landscape Regarding Fourth Amendment Rights," in University of Washington Law Tech Policy Law Journal, fall quarter, 2017; and "Privacy and the Press-- An Examination of how the Supreme Court Confused Press Freedom and False Light Privacy in Critical Cases," in Stanford Law & Policy Review, March, 2017.

3. Banning a popular technology must be done with deliberation and caution, especially where the technology is used for communication that transmits protected speech. The Trump Administration's August 6, 2020 Executive Order 13943 prohibiting

1  "transactions" relating to the popular application WeChat falls into this category. The
2  plaintiffs' lawsuit and media reports indicate that WeChat is used for communication
3  inside the United States, between the U.S. and foreign countries, such as China, and within
4  China. First Amendment concerns arise when the Federal government bans speech by
5  U.S. persons or burdens the rights to freely communicate and associate.

6      4.    I have no information related to the national security concerns cited by the
7  administration in Executive Order 13943 and would agree that there are circumstances
8  where such concerns warrant curbs or a prohibition of specific speech that gives rise to a
9  national security threat. However, Executive Order 13943 is so broadly and vaguely
10 drawn that its scope is unclear and the behavior that the administration seeks to ban is
11 unknown. The operative section of Executive Order 13943 is Section 1:

> Section 1. (a) The following actions shall be prohibited beginning 45 days after the date of this order, to the extent permitted under applicable law: any transaction that is related to WeChat by any person, or with respect to any property, subject to the jurisdiction of the United States, with Tencent Holdings Ltd. (a.k.a. Téngxùn Kònggǔ Yǒuxiàn Gōngsī), Shenzhen, China, or any subsidiary of that entity, as identified by the Secretary of Commerce (Secretary) under section 1(c) of this order.

16     5.    The word "transaction" is not defined, making this Executive Order
17 extremely vague. Further, the phrase "related to WeChat by any person" is neither defined
18 nor explained. Is the Executive Order aimed at personal communication by WeChat users
19 or other scenarios involving the transfer of WeChat data between certain entities? Is the
20 order intended to affect speech by people using the application within the U.S. or is it
21 intended to have extraterritorial effect? The Executive Order does not say. The
22 Administration indicates that the Commerce Department will retroactively determine what
23 it means by a "transaction" subject to the Executive Order, creating confusion and
24 uncertainty as to how it might be applied.

25     6.    We are left to interpret an overly broad and extremely vague directive. As
26 noted in Congressional Research Service, *Modern Tests and Standards: Vagueness,*

*Overbreadth, Strict Scrutiny, Intermediate Scrutiny, and Effectiveness of Speech Restrictions,"* in U.S. Constitution Annotated[1]:

> Vagueness is a concern of due process, but it has an increased significance when applied to the government's restrictions on speech; the fear that a vague restriction may apply to one's speech may chill constitutionally protected speech. The void-for-vagueness doctrine is often analyzed in connection with the overbreadth doctrine, which focuses on the need for precision in drafting laws that may affect First Amendment rights; an overbroad law that covers both protected and unprotected speech and/or conduct will normally be struck down as facially invalid.

As American law has firmly established, government directives affecting permissible speech must be clearly and narrowly drawn. Laws cannot be unclear as to what type of speech is under scrutiny or what actions threaten a national interest. Banning the use of an application used by tens of millions of individuals, both inside and outside the United States, without identifying the potential harm of speech would violate well-established Constitutional principles.

7. As a former state government official, I am familiar with the principles of drafting orders relating to government action. In such cases, best practices call for tightly defined laws relating to the persons and activities affected. In the case of Executive Order 13943, one cannot tell whether the government intends to regulate the speech of the user base of WeChat or whether the government is primarily concerned with a privacy violation and transfer of personally identifiable information between companies or countries. If the government was concerned with a potential privacy violation or data breach, the Executive Order should have plainly and specifically identified the harm that is feared and the activity that is banned. Executive Order 13943 could have been much more narrowly drawn by defining what is meant by "transaction" and clarifying whether it was meant to ban the use of the application for personal and business communications by users of the application. The administration vaguely suggests in its directive that users of WeChat

---

[1] *Available at*: https://www.law.cornell.edu/constitution-conan/amendment-1/modern-tests-and-standards-vagueness-overbreadth-strict-scrutiny-intermediate-scrutiny-and-effectiveness-of-speech-restrictions.

might be harmed if their personal data was collected by the Chinese Communist Party, yet it does not address the scenarios under which such "collection" would occur, nor does it prohibit specific activities, such as unauthorized data transfers or surveillance, which would lead to such result.

8. In conclusion, a more precisely worded Executive Order, specifying the prohibited behavior regarding unauthorized data transfers might have accomplished the administration's goals and not run afoul of First Amendment principles, but that is not the situation here.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Los Angeles California, this 28th day of August, 2020.

_____
Alex Alben

# EXHIBIT A

## *Alex Alben C.V.*

Alex Alben has played a leadership role in high tech companies that pioneered the field of electronic media.  As an executive at RealNetworks and Starwave, he executed business strategies by supervising product development and building new departments within growing companies.  He served as Washington State's first Chief Privacy Officer from 2015-19.

Alex has represented the high tech industry in national and global policy groups and testified before the U.S. House, Senate and Copyright Office on copyright and media issues resulting from the growth of the Internet and online networks.

His teaching career has focused on privacy and Internet Law, with an emphasis on public policy and protecting personal data.  After three years at the Tech Policy Law Clinic at the University of Washington, Alex currently is a Lecturer at Law at the UCLA School of Law, where he teaches "Internet Law, Media & Society."

## *Government Experience*

### **Chief Privacy Officer—State of Washington—2015 to 2019**

Named Washington State's first Chief Privacy Officer in April of 2015 and created the Office of Privacy and Data Protection.  Consulted to the Governor and Legislature on technology and policy issues relating to privacy and security issues.  Named one of 25 top "Doers, Dreamers & Drivers" in state government by Gov. Tech Magazine in March of 2017.

Responsible for training over 50 state agencies on data protection and best practices.  Testified before legislature on biometrics, drones and Internet privacy issues.  Tasked with broadband policy study relating to digital divide and coverage of rural areas.

## *Business and Product Experience*

### **Alben Ventures, Seattle—2005 to 2014**

From 2005-07, investor and management team member for Internet and social media start up companies, including Wetpaint, Inc., a social media platform, and Delve Networks, a video and search technology company.

From 2008-11, business strategy and policy consultant to Intellectual Ventures and TerraPower LLC venture focused on developing next generation nuclear energy technology, founded by Bill Gates and Nathan Myhrvold.

From 2011-12, special assistant to Vice Provost for Center for Commercialization at University of Washington with a focus on economic development and financing the W Fund, an early-stage venture fund.

2013—Consultant to City of Seattle, Office of Economic Development and University of Washington Office of Planning and Budget.  Responsible for authoring "Incubator

Study" with a focus on the University District. Coordinated with policy makers and University District Livability Partnership.

2014-- Consultant to State of Washington, Department of Commerce. Focus on economic development and outreach to emerging companies.

### RealNetworks, Inc., Seattle—1997-2004

Held senior executive positions as Vice President of Media Publishing, Music Products and Public Policy/Government Affairs. Primary accomplishments:

- Started the company's government affairs department and served as its first Chief Privacy Officer.
- Developed communications and marketing strategies for Real Network music and entertainment products and services.
- Negotiated major agreements for patents, IP rights and company partnerships.
- Represented the company in international entertainment and music industry negotiations for development of new digital products and standards setting initiatives relating to online security and privacy.
- Testified before U.S. Senate, U.S. House and Copyright Office on digital media distribution issues.

### Starwave Corporation, Bellevue, WA—1993-1997

Member of senior management team of this Paul Allen venture:

- Vice President of Business Affairs and General Counsel responsible for creating the company's legal department, IP policies and licensing procedures.
- Negotiated key deals for creating, distributing and operating ESPN.com, ABCNews.com, NASCAR Online, Mr. Showbiz and other entertainment web sites and CD-Rom products.
- Led business development efforts on Eastwood CD-Rom and NASCAR products.
- Responsible for industry and public policy outreach in the emerging Internet sector relating to digital rights management and IP protection issues.

### Motion Picture Attorney, Los Angeles, CA—1985-1993

Warner Bros. Studio and Orion Pictures Corporation:

- Handled all legal aspects of motion picture production for over 20 films, including financing, talent contracts and acquisition of literary rights.
- Wrote strategic plan for electronic media distribution of film products for Warner Bros. studio.
- Practiced entertainment law as an associate with Rosenfeld, Meyer & Susman. Member of Los Angeles Copyright Law Society. (1985 to 1993)

### CBS News, New York—1980-1981

Broadcast researcher and writer for CBS News:

- Researcher for Walter Cronkite for CBS Special Events unit covering the 1980 presidential primaries, election and inauguration.
- Reporter for CBS News internal wire service at national conventions.
- Researcher for "The Uncounted Enemy" CBS Reports documentary with Mike Wallace, which became the subject of the *Westmoreland v. CBS* libel suit.  (1980 to 1981)

## *Education*

Stanford University, A.B. with distinction, 1980

Activities:  *Stanford Daily* editorial page editor, co-founder of Stanford Committee on Political Education, Stanford Student Senate.

Stanford Law School, J.D., 1984

Activities: Graduate student teaching assistant in Arms Control & Disarmament Program.  Externship with National Association of Broadcasters.  Wrote three student "law review" musicals.

## *Community Leadership and Activities*

**Alben For Congress—2003-2004**-- Democratic Candidate for the U.S. Congress from Washington's 8th Congressional District.  Endorsed by *Seattle Times, Seattle Post-Intelligencer, King County Journal* and leading trade and professional organizations.

Co-chair of Stanford Law School's Seattle Law Society for 16 years.  Stanford Associates Outstanding Achievement award (2003).  Stanford Law School Board of Visitors (two terms).

Executive Board Member, Cornish College of the Arts.  Responsible for developing the Cornish 5-year strategic plan.  Served on Cornish Board from 2009 to 2015.

Served on boards of Washington Council for International Trade, ACT Theatre, Temple De Hirsch Sinai and Youth Theatre NorthWest.

Member of Stanford Law School "Law, Science and Technology" Advisory Board.

Humanities Washington—On speaker roster for this non-profit organization, promoting cultural dialog in Washington State from 2010-16.  Topics:  "Analog Days—How Technology Rewrote Our Culture," and "Privacy in the Digital Age.

Wikipedia Profile:

http://en.wikipedia.org/wiki/Alex_Alben