MICHAEL W. BIEN – 096891
VAN SWEARINGEN – 259809
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:      (415) 433-7104
Email:          mbien@rbgg.com
                     vswearingen@rbgg.com
                     agourse@rbgg.com
                     axu@rbgg.com

KELIANG (CLAY) ZHU – 305509
DEHENG LAW OFFICES PC
7901 Stoneridge Drive #208
Pleasanton, California  94588
Telephone:    (925) 399-5856
Facsimile:      (925) 397-1976
Email:          czhu@dehengsv.com

ANGUS F. NI (admitted *Pro Hac Vice*)
AFN LAW PLLC
502 Second Avenue, Suite 1400
Seattle, Washington  98104
Telephone:    (773) 543-3223
Email:          angus@afnlegal.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| U.S. WECHAT USERS ALLIANCE, CHIHUO INC., BRENT COULTER, FANGYI DUAN, JINNENG BAO, ELAINE PENG, and XIAO ZHANG, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, and WILBUR ROSS, in his official capacity as Secretary of Commerce, <br><br> Defendants. | Case No. 3:20-cv-05910-LB <br><br> **DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Judge:   Hon. Laurel Beeler <br><br> Date:     September 17, 2020 <br> Time:    9:30 a.m. <br> Crtrm.:  Remote <br><br> Trial Date:     None Set |

[3604740.3]

1    I, Michael W. Bien, declare:

2        1.    I am an attorney duly admitted to practice before this Court. I am a partner

3    in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs. I

4    have personal knowledge of the facts set forth herein, and if called as a witness, I could

5    competently so testify. I make this declaration in support of Plaintiffs' Motion for

6    Preliminary Injunction.

7        2.    Attached hereto as **Exhibit A** is a true and correct copy of Executive Order

8    13943, titled "Addressing the Threat Posed by WeChat, and Taking Additional Steps to

9    Address the National Emergency with Respect to the Information and Communications

10   Technology and Services Supply Chain." 85 Fed. Reg. 48641 (Aug. 6, 2020), *available*

11   *at:* https://www.federalregister.gov/documents/2020/08/11/2020-17700/addressing-the-

12   threat-posed-by-wechat-and-taking-additional-steps-to-address-the-national-emergency.

13       3.    Attached hereto as **Exhibit B** is a true and correct copy of Executive Order

14   13873, titled "Securing the Information and Communications Technology Services Supply

15   Chain." 84 Fed. Reg. 22689 (May 17, 2019), *available at:*

16   https://www.federalregister.gov/documents/2019/05/17/2019-10538/securing-the-

17   information-and-communications-technology-and-services-supply-chain.

18       4.    Attached hereto as **Exhibit C**, is a true and correct copy of Executive Order

19   13942, titled "Addressing the Threat Posed by TikTok, and Taking Additional Steps To

20   Address the National Emergency with Respect to the Information and Communications

21   Technology and Services Supply Chain," 85 Fed. Reg. 48637 (Aug. 6, 2020), *available at:*

22   https://www.federalregister.gov/documents/2020/08/11/2020-17699/addressing-the-threat-

23   posed-by-tiktok-and-taking-additional-steps-to-address-the-national-emergency.

24       5.    Attached hereto as **Exhibit D** is a true and correct copy of a news article

25   dated August 11, 2020 from CNN entitled "Trump Says Americans Will Have to Learn

26   Chinese if Biden Wins, but Offers Little Condemnation of Beijing," *available at:*

27   https://www.cnn.com/2020/08/11/politics/trump-china-biden-learn-chinese/index.html.

28

6.      Attached hereto as **Exhibit E** is a true and correct copy of a news article dated August 26, 2015 from South China Morning Post entitled "'We want deal!': Trump fakes Asian accent to mock Chinese and Japanese businessmen at US rally," *available at:* https://www.scmp.com/news/world/article/1852785/we-want-deal-trump-fakes-asian-accent-mock-chinese-japanese-businessmen.

7.      Attached hereto as **Exhibit F** is a true and correct copy of a news article dated August 9, 2019 from the New York Post entitled "Trump cracks jokes about Equinox scandal, kamikaze pilots at Hamptons fundraiser," *available at:* https://nypost.com/2019/08/09/trump-cracks-jokes-about-rent-control-kamikaze-pilots-at-hamptons-fundraiser/.

8.      Attached hereto as **Exhibit G** is a true and correct copy of the remarks by President Trump in White House Press Briefing from July 30, 2020, *available at:* https://www.whitehouse.gov/briefings-statements/remarks-president-trump-press-briefing-july-30-2020.

9.      Attached hereto as **Exhibit H** is a true and correct copy of the remarks by President Trump in White House Press Briefing on July 23, 2020, *available at:* https://www.whitehouse.gov/briefings-statements/remarks-president-trump-press-briefing-072320/.

10.      Attached hereto as **Exhibit I** is a true and correct copy of President Trump's Tweet dated August 2, 2020, last accessed on August 26, 2020, *available at:* https://twitter.com/realDonaldTrump/status/1289887533250351110 ("Big **China Virus** breakouts all over the World, including nations which were thought to have done a great job. The Fake News doesn't report this. USA will be stronger than ever before, and soon!").

11.      Attached hereto as **Exhibit J** is a true and correct copy of President Trump's Tweet dated August 11, 2020, last accessed August 26, 2020, *available at:* https://twitter.com/realDonaldTrump/status/1293163704188645385 ("More Testing, which is a good thing (we have the most in the world), equals more Cases, which is Fake News

Gold. They use Cases to demean the incredible job being done by the great men & women of the U.S. fighting the **China Plague**!").

12.     Attached hereto as **Exhibit K** is a true and correct copy of President Trump's Tweet dated July 26, 2020, last accessed August 26, 2020, *available at:* https://twitter.com/realDonaldTrump/status/1287473812733341696 ("Because of my strong focus on the **China Virus**, including scheduled meetings on Vaccines, our economy and much else, I won't be able to be in New York to throw out the opening pitch for the @Yankees on August 15th. We will make it later in the season!").

13.     Attached hereto as **Exhibit L** is a true and correct copy of President Trump's Tweet dated March 18, 2020, last accessed August 26, 2020, *available at:* https://twitter.com/realDonaldTrump/status/1240243188708839424 ("I always treated the **Chinese Virus** very seriously, and have done a very good job from the beginning, including my very early decision to close the "borders" from China - against the wishes of almost all. Many lives were saved. The Fake News new narrative is disgraceful & false!").

14.      Attached hereto as **Exhibit M** is a true and correct copy of a news article dated June 23, 2020 from Vox entitled "Trump's Racist References to the Coronavirus Are His Latest Effort to Stoke Xenophobia," *available at:* https://www.vox.com/2020/6/23/21300332/trump-coronavirus-racism-asian-americans.

15.     Attached hereto as **Exhibit N** is a true and correct copy of a news article dated June 23, 2020 from The Washington Post entitled "Trump Again Uses Racially Insensitive Term to Describe Coronavirus," *available at:* https://www.washingtonpost.com/politics/trump-again-uses-kung-flu-to-describe-coronavirus/2020/06/23/0ab5a8d8-b5a9-11ea-aca5-ebb63d27e1ff_story.html.

16.     Attached hereto as **Exhibit O** is a true and correct copy of a news article dated June 22, 2020 from The Wall Street Journal entitled "White House Defends Trump Comments on 'Kung Flu,' Coronavirus Testing," *available at:* https://www.wsj.com/articles/white-house-defends-trump-comments-on-kung-flu-coronavirus-testing-11592867688.

17.     Attached hereto as **Exhibit P** is a true and correct copy of a blog post dated June 18, 2020 from the Anti-Defamation League entitled "Reports of Anti-Asian Assaults, Harassment and Hate Crimes Rise as Coronavirus Spreads," *available at:* https://www.adl.org/blog/reports-of-anti-asian-assaults-harassment-and-hate-crimes-rise-as-coronavirus-spreads.

18.     Attached hereto as **Exhibit Q** is a true and correct copy of Frequently Asked Questions page, last accessed August 26, 2020, from the Church of Jesus Christ of Latter-Day Saints in China webpage, *available at:*  https://www.churchofjesuschrist.org/China.

19.     Attached hereto as **Exhibit R** is a true and correct copy of a news article dated June 11, 2020 from CNN entitled "This US Church with Expansion in its DNA Wants to Open a Temple in China," *available at:* https://www.cnn.com/2020/06/06/asia/mormon-church-latter-day-saints-china-intl-hnk/index.html.

20.     Attached hereto as **Exhibit S** is a true and correct copy of a news article dated August 24, 2020 from KQED and a link to a broadcast segment, entitled "WeChat Ban and SF's Chinatown: Plan Could Hurt Housing Rights Campaigns," *available at:* https://www.kqed.org/news/11834806/wechat-ban-and-sfs-chinatown-how-trumps-plan-could-hurt-housing-rights-campaigns.

21.     Attached hereto as **Exhibit T** is a true and correct copy of a news article dated March 22, 2018 from The New York Times entitled "Instagram Is Changing Its Algorithm. Here's How," *available at:* https://www.nytimes.com/2018/03/22/technology/instagram-algorithm-change.html.

22.     Attached hereto as **Exhibit U** is a true and correct copy of a news article dated October 7, 2019 from Vox entitled "How Twitter Sees Itself," *available at:* https://www.vice.com/en_us/article/a35nbj/twitter-content-moderation. https://www.nytimes.com/2018/03/22/technology/instagram-algorithm-change.html

23.     Attached hereto as **Exhibit V** is a true and correct copy of Facebook Terms of Service, last updated July 31, 2019, *available at:* https://www.facebook.com/terms.php.

24.    Attached hereto as **Exhibit W** is a true and correct copy of a news article last updated August 26, 2020 from CNN Business entitled "Trump's WeChat ban could prevent US companies from doing business in China," *available at:*

https://www.cnn.com/2020/08/26/tech/wechat-us-ban-impact-hnk-intl/index.html.

25.    Attached hereto as **Exhibit X** is a true and correct copy of a news article dated August 24, 2020 from the Los Angeles Times entitled "Why Trump's WeChat ban could hurt Hollywood's ties to China," *available at:*

https://www.latimes.com/entertainment-arts/business/story/2020-08-24/trump-wechat-ban-china-hollywood.

26.    Attached hereto as **Exhibit Y** is a true and correct copy of a news article dated March 4, 2019 from the Financial Times entitled "Hundreds of millions of Chinese chat logs leak online," *available at:* https://www.ft.com/content/1e0365f0-3e73-11e9-b896-fe36ec32aece.

27.    Attached hereto as **Exhibit Z** is a true and correct copy of posting, dated August 10, 2020, from the law firm Wilmer Cutler Pickering Hale and Dorr, entitled "New Executive Order Target Chinese Apps." This posting is also *available at:*

https://www.wilmerhale.com/en/insights/client-alerts/20200810-new-executive-orders-target-chinese-apps.

28.    Attached hereto as **Exhibit AA** is a true and correct copy of posting, dated August 7, 2020, from the law firm Nixon Peabody, entitled "Administration's attempt to delete TikTok and WeChat: Latest trade tiff or new battle."  This posting is also *available at:* https://www.nixonpeabody.com/en/ideas/articles/2020/08/07/administrations-attempt-to-delete-tiktok-and-wechat.

29.    Attached hereto as **Exhibit BB** is a true and correct copy of posting, dated August 10, 2020, from law firm Wilson Sonsini Goodrich & Rosati, entitled "Executive Orders on TikTok and WeChat: Ambiguity and a Few Other Takeaways."  The article is also *available at:* https://www.jdsupra.com/legalnews/executive-orders-on-tiktok-and-wechat-21639/.

30.     Attached hereto as **Exhibit CC** is a true and correct copy of WeChat Terms of Service, last updated March 21, 2018, *available at:*

https://www.wechat.com/en/service_terms.html, accessed on August 27, 2020 at 10:26AM.

31.     Attached hereto as **Exhibit DD** is a true and correct copy of WeChat's Privacy Policy, last updated August 7, 2020, *available at:*

https://www.wechat.com/en/privacy_policy.html, accessed on August 28, 2020 at 9:45AM

32.     Attached hereto as **Exhibit EE** is a true and correct copy of a news article from the New Yorker, dated October 31, 2019 and entitled "Facebook and the 'Free Speech Excuse.'"  This article is also *available at:*

https://www.newyorker.com/news/daily-comment/facebook-and-the-free-speech-excuse.

33.     Attached hereto as **Exhibit FF** is a true and correct copy of a news article from The Atlantic, dated November 20, 2018, entitled "The App at the Heart of the Movement to End Affirmative Action."  The article is also *available at:*

https://www.theatlantic.com/education/archive/2018/11/asian-americans-wechat-war-affirmative-action/576328/.

34.     Attached hereto as **Exhibit GG** is a true and correct copy of Congressional Research Service report number R45618, which states that it was last updated on July 14, 2020, and which is entitled "The International Emergency Economic Powers Act: Origins, Evolution, and Use."  The report is also *available at:*

https://fas.org/sgp/crs/natsec/R45618.pdf.

35.     Attached hereto as **Exhibit HH** is a true and correct copy of a news article from the San Gabriel Valley Tribune, dated August 10, 2020, entitled "Some San Gabriel Valley communities could be seriously affected by Trump's WeChat ban." This article is also *available at:* https://www.sgvtribune.com/2020/08/10/how-trumps-wechat-ban-could-disrupt-life-in-the-san-gabriel-valley/.

36.     Per my instructions, my litigation team located the official Alhambra, California Police Department WeChat profile while logged into an existing WeChat user

account.  Attached hereto as **Exhibit II** is a true and correct copy of a screenshot of the search query for the official Alhambra Police Department WeChat account, accessed on August 27, 2020.  Attached hereto as **Exhibit JJ** is a true and correct copy of a screenshot of the main news feed for official Alhambra Police Department WeChat account, accessed on August 27, 2020, in which the Alhambra Police Department posts real-time public safety announcements, safety tips, and updates about community events such as holiday donation drives.  WeChat users are able to view these announcements, engage with these posts by "like" or "wow" reacting, and share the original post to their "Moments" feed as well as to individual and group chats.  Attached hereto as **Exhibit KK** is a true and correct copy of a screenshot of the about page for official Alhambra Police Department WeChat account, accessed on August 27, 2020, in which the Alhambra Police Department specifies that the role of this account is to provide "Service and Communication from California Alhambra City Police Department to community members and visitors."  Attached hereto as **Exhibit LL** is a true and correct copy of a screenshot of the Weibo blog digest feed within the WeChat profile for the official Alhambra Police Department WeChat account, accessed on August 27, 2020.  WeChat users are able to access Alhambra Police Department's Weibo blog digest feed in a streamlined fashion  within the WeChat app, without having to be redirected to an outside web browser.  Attached hereto as **Exhibit MM** is a true and correct copy of a screenshot of the chat response function for the official Alhambra Police Department WeChat account, accessed on August 28, 2020. There is an automated message chat response function that provides WeChat users information for an emergency 911 response number, a local non-emergent telephone number with instructions on how to speak to either a Mandarin-speaking or Cantonese-speaking phone operator, and general information around topics such as personal and home safety and the validity of Chinese drivers licenses.  There is also a direct messaging function in which WeChat users are able to communicate directly with the official Alhambra Police Department WeChat account via written messages or voice memos.

37.     Per my instructions, my litigation team located the official City of San Gabriel, California WeChat profile while logged into an existing WeChat user account. Attached hereto as **Exhibit NN** is a true and correct copy of a screenshot of the search query for the official City of San Gabriel WeChat account, accessed on August 27, 2020. Attached hereto as **Exhibit OO** is a true and correct copy of the screenshot of the main news feed for the official City of San Gabriel WeChat account, accessed on August 27, 2020 , in which the City of San Gabriel posts information about local ballot measures, safety announcements, community announcements for holiday events such as Lunar New Year, Day of the Dead (Dia de los Muertos), and Christmas.  More recently, the City of San Gabriel posted information on its WeChat news feed regarding the Los Angeles County curfew restriction put in place in response to the COVID-19 pandemic.  WeChat users are able to view these announcements, engage with these posts by "like" or "wow" reacting, and share the original post to their "Moments" feed as well as to individual and group chats.  Attached hereto as **Exhibit PP** is a true and correct copy of a screenshot of the about page for official City of San Gabriel WeChat account, accessed on August 27, 2020.  Attached hereto as **Exhibit QQ** is a true and correct copy of a screenshot of the chat response function for the official City of San Gabriel WeChat account, accessed on August 28, 2020.  There is an automated message chat response function that provides WeChat users with information such as public service announcements, recent city alerts, city social media accounts, city-sponsored events, business activities, parking permits, public safety, and general FAQ.  There is also a direct messaging function in which WeChat users are able to communicate directly with the official City of San Gabriel WeChat account via written messages or voice memos.

38.     Attached hereto as **Exhibit RR** is a true and correct copy of an article entitled "Chinese Immigrants in the United States" and dated January 15, 2020, which states that there are almost 2.5 million Chinese immigrants in the United States in 2018. The article is *available at:* https://www.migrationpolicy.org/article/chinese-immigrants-united-states-2018.

39.     Attached hereto as **Exhibit SS** is a true and correct copy of Pew Research Center website page entitled "Chinese in the U.S. Fact Sheet," dated September 8, 2017, which is *available at:* https://www.pewsocialtrends.org/fact-sheet/asian-americans-chinese-in-the-u-s/.

40.     Attached hereto as **Exhibit TT** is a true and correct copy of a Bloomberg Quint article entitled "WeChat Users in the U.S. Fear Losing Family Links With Ban" and dated August 11, 2020, which states that WeChat has about 19 million daily active users in the U.S.  The article is *available at:* https://www.bloombergquint.com/technology/wechat-users-in-the-u-s-fear-losing-family-links-with-ban.

41.     Attached hereto as **Exhibit UU** is a true and correct copy of a news article from The Guardian entitled "Huawei hits back over Trump's national emergency on telecoms 'threat" and dated May 16, 2019.  The article is *available at:*

https://www.theguardian.com/us-news/2019/may/15/donald-trump-national-emergency-telecoms-threats-huawei.

42.     Attached hereto as **Exhibit VV** is a true and correct copy of a news article from The Verge entitled "Over 300 million Chinese private messages were left exposed online" and dated March 4, 2019.  The article is *available at:*

https://www.theverge.com/2019/3/4/18250474/chinese-messages-millions-wechat-qq-yy-data-breach-police.

43.     Attached hereto as **Exhibit WW** is a true and correct copy of a news article from The New York Times entitled "India Bans Nearly 60 Chinese Apps, Including TikTok and WeChat" and updated June 30, 2020.  The article is *available at:*

https://www.nytimes.com/2020/06/29/world/asia/tik-tok-banned-india-china.html.

44.     Attached hereto as **Exhibit XX** is a true and correct copy of a news article from The Wall Street Journal entitled "India's Retaliation Against China Carries Economic Costs" and dated July 4, 2020.  The article is *available at:*

https://www.wsj.com/articles/indias-retaliation-against-china-carries-economic-costs-11593869295.

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

45.     Attached hereto as **Exhibit YY** is a true and correct copy of a news article from The Sydney Morning Herald entitled "'Buyer beware': Prime Minister says there is no case to ban TikTok" and dated August 5, 2020.  The article is *available at:* https://www.smh.com.au/politics/federal/buyer-beware-prime-minister-says-there-is-no-case-to-ban-tiktok-20200805-p55inl.html.

46.     Attached hereto as **Exhibit ZZ** is a true and correct copy of a news article from ABC Australia entitled "Why are Australian politicians intensifying their presence on Chinese social media platforms?" and dated April 3, 2019.  The article is *available at:* https://www.abc.net.au/news/2019-04-04/why-are-australian-politicians-jumping-on-chinese-social-media/10966152.

47.     Attached hereto as **Exhibit AAA** is a true and correct copy of a news article from ABC Australia entitled "'Uncharted territory': WeChat's new role in Australian public life raises difficult questions" and dated April 18, 2019.  The article is *available at:* https://www.abc.net.au/news/2019-04-19/wechats-new-role-in-australian-politics-raises-questions/11031878.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 28th day of August, 2020.


*/s/ Michael W. Bien*
Michael W. Bien

# Exhibit A


# Presidential Documents

Executive Order 13943 of August 6, 2020

## Addressing the Threat Posed by WeChat, and Taking Additional Steps To Address the National Emergency With Respect to the Information and Communications Technology and Services Supply Chain

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*), and section 301 of title 3, United States Code,

I, DONALD J. TRUMP, President of the United States of America, find that additional steps must be taken to deal with the national emergency with respect to the information and communications technology and services supply chain declared in Executive Order 13873 of May 15, 2019 (Securing the Information and Communications Technology and Services Supply Chain). As I explained in an Executive Order of August 6, 2020 (Addressing the Threat Posed by Tiktok, and Taking Additional Steps to Address the National Emergency With Respect to the Information and Communications Technology and Services Supply Chain), the spread in the United States of mobile applications developed and owned by companies in the People's Republic of China (China) continues to threaten the national security, foreign policy, and economy of the United States. To protect our Nation, I took action to address the threat posed by one mobile application, TikTok. Further action is needed to address a similar threat posed by another mobile application, WeChat.

WeChat, a messaging, social media, and electronic payment application owned by the Chinese company Tencent Holdings Ltd., reportedly has over one billion users worldwide, including users in the United States. Like TikTok, WeChat automatically captures vast swaths of information from its users. This data collection threatens to allow the Chinese Communist Party access to Americans' personal and proprietary information. In addition, the application captures the personal and proprietary information of Chinese nationals visiting the United States, thereby allowing the Chinese Communist Party a mechanism for keeping tabs on Chinese citizens who may be enjoying the benefits of a free society for the first time in their lives. For example, in March 2019, a researcher reportedly discovered a Chinese database containing billions of WeChat messages sent from users in not only China but also the United States, Taiwan, South Korea, and Australia. WeChat, like TikTok, also reportedly censors content that the Chinese Communist Party deems politically sensitive and may also be used for disinformation campaigns that benefit the Chinese Communist Party. These risks have led other countries, including Australia and India, to begin restricting or banning the use of WeChat. The United States must take aggressive action against the owner of WeChat to protect our national security.

Accordingly, I hereby order:

**Section 1**. (a) The following actions shall be prohibited beginning 45 days after the date of this order, to the extent permitted under applicable law: any transaction that is related to WeChat by any person, or with respect to any property, subject to the jurisdiction of the United States, with Tencent Holdings Ltd. (a.k.a. Téngxùn Kònggǔ Yǒuxiàn Gōngsī), Shenzhen, China,

or any subsidiary of that entity, as identified by the Secretary of Commerce (Secretary) under section 1(c) of this order.

(b) The prohibition in subsection (a) of this section applies except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted before the date of this order.

(c) 45 days after the date of this order, the Secretary shall identify the transactions subject to subsection (a) of this section.

Sec. **2**. (a) Any transaction by a United States person or within the United States that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate the prohibition set forth in this order is prohibited.

(b) Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

Sec. **3**. For those persons who might have a constitutional presence in the United States, I find that because of the ability to transfer funds or other assets instantaneously, prior notice to such persons of measures to be taken pursuant to section 1 of this order would render those measures ineffectual. I therefore determine that for these measures to be effective in addressing the national emergency declared in Executive Order 13873, there need be no prior notice of an identification made pursuant to section 1(c) of this order.

Sec. **4**. For the purposes of this order:

(a) the term "person" means an individual or entity;

(b) the term "entity" means a government or instrumentality of such government, partnership, association, trust, joint venture, corporation, group, subgroup, or other organization, including an international organization; and

(c) the term "United States person" means any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States.

Sec. **5**. The Secretary is hereby authorized to take such actions, including adopting rules and regulations, and to employ all powers granted to me by IEEPA as may be necessary to implement this order. The Secretary may, consistent with applicable law, redelegate any of these functions within the Department of Commerce. All departments and agencies of the United States shall take all appropriate measures within their authority to implement this order.

Sec. **6**. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*August 6, 2020.*

[FR Doc. 2020–17700
Filed 8–10–20; 11:15 am]
Billing code 3295–F0–P

# Exhibit B


Federal Register

Vol. 84, No. 96

Friday, May 17, 2019

# Presidential Documents

Title 3—

The President

Executive Order 13873 of May 15, 2019

## Securing the Information and Communications Technology and Services Supply Chain

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*), and section 301 of title 3, United States Code,

I, DONALD J. TRUMP, President of the United States of America, find that foreign adversaries are increasingly creating and exploiting vulnerabilities in information and communications technology and services, which store and communicate vast amounts of sensitive information, facilitate the digital economy, and support critical infrastructure and vital emergency services, in order to commit malicious cyber-enabled actions, including economic and industrial espionage against the United States and its people. I further find that the unrestricted acquisition or use in the United States of information and communications technology or services designed, developed, manufactured, or supplied by persons owned by, controlled by, or subject to the jurisdiction or direction of foreign adversaries augments the ability of foreign adversaries to create and exploit vulnerabilities in information and communications technology or services, with potentially catastrophic effects, and thereby constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States. This threat exists both in the case of individual acquisitions or uses of such technology or services, and when acquisitions or uses of such technologies are considered as a class. Although maintaining an open investment climate in information and communications technology, and in the United States economy more generally, is important for the overall growth and prosperity of the United States, such openness must be balanced by the need to protect our country against critical national security threats. To deal with this threat, additional steps are required to protect the security, integrity, and reliability of information and communications technology and services provided and used in the United States. In light of these findings, I hereby declare a national emergency with respect to this threat.

Accordingly, it is hereby ordered as follows:

**Section 1.** *Implementation.* (a) The following actions are prohibited: any acquisition, importation, transfer, installation, dealing in, or use of any information and communications technology or service (transaction) by any person, or with respect to any property, subject to the jurisdiction of the United States, where the transaction involves any property in which any foreign country or a national thereof has any interest (including through an interest in a contract for the provision of the technology or service), where the transaction was initiated, is pending, or will be completed after the date of this order, and where the Secretary of Commerce (Secretary), in consultation with the Secretary of the Treasury, the Secretary of State, the Secretary of Defense, the Attorney General, the Secretary of Homeland Security, the United States Trade Representative, the Director of National Intelligence, the Administrator of General Services, the Chairman of the Federal Communications Commission, and, as appropriate, the heads of other executive departments and agencies (agencies), has determined that:

(i) the transaction involves information and communications technology or services designed, developed, manufactured, or supplied, by persons owned by, controlled by, or subject to the jurisdiction or direction of a foreign adversary; and

(ii) the transaction:

(A) poses an undue risk of sabotage to or subversion of the design, integrity, manufacturing, production, distribution, installation, operation, or maintenance of information and communications technology or services in the United States;

(B) poses an undue risk of catastrophic effects on the security or resiliency of United States critical infrastructure or the digital economy of the United States; or

(C) otherwise poses an unacceptable risk to the national security of the United States or the security and safety of United States persons.

(b) The Secretary, in consultation with the heads of other agencies as appropriate, may at the Secretary's discretion design or negotiate measures to mitigate concerns identified under section 1(a) of this order. Such measures may serve as a precondition to the approval of a transaction or of a class of transactions that would otherwise be prohibited pursuant to this order.

(c) The prohibitions in subsection (a) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order.

**Sec. 2.** *Authorities.* (a) The Secretary, in consultation with, or upon referral of a particular transaction from, the heads of other agencies as appropriate, is hereby authorized to take such actions, including directing the timing and manner of the cessation of transactions prohibited pursuant to section 1 of this order, adopting appropriate rules and regulations, and employing all other powers granted to the President by IEEPA, as may be necessary to implement this order. All agencies of the United States Government are directed to take all appropriate measures within their authority to carry out the provisions of this order.

(b) Rules and regulations issued pursuant to this order may, among other things, determine that particular countries or persons are foreign adversaries for the purposes of this order; identify persons owned by, controlled by, or subject to the jurisdiction or direction of foreign adversaries for the purposes of this order; identify particular technologies or countries with respect to which transactions involving information and communications technology or services warrant particular scrutiny under the provisions of this order; establish procedures to license transactions otherwise prohibited pursuant to this order; establish criteria, consistent with section 1 of this order, by which particular technologies or particular participants in the market for information and communications technology or services may be recognized as categorically included in or as categorically excluded from the prohibitions established by this order; and identify a mechanism and relevant factors for the negotiation of agreements to mitigate concerns raised in connection with subsection 1(a) of this order. Within 150 days of the date of this order, the Secretary, in consultation with the Secretary of the Treasury, Secretary of State, the Secretary of Defense, the Attorney General, the Secretary of Homeland Security, the United States Trade Representative, the Director of National Intelligence, the Administrator of General Services, the Chairman of the Federal Communications Commission and, as appropriate, the heads of other agencies, shall publish rules or regulations implementing the authorities delegated to the Secretary by this order.

(c) The Secretary may, consistent with applicable law, redelegate any of the authorities conferred on the Secretary pursuant to this section within the Department of Commerce.

**Sec. 3.** *Definitions.* For purposes of this order:

(a) the term "entity" means a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization;

(b) the term "foreign adversary" means any foreign government or foreign non-government person engaged in a long-term pattern or serious instances of conduct significantly adverse to the national security of the United States or security and safety of United States persons;

(c) the term "information and communications technology or services" means any hardware, software, or other product or service primarily intended to fulfill or enable the function of information or data processing, storage, retrieval, or communication by electronic means, including transmission, storage, and display;

(d) the term "person" means an individual or entity; and

(e) the term "United States person" means any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States.

**Sec. 4**. Recurring and Final Reports to the Congress. The Secretary, in consultation with the Secretary of State, is hereby authorized to submit recurring and final reports to the Congress on the national emergency declared in this order, consistent with section 401(c) of the NEA (50 U.S.C. 1641(c)) and section 204(c) of IEEPA (50 U.S.C. 1703(c)).

**Sec. 5**. *Assessments and Reports.* (a) The Director of National Intelligence shall continue to assess threats to the United States and its people from information and communications technology or services designed, developed, manufactured, or supplied by persons owned by, controlled by, or subject to the jurisdiction or direction of a foreign adversary. The Director of National Intelligence shall produce periodic written assessments of these threats in consultation with the heads of relevant agencies, and shall provide these assessments to the President, the Secretary for the Secretary's use in connection with his responsibilities pursuant to this order, and the heads of other agencies as appropriate. An initial assessment shall be completed within 40 days of the date of this order, and further assessments shall be completed at least annually, and shall include analysis of:

(i) threats enabled by information and communications technologies or services designed, developed, manufactured, or supplied by persons owned by, controlled by, or subject to the jurisdiction or direction of a foreign adversary; and

(ii) threats to the United States Government, United States critical infrastructure, and United States entities from information and communications technologies or services designed, developed, manufactured, or supplied by persons owned by, controlled by, or subject to the influence of a foreign adversary.

(b) The Secretary of Homeland Security shall continue to assess and identify entities, hardware, software, and services that present vulnerabilities in the United States and that pose the greatest potential consequences to the national security of the United States. The Secretary of Homeland Security, in coordination with sector-specific agencies and coordinating councils as appropriate, shall produce a written assessment within 80 days of the date of this order, and annually thereafter. This assessment shall include an evaluation of hardware, software, or services that are relied upon by multiple information and communications technology or service providers, including the communication services relied upon by critical infrastructure entities identified pursuant to section 9 of Executive Order 13636 of February 12, 2013 (Improving Critical Infrastructure Cybersecurity).

(c) Within 1 year of the date of this order, and annually thereafter, the Secretary, in consultation as appropriate with the Secretary of the Treasury, the Secretary of Homeland Security, Secretary of State, the Secretary of Defense, the Attorney General, the United States Trade Representative, the

Director of National Intelligence, and the Chairman of the Federal Communications Commission, shall assess and report to the President whether the actions taken by the Secretary pursuant to this order are sufficient and continue to be necessary to mitigate the risks identified in, and pursuant to, this order.

**Sec. 6**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*May 15, 2019.*

[FR Doc. 2019–10538
Filed 5–16–19; 11:15 am]
Billing code 3295–F9–P

# Exhibit C



Federal Register

Vol. 85, No. 155

Tuesday, August 11, 2020

# Presidential Documents

Title 3—

The President

Executive Order 13942 of August 6, 2020

## Addressing the Threat Posed by TikTok, and Taking Additional Steps To Address the National Emergency With Respect to the Information and Communications Technology and Services Supply Chain

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*), and section 301 of title 3, United States Code,

I, DONALD J. TRUMP, President of the United States of America, find that additional steps must be taken to deal with the national emergency with respect to the information and communications technology and services supply chain declared in Executive Order 13873 of May 15, 2019 (Securing the Information and Communications Technology and Services Supply Chain). Specifically, the spread in the United States of mobile applications developed and owned by companies in the People's Republic of China (China) continues to threaten the national security, foreign policy, and economy of the United States. At this time, action must be taken to address the threat posed by one mobile application in particular, TikTok.

TikTok, a video-sharing mobile application owned by the Chinese company ByteDance Ltd., has reportedly been downloaded over 175 million times in the United States and over one billion times globally. TikTok automatically captures vast swaths of information from its users, including internet and other network activity information such as location data and browsing and search histories. This data collection threatens to allow the Chinese Communist Party access to Americans' personal and proprietary information— potentially allowing China to track the locations of Federal employees and contractors, build dossiers of personal information for blackmail, and conduct corporate espionage.

TikTok also reportedly censors content that the Chinese Communist Party deems politically sensitive, such as content concerning protests in Hong Kong and China's treatment of Uyghurs and other Muslim minorities. This mobile application may also be used for disinformation campaigns that benefit the Chinese Communist Party, such as when TikTok videos spread debunked conspiracy theories about the origins of the 2019 Novel Coronavirus.

These risks are real. The Department of Homeland Security, Transportation Security Administration, and the United States Armed Forces have already banned the use of TikTok on Federal Government phones. The Government of India recently banned the use of TikTok and other Chinese mobile applications throughout the country; in a statement, India's Ministry of Electronics and Information Technology asserted that they were ''stealing and surreptitiously transmitting users' data in an unauthorized manner to servers which have locations outside India.'' American companies and organizations have begun banning TikTok on their devices. The United States must take aggressive action against the owners of TikTok to protect our national security.

Accordingly, I hereby order:

**Section 1**. (a) The following actions shall be prohibited beginning 45 days after the date of this order, to the extent permitted under applicable law:

any transaction by any person, or with respect to any property, subject to the jurisdiction of the United States, with ByteDance Ltd. (a.k.a. Zìjié Tiàodòng), Beijing, China, or its subsidiaries, in which any such company has any interest, as identified by the Secretary of Commerce (Secretary) under section 1(c) of this order.

(b) The prohibition in subsection (a) of this section applies except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted before the date of this order.

(c) 45 days after the date of this order, the Secretary shall identify the transactions subject to subsection (a) of this section.

**Sec. 2**. (a) Any transaction by a United States person or within the United States that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate the prohibition set forth in this order is prohibited.

(b) Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

**Sec. 3**. For the purposes of this order:

(a) the term ''person'' means an individual or entity;

(b) the term ''entity'' means a government or instrumentality of such government, partnership, association, trust, joint venture, corporation, group, subgroup, or other organization, including an international organization; and

(c) the term ''United States person'' means any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States.

**Sec. 4**. The Secretary is hereby authorized to take such actions, including adopting rules and regulations, and to employ all powers granted to me by IEEPA as may be necessary to implement this order. The Secretary may, consistent with applicable law, redelegate any of these functions within the Department of Commerce. All departments and agencies of the United States shall take all appropriate measures within their authority to implement this order.

**Sec. 5**. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*August 6, 2020.*

[FR Doc. 2020–17699
Filed 8–10–20; 11:15 am]
Billing code 3295–F0–P

# Exhibit D

# Trump says Americans will have to learn Chinese if Biden wins but offers little condemnation of Beijing

By Kevin Liptak, CNN

Updated 1:58 PM ET, Tue August 11, 2020



(CNN) — In a pair of interviews on Tuesday, President Donald Trump railed against his competitor for being weak on China -- but stopped short himself of condemning China's repression of its Uyghur ethnic minority or its crackdown on political freedoms in Hong Kong.

"China will own the United States if this election is lost by Donald Trump," Trump, referring to himself in the third person, told conservative radio host Hugh Hewitt. "If I don't win the election, China will own the United States. You're going to have to learn to speak Chinese, you want to know the truth."

His remark was the latest escalation in a contest with former Vice President Joe Biden over who can sound toughest on China, a battle that has become a central facet of the presidential campaign.

Trump blames China for failing to contain the spread of coronavirus and concealing information about the disease in its early stages. He says his once-chummy relationship with Chinese President Xi Jinping has soured. And his administration has taken a series of actions that have heightened tensions with Beijing, including this week with the highest-profile visit by an American official to Taiwan in decades.

Yet even as the administration ratchets up pressure, Trump himself has declined on multiple occasions to condemn some of China's most provocative moves.

Pressed in the same interview Tuesday on a claim his former national security adviser made recently -- that Trump told Xi to proceed with detaining Uyghurs in camps in western China -- Trump chose not to condemn the repression.

Instead, he offered a cursory denial of John Bolton's claim while trashing his former aide.

"Who would ever say a thing like that? He made it up. He made up everything," Trump said. "John Bolton is a sick person. And John, and he's not a smart person."

In his book, Bolton wrote Trump discussed the detention camps built by the Chinese government for Uyghurs in western China during a dinner at the G20 last year.

"With only interpreters present, Xi had explained to Trump why he was basically building concentration camps in Xinjiang. According to our interpreter, Trump said that Xi should go ahead with building the camps, which Trump thought was exactly the right thing to do," Bolton writes.

The US State Department estimates that more than one million Uyghurs, ethnic Kazakhs, Kyrgyz and members of other Muslim minority groups have been detained by the Chinese government in internment camps, where they are reportedly "subjected to torture, cruel and inhumane treatment such as physical and sexual abuse, forced labor and death."

Secretary of State Mike Pompeo has called Beijing's actions in Xinjiang "the stain of the century."

**Related Article:** US-China relations are at an all time low, but Trump still seems unsure how to handle Beijing

Yet Trump has voiced little public concern about the actions, and said in an interview earlier this month that he held off imposing sanctions on China because he was negotiating a trade deal.

Similarly, during a private phone call last summer with Xi, Trump promised that the US would remain quiet on pro-democracy protests in Hong Kong while trade talks continued, two sources familiar with the call told CNN last year.

Trump's parallel responses to the ethnic repression and the Hong Kong protests illustrate an unfolding dynamic as he works to paint Biden as an unworthy negotiator. Even as he seeks to project toughness, Trump has a history of praising Xi and remains hopeful at salvaging the China trade deal which remains his signature foreign policy achievement.

In another radio interview Tuesday, Trump seemed more focused on the potential upsides for the United States to the political crackdown in Hong Kong, which his government has decried.

"For years Hong Kong was making a lot of money that we could have been made that we could have been making in the New York Stock Exchange and our great exchanges," he told Clay Travis on Fox Sports Radio, adding later: "We gave tremendous incentives that cost us a fortune to keep Hong Kong viable and going, and now what we've done, I've ended everything, I've ended all of that. There is no incentive whatsoever. We're not sending money through incentives back down, we're going to make a lot more money because they're not going to be competitive."

Trump said the geography of Hong Kong -- which sits partially on an island off mainland China -- made it complicated to challenge China's authority.

"Take a look at a map, it's attached to China. So it's a little bit tough from certain standpoints, but we will do very well by not having a good competitor, I guess it'll be a competitor but on a much smaller scale," he said.

Trump's remarks came amid an increasingly tough stance his own administration is adopting toward China.

Last week, the US sanctioned Hong Kong Chief Executive Carrie Lam as well as 10 other Chinese and Hong Kong officials for their role in crackdowns on political freedom in the region. That came after Trump revoked Hong Kong's special status on trade in May.

Also last week, the administration began proposals that would delist Chinese companies from US stock exchanges. And Trump took steps to ban TikTok, which is owned by a Chinese company, from the United States.

The administration has also closed a Chinese consulate in Houston, toughened its position on the South China Sea and worked to persuade allies not to allow Chinese mobile giant Huawei onto their 5G networks.

And this week, US Health and Human Services Secretary Alex Azar visited Taiwan and met with President Tsai Ing-wen, the highest-level meeting between Washington and the self-ruled island in decades. The visit was condemned by Beijing, which regards Taiwan as Chinese territory.

Yet despite US-China relations sinking to historic lows, Trump himself has declined to speak out forcefully on the human rights abuses. Instead, he has focused his attention on China's actions on the coronavirus, which he said have caused his relationship with Xi to suffer.

"I had a very good relationship with President Xi. I would even say better than good. I would say we had a great relationship. He's a great gentleman. But my relationship is no longer very good with him because of what they did with the China virus," Trump told Hewitt.

Still, his beef with China appeared centered on how the country's failure to contain the virus has affected his political standing.

"George Washington would have had a hard time beating me before the plague came in, before the China plague," he said.

Search CNN...

US

World

Politics

# Exhibit E

World

# 'We want deal!': Trump fakes Asian accent to mock Chinese and Japanese businessmen at US rally

 Laura Ma
Published in 16pm, 26 Aug, 2015

Republican presidential candidate Donald Trump at the Grand River Center in Dubuque, Iowa yesterday. Photo: AFP

Just 24 hours after suggesting that Chinese President Xi Jinping deserved a McDonald's hamburger instead of a formal White House state dinner, Republican presidential hopeful Donald Trump took another jab at Asia – this time by mocking Chinese and Japanese "business styles".

Trump, at a campaign rally in Dubuque, Iowa, attempted an impersonation – in broken English – of potential business partners who he says dispense with pleasantries and brashly demand an agreement.

*READ MORE: 'I would get him a McDonald's hamburger': Trump says Xi Jinping shouldn't be given a state dinner when he visits Washington*



"Negotiating with Japan, negotiating with China, when these people walk into the room, they don't say, 'Oh hello, how's the weather?' So beautiful outside, isn't it lovely?' 'How are the Yankees doing?' Oh they are doing wonderful, great.

"They say, 'We want deal!'" he says, to laughter.

Trump's anecdote – while mild compared his past, widely criticised remarks on China, immigrants and women – caused a stir, and a few cringes, among observers and journalists following his campaign.



"'We want deal.' He might as well stick on a bamboo hat and hold [back the corners of] his eyes," said one journalist on Twitter.

"'We want deal." He might as well stick on a bamboo hat and hold his eyes... #Trump

— Paul Vale (@PaulVale) August 25, 2015

A Los Angeles film critic tweeted: "So Jeb and Trump are freely (strategically?) bad-mouthing Asians because we're too small a group to care about alienating, right?"

So Jeb! and Trump are freely (strategically?) bad-mouthing Asians because we're too small a group to care about alienating, right?

— Inkoo Kang (@thinkovision) August 26, 2015

Trump's rival, Republican presidential candidate Jeb Bush, had come under fire a day before for linking Asians to the term "anchor babies". "Frankly, it's more Asian people," the Florida governor said, clarifying that he was not only talking about Latinos.

Bush later said he was referring strictly to people "committing fraud" by engaging in birth tourism, in which foreign mothers come to America solely to give birth there so that their children can have US citizenship.

Reactions to Trump's latest barb were mixed. Some social media users reported being offended by the offhand – and inaccurate – remark about the Chinese and Japanese way of doing business.

It is a cultural faux-pas to dive right into discussion of a business deal in those cultures, according to reports in *Forbes* and *Business Insider*. Rather, Chinese and Japanese businessmen would prefer to take time to build trust by wining and dining first before talking about deals.

Although not many Chinese internet users picked up Trump's controversial remark, those who did find it very offensive.

"I feel this guy is a racist. I would not want democracy if men like him are elected," one blogger commented on popular Chinese microblog Weibo.

Other reactions to Trump's comments were more measured. "As an Asian guy, that is a realistic impression and is hardly offensive. I mimic southern hicks [in the US] all the time," said one man on YouTube.



Another YouTube user said it was unbecoming of someone "who could potentially be a president of the United States". "This would be appropriate if he were running for *Last Comic Standing*", a stand-up comedy reality show, he said.



The incident also highlights the real estate tycoon's diplomatic mettle, or lack of it. Trump has previously criticised China for alleged currency manipulation and allegedly stealing American jobs, although he has also said he admired the country.

As a businessman, Trump has yet to open a hotel in China or Japan, although interest in opening in Asia has been buzzing for years.

The company signed an agreement two days ago to develop in Bali, the first Trump Hotel Collection in Asia, according to *Japan Today*.

The Trump Organisation has also indicated interest in expanding hotels into China.

Much of the imported goods including teddy bears and T-shirts sold at the New York Trump Store inside the Trump Tower on Fifth Avenue are made in China.



# Exhibit F

**NEWS** **EXCLUSIVE**

# Trump cracks jokes about Equinox scandal, kamikaze pilots at Hamptons fundraiser

By Jennifer Gould and Emily Smith                                    August 9, 2019  |  7:33pm  |  Updated



Donald Trump
AP

President Trump cracked jokes about the Equinox scandal, the old days of rent-controlled New York and his dealings with North and South Korea among deep-pocketed pals in the Hamptons on Friday.



Donald Trump speaks at Joe Farrell's Hamptons fundraiser.

Trump was feted at two big-money fundraisers — first a lunch for 60 hosted by real estate guru Stephen Ross, whose company owns Equinox and Soul Cycle. Then Trump talked for an hour to a crowd of 500 at the sprawling Bridgehampton home of developer Joe Farrell. The two events raised a total of $12 million.

After Equinox members revolted over Ross' fundraising for the president, with many threatening to cancel memberships, Trump said he had joked with Ross about how divided the nation is.

Noting the relentless attacks on himself by the media, Trump quipped, "Steve Ross got into a little bit of trouble this week, I said, 'Steve, welcome to the world of politics!' "

Of his fundraising visit, Trump went on to say, "I love coming to the Hamptons, I know the Hamptons well, everyone here votes for me but they won't admit it."

And of his tough stance on trade tariffs and US military aid, Trump told a story of going as a boy to collect rent checks with his father, adding, "It was easier to get a billion dollars from South Korea than to get $114.13 from a rent-controlled apartment in Brooklyn, and believe me, those 13 cents were very important."

Trump thanked a number of people at the event, held in a huge tent in the garden of Farrell's famous home, called Sandcastle. Trump said, "There's Don Jr., I didn't think he liked politics, but actually he's really good at it. And so is [Trump Jr.'s girlfriend] Kimberly [Guilfoyle]. Don Jr. is my gun expert, he knows more about guns than anyone I know."

Turning to the tragic events of the past week, Trump said, to applause, "We need meaningful background checks. It is time.

"I spoke to Lindsey Graham on the way over in the car, I spoke to Nancy Pelosi, I called her, she called me, I talked to Chuck Schumer … we are all in agreement about this. It is time for meaningful background checks."

**SEE ALSO**



**Trump says 'serious discussions' taking place on background checks**

Trump kept returning to hit back at the "fake news" media attacks on him, saying of claims from the Democrats that he is a racist, "That is the only ammunition they have."

Trump also made fun of US allies South Korea, Japan and the European Union — mimicking Japanese and Korean accents — and talked about his love of dictators Kim Jong Un and the current ruler of Saudi Arabia.

He started by saying how the EU had not paid its share to NATO and how he insisted it do so.

Talking about South Korea, Trump said it makes great TVs and has a thriving economy, "So why are we paying for their defense. They've got to pay." He then mimicked the accent of the leader Moon Jae-in while describing how he caved in to Trump's tough negotiations.

On his remarkable friendship with North Korean leader Kim Jong Un, "I just got a beautiful letter from him this week. We are friends. People say he only smiles when he sees me.

"If I hadn't been elected president, we would be in a big, fat, juicy war with North Korea."

Turning to Japan, Trump then put on a fake Japanese accent to recount his conversations with Shinzo Abe over their conversations over trade tariffs.



**SEE ALSO**

Equinox employee urging strike to protest owner's Trump fundraiser

Trump spoke about his friendship with Abe and how fascinated he was with Abe's father, who had been a kamikaze pilot. Trump asked Abe if the kamikaze pilots were drunk or on drugs. Abe said no, they just loved their country. Trump remarked, "Imagine they get in a plane with a half a tank of gas and fly into steel ships just for the love of their country!"

Of the midterm elections, he said the media predicted a disaster for the Republican Party, but in the end it won seats in the Senate with only a few shocking defeats (the Democrats won the House). Trump added, "We got rid of two nasty ones," perhaps referring to some politicians he claimed at the time hadn't shown him enough love.

And he couldn't resist a real estate joke or two. Noting that the very house the event was at is currently on the market for $39 million, Trump joked to Farrell, "What would you rather have, Joe, this beautiful house for $40 million or the White House for free?"

Among the 500 people at the Farrell event were Somers and Jonathan Farkas, Steve Mnuchin, Wilbur Ross and wife Hilary Geary Ross, Rory Tahari, Joe Piscopo, Geraldo Rivera, Rudy Giuliani, Andrew Giuliani, Phil Falcone and wife Lisa Maria, Jean Shafiroff and Neal Sroka.

Also at the event were Estee Lauder billionaire and philanthropist Ronald Lauder, financier Leon Wagner, Vornado founder Steve Roth, co-chair of the RNC, Graham, Bob Castellani, CEO of North American Rescue, real estate mogul Richard Le Frak, financier Peter Worth, commercial real estate developer Bill Stern, Rob Godfrey, former first lady of Florida Carole Crist, Monica Crowley, Cantor Fitzgerald's Howard Lutnicki, Steve Witkoff, Bill Ford, Joe Thal, Andrea Catsimatidis and Ed Cox.

**FILED UNDER**  DONALD TRUMP, EQUINOX, JAPAN, KOREA, STEPHEN ROSS, THE HAMPTONS, 8/9/19

# Exhibit G



REMARKS

# Remarks by President Trump in Press Briefing | July 30, 2020

Issued on: **July 30, 2020**

★ ★ ★

James S. Brady Press Briefing Room

5:41 P.M. EDT

THE PRESIDENT: Thank you very much. Let me begin by expressing our sadness at the passing of a wonderful man and a dear friend of mine, Herman Cain. He was a very special person. I got to know him very well. And unfortunately, he passed away from the thing called the China virus. And we send our prayers to Herman's great wife, Gloria. Wonderful family.

And I have to say, America grieves for all of the 150,000 Americans who had their lives taken by this horrible, invisible enemy. We mourn their loss, as a nation; we mourn their loss, as people — as people that love one another. And we're working very hard to not only contain this horrible event, this horrible plague — it's what it is, is a plague — but also to come up with therapeutics and vaccines. And we're making a lot of strides.

All over the world, they're having tremendous problems. A resurgence has taken place in many countries that people thought were doing well. Despite a wide range of approaches to the pandemic between countries, this resurgence in cases is occurring throughout large portions of our planet — in Japan, China, Australia, Belgium, Spain, France, Germany, Hong Kong — places where they thought it was — they had really done great. It came back. And in a couple of cases, it came back very strongly.

The virus was said to be under control, but new cases have risen very significantly once again. So when you think somebody is doing well, sometimes you have to hold your decision on that; you have to hold your statement.

Since the beginning of June, daily new cases have increased by a factor of 14 times in Israel; 35 times — that's 35 times — in Japan; and nearly 30 times in Australia, just to name a few. These were countries that were doing incredibly well; leadership was being praised. Latin America now leads the world in confirmed infections. And with the scarcity of testing in Latin America, the true numbers — you have no idea what they might be. And I can say "scarcity of testing." Almost anywhere, except for our country.

This disease is highly contagious and presents unique challenges to our border states. Meanwhile, states like California, Washington State, Maryland, Virginia, Nevada, Illinois, Oregon, and many others — they were thought to be doing well, and they had a big resurgence and were hit very hard.

And governors that were extremely popular are not so popular anymore. They were held up as models to follow, and then they got hit and — now, I'm not even saying this is their fault. It's probably not their fault. It's just the way it is. That's the way it is. Highly infectious — one of the most infectious diseases that anybody has ever seen. Not since 1917, over 100 years ago, has anyone seen anything like what we're witnessing now.

But these states have also seen the virus substantially rebound. And, again, no one is immune. No one is immune. These facts illustrate the imposing determinant — and it is a determinant — that a blanket shutdown to achieve a temporary reduction in cases is certainly not a viable long-term strategy for any country. People are starting to understand the disease now. We certainly have understood a lot about the disease that we didn't have any idea. We didn't — nobody ever saw anything like this.

The primary purpose of a shutdown was to flatten the curve, ensure sufficient hospital capacity, and develop effective treatments and therapies to reduce mortality. And we've done that. But it can come rearing back when you least suspect it.

We did the right thing initially. We saved millions of lives, what we did. We did the right thing. But a permanent shutdown would no longer be the answer at all. A small shutdown of certain areas —

but we don't want to do that — small shutdowns can be very helpful, but not for long periods of time.

We understand what we're dealing with now, but it's a very complex situation. And I can only say: Thank Heaven that we — that we are so advanced in what we're doing, in terms of vaccines and therapies.

We now know a great deal about the virus and how to treat it and who it targets. Almost half of the deaths come from less than 1 percent of our population. Think of it: Half of the deaths — really, a tremendous number — half of the deaths come from less than 1 percent of our population, those living in nursing homes and assisted living facilities. The average age of those who die from the illness is 78.

We've announced very strong measures to protect those who are most vulnerable. The scientific path forward is to protect those at highest risk, while allowing those at lower risk to carefully return to work and to school with appropriate precautions.

I'm once again urging the American people to protect their dear family and friends and anybody who's elderly — especially if somebody is elderly and they have heart problems, if they have certain illnesses. Diabetes is a very bad one, having to do with what we're discussing. But you want to protect the elderly and socially distance, wear a mask if you cannot socially distance, and practice vigorous hygiene.

Everyone, even healthy young people, should be taking extraordinary care to avoid infecting those at the highest risk from this terrible disease. The elderly and those with chronic health issues have to be protected.

In the current hotspots across the Sun Belt, the data is showing very encouraging signs. Arizona, in particular, has crossed an important threshold. For every person with the virus, we're now seeing an average of less than one additional person infected. And the numbers are coming down and coming down very substantially. They're starting to come down in Florida. Arizona is really leading the way.

I was in Texas yesterday, and they're starting to come down significantly, we believe, in Texas. Need another few days to figure that one out, but it looks like they're coming down very significantly.

Earlier today, I visited the Red Cross headquarters to discuss plasma therapy — which is a tremendous — a tremendous thing that they're looking at, and they have a lot of experience with it — potentially lifesaving treatments that infuse sick patients with powerful antibodies donated by those who have recovered successfully from this disease.

More than 2 million Americans have recovered from the virus, and today we're asking them to visit Coronavirus.gov — Coronavirus.gov — and volunteer to donate plasma. We need plasma. It's something that's been very effective, and we need plasma from those that were infected and successfully recovered, as most people do. Most people do.

Plasma is one of the many promising treatments my administration is accelerating. We've secured over 90 percent of the world's supply of remdesivir — which is terrific — an encouraging antiviral drug that can effectively block replication of the virus.

We've also approved the use of the widely-available steroid — which has been very successful — dexamethasone, which has shown success, even in patients at more advanced stages of the disease.

On July 17th, we announced a $450 million agreement with Regeneron to build manufacturing plants and hundreds of thousands of doses of its antibody treatment, which is currently in late-stage clinical trials — moving along very rapidly. That's Regeneron.

As a result of such significant strides in treatment, the mortality rate in those over the age of 18 is 85 percent lower than it was just in April. So in a very short period of time. Think of that: Just 18 — 85 percent lower than it was in April. It's a big statement.

Now I want to provide an update on our efforts to ensure a strong economic comeback, including our negotiations on Capitol Hill. Throughout this crisis, my administration has taken the most aggressive action in history to rescue American workers. We love our American workers. And we've set records on job creation — records — two months in a row.

We enacted a $3 trillion economic relief package. The Paycheck Protection Program alone saved over 50 million jobs. We delivered $300 billion to direct cash payments to Americans. We approved $500 billion for our hardest-hit industries — $500 billion.

We allowed struggling homeowners to reduce or defer their mortgage payments, and we put a nationwide moratorium on evictions from federally backed properties. It was a big thing, a very big thing.

We also suspended student loan payments for six months, and we're looking to do that additionally and for additional periods of time.

As a result of these extraordinary steps by the administration, we added a record 7 million jobs in the two months past alone.

To ensure this comeback continues, which we think it will — we had a great foundation to build on. We were the strongest country in the world; nobody close. We were outdoing everybody from China. If you remember, for many years, you heard that in 2019, China would surpass the United States. Well, it didn't. We gained on them very significantly. We took it to a level that nobody has ever seen — 2019, and we'll be back there very shortly. It won't take very long, based on everything that we're seeing. It's not going to take very long. I think next year is going to be an excellent year — maybe one of our best years ever, from an economic standpoint.

We can never, ever forget the people that have been lost, and we never will. We'll never forget them; never forget what happened. This could have been stopped in China. They should have stopped it, and they didn't.

But I'm asking Congress to pass additional legislation to support Americans in need. First, we want a temporary extension of expanded unemployment benefits. This will provide a critical bridge for Americans who lost their jobs to the pandemic through no fault of their own. This was not anybody's fault. From the standpoint of jobs, it happened — a terrible thing happened. Could've been stopped. It happened.

I want to thank Senate Republicans for fighting to extend unemployment benefits today — in the face of very strong Democrat obstruction, which I'm surprised at — because this is great for our country and it's great for our workers, and it wasn't our workers' fault.

Second, we're asking Democrats to work with us to find a solution that will temporarily stop evictions. We do not want people who have lost their jobs due to the virus to be evicted from their homes or apartments. We don't want that to happen.

Third, we need Democrats to join us to pass additional economic relief payments for American citizens, like the payments sent directly to 160 million Americans earlier this year, which was a tremendously successful program. This money will help millions of hardworking families get by.

My administration is also asking Democrats to work with us to pass $105 billion to help schools safely reopen. Children are not [sic] at the lowest risk. If you look at what's going on: the younger, the better. Amazing — the immune system. For children, the lower they are in age, the lower the risk, in terms of the age group itself.

I tell the story that, in New Jersey, with thousands and thousands of people dying — sadly, dying — the governor was telling me that only one — Phil Murphy — only one died under the age of 18. That's incredible. Where thousands of people that died in the state of New Jersey, one made an impact; one died under the age of 18.

Children are at the lowest risk of any age group from the virus. Indefinite school closures will inflict lasting harm to our nation's children. We must follow the science and get students safely back to school, while protecting children, teachers, staff, and family. We have to remember that there's another side to this: Keeping them out of school and keeping work closed is causing death also. Economic harm, but it's causing death for different reasons. But death — probably more death.

If governors do not want to open the public schools, the money should go to parents so they can send their children to the school of their choice. So we say if a school doesn't want to open or if a governor doesn't want to open — maybe for a political reason and maybe not, but there is some of that going on — the money should go to the parents so they can send their children to the school of their choice.

If schools stay closed, the money should follow the students so families are in control of decisions about their sons and daughters — about their children.

But to pass a bill, Democrats must reject the extreme, partisan voices in their party. They have tremendous voices. They're looking at November 3rd. And probably a day later, they'll say, "Let's open up the country."

But the Democrats have to reject the extreme, partisan voices in their party so that we can get our country going even quicker than it's going right now. We have a lot opening, and we have a lot of

states that you thought were doing pretty poorly, from the standpoint of the virus, and they're actually coming back very strong.

This pandemic has underscored the importance of economic policies that put American families and workers first. I got elected on the fact that I put America first.

For many, many decades, in my opinion, we put America last. If you look at the crazy, horrible, disgraceful trade deals that we've watched for many years destroy our country — NAFTA, we terminated it. We have USMCA now, which is a great deal, and our farmers are doing really well despite the pandemic. But we put America first, America's families first, and America's workers first.

But that means bringing jobs and factories back to our shores, reducing unnecessary regulations, and creating new training opportunities for jobs and for the future. We've cut regulations at a level that no President has ever cut regulations. And we've cut taxes more than any President in the history of our country.

Americans always rise to the challenge, and we will emerge more resilient, more self-reliant, more independent, and more prosperous than ever before.

So I just want to thank you all. And if you'd like, we'll take a few questions.

Steve, please.

Q   Are we going to launch an effort to try to delay the election? Or was that just a trial balloon this morning?

THE PRESIDENT: Well, what I want to explain to people, but it doesn't need much explanation — I mean, you look at article after article: "New York's Mail-Vote Disaster," "Tens of thousands of mail ballots have been tossed out in this year's primaries. What will happen in November?" It's a mess. This is done by Washington Post. Can you believe it? The Washington Post, of all papers. Fake news, but in this case, it's not fake, it's true.

This is done by the Wall Street Journal. Here's another one, "Vote-by-mail experiment reveals potential problems within postal voting system ahead [in the] November election." And you see what's happening with so many different places. They're doing even trial runs; they're a disaster.

And I don't want to see an election — you know, so many years, I've been watching elections. And they say the "projected winner" or the "winner of the election" — I don't want to see that take place in a week after November 3rd or a month or, frankly, with litigation and everything else that can happen, years. Years. Or you never even know who won the election.

You're sending out hundreds of millions of universal, mail-in ballots — hundreds of millions. Where are they going? Who are they being sent to? It's common sense; you don't have to know anything about politics. And the Democrats know this. The Democrats know this, Steve.

So, I want to see — I want an election and a result much, much more than you. I think we're doing very well. We have the same pho- — fake polls, but we have real polls. We're doing very well.

I just left Texas. And Biden came out against fracking. Well, that means Texas is going to be one of the most unemployed states in our country. That means Oklahoma, North Dakota, New Mexico are going to be a disaster. Ohio, Pennsylvania — disaster. No fracking.

I want to have the result of the election. I don't want to be waiting around for weeks and months. And, literally, potentially — if you really did it right — years, because you'll never know.

These ballots are missing. You saw Paterson, New Jersey. You saw many other instances. There's tremendous litigation on that right now.

And that doesn't include absentee. Absentee is different. Absentee — you have to work and you have to send in for applications. You have to go through a whole procedure.

Like, for instance, I'm an absentee voter because I can't be in Florida because I'm in Washington; I'm at the White House. So, I'll be an absentee voter. We have a lot of absentee voters, and it works. So we're in favor of absentee, but it's much different than millions of people.

In California, they're going to send out tens of millions of voting forms. Well, where are they going to go? You read where postmen are in big trouble now. You read where city councils are in big trouble now. Voter fraud, all over the — the ballots.

So, no, I want to get — I want to be standing, hopefully, hand held high, big victory, because we're doing things with our country that I think nobody else could have done. Our country is — despite

this pandemic, which is devastating the rest of the world, by the way — devastating.

One of the articles that came out was, "The World's Covid Resurgence." This is the Wall Street Journal editorial — the main editorial yesterday in the Wall Street Journal. I don't always agree with them. But they have "The World's Covid Resurgence." "Countries hailed as models [to] see…" — and then they go, the virus returns at a level it's never — they haven't even seen.

We've been giving praise to certain countries, and the virus has now come to them like — like the first time. But it's a very interesting — and it talks about many countries where everybody was holding them up and saying what a great job they did. Well, it's just one of those things. Didn't work out so well.

So we want to have an election. I'd love to see voter ID, but this is the opposite of voter ID. The Democrats love it; the Republicans hate it. We all agree that absentee voting is good. Mail-in ballots will lead to the greatest fraud.

You know, we talk about "Russia, Russia, Russia" for two and a half years, and then they found nothing, and there was nothing. But they talk "Russia, Russia, Russia." They talk China. They talk all of these countries. They say they get involved in our elections. This is easy. You can forge ballots. This is much easier for foreign countries.

Go ahead, Steve.

Q But — but delaying the election is probably a nonstarter. I mean, wouldn't you agree with that?

THE PRESIDENT: I — I just feel — I don't want a delay. I want to have the election. But I also don't want to have to wait for three months and then find out that the ballots are all missing and the election doesn't mean anything. That's what's going to happen, Steve. That's common sense, and everyone knows it. Smart people know it. Stupid people may not know it. And some people don't want to talk about it, but they know it.

And, no, we want to have an election where people actually go in and — "What's your name?" "My name is so-and-so." Boom, you sign the book, like I've been doing for years.

It's very, very unfair to our country. If they do this, our country will be a laughingstock all over the world because everyone knows it doesn't work.

How many ballots is he sending in California, as an example? Twenty-eight million or some massive number? Other states are sending out millions and millions of ballots. Well, they've done it. They had experiments. They had news organizations experimenting.

And, look, read the story in the Washington Post about mail-in voting; it's a disaster. I'm very surprised to see that story, frankly, from them. The story is a disaster. So we're asking for a lot of trouble.

And, no, do I want to see a date change? No. But I don't want to see a crooked election. This election will be the most rigged election in history.

John.

Q So, Mr. President, you said that you don't want to see a delay in the election, but then it looks like the process of these mail-in ballots is going to continue to November the 3rd.

THE PRESIDENT: Well, we have many court cases, John. We have one that's been filed for a while now in western Pennsylvania, as an example, on mail-in ballots.

Q So, I'm just wondering, is —

THE PRESIDENT: And, by the way, John, we give tremendous examples — numbers of examples of all the fraud and all of the things that have taken place with respect to mail-in ballots.

Q I'm just wondering, is the net effect of what you tweeted this morning and what you're talking about now to cast doubt on the results of the November 3rd election?

THE PRESIDENT: Well, it's had an interesting impact. I didn't know it was going to be the impact it had. What people are now looking at is: Am I right? But not me. Are all these stories right about the fact that these elections will be fraudulent, they'll be fixed, they'll be rigged? And everyone is looking at it, and a lot of people are saying, "You know. that probably will happen."

Please, Jennifer.

Q Mr. President, to break the logjam in Congress and to prevent that unemployment insurance from lapsing, what do you plan to put on the table tonight? What are you —

THE PRESIDENT: Well, it's a great question. I can't tell you, though, because that wouldn't be very smart from a negotiating standpoint. But we'll be putting certain things on the table.

Q Do you have a plan to put on the table?

THE PRESIDENT: We want to get money to people. It wasn't their fault. And we want to get money to people, and it has to be substantial. It's not their fault what happened.

The fact is, people don't like saying it — they know it's true: It's China's fault. Okay? It's not their fault. It's not the worker who lost his job; it's China's fault. And that's the way it is.

OAN, please.

Q Thank you, Mr. President. Yesterday, DHS came to an agreement with the governor of Oregon to remove federal officers, and Oregon state troopers took over. Mayor Ted Wheeler was noticeably absent from that agreement. Are you confident, sir, that the state of Oregon will be able to quell the protests in Portland? And if the violence does continue, would you consider redeploying federal troops?

THE PRESIDENT: So our people have done — Homeland Security have done a fantastic job. They went to Oregon a little more than a week ago. The place was a mess. The city, Portland, was just a disaster. You see it, and a lot of people weren't reporting it right. They tried to pretend it was a protest, as opposed to anarchists and agitators. You understand what I'm saying. It's a mess.

They went there a short while ago, and they saved a federal courthouse that costs hundreds of millions of dollars. And they put a ring around the courthouse and they saved it. But the group that's there is basically meant to save buildings, and they were very strong, very powerful. And they didn't come out too often out of this cocoon that they built in order to save these very expensive, valuable, and psychologically important buildings — right? — like courthouses.

The governor and the mayor, we've been dealing with them, and we think they don't know what they're doing, because this should not have been going on for 60 days. It's not our job unless, in case of emergency — which I consider now to be an emergency — it's not our job to go in and clean out the cities. That's supposed to be done by local law enforcement.

Yesterday, the governor worked a deal where they'll do it; we'll stand by, they'll do it — and that's good. That was very good, but she didn't report it that way. What she reported was totally different. She said, "I think Trump wants to take over the country." It's crazy.

So what happened is our people are staying there to see whether or not they can do it today and tomorrow. And if they don't do it, we will send in the National Guard and we'll take care of it. And we're telling, right now, these protesters — and many should be arrested because these are professional agitators, these are professional anarchists; these are people that hate our country. We're telling them, right now, that we're coming in very soon — the National Guard. A lot of people. A lot of very tough people. And these are not people that just have to guard the courthouse and save it. These are people that are allowed to go forward and do what they have to do. And I think that makes the governor's job and the mayor's job a lot easier.

So they're working today and probably tomorrow to clean out this beehive of — of terrorists. And if they do it, I'm going to be very happy. And then, slowly, we can start to leave the city. If they don't do it, we'll be sending in the National Guard.

Please.

Q Mr. Trump, given what's happening with Major League Baseball and now, today, the Rutgers football team is quarantined, how can you assure people that schools will be safely reopened?

THE PRESIDENT: So, can you assure anybody of anything? I do say, again: Young people are almost immune to this disease. The younger, the better, I guess. They're stronger. They're stronger. They have a stronger immune system. It's an incredible thing. Nobody has ever seen this before. Various types of flu will hurt young people more than older people.

But young people are almost immune. If you look at the percentage, it's a tiny percent of 1 percent. It's a tiny percent of 1 percent. So we have to have our schools open. We have to protect our teachers. We have to protect our elderly. But we do have to have our schools open.

Yeah, please. Go ahead.

Q Mr. President, a week ago, you said: "We are in the process of developing a strategy that's going to be very, [very] powerful," involving the coronavirus. Where is that strategy?

THE PRESIDENT: Well, I think you're seeing it, and I think you will see it. And one of the things that we've done that we're getting — and it hasn't been utilized fully yet — but we're all set to march when it comes to the vaccine.

We have great therapeutics that are testing very well, and we have great vaccines from incredible companies — Johnson & Johnson and Pfizer and Merck —

Q But (inaudible) actually slowing the spread of the virus?

THE PRESIDENT: — and all of these great companies, and they're doing very well.

And the delivery system is all set, logistically. We have a general that — that's all he does, is deliver things, whether it's soldiers or other items. And I think you're going to see something that's going to be spectacular.

The FDA has approved things at a rate that's a tiny fraction of what it would cost — what it would take during a — another administration, let's say.

We are way ahead on vaccines, way ahead on therapeutics. And when we have it, we're all set up with our platforms to deliver them very, very quickly. The vaccines are doing well, the therapeutics are doing well, and we're all set to deliver them as soon as we have them, and that's going to be very soon.

Thank you very much. Thank you.

END

6:12 P.M. EDT

# Exhibit H

**REMARKS**

# Remarks by President Trump in Press Briefing

Issued on: **July 23, 2020**



James S. Brady Press Briefing Room

5:25 P.M. EDT

THE PRESIDENT:  Thank you very much.  Thank you, everybody.
Thank you.

We've had a tremendous week uniting the country in our fight against the China virus.  I have reminded people of the importance of masks when you can't socially distance, in particular.  A strong message has been sent out to young people to stop going to crowded bars and other crowded places.

Yesterday, we made the amazing announcement for our plans to protect nursing home residents.  We're working very hard on that.  We're doing very well all over the country.  And also about contracting with Pfizer — we made a big, big, beautiful contract with Pfizer.  We think they're very close — but we have a lot of companies that are very close — to produce a vaccine.

And I wanted to come out again today to share some additional news with you: This afternoon, my political team came to me and laid out our plans for the convention in Jacksonville, Florida.  It's a place I love.  I love that state.  The drawings look absolutely beautiful.  I never thought we could have something look so good, so fast with everything going on.  And everything was going well — a tremendous list of speakers; thousands of people wanting to be there — and I mean, in some cases, desperately be there.  They wanted to attend.  People making travel arrangements all over the

country; they wanted to be there.  The pageantry, the signs, the excitement were really, really top of the line.

But I looked at my team, and I said, "The timing for this event is not right.  It's just not right with what's happened recently — the flare up in Florida — to have a big convention.  It's not the right time."

It's really something that, for me — I have to protect the American people.  That's what I've always done.  That's what I always will do.  That's what I'm about.

They said, "Sir, we can make this work very easily.  We have great enthusiasm.  Incredible enthusiasm.  Even the polls say about the most enthusiasm they've seen.  We can do this safely, and we can do it responsibly."

And I said, "There's nothing more important in our country than keeping our people safe, whether that's from the China virus or the radical-left mob that you see in Portland" — where I want to thank Homeland Security and others in law enforcement for doing a fantastic job over the last few days.  They went in, and people were out of control for 51 days — a long time.  And Homeland Security and other law enforcement with us went in, and they've done a great job protecting our property — the federal courthouse and other property — and, most importantly, protecting our people.  Or the senseless violence that you see in Chicago or New York or Detroit — a lot of other cities where so many people are shot, and so many people are killed.  And people elected me to help and to protect.

So, I told my team, "It's time to cancel the Jacksonville, Florida, component of the GOP Convention."  We'll be starting in North Carolina for the Monday, as has always been planned.  We were never taking that off.  That's remaining as it is.  The delegates are going to get together.  That's where they do their nomination.  So, the delegates are going to North Carolina, and they'll be doing the nomination.  And we're going to do some other things with tele-rallies and online — the week that we're discussing, which will be really good.  I think we're going to do it well.  And I'll still do a convention speech in a different form, but we won't do a big, crowded convention per se.  It's just not the right time for that.

I care deeply about the people of Florida and everywhere else, frankly, in this country — and even in the world — who would be coming into the state, and I don't want to do anything to upset it.

They'll be doing very well very shortly.  We're going to put some maps up of the country behind me, and you'll see that the area that we're talking about is a hotspot.  You will also see a lot of the country is — has no problem whatsoever — most of the country, actually.  So I'm always going to take care of you, so that that's the way we're going to do it.

I've spoken to Governor DeSantis and informed other political leaders.  I want to thank the Jacksonville community, and its great mayor.  He's a great — great guy.  Really great guy.  They wanted it so badly.  And all of the other political representatives in Jacksonville and in Florida.  And just very special people — a very special group.  And they were there for us, 100 percent.

Today, I want to provide an update on the actions we're taking to support the safe reopening of America's schools.  Parents around the world who have had their children home for the last few months have a greater appreciation for the fact that teachers are essential workers, that they're essential to our children's future.  Our goal is to protect our teachers and students from the China virus while ensuring that families with high-risk factors can continue to participate from home. Very important.

The American Academy of Pediatrics has released guidance recommending that schools reopen.  It said, quote:

  *"Lengthy time away from school and associated interruption of supportive services often results in [a] social isolation, making it difficult for schools to identify and address important learning deficits as well as child and adolescent physical [and] sexual abuse, substance use, depression, and suicidal ideation.  This, in turn, places children and adolescents at considerable risk of morbidity and, in some cases, mortality.  Beyond the educational impact and social impact of school closures, there has been [a] substantial impact on food security and physical activity for children and [for] families."*

So, that's very important, and there's a highway — it goes both ways.

The National Education Association recently stated, "Despite the momentous efforts of educators during the pandemic, online learning has never been an effective replacement for in-person learning and support."  Being at the school, being on the campus is very, very important.

One study estimates that, due to school closures last spring, the average student will begin the school year roughly 35 percent behind in reading compared to the typical year, and more than 50

percent behind in math.  That's a big statement.

According to McKinsey & Company, learning loss will probably be greatest among low-income black and Hispanic students.  They're the ones that are hit the hardest.  We don't want that happening.

Thirty million American students rely on schools for free and reduced meals.  Over 70 percent of the students who receive mental health services do so through their schools.  According to HHS, one in five reports allegedly, having to do with child abuse, they have neglect — and these are neglect and neglected cases are submitted by education personnel.  So people in the education world, on the premises, will be the ones that report neglect and other problems when they see the children.  They know if they've been neglected.  They know if they've been hurt or harmed in any way, whether it's at home or someplace else.  But they see this at school.  You don't get to see that if you're not going to school.  It's a big thing.

Fortunately, the data shows that children are lower risk from the China virus, very substantially.  When children do contact the virus, they often have only very mild symptoms or none at all, and medical complications are exceedingly rare.  Those that do face complications often have underlying medical conditions.  Ninety-nine percent of all China virus hospitalizations are adults.  And 99.96 percent of all fatalities are adults.  That means that children are a tiny percentage — less than 1 percent, and even a small percentage of 1 percent.

In a typical year, the flu results in more deaths of those under 18 in the United States than have been lost thus far to the coronavirus.  Many different names.  Many, many different names.

The life of every child is sacred and must be protected.  Our sole focus is the health and wellbeing of America's children.

I have a very, very special person who loves children, who is — who is, I think, one of the greatest athletes of all time.  A lot of people say "the greatest pitcher of all time."  Known as a "relief pitcher" who could have been whatever he wanted.  Some people — he is the greatest reliever of all time, by far.  Substantially more saves than anybody else.  In fact, he got the Presidential Medal of Freedom recently.

And he — I'm reading off these stats.  I knew he was the best.  I knew he was great, but I didn't know it was almost double anybody else.  But he's a man who loves children — has children, loves

children, works hard with children.  We're going to go outside and be with some little leaguers.  Mariano Rivera — you know, he's the "Sandman," right?  My wife said, "Darling, why do they call him the 'Sandman'?"  I said, "You know, they play the song.  He just puts the batters to sleep."  And that's exactly what happened.

So, having Mariano here is a great honor.  Thank you very much.  He was talking about children in schools.  And there's nobody that's done more than you have.  Thank you very much, Mariano.  Fantastic man.

Given these considerations, we believe many school districts can now reopen safely, provided they implement mitigation measures and health protocols to protect families, protect teachers, and to protect students.  And we do have to protect the teachers and the families also; we have to remember that.

All families should be empowered to make the decision that is right for their own circumstance.  This is especially important if a child has underlying health conditions or lives with a parent or grandparent who is at high risk.

In cities or states that are current hotspots — and you'll see that in the map behind me — districts may need to delay reopening for a few weeks, and that's possible.  That'll be up to governors.  The decision should be made based on the data and the facts on the grounds in each community, but every district should be actively making preparations to open.

Again, the children obviously have a very strong immune system, maybe even as strong as yours.  They seem to be able to fight it off and not have a problem.  So, it's pretty amazing actually.  Great, great credit.

Our strategy to safely reopen schools mirrors our approach nationwide.  As we race toward the completion of a vaccine and therapeutics, the responsible path is to shelter those at highest risk, while allowing those at lower risk — much lower, in the case of young children — to resume work and school and — as long as everyone practices vigilant hygiene and social distancing.  We want that.

A permanent shutdown was never the strategy, which would ultimately lead to greater mortality and irreversible harms.  We don't want to do that.

At the same time, we have to get our economy going.  We had tremendous numbers issued yesterday.  Housing prices — pricing of housing up 21 percent.  It's the highest in history.  It's the highest number in history.  Real estate housing went up 21 percent.

Today, the CDC will provide additional guidance for how schools can reopen safely.  I hope that local leaders put the full health and wellbeing of their students first and make the right decision for children, parents, teachers, and not make political decisions.  This isn't about politics; it's about something very, very important.  This is not about politics.  I even think it's bad politics if you do the wrong decision.  Very bad politics.

We're asking Congress to provide $105 billion to schools as part of the next coronavirus relief bill.  This funding will support mitigation measures, such as smaller class sizes, more teachers and teacher aides, repurposing spaces to practice social distancing, and crucially, mask-wearing.  This money is in addition to the $30 billion we secured for schools and universities earlier this year.  That money we have; some is distributed, and some is not distributed.

If schools do not reopen, the funding should go to parents to send their child to public, private, charter, religious, or homeschool of their choice.  The key word being "choice."  If the school is closed, the money should follow the student so the parents and families are in control of their own decisions.  So we'd like the money to go to the parents of the student.  This way, they can make the decision that's best for them.

We cannot indefinitely stop 50 million American children from going to school — harming their mental, physical, and emotional development.  Reopening our schools is also critical to ensuring that parents can go to work and provide for their families.

The Council of Economic Advisers estimates that 5.6 million parents will be unable to return to work if schools do not reopen this year.  That's a tremendous problem.  It's a tremendous problem.  Schools have to open safely, but they have to open.

More than a dozen European countries — as well as South Korea, Taiwan, and many others — have already reopened schools, and cases have not risen.  We can achieve the same goal if we unite together, follow the best medical practices, and apply common sense.

We'll continue to support states and cities in the current hotspots in the South, Southwest, and West.  The governors — I know them all.  They're all very, very capable.  They're doing a very good job.  They're working so hard.  You wouldn't even believe it.

We have nearly 30,000 federal personnel deployed in the states that need assistance.  We're helping with doctors and nurses — medical personnel of all kinds.  As a PPE update, we're in close communication with governors and states.

We have supplies — everything they could possibly need.  We're very strong on supplies.  Remember I used to say the cupboards were bare?  Well, now the cupboards are the opposite.

Due to our historic efforts to increase both the National Stockpile and the state stockpiles, the vast majority of the states have 60 days' worth of supplies on hand.  And most importantly, they have ventilators — because the ventilators are very, very hard to come by, at least in the past.  Now we're making thousands of ventilators a month and supplying them, in many cases, to other countries.

For states that are making requests, we're rapidly delivering.  In the last 24 hours, FEMA has deployed more than 1.5 million masks upon request, 1.7 million gowns, and 600,000 — well, let me change that.  We've created about 600,000 different supplies.  We have 600 ventilators to Arizona, North Carolina, Pennsylvania, Colorado, Idaho, and Washington.  I think the number is 600.  We'll go check that, and we'll give it you in a little while.  But we've — we've got a stockpile of thousands of ventilators.  I think we've sent out about 600 just recently.

The United States has now conducted more than 51 million tests, which is more than any other country in the world, by far.  Roughly half of the tests are either the rapid, point-of- care tests, which, frankly, solves a lot of problem in delay — 5 to 15 minutes, instead of waiting for service both ways, in both directions, and then at the lab.  But roughly half of them now, which is a tremendous increase, are 5- to 15-minute tests or tests done in a hospital where you get the results back in less than a day — in some cases, immediately.

We're continuing to surge testing to current ho- — hotspots, such as Miami and Phoenix, to detect those with the virus and take steps to stop from spreading it further.

This is a copy of the map, and this is a — you have it right behind me.  That's really very much indicating where the problems are.  You see from — from that, it's in great shape — lots of it.  The

Northeast has become very clean.  The country is in very good shape, other than if you look South and West — some problems.  That will all work out.

On therapies: We've worked with Florida to ensure that over 40,000 vials of remdesivir are arriving this week.  That's a lot.  That's really — that's a lot.  They're working around the clock to make it.  It's had a tremendous impact.  We've also shipped thousands of vials to Arizona, California, and Texas over the past two weeks.  Arizona is doing very well; it's heading down.  The numbers are heading down, I think, very quickly.  The governor has done a great job.  They've all done a great job.  They've all done a great job.  Working hard.

We'll continue to monitor the areas rising and — with respect to cases.  And we ask all Americans to exercise vigilance, practice social distancing, wear a mask, do whatever is necessary so we get rid of this horrible situation — this horrible disease that was sent to us by China.

It should not have been sent.  They should have stopped it.  They could have stopped it.  They didn't.  And the entire world has gotten infected, and a lot of countries are going through a lot right now.

This morning, I spoke with President Putin of Russia, and they're going through a very hard time with this — in Moscow, in particular.  I spoke to the Crown Prince of Saudi Arabia.  They're doing well, but they're going through a lot.  Everybody is going through a lot.

Yesterday, I spoke to the heads of four different countries.  All four are going through a lot.  They're going through a hard time.

This could have been stopped.  It could have been stopped quickly and easily.  But for some reason, it wasn't, and we'll figure out what that reason was.

So, with that, if you have any questions — please.

Q   On the convention, were you simply not convinced that you could keep people safe at the convention?

THE PRESIDENT:  I just felt it was wrong, Steve, to have people going to what turned out to be a hotspot.  You know, when we chose it, it was not at all hot; it was free.  And all of a sudden, it

happened quickly.  It happens quickly.  And it goes away, and it goes away quickly.  The key is, we want it to go away without a lot of death, without a lot of problems.

And we're learning so much about the disease.  That's why we're — we're very cognizant of nursing homes — we're watching them very carefully — and people over a certain age, and especially people over a certain age with diabetes or — or heart disease, in particular — but with a problem.

So, we didn't want to take any chances.  So we had a lot of people.  We have — the delegates want to be there.  We're going to do a fairly reasonably quick meeting in North Carolina.  The nomination will be produced.  And then we'll announce what we're doing, how we're doing it, whether it's something that's done online; I guess you could call it "online."  So, there can nothing — there can be nothing like our last convention, unfortunately.  That was a great convention and in a great place, as you know.  We had a — we had a great time — a great time in Cleveland.

But it's a different world, and it will be for a little while.  We want to get the world back to what it was, and I think we'll have that, including great job numbers, including so many things that are happening so positive.

I have to say, the stock market is close to records.  For Nasdaq, it is a record.  It's already exceeded its highest numbers.  But we want to get our country back to what it was.

Q    And so would your acceptance speech be from the White House?  Are you worried that —

THE PRESIDENT:  We haven't set that yet, Steve.  We'll have that — we'll probably announce that over the next few days.

Q    Are you worried this might dampen enthusiasm for you?

THE PRESIDENT:  Look, we've done a great job.  We built the greatest economy in the world.  Nobody close — not China, not anybody.  We had to close it, we saved millions of lives, then we opened it.  But we had the best numbers in history for African Americans, Hispanic Americans, Asian Americans, every group you want to name — young people without a diploma; young people with a high school diploma, with a college diploma.  Anything you want to name, we had the best numbers.  Women doing incredibly.  Never — never been a time like that.

And we had to turn it off because of what China did. We had to turn it off. And then, all of the sudden — now we turn it back on, and we're doing very well. But it was very bad.

China — speaking about China, the trade deal means less to me now than it did when I made it. When I made it, it was a great deal. But they're — they're setting records. Yesterday was a record corn day. They purchased more corn than any order ever, and that went on for two or three days. And soy beans and all. But it just means much less to me. Can you understand that? It just means much less to me.

Please, go ahead.

Q    Thank you. What was the one thing — if there was one thing — that changed your mind about the convention? And did Florida officials ask you to cancel it?

THE PRESIDENT: No, they didn't. We're dealing with them, but they didn't. I would just say safety. Just safety. I just — you know, I could see the media saying, "Oh this is very unsafe. This is…" I don't want to be in that position. It's safety — not because of the media, but that's what they would say.

And we'll have a very nice something; we'll figure it out. It'll be — it'll be online, in some form. Maybe it'll be something even a little bit different. We have time. You know, we're talking about the end of August. But I think it'll be something that will be exciting, but there can be nothing like having 25,000 people.

We had a tremendous thing planned in — and a tremendous convention planned in North Carolina. And it would have been very good, but a much smaller version in Florida. But then, we saw what was happening. Pretty quickly, we saw that — that the virus was coming up that coast.

Q    Do you think it's an acknowledgment of the severity of the situation in Florida?

THE PRESIDENT: No, I think it's going to come and go. It will. I mean, you take a look at — some of these locations were heavily infected. I mean, to a point where — Deborah and I were talking that — you know, when you look at what happened in New York and what happened in New Jersey and other places. And now you're looking, and it's gone. I hope it stays gone. I think we — I think it will. But we had to be — we had to be — we have to be vigilant. We have to be careful.

And we also have to set an example.  I think setting the example is very important.  It's hard for us to say we're going to have a lot of people packed in a room, and then other people shouldn't do it.

Don't forget, we're talking about schools.  And we want them to be vigilant.  And we're saying, "Open."  And then we're saying — here you have a big room.  But I also — if you notice, I said, "Where bars are crowded, where other things are crowded…"  Well, there's nothing more crowded than a convention.  A convention — I mean, you've seen them.  And even though you try and keep people away from each other, it's just not that kind of a thing.  They probably can't do that.  It just doesn't work for them.  So it's a very hard — so I think we're setting an example by doing it.  It's very important.

Yeah, John.

Q   Mr. President, if I can come back to school openings.  You talked about money that Congress was looking at to help schools who want to reopen.  If a school wants to reopen, but is concerned about testing, would you consider directing some of that money toward testing for either —

THE PRESIDENT:  Yeah.

Q   — a school district or even individual schools if that's what it took to open the schools?

THE PRESIDENT:  Yeah, I think so.  I mean, I — a lot of people feel differently about testing.  We talk about it a lot.  When we have 50 million tests-plus, and — you know, we bra- — we broke the 50 million-test mark.

Second in the world is India, which has 1.4 billion people, and they had 12 million tests.  And other countries that are very big had 2 million tests.  And some countries essentially only test if you're sick and walk into a hospital or walk into a doctor's office or you're literally really sick.  They essentially don't do tests unless you're sick, and I understand that, too.

So, yeah, if they feel that that's what they want, it's — that would be fine.

Q   You would — you would tell Congress — you would encourage Congress to pay for testing for school districts?

THE PRESIDENT:  I would if they want.  Again, we've done 50 million tests.  There's nobody even close in the whole world.  You look at our mortality rate.  You look at our death rate.  You look at different statistics.  We're doing very well.  But one death is too many.  This should never have happened.  This should never have been allowed to happen from China.

Q   Also — also, Mitch McConnell's office just put out a statement, a moment ago, about the phase four relief package, CARES II, saying, quote, it's "tailored precisely for this phase of the crisis."  Yet, it does not include your payroll tax cut.  So do you believe it's perfectly tailored?

THE PRESIDENT:  Yeah, I'd like to see a payroll tax cut.  I think it's great for the workers.  The Democrats would never have gone for it.  They don't want it.  They're not big into the workers, I guess.  And based on that, I told them last night — I told the Republicans, who have been working very hard on this, I'll tell you — and they want what's right for the country, and hopefully the Democrats ultimately will.

But I said, "I think a payroll tax will be good, but you're not going to get it from the Democrats."  We need their votes, as you know.  It's not like — you know, we have a majority, but it's not enough that we — that's why I guess we have an election coming up.  So you still need Democrat votes, and we're not going to get the Democratic votes on that.

So I'd like to see it.  I think it would be very good for the workers.  But if we're not going to get their votes, I guess we have to go on to the next thing.  A payroll tax cut would have been very good.  And maybe — maybe something happens.

Yes, please.

Q   You talk about setting an example on Jacksonville.  But I — I just wonder: Some people are going to take away from this the lesson that you're pushing too far, too fast.  It seemed, for a while, the numbers were going up in Jacksonville, and you were going to have a problem there.  This comes up at a time you're pushing for schools to reopen, have the opening of the Major League Baseball season.  Isn't — isn't the example of Jacksonville that we're — we're pushing too fast?

THE PRESIDENT:  Well, baseball, as an example — we were discussing it a little while ago — you're going to be at an empty stadium.  I've agreed — Randy Levine is a great friend of mine from the Yankees, and he asked me to throw out the first pitch, and I think I'm doing that on August 15th at

Yankee Stadium.  And I say, "How's the crowd going to be?"  And, you know, it's like you don't have a crowd; there is no such thing.

It's going to be interesting, Mariano.  He's not used to that.  I've been at many games.  He walks in; the place goes crazy.  I think it'd be just as good without the crowd.  You were just born with it, you know.  Some people are born with it.

I don't know if — this is only for the baseball players, but I've never seen a pitcher throw a ball where so many bats were broken as Mariano.  He's got the all-time record.  I said, "How do you do that?"  He said, "Parents."  Great parents, when you get right down to it.  Right?  "How do you do that?"  It's called parents.

Q   (Inaudible) baseball, but the question —

THE PRESIDENT:  But — but —

Q   — the question really is —

THE PRESIDENT:  Yeah, I just — just to finish, I think — I think that we have to all set examples.  I think Major League Baseball is setting the example by, you know, playing to empty stadiums, and so are other sports.  You see that.  Now, then they'll allow a certain number in.  I see golf is now — soon will be allowing people to come in, in percentages.  And all of a sudden, we want to get back to normal.

The key is to get back to normal, because nobody wants to see this.  But I think it's really good that baseball is opening.  It looks like football is opening.  It looks like sports are opening.  We — we have — it's a tremendous thing, psychologically, for our country.

And we're all — we're all, whether we're se- — we're going to see right now some beautiful, young Little Leaguers outside with a great future ahead of them.  They're already practicing on the front lawn of the White House, and we're going to go out and say hello to them, and it'll be really great.

Okay, how about one more?  Yeah, please.  Go ahead.

Q   President Trump, the Washington Post, earlier today, reported that one thing holding up the GOP coronavirus bill is the White House asking that it include language regarding the FBI building in downtown Washington, D.C.  Is that true?

THE PRESIDENT:  I don't know that they're putting it in this bill, but I know they want to have a new FBI building.  This one is very old, and it's really — it was never built to a very high standard, as you probably have heard.  And it's got a lot of danger involved and panels falling off the outside and pieces of concrete falling off the building.

And they want to build it at the site that they have it.  They had options very far away from Washington.  And I said to him, "Frankly, you have to be near the Justice Department."  There's nothing better than the site.  The site they have now is better.  But they were looking in sites in Maryland and Virginia, in different places, but they would've been too far away.

So I am — I've been encouraging them to build it.  And if you're going to — you have a choice: You can renovate the existing building — but it's not a good building — or you could take it down and build a great building for the FBI for 100 years and have it be incredible.  Even with tracks on top, they're talking about — you know, we have — because FBI people like to work out a lot.  And you could have, literally, quarter-mile tracks on top.  It's a very big site, a very wide site.

So I think the idea — the best idea would be to build a new building.  And that way, you have it for a long time.  Renovation can never be as good as a new building, in that case.  I know they're talking about it, whether or not they put it in this bill or someplace else.  But the FBI needs a new building, and we'll get it done.

Thank you all very much.  Thank you. Thank you very much.

END

5:56 P.M. EDT

# Exhibit I



← **Tweet**

**Donald J. Trump** ✔
@realDonaldTrump

Big China Virus breakouts all over the World, including nations which were thought to have done a great job. The Fake News doesn't report this. USA will be stronger than ever before, and soon!

> Twitter Moments Australia ✔ @MomentsAU · Aug 1
> A State of Disaster has been declared in Victoria over the COVID-19 outbreak and Melbourne residents face strict new restrictions including a nightly curfew and limits on movement outside of the home. Here are the details.
> twitter.com/i/events/12897...

4:35 AM · Aug 2, 2020 · Twitter for iPhone

**23.8K** Retweets and comments    **76.4K** Likes

Patricia Grzelewski @PatriciaGrzele1 · Aug 3
Replying to @someknew and @realDonaldTrump
This is crazy what have people become
♡ 2

Jorge García del Castillo @ElGeorg98759519 · Aug 3
Replying to @TONYxTWO and @realDonaldTrump

Mrs. Krassenstein @HKrassenstein · Aug 2
Replying to @realDonaldTrump
Donald Trump is literally celebrating the fact that COVID19 is breaking out all over the world because he thinks it makes his horrific handling of the virus in America look less horrific!
297    ♡ 967    ♡ 9.5K

Mrs. Krassenstein @HKrassenstein · Aug 2
If you didn't think Trump was a sociopath before this tweet, it's pretty much confirmation right now.  He's literally celebrating the death and distress of human beings because he thinks it benefits himself.
133    ♡ 618    ♡ 5.4K

2 more replies

Calliope Zac @calliopezac · Aug 2
Replying to @realDonaldTrump
One Australian state is having 500-600 cases a day. They are going to stage 4 lockdown to try and eliminate it. Curfew 8pm to 5am, you can leave home except for work exercise and food. You have to stay 5kms within your home. Schools and childcare closed.
15    ♡ 5    ♡ 173

Search Twitter

**New to Twitter?**
Sign up now to get your own pers

Sign up

**Relevant people**

**Donald J. Trump** ✔
@realDonaldTrump
45th President of th
America

**Twitter Moments .**
@MomentsAU
The best of what's h
Twitter in an instant

**What's happening**

Weather · LIVE
**Hurricane Laura upgraded 'extremely dangerous' Cate 4 storm by US National Hu Center**
Trending with: Cat 5

Sports · Trending
**Forfeit**
6,112 Tweets

Food · Trending
**Burger King**
122K Tweets

News · LIVE
**Weather and reinforcemen firefighters battle Californi wildfires that have killed at seven**

Trending in United States
**At 17**
92.7K Tweets

Show more

Terms  Privacy policy  Cookies  A
© 2020 Twitter, Inc.

**Don't miss what's happening**
People on Twitter are the first to know.

Log in    S

# Exhibit J

← **Tweet**

 Search Twitter

# Explore

⚙ Settings

**Donald J. Trump** ✔
@realDonaldTrump

More Testing, which is a good thing (we have the most in the world), equals more Cases, which is Fake News Gold. They use Cases to demean the incredible job being done by the great men & women of the U.S. fighting the China Plague!

5:33 AM · Aug 11, 2020 · Twitter for iPhone

**29.1K** Retweets and comments   **122.6K** Likes

💬          ⟳          ♡          ⬆

**Paul the other one, it's got bells** @paulcshipley · Aug 11
Replying to @realDonaldTrump
Dream on, Donald. Dream on.



From George Takei ✔

💬 23          ⟳ 31          ♡ 76          ⬆

**Stell** @buffy788 · Aug 13
OMG !

💬          ⟳          ♡          ⬆

**RD** @real_defender · Aug 11
Replying to @realDonaldTrump
Keep fighting Mr. President, we all appreciate your leadership and stand with you.

💬 363          ⟳ 122          ♡ 935          ⬆

**Pat Lavery Hopkins** @lavery_pat · Aug 13
Not all of us!

💬          ⟳          ♡          ⬆

**New to Twitter?**
Sign up now to get your own pers

Sign up

**Relevant people**

**Donald J. Trump** ✔
@realDonaldTrump
45th President of th
America

**What's happening**

Weather · LIVE
**Hurricane Laura upgraded 'extremely dangerous' Cate 4 storm by US National Hu Center**
Trending with: Cat 5

Trending in United States
**At 17**
94.1K Tweets

Sports · Trending

**Don't miss what's happening**
People on Twitter are the first to know.

Log in          S

# Exhibit K



← **Tweet**

🔍 Search Twitter

**Donald J. Trump** ✔
@realDonaldTrump

Because of my strong focus on the China Virus, including scheduled meetings on Vaccines, our economy and much else, I won't be able to be in New York to throw out the opening pitch for the @Yankees on August 15th. We will make it later in the season!

12:44 PM · Jul 26, 2020 · Twitter for iPhone

**31.3K** Retweets and comments    **112.4K** Likes

**New to Twitter?**

Sign up now to get your own pers

Sign up

**Relevant people**

**Donald J. Trump** ✔
@realDonaldTrump
45th President of th
America

**New York Yankees**
@Yankees
Official Twitter of th
Series Champions

**Trump_owo** @Trump_owo · Jul 26
Replying to @realDonaldTrump
Because of my stwong focus on the China Viwus, incwuding scheduwed meetings on Vaccines, ouw economy and much ewse, I won't be abwe to be in New Yowk to thwow out the opening pitch fow the @Yankees on August 15th. We wiww make it watew in the season!

💬 27    🔁 9    ♡ 209

**Mimi Freeman** @MimiFreeman16 · Jul 28
Hahahaha

**Omar Navarro** ✔ @RealOmarNavarro · Jul 26
Replying to @realDonaldTrump and @Yankees
I'm running against Gavin Newsom as a Republican. I believe in building the WALL. I'm standing AGAINST California being a Sanctuary State. Please follow me @RealOmarNavarro

💬 1.3K    🔁 698    ♡ 2.6K

**The Jaded Bastard** @Notorious_MDF · Jul 29
BWAHAHAHAHAHAHAHA!!! <COUGH>

Criminal LOSER!

💬    🔁    ♡ 2

**Mrs. Krassenstein** @HKrassenstein · Jul 26
Replying to @realDonaldTrump and @Yankees
Dude, you are literally playing golf this weekend.

💬 316    🔁 1.7K    ♡ 27.5K

**Mrs. Krassenstein** @HKrassenstein · Jul 26
Trump didn't want to throw out the first pitch because he knows the baseball players will be kneeling.  He can't deal with peaceful protests.

💬 644    🔁 2K    ♡ 23.7K

2 more replies

**What's happening**

US news · Yesterday
**Illinois police arrest one su**
in connection to fatal shoo
Jacob Blake protest
Trending with: Molotov

Sports icons · Trending
**Adam Silver**
3,764 Tweets

Trending in United States
**Gerrit Cole**
1,961 Tweets

News · LIVE
**Weather and reinforcemen**
firefighters battle Californi
wildfires that have killed at
seven

Trending in United States
**Kyrie**
17.6K Tweets

Show more

Terms  Privacy policy  Cookies  A
© 2020 Twitter, Inc.

Twitter
# Explore
⚙ Settings

**Don't miss what's happening**
People on Twitter are the first to know.

Log in    S

# Exhibit L



← **Tweet**

**Donald J. Trump** ✓
@realDonaldTrump

I always treated the Chinese Virus very seriously, and
have done a very good job from the beginning,
including my very early decision to close the "borders"
from China - against the wishes of almost all. Many lives
were saved. The Fake News new narrative is disgraceful
& false!

4:46 AM · Mar 18, 2020 · Twitter for iPhone

**82.3K** Retweets and comments   **294.6K** Likes

**Jeffrey Guterman, Ph.D.** ✓ @JeffreyGuterman · Mar 18
Replying to @realDonaldTrump
Your response to the virus was late. You have lied and minimized. Your
conduct has put people in danger and may result in deaths. Millions will die.
You are a menace to the world. Resign or lose.

💬 442        ↻ 1.2K        ♡ 10.5K

**VOTE BLUE 2020**        @MFrance923 · Mar 18
I H8 Moronavirus in Chief to the bones!!!

💬 2        ↻ 36        ♡ 121

**Hong Kong Citizen** @HKCitizens19 · Mar 18
Replying to @realDonaldTrump
I love u trump

💬 1        ↻        ♡ 1

**Marie-Caroline**        @NoWay7790 · Mar 18
Replying to @realDonaldTrump
Why are you always lying?

---

🐦

# Explore

⚙ Settings

🔍 Search Twitter

**New to Twitter?**

Sign up now to get your own pers

Sign up

**Relevant people**

**Donald J. Trump** ✓
@realDonaldTrump
45th President of th
America

**What's happening**

Weather · LIVE
**Hurricane Laura upgraded
'extremely dangerous' Cate
4 storm by US National Hu
Center**
Trending with: Cat 5

Sports · Trending
**Forfeit**
12.9K Tweets

Trending in United States
**At 17**
95.6K Tweets

News · LIVE
**Weather and reinforcemen
firefighters battle Californi
wildfires that have killed at
seven**

Food · Trending
**Burger King**
124K Tweets

Show more

Terms  Privacy policy  Cookies  A
© 2020 Twitter, Inc.

**Don't miss what's happening**
People on Twitter are the first to know.        Log in    S

# Exhibit M



Support our journalism:

Nearly 25,000 people support Vox's explanatory journalism. Join them to help keep Vox free for all.

Contribute

# Trump's racist references to the coronavirus are his latest effort to stoke xenophobia

The president's rhetoric is seen as fueling a surge in harassment toward Asian Americans.

By Li Zhou | li@vox.com | Jun 23, 2020, 6:30pm EDT



Supporters of US President Donald Trump react as he concludes speaking at a campaign rally at the BOK Center, June 20, 2020, in Tulsa, Oklahoma.
| Win McNamee/Getty Images

In a rally in Tulsa, Oklahoma, this past weekend, President Donald Trump used the term "kung flu" to describe the **coronavirus**, one of several racist statements he made during a wide-ranging speech that touched on his administration's handling of the pandemic.

"By the way, it's a disease, without question, [that] has more names than any disease in history," Trump said at the time. "I can name kung flu, I can name 19 different versions of names."

Since then, Trump's press secretary Kayleigh McEnany has gone on to defend his use of the term. And Senate Majority Leader Mitch McConnell has been noncommittal: When asked how he and his wife, Transportation Secretary Elaine Chao, felt about Trump's remarks, McConnell declined to say whether he was comfortable with the president's rhetoric, instead suggesting that the question should be directed to Chao, who immigrated from Taiwan to the US as a child.

McEnany's defense of Trump is the same flimsy one he's been using ever since he began calling the coronavirus the "Chinese virus:" She argued that such names simply associate the illness with its "place of origin," an effort that even if conducted in good faith goes against World Health Organization guidelines that warn against promoting labels that could stigmatize an entire region.

"The president does not believe it's offensive to note that the virus came from China," McEnany said during a briefing on Monday.

Trump's use of the "Chinese virus" or "kung flu" is, of course, not in good faith and very much about tapping into the same racism and xenophobia he's long amplified in myriad comments he's made about people of color. **As the Washington Post's Jose Del Real reported**, Trump made several other racist statements during his Tulsa remarks: In his speech, he described racial justice protesters as "thugs" and used a scenario involving a "tough hombre" to illustrate the threat of defunding police.

These statements, as well as references to **Mexican immigrants as "rapists"** and **multiple African nations as "shithole countries,"** are among the racist comments he's used in campaign rallies and presidential remarks over the past four-plus years.

As the country reckons with systemic racism and police brutality, Trump appears as eager as ever to stoke racial divisions, using rhetoric that both contradicts **his March claims** of wanting to "protect" Asian Americans and directly contributes to hate incidents against members of this group.

**Trump is still using racist terms to describe the coronavirus as Asian Americans continue to report hate incidents**

Trump's decision to lean into racist rhetoric — **including terminology his own adviser, Kellyanne Conway,** has condemned in the past — comes as Asian Americans continue to report hate incidents such as verbal abuse, physical assault, and property damage during the pandemic. As the coronavirus spread around the world, tropes that treat Asians as perpetual foreigners have also resurfaced, fueling racist and hostile anti-Asian sentiment.

**Stop AAPI Hate**, an organization that's been tracking self-reported hostile anti-Asian incidents since late March, says it's received more than 2,100 reports since the project began. Such incidents have included instances of employees getting shunned in the workplace, families being spat on at fast food restaurants, and children getting beaten up by their classmates. The group says it saw a surge in reports after Trump began using rhetoric like the "Chinese virus" and noted that many **"anti-China" comments** were frequently associated with verbal and physical assaults.

"A White male walked by me and said, 'you f—king Chinese spread the Coronavirus to this country, you should all leave this country!'" one incident report read.

"A woman sitting at a bus stop was screaming at myself and other Asians that she saw walking," read another. "She said that we were 'dirty Chinese,' that we were trying to take over the US."

Researchers, too, emphasize that Trump's rhetoric has mattered in the past: **An NBC News report by Kimmy Yam points to a February study,** which determined that Trump's racist comments against Latino Americans "emboldened" others who held similar views to express them.

Trump's continued use of racist statements about the coronavirus — ultimately trying to deflect blame by pointing out it is foreign-born — comes as he struggles to deal with the fallout of his own handling of the pandemic: Most recently he came under fire for saying he **intends to slow down coronavirus testing** because doing so would reveal the presence of fewer cases.

"President Trump continues to utilize white supremacist and nationalist views as a means of scapegoating his failures for political gain," said Manjusha Kulkarni, executive director of the Asian Pacific Policy and Planning Council, in a statement. "Unless we hold him accountable, the discrimination and harassment against Asian Americans will become deeply entrenched, cause unimaginable harm and suffering, and take decades to unwind."

## Support Vox's explanatory journalism

Every day at Vox, we aim to answer your most important questions and provide you, and our audience around the world, with information that has the power to save lives. Our mission has never been more vital than it is in this moment: to empower you through understanding. Vox's work is reaching more people than ever, but our distinctive brand of explanatory journalism takes resources — particularly during a pandemic and an economic downturn. Your financial contribution will not constitute a donation, but it will enable our staff to continue to offer free articles, videos, and podcasts at the quality and volume that this moment requires. **Please consider making a contribution to Vox today**.

# Exhibit N

# The Washington Post

*Democracy Dies in Darkness*

# Trump again uses racially insensitive term to describe coronavirus

By **Colby Itkowitz**

June 23, 2020 at 5:05 p.m. PDT

President Trump again referred to the novel coronavirus as "kung flu," eliciting laughter and wild cheers from a young crowd in Arizona on Tuesday.

Trump was listing the different names he has heard for the virus, which has killed at least 119,000 Americans, during a speech for the student Republican group Turning Point Action.

"Wuhan. Wuhan was catching on, coronavirus, kung flu," he said, repeating it as the crowd roared. "I could give you many, many names. Some people call it the Chinese flu, the China flu, they call it the China."

Trump drew criticism after he used the racially insensitive moniker to describe the coronavirus at a campaign rally in Tulsa on Saturday night — his first since the outbreak largely shut down the country.

At his rally Tuesday, Trump downplayed the virus that has afflicted millions across the globe, saying, "I can name kung flu, I can name 19 different versions of names. Many call it a virus, which it is. Many call it a flu, what difference?"

White House press secretary Kayleigh McEnany tried to defend the president's use of the name when asked by a reporter on Monday why he uses such "racist language."

"The president doesn't," McEnany said. "What the president does do is point to the fact that the origin of the virus was China. It's a fair thing to point out."

Trump has repeatedly blamed China for the global outbreak in an effort to deflect blame for his handling of the virus in its early days. He was criticized in March for continuing to call it the "Chinese virus" long after it had spread to other countries and Asian Americans voiced concern that the affiliation would stoke fears and result in prejudice against them.

The 24-Hour Sale Get one year for $29

# Exhibit O

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/white-house-defends-trump-comments-on-kung-flu-coronavirus-testing-11592867688

POLITICS

# White House Defends Trump Comments on 'Kung Flu,' Coronavirus Testing

Democrats, Asian-Americans call the term racist; press secretary says president didn't direct staff to reduce testing



President Trump during a campaign rally in Tulsa, Okla., on Saturday.
PHOTO: LEAH MILLIS/REUTERS

*By* *Andrew Restuccia*
Updated June 22, 2020 8:04 pm ET

WASHINGTON—The White House defended President Trump's description of the disease caused by the coronavirus as "kung flu" after civil rights groups, Democrats and Asian-Americans criticized his use of the slur as racist.

White House press secretary Kayleigh McEnany also said at a briefing Monday that the president hadn't directed staff to slow the rate of testing for the illness.

<u>During a Saturday night rally in Tulsa</u>, Okla., Mr. Trump referred to Covid-19 as the "kung flu," publicly using a term that the White House had previously distanced itself from. "By the way, it's a disease, without question, [that] has more names than any disease in history. I can name kung flu, I can name 19 different versions of names," Mr. Trump said during his Saturday remarks.

Democratic lawmakers, activists and experts have said the phrase, a reference to Chinese martial arts, is rooted in racist stereotypes about Asian people.

"121,000 Americans are dead. Thousands died alone. Isolated. Families could not grieve. Donald Trump's response is to make racist jokes," Sen. Tammy Duckworth (D., Ill.) said on Twitter.

"He is linking it to its place of origin," Ms. McEnany said, arguing that Mr. Trump was stressing that the virus started in China. Later, she said, "The president does not believe it's offensive to note that the virus came from China."

The White House has sought to emphasize China's role in the spread of the virus amid mounting criticism about the halting U.S. response to the virus, including the lack of early testing capacity. Mr. Trump also has called it "the Wuhan virus" because the first cases were detected in the Chinese city as well as the "China plague."

In repeatedly linking the virus to China, Mr. Trump is tapping into stereotypes about Asian people as foreigners who spread disease, civil rights advocates have said.

A reporter for CBS News said in March that a White House official had used the phrase "kung flu" in a conversation with her, but she declined to name the person. At the time, Kellyanne Conway, a senior adviser to the president, challenged the reporter to reveal the name of the official and said the phrase was "highly offensive."

Ms. McEnany on Monday didn't directly answer a question about Ms. Conway's previous comments.

Some civil rights groups have raised concerns his language could result in violence and against Asian Americans. "It's racist to refer to #COVID19, a disease that has killed 100k+

in America, by a name that incites hate," Jonathan Greenblatt, the chief executive of the Anti-Defamation League, wrote on Twitter on Sunday.

During the briefing, the press secretary also cast Mr. Trump's Saturday comments about Covid-19 testing as a joke.

"When you do testing to that extent, you're going to find more people, you're going to find more cases. So, I said to my people, slow the testing down, please," Mr. Trump said during the rally.

Ms. McEnany said Mr. Trump didn't direct his staff to slow the rate of testing. "Any suggestion that testing has been curtailed is not rooted in fact," she said.

During an interview with a local television reporter earlier Monday, Mr. Trump didn't answer a question about whether he had directed his staff to slow testing.

In an interview Monday with Christian Broadcasting Network, Mr. Trump said his Tulsa remark was "semi-tongue-in-cheek" and argued that the U.S. is at a "disadvantage" with other countries due to availability of testing.

"I tell my people it's a double-edged sword because we do so much testing," Mr. Trump said. He said there wasn't a direct order to stop testing and added, "But I think we put ourselves at a disadvantage, I told my people."

In recent weeks, Mr. Trump has frequently expressed frustration that the scope of testing is making the scale of the outbreak in the U.S. seem bigger.

"Well, the problem is because we're showing cases whereas other countries that don't have testing capacity, they don't show cases," Mr. Trump said in a recent interview with The Wall Street Journal. "So they say the United States has more cases than anybody else. That's because we do more testing."

Public health experts—including Dr. Anthony Fauci, the government's top infectious disease expert—have said the U.S. needs to further increase testing to help stop the spread of the virus. The U.S. has conducted more than 26 million coronavirus tests, according to the Centers for Disease Control and Prevention.

**Write to** Andrew Restuccia at Andrew.Restuccia@wsj.com

# Exhibit P



# Reports of Anti-Asian Assaults, Harassment and Hate Crimes Rise as Coronavirus Spreads



Photo credit: Bebeto Matthews/Associated Press

Amid the ongoing threat of the coronavirus, there are surging reports of xenophobic and racist incidents targeting members of the Asian American and Pacific Islander (AAPI) community in the U.S.

Since January 2020, there have been a significant number of reports of AAPI individuals being threatened and harassed on the street. These incidents include being told to "Go back to China," being blamed for "bringing the virus" to the United States, being referred to with racial slurs, spat on, or physically assaulted. Statements by public officials referring to COVID-19 as the "Chinese virus," "Kung Flu" or "Wu Flu" may be exacerbating the scapegoating and

targeting of the AAPI community. Meanwhile, extremists continue to spread antisemitic and xenophobic conspiracies about COVID-19, blaming Jews and China for creating, spreading and profiting off the virus.

The following is a representative list of coronavirus-related anti-Asian incidents reported in the media or by the victims. The description of the victims is based on media reporting. Please note: This is not a comprehensive list; for more detailed information or to report an incident, refer to resources established by the Asian Pacific Policy and Planning Council (A3PCON) or Chinese for Affirmative Action (CAA).

July

- July 31 – Bronx, NY: A man was arrested after harassing an Asian woman on the subway. The man reportedly spat on the woman and yelled at her, "Asians caused the virus!" and "Go back to China! Go back to Manhattan!" (Source: New York Daily News)

- July 18: An Asian American restaurant owner says he was attacked by a man who refused to comply with the restaurant's health measures. The man allegedly told the restaurant owner, "Fuck you and your chinky ass policy" and told him to "Go back to China, you COVID ass." (Source: NextShark)

June

- June 17 – Wyckoff, NJ: A Chinese restaurant was vandalized with graffiti that read, "coronavirus" and "COVID-19." (Source: NorthJersey.com)

- June 14 – Newark, DE: Fliers targeting Asian and Asian American students were found at off-campus housing at the University of Delaware, Newark. The flyers included the message "Kill China Virus." (Source: WDEL)

- June 13 – Queens, NY: A man at a Bayside 7-Eleven made anti-Asian remarks regarding the COVID-19 pandemic and then verbally harassed an Asian customer whom he also allegedly pushed. (Source: NY Daily News)

- June 6 – Denver, CO: Two Asian American people were verbally accosted while walking on the street by a woman who told them they "smell like shit" and "You guys are all disgusting! You all!" (Source: Reported to ADL)

- June 3 – Brooklyn, NY: Conspiratorial anti-Chinese fliers were posted in Bay Ridge. The flyers blamed the spread of COVID-19 on Chinese immigrants. (Source: Gothamist)

May

- May 30 – San Mateo, CA: Racist anti-Chinese messages were found in the Laurelwood neighborhood, written on utility boxes and poles. (Source: The Daily Journal)

- May 23 – Seattle, WA: A man harassed Asian people at a park and an Asian woman in her car, saying, "Where are you from…where is your ID?", and "Chinese disease…they bring it here!" Later, the man allegedly yelled anti-Asian remarks inside an Asian restaurant. (Source: King 5)

- May 22 – San Leandro, CA: A woman was arrested after posting handwritten fliers on homes that read, in part, "If you are a woman or man and was born in other country, return, go back to your land immediately, fast, with urgency" and "In this place, no Asians allowed." (Source: SF Gate)

- May 17 – Contra Costa, CA: A farm stand displayed a racist sign that read "Fresh bat soup" and "Thank you China." (Source: Reported to ADL)

- May 15 – New York, NY: An Asian woman was verbally harassed by fellow subway passenger for not wearing her mask "properly." The

passenger yelled at the victim, "You fucking Chinese don't speak English! Go back to China!" She also slapped the victim's phone away. (Source: NY Daily News)

- May 12 – Stevens Point, WI: A man was arrested after using racial slurs against Asian customers in a grocery store. According to police "the customers were called names and harassed for wearing masks because of their race." (Source: WSAW)

- May 14 – San Luis Obispo, CA: The Cal Poly Chinese Student Association's Zoom meeting was disrupted by unknown participants who drew swastikas and filled the chat box with xenophobic comments blaming the pandemic on people of Chinese descent. (Source: KSBY)

- May 5 – St. Louis, MO: A restaurant displayed a pinata in the shape of the coronavirus with a racist depiction of an Asian face on it. (Source: Riverfront Times)

- May 17 – Contra Costa, CA: A farm stand displayed a racist sign that read "Fresh bat soup" and "Thank you China." (Source: Reported to ADL)

- May 3 – Pasadena, CA: Police arrested a man who threw a drink at several Asian American people while yelling racial slurs at them. (Source: Pasadena Now)

- May 3 – New York, NY: An Asian man was attacked on the subway by a stranger who shouted at him, "You're infected China boy, you need to get off the train." The assailant then grabbed the victim and attempted to pull him out of his seat. (Source: NY Daily News)

- May 1 – Hoboken, NJ: Spray-painted anti-Asian graffiti was reported on the sidewalk outside an apartment building. (Source: Patch)

**April**

- April 26 – Queens, NY: An Asian woman in Rego Park was harassed by a man who yelled expletives and told her, "You're the one who brought the virus here." After the woman attempted to record him on her cellphone, he slapped her phone away. (Source: Patch)

- April 25 – Pasadena, CA: An Asian man was walking with a friend when a motorist drove past and yelled at them, "Fucking Asians, motherfuckers. You brought this disease here." Source: NextShark

- April 25 – Chesapeake, VA: A Chinese restaurant owner was harassed by an individual who entered the restaurant and threw water on her and her husband. The owner of the restaurant also reported that someone painted "Go back to China" on her car. (Source: The Virginian-Pilot)

- April 22 – San Jose, CA: Five Asian-Owned businesses were vandalized in nearby neighborhoods of San Jose. (Source: East Bay Times)

- April 20 – Orange County, CA:  During a second-grade class held on Zoom, one student told the class he does not like "China or Chinese people because they started this quarantine." (Source: Facebook)

- April 19 – San Francisco, CA: An Asian American woman was harassed while walking her dogs. She was told to "Go back to whatever fucking country you came from" and that "nasty people should stay in fucking Asia." (Source: Facebook)

- April 18 – Atlanta, GA: A plaque of Winnie the Pooh using chopsticks to eat a bat and the words "Wuhan Plague" was found outside a coffee shop. The plaque was also reportedly posted at other locations around East Atlanta on April 13 and April 16. (Source: The Atlanta Journal-Constitution)

- April 17 – Philadelphia, PA: (Date approximate) An Asian-owned restaurant was vandalized with spray-painted graffiti that included the racial slur "Chink." Source: WHYY

- April 17 – Albuquerque, NM: A Chinese American man reported that while at a supermarket another customer singled him out and told him to "stay away." (Source: Reported to ADL)

- April 16 – Brooklyn, NY: An Asian woman was walking on the street in the Bedford-Stuyvesant neighborhood when two men harassed her with remarks about Chinese people and called her a "Fucking freak." (Source: Reported to ADL)

- April 15 – Newton, MA: A high school advance placement Chinese class held on Zoom was disrupted by individuals who targeted the students and teachers using racial slurs and loud mock-Chinese, and posting "vile, hate-filled images." (Source: Boston Globe)

- April 12 – Seattle, WA: Patriot Front, an alt right group, posted propaganda around Seattle's International District targeting Asian American/Pacific Islander businesses. (Source: ADL identified)

- April 10 – New York, NY: A Korean restaurant was defaced with graffiti that read, "Stop eating dogs." (Source: NY Eater)

- April 10 – New York, NY: A Zoom session hosted by an Asian American organization was disrupted by unknown individuals who wrote racist and anti-Asian slurs in the chat function. (Source: Reported to ADL)

- April 8 – Houston, TX: A woman verbally harassed employees of a Vietnamese restaurant, telling them, "Get out of our country." (Source: ABC-13)

- April 7 – Amherst, MA: (Date approximate) In a letter to the Amherst College community, the president of the college reported that two Asian students at Amherst College had reportedly been the victims of verbal harassment in the town of Amherst. (Source: Amherst College)

- April 5 – San Marcos, CA: An Asian woman was verbally harassed in a Costco parking lot of by an unidentified male who blamed the woman

and Chinese people for the virus. (Source: FOX 16)

- April 4 – Edison, NJ: A group of juveniles surrounded an Asian woman and attacked her with racial slurs before punching her in the back of the head. (Source: NJ Advance Media)

- April 3 – Seymour, CT: A Chinese food restaurant received racist and threatening phone calls from callers who blamed the owners, who are Chinese, for the COVID-19 pandemic. The callers also threatened to shoot the owners. (Source: Valley New Haven Independent)

- April 2 – Cherry Hill, NJ: A Vietnamese American man was walking his dog when he was verbally harassed by a stranger who yelled that he "caused the coronavirus and needed to get the fuck out of here." Source: WHYY

- April 1 – Pittsburgh, PA: (Date approximate) An Asian American woman was at a grocery store when she was told by another shopper to shop with her own kind and that she "should be rounded up with the virus and shipped back to China." (Source: Pittsburgh's Action News 4)

**March**

- March 31 – Philadelphia, PA: Several Asian American homes received a letter that referenced eating bats and pangolin and encouraged the recipients to burn themselves alive. Source: WHYY

- March 31 – Webster Groves, MO: American Identity Movement, an alt right group, distributed propaganda that read promoted their group and featured a Corona beer bottle with the coronavirus germ and read: "Immigration kills," and "Made in China." (Source: ADL identified)

- March 30 – Yakima, WA: An Asian buffet restaurant was vandalized with graffiti that included an ethnic slur and a message that read, "Take the corona back." (Source: YakTriNews)

- March 29 – Bronx, NY: Three teenage girls harassed and used an umbrella to attack an Asian woman, saying, "You caused coronavirus, bitch." (Source: New York Post)

- March 28 – Evanston, IL: "Chinese virus" was found spray-painted on a jetty on the Northwestern University campus. (Source: Reported to ADL)

- March 28 – New York, NY: An Asian woman walking her dogs was verbally harassed by two people who called her "the virus." (Source: NextShark)

- March 27 – San Angelo, TX: A Korean student at Angelo State University returned to his dorm room to find that someone had placed posters about COVID-19 on his door. (Source: San Angelo Live)

- March 27 – Martinsville, IN: A man of Korean descent was denied entry into a gas station and told to "never come back." The gas station attendants reportedly told police that "anyone of Chinese descent was not allowed in the store." (Source: WISH-TV)

- March 27 – Cerritos, CA: A Korean American woman was verbally harassed in the parking lot of a Walmart by a man who called her a "bitch asshole" and threatened to hit her. (Source: Reported to ADL)

- March 27 – Evanston, IL: Someone spray-painted the words "Make China Pay" inside a bus shelter. (Source: Reported to ADL)

- March 27 – Asheville, NC: A cooking class held on Zoom by an Asian American chef was disrupted by an unknown person who yelled anti-Asian and homophobic epithets. (Source: Citizen-Times)

- March 26 – Seattle, WA: A Chinese restaurant in the Chinatown-International District of Seattle was vandalized. (Source: NBC News)

- March 25 – South Bend, IN: A student at the University of Notre Dame posted racist, anti-Asian, anti-Chinese comments on their Facebook

page. The student also wrote "Go home" on the Facebook page of an international student from China. (Source: The Observer)

- March 25 – Woodbury, MN: A woman returned home to find this flier posted on her door: "We're watching you fucking chinks take the [C]hinese virus back to [C]hina. We don't want you hear [sic] infecting us with your diseases!!!!!!!" (Source: Facebook)

- March 24 – Brooklyn, NY:  In a subway station, someone spat on an Asian man and yelled, "You fucking Chinese, spreading the coronavirus. You people got the virus." Source: NY Daily News)

- March 24 – Columbia, MD: An Asian-American family was walking on a neighborhood trail when they were verbally harassed by neighbors who shouted at them, "Coronavirus, coronavirus! Asian pig!"
(Source: Baltimore Sun)

- March 24 – Madison, WI: Anti-Chinese messages referring to COVID-19 as the "Chinese Virus" were found written in chalk on the University of Wisconsin-Madison campus. (Source: Milwaukee Journal Sentinel)

- March 24 – San Francisco, CA: A man yelled at a Filipino-American man, using an anti-Asian derogatory term. (Source: Twitter)

- March 23 – Des Moines, IA: An Asian American woman was waiting in line at a bakery when a white couple said, "Oh gosh, not here" and "fled" to another line when they saw she was Asian. (Source: Des Moines Register)

- March 21 – Huntington Beach, CA: A flier that read, "You guys are Chinese Viruses" and "Get out of our country" was posted on a family's front door and left on their car. (Source: Reported to ADL)

- March 21 – Naperville, IL: A Chinese American man was jogging when he was attacked by two women who accused him of having the virus and

told him to "go back to China." They also threw a log at him and spat on him. (Source: WBEZ Chicago)

- March 20 – Los Angeles, CA: CNN journalist Kyung Lah was preparing for a broadcast when a man approached her and used a racial slur. (Source: CNN)

- March 19 – Brooklyn, NY: Oswald Jones, 60, targeted a 26-year-old Asian woman, allegedly yelling "Go back to China" and "You are dirty, get your temperature checked," before attempting to punch her and steal her cellphone. Source: (NY Daily News)

- March 17 – New York, NY: Jiayang Fan, a staff writer at The New Yorker magazine, reported being verbally harassed outside her apartment building by a passerby who repeatedly yelled "Fucking Chinese" at her, and called her a "Chinese bitch." (Source: Twitter)

- March 17 – Albuquerque, NM: A local Asian restaurant was vandalized with a spray-painted message that read "Trucha with the corona virus." "Trucha" is slang in Spanish for "beware" or "watch out."(Source: KOB 4)

- March 16 – Daly City, CA: An Asian man coughed while shopping at Target and was verbally harassed by other shoppers. (Source: NextShark)

- March 16 – Vestal, NY: A student at Binghamton University discovered that someone had submitted a racist response to a public Google form she had posted for an event. The submission included anti-Asian terms and referred to the coronavirus. (Source: Pipe Dream)

- March 16 – New York, NY: An Asian woman was physically assaulted by a woman who accused her of spreading the coronavirus. The alleged perpetrator was arrested and charged with a hate crime. (Source: New York Post)

- March 16 – Fresno, CA: An Asian American woman was harassed while buying diapers. She was told to "move out of the way" and then referred

to using a racial slur. (Source: The Fresno Bee)

- March 15 – Los Angeles, CA: A Filipino-American woman was harassed by a woman on the street who said, "Please don't give me the virus." (Source: Twitter)

- March 15 – New York, NY: A man approached an Asian woman on the subway and said, "You're Chinese, why did you bring Corona to America?"  (Source: Facebook)

- March 15 – Louisville, CO: Union Jack Liquor changed the message on their marquee to read "Firestone $14.88 Thanks China." "14/88" combines two popular white supremacist numeric hate symbols. (Source: Colorado Hometown Weekly)

- March 15 – Davie, FL: An Asian woman who works as a musician received harassing and racist text messages saying that she would not be hired anymore until she surrenders her "Chinese passport and renounce your Chinese citizenship." (Source: NextShark)

- March 14 – Midland, TX: A Burmese man and his two children, ages six and two, were attacked and stabbed at a Sam's Club by a 19-year-old man. The alleged assailant admitted to targeting the family because he believed the family was Chinese and infecting people with coronavirus. The assailant was charged with three counts of attempted capital murder and one count aggravated assault. (Source: The Daily Beast)

- March 13 – Pasadena, CA: A movie poster for Mulan was defaced with graffiti that depicted a mask over the titular character's face and the message "Toxic made in Wuhan." (Source: NBC News)

- March 13 - Miami, FL: (Date approximate) Video shows an elderly Asian woman being chased with a bottle of Purell and a man yelling, "Come here! You need some hand sanitizer. Sanitize your ass!" (Source: NextShark)

- March 12 – New York, NY: An Asian man was in a restroom at Penn Station when he was verbally harassed by a man who called him a "Chinese fuck" and said, "I hope you die by the coronavirus." The perpetrator also spat on the victim. (Source: Patch)

- March 12 - Queens, NY: Police arrested Raoul Ramos and charged him with aggravated harassment as a hate crime after he allegedly harassed and pushed a 47-year-old Asian man who was walking with his 10-year-old son in the Forest Hills neighborhood. Ramos approached the pair and started screaming, "Where the [expletive] is your mask?" He also referred to them as "You fucking Chinese." (Source: New York Post)

- March 12 - Albuquerque, NM: (Date approximate) At the University of New Mexico, an international student from China returned to his dorm room in Lobo Village to discover plastic covering his door and a sign that read, "Caution, Keep Out, Quarantine." (Albuquerque, NM). Source: KOB 4

- March 12 - Albuquerque, NM: (Date approximate) Kay Bounkeua, Executive Director of NM Asian Family Center, told local news that while walking into her office building someone on the street yelled at her to "go back" to where she came from. (Source: KOB 4)

- March 12 - Milwaukee, WI: Komeng Yang recounted in a Facebook post that people on the bus avoided him and kept their distance "because of the fear of the virus." After he sneezed because of pollen from a passenger's flowers, someone allegedly said, "Kick him off the bus." (Source: Facebook)

- March 11 - Seattle, WA: A student at the University of Washington told reporters that he had been harassed the previous week while commuting on the light rail to school. According to Kim, another passenger yelled at him about Chinese people bringing diseases to the United States. (Source: Crosscut)

- March 11 - Washington DC: A Cambodian-American man was at a 7-Eleven when a fellow customer called him a "chink" multiple times. (Source: NextShark)

- March 10 - Charlottesville, VA: The Mainland Student Network at the University of Virginia reported that two Chinese international students were attacked by assailant(s) who threw raw eggs at them from a moving vehicle. (Source: Facebook)

- March 10 - New York, NY: NYPD arrested a 13-year-old boy and charged him with assault and aggravated harassment as hate crimes after he approached a 59-year-old Asian man from behind and made anti-Asian statements. The boy allegedly told the victim to "go back to his country" and mentioned the coronavirus. He also kicked the victim. (Source: CBS-NY)

- March 10 - New York, NY: An international student from Korea was assaulted while entering a building on West 34th Street. The suspect asked her, "Where's your (expletive) mask?" She then proceeded to grab the victim by the hair and punch her in the face. The woman allegedly also told the victim, "You've got coronavirus, you Asian (expletive)." NYPD is investigating the assault as a possible bias crime. (Source: ABC-NY)

- March 10 - New York, NY: Ed Park wrote in The New Yorker magazine that "a young black man" told him "Get the fuck away from me." Park asked the man, "Are you talking to me?" and the man responded: "Yes, you, fucking Chinese motherfucker, don't fucking get me sick." Park is Korean. (Source: The New Yorker)

- March 9 - San Francisco, CA: A woman told reporters that while walking to the gym she was harassed by a man who shouted expletives about China at her and encouraged a passing bus to "run them over." The man then spat at her. (Source: New York Times)

- March 9 - Fresno, CA: An Asian man's car was vandalized with the message "Fuck, Asions [sic] and Coronyvirus [sic]." (Source: ABC 30)

- March 7 - Syracuse, NY: At Syracuse University, a flier with information about preventing the spread of the coronavirus was vandalized with racist language targeting Chinese people. (Source: The Daily Orange)

- March 7 - New York, NY: A 13-year-old boy spat at a 59-year-old Asian man and allegedly saying Chinese people have COVID-19. The same boy attacked the same man again on March 10 in a similar incident. (Source: CBS-NY)

- March 6 – Cumberland County, PA: A passerby on campus harassed and hurled racist insults at an Asian-American student at a local college. (Source: Reported to ADL)

- March 6 - Garden City, CA: Two students at Bolsa Grande High School filmed themselves verbally harassing and mocking Vietnamese-American classmates, yelling "coronavirus" at them during an International Week assembly. (Source: OC Register)

- March 4 - Brooklyn, NY: Video shows a man on the subway arguing with a fellow passenger, who is Asian, and then spraying Febreze air freshener on the Asian passenger. (Source: ABC-NY)

- March 1 - New York, NY: An Asian man was standing on the street smoking a cigarette when someone threw a bucket of water on him, resulting in a physical altercation. Source: NextShark

- Early March – Los Angeles, CA: A woman reported that a man followed her while she was jogging, and shouted that because she is Chinese, she was to blame for bringing the virus to the United States. (Source: Los Angeles Times)

- Early March – Orange County, CA: It was reported in an op-ed that in early March, an Asian-American fourth grade student's classmates

accused him of having coronavirus. (Source: Los Angeles Times)

**February**

- February 27 - Philadelphia, PA: A young man and woman were physically assaulted by a group of juveniles at a SEPTA station in what appears to be a racially motivated anti-Asian attack. (Source: NextShark)

- February 22 - San Francisco, CA: An elderly Asian man was physically assaulted while collecting recyclables near a housing project. The incident was filmed and shared widely on social media. In the video, one person can be heard saying, "I hate Asians." Dwayne Grayson was arrested on suspicion of robbery, elder abuse and committing a hate crime, as well as a probation violation for an earlier robbery. (Source: San Francisco Chronicle)

- February 13 - Los Angeles, CA: In the San Fernando Valley, a 16-year-old student, who is of Asian descent, was physically assaulted by classmates due to coronavirus fears. (Source: CBS-Los Angeles)

- February 12 - Plymouth, IN: Kao Lor and Lee Lor, both of Hmong descent, were traveling through Indiana and tried to get a room at a Super 8 Motel. The Super 8 employee asked Lor if he was Chinese. When Lor asked why he needed to know the employee responded, "Because of the coronavirus going around. And anyone from China, I am told, has to be picked up and quarantined for two weeks." (Source: WBND)

- February 5 - Los Angeles, CA: An eighth-grade Asian-American student at Walter Reed Middle School was sent to the nurse's office after he started coughing from choking on water. After the nurse sent him back to class the other students teased him that he had coronavirus. (Source: FOX-Los Angeles)

- February 2 - New York, NY: An Asian woman was attacked in the subway station for wearing a mask. One witness said she heard a man call the

woman, who appeared Asian, a "diseased bitch." (Source: CNN)

- February 1 - Los Angeles, CA: An Asian woman was subjected to an anti-Asian xenophobic rant about the coronavirus from another passenger while taking the Metro. The man stated that "Every disease has ever come from China, homie. Everything comes from China because they're fucking disgusting." (Source: Twitter)

- Early February – Pasadena, CA: Chinese-American actor Tzi Ma reported that in early February a man yelled at him, "You should be quarantined." (Source: Good Morning America)

**January**

- January 26 – Bellevue, WA: A man's son, whose mother is Asian, was told to "get away" from a food sample table at a Costco because "he may be from China" (Bellevue, WA). Source: Twitter

- January – Jersey City, NJ: The NJ Patch reported that in January, a man approached an Asian woman on the street and told her to "Go back to China" and referred to her with an anti-Asian slur. He also spat in her direction. (Source: Patch)

# Exhibit Q

**THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS IN CHINA**

简体中文 (Simplified Chinese)        繁體中文 (Traditional Chinese)



## Purpose of this Website

Many individuals from the People's Republic of China (PRC) have joined The Church of Jesus Christ of Latter-day Saints while living in other countries. Chinese language congregations are now found in many countries.

Many of these Chinese members remain where they have been working or studying, but many also return to China and may not understand how they should comply with Chinese laws in relation to religious practice.

This website seeks to answer "Frequently Asked Questions" by PRC Church members outside China and by Church leaders who work around the world with those members. It gives needed basic information for PRC Chinese members returning to China, including whom to contact for information, attending Sunday Church meetings and encouragement to observe relevant Chinese laws. Also provided are links to online Church resources in simplified Chinese.

Over the years, the Church has built a strong relationship of trust with the People's Republic of China by always respecting the laws and traditions of that country. The Church teaches its members in each country to obey, honor, and sustain the law, to be good parents and exemplary citizens, and to make positive contributions to society.

## Recent Questions and Answers:

### If I am thinking of returning to China can I still contact with other members?

Members in China will carefully follow China's guidelines on activities and travel.  Members are encouraged to be prudent, safe and strictly comply with local requirements.  Please follow publicly available information on current conditions and requirements.

### I am concerned about family and friends.  How do we encourage, support and help each other?

We can always provide comfort, hope and encouragement to each other.  Appropriate, safe and permitted contact with each other can be a source of mutual peace and love.

### I am an expatriate considering traveling or returning to China.  Can I contact with other expatriate members there?

All members should be prudent, safe and strictly comply with laws and local requirements. Please monitor carefully publicly available

information on conditions and any changes to current requirements.

# Frequently Asked Questions by Church Leaders and PRC Chinese Members Outside China

### I am a PRC Chinese member living overseas. Whom should I contact as I prepare to return to China? ⌄

Please contact the China Administrative Unit (CAU) Director who is a local Chinese leader and helps take care of and directs the local members and local member congregations in China. He lives in Beijing. His email is: caudir@churchofjesuschrist.org. He will welcome you, answer your questions, connect you with your local leaders in China, provide times and places for Sunday meetings, and establish your Church membership in the right place.

### As a PRC Chinese member living overseas, when I return to China, can I attend Church on Sunday? ⌄

Yes. Local members meet on Sundays in various cities around China, led by local priesthood leaders, with local families and members of all ages, professions, and family situations.

### As a PRC Chinese member living overseas, will Sunday Church meetings in China be similar to or different from the ward/branch I attend now? ⌄

In fundamental spirit, Church scriptures, doctrines, and the gospel friendship of the Latter-day Saints are the same everywhere. Around the world, including in China, meeting places may be larger or smaller, rented, and closer or farther to where members live. But Chinese members returning to China will find a warm spirit, close feelings one to another, and mutual support, service, and love.

## How can Church leaders help Chinese members as they prepare to return to China? ⌄

Please let Chinese members returning to China know that they may have Church members among their family, friends, and acquaintances in China. Having much in common with other Chinese Church members will be a joy, comfort, and blessing. Please invite new Chinese members who are thinking of returning or planning to return to China at any point to contact their current bishop/branch president. For questions related to returning to China, Chinese members may contact the CAU Director.

## Who best answers questions asked by Chinese members living outside China? ⌄

New Church members everywhere are happy about what they feel and have found. They naturally want to learn everything they can about the gospel and the Church. They welcome being able to read God's scriptures, to explore churchofjesuschrist.org and other digital Church resources, and to attend Sunday meetings weekly with Church members. For some questions, your current bishop/branch president will have the answers. For questions related to your return to China, you may contact the CAU Director.

# Frequently Asked Questions by PRC Chinese Members Outside China

## What are the basic principles of the Church in China?  ⌄

The Church of Jesus Christ of Latter-day Saints teaches its members everywhere to lead Christ-like lives of faith, virtue, compassion, and integrity as indicated in the 13 Articles of Faith. One important tenet is for members to obey, honor and sustain the laws of the land. In countries around the world, including in the People's Republic of China, the Church teaches members to be good citizens and good parents.

## What is the status of the Church in China? Does the Chinese government know about the Church's presence in China?  ⌄

The Constitution of the People's Republic of China guarantees freedom of religious belief to its citizens. Religious practices, however, are subject to a variety of rules and regulations. It is important to understand these rules and regulations and how the Church works to follow them. The Church of Jesus Christ of Latter-day Saints is not one of the five recognized religions in China. Overall, because members of our Church have worked to follow government regulations, the Church has a good reputation and is respected.

## Are there any restrictions for the Church or its members in China?  ⌄

The Church follows established official guidelines for the activities of its members in China. Within established guidelines, Church

members are able to pursue personal individual belief and practice.

---

### I am a Chinese Church member living overseas. Can I introduce my family to attend Sunday meetings in China? Can my family be taught and be baptized? ⌄

Within guidelines, family members may be able to attend Sunday meetings, be taught, and be baptized. Please contact the CAU Director for further information.

---

### Can my friends be taught and baptized in China? ⌄

Not at present. Please contact the CAU Director for guidelines and further information.

---

### Are there any activities that I should pay attention to avoid? ⌄

Please do not distribute any Church literature or other religious materials; please do not seek to attend Church meetings with foreign Church members, and please do not set up religious-based social media accounts, blogs, microblogs, WeChat public number, video site internet accounts, etc., that could be misunderstood as trying to promote the Church in China. Church members can take only one copy of each Church magazine or Church material for personal use in China. To avoid any misunderstanding, please do not send Church magazines or Church materials by mail or through the internet.

---

### When did Sunday meetings for local Church members of The Church of Jesus Christ of Latter- ⌄

days begin in China?

After education or employment, Chinese baptized overseas returning to China have had Sunday meetings since the late 1990s.

---

Can a Church member receive a patriarchal blessing in China? ⌄

Yes.

---

Do Hong Kong, Macau or Taiwan members attend Church with foreign or local Chinese members in China? ⌄

Hong Kong, Macau or Taiwan Church members who live in China can attend local Church meetings. Hong Kong, Macau or Taiwan Church members who travel to China for business or tourist purposes should attend Church meetings with foreign members.

---

Do returning Chinese members meet with foreign Church members on Sundays in China? (For example, my foreign friend is also a Church member.) ⌄

No. Presently, there are no Church meetings held jointly with both foreign expatriate passport holders and local PRC Chinese members. The one exception is that PRC Chinese members who are married to foreign expatriate passport holders, and their children, may attend Church meetings held by foreign expatriate passport holders.

# Frequently Asked Questions by Church Leaders

## Can Church leaders/members outside China keep in touch with Chinese members baptized in their branch/ward after those Chinese members return to China? Email? WeChat? Letters?

Of course. It is natural for relationships among friends to continue. Friendships and associations with foreigners are not restricted in China, though Church meetings for foreign and local Church members are held separately in China, and local and foreign Church members do not meet together for Church. When a new Chinese member joins the Church, please include in their baptism record their home address in China, WeChat account and mobile number. This will help everyone keep in touch. Please do not send email or other messages to those who are not members of the Church or whom you do not know personally. Obey the rules of internet usage. For example, some social websites are not allowed to be used in China.

## Can we send the Liahona or Church magazines to Chinese members when they return to China?

Church members can take only one copy of each Church magazine or Church material for personal use in China. To avoid any misunderstanding, please do not send Church magazines or Church materials by mail or email.

## Some Chinese members have gone away for holiday or school break and thereafter have not yet returned to Church. What can we do?

This is natural when students and others are moving about all the time. Having a social or other point of contact set before the holiday or break can give everyone a method and time for continuing communication.

## What Church materials are currently available in Chinese? ⌄

The scriptures – Holy Bible, Book of Mormon, Doctrine and Covenants, Pearl of Great Price – are all available in Chinese. Church magazines and basic Church curriculum are available in Chinese. Chinese materials can also be accessed through Gospel Library App.

## What can Chinese members expect when they return to China? ⌄

Sometimes seeing once is better than hearing a hundred times. Invite Chinese members preparing to return home to find out as much as they can from the CAU Director, current bishop/branch president, local Chinese members, and others. This way returning Chinese members can feel confident and know what to expect.

## How can Church leaders help Chinese members prepare to live gospel covenants when they return to China? ⌄

Please help new members prepare for their coming transitions, for example, by emphasizing the importance of continuing to live the Word of Wisdom. Please be understanding and kind, and follow good judgment as you counsel together.

## In countries outside China where many Chinese members live, are multi-unit Church activities for Chinese members appropriate? ⌄

Yes, in countries outside China where large numbers of Chinese members live, Church leaders can organize Institute classes, Young Single Adult conferences or devotionals, outings or activities around Chinese holidays (such as the lunar New Year), etc. With appropriate Church leader coordination, these activities can be organized on a ward/branch, stake or multi-stake, or even a country or area basis.

## How can Church leaders help new Chinese members when they first join the Church? ⌄

New Church members everywhere need gospel friends, Church opportunities to serve and grow, and continued spiritual nourishment. New Chinese members appreciate opportunities to feel the faith and fellowship of Church members each Sunday at Church. They like to meet other Chinese Church members. Continuing to study and deepen their testimony of the Book of Mormon is important.

## Some Chinese members ask how to deepen their faith in and understanding of God and Jesus Christ? ⌄

Everyone wants a happy and eternal family. In the quiet reflective moments – a beautiful sunrise, a baby's smile, a challenge such as death – we sense there is order and meaning in life beyond what we see. In those moments, God's existence, life's purpose and direction, etc., become clear. Humble reflection and contemplation deepen our love for God, and the love we feel from God. Studying, asking with real intent, and listening with an open heart can deepen faith, and our willingness and desire to follow the truth we feel.

Any suggestions for helping Chinese members outside of China who are busy in school feel part of our branch/ward, including where language or cultural differences may exist?  ⌄

Church leaders everywhere are considerate of student examination, study, and work circumstances when arranging Church activities and service opportunities. Church leaders also know different individuals enjoy different activities – social, athletic, gospel-living, hobbies, etc. Sharing food, holidays, and other special occasions enriches everyone.

What counsel can a Church leader give when a Chinese Church member is preparing to return to China, in circumstances where this member's home in China is some distance from the Sunday Church meeting place?  ⌄

Chinese Church members meet in organized Sunday meetings with local Chinese leaders in various locations throughout China.  As is true in every country, some Church members live farther from meetings places and need to travel for Sunday meetings.   Faith and sacrifice bring blessings. The love and concern of local Chinese Church leaders and fellow members are not limited by distance or geography.

# Non-Chinese Members Visiting or Moving to China

I am an expatriate (someone entering China on a foreign passport) visiting or moving to China. Whom  ⌄

foreign passport, visiting or moving to China. Whom should I contact about attending Church?

For foreign expatriates (foreigners entering China on a foreign passport) please see Meetinghouse Locator in churchofjesuschrist.org for several international district meeting locations and contact information. For other questions, please email bcidclerk@gmail.com. Your email will be directed to an expatriate Church leader who can provide Sunday Church times and places where expatriate Church members are permitted to meet. If you are an expatriate member moving to China, you will be directed to an expatriate priesthood leader for the area in which you plan to live. Please remember, in China, expatriate members and local Chinese members meet separately. (Hong Kong or Taiwan Church members, please refer to the related question above: "Do Hong Kong or Taiwan members attend Church with foreign or local Chinese members in China?")

## What general conduct is expected of expatriate members of the Church while living or visiting China? ⌄

Expatriate members living in or visiting China should be aware of the unique limitations on religious activities in China.  While China permits freedom of religious belief, all religious activities in China need to comply with relevant laws and regulations. Some of the key limitations of which you should be aware include:  members may not engage in active or passive proselyting among China nationals;  only individuals who hold foreign passports, and their spouses, may attend meetings or other activities with expatriate members in China; expatriate members are not permitted to participate in religious activities with Chinese nationals, whether or not they are members of the Church; and religious materials may not be disseminated to Chinese nationals in China. Observing these guidelines helps support our efforts to build a foundation of trust with government authorities and enables us to continue to meet together as the government now permits us to do.

# Frequently Asked Questions About Sharing the Gospel Online with PRC Citizens

### As online missionaries we are asked to share the restored Gospel of Jesus Christ with everyone. Does this now include people in China?  ⌄

Thank you for your faith and dedication. Appropriately implemented, online proselyting can help hasten the work of salvation.

However, online proselyting should not cross international borders into countries where the Church has chosen or agreed not to proselyte. This currently includes the People's Republic of China.

Please refer PRC citizens living outside of China interested in learning more about the Church to the Church website china.churchofjesuschrist.org.

### As online missionaries, we sometimes find investigators who live far from established Church units. What should we do?  ⌄

To help establish the Church in ways appropriate to local circumstance, missionaries involved with online proselyting which crosses international borders should refer international online investigators to the mission and missionaries where the online investigators live.

This united effort to teach international investigators where they live will promote local friends, opportunities to serve, and long-term gospel nurturing.

It will also promote needed coordination in cases where online investigators may move to different locations, including between

locations where the Church is free to proselyte and locations where the Church has chosen or agreed not to proselyte.

---

## We often have Chinese online investigators who return to the People's Republic of China. We would like to remain in contact with them. Can we continue to work with them over the internet? ⌄

Online proselyting should not cross international borders into countries where the Church has chosen or agreed not to proselyte. This currently includes the People's Republic of China.

---

## Chinese online investigators who are living outside the People's Republic of China want to share the gospel with family members and friends who are living in the People's Republic of China. May they do so over the internet? ⌄

Generally, online proselyting by missionaries or members should not cross international borders into countries where the Church has chosen or agreed not to proselyte. This currently includes the People's Republic of China.

Guidelines for those who desire to share the gospel with family or friends that are provided on china.churchofjesuschrist.org should be applied in these situations.

---

## Recently baptized members are returning to the People's Republic of China. May we continue to teach them after-baptism lessons and continue to fellowship them online after they have returned to China, or should we help them contact the CAU Director? ⌄

Encourage new members to contact the CAU Director. He will help them contact their local leaders. If there is a new member that has special needs or circumstances, you may also contact the CAU Director with that information.

## May I communicate with Chinese non-members living in the People's Republic of China who contacted me over the internet? ⌄

Online proselyting should not cross international borders into countries where the Church has chosen or agreed not to proselyte. This currently includes the People's Republic of China.

# Online Resources

- General Conference

- Liahona

- Articles of Faith

- The Living Christ: The Testimony of the Apostles

- The Family: A Proclamation to the World

- Mormon Channel

# Exhibit R



# This US church with expansion in its DNA wants to open a temple in China

By James Griffiths, CNN

Updated 11:14 PM ET, Thu June 11, 2020

**Hong Kong (CNN) —** Every Sunday, when members of the Church of Jesus Christ of Latter-day Saints (LDS) meet in the conference room of a blue-glass skyscraper in downtown Shanghai, one person always takes a seat right at the back, by the doors.

They are there to intercept the wrong person coming in. This is not to protect any religious mysteries; Mormonism is not a particularly secretive faith and usually seeks out new converts, but because if a Chinese passerby were to join the service, it could mean all those taking part were breaking the law.

There are only five state-sanctioned religious associations in China, all under the tight control of the Communist Party. Others walk a delicate legal tightrope, with the threat of a crackdown always hanging over their heads. While the government tolerates foreigners practicing their religion and attending services together, it takes a hard line against anything approaching proselytising or missionary work, a prohibition the Mormon Church takes seriously.

"We have to ask to see if they have a foreign passport to attend," said Jason, a lifelong member of the Church who worked in Shanghai for almost a decade until relocating back to the United State in 2018. "I have frequently been this person watching the doors and on many occasions I have sadly had to turn away Chinese citizens who wished to worship with us."

And that is during the good times. In recent years, the Chinese government has increased its regulation of religious worship, launched crackdowns against underground churches and instituted new restrictions on those faiths which operate in the grey area of only catering to foreigners.

So the Church's announcement on April 5, that it plans to open a temple in Shanghai, the first ever in mainland China, was seen by some as a bold decision.

The Church claims it won't change anything, but the idea that a US church with expansion in its DNA could open an official temple in China is likely to be controversial -- and may not be allowed by Beijing. Already, authorities in Shanghai have suggested that the announcement was made without their prior approval, even as experts said the Church would likely never have revealed the plans without a clear go ahead.

In Salt Lake City, Utah, the spiritual headquarters of the US-based Church, Jason "could hardly believe" the news.

"I couldn't have imagined that we would ever have a temple in Shanghai at this time," he said. "Immediately, my WeChat started lighting up as we were all expressing joy and excitement with our China friends."

Jason is a pseudonym. Like several other current members of the Church interviewed for this story, he requested anonymity to speak about its functioning in China without the permission of Church leadership.

The Church of Jesus Christ of Latter-day Saints declined multiple requests for an interview for this story, referring CNN to a website about its operations in China and President Russell Nelson's statement on April 5.



Members watch as Russell M. Nelson President of the Church of Jesus Christ of Latter -Day Saints, makes an announcement in January 2017. Nelson said this April that the Church will open a temple in Shanghai.

## In the beginning

Founded in upstate New York by Joseph Smith in 1830, it took the Mormon Church some 117 years to grow from six initial members to its first million. Today, it claims more than 16.5 million members globally, with most outside the US.

While the true size of the church is debated (some say they include members who are no longer active) one thing is clear: the massive growth of the Church has been achieved through the work of thousands of missionaries.

Smith said he received a revelation in February 1831, in which God told his followers to "go forth in my name, every one of you" and "build up my church in every region."

That is how the Church arrived in China over a century and a half ago.

Its start in the country, however, was less than auspicious. In 1853, its then-leader Brigham Young dispatched three missionaries to British-controlled Hong Kong, then a common staging ground for those seeking to spread the gospel in China.

When they arrived, however, they realized that China was in the midst of a bloody civil war, making travel outside of Hong Kong exceptionally dangerous. Their reception in the city was not much better, as the English-language press ran lurid articles about the Mormon faith and accused the faith of blasphemy. Their funds running out, they struggled even to find a Chinese teacher.

"Our staying here to learn the Chinese language without one friend or one possible recourse to us appears totally impractable (sic)," the missionaries wrote in a letter to church leaders as, less than two months after they had arrived in Asia, they boarded a ship bound for California, historian Stephen Prince recounts in his biography of one of the missionaries, Hosea Stout.



A sign outside the Hong Kong China Temple of the Church of Jesus Christ of Latter-day Saints in Kowloon, Hong Kong.

It was not until 1949 that the Church established a permanent presence in Hong Kong, with the intention again of using the city to get a foothold into China.

"Nearly one billion of our Father's children live in China," then-President Spencer Kimball said in 1978. "If we could only make a small beginning in every nation, soon the converts among each kindred and tongue could step forth

as lights to their own people."

Beginning in 1980, Church leadership began reaching out to the Chinese authorities to try to get permission to operate in the country, and in 1986, small church branches -- meeting houses -- were organized in Beijing and Xi'an, though only those holding foreign passports were permitted to attend. According to the Church, today there are around 10 meeting houses across mainland China. By comparison, there are around the same number in Hong Kong alone, and more than 50 meeting houses in self-governed Taiwan, where the Church claims around 61,000 members.

Despite this apparent lack of progress, Church leaders say they have built a strong relationship with the Chinese authorities, and in 2010 they announced moves to "regularize" their activities in the country.

"The Church deeply appreciates the courtesy of the Chinese leadership in opening up a way to better define how the Church and its members can proceed with daily activities, all in harmony with Chinese law," spokesman Michael Otterson said at the time. "They have become thoroughly familiar with us through numerous contacts, and they have seen how we and our members operate in China. They know that we are people of our word when it comes to respecting Chinese law and cultural expectations."

Currently, two types of Mormon worship are permitted in China: services for foreign nationals, and services for Chinese nationals who converted while overseas. The two are kept separate, and the Church is careful to avoid any sign of seeking to expand its Chinese membership within the country. Unlike with other countries in which it operates, however, the church does not provide membership figures for China.

# Building trust

The Chinese Communist Party has always had an uneasy relationship with religion. The state is officially atheist, and the tens of millions of Party members are barred from holding religious beliefs.

Despite a constitutional commitment to religious freedom, only a handful of faiths are permitted to operate, each under umbrella organizations with strong links to the Communist Party.

Two are considered domestic faiths -- Buddhism and Taoism -- while the others are foreign religions, with varying historical pedigrees in the country, Islam, Protestantism and Catholicism, though Chinese Catholic organizations operate separately to Rome.

Other religions fall into a grey area: the State Council says it is "open" to foreign organizations -- but only if they respect China's sovereignty and principle of religious self-administration.

In practice, this means religious bodies' first loyalty must be to the Communist Party, not a foreign Church leadership. This point has caused a long-standing rift with the Vatican since the establishment of the People's Republic, and Chinese Catholics operate separately to the global church, though some progress has been made towards rapprochement in recent years.

Despite this, religious practice is on the rise. But alongside this growth in belief has come increased suspicion of "foreign" religions, particularly Islam and Christianity (though both have long-histories in China). Muslims in the far-western region of Xinjiang have had their religious practices strictly curtailed, while underground Christian churches, once broadly tolerated, have been cracked down upon.

Indeed, around the time Nelson was making the announcement of the new temple, International Christian Concern, a US-based advocacy group, said that believers holding Easter services online were raided by the authorities. Local police could not be reached for comment, the Early Rain Covenant Church which organized the service is considered an "underground," or unlicensed, operation and has previously been ordered to cease activities, according to Human Rights Watch.

"The Chinese government is very suspicious of religion as a vehicle for potential political opposition," said William Nee, a Hong Kong-based researcher for Amnesty International.



A statue of Brigham Young, second president of the Church of Jesus Christ of Latter-day Saints stands in the center of Salt Lake City, Utah with the Mormon Temple spires in the background.

Pierre Vendassi, an expert on Christianity in China, said that the government "is mainly trying to take back the control over religious activities, and uses full force to do so, after a period of time when people could almost freely opt for unregistered, unmonitored religious activities, without facing any consequences, most of the time."

"Now the message is clear: either accept state control, monitoring and restrictions, or face state hostility," he said. "For the Christian activities, the purpose is to get house churches and Catholic underground church back under control."

As far as non-official faiths go, the Mormon Church is perhaps the gold standard for such a group in China. Current and former members, as well as outside observers, agreed that the Church is scrupulous about following Chinese law and avoiding anything that could be seen as proselytization.

Nee contrasted this with "other forms of Protestant Christianity or evangelical traditions coming out of the US, who have a much more aggressive or underground strategy for spreading the faith."

Sarah, a Mormon who worked as a university professor for several years in China, said she "did not tell people what church I belonged to or even if I belonged to a church."

"Some friends would ask me if I was Christian. I would say yes (but) we do not talk about it in China," she said. "They would nod and agree. That is as far as the conversation would go."

Marcelo Gameiro, a Church member living in Shanghai, said that he does not talk about the church "because it is against the law."

"But I don't hide (that) I am a member of the church," he added. "When I was in Huzhou, I used to go to the Hangzhou branch, it took me three hours to get there, and people started to notice I was going somewhere every

Sunday dressed in a tie, so I did tell them where I was going with no problem, I just did not preach the gospel to anyone."

Sarah said she would "occasionally see Christian religious groups that would come in and rather openly flout the rules of China." Korean students would get scholarships in China and then try and convert their classmates.

"Several times I talked to them about it, I asked is this the right thing to do, are you making a good example," she said. "I heard from Chinese people who got rather angry because people would come from other countries and give away Bibles and start conversations about religion, and they would say we are not allowed to talk about this in China."



A screenshot of a dedicated website set up by the Church of Jesus Christ of Latter-day Saints for members in China.

## Playing the long game

John Wakefield, a now ex-Mormon who came to Hong Kong as a missionary in the 1980s and still lives in the city, said a big part of the Mormon religion is "we're going to convert the whole world" and that it's the fastest growing church in the world. "For them, numbers are really important," he said.

Another former Mormon, Bryce Bushman, who lived in China for almost four years, where he worked as an urban planner and designer, said that: "Mormon doctrine states that the LDS Church will eventually cover the whole Earth."

"It's considered a prophecy, something that is definitely going to happen at some point in the future," he said. "This gives both the church organization and the members of the church a kind of patient confidence that eventually every nation on earth will allow Mormon missionaries to proselyte and establish church congregations."

Mormon doctrine also permits "baptisms for the dead," allowing for the potential salvation of those already deceased, who can then "choose to accept or reject what has been done in their behalf." This alleviates somewhat the need to spread the word of Jesus to people before they die, has been stated as a motivation for some evangelical missionaries to take great risks in the name of saving souls.

This patience allows the Church to play the long game in China, confident that one day it will be able to bring its message to the country's vast population.

Josh Steimle, a practicing Mormon who lived in the Chinese city of Shenzhen for two years, said it "would have been so easy to pass along the URL to a Church website to someone who was curious, or give them a Book of Mormon, or a pamphlet about the Church."

"It was very difficult because we're a Church that believes in sharing what we believe, and we're always being encouraged to be good missionaries, and then to move to China and be told to not say a word about what we believe seems to be contrary to everything we've been taught," he added. "But it's all about the long term vs. the short term. If we shared our beliefs in violation of Chinese law, a few people might join our Church and then the Church would be shut down and kicked out of the country."



A woman decorates a grave during the Qing Ming festival, also known as Tomb Sweeping Day, at a cemetery in Shanghai on April 6, 2018. Traditional religious practice is growing in China, but the government tightly controls foreign faiths.

## Temple doctrine

On paper, a temple should not be too much for the Chinese authorities to stomach.

In its description of the proposed temple in Shanghai, the Church is clear that this does not represent a climactic shift, nor will the Chinese temple be anything like the grand white stone buildings that dot many American cities.

"It would be modest in appearance. It would fit and be consistent with local custom and environment as a place of peace, tranquility, and dignity," the Church said of the proposed temple, which it said is intended to serve as a replacement for the Hong Kong building, which is currently closed for "long-planned maintenance and renovation."

It said that entry will be limited to Chinese members of The Church of Jesus Christ of Latter-day Saints -- those who have converted overseas and returned to China -- adding that this "does not represent a change in the legal status" or the ability of missionaries to operate in China.

Unlike a regular church, Mormon temples are not open to non-members, and even those within the Church must be considered in good standing and receive a "recommend" from a Church official in order to enter.

While the Church appears to be downplaying the significance of a potential temple, all current and former members interviewed by CNN agreed that it would be a major achievement.

Steimle said that it was "difficult to express how big of a deal this is for me, personally, other members of the Church who have ties to China, and really to the entire Church membership worldwide. It's going to be a very small temple, but it's a huge thing for the Church."

Temples are where the most important and sacred Mormon ceremonies are carried out, including baptisms and "celestial marriages."

If established, the temple would not be the first active place of worship in Shanghai for an unofficial religion. In recent years, limited services have been held at the Ohel Rachel Synagogue, a historic building that predates the establishment of the Communist state. Most Jews in China however continue to practice behind closed doors, in arrangements similar to Mormon meeting houses.

Whether Mormons in China will be able to get nearer to that presence remains to be seen. In a statement issued two days after the Church's announcement, the Shanghai Municipal Bureau of Ethnic and Religious Affairs said that "according to the relevant laws and regulations of China, foreigners are not allowed to set up religious organizations or venues for religious activities in China."

The bureau denied any knowledge of plans for a temple in Shanghai, saying they were the "wishful thinking of the Mormon Church in the United States."

When CNN asked the Church about the current status of the project, a spokesman would only provide a link to the Church's website detailing plans for the temple and how it would operate. Church representatives would neither confirm nor deny the veracity of the original statement announcing the temple. However, since reporting on this story began, reference to the Shanghai temple has been removed from the Church's website, though it is still available on an archived version of the page.

Vendassi, the expert on religion in China, said that despite this apparent denial by the authorities, a temple may still end up opening at some point in the near future.

"If an LDS temple has been announced in Shanghai, I think it means they probably had a 'go' from Chinese officials to do so," Vendassi said. "Even if the government says it is a unilateral statement -- they actually have no interest in making a bilateral statement, because that would send a message of religious openness."

Nee, the Amnesty researcher, said that while there was no reason on paper for the Chinese authorities to object to a temple, he doubted whether officials "would be willing to understand the nuances of religions and their theologies" in order to permit such an institution.

As a uniquely American religion, Mormonism's hopes in China may also be hurt by worsening relations between Washington and Beijing. In the same month the Shanghai temple was announced, Senator Mitt Romney said the coronavirus pandemic had exposed China's "grand strategy for economic, military and geopolitical domination."

Romney is by no means alone in criticizing Beijing, but as the country's highest-ranking elected Mormon, his words may carry more weight with China's leaders when they are considering the Church's position there.



Over 20,000 members of the Church of Jesus Christ of Latter-day Saints and the Tabernacle Choir at Temple Square sing a song together at first session of the 189th Annual General conference of the church at the Conference Center on April 6, 2019 in Salt Lake City, Utah.

## China change

If the Mormon Church does have to exercise more patience before they open a temple in mainland China, what are a few more years or decades after a century and a half?

Responding to a question of when China would be open to missionaries in 1991, Elder Dallin Oaks -- a senior Church leader -- said that "I state my belief that China is already 'open' -- it is we who are closed ... We must understand their way of thinking ... observe their laws, and follow their example of patience."

Quoting Mormon scripture, Oaks added that God "will bring His purposes to pass in that great nation 'in his own time, and in his own way, and according to his own will'."

Mormons who lived in China spoke of the country with great fondness, despite the restrictions placed on how they worshipped there. Both Jason and Sarah keep in contact with Chinese friends over WeChat, and hope to visit again in future.

Sarah saw many parallels between China and the Mormon people, pointing in particular to the importance of venerating ancestors in Chinese culture.

"My ancestors are special to me," she said. "Many of them joined the Church of Jesus Christ of Latter-day Saints while our first leader, Joseph Smith, was a prophet. Like the people of China who went on the (Long March), my people also traveled across a continent in search of their dream."

Two of Jason's four children were born while the family was living in Shanghai, and the kids went to local Chinese schools. Jason and his wife made a concerted effort to integrate into Chinese life more than many other expats

around them, doing "many things that few foreigners experience in China."

"We didn't speak any Chinese when we came but we did when we left," he said. This brought him closer both to locals and to other members of the foreign Mormon community who weren't as comfortable operating in China.

"I can't possibly begin to count the number of people we had over for dinners, the people we took shopping because everything the supermarket was unfamiliar, how many people we helped to simply get a Chinese phone number and register for WeChat, both for members of our Church and those who were not."

Both were optimistic about the future of the Church in China, but emphasized the need for patience, a view shared by Steimle.

"Great progress usually doesn't happen in a straight line," he said. "Although there have been crackdowns on religion in China, perhaps the obedience of our members and the trust and friendship our Church leadership has built up over the years by working openly with the Chinese government will help open doors."

*This story has been updated to clarify which foreign students were allegedly seen proselytizing in China.*

Search CNN...

US

World

Politics

Business

Opinion

Health

Entertainment

Tech

Style

Travel

Sports

# Exhibit S

Always free. Subscribe

News   Election 2020   Politics   Education   Housing   Immigration   Criminal Justice   Silicon

---

**NEWS**

# WeChat Ban and SF's Chinatown: How Trump's Plan Could Hurt Housing Rights Campaigns

 **LISTEN**   13 min

By Joe Fitzgerald Rodriguez   Aug 24

 



Protesters marched for Veritas tenants in a demonstration organized on WeChat in 2019. *(Courtesy of Tenants Together)*

"*Renters fight rent hikes!*"

Those words streaked across the social media sphere in San Francisco in September last year. But they weren't read in English, and they weren't sent on Facebook, Twitter or even NextDoor.

No, the slogan was written in Chinese and sent on the world's third-largest mobile messaging app: WeChat.

Voice-memos, photos of picket signs and long text chains for scheduling purposes sent by the Chinese Progressive Association on WeChat bore fruit. Monolingual-Cantonese speaking Chinese tenants joined other organizers on the streets against San Francisco's largest landlord, Veritas — which operates more than 250 buildings in the city — to protest rent-hikes to pay for construction.

Now that organizing tool is threatened.

Sponsored

---

**'In campaigning, especially since it is not safe to proactively go out and meet people face to face, WeChat is one place to organize and meet the community where they are.'**
**—Marjan Philhour, a candidate for San Francisco's Board of Supervisors representing the Richmond District**

President Donald Trump issued an executive order in early August that may lead to a ban on social media giants TikTok and WeChat on Sept. 20, because he says the two Chinese companies pose a threat to national security. A nonprofit group, the WeChat Users Alliance, filed a suit against the Trump administration Friday to halt his ban, calling it a violation of constitutional rights and claiming it targets an oft-marginalized group, according to The Hill.

Certainly, WeChat has drawn critique from even its own community, having censored messages in China — including reportedly suppressing political speech and blocking keywords surrounding the COVID-19 pandemic.

But the Chinese Progressive Association, grassroots organizers and politicians agree that in San Francisco, a ban on WeChat would hamper a major communication tool within the monolingual Chinese community, particularly in one of the city's most cherished neighborhoods: Chinatown.

# Pillar of the Community

San Francisco's Chinese community reads, watches and listens to the news in their own language and dialects: newspapers like Sing Tao Daily and the World Journal, or broadcast entities like Sing Tao Chinese Radio and TV station KTSF.

Because Chinatown is often a key first stop for recent Chinese immigrants who may not know English, those media outlets are depended on to inform a community who don't have access to the San Francisco Chronicle, the Examiner or even KQED, for that matter.

"Chinese media, I think not just in San Francisco, but in the Bay Area, I think plays a crucial role in how the monolingual immigrant community gets their information," said Malcolm Yeung, executive director of the nonprofit Chinatown Community Development Center. "For as long as I've worked in the community, Chinese media in some form or another has been the primary source of information for folks in the Chinese monolingual community in particular."





The Chinese Progressive Association's staff uses WeChat's voice memo function to directly message a Single Room Occupancy resident, Ah Ying, to bring their family to the Veritas rent passthrough march. The image in the chat is the Housing Rights Committee's march flyer, in Chinese. *(WeChat Screenshot)*

The monolingual and bilingual Chinese community, then, has its own media ecosystem. But in recent years, WeChat has emerged as its own pillar in that ecosystem.

After its launch in 2010, it started as a way for people to affordably communicate across the world, expanding in popularity in the Chinese community locally and in similar communities across the country.

But that popularity also fed the platform's growth in information-sharing, a change that paralleled new features in the app, including a Facebook-like "timeline."

Two candidates competing to represent San Francisco's Richmond District on the Board of Supervisors, Marjan Philhour and Connie Chan, both said they utilize WeChat to reach out to monolingual Chinese voters, an important community group in their campaigns.

"In campaigning, especially since it is not safe to proactively go out and meet people face to face, WeChat is one place to organize and meet the community where they are," Philhour said.

Much of that campaigning encompasses housing rights. Chan said her campaign often sends notifications about the city and state's eviction moratoriums to voters on WeChat. "That's been critical to a lot of new immigrants who are actually still fluent in Chinese," no matter how long they've been here, she said.

Mason Lee, a Chinese community liaison from San Francisco Mayor London Breed's office, said more members of the Chinese community reach out to Breed on WeChat than by phone or email. The Mayor's office often uses WeChat as a resource for small businesses or informing tenants about their rights.

The platform's growth is still historically new and has caught some off guard. Yeung said his organization, CCDC, recently completed a survey of families in the Single Room Occupancy developments they operate, which often house vulnerable, low-income families who live in single rooms but use shared kitchens and bathrooms.

"We always like to ask, 'Where do you get your source of information?' And for SRO families, it was shocking to me that more than half relied on WeChat for information, you know, versus Chinese media, which really kind of shows you the evolution and growth of the platform in our community," Yeung said.

And even as the platform grew as a news source, it grew as an organizing source as well.

## Organizing for Themselves

Since 1972, the Chinese Progressive Association has organized its community in Chinatown, and beyond, to push for better wages, protect tenants and advocate for themselves.

Nowadays, much of that organizing gets off the ground on WeChat. KC Ho, a community organizer at the Chinese Progressive Association, said the organization's dependence on WeChat goes beyond the occasional, simple two-way message.

"Over the years we've also grown our groups, and WeChat groups associated with us," Ho said. There are groups, within groups, within groups — all communicating to harness tenants' rights.

Chinese Progressive Association organizes 50 single room occupancy hotels in Chinatown, which each can house a dozen living units, or more than a hundred. They host group chats between tenants who are organizing their own buildings, and group chats with tenants across each building, too. The uses range from the mundane — like settling arguments with landlords — to the eventful, like the aforementioned rent hike protest.

So why not just use a new app?

Many people those organizations are reaching on WeChat are seniors who are slow to adopt new technology, organizers told KQED. So while adopting a new platform might happen, reaching wider adoption could potentially take years. Perhaps most importantly, the growth of WeChat in organizing was predicated on its use in people's personal lives, not the other way around.

*#Veritas* **protest w/ tenant community in** *#SanFrancisco pic.twitter.com/XPelRaA6v2*

▌ — *Council of Community Housing Organizations (@SF_CCHO) September 24, 2019*

Organizers rely on it so heavily, "It would be pretty devastating losing WeChat," Ho said.

Many older adults they work with don't use Facebook because they use WeChat, she said, and younger members they organize "don't care about Facebook."

---

**RELATED COVERAGE**

**SF Landlords of Single-Family Homes Can't Triple Rent to Force Tenants Out, Court Rules**

**Pandemic Loans Were Meant for Small Businesses. Why Did These Giant Property Firms Get Millions?**

**'Eviction Time Bomb': Over 40,000 Santa Clara County Renters Could Soon Face Eviction, New Report Warns**

Angela Zhou is one of those community members who organize using WeChat for the Chinese Progressive Association. She came to the United States from China in 2004 and used to live in the kind of SRO hotels that the Chinese Progressive Association organizes.

Now, Zhou said, she uses those skills to mobilize other parents around school issues. Her own son is 14, and her daughter is 20.

"We create WeChat groups for our parents for those schools with short messages, announcements so that parents can actually stay updated on what's going on. Because even if they get a letter from the school, it might be a really complicated and long message, so having

a quick group with short messages has actually been really helpful," Zhou said in Cantonese, with Ho translating for KQED.

Zhou relies on WeChat to turn out parents for protests and to ask for political support to advocate on their behalf. Losing the prominent social media platform wouldn't just hurt the community emotionally to no longer communicate with family overseas, she said, but would cut off an important organizing tool to fight for their rights.

SPONSORED

"It would really demoralize me and make it much harder to stay motivated to participate politically," Zhou said.

# KQED

## Stay in touch. Sign up for our daily newsletter.

Enter your email          Sign Up

Copyright © 2020 KQED Inc. All Rights Reserved.

Terms of Service   Privacy Policy   Contact Us

TV                    News                    Donate

Radio                 Science                 Help Center

Podcasts              Arts & Culture          About

Events                                        Careers

**For Educators**

**Corporate Sponsorship**

**Contact Us**



Copyright © 2020 KQED Inc. All Rights Reserved.

Terms of Service    Privacy Policy

Contest Rules    FCC Public Files

# Exhibit T

**The New York Times** | https://nyti.ms/2G2a1q5

# Instagram Is Changing Its Algorithm. Here's How.

**By Jacey Fortin**

March 22, 2018

Instagram is changing its algorithm to make things a little more timely.

Users are now likely to see newer posts higher up, the image-sharing app said in a statement on Thursday, adding that its feeds will "feel more fresh." Instagram's algorithm, in other words, won't be meddling quite as much. More images and videos will be allowed to bubble up as they come.

The company also said it was testing a "New Posts" button so that users can refresh their feeds when they want to, rather than automatically being transported to the top in the middle of browsing.

The changes are in response to user feedback. They appear to address some common gripes, like how certain posts can keep appearing on your screen for days and days and days, or how your feed can begin to feel skewed in favor of the same old friends you habitually double-tap.

"We did this via a number of changes, including an adjustment so that very old content does not get bumped up higher in feed," said Gabe Madway, Instagram's spokesman.

He added that the company was not returning to a chronological feed. As Instagram said in its statement (apparently addressing users in the Western Hemisphere): "If your best friend shares a selfie from her vacation in Australia, it will be waiting for you when you wake up."

Still, the move appears to dial back, even if only slightly, the major change that came in March 2016 when Instagram said feeds would be "ordered to show the moments we believe you will care about the most."

Instagram is one of several social media companies that are striving to find the right balance between arranging content chronologically and ranking it according to machine-learned impressions of relevance.

Twitter's feed is largely chronological — though it is has been known to experiment with ranking, sometimes irritating users — while Facebook, which owns Instagram, relies more heavily on algorithms, meaning well-liked content and posts from good friends tend to show up front and center.

"Instagram's feed ranking is powered by machine learning, which is constantly adapting and improving based on new data," Mr. Madway said. "But this is a nice change that people should notice."

Pew Research Center reported this month that Instagram use is higher than that of Twitter, Snapchat and WhatsApp, at least in terms of the percentage of Americans who say they use it. (By that measure, only Facebook and YouTube are more popular.)

Last year the company said it had 800 million users interacting with the app on at least a monthly basis.

# Exhibit U

VICE    Video    The 19th in 2020    The 8:46 Project    News    Tech    Music    Food    




IMAGE: CATHRYN VIRGINIA

**MOTHERBOARD**
TECH BY VICE

# How Twitter Sees Itself

Multiple current and former Twitter employees, including executives, explain how Twitter really positions itself and its responsibilities around moderating speech.

 By Jason Koebler         By Joseph Cox

October 7, 2019, 6:00am    Share    Tweet    🔖 Snap

In leaked audio published by The Verge last week, Facebook CEO Mark Zuckerberg said Twitter can't do as good a job at policing its network as his own company.

"I mean, they face, qualitatively, the same types of issues. But they can't put in the investment. Our investment on safety is bigger than the whole revenue of their company," Zuckerberg said in a July Facebook meeting.

Facebook may indeed be much bigger than Twitter, but budget is not the only reason the two companies' approaches to content moderation, such as policing hate speech and harassment, are drastically different.

ADVERTISEMENT

Rather than act decisively by banning certain types of behavior and allowing others, Twitter's policy and engineering teams sometimes de-emphasize content and allow users to hide content that may be offensive but not explicitly against the platform's terms of service. In doing so, Twitter says it gives more freedom to users, while critics argue it places more burden on users and more trust in software solutions (or in some cases, band-aids) to police hateful or otherwise violating content on the site.

Twitter has not spoken at length about this approach before. Motherboard interviewed an array of current employees, executives, and former employees of Twitter about how the company tackles content moderation.

According to Vijaya Gadde, Twitter's head of trust and safety, legal and public policy, the emphasis on user control is due at least in part to Twitter not being able to enforce highly specific rules at the scale it operates. Twitter has an unflinching commitment to being a public space, where even highly offensive voices are allowed to be heard.

"I think there's a fundamental mission that we're serving, our purpose of the company, which is to serve the public conversation," Gadde told Motherboard in an interview. "And in order to really be able to do that, we need to permit as many people in the world as possible for engaging on a public platform, and it means that we need to be open to as many viewpoints as possible."

ADVERTISEMENT

Although it is smaller than Facebook, Twitter still handles a tsunami of content and tweets everyday. Twitter says it sees itself as fundamentally different than Facebook.

"Twitter is really the only public platform in this space," Nick Pickles, global senior strategist for public policy at Twitter said. "We are in many ways quite different to our peers."

But belaboring this idea that Twitter is a public space may be misleading.

> **Do you work at Twitter or another social network? Did you used to?**
> **We'd love to hear from you. Using a non-work phone or computer, you**
> **can contact Joseph Cox securely on Signal on +44 20 8133 5190, Wickr**
> **on josephcox, OTR chat on jfcox@jabber.ccc.de, or email**
> **joseph.cox@vice.com.**

"The comparison obscures the extremely active roles that the platforms themselves have in shaping and generating conversation," Becca Lewis, who researches networks of far right influencers on social media for the nonprofit Data & Society, said. Public spaces "don't have algorithms that surface certain content; they don't have an advertising-based business model meant to drive engagement; they don't generate billions of dollars of revenue. What we're actually experiencing is a media and communication environment that we don't have any apt comparisons for, since we have never experienced anything like this in the past."

Twitter's commitment to being a public space, and how it tries to juggle that simultaneously with being a healthy venue for conversation free of harassment or other violations, manifested in it studying how white supremacists use the platform, and whether leaving their accounts online may help de-radicalization efforts. In May, Motherboard reported that Twitter was researching the topic, while other platforms have already banned accounts related to the ideology. Facebook banned white nationalism and separatism in March, calling them ideologically the same as white supremacy.

ADVERTISEMENT

"From a broader kind of philosophical point of view, I think there is something there that says that if we don't have these conversations out in the open, and have these issues, and these ideologies out in the open, actually how do you counter them?" Pickles said. "How do you have those conversations that drive progress?"

That commitment is also demonstrated in how the network places ordinary users' potentially offensive replies to tweets behind a barrier that needs to be clicked instead of deleting them; tweaks what tweets may be available in search results; or is now letting users hide the replies to their tweets—the content is still there, existing in the public space, you can just choose not to see it.

"There are times when we could simply disappear something. We don't do that," Gadde said. "We downgrade things and we put them behind interstitials and we're very clear when we've done that, and the reason for that, is because our platform is meant to be transparent. We need people to trust that it operates in a certain way."



Tech

**Twitter Has Started Researching Whether White Supremacists Belong on Twitter**

JASON KOEBLER, JOSEPH COX

05.29.19

This choose-your-own adventure of content moderation is unlike what Facebook and Google's YouTube do on their platforms. While there are some instances in which specific types of content are hidden behind content warnings, which tell users that they may be about to view something offensive or graphic, both of those platforms rely on content moderation teams of many thousands of people to tag the types of content that should be deleted or put behind these so-called "interstitial warnings."

This is not to say that Twitter doesn't ban anything. Its rules prohibit violence, terrorism, and several other content categories, and its moderators are supposed to delete this content and ban users. According to Twitter's most recent transparency report, roughly 10.8 million accounts were reported between July and December 2018; it took action against 612,563 of those accounts.

ADVERTISEMENT

Multiple current and one former employee described Twitter's human content moderators as "agents." Donald Hicks, VP of Twitter Service, confirmed that Twitter uses a so-called "hybrid" model, where it uses in-house employees as well as external contractors to moderate content. A content moderation source said that Cognizant Technologies, a well-known contractor, has a contract with Twitter for this work; Twitter confirmed this to Motherboard.

> **"We need to permit as many people in the world as possible for engaging on a public platform, and it means that we need to be open to as many viewpoints as possible."**

Twitter has content moderation centers spread across the globe, with facilities in Toronto, Tokyo, San Francisco, Manila, Budapest, Warsaw, Dublin, and Bangalore, Twitter said. In all, its enforcement team is made up of about 1,500 people, the company added. Facebook's own somewhat equivalent group is 15,000 strong (Twitter's monthly active users are a fraction of Facebook's, at 320 million compared to over 2 billion.)

Twitter also places a greater emphasis on automatic and software-based solutions. Twitter said 40 percent of content that needs to be acted upon is now surfaced to teams automatically, so users don't have to report that material themselves.

David Gasca, who leads the company's product efforts to build a "healthier

service, said, "moderation is a blunt force tool, and so with the product we really want to focus more on just than keeping it up or taking it down." A lot of the time, Gasca said, some content may be considered abusive but isn't against the site's terms of service.

ADVERTISEMENT

The natural response to that may be—then why not change the rules to make the abusive behaviour fall under the site's policies? Gasca said that what may be seen as abusive in, say, Japan, may not be the same as in the United States. On top of that, Gadde said Twitter believes changing the rules doesn't change how people interact with the site.

"One of the mistakes we made in the early days was thinking that we could change the rules and change the behavior, and what we found as we put more aggressive rules in place, that it really wasn't having that much of an impact," Gadde said.

"Realistically what we've found that has had much more effect is if we work really closely with teams, like Product and Engineering teams, for future research, to really think about how to address these problems holistically, and not think of these as just one team has to go figure out the answer to this," she said. This is where various teams will work on developing the strategies that go beyond simply banning or not.

## "The growth team tended to have priority over everything, because those monthly active users were so crucial."

It's worth mentioning that, on other social networks that have banned specific types of offensive content or specific communities, researchers have found that those communities do not reconstitute themselves in meaningful numbers elsewhere on the site. For example, after Reddit banned a series of racist and misogynistic subreddits, Georgia Tech researchers found that users affected by the ban reduced their overall hate speech and found that many users simply left the platform altogether.

Twitter's approach of leaving content up, albeit perhaps not immediately visible to a user, instead of removing it is still open to plenty of criticism.

"Twitter's responses, even those that move beyond a binary approach, show how they are actually playing an active role in the type of content that appears and surfaces on their platform," Lewis from Data & Society said. "And hiding content instead of removing it can lead to unintended consequences. Among other issues, it can generate a conspiratorial mindset among content creators who feel that their content is being suppressed but cannot always prove it. In short, it shows a lack of transparency that breeds distrust on the platform while still failing to grapple with the root issues at work."

In its early days, the trust and safety team was made up of just around five or six people, one former employee said. Those people were not only responsible for designing and implementing the site's policies, but enforcing them as well with a basic email system, they added.

"I guess the team was able to handle the tickets, but we purposefully made it difficult to file them, to report tweets," the former employee said. "That was very intentional; to make it difficult to do, so there'd be less incoming tickets to handle, therefore less employees needed." A second former employee characterized the decision differently. Instead of making it intentionally difficult, the motivation was closer to: why improve the reporting mechanism if the team knew it would increase the time it takes to reply to a ticket?

The trust and safety team previously batted heads with the part of Twitter tasked with making the platform bigger.

"The growth team tended to have priority over everything, because those monthly active users were so crucial," one of the former employees said. "If

we suspend more people, we lose people, which the growth team doesn't like, and there is a lot of that."

"If we make it harder to make an account to weed out some bots, the growth team doesn't like that," they added.

Twitter denied the company purposefully made it harder for people to report tweets, and instead said it focused on making it easier to report tweets that legitimately required attention, while cutting down on the number of malicious reports, such as those from trolls abusing the reporting system.

One of the former employees, who criticized the company in other ways, nevertheless stressed that Twitter is better at fighting abuse now than it has ever been.

"While we're still growing, we still have growing pains, we've come a long way in the last 24 months," Hicks said.

*Update: This piece has been updated to include a more specific phrasing of David Gasca's work.*

**Subscribe to our cybersecurity podcast, CYBER.**

TAGGED:  FACEBOOK,  WHITE SUPREMACY,  WHITE NATIONALISM,  RADICALIZATION,  HATESPEECH,
CONTENT MODERATION,  CONTENT MODERATORS,  ONLINE CONTENT MODERATION,
TWITTER CONTENT MODERATION

## GET A PERSONALIZED ROUNDUP OF VICE'S BEST STORIES IN YOUR INBOX.

[Your email address]  **Subscribe**

By signing up to the VICE newsletter you agree to receive electronic communications from VICE that may sometimes include advertisements or sponsored content.

You may like   ABOUT THIS CONTENT ▷

You may like   ABOUT THIS CONTENT ▷

# MORE FROM VICE

Tech

**How Is Twitter Going to Moderate These Voice Recordings?**

Audio recordings are notoriously difficult to moderate, and Twitter already has a harassment and white supremacist problem.

JASON KOEBLER
06.17.20

Tech

**Facebook Employee Vocally Resigns, Says Company on 'Wrong Side of History'**

Timothy J. Aveni explicitly his resignation to Facebook's refusal to act on posts from Trump which call for violence.

JOSEPH COX
06.02.20

Tech

**In Wake of Ad Crisis, Senators Demand Facebook Address White Supremacy**

"We are concerned Facebook is unable (or unwilling) to enforce its own Community Standards and rid itself of white supremacist and other extremist content."

MATTHEW GAULT
06.30.20

# Exhibit V



Email or Phone        Password

Forgot account?

1. The services we provide

2. How our services are funded

3. Your commitments to Facebook and our community

4. Additional provisions

5. Other terms and policies that may apply to you

Facebook Ads Controls

Privacy Basics

Cookies Policy

Data Policy

More Resources

· View a printable version of the Terms of Service

# Terms of Service

Welcome to Facebook!

Facebook builds technologies and services that enable people to connect with each other, build communities, and grow businesses. These Terms govern your use of Facebook, Messenger, and the other products, features, apps, services, technologies, and software we ofer (the Facebook Products or Products), except where we expressly sate that separate terms (and not these) apply . These Products are provided to you by Facebook, Inc.

We don't charge you to use Facebook or the other products and services covered by these Terms. Insead, businesses and organizations pay us to show you ads for their products and services. By using our Products, you agree that we can show you ads that we think will be relevant to you and your interess. W e use your personal data to help determine which ads to show you.

We don't sell your personal data to advertisers, and we don't share information that directly identifes you (such as your name, email address or other contact information) with advertisers unless you give us specifc permission. Insead, advertisers can tell us things like the kind of audience they want to see their ads, and we show those ads to people who may be interesed. W e provide advertisers with reports about the performance of their ads that help them undersand how people are interacting with their content. See Section 2 below to learn more.

Our Data Policy explains how we collect and use your personal data to determine some of the ads you see and provide all of the other services described below. You can also go to your settings at any time to review the privacy choices you have about how we use your data.

 Return to top

# 1. The services we provide

Our mission is to give people the power to build community and bring the world closer together. To help advance this mission, we provide the Products and services described below to you:

**Provide a personalized experience for you:**
Your experience on Facebook is unlike anyone else's: from the poss, sories, events, ads, and other content you see in News Feed or our video platform to the Pages you follow and other features you might use, such as Trending, Marketplace, and search. We use the data we have - for example, about the connections you make, the choices and settings you select, and what you share and do on and of our Products - to personalize your experience.

**Connect you with people and organizations you care about:**
We help you fnd and connect with people, groups, businesses, organizations, and others that matter to you across the Facebook Products you use. We use the data we have to make suggesions for you and others - for example, groups to join, events to attend, Pages to follow or send a message to, shows to watch, and people you may want to become friends with. Stronger ties make for better communities, and we believe our services are mos useful when people are connected to people, groups, and organizations they care about.

**Empower you to express yourself and communicate about what matters to you:**
There are many ways to express yourself on Facebook and to communicate with friends, family, and others about what matters to you - for example, sharing satus updates, photos, videos, and sories across the Facebook Products you use, sending messages to a friend or several people, creating events or groups, or adding content to your profle. W e have also developed, and continue to explore, new ways for people to use technology, such as augmented reality and 360 video to create and share more expressive and engaging content on Facebook.

**Help you discover content, products, and services that may interest you:**
 We show you ads, ofers, and other sponsored content to help you discover content, products, and services that are ofered by the many businesses and organizations that use Facebook and other Facebook Products. Section 2 below explains this in more detail.

**Combat harmful conduct and protect and support our community:**
People will only build community on Facebook if they feel safe. We employ dedicated teams around the world and develop advanced technical sysems to detect misuse of our Products, harmful conduct towards others, and situations where we may be able to help support or

protect our community. If we learn of content or conduct like this, we will take appropriate action - for example, ofering help, removing content, removing or resricting access to certain features, disabling an account, or contacting law enforcement. We share data with other Facebook Companies when we detect misuse or harmful conduct by someone using one of our Products.

**Use and develop advanced technologies to provide safe and functional services for everyone:**
We use and develop advanced technologies - such as artifcial intelligence, machine learning sysems, and augmented reality - so that people can use our Products safely regardless of physical ability or geographic location. For example, technology like this helps people who have visual impairments undersand what or who is in photos or videos shared on Facebook or Insagram. W e also build sophisicated network and communication technology to help more people connect to the internet in areas with limited access. And we develop automated sysems to improve our ability to detect and remove abusive and dangerous activity that may harm our community and the integrity of our Products.

**Research ways to make our services better:**
We engage in research to develop, tes, and improve our Products.  This includes analyzing the data we have about our users and undersanding how people use our Products, for example by conducting surveys and tesing and troubleshooting new features. Our  Data Policy explains how we use data to support this research for the purposes of developing and improving our services.

**Provide consistent and seamless experiences across the Facebook Company Products:**
Our Products help you fnd and connect with people, groups, businesses, organizations, and others that are important to you. We design our sysems so that your experience is consient and seamless across the diferent  Facebook Company Products that you use. For example, we use data about the people you engage with on Facebook to make it easier for you to connect with them on Insagram or Messenger, and we enable you to communicate with a business you follow on Facebook through Messenger.

**Enable global access to our services:**
To operate our global service, we need to sore and disribute content and data in our data centers and sysems around the world, including outside your country of residence. This infrasructure may be operated or controlled by Facebook, Inc., Facebook Ireland Limited, or its afliates.

 Return to top

# 2. How our services are funded

Insead of paying to use Facebook and the other products and services we ofer , by using the Facebook Products covered by these Terms, you agree that we can show you ads that businesses and organizations pay us to promote on and of the <u>Facebook Company Products</u>. We use your personal data, such as information about your activity and interess, to show you ads that are more relevant to you.

Protecting people's privacy is central to how we've designed our ad sysem. This means that we can show you relevant and useful ads without telling advertisers who you are. We don't sell your personal data. We allow advertisers to tell us things like their business goal, and the kind of audience they want to see their ads (for example, people between the age of 18-35 who like cycling). We then show their ad to people who might be interesed.

We also provide advertisers with reports about the performance of their ads to help them undersand how people are interacting with their content on and of Facebook. For example, we provide general demographic and interes information to advertisers (for example, that an ad was seen by a woman between the ages of 25 and 34 who lives in Madrid and likes software engineering) to help them better undersand their audience. We don't share information that directly identifes you (information such as your name or email address that by itself can be used to contact you or identifes who you are) unless you give us specifc permission. Learn more about how Facebook ads work <u>here</u>.

We collect and use your personal data in order to provide the services described above to you. You can learn about how we collect and use your data in our <u>Data Policy</u>. You have controls over the types of ads and advertisers you see, and the types of information we use to determine which ads we show you. <u>Learn more</u>.

 Return to top

# 3. Your commitments to Facebook and our community

We provide these services to you and others to help advance our mission. In exchange, we need you to make the following commitments:

> **1. Who can use Facebook**
> When people sand behind their opinions and actions, our community is safer and more accountable. For this reason, you mus:

- Use the same name that you use in everyday life.
- Provide accurate information about yourself.
- Create only one account (your own) and use your timeline for personal purposes.

- Not share your password, give access to your Facebook account to others, or transfer your account to anyone else (without our permission).

We try to make Facebook broadly available to everyone, but you cannot use Facebook if:

- You are under 13 years old.
- You are a convicted sex ofender .
- We've previously disabled your account for violations of our Terms or Policies.
- You are prohibited from receiving our products, services, or software under applicable laws.

**2. What you can share and do on Facebook**
We want people to use Facebook to express themselves and to share content that is important to them, but not at the expense of the safety and well-being of others or the integrity of our community. You therefore agree not to engage in the conduct described below (or to facilitate or support others in doing so):

1. You may not use our Products to do or share anything:

   - That violates these Terms, our Community Standards, and other terms and policies that apply to your use of Facebook.
   - That is unlawful, misleading, discriminatory or fraudulent.
   - That infringes or violates someone else's rights, including their intellectual property rights.

2. You may not upload viruses or malicious code or do anything that could disable, overburden, or impair the proper working or appearance of our Products.

3. You may not access or collect data from our Products using automated means (without our prior permission) or attempt to access data you do not have permission to access.

We can remove or resrict access to content that is in violation of these provisions.

If we remove content that you have shared in violation of our Community Standards, we'll let you know and explain any options you have to reques another review , unless you seriously or repeatedly violate these Terms or if doing so may expose us or others to legal liability; harm our community of users; compromise or interfere with the integrity or operation of any of our services, sysems or Products; where we are resricted due to technical limitations; or where we are prohibited from doing so for legal reasons.

To help support our community, we encourage you to report content or conduct that you believe violates your rights (including intellectual property rights) or our terms and policies.

**3. The permissions you give us**

We need certain permissions from you to provide our services:

1. Permission to use content you create and share: Some content that you share or upload, such as photos or videos, may be protected by intellectual property laws.

   You own the intellectual property rights (things like copyright or trademarks) in any such content that you create and share on Facebook and the other Facebook Company Products you use. Nothing in these Terms takes away the rights you have to your own content. You are free to share your content with anyone else, wherever you want.

   However, to provide our services we need you to give us some legal permissions (known as a 'license') to use this content. This is solely for the purposes of providing and improving our Products and services as described in Section 1 above.

   Specifcaly , when you share, pos, or upload content that is covered by intellectual property rights on or in connection with our Products, you grant us a non-exclusive, transferable, sub-licensable, royalty-free, and worldwide license to hos, use, disribute, modify , run, copy, publicly perform or display, translate, and create derivative works of your content (consient with your privacy and application settings). This means, for example, that if you share a photo on Facebook, you give us permission to sore, copy, and share it with others (again, consient with your settings) such as service providers that support our service or other Facebook Products you use.This license will end when your content is deleted from our sysems.

   You can delete content individually or all at once by deleting your account. Learn more about how to delete your account. You can download a copy of your data at any time before deleting your account.

   When you delete content, it's no longer visible to other users, however it may continue to exis elsewhere on our sysems where:

   - immediate deletion is not possible due to technical limitations (in which case, your content will be deleted within a maximum of 90 days from when you delete it);

   - your content has been used by others in accordance with this license and they have not deleted it (in which case this license will continue to apply until that content is deleted); or

   - where immediate deletion would resrict our ability to:

     - invesigate or identify illegal activity or violations of our terms and policies (for example, to identify or invesigate misuse of our Products or sysems);

     - comply with a legal obligation, such as the preservation of evidence; or

- comply with a reques of a judicial or adminisrative authority, law enforcement or a government agency;

in which case, the content will be retained for no longer than is necessary for the purposes for which it has been retained (the exact duration will vary on a case-by-case basis).

In each of the above cases, this license will continue until the content has been fully deleted.

2. Permission to use your name, profle picture, and information about your actions with ads and sponsored content: You give us permission to use your name and profle picture and information about actions you have taken on Facebook next to or in connection with ads, ofers, and other sponsored content that we display across our Products, without any compensation to you. For example, we may show your friends that you are interested in an advertised event or have liked a Page created by a brand that has paid us to display its ads on Facebook. Ads like this can be seen only by people who have your permission to see the actions you've taken on Facebook. You can learn more about your ad settings and preferences.

3. Permission to update software you use or download: If you download or use our software, you give us permission to download and insall updates to the software where available.

> **4. Limits on using our intellectual property**
> If you use content covered by intellectual property rights that we have and make available in our Products (for example, images, designs, videos, or sounds we provide that you add to content you create or share on Facebook), we retain all rights to that content (but not yours). You can only use our copyrights or trademarks (or any similar marks) as expressly permitted by our Brand Usage Guidelines or with our prior written permission. You mus obtain our written permission (or permission under an open source license) to modify, create derivative works of, decompile, or otherwise attempt to extract source code from us.

 Return to top

# 4. Additional provisions

> **1. Updating our Terms**
> We work consantly to improve our services and develop new features to make our Products better for you and our community. As a result, we may need to update these Terms from time to time to accurately refect

our services and practices. Unless otherwise required by law, we will notify you before we make changes to these Terms and give you an opportunity to review them before they go into efect. Once any updated Terms are in efect, you will be bound by them if you continue to use our Products.

We hope that you will continue using our Products, but if you do not agree to our updated Terms and no longer want to be a part of the Facebook community, you can <u>delete</u> your account at any time.

## 2. Account suspension or termination

 We want Facebook to be a place where people feel welcome and safe to express themselves and share their thoughts and ideas.

If we determine that you have clearly, seriously or repeatedly breached our Terms or Policies, including in particular our Community Standards, we may suspend or permanently disable access to your account. We may also suspend or disable your account if you repeatedly infringe other people's intellectual property rights or where we are required to do so for legal reasons.

Where we take such action we'll let you know and explain any options you have to reques a review , unless doing so may expose us or others to legal liability; harm our community of users; compromise or interfere with the integrity or operation of any of our services, sysems or Products; or where we are resricted due to technical limitations; or where we are prohibited from doing so for legal reasons.

You can <u>learn more</u> about what you can do if your account has been disabled and how to contact us if you think we have disabled your account by misake.

If you delete or we disable your account, these Terms shall terminate as an agreement between you and us, but the following provisions will remain in place: 3, 4.2-4.5.

## 3. Limits on liability

We work hard to provide the bes Products we can and to specify clear guidelines for everyone who uses them. Our Products, however, are provided "as is," and we make no guarantees that they always will be safe, secure, or error-free, or that they will function without disruptions, delays, or imperfections. To the extent permitted by law, we also DISCLAIM ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT. We do not control or direct what people and others do or say, and we are not responsible for their actions or conduct (whether online or ofine) or any content they share (including ofensive, inappropriate, obscene, unlawful, and other objectionable content).

We cannot predict when issues might arise with our Products. Accordingly, our liability shall be limited to the fulles extent permitted by applicable law, and under no circumsance will we be liable to you for any los profts, revenues, information, or data, or consequential, special, indirect, exemplary, punitive, or incidental damages arising out

of or related to these Terms or the Facebook Products, even if we have been advised of the possibility of such damages. Our aggregate liability arising out of or relating to these Terms or the Facebook Products will not exceed the greater of $100 or the amount you have paid us in the pas twelve months.

### 4. Disputes

We try to provide clear rules so that we can limit or hopefully avoid disputes between you and us. If a dispute does arise, however, it's useful to know up front where it can be resolved and what laws will apply.

For any claim, cause of action, or dispute you have agains us that arises out of or relates to these Terms or the Facebook Products ("claim"), you agree that it will be resolved exclusively in the U.S. Disrict Court for the Northern Disrict of California or a sate court located in San Mateo County. You also agree to submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim, and that the laws of the State of California will govern these Terms and any claim, without regard to conflct of law provisions.

### 5. Other

1. These Terms (formerly known as the Statement of Rights and Responsibilities) make up the entire agreement between you and Facebook, Inc. regarding your use of our Products. They supersede any prior agreements.

2. Some of the Products we ofer are also governed by supplemental terms. If you use any of those Products, supplemental terms will be made available and will become part of our agreement with you. For insance, if you access or use our Products for commercial or business purposes, such as buying ads, selling products, developing apps, managing a group or Page for your business, or using our measurement services, you mus agree to our Commercial Terms. If you pos or share content containing music, you mus comply with our Music Guidelines. To the extent any supplemental terms conflct with these Terms, the supplemental terms shall govern to the extent of the conflct.

3. If any portion of these Terms is found to be unenforceable, the remaining portion will remain in full force and efect. If we fail to enforce any of these Terms, it will not be considered a waiver. Any amendment to or waiver of these Terms mus be made in writing and signed by us.

4. You will not transfer any of your rights or obligations under these Terms to anyone else without our consent.

5. You may designate a person (called a legacy contact) to manage your account if it is memorialized. Only your legacy contact or a person who you have identifed in a valid will or similar document expressing clear consent to disclose your content upon death or incapacity will be able to seek disclosure from your account after it

is memorialized.

6. These Terms do not confer any third-party beneficiary rights. All of our rights and obligations under these Terms are freely assignable by us in connection with a merger, acquisition, or sale of assets, or by operation of law or otherwise.

7. You should know that we may need to change the username for your account in certain circumstances (for example, if someone else claims the username and it appears unrelated to the name you use in everyday life).

8. We always appreciate your feedback and other suggesions about our products and services. But you should know that we may use them without any resriction or obligation to compensate you, and we are under no obligation to keep them confdential.

9. We reserve all rights not expressly granted to you.

 Return to top

# 5. Other terms and policies that may apply to you

- <u>Community Standards</u>: These guidelines outline our sandards regarding the content you pos to Facebook and your activity on Facebook and other Facebook Products.

- <u>Commercial Terms</u>: These terms apply if you also access or use our Products for any commercial or business purpose, including advertising, operating an app on our Platform, using our measurement services, managing a group or a Page for a business, or selling goods or services.

- <u>Advertising Policies</u>: These policies specify what types of ad content are allowed by partners who advertise across the Facebook Products.

- <u>Self-Serve Ad Terms</u> : These terms apply when you use self-serve advertising interfaces to create, submit, or deliver advertising or other commercial or sponsored activity or content.

- <u>Pages, Groups and Events Policy</u>: These guidelines apply if you create or administer a Facebook Page, group, or event, or if you use Facebook to communicate or administer a promotion.

- <u>Facebook Platform Policy</u>: These guidelines outline the policies that apply to your use of our Platform (for example, for developers or operators of a Platform application or website or if you use social plugins).

- <u>Developer Payment Terms</u> : These terms apply to developers of applications that use Facebook Payments.

- <u>Community Payment Terms</u> : These terms apply to payments made on or through Facebook.

- **Commerce Policies**: These guidelines outline the policies that apply when you ofer products and services for sale on Facebook.

- **Facebook Brand Resources**: These guidelines outline the policies that apply to use of Facebook trademarks, logos, and screenshots.

- **Music Guidelines**: These guidelines outline the policies that apply if you pos or share content containing music on Facebook.

Date of Las Revision: July 31, 2019

English (US)   Español   Français (France)   中文(简体)   العربية   Português (Brasil)   한국어   Italiano   Deutsch   हिन्दी   日本語

Sign Up   Log In   Messenger   Facebook Lite   Watch   People   Pages   Page Categories   Places   Games   Locations   Marketplace   Facebook Pay
Groups   Oculus   Portal   Instagram   Local   Fundraisers   Services   About   Create Ad   Create Page   Developers   Careers   Privacy   Cookies
Ad Choices▷   Terms   Help

Facebook © 2020

# Exhibit W

# Trump's WeChat ban could prevent US companies from doing business in China

By Sherisse Pham, CNN Business
Updated 5:26 AM ET, Wed August 26, 2020

**Hong Kong (CNN Business) —** President Donald Trump's threat to ban WeChat has already upset millions of users in America who depend on the app as a lifeline to family and friends in China. But it could also become a major headache for US companies operating in the world's second largest economy.

The executive order, issued earlier this month, would prohibit Americans and US firms from "any transaction that is related to WeChat" — a significant escalation of the tech war between Washington and Beijing that has already resulted in sanctions and threats against other Chinese companies, including TikTok and Huawei.

The Trump administration alleges that WeChat poses a national security risk because it collects a lot of user data that could be accessed by the Chinese Communist Party.

WeChat's Chinese parent company Tencent (TCEHY) did not respond to a request for comment for this story. It said previously that it was seeking clarification of the order and has emphasized that the international version of WeChat is separate from the Chinese app, which is also known as Weixin. Its website says Tencent uses data "in strict accordance with applicable laws and regulations."

The order clearly targets usage of the app stateside, but its broad wording also suggests that its effects "could go beyond the United States, and restrict all US entities whether they were in the United States or globally here in China," said Ker Gibbs, president of the American Chamber of Commerce in Shanghai.

**Related Article:** Tencent just became Trump's new target in the tech war with China

That would be a huge problem for US firms operating in China, where WeChat has become essential for hundreds of millions of people who use it to message friends, pay for goods, hail rides, book train tickets, order food and more. Companies use the platform to engage with customers, advertise goods, and most importantly, accept payments.

## Losing WeChat would be 'an existential threat' for US firms in China

WeChat and Weixin users can easily send messages and payments to each other. And, like many other people, Tencent executives as recently as last year were using the names interchangeably.

The ubiquity of WeChat in China means the order could be a big problem for US companies.

Starbucks (SBUX), Walmart (WMT) and Nike (NKE), for example, could be cut off from customers who use WeChat to order their products. Walmart said last year that 30% of transactions in China came from its "Scan and Go" app, a program embedded within WeChat.

During an earnings call in December, Nike president and CEO Mark Parker said the company was seeing "great momentum" with digital partners, such as "Instagram and Google and Tmall and WeChat." The company uses the apps to build "relationships with the consumer," Parker said.

Starbucks, Walmart and Nike did not immediately respond to a request for comment.

Washington officials are reportedly seeking to reassure US companies that they can still conduct business with the WeChat app in China, according to a Bloomberg report citing people familiar with the matter. The report cited one person as saying officials are still deliberating the scope of the ban, and that "the president could ultimately overrule anything they decide."

But those reports are little comfort to many businesses, according to Gibbs, the AmCham Shanghai president. The business organization has 3,000 members from 1,500 firms, including Fortune 500 companies and small- and medium-sized enterprises.

"We're not reassured at all, and we're not hearing from the government at all," he said. "For US companies in China, losing the ability to use the WeChat platform could literally be an existential threat."

Gibbs added that "almost everything" in China is purchased using a digital platform like WeChat Pay or the Alibaba-affiliated AliPay.

"If you can't accept those forms of payments, you can't accept money."

Gibbs added that some companies have flagged that a ban limited to the United States could still affect their ability to accept payments using WeChat's platform, because orders placed in China often use global IT systems that pass through the United States.

Paul Triolo, geotechnology head at Eurasia Group, said the order could also require Apple (AAPL) to remove WeChat from its app store in China, which would be devastating. Last year, Apple made nearly $44 billion in revenue in greater China, an area that includes Hong Kong and Taiwan.

It would "be cataclysmic for Apple's business in China — without Weixin available on the iPhone, for example, sales would likely plummet," Triolo wrote in a note earlier this month.

> **Related Article:** TikTok and WeChat may raise security concerns, but Trump's knee-jerk reaction isn't the way to deal with them

## WeChat is 'like oxygen' for Chinese users

Even if the ban only affects WeChat in the United States, that would still be a big blow to a lot of Americans. WeChat has 19 million daily active users in the United States, according to market research firm Apptopia.

"WeChat is like oxygen for a lot of Chinese people," said Mei Zhang, a Hong Kong-based columnist for Week in China. "It's hugely important, of course, for people inside China. But now increasingly, for people outside of China as well."

Chinese diaspora rely on the app to keep in touch with family.

A coalition of WeChat users in the United States filed a lawsuit against the Trump administration on Friday, challenging the executive order against the app.

"There are critical Constitutional protections at stake in this case. Chinese Americans use and depend on WeChat as their critical mode of communication, personally and professionally, every day," Michael Bien, co-counsel for US WeChat Users Alliance, said in a statement.

Zhang, for example, uses the app to stay in touch with her sister and her sister's children, who all live in the United States, and her mother, who lives in mainland China, where popular Western social media platforms such as

Facebook (FB) and WhatsApp have long been banned.

"Three generations in three different parts of [the world], and the only way we can [...] constantly stay in touch — by doing calls, by sharing photos or making jokes — is through WeChat," Zhang said.

The Trump order against WeChat is expected to go into effect next month.



# Exhibit X

ADVERTISEMENT

COMPANY TOWN

# Why Trump's WeChat ban could hurt Hollywood's ties to China



Eden Chen, chief executive of Culver City-based Pragma and Manhattan Beach-based Fishermen Labs, in his L.A. home office. Chen uses the Chinese messaging app WeChat to communicate with businesses in China.   (Jason Armond / Los Angeles Times)

By WENDY LEE, RYAN FAUGHNDER

AUG. 24, 2020 | 2:11 PM

For many Hollywood companies with ties to China, WeChat is the indispensable link to the country's 1.4 billion people.

The app, owned by Shenzhen-based Tencent, is essential to daily modern life in China. It's a digital payment service, social network and a messaging service all in one — used for everything from buying tickets at Shanghai Disneyland to negotiating brand deals worth hundreds of thousands of dollars. Few even bother to trade old-fashioned phone numbers: They stay in touch with WeChat accounts.

So when President Trump signed an executive order this month barring U.S. firms from transactions over WeChat starting Sept. 20 because of purported national security concerns, that left some entertainment executives and investors scrambling to find an alternative. U.S. businesses, including Disney and Apple, voiced their concerns in a call with White House officials last week, according to the Wall Street Journal.

"Every American who does business in China is about to wonder how they are going to be in touch with people in China," said a talent manager who negotiated nearly $1-million worth of deals over WeChat last year between American celebrities and brands.

"I don't have phone numbers. I don't have email addresses. I just have WeChat — that's the norm," said the manager, who declined to be named, citing the potential impact on his business relationships.

Severing WeChat from U.S. businesses could suddenly cut off many from their Chinese contacts.

Kevin Zhang, a partner at Santa Monica-based Upfront Ventures, said he has nearly 500 connections on WeChat.

"It really is a kind of critical tool that you need to work with any Chinese partners, distributors, investors, etc.," he added.



TECHNOLOGY

**WeChat is a lifeline for the Chinese diaspora. What happens now that Trump banned it?**

Aug. 12, 2020

Hollywood has increasingly looked to China as a [major source of growth](#) and cutting off the main communication tool could cause problems for large and small companies. Disney, for example, has invested heavily in its theme parks in Hong Kong and Shanghai and in promoting its wide array of movies in the country.

U.S. studios also use WeChat as a platform to market big movies in the world's second-largest box office market, which accounted for $9.2 billion in ticket sales in 2019. Because film releases are tightly controlled by the Chinese government, foreign studios work with local distributors, such as Alibaba, to market and distribute movies.

WeChat is often part of the campaigns, [allowing markers to send promotions](#) directly to moviegoers. Such tactics are doubly beneficial because virtually all movie tickets are bought online in China, and radio and TV advertising is largely a nonfactor.

Complicating matters is that Hollywood was already facing headwinds in China because of the escalating trade war with the U.S. In another headache, China tightened censorship of foreign films by eliminating the regulatory body that traditionally oversaw entertainment in 2018 and shifting control to the Communist Party's propaganda department.

Moreover, some experts worry Trump's ban on WeChat and TikTok could lead to further retaliation by China against U.S. companies. Hollywood insiders expressed similar concerns as Trump administration officials and allies such as Atty. Gen. William

Barr stepped up attacks on Hollywood for kowtowing to China's demands to alter its content.

Representatives from Disney did not respond to requests for comment.

WeChat launched in 2011 and is China's No. 1 messaging app, according to San Francisco-based mobile research firm Sensor Tower.

Unlike the U.S., in China, it's more common to communicate with businesses through WeChat instead of email, because many Chinese people don't own computers and get the internet through their cellphones, Zhang said. Messaging through WeChat is also free, compared to charges racked up by texting foreign numbers, he added.

There are no good alternatives that could fill a void left by a ban on WeChat. Facebook-owned WhatsApp does not operate in China. Encrypted messaging app Signal is rising in popularity but still ranks 136 in China in the social networking category, for free iPhone apps, compared to WeChat, which ranks first, Sensor Tower said. VPN is also an option but presents a hassle for Chinese businesses looking to get around China's firewall.

"I can't even think of an app off the top of my head that you could use to transition over because pretty much every single nonlocal communication app is banned in China," Zhang said. "It's inconvenient."

Trump's executive order bans transactions from Tencent's WeChat with U.S. companies and individuals starting on Sept. 20. The president raised concerns about the app's collection of data could get into the hands of the Chinese government and that WeChat could be used to track Chinese nationals visiting the U.S.

"The United States must take aggressive action against the owner of WeChat to protect our national security," Trump wrote in the order.

COMPANY TOWN

## Influencer exits. Ban threats. Can TikTok weather the storm?

July 31, 2020

But the wording in the order is vague and broad, and it's unclear if companies could be in violation if they use WeChat for messaging, for promoting their products or services, or accepting payments, legal experts said.

"What companies like, especially when they're operating overseas, is as much certainty as they can get," said Carl Tobias, a professor at University of Richmond's School of Law. "This is nothing if not unclear and breathes uncertainty. It seems in some ways, it's going to be counterproductive, because it's going to shut down certain practices — the back and forth between the two countries."

Studios expect to receive more guidance from government officials clarifying what the executive order means for their businesses in about a month, said one person familiar with the matter who was not authorized to comment.

Tencent executives said in an Aug. 12 earnings call with investors they believe the order only affects WeChat and not Tencent's other businesses in the United States or advertising done on WeChat in China.

"We are in the process of seeking further clarification from relevant parties in the U.S.," said John Lo, Tencent's chief financial officer on the earnings call.

Trump has also signed executive orders targeting China-based ByteDance's streaming video app TikTok. One of them required ByteDance to sell its TikTok U.S. operations by Nov. 12.

The orders have caused panic among video creators who make money through brand deals on TikTok and raised fears among employees that their paychecks may be frozen on Sept. 20. On Monday, TikTok sued the Trump administration in federal court, alleging the proposed ban is unconstitutional.

The president is also considering action against other Chinese companies like Alibaba, which raised the issue in its earnings call last week.

"Today, we face uncertainties from not only the pandemic but also increasing tensions between US and China," said Alibaba chief executive Daniel Yong Zhang. "We are closely monitoring the latest shift in US government policies towards Chinese companies, which is a very fluid situation."

Changes in how U.S. companies conduct business in China could have an overall chilling effect on deal making.

"If [WeChat] is not allowed, and all of our European and Japanese and Chinese competitors are allowed to proceed merrily, then we will be held at a disadvantage," said Craig Allen, president of US-China Business Council.

Some business leaders say the risks of doing business in China are necessary to gain access to one of the world's biggest markets.

"As a company, you're always thinking about worst case scenarios ... to plan for the fact that things may be monitored when they're in China, whether that be via WeChat or anything else," said Eden Chen, chief executive of Manhattan Beach-based Fishermen Labs, which provides augmented and virtual reality experiences.

In the past, Chen says he's discussed deals worth $50,000 to $100,000 on WeChat for Fishermen Labs. Sometimes a deal could close in two days over the messaging app. Now, people are asking him on WeChat to move their conversations elsewhere.

POLITICS

**News Analysis: In ramping up trade war with China, Trump could be playing with fire**

Aug. 6, 2019

At a news conference earlier this month, Trump stood by his executive order against WeChat when asked about U.S. business concerns.

"We're going to do what's good in terms of the security of our country," Trump said. "We've been very badly let down by China."

The Chinese government hasn't retaliated but voiced its concern.

"It just cuts lines of communication which are really valuable," said Marshall Meyer, professor emeritus at University of Pennsylvania's the Wharton School, of the potential WeChat ban. "That would be my real worry is that they cut off all the Chinese apps and then people who really want to engage with China or in China are at an enormous disadvantage."

COMPANY TOWN    ENTERTAINMENT & ARTS



### From the Emmys to the Oscars.

Get our revamped Envelope newsletter, sent twice a week, for exclusive awards season coverage, behind-the-scenes insights and columnist Glenn Whipp's commentary.

Enter Email Address

**SIGN ME UP**

# Exhibit Y

**Cyber Security**

## Hundreds of millions of Chinese chat logs leak online

Database of 364m records containing social media profiles was freely available

**Yuan Yang** in Beijing MARCH 4 2019

Hundreds of millions of private chat logs from Chinese users have been left exposed on the internet, a researcher has found, in another worrying case of weak data protection in China.

Victor Gevers, a security researcher at the cyber-security organisation GDI Foundation, said that he had found a database of 364m records, containing social media profiles and chat logs linked to names and identity card numbers.

The database was freely accessible online to anyone who searched for its IP address, and user profiles were stored together with photographs, addresses and locations, said Mr Gevers. The main database was piping data to 17 other servers depending on which area the data came from, Mr Gevers said.

"It's worrisome that these things appear online so easily. There are privacy worries of course if data like this is being exposed," said Mr Gevers.

A large number of the records had the names and addresses of web cafés on them.

Chinese cyber-security experts have long warned that web cafés collect vast amounts of customer data. The databases were secured after Mr Gevers reported the problem, as per GDI Foundation's policy of responsible disclosure.

"Our biggest concern was to notify the owner as quickly as possible, and the internet service provider closed it down very quickly," Mr Gevers added.

Under Chinese law, all web cafés have to be approved by the local police station and the local branch of the ministry of culture. Several local governments have asked web cafés to install monitoring software on their computers, such as Jingwang Xianfeng ("Clean Web Vanguard").

Mr Gevers previously revealed a vast facial-recognition database in China's heavily policed region of Xinjiang that was also freely accessible online.

The records in the databases have labels referring to domestic social-media platforms WeChat and QQ, as well as records of WeChat payments and QQ account numbers, suggesting that the conversation logs might have been derived from services provided by China's tech giant Tencent. The company did not immediately respond to a request for comment and there is nothing to suggest Tencent was aware data were being derived from the services it provides.

Although activists as well as businesspeople in China have reported having their private messages monitored by police, it is not clear how and whether the police are using the databases found by Mr Gevers.

Many of the chat logs appeared to be of everyday conversations between Chinese millennials, revolving around money, love and relationships, and not obviously containing material that Beijing might consider illegal or politically sensitive.

Following the Snowden revelations of US-orchestrated spying worldwide and fearing that Chinese citizens' data might be easily exploited, Beijing made data protection and cyber security one of its legislative priorities.

Despite decades of lax enforcement of privacy law online, Chinese regulators last year embarked on a wave of harsh rebukes and negotiations with domestic tech companies. The government accused the companies of failing to abide by data protection principles recently enshrined in the country's first ever cyber-security law.

Copyright The Financial Times Limited 2020. All rights reserved.

# Exhibit Z



# *New Executive Orders Target Chinese Apps*

August 10, 2020

*O*n August 6, 2020, President Trump issued two nearly parallel executive orders (EOs) targeting the enormously popular apps TikTok and WeChat: Executive Order on Addressing the Threat Posed by TikTok (TikTok EO), and Executive Order on Addressing the Threat Posed by WeChat (WeChat EO). These EOs arrive in the wake of the review by the Committee on Foreign Investment in the United States of a past acquisition by TikTok's parent, ByteDance Ltd., as well as President Trump's repeated threats against TikTok as Microsoft considers acquiring the company.[1]  Importantly, the EOs do not have immediate effect; rather, 45 days from the date the EOs were issued (on September 20, 2020), the Commerce Secretary is authorized to identify transactions that will be subject to prohibitions.

But the extraordinary breadth and ambiguity of the EOs have left US companies and many others looking to the Trump Administration for additional clarity on how the EOs will be implemented, with much of the focus on whether the WeChat EO sweeps in transactions with WeChat's parent, Tencent Holdings, and the types of transactions that will be subject to the prohibitions. Despite some uncertainty over how exactly the Commerce Secretary will implement these EOs, we can now highlight certain key aspects.

TikTok, owned by ByteDance Ltd. (ByteDance), is a video-sharing mobile application that, according to the TikTok EO, has been downloaded over 175 million times in the United States and over one billion times globally. WeChat, owned by Tencent Holdings Ltd. (Tencent), is a messaging, social media and electronic payment application that the WeChat EO states has over one billion users in the United States and worldwide.

In the preambles to the EOs, the President asserts that these apps present national security and foreign policy threats to the United States because they automatically capture—and may allow the Chinese government to access—vast swaths of personal and proprietary information of Americans and Chinese dissidents visiting the United States (the latter only in the case of WeChat). He also cites the perceived role that these applications play in the Chinese government's censorship of content it deems undesirable and in Chinese disinformation campaigns. Although the EOs do not require that the Commerce Secretary only prohibit transactions that contribute to these risks, we would expect such transactions to be the focus of any new prohibitions issued on or after September 20, 2020.

Both EOs derive authority from the International Emergency Economic Powers Act (IEEPA)[2] and expand on the national emergency declared in EO 13873 of May 15, 2019, Securing the Information and Communications Technology and Services Supply Chain, which creates a framework for regulating the

acquisition, importation, transfer, installation, dealing in or use of any information and communications technology or service by any person, or with respect to any property, subject to the jurisdiction of the United States, where the transaction involves a "foreign adversary." That executive order directed the Commerce Secretary to ban such transactions that pose an "undue" or "unacceptable" risk to the national security of the United States. In November 2019, the Commerce Department issued a proposed rule to implement EO 13873.

The TikTok and WeChat EOs have several noteworthy features.

First, the EOs delegate the authority to identify prohibited "transactions" not to the Secretaries of the Treasury or State, who typically administer IEEPA-based financial and commercial sanctions against designated targets, but instead to the Commerce Secretary, who typically administers US export controls. In this way, the EOs extend the EO 13873 delegation of authority to an agency that does not currently maintain a regulatory framework to administer this kind of sanctions regime.

How the Commerce Department will execute this newfound authority is unclear. One possibility is that the Commerce Department's Bureau of Industry and Security, which administers the Export Administration Regulations (EAR), could use the EAR as the regulatory framework within which to administer these EOs. One relatively straightforward regulatory action that the Commerce Department could take would be to use its Entity List to limit exports of certain items "subject to the EAR" (US-origin goods, software and technology, and some foreign-produced items containing or derived from US technology) to ByteDance, Tencent and/or an enumerated list of their subsidiaries. This is the approach that the Commerce Department has taken with respect to Huawei Technologies Co. Ltd. (Huawei). But the US policy interests at issue with respect to Huawei—which has been accused of diverting US-origin technology to Iran, among other activities involving US-origin technology that are inconsistent with US national security and foreign policy objectives—were better advanced by the use of the EAR than would be the case here. Indeed, the EAR may be an awkward fit in this case given that it is limited to regulating items "subject to the EAR," which generally does not include US users' dealings with Chinese mobile apps nor the transfer of US user data to China.

Second, these EOs do not appear to contemplate sanctions applicable to all dealings with designated individuals or entities but, rather, they contemplate sanctions applicable to specific transactions. In this way they may function similarly to so-called sectoral sanctions against Russia, where the Treasury Department's Office of Foreign Assets Control issued four specific directives specifying the types of transactions that would be subject to US sanctions prohibitions. The Commerce Department here could issue similar directives or other measures specifying the particular types of transactions that are prohibited.

Because the EOs are not a model of clarity, it is difficult to predict what transactions could become subject to future prohibitions. The TikTok EO appears to authorize the Commerce Department to impose prohibitions on any transaction subject to US jurisdiction (i.e., where a US person and/or US property are involved in the transaction) with ByteDance. In contrast, the WeChat EO appears to authorize the Commerce Department to impose prohibitions on any transaction subject to US jurisdiction with Tencent "that is related to WeChat," though the EO is not sufficiently clear to rule out the possibility that it could be used to otherwise target transactions with Tencent.

The authorization to prohibit transactions involving *property* subject to US jurisdiction creates the possibility that the Commerce Department could be quite expansive, e.g., by prohibiting transactions by non-US companies that involve US-based services (see third point, below). The Commerce Department

may decide to tailor the prohibitions narrowly or issue carveouts, safe havens or general licenses, e.g., for companies to wind down relevant operations, though the EOs themselves do not require it to do so. Indeed, the WeChat EO (but, for reasons that are not apparent, not the TikTok EO), contains a provision that is standard in IEEPA-based executive orders that permits action to be taken to prohibit transactions with "no prior notice."

Some limitation on the scope of prohibited transactions may be required, however, with respect to transactions involving "information or informational materials." Because the President relied on the authority granted to him under IEEPA to issue the EOs, any restrictions impacting the free exchange of international communications through the apps could contravene the so-called Berman Amendment to IEEPA, which carves out from IEEPA's broad grant of powers to the President the authority to restrict, "directly or indirectly," the import or export, "whether commercial or otherwise, regardless of format or medium of transmission," of "information or informational materials."[3]  The Commerce Department may face legal challenges if it seeks to restrict the use of these apps for communicative purposes.

Third, the Commerce Secretary may impose the contemplated prohibitions on any transaction "by *any person*, or with respect to *any property*, subject to the jurisdiction of the United States."[4]  Based on this plain language, the Commerce Secretary could prohibit transactions by foreign subsidiaries of US companies and other non-US firms where such transactions involve US-based computing, banking or other services—though the preambles to the EOs suggest that such transactions may not be the focus of implementation. In contrast, the EOs' prohibitions against sanctions evasion extend only to transactions by "a United States person or within the United States," which excludes activities of non-US firms outside the United States.

These EOs authorize the Commerce Secretary to prohibit a broad range of commercial relationships and thus have the potential to be highly disruptive. Many stakeholders will likely engage with the Trump Administration prior to September 20 to seek clarity on the Commerce Department's implementation of the EOs, or to influence the Commerce Department's approach. Regardless of whether the scope and application of the EOs is clarified, there remains the prospect of Chinese retaliatory action. Already, China's Foreign Ministry spokesman, Wang Wenbin, reacted to the EOs by stating, "The US is using national security as an excuse and using state power to oppress non-American businesses. That's just a hegemonic practice." A stronger response by China may be forthcoming.

WilmerHale continues to monitor these developments closely and stands ready to assist clients in assessing the potential impact of the EOs and ways to mitigate negative consequences for their operations.

---

1.   Microsoft reportedly is in negotiations with ByteDance to purchase TikTok's global operations. If the purchase occurs before September 20, 2020, it could potentially spare TikTok (and other ByteDance entities) from being subject to prohibitions under the TikTok EO.

2.   50 U.S.C. § 1702(b)(3); 50 U.S.C. app. § 5(b)(4) (2006).

3.   The Berman Amendment also provides a non-exhaustive list of items that qualify under the exemption, "including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. 50 U.S.C. § 1702(b)(3); 50 U.S.C. app. § 5(b)(4) (2006). The exemption does not include exports that are controlled for export on national security grounds or on foreign policy grounds to

the extent that such controls promote the nonproliferation or antiterrorism policies of the United States.

4.   TikTok EO, Section 1(a) (emphasis added); WeChat EO, Section 1(a) (emphasis added).

---

## *Contributors*



### Ambassador Charlene Barshefsky

**PARTNER**

Chair, International Trade, Investment and Market Access Practice Group

✉ charlene.barshefsky@wilmerhale.com

☎ +1 202 663 6130



### David S. Cohen

**PARTNER**

✉ david.cohen@wilmerhale.com

☎ +1 202 663 6205



### Ronald I. Meltzer

**SENIOR COUNSEL**

✉ ronald.meltzer@wilmerhale.com

☎ +1 202 663 6389



### David M. Horn

**SPECIAL COUNSEL**

✉ david.horn@wilmerhale.com

☎ +1 202 663 6749



### Semira Nikou

**SENIOR ASSOCIATE**

✉ semira.nikou@wilmerhale.com

☎ +1 202 663 6511

# Exhibit AA



HOME > IDEAS > THOUGHT LEADERSHIP

# ADMINISTRATION'S ATTEMPT TO DELETE TIKTOK AND WECHAT: LATEST TRADE TIFF OR NEW BATTLE

**August 07, 2020**

**Asia-Pacific Alert**

**Author(s):** David A. Kaufman, John Sandweg, David K. Cheng, Rachel S. Winkler

On Thursday evening, August 6, President Trump issued a pair of unprecedented Executive Orders that took aim at two large Chinese affiliated technology companies. This Alert takes a look at what this action could mean for businesses, consumers, and the larger U.S./China trade conflict.

---

**SUBSCRIBE**

---

On Thursday evening, August 6, President Trump issued a pair of unprecedented Executive Orders that took aim at two large Chinese affiliated technology companies.  The orders are designed to limit transactions with social media platform TikTok and the WeChat communications network.  The bans are set to take place in 45 days.  Given that this type of executive action in this arena is novel, is not clear how the prohibitions will impact business partners and customers. However, in the context of similar national security actions we have a roadmap to follow as to how the bans may be rolled out.

## IDEAS

Thought Leadership
Blogs & Podcasts
Events

Continuing Education
Webinars
Conferences/Speaking
Engagements

## PEOPLE

David K. Cheng
David A. Kaufman
John Sandweg
Rachel S. Winkler

## SERVICES

China
Export Controls &
Economic Sanctions
International Services

Since at least the fall of 2019, U.S. government regulators have been investigating TikTok, which has seen explosive growth in America (175 million downloads in the U.S. alone according to the Executive Order) and around the world in just the past two years. TikTok has been accused of collecting data on users and sharing that information with the Chinese government. TikTok has denied these accusations and acknowledged in October that it was in discussions with the U.S. government. "While we cannot comment on ongoing regulatory processes, TikTok has made clear that we have no higher priority than earning the trust of users and regulators in the U.S."

Last week, President Trump in media interviews hinted that a ban was imminent, just as details emerged of talks around a possible sale of the company between TikTok's owner and technology behemoth Microsoft. There have been a series of sometimes conflicting statements by Trump and others in his Administration regarding how a sale to Microsoft or in Trump's words another "very American" company would work and if that could make the Executive Order moot. Trump himself indicated that any deal would require, "a very substantial portion of that price is going to have to come into the Treasury of the United States, because we're making it possible for this deal to happen." It is unclear what legal route the Administration would take to try to enforce this condition.

WeChat has been around for much longer than TikTok and has not seen as much public scrutiny as the social medial upstart. However, the messaging, social media, and payments service has been tagged with similar criticism by the Administration. The Executive Order addressing WeChat described the rationale for acting as, "Like TikTok, WeChat automatically captures vast swaths of information from its users. This data collection threatens to allow the Chinese Communist Party access to Americans' personal and proprietary information. In addition, the application captures the personal and proprietary information of Chinese nationals visiting the United States, thereby allowing the Chinese Communist Party a mechanism for keeping tabs on Chinese citizens who may be enjoying the benefits of a free society for the first time in their lives."

The orders are similar in how they outline the bans, which appear rather broad.

> - "any transaction by any person, or with respect to any property, subject to the jurisdiction of the United States, with ByteDance Ltd. (a.k.a. Zìjié Tiàodòng), Beijing, China, or its subsidiaries, in which any such company has any interest, as identified by the Secretary of Commerce"

> - "any transaction that is related to WeChat by any person, or with respect to any property, subject to the jurisdiction of the United States, with Tencent Holdings Ltd. (a.k.a. Téngxùn Kònggǔ Yǒuxiàn Gōngsī), Shenzhen, China, or any subsidiary of that entity, as identified by the Secretary of Commerce"

However, both orders provide discretion by tasking the Secretary of Commerce with the identification of the specific transactions that will be prohibited – so there is a high degree of uncertainty around what actually will be banned. Already the Administration has indicated through the media that it is NOT targeting Tencent's extensive video game portfolio, including Riot Games and Epic Games. In addition, both companies have indicated that there could be litigation to block the Executive Order's implementation.

While it is unclear what transactions will be included by the Secretary of Commerce, whether a sale may occur, or litigation may blunt its effects – **businesses and users should recognize that the national security regulations cited in the orders can have a powerful negative impact on these two large technology companies.** Both applications could be pulled out of the app stores and off of American phones. Advertisers could be prohibited from purchasing advertisements on TikTok. Companies could be banned from interacting with the extensive interactive payment network used by WeChat. Plus, these orders could impact a wide range of transactions, including products, real estate, finance, services, that have nothing to do with the consumer side of the applications.  Finally, it may be possible that additional executive actions will be taken against these companies, including their potential inclusion on the Department of Commerce's "entity list" which would further restrict the business activities of these companies.

It is widely anticipated that the Chinese government will respond in some fashion – perhaps hitting back at a large or several U.S.-based technology companies. A proportional response could signal a major escalation on the long-running trade dispute between the world's two largest economies and as the bilateral relationship takes center stage in the 2020 U.S. presidential election.

Nixon Peabody's Asia-Pacific, Cross Border Risks, and Export Controls practices are closely monitoring the implementation of the Executive Orders, the Chinese government's response, and the U.S./China trade and investment climate generally and will provide additional updates. Additionally, we can assist clients evaluate their circumstances as they navigate through this turbulent environment.

### PDF: EXECUTIVE ORDERS BAN ON TIKTOK AND WECHAT

---

*The foregoing has been prepared for the general information of clients and friends of the firm. It is not meant to provide legal advice with respect to any specific matter and should not be acted upon without professional counsel. If you have any questions or require any further information regarding these or other related matters, please contact your regular Nixon Peabody LLP representative. This material may be considered advertising under certain rules of professional conduct.*

# Exhibit BB

August 10, 2020

# Executive Orders on TikTok and WeChat: Ambiguity and a Few Other Takeaways

Joshua Gruenspecht, Stephen Heifetz, Anne Seymour

Wilson Sonsini Goodrich & Rosati

+ Follow      Contact



On August 6, 2020, the White House issued two executive orders purportedly intended to "address[] the threat posed by" TikTok and WeChat, considered by the White House to be Chinese-owned mobile applications. The broadly worded orders will take effect 45 days after they were issued (September 20 or 21, 2020, depending on timing rules). The orders purport to prohibit U.S. persons, including companies organized or located in the U.S., or non-U.S. persons using property subject to the jurisdiction of the U.S. from carrying out: 1) any transaction with ByteDance Ltd. (ByteDance), the owner of TikTok or its subsidiaries, and 2) any transaction that is "related to WeChat … with Tencent Holdings Ltd." (Tencent) or its subsidiaries.

According to both orders, the Secretary of Commerce (the Secretary) will identify the specific transactions prohibited within 45 days. The orders purport to grant the Secretary the authority to take actions, including adopting rules and regulations, as may be necessary to implement each order. Until these implementing steps occur, many effects of these orders may be unclear.

The ByteDance and WeChat orders will bring about significant uncertainty for U.S. companies. This is consistent with other recent national security executive orders issued by the President under the same authorities, including the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) (IEEPA).

To explain the national emergency, both orders cite the May 2019 Executive Order on Securing the Information and Communications Technology and Services Supply Chain (the ICT Order)— which called for restrictions on transactions involving information and communications technology or services (ICT) from foreign adversaries. The May 2020 Executive Order on Securing the United States Bulk-Power System similarly called for restrictions on transactions involving bulk-power system electric equipment from foreign adversaries. In both cases, the

suggestion from the government was that the specific "foreign adversaries" at issue were Chinese parties.

Neither of those earlier orders has been fully implemented. For example, under the ICT Order in 2019, the Secretary was granted authority to address ICT-related threats. Using that authority, in November 2019 the Secretary proposed to create a new regime to regulate foreign ICT importation and acquisition, but no regulations have yet been issued. However, that does not mean that the order has had no effect. While the specific regulatory action called for in the ICT Order has not yet occurred, other executive branch entities such as the Federal Communications Commission and the Committee on Foreign Investment in the United States (CFIUS) have hardened their approach to regulation and/or enforcement, e.g., by taking actions against Chinese parties that make ICT.

Given the broad language and many ambiguities in the ByteDance and WeChat orders, and the history of uneven enforcement associated with similar prior orders, it is unclear what impact they will have on U.S. companies that may do business with TikTok, ByteDance, or Tencent. Still, there are a few important takeaways:

First, the orders, on their face, take effect no earlier than 45 days after the August 6 issuance (September 20 or 21, 2020, depending on timing rules), so parties that do business with the affected entities will have a grace period to consider their preferred approach or to decide to wait and see what follows. This grace period might not be particularly helpful, however, since specification of the prohibited actions might not occur until on or just before the effective date of the prohibitions. For this reason, it is difficult to know what adjustments to consider during this waiting period.

Second, the prohibitions at issue seem more consistent with restrictions placed on individuals and entities that have been placed on the Specially Designated Nationals (SDN) list. These are restrictions under regulations promulgated and administered by the Office of Foreign Assets Control (OFAC) at the Treasury Department, not the Commerce Department or the Secretary of Commerce. Commerce Department restrictions generally focus on items that are controlled by the Export Administration Regulations (EAR) including hardware, software, and technology. Because the regulations explaining the prohibition may need to be drafted from scratch by the Department of Commerce and may not follow the traditional model for OFAC SDN listings, it is particularly difficult to forecast the final regulations.

Third, the WeChat order appears to limit the prohibited transactions with Tencent to those related to WeChat. However, many U.S. companies conduct a wide range of business with Tencent and its affiliates and subsidiaries, including receiving investment. If, in the Secretary's rules implementing the order, the prohibitions extend beyond WeChat to Tencent and affiliates or subsidiaries more generally, the impact on U.S. companies could be even more significant.

Fourth, as with the ICT Order, it is possible that the regulations required from the Secretary will arrive later than anticipated or may never appear at all. If no regulations are produced, the orders seemingly would have no direct impact.

Fifth, as occurred in the case of the ICT Order, even if regulations are delayed or are not promulgated, the new orders may have impacts through other regulatory regimes. CFIUS enforcement related to the affected parties or other Chinese ICT companies may be stepped up based on the administration's new priorities. As noted here, CFIUS's enforcement activities have already been on the upswing; the orders may provide further impetus to focus on the ICT space.

Sixth and finally, should the orders take effect, there will be significant potential penalties for violations. Civil penalties under IEEPA, one of the statutory bases for the orders, can be more than $300,000 per violation, and willful offenders may also be subject to criminal penalties and jail time.

As information about the orders develops, there may be opportunities to influence the development of the underlying rules—e.g., through notice and comment on the regulations promulgated by the Secretary.



## LATEST POSTS

- **Administrative Notice Limits the FDA's Ability to Regulate Laboratory Developed Tests, Including COVID-19 Tests**

- **Federal Circuit Holds That Claims of a Patent Asserted During a Patent Term Extension Are Not Infringed by the Carboxylic Acid Derivative of an FDA-Approved Ester Containing Drug**

- **FDA Issues Umbrella EUA for Surgical Masks**

- **Further Expansion of U.S. Export Controls on Huawei and Related Entities**

- **Delaware Court of Chancery Limits Application of California Books and Records Statute to Delaware Corporations Under the Internal Affairs Doctrine**

See more »

DISCLAIMER: Because of the generality of this update, the information provided herein may not be applicable in all situations and should not be acted upon without specific legal advice based on particular situations.

© Wilson Sonsini Goodrich & Rosati 2020 | Attorney Advertising

# Exhibit CC



# WECHAT – TERMS OF SERVICE

## INTRODUCTION

Welcome to WeChat!

Your use of WeChat is subject to these Terms of Service (these "**Terms**"). Thank you for reviewing these Terms – we hope you enjoy using WeChat.

If you have any questions about, or if you wish to send us any notices in relation to, these Terms, please contact us by going to "Me" -> "Settings" -> "Help & Feedback" from within WeChat or by visiting help.wechat.com.

*Compliance with these Terms*

**These Terms apply to you if you are a user of WeChat anywhere in the world, except if you belong in any of the following categories: (a) a user of Weixin or WeChat in the People's Republic of China; (b) a citizen of the People's Republic of China using Weixin or WeChat anywhere in the world; or (c) a Chinese-incorporated company using Weixin or WeChat anywhere in the world. If you belong to any of these categories, please refer to the** *Terms of Service (PRC Users)* for the terms that apply to you.** For the purposes of these Terms, a reference to "People's Republic of China" does not include a reference to Taiwan, Hong Kong or Macau. If you are a user of Weixin or WeChat and are located in Taiwan, Hong Kong or Macau, and are not in categories (b) or (c) above, these Terms apply to you.

Please review these Terms and our policies and instructions to understand how you can and cannot use WeChat. You must comply with these Terms in your use of WeChat and only use WeChat as permitted by applicable laws and regulations, wherever you may be when you use them. In some countries, there are restrictions on your use of WeChat – it is your responsibility to ensure that you are legally allowed to use WeChat where you are located, and certain WeChat functionalities may not be available in some countries.

**By using WeChat, you agree to these Terms. If you do not agree to these Terms, you must not use WeChat.**

*Other general terms in relation to these Terms*

If you are under the age of 13, you must not use WeChat. If you are between the ages of 13 and 18 (or the relevant age in your jurisdiction where you are considered a minor), your parent or guardian must agree to these Terms (both for themselves and on your behalf) before you can use WeChat.

If you are using WeChat on behalf of a company, partnership, association, government or other organisation (your "**Organisation**"), you warrant that you are authorised to do so and that you are authorised to bind your Organisation to these Terms. In such circumstances, "you" will include your Organisation.

We may translate these Terms into multiple languages. If there is any difference between the English version and any other language version of these Terms, the English version will apply (to the extent permitted by applicable laws and regulations).

*"WeChat"*

For the purposes of these Terms, any reference in these Terms to "WeChat" refers to WeChat and all WeChat-related services provided by or on behalf of us or our affiliate companies from time to time, including the following services:

- WeChat;
- WeChat Mini Programs Platform;
- WeChat Developers Platform;
- Official Account Admin Platform;
- WeChat Out; and
- WeChat Pay.

*Contracting Entity*

By using WeChat, you are agreeing to be bound by these Terms between you and:

(i) if you are a user located within the European Economic Area or Switzerland ("**European Union**" or "**EU**"), **Tencent International Services Europe BV**, a Dutch company located at 26.04 on the 26th floor of Amstelplein 54, 1096 BC Amsterdam, the Netherlands; or

(ii) if you are a user located outside the EU, **Tencent International Service Pte. Ltd.**, a Singaporean company located at 10 Anson Road, #21-07 International Plaza, Singapore 079903,

(in each case, "**we**", "**our**" and "**us**").

We may specify in certain of our WeChat service-specific terms that you are contracting with one of our affiliate companies (instead of Tencent International Services Europe BV or Tencent International Service Pte. Ltd., as applicable) in relation to your use of the relevant WeChat service or feature to which the relevant service-specific terms apply. Where this is the case, the relevant contracting entity will be identified in the relevant WeChat service-specific terms, and these Terms (including those relevant service-specific terms) will apply between you and that identified contracting entity in relation to your use of the relevant WeChat service or feature.

## ADDITIONAL TERMS AND POLICIES

We offer a diverse range of services and features within WeChat, so there are additional terms and policies that may be applicable to your use of all or part of WeChat (the "**Additional Terms**"). We will notify you of the Additional Terms from time to time, including as set out in this section and otherwise from time to time within WeChat. These Additional Terms all form part of and are incorporated into these Terms.

*WeChat policies*

The following policies are Additional Terms that you must comply with in using WeChat:

• *WeChat Privacy Policy* – which sets out how we collect, store and use your personal information, as well as our policy on the use of tracking technologies.

• *WeChat Acceptable Use Policy* – which sets out rules of good behaviour applicable to your use of WeChat.

• *Copyright Policy* – which sets out how we deal with intellectual property rights-related complaints in accordance with the DMCA.

*Terms applicable to specific WeChat features*

Some of our services and features have Additional Terms specific to their use. You must comply with such Additional Terms (as well as these Terms) in your use of such services and features. Such service-specific Additional Terms include:

• *Sticker Licence Agreement* – governing your use of Stickers (as defined in such agreement) within WeChat.

• *WeChat Developers Platform Use Agreement* – governing your use of the WeChat Developers Platform.

• *WeChat e-Commerce Agreement and/or WeChat Official Account Admin Platform Merchant Function Agreement* – governing your use of WeChat's e-commerce services.

• *WeChat Official Account Admin Platform User Agreement* – governing your use of the WeChat Official Account Admin Platform.

• *WeChat Out Terms of Service* – governing your use of WeChat Out.

• *WeChat Pay System User Service Agreement* – governing your use of WeChat Pay.

*Additional country-specific terms*

If you are a citizen or a habitual resident of the following countries, the following country-specific Additional Terms will also apply to your use of WeChat:

• USA.

• Australia.

• European Union.

*Inconsistencies*

Subject to the next paragraph and except as otherwise expressly specified within these Terms or any Additional Terms – to the extent that any Additional Terms conflict with these Terms, the relevant Additional Terms will apply to the extent of the conflict.

## CHANGES

We may make changes to these Terms (and any applicable Additional Terms) over time (for example, to reflect technical improvements and changes to WeChat (for example, to address a security threat) or applicable laws and regulations (for example, to reflect applicable consumer rights)), so please come back and review these Terms regularly.

Where we consider that such changes are reasonably material, we will (where reasonably practicable) notify you (via http://www.wechat.com, direct communication to you, on this page or the relevant page for the relevant additional terms or policy, or other means), prior to such changes becoming effective. **By continuing to use WeChat after we make any changes to these Terms, you are agreeing to be bound by the revised Terms.**

## CHANGES TO WECHAT

As WeChat and user experiences are constantly evolving, we may from time to time:

- add, change or remove features or services from WeChat (including in relation to whether a feature or service is free of charge or not); and/or

- suspend, discontinue or terminate WeChat altogether.

You agree that we may take any such actions at any time. Where we consider that any changes to WeChat or any services or features accessible within WeChat are reasonably material, we will (where reasonably practicable) notify you (via http://www.wechat.com, direct communication to you, on this page or the relevant page for the relevant additional terms or policy, or other means), prior to such changes becoming effective.

## YOUR ACCOUNT

You need to create an account with us in order to access and use WeChat. Any account that you open with us is personal to you and you are prohibited from gifting, lending, transferring or otherwise permitting any other person to access or use your account. Your account name, user ID and other identifiers you adopt within WeChat remains our property and we can disable, reclaim and reuse these once your account is terminated or deactivated for whatever reason by either you or us.

You are responsible for: (a) safeguarding your account details, including any passwords used to access your account and WeChat, and (b) all use of WeChat under your account, including any purchases made and/or payment obligations arising under your account. You must promptly notify us by going to "Me" -> "Settings" -> "Help & Feedback" from within the WeChat app or by visiting http://help.wechat.com if you know or suspect that your password or account has been compromised. We will regard all use of your account on WeChat as being by you, except where we have received a valid and –properly received notification to us regarding your account or password being compromised.

We may allow you to register for and login to WeChat using sign-on functionalities provided by third party platforms, such as Facebook or Google. You agree to comply with the relevant third party platform's terms and conditions applicable to your use of such functionalities (in addition to these Terms).

## PAYMENTS

You may, from time to time, make payments to us or third parties as part of your use of WeChat (including for the provision of WeChat or provision of certain additional features within WeChat). We may set out further terms applying to such payments (including in relation to refunds (if any), billing arrangements and any consequences of failing to make timely payments). You must comply with all such terms in relation to your payments to us. You agree that you are solely responsible for all fees and taxes associated with any such payments. and that pricing and availability of Items and products are subject to change at any time.

We may from time to time make available payment methods to you for automatic, recurring or subscription-based charges. Where we do so, you agree that (subject to applicable laws and regulations):

- such purchases or payments are generally made by you on an advance basis. Unless the purchase was on a subscription basis, we will notify you prior to any automatic renewals;

- you authorise us to: (a) save your chosen payment method's information (e.g. credit card information) on our systems; and (b) bill your chosen payment method for the relevant time-periods as chosen by or notified to you;

- if any payment made via your chosen payment method is rejected, denied or returned unpaid for any reason: (a) we may not provide you with, or suspend our provision of, the relevant WeChat product or service until payment is properly processed; and (b) you are liable to us for any fees, costs, expenses or other amounts we incur arising from such rejection, denial or return (and we may automatically charge you for such amounts); and

- we will provide you with further instructions within WeChat regarding how you may update or cancel the relevant payment method.

We may change any fees that we charge for WeChat (or any parts of WeChat) at any time upon publication within WeChat. If you do not accept such change to the fees, we may be unable to provide WeChat (or the relevant part of WeChat) to you.

SUBJECT TO MANDATORY APPLICABLE LAWS AND REGULATIONS OR AS OTHERWISE SPECIFIED BY US IN THESE TERMS OR FOR A PARTICULAR ITEM OR SERVICE WITHIN WECHAT, IN NO CIRCUMSTANCES WILL WE BE REQUIRED TO PROVIDE A REFUND FOR ANY PAYMENTS MADE BY YOU TO US IN RELATION TO ANY ITEMS OR SERVICE WITHIN WECHAT (WHETHER USED OR UNUSED).

If you believe that we have charged you in error, and subject to applicable laws and regulations: (a) you must contact us within 30 days of the date of the relevant charge; and (b) no refunds will be given for any erroneous charges after such 30 days period. We may process payments from you in WeChat via a third party service, and we may provide your relevant Information to such third parties to process your payments. You agree to comply with that relevant third party's terms and conditions in relation to the payment processing service, as further set out in the "Third Party Content and Services" section below.

## YOUR CONTENT

When you submit, upload, transmit or display any data, information, media or other content in connection with your use of WeChat ("Your Content"), you understand and agree that:

- you will continue to own and be responsible for Your Content;

- we will not sell Your Content to any third party;

- you are giving us and our affiliate companies a perpetual, non-exclusive, transferable, sub-licensable, royalty-free, worldwide licence to use Your Content (with no fees or charges payable by us to you) for the purposes of providing, promoting, developing and trying to improve WeChat and our other services, including new services that we may provide in the future. All such use will, to the extent Your Content contains Personal Information, be in accordance with our WeChat Privacy Policy. As part of this licence, we and our affiliate companies may, subject to the our WeChat Privacy Policy, copy, reproduce, host, store, process, adapt, modify, translate, perform, distribute and publish Your Content worldwide in all media and by all distribution methods, including those that are developed in the future;

- you grant other WeChat users a non-exclusive licence to access and use Your Content within WeChat, in accordance with these Terms and WeChat's functionalities;

- we may share Your Content with third parties that we work with to help provide, promote, develop and improve WeChat in accordance with the WeChat Privacy Policy;

- we may use the name that you submit in connection with Your Content (whether that be your account name, real name or otherwise); and

- you will comply with these Terms, including our WeChat Acceptable Use Policy, in your submission of Your Content.

In addition, you agree that we and our affiliate companies (subject to these Terms, our WeChat Privacy Policy and applicable laws and regulations):

- are allowed to retain and continue to use Your Content after you stop using WeChat;

- may be required to retain or disclose Your Content: (a) in order to comply with applicable laws or regulations; (b) in order to comply with a court order, subpoena or other legal process; (c) in order to respond to a lawful request by a government authority, law enforcement agency or similar body (whether situated in your jurisdiction or elsewhere); or (d) where we believe it is reasonably necessary to comply with applicable laws or regulations, in each case whether such applicable law or regulation, legal process or government body is of your jurisdiction or elsewhere;

- may be required to retain or disclose Your Content in order to enforce these Terms or to protect any rights, property or safety of ours, our affiliate companies or other users of WeChat.

You understand that even if you seek to delete Your Content from WeChat, it may as a technical and administrative matter take some time or not be possible to achieve this – for example, we may not be able to prevent any third party from storing or using any of Your Content that you have made public via WeChat. Further information on your rights in relation to Your Content are set out in our WeChat Privacy Policy.

We reserve the right to block or remove Your Content for any reason, including as is in our opinion appropriate, as required by applicable laws and regulations or in accordance with the Copyright Policy. We reserve the right to artificially manipulate the visibility, status, or rank of Your Content on WeChat.

*Responsibility for Your Content*

You are solely responsible for Your Content. We are not responsible for maintaining a backup of Your Content - we recommend that you keep a back-up copy of it at all times.

You must at all times ensure that: (a) you have the rights required to copy, process, transmit, access, publish, display and use Your Content, and to grant us and other third parties the rights as set out in these Terms; and (b) Your Content (and our use of Your Content in accordance with these Terms) does not infringe or violate any applicable laws or regulations or the rights of any person.

## INFRINGEMENT OF RIGHTS

We comply with the provisions of the Digital Millennium Copyright Act applicable to Internet service providers (17 U.S.C. §512, as amended) (the "**DMCA**"). If you have an intellectual property rights-related complaint about any content posted in WeChat, please follow the instructions set out in our Copyright Policy.

## THIRD PARTY CONTENT AND SERVICES

We are not responsible for and we do not endorse, support or guarantee the lawfulness, accuracy or reliability of any content submitted to, transmitted or displayed by or linked by WeChat, including content provided by users of WeChat or by our advertisers. You acknowledge and agree that by using WeChat, you may be exposed to content which is inaccurate, misleading, defamatory, offensive or unlawful. Any reliance on or use of any content on or accessible from WeChat by you is at your own risk. Your use of WeChat does not give you any rights in or to any content you may access or obtain in connection with your use of WeChat.

We also do not guarantee the quality, reliability or suitability of any third party services, programs (including any Mini Programs as made available on the WeChat Mini Programs Platform) or websites provided, made available, advertised or linked through WeChat (including any of WeChat's associated platforms or services) and we will bear no responsibility for your use of or relationship with any such third parties services, programs or websites, including any payment obligations or fees that you may incur in your use of such third party services or websites.

We may review (but make no commitment to review) content (including any content posted by WeChat users) or third party programs or services made available through WeChat to determine whether or not they comply with our policies, applicable laws and regulations or are otherwise objectionable. We may remove or refuse to make available or link to certain content or third party programs or services if they infringe intellectual property rights, are obscene, defamatory or abusive, violate any rights or pose any risk to the security or performance of WeChat.

There may be, from time to time, third party content, programs and/or services on WeChat that are subject to further terms from that third party – for examples, terms from the relevant third party that originally produced or created such content or service, terms in relation to promotional activities being held on WeChat, terms relating to your use of third party-provided WeChat login functionality or terms governing your use of any Mini Programs provided by a third party. You are solely responsible for reviewing and complying with any such third party terms and conditions.

We have the right to remove, at our sole discretion and without notice to you, any content, programs and/or services that are made available within WeChat (including any of WeChat's associated platforms or services), in accordance with these Terms.

## ADVERTISING CONTENT ON WECHAT

WeChat may include advertising or commercial content. You agree that: (a) we may integrate, display and otherwise communicate advertising or commercial content in WeChat and that (where reasonably practicable) we will identify such advertising or commercial content; and (b) as explained in more detail in our WeChat Privacy Policy, we may use targeted advertising to try to make advertising more relevant and valuable to you.

## OUR INTELLECTUAL PROPERTY RIGHTS

All intellectual property rights in or to WeChat and any WeChat Software (including any future updates, upgrades and new versions to all such WeChat Software), will continue to belong to us and our licensors. Except as expressly provided in these Terms, you have no right to use our intellectual property rights, including our trade marks or product names (for example, "**Tencent**", "**WeChat**" or "**QQ**"), logos, domain names or other distinctive brand features, without our prior written consent. Any comments or suggestions you may provide regarding WeChat are entirely voluntary and we will be free to use these comments and suggestions at our discretion (including using such comments to improve existing services or create new services) without any payment or other obligation to you.

We grant you a limited, personal, on-exclusive, non-sublicensable, non-transferrable, royalty-free and revocable right to use WeChat and any software from us as part of or in relation to your use of WeChat (any such software being the "**WeChat Software**"), solely in accordance with these Terms and subject to any other instructions as provided by us to you in relation to your use of WeChat and/or the WeChat Software from time to time. Please note that these terms may be supplemented by terms and conditions applicable to WeChat Software (or specific features within WeChat Software).

You may not copy, modify, create derivative works, reverse compile, reverse engineer or extract source codes from WeChat Software, and you may not sell, distribute, redistribute or sublicense WeChat or the WeChat Software, except in each case to the extent that we may not prohibit you from doing so under applicable laws or regulations or you have our prior written consent to do so. Where applicable laws or regulations entitle you to reverse compile or extract source codes from WeChat Software, you will first contact us to request the information you need.

We may from time to time provide updates to WeChat Software. Such updates may occur automatically or manually. Please note that WeChat Software may not operate properly or at all if upgrades or new versions are not installed by you. We do not guarantee that we will provide any updates for any WeChat Software, or that such updates will continue to support your device or system. All updates to the WeChat Software are part of the WeChat Software and subject to these Terms, except as otherwise specified by us.

For the purposes of these Terms, "WeChat Software" includes any items, content or features (the "**Items**") within the WeChat Software – for example, Stickers, games or other downloadable items within WeChat, and any content accessed or used by you within WeChat. You must comply with any Additional Terms applicable to any such Items. We will notify you of any such additional terms and conditions within WeChat, within an Appendix to these Terms and/or in another manner. We may grant you a limited right to use these Items upon payment by you of "real world money" as applicable from time to time. You acknowledge that you do not own these Items and the amounts associated with such Items do not refer to any credit balance of real currency or the equivalent. We may eliminate these Items from WeChat at any time, and we have no liability to you in the event that we exercise these rights.

For the purpose of these Terms, "WeChat Software" also includes any APIs we make available to you for use in connection with WeChat or the WeChat Software. You must comply with any Additional Terms applicable to such APIs.

We may in our discretion provide technical support for WeChat (whether for free or for a fee). We provide technical support without any guarantee or warranty of any kind, and subject always to these Terms.

OPEN SOURCE SOFTWARE

Certain WeChat Software may contain software that are subject to "open source" licences (the "**Open Source Software**"). Where we use such Open Source Software, please note that:

- there may be provisions in the Open Source Software's licence that expressly override these Terms, in which case such provisions shall prevail to the extent of any conflict with these Terms; and

- we will credit the relevant Open Source Software used in WeChat Software within an Appendix to these terms and/or within the relevant WeChat Software.

USE OF YOUR DEVICE BY WECHAT

In order for us to provide WeChat to you, we may require virtual access to and/or use of your relevant device (e.g. mobile phone, tablet or desktop computer) that you use to access WeChat – for example, we may need to use your device's processor and storage to complete the relevant WeChat Software installation, or we may need to access your contact list to provide certain interactive functions within WeChat.

We will provide further information regarding how WeChat uses and accesses your device within WeChat or in another manner (e.g. via the relevant app store as part of the installation process for WeChat on your device). You agree to give us such access to and use of your device, and you acknowledge that if you do not provide us with such right of use or access, we may not be able to provide WeChat (or certain features within WeChat) to you.

Any Personal Information (as defined in the WeChat Privacy Policy) that we use or access within your device will be treated in accordance with these Terms, including our WeChat Privacy Policy.

You may need an adequate internet connection in order to authenticate your WeChat account or use WeChat. You may also be required to activate certain functionalities within WeChat in the manner described within WeChat. You may not be able to use certain functionalities within WeChat if you do not comply with such requirements.

Please note that we are not responsible for any third party charges you incur (including any charges from your internet and telecommunication services providers) in relation to or arising from your use of WeChat or WeChat Software.

THIRD PARTY SOFTWARE AND CONNECTIVITY

You are solely responsible for any software (whether your own software or software supplied by third parties) used by you in connection with your use of WeChat, including any third party software or services made available to you through WeChat, such as Mini Programs made available on the WeChat Mini Programs Platform ("**Third Party Software**").

Please note that we are not responsible for and are not liable for any damages or losses arising from your use of the Third Party Software and we do not endorse, support or guarantee the quality, reliability or suitability of any Third Party Software. You must comply with any terms and conditions applicable to Third Party Software.

We do not provide any technical support for any Third Party Software. Please contact the relevant supplying third party for such technical support.

You will need an adequate internet connection in order to authenticate your WeChat account or use WeChat. You may also be required to activate certain functionalities within WeChat in the manner described within WeChat. You may not be able to use certain features within WeChat if you do not comply with such requirements.

Please note that we are not responsible for any third party charges you incur (including any charges from your internet and telecommunication services providers) in relation to or arising from your use of WeChat or WeChat Software.

WARRANTY AND DISCLAIMER

We warrant to you that we will provide WeChat using reasonable care and skill.

APART FROM THIS WARRANTY, TO THE EXTENT PERMITTED BY APPLICABLE LAWS AND REGULATIONS, WECHAT (INCLUDING ANY WECHAT SOFTWARE) IS PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS AND NEITHER US NOR ANY OF OUR AFFILIATE COMPANIES MAKE ANY REPRESENTATION OR WARRANTY OR GIVE ANY UNDERTAKING IN RELATION TO WECHAT, ANY WECHAT SOFTWARE OR ANY DATA, MEDIA OR OTHER CONTENT SUBMITTED, TRANSMITTED OR DISPLAYED BY WECHAT, INCLUDING: (A) ANY REPRESENTATION, WARRANTY OR UNDERTAKING THAT WECHAT OR WECHAT SOFTWARE WILL BE UNINTERRUPTED, SECURE OR ERROR-FREE OR FREE FROM VIRUSES; (B) THAT WECHAT OR WECHAT SOFTWARE WILL BE COMPATIBLE WITH YOUR DEVICE; OR (C) THAT WECHAT OR WECHAT SOFTWARE WILL BE OF MERCHANTABLE QUALITY, FIT FOR A PARTICULAR PURPOSE OR NOT INFRINGE THE INTELLECTUAL PROPERTY RIGHTS OF ANY PERSON. TO THE EXTENT PERMITTED BY APPLICABLE LAWS AND REGULATIONS, YOU WAIVE ANY AND ALL IMPLIED REPRESENTATIONS, WARRANTIES AND UNDERTAKINGS.

LIABILITY FOR WECHAT

TO THE EXTENT PERMITTED BY APPLICABLE LAWS AND REGULATIONS, THE TOTAL AGGREGATE LIABILITY OF US AND OUR AFFILIATE COMPANIES FOR ALL CLAIMS IN CONNECTION WITH THESE TERMS, OR WECHAT (INCLUDING ANY WECHAT SOFTWARE), ARISING OUT OF ANY CIRCUMSTANCES, WILL BE LIMITED TO THE GREATER OF THE FOLLOWING AMOUNTS: (A) THE AMOUNT THAT YOU HAVE PAID TO US FOR YOUR USE OF WECHAT OR WECHAT SOFTWARE TO WHICH THE CLAIM RELATES IN THE 6 MONTHS IMMEDIATELY PRECEDING THE DATE OF THE MOST RECENT CLAIM; AND (B) USD100 (ONE HUNDRED US DOLLARS). TO THE EXTENT PERMITTED BY APPLICABLE LAWS AND REGULATIONS, IN NO EVENT WILL WE OR ANY OF OUR AFFILIATE COMPANIES BE LIABLE FOR ANY OF THE FOLLOWING:

- IN CONNECTION WITH THESE TERMS OR WECHAT OR WECHAT SOFTWARE, FOR ANY DAMAGES OR LOSSES CAUSED BY: (A) ANY NATURAL DISASTER SUCH AS FLOODS, EARTHQUAKES OR EPIDEMICS; (B) ANY SOCIAL EVENT SUCH AS WARS, RIOTS OR GOVERNMENT ACTIONS; (C) ANY COMPUTER VIRUS, TROJAN HORSE OR OTHER DAMAGE CAUSED BY MALWARE OR HACKERS; (D) ANY MALFUNCTION OR FAILURE OF OUR OR YOUR SOFTWARE, SYSTEM, HARDWARE OR CONNECTIVITY; (E) IMPROPER OR UNAUTHORISED USE OF WECHAT OR WECHAT SOFTWARE; (F) YOUR USE OF WECHAT OR WECHAT SOFTWARE IN BREACH OF THESE TERMS; (G) ANY REASONS BEYOND OUR REASONABLE CONTROL OR PREDICTABILITY; OR (H) FAILURE TO SAVE OR BACK UP ANY DATA OR OTHER CONTENT;

- ANY LOSS ARISING FROM ANY CONTENT, PROGRAMS OR SERVICES PROVIDED BY ANY PARTY OTHER THAN US (OR OUR AFFILIATES);

- ANY LOSS OR DAMAGE WHICH ARE NOT FORESEEABLE, INDIRECT, SPECIAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES OR LOSSES. FOR THE PURPOSES OF THIS CLAUSE, LOSS OR DAMAGE IS FORESEEABLE IF EITHER IT IS OBVIOUS THAT IT WILL HAPPEN OR IF, AT THE TIME THE CONTRACT WAS MADE, BOTH WE AND YOU KNEW IT MIGHT HAPPEN; AND/OR

- ANY:
  - LOSS OF USE;
  - LOSS OR INTERRUPTION OF BUSINESS;
  - LOSS OF REVENUES;
  - LOSS OF PROFITS;
  - LOSS OF GOODWILL;
  - LOSS OR DESTRUCTION OF CONTENT OR DATA.

Nothing in these Terms limits or excludes any of the following liabilities, except to the extent that such liabilities may be waived, limited or excluded under applicable laws and regulations:

- any liability for fraud;
- any liability for negligently caused death or personal injury;
- any liability for gross negligence or wilful misconduct; or
- any other liability to the extent that such other liability cannot be waived, limited or excluded under applicable laws and regulations.

NOTWITHSTANDING ANY OTHER PROVISIONS OF THESE TERMS, NOTHING IN THESE TERMS LIMITS OR EXCLUDES ANY OF YOUR STATUTORY RIGHTS IN YOUR JURISDICTION (INCLUDING ANY RIGHTS UNDER APPLICABLE CONSUMER PROTECTION REGULATION), TO THE EXTENT SUCH STATUTORY RIGHTS MAY NOT BE EXCLUDED OR WAIVED UNDER APPLICABLE LAWS AND REGULATIONS.

YOU AGREE THAT YOU (AND YOUR ORGANISATION, IF YOU ARE USING WECHAT OR WECHAT SOFTWARE ON BEHALF OF SUCH ORGANISATION) INDEMNIFY US AND OUR AFFILIATE COMPANIES FROM AND AGAINST ANY CLAIM, SUIT, ACTION, DEMAND, DAMAGE, DEBT, LOSS, COST, EXPENSE (INCLUDING LITIGATION COSTS AND ATTORNEYS' FEES) AND LIABILITY ARISING FROM: (A) YOUR USE OF WECHAT OR WECHAT SOFTWARE; OR (B) YOUR BREACH OF THESE TERMS.

## NO LIABILITY FOR THIRD PARTIES

As set out in the "Third Party Content and Services" and "Third Party Software" sections of these Terms, various third parties may provide certain content, services or software within WeChat.

THESE TERMS GOVERN THE RELATIONSHIP BETWEEN YOU AND US (AND, WHERE RELEVANT, OUR AFFILIATE COMPANIES). YOUR DEALINGS WITH ALL THIRD PARTIES (INCLUDING THOSE FOUND THROUGH, PROMOTED THROUGH, ACCESSED VIA HYPERLINK THROUGH OR OTHERWISE THROUGH WECHAT), ARE SOLELY BETWEEN YOU AND THE RELEVANT THIRD PARTY. SUBJECT TO MANDATORY APPLICABLE LAWS AND REGULATIONS, WE AND OUR AFFILIATE COMPANIES HAVE NO LIABILITY TO YOU IN RELATION TO ANY THIRD PARTIES (INCLUDING ANY CONTENT, SERVICES OR SOFTWARE PROVIDED BY SUCH THIRD PARTIES WITHIN WECHAT), NOTWITHSTANDING YOUR ENGAGEMENT WITH ANY SUCH THIRD PARTIES THROUGH WECHAT.

## TERMINATION

These Terms will apply to your use of WeChat until your access to WeChat is terminated by either you or us.

You may terminate your use of WeChat, or any of the services accessible therein, at any time (including if we have told you about an upcoming change to all or part of WeChat or these Terms which you do not agree to). If the terminated service is a paid service, we may deduct from any refund a reasonable proportion of such fee as compensation for the costs incurred by us in ending the relevant service.

We may suspend or terminate your access to your account or any or all of WeChat:

- if we undertake maintenance or support of WeChat;

- to make changes to WeChat as notified by us to you;

- if we reasonably believe that you have breached these Terms;

- if your use of WeChat creates risk for us or for other users of WeChat, gives rise to a threat of potential third party claims against us or is potentially damaging to our reputation;

- if you fail to use WeChat for a prolonged period;

- if such suspension or termination is required due to Applicable Laws; or

- to the extent permitted by applicable laws and regulations, for any other reason in our sole and absolute discretion,

and where reasonably practicable, we will give you advance notice of any suspension or termination.

If we suspend your access to any or all of WeChat then, to the extent permitted by applicable laws and regulations in your jurisdiction: (a) you remain responsible for all fees accrued through the date of suspension (including where the fees were incurred before suspension date but performance of the relevant obligations were after the suspension date); and (b) you remain responsible for any applicable fees for any part of WeChat to which you continue to have access.

If your access to WeChat is terminated (in whole or in part) by you or us, you agree that: (a) all of your rights under these Terms will terminate; (b) you remain responsible for all fees accrued through the date of termination (including where the fees were incurred before termination date but performance of the relevant obligations were after the termination date); and (c) you will immediately permanently delete all copies of WeChat Software to which the termination relates and you will immediately cease accessing and using any such WeChat Software.

*Retention and back-up of Your Content*

Following termination of these Terms, we will only retain and use Your Content in accordance with these Terms and, to the extent Your Content includes Personal Information, the WeChat Privacy Policy. Subject to the WeChat Privacy Policy and applicable laws and regulations in your jurisdiction, where we suspend or terminate all or part of WeChat, or where your access to WeChat is terminated by you or us, we do not guarantee that we will be able to return any of Your Content back to you and we may permanently delete Your Content without notice to you at any time after termination. Please ensure that you regularly back up Your Content.

## GENERAL

Subject to the applicable laws and regulations in your jurisdiction, these Terms sets out the entire agreement between you and us in relation to WeChat – you agree that you will have no claim against us for any statement which is not explicitly set out in these Terms. The words "include" and "including" are to be construed without limitation. The invalidity of any provision of these Terms (or parts of any provision) will not affect the validity or enforceability of any other provision (or the remaining parts of that provision). If a court holds that we cannot enforce any part of these Terms as drafted, we may replace those terms with similar terms to the extent enforceable under applicable laws and regulations, without changing the remaining terms of these Terms. No delay in enforcing any provision of these Terms will be construed to be a waiver of any rights under that provision. Any rights and obligations under these Terms which by their nature should survive, including any obligations in relation to the liability of, or indemnities (if any) given by, the respective parties, will remain in effect after termination or expiration of these Terms.

No person other than you and us will have any right to enforce these Terms, whether pursuant to the Contracts (Rights of Third Parties) Ordinance or otherwise, and you may not delegate, assign or transfer these Terms or any rights or obligations under these Terms without our prior consent. We may freely assign or transfer these Terms or our rights and obligations under these Terms, in whole or in part, without your prior consent or prior notice to you. We may freely sub-contract any part of our performance of these Terms at any time, without your prior consent or prior notice to you.

## GOVERNING LAW AND DISPUTE RESOLUTION

Except to the extent that: (a) any applicable additional terms incorporated into these Terms provide differently, or (b) the applicable laws and regulations of your jurisdiction mandate otherwise (for example, you may have statutory rights in your jurisdiction in relation to bringing or defending claims in a local court (including small claims court)):

- these Terms and any dispute or claim arising out of or in connection with these Terms will be governed by the law of the Hong Kong Special Administrative Region; and

- any dispute, controversy or claim (whether in contract, tort or otherwise) arising out of, relating to, or in connection with these Terms, including their existence, validity, interpretation, performance, breach or termination, will be referred to and finally resolved by arbitration

administered by the Hong Kong International Arbitration Centre under the Hong Kong International Arbitration Centre Administered Arbitration Rules in force when the Notice of Arbitration is submitted. The seat of the arbitration will be Hong Kong. There will be one arbitrator only. The arbitration proceedings will be conducted in English.

## WECHAT TERMS OF SERVICE (USA-SPECIFIC TERMS)

*If you are a user of WeChat in the United States of America, the below Additional Terms: (a) are incorporated into these Terms; (b) apply to your use of WeChat; and (c) override the head terms of these Terms to the extent of any inconsistency.*

If you are a user of WeChat in the United States of America, the following terms expressly replaces the above "Governing law and dispute resolution" section of these Terms.

If you live in (or, if a business, your principal place of business is in) the United States, the laws of the state where you live govern all claims, regardless of conflict of law principles, except that the Federal Arbitration Act governs all provisions relating to arbitration. You and we irrevocably consent to the exclusive jurisdiction and venue of the state or federal courts of California, for all disputes arising out of or relating to these Terms that are heard in court (excluding arbitration).

EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY OR TO PARTICIPATE IN A CLASS ACTION IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THESE TERMS OR THE TRANSACTIONS CONTEMPLATED HEREBY.

In the event of a dispute, you and we agree to try for sixty (60) days to resolve it informally. If you and we are unable to come to informal resolution within sixty (60) days, you and we agree to binding individual arbitration before the American Arbitration Association ("**AAA**") under the Federal Arbitration Act ("**FAA**") (with such arbitration to be conducted under the AAA's Commercial Arbitration Rules), and not to sue in court in front of a judge or jury. Instead, a neutral arbitrator will decide and the arbitrator's decision will be final except for a limited right of appeal under the FAA. Class action lawsuits, class-wide arbitrations, private attorney-general actions, and any other proceeding where someone acts in a representative capacity are not allowed, and nor is combining individual proceedings without the consent of all parties. These Terms govern to the extent they conflict with the AAA's Commercial Arbitration Rules or Consumer Arbitration Rules. You and we must file in arbitration any claim or dispute (except intellectual property disputes) within one year from when it first could be filed. If the class action waiver is found to be illegal or unenforceable as to all or some parts of a dispute, then those parts won't be arbitrated but will proceed in court, with the rest proceeding in arbitration. If any other provision of these provisions regarding arbitration is found to be illegal or unenforceable, that provision will be severed but the rest of these provisions regarding arbitration still apply.

If you are a California resident, then (except to the extent prohibited by applicable laws) you agree to waive California Civil Code Section 1542, and any similar provision in any other jurisdiction (if you are a resident of such other jurisdiction), which states: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favour at the time of executing the release, which, if known by him must have materially affected his settlement with the debtor".

## WECHAT TERMS OF SERVICE (AUSTRALIA-SPECIFIC TERMS)

*If you are a user of WeChat in Australia, the below Additional Terms: (a) are incorporated into these Terms; (b) apply to your use of WeChat; and (c) override the head terms of these Terms to the extent of any inconsistency.*

All express or implied guarantees, warranties, representations, or other terms and conditions relating to these Terms or their subject matter, not contained in these Terms, are excluded from these Terms to the maximum extent permitted by applicable laws and regulations.

Nothing in these Terms excludes, restricts or modifies any guarantee, warranty, term or condition, right or remedy implied or imposed by any applicable laws and regulations which cannot lawfully be excluded, restricted or modified.

If any guarantee, condition, warranty or term is implied or imposed by any applicable laws and regulations and cannot be excluded (a "**Non-Excludable Provision**"), and we are able to limit your remedy for a breach of the Non-Excludable Provision, then our liability for breach of the Non-Excludable Provision is limited to one or more of the following at our option:

- in the case of goods, the replacement of the goods or the supply of equivalent goods, the repair of the goods, the payment of the cost of replacing the goods or of acquiring equivalent goods, or the payment of the cost of having the goods repaired; or

- in the case of services, the supplying of the services again, or the payment of the cost of having the services supplied again.

## WECHAT TERMS OF SERVICE (EUROPEAN UNION-SPECIFIC TERMS)

*If you are a user of WeChat and located in the European Union, the below Additional Terms: (a) are incorporated into these Terms; (b) apply to your use of WeChat; and (c) override the head terms of these Terms to the extent of any inconsistency.*

*Refund of your purchases*

If you have purchased and paid for a WeChat product or service provided by us (and not by any third parties), you may receive a refund for such purchase if we receive a refund request from you within 14 days from the date you completed the relevant purchase. If you have already used a portion of the relevant product or service, you will receive a refund for the unused portion only. In the case of a download or streaming product, you acknowledge that by proceeding to download or stream such product, you will not be entitled to a refund of such purchase.

We set out further information within the relevant WeChat services and applicable Additional Terms in relation to how you can submit your refund request.

*Dispute Resolution*

Notwithstanding the "Governing Law and Dispute Resolution" section of these Terms, if you are a "consumer" as defined under the EU Direction 83/2011/EU, any dispute, controversy or claim (whether in contract, tort or otherwise) between us and you, arising out of, relating to, or in connection with these Terms will be referred to and finally resolved by the court of your place or residence or domicile. You can also file a complaint at the online platform for alternative dispute resolution (ODR-platform). You can find the ODR-platform through the following link: https://ec.europa.eu/consumers/odr.

*Loss or damage*

If any WeChat services or features which we have supplied damages a device or digital content belonging to you and this is caused by our failure to use reasonable care and skill we will either repair the damage or pay you reasonable compensation for such damage. However, we will not be liable for damage which you could have avoided by following our advice to apply an update offered to you free of charge or for damage which was caused by you failing to correctly follow installation instructions or to have in place the minimum system requirements advised by us. We only supply WeChat and the services or features accessible via WeChat for domestic and private use. If you use WeChat or the services or features for any commercial or business purpose we will have no liability to you for any loss of profit, loss of business, business interruption, or loss of business opportunity.

Last modified: 2018-03-21

# Exhibit DD



# WeChat Privacy Protection Summary

Thank you for using our products and services! We respect your concerns about privacy and appreciate your trust and confidence in us.

Here is a summary of the information contained in this privacy policy. This summary is to help you navigate the privacy policy and it is not a substitute for reading everything! You can use the hyperlinks below to jump directly to particular sections.

## What information do you need to provide WeChat?

If you register an account to use WeChat then we will need some information from you to set this up (e.g., to set up a profile and validate your phone number). To set up your account, we will need a nickname, your mobile number, and a password. You can further refine and populate your profile with additional information. If you use the services available within WeChat (such as posting photos to your Moments and Time Capsule or following Official Accounts), we will process information to allow the services to operate. More...

## How do we use your information?

We use your information to provide WeChat to you, allow you to communicate with other users, and to use the features of the WeChat Open Platform. We use your information for account set-up, to facilitate communications, provide support, allow you to access features of WeChat, and to improve WeChat. WeChat uses contact channels provided by you, such as mobile number or email address, for verifying and protecting your account and for important administrative reasons and does not use these channels for promotional or marketing reasons. More...

## Who do we share your data with?

We do not share your information with any third parties, except where we need to in order to provide the service (e.g., use SMS service providers for account validation; for mapping services; for other point-of-interest services; using our affiliates around the world to help us to deliver WeChat) or if we are instructed to by a court, authority or compelled by law. We use these third party services solely to process or store your information for the purposes described in this policy. Any third party (selected by us) with whom we share user data is required to provide the same or equal protection of user data as stated in this policy. More...

## Where do we process your data?

Our servers are located in Ontario, Canada and Hong Kong. We also have support, engineering and other teams that support the provision of WeChat to you, located around the world. Your data may be accessed from such locations. Rigorous internal control measures are undertaken to strictly limit access to your data by designated team members. More...

## How long do we keep hold of your data?

The time we retain your information for depends on the type of information – for example, log-in data is retained for up to 90 days from the date the data is collected. If you instruct us to delete your WeChat account, your information is deleted within 60 days of the latter of verification of account ownership and receiving your account deletion request. More...

## How can I exercise my rights over my data?

Depending on where you live, you may have special rights over your data and how we can use it. These include how you can access the data, erasing the data, restricting how your data can be used, objecting to its use, and getting a copy of your information. More...

## How will we notify you of changes?

If there are any significant changes to this Privacy Policy, we will update the policy here and notify you before the change becomes effective.

## Contact Information for Dispute Resolution

If you have any concerns or complaints, please contact us here.

Data Controllers:

Users located in the European Economic Area and Switzerland: Tencent International Service Europe BV.

Users located outside of the European Economic Area or Switzerland (subject to the below): Tencent International Service Pte. Ltd.

IIf you either:

register by linking a mobile number that is made available to you in the People's Republic of China (except for Taiwan, Hong Kong, or Macau) (being the "PRC") ((i.e., a contact number that uses international dialing code +86)); or

have contracted with 深圳市腾讯计算机系统有限公司 (Shenzhen Tencent Computer Systems Company Limited) for Weixin or WeChat (for example, if you have downloaded Weixin or WeChat from the PRC iOS App Store or from a PRC Android app store),

you are subject to the Weixin Terms of Service and Weixin Privacy Policy and not this Privacy Policy.

Data Protection Officer:

Email: dataprotection@wechat.com

Postal mail: 26.04 on the 26th floor of Amstelplein 54, 1096 BC Amsterdam, the Netherlands

If you have an unresolved privacy or data use concern that we have not addressed satisfactorily, please contact our third party dispute resolution provider (free of charge) at https://feedback-form.truste.com/watchdog/request.

# WeChat Privacy Policy

## INTRODUCTION

Welcome to WeChat!

The use of our services (being the WeChat mobile app, the website www.wechat.com or any third party platforms through which WeChat is provided) (together, **"WeChat"**) involve the processing of your Information.

This privacy policy explains the when, how, and why when it comes to processing of your Information in connection with WeChat, and sets out your choices and rights in relation to that Information. Please read it carefully – it is important for you to understand how we collect and use your Information, and how you can control it.

**By using WeChat you agree to the processing of your Information in accordance with this Privacy Policy.**

**When you use certain features you will be asked to agree to the processing of your Information in certain ways (for example, when you follow an Official Account, you are asked if you agree to the transfer of your data to a third party). You can find information on how to control your preferences and the use of your Information via your account here. For certain Information you may withdraw your agreement to the processing of that Information in accordance with this Privacy Policy.**

**If you do not agree to the processing of your Information in the way this privacy policy describes, please do not provide your Information when requested and stop using WeChat.**

**Contact**

In this Privacy Policy, **"we"**, **"our"**, or **"us"** refers to:

if you are a user located in the European Economic Area or Switzerland: Tencent International Service Europe B.V., a Dutch company, located at 26.04 on the 26th floor of Amstelplein 54, 1096 BC Amsterdam, the Netherlands; and

if you are a user located outside of the European Economic Area, Switzerland, or the People's Republic of China (excluding Taiwan, Hong Kong, and Macau: Tencent International Service Pte. Ltd., a Singaporean company located at 10 Anson Road, #21-07 International Plaza, Singapore 079903.

If you have any questions or complaints regarding this Privacy Policy or the use of your Personal Information, please contact our Data Protection Officer via email at dataprotection@wechat.com or via postal mail at 26.04 on the 26th floor of Amstelplein 54, 1096 BC Amsterdam, the Netherlands (Attention: Data Protection Officer, Legal Department).

If you wish to make any complaints regarding this Privacy Policy or its implementation by us, please contact us via the above contact details. Please note that if you are a resident in the European Union you have the right to lodge a complaint with your country's data protection authority.

## SCOPE AND APPLICATION OF THIS PRIVACY POLICY

This Privacy Policy applies to WeChat, as well as any services accessible on the WeChat platform that state that this Privacy Policy applies to the use of such service (for example, users that follow or use Official Accounts, Mini Programs and WeChat Login for third-party apps). Those WeChat services may have further privacy-related terms that you must agree to if you use those services. Any capitalised terms used in this Privacy Policy have the same meaning as the equivalent defined terms in the WeChat Terms of Service, unless they are defined otherwise in this Privacy Policy.

Please note that this Privacy Policy does not apply to Information that you choose to disclose or submit to:

a) services other than WeChat (such as other products or services supplied or operated by us or our affiliates), that do not expressly state that this Privacy Policy applies;

b) any third party services (including any third party websites) that you may access through WeChat; or

c) companies or organisations that advertise products or services on WeChat.

If you are using WeChat on behalf of a company, partnership, association, government or other organisation (your **"Organisation"**), you agree to notify your Organisation's relevant individual owners, shareholders, directors, officers, managers, employees and other relevant individuals whose Personal Information we collect or you provide to us from time to time (**"Connected Persons"**) of the collection of their Personal Information, and you agree to obtain your Connected Persons' consent to the processing of their Personal Information in accordance with this Privacy Policy as required by applicable laws and regulations. When this Privacy Policy refers to "you" or "your" this includes you and any Connected Persons. If you or any Connected Persons would like to request your personal information be removed from our database, please contact us at dataprotection@wechat.com.

## WHAT INFORMATION DO YOU NEED TO PROVIDE WECHAT?

This section describes the different types of personal information we collect from you and how we collect it. If you would like to know more about specific types of data and how we use that data, please see the section entitled "How do we use your information" below.

We process different categories of information and data in providing WeChat. These are set out below:

**"Location Data"** is information that is derived from your GPS, Wi-Fi, compass, accelerometer, IP address, or public posts that contain location information. Location information will be disclosed (either to us, to other users, or both):

when you use location-based features, such as People Nearby, POI search, WeRun, and when you share your location with other WeChat users; and

when you access WeChat, as we derive location information from your IP address, device, or internet service to prevent multiple or fraudulent log-ins to your account.

**"Log Data"** is information that we automatically collect when you use WeChat, whether through the use of cookies, web beacons, log files, scripts or ETags (as explained in more detail in our Cookies Policy), including:

technical information, such as your mobile carrier-related information, configuration information made available by your web browser or other programs you use to access WeChat, your IP address and your device's version and identification number;

information about what you have searched for and looked at while using WeChat, such as web search terms used, social media profiles visited, and details of other information and content accessed or requested by you in using WeChat;

metadata, which means information related to items you have made available through WeChat, such as the date, time or location that a shared photograph or video was taken or posted.

**"Non-Personal Information"** is any information that is not reasonably practicable to directly or indirectly identify you.

**"Personal Information"** is any information, or combination of information, that relates to you, that can be used (directly or indirectly) to identify you. We set out examples of Personal Information (and how we collect such Personal Information) in "How do we use your information" below.

**"Shared Information"** is information about you or relating to you that is voluntarily shared by you on WeChat. Shared Information may include postings that you make on WeChat (including your public profile, the lists you create, and photos, videos and voice recordings as accessed with your prior consent through your device's camera and/or microphone sensor), any postings from others that you re-post and Location Data and Log Data associated with such postings. Shared Information also includes information about you (including Location Data and Log Data) that others who are using WeChat share about you.

References to **"Information"** in this Privacy Policy mean both Personal Information and Non-Personal Information.

## HOW DO WE USE YOUR INFORMATION?

This section provides more detail on the types of personal information we collect from you, and why. For users who live in the European Economic Area (**EEA**), it also identifies the legal basis under which we process your data:

| Information | Purpose of Processing |
|---|---|
| **Registration Data and Log-in Data.** Your name, user alias, mobile phone number, password, gender, and IP address.<br>**Legal Basis (EEA):** Necessary to perform our contract with you to provide you r WeChat profile and provide WeChat services. | to set up and log in to a user account on WeChat;<br>to notify you about changes to WeChat;<br>to facilitate communication;<br>to provide you with user support;<br>to enforce our terms, conditions, and policies;<br>to place VoIP calls using WeChat;<br>to communicate with you;<br>to provide personalised help and instructions;<br>to better understand how you access and use WeChat;<br>to develop new and improve existing services;<br>to provide language and location customisation;<br>to protect any rights, property or safety of ours, our affiliate companies, or other users of WeChat; and<br>to administer WeChat and for internal operations, including troubleshooting, data analysis, testing, research, security, fraud-detection, account management, and survey purposes. |
| **User Profile Search Data.** Record of search inquiries.<br>**Legal Basis (EEA):** Necessary to perform our contract with you to provide efficient access to your WeChat activity. | to provide quick access to previous searches. |
| **Shared Information - Profile Data.** Any information that you include in your publicly-visible WeChat profile, which may include your profile ID, name, and photo.<br>**Legal Basis (EEA):** Necessary to perform our contract with you to provide you r WeChat profile and provide WeChat services. | to administer the WeChat platform in accordance with your instructions and requests;<br>to provide personalised help and instructions;<br>to provide language and location customisation;<br>to develop new and improve existing services;<br>to better understand how you access and use WeChat;<br>to maintain your WeChat account in accordance with your instructions and requests. |

| Information | Purpose of Processing |
|---|---|
| **Shared Information – Profile Media.** This comprises all of the information you make available to other users via WeChat, comprising: WeChat Moments and Time Capsule posts and responding to other users' WeChat Moments and and Time Capsules; and information made available by another user about you via their use of WeChat – for example, any Shared Information that others using WeChat make available about you via WeChat Moments, Time Capsule, and and communications they make to you and others using WeChat. <br><br> **Legal Basis (EEA):** Necessary to perform our contract with you to provide your WeChat profile and provide WeChat services. | to administer the WeChat platform; to provide personalised help and instructions; to provide language and location customisation; to develop new and improve existing services; to maintain your WeChat account; to better understand how you access and use WeChat. |
| **Additional Account Security.** Voiceprint (an optional security features for you), Emergency Contacts, Managed Devices, Email address, Facebook Connect OpenID, Facebook Connect Token, Facebook Username, QQ ID, and if you opt in: credit card number, facial mapping/detection, and/or Sign in with Apple. <br> **Legal Basis (EEA):** Necessary to perform our contract with you to provide and secure your WeChat account. | to verify your identity account security. |
| **Chat Data.** Content of communications between you and another user or group of users. This is stored on your device and the devices of the users that you have sent communications to. We do not permanently store this information on our servers and it only passes through our servers so that it can be distributed to the users you have chosen to send communications to. <br> **Legal Basis (EEA):** Necessary to perform our contract with you to provide the chat services of WeChat. | to facilitate delivery of communication to another user. |
| **Contacts List.** Your on-device contact list. <br> **Legal Basis (EEA):** Necessary to perform our contract with you to provide WeChat and connect you with your friends. | to connect you with other WeChat users using the "Recommended Friends" function. |
| **OpenID.** We generate an OpenID each instance your WeChat account activates a third-party WeChat Open Platform service. It is a unique identifier that only exists for one account connecting to a single service and allows it to be identified without using other personal information – for example, your name or email address. In addition, we create a UnionID for each instance your WeChat account connects to a service or services operated by a single third-party operator. This allows the third-party operator to associate your activity more easily across various inter-related services offered by the same operator. <br> **Legal Basis (EEA):** Necessary to perform our contract with you to provide your WeChat profile and provide WeChat services. | to allow you to follow an Official Account; to allow you to use a Mini Program; and to allow you to use your WeChat ID to log-in to third party services. |
| **Log Data.** See definition above. <br> **Legal Basis (EEA):** It is in our legitimate interest to ensure the security of our services, manage registrations and improve our services. | to better understand how you access and use WeChat; to administer WeChat; for internal operations, including troubleshooting, data analysis, testing, research, security, fraud-detection, and account management. |
| **Location Information.** See definition above. <br> **Legal Basis (EEA):** Necessary to perform our contract with you to provide WeChat location-related services. | |

| Information | Purpose of Processing |
|---|---|
| Please note that use of products and services that use location information are, when used outside of the PRC, subject to the HERE Terms of Use and the HERE Privacy Policy. | for security, fraud-detection and account management (such as to ensure there are not multiple log-ins or suspicious log-ins on your account);<br>to provide you with location-based services that you choose to use:<br>Share Location (when you elect to share your location within a chat with other users);<br>Moments and Time Capsule/Point of Interest (geo-tagging a place in a Moments or Time Capsule post);<br>WeRun (when you elect to use this feature WeChat uses your accelerometer and gyroscope<br>Official Accounts (if you elect to disclose your location to an Official Account, that information will be shared with the Official Account);<br>Mini Program (if you choose to disclose your location to a Mini Program, or choose to find Mini Programs Nearby);<br>People Nearby, Shake, Message in a Bottle (these are location-based services that you can choose to use to disclose your general location for a limited period of time (and you can choose to clear such location data at any time);<br>Top Stories (if you access this feature, we use your location to optimize locally relevant news content for you);<br>Search (if you perform an external search using WeChat, the service uses your location to provide you with locally relevant information);<br>to provide language and location customisation. |
| **Credit card information**<br>**Legal Basis (EEA):** We process this data in accordance with our obligations under applicable law. | In some regions, credit card information is collected and the card information verified via a third-party payment processing service for the purpose of verifying parental or guardian consent to use WeChat by an underage minor. This information is not permanently stored to WeChat's servers and is immediately disposed after a verification request has been performed by the third-party payment processing service. |
| **Customer Support Information.** Any information that you provide to our customer support team.<br>**Legal Basis (EEA):** Necessary to perform our contract with you to provide and support WeChat. | to investigate your support issue. |
| **Device Data.** Media stored on your device.<br>**Legal Basis (EEA):** Necessary to perform our contract with you to provide WeChat services. | to facilitate the sharing of such media using WeChat. |

| Information | Purpose of Processing |
|---|---|
| **Social Connect Information.** Your QQ ID or Facebook Connect Token (as applicable).<br>**Legal Basis (EEA):** Necessary to perform our contract with you to provide WeChat services. | if you choose to connect a third party social media account to your WeChat account, we process this information to facilitate login to WeChat via social media account.<br>if you publish content on your Moments or Time Capsule, WeChat will facilitate the publishing to a authenticated third party social media account if you choose to share this content to the third party account |
| **Surveys.** If you choose to participate in a survey, we may request certain Personal Information from you. We may use a service provider to conduct these surveys and this will be notified to you prior to you completing the survey.<br>**Legal Basis (EEA):** We collect this information with your consent. | to better understand how you access and use WeChat;<br>to provide personalised help and instructions;<br>to develop new and improve existing services;<br>to improve WeChat and respond to customer requests and preferences. |
| **Contest Information.** Any information that you provide to us in submitting an entry to a contest offered on WeChat.<br>**Legal Basis (EEA):** Necessary to perform our contract with you to validate contest entry and award prizes. | to facilitate your participation in the contest;<br>to award prizes, if applicable. |
| **Pseudonymised and Aggregated Data.** We pseudonymise and aggregate certain Personal Information to improve our services.<br>**Legal Basis (EEA):** It is in our legitimate interest to ensure the security of our services, manage registrations and improve our services. | Analysis of what features or actions are taken within the app in order to improve app experience<br>Fraud detection and account safety analysis<br>User demographic analysis on items such as region, phone model, operating system platform, system language, and WeChat version in order to better understand how our users are using WeChat<br>Web and account traffic statistics of what content and services are used when users access third-party services on the WeChat Open Platform as a method for informing third-party service providers basic analysis of how their service is being used by WeChat users |

Some features of WeChat are only available to users in certain jurisdictions. For these features we collect additional information as follows:

| Information | Purpose of Processing |
|---|---|
| **Additional Registration Data – Verified Account.** Nationality, date of birth, residential address, copy of residential address proof, copy of personal identification document (for example passport, identification card, home return permit, etc.), personal identification document number, occupation, and source of funds.<br>**Availability:** This feature is only available to users with mobile numbers issued in certain jurisdictions (such as Hong Kong) | If you choose to apply for account verification (in order to unlock additional payment and fund settlement features in WeChat), we use this information to:<br>to verify your identity; and<br>to facilitate payment and funds settlement. |

| Information | Purpose of Processing |
|---|---|
| **Payments Information.** Your credit card number, expiry, CVC, cardholder name, and transactional payment data via MIDAS payment SDK.. Please note that where a payment is processed by a third party payment service provider, we do not collect or store any Personal Information, though we may receive summary information about transactions. **Availability:** This feature is only available to users with mobile numbers issued in certain jurisdictions (such as Hong Kong) | to facilitate your purchases within WeChat; to validate your real name to facilitate the creation of your WeChat Pay account; to process your payment using the MIDAS payments platform |

**Personal Information within Your Content**

If any of your Personal Information comprises Your Content (as defined in the WeChat Terms of Service), we and our affiliate companies may (subject to this Privacy Policy) use such Personal Information in accordance with the "Your Content" section of the WeChat Terms of Service.

## WHO DO WE SHARE YOUR DATA WITH?

**We will not transfer your Personal Information to any other third parties except as specified below, or in circumstances where you consent to such transfer.**

Only where necessary will we share your information with selected recipients who have a legal basis and valid jurisdiction to request such data. These categories of recipients include:

government, public, regulatory, judicial and law enforcement bodies or authorities: there are circumstances in which we are legally required to disclose information, including to comply with a legal obligation or processes, such as a court order, subpoena or other legal process, to enforce our terms, address issues relating to security or fraud, or protect our users and provided the requesting entity has valid jurisdiction to obtain your personal information;

related group companies: we share your Personal Information within our group of companies (and all related group companies may only use your personal information in accordance with this policy), including Tencent International Service Europe BV (located in the Netherlands), Tencent International Service Pte. Ltd (located in Singapore), WeChat International Pte Ltd (located in Singapore) and Oriental Power Holdings Limited (located in Hong Kong) and WeChat International (Canada) Limited (located in Canada) that run the Hong Kong and Canadian Servers, for the purpose of:

providing WeChat to you, assisting us in carrying out the purposes set out under the **"How do we use Your Information"** section above, and carrying out our obligations and enforcing our rights under the WeChat Terms of Service or this Privacy Policy; and

in the event of an internal restructuring of our or our affiliates businesses, or the sale of WeChat or any of its assets to a third party, the entity that consequently operates WeChat may be a different entity to us and we will transfer your information accordingly so that your service can continue;

service providers: service providers supplying services to support, improve, or promote other products or features through our services, including the service providers listed here. These include communication service providers who send SMSs on our behalf, VoIP providers for connection to traditional telephony services card processing and verification, and translation services. We also use service providers to help speed up content delivery to you in your region using acceleration points and content delivery networks; and to provide location and mapping data. Any third party (selected by us) with whom we share user data is required to provide the same or equal protection of user data as stated in this policy and is prohibited from retaining, using, or disclosing your information except as necessary to provide services to us;

WeChat Official Accounts and Mini Program operators, other services via which you choose to use WeChat Login for third-party apps, if you elect to follow or use the relevant Official Account / Mini Program/ WeChat Login for third-parties;

a third party that acquires all or substantially all of us or our business. If we sell or buy any business, undergo a merger, enter into a partnership, or sell some or all of our assets we may disclose your information to the prospective buyer of such business. Under these circumstances, we will always require the prospective buyer to comply with this privacy policy.

**SHARED INFORMATION**

WeChat enables certain information to be shared publicly with your WeChat contacts and other users of WeChat. At any time you can hide your profile from public view and search by unchecking "allow find by phone number, WeChat ID or QQ ID" in your account settings. This means that other users of WeChat will not be able to find you. We refer to this type of information above as Shared Information. Shared Information will remain publicly-available for so long as you or a user that has shared such information retains it. Even after you delete Shared Information, it may still be separately cached, copied, or stored by, or remain public through, other users or third parties who are not affiliated with and not controlled by us.

Where you have requested that we erase your Personal Information that we have made public and there are grounds for erasure, we will use reasonable steps try to tell others that are displaying the Personal Information or providing links to the Personal Information to erase it too.

**Please consider carefully what you post and communicate through WeChat.** In some instances, you may control what access the wider public has to your Shared Information via the privacy settings in WeChat.

## COMMUNICATIONS FROM US

We may from time to time send you service-related announcements when we consider it necessary to do so (such as when we temporarily suspend WeChat for maintenance, or security, privacy, or administrative-related communications). We send these to your email address or via SMS. You may not opt-out of these service-related announcements, which are not promotional in nature and used solely to protect your account and keep you informed of important changes to WeChat.

## SENSITIVE PERSONAL INFORMATION

In some jurisdictions, certain types of Personal Information, such as information about your race or ethnic origin, religious or philosophical views or personal health, is characterised as "sensitive" and is subject to stricter regulation than other types of Personal Information. Please note that content and information that you input to WeChat, such as photographs or information about your school or social activities, may reveal your sensitive Personal Information to others.

Before communicating any Personal Information of a sensitive nature within WeChat, please consider whether it is appropriate to do so.

**By posting any Personal Information of a sensitive nature within WeChat, you are consenting to such information being available within the controls you have selected (for example, available to the audience of users you select as being capable of viewing your post or profile information).**

## SOCIAL MEDIA SHARING

**Sharing Your WeChat Data outside of WeChat**

Some WeChat-related features allow you to provide Shared Information to those outside of your WeChat network – for example, publicly accessible blogs and forums, or certain social media features within WeChat (such as "plug-ins" (which create a direct link between two websites) and "widgets" (which are interactive Mini Programs that provide third party services within WeChat)) allow you to re-post and disclose Shared Information. If you share information using these features then third parties unrelated to us may be able to see and use that information.

You are also able to link your WeChat contact list with the contact lists on your device and/or in your account on third party services, in order to search for and connect with contacts on those contact lists who also have a WeChat account. WeChat will ask you to consent to accessing your contact list before doing so.

**Accessing and Importing Information using WeChat**

WeChat allows you to link your WeChat services with select third party social media services, and import certain content and information from such third party services. For example:

you may share content on, or login to, WeChat using services provided by third parties. These third party services will authenticate you and provide you with the option of sharing certain Personal Information with us. They may also give you the option to post information from your third party service account to WeChat as Shared Information.

you may login to WeChat using other sign-in services such as an Open ID provider. These sign-in services will authenticate your identity and provide you the option to share certain Personal Information with us for account registration and login purposes, such as your name and email address; and

WeChat may (whether in banners, pop-ups or otherwise within WeChat) provide you with links or features that allow you to access third party services or websites (or access within WeChat content that is hosted on those third party services or websites). For example, you may be able to access videos hosted by a third party without leaving the WeChat application.

Third party social media platforms are hosted by the relevant third party. WeChat services are hosted by us. Third parties that provide third party services may collect your Information (including your Personal Information and Log Data), and set cookies on your computer, or device to enable such features to function properly.

Your use of any third party services (whether social media services or otherwise), including any Personal Information you provide to such third parties and their collection and use of your Personal Information, are subject to the relevant third party's own terms of services and privacy policies and not the WeChat Terms of Service or this Privacy Policy, so please review those third party terms carefully.

**This Privacy Policy only applies to any Information collected by us, and does not apply to any services offered by or information practices of any third parties. If you choose to use third party services or features that are made available within WeChat (for example, you choose to follow an Official Account or use a Mini Program), then we will share certain information with that third party to allow you to use that third party service. The information we share with such a third party is described to you at the time you first use that service or feature, and we require that the third party will provide the same or equal protection of user data as stated in this policy. You can control which third parties have access to this information in your account. You can withdraw your agreement to the sharing of that information at any time by following the instructions set out here. Please note however that if you ask us not to share that information with the third party, you may no longer be able to use that service or feature. We are not responsible for any third party use of any Information provided by you to them.**

## AGE RESTRICTIONS

WeChat is not intended for Children. Children under the age of 16 must not use WeChat for any purpose without first obtaining parental/guardian agreement to this Privacy Policy (both for themselves and on your behalf). We do not knowingly collect Personal Information from any children under the age of 16 without such consent. Please contact our Data Protection Officer if you believe we have any Personal Information from any children under the age of 16 without such parental/guardian consent – we will promptly investigate (and remove) such Personal Information.

## WHERE DO WE PROCESS YOUR DATA?

The Tencent group operates around the world. The Personal Information that we collect from you will be transferred to, stored at, or processed in:

Ontario, Canada (which was found to have an adequate level of protection for Personal Information under Commission Decision 2002/2/EC of 20 December 2001); and

Hong Kong (we rely on the European Commission's model contracts for the transfer of personal data to third countries (i.e., the standard contractual clauses), pursuant to Decision 2001/497/EC (in the case of transfers to a controller) and Decision 2010/915/EC (in the case of transfers to a processor).

Our engineering, technical support, and other teams that support the supply of WeChat to you are based in our offices around the world (including Singapore, Hong Kong and the Netherlands) and may have incidental access to certain of your data in order to provide the service (for example, in order to fix technical issues that you report). We rely on the European Commission's model contracts for the transfer of personal data to such third countries (i.e., the standard contractual clauses), pursuant to Decision 2001/497/EC (in the case of transfers to a controller) and Decision 2010/915/EC (in the case of transfers to a processor.

## SECURITY OF YOUR PERSONAL INFORMATION

We are committed to maintaining the privacy and integrity of your personal information no matter where it is stored. We have information security and access policies that limit access to our systems and technology, and we protect data through the use of technological protection measures such as encryption.

Unfortunately, the transmission of information via the internet is not completely secure. Although we will implement and maintain reasonable measures to protect your personal information, we cannot guarantee the security of the information transmitted to our services; therefore we do not assume any responsibility for any transmission of your information which you do at your own risk.

## HOW LONG DO WE KEEP HOLD OF YOUR DATA?

We will retain your Personal Information as set out in the following table, except where we are otherwise required to retain such data in accordance with law. Should you or we terminate your account for any reason, we will take steps to ensure that your Personal Information is no longer available through WeChat, or otherwise used by us, within a reasonable period of time (subject to technical limitations) after such account termination.

| Information Type | Retention Period |
| --- | --- |
| Registration data | Until such time as you instruct WeChat to delete your account or you have not logged in for 180 days. Your account will be permanently deleted within 60 days of both verification of account ownership and the account deletion request. |
| Login data | Information is retained for a period of 3 months from the date of such log in. |
| User profile search data | Until you request removal or amendment of the Personal Information or your account is deleted, whichever is earlier. |
| Profile data and profile media (viewable by all users) | Until you request removal or amendment of the Personal Information or your account is deleted, whichever is earlier (however, the data may be available if cached on third party services). |
| Profile data (viewable upon friend verification) | Until you request removal or amendment of the Personal Information or your account is deleted, whichever is earlier (however, the data may be available if cached on third party services). |
| Additional account security | Until you request removal or amendment of the Personal Information or your account is deleted, whichever is earlier (however, the data may be available if cached on third party services). |
| Chat – non-persistent and semi-persistent communication between users | Data is retained for a period of 120 hours from the time of the relevant interaction and then permanently deleted. |
| Chat - media such as images, video, audio, and files | Data is retained for a period of 72 hours from the time of the relevant interaction and then permanently deleted. |
| Contacts list | Until you request removal or amendment of the Personal Information or your account is deleted, whichever is earlier. |
| Location-based services and Location-based media | Data is retained for a period of 72 hours from the time of the relevant interaction and then permanently deleted. |
| Moments, Time Capsule, and Favorites -- data and media | Until you request removal or amendment of the Personal Information or your account is deleted, whichever is earlier (however, the data may be available if cached on third party services). |
| OpenID and Open ID media (given to third parties) | Until you unfollow the third party developer's application, Official Account, Mini Program or similar, or your account is deleted, whichever is earlier. |
| Provision of third party products and services (i.e. if you are a provider of an Official Account or Mini Program) | Until such time as you instruct WeChat to delete your account. Your account will be permanently deleted within 60 days of both verification of account ownership and the account deletion request. Please note that the information disclosed to the third party is controlled by them. We will use reasonable efforts to seek that they delete such information when we do. |

| Information Type | Retention Period |
|---|---|
| Information provided to an Official Account / Mini Program | Until such time as you instruct WeChat to delete your account or you withdraw your permission / unfollow such third party. Please note that the information disclosed to the third party is controlled by them. We will use reasonable efforts to seek that they delete such information when we do. |
| Information provided to customer service | Until such time as you instruct WeChat to delete your account. Your account will be permanently deleted within 60 days of the account deletion request. |
| Metadata / Log Data | Data is retained for 3 months from the date of log in and then permanently deleted. |
| Device Data | Until such time as you instruct WeChat to delete your account. Your account will be permanently deleted within 60 days of the account deletion request. |
| Social Connect Information | Until such time as you instruct WeChat to delete your account or unbind your social account from your WeChat account. Your account will be permanently deleted within 60 days of the account deletion request. |
| Cookies | Data is retained for 3 months from the date of log in and then permanently deleted. |

Full description of data is set out in the section *"How do we use your information"** above.

If we are required to retain your information beyond the retention periods set out above, for example to comply with applicable laws, we will store it separately from other types of personal information.

## HOW CAN I EXERCISE MY RIGHTS OVER MY DATA?

Some countries' laws grant specific rights to users of WeChat, which are set out in this section.

**The following section applies only to persons that are resident in the European Economic Area.**

You have certain rights in relation to the Personal Information we hold about you. Some of these only apply in certain circumstances as set out in more detail below.

We set out how to exercise those rights. Please note that we will require you to verify your identity before responding to any requests to exercise your rights. We must respond to a request by you to exercise those rights without undue delay and at least within one month (although this may be extended by a further two months in certain circumstances, such as where the request involves substantial volumes of information or is otherwise complex). To exercise any of your rights, please complete the request form and follow the steps for submission.

**Access & Correction**

Upon request WeChat will provide you with information about whether we hold any of your personal information. You also have the right to access personal information we hold about you, how we use it, and who we share it with. You also have the right to correct that information.

You can access and correct your personal information by logging into your **WeChat account** at any time. For example, you can delete certain Location Data that you have provided us via your device settings or the "Clear Location" option within WeChat.

If you believe we hold any other personal information, or you want to correct information that you are unable to correct using your account, please complete the request form here. We may not be able to provide you with certain Personal Information if providing it would interfere with another's rights (e.g. where providing the Personal Information we hold about you would reveal information about another person).

With respect to correction requests, where we agree that the Personal Information is inaccurate or incomplete, we will try to tell any third party to whom we have disclosed the relevant Personal Information so that they can rectify the Personal Information too.

**Erasure**

You can delete your account, or remove certain personal information, by logging into your WeChat account and following the account deletion instructions here. If there is any other personal information you believe we process that you would like us to erase, please complete the request form here.

You may request that we erase the Personal Information we hold about you in the following circumstances:

you believe that it is no longer necessary for us to have your Personal Information;

we obtained your consent to process the Personal Information and you withdraw that consent (and we have no other grounds for processing the Personal Information);

you believe we are unlawfully processing your Personal Information; or

you are or were under the age of 16 when we collected the Personal Information and we can verify your age.


Also note that you may exercise your right to restrict our processing your Personal Information (as described below) whilst we consider a request to erase your data.

Please note, however, that we may retain the Personal Information if there are valid grounds under law for us to do so (e.g., for the defence of legal claims, freedom of expression or some other legal obligation) but we will let you know if that is the case.

Where you have requested that we erase your Personal Information that we have made public and there are grounds for erasure, we will use reasonable steps try to tell others that are displaying the Personal Information or providing links to the Personal Information to erase it too.

### Restriction of Processing to Storage Only

You have a right to require us to stop processing the Personal Information we hold about you other than for storage purposes in certain circumstances. Please note, however, that if we stop processing the Personal Information, we may use it again if there are valid grounds under data protection law for us to do so (e.g. for the defence of legal claims or for another's protection).

Where we agree to stop processing the Personal Information, we will try to tell any third party to whom we have disclosed the relevant Personal Information so that they can stop processing it too.

You may request we stop processing and just store the Personal Information we hold about you where:

you believe the Personal Information is not accurate (for the period it takes for us to verify whether it is accurate);

we wish to erase the Personal Information as the processing we are doing is unlawful (but you want us to retain the Personal Information and just store it instead); or

we wish to erase the Personal Information as it is no longer necessary for our purposes (but you require it to be stored for the establishment, exercise or defence of legal claims).


### Portability

You have the right to receive a copy of certain Personal Information we collect from you. This comprises any personal information we process on the basis of your consent (e.g., voluntarily-provided profile data, social media content posted to Moments and Time Capsule, content selected to store to Favorites) or pursuant to our contract with you (e.g., profile data), as described in the section **"How do we use your information"**. You have the right to receive this information in a structured, commonly used and machine-readable format. You also have the right to request that we transfer that personal information to another party. You can exercise your right to export your data by following the instructions here.

If you wish for us to transfer the Personal Information to a third party, please ensure you detail that party. Note that we can only do so where it is technically feasible. We are not responsible for the security of the Personal Information or its processing once received by the third party. We also may not provide you with certain Personal Information if providing it would interfere with another's rights (e.g. where providing the Personal Information we hold about you would reveal information about another person or our trade secrets or intellectual property).

### Objection

You may object to our use of your Personal Information if we use your information on the basis of our legitimate interests (such as when we use your personal information for your account security, such as to prevent malicious log-ins). If you object to such processing, please review and submit the form here, providing detailed reasons.

To the extent provided by applicable laws and regulations, you may withdraw any consent you previously provided to us by following the instructions set out here.

### HOW WILL WE NOTIFY YOU OF CHANGES?

We may from time to time revise or add specific instructions, policies and terms to this Privacy Policy. These instructions, policies and terms form part of this Privacy Policy.

Whenever we make any changes to this Privacy Policy that are important for you to know about, we will post the updated Privacy Policy at this link and notify you via WeChat or other means before the change becomes effective.

PRIVACY FEEDBACK
Powered by **TRUSTe**

Last modified: 2020-08-07

## Addendum for California Residents

The terms of this Addendum apply to residents of California under the California Consumer Privacy Act ("CCPA") and other applicable laws. The CCPA provides California residents with certain legal rights such as access, deletion, disclosure, or "do not sell." These rights are not absolute and are subject to certain exceptions.

**Collection and Disclosure of Personal Information**

Over the past 12 months, through your use of WeChat, we may have collected and disclosed the following categories of personal information from or about consumers, as defined in the CCPA:

Identifiers, such as phone number, name, nickname, token, username, IP address, mobile application store user ID, mailing address, emergency contact information, and contact list. This information is collected directly from the consumer or device.
Geolocation data, including geolocation information derived from GPS coordinates, Wi-Fi access points, the compass, the accelerometer, IP address, and public posts. This information is collected directly from the consumer or device.
Internet or other electronic network activity information, including your device model, network type, OS type and version, client version, call history, chat data, invitations data, call credits history, search history, log data, information linked to social media accounts linked to use of WeChat, and survey information. This information is collected directly from a device.
Biometric information, such as voiceprints and facial recognition data. This information is collected directly from the consumer or device.
Commercial information, including payment card information and transaction verification information. This information is collected directly from the consumer or device.
Audio, electronic, visual, thermal, olfactory, or similar information, including a profile picture. This information is collected directly from the consumer.
Other information that is described in subdivision (e) of Section 1798.80, such as nationality and gender (this information is being collected in the consumer context rather than the employer context). This information is collected directly from the user.

We collect personal information for the following purposes:

To operate and administer WeChat;
To communicate with consumers;
To personalise WeChat, including by providing personalised advertisements;
To improve our services;
For security and verification purposes, including to prevent and detect fraudulent activity; and
To address and remediate technical issues and bugs.

For additional information about what each type of personal information is used for, see this chart in the main portion of the Privacy Policy.

We disclose personal information to the following types of entities:

Our affiliate companies within our corporate group who process your personal information in order to operate the Services
Other companies that provide services on our behalf who are prohibited by contract from retaining, using, or disclosing personal information for any purpose other than for providing the services to us
Other users of WeChat with respect to personal information you publicly post through WeChat
WeChat Official Accounts and Mini Program operators, other services via which you choose to use WeChat Login for third-party apps, if you elect to follow or use the relevant Official Account / Mini Program / WeChat Login for third-parties
Regulators and judicial authorities and law enforcement agencies
Entities that acquire all or substantially all of our business

**In the past 12 months, we have not sold personal information of California residents within the meaning of "sold" in the CCPA.**

**Rights under the CCPA**

If you are a California resident and the CCPA does not recognize an exemption that applies to you or your personal information, you have the right to:

Request we disclose to you free of charge the following information covering the 12 months preceding your request:
the categories of personal information about you that we collected;
the categories of sources from which the personal information was collected;
the purpose for collecting personal information about you;
the categories of third parties to whom we disclosed personal information about you and the categories of personal information that was disclosed (if applicable) and the purpose for disclosing the personal information about you; and
the specific pieces of personal information we collected about you;

Request we delete personal information we collected from you, unless CCPA recognizes an exemption; and
Be free from unlawful discrimination for exercising your rights including providing a different level or quality of services or deny goods or services to you when you exercise your rights under the CCPA.

We aim to fulfill all verified requests within 45 days pursuant to the CCPA. If necessary, extensions for an additional 45 days will be accompanied by an explanation for the delay.

**How to Exercise Your Rights**

First, you may wish to log into your account and manage your data from there.If you are a California resident to whom the CCPA applies, you may exercise your rights, if any, to other data by contacting us at dataprotection@wechat.com.

## Republic of Korea

**The following section applies for the purposes of users located in Korea only.**

WeChat is not intended for children. Children under the age of 14 must not use WeChat for any purpose without first obtaining parental/guardian consent to this Privacy Policy (both for the parent/guardian themself and on their child's behalf). We do not knowingly collect Personal Information from any children under the age of 14 without such consent. Please contact our Data Protection Officer if you believe we have any Personal Information from any children under the age of 14 without such parental/guardian consent – we will promptly investigate (and remove) such Personal Information.

The Personal Information we provide to third-parties located outside of Korea for the WeChat service is as follows:

| Identity of the recipient and Contact information of Chief Privacy Officer | Location of the recipient (or as otherwise stated in the recipient's privacy policy) | Purposes of use of Personal Information by the recipient | Items of Personal Information to be provided | Date and method of transfer | Period of retention and use of Personal Information by the recipient |
|---|---|---|---|---|---|
| Facebook (Facebook Connect) https://www.facebook.com/help/contact/861937627253138 | USA | To allow users to register their accounts via their Facebook account | Technical APIs Facebook Connect OpenID Facebook Connect Token Email Address | Transmitted from time to time | For a period of time no longer than 5 years unless retained out of legitimate interests for fraud prevention and account security. |

| Identity of the recipient and Contact information of Chief Privacy Officer | Location of the recipient (or as otherwise stated in the recipient's privacy policy) | Purposes of use of Personal Information by the recipient | Items of Personal Information to be provided | Date and method of transfer | Period of retention and use of Personal Information by the recipient |
|---|---|---|---|---|---|
| Apple (Sign in with Apple ID) https://www.apple.com/legal/privacy/contact/ | USA | For allowing users to unblock their accounts via their Apple ID. | Sign-in with Apple OpenID and Token | Transmitted from time to time | For a period of time no longer than 5 years unless retained out of legitimate interests for fraud prevention and account security. |
| WeChat International Pte. Ltd. dataprotection@wechat.com Tencent International Service Pte. | Canada, Hong Kong SAR, Singapore | For the operation of WeChat Out For general operational service | WeChat ID Date/Time App Store/Google Play OpenID IAP/GP Payment metadata Credits History Call History Invitations data Login request log metadata, communication metadata (but not content of communication) | Transmitted from time to time | 3 months |
| WeChat International Pte. Ltd. dataprotection@wechat.com Tencent International Service Pte. Ltd. Tenpay Payment Technology Co., Ltd. (for WeChat Pay only) dataprivacy@tencent.com | Canada, Hong Kong SAR, Singapore, PRC (for WeChat Pay only) | Function based on user's consent * importing contact lists * provision of third party products & services (e.g. developer/ operator/ vend or accounts on open Platform or WeChat Pay) * customer service – fulfilling support ticket following user's request | Mobile address book (hashed prior to transfer to make plain text data unavailable to any other person including Tencent) Contact lists (including Friend's WeChat ID, Alias, tag(s) and description as provided by subject) Account admin's name, mobile phone number, email address, ID document. Business name, mailing address, license, commercial bank, account information. Transaction payment data via MIDAS payment SDK. WeChat ID, OpenID, mobile phone number, email address, Feedback Content, IP address | From time to time through Tencent's WXG and CDG | Until user revokes data permission, or user account deleted |

| Identity of the recipient and Contact information of Chief Privacy Officer | Location of the recipient (or as otherwise stated in the recipient's privacy policy) | Purposes of use of Personal Information by the recipient | Items of Personal Information to be provided | Date and method of transfer | Period of retention and use of Personal Information by the recipient |
|---|---|---|---|---|---|
| Operators of Official Accounts, Mini Programs and other online services (including apps) that allows users to use WeChat to log-in (third party developers i.e. partners subject has elected to "follow" and grant access to).<br>Please refer to the privacy policy of the specific Official Account or Mini Program for contact information. | Where the servers of the Operators of Official Accounts, Mini Programs and other online services are located | For providing access to third party service in accordance with the user's requests. | User alias Profile Region info Gender OpenID OpenID of friends who have also granted permission to the third-party product or service Profile photo | From time to time | Until user unfollows the third-party developer's app, Official Account, Mini program, etc. or user has deleted their WeChat account. |
| Foursquare<br>privacy@foursquare.com | USA | For providing location-based services in accordance with the user's requests. | Location Data | From time to time | 24 hours |
| Google<br>https://policies.google.com/privacy | USA | Translation service | Text to be translated | From time to time | 3 months |
| Microsoft<br>https://privacy.microsoft.com/ | USA | Translation service Location-based services | Text to be translated Location Data | From time to time | 3 months for translation service 24 hours for location-based services |
| Youdao<br>privacy@service.netease.com | PRC | Translation service (no Korean language supported) | Text to be translated | From time to time | 3 months |
| FanYiJun<br>dataprivacy@tencent.com | PRC | Translation service | Text to be translated | From time to time | 3 months |

The mandatory retention periods for Personal Information required by law in Korea is as follows:

| Items | Relevant Statute | Retention Period |
|---|---|---|
| Records related to entering into and withdrawing from a contract | Act on the Consumer Protection in Electronic Commerce | 5 years |
| Records related to payment and other supplies of money | Act on the Consumer Protection in Electronic Commerce | 5 years |
| Records related to consumer complaints and dispute settlement | Act on the Consumer Protection in Electronic Commerce | 3 years |
| Records related to labelling/advertisement | Act on the Consumer Protection in Electronic Commerce | 6 months |
| Service visit log | Protection of Communications Secrets Act | 3 months |

**Destruction of Personal Information**

We destroy Personal Information upon the extinguishment of need for such Personal Information, such as the expiration of its retention period and achievement of its purpose for processing, except where there is a law or regulation that requires us to retain that Personal Information. Inactive accounts are automatically deleted after 180 days (except if you have a positive balance in your WeChat Pay account or are the administrator of a WeChat feature such as a Mini Program).

The destruction procedure of Personal Information is as follows:

**Destruction procedure**

Personal Information that needs to be destroyed is destroyed in accordance with our data deletion and retention protocols under the supervision of our Data Protection Officer.

**Destruction method**

We destroy Personal Information recorded and saved in electronic format via methods such as Low Level Format so as to disable the reproduction thereof; and Personal Information recorded and saved in hardcopy via grinder or incineration.

**Domestic Privacy Representative**

Pursuant to the Article 32-5 of Act on the Promotion of the Use of the Information Network and Information Protection, the information regarding the domestic agent is as follows:

Name: Tencent Korea Yuhan Hoesa
Address: 152, Taeheran-ro, Gangnam-gu (Gangnam Finance Center, Yeoksam-dong), Seoul, Korea
Telephone Number: +82-2185-0902
E-mail: dataprotection@wechat.com

# Exhibit EE

DAILY COMMENT

# FACEBOOK AND THE "FREE SPEECH" EXCUSE



**By <u>Andrew Marantz</u>**

**October 31, 2019**



*Mark Zuckerberg and other Facebook executives have retreated repeatedly to nebulous rhetoric about free speech and political neutrality.*  Photograph by Win McNamee / Getty

F or the first decade or so of his career, which also happened to be the first decade or so of his adult life, Mark Zuckerberg, the founder and C.E.O. of Facebook, was able to move fast and break things—the news industry, for example—without being held to account for what he'd broken. He insisted repeatedly that Facebook was a platform, not a publisher. A publisher, after all, could be expected to make factual, qualitative, even moral distinctions; a publisher would have to stand behind what it published; a publisher might be responsible, reputationally or even legally, for what its content was doing to society. But a platform, at least according to the metaphor, was nothing but pure, empty space.

The metaphor doesn't bear out, of course. Facebook has never been a neutral platform; it is a company whose business model depends on monitoring its users, modifying and manipulating their behavior, and selling their attention to the highest bidder. In 2008, Zuckerberg was interviewed by the journalist Kara Swisher. "I think you're a media company," she said.

"We're definitely a technology company," Zuckerberg said, laughing awkwardly.

"You're building an audience and selling that audience," Swisher continued.

"No, I mean, I think we're building a lot of products in different ways that people can share information," Zuckerberg said. He had just turned twenty-four—earlier in the interview, Swisher had apologized for referring to him as "the toddler C.E.O."—but he had already mastered the C-suite art of speaking without conveying too much specific meaning, so as to avoid committing himself to policies that might hamper his company's future growth.

I recently wrote a book, "Antisocial," that shows how Zuckerberg and his fellow-founders came to build a new attentional economy, and how their techno-utopian ideology brought us to our current moment. At the core of this ideology—by turns naïve, blithely rapacious, and hubristic—was the technologists' determination to avoid being perceived as gatekeepers. It's now clear that they were gatekeepers—what else to call people whose algorithms influenced what billions of people saw, heard, and knew about the world?—and yet they were surprisingly adept at denying this fact. Some of them, at least in some circles, are still getting away with it.

Last month, Facebook announced a new policy regarding political ads. The policy is that politicians can say more or less whatever they want. "Our approach is grounded in Facebook's fundamental belief in free expression," Katie Harbath, the company's policy director for global elections and a former employee of Rudy Giuliani's 2008 Presidential campaign, wrote. Last week, testifying before Congress, Zuckerberg said, "Our policy is that we do not fact-check politicians' speech. And the reason for that is that we believe that in a democracy it is important that people can see for themselves what politicians are saying."

This rhetoric sounds nice—"free expression" and "in a democracy" are the phrasal equivalents of American-flag lapel pins—but it doesn't amount to much. It's one thing for Zuckerberg to build the world's biggest microphone and then choose to rent that microphone to liars, authoritarians, professional propagandists, or anyone else who can afford to pay market rate. It's another, more galling thing for him to claim that he is doing so for everyone's benefit. And yet many of the members of Congress at last week's hearing—the Republican ones, to be precise—seemed to take Zuckerberg's rationale at face value. "I do want to commend you," Andy Barr, a G.O.P. congressman from Kentucky, said. "I don't want you to be bullied by politicians to relinquish our treasured free speech under the First Amendment." Free speech is treasured indeed. It is also, in a discussion about Facebook's policies, a canard: the First Amendment restricts government, not private companies. Bill Posey, a Republican from Florida, also encouraged Facebook to resist any temptation "to censor its users' speech." He was particularly concerned about one form of censorship: "I was disappointed that Facebook would consider restricting free-speech rights to communicate the risks associated with vaccinations."

Amazon doesn't sell cigarettes. Whole Foods doesn't sell cigarettes. One could argue that this is a Maoist form of overreach, a repudiation of the system of free enterprise, a brazen attempt to enact central planning on a terrifying scale. One could argue that a single person—Jeff Bezos, the richest man in the world, a gatekeeper among gatekeepers—should not be in a position to decide what average American citizens can or can't do with their bodies. One could argue that the inalienable rights of smokers, or of tobacco companies, are being violated. But nobody makes these arguments. It seems perfectly natural that Bezos chooses not to sell tobacco. It's possible that this reflects his principled belief that some things are not worth profiting from, that even world-conquering companies can make moral distinctions when the stakes are clear enough. More likely, it's a

straightforward cost-benefit decision. In any case, it has little to do with gauzy abstractions about freedom.

The *Times* recently published a <u>letter</u>, initially posted on Facebook's internal message board and signed by more than two hundred and fifty of the company's employees, decrying the new ad policy. "Free speech and paid speech are not the same thing," the letter read, followed by six specific suggestions as to how the policy could be improved, "short of eliminating political ads altogether." If Zuckerberg were to implement his employee's suggestions, the First Amendment would not suffer. No government agents would be dispatched to seize the servers of <u>anti-vax</u> bloggers. No dissembling politicians would be arrested for their lies. Facebook's decision to change its policy would be a business decision, just as continuing to profit from disinformation is a business decision.

Last week, Facebook announced that it would launch an official news tab: a dedicated space within Facebook, curated by professional journalists, where users can find high-quality news from trusted sources. This was a long overdue recognition that Facebook is a publisher, not a platform. "What took you so long?" Robert Thomson, the C.E.O. of News Corp, asked Zuckerberg during an onstage event. (*The New Yorker* is one of five publications at Condé Nast that will participate in Facebook's news tab.) The announcement of the news tab was designed to make journalists happy, and perhaps to garner Facebook a rare spate of good press. But it was quickly overshadowed by the revelation that one of the "trusted sources" would be Breitbart News. Again, Zuckerberg and other Facebook executives retreated to nebulous rhetoric about free speech and political neutrality. But, again, the decision to include Breitbart in the news tab was a business decision. Critics of this decision did not call for Breitbart to be stripped of its First Amendment right to publish without government interference. For the most part, the critics did not object to Breitbart's inclusion in Facebook's news tab on political grounds. The most salient objection was that a list of trusted news sources should not include Breitbart because Breitbart is not a trustworthy news source.

On Wednesday, on an earnings call, Zuckerberg spoke at length about why "I believe strongly" in "defending free expression." "We face a lot of criticism from both progressives and conservatives," he said. "Frankly, if our goal were trying to make either side happy, then we're not doing a very good job." This is classic C-suite self-justification. But Zuckerberg seems more anxious to assuage the right than the left, at least for now. According to a recent Politico <u>story</u>, Zuckerberg has dined

privately with many prominent conservatives—Lindsey Graham, <u>Tucker Carlson</u>, and so on—"to talk about issues like free speech and discuss partnerships." One of these conservatives was Ben Shapiro, the editor of a right-wing tabloid called the Daily Wire, who has recently emerged as a staunch defender of Facebook's policies. On Monday, the progressive journalist Judd Legum published an <u>article</u> demonstrating that the Daily Wire uses a "secret network of Facebook pages" that coördinate to generate astonishing amounts of traffic, in violation of Facebook's rules. A spokesperson for Facebook responded to the story by saying that the company was aware of the Daily Wire's practices but would do nothing to curtail them. (The Daily Wire did not respond to Legum's request for comment. Later, Oliver Darcy, a CNN reporter, did receive a comment from the Daily Wire's chief operating officer, Jeremy Boreing: "When a platform alerts us to an infraction, we address it.") Legum's story was published in his newsletter, which is called Popular Information. This is an allusion to James Madison: "A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both." Madison was prescient, but even he could not have imagined how farcical and/or tragic the American informational landscape could become.

On Wednesday, <u>Jack Dorsey</u>, the C.E.O. of Twitter, announced, via <u>tweet thread</u>, that his company would no longer accept political advertising. People, including politicians, will still be allowed to tweet about politics, of course, but their political messages will no longer be amplified by money. ("Free speech and paid speech are not the same thing," the letter from Facebook employees read.) Dorsey's thread was clearly aimed at Zuckerberg—Kara Swisher, in the *Times*, called it "the best subtweet ever"—and it ended with a finger-wag. "Paying to increase the reach of political speech has significant ramifications that today's democratic infrastructure may not be prepared to handle," Dorsey tweeted. "It's worth stepping back in order to address." Twitter represents a tiny fraction of the global advertising market, and the company's new policy won't fix everything that needs fixing. But, as far as mottos go, "stepping back in order to address" is more Madisonian than "move fast and break things."



*Andrew Marantz, a staff writer, has contributed to The New Yorker since 2011. His first book, "Antisocial: Online Extremists, Techno-Utopians, and the Hijacking of the American Conversation," is out now.*

More:   Facebook   Mark Zuckerberg   Social Media   Twitter   Jack Dorsey   Tech

# Exhibit FF



**More in This Series**

See Project

## EDUCATION

# The App at the Heart of the Movement to End Affirmative Action

"WeChat is a monster. There's nothing like it on Earth."

**ALIA WONG**  **NOVEMBER 20, 2018**



JACQUELYN MARTIN / AP / BRIAN SNYDER / REUTER / ARSH RAZIUDDIN / THE ATLANTIC

OiYan Poon stumbled upon WeChat largely by accident.

Poon is a professor at Colorado State University who studies the racial politics of higher education. For years she had consistently found that most Asian Americans supported affirmative action, but in 2014, something surprised her: A fledgling network of politically savvy Asian Americans had derailed a Democrat-backed ballot initiative in California that would've rescinded the state's long-standing ban on race-conscious admissions. These activists—with their loud, recurring demonstrations, scathing op-eds, pro-Republican canvassing, and roundtable discussions on Chinese-language talk shows—had materialized unexpectedly, at least to Poon.

Determined to learn more, Poon in 2016 took to her typical research methods—convening a team of students and colleagues to help her pore through court filings, news stories, social-media posts, and the like—in an effort to track these dissenters down. But the few activists who did have an online footprint didn't respond to Poon's inquiries. The professor continued to flounder until she took the advice of an acquaintance and opened an account on WeChat, the popular messaging app based in China. The virtual gathering place was a hub for these activists.

*[ Read: The Harvard case is about the future of affirmative action. ]*

Once comprising a relatively small, California-centric group of well-educated Chinese immigrants, this network of activists has connected like-minded people across the country, many of whom are part of separate groups all campaigning against affirmative action—including the organization behind the pending federal lawsuit accusing Harvard of anti-Asian discrimination, as well as a group that recently filed a lawsuit against the University of California in pursuit of admissions and enrollment data. The activists' growing savvy and resulting sway, however, contradict the narrative painted by public-opinion data, which consistently show that most Asian Americans support affirmative action. So why was it that these activists had managed to dominate headlines and distort the narrative around Asian Americans and their relationship with race-conscious admissions? The answer to that question, Poon may have inadvertently discovered, could be found in WeChat.

"There was no such mobilization [among the Chinese American] community before WeChat happened," says Steven Chen, a Los Angeles–area computer

engineer who immigrated to the United States from mainland China in the late 1980s in pursuit of a graduate degree.

Text messages and phone calls are WeChat's bread-and-butter functions, but the app does a lot more: People can hail taxis or share car rides, exchange money, order takeout, and shop online, among a litany of other mundane tasks and interactions. A smartphone's WeChat widget, in other words, is kind of like a portal into a sea of more widgets; iMessage, Skype, Uber, Venmo, and so on, all in one place. Every day, according to company data, an average of more than 900 million people use the app, many of them utilizing its various social-networking functions to engage with folks they've never met in person. One Chinese American immigrant I spoke with, Jing Liu, told me that she had met most of her present-day friends through the app.

"WeChat is a monster," says Janelle Wong, a political scientist and professor of Asian American studies at the University of Maryland. "There's nothing like it on Earth."

Launched in 2011, WeChat first gained traction among immigrants who used it to stay in touch with relatives and keep up on current events in mainland China. In the years since, the app has taken on a life of its own in the United States, becoming what Chen has described as a "virtual Chinatown."

In reflecting on the app's reach in the U.S., Chi Zhang, a doctoral student at the University of Southern California who studies WeChat, pointed to its function as a form of ethnic media. By connecting Chinese American immigrants to their homeland and by providing them the kinds of culturally relevant news tidbits seldom covered by mainstream American news outlets, she says, it "fosters their collective memory of their political struggles." But, Zhang notes, WeChat also helps bridge the Chinese American community with broader U.S. society; it's the place these immigrants go to stay abreast of everything from Supreme Court developments to the goings-on of their city council. In this sense, WeChat allows Chinese American users to feel at once more Chinese and more American. And this dual empowerment helped enable the Chinese American uprising against affirmative action.

A growing body of survey data shows that Chinese Americans—the United States' largest Asian ethnic group—are almost single-handedly responsible for what's been

affirmative action's slight decline in popularity among Asian Americans as a whole. In a 2012 AAPI Data survey, close to 80 percent of Chinese respondents said they favored policies that promote better access to higher education for black students and other minorities; by 2016, the number was roughly half that. Interestingly, that reversal was driven by Chinese Americans who were born abroad, according to Wong. Crunching the numbers from another survey, Wong found that among respondents who said they had an opinion (a significant portion did not), the amount of support among immigrants from China was more than 20 percentage points less than that of U.S.-born Chinese Americans.

The Chinese Americans driving this movement are highly educated, many of them with an undergraduate degree in a STEM field from one of China's extremely competitive universities and having arrived in the U.S. with the help of selective-recruitment immigration policies. These educational and immigration experiences tend, in turn, to shape their attitudes about college-admissions policies. While Wong and other scholars cautioned against buying into model-minority stereotypes, activists regularly cited such traits in explaining their fervent opposition to affirmative action.

For example, Crystal Lu, an affirmative-action opponent who immigrated to the U.S. in 1999, says that in Chinese culture "there are no shortcuts" for doing well academically or otherwise. Lu received a master's degree in journalism from Stanford and today is president of the Silicon Valley Chinese Association Foundation. "We truly believe that education is the one single enabler for social mobility," she told me, "and with that philosophy our children … [learn to] think about the long term and forget about the short-term pleasures like watching TV, playing games, and going to parties." Many of her fellow activists have generally conservative political views and support Donald Trump, whose administration is investigating allegations against Yale similar to those at the center of the Harvard lawsuit. "We realized our American dream, our aspiration to move up the social ladder, was being stripped away," Lu says. "If we do not fight, then our whole cultural heritage collapses … That's heartening to see—that this group that had been really [politically] apathetic, really quiet, is stirred and provoked and stimulated, and started to do something that's completely opposite to their nature."

Is WeChat just where these people happened to be, and so that's the tool they used? Or is there something specific about how this app works that amplified and

expanded this movement? WeChat did not respond to numerous requests for comment. But virtually everyone I interviewed for this story agreed that this movement wouldn't be where it is today—a well-organized network of activists with leaders in every major U.S. city that has garnered widespread media coverage and is poised to bring affirmative action back to the Supreme Court—if it weren't for WeChat.

Why? A key reason has to do with the way in which information travels within WeChat's confines.

As long as she fulfills a very basic set of criteria, pretty much any casual user can be approved as an "official account," becoming her own news-media outlet and generating unique content or aggregating information from other sources. Much of that information is disseminated via closed chat groups, where as many as 500 members each discuss a wide array of topics, including the Harvard suit and college admissions.

The result is, to borrow Zhang's words, a "self-contained news ecosystem" that at its best builds and bridges communities and at its worst breeds echo chambers and facilitates the spread of misinformation. As private gathering places, the groups rely on gatekeepers who effectively foster tribes—ideological safe spaces that can intensify emotions around a sensitive issue. According to Zhang and other observers, this emotional underpinning combined with the limited scrutiny of official accounts allows extreme viewpoints to spread. I reviewed a number of conversations in WeChat groups whose focus includes affirmative action and found that in some of them antiblack racism was common, as was vitriol toward members who pushed back against the dominant beliefs of the group. Such commentary often included misinformation, such as unfounded accusations that Ivy League institutions have Asian quotas.

*[ Read: "The model minority" at the country's top-ranked universities ]*

The fact that the affirmative-action debate is so emotional, however, also reveals the limitations in attributing to WeChat the current state of Chinese American political engagement. WeChat is simply "a tool" that enabled the movement to spread beyond the core coalition of activists whose political views long preceded the app, says Jack Ouyang, the vice president of the Asian American Coalition for

<u>Education</u>, the now-vast network of affirmative-action opponents that drove the 2014 crusade in California.

From her vantage point as an expert on WeChat as a vehicle for political mobilizing, Zhang, who hasn't yet figured out what her stance on affirmative action is, echoed Ouyang's point. "Especially at this moment, there's a real sense that Chinese Americans who otherwise are pretty invisible … could change the direction that the country is heading, and that itself is very energizing," Zhang says. "So I think there is a certain energy and momentum that people who oppose affirmative action are latching on to." Simply put: Activists were already on WeChat, so that's where they leveraged their existing energy and momentum. Had they dedicated more of their organizing to Facebook, the same could have happened there.

"WeChat's impact has to be understood as an information environment as a whole —it's kind of like a fishbowl in which you have these different narratives that kind of cohere together, one of which is the neglect and marginalization of Chinese Americans," Zhang says. When she tries to put herself in the shoes of one of these activists—say, someone who immigrated to the U.S. relatively recently and isn't familiar with the history of racial oppression in the country—she can see why they have taken to this cause. It's easy to see how that person might feel especially provoked if she herself feels she was held to higher standards in her pursuit of college admission or a good job. "I don't see how they would support affirmative action," Zhang says, "without significant persuasion otherwise."

*Karen Yuan contributed research.*

---

*This article is part of "The Speech Wars," a project supported by the Charles Koch Foundation, the Reporters Committee for the Freedom of the Press, and the Fetzer Institute.*

---

*We want to hear what you think about this article. <u>Submit a letter</u> to the editor or write to letters@theatlantic.com.*

# Exhibit GG



# The International Emergency Economic Powers Act: Origins, Evolution, and Use

Updated July 14, 2020

**Congressional Research Service**

https://crsreports.congress.gov

R45618

**CRS REPORT**
Prepared for Members and
Committees of Congress



Congressional Research Service
Informing the legislative debate since 1914

SUMMARY

R45618

July 14, 2020

**Christopher A. Casey, Coordinator**
Analyst in International Trade and Finance

**Ian F. Fergusson**
Specialist in International Trade and Finance

**Dianne E. Rennack**
Specialist in Foreign Policy Legislation

**Jennifer K. Elsea**
Legislative Attorney

# The International Emergency Economic Powers Act: Origins, Evolution, and Use

The International Emergency Economic Powers Act (IEEPA) provides the President broad authority to regulate a variety of economic transactions following a declaration of national emergency. IEEPA, like the Trading with the Enemy Act (TWEA) from which it branched, sits at the center of the modern U.S. sanctions regime. Changes in the use of IEEPA powers since the act's enactment in 1977 have caused some to question whether the statute's oversight provisions are robust enough given the sweeping economic powers it confers upon the President during a declared emergency.

Over the course of the twentieth century, Congress delegated increasing amounts of emergency power to the President by statute. TWEA was one such statute. Congress passed TWEA in 1917 to regulate international transactions with enemy powers following the U.S. entry into the First World War. Congress expanded the act during the 1930s to allow the President to declare a national emergency in times of peace and assume sweeping powers over both domestic and international transactions. Between 1945 and the early 1970s, TWEA became the central means to impose sanctions as part of U.S. Cold War strategy. Presidents used TWEA to block international financial transactions, seize U.S.-based assets held by foreign nationals, restrict exports, modify regulations to deter the hoarding of gold, limit foreign direct investment in U.S. companies, and impose tariffs on all imports into the United States.

Following committee investigations that discovered that the United States had been in a state of emergency for more than 40 years, Congress passed the National Emergencies Act (NEA) in 1976 and IEEPA in 1977. The pair of statutes placed new limits on presidential emergency powers. Both included reporting requirements to increase transparency and track costs, and the NEA required the President to annually assess and extend, if appropriate, an emergency. However, some experts argue that the renewal process has become *pro forma*. The NEA also afforded Congress the means to terminate a national emergency by adopting a concurrent resolution in each chamber. A decision by the Supreme Court, in a landmark case, however, found the use of concurrent resolutions to terminate an executive action unconstitutional. Congress amended the statute to require a joint resolution, significantly increasing the difficulty of terminating an emergency.

Like TWEA, IEEPA has become an important means to impose economic-based sanctions since its enactment; like TWEA, Presidents have frequently used IEEPA to restrict a variety of international transactions; and like TWEA, the subjects of the restrictions, the frequency of use, and the duration of emergencies have expanded over time. Initially, Presidents targeted foreign states or their governments. Over the years, however, presidential administrations have increasingly used IEEPA to target non-state individuals and groups, such as terrorists, persons who engage in malicious cyber-enabled activities, and certain persons associated with the International Criminal Court.

As of July 1, 2020, Presidents had declared 59 national emergencies invoking IEEPA, 33 of which are still ongoing. Typically, national emergencies invoking IEEPA last nearly a decade, although some have lasted significantly longer—the first state of emergency declared under the NEA and IEEPA, which was declared in response to the taking of U.S. embassy staff as hostages by Iran in 1979, may soon enter its fifth decade.

IEEPA grants sweeping powers to the President to control economic transactions. Despite these broad powers, Congress has never attempted to terminate a national emergency invoking IEEPA. Instead, Congress has directed the President on numerous occasions to use IEEPA authorities to impose sanctions. Congress may want to consider whether IEEPA appropriately balances the need for swift action in a time of crisis with Congress' duty to oversee executive action. Congress may also want to consider IEEPA's role in implementing its influence in U.S. foreign policy and national security decision-making.

# Contents

Introduction ...................................................................................................................... 1

Origins ............................................................................................................................. 2

The First World War and the Trading with the Enemy Act (TWEA) ............................ 2
The Expansion of TWEA ............................................................................................ 4
Pushing Back Against Executive Discretion ............................................................... 6
Enactment of the National Emergencies Act and the International Emergency
   Economic Powers Act ........................................................................................... 8

IEEPA's Statute, its Use, and Judicial Interpretation ...................................................... 10

IEEPA's Statute .......................................................................................................... 10
Amendments to IEEPA ............................................................................................... 11
   The Informational Materials Amendments to IEEPA ............................................. 12
   USA PATRIOT Act Amendments to IEEPA ......................................................... 13
IEEPA Trends ............................................................................................................ 17
   Presidential Emergency Use .................................................................................. 17
   Congressional Nonemergency Use and Retroactive Approval ................................ 23
Current Uses of IEEPA ............................................................................................. 25
Use of Assets Frozen under IEEPA ............................................................................ 28
   Presidential Use of Foreign Assets Frozen under IEEPA ....................................... 28
   Congressionally Mandated Use of Frozen Foreign Assets and Proceeds of
      Sanctions .......................................................................................................... 30
Judicial Interpretation of IEEPA ................................................................................ 33
   *Dames & Moore v. Regan* .................................................................................... 33
   Separation of Powers—Non-Delegation Doctrine .................................................. 34
   Separation of Powers—Legislative Veto ............................................................... 35
   Fifth Amendment "Takings" Clause ...................................................................... 36
   Fifth Amendment "Due Process" Clause ............................................................... 37
   First Amendment Challenges ................................................................................ 40
   Use of IEEPA to Continue Enforcing the Export Administration Act (EAA) .......... 41

Issues and Options for Congress ..................................................................................... 43

Delegation of Authority under IEEPA ......................................................................... 43
   Definition of "National Emergency" and "Unusual and Extraordinary Threat" ....... 44
   Scope of the Authority .......................................................................................... 44
   Terminating National Emergencies or IEEPA Authorities ...................................... 46
   The Status Quo ..................................................................................................... 46
The Export Control Reform Act of 2018 ..................................................................... 47

# Figures

Figure 1. Timeline of NEA and IEEPA Use .................................................................... 16
Figure 2. Declarations and Executive Orders Citing IEEPA ............................................ 18
Figure 3. Average Length of Emergencies Citing IEEPA ................................................. 19
Figure 4. Cumulative Number of Ongoing National Emergencies by Year ........................ 20
Figure 5. Geographically Defined Emergencies Citing IEEPA .......................................... 21

## Tables

Table 1. Amendments to IEEPA ....................................................................................................11

Table A-1. National Emergencies Declared Pursuant to the NEA ................................................ 48

Table A-2. IEEPA National Emergency Use by Executive Order ................................................. 51

## Appendixes

Appendix A. NEA and IEEPA Use ............................................................................................... 48

## Contacts

Author Information..................................................................................................................... 67

# Introduction

The issue of executive discretion has been at the center of constitutional debates in liberal democracies throughout the twentieth century. Specifically, the question of how to balance a commitment to the rule of law with the exigencies of modern political and economic crises has been a consistent concern of legislators and scholars in the United States and around the world.[1]

The United States Constitution is silent on the question of emergency power. As such, over the past two centuries, Congress and the President have answered that question in varied and often *ad hoc* ways. In the eighteenth and nineteenth centuries, the answer was often for the President to act without congressional approval in a time of crisis, knowingly risking impeachment and personal civil liability.[2] Congress claimed primacy over emergency action and would decide subsequently to either ratify the President's actions through legislation or indemnify the President for any civil liability.[3]

By the twentieth century, a new pattern had begun to emerge. Instead of retroactively judging an executive's extraordinary actions in a time of emergency, Congress enacted statutes authorizing the President to declare a state of emergency and make use of extraordinary delegated powers.[4] The expanding delegation of emergency powers to executives, and the increase in governing via emergency power by executives, was a common trajectory among twentieth-century liberal democracies.[5] As innovation quickened the pace of social change and global crises, some legislatures felt compelled to delegate to their executives, who traditional political theorists assumed could operate with greater "dispatch" than the more deliberate and future-oriented

---

[1] Clinton Rossiter, *Constitutional Dictatorship: Crisis Government in the Modern Democracies* (Princeton, NJ: Princeton University Press, 1948); Edward Corwin, *Total War and the Constitution* (New York: Knopf, 1963). Giorgio Agamben, *State of Exception* (Chicago: University of Chicago Press, 2005); Carl Schmitt, *Political Theology: Four Chapters on the Concept of Sovereignty* (Chicago: University of Chicago Press, 1985).

[2] Such an answer can be traced to, among others, John Locke, whose political theory was central to the development of American political institutions. John Locke, *Two Treatises of Government*, ed. Thomas Hollis (London: A. Millar et al., 1764), pp. 340-341 ("This power to act according to discretion, for the public good, without the prescription of the law, and sometimes even against it, is that which is called prerogative….").

[3] Jules Lobel, "Emergency Power and the Decline of Liberalism," *Yale Law Journal* 98, no. 7 (May 1989), pp. 1392-1398; John Fabian Witt, "A Lost Theory of American Emergency Constitutionalism," *Law and History Review* 36, no. 3 (Aug. 2018); George M. Dennison, "Martial Law: The Development of a Theory of Emergency Powers, 1776-1861," *The American Journal of Legal History* 18, no. 1 (Jan. 1974); Saikrishna Bangalore Prakash, *Imperial from the Beginning: The Constitution of the Original Executive* (New Haven, CT: Yale University Press, 2015), pp. 208-210; Matthew Warshauer, *Andrew Jackson and the Politics of Martial Law* (Knoxville: University of Tennessee Press, 2006). As Thomas Jefferson wrote, an executive officer acting illegally for what he determines to be the good of the country "does indeed risk himself on the justice of the controlling powers of the constitution, and his station makes it his duty to incur that risk." Qtd. in Prakash, *Imperial from the Beginning*, p. 214.

[4] U.S. Congress, Special Committee on National Emergencies and Delegated Emergency Powers, *A Brief History of Emergency Powers in the United States*, committee print, 93rd Cong., 2nd sess., July 1974 (Washington, DC: GPO, 1974), pp. 40-41.

[5] For scholarship on this general trend, see, e.g., William E. Scheuerman, *Liberal Democracy and the Social Acceleration of Time* (Baltimore: Johns Hopkins University Press, 2004); John M. Carey and Matthew Soberg Shugart, eds, *Executive Decree Authority* (Cambridge: Cambridge University Press, 1998); Peter L. Lindseth, "The Paradox of Parliamentary Supremacy: Delegation, Democracy, and Dictatorship in Germany and France, 1920s-1950s," *Yale Law Journal* 113, no. 7 (May 2004); Jules Lobel, "Emergency Power and the Decline of Liberalism"; Mary L. Dudziak, *War-Time: An Idea, Its History, Its Consequences* (Oxford: Oxford University Press, 2012); Corwin, *Total War and the Constitution*; Rossiter, *Constitutional Dictatorship*.

legislatures.[6] Whether such actions subvert the rule of law or are a standard feature of healthy modern constitutional orders has been a subject of extensive debate.[7]

The International Emergency Economic Powers Act (IEEPA) is one such example of a twentieth-century delegation of emergency authority.[8] One of 117 emergency statutes under the umbrella of the National Emergencies Act (NEA),[9] IEEPA grants the President extensive power to regulate a variety of economic transactions during a state of national emergency. Congress enacted IEEPA in 1977 to rein in the expansive emergency economic powers that it had delegated to the President under the Trading with the Enemy Act (TWEA). Nevertheless, some scholars argue that judicial and legislative actions subsequent to IEEPA's enactment have made it, like TWEA, a source of expansive and unchecked executive authority in the economic realm.[10] Others, however, argue that IEEPA is a useful tool for Presidents to quickly implement the will of Congress either as directed by law or as encouraged by congressional activity.[11]

Until recently, there has been little congressional discussion of modifying either IEEPA or its umbrella statute, the NEA. Recent presidential actions, however, have drawn attention to presidential emergency powers under the NEA of which IEEPA is the most frequently used. Should Congress consider changing IEEPA, there are two issues that Congress may wish to address. The first pertains to how Congress has delegated its authority under IEEPA and its umbrella statute, the NEA. The second pertains to choices made in the Export Control Reform Act of 2018.

# Origins

## The First World War and the Trading with the Enemy Act (TWEA)

The First World War (1914-1919) saw an unprecedented degree of economic mobilization. The executive departments of European governments began to regulate their economies with or

---

[6] Scheuerman, *Liberal Democracy and the Social Acceleration of Time*, ch. 2; See, e.g., Carl Schmitt, "The Plight of European Jurisprudence," tr. G. L. Ulmen, *Telos* 83 (Spring 1990); John Locke, *Two Treatises of Government*, pp. 340-341 ("…since in some governments the lawmaking power is not always in being, and is usually too numerous, and so too slow, for the dispatch requisite to execution; and because also it is impossible to foresee, and so by laws to provide for, all accidents and necessities that may concern the public, or to make such laws as will do no harm, if they are executed with an inflexible rigour, on all occasions, and upon all persons that may come in their way; therefore there is a latitude left to the executive power, to do many things of choice which the laws do not prescribe.").

[7] For arguments that emergency government subverts the rule of law, see, e.g., Sanford Levinson, "Constitutional Norms in a State of Permanent Emergency," *Georgia Law Review* 40, no. 3 (Spring 2006); Bruce Ackerman, *The Decline and Fall of the American Republic* (Cambridge, MA: Harvard University Press, 2010). For an argument that states of emergency can be a standard feature of healthy modern constitutional orders or that they can reflect or anticipate the preferences of the legislature, see, e.g., Kim Lane Scheppele, "Small Emergencies," *Georgia Law Review* 40, no. 3 (Spring 2006), p. 836; Carey and Shugart, *Executive Decree Authority*, p. 3.

[8] P.L. 95-223 (October 28, 1977), 91 Stat. 1626, codified as amended at 50 U.S.C. § 1701 *et seq.* (2018) ("IEEPA").

[9] P.L. 94-412 (September 14, 1976), 90 Stat. 1255, codified as amended at 50 U.S.C. § 1601 *et seq.* (2018) ("NEA"); CRS Report R46379, *Emergency Authorities Under the National Emergencies Act, Stafford Act, and Public Health Service Act*, coordinated by Jennifer K. Elsea.

[10] See, e.g., Patrick Thronson, "Toward Comprehensive Reform of America's Emergency Law Regime," *Michigan Journal of Law Reform* 46, no. 2 (2013), pp. 757-759; "The International Emergency Economic Powers Act: A Congressional Attempt to Control Presidential Emergency Power," *Harvard Law Review* 96, no. 5 (Mar., 1983), p. 1120.

[11] See, e.g., Scheppele, "Small Emergencies," pp. 845-847 (Statutes like IEEPA show "that emergencies have been brought inside the constitutional order by being normalized in the ordinary legislative process.").

without the support of their legislatures. The United States, in contrast, was in a privileged position relative to its allies in Europe. Separated by an ocean from Germany and Austria-Hungary, the United States was never under substantial threat of invasion. Rather than relying on the inherent powers of the presidency, or acting unconstitutionally and hoping for a subsequent congressional ratification, President Wilson sought explicit pre-authorization for expansive new powers to meet the global crisis.[12] Between 1916 and the end of 1917, Congress passed 22 statutes empowering the President to take control of private property for public use during the war.[13] These statutes gave the President broad authority to control railroads, shipyards, cars, telegraph and telephone systems, water systems, and many other sectors of the American economy.[14]

TWEA was one of those 22 statutes.[15] It granted to the executive an extraordinary degree of control over international trade, investment, migration, and communications between the United States and its enemies.[16] TWEA defined "enemy" broadly and included "any individual, partnership, or other body of individuals [including corporations], of any nationality, resident within the territory ... of any nation with which the United States is at war, or resident outside of the United States and doing business within such a territory ...."[17] The first four sections of the act granted the President extensive powers to limit trading with, communicating with, or transporting enemies (or their allies) of the United States.[18] These sections also empowered the President to censor foreign communications and place extensive restrictions on enemy insurance or reinsurance companies.[19]

It was Section 5(b) of TWEA, however, that would form one of the central bases of presidential emergency economic power in the twentieth century. Section 5(b), as originally enacted, states:

> That the President may investigate, regulate, or prohibit, under such rules and regulations as he may prescribe, by means of licenses or otherwise, any transactions in foreign exchange, export or earmarkings of gold or silver coin or bullion or currency, transfers of credit in any form (other than credits relating solely to transactions to be executed wholly within the United States), and transfers of evidences of indebtedness or of the ownership of property between the United States and any foreign country, whether enemy, ally of enemy or otherwise, or between residents of one or more foreign countries, by any person within the United States; and he may require any such person engaged in any such transaction to furnish, under oath, complete information relative thereto, including the production of any books of account, contracts, letters or other papers, in connection

---

[12] Rossiter, *Constitutional Dictatorship*, pp. 241-243; U.S. Congress, *A Brief History of Emergency Powers in the United States*, pp. 40-41.

[13] J. Reuben Clark, *Emergency Legislation Passed Prior to December, 1917: Dealing with the Control and Taking of Private Property for the Public Use, Benefit, or Welfare* (Washington, DC: GPO, 1918), pp. 1-125.

[14] Clark, *Emergency Legislation Passed Prior to December, 1917*, pp. 1-125; Rossiter, *Constitutional Dictatorship*, p. 243; David M. Kennedy, *Over Here: The First World War and American Society* (Oxford: Oxford University Press, 2004), ch. 2.

[15] For an overview of TWEA's development, see Benjamin A. Coates, "The Secret Life of Statutes: A Century of the Trading with the Enemy Act," *Modern American History* 1, no. 2 (2018).

[16] P.L. 65-91 (October 6, 1917) § 2, 40 Stat. 411, codified as amended at 50 U.S.C. § 4305 (2018) ("TWEA").

[17] Ibid.

[18] Ibid. § 3.

[19] Ibid. § 4.

therewith in the custody or control of such person, either before or after such transaction is completed.[20]

The statute gave the President expansive control over private international economic transactions in times of war.[21] While Congress terminated many of the war powers in 1921, TWEA was specifically exempted because the U.S. Government had yet to dispose of a large amount of alien property in its custody.[22]

## The Expansion of TWEA

The Great Depression, a massive global economic downturn that began in 1929, presented a challenge to liberal democracies in Europe and the Americas. To deal with the complexities presented by the crisis, nearly all such democracies began delegating discretionary authority to their executives to a degree that had only previously been done in times of war.[23] The U.S. Congress responded, in part, by dramatically expanding the scope of TWEA, delegating to the President the power to declare states of emergency in peacetime and assume expansive domestic economic powers.

Such a delegation was made politically possible by analogizing economic crises to war. In public speeches, President Franklin D. Roosevelt asserted that the Depression was to be "attacked," "fought against," "mobilized for," and "combatted" by "great arm[ies] of people."[24] The economic mobilization of the First World War had blurred the lines between the executive's military and economic powers. As the Depression was likened to "armed strife"[25] and declared to be "an emergency more serious than war"[26] by a Justice of the Supreme Court, it became routine to use emergency economic legislation enacted in wartime as the basis for extraordinary economic authority in peacetime.[27]

As the Depression entered its third year, the newly-elected President Roosevelt asked Congress for "broad Executive power to wage a war against the emergency, as great as the power that would be given to me if we were in fact invaded by a foreign foe."[28] In his first act as President, Roosevelt proclaimed a bank holiday, suspending all transactions at all banking institutions located in the United States and its territories for four days.[29] In his proclamation, Roosevelt claimed to have authority to declare the holiday under Section 5(b) of TWEA.[30] However,

---

[20] Ibid. § 5b.

[21] Ibid. § 2.

[22] U.S. Congress, House, *Trading with the Enemy Act Reform Legislation, Report of the Committee on International Relations on H.R. 7738*, 95th Cong., 1st sess., H.Rept. 95-459 (Washington, DC: GPO, 1977), p. 4.

[23] William E. Scheuerman, "The Economic State of Emergency," *Cardozo Law Review* 21 (2000), p. 1872.

[24] See, e.g., Franklin D. Roosevelt's Inaugural Address of 1933 (Washington, DC: National Archives and Records Administration, 1988); Rossiter, *Constitutional Dictatorship*, p. 256; U.S. Congress, *A Brief History of Emergency Powers in the United States*, p. 56.

[25] Franklin D. Roosevelt's Inaugural Address of 1933.

[26] New State Ice Co. v. Liebmann, 285 U.S. 262, 306 (1932) (J. Brandeis, dissenting).

[27] Scheuerman, "The Economic State of Emergency," p. 1878.

[28] Franklin D. Roosevelt's Inaugural Address of 1933.

[29] Pres. Proc. No. 2039 (Mar. 6, 1933).

[30] In his proclamation, President Roosevelt did not refer to the "Trading with the Enemy Act," but instead chose to use the more opaque "Act of October 6, 1917." Pres. Proc. No. 2039 (Mar. 6, 1933).

because the United States was not in a state of war and the suspended transactions were primarily domestic, the President's authority to issue such an order was dubious.[31]

Despite the tenuous legality, Congress ratified Roosevelt's actions by passing the Emergency Banking Relief Act three days after his proclamation.[32] The act amended Section 5(b) of TWEA to read:

> *During time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate, or otherwise,* investigate, regulate, or prohibit....[33]

This amendment gave the President the authority to declare that a national emergency existed and assume extensive controls over the national economy previously only available in times of war. By 1934, Roosevelt had used these extensive new powers to regulate "Every transaction in foreign exchange, transfer of credit between any banking institution within the United States and any banking institution outside of the United States."[34]

With America's entry into the Second World War in 1941, Congress again amended TWEA to grant the President extensive powers over the disposition of private property, adding the so-called "vesting" power, which authorized the permanent seizure of property. Now in its most expansive form, TWEA authorized the President to declare a national emergency and, in so doing, to regulate foreign exchange, domestic banking, possession of precious metals, and property in which any foreign country or foreign national had an interest.[35]

The Second World War ended in 1945. Following the conflict, the allied powers constructed institutions and signed agreements designed to keep the peace and to liberalize world trade. However, the United States did not immediately resume a peacetime posture with respect to emergency powers. Instead, the onset of the Cold War rationalized the continued use of TWEA and other emergency powers outside the context of a declared war.[36] Over the next several decades, Presidents declared four national emergencies and assumed expansive authority over economic transactions in the postwar period.[37]

---

[31] President Herbert Hoover had likewise contemplated using TWEA for such a purpose. However, Hoover's Attorney General, William D. Mitchell, had expressed serious doubts about the legality of such an action. In the last days of Hoover's presidency, Mitchell said that Hoover "should not issue [such an] executive order unless it was unanimously agreed by [the] outgoing and incoming administrations that it was necessary and assurances [were] obtained from Congressional leaders that [such an action] would be ratified promptly and that enabling legislation would be passed" as there was only a "shoe string" on which to base the legality of such an order. Raymond Moley, *The First New Deal* (New York: Harcourt, Brace and World, 1966), pp. 146-147.

[32] P.L. 73-1 (Mar. 9, 1933), 48 Stat. 1. The House, despite having no copies of the bill and relying upon a draft text read aloud by the Speaker, passed the bill after only 38 minutes of debate. The Senate voted to pass the measure the same evening. U.S. Congress, *A Brief History of Emergency Powers in the United States*, p. 57.

[33] Ibid. Italics show the language added by the Emergency Banking Relief Act.

[34] E.O. 6560 (Jan. 15, 1934). These actions came in the context of greater participation by the executive in international economic transactions generally. The Reciprocal Trade Agreement Act of 1934 gave the President the authority to negotiate bilateral trade agreements, marking the beginning of a period of increasing U.S. trade liberalization through executive action. Douglas A. Irwin, *Clashing Over Commerce* (Chicago: Chicago University Press, 2017), ch. 9.

[35] P.L. 77-354 (Dec. 18, 1941), 55 Stat. 838.

[36] Scheuerman, "The Economic State of Emergency," p. 1879; Robert S. Rankin and Winfried R. Dallmyr, *Freedom and Emergency Powers in the Cold War* (New York: Appleton-Century-Crofts, 1964).

[37] Pres. Proc. No. 2914 (Dec. 16, 1950); Pres. Proc. 3972 (Mar. 23, 1970); Pres. Proc. 3972 (Feb. 23, 1971); Pres. Proc. 4074 (Aug. 15, 1971). See also CRS Legal Sidebar LSB10267, *Definition of National Emergency under the National Emergencies Act*, by Jennifer K. Elsea; CRS Report 98-505, *National Emergency Powers*, by L. Elaine Halchin.

During the Cold War, economic sanctions became an increasingly popular foreign policy and national security tool, and TWEA was a prominent source of presidential authority to use the tool. In 1950, President Harry S. Truman declared a national emergency, citing TWEA, to impose economic sanctions on North Korea and China.[38] Subsequent Presidents referenced that national emergency as authority for imposing sanctions on Vietnam, Cuba, and Cambodia.[39] Truman likewise used Section 5(b) of TWEA to maintain regulations on foreign exchange, transfers of credit, and the export of coin and currency that had been in place since the early 1930s.[40] Presidents Richard M. Nixon and Gerald R. Ford invoked TWEA to continue export controls established under the Export Administration Act when the act expired.[41]

TWEA was also a prominent instrument of postwar presidential monetary policy. Presidents Dwight D. Eisenhower and John F. Kennedy used TWEA and the national emergency declared by President Roosevelt in 1933 to maintain and modify regulations controlling the hoarding and export of gold.[42] In 1968, President Lyndon B. Johnson explicitly used Truman's 1950 declaration of emergency under Section 5(b) of TWEA to limit direct foreign investment by U.S. companies in an effort to strengthen the balance of payments position of the United States after the devaluation of the pound sterling by the United Kingdom.[43] In 1971, after President Nixon suspended the convertibility of the U.S. dollar to gold, he made use of Section 5(b) of TWEA to declare a state of emergency and place a 10% *ad valorem* supplemental duty on all dutiable goods entering the United States.[44]

The reliance by the executive on the powers granted by Section 5(b) of TWEA meant that postwar sanctions regimes and significant parts of U.S. international monetary policy relied on continued states of emergency for their operation.

## Pushing Back Against Executive Discretion

By the mid-1970s, following U.S. military involvement in Vietnam, revelations of domestic spying, assassinations of foreign political leaders, the Watergate break-in, and other related abuses of power, Congress increasingly focused on checking the executive branch. The Senate formed a bipartisan special committee chaired by Senators Frank Church and Charles Mathias to

---

[38] Pres. Proc. No. 2914 (Dec. 16, 1950). This emergency would remain in place until 1976 and would be used to justify a host of emergency powers. See the partial list of executive orders issued pursuant to Proclamation 2914 in U.S. Congress, Special Committee on National Emergencies and Delegated Emergency Powers, *Executive Orders in Times of War and National Emergency, Report of the Special Committee on National Emergencies and Delegated Emergency Powers*, committee print, 93rd Cong., 2nd sess., June 1974 (Washington, DC: GPO, 1974), p. 15.

[39] U.S. Congress, House Committee on International Relations, Subcommittee on Trade and Commerce, *United States Embargo on Trade with South Vietnam and Cambodia*, 94th Cong. 1st sess., June 4, 1975 (Washington, D.C., GPO, 1975), p. 2; 31 C.F.R. 500.101-500.808 (1975).

[40] E.O. 10348 (Apr. 26, 1952).

[41] E.O. 11677 (Aug. 1, 1972); E.O. 11683 (Aug. 29, 1972); E.O. 11796 (Jul 30, 1974); E.O. 11798 (Aug. 14, 1974); E.O. 11810 (Sept. 30, 1974); E.O. 11818 (Nov. 5, 1974); E.O. 11940 (Sept. 30, 1976).

[42] E.O. 10896 (Nov. 29, 1960); E.O. 11037 (July 20, 1962).

[43] E.O. 11387 (Jan. 1, 1968).

[44] Pres. Proc. No. 4074 (Jan. 21, 1971). Although the proclamation did not explicitly refer to TWEA in order to avoid the possible embarrassment of using a statute named the "Trading with the Enemy Act" to impose a tariff principally aimed at U.S. allies, the proclamation was carefully worded to not exclude TWEA as an authority under which the proclamation was issued. When a legal challenge was issued, the Government argued, and the U.S. Court of Customs and Patent Appeals agreed, that TWEA was the source of the authority for the proclamation. United States v. Yoshida Int'l, Inc., 526 F.2d 560, 584 (C.C.P.A. 1975). See also CRS Insight IN11129, *The International Emergency Economic Powers Act (IEEPA) and Tariffs: Historical Background and Key Issues*, by Christopher A. Casey.

reevaluate delegations of emergency authority to the President.[45] The special committee issued a report surveying the President's emergency powers in which it asserted that the United States had technically "been in a state of national emergency since March 9, 1933" and that there were four distinct declarations of national emergency in effect.[46] The report also noted that the United States had "on the books at least 470 significant emergency statutes without time limitations delegating to the Executive extensive discretionary powers, ordinarily exercised by the Legislature, which affect the lives of American citizens in a host of all-encompassing ways."[47]

In the course of the Committee's investigations, Senator Mathias, a committee co-chair, noted, "A majority of the people of the United States have lived all of their lives under emergency government." Senator Church, the other co-chair, said the central question before the committee was "whether it [was] possible for a democratic government such as ours to exist under its present Constitution and system of three separate branches equal in power under a continued state of emergency."[48]

Among the more controversial statutes highlighted by the committee was TWEA. In 1977, during the House markup of a bill revising TWEA, Representative Jonathan Bingham, Chairperson of the House International Relations Committee's Subcommittee on Economic Policy, described TWEA as conferring "on the President what could have been dictatorial powers that he could have used without any restraint by Congress."[49] According to the Department of Justice, TWEA granted the President four major groups of powers in a time of war or other national emergency:

> (a) Regulatory powers with respect to foreign exchange, banking transfers, coin, bullion, currency, and securities;
>
> (b) Regulatory powers with respect to "any property in which any foreign country or a national thereof has any interest";

---

[45] The bipartisan, special committee was called the "Senate Special Committee on the Termination of the National Emergency," and was charged with conducting "a study and investigation with respect to the matter of terminating the national emergency proclaimed by the President of the United States on December 16, 1950." U.S. Congress, Senate, Subcommittee on International Trade and Commerce of the Committee on International Relations, *Trading with the Enemy: Legislative and Executive Documents Concerning Regulation of International Transactions in Time of Declared National Emergency*, committee print, 94th Cong., 2nd sess., Nov. 1976 (Washington, DC: GPO, 1976), p. iii.

[46] U.S. Congress, *A Brief History of Emergency Powers in the United States*, p. v. The four national emergencies were those proclaimed by President Roosevelt in 1933, President Truman in 1950, and the two proclaimed by President Nixon in 1970 and 1971.

[47] U.S. Congress, *A Brief History of Emergency Powers in the United States*, p. v.

[48] Qtd. in *Trading with the Enemy: Legislative and Executive Documents*, p. iii.

[49] U.S. Congress, House, Committee on International Relations, *Revision of the Trading with the Enemy Act: Markup before the Committee on International Relations ("House Markup")*, 95th Cong., 1st sess., June 1977 (Washington, DC: GPO, 1977), p. 5. House and Senate committee reports expressed the view that past Presidents had abused the authority to regulate economic transactions in a national emergency conferred by TWEA by using it in circumstances far removed from those that originally gave rise to the declaration of national emergency. H. Rept. No. 95-459 (June 23, 1977); S. Rept. No. 95-466 (Oct. 3, 1977). Both reports noted that President Lyndon B. Johnson, citing President Truman's declaration of national emergency with respect to Korea in 1950, had imposed controls on direct investment abroad by U.S. nationals in 1968, and that President Gerald R. Ford had used President Nixon's declaration of national emergency with respect to the balance of payments in 1971 to justify extending the controls and regulations of the Export Administration Act when that Act lapsed temporarily in 1976. H. Rept. No. 95-459, at 5; S. Rept. No. 95-466, at 2. More generally, the House report noted that the national emergency authority of TWEA had been used by President Franklin D. Roosevelt to regulate the banking industry in 1933 and to impose consumer credit controls in 1941 and by President Richard M. Nixon to impose a surcharge on imports into the United States in 1971. Thus, the House report concluded, TWEA "has become essentially an unlimited grant of authority for the President to exercise, at his discretion, broad powers in both the domestic and international economic arena, without congressional review." Ibid., p. 7.

(c) The power to vest "any property or interest of any foreign country or national thereof"; and

(d) The powers to hold, use, administer, liquidate, sell, or otherwise deal with "such interest or property" in the interest of and for the benefit of the United States.[50]

The House report on the reform legislation called TWEA "essentially an unlimited grant of authority for the President to exercise, at his discretion, broad powers in both the domestic and international economic arena, without congressional review."[51] The criticisms of TWEA centered on the following:

(a) It required no consultation or reports to Congress with regard to the use of powers or the declaration of a national emergency.

(b) It set no time limits on a state of emergency, no mechanism for congressional review, and no way for Congress to terminate it.

(c) It stated no limits on the scope of TWEA's economic powers and the circumstances under which such authority could be used.

(d) The actions taken under the authority of TWEA were rarely related to the circumstances in which the national emergency was declared.[52]

In testimony before the House Committee on International Relations, Professor Harold G. Maier, a noted legal scholar, summed up the development and the main criticisms of TWEA:

Section 5(b)'s effect is no longer confined to "emergency situations" in the sense of existing imminent danger. The continuing retroactive approval, either explicit or implicit, by Congress of broad executive interpretations of the scope of powers which it confers has converted the section into a general grant of legislative authority to the President…"[53]

## Enactment of the National Emergencies Act and the International Emergency Economic Powers Act

Congress's reforms to emergency powers under TWEA came in two acts. First, Congress enacted the National Emergencies Act (NEA) in 1976.[54] The NEA provided for the termination of all existing emergencies in 1978, except those making use of Section 5(b) of TWEA, and placed new restrictions on the manner of declaring and the duration of new states of emergency, including:

- Requiring the President to immediately transmit to Congress a notification of the declaration of national emergency.

- Requiring a biannual review whereby "each House of Congress shall meet to consider a vote on a concurrent [now joint, see below] resolution to determine whether that emergency shall be terminated."

- Authorizing Congress to terminate the national emergency through a privileged concurrent [now joint] resolution.[55]

---

[50] House, *Trading with the Enemy Act Reform Legislation*, p. 2.

[51] Ibid.

[52] Ibid., p. 9.

[53] Ibid., p. 9.

[54] P.L. 94-412 (Sept. 14, 1976), 90 Stat. 1255, codified as amended at 50 U.S.C. § 1601 *et seq* (2018).

[55] Ibid. While the NEA terminated the national emergencies on September 14, 1978, it explicitly enabled the continuation of those emergencies with respect to Section 5(b) of TWEA to give the Congress more time to consider

Second, Congress tackled the thornier question of TWEA. Because the authorities granted by TWEA were heavily entwined with postwar international monetary policy and the use of sanctions in U.S. foreign policy, unwinding it was a difficult undertaking.[56] The exclusion of Section 5(b) reflected congressional interest in preserving existing regulations regarding foreign assets, foreign funds, and exports of strategic goods.[57] Similarly, establishing a means to continue existing uses of TWEA reflected congressional interest in "improving future use rather than remedying past abuses."[58]

The subcommittee charged with reforming TWEA spent more than a year preparing reports, including the first complete legislative history of TWEA, a tome that ran nearly 700 pages.[59] In the resulting legislation, Congress did three things. First, Congress amended TWEA so that it was, as originally intended, only applicable "during a time of war."[60] Second, Congress expanded the Export Administration Act to include powers that previously were authorized by reference to Section 5(b) of TWEA.[61] Finally, Congress wrote the International Emergency Economic Powers Act (IEEPA) to confer "upon the President a new set of authorities for use in time of national emergency which are both more limited in scope than those of section 5(b) and subject to procedural limitations, including those of the [NEA]."[62]

The Report of the House Committee on International Relations summed up the nature of an "emergency" in their "new approach" to international emergency economic powers:

> [G]iven the breadth of the authorities, and their availability at the President's discretion upon a declaration of a national emergency, their exercise should be subject to various substantive restrictions. The main one stems from a recognition that emergencies are by their nature rare and brief, and are not to be equated with normal ongoing problems. A national emergency should be declared and emergency authorities employed only with respect to a specific set of circumstances which constitute a real emergency, and for no other purpose. The emergency should be terminated in a timely manner when the factual

---

how to address the issue of sanctions and international economic regulation. The International Emergency Economic Powers Act (IEEPA) grandfathered powers that "were being exercised [under TWEA] with respect to a country on July 1, 1977," including those with respect to Cuba, North Korea, Vietnam, and Cambodia. P.L. 95-223 (Dec. 28, 1977) § 101(b). The grandfathered powers, however, would require a declaration or renewal. See, e.g., Memorandum of Sept. 8, 1978, 45 Fed. Reg. 40,695; Memorandum of Sept. 12, 1979; Presidential Determination of Sept. 8, 1980, 45 Fed. Reg. 59,549; Memorandum of Sept. 10, 1981, 46 Fed. Reg. 45,321; Memorandum of Sept. 8, 1982, 47 Fed. Reg. 39,797; Memorandum of Sept. 7, 1983, 48 Fed. Reg. 40,695; Memorandum of Sept. 11, 1984, 49 Fed. Reg. 35,927.

[56] House, *Trading with the Enemy Act Reform Legislation*, pp. 6-7.

[57] U.S. Congress, Senate, *International Emergency Economic Powers Legislation, Report of the Committee on Banking, Housing, and Urban Affairs to Accompany H.R. 7738*, 95th Cong., 1st Sess., S.Rept. 95-466 (Washington, DC: GPO, 1977), p. 3.

[58] House, *Trading with the Enemy Act Reform Legislation*, 10.

[59] *House Markup*, p. 9; U.S. Congress, House, Subcommittee on International Trade and Commerce of the Committee on International Relations, *Trading with the Enemy: Legislative and Executive Documents Concerning Regulation of International Transactions in a Time of Declared Emergency*, 94th Cong., 2nd sess., Nov. 1976, committee print (Washington, DC: GPO, 1976).

[60] P.L. 95-223 (Dec. 28, 1977) (Title I) ("Section 5(b)(1) of the Trading With the Enemy Act // 50 USC app. 5. // is amended by striking out "or during any other period of national emergency declared by the President" in the text preceding subparagraph (A)."); 91 Stat. 1625, codified as amended at 50 U.S.C. § 4305 (2018); House, *Trading with the Enemy Act Reform Legislation*, p. 2.

[61] Ibid. (Title III); House, *Trading with the Enemy Act Reform Legislation*, p. 2 ("Title III of the bill makes a series of conforming amendments to the Export Administration Act, which transfer to that act the authority, heretofore exercised under section 5(b) of the Trading With the Enemy Act. to regulate exports of non-U.S.-origin goods and technology by foreign subsidiaries of U.S. concerns.").

[62] Ibid. (Title II); House, *Trading with the Enemy Act Reform Legislation*, p. 2.

state of emergency is over and not continued in effect for use in other circumstances. A state of national emergency should not be a normal state of affairs.[63]

# IEEPA's Statute, its Use, and Judicial Interpretation

## IEEPA's Statute

IEEPA, as currently amended, empowers the president to:

> (A) investigate, regulate, or prohibit:
>
> > (i) any transactions in foreign exchange,
> >
> > (ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or national thereof,
> >
> > (iii) the importing or exporting of currencies or securities; and
>
> (B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.
>
> (C) when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals, confiscate any property, subject to the jurisdiction of the United States, of any foreign person, foreign organization, or foreign country that he determines has planned, authorized, aided, or engaged in such hostilities or attacks against the United States; and all right, title, and interest in any property so confiscated shall vest, when, as, and upon the terms directed by the President, in such agency or person as the President may designate from time to time, and upon such terms and conditions as the President may prescribe, such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes.[64]

These powers may be exercised "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat."[65] Presidents may invoke IEEPA under the procedures set forth in the NEA. When declaring a national emergency, the NEA requires that the President "immediately" transmit the proclamation declaring the emergency to Congress and publish it in the *Federal Register*.[66] The President must also specify the provisions of law that he or she intends to use.[67]

In addition to the requirements of the NEA, IEEPA provides several further restrictions. Preliminarily, IEEPA requires that the President consult with Congress "in every possible

---

[63] House, *Trading with the Enemy Act Reform Legislation*, p. 11.

[64] 50 U.S.C. § 1702.

[65] Ibid. § 1701.

[66] Ibid. § 1621.

[67] Ibid. § 1631.

instance" before exercising any of the authorities granted under IEEPA.[68] Once the President declares a national emergency invoking IEEPA, he or she must immediately transmit a report to Congress specifying:

> (1) the circumstances which necessitate such exercise of authority;

> (2) why the President believes those circumstances constitute an unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States;

> (3) the authorities to be exercised and the actions to be taken in the exercise of those authorities to deal with those circumstances;

> (4) why the President believes such actions are necessary to deal with those circumstances; and

> (5) any foreign countries with respect to which such actions are to be taken and why such actions are to be taken with respect to those countries.[69]

The President subsequently is to report on the actions taken under the IEEPA at least once in every succeeding six-month interval that the authorities are exercised.[70] As per the NEA, the emergency may be terminated by the President, by a privileged joint resolution of Congress, or automatically if the President does not publish in the Federal Register and transmit to Congress a notice stating that such emergency is to continue in effect after such anniversary.[71]

## Amendments to IEEPA

Congress has amended IEEPA eight times (**Table 1**). Five of the eight amendments have altered civil and criminal penalties for violations of orders issued under the statute. Other amendments excluded certain informational materials and expanded IEEPA's scope following the terrorist attacks of September 11, 2001. Congress also amended the NEA in response to a ruling by the Supreme Court to require a joint rather than a concurrent resolution to terminate a national emergency.

### Table 1. Amendments to IEEPA

| Date | Action |
|---|---|
| December 28, 1977 | IEEPA Enacted |
| | (P.L. 95-223; 91 Stat. 1625) |
| August 16, 1985* | Following the Supreme Court's holding in *INS v. Chadha*, 462 U.S. 919 (1983) finding so-called legislative vetoes unconstitutional, Congress amends the NEA to change "concurrent" resolution to "joint" resolution. (P.L. 99-93; 99 Stat. 407, 448). |
| | * While not technically an amendment to IEEPA, IEEPA is tied to the NEA's provisions relating to the declaration and termination of national emergencies. |
| August 23, 1988 | IEEPA amended to exclude informational materials (Berman Amendment, see elaboration below). |
| | (Omnibus Trade and Competitiveness Act of 1988; P.L. 100-418; 102 Stat. 1107, 1371) |

---

[68] Ibid. § 1703(a).

[69] Ibid. § 1703(b).

[70] Ibid. § 1703(c).

[71] Ibid. § 1622.

| Date | Action |
|------|--------|
| October 6, 1992 | Section 206 of IEEPA amended to increase civil and criminal penalties under the act. (Treasury, Postal Service, and General Government Appropriations Act, 1993; P.L. 102-393; 106 Stat. 1729) |
| October 6, 1992 | Section 206 of IEEPA amended to decrease civil and criminal penalties under the act. (Department of Defense Appropriations Act, 1993; P.L. 102-396; 106 Stat. 1876) |
| April 30, 1994 | IEEPA amended to update the definition of informational materials. (Foreign Relations Authorization Act for Fiscal Years 1994 and 1995; P.L. 103-236; 108 Stat. 382) |
| September 23, 1996 | IEEPA amended to penalize attempted violations of licenses, orders, regulations or prohibitions issued under the authority of IEEPA. (National Defense Authorization Act for Fiscal Year 1997; P.L. 104-201; 110 Stat. 2725) |
| October 26, 2001 | USA PATRIOT Act Amendments, see elaboration below. (Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001; P.L. 107-56; 115 Stat. 272) |
| March 9, 2006 | Section 206 of IEEPA amended to increase civil and criminal penalties under the act. (USA PATRIOT Improvement and Reauthorization Act of 2005; P.L. 109-177; 120 Stat. 192) |
| October 16, 2007 | The International Emergency Economic Powers Enhancement Act amended Section 206 of IEEPA to increase civil and criminal penalties and added conspiracy to violate licenses, orders, regulations or prohibitions issued under the authority of IEEPA. Civil penalties are capped at $250,000 or twice the amount of the transaction found to have violated the law. Criminal penalties now include a fine of up to $1,000,000 and imprisonment of up to 20 years. (International Emergency Economic Powers Enhancement Act; P.L. 110-96; 121 Stat. 1011) |

**Source:** Congressional Research Service, based on United States Code, annotated.

## The Informational Materials Amendments to IEEPA

As originally enacted, IEEPA protected the rights of U.S. persons to participate in the exchange of "any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value" with a foreign person otherwise subject to sanctions. Amendments in 1988 and 1994 updated this list of protected rights to include the exchange of published information in a variety of formats.[72] As amended, the act currently protects the exchange of "information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds," provided such exchange is not otherwise controlled for national security or foreign policy reasons related to weapons proliferation or international terrorism.[73]

---

[72] P.L. 100-418 (Aug. 23, 1988); P.L. 103-236 (Apr. 30, 1994). The amendments were introduced by Rep. Howard Berman (D-CA) and are occasionally referred to as the "Berman Amendments." For more background, see, "Sleeping with the Enemy? OFAC Rules and First Amendment Freedoms," *Perspectives on History* (May 2004).

[73] Codified as amended at 50 U.S.C. § 1702(b)(3).

## USA PATRIOT Act Amendments to IEEPA[74]

Unlike the Trading with the Enemy Act (TWEA), IEEPA did not allow the President to vest assets as originally enacted.[75] In 2001, at the request of the George W. Bush Administration, Congress amended IEEPA as part of the USA PATRIOT Act[76] to return to the President the authority to vest frozen assets, but only under certain circumstances:

> ... the President may ... when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals, confiscate any property, subject to the jurisdiction of the United States, of any foreign person, foreign organization, or foreign country that [the President] determines has planned, authorized, aided, or engaged in such hostilities or attacks against the United States; and all right, title, and interest in any property so confiscated shall vest, when, as, and upon the terms directed by the President, in such agency or person as the President may designate from time to time, and upon such terms and conditions as the President may prescribe, such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes.[77]

Speaking about the efforts of intelligence and law enforcement agencies to identify and disrupt the flow of terrorist finances, Attorney General John Ashcroft told Congress:

> At present the President's powers are limited to freezing assets and blocking transactions with terrorist organizations. We need the capacity for more than a freeze. We must be able to seize. Doing business with terrorist organization must be a losing proposition. Terrorist financiers must pay a price for their support of terrorism, which kills innocent Americans.
>
> Consistent with the President's [issuance of E.O. 13224[78]] and his statements [of September 24, 2001], our proposal gives law enforcement the ability to seize the terrorists' assets. Further, criminal liability is imposed on those who knowingly engage in financial transactions, money-laundering involving the proceeds of terrorist acts.[79]

The House Judiciary Committee report explaining the amendments described its purpose as follows:

> Section 203 of the International Emergency Economic Powers Act (50 U.S.C. § 1702) grants to the President the power to exercise certain authorities relating to commerce with foreign nations upon his determination that there exists an unusual and extraordinary threat to the United States. Under this authority, the President may, among other things, freeze certain foreign assets within the jurisdiction of the United States. A separate law, the Trading With the Enemy Act, authorizes the President to take title to enemy assets when Congress has declared war.

---

[74] This section was authored by Jennifer K. Elsea, Legislative Attorney, American Law Division (ALD), CRS.

[75] P.L. 95-223. House, *Trading with the Enemy Act Reform Legislation*, p. 15 ("This grant of authorities does not include the following authorities … : (1) the power to vest … property."); Senate, *International Emergency Economic Powers Legislation*, p. 5 ("Authority to vest property, seize records and regulate purely domestic economic transactions would not be granted.").

[76] Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001, P.L. 107-56, 115 Stat. 272.

[77] P.L. 107-56 § 106, 115 Stat. 272, 277, codified at 50 U.S.C. § 1702(a)(1)(C) (2018).

[78] E.O. 13224, 66 Fed. Reg. 49,079 (Sept. 24, 2001).

[79] *Administration's Draft Anti-Terrorism Act of 2001: Hearing before the Committee on the Judiciary*, 107th Cong., 1st sess., serial no. 39 (Washington, DC: GPO, 2001), p. 7 (testimony of Attorney General Ashcroft).

Section 159 of this bill amends section 203 of the International Emergency Economic Powers Act to provide the President with authority similar to what he currently has under the Trading With the Enemy Act in circumstances where there has been an armed attack on the United States, or where Congress has enacted a law authorizing the President to use armed force against a foreign country, foreign organization, or foreign national. The proceeds of any foreign assets to which the President takes title under this authority must be placed in a segregated account can only be used in accordance with a statute authorizing the expenditure of such proceeds.

Section 159 also makes a number of clarifying and technical changes to section 203 of the International Emergency Economic Powers Act, most of which will not change the way that provision currently is implemented.[80]

The government has apparently never employed the vesting power to seize Al Qaeda assets within the United States. Instead, the government has sought to confiscate them through forfeiture procedures.[81]

The first, and to date, apparently only, use of this power under IEEPA occurred on March 20, 2003. On that date, in Executive Order 13290, President George W. Bush ordered the blocked "property of the Government of Iraq and its agencies, instrumentalities, or controlled entities" to be vested "in the Department of the Treasury.... [to] be used to assist the Iraqi people and to assist in the reconstruction of Iraq."[82] However, the President's order excluded from confiscation Iraq's diplomatic and consular property, as well as assets that had, prior to March 20, 2003, been ordered attached in satisfaction of judgments against Iraq rendered pursuant to the terrorist suit provision of the Foreign Sovereign Immunities Act and § 201 of the Terrorism Risk Insurance Act[83] (which reportedly totaled about $300 million)[84].

A subsequent executive order blocked the property of former Iraqi officials and their families, vesting title of such blocked funds in the Department of the Treasury for transfer to the Development Fund for Iraq (DFI) to be "used to meet the humanitarian needs of the Iraqi people, for the economic reconstruction and repair of Iraq's infrastructure, for the continued disarmament of Iraq, for the cost of Iraqi civilian administration, and for other purposes benefitting of the Iraqi people."[85] The DFI was established by UN Security Council Resolution 1483, which required member states to freeze all assets of the former Iraqi government and of Saddam Hussein, senior officials of his regime and their family members, and transfer such assets to the DFI, which was then administered by the United States. Most of the vested assets were used by the Coalition Provisional Authority (CPA) for reconstruction projects and ministry operations.[86]

---

[80] U.S. Congress, House, *Report of the Committee on the Judiciary to Accompany H.R. 2975*, 107th Cong., 1st sess., H.Rept. 107-236 (Washington, DC: GPO, 2001), p. 62.

[81] See United States v. All Funds on Deposit with R.J. O'Brien & Assocs., 783 F.3d 607, 617 (7th Cir. 2015) (insurance companies' attempt to intercede in civil forfeiture action involving Al Qaeda assets).

[82] E.O. 13290, 68 Fed. Reg. 14,307 (Mar. 24, 2003).

[83] P.L. 107-297, 116 Stat. 2322 (2002).

[84] See Tom Schoenberg, "Fights Loom for Iraqi Riches," *Legal Times* (March 31, 2003). Judgment creditors were paid about $140 million from the vested assets to cover the unsatisfied portions of judgments and interest.

[85] E.O. 13315, 68 Fed. Reg. 52,315 (September 3, 2003).

[86] GAO-04-579T Recovering Iraq's Assets (March 18, 2004). As of March 2004, according to GAO, the CPA had spent $1.67 billion of the $1.9 billion for "emergency needs, including salaries for civil servants and pensions, and for ministry operations." Ibid. at 7. The CPA was also authorized to use the more than $900 million in assets seized by the U.S. military in Iraq for humanitarian and reconstruction activities. Ibid.

The USA PATRIOT Act made three other amendments to Section 203 of IEEPA.[87] After the power to investigate, it added the power to block assets during the pendency of an investigation.[88] It clarified that the type of interest in property subject to IEEPA is an "interest by any person, or with respect to any property, subject to the jurisdiction of the United States."[89] It also added subsection (c), which provides:

> In any judicial review of a determination made under this section, if the determination was based on classified information (as defined in section 1(a) of the Classified Information Procedures Act) such information may be submitted to the reviewing court ex parte and in camera. This subsection does not confer or imply any right to judicial review.[90]

As described in the House Judiciary Committee report, these provisions were meant to clarify and codify existing practices.[91]

---

[87] P.L. 107-56 §106, 115 Stat. 277 (2001).

[88] Ibid., codified at 50 U.S.C. § 1702(a)(1)(B) (2018).

[89] Ibid., codified at 50 U.S.C. § 1702(a) (2018).

[90] Ibid., 115 Stat. at 278, codified at 50 U.S.C. § 1702(c) (2018).

[91] House, *Report of the Committee on the Judiciary to Accompany H.R. 2975*, 62.

## Figure 1. Timeline of NEA and IEEPA Use



**Source:** CRS.

**Notes:** Emergencies not citing IEEPA invoke one of the other 116 emergency powers under the umbrella of the NEA. For a list of these emergency powers, see CRS Report R46379, *Emergency Authorities Under the National Emergencies Act, Stafford Act, and Public Health Service Act*, coordinated by Jennifer K. Elsea.

# IEEPA Trends

Like TWEA prior to its amendment in 1977, the President and Congress together have often turned to IEEPA to impose economic sanctions in furtherance of U.S. foreign policy and national security objectives. While initially enacted to rein in presidential emergency authority,[92] presidential emergency use of IEEPA has expanded in scale, scope, and frequency since the statute's enactment. The House report on IEEPA stated, "emergencies are by their nature rare and brief, and are not to be equated with normal, ongoing problems."[93] National emergencies invoking IEEPA, however, have increased in frequency and length since its enactment.

Since 1977, Presidents have invoked IEEPA in 59 declarations of national emergency. On average, these emergencies last more than nine years. Most emergencies have been geographically specific, targeting a specific country or government. However, since 1990, Presidents have declared non-geographically-specific emergencies in response to issues like weapons proliferation, global terrorism, and malicious cyber-enabled activities. The erosion of geographic limitations has been accompanied by an expansion in the nature of the targets of sanctions issued under IEEPA authority. Originally, IEEPA was used to target foreign governments; however, Presidents have increasingly targeted groups and individuals.[94] While Presidents usually make use of IEEPA as an emergency power, Congress has also directed the use of IEEPA or expressed its approval of presidential emergency use in several statutes.[95]

## Presidential Emergency Use[96]

IEEPA is the most frequently cited emergency authority when the President invokes NEA authorities to declare a national emergency. (**Figure 1**). Rather than referencing the same set of emergencies, as had been the case with TWEA, IEEPA has required the President to declare a national emergency for each independent use. As a result, the number of national emergencies declared under the terms of the NEA has proliferated over the past four decades. Presidents declared only four national emergencies under the auspices of TWEA in the four decades prior to IEEPA's enactment. In contrast, Presidents have invoked IEEPA in 59 of the 67 declarations of

---

[92] House, *Trading with the Enemy Act Reform Legislation*, pp. 2-9.

[93] Ibid, p. 11.

[94] See "Presidential Emergency Use."

[95] See "Congressional Nonemergency Use and Retroactive Approval."

[96] The numbers here define emergencies by executive orders declaring an emergency. This choice causes some anomalies in the data. For example, the national emergency with regard to controlling the whereabouts of highly enriched uranium extracted from nuclear weapons in Russia lapsed when the notice extending the emergency was not published in the Federal Register by the emergency's anniversary date on June 21, 2012. As such, President Barack Obama issued an executive order declaring a new national emergency to reinstate the restrictions. For consistency, such anomalies have been treated as two distinct national emergencies. Such treatment decreases the average duration of emergencies. See, e.g., E.O. 13159, Blocking Property of the Government of the Russian Federation Relating to the Disposition of Highly Enriched Uranium Extracted From Nuclear Weapons (June 21, 2000); E.O. 13617, Blocking Property of the Government of the Russian Federation Relating to the Disposition of Highly Enriched Uranium Extracted From Nuclear Weapons (June 25, 2012).

national emergency issued under the National Emergencies Act.[97] As of July 1, 2020, there were 37 ongoing national emergencies; all but four involved IEEPA.[98]

### Figure 2. Declarations and Executive Orders Citing IEEPA



**Source:** CRS, 2020s current to July 1, 2020.

**Notes:** Executive orders include declarations of national emergency that cite IEEPA that were made by executive order and any subsequent modifications or amendments to an emergency or such an order.

Each year since 1990, Presidents have issued roughly 4.5 executive orders citing IEEPA and declared 1.5 new national emergencies citing IEEPA.[99] (**Figure 2**).

On average, emergencies invoking IEEPA last more than nine years.[100] The longest emergency was also the first. President Jimmy Carter, in response to the Iranian hostage crisis of 1979, declared the first national emergency under the provisions of the National Emergencies Act and invoked IEEPA.[101] Six successive Presidents have renewed that emergency annually for nearly

---

[97] The seven declarations of emergency under the NEA that did not involve IEEPA as of March 1, 2019 were all made by presidential proclamation. See Proc. 6491, To Suspend the Davis-Bacon Act of March 3, 1931, Within a Limited Geographic Area in Response to the National Emergency Caused by Hurricanes Andrew and Iniki (October 14, 1992); Proc. 6867, Declaration of a National Emergency and Invocation of Emergency Authority Relating to the Regulation of the Anchorage and Movement of Vessels around Cuba (March 1, 1996); Proc. 6907, Declaration of a State of Emergency and Release of Feed Grain From the Disaster Reserve (July 1, 1996); Proc. 7463, Declaration of National Emergency by Reason of Certain Terrorist Attacks (September 14, 2001); Proc. 7924, To Suspend Subchapter IV of Chapter 31 of Title 40, United States Code, Within a Limited Geographic Area in Response to the National Emergency Caused by Hurricane Katrina (September 8, 2005); Proc. 8443, Declaration of a National Emergency With Respect to the 2009 H1N1 Influenza Pandemic (October 23, 2009); Proc. 9844, Declaration of a National Emergency Concerning the Southern Border of the United States (February 15, 2019).

[98] The three ongoing emergencies not involving IEEPA as of August 1, 2019 were declared in: Proc. 6867, Proc. 7463, Proc. 9844. The first two of these national emergencies were declared in response to foreign threats. Notably, while IEEPA was not invoked in the first declaration of national emergency following the terrorist attacks of September 11, 2001, President George W. Bush declared a second state of emergency invoking IEEPA. E.O. 13224, Blocking Property and Prohibiting Transaction with Persons who Commit, Threaten to Commit, or Support Terrorism (September 23, 2001).

[99] The practice of issuing IEEPA-related executive orders has also changed over time. During the Iran hostage-taking in 1979, for example, President Carter issued a new and separate EO with each fine-tuning of the initial national emergency declaration; overall from November 1979 to his last day in office in January 1981, President Carter issued 12 executive orders relating to the hostage crisis and negotiations with Iran. Later presidents have opted, instead, to issue one executive order to declare the existence of a national emergency, and then to revisit that order to adjust or expand its reach by amending the original language.

[100] Emergencies invoking IEEPA that have been terminated lasted an average of 6.5 years. However, most emergencies citing IEEPA have not been terminated, including the first ever declared, which has been ongoing since 1979. Since the last time this report was updated, there have been a number of new emergencies citing IEEPA which has lowered the mean length for all emergencies citing IEEPA from roughly a decade to 8.9 years; the median is currently 6 years.

[101] E.O. 12170, Blocking Iranian Government Property (November 14, 1979).

forty years. As of July 1, 2020, that emergency is still in effect, largely to provide a legal basis for resolving matters of ownership of the Shah's disputed assets.[102] That initial emergency aside, the length of emergencies invoking IEEPA has increased each decade. The average length of an emergency invoking IEEPA declared in the 1980s was four years. That average extended to 10 years for emergencies declared in the 1990s and 12 years for emergencies declared in the 2000s (**Figure 3**).[103] As such, the number of ongoing national emergencies has grown nearly continuously since the enactment of IEEPA and the NEA (**Figure 4**). Between January 1, 1979, and July 1, 2020, there were on average 14 ongoing national emergencies each year, 13 of which invoked IEEPA.

In most cases, the declared emergencies citing IEEPA have been geographically specific (**Figure 5**). For example, in the first use of IEEPA, President Jimmy Carter issued an executive order that both declared a national emergency with respect to the "situation in Iran" and "blocked all property and interests in property of the Government of Iran [...]."[104] Five months later, President Carter issued a second order dramatically expanding the scope of the first EO and effectively blocked the transfer of all goods, money, or credit destined for Iran by anyone subject to the jurisdiction of the United States.[105] A further order expanded the coverage to block imports to the United States from Iran.[106] Together, these orders touched upon virtually all economic contacts between any place or legal person subject to the jurisdiction of the United States and the territory and government of Iran.[107]



**Figure 3. Average Length of Emergencies Citing IEEPA**

**Source:** CRS. Current as of July 1, 2020.

**Notes:** A single emergency was declared in the 1970s (Iran) and that has lasted 40 years. 2010s do not have sufficient data to create an average length.

Many of the executive orders invoking IEEPA have followed this pattern of limiting the scope to a specific territory, government, or its nationals. Executive Order 12513, for example, prohibited "imports into the United States of goods and services of Nicaraguan origin" and "exports from the United States of goods to or destined for Nicaragua." The order likewise prohibited Nicaraguan air carriers and vessels of Nicaraguan registry from entering U.S. ports.[108] Executive Order 12532 prohibited various transactions with the "Government of South Africa or to entities owned or controlled by that Government."[109]

---

[102] Continuation of the National Emergency With Respect to Iran, 83 Fed. Reg. 56,251 (November 8, 2018).

[103] Not enough time has passed to understand whether the trend will continue with those national emergencies declared in the 2010s.

[104] E.O. 12170.

[105] E.O. 12205, Economic Sanctions Against Iran (Apr. 7, 1980). The order exempted "food, medicine and supplies intended strictly for medical purposes, and donations of clothing intended to be used to relieve human suffering."

[106] E.O. 12211, Economic Sanctions Against Iran (April 17, 1980).

[107] Exceptions were made for family remittances.

[108] E.O. 12513, Prohibiting Trade and Certain Other Transactions Involving Nicaragua (May 1, 1985).

[109] E.O. 12532, Prohibiting Trade and Certain Other Transactions Involving South Africa (September 9, 1985).

**Figure 4. Cumulative Number of Ongoing National Emergencies by Year**



**Source:** CRS. Current as of July 1, 2020.

While the majority (40) of national emergencies invoking IEEPA have been geographically specific, 13 have lacked explicit geographic limitations.[110] President George H.W. Bush declared the first geographically nonspecific emergency in response to the threat posed by the proliferation of chemical and biological weapons.[111] Similarly, President George W. Bush declared a national emergency in response to the threat posed by "persons who commit, threaten to commit, or support terrorism."[112] President Barack Obama declared emergencies to respond to the threats of "transnational criminal organizations" and "persons engaging in malicious cyber-enabled activities." President Donald Trump declared an emergency to respond to "foreign adversaries" who were "creating and exploiting vulnerabilities in information and communications technologies and services."[113] Without explicit geographic limitations, these orders have included provisions that are global in scope. These geographically nonspecific emergencies invoking IEEPA have increased in frequency over the past 40 years—seven of the 13 have been declared since 2015.[114]

---

[110] This number excludes those emergencies declared to extend the Export Administration Act of 1979.

[111] E.O. 12735, Chemical and Biological Weapons Proliferation (November 16, 1990).

[112] E.O. 13224, Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (September 23, 2001).

[113] E.O. 13873, Securing the Information and Communications Technology and Services Supply Chain (May 14, 2019).

[114] E.O. 13694, Blocking the Property of Certain Persons Engaging in Significant Malicious Cyber-Enabled Activities (April 1, 2015); E.O. 13818, Blocking the Property of Persons Involved in Serious Human Rights Abuse or Corruption (December 20, 2017); E.O. 13848, Imposing Certain Sanctions in the Event of Foreign Interference in a United States Election (September 12, 2018); E.O. 13873, Securing the Information and Communications Technology and Services Supply Chain (May 15, 2019); E.O. 13920, Securing the United States Bulk-Power System (May 1, 2020); E.O. 13928, Blocking Property of Certain Persons Associated With the International Criminal Court (June 11, 2020). Some have argued that this shift was the result of humanitarian concerns about the effects of sanctions on the populations of the targeted states. Beginning in the 1990s, United Nations Security Council sanctions began to target the political and economic elites of a state, rather than the whole population. Kern Alexander, *Economic Sanctions: Law and Public Policy* (London: Palgrave Macmillan, 2009), p. xi. However, use of such orders has expanded beyond political and economic elites. See, e.g., E.O. 13928.

**Figure 5. Geographically Defined Emergencies Citing IEEPA**



**Source:** CRS. Current as of July 1, 2020.

In addition to the erosion of geographic limitations, the stated motivations for declaring national emergencies have expanded in scope as well. Initially, stated rationales for declarations of national emergency citing IEEPA were short and often referenced either a specific geography or the specific actions of a government. Presidents found that circumstances like "the situation in Iran,"[115] or the "policies and actions of the Government of Nicaragua,"[116] constituted "unusual and extraordinary threat[s] to the national security and foreign policy of the United States" and would therefore declare a national emergency.[117]

The stated rationales have, however, expanded over time in both the length and subject matter. Presidents have increasingly declared national emergencies, in part, to respond to

**Examples of Actions Taken in Non-Geographic Emergencies Citing IEEPA**

- Chemical and biological weapons proliferation
- Measures to restrict the participation by United States persons in weapons proliferation activities
- Measures to prevent proliferation of weapons of mass destruction
- Prohibiting transactions with terrorists who threaten to disrupt the Middle East peace process
- Blocking property and prohibiting transactions with persons who commit, threaten to commit, or support terrorism
- Blocking property of transnational criminal organizations
- Blocking the property of certain persons engaging in significant malicious cyber-enabled activities
- Blocking the property of persons involved in serious human rights abuse or corruption
- Imposing certain sanctions in the event of foreign interference in a United States election

---

[115] E.O. 12170.

[116] E.O. 12513.

[117] Ibid.

human and civil rights abuses,[118] slavery,[119] denial of religious freedom,[120] political repression,[121] public corruption,[122] and the undermining of democratic processes.[123] While the first reference to human rights violations as a rationale for a declaration of national emergency came in 1985,[124] most of such references have come in the past twenty years. **Table A-2**.

Presidents have also expanded the nature of the targets of IEEPA sanctions. Originally, the targets of sanctions issued under IEEPA were foreign governments. The first use of IEEPA targeted "Iranian Government Property."[125] Use of IEEPA quickly expanded to target geographically defined regions.[126] Nevertheless, Presidents have also increasingly targeted groups, such as political parties, corporations, or terrorist organizations, and individuals, such as supporters of terrorism, suspected narcotics traffickers, or associates of the International Criminal Court.[127]

The first instances of orders directed at groups or persons were limited to *foreign* groups or persons. For example, in Executive Order 12978, President Bill Clinton targeted specific "foreign persons" and "persons determined [...] to be owned or controlled by, or to act for or on behalf of" such foreign persons.[128] An excerpt is included below:

> Except to the extent provided in section 203(b) of IEEPA (50 U.S.C. 1702(b)) and in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date, I hereby order blocked all property and interests in property that are or hereafter come within the United States, or that are or hereafter come within the possession or control of United States persons, of:
>
> (a)    the *foreign persons* listed in the Annex to this order;
>
> (b)    *foreign persons* determined by the Secretary of the Treasury, in consultation with the Attorney General and the Secretary of State:
>
>> (i)    to play a significant role in international narcotics trafficking centered in Colombia; or

---

[118] E.O. 12532; E.O. 13396, Blocking Property of Certain Persons Contributing to the Conflict in Cote d'Ivoire (February 7, 2006); E.O. 13067, Blocking Sudanese Government Property and Prohibiting Transactions With Sudan (November 3, 1997); E.O. 13692, Blocking Property and Suspending Entry of Certain Persons Contributing to the Situation in Venezuela (March 8, 2015).

[119] E.O. 13067.

[120] E.O. 13067.

[121] E.O. 13405, Blocking Property of Certain Persons Undermining Democratic Processes or Institutions in Belarus (Jun. 16, 2006).

[122] Ibid.

[123] Ibid.

[124] E.O. 12532.

[125] E.O. 12170.

[126] See, e.g., E.O. 12513.

[127] See, e.g., E.O. 12865 (prohibiting transactions with the National Union for the Total Independence of Angola (UNITA), the second largest political party in Angola); E.O. 13129 (prohibiting transactions with the Taliban); E.O. 13224 (prohibiting transactions with persons who commit, threaten to commit, or support terrorism); E.O. 12978 (prohibiting transactions with certain narcotics traffickers); E.O. 13928 (blocking property of certain persons associated with the International Criminal Court). See also CRS Insight IN11428, *International Criminal Court: U.S. Sanctions in Response to Investigation of War Crimes in Afghanistan*, by Matthew C. Weed and Dianne E. Rennack.

[128] E.O. 12978, Blocking Assets and Prohibiting Transactions With Significant Narcotics Traffickers (October 21, 1995).

> (ii)      materially to assist in, or provide financial or technological support for or goods or services in support of, the narcotics trafficking activities of persons designated in or pursuant to this order; and
>
> (c)      persons determined by the Secretary of the Treasury, in consultation with the Attorney General and the Secretary of State, to be owned or controlled by, or to act for or on behalf of, persons designated in or pursuant to this order.[129]

However, in 2001, President George W. Bush issued Executive Order 13219 to target "persons who threaten international stabilization efforts in the Western Balkans." While the order was similar to that of Executive Order 12978, it removed the qualifier "foreign." As such, persons in the United States, including U.S. citizens, could be targets of the order.[130] The following is an excerpt of the order:

> Except to the extent provided in section 203(b)(1), (3), and (4) of IEEPA (50 U.S.C. 1702(b)(1), (3), and (4)), the Trade Sanctions Reform and Export Enhancement Act of 2000 (title IX, P.L. 106-387), and in regulations, orders, directives, or licenses that may hereafter be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date, all property and interests in property of:
>
> (i)      *the persons* listed in the Annex to this order; and
>
> (ii)      *persons* designated by the Secretary of the Treasury, in consultation with the Secretary of State, because they are found:
>
>> (A)      to have committed, or to pose a significant risk of committing, acts of violence...[131]

Several subsequent invocations of IEEPA have similarly not been limited to foreign targets.[132]

In sum, presidential emergency use of IEEPA was directed at foreign states initially, with targets that were delimited by geography or nationality. Since the 1990s, however, Presidents have expanded the scope of their declarations to include groups and individual persons, regardless of nationality or geographic location, who are engaged in specific activities.

## Congressional Nonemergency Use and Retroactive Approval

While IEEPA is often categorized as an emergency statute, Congress has used IEEPA outside of the context of national emergencies. When Congress legislates sanctions, it often authorizes or directs the President to use IEEPA authorities to impose those sanctions.

In the Nicaragua Human Rights and Anticorruption Act of 2018, for example, Congress directed the President to exercise "all powers granted to the President [by IEEPA] to the extent necessary

---

[129] Ibid. Emphasis added.

[130] See, e.g., the facts of Aaran Money Wire Serv., Inc. v. United States, No. 02CV789JMR/FLN, 2003 WL 22143735, at *3 (D. Minn. Aug. 21, 2003).

[131] E.O. 13219, Blocking Property of Persons Who Threaten International Stabilization Efforts in the Western Balkans (June 26, 2001). Emphasis added.

[132] See, e.g., E.O. 13224, Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (September 23, 2001); E.O. 13396, Blocking Property of Certain Persons Contributing to the Conflict in Côte d'Ivoire (February 7, 2006).

to block and prohibit [certain transactions]."[133] Penalties for violations by a person of a measure imposed by the President under the Act would be, likewise, determined by reference to IEEPA.[134]

This trend has been long-term. Congress first directed the President to make use of IEEPA authorities in 1986 as part of an effort to assist Haiti in the recovery of assets illegally diverted by its former government. That statute provided:

> The President shall exercise the authorities granted by section 203 of the International Emergency Economic Powers Act [50 USC 1702] to assist the Government of Haiti in its efforts to recover, through legal proceedings, assets which the Government of Haiti alleges were stolen by former president-for-life Jean Claude Duvalier and other individuals associated with the Duvalier regime. This subsection shall be deemed to satisfy the requirements of section 202 of that Act. [50 USC 1701][135]

In directing the President to use IEEPA, Congress waived the requirement that he declare a national emergency (and none was declared).[136]

Subsequent legislation has followed this general pattern, with slight variations in language and specificity.[137] The following is an example of current legislative language that has appeared in several recent statutes:

> (a) IN GENERAL.—The President shall impose the sanctions described in subsection (b) with respect to—
>
> ...
>
> (b) SANCTIONS DESCRIBED.—
>
>    (1) IN GENERAL.—The sanctions described in this subsection are the following:
>
>       (A) ASSET BLOCKING.—The exercise of all powers granted to the President by the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) to the extent necessary to block and prohibit all transactions in all property and interests in property of a person determined by the President to be subject to subsection (a) if such property and interests in property are in the United States, come within the United States, or are or come within the possession or control of a United States person.
>
>       ...

---

[133] P.L. 115-335 (Dec. 20, 2018), 132 Stat. 5019.

[134] Ibid.

[135] P.L. 99-529 (October 24, 1986), 100 Stat. 3010.

[136] Ibid.

[137] See, e.g., National Defense Authorization Act for Fiscal Year 1993, P.L. 102-484 (October 23, 1992), 106 Stat. 2315; Iran and Libya Sanctions Act of 1996, P.L. 104-1172 (August 5, 1996), 110 Stat. 1541; Strom Thurmond National Defense Authorization Act for Fiscal Year 1999, P.L. 105-261 (October 17, 1998) 112 Stat. 1920; Victims of Trafficking and Violence Protection Act of 2000, P.L. 106-386 (October 28, 2000), 114 Stat. 1464; Comprehensive Peace in Sudan Act of 2004, P.L. 108-497 (December 23, 2004), 118 Stat. 4012; Darfur Peace and Accountability Act of 2006, P.L. 109-344 (October 13, 2006), 120 Stat. 1869; Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010, P.L. 111-195 (July 1, 2010) 124 Stat 1312; National Defense Authorization Act for Fiscal Year 2012, P.L. 112-81, December 31, 2011, 125 Stat 1298; Iran Threat Reduction and Syria Human Rights Act of 2012, P.L. 112-158 (August 10, 2012) 126 Stat 1214 (makes some of the most extensive use of IEEPA); Russia and Moldova Jackson-Vanik Repeal and Sergei Magnitsky Rule of Law Accountability Act of 2012, P.L. 112-208 (December 14, 2012) 126 Stat 1496; Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act P.L. 113-291 (December 19, 2014), 128 Stat. 3293; Hizballah International Financing Prevention Amendments Act of 2018, P.L. 115-272 (October 25, 2018) 132 Stat. 4144.

> (2) PENALTIES.—A person that violates, attempts to violate, conspires to violate, or causes a violation of paragraph (1)(A) or any regulation, license, or order issued to carry out paragraph (1)(A) shall be subject to the penalties set forth in subsections (b) and (c) of section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705) to the same extent as a person that commits an unlawful act described in subsection (a) of that section.[138]

Congress has also expressed, retroactively, its approval of unilateral presidential invocations of IEEPA in the context of a national emergency. In the Countering Iran's Destabilizing Activities Act of 2017, for example, Congress declared, "It is the sense of Congress that the Secretary of the Treasury and the Secretary of State should continue to implement Executive Order No. 13382."[139]

Presidents, however, have also used IEEPA to preempt or modify parallel congressional activity. On September 9, 1985, President Reagan, finding "that the policies and actions of the Government of South Africa constitute an unusual and extraordinary threat to the foreign policy and economy of the United States," declared a national emergency and limited transactions with South Africa.[140] The President declared the emergency despite the fact that legislation limiting transactions with South Africa was quickly making its way through Congress.[141] In remarks about the declaration, President Reagan stated that he had been opposed to the bill contemplated by Congress because unspecified provisions "would have harmed the very people [the U.S. was] trying to help."[142] Nevertheless, members of the press at the time[143] (and at least one scholar since)[144] noted that the limitations imposed by the executive order and the provisions in legislation then winding its way through Congress were "substantially similar."[145]

## Current Uses of IEEPA

In general, IEEPA has served as an integral part of the postwar international sanctions regime.[146] The President, either through a declaration of emergency or via statutory direction, has used IEEPA to limit economic transactions in support of administrative and congressional national

---

[138] Support for the Sovereignty, Integrity, Democracy, and Economic Stability of Ukraine Act of 2014, P.L. 113-95 (April 3, 2014) 128 Stat. 1088. Identical language can be found, for example, in: The Venezuela Defense of Human Rights and Civil Society Act of 2014, P.L. 113-278 (December 18, 2014) 128 Stat. 3011; National Defense Authorization Act for Fiscal Year 2017, P.L. 114-328 (December 23, 2016) 130 Stat. 2000. Similar language can be found, for example, in: the North Korea Sanctions and Policy Enhancement Act of 2016, P.L. 114-122 (February 18, 2016) 130 Stat. 93; the Countering America's Adversaries through Sanctions Act, P.L. 115-44 (August 2, 2017) 130 Stat 886. Depending on the circumstance, Congress also includes a clause waiving the requirement to declare a national emergency. See, e.g., P.L. 115-44; P.L. 115-272 ("(1) ASSET BLOCKING.—The exercise of all powers granted to the President by the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) (except that the requirements of section 202 of such Act (50 U.S.C. 1701) shall not apply) to the extent necessary to block and prohibit all transactions [...].").

[139] Countering Iran's Destabilizing Activities Act of 2017, title I of the Countering America's Adversaries through Sanctions Act, P.L. 115-44 (August 2, 2017) § 104 (22 U.S.C. 9403); E.O. 13382 of June 28, 2005, "Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters," 70 Fed. Reg. 38,567 (July 1, 2005).

[140] E.O. 12532.

[141] 99 H.R. 1460; See also P.L. 99-440 (October 2, 1986).

[142] Economic Sanctions Against South Africa, Remarks and a Question-and-Answer-Session with Reporters on Signing E.O. 12532, September 9, 1985, 21 *Weekly Comp. Pres. Doc.* 1048, 1050.

[143] See, e.g., questions by Helen Thomas, United Press International, *Ibid*, 1050.

[144] Carter, *International Economic Sanctions*, p. 201.

[145] Ibid.

[146] Ibid., ch. 9.

security and foreign policy goals. Much of the action taken pursuant to IEEPA has involved blocking transactions and freezing assets.

Once the President declares that a national emergency exists, he may use the authority in Section 203 of IEEPA (Grants of Authorities; 50 U.S.C. § 1702) to investigate, regulate, or prohibit foreign exchange transactions, transfers of credit, transfers of securities, payments, and may take specified actions relating to property in which a foreign country or person has interest—freezing assets, blocking property and interests in property, prohibiting U.S. persons from entering into transactions related to frozen assets and blocked property, and in some instances denying entry into the United States.

Pursuant to Section 203, Presidents have

- prohibited transactions with and blocked property of those designated as engaging in malicious cyber-enabled activities, including "interfering with or undermining election processes or institutions" [Executive Order 13694 of April 1, 2015, as amended; 50 U.S.C. § 1701 note. See also Executive Order 13848 of September 12, 2018; 83 F.R. 46843.];

- prohibited transactions with and blocked property of those designated as illicit narcotics traffickers including foreign drug kingpins;

- prohibited transactions with and blocked property of those designated as engaging in human rights abuses or significant corruption;

- prohibited transactions related to illicit trade in rough diamonds;

- prohibited transactions with and blocked property of those designated as Transnational Criminal Organizations;

- prohibited transactions with "those who disrupt the Middle East peace process;"

- prohibited transactions related to overflights with certain nations;

- instituted and maintained maritime restrictions;

- prohibited transactions related to weapons of mass destruction, in coordination with export controls authorized by the Arms Export Control Act and the Export Administration Act of 1979,[147] and in furtherance of efforts to deter the weapons programs of specific countries (i.e., Iran, North Korea);

- prohibited transactions with those designated as "persons who commit, threaten to commit, or support terrorism;"

- maintained the dual-use export control system at times when its then-underlying authority, the Export Administration Act authority had lapsed;

- blocked property of, and prohibited transactions with, those designated as engaged in cyber activities that compromise critical infrastructures including election processes or the private sector's trade secrets;

- blocked property of, and prohibited transactions with, those designated as responsible for serious human rights abuse or engaged in corruption;

- blocked certain property of, and prohibited transactions with, foreign nationals of specific countries and those designated as engaged in activities that constitute an extraordinary threat;

---

[147] Legislation to replace the Export Administration Act was passed as part of the John S. McCain National Defense Authorization Act for Fiscal Year 2019, P.L. 115-232 (Aug. 13, 2018), as the Export Control Reform Act of 2018, Title XVII(B).

- prohibited transactions with those who pose "an undue risk of sabotage to or subversion of the design, integrity, manufacturing, production, distribution, installation, operation, or maintenance of information and communications technology or services in the United States."

No President has used IEEPA to place tariffs on imported products from a specific country or on products imported to the United States in general. However, IEEPA's similarity to TWEA, coupled with its relatively frequent use to ban imports and exports, suggests that such an action could happen.[148] In addition, no President has used IEEPA to enact a policy that was primarily domestic in effect. Some scholars argue, however, that the interconnectedness of the global economy means it would probably be permissible to use IEEPA to take an action that was primarily domestic in effect.[149]

---

### IEEPA vs Section 232 for Imposing Tariffs in Response to a National Security Threat

While a President could likely use IEEPA to impose additional tariffs on imported goods as President Nixon did under TWEA, no President has done so. Instead, Presidents have turned to Section 232 of the Trade Expansion Act of 1962 in cases of purported emergency.[150] Section 232 provides that if the Secretary of Commerce "finds that an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security," then the President may take action to adjust the imports such that they will no longer impair national security.[151] While the use of Section 232 requires findings by the Secretary of Commerce, the restrictions and reporting requirements of the NEA do not apply. For that reason, Section 232 may be an attractive source of presidential authority for imposing additional tariffs for national security purposes. Using this authority, President Donald J. Trump applied additional duties on steel and aluminum in March 2018.[152]

However, IEEPA is not subject to the same procedural restraints as Section 232. As no investigation is required, IEEPA authorities can be invoked at any time in response to a national emergency based on an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States." As such, IEEPA may be a source of authority for the President to quickly impose a tariff. On May 30, 2019, President Trump announced his intention to use IEEPA to impose on and gradually increase a five percent tariff on all goods imported from Mexico until "the illegal migration crisis is alleviated through effective actions taken by Mexico."[153] The tariffs were scheduled to be implemented on June 10, 2019, with five percent increases to take effect at the beginning of each subsequent month. On June 7, 2019, President Trump announced that that "The Tariffs scheduled to be implemented by the U.S. [on June 10], against Mexico, are hereby indefinitely suspended."[154]

---

[148] President Nixon, in effect, used TWEA to place a 10% ad valorem tariff on all imports to the U.S. Pres. Proc. No. 4074 (Jan. 21, 1971; United States v. Yoshida Int'l, Inc., 526 F.2d 560, 584 (C.C.P.A. 1975); See also Jason Luong, "Forcing Constraint: The Case for Amending the International Emergency Economic Powers Act," *Texas Law Review* 78 (2000), p. 1190.

[149] "The International Emergency Economic Powers Act," p. 1111; Patrick A. Thronson, "Toward Comprehensive Reform of America's Emergency Law Regime," *University of Michigan Journal of Law Reform* 46, no. 2 (2013), pp. 757-758.

[150] Trade Expansion Act of 1962, P.L. 87-794, § 232(b)–(c), 76 Stat. 877 (codified as amended at 19 U.S.C. § 1862(b)–(c)).

[151] Ibid.; CRS In Focus IF10667, *Section 232 of the Trade Expansion Act of 1962*, by Rachel F. Fefer and Vivian C. Jones; CRS Report R44707, *Presidential Authority over Trade: Imposing Tariffs and Duties*, by Caitlain Devereaux Lewis.

[152] Procl. 9704, 83 Fed. Reg. 11,619 (March 15, 2019); Procl. 9705, 83 Fed. Reg. 13,361 (March 15, 2019). CRS Report R45249, *Section 232 Investigations: Overview and Issues for Congress*, coordinated by Rachel F. Fefer and Vivian C. Jones.

[153] Statement from the President Regarding Emergency Measures to Address the Border Crisis, May 30, 2019, available at: https://www.whitehouse.gov/briefings-statements/statement-president-regarding-emergency-measures-address-border-crisis/.

[154] President Donald J. Trump, Twitter Post, June 7, 2018, 5:31 p.m., https://twitter.com/realdonaldtrump/status/

# Use of Assets Frozen under IEEPA[155]

The ultimate disposition of assets frozen under IEEPA may serve as an important part of the leverage economic sanctions provide to influence the behavior of foreign actors. The President and Congress have each at times determined the fate of blocked assets to further foreign policy goals.

## Presidential Use of Foreign Assets Frozen under IEEPA

Presidents have used frozen assets as a bargaining tool during foreign policy crises and to bring a resolution to such crises, at times by unfreezing the assets, returning them to the sanctioned entity, or channeling them to a follow-on government. The following are some examples of how Presidents have used blocked assets to resolve foreign policy issues.

President Carter invoked authority under IEEPA to impose trade sanctions against Iran, freezing Iranian assets in the United States, in response to the hostage crisis in 1979.[156] On January 19, 1981, the United States and Iran entered into a series of executive agreements brokered by Algeria under which the hostages were freed and the frozen assets were distributed to various entities.[157] Of the blocked assets, the agreements directed $5.1 billion to repay outstanding U.S. bank loans to Iran, $2.8 billion returned to Iran, $1 billion transferred into a security account in the Hague to pay other U.S. claims against Iran as arbitrated by the Iran-U.S. Claims Tribunal (IUSCT), and $2 billion remained blocked pending further agreement with Iran or decision of the Tribunal. The United States also froze the assets of the former Shah's estate along with those of the Shah's close relatives pending litigation in U.S. courts to ascertain Iran's right to their return. Iran's litigation was unsuccessful, and none of the contested assets were returned to Iran.[158]

Presidents have also channeled frozen assets to opposition governments in cases where the United States continued to recognize a previous government that had been removed by coup d'état or otherwise replaced as the legitimate government of a country. For example, after Panamanian President Eric Arturo Delvalle tried to dismiss de facto military ruler General Manuel Noriega from his post as head of the Panamanian Defense Forces, which resulted in Delvalle's own

---

1137155056044826626. The suspension preceded the release of a U.S. Mexico Joint Declaration on migration. Department of State, Office of the Spokesperson, U.S.-Mexico Joint Declaration, June 7, 2019, available at https://www.state.gov/u-s-mexico-joint-declaration/.

[155] This section was authored by Jennifer K. Elsea, Legislative Attorney, American Law Division (ALD), CRS.

[156] E.O. 12170, 44 Fed. Reg. 65729 (Nov. 14, 1979).

[157] The Algiers Accords comprise the following five documents: THE DECLARATION OF THE GOVERNMENT OF THE DEMOCRATIC AND POPULAR REPUBLIC OF ALGERIA, Jan. 19, 1981, 81 Dep't St. Bull., No. 2047 1, 1 (1981) [hereinafter "General Declaration"], reprinted in 1 Iran-U.S. Cl. Trib. Rep. 3; THE DECLARATION OF THE GOVERNMENT OF THE DEMOCRATIC AND POPULAR REPUBLIC OF ALGERIA CONCERNING THE SETTLEMENT OF CLAIMS BY THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE ISLAMIC REPUBLIC OF IRAN, Jan. 19, 1981, 81 Dep't St. Bull., No. 2047, at 3, reprinted in 1 Iran-U.S. Cl. Trib. Rep. 9; UNDERTAKINGS OF THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE ISLAMIC REPUBLIC OF IRAN WITH RESPECT TO THE DECLARATION OF THE GOVERNMENT OF THE DEMOCRATIC AND POPULAR REPUBLIC OF ALGERIA, 19 Jan. 1981, 81 Dep't St. Bull., No. 2047, at 4, reprinted in 1 Iran-U.S. Cl. Trib. Rep. 13; ESCROW AGREEMENT AMONG THE UNITED STATES, Federal Reserve Bank of New York, Bank Markazi Iran, and the Banque Centrale d'Algerie, Jan. 20, 1981, 81 Dep't St. Bull., No. 2047, at 6, reprinted in 1 Iran-U.S. Cl. Trib. Rep. 16; and TECHNICAL ARRANGEMENT BETWEEN BANQUE CENTRALE D'ALGERIE AND THE GOVERNOR AND COMPANY OF THE BANK OF ENGLAND AND THE FEDERAL RESERVE BANK OF NEW YORK, Jan. 20, 1981, 81 Dep't St. Bull., No. 2047, at 14, reprinted in 1 Iran-U.S. Cl. Trib. Rep. 20 (hereinafter "Algiers Accords").

[158] Sean D. Murphy, *Contemporary Practice of the United States Relating to International Law*, 94 Am. J. Int'l L. 677, 704 (Oct. 2000) (explaining that "[a]ll of Iran's lawsuits in U.S. courts [to recover the Shah's assets] were eventually dismissed, principally on grounds of forum non conveniens").

dismissal by the Panamanian Legislative Assembly, President Reagan recognized Delvalle as the legitimate head of government and instituted economic sanctions against the Noriega regime.[159] As part of these sanctions, the Department of State, in February 1988, advised U.S. banks not to disburse funds to the Noriega regime, and Delvalle obtained court orders permitting him access to those funds.[160] In April 1988, President Reagan issued Executive Order 12635, which "blocked all property and interests in property of the Government of Panama that are in the United States . . . or that come within the possession or control of persons located within the United States."[161] In June 1988, the Department of the Treasury issued regulations directing most payments from the U.S. government owed to Panama and all payments owed "to Panama from the operation of the Panama Canal Commission" to an escrow account established at the Federal Reserve Bank of New York.[162] One escrow account contained funds for the payment of operating expenses of the Delvalle government.[163] After the U.S. invasion of Panama ended in early 1990, President George H.W. Bush lifted economic sanctions against the country[164] and used some of the frozen funds to repay debts owed by Panama to foreign creditors, with remaining funds turned over to the successor government.[165]

The Obama and Trump Administrations took similar actions in response to the political situation in Venezuela. President Barack Obama initially froze Venezuelan government assets in 2015 under IEEPA and the Venezuela Defense of Human Rights and Civil Society Act of 2014.[166] In January 2019, the Trump Administration officially recognized Venezuelan opposition leader Juan Guaidó as Venezuela's interim president[167] and permitted Guaidó access to the frozen Venezuelan *government* assets that were "held at the United States Federal Reserve and other insured United States financial institutions."[168] The Trump Administration also imposed additional sanctions under IEEPA to freeze the assets of the main Venezuelan state-owned oil company, Petróleos de Venezuela (Pdvsa),[169] which significantly reduced funds available to the regime of Nicolas Maduro.[170] The U.S. recognition may allow the interim government to apply for a license from OFAC to access some of Venezuela's frozen funds.

There is also precedent for using frozen foreign assets for purposes authorized by the U.N. Security Council. After the first war with Iraq, President George H.W. Bush ordered the transfer

---

[159] GAO Review of Economic Sanctions Imposed Against Panama, GAO/T-NSIAD-89-44, 4-5 (July 26, 1989).

[160] Ibid. at 5.

[161] E.O. 12635, 53 Fed. Reg. 12,134 (Apr. 8, 1988).

[162] GAO Report, *supra* note 159, at 5.

[163] Ibid. at 7.

[164] E.O. 12,710, 55 Fed. Reg. 13,099 (Apr. 5, 1990).

[165] See 1989 Cong. Q. Almanac 607 (reporting that the Department of the Treasury had concluded "that the net amount still due Panama, after 'offsets, was about $200 million").

[166] E.O. 13692, 80 Fed. Reg. 12,747 (Mar. 8, 2015). For information about current sanctions against Venezuela, see CRS In Focus IF10715, Venezuela: Overview of U.S. Sanctions, by Clare Ribando Seelke.

[167] *President Donald J. Trump Supports the Venezuelan People's Efforts to Restore Democracy in Their Country*, White House Fact Sheet Jan. 29, 2019, https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-supports-venezuelan-peoples-efforts-restore-democracy-country/. For background of the situation in Venezuela, see CRS Report R44841, *Venezuela: Background and U.S. Relations*, coordinated by Clare Ribando Seelke.

[168] *Trump Supports the Venezuelan People's Efforts*.

[169] E.O. 13857, 84 Fed. Reg. 509 (Jan. 25, 2019); *Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A.*, U.S. Dep't of the Treasury (Jan. 28, 2019), https://home.treasury.gov/news/press-releases/sm594.

[170] Marianna Parraga, "Venezuela's oil exports sink to 17-year low, choked by U.S. sanctions," *Reuters*, Jun. 2, 2020, https://www.reuters.com/article/us-venezuela-oil-exports/venezuelas-oil-exports-sink-to-17-year-low-choked-by-us-sanctions-idUSKBN2392SG.

of frozen Iraqi assets derived from the sale of Iraqi petroleum held by U.S. banks to a holding account in the Federal Reserve Bank of New York to fulfill "the rights and obligations of the United States under U.N. Security Council Resolution No. 778."[171] The President cited a section of the United Nations Participation Act (UNPA),[172] as well as IEEPA, as authority to take the action.[173] The President ordered the transferred funds to be used to provide humanitarian relief and to finance the United Nations Compensation Commission,[174] which was established to adjudicate claims against Iraq arising from the invasion.[175] Other Iraqi assets remained frozen and accumulated interest until the United States vested them in 2003 pursuant to IEEPA.

In some cases, the United States has ended sanctions and returned frozen assets to successor governments. For example, as a condition of releasing sanctions, the United States released $237.6 million in frozen funds that had belonged to the Central Bank of the Socialist Federal Republic of Yugoslavia to the central banks of the successor states in 2003.[176] In 2002, the United States released $217 million in frozen funds that had belonged to the Taliban to the Afghan Interim Authority.[177]

## Congressionally Mandated Use of Frozen Foreign Assets and Proceeds of Sanctions

The executive branch has traditionally resisted congressional efforts to vest foreign assets to pay U.S. claimants without first obtaining a settlement agreement with the country in question.[178] Congress has overcome such resistance in the case of foreign governments that have been designated as "State Supporters of Terrorism."[179] U.S. nationals who are victims of state-supported terrorism involving designated states have been able to sue those countries for damages under an exception to the Foreign Sovereign Immunities Act (FSIA) since 1996.[180]

---

[171] E.O. 12817, 3 C.F.R. § 317 (1992). President George H.W. Bush froze Iraqi assets under U.S. jurisdiction pursuant to IEEPA in response to Iraq's invasion and occupation of Kuwait. E.O. 12,722, 55 Fed. Reg. 31,803 (Aug. 2, 1990).

[172] 22 U.S.C. § 287c (2018). The provision authorizes the President to give effect to U.N. Security Council resolutions by "investigat[ing], regulat[ing], or prohibit[ing], in whole or in part, economic relations or rail, sea, air, postal, telegraphic, radio, and other means of communication between any foreign country or any national thereof or any person therein and the United States or any person subject to the jurisdiction thereof, or involving any property subject to the jurisdiction of the United States." The provision does not explicitly mention asset confiscation.

[173] E.O. 12817, 57 Fed. Reg. 48,433 (Oct. 23, 1992).

[174] See Ronald J. Bettauer, "Establishment of the United Nations Compensation Commission: The U.S. Government Perspective," *The United Nations Compensation Commission* (Leiden: Brill, 1994), p. 35.

[175] S.C. Res. 687, para. 16 (April 8, 1991) (reaffirming that "Iraq ... is liable under international law for any direct loss, damage, ... or injury to foreign Governments, nationals and corporations, as a result of Iraq's unlawful invasion and occupation of Kuwait"; S.C. Res. 692 (May 20, 1991) (establishing the United Nations Compensation Commission (UNCC) to administer a system to provide compensation for claims for which Iraq is liable under paragraph 16 of S.C. Res. 687); S.C. Res. 706 and 712 (1991) (establishing an escrow account administered by the U.N. Secretary General to fund the costs of the UNCC and other activities); S.C. Res. 778 (1992) (directing all States in possession of funds due to Iraq for the sale of petroleum and petroleum products to transfer those funds to the U.N. escrow account).

[176] FOREIGN REGIMES' ASSETS, GAO-04-1006, 11 (Sept. 2004).

[177] Ibid. at 12.

[178] See, generally, 22 U.S.C. §§ 1621-1645o (Settlement of International Claims).

[179] Current states designated as sponsors of terrorism are Iran, Sudan, North Korea and Syria. *See* U.S. Department of State, State Sponsors of Terrorism, https://www.state.gov/j/ct/list/c14151.htm.

[180] The so-called terrorism exception to the Foreign Sovereign Immunities Act (FSIA) was originally codified at 28 U.S.C. § 1605(a)(7), but an amended version is now codified at 28 U.S.C. § 1605A (2018). *See* CRS Report RL31258, *Suits Against Terrorist States by Victims of Terrorism*, by Jennifer K. Elsea.

To facilitate the payment of judgments under the exception, Congress passed Section 117 of the Treasury and General Government Appropriations Act, 1999,[181] which further amended the FSIA by allowing attachment and execution against state property with respect to which financial transactions are prohibited or regulated under Section 5(b) TWEA, Section 620(a) of the Foreign Assistance Act (authorizing the trade embargo against Cuba), or Sections 202 and 203 of IEEPA, or any orders, licenses or other authority issued under these statutes. Because of the Clinton Administration's continuing objections, however, Section 117 also gave the President authority to "waive the requirements of this section in the interest of national security," an authority President Clinton promptly exercised in signing the statute into law.[182]

The Section 117 waiver authority protecting blocked foreign government assets from attachment to satisfy terrorism judgments has continued in effect ever since, prompting Congress to take other actions to make frozen assets available to judgment holders. Congress enacted § 2002 of the Victims of Trafficking and Violence Protection Act of 2000 (VTVPA)[183] to mandate the payment from frozen Cuban assets of compensatory damages awarded against Cuba under the FSIA terrorism exception on or prior to July 20, 2000.

The Department of the Treasury subsequently vested $96.7 million in funds generated from long-distance telephone services between the United States and Cuba in order to compensate claimants in *Alejandre v. Republic of Cuba*, the lawsuit based on the 1996 downing of two unarmed U.S. civilian airplanes by the Cuban air force.[184] Another payment of more than $7 million was made using vested Cuban assets to a Florida woman who had won a lawsuit against Cuba based on her marriage to a Cuban spy.[185]

As unpaid judgments against designated state sponsors of terrorism continued to mount, Congress enacted the Terrorism Risk Insurance Act (TRIA).[186] Section 201 of TRIA overrode long-standing objections by the executive branch to make the frozen assets of terrorist states available to satisfy judgments for compensatory damages against such states (and organizations and persons) as follows:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment

---

[181] P.L. 105-277, Div. A, Title I, § 117, 112 Stat. 2681-491 (1998), *codified at* 28 U.S.C. § 1610(f)(1)(A) (2018).

[182] Presidential Determination 99-1 (October 21, 1998), reprinted in 34 WEEKLY COMP. PRES. DOC. 2088 (October 26, 1998).

[183] P.L. 106-386, § 2002, 114 Stat. 1541 (2000). Section 2002(b)(1) required the President to "vest and liquidate up to and not exceeding the amount of property of the Government of Cuba and sanctioned entities in the United States or any commonwealth, territory, or possession thereof that has been blocked pursuant to [TWEA or IEEPA]" to pay the compensatory damages portion of such judgments. Judgments against Iran were paid from appropriated funds.

[184] Alejandre v. Republic of Cuba, 996 F. Supp. 1239 (S.D. Fla. 1997) ($50 million in compensatory damages and $137.7 million in punitive damages awarded to the families of three of the four persons who were killed when Cuban aircraft shot down two Brothers to the Rescue planes in 1996). The payment represented compensatory damages, judicially imposed sanctions, and interest.

[185] Martinez v. Republic of Cuba, No. 13-1999-CA 018208 (Miami-Dade Co., Fla., Cir. Ct. 2001) (awarding $7.1 million in compensatory damages and $20 million in punitive damages).

[186] P.L. 107-297, 116 Stat. 2322 (2002).

to the extent of any compensatory damages for which such terrorist party has been adjudged liable.[187]

Subsection (b) of Section 201 provided waiver authority "in the national security interest," but only with respect to frozen foreign government "property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations." When Congress amended the FSIA in 2008[188] to revamp the terrorism exception, it provided that judgments entered under the new exception could be satisfied out of the property of a foreign state notwithstanding the fact that the property in question is regulated by the United States government pursuant to TWEA or IEEPA.[189] Congress has also crafted legislation on occasion that makes specific assets available to satisfy specific judgments.[190]

Congress has also directed that the proceeds from certain sanctions violations be paid into a fund for providing compensation to the former hostages of Iran and terrorist state judgment creditors.[191] To fund the program, Congress designated that certain real property and bank accounts owned by Iran and forfeited to the United States could go into the United States Victims of State Sponsored Terrorism Fund, along with the sum of $1,025,000,000, representing the amount paid to the United States pursuant to the June 27, 2014, plea agreement and settlement between the United States and BNP Paribas for sanctions violations.[192] The fund is replenished through criminal penalties and forfeitures for violations of IEEPA or TWEA-based regulations, or any related civil or criminal conspiracy, scheme, or other federal offense related to doing business or acting on behalf of a state sponsor of terrorism.[193] Half of all civil penalties and forfeitures relating to the same offenses are also deposited into the fund.[194]

---

[187] The term "blocked asset" is defined in § 201(d) of TRIA to mean

> (A) any asset seized or frozen by the United States under [TWEA or IEEPA]; and

> (B) does not include property that—

> (i) is subject to a license issued by the United States Government for final payment, transfer, or disposition by or to a person subject to the jurisdiction of the United States in connection with a transaction for which the issuance of such license has been specifically required by statute other than [IEEPA] or the United Nations Participation Act of 1945 (22 U.S.C. 287 *et seq.*); or

> (ii) in the case of property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, or that enjoys equivalent privileges and immunities under the law of the United States, is being used exclusively for diplomatic or consular purposes.

[188] P.L. 110-181 § 1083 (2008) (amending the Foreign Sovereign Immunities Act).

[189] 28 U.S.C. § 1610(g) (2018). It is unclear whether "regulated" property and "blocked asset" are meant to be synonymous.

[190] P.L. 112-158, Title V, §502, 126 Stat. 1258 (2012); P.L. 116-92, div. A, Title XII, §1226, 133 Stat. 1645 (2019), both codified at 22 USC § 8772. The Supreme Court upheld this approach in Bank Markazi v. Peterson, 136 S. Ct. 1310 (2016). For an explanation of the case, see CRS Report R44967, *Congress's Power over Courts: Jurisdiction Stripping and the Rule of Klein*, coordinated by Kevin M. Lewis.

[191] *See* the Justice for United States Victims of State Sponsored Terrorism Act, P.L. 114-113, div. O, title IV (2015), 129 Stat. 3007, codified at 34 U.S.C. § 20144 (2018).

[192] Ibid., for more information about the program and funding for it, see CRS In Focus IF10341, *Justice for United States Victims of State Sponsored Terrorism Act: Eligibility and Funding*, by Jennifer K. Elsea.

[193] 34 U.S.C. § 20144(e) (2018).

[194] Ibid.

# Judicial Interpretation of IEEPA[195]

A number of lawsuits seeking to overturn actions taken pursuant to IEEPA have made their way through the judicial system, including challenges to the breadth of congressionally delegated authority and assertions of violations of constitutional rights. As demonstrated below, most of these challenges have failed. The few challenges that succeeded did not seriously undermine the overarching statutory scheme for sanctions.

## *Dames & Moore v. Regan*

The breadth of presidential power under IEEPA is illustrated by the Supreme Court's 1981 opinion in *Dames & Moore v. Regan*.[196] In *Dames & Moore*, petitioners had challenged President Carter's executive order establishing regulations to further compliance with the terms of the Algiers Accords, which the President had entered into to end the hostage crisis with Iran.[197] Under these agreements, the United States was obligated (1) to terminate all legal proceedings in U.S. courts involving claims of U.S. nationals against Iran, (2) to nullify all attachments and judgments, and (3) to resolve outstanding claims exclusively through binding arbitration in the Iran-U.S. Claims Tribunal (IUSCT). The President, through executive orders, revoked all licenses that permitted the exercise of "any right, power, or privilege" with regard to Iranian funds, nullified all non-Iranian interests in assets acquired after a previous blocking order, and required banks holding Iranian assets to transfer them to the Federal Reserve Bank of New York to be held or transferred as directed by the Secretary of the Treasury.[198]

Dames and Moore had sued Iran for breach of contract to recover compensation for work performed.[199] The district court had entered summary judgment in favor of Dames and Moore and issued an order attaching certain Iranian assets for satisfaction of any judgment that might result,[200] but stayed the case pending appeal.[201] The executive orders and regulations implementing the Algiers Accords resulted in the nullification of this prejudgment attachment and the dismissal of the case against Iran, directing that it be filed at the IUSCT.

In response, Dames and Moore sued the government. The plaintiffs claimed that the President and the Secretary of the Treasury exceeded their statutory and constitutional powers to the extent they adversely affected Dames and Moore's judgment against Iran, the execution of that judgment, the prejudgment attachments, and the plaintiff's ability to continue to litigate against the Iranian banks.[202]

The government defended its actions, relying largely on IEEPA, which provided explicit support for most of the measures taken—nullification of the prejudgment attachment and transfer of the

---

[195] This section was authored by Jennifer K. Elsea, Legislative Attorney, American Law Division (ALD), CRS.

[196] 453 U.S. 654 (1981).

[197] Declaration of the Government of the Democratic and Popular Republic of Algeria Relating to the Commitments Made by Iran and the United States and Declaration of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran, 20 I.L.M. 223 (1981) (collectively "Algiers Accords").

[198] E.O. 12170, 44 Fed. Reg. 65,729 (Nov. 14, 1979); E.O. 12279, 46 Fed. Reg. 7,919 (Jan. 19, 1981).

[199] *Dames & Moore*, 453 U.S. at 644.

[200] Ibid.

[201] Ibid. at 666.

[202] Ibid. at 666-67.

property to Iran—but could not be read to authorize actions affecting the suspension of claims in U.S. courts. Justice Rehnquist wrote for the majority:

> Although we have declined to conclude that the IEEPA…directly authorizes the President's suspension of claims for the reasons noted, we cannot ignore the general tenor of Congress' legislation in this area in trying to determine whether the President is acting alone or at least with the acceptance of Congress. As we have noted, Congress cannot anticipate and legislate with regard to every possible action the President may find it necessary to take or every possible situation in which he might act. Such failure of Congress specifically to delegate authority does not, "especially . . . in the areas of foreign policy and national security," imply "congressional disapproval" of action taken by the Executive. On the contrary, the enactment of legislation closely related to the question of the President's authority in a particular case which evinces legislative intent to accord the President broad discretion may be considered to "invite" "measures on independent presidential responsibility." At least this is so where there is no contrary indication of legislative intent and when, as here, there is a history of congressional acquiescence in conduct of the sort engaged in by the President.[203]

The Court remarked that Congress's implicit approval of the long-standing presidential practice of settling international claims by executive agreement was critical to its holding that the challenged actions were not in conflict with acts of Congress.[204] For support, the Court cited to Justice Frankfurter's concurrence in *Youngstown Sheet and Tube Co. v. Sawyer*[205] stating that "a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned … may be treated as a gloss on 'Executive Power' vested in the President by § 1 of Art. II."[206] Consequently, it may be argued that Congress's exclusion of certain express powers in IEEPA do not necessarily preclude the President from exercising them, at least where a court finds sufficient precedent exists.

Lower courts have examined IEEPA under a number of other constitutional doctrines.

### Separation of Powers—Non-Delegation Doctrine

Courts have reviewed whether Congress violated the non-delegation principle of separation of powers by delegating too much power to the President to legislate, in particular by creating new crimes.[207] These challenges have generally failed.[208] As the U.S. Court of Appeals for the Second

---

[203] *Dames & Moore*, 453 U.S. at 678-79 (internal citations omitted).

[204] Ibid. at 680 (citing the International Claims Settlement Act of 1949, 64 Stat. 13, codified as amended at 22 U.S.C. § 1621 *et seq.* (1976 ed. and Supp. IV)).

[205] Youngstown Sheet and Tube Co. v. Sawyer, 343 U.S. 579, 610-11 (1952).

[206] *Dames & Moore*, 453 U.S. at 686 (citing *Youngstown*, 343 U.S. at 610-11 (Frankfurter, J., concurring)).

[207] United States v. Dhafir, 461 F.3d 211, 212–13 (2d Cir. 2006) (appeal of whether IEEPA constitutes an appropriate delegation of congressional authority to the executive).

[208] United States v. Amirnazmi, 645 F.3d 564, 576 (3d Cir. 2011) (upholding IEEPA's delegation of authority to the President); United States v. Mirza, 454 F. App'x 249, 256 (5th Cir. 2011) (same); *Dhafir*, 461 F.3d at 216-17 (same); United States v. Arch Trading Co., 987 F.2d 1087, 1092–94 (4th Cir.1993) (same); see also United States v. Nazemzadeh, No. 11 CR 5726 L, 2014 WL 310460, at *8 (S.D. Cal. Jan. 28, 2014); United States v. Vaghari, No. CRIM.A. 08-693-01-02, 2009 WL 2245097, at *1 (E.D. Pa. July 27, 2009); Clancy v. Office of Foreign Assets Control, No. 05–C–580, 2007 WL 1051767, at *20–21 (E.D. Wis. Mar. 31, 2007), *aff'd*, 559 F.3d 595 (7th Cir.2009); United States v. Chalmers, 474 F. Supp. 2d 555, 566–68 (S.D.N.Y. 2007); United States v. Esfahani, No. 05–CR–0255, 2006 WL 163025, at *1–4 (N.D. Ill. Jan. 17, 2006); United States v. Anvari-Hamedani, 378 F. Supp. 2d 821, 829–30 (N.D. Ohio 2005); Global Relief Found., Inc. v. O'Neill, 207 F. Supp. 2d 779, 807 (N.D.Ill. 2002), *aff'd*, 315 F.3d 748 (7th Cir. 2002).

Circuit explained while evaluating IEEPA, delegations of congressional authority are constitutional so long as Congress provides through a legislative act an "intelligible principle" governing the exercise of the delegated authority.[209] Even if the standards are higher for delegations of authority to define criminal offenses, the court held, IEEPA provides sufficient guidance.[210] The court stated:

> The IEEPA "meaningfully constrains the [President's] discretion," by requiring that "[t]he authorities granted to the President ... may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared." And the authorities delegated are defined and limited.[211]

The Second Circuit found it significant that "IEEPA relates to foreign affairs—an area in which the President has greater discretion,"[212] bolstering its view that IEEPA does not violate the non-delegation doctrine.

## Separation of Powers—Legislative Veto

The U.S. Court of Appeals for the Eleventh Circuit considered whether Section 207(b) of IEEPA is an unconstitutional legislative veto. That provision states:

> The authorities described in subsection (a)(1) may not continue to be exercised under this section if the national emergency is terminated by the Congress by concurrent resolution pursuant to section 202 of the National Emergencies Act [50 U.S.C. § 1622] and if the Congress specifies in such concurrent resolution that such authorities may not continue to be exercised under this section.[213]

In *U.S. v. Romero-Fernandez*, two defendants convicted of violating the terms of an executive order issued under IEEPA argued on appeal that IEEPA was unconstitutional, in part, because of the above provision. The Eleventh Circuit accepted that the provision was an unconstitutional legislative veto (as conceded by the government) based on *INS v. Chadha*,[214] in which the Supreme Court held that Congress cannot void the exercise of power by the executive branch through concurrent resolution, but can act only through bicameral passage followed by presentment of the law to the President.[215] The Eleventh Circuit nevertheless upheld the defendants' convictions for violations of IEEPA regulations,[216] holding that the legislative veto provision was severable from the rest of the statute.[217]

---

[209] *Dhafir*, 461 F.3d at 215 (citing *Mistretta v. United States*, 488 U.S. 361, 372 (1989)).

[210] Ibid. at 216 ("Even if a heightened standard should apply to delegations concerning criminal offenses, the IEEPA's delegation is subject to constraints similar to those found sufficient in [*Touby v. United States*, 500 U.S. 160, 111 (1991)]"); see also *Amirnazmi*, 645 F.3d at 576 ("We too conclude that IEEPA 'meaningfully constrains' the President's discretion."); *Arch Trading Co.*, 987 F.2d at 1092–94 (holding "constraining factors" in IEEPA sufficient to conclude the President's powers are "explicitly defined and circumscribed").

[211] *Dhafir*, 461 F.3d at 216-17 (internal citations omitted).

[212] Ibid. at 217 (citing *Dames & Moore*, 453 U.S. at 675).

[213] 50 U.S.C. § 1706(b) (2018).

[214] United States v. Romero-Fernandez, 983 F.2d 195, 196 (11th Cir. 1993) (citing *Chadha*, 462 U.S. 919 (1983)).

[215] *Chadha*, 462 U.S. at 954–55.

[216] *Romero-Fernandez*, 983 F.2d at 197 ("Because [defendants] were charged and convicted under 50 U.S.C. § 1705(b), and this section is not affected by the unconstitutionality of § 1706(b), the constitutionality of the legislative veto is irrelevant to their convictions.").

[217] Ibid., 196 (finding that the balance of IEEPA is capable of functioning independently and noting Congress's inclusion of a severability clause).

## Fifth Amendment "Takings" Clause

Courts have also addressed whether certain actions taken pursuant to IEEPA have effected an uncompensated taking of property rights in violation of the Fifth Amendment. The Fifth Amendment's Takings Clause prohibits "private property [from being] taken for public use, without just compensation."[218] The Fifth Amendment's prohibitions apply as well to regulatory takings, in which the government does not physically take property but instead imposes restrictions on the right of enjoyment that decreases the value of the property or right therein.[219]

The Supreme Court has held that the nullification of prejudgment attachments pursuant to regulations issued under IEEPA was not an uncompensated taking, suggesting that the reason for this position was the contingent nature of the licenses that had authorized the attachments.[220] The Court also suggested that the broader purpose of the statute supported the view that there was no uncompensated taking:

> This Court has previously recognized that the congressional purpose in authorizing blocking orders is "to put control of foreign assets in the hands of the President...." Such orders permit the President to maintain the foreign assets at his disposal for use in negotiating the resolution of a declared national emergency. The frozen assets serve as a "bargaining chip" to be used by the President when dealing with a hostile country. Accordingly, it is difficult to accept petitioner's argument because the practical effect of it is to allow individual claimants throughout the country to minimize or wholly eliminate this "bargaining chip" through attachments, garnishments, or similar encumbrances on property. Neither the purpose the statute was enacted to serve nor its plain language supports such a result.[221]

Similarly, a lower court held that the extinguishment of contractual rights due to sanctions enacted pursuant to IEEPA does not amount to a regulatory taking requiring compensation under the Fifth Amendment.[222] Even though the plaintiff suffered "obvious economic loss" due to the sanctions regulations, that factor alone was not enough to sustain plaintiff's claim of a

---

[218] U.S. Const. Amdt. V.

[219] *See* Paradissiotis v. United States, 49 Fed. Cl. 16, 20 (2001) (describing a regulatory taking as "not involv[ing] physical invasion or seizure of property [but rather] concern[ing] action that affects an owner's use of property, … based on the 'general rule ... that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking'") (citing *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)), *aff'd*, 304 F.3d 1271 (Fed. Cir. 2002).

[220] *Dames & Moore*, 453 U.S. at 673 n. 6. (noting that "an American claimant may not use an attachment that is subject to a revocable license and that has been obtained after the entry of a freeze order to limit in any way the actions the *President* may take" pursuant to IEEPA).

[221] Ibid. at 673–674; *see also* Marschalk Co. v. Iran Nat. Airlines Corp., 657 F.2d 3, 4 (2d Cir. 1981) ("The President's action in nullifying the attachments did not constitute a taking of property for which compensation must be paid.").

[222] 767 Third Ave. Assocs. v. United States, 48 F.3d 1575, 1581 (Fed. Cir. 1995) (landlord leasing office space to a foreign government "did so against the backdrop of the government's foreign policy power" and did not have reasonable investment-backed expectation that its contract would be fulfilled); Rockefeller Ctr. Properties v. United States, 32 Fed. Cl. 586, 592 (1995) ("[T]hose who trade with foreign governments must… take the President's power into account in structuring their transactions."); Chang v. United States, 859 F.2d 893, 897 (Fed. Cir. 1988) ("[T]hose who enter into employment contracts overseas do so in light of one salient fact of economic life: that their ability to perform and compel performance is contingent upon the continuation of friendly relations between nations" (citing *Chang v. United States*, 13 Cl. Ct. 555, 559-60 (1987)); *Paradissiotis*, 49 Fed. Cl. at 21 (holding there was no taking because "plaintiff's [stock options] were 'in every sense subordinate to the President's power under the IEEPA.'").

compensable taking.[223] The court quoted long-standing Supreme Court precedent to support its finding:

> A new tariff, an embargo, a draft, or a war may inevitably bring upon individuals great losses; may, indeed, render valuable property almost valueless. They may destroy the worth of contracts. But whoever supposed that, because of this, a tariff could not be changed, or a non-intercourse act, or an embargo be enacted, or a war be declared? .... [W]as it ever imagined this was taking private property without compensation or without due process of law?[224]

Accordingly, it seems unlikely that entities whose business interests are harmed by the imposition of sanctions pursuant to IEEPA will be entitled to compensation from the government for their losses.

Persons whose assets have been directly blocked by the U.S. Department of the Treasury Office of Foreign Assets Control (OFAC) pursuant to IEEPA have likewise found little success challenging the loss of the use of their assets as uncompensated takings.[225] Many courts have recognized that a temporary blocking of assets does not constitute a taking because it is a temporary action that does not vest title in the United States.[226] This conclusion is apparently so even if the blocking of assets necessitates the closing altogether of a business enterprise.[227] In some circumstances, however, a court may analyze at least the initial blocking of assets under a Fourth Amendment standard for seizure.[228] One court found a blocking to be unreasonable under a Fourth Amendment standard where there was no reason that OFAC could not have first obtained a judicial warrant.[229]

### Fifth Amendment "Due Process" Clause

Some persons whose assets have been blocked have asserted that their right to due process has been violated. The Due Process Clause of the Fifth Amendment provides that no person shall be deprived of life, liberty, or property, without due process of law.[230] Where one company protested that the blocking of its assets without a pre-deprivation hearing violated its right to due process, a district court found that a temporary deprivation of property does not necessarily give rise to a right to notice and an opportunity to be heard.[231] A second district court stated that the exigencies

---

[223] *Paradissiotis*, 49 Fed. Cl. at 21.

[224] Ibid. (citing Knox v. Lee, 79 U.S. 457, 551 (1870), quoted in *Chang*, 859 F.2d at 897).

[225] Glob. Relief Found., Inc. v. O'Neill, 207 F. Supp. 2d 779, 802 (N.D. Ill.) ("Takings claims have often been raised—and consistently rejected—in the IEEPA context."), *aff'd*, 315 F.3d 748 (7th Cir. 2002).

[226] Ibid. (citing *Tran Qui Than v. Regan*, 658 F.2d 1296, 1304 (9th Cir.1981); *Miranda v. Secretary of Treasury*, 766 F.2d 1, 5 (1st Cir.1985)); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 78–79 (D.D.C. 2002) ("[T]he case law is clear that a blocking of this nature does not constitute a seizure." (citations omitted)), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003).

[227] IPT Co. v. U.S. Dep't of Treasury, No. 92 CIV. 5542 (JFK), 1994 WL 613371, at *5 (S.D.N.Y. 1994) (holding that the blocking of assets is not a taking as title to the property has not vested in the Government, the company IPT did not become a government-owned enterprise, and any proceeds from a sale of the business or its assets will still vest in its owners, who may claim such assets when the blocking order is lifted).

[228] KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner, 647 F. Supp. 2d 857, 872 (N.D. Ohio 2009); Al–Haramain Islamic Foundation, Inc. v. U.S. Dept. of Treasury, 585 F. Supp.2d 1233, 1263 (D. Or. 2008).

[229] *KindHearts*, 647 F. Supp. 2d at 883.

[230] U.S. Const. Amdt V.

[231] *IPT Co.*, 1994 WL 613371, at *6 (citing *United States v. James Daniel Good Real Property*, 114 S. Ct. 492, 498 (1993); *Mathews v. Eldridge*, 424 U.S. 319, 333–34 (1976)).

of national security and foreign policy considerations that are implicated in IEEPA cases have meant that OFAC historically has not provided pre-deprivation notice in sanctions programs.[232] A third district court stated that OFAC's failure to provide a charitable foundation with notice or a hearing prior to its designation as a terrorist organization and blocking of its assets did not violate its right to procedural due process, because the OFAC designation and blocking order serve the important governmental interest of combating terrorism by curtailing the flow of terrorist financing.[233] That same court also held that prompt action by the government was necessary to protect against the transfer of assets subject to the blocking order.[234]

In *Al Haramain Islamic Foundation v. U.S. Department of Treasury*, the U.S. Court of Appeals for the Ninth Circuit considered whether OFAC's use of classified information without any disclosure of its content in its decision to freeze the assets of a charitable organization, and its failure to provide adequate notice and a meaningful opportunity to respond, violated the organization's right to procedural due process.[235] The court applied the balancing test set forth by the Supreme Court in its landmark administrative law case *Mathews v. Eldridge*[236] to resolve these questions.[237] Under the *Eldridge* test, to determine if an individual has received constitutional due process, courts must weigh:

> (1) [the person's or entity's] private property interest,
>
> (2) the risk of an erroneous deprivation of such interest through the procedures used, as well as the value of additional safeguards, and
>
> (3) the Government's interest in maintaining its procedures, including the burdens of additional procedural requirements."[238]

While weighing the interests and risks at issue in *Al Haramain*, the Ninth Circuit found the organization's property interest to be significant:

> By design, a designation by OFAC completely shutters all domestic operations of an entity. All assets are frozen. No person or organization may conduct any business whatsoever with the entity, other than a very narrow category of actions such as legal defense. Civil penalties attach even for unwitting violations. Criminal penalties, including up to 20 years' imprisonment, attach for willful violations. For domestic organizations such as AHIF–Oregon, a designation means that it conducts no business at all. The designation is indefinite. Although an entity can seek administrative reconsideration and limited judicial relief, those remedies take considerable time, as evidenced by OFAC's long administrative delay in this case and the ordinary delays inherent in our judicial system. In sum, designation is not a mere inconvenience or burden on certain property interests; designation indefinitely renders a domestic organization financially defunct.[239]

Nevertheless, the court found "the government's interest in national security [could not] be understated."[240] In evaluating the government's interest in maintaining its procedures, the Ninth

---

[232] *Glob. Relief Found.*, 207 F. Supp. 2d at 803–04 (emphasizing "the Executive's need for speed in these matters, and the need to prevent the flight of assets and destruction of records"), *aff'd*, 315 F.3d 748 (7th Cir. 2002).

[233] *Holy Land Found.*, 219 F. Supp. 2d at 77 (D.D.C. 2002).

[234] Ibid.

[235] 686 F.3d 965, 979 (9th Cir. 2012).

[236] 424 U.S. 319 (1976).

[237] *Al Haramain*, 686 F.3d at 979.

[238] Ibid. (citing *Mathews*, 424 U.S. at 334–35).

[239] Ibid. at 979–80 (internal citations omitted).

[240] Ibid. at 980.

Circuit explained that the Constitution requires that the government "take reasonable measures to ensure basic fairness to the private party and that the government follow procedures reasonably designed to protect against erroneous deprivation of the private party's interests."[241] While the Ninth Circuit had previously held that the use of undisclosed information in a case involving the exclusion of certain longtime resident aliens should be considered presumptively unconstitutional,[242] the court found that the presumption had been overcome in this case.[243] The Ninth Circuit noted that all federal courts that have considered the argument that OFAC may not use undisclosed classified information in making its determinations have rejected it.[244] Although the court found that OFAC's failure to provide even an unclassified summary of the information at issue was a violation of the organization's due process rights,[245] the court deemed the error harmless because it would not likely have affected the outcome of the case.[246]

In the same case, the Ninth Circuit also considered the organization's argument that it had been denied adequate notice and an opportunity to be heard.[247] Specifically, the organization asserted that OFAC had refused to disclose its reasons for investigating and designating the organization, leaving it unable to respond adequately to OFAC's unknown suspicions.[248] Because OFAC had provided the organization with only one document to support its designation over the four-year period between the freezing of its assets and the redesignation of the organization as a specially designated global terrorist (SDGT), the court agreed that the organization had been deprived of due process rights.[249] However, the court found that this error too was harmless.[250]

The U.S. District Court for the District of Columbia found that a foreign individual could not challenge his designation as a specially designated national under IEEPA on due process grounds because he had not established a sufficient connection with the United States to warrant constitutional protections.[251] The court acknowledged that the D.C. Circuit has not articulated a specific test for determining whether a foreign national residing outside the United States maintains the requisite "substantial connections" to avail himself of due process rights.[252] The

---

[241] Ibid.

[242] *Al Haramain*, 686 F.3d at 981 (stating the use of classified information "should be presumptively unconstitutional" (citing *Am.–Arab Anti–Discrimination Comm. v. Reno*, 70 F.3d 1045, 1070 (9th Cir.1995)).

[243] Ibid. at 982 "[T]he use of classified information in the fight against terrorism, during a presidentially declared "national emergency," qualifies as sufficiently "extraordinary" to overcome the presumption.").

[244] Ibid. at 981 (citing *Holy Land*, 333 F.3d at 164; *Global Relief Found., Inc. v. O'Neill*, 315 F.3d 748, 754 (7th Cir. 2002); *KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner* (*KindHearts II*), 710 F.Supp.2d 637, 660 (N.D. Ohio 2010); *Al–Aqeel v. Paulson*, 568 F.Supp.2d 64, 72 (D.D.C. 2008)).

[245] Ibid. at 984 ("OFAC's failure to pursue potential mitigation measures violated AHIF–Oregon's due process rights.").

[246] Ibid. at 990.

[247] Ibid. at 984.

[248] Ibid. at 984-85.

[249] *Al Haramain*, 686 F.3d at 987 (holding that, at a minimum, OFAC must provide a timely statement of reasons for the investigation).

[250] Ibid. at 990 ("Even if [the organization] had enjoyed better access to classified information and constitutionally adequate notice, we are confident that it would not have changed OFAC's ultimate designation determination.").

[251] Rakhimov v. Gacki, No. CV 19-2554 (JEB), 2020 WL 1911561, at *5 (D.D.C. Apr. 20, 2020) (citing People's Mojahedin Org. of Iran v. U.S. Dep't of State, 182 F.3d 17, 22 (D.C. Cir. 1999)); *see also* Fulmen Co. v. Office of Foreign Assets Control, No. CV 18-2949 (RJL), 2020 WL 1536341, at *5 (D.D.C. Mar. 31, 2020) ("Because Fulmen's own pleadings demonstrate no property or presence in the United States, it cannot establish the 'substantial connections' necessary to potentially entitle it to constitutional protections as a non-resident alien.").

[252] *Rakhimov*, 2020 WL 1911561 at *5 (citing Nat'l Council of Resistance of Iran v. U.S. Dep't of State, 251 F.3d 192, 201–03 (D.C. Cir. 2001); 32 Cty. Sovereignty Comm. v. U.S. Dep't of State, 292 F.3d 797, 799 (D.C. Cir. 2002)).

court held that, irrespective of the proper test, the individual had failed to meet the requisite constitutional standard because he "ha[d] not established *any* connection to the United States, let alone a substantial one."[253] The court did, however, hold that the foreign national retained the right to procedural review under the Administrative Procedure Act (APA).[254]

## First Amendment Challenges

Some courts have considered whether asset blocking or penalties imposed pursuant to regulations promulgated under IEEPA have violated the subjects' First Amendment rights to free association, free speech, or religion. Challenges on these grounds have typically failed.[255] Courts have held that there is no First Amendment right to support terrorists.[256] The U.S. Court of Appeals for the District of Columbia Circuit distinguished advocacy from financial support and held that the blocking of assets affected only the ability to provide financial support, but did not implicate the organization's freedom of association.[257] Similarly, a district court interpreted relevant case law to hold that government actions prohibiting charitable contributions are subject to intermediate scrutiny rather than strict scrutiny, a higher standard that applies to political contributions.[258]

With respect to a free speech challenge brought by a charitable organization whose assets were temporarily blocked during the pendency of an investigation, a district court explained that "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important government interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms."[259] Accordingly, the district court applied the following test to determine whether the designations and blocking actions were lawful. Citing the Supreme Court's opinion in *United States v. O'Brien*, the court stated that a government regulation is sufficiently justified if:

> (1)  it is within the constitutional power of the government;

---

[253] Ibid.

[254] See ibid. at *6 (observing that the court must follow "the APA's [5 U.S.C. § 706(2)(A)] 'highly deferential standard,' meaning that [it] may set aside Treasury's action 'only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.') (quoting Zevallos v. Obama, 793 F.3d 106, 112 (D.C. Cir. 2015)).

[255] *KindHearts*, 647 F. Supp. 2d at 889 ("Courts have uniformly held that OFAC's blocking and designation authorities do not reach a substantial amount of protected speech, and that its restrictions are narrowly tailored."). Islamic Am. Relief Agency v. Unidentified FBI Agents, 394 F. Supp. 2d 34, 52–55 (D.D.C. 2005) (rejecting claims that OFAC blocking action violated plaintiff's First Amendment freedom of speech, freedom of association and freedom of religion, and noting that "nothing in the IEEPA or the executive order prohibits [the plaintiff] from expressing its views"); United States v. Lindh, 212 F. Supp. 2d 541, 570 (E.D. Va. 2002) ("The First Amendment's guarantee of associational freedom is no license to supply terrorist organizations with resources or material support in any form, including services as a combatant.").

[256] Islamic Am. Relief Agency v. Gonzales, 477 F.3d 728, 735 (D.C. Cir. 2007) (holding that "where an organization is found to have supported terrorism, government actions to suspend that support are not unconstitutional" under the First Amendment); Holy Land, 333 F.3d at 166 (holding "as other courts have," with respect to a First Amendment right to association claim, that "there is no First Amendment right nor any other constitutional right to support terrorists" (citing *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1133 (9th Cir. 2000)).

[257] *Islamic Am. Relief Agency,* 477 F.3d at 736 ("The blocking was not based on, nor does it prohibit, associational activity other than financial support.").

[258] Kadi v. Geithner, 42 F. Supp. 3d 1, 32 (D.D.C. 2012) (noting cases that concluded that intermediate scrutiny applies to a designation as a specially designated global terrorist (SDGT) and blocking order affecting funds purportedly intended for charitable purposes).

[259] *Glob. Relief Found.*, 207 F. Supp. 2d at 806 (citing *United States v. O'Brien*, 391 U.S. 367, 376–77 (1968)), *aff'd on other grounds*, 315 F.3d 748 (7th Cir. 2002).

(2)  it furthers an important or substantial governmental interest;

(3)  the governmental interest is unrelated to the suppression of free expression; and

(4)  the incidental restriction on alleged First Amendment freedoms is no greater than essential to the furtherance of that interest.[260]

The court found the government's actions to fall within the bounds of this test:

> First, the President clearly had the power to issue the Executive Order. Second, the Executive Order promotes an important and substantial government interest—that of preventing terrorist attacks. Third, the government's action is unrelated to the suppression of free expression; it prohibits the provision of financial and other support to terrorists. Fourth, the incidental restrictions on First Amendment freedoms are no greater than necessary.[261]

However, with respect to an organization that was not itself designated as an SDGT but wished to conduct coordinated advocacy with another organization that was so designated, one appellate court found that an OFAC regulation barring such coordinated advocacy based on its content was subject to strict scrutiny.[262] Accordingly, the court rejected the government's reliance on the Supreme Court's decision in *Holder v. Humanitarian Law Project*[263] to find that the regulation impermissibly implicated the organization's right to free speech.[264] Accordingly, there may be some circumstances where the First Amendment protects speech coordinated with (but not on behalf of) an organization designated as an SDGT.

## Use of IEEPA to Continue Enforcing the Export Administration Act (EAA)

Until the recent enactment of the Export Control Reform Act of 2018,[265] export of dual use goods and services was regulated pursuant to the authority of the Export Administration Act (EAA),[266] which was subject to periodic expiry and reauthorization. President Reagan was the first President to use IEEPA as a vehicle for continuing the enforcement of the EAA's export controls.[267]

After Congress did not extend the expired EAA, President Reagan issued Executive Order 12444 in 1983, finding that "unrestricted access of foreign parties to United States commercial goods, technology, and technical data and the existence of certain boycott practices of foreign nations constitute, in light of the expiration of the Export Administration Act of 1979, an unusual and extraordinary threat to the national security."[268] Although the EAA had been reauthorized for short periods since its initial expiration in 1983, every subsequent President utilized the

---

[260] Ibid. (citing *O'Brien*, 391 U.S. at 376-77).

[261] Ibid.

[262] *Al Haramain*, 686 F.3d at 997 (holding strict scrutiny applies and that, "[a]ccordingly, the prohibition survives only if it is narrowly tailored to advance the concededly compelling government interest of preventing terrorism").

[263] 561 U.S. 1, 38 (2010) (upholding the prohibition on material support of terrorist organizations, 18 U.S.C. § 2339B, against First Amendment challenge).

[264] *Al Haramain*, 686 F.3d at 1001 (holding that under the prevailing fact circumstances, OFAC's content-based prohibitions on speech violate the First Amendment).

[265] P.L. 115-232, Title XVIII(B). In 2018, Congress passed the Export Control Reform Act to repeal the Export Administration Act of 1979 and provide new statutory authority for the continuation of EAR. However, three sections were not repealed and Congress directed their continued application through the exercise of IEEPA. See "The Export Control Reform Act of 2018" below.

[266] P.L. 96-72, § 2, 93 Stat. 503 (1979), codified as amended at 50 U.S.C. §§ 4601-4623 (2018).

[267] E.O. 12444, 48 Fed. Reg. 48,215 (Oct. 18, 1983).

[268] Ibid.

authorities granted under IEEPA to maintain the existing system of export controls during periods of lapse. **Figure 1**.

In the latest iteration, President George W. Bush issued Executive Order 13222 in 2001, finding the existence of a national emergency with respect to the expiration of the EAA and directing—pursuant to the authorities allocated under IEEPA—that "the provisions for administration of the [EAA] shall be carried out under this order so as to continue in full force and effect…the export control system heretofore maintained."[269] Presidents Obama and Trump annually extended the 2001 executive order.[270]

Courts have generally treated this arrangement as authorized by Congress,[271] although certain provisions of the EAA in effect under IEEPA have led to challenges. The determining factor appears to be whether IEEPA itself provides the President the authority to carry out the challenged action. In one case, the U.S. Court of Appeals for the Fifth Circuit upheld a conviction for an attempt to violate the regulations even though the EAA had expired and did not expressly criminalize such attempts.[272] The circuit court rejected the defendants' argument that the President had exceeded his delegated authority under the EEA by "enlarging" the crimes punishable under the regulations.[273]

Nevertheless, a district court held that the conspiracy provisions of the EAA regulations were rendered inoperative by the lapse of the EAA and "could not be repromulgated by executive order under the general powers that IEEPA vests in the President."[274] The district court found that, even if Congress intended to preserve the operation of the EAA through IEEPA, that intent was limited by the scope of the statutes' substantive coverage at the time of IEEPA's enactment, when no conspiracy provision existed in either statute.[275]

The U.S. Court of Appeals for the D.C. Circuit upheld the application of the EAA as a statute permitting the government to withhold information under exemption 3 of the Freedom of Information Act (FOIA),[276] which exempts from disclosure information exempted from disclosure by statute, even though the EAA had expired.[277] Referring to legislative history it interpreted as congressional approval of the use of IEEPA to continue the EAA provisions during periods of lapse, the court stated:

> Although the legislative history does not refer to the EAA's confidentiality provision, it does evince Congress's intent to authorize the President to preserve the operation of the export regulations promulgated under the EAA. Moreover, it is significant for purposes of determining legislative intent that Congress acted with the knowledge that the EAA's export regulations had long provided for confidentiality and that the President's ongoing

---

[269] E.O. 13222, 66 Fed. Reg. 44,025 (Aug. 17, 2001).

[270] See, e.g., Continuation of Emergency Regarding Export Control Regulations, 82 Fed. Reg. 39,005 (Aug. 15, 2017).

[271] Owens v. Republic of Sudan, 374 F. Supp. 2d 1, 22 (D.D.C. 2005) ("Courts uniformly have read [the executive order preserving the EAA regulations under IEEPA] to mean that the statute remained in full effect during the periods of lapse."). In this case, Sudan challenged its designation as a state sponsor of terrorism pursuant to a provision of the EAA because the statute had expired.

[272] United States v. Mechanic, 809 F.2d 1111, 1112-13 (5th Cir. 1987).

[273] Ibid. at 1113-14 (emphasizing the foreign affairs connection served by the EAA).

[274] United States v. Quinn, 401 F. Supp. 2d 80, 93 (D.D.C. 2005).

[275] Ibid. at 95.

[276] 5 U.S.C. § 552(b)(3) (2018).

[277] Wisconsin Project on Nuclear Arms Control v. U.S. Dep't of Commerce, 317 F.3d 275, 282 (D.C. Cir. 2003).

practice of extending the EAA by executive order had always included these confidentiality protections.[278]

The D.C. Circuit distinguished this holding in a later case involving appellate jurisdiction over a decision by the Department of Commerce to apply sanctions for a company's violation of the EAA regulations.[279] Pursuant to the regulations and under the direction of the Commerce Department, the company sought judicial review directly in the D.C. Circuit.[280] The D.C. Circuit, however, concluded that it lacked jurisdiction:

> This court would have jurisdiction pursuant to the President's order only if the President has the authority to confer jurisdiction—an authority that, if it exists, must derive from either the Executive's inherent power under the Constitution or a permissible delegation of power from Congress. The former is unavailing, as the Constitution vests the power to confer jurisdiction in Congress alone. Whether the executive order can provide the basis of our jurisdiction, then, turns on whether the President can confer jurisdiction on this court under the auspices of IEEPA….. We conclude that the President lacks that power. Nothing in the text of IEEPA delegates to the President the authority to grant jurisdiction to any federal court.[281]

Consequently, the appeal of the agency decision was determined to belong in the district court according to the default rule under the Administrative Procedure Act (APA).[282]

# Issues and Options for Congress

Congress may wish to address a number of issues with respect to IEEPA; two are addressed here. The first pertains to how Congress has delegated its authority under IEEPA and its umbrella statute, the NEA. The second pertains to choices made in the Export Control Reform Act of 2018.

## Delegation of Authority under IEEPA

Although the stated aim of the drafters of the NEA and IEEPA was to restrain the use of emergency powers, the use of such powers has expanded by several measures. Presidents declare national emergencies and renew them for years or even decades. The limitation of IEEPA to transactions involving some foreign interest was intended to limit IEEPA's domestic application. However, globalization has eroded that limit, as few transactions today do not involve some foreign interest. Many of the other criticisms of TWEA that IEEPA was supposed to address— consultation, time limits, congressional review, scope of power, and logical relationship to the emergency declared—are criticisms that scholars levy against IEEPA today.[283] TWEA came under criticism because the first national emergency declared pursuant to its authority had been ongoing for 41 years.[284] In November 2020, the first emergency declared pursuant to authority under IEEPA, the emergency with Iran declared in 1979, will enter its forty-first year.

---

[278] Ibid.

[279] Micei Int'l v. Dep't of Commerce, 613 F.3d 1147, 1150 (D.C. Cir. 2010).

[280] Ibid. at 1151.

[281] Ibid. at 1153 (internal citations omitted).

[282] Ibid. at 1152 (citing 5 U.S.C. § 704 (2009)).

[283] See, e.g., Jason Luong, "Forcing Constraint"; Jules Lobel, "Emergency Power and the Decline of Liberalism."

[284] See, e.g., "After 41 Years The Depression Finally Ending," *New York Times*, Oct. 13, 1974; "Senate Votes to Conclude 4 National Emergencies," *New York Times*, Oct. 8, 1974; U.S. Congress, *A Brief History of Emergency Powers in the United States*, p. v.

In general, three common criticisms are levied by scholars with respect to the structure of the NEA and IEEPA that may be of interest to Congress. First, the NEA and IEEPA do not define the phrases "national emergency" and "unusual and extraordinary threat" and Presidents have interpreted these terms broadly. Second, the scope of presidential authority under IEEPA has become less constrained in a highly globalized era. Third, owing to rulings by the Supreme Court and amendments to the NEA, Congress would likely have to have a two-thirds majority rather than a simple majority to terminate a national emergency. Despite these criticisms, Congress has not acted to terminate or otherwise express displeasure with an emergency declaration invoking IEEPA. This absence of any explicit statement of disapproval, coupled with explicit statements of approval in some instances, may indicate congressional approval of presidential use of IEEPA thus far. Arguably, then, IEEPA could be seen as an effective tool for carrying out the will of Congress.

## Definition of "National Emergency" and "Unusual and Extraordinary Threat"

Neither the NEA nor IEEPA define what constitutes a "national emergency." IEEPA conditions its invocation in a declaration on its necessity for dealing with an "unusual and extraordinary threat … to the national security, foreign policy, or economy of the United States."[285] In the markup of IEEPA in the House, Fred Bergsten, then-Assistant Secretary for International Affairs in the Department of the Treasury, praised the requirement that a national emergency for the purposes of IEEPA be "based on an unusual and extraordinary threat" because such language "emphasizes that such powers should be available only in true emergencies."[286] Because "unusual" and "extraordinary" are also undefined, the usual and ordinary invocation of the statute seems to conflict with those statutory conditions.

If Congress wanted to refine the meaning of "national emergency" or "unusual and extraordinary threat," it could do so through statute. Additionally, Congress could consider requiring some sort of factual finding by a court prior to, or shortly after, the exercise of any authority, such as under the First Militia Act of 1792[287] or the Foreign Intelligence Surveillance Act.[288] However, Congress may consider that the ambiguity in the existing statute provides the executive with the flexibility necessary to address national emergencies with the requisite dispatch.

## Scope of the Authority

While IEEPA nominally applies only to foreign transactions, the breadth of the phrase, "any interest of any foreign country or a national thereof" leaves a great deal of room for executive discretion. The interconnectedness of the modern global economy has left few major transactions in which a foreign interest is not involved.[289] As a result, at least one scholar has concluded, "the

---

[285] 50 U.S.C. § 1701.

[286] *House Markup*, p. 12.

[287] Using the judiciary to determine whether an emergency authority can be exercised by the executive has been common. The First Militia Act of 1792, for example, required that either an associate justice of the Supreme Court or a district judge confirm that an insurrection "too powerful to be suppressed by the ordinary course of judicial proceedings" existed. Act of May 2, 1792, ch. 28, 1 Stat. 264. Using a court to determine whether an emergency existed and whether an action was necessary was also the method favored by the German-American jurist, advisor to President Abraham Lincoln, and founder of American political science, Francis Lieber, who argued that the acts of officials in states of emergency should be adjudged in court "to be necessary in the judgment of a moderate and reasonable man." Qtd. in Witt, "A Lost Theory of American Emergency Constitutionalism," p. 588.

[288] 50 U.S.C. §§ 1803-1805.

[289] "The International Emergency Economic Powers Act," *Harvard Law Review*, p. 1111 n49.

exemption of purely domestic transactions from the President's transaction controls seems to be a limitation without substance."[290]

Presidents have used IEEPA since the 1980s to control exports by maintaining the dual-use export control system, enshrined in the Export Administration Regulations (EAR) in times when its underlying authorization, the Export Administration Act (EAA), periodically expired. During those times when Congress did not reauthorize the EAA, Presidents have declared emergencies to maintain the dual-use export control system.[291] The current emergency has been ongoing since 2001.[292]

While Presidents have used IEEPA to implement trade restrictions against adversaries, it has not been used as a general way to impose tariffs. However, as noted above, President Nixon used TWEA to impose a 10% ad valorem tariff on goods entering the United States to avoid a balance of payments crisis after he ended the convertibility of the U.S. dollar to gold. Although the use of TWEA in this instance was criticized at the time,[293] the U.S. Court of Customs and Patent Appeals upheld President Nixon's actions[294] and Congress maintained the language that President Nixon relied upon in nearly identical form in the subsequent reforms resulting in the enactment of IEEPA.[295]

The scope of powers over individual targets is also extensive. Under IEEPA, the President has the power to prohibit all financial transactions with individuals designated by executive order. Such power allows the President to block all the assets of a U.S. citizen or permanent resident.[296]

Such uses of IEEPA may reflect the will of Congress or they may represent a grant of authority that may have gone beyond what Congress originally intended.

---

[290] Ibid.; See also Thronson, "Toward Comprehensive Reform of America's Emergency Law Regime," pp. 757-758.

[291] In 2018, Congress passed the Export Control Reform Act to provide new statutory authority for the continuation of EAR. However, three sections were not repealed and Congress directed their continued application through the exercise of IEEPA. See "The Export Control Reform Act of 2018" below.

[292] Ibid.

[293] See, e.g., the testimony of Andreas F. Lowenfeld before the House Subcommittee on International Economic Policy and Trade. U.S. Congress, House, *Hearings Before the Subcommittee on International Economic Policy and Trade of the Committee on International Relations and Markup of the Trading with the Enemy Reform Legislation*, 95th Cong., 1st sess. (Washington, DC: GPO, 1977), pp. 8-9.

[294] United States v. Yoshida Int'l, Inc., 526 F.2d 560, 573 (C.C.P.A. 1975) ("Congress, in enacting s 5(b) of the TWEA, authorized the President, during an emergency, to […] 'regulate importation,' by imposing an import duty surcharge or by other means appropriately and reasonably related […] to the particular nature of the emergency declared.").

[295] TWEA, codified as amended in 1971 at §5(b), provided that during a period of national emergency, the President may "investigate, regulate, direct and compel, nullify, void, prevent, or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest." IEEPA, as passed in 1977 at §203(a)(1)(B), provided that during a period of national emergency, the President may "investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest."

While he did not ultimately end up doing so, President Trump announced his intention to use IEEPA to impose and gradually increase a five percent tariff on all goods imported from Mexico. Statement from the President Regarding Emergency Measures to Address the Border Crisis, May 30, 2019, available at: https://www.whitehouse.gov/briefings-statements/statement-president-regarding-emergency-measures-address-border-crisis/. See also CRS Insight IN11129, *The International Emergency Economic Powers Act (IEEPA) and Tariffs: Historical Background and Key Issues*, by Christopher A. Casey.

[296] Thronson, "Toward Comprehensive Reform of America's Emergency Law Regime," p. 759.

---

## Terminating National Emergencies or IEEPA Authorities

The heart of the curtailment of presidential power by the NEA and IEEPA was the provision that Congress could terminate a state of emergency declared pursuant to the NEA with a concurrent resolution. When the "legislative veto" was struck down by the Supreme Court (see above), it left Congress with a steeper climb—presumably requiring passage of a veto-proof joint resolution—to terminate a national emergency declared under the NEA.[297] Two such resolutions have ever been introduced and neither declarations of emergency involved IEEPA.[298] The lack of congressional action here could be the result of the necessity of obtaining a veto-proof majority or it could be that the use of IEEPA has so far reflected the will of Congress.

If Congress wanted to assert more authority over the use of IEEPA, it could amend the NEA or IEEPA to include a "sunset provision," terminating any national emergency after a certain number of days. At least one scholar has recommended such an amendment.[299] Alternatively, Congress could amend IEEPA to provide for a review mechanism that would give Congress an active role. In the Senate during the 116th Congress, for example, Senator Mike Lee introduced the Global Trade Accountability Act, which required the President to report to Congress on any proposed trade action (including the use of IEEPA), including a description of the proposal together with a list of items to be affected, an economic impact study of the proposal including potential retaliation. Congress, using expedited procedures, would need to approve the President's action through a joint resolution within a 45-day period.[300] Similarly, Senator Lee introduced the Article One Act, a bill to provide for congressional approval of national emergency declarations, and for other purposes, which would amend the NEA to require an act of Congress within 30 days to allow a national emergency to continue.[301] Several other bills have taken a similar approach.[302]

Alternatively, Congress could use any of these mechanisms to amend the current disapproval resolution process in IEEPA or the NEA itself.

## The Status Quo

In testimony before the House Committee on International Relations in 1977, Professor Harold G. Maier summed up the main criticisms of TWEA:

> Section 5(b)'s effect is no longer confined to "emergency situations" in the sense of existing imminent danger. The continuing retroactive approval, either explicit or implicit, by Congress of broad executive interpretations of the scope of powers which it confers has converted the section into a general grant of legislative authority to the President…"[303]

---

[297] Congress amended NEA in 1985 to require a joint resolution, which is subject to the President's veto, to terminate an emergency. P.L. 99-93 (Aug. 16, 1985), 99 Stat. 405.

[298] In 2005, Rep. George Miller (CA) introduced a resolution to terminate the declaration of a national emergency as a result of Hurricane Katrina. It was not considered. H.J.Res. 69 (Miller), 109th Cong., 1st sess., September 8, 2005. In 2019, Rep. Castro and Sen. Udall introduced resolutions to terminate the declaration of a national emergency with respect to the Southern Border of the United States. H.J.Res. 46 (Castro), 116th Cong., 1st sess., Feb. 22, 2019; S.J.Res. 10 (Udall), 116th Cong., 1st sess., February 28, 2019. Neither emergency had invoked IEEPA authorities.

[299] Luong, "Forcing Constraint," p. 1181.

[300] Global Trade and Accountability Act, S. 1284 (Lee), 116th Cong., 1st Sess., May 2, 2019.

[301] Article One Act, S. 764 (Lee), 116th Cong., 1st sess., March 12, 2019.

[302] See, e.g., Global Tarde Accountability Act, H.R. 723 (Davidson), 116th Cong., 1st sess., January 23, 2019; Reclaiming Congressional Trade Authority Act of 2019 (Kaine), 116th Cong., 1st sess., March 27, 2019.

[303] House, *Trading with the Enemy Act Reform Legislation*, p. 9.

Like TWEA before it, IEEPA sits at the center of the modern U.S. sanction regime. Like TWEA before it, Congress has often approved explicitly of the President's use of IEEPA. In several circumstances, Congress has directed the President to impose a variety of sanctions under IEEPA and waived the requirement of an emergency declaration. Even when Congress has not given explicit approval, no Member of Congress has ever introduced a resolution to terminate a national emergency citing IEEPA.[304] The NEA requires that both houses of Congress meet every six months to consider a vote on a joint resolution on terminating an emergency.[305] Neither house has ever met to do so with respect to an emergency citing IEEPA. In response to concerns over the scale and scope of the emergency economic powers granted by IEEPA, supporters of the status quo would argue that Congress has implicitly and explicitly expressed approval of the statute and its use. Indeed, Senator Lee's Article One Act, which seeks to reform the NEA by requiring a joint resolution of approval for an emergency to continue beyond 30 days, would explicitly exclude its application to IEEPA.[306]

## The Export Control Reform Act of 2018

In 2018, Congress passed the Export Control Reform Act (ECRA).[307] The legislation repealed the expired Export Administration Act of 1979,[308] the regulations of which had been continued by reference to IEEPA since 2001.[309] The ECRA became the new statutory authority for Export Administration Regulations. Nevertheless, several export controls addressed in the Export Administration Act of 1979 were not updated in the Export Control Reform Act of 2018;[310] instead, Congress chose to require the President to continue to use IEEPA to continue to implement the three sections of the Export Administration Act of 1979 that were not repealed.[311] Going forward, Congress may wish to revisit these provisions, which all relate to deterring the proliferation of weapons of mass destruction.

---

[304] Since the enactment of the NEA, two resolutions to terminate a national emergency have been introduced. The first was to terminate the national emergency declared in response to Hurricane Katrina, but the declaration of emergency in that case did not invoke IEEPA. H.J.Res. 69 (Miller), 109th Congress, 1st session, September 8, 2005. The second was to terminate the national emergency declared February 15, 2019 with respect to the Southern Border of the United States. H.J.Res. 46 (Castro), 116th Cong., 1st sess., Feb. 22, 2019; S.J.Res. 10 (Udall), 116th Cong., 1st sess., February 28, 2019. However, neither of the declarations of national emergency at issue invoked IEEPA.

[305] 50 U.S.C. § 1622(b).

[306] Article One Act, S. 764 (Lee), 116th Cong., 1st sess., March 12, 2019, as reported to the Senate November 19, 2019.

[307] P.L. 115-232 (Aug. 13, 2018), Title XVII(B).

[308] Ibid. § 1766(a).

[309] E.O. 13222.

[310] Ibid. § 1766(a). Sections 11A, 11B, and 11C of the Export Administration Act of 1979, codified at 50 U.S.C. §§ 4611, 4612, 4613, were not repealed.

[311] Ibid. § 1766(b) ("The President shall implement [Sections 11A, 11B, and 11C of the Export Administration Act of 1979] by exercising the authorities of the President under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.).").

# Appendix A. NEA and IEEPA Use

## Table A-1. National Emergencies Declared Pursuant to the NEA

*Greyed lines indicate emergencies declared pursuant to the NEA but that did not invoke IEEPA.

| Title of E.O. or Procl. Declaring National Emergency Pursuant to NEA | Date of Declaration | Date of Revocation | Originating E.O./Procl. | Revoking E.O./Procl. |
|---|---|---|---|---|
| Blocking Iranian Government Property | 11/14/1979 | Ongoing | 12170 | |
| Sanctions Against Iran | 4/17/1980 | 4/17/1981 | 12211 | |
| Continuation of Export Control Regulations | 10/14/1983 | 12/20/1983 | 12444 | 12451 |
| Continuation of Export Control Regulations | 3/30/1984 | 7/12/1985 | 12470 | 12525 |
| Prohibiting Trade and Certain Other Transactions Involving Nicaragua | 5/1/1985 | 3/13/1990 | 12513 | 12707 |
| Prohibiting Trade and Certain Other Transactions Involving South Africa | 9/9/1985 | 7/10/1991 | 12532 | 12769 |
| Prohibiting Trade and Certain Transactions Involving Libya | 1/7/1986 | 9/20/2004 | 12543 | 13357 |
| Prohibiting Certain Transactions With Respect to Panama | 4/8/1988 | 4/5/1990 | 12635 | 12710 |
| Blocking Iraqi Government Property and Prohibiting Transactions with Iraq | 8/2/1990 | 7/29/2004 | 12722 | 13350 |
| Continuation of Export Control Regulations | 9/30/1990 | 9/30/1993 | 12730 | 12867 |
| Chemical and Biological Weapons Proliferation | 11/16/1990 | 11/11/1994 | 12735 | 12938 |
| Prohibiting Certain Transactions with Respect to Haiti | 10/4/1991 | 10/14/1994 | 12775 | 12932 |
| Blocking "Yugoslav Government" Property and Property of the Governments of Serbia and Montenegro | 5/30/1992 | 5/28/2003 | 12808 | 13304 |
| To Suspend the Davis-Bacon Act of March 3, 1931, Within a Limited Geographic Area in Response to the National Emergency Caused by Hurricane Andrew[a] | 10/14/1992 | 3/6/1993 | 6491 | 6534 |
| Prohibiting Certain Transactions Involving UNITA | 9/26/1993 | 5/6/2003 | 12865 | 24857 |
| Measures To Restrict The Participation By United States Persons In Weapons Proliferation Activities | 9/30/1993 | 9/29/1994 | 12868 | 12930 |
| Continuation of Export Control Regulations | 6/30/1994 | 8/19/1994 | 12923 | 12924 |
| Continuation of Export Control Regulations | 8/19/1994 | 4/4/2001 | 12924 | 13206 |
| Measures To Restrict The Participation By United States Persons In Weapons Proliferation Activities | 9/29/1994 | 11/14/1994 | 12930 | 12938 |
| Proliferation of Weapons of Mass Destruction | 11/14/1994 | Ongoing | 12938 | |
| Prohibiting Transactions With Terrorists Who Threaten To Disrupt the Middle East Peace Process | 1/23/1995 | Ongoing | 12947 | |

| Title of E.O. or Procl. Declaring National Emergency Pursuant to NEA | Date of Declaration | Date of Revocation | Originating E.O./Procl. | Revoking E.O./Procl. |
|---|---|---|---|---|
| Prohibiting Certain Transactions With Respect to the Development of Iranian Petroleum Resources | 3/15/1995 | Ongoing | 12957 | |
| Blocking Assets and Prohibiting Transactions With Significant Narcotics Traffickers | 10/21/1995 | Ongoing | 12978 | |
| Regulation of the Anchorage and Movement of Vessels with Respect to Cuba | 3/1/1996 | Ongoing | 6867 | |
| Declaration of a State of Emergency and Release of Feed Grain from the Disaster Reserve | 7/1/1996 | 6/30/1997 | 6907 | |
| Prohibiting New Investment in Burma | 5/20/1997 | 10/7/2016 | 13047 | 13742 |
| Blocking Sudanese Government Property and Prohibiting Transactions With Sudan | 11/3/1997 | Ongoing | 13067 | |
| Blocking Property of the Governments of the Federal Republic of Yugoslavia (Serbia and Montenegro), the Republic of Serbia, and the Republic of Montenegro, and Prohibiting New Investment in the Republic of Serbia in Response to the Situation in Kosovo | 6/9/1998 | 5/28/2003 | 13088 | 13304 |
| Blocking Property and Prohibiting Transactions With the Taliban | 7/4/1999 | 7/2/2002 | 13129 | 13268 |
| Blocking Property of the Government of the Russian Federation Relating to the Disposition of Highly Enriched Uranium Extracted From Nuclear Weapons | 6/21/2000 | 6/21/2012 | 13159 | |
| Prohibiting the Importation of Rough Diamonds From Sierra Leone | 1/18/2001 | 1/15/2004 | 13194 | 13324 |
| Blocking Property of Persons Who Threaten International Stabilization Efforts in the Western Balkans | 6/26/2001 | Ongoing | 13219 | |
| Continuation of Export Control Regulations | 8/17/2001 | Ongoing | 13222 | |
| Declaration of National Emergency by Reason of Certain Terrorist Attacks | 9/14/2001 | Ongoing | 7463 | |
| Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism | 9/23/2001 | Ongoing | 13224 | |
| Blocking Property of Persons Undermining Democratic Processes or Institutions in Zimbabwe | 3/6/2003 | Ongoing | 13288 | |
| Protecting the Development Fund for Iraq and Certain Other Property in Which Iraq Has an Interest | 5/22/2003 | Ongoing | 13303 | |
| Blocking Property of Certain Persons and Prohibiting the Export of Certain Goods to Syria | 5/11/2004 | Ongoing | 13338 | |

| Title of E.O. or Procl. Declaring National Emergency Pursuant to NEA | Date of Declaration | Date of Revocation | Originating E.O./Procl. | Revoking E.O./Procl. |
|---|---|---|---|---|
| Blocking Property of Certain Persons and Prohibiting the Importation of Certain Goods From Liberia | 7/22/2004 | 11/12/2015 | 13348 | 13710 |
| To Suspend Subchapter IV of Chapter 31 of Title 40, United States Code, Within a Limited Geographic Area in Response to the National Emergency Caused by Hurricane Katrina[b] | 9/8/2005 | 11/3/2005 | 7924 | 7959 |
| Blocking Property of Certain Persons Contributing to the Conflict in Cote d'Ivoire | 2/7/2006 | 9/14/2016 | 13396 | 13739 |
| Blocking Property of Certain Persons Undermining Democratic Processes or Institutions in Belarus | 6/16/2006 | Ongoing | 13405 | |
| Blocking Property of Certain Persons Contributing to the Conflict in the Democratic Republic of the Congo | 10/27/2006 | Ongoing | 13413 | |
| Blocking Property of Persons Undermining the Sovereignty of Lebanon or Its Democratic Processes and Institutions | 8/1/2007 | Ongoing | 13441 | |
| Continuing Certain Restrictions With Respect to North Korea and North Korean Nationals | 6/26/2008 | Ongoing | 13466 | |
| Declaration of a National Emergency With Respect to the 2009 H1N1 Influenza Pandemic | 10/23/2009 | 10/22/2010 | 8443 | |
| Blocking Property of Certain Persons Contributing to the Conflict in Somalia | 4/12/2010 | Ongoing | 13536 | |
| Blocking Property and Prohibiting Certain Transactions Related to Libya | 2/25/2011 | Ongoing | 13566 | |
| Blocking Property of Transnational Criminal Organizations | 7/24/2011 | Ongoing | 13581 | |
| Blocking Property of Persons Threatening the Peace, Security, or Stability of Yemen | 5/16/2012 | Ongoing | 13611 | |
| Blocking Property of the Government of the Russian Federation Relating to the Disposition of Highly Enriched Uranium Extracted From Nuclear Weapons | 6/25/2012 | 5/26/2015 | 13617 | 13695 |
| Blocking Property of Certain Persons Contributing to the Situation in Ukraine | 3/6/2014 | Ongoing | 13660 | |
| Blocking Property of Certain Persons With Respect to South Sudan | 4/3/2014 | Ongoing | 13664 | |
| Blocking Property of Certain Persons Contributing to the Conflict in the Central African Republic | 5/12/2014 | Ongoing | 13667 | |
| Blocking Property and Suspending Entry of Certain Persons Contributing to the Situation in Venezuela | 3/8/2015 | Ongoing | 13692 | |

| Title of E.O. or Procl. Declaring National Emergency Pursuant to NEA | Date of Declaration | Date of Revocation | Originating E.O./Procl. | Revoking E.O./Procl. |
|---|---|---|---|---|
| Blocking the Property of Certain Persons Engaging in Significant Malicious Cyber-Enabled Activities | 4/1/2015 | Ongoing | 13694 | |
| Blocking Property of Certain Persons Contributing to the Situation in Burundi | 11/22/2015 | Ongoing | 13712 | |
| Blocking the Property of Persons Involved in Serious Human Rights Abuse or Corruption | 12/20/2017 | Ongoing | 13818 | |
| Imposing Certain Sanctions in the Event of Foreign Interference in a United States Election | 9/12/2018 | Ongoing | 13848 | |
| Blocking Property of Certain Persons Contributing to the Situation in Nicaragua | 11/27/2018 | Ongoing | 13851 | |
| Declaring a National Emergency Concerning the Southern Border of the United States | 2/15/2019 | Ongoing | 9844 | |
| Securing the Information and Communications Technology and Services Supply Chain | 5/15/2019 | Ongoing | 13873 | |
| Blocking Property and Suspending Entry of Certain Persons Contributing to the Situation in Mali | 07/26/2019 | Ongoing | 13882 | |
| Blocking Property and Suspending Entry of Certain Persons Contributing to the Situation in Syria | 10/17/2019 | Ongoing | 13894 | |
| Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak | 03/13/2020 | Ongoing | 9994 | |
| Securing the United States Bulk-Power System | 05/01/2020 | Ongoing | 13920 | |
| Blocking Property of Certain Persons Associated With the International Criminal Court | 06/11/2020 | Ongoing | 13928 | |

**Source:** CRS

**Notes:** Greyed lines indicate emergencies declared pursuant to the NEA that did not invoke IEEPA.

a. Although the President did not explicitly use that phrase "declare a national emergency," the Davis-Bacon act, as amended at the date of the proclamation, and as noted in the proclamation, provided for the suspension of the act's provisions "in the event of a national emergency."

b. Similar to the suspension of the Davis-Bacon act in 1992, this proclamation was somewhat anomalous. The proclamation did not cite to the NEA when declaring a national emergency for the purposes of suspending the act. However, the revoking proclamation did cite the NEA. Moreover, Rep. George Miller (CA) introduced a resolution to terminate the declaration of a national emergency pursuant to the NEA. H.J.Res. 69 (Miller), 109th Cong., 1st sess., September 8, 2005.

## Table A-2. IEEPA National Emergency Use by Executive Order

In chronological order, from first use (1979) to present day (January 2019)

| Executive Order | Country or Issue of Concern | Sanction/Remedy | Current Status |
|---|---|---|---|
| **Administration of President Jimmy Carter (1977-1981)** | | | |

| Executive Order | Country or Issue of Concern | Sanction/Remedy | Current Status |
|---|---|---|---|
| 12170 (Nov. 14. 1979; 44 FR 65729) | Iran (hostage taking) | Declares national emergency; blocks Iran government property | Revoked and replaced, E.O. 13599 (2012) |
| 12205 (Apr. 7, 1980; 45 FR 24099) | Iran (hostage taking) | Prohibits certain transactions | Revoked in part by E.O. 12282 (1981) |
| 12211 (Apr. 17, 1980; 45 FR 26685) | Iran (hostage taking) | Prohibits transactions | Revoked in part by E.O. 12282 (1981) |
| 12276 (Jan. 19, 1981; 46 FR 7913) | Iran (hostage taking—resolution) | Establishes escrow accounts | Ratified by E.O. 12294 (1981) |
| 12277 (Jan. 19, 1981; 46 FR 7915) | Iran (hostage taking—resolution) | Transfers Iran government funds | Ratified by E.O. 12294 (1981) |
| 12278 (Jan. 19, 1981; 46 FR 7917) | Iran (hostage taking—resolution) | Transfers Iran government assets overseas | Ratified by E.O. 12294 (1981) |
| 12279 (Jan. 19, 1981; 46 FR 7917) | Iran (hostage taking—resolution) | Transfers Iran government assets held in U.S. banks | Ratified by E.O. 12294 (1981) |
| 12280 (Jan. 19, 1981; 46 FR 7921) | Iran (hostage taking—resolution) | Transfers Iran government financial assets held by non-banks | Ratified by E.O. 12294 (1981) |
| 12281 (Jan. 19, 1981; 46 FR 7923) | Iran (hostage taking—resolution) | Transfers other Iran government assets | Ratified by E.O. 12294 (1981) |
| 12282 (Jan. 19, 1981; 46 FR 7925) | Iran (hostage taking—resolution) | Revokes prohibitions against transactions involving Iran | Ratified by E.O. 12294 (1981) |
| 12283 (Jan. 19, 1981; 46 FR 7927) | Iran (hostage taking—resolution) | Non-prosecution of claims of Iran hostages | Ratified by E.O. 12294 (1981) |
| 12284 (Jan. 19, 1981; 46 FR 7929) | Iran (hostage taking—resolution) | Restricts transfer of property of the Shah | Ratified by E.O. 12294 (1981) |
| 12285 (Jan. 19, 1981; 46 FR 7931) | Iran (hostage taking--resolution) | Establishes Commission on Hostage Compensation | Revoked by E.O. 12379 (1982) |
| **Administration of President Ronald Reagan (1981-1989)** | | | |
| 12294 (Feb. 24, 1981; 46 FR 14111) | Iran (hostage taking—resolution) | Suspends claims and litigation against Iran | Amended by E.O. 12379 (1982) |

| Executive Order | Country or Issue of Concern | Sanction/Remedy | Current Status |
|---|---|---|---|
| 12444<br><br>(Oct. 14, 1983; 48 FR 48215) | Expiration of Export Administration Act of 1979 (EAA) | Continues Export Administration Regulations (EAR) | Revoked by E.O. 12451 (1983) (EAA reauthorized) |
| 12470<br><br>(Mar. 30, 1984; 49 FR 13099) | Expiration of EAA | Continues EAR | Revoked by E.O. 12525 (1985) (EAA reauthorized) |
| 12513<br><br>(May 1, 1985; 50 FR 18629) | Nicaragua (civil war) | <u>Declares national emergency</u>; prohibits imports, exports, air traffic, use of U.S. ports | Revoked by E.O. 12707 (1990) |
| 12532<br><br>(Sept. 9, 1985; 50 FR 36861) | South Africa (apartheid, to meet requirements of U.N. Security Council (UNSC) Resolution) | <u>Declares national emergency</u>; prohibits loans to government, crime control exports, nuclear-related exports, military-related imports; supports Sullivan Principles | Revoked by E.O. 12769 (1991) |
| 12535<br><br>(Oct. 1, 1985; 50 FR 40325) | South Africa (apartheid, to meet requirements of UNSC Resolution) | Prohibits import of krugerrands | Revoked by E.O. 12769 (1991) |
| 12543<br><br>(Jan. 1, 1986; 51 FR 875) | Libya (terrorism, regional unrest) | <u>Declares national emergency</u>; prohibits most imports and exports, transactions relating to transportation to/from Libya, performance of contract obligations in support of Libyan projects, bank loans, financial transactions related to travel to Libya | Revoked by E.O. 13357 (2004) |
| 12544<br><br>(Jan. 8, 1986; 51 FR 1235) | Libya (terrorism, regional unrest) | Blocks Libyan Government assets in United States | Revoked by E.O. 13357 (2004) |
| 12635<br><br>(Apr. 8, 1988; 53 FR 12134) | Panama (finding government of Noriega and Palma a threat) | <u>Declares national emergency</u>; blocks Panama assets in United States | Revoked by E.O. 12710 (1990) |
| **Administration of President George H.W. Bush (1989-1993)** | | | |
| 12722<br><br>(Aug. 2, 1990; 55 FR 31803) | Iraq (invasion of Kuwait; to meet requirements of UNSC Resolution) | <u>Declares national emergency</u>; blocks Iraq Government assets in U.S.; prohibits most export and import; restricts transactions related to travel; prohibits loans | Revoked by E.O. 13350 (2004) |

| Executive Order | Country or Issue of Concern | Sanction/Remedy | Current Status |
|---|---|---|---|
| 12723 (Aug. 2, 1990; 55 FR 31805) | Kuwait (after Iraq's invasion; to meet requirements of UNSC Resolution) | Declares national emergency; blocks Kuwait Government assets in U.S. | Revoked by E.O. 12725 (1990) |
| 12724 (Aug. 9, 1990; 55 FR 33089) | Iraq (invasion of Kuwait; to meet requirements of UNSC Resolution) | Blocks Iraq Government assets in U.S.; prohibits most export and import; restricts transactions related to travel; prohibits loans | Revoked by E.O. 13350 (2004) |
| 12725 (Aug. 9, 1990; 55 FR 33091) | Kuwait (after Iraq's invasion, to meet requirements of UNSC Resolution) | Blocks Kuwait Government assets in U.S.; prohibits most export and import; restricts transactions related to travel; prohibits loans | Revoked by E.O. 12771 (1991) |
| 12730 (Sept. 30, 1990; 55 FR 40373) | Expiration of EAA | Continues EAR | Revoked by E.O. 12867 (1993) |
| 12735 (Nov. 16, 1990; 55 FR 48587) | Chemical and biological weapons proliferation | Declares national emergency; prohibits transactions | Revoked and replaced by E.O. 12938 (1994) |
| 12775 (Oct. 4, 1991; 56 FR 50641) | Haiti (military coup) | Declares national emergency; blocks Haiti Government assets in U.S.; prohibits transactions | Revoked by E.O. 12932 (1994) |
| 12779 (Oct. 28, 1991; 56 FR 55975) | Haiti (military coup) | Blocks Haiti Government assets in U.S.; prohibits export and import, transactions | Revoked by E.O. 12932 (1994) |
| 12801 (Apr. 15, 1992; 57 FR 14319) | Libya (to meet requirements of UNSC Resolution) | Bars overflight, takeoff and landing planes traveling to/from Libya | Revoked by E.O. 13357 (2004) |
| 12808 (May 30, 1992; 57 FR 23299) | Yugoslavia (Serbia and Montenegro) (regional conflict; to meet requirements of UNSC Resolution) | Declares national emergency; blocks Yugoslav Government assets in United States | Revoked by E.O. 13304 (2003) |
| 12810 (June 5, 1992; 57 FR 24347) | Yugoslavia (Serbia and Montenegro) (regional conflict; to meet requirements of UNSC Resolution) | Blocks Yugoslav Government assets in U.S.; prohibits import and export, transactions related to travel, air traffic, loans, completing contracts, sports participation, tech/cultural exchanges | Revoked by E.O. 13304 (2003) |

| Executive Order | Country or Issue of Concern | Sanction/Remedy | Current Status |
|---|---|---|---|
| 12817<br><br>Oct. 21, 1992; 57 FR 48433) | Iraq (postwar; to meet requirements of UNSC Resolution) | Blocks assets | Revoked by E.O. 13350 (2004) |
| 12831<br><br>(Jan. 15, 1993; 58 FR 5253) | Yugoslavia (Serbia and Montenegro) (regional conflict) | Prohibits transshipment | Revoked by E.O. 13304 (2003) |
| **Administration of President William Clinton (1993-2001)** | | | |
| 12846<br><br>(Apr. 25, 1993; 58 FR 25771) | Yugoslavia (Serbia and Montenegro) (regional conflict; to meet requirements of UNSC Resolution) | Tightens sanctions, especially those relating to maritime restrictions | Revoked by E.O. 13304 (2003) |
| 12853<br><br>(June 30, 1993; 58 FR 35843) | Haiti (military coup) | Blocks assets of regime; prohibits export of petroleum, arms, and related materiel | Revoked by E.O. 12932 (1994) |
| 12865<br><br>(Sept. 26, 1993; 58 FR 51005) | UNITA (Angola) (to meet requirements of UNSC Resolution) | <u>Declares national emergency</u>; prohibits sales to UNITA and UNITA-controlled regions | Revoked by E.O. 13298 (2003) |
| 12868<br><br>(Sept. 30, 1993; 58 FR 51749) | Weapons proliferation | <u>Declares national emergency</u>; controls exports; prohibits transactions with those found not in compliance with controls | Revoked and replaced by E.O. 12930 (1994) |
| 12872<br><br>(Oct. 18, 1993; 58 FR 54029) | Haiti (military coup) | Blocks assets of those impeding democratization process | Revoked by E.O. 12932 (1994) |
| 12914<br><br>(May 7, 1994; 59 FR 24339) | Haiti (military coup) | Blocks assets of military and participants in 1991 overthrow; prohibits air traffic | Revoked by E.O. 12932 (1994) |
| 12917<br><br>(May 21, 1994; 59 FR 26925) | Haiti (military coup) | Prohibits imports | Revoked by E.O. 12932 (1994) |
| 12920<br><br>(June 10, 1994; 59 FR 30501) | Haiti (military coup) | Prohibits certain financial transactions, exports | Revoked by E.O. 12932 (1994) |
| 12922<br><br>(June 21, 1994; 59 FR 32645) | Haiti (military coup) | Blocks assets of certain individuals | Revoked by E.O. 12932 (1994) |
| 12923<br><br>(June 30, 1994; 59 FR 34551) | Expiration of EAA | Continues EAR | Revoked and replaced by E.O. 12924 (1994) |

| Executive Order | Country or Issue of Concern | Sanction/Remedy | Current Status |
|---|---|---|---|
| 12924 (August 19, 1994; 59 FR 34551) | Expiration of EAA | Continues EAR | Amended by E.O. 12981 (1995) |
| 12930 (Sept. 29, 1994; 59 FR 50475) | Proliferation of weapons of mass destruction | <u>Declares national emergency</u>; controls exports; prohibits transactions with those found not in compliance with controls | Revoked and replaced by E.O. 12938 (1994) |
| 12934 (Oct. 25, 1994; 59 FR 54117) | Bosnian Serb-controlled areas of Bosnia and Herzegovina (to meet requirements of UNSC resolution) | Blocks assets; prohibits export, maritime access to certain ports | Revoked by E.O. 13304 (2003) |
| 12938 (Nov. 19, 1994; 59 FR 59099) | Proliferation of weapons of mass destruction | <u>Declares national emergency</u>; controls exports; prohibits transactions with those found not in compliance with controls | Amended by E.O. 13099 (1998) |
| 12947 (Jan. 23, 1995; 60 FR 5079) | Terrorists who disrupt Middle East peace process | <u>Declares national emergency</u>; blocks assets; prohibits transactions | Renewed annually |
| 12957 (Mar. 15, 1995; 60 FR 14615) | Iran (weapons proliferation) | <u>Declares national emergency</u>; prohibits investment in oil development | Revoked in part, and restated in E.O. 12959 (1995) |
| 12959 (May 6, 1995; 60 FR 24757) | Iran (weapons proliferation) | Prohibits investment in oil development | Revoked in part by E.O. 13059 (1997) |
| 12978 (Oct. 21, 1995; 60 FR 54579) | Significant narcotics traffickers (initially Colombia) | <u>Declares national emergency</u>; blocks assets; prohibits transactions | Renewed annually |
| 12981 (Dec. 5, 1995) | EAA | Amends the administration of export controls. | Amended by E.O. 13020 (1996) |
| 13020 (Oct. 12, 1996) | EAA | Further amends the administration of export controls. | Amended by E.O. 13026 (1996) |
| 13026 (Nov. 15, 1996) | EAA | Further amends the administration of export controls. Adds rules for encryption products. | Revoked by E.O. 13206 (2001) |
| 13047 (May 22, 1997; 62 FR 28301) | Burma (military government; to implement Sec. 570 of P.L. 104-208) | <u>Declares national emergency</u>; blocks new investment | Revoked by E.O. 13742 (2016) |

| Executive Order | Country or Issue of Concern | Sanction/Remedy | Current Status |
|---|---|---|---|
| 13059 (Aug. 19, 1997; 62 FR 44531) | Iran (weapons proliferation, terrorism, regional stability) | Blocks imports, exports | Amended by E.O. 13716 (2016) |
| 13067 (Nov. 3, 1997; 62 FR 59989) | Sudan (conflict) | <u>Declares national emergency</u>; blocks Sudan Government assets; prohibits exports, imports, other transactions | Revoked in part by E.O. 13761 (2017) |
| 13069 (Dec. 12, 1997; 62 FR 65989) | UNITA (Angola) (war) | Prohibits certain transaction | Revoked by E.O. 13298 (2003) |
| 13088 (June 9, 1998; 63 FR 32109) | Yugoslavia (Serbia and Montenegro) (war) | <u>Declares national emergency</u>; blocks Yugoslav Government assets; prohibits transactions | Revoked by E.O. 13304 (2003) |
| 13094 (July 28, 1998; 63 FR 40803) | Proliferation of weapons of mass destruction | Prohibits some transactions, assistance, imports | Amended by E.O. 13128 (1999) |
| 13098 (Aug. 18, 1998; 63 FR 44771) | UNITA (Angola) (war; to meet requirements of UNSC resolution) | Blocks UNITA assets in U.S.; prohibits imports from and exports to UNITA-controlled or influences industries | Revoked by E.O. 13298 (2003) |
| 13099 (Aug. 20, 1998; 63 FR 45167) | Terrorists who disrupt the Middle East peace process | Adds Usama bin Laden and others to the terrorist list | Amends E.O. 12947 (1995); see above |
| 13121 (Apr. 30, 1999; 64 FR 24021) | Yugoslavia (Serbia and Montenegro) (war) | Blocks Yugoslav Government assets; prohibits transactions | Revoked by E.O. 13304 (2003) |
| 13128 (Jun. 25, 1999) | Proliferation of weapons of mass destruction | Implements the Chemical Weapons Convention and the Chemical Weapons Convention Implementation Act. | Renewed Annually. |
| 13129 (July 4, 1999; 64 FR 36759) | Taliban (terrorism) | <u>Declares national emergency</u>; blocks property | National emergency terminated by E.O. 13268 (2002); see, however, E.O. 13224 (2001) |
| E.O. 13159 (June 21, 2000; 65 FR 39279) | Russia for misuse of highly enriched uranium extractions | <u>Declares national emergency</u>; blocks property | Superseded by E.O. 13617 (2012) |
| 13192 (Jan. 17, 2001; 66 FR 7379) | Yugoslavia (Serbia and Montenegro) (war) | Substantially expands sanctions in E.O. 13088 (1998) to apply to humanitarian crisis in Kosovo | Revoked by E.O. 13304 (2003) |

| Executive Order | Country or Issue of Concern | Sanction/Remedy | Current Status |
|---|---|---|---|
| 13194 (Jan. 18, 2001; 66 FR 7389) | Sierra Leone (diamond trade) | <u>Declares national emergency</u>; prohibits diamond imports | Revoked by E.O. 13324 2004) |
| **Administration of President George W. Bush (2001-2009)** | | | |
| 13213 (May 22, 2001; 66 FR 28829) | Sierra Leone (diamond trade) | Expands prohibitions on diamond trade | Revoked by E.O. 13324 2004) |
| 13219 (June 26, 2001; 66 FR 34775) | Western Balkans (destabilization postwar) | <u>Declares national emergency</u>; blocks property | Renewed annually |
| 13222 (Aug. 17, 2001; 66 FR 44025) | Expiration of EAA | Continues EAR | Renewed annually |
| 13224 (Sept. 23, 2001; 66 FR 49079 | Terrorism | <u>Declares national emergency</u>; blocks property; prohibits transactions | Renewed annually |
| 13268 (July 2, 2002; 67 FR 44751) | Taliban and Terrorism | Terminates E.O. 13129 (1999); amends E.O. 13224 (2001) | Expanded by E.O. 13371 (2005) |
| 13288 (Mar. 6, 2003; 68 FR 11457) | Zimbabwe (undermining democratic processes) | <u>Declares national emergency</u>; blocks property | Renewed annually, superseded in part by E.O. 13391 (2005) |
| 13290 Mar. 20, 2003; 68 FR 14307) | Iraq (war) | Authorizes the confiscation and vesting of property | Modified by E.O. 13350 (2004) |
| 13298 (May 6, 2003; 68 FR 24857) | UNITA (Angola) | Terminates earlier emergency | Revokes earlier orders |
| 13303 (May 22, 2003; 68 FR 31931) | Iraq (war) | <u>Declares national emergency</u>; Protects certain property, revokes earlier orders. | Amends earlier order |
| 13304 (May 28, 2003; 68 FR 32315) | Yugoslavia (regional war) | Terminates earlier emergency | Revokes and modifies earlier orders |
| 13310 (July 28, 2003; 68 FR 44853) | Burma (military government) | Blocks property | Revoked by E.O. 13742 (2016) |
| 13312 (Jul. 3, 2003) | Sierra Leone and Liberia (conflict) | Implements the Clean Diamond Trade Act | Revoked by E.O. 13324 (2004) |
| 13315 (Aug. 28, 2003; 68 FR 52315) | Iraq (former regime) | Blocks property | Superseded by E.O. 13350 (2004) |

| Executive Order | Country or Issue of Concern | Sanction/Remedy | Current Status |
|---|---|---|---|
| 13324<br>(Jan. 15, 2004) | Sierra Leone and Liberia (conflict) | Terminates earlier emergency | Revokes earlier order |
| 13338<br>(May 11, 2004; 69 FR 26751) | Syria (civil conflict) | <u>Declares national emergency</u>; blocks property of those who export certain goods to Syria | Modified by E.O. 13460 (2008); renewed annually |
| 13348<br>(July 22, 2004; 69 FR 44885) | Liberia (corruption, to meet requirements of UNSC resolution) | <u>Declares national emergency</u>; blocks property; prohibits imports | Revoked by E.O. 13710 (2015) |
| 13350<br>(July 29, 2004; 69 FR 46055) | Iraq (postwar) | Ends emergency from 1990 Kuwait invasion | Amended by E.O. 13364 (2004) |
| 13357<br>(Sept. 20, 2004; 69 FR 56665) | Libya (terrorism) | Terminates earlier emergency | Revokes earlier orders |
| 13364<br>(Nov. 29, 2004) | Iraq (postwar) | Amends transaction controls and regulations on the Development fund for Iraq | Amended by E.O. 13668 (2014) |
| 13372<br>(Feb. 16, 2005; 70 FR 8499) | Terrorism | Clarifies use of sanctions | Amends E.O. 12947, E.O. 13224 |
| 13382<br>(June 28, 2005; 70 FR 38567) | Weapons proliferation | Expands on earlier orders; blocks property | Amends E.O. 12938 (1994) and 13094 (1998), see above |
| 13391<br>(Nov. 22, 2005; 70 FR 71201) | Zimbabwe (undermining democratic processes) | Blocks property | Amends and supersedes, in part, E.O. 13288 (2003) |
| 13396<br>(Feb. 7, 2006; 71 FR 7389) | Cote d'Ivoire (conflict) | <u>Declares national emergency</u>; blocks property | Revoked by E.O. 13739 (2016) |
| 13399<br>(Apr. 25, 2006; 71 FR 25059) | Syria (civil war) | Expands E.O. 13338 (2004); blocks property | Amends earlier order |
| 13400<br>(Apr. 26, 2006; 71 FR 25483) | Sudan (Darfur) | Expands E.O. 13067 (1997); blocks property | Amends earlier order |
| 13405<br>(June 16, 2006; 71 FR 35485) | Belarus (undermining democracy) | <u>Declares national emergency</u>; blocks property | Renewed annually |
| 13412<br>(Oct. 13, 2006; 71 FR 61369) | Sudan (Darfur, regional stability) | Expands E.O. 13067 (1997; blocks property and transactions | Revoked by E.O. 13761 (2017) |

| Executive Order | Country or Issue of Concern | Sanction/Remedy | Current Status |
|---|---|---|---|
| 13413 (Oct. 27, 2006; 71 FR 64105) | Democratic Republic of the Congo (regional stability) | <u>Declares national emergency</u>; blocks property | Renewed annually; amended by E.O. 13671 (2014) |
| 13438 (July 17, 2007; 72 FR 39719) | Those who threaten stabilization efforts in Iraq | Expands E.O. 13303 (2003); blocks property | Expands other orders |
| 13441 (Aug. 1, 2007; 72 FR 43499) | Those who threaten the sovereignty of Lebanon (primarily Syria) | <u>Declares national emergency</u>; blocks property | Renewed annually |
| 13448 Oct. 18, 2007; 72 FR 60223) | Burma (military government) | <u>Declares national emergency</u>; blocks property and transactions | Revoked by E.O. 13742 (2016) |
| 13460 (Feb. 13, 2008; 73 FR 8991) | Syria (civil conflict) | Blocks property of those who support certain activities in Syria | Amends E.O. 13338 (2004) |
| 13464 Apr. 30, 2008; 72 FR 24491) | Burma (military government) | Blocks property and transactions | Revoked by E.O. 13742 (2016) |
| 13466 (June 26, 2008; 73 FR 36787) | North Korea (weapons proliferation, to meet requirements of UNSC resolution) | <u>Declares national emergency</u>; blocks property and transactions | Renewed annually |
| 13469 (July 25, 2008; 73 FR 43841) | Zimbabwe (undermining democracy) | Blocks property | Expands E.O. 13288 (2003) and 13391 (2005) |

### Administration of President Barack Obama (2009-2017)

| Executive Order | Country or Issue of Concern | Sanction/Remedy | Current Status |
|---|---|---|---|
| 13536 (Apr. 12, 2010; 75 FR 19869) | Somalia (conflict) | <u>Declares national emergency</u>; blocks property | Amended by E.O. 13620 (2012); renewed annually |
| 13551 (Aug. 30, 2010; 75 FR 53837) | North Korea (weapons proliferation, to meet requirements of UNSC resolution) | <u>Declares national emergency</u>; Blocks property | Renewed annually |
| 13553 (Sept, 28, 2010; 75 FR 60567) | Iran (human rights) | Blocks property including that of Iranian officials | Expands E.O. 12957 (1995) |
| 13566 (Feb. 25, 2011; 76 FR 11315) | Libya (stability) | <u>Declares national emergency</u>; blocks property and transactions | Modified by E.O. 13726 (2016); renewed annually |
| 13570 (Apr. 18, 2011; 76 FR 22291) | North Korea (weapons proliferation, to meet requirements of UNSC resolution) | Blocks transactions | Expands E.O. 13466 (2008), 13551 (2010); amended by E.O. 13687 (2015) |
| 13572 (Apr. 29, 2011; 76 FR 24787) | Syria (human rights) | Blocks property of human rights violators | Expands E.O. 13338 (2004), 13399 (2006), and 13460 (2008) |

| Executive Order | Country or Issue of Concern | Sanction/Remedy | Current Status |
|---|---|---|---|
| 13573<br>(May 18, 2011; 76 FR 29143) | Syria (war) | Blocks property of senior government officials | Expands E.O. 13338 (2004), 13399 (2006), 13460 (2008), and 13572 (2011); amended by E.O. 13582 (2011) |
| 13574<br>(May 23, 2011; 76 FR 30505) | Iran (weapons proliferation) | Implements new sanctions in Iran Sanctions Act of 1996 | Revoked by E.O. 13716 (2016) |
| 13581<br>(July 24, 2011; 76 FR 44757) | Transnational Criminal Organizations | <u>Declares national emergency</u>; blocks property | Renewed annually |
| 13582<br>(Aug. 17, 2011; 76 FR 52209) | Syria (war) | Blocks property of Government of Syria and transactions | Expands E.O. 13338 (2004), 13399 (2006), 13460 (2008), 13572 (2011), and E.O. 13573 (2011) |
| 13590<br>(Nov. 20, 2011; 76 FR 72609) | Iran (weapons proliferation) | Prohibits transactions related to Iran's energy and petrochemical sectors | Revoked by E.O. 13716 (2016) |
| 13599<br>(Feb. 5, 2012; 77 FR 6659) | Iran (weapons proliferation) | Blocks property of government and financial institutions | Expands E.O. 12957 (1995) |
| 13606<br>(Apr. 22, 2012; 77 FR 24571) | Iran and Syria (human rights) | Blocks property and denies visas | Expands E.O. 12957 (1995) and 13338 (2004) |
| 13608<br>(May 1, 2012; 77 FR 26409) | Iran and Syria (sanctions evasion) | Blocks transactions and denies visas | Expands E.O. 12938 (1994), 12957 (1995), 13224 (2001), and 13338 (2004) |
| 13611<br>(May 16, 2012; 77 FR 29533) | Yemen (stability) | <u>Declares national emergency</u>; blocks property | Renewed annually |
| 13617<br>(June 25, 2012; 77 FR 38459) | Russia (misuse of highly enriched uranium extractions | Blocks property | Revoked by E.O. 13695 (2015) |
| 13619<br>(July 11, 2012; 77 FR 41243) | Burma (military government) | Blocks property | Revoked by E.O. 13742 (2016) |
| 13620<br>July 20, 2012; 77 FR 43483) | Somalia (conflict) | Expands targets to include misappropriations, corruption, impeding humanitarian aid | Amends E.O. 13536 (2010) |
| 13622<br>(July 30, 2012; 77 FR 45897) | Iran (weapons proliferation) | Additional sanctions | Revoked by E.O. 13716 (Jan. 16, 2016; 81 FR 3693) |

| Executive Order | Country or Issue of Concern | Sanction/Remedy | Current Status |
|---|---|---|---|
| 13628 (Oct. 9, 2012; 77 FR 62139) | Iran (weapons proliferation, human rights, sanctions evasion) | Implements Iran Threat Reduction Act | Amended by E.O. 13716 (2016) |
| 13637 (Mar. 8, 2013) | EAA | Amends EAR | Renewed annually |
| 13645 (June 3, 2013; 78 FR 33945) | Iran (weapons proliferation, human rights) | Implements Iran Freedom and Counter-Proliferation Act of 2012 | Revoked by E.O. 13716 (Jan. 16, 2016; 81 FR 3693) |
| 13651 (Aug. 6, 2013; 78 FR 48793) | Burma | Prohibits import of jadeite and rubies | Expands E.O. 13047 (1997) and subsequent orders |
| 13660 (Mar. 6, 2014; 79 FR 13493) | Ukraine (stability) | <u>Declares national emergency</u>; blocks property | Renewed annually |
| 13661 (Mar. 16, 2014; 79 FR 15535) | Russia (destabilization of Ukraine) | Blocks property | Expands E.O. 13660 (2014) |
| 13662 (Mar. 20, 2014; 79 FR 16169) | Russia (destabilization of Ukraine) | Blocks property | Expands E.O. 13660 (2014) |
| 13664 (Apr. 3, 2014; 79 FR 19283) | South Sudan (conflict) | <u>Declares national emergency</u>; blocks property | Renewed annually |
| 13667 (May 12, 2014; 79 FR 28387) | Central African Republic (conflict) | <u>Declares national emergency</u>; blocks property | Renewed annually |
| 13668 (May 27, 2014) | Iraq (postwar) | Ends immunities granted to the Development Fund for Iraq | Renewed annually |
| 13671 (July 8, 2014; 79 FR 39949) | Democratic Republic of the Congo (regional stability) | Additional sanctions | Expands E.O. 13413 (2006) |
| 13685 (Dec. 19, 2014; 79 FR 77357) | Ukraine (destabilizing activities in Crimea) | Blocks property and transactions | Expands E.O. 13660 (2014) |
| 13687 (Jan. 2, 2015; 80 FR 819) | North Korea (weapons proliferation, to meet requirements of UNSC resolution) | Additional sanctions | Expands E.O. 13466 (2008), 13551 (2010), 13570 (2011) |
| 13692 (Mar. 8, 2015; 80 FR 12747) | Venezuela (corruption, stability) | <u>Declares national emergency</u>; blocks property and deny visas | Renewed annually |
| 13694 (Apr. 1, 2015; 80 FR 18077) | Malicious Cyber-Enabled Activities | <u>Declares national emergency</u>; blocks property | Renewed annually |

| Executive Order | Country or Issue of Concern | Sanction/Remedy | Current Status |
|---|---|---|---|
| 13695<br>(May 26, 2015; 80 FR 30331) | Russia's misuse of highly enriched uranium extractions | Terminates emergency | Revokes E.O. 13617 (2012) |
| 13710<br>(Nov. 12, 2015; 80 FR 71679) | Liberia (corrupt government) | Terminates emergency | Revokes E.O. 13348 (2004) |
| 13712<br>(Nov. 22, 2015; 80 FR 73633) | Burundi (stability) | <u>Declares national emergency;</u> blocks property | Renewed annually |
| 13716<br>(Jan. 16, 2016; 81 FR 3693) | Iran (nuclear weapons) | Implements U.S. obligations under the Joint Comprehensive Plan of Action | Revokes and modifies earlier orders |
| 13722<br>(Mar. 15, 2016; 81 FR 14943) | North Korea (weapons proliferation, to meet requirements of UNSC resolution) | Blocks property of North Korea government and central party; prohibits transactions | Expands E.O. 13466 (2008) |
| 13726<br>(Apr. 19, 2016; 81 FR 23559) | Libya (stability) | Additional sanctions | Expands E.O. 13566 (2011) |
| 13739<br>(Sept. 14, 2016; 81 FR 63673) | Cote d'Ivoire (conflict) | Terminates emergency | Revokes E.O. 13396 (2006) |
| 13742<br>(Oct. 7, 2016; 81 FR 70593) | Burma | Terminates emergency | Revokes E.O. 13047 (1997), 13310 (2003), 13448 (2007), 13464 (2008), 13619 (2012) |
| 13757<br>(Dec. 28, 2016) | Malicious Cyber-Enabled Activities | Additional sanctions | Modifies E.O. 13694 (2015) |
| 13761<br>(Jan. 13, 2017; 82 FR 5331) | Sudan (war, human rights) | Recognizes "positive actions" by the Government of Sudan by removing some sanctions | Revokes in part E.O. 13067 (1997), in whole E.O. 13412 (2006) |
| **Administration of President Donald J. Trump (2017-)** | | | |
| 13804<br>(July 11, 2017; 82 FR 32611) | Sudan (war, human rights) | Extends deadlines in E.O. 13761 | Modifies E.O. 13761 (2017) |
| 13808<br>(Aug. 24, 2017; 82 FR 41155) | Venezuela (human rights, democracy, corruption) | Additional sanctions | Expands actions based on national emergency declared in E.O. 13692 (2015) |
| 13810<br>(Sept. 20, 2017; 82 FR 44705) | North Korea (weapons proliferation, human rights) | Additional sanctions | Expands actions based on national emergency declared in E.O. 13466 (2008) |

| Executive Order | Country or Issue of Concern | Sanction/Remedy | Current Status |
|---|---|---|---|
| 13818<br>(Dec. 20, 2017; 82 FR 60839) | Global Magnitsky (human rights, corruption) | <u>Declares national emergency</u>; blocks property | Likely to be renewed annually (pending first anniversary) |
| 13827<br>(Mar. 19, 2018; 83 FR 12469) | Venezuela (sanctions evasion) | Prohibits transactions, financing, trade in digital currency issued by or on behalf of the Government of Venezuela | Expands actions based on national emergency declared in E.O. 13692 (2015) |
| 13835<br>(May 21, 2018; 83 FR 24001) | Venezuela (economic mismanagement, public corruption, undermining democratic order, humanitarian and public health crisis) | Prohibits U.S. persons from purchasing debt owed the Government of Venezuela or trading in equity in which the Government holds at least a 50% stake | Expands actions based on national emergency declared in E.O. 13692 (2015) |
| 13846<br>(Aug. 6, 2018; 83 FR 38939) | Iran | Reimposes sanctions lifted for U.S. meeting its obligations under the Joint Comprehensive Plan of Action of July 14, 2015 (JCPOA) | Expands actions based on national emergency declared in E.O. 12957 (1995) |
| 13848<br>(Sept. 12, 2018; 83 FR 46843) | Foreign interference in U.S. elections | <u>Declares national emergency</u> relating to election interference. Establishes framework to assess possible interference by foreign persons or governments in any U.S. election. Blocks property and interests in property of those designated for being complicit in interfering in an election. | Complements actions taken under E.O. 13694, as amended. |
| 13849<br>(Sept. 21, 2018; 83 FR 48195) | Implements Russia-related sanctions adopted in the Countering Russian Influence in Europe and Eurasia Act of 2017 (Title II, P.L. 115-44; 22 U.S.C. § 9501 et seq.) | Limits U.S. bank loans, prohibits foreign exchange, blocks property, prohibits Export-Import Bank programs, limits the issuing of specific licenses, requires "no" votes in the international financial institutions where a loan would benefit a person otherwise subject to sanctions, limits access to the U.S. banking system, prohibits procurement contracts with the USG, denies entry into the United States. | Expands actions based on national emergencies declared in E.O. 13660 (2014) and related EO, and E.O. 13694 (2015), as amended. |

| Executive Order | Country or Issue of Concern | Sanction/Remedy | Current Status |
|---|---|---|---|
| 13851 (Nov. 27, 2018; 83 FR 61505) | Nicaragua | Blocks property of certain persons contributing to the situation in Nicaragua. | |
| 13857 (Jan. 25, 2019; 84 FR 509) | Venezuela | Taking additional steps to address the national emergency with respect to Venezuela; redefines "the government of Venezuela" | Expands actions based on national emergency declared in E.O. 13692 (2015); modifies EOs 13692, 13808, 13827, 13850 |
| 13871 (May 8, 2019; 84 FR 20761) | Iran | Prohibits transactions related to Iran's iron, steel, aluminum, or copper sectors. | Expands actions based on national emergency declared in Exec. Order 12957 (1995) |
| 13873 (May 15, 2019, 84 FR 22689) | The Information and Communications Technology and Services Supply Chain | <u>Declares national emergency</u>. Prohibits unduly risky transactions involving information and communications technology or services designed, developed, manufactured, or supplied, by foreign adversaries. | Likely to be renewed annually (pending first anniversary) |
| 13876 (June 24, 2019; 84 FR 30573) | Iran | Prohibits transactions related to U.S.-based assets of the Supreme Leader of the Islamic Republic of Iran, Supreme Leader's Office (SLO), and anyone appointed to a state position in Iran. | Expands actions based on national emergency declared in Exec. Order 12957 (1995) |
| 13882 (July 26, 2019; 84 FR 37055) | Mali | <u>Declares national emergency</u> relating to terrorism, narcotics trafficking, trafficking in persons, human rights abuses, hostage-taking, and attacks against civilians and international security forces in Mali; no designations made at time of issuance. | Likely to be renewed annually (pending first anniversary) |
| 13883 (August 1, 2019; 84 F.R. 38113) | Chemical and biological weapons proliferation or use; currently could be used against Syria, North Korea, and Russia, based on determinations made under sec. 307 of P.L. 102-182 (22 U.S.C. 5605) | Requires the U.S. to oppose international financial institutions' programs to the targeted state; prohibits U.S. banks from providing loans or credits to the targeted government. | Expands actions based on E.O. 12938 (1994); implements sanctions requirements of Sec. 307, P.L. 102-182; and amends Exec. Order 12851 (1993) to include CBW-related determinations |
| 13884 (August 5, 2019; 84 F.R. 38843) | Venezuela | Blocks property of the government of Venezuela in the United States | Expands actions based on E.O. 13692 (2015) |

| Executive Order | Country or Issue of Concern | Sanction/Remedy | Current Status |
|---|---|---|---|
| 13886 (September 9, 2019; 84 F.R. 48041) | Terrorism | Consolidates and enhances "sanctions to combat acts of terrorism and threats of terrorism by foreign terrorists" | Revokes E.O. 12947 (1995); amends E.O. 13224 (2001) |
| 13894 (October 14, 2019; 84 F.R. 55851) | Turkey's incursion into Syria | Declares a national emergency relating to Turkey's military invasion of northeast Syria; blocks property and suspends entry into the United States of "certain persons contributing to the situation in Syria" | Current |
| 13902 (January 10, 2020; 85 F.R. 2003) | Iran | Blocks property and prohibits transactions related to Iran's construction, mining, manufacturing, or textiles sectors, or any other sector to be determined by the Secretary of the Treasury | Expands actions based on E.O. 12957 (1995) |
| 13920 (May 1, 2020; 85 F.R. 26595 | United States Bulk-Power System | Declares a national emergency relating to bulk-power system equipment. | Current |
| 13928 (June 11, 2020; 85 F.R. 36139) | International Criminal Court (ICC) | Declares national emergency related to the ICC's intention to "investigate, arrest, detain, or prosecute any United States personnel without the consent of the United States"; blocks property and entry into the United States of any person found to be engaged in or facilitating ICC investigations. | Current |

**Source:** CRS, based on National Archives: Executive Orders Disposition Tables; The American Presidency Project, University of California, Santa Barbara; and *Federal Register*, various dates.

# Author Information

Christopher A. Casey, Coordinator
Analyst in International Trade and Finance

Ian F. Fergusson
Specialist in International Trade and Finance

Dianne E. Rennack
Specialist in Foreign Policy Legislation

Jennifer K. Elsea
Legislative Attorney

# Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

# Exhibit HH

**LOCAL NEWS** • News

# Some San Gabriel Valley communities could be seriously affected by Trump's WeChat ban

To Chinese communities, WeChat is an irreplaceable channel of communication.



Icons for the smartphone apps TikTok and WeChat are seen on a smartphone screen in Beijing, Friday, Aug. 7, 2020. President Donald Trump has ordered a sweeping but unspecified ban on dealings with the Chinese owners of the consumer apps TikTok and WeChat, although it remains unclear if he has the legal authority to actually ban the apps from the U.S. (AP Photo/Mark Schiefelbein)

By **ASHLEY FAN** | afan@scng.com |
PUBLISHED: August 10, 2020 at 8:40 a.m. | UPDATED: August 10, 2020 at 9:07 a.m.



If President Donald Trump is successful banning the Chinese social media app WeChat, the San Gabriel Valley's Chinese-speaking communities may lose a vital means of communication.

In an executive order last week, Trump announced a ban on Chinese social media apps TikTok and WeChat, citing concerns that these Chinese companies collect American users' information.

While Trump's ban faces legal challenges, communities and businesses in the San Gabriel Valley that rely on WeChat are worried they may lose a certain way of life.

WeChat is often compared to Facebook, but the all-in-one Chinese app is more than just a social media and messaging service — users can send peer-to-peer payments, access ride-hailing and food delivery services, book doctor appointments or concert tickets, and in China, users can even file for divorce right in the app.

The WeChat ban seems to only target financial transactions, but Chinese American users have begun to panic, transferring their funds and migrating their group chats to foreign messaging apps, such as Line and Telegram.

If WeChat is banned in America, Chinese Americans may lose their only form of communication with family and friends in China — virtually all other messaging apps are blocked by China's "Great Firewall."

"I don't know any Chinese (person) not on WeChat," said Fenglan Liu, a Chinese community organizer in Arcadia. "(The ban) is a big shock for the Chinese community. Everybody is worrying, and thinking of other solutions to contact their friends and family."

Nearly half the populations of some local cities, including Arcadia, Alhambra and San Gabriel, are Chinese, including many first-generation immigrants who experience language barriers. WeChat is ubiquitous in these immigrant communities as a principal source of news.

Responding to its community's needs, the Alhambra Police Department became the first in the nation to use WeChat in 2015. The cities of Arcadia and San Gabriel have since created their own official WeChat accounts as well, communicating directly with their Chinese-speaking populations in a familiar language.

"WeChat is an unofficial channel of the city of Arcadia," resident Gordon Martin wrote on Twitter in response to the ban. "Its power is vast."



WeChat's platform is the backbone of Chinese social organizing, from businesses to political movements. The loss of WeChat could hit the real estate market in the San Gabriel Valley, blocking communication with Chinese clients who made up almost half of all international homebuyers in California in 2018.

Mike Chou, a Realtor based in Alhambra, prefers WeChat for client communications and believes a ban would harm business, he said.

"We rely on the Chinese international market in the San Gabriel area, and not being able to market or communicate with them would be hard on the housing market," Chou said. "Some areas are already struggling, like Arcadia, where (the market) has taken a hit because of COVID-19 and cash flow restrictions. (The WeChat ban) is just another issue, and we don't need any more. It's unfortunate that we have to ban it due to national security or different political agendas."

WeChat also serves as a main channel for political organizing in Chinese communities. Vocal Chinese opponents who defeated Senate Constitutional Amendment 5 in 2014, which tried to legalize affirmative action in California public institutions, reportedly used Chinese networks WeChat and Weibo as tools for generating political action.

Today, WeChat is once again instrumental in organizing opposition against Proposition 16, a second attempt at repealing California's ban on affirmative action.

"A lot of community leaders set up groups on WeChat," said Liu, who leads local opposition against Proposition 16. "Everybody is talking about Proposition 16. We all use WeChat — it's easy to use."

WeChat's fate will remain in limbo for 45 days, when Trump's ban is set to take effect unless WeChat and TikTok are sold by their Chinese parent companies. If not, Chinese communities braving the pandemic in the San Gabriel Valley may soon experience a different kind of social isolation.

Newsroom Guidelines
News Tips
Contact Us
Report an Error

 The Trust Project



Tags:   community   social-media   Top Stories PSN

Tags: **Community**, **Social Media**, **Top Stories PSN**, **Top Stories SGVT**

## Ashley Fan

Ashley is a rising junior at Yale University, where she writes and edits for the Yale Daily News Magazine. She covers local news with a focus on the Asian American community in the San Gabriel Valley area, where she grew up.

**VIEW COMMENTS**

## Join the Conversation

We invite you to use our commenting platform to engage in insightful conversations about issues in our community. Although we do not pre-screen comments, we reserve the right at all times to remove any information or materials that are unlawful, threatening, abusive, libelous, defamatory, obscene, vulgar, pornographic, profane, indecent or otherwise objectionable to us, and to disclose any information necessary to satisfy the law, regulation, or government request. We might permanently block any user who abuses these conditions.

If you see comments that you find offensive, please use the "Flag as Inappropriate" feature by hovering over the right side of the post, and pulling down on the arrow that appears. Or, contact our editors by emailing moderator@scng.com.



# Exhibit II



# Exhibit JJ



# Exhibit KK



5:51

关于公众号                   ...

公众号简介

Service and Communication from California Alhambra City Police Department to community members and visitors

WeChat ID

alhambrapolice

Account Entity

Individual >

# Exhibit LL



6:14

× 微博 ···

< 返回

阿罕布拉警察局

关注 135 | 粉丝 39675

微博认证：美国加州洛杉矶县阿罕布拉市警察局官方微博

主页    微博    相册

 阿罕布拉警察局
07-25 来自 微博 weibo.com

昨晚，前一天晚上從我們城市偷來的一輛汽車
被追回，並逮捕了一名對象。找到了帶有汽車
鑰匙的對象，我們謹在此提醒大家，不要讓汽
車在點火時無人看管的情況下，只花幾秒鐘的
時間就可以犯下機會。

請在下面查看其他安全提示：

·始終將車窗捲起並鎖上車，以確保車輛安全，
即使它在車道或車庫中也是如此 ...全文



⤢2        💬 11        👍 22

＋关注      💬 聊天      文章

# Exhibit MM



# Exhibit NN



# Exhibit OO



# Exhibit PP

7:30

×          关于公众号          ...

公众号简介

欢迎访问圣盖博市的官方账号。加我来了解更多城市信息和新闻。Welcome to the official account for the City of San Gabriel.

WeChat ID

SanGabrielCity

Account Entity

City of San Gabriel >

# Exhibit QQ



# Exhibit RR



Published on *migrationpolicy.org* (https://www.migrationpolicy.org)

Home > Chinese Immigrants in the United States

**MIGRATION INFORMATION SOURCE**
FRESH. GLOBAL. AUTHORITATIVE.

THE ONLINE JOURNAL of the MIGRATION POLICY INSTITUTE

# Chinese Immigrants in the United States

**JANUARY 15, 2020**   SPOTLIGHT   | By Carlos Echeverria-Estrada and Jeanne Batalova

The population of Chinese immigrants in the United States has grown nearly seven-fold since 1980, reaching almost 2.5 million in 2018, or 5.5 percent of the overall foreign-born population. Whereas in 1980 Chinese immigrants did not appear among the ten largest foreign-born groups in the United States, China in 2018 replaced Mexico as the top sending country. After immigrants from Mexico and India, the Chinese represented the third largest group in the U.S. foreign-born population of nearly 45 million in 2018.

Chinese immigration in the United States has a long and fraught history. Throughout the first half of the 19th century, Chinese manual laborers (predominately men) migrated to the West Coast, where they found employment in agriculture, mining, railroad construction, and other low-skilled jobs. In response to negative public sentiments and organized labor lobbying, Congress in 1882 passed the Chinese Exclusion Act, the first legislation aimed at excluding certain foreigners based on their origin.

Political, economic, and legal developments in both countries during the next half century made it difficult for Chinese nationals either to leave China or to obtain a U.S. visa, stemming subsequent migration flows. The 1965 amendments to the Immigration and Nationality Act removed barriers for non-European immigration to the United States and created temporary worker programs for skilled workers. In contrast, nationals of Hong Kong did not face the same movement barriers as mainland Chinese and began arriving in the late 1960s. Chinese authorities relaxed emigration controls in 1978, and U.S.-China relations were normalized in 1979, beginning a second wave of Chinese migration to the United States.

The number of immigrants from China residing in the United States nearly doubled from 1980 to 1990, and again by 2000. Since then the population continued growing but at a slower pace (see Figure 1).

**Figure 1. Chinese Immigrant Population in the United States, 1980-2018\***



* Estimates refer to immigrants from mainland China, Hong Kong, and Macau.
*Sources*: Data from U.S. Census Bureau 2010 and 2018 American Community Surveys (ACS), and 1980, 1990, and 2000 Decennial Census.

The Hong Kong-born population in the United States is far smaller than that from mainland China. There were 80,000 Hong Kong-born immigrants in the United States in 1980, a number that more than doubled to about 204,000 in 2000 and then increased slowly to 233,000 in 2018. Today, Hong-Kong born immigrants make up 10 percent of all Chinese immigrants residing in the United States.

China is the main source of foreign students enrolled in U.S. higher education, and its nationals received the second-largest number of employer-sponsored H-1B temporary visas in fiscal year 2018, after Indians. Chinese nationals received nearly half of EB-5 investor green cards in 2018.

The United States is the top destination for Chinese immigrants, accounting for almost 27 percent of the more than 12 million Chinese living outside of China, according to mid-2019 estimates by the United Nations Population Division. Other popular destinations include Canada (920,000), Japan (785,000), Australia (750,000), South Korea (620,000), and Singapore (451,000).

**Click here** to view an interactive map showing where migrants from China and other countries have settled worldwide.

Compared to the overall foreign- and native-born populations in the United States, Chinese immigrants are significantly better educated and more likely to be employed in management positions. Almost 30 percent of Chinese who obtain lawful permanent residence in the United States (also known as getting a green card) did so through employment-based routes; the remainder qualified through family ties or as asylees.

**Definitions**

The U.S. Census Bureau defines the *foreign born* as individuals who had no U.S. citizenship at birth. The foreign-born population includes naturalized citizens, lawful permanent residents, refugees and asylees, legal nonimmigrants (including those on student, work, or other temporary visas), and persons residing in the country without authorization.

The terms *foreign born* and *immigrant* are used interchangeably and refer to those who

Using data from the U.S. Census Bureau (the most recent 2018 American Community Survey [ACS] and pooled 2014-18 ACS data), the Department of Homeland Security's Yearbook of Immigration Statistics, and World Bank annual remittance data, this Spotlight provides information on the Chinese immigrant population in the United States, focusing on its size, geographic distribution, and socioeconomic characteristics.

were born in another country and later emigrated to the United States.

Unless otherwise stated, estimates for China include the People's Republic of China, Hong Kong, and Macau, but exclude Taiwan.

Click on the bullet points below for more information:

- **Distribution by State and Key Cities**
- **English Proficiency**
- **Age, Education, and Employment**
- **Income and Poverty**
- **Immigration Pathways and Naturalization**
- **Health Coverage**
- **Diaspora**
- **Remittances**

## Distribution by State and Key Cities

Roughly half of Chinese immigrants reside in just two states: California (32 percent) and New York (19 percent). The top four counties by concentration in the 2014-18 period were Los Angeles County, CA; Queens County, NY; Kings County, NY; and San Francisco County, CA. Together, these four counties accounted for one-quarter of the overall Chinese-born population in the United States.



Figure 2. Top Destination States for Chinese Immigrants in the United States, 2014-18

Number of immigrants from China (incl. HK & Macau)
710   2,331,703

*Note*: Pooled 2014-18 ACS data were used to get statistically valid estimates at the state level for smaller-population geographies. Not shown are Chinese populations in Alaska and Hawaii, which are small in size; for details, visit the Migration Policy Institute (MPI) Data Hub for an interactive map showing geographic distribution of immigrants by state and county, available online.
*Source*: MPI tabulation of data from U.S. Census Bureau pooled 2014-18 ACS.

As of 2014-18, the greater New York City, San Francisco, and Los Angeles metropolitan areas had the largest number of Chinese immigrants. These three metro areas accounted for about 43 percent of Chinese immigrants.

**Figure 3. Top Metropolitan Destinations for Chinese Immigrants in the United States, 2014-18**



*Note*: Pooled 2014-18 ACS data were used to get statistically valid estimates at the metropolitan statistical-area level for smaller-population geographies.
*Source*: MPI tabulation of data from U.S. Census Bureau pooled 2014-18 ACS.

**Table 1. Top Concentrations by Metropolitan Area for Chinese Immigrants, 2014-18**

| Metropolitan Area | Immigrant Population from China | % of Metro Area Population |
|---|---|---|
| New York-Newark-Jersey City, NY-NJ-PA | 478,000 | 2.4 |
| San Francisco-Oakland-Hayward, CA | 264,000 | 5.6 |
| Los Angeles-Long Beach-Anaheim, CA | 262,000 | 2.0 |
| San Jose-Sunnyvale-Santa Clara, CA | 92,000 | 4.6 |
| Boston-Cambridge-Newton, MA-NH | 90,000 | 1.9 |
| Chicago-Naperville-Elgin, IL-IN-WI | 72,000 | 0.8 |
| Seattle-Tacoma-Bellevue, WA | 65,000 | 1.7 |
| Washington-Arlington-Alexandria, DC-VA-MD-WV | 59,000 | 1.0 |
| Houston-The Woodlands-Sugar Land, TX | 52,000 | 0.8 |
| Philadelphia-Camden-Wilmington, PA-NJ-DE-MD | 49,000 | 0.8 |

*Source*: MPI tabulation of data from the U.S. Census Bureau pooled 2014-18 ACS.

**Click here** for an interactive map that highlights the metropolitan areas with the highest concentrations of immigrants. Select China from the dropdown menu.

### English Proficiency

Chinese immigrants are less likely to be proficient in English and speak English at home than the overall U.S. foreign-born population. In 2018, about 58 percent of Chinese immigrants ages 5 and over reported limited English proficiency, compared to 47 percent of the total foreign-born population. Approximately 11 percent of Chinese immigrants spoke only English at home, compared to 17 percent of all immigrants.

*Note: Limited English proficiency refers to those who indicated on the ACS questionnaire that they spoke English less than "very well."*

### Age, Education, and Employment

On average, Chinese immigrants are of similar median age compared to the overall foreign-born population (median age of 45 years)—and both groups are older than the U.S.-born population (36 years). In 2018, Chinese immigrants were slightly less likely than the overall foreign-born population, but more likely than the native-born population, to be of working age (18 to 64; see Figure 4).

Figure 4. Age Distribution of the U.S. Population by Origin, 2018



*Note*: Numbers may not add up to 100 as they are rounded to the nearest whole number.
*Source*: MPI tabulation of data from the U.S. Census Bureau, 2018 ACS. Click here to view an interactive chart showing the age and sex distribution of top immigrant groups, including the Chinese born.

Chinese immigrants have considerably higher levels of educational attainment, especially in terms of advanced degrees, compared to the overall foreign- and U.S.-born populations. In 2018, about half of Chinese ages 25 and over had at least a bachelor's degree, significantly higher than among immigrants overall and U.S.-born adults (32 percent and 33 percent, respectively). Notably, Chinese immigrants were more than twice as likely to have a graduate or professional degree compared to the other two groups (29 percent compared to 14 percent for all immigrants and 12 percent for the U.S. born).

This high educational attainment is linked to the specific channels through which Chinese immigrants enter the United States. In recent decades, many Chinese immigrants arrived either as international college students or high-skilled H-1B temporary workers (generally requiring a university degree). China is the leading sending country of international students in the United States: In the 2018-19 school year, close to 377,000 students from mainland China, Hong Kong, and Macau were enrolled in U.S. higher education institutions, according to the Institute of International Education. They accounted for about one-third of the 1 million international students studying in the United States. Approximately 46 percent of Chinese students were enrolled in science, technology, engineering, and math (STEM) fields. In FY 2018, Chinese citizens represented 12 percent of the 332,000 H-1B petitions (initial and continuing employment) approved by U.S. Citizenship and Immigration Services (USCIS), outnumbered only by Indian nationals, who accounted for 73 percent of those petitions.

Chinese immigrants participate in the labor force at a lower rate than the overall immigrant and native-born populations. In 2018, almost 60 percent of Chinese immigrants ages 16 and over were in the civilian labor force, compared to 66 percent and 62 percent of the total foreign- and native-born populations, respectively. More

than half of Chinese immigrants were employed in management, business, science, and arts occupations versus 33 percent of the overall foreign-born and 40 percent of the native-born population.



Figure 5. Employed Workers in the Civilian Labor Force (ages 16 and older) by Occupation and Origin, 2018

*Source*: MPI tabulation of data from the U.S. Census Bureau 2018 ACS.

## Income and Poverty

In 2018, Chinese immigrants had higher median household incomes compared to the overall foreign-born population: $70,000 compared to $60,000 (and $62,000 for native-born households)

Chinese immigrants were slightly more likely to live in families with annual incomes below the official poverty threshold (17 percent) compared to immigrants overall (15 percent) or the U.S. born (13 percent).

## Immigration Pathways and Naturalization

In 2018, 53 percent of all Chinese immigrants in the United States were naturalized U.S. citizens, a share slightly higher than for the overall foreign-born population (51 percent).

Compared to all immigrants, Chinese immigrants are more likely to have arrived in the United States recently. Thirty-four percent of Chinese immigrants arrived in 2010 or later. Another 24 percent arrived between 2000

and 2009, and 42 percent before 2000 (see Figure 6).



Figure 6. Immigrants from China and All Immigrants in the United States by Period of Arrival, 2018

*Note*: Numbers may not add up to 100 as they are rounded to the nearest whole number.
*Source*: MPI tabulation of data from the U.S. Census Bureau 2018 ACS.

In FY 2018, China was the third largest country of origin for new lawful permanent residents (LPRs, also known as green-card holders), after Mexico and Cuba. Approximately 67,000 (6 percent) of the nearly 1.1 million new LPRs were from mainland China, Hong Kong, or Macau. Compared to new green-card holders in general, Chinese immigrants were much more likely to use employment-based preferences (29 percent versus 13 percent of all LPRs; see Figure 7). In contrast, Chinese immigrants were less likely than new LPRs overall to obtain green cards as immediate relatives of U.S. citizens (37 percent, compared to 44 percent).

There are significant backlogs for mainland Chinese applying for LPR status through employment-based and family-sponsored channels, due to the annual per-country cap on the number of immigrant visas available for these categories. According to the most recent visa issuance data, in January 2020 the State Department was processing family-sponsored green-card applications that had been filed by Chinese applicants well more than a decade earlier: February 2007 for those with family-linked visas and April 2008 for those with employment-related applications.

Figure 7. Immigration Pathways of Chinese Immigrants and All Immigrants in the United States, 2018



*Notes: Family-sponsored*: Includes adult children and siblings of U.S. citizens as well as spouses and children of green-card holders.
*Immediate relatives of U.S. citizens*: Includes spouses, minor children, and parents of U.S. citizens. *Diversity Visa Lottery*: The Immigration Act of 1990 established the Diversity Visa Lottery to allow entry to immigrants from countries with low rates of immigration to the United States. The law states that 55,000 diversity visas in total are made available each fiscal year. While individuals born in mainland China are not eligible for the lottery, those from Hong Kong and Macau are eligible.
*Source*: MPI tabulation of data from Department of Homeland Security (DHS), 2018 Yearbook of Immigration Statistics (Washington, DC: DHS Office of Immigration Statistics, 2019), available online.

Although most Chinese immigrants in the United States are legally present, approximately 362,000 were unauthorized in 2016, according to Migration Policy Institute (MPI) estimates, comprising around 3 percent of the 11.3 million unauthorized immigrants in the United States.

The Deferred Action for Childhood Arrivals (DACA) program provides temporary reprieve from deportation and work authorization to qualified unauthorized immigrants who came to the United States as children. As of April 30, 2019, 780 of the approximately 669,000 DACA recipients were born in China or Hong Kong.

### Health Coverage

Chinese immigrants are more likely to have private health insurance than the overall foreign-born population, and less likely to be covered by public health insurance programs (see Figure 8). Chinese immigrants are also less than half as likely to be uninsured, compared to the overall immigrant population.

Figure 8. Health Coverage for Chinese Immigrants, All Immigrants, and the Native Born, 2018



*Note*: The sum of shares by type of insurance is likely to be greater than 100 because people may have more than one type of insurance.
*Source*: MPI tabulation of data from the U.S. Census Bureau, 2018 ACS.

## Diaspora

The Chinese diaspora in the United States is comprised of approximately 5.5 million individuals who were either born in China or reported Chinese ancestry or race, according to 2018 Census Bureau tabulations.

## Remittances

Remittances to mainland China have regained momentum since 2016, making the country the second-largest global recipient of remittances (after India). In 2019, mainland China took in an estimated $70 billion in remittances via formal channels, its highest ever recorded. Remittances represented less than 1 percent of China's gross domestic product (GDP) in 2019.



Figure 9. Annual Remittance Flows to Mainland China, 1982 to 2019



*Source*: MPI tabulations of data from the World Bank Prospects Group, "Annual Remittances Data," October 2019 update.

**Visit the Data Hub's collection of interactive remittances tools**, which track remittances by inflow and outflow, between countries, and over time.

## Sources

Knapp, Anthony. 2019. Net International Migration Projected to Fall to Lowest Levels This Decade. United States Census Bureau, December 20, 2019. **Available online**.

Institute of International Education. N.d. Open Doors 2019. Accessed January 3, 2020. **Available online**.

United Nations Population Division. N.d. International Migrant Stock by Destination and Origin. Accessed January 2, 2020. **Available online**.

U.S. Census Bureau. N.d. 2019 American Community Survey (ACS). Explore Census Data. Accessed January 3, 2020. **Available online**.

---. 2019. 2018 ACS. Accessed from Steven Ruggles, Katie Genadek, Ronald Goeken, Josiah Grover, and Matthew Sobek. Integrated Public Use Microdata Series: Version 6.0 [Machine-readable database]. Minneapolis: University of Minnesota, 2019. **Available online**.

U.S. Citizenship and Immigration Services (USCIS). 2019. *Characteristics of H-1B Specialty Occupation Workers: Fiscal Year 2018 Annual Report to Congress*. Washington, DC: USCIS. **Available online**.

U.S. Department of Homeland Security (DHS) Office of Immigration Statistics. N.d. 2018 Yearbook of Immigration Statistics. Accessed January 3, 2020. **Available online**.

U.S. Department of State. 2020. Visa Bulletin for January 2020. **Available online**.

World Bank Prospects Group. 2017. Annual Remittances Data. Updated October 2019. **Available online**.

IF YOU HAVE QUESTIONS OR COMMENTS ABOUT THIS ARTICLE, CONTACT US AT
**Source@MigrationPolicy.org**

**Source URL:** https://www.migrationpolicy.org/article/chinese-immigrants-united-states-2018

# Exhibit SS



NUMBERS, FACTS AND TRENDS SHAPING YOUR WORLD

ABOUT  |  FOLLOW  |  MY ACCOUNT ▾  |  DONATE

SEARCH... 🔍

MENU    RESEARCH AREAS

FACT SHEET

SEPTEMBER 8, 2017

# Chinese in the U.S. Fact Sheet

MORE FACT SHEETS: ASIANS IN THE U.S.

## Chinese population in the U.S., 2000-2015



Note: Chinese also includes those identifying as Taiwanese. Based on mixed-race and mixed-group populations, regardless of Hispanic origin. See methodology for more detail.
Source: 2000 and 2010 population estimates from U.S. Census Bureau, "The Asian Population: 2010" Census Brief, Table 6. 2015 population estimates from 2015 American Community Survey 1-year estimates (American FactFinder).

PEW RESEARCH CENTER

---

# English proficiency of Chinese population in the U.S., 2015

| Chart | Data | Share | Embed |

*% among those ages 5 and older who are English proficient*



Note: Proficient English speakers are those who speak only English at home, or if they speak a non-English language at home, they indicate they can speak English at least "very well." Chinese also includes those identifying as Taiwanese. Figures for Chinese and all Asians based on mixed-race and mixed-group populations, regardless of Hispanic origin. See methodology for more detail.
Source: Pew Research Center analysis of 2013-2015 American Community Survey (IPUMS).

PEW RESEARCH CENTER

---

# Length of time in the U.S. for Chinese immigrants, 2000-2015

| **All Chinese immigrants** |          | All Asian immigrants |

| Chart | Data | Share | Embed |



*% of foreign-born population who have lived in the U.S. …*

○─○ 0 to 10 years    ○─○ More than 10 years

Note: Figures may not sum to 100% due to rounding. Chinese also includes those identifying as Taiwanese. Based on mixed-race and mixed-group populations, regardless of Hispanic origin. See methodology for more detail.
Source: Pew Research Center analysis of 2000 decennial census, 2008-2010 American Community Survey 3-year file, and 2013-2015 American Community Survey (IPUMS).

PEW RESEARCH CENTER

## Educational attainment of Chinese population in the U.S., 2015

| Chart | Data | Share | Embed |

*% of those ages 25 and older, by educational attainment*



Note: "High school" refers to those who have attained a high school diploma or its equivalent, such as a General Education Development (GED) certificate. "Some college" includes those with an associate degree and those who attended college but did not obtain a degree. Figures may not sum to 100% due to rounding. Chinese also includes those identifying as Taiwanese. Figures for Chinese and all Asians based on mixed-race and mixed-group populations, regardless of Hispanic origin. See methodology for more detail.

Source: Pew Research Center analysis of 2013-2015 American Community Survey (IPUMS).

PEW RESEARCH CENTER

# U.S. Chinese population living in poverty, 2015

| Chart | Data | Share | Embed |

*% living in poverty*



● All Chinese  ● All Asians  ● All Americans

Note: Poverty status is determined for individuals in housing units and noninstitutional group quarters. It is unavailable for children younger than 15 who are not related to the householder, people living in institutional group quarters and people living in college dormitories or military barracks. Due to the way in which the IPUMS assigns poverty values, these data will differ from those provided by the U.S. Census Bureau. Chinese also includes those identifying as Taiwanese. Figures for Chinese and all Asians based on mixed-race and mixed-group populations, regardless of Hispanic origin. See methodology for more detail.
Source: Pew Research Center analysis of 2013-2015 American Community Survey (IPUMS).

**PEW RESEARCH CENTER**

# Top 10 U.S. metropolitan areas by Chinese population, 2015

| Chart | Data | Share | Embed |



Note: Chinese also includes those identifying as Taiwanese. Based on mixed-race and mixed-group populations, regardless of Hispanic origin. See methodology for more detail.
Source: Pew Research Center analysis of 2013-2015 American Community Survey (IPUMS).

PEW RESEARCH CENTER

# Demographic characteristics of U.S. Chinese population, 2015

*% (unless otherwise noted)*

| | All Asians in the U.S. | Among Chinese in the U.S. | | |
| --- | --- | --- | --- | --- |
| | | All | U.S. born | Foreign born |
| **MEDIAN AGE** (in years) | 34 | 36 | 19 | 45 |
| **AGE** | | | | |
| Younger than 5 | 7 | 6 | 14 | 1 |
| 5-17 | 18 | 16 | 33 | 5 |
| 18-29 | 19 | 20 | 24 | 17 |
| 30-39 | 16 | 14 | 11 | 16 |
| 40-49 | 15 | 14 | 7 | 19 |
| 50-64 | 16 | 19 | 7 | 26 |
| 65+ | 10 | 12 | 4 | 16 |
| **NATIVITY** | | | | |

| | All Asians in the U.S. | Among Chinese in the U.S. | | |
| --- | --- | --- | --- | --- |
| | | All | U.S. born | Foreign born |
| U.S. born | 41 | 37 | - | - |
| Foreign born | 59 | 63 | - | - |
| **YEARS IN U.S.** (among foreign born) | | | | |
| 0-5 years | 20 | - | - | 21 |
| 6-10 years | 14 | - | - | 13 |
| 11-15 years | 13 | - | - | 13 |
| 16-20 years | 11 | - | - | 11 |
| 21+ years | 42 | - | - | 42 |
| **CITIZENSHIP** (among foreign born) | | | | |
| U.S. citizen | 58 | - | - | 58 |
| Not a U.S. citizen | 42 | - | - | 42 |
| **MARITAL STATUS** (18 and older) | | | | |
| Married | 59 | 58 | 34 | 65 |
| Divorced/Separated/Widowed | 12 | 11 | 7 | 12 |
| Never married | 30 | 32 | 59 | 23 |
| **FERTILITY** (among women ages 15 to 44) | | | | |
| Women who have given birth in the past 12 months | 6 | 5 | 4 | 6 |
| **HOUSEHOLD TYPE, BY PERSONS** | | | | |
| Married-couple household | 71 | 68 | 70 | 67 |
| Other family household | 17 | 16 | 16 | 15 |
| Non-family household | 12 | 16 | 14 | 18 |
| **IN A MULTIGENERATIONAL HOUSEHOLD** | | | | |
| Multigenerational household | 26 | 25 | 21 | 28 |

Note: Family households are those with a household head and one or more persons living in the household who are related to the household head by birth, marriage or adoption. Households with a household head and an unmarried partner are only considered family households if there are other persons in the household who are related to the household head by birth, marriage or adoption. Multigenerational households are households with two or more adult generations or one that includes grandparents and grandchildren. Figures may not sum to 100% due to rounding. Chinese also includes those identifying as Taiwanese. Figures for Chinese and all Asians based on mixed-race and mixed-group populations, regardless of Hispanic origin. See methodology for more detail.

Source: Pew Research Center analysis of 2013-2015 American Community Survey (IPUMS).

PEW RESEARCH CENTER

# Economic characteristics of U.S. Chinese population, 2015

*% (unless otherwise noted)*

| | All Asians in the U.S. | Among Chinese in the U.S. | | |
| --- | --- | --- | --- | --- |
| | | All | U.S. born | Foreign born |
| **MEDIAN ANNUAL HOUSEHOLD INCOME** | $73,060 | $70,000 | $86,000 | $65,000 |
| **MEDIAN ANNUAL PERSONAL EARNINGS** (ages 16 and older with positive earnings) | | | | |
| All | $35,600 | $38,000 | $40,000 | $37,100 |
| Full-time, year-round workers | $51,000 | $58,000 | $60,000 | $55,000 |
| **EMPLOYMENT STATUS** (civilians ages 16 and older) | | | | |
| Employed | 61 | 59 | 62 | 58 |
| Not employed | 4 | 4 | 4 | 3 |
| Not in labor force | 35 | 38 | 34 | 39 |
| **UNEMPLOYMENT RATE** (civilians ages 16 and older in the labor force) | 6.0 | 5.8 | 6.4 | 5.5 |
| **LIVING IN POVERTY** | | | | |
| All ages | 12.1 | 14.4 | 10.5 | 16.7 |
| Younger than 18 | 12.0 | 10.4 | 9.2 | 16.6 |
| 18-64 | 12.1 | 15.3 | 12.2 | 16.3 |
| 65 and older | 12.8 | 17.2 | 7.1 | 18.6 |
| **HOMEOWNERSHIP** (households) | | | | |
| Owner-occupied | 57 | 62 | 63 | 62 |
| Renter-occupied | 43 | 38 | 37 | 38 |

Note: The household population excludes persons living in institutions, college dormitories and other group quarters. Households are classified by the race or detailed Asian group of the head. "Full-time, year-round workers" are defined as people ages 16 and older who usually worked at least 35 hours per week and at least 48 weeks in the past year. The share of the population ages 16 and older who are not employed differs from the unemployment rate because the share not employed is based on the total population, while the unemployment rate is based on those who are in the labor force (i.e. working or looking for work). Poverty status is determined for individuals in housing units and non-institutional group quarters. It is unavailable for children younger than 15 who are not related to the householder, people living in institutional group quarters and people living in college dormitories or military barracks. Due to the way in which the IPUMS assigns poverty values, these data will differ from those provided by the U.S. Census Bureau. Figures may not sum to 100% due to rounding. Chinese also includes those identifying as Taiwanese. Figures for Chinese and all Asians based on mixed-race and mixed-group populations, regardless of Hispanic origin. See methodology for more detail.
Source: Pew Research Center analysis of 2013-2015 American Community Survey (IPUMS).

PEW RESEARCH CENTER

# Find out more

Explore fact sheets on other Asian groups in the U.S.

Read the methodology.

The Asian American fact sheets were compiled by Gustavo López, research analyst, Anthony Cilluffo, research assistant, and Eileen Patten, former research analyst.

# Exhibit TT



# WeChat Users in the U.S. Fear Losing Family Links With Ban

Maya Tribbitt   Michael Tobin

Published: Aug 11 2020, 1:14 AM Last Updated: Aug 11 2020, 4:51 PM

(Bloomberg) -- U.S. President Donald Trump's order to ban Chinese social media app WeChat may not have resonated with many Americans who are used to Facebook, Instagram and Twitter to keep in touch with family. But for millions of people with family or business in China, the move has personal consequences.

Johnnie Yu a 20-year-old student at New York University where he's the incoming co-president of the Chinese Student Society, chats with his parents in China every day on the messaging platform. When Yu heard about the ban, he began thinking of different ways to communicate with them but came up short. In China, most other messaging services that are popular in the U.S. are prohibited.

"It's going to be very difficult chatting with my parents because I'm thinking of what other apps they use," Yu said. "Facebook is blocked by the firewall, Telegram is blocked too, so we're exploring the alternatives."

Yu is just one of WeChat's more than one billion users globally. The app, owned by Tencent Holdings Ltd., is more than just a messaging service. It's used for online payments, for food and metro fare and is a staple of personal and business communication in China. Yu's parents, who work in investment banking and real estate, use the platform for their jobs.

WeChat has about 19 million daily active users in the U.S., according to analytics firm

Apptopia. For some, the app is a way to stay connected to the elderly in the U.S. and abroad. "Young activists and community organizations led by Asian Americans also use WeChat to engage our elder and immigrant communities, since the translation tool is helpful for overcoming language barriers," said Joyce Chang, a WeChat user from New York. "WeChat is the dominant tool that our older generation uses, and losing it would also be a loss of a bridge we use to connect with them."

A feature of the app allows users to translate messages in real time, according to its description on Apple Inc.'s App Store.

Trump's order, which also ensnared ByteDance Ltd.'s popular social media app TikTok, is an escalation of the U.S.'s aggressive stance against Chinese technology companies. The Trump administration has claimed that the apps pose a national security risk since the data they collect on U.S. citizens could potentially be turned over to the Chinese government. Microsoft Corp. is in talks to acquire TikTok's operations in the U.S., Canada, Australia and New Zealand in order to allow it to continue to operate in the U.S.

Some users said Trump's actions against WeChat and other Chinese apps are unjustified. "This attempt to leverage technology to wage a tech war with China is frustrating and a huge distraction from his lack of efforts with the pandemic in the United States," said Shirley Wu, a designer and WeChat user from San Francisco. Wu said she already has been unable to visit family members in Hong Kong for an annual visit. "Now I feel like my connection with some folks in my family may get cut off until we figure out other applications we can use."

Yu might also have to come up with a Plan B. Microsoft, for example, is one of the few U.S. companies that still has apps allowed in China, such as Skype and LinkedIn, though they are censored versions.

"I have so many relatives that I keep in touch with perhaps once a year and it might not occur to them or to me that I'll have to get them on other platforms," he said.

©2020 Bloomberg L.P.

*Bloomberg*

# Exhibit UU

Advertisement

Support The Guardian
Available for everyone, funded by readers
Contribute Subscribe

Sign in

US  Elections 2020  World  Environment  Soccer  US Politics  Business  Tech  Science

**Donald Trump**

This article is more than **1 year old**

# Huawei hits back over Trump's national emergency on telecoms 'threat'

**Chinese firm says ban on tech from 'foreign adversaries' will harm US consumers**



Donald Trump has directed the commerce department to draw up a plan for enforcement of his order. Photograph: Kevin Dietsch/Pool/EPA

**Lily Kuo** *in Beijing and* **Sabrina Siddiqui** *in Washington*

Thu 16 May 2019 05.57 EDT

579
579

Huawei has hit back at Donald Trump's administration after it declared a national emergency to ban technology from "foreign adversaries" and subjected the Chinese telecommunications company to strict export controls.

An executive order issued by the US president on Wednesday declared a national economic emergency that empowers the government to ban the technology and services of "foreign adversaries" deemed to pose "unacceptable risks" to national security, including from cyber-espionage and sabotage.

The order did not name specifc countries or companies but came after months of US pressure on Huawei. It refects government concerns that equipment from Chinese suppliers could pose an espionage threat to US internet and telecommunications infrastructure.

In a statement reported by the state-run Global Times, Huawei said: "If the US restricts Huawei, it will not make the US safer, nor will it make the US stronger. It will only force the US to use inferior and expensive alternative equipment, lagging behind other countries … and ultimately harming US companies and consumers."

The company said it was willing to "communicate with the US to ensure product security", echoing reassurances given to the UK.



Huawei 'prepared to sign no-spy agreement with UK government'
Read more

Trump's executive order invokes the International Emergency Economic Powers Act, which gives the president the authority to regulate commerce in response to a national emergency that threatens the US. The order directs the commerce department, working with other government agencies, to draw up a plan for enforcement within 150 days.

The commerce department said it was adding Huawei and 70 afliates to its "entity list", banning the company from acquiring components and technology from US frms without government approval.

The world's two largest economies have recently increased tarifs in a battle over what US ofcials call China's unfair trade practices. Talks

between Washington and Beijing have ground to a halt, causing volatility amid concerns about a global trade war.

Gao Feng, a spokesman for China's ministry of commerce, said: "China has emphasised many times that the concept of national security should not be abused, and that it should not be used as a tool for trade protectionism".

A foreign afairs spokesman described US actions against specifc Chinese companies as disgraceful and unjust. "We urge the US side to stop oppressing Chinese companies under the pretext of security concerns and provide a fair, just and non-discriminatory environment for their normal investment and operation," the spokesman said at a press briefng ahead of the executive order.

Trump's commerce secretary, Wilbur Ross, said the order, which has been under review for more than a year, was aimed at protecting the supply chain from "foreign adversaries to the nation's information and communications technology and services supply chain".

"Under President Trump's leadership, Americans will be able to trust that our data and infrastructure are secure," he said.

**Q&A**

What is Huawei and why is its role in 5G so controversial?

 Show

US ofcials have previously labelled Huawei a threat and lobbied allies not to use Huawei network equipment in next-generation 5G networks, calling it untrustworthy.

Beijing has pledged to take necessary counter-measures against the US actions, announcing plans this week to increase tarifs on nearly $60bn (£46.7bn) worth of US imports beginning on 1 June, in what the Chinese government said was a retaliatory move after Washington imposed tarifs on $200bn (£155.8bn) of Chinese goods.

Observers say other measures could include added regulatory hurdles for US companies operating in China.

Lu Kang, a spokesman for China's foreign ministry, said: "The Chinese government naturally cares about the rights and interests of Chinese businesses and the government will take necessary measures to safeguard their rights. As for foreign businesses in China, as long as their operation is lawful, they should not be concerned."



Contact the Guardian securely
Read more

Trump is expected to meet China's president, Xi Jinping, in Japan next month.

Huawei has strongly denied US allegations that its equipment could be used by the Chinese state to spy.

Ren Zhengfei, the company's founder and chief executive, claimed in February that Huawei would reject any eforts to gather intelligence through its products even if the Chinese government required it to do so.

"We never participate in espionage and we do not allow any of our employees to do any act like that. And we absolutely never install backdoors," he told CBS News.



Huawei 'prepared to sign no-spy agreement with UK government'
Read more

In August, Trump signed a bill that barred the US government from using equipment from Huawei and another Chinese provider, ZTE Corp.

The export restriction is "a grave escalation with China that, at minimum, plunges

the prospect of continued trade negotiations into doubt," Eurasia Group analysts said in a report. "Unless handled carefully, this situation is likely to place US and Chinese companies at new risk."

It appears the law invoked in Wednesday's executive order has never before been declared in a way that affects an entire commercial sector.

Huawei said in a statement on Thursday that the decision was "in no one's interest" and would "affect tens of thousands of American jobs, and disrupt the current collaboration and mutual trust that exist on the global supply chain".

Democracy is in peril ...
... ahead of this year's US election. Donald Trump is busy running the largest misinformation campaign in history as he questions the legitimacy of voting by mail, a method that will be crucial to Americans casting their vote in a pandemic. Meanwhile, the president has also appointed a new head of the US Postal Service who has stripped it of resources, undermining its ability to fulfill a crucial role in processing votes.
This is one of a number of attempts to suppress the votes of Americans – something that has been a stain on US democracy for decades. The Voting Rights Act was passed 55 years ago to undo a web of restrictions designed to block Black Americans from the ballot box. Now, seven years after that law was gutted by the supreme court, it is being actively threatening a free and fair election.
Through our Fight to vote project, the Guardian has pledged to put voter suppression at the center of our 2020 coverage. This election will impact every facet of American life. But it will not be a genuine exercise in democracy if American voters are stopped from participating in it.
At a time like this, an independent news organisation that fights for truth and holds power to account is not just optional. It is essential. Like many other news organisations, the Guardian has been significantly impacted by the pandemic. We rely to an ever greater extent on our readers, both for the moral force to continue doing journalism at a time like this and for the financial strength to facilitate that reporting.
We believe every one of us deserves equal access to fact-based news and analysis. We've decided to keep Guardian journalism free for all readers, regardless of where they live or what they can afford to pay. This is made possible thanks to the support we receive from readers across America in all 50 states.
As our business model comes under even greater pressure, we'd love your help so that we can carry on our essential work. If you can, support the Guardian from as little as $1 – and it only takes a minute. Thank you.
Support The Guardian

Remind me in October

   

Topics

**Donald Trump**

Huawei / Trump adminisration / China / Cybercrime / Asia Pacifc / US politics / news

Most popular

US   Elections 2020   World   Environment   Soccer   **US Politics**   Business   Tech   Science

**News** | **Opinion** | **Sport** | **Culture** | **Lifestyle**

Sign up to our daily email

Email address

About us
Contact us
Complaints & corrections

All topics
All writers
Digital newspaper archive

Advertise with us
Guardian Labs
Search jobs
Discount Codes

# Exhibit VV

Over 300 million Chinese private messages were left exposed online - The Verge

# THE VERGE

US & WORLD \ TECH \ CYBERSECURITY

# Over 300 million Chinese private messages were left exposed online

*The messages looked like they were collected to be sent over for police surveillance*

By Shannon Liao | @Shannon_Liao | Mar 4, 2019, 5:07pm EST



Photo by Shannon Liao / The Verge

Over 300 million private messages from Chinese users on popular messaging apps were sitting exposed on the internet on Saturday, according to security researcher Victor Gevers, who works for the nonprofit organization GDI. The database of 364 million records left users' personal identities searchable to anyone who found the IP address, as reported by *the Financial Times*.

Each record, drawn from apps like WeChat and QQ, also contained personally identifying Chinese citizen ID numbers, photos, addresses, GPS location data, and info on the type of device being used. Worse, the main database also sent the data back to 17 other remote servers, according to Gevers.

Over 300 million Chinese private messages were exposed online | The Verge

## *"I DON'T THINK CHINESE PEOPLE WILL APPRECIATE IT IF WE START DIGGING INTO THEIR CONVERSATIONS."*

To Gevers, it looks like the data ultimately gets distributed to police stations in cities or provinces — the other 17 servers — identifiable by their numerical codes. To be clear, he tells *The Verge*, "There is no evidence that law enforcement is doing something active with this spoonfed data. But the infrastructure and well-planned data distribution are there."

"There were chats from teenagers. Direct messages that were supposed to be private," Gevers says, "I threw a few into Google Translate and shared those to Twitter. But we stopped there — I don't think Chinese people will appreciate it if we start digging more into their conversations."

Many of the records contained addresses of internet cafes, indicating that the users might be gamers who frequent these cafes. Internet cafes have often been a target of censorship in China. Some local officials have asked cafes to install software that would track what its users browse.

Gevers first found the leak when monitoring devices through Shodan, a search engine that lets you look up internet-connected devices. According to him, it looked like someone had messed up a firewall configuration, leaving the database exposed. Gevers reached out to a Chinese internet service provider, ChinaNet Online, on Saturday and the database was locked down after a few hours.



**0xDUDE** @0xDUDE · Mar 2, 2019
Replying to @0xDUDE
The most dialogs which are being monitored are typical teenager conversations. Which conversations need to be reviewed by a human based on "trigger words" is at this moment still not entirely clear.

**0xDUDE**
@0xDUDE

One of the multiple intelligence feeds showing the distribution of triggered events routed to the police stations identified by numbers. It's a very effective way of spreading the workload from a single source to multiple operators. It will require tremendous work ethics as well



12:25 PM · Mar 3, 2019 from Beijing, People's Republic of China ⓘ

♡ 520    💬 328 people are Tweeting about this

It's pretty common for the Chinese government to monitor or otherwise outsource monitoring of internet users' conversations to ensure nothing untoward is said. Chinese tech companies are similarly straightforward in terms of use over the type of data collection that occurs on apps and websites.

For instance, the biggest social media app, WeChat, states in its privacy policy that it collects user data to "comply with applicable laws and regulations." This has led to criticism and speculation from prominent figures, like businessman Li Shufu, who said that Tencent CEO Ma Huateng "must be watching all our WeChats every day." WeChat has publicly denied the accusations.

## "LOOKS LIKE THEY HAVE NO IDEA WHAT THEY'RE DOING."

What's actually surprising in this case was that the information was open to anyone to access. Gevers told Bleeping Computer in an earlier interview, "There is no security. It looks like they have no clue what they are doing."

When Gevers emailed the Chinese ISP to warn it to secure the data, he included some tips for how to keep the information more secure. He advised the ISP to protect the server with a firewall blocking port or to only accept local connections. "Criminals often target open databases to deploy their activities like data theft or ransom," he warned the Chinese ISP. "But we also have seen cases where open servers like these are used for hosting malware and botnets."

# Exhibit WW

The New York Times | https://nyti.ms/31qy53w

## India Bans Nearly 60 Chinese Apps, Including TikTok and WeChat

*The move is part of the tit-for-tat retaliation after the Indian and Chinese militaries clashed earlier this month.*



By Maria Abi-Habib

Published June 29, 2020   Updated June 30, 2020

India's government banned nearly 60 Chinese mobile apps on Monday, including TikTok, citing national security concerns, after a deadly clash between their militaries this month raised tensions between the two countries to the highest level in decades.

The fighting two weeks ago, along the disputed border between the world's two most populous countries, left 20 Indian soldiers dead and an unknown number of Chinese casualties.

While India has vowed to retaliate, it lags far behind China in military and economic power, leaving it with few options. But Chinese telecommunication and social networking companies have long eyed India's giant market and its enormous potential. About 50 percent of India's 1.3 billion citizens are online.

In addition to TikTok, the popular video-sharing social networking platform, the banned apps include WeChat, UC Browser, Shareit and Baidu Map.

Analysts say up to a third of TikTok's global users are based in India.

The Chinese apps were "stealing and surreptitiously transmitting users' data in an unauthorized manner to servers which have locations outside India," India's Ministry of Electronics and Information Technology said in a statement Monday.

"The compilation of these data, its mining and profiling by elements hostile to national security and defense of India, which ultimately impinges upon the sovereignty and integrity of India, is a matter of very deep and immediate concern which requires emergency measures," the statement added.

The Chinese government did not immediately comment on the move, which was announced late at night in Beijing, nor did TikTok.

This month's border brawl was the worst violence between the two nuclear-armed countries in more than 50 years. India blamed China for provoking the clash by intruding into territory it claims high in the Himalayan mountain range. China said the incident happened on its side of the border, and that Indian troops intruded.

The situation remains tense, with troop buildups on both sides of the border.



An Indian military convoy driving toward the border with China on Monday. Both countries have sent additional troop to the border.  Tauseef Mustafa/Agence France-Presse — Getty Images

Case 3:20-cv-05910-LB Document 17-12 Filed 08/29/20 Page 366 of 392

Cybersecurity analysts have warned in the past about the risks Chinese apps and telecom companies may pose, citing the country's National Intelligence Law. The law holds Chinese companies legally responsible for providing access, cooperation or support for Chinese intelligence gathering.

The same argument has been at the center of a campaign to persuade Western countries not to allow Chinese companies to build their next-generation 5G wireless networks.

"India's concerns aren't overblown, they are valid," said Christopher Ahlberg, the chief executive of Recorded Future, a cybersecurity company in Massachusetts that analyzes and collects threat intelligence.

"China would not be above using these apps for large scale data collection," Mr. Ahlberg added. "I don't expect that the government is running all these apps, but they may make an agreement with the companies that they have to cooperate once in a while. And it's easy under Chinese law to require them to do so."

After a 2017 clash between India's and China's militaries over another border dispute, Indian troops were forced to delete dozens of Chinese apps from their phones over national security concerns. Some of the apps Indian troops were ordered to delete then — such as Weibo, UC Browser and Shareit — are among those that are now banned for the entire country.

"Chinese mobile app firms and other tech firms are beholden to the CCP under Chinese law," Brahma Chellaney, a former adviser to India's National Security Council, tweeted on Monday, referring to the country's ruling Communist Party. "As extensions of the Chinese state, they pose a national security risk."

Monday's move comes shortly after India's government quietly told two state-run telecommunication firms to stop using Chinese equipment and instead use local providers, according to Reuters. And in April, the government passed legislation requiring government approval for any investments from Chinese entities.

"Techno-nationalism has been in vogue in India for a while, which views data as a national asset," said Nikhil Pahwa, the founder of MediaNama, an organization that advocates a free and open internet.



A protester calling for the boycott of Chinese products in Ahmedabad, India, last week.  Ajit Solanki/Associated Press

Mr. Pahwa added that while the Indian government has had longstanding worries that Chinese companies are dominating local markets and are beating out Indian app developers, it also has national security concerns about what China does with the data it collects.

"The government views Indian citizens' data as sovereign. India has a fear of digital colonization, and has avoided signing data sharing agreements in the past," Mr. Pahwa said.

India's announcement highlights how technology companies are increasingly becoming entangled in broader geopolitical disputes. In China, American platforms like Facebook, Google, Twitter, Instagram, Wikipedia and many others have long been banned.

The Chinese telecommunications giant Huawei has been the subject of some of the greatest scrutiny, as American authorities push allies to ban the company from building wireless networks over claims it aids the Chinese state in cyberespionage. Huawei has denied the accusations.

Since the deadly border clash earlier this month, diplomats have expected India to prevent Huawei entry into the Indian market to build a 5G network.

The U.S. government is investigating TikTok, which is owned by the Chinese company ByteDance, over national security concerns. In Europe, authorities are probing the company's data-collection practices.

In India, a remaining question is how the government will go about enforcing the ban announced on Monday. One option would be to pressure operators of app stores, like Apple and Google, to no longer make the services available for download. That could set off further retaliatory actions by Chinese authorities.

Internet researchers have long warned that competing national interests could lead to a more fractured internet, with people's access to certain information and services limited by their governments.

Adam Satariano contributed reporting from London and Vindu Goel contributed from San Francisco.

# Exhibit XX

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit
https://www.djreprints.com.

https://www.wsj.com/articles/indias-retaliation-against-china-carries-economic-costs-11593869295

ASIA

# India's Retaliation Against China Carries Economic Costs

New Delhi has banned Chinese apps after 20 Indian soldiers were killed in a Himalayan border clash



A man showed support June 30 in New Delhi for India's ban of Chinese apps.

**PHOTO:** ALTAF QADRI/ASSOCIATED PRESS

*By Eric Bellman and Rajesh Roy*
July 4, 2020 9:28 am ET

NEW DELHI—India intends its ban on Chinese apps to show its willingness to dismantle important economic links between the two countries to pressure Beijing to back off in a border dispute, Indian officials and analysts say.

But further steps to roll back economic integration would be at least as painful for India as China.

Economic ties between India and China have increased markedly over the last five years, particularly in technology industries. Billions more dollars in trade, direct investment and acquisitions now flow between them every year. Government officials and analysts say New Delhi is prepared to continue unraveling that partnership to improve its position in

the border dispute after 20 Indian soldiers were killed last month in <u>hand-to-hand combat with Chinese troops</u> in the Himalayas.



**Booming Business**
India's imports from China have been surging.

**India's trade with China**

Note: Fiscal year ends March 31.
Source: Indian Ministry of Commerce and Industry

With India outspent and outflanked by China's military, economic retaliation is one of its few available tools. Shutting down Chinese apps in India, citing cybersecurity concerns, isn't the biggest weapon in New Delhi's economic arsenal, analysts say. India could add import tariffs and restrictions on Chinese investment and businesses in India, but it would have to be willing to take a big economic hit at a time when its economy is already contracting.

"When you have [news] images of Indians throwing their Chinese televisions out of their windows, I think this is a pretty accurate indicator of what the public wants their government to do," said Michael Kugelman, deputy director of the Asia Program at the Wilson Center in Washington. "But the more India tries to tighten the screws, the more likely it could get more punished than China."

India is one of the biggest international markets for Chinese apps. The 59 apps it banned —including ByteDance Ltd.'s video app TikTok and Tencent Holdings Ltd.'s WeChat messaging platform—have garnered 4.9 billion downloads in India, including 750 million so far this year, according to Sensor Tower. But they generally aren't major revenue generators for their Chinese makers.

It is in the areas of trade and investment that both India and China are more co-dependent. Bilateral trade between the two countries has almost doubled in the last 10 years to just above $80 billion, most of which is Chinese products entering India.

While government numbers on China's foreign direct investment in India show around $2.3 billion invested over the last decade, the amount was likely much higher as the official figures don't capture Chinese money routed through other countries, said a March Brookings Institution paper on India's growing dependence on China.



A memorial was held in Ahmedabad on June 26 to honor the Indian soldiers killed in border clashes with Chinese forces. India's efforts at economic retaliation could add to its woes domestically.
PHOTO: SAM PANTHAKY/AGENCE FRANCE-PRESSE/GETTY IMAGES

Chinese direct investment and planned investment is well above $25 billion, the paper estimated. It also said India has become overly reliant on imports and investment from China in key industries, including telecommunications, pharmaceuticals and infrastructure.

"It's not going to be easy for India overnight to stop importing equipment for power plants, telecom equipment and active pharmaceutical ingredients," said Ananth Krishnan, author of the report. "These are structural dependencies."

While India has refused to be part of China's global infrastructure network, <u>the Belt and Road initiative</u>, it has found its economy increasingly intertwined with China's, though on a much smaller scale than some of its neighbors that are part of the initiative, including Pakistan and Sri Lanka.

Mumbai think tank Gateway House has gone as far as to say India is now functionally part of China's "virtual Belt and Road," thanks to the rising trade and investment ties. It estimates that 18 of India's 30 unicorns—startups valued at $1 billion or more—have some Chinese ownership. The Alibaba Group owns a large stake in Indian mobile payments leader Paytm, for example, while Tencent owns a big stake in India's largest ride-hailing company, Ola.



**China Calling**
Chinese brands have taken over the Indian smartphone market.

India's smartphone market, by brand origin

Note: The 2020 figure is for the first quarter.
Source: Counterpoint Research

Smartphones are another area where Chinese companies have rushed into India over the last five years. Chinese companies have displaced others to take over more than 80% of the market this year, up from 18% in 2015, according to Counterpoint Research. To make more affordable handsets for those new customers, the Chinese companies have invested billions of dollars in new facilities across India.

If the standoff at the border doesn't cool, India might be tempted to target all these new trade and investment linkages to China, said Sreeram Chaulia, dean at O.P. Jindal Global

University's School of International Affairs in Sonipat, India.

"There will be a graduated step-by-step trade war, followed by an investment war, too," if tensions don't diminish, he said. "China cannot expect to freely access India's vast market and profit from it if the Chinese military continues committing incursions and violent acts against the Indian Army."

An economic showdown with the world's second-largest economy would add to India's economic woes. Like most economies, India's has been hit hard by the fear and restrictions connected to the battle against the coronavirus. Its economy had slowed to an 11-year low even before the pandemic hit the region. This year India's economy is expected to shrink for the first time in decades.

Economists and executives say the Indian economy—the third-largest in Asia—would need to be opened up further, not closed down, to return to the high growth required to create jobs for its massive population.

"Economic decisions must be driven by pragmatism and practical consideration. It is the wrong call to boycott Chinese products," said Mohit Singla, chairman at the Trade Promotion Council of India. "We have many industries which depend on Chinese imports."

China has called India's app ban unfair and said Chinese apps weren't a security threat. Chinese Foreign Ministry spokesman Zhao Lijian said Tuesday that Beijing is very concerned about India's move.

"The practical cooperation between China and India is mutually beneficial and win-win, and any man-made damage to the patterns is actually not in line with India's own interests," he said.

Indian government officials say they are weighing their options, but business with China won't be returning to normal until trust is repaired.

In recent months, Indian authorities have moved to take a series of economic actions against Beijing including adding a new layer of approval for acquisitions from China and other countries bordering India, increasing tariffs on 89 Chinese products and restricting purchases of telecommunications-network equipment from China.

"If trust is built between both the countries and their businesses, there could be a possibility of greater collaboration," said an Indian government official. "But with mistrust and threat of espionage and data security breach, there can't be."

**Write to** Eric Bellman at eric.bellman@wsj.com and Rajesh Roy at rajesh.roy@wsj.com

Copyright © 2020 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

# Exhibit YY

# The Sydney Morning Herald

BREAKING    **POLITICS**   **FEDERAL**   NATIONAL SECURITY

# 'Buyer beware': Prime Minister says there is no case to ban TikTok



By **Anthony Galloway**

August 5, 2020 — 11.00am

↗ Share   |      A   

29   View all comments

Australia will not ban social media platform Tiktok after security agencies found the Chinese company did not pose serious national security concerns.

The Australian government is still looking at ways to manage privacy and security risks posed by social media companies such as TikTok and WeChat, but has decided any kind of ban or country-wide restrictions on the applications are not warranted on national security grounds.



The Australian government will not ban TikTok. BLOOMBERG

Case 3:20-cv-05910-LB    Document 17-12    Filed 08/24/20    Page 377 of 392

Prime Minister Scott Morrison said on Wednesday morning the Australian government had had a "good look" at whether to ban apps such as TikTok and concluded there was "no reason for us to restrict those applications at this point".

But he warned there were still risks that personal data could be sent back to Beijing.

"Australians have to be very aware, and it's not just with TikTok and things like that," Mr Morrison said.

Microsoft is in discussions to buy Tiktok in the United States - and possibly its operations in Australia, Canada and New Zealand - after US President Donald Trump gave Chinese company ByteDance 45 days to sell TikTok or face being banned.

*The Sydney Morning Herald* and *The Age* revealed last month that Australian Prime Minister Scott Morrison had ordered an investigation into the potential security threats posed by TikTok, as well as platforms used primarily by the Chinese diaspora such as WeChat.

The probe was ordered after India has already banned the social media platform and some Liberal MPs had been raising concern about the way in which TikTok collected users' data and whether the Chinese company will be required to share users' information with the Chinese government.

The Australian government will continue to look at ways to manage the privacy concerns posed by social media companies such as TikTok. The Australian Defence Force has already banned the use of TikTok on its devices, and other Commonwealth departments could follow.

Mr Morrison said there was "nothing at this point that would suggest to us that security interests have been compromised or Australian citizens have been compromised because of what's happening with those applications".

"Now, it is true that with applications like TikTok, that data, that information, can be accessed at a sovereign state level. That is not the case in relation to the applications that are coming into the United States. But I think people should understand and there's sort of a buyer beware process," Mr Morrison told the Aspen Security Forum via a video call on Wednesday morning.

"But people should know that the line connects right back to China and that they should exercise their own judgement about whether they should participate in those things or not," he said.

"There is a greater level of transparency, I would argue, about how applications like WhatsApp and things like that, you know, if you go on one of those, how data is used and managed, that's pretty upfront, relatively speaking compared to TikTok and things like that."

8/28/2020
Case 3:20-cv-05910-LB   Document 17-12   Filed 08/29/00   Page 378 of 392
TikTok won't be banned by Australia's Scott Morrison

Mr Morrison said the government would "keep watching" the social media apps, but it was up to Australians to understand the "where the extension cord goes back to".

TikTok is the first Chinese tech giant to have a truly international user base.

The company is owned by ByteDance, which runs a separate China-only version called Douyin, that regularly censors content in accordance with regulations enforced by the Chinese Communist Party.

The Committee on Foreign Investment in the United States is investigating if the millions of videos uploaded to TikTok daily could give the Chinese government access to a vast facial recognition database.



**Anthony Galloway**

 

Anthony is foreign affairs and national security correspondent for The Sydney Morning Herald and The Age.

# Exhibit ZZ

Case 3:20-cv-05910-LB Document 17-12 Filed 08/28/20 Page 380 of 392

## ০০০NEWS

Just In    Coronavirus    Politics    World    Business    Analysis    Sport    Science    Health    Arts    Fact Check    Other

# Why are Australian politicians intensifying their presence on Chinese social media platforms?

By Michael Walsh, Stephen Dziedzic and Jason Fang

Posted Wed 3 Apr 2019 at 12:05pm, updated Wed 3 Apr 2019 at 2:46pm



A recent screenshot from Scott Morrison's WeChat account. *(WeChat)*

As an election looms, Australian politicians are spending more time courting voters on the Chinese social media site Weibo and the popular "super app" WeChat.

Shadow Treasurer Chris Bowen on Wednesday night held a live session on WeChat, answering questions sent in from members of the Chinese community using the app.

Opposition Leader Bill Shorten held a similar session last week, during which he criticised comments made by former New South Wales Labor leader Michael Daley about "Asians with PhDs".

And even Prime Minister Scott Morrison has been active on Chinese platforms, taking to WeChat to slap down widely criticised remarks from Nationals Senator Barry O'Sullivan.

The use of Chinese social media is nothing new for Australian politicians — Kevin Rudd has been on Weibo and WeChat for years — but let's take a look at why their engagement on the platform has become more frequent, and how effective it's been.

**Key points:**

- Politicians are eyeing marginal seats with high Chinese-Australian populations

- However there are security and censorship concerns on WeChat and Weibo

- Labor claims the Liberals have circulated "deliberate misinformation" via WeChat

## Why are they using Chinese social media?



Labor leader Bill Shorten appears on a video published on the Chinese social media platform WeChat. *(Supplied: WeChat)*

The short answer is electoral math.

Several marginal seats with large numbers of Chinese-Australian voters are up for grabs at the upcoming federal election, which could be called any day now.

The seat of Chisholm in Victoria is the big-ticket item, with both major parties putting forward two candidates with Chinese heritage — Labor's Jennifer Yang and the Liberals' Gladys Liu.

Both are active WeChat users.

Fifteen per cent of people living in that electorate speak Mandarin at home and a further 5 per cent speak Cantonese, according to Census data.

There will also be tight contests in the New South Wales seats of Banks and Reid, both of which are home to a significant number of Chinese-Australians.

## Is there any problem with it?



Defence Department staff were reportedly banned from using the WeChat app on their work phones. *(Reuters: Peter Kujundzic)*

Chinese social media is not policed in the same way as Western sites and apps — it is a heavily censored space, regardless of whether you use it inside or outside China.

Discussion of sensitive political issues and criticism of the Chinese Government and President Xi Jinping are frequently deleted, and accounts that regularly post such content are wiped from the platforms.

Even private messages sent between WeChat users can be monitored and censored.

There are also data security concerns. Last year Defence Department staff were reportedly banned from using the app on their work phones.

However cyber analyst Fergus Ryan from the Australian Strategic Policy Institute said the issue of censorship, and potential self-censorship, were far bigger issues.

> "When Australian politicians are trying to communicate with their Chinese-Australian voters via this app, they are automatically part of the censorship apparatus that is being run out of Beijing," he said.

"It means that certain sensitive topics that Beijing doesn't like people discussing are not able to be discussed."

Mr Ryan raised the example, uncovered by a recent Human Rights Watch report, of a Canadian member of Parliament whose WeChat message on Hong Kong's pro-Democracy Umbrella Movement was deleted by censors.

While discussion of the "three Ts" — Tiananmen Square, Tibet and Taiwan — are frequent targets of censorship, recent research found discussions of the US-China trade war and the Chinese telco Huawei were the most censored topics last year.

"If anyone wanted to ask their representative or a candidate about those subjects, they wouldn't be able to easily," Mr Ryan said.

## How effective has it been?

**Stephen Dziedzic** ✔ @stephendzied... · Apr 2,
Replying to @stephendziedzic
Both major parties are intensifying their engager Chinese language social media - @Bowenchris i: expected to hold a q and a on WeChat this after (after @billshortenmp last week)

**Stephen Dziedzic** ✔
@stephendziedzic

This will continue to ramp up over the next s weeks

8/28/2020
Case 3:20-cv-05910-LB Document 17-12 Filed 08/28/20 Page 383 of 392
Why are Australian politicians jumping on Chinese social media? - ABC News



The Liberals' Gladys Liu, pictured, is competing for the seat of Chisholm in Victoria.
*(Supplied)*

It depends on your definition of success.

Perhaps the most famous WeChat campaign was waged during the contest for Chisholm in 2016, when Gladys Liu was a Liberal Party volunteer.

She told the Guardian back in 2016 that a volunteer-run WeChat campaign she organised during that year's election was responsible for the victory of then-Liberal candidate Julia Banks.

But the ALP accused Ms Liu of using the platform to co-ordinate a misleading scare campaign against Labor on same sex marriage and refugees.

"In 2016 the Liberals spread outright lies to Chinese Australians about Labor policies and they are trying it again in a desperate 'fake news' scare campaign," said Labor MP Julian Hill, who represents the neighbouring seat of Bruce.

Unsurprisingly, Labor is determined not to be caught flat-footed this year, and is promising to use WeChat to fight misinformation in this year's election.

> "The truth is, like any social media platform, people need to be cautious about information shared," said Mr Hill.

"By engaging directly with the community through technology such as WeChat Live people can ask questions and hear directly from Labor about our policies."

Ms Liu dismissed Labor's accusations and said she believed all materials shared during the 2016 campaign were legitimate and authorised.

**Bang Xiao 肖邦** 
@BangXiao_

Australian Prime Minister Scott Morrison has published the first Chinese post on his WeCh public account today, saying that he was exp to "promote his work and national policies" t Chinese Australians on the one of China's m popular social media apps.

Case 3:20-cv-05910-LB   Document 17-12   Filed 08/28/20   Page 384 of 392

"[Labor] of course would treat anything they don't
want to hear as fake news," she said.

"In reality, everything that comes out of the Liberal Party's official site, everyone can go and have a look and see whether they can find any inappropriate postings."

A Coalition source said their outreach on WeChat this year would focus on bread-and-butter issues like health, education and the economy.



Labor candidate Jennifer Yang is also an active WeChat user. *(Supplied)*

The Coalition also believes that many Chinese Australian voters remain hostile to Labor's plan to wind back negative gearing.

A spokesman for the Federal Government didn't comment on the Prime Minister's social media strategy but said "the Government will connect with Australians wherever they are".

So expect senior politicians from both major parties to make regular appearances on platforms like WeChat as Australians prepare to go to the polls.

Political campaigning is changing — and the evolution is unlikely to stop in 2019.

# Exhibit AAA

Case 3:20-cv-05910-LB   Document 17-12   Filed 08/28/20   Page 386 of 392

# ₵₵₵ NEWS

Just In    Coronavirus    Politics    World    Business    Analysis    Sport    Science    Health    Arts    Fact Check    Other

CHINA POWER

## 'Uncharted territory': WeChat's new role in Australian public life raises difficult questions

By Michael Walsh and Bang Xiao

Posted Thu 18 Apr 2019 at 2:03pm, updated Thu 18 Apr 2019 at 10:18pm



WeChat's new role in Australian politics raises difficult questions.

As more Australian politicians and media organisations sign up to the Chinese social media mega-app WeChat, questions are being raised about its new place within Australia's democracy.

There are concerns politicians using WeChat may have to self-censor their comments, avoiding criticism of China and dodging other topics Beijing finds sensitive.

Prime Minister Scott Morrison and Opposition Leader Bill Shorten both use WeChat to communicate with Chinese-Australian voters, while several media organisations including the ABC, SBS and the Australian also have accounts.

But the news stories posted on WeChat aren't always the same ones making headlines in Australia.

China expert John Fitzgerald, from Swinburne University, told the ABC the use of WeChat among politicians and the media could present unprecedented challenges.

**Key points:**

- Popular Chinese social media platform WeChat blocks and censors content in Australia

- Politicians and the media use service to communicate with Chinese-Australians

- This use of WeChat could present unprecedented challenges around censorship

> "We are entering uncharted territory. WeChat was not designed to work in a democracy, and a democracy can't work with WeChat," he said.

"It does not matter if it's one Australian writing to another or someone in China writing to someone in Australia — Xi [Jinping's] scissors are at work clipping away wherever people are messaging."

## Canberra jumps the Great Firewall



Bill Shorten and Scott Morrison's WeChat accounts are tied to the national IDs of two unknown Chinese citizens. *(ABC News: Alistair Kroie)*

To understand how those scissors work, it's important to get a sense of how WeChat blocks and censors content in both Australia and China.

Censorship is believed to apply mainly to WeChat users who register in China, and who are required to supply a Chinese mobile phone number in order to sign up. Australian users have to use an Australian phone number.

It is understood Chinese WeChat accounts are not able to see "sensitive" content sent to them by international accounts, however international accounts can usually share such content with other WeChat users outside mainland China.

Businesses, public figures and media organisations can set up "Official Accounts", which allow them to post content publicly to their followers.

Until late last year, Chinese WeChat users could not see any content posted by international Official Accounts, and this significant barrier forced foreign organisations to find ways to set up Chinese Official Accounts in order to reach WeChat's massive mainland China userbase.

However Chinese Official Accounts required a higher level of accountability: you needed to either supply the ID of a Chinese national who would act as the "account operator", or tie your account to a business registered in China.

Scott Morrison and Bill Shorten's respective WeChat accounts are both Chinese Official Accounts — and they are tied to two unknown, male Chinese citizens, whose ID details have been logged with WeChat.

> "That could mean that at any stage, that unnamed Chinese national could shut down the account, which would affect either side's ability to campaign properly," said cyber security analyst Fergus Ryan from the Australian Strategic Policy Institute.

While the old rules around international Official Accounts on WeChat no longer apply, both Mr Morrison and Mr Shorten's accounts are still linked to those foreign citizens.

Mr Shorten's office denied the account registration process presented a security risk, and told the ABC that the Chinese citizen listed on the Opposition Leader's account was an Australian resident and an Australian Labor Party employee.

Mr Morrison's office declined to comment on the Chinese national tied to the Prime Minister's account.

Case 3:20-cv-05910-LB   Document 17-12   Filed 08/28/20   Page 388 of 392



Mr Shorten's office denied his WeChat account's Chinese registration could be a security risk. *(Supplied: WeChat)*

Wanning Sun, an expert on China's digital media from the University of Technology Sydney, said it was possible their accounts may be subject to higher scrutiny than international accounts, given they were registered using the IDs of Chinese citizens.

However she said the criteria and principles WeChat used when deciding what content to censor remained something of a mystery.

"As far as I know, as long as the content does not touch on political topics and social issues about certain aspects of China which the Chinese Government is sensitive about, they usually leave content created by foreigners alone," she said.

Professor Sun said she would be surprised if Australian politicians on WeChat were not aware of the potential for censorship, but it was a risk they appeared willing to take to improve their electoral prospects.

And it's a risk Australian media organisations are also taking, including taxpayer-funded organisations like the ABC and SBS.

## 'ABC Australia is not a news WeChat account'



Peter Dutton and Huang Xiangmo. *(ABC News: Georgina Piper)*

Case 3:20-cv-05910-LB Document 17-12 Filed 08/28/20 Page 389 of 392

Home Affairs Minister Peter Dutton's private lunch with the Chinese Communist Party-aligned billionaire Huang Xiangmo, revealed in last week's Four Corners program Interference, was a top news story for days.

The specialist Chinese-language teams at the ABC, SBS and the Australian newspaper provided extensive coverage of the investigation in Mandarin, across a number of articles on their respective websites.

However none of these stories were posted on their respective WeChat accounts — the place where the majority of Chinese-Australians now get their news.

Instead, on the days the Four Corners revelations were making national headlines, the ABC Australia WeChat posted tips for learning English, a story about university rankings, and a recipe for a brown rice congee with chilli oil and kale.

The ABC's WeChat is a China-registered official account, tied to a business registered in Shanghai wholly owned by the national broadcaster — this makes its posts accessible in mainland China, and vulnerable to Beijing's censorship regime.

It is managed by ABC International, and operates separately from the ABC's Chinese-language news team.

An ABC International spokesperson said the Four Corners investigation was not shared on WeChat as its account was "lifestyle focussed and aims to showcase Australian culture, conversations and stories".

"As it is targeted at a mainland Chinese audience, it does not have a news and current affairs brief because the authorities would block the content," the spokesperson said.

The spokesperson denied the decision not to post stories about political interference on WeChat was a form of self-censorship, as "ABC Australia is not a news WeChat account".



传统粥搭配脆炒甘蓝和辣椒油   (ABC Life: Hetty McKinnon)

While foreign interference was making headlines in Australia, ABC Australia was posting about congee. *(WeChat: ABC Australia)*

However the account has posted news stories in the recent past. A couple of weeks ago it published a budget preview, and it shared multiple stories late last year on the arrest of Huawei executive Meng Wanzhou.

Beyond questions of self-censorship, Professor Sun said the "real problem" with the ABC's use of WeChat was that it focused on mainland Chinese audiences, instead of better serving Chinese-Australians.

"The ABC chooses to waste resources on soft, light content to appeal to Chinese audiences in China, but with minimum impact," she said.

"In the meantime, ABC Chinese has largely failed to reach out, resonate, and serve the interests and needs of the Australian Chinese audiences, most of whom are on WeChat."

## SBS Radio censored on WeChat

While WeChat has become an arena for Australian conversations, players need to follow Beijing's rules.

SBS Radio's WeChat is an international account, and it explicitly pitches its stories toward Mandarin-speaking WeChat users in Australia.

This would, generally speaking, put the account at relatively low risk of facing censorship on WeChat. Moderators are more concerned about news that could stir up trouble in China.

However the ABC understands that SBS Radio has had some stories removed from its WeChat account due to keyword restrictions, a form of censorship that filters out news stories deemed potentially damaging to Beijing.

Asked about the issue of censorship, and why SBS Radio's comprehensive coverage of the foreign interference debate has rarely been shared on its WeChat, an SBS spokesperson said "restrictions of the platform" did not influence their editorial approach.

> "SBS Radio approaches news related to China as it does any other subject, focused on providing Australian audiences with accurate, impartial and balanced reporting," the spokesperson said.

As an international account, SBS Radio can only publish articles on WeChat once a week, and the spokesperson said it focused on posting "less time-sensitive" news stories that were "relevant to audiences settling into life in Australia".

It appears as though The Australian's WeChat account may have faced censorship, too.

In one story about ASIO funding viewed by the ABC, a reference to the threat of foreign political interference coming "predominately from China" was cut from the WeChat version.



SBS电台中文广播

如何观看这场盛大的游行呢？

悉尼同性恋狂欢节（Sydney Gay and Lesbian Mardi Gras）进入第41个年头，今年的主题是"无所畏惧"，3月2日（周六）将迎来盛大的狂欢游行，届时将有30万人来到现场、200两花车沿着标志性的Oxford Street前行。

SBS Radio posts about a wide range of subjects on WeChat, including the Sydney Gay and Lesbian Mardi Gras. *(WeChat: SBS Radio)*

该中心将基于为衡量恐怖主义威胁的严重程度而设置的中心的模式，将跨越警察部队，间谍机构和政府官僚机构，来反映外国干涉问题的庞大性质。ASIO 将在四年内获得1,450万来应对外国干涉的威胁。

该中心将基于为衡量恐怖主义威胁的严重程度而设置的中心的模式，将跨越警察部队，间谍机构和政府官僚机构，来反映外国干涉问题的庞大性质。ASIO将在四年内获得1,450万来应对外国干涉的威胁，<u>主要来自中国</u>。

The centre, which is modelled on one designed to gauge the severity of terrorism threats, reflects the sprawling nature of the foreign interference problem, which straddles police forces, spy agencies and government bureaucracies. ASIO will receive $14.5 million over four years to meet the threat, <u>which comes</u> <u>predominately from China.</u>

On the top left, the WeChat version of the article is missing the line about the threat of interference coming "predominately from China". *(WeChat: The Australian)*

The offending line was present in both the English and Mandarin versions of the story on The Australian's website.

The newspaper declined to respond to questions asking why this line was omitted.

### Beijing 'curating' Australian debate

When it comes to WeChat news accounts aimed at Chinese-Australians, SBS Mandarin and the Australian are small players, and official accounts run by local Chinese-language outlets in Melbourne and Sydney have far larger readerships.

But some of these accounts have been accused of toeing Beijing's line on political issues.



Chinese-language outlets in Australia are said to regularly rehash stories published by state media in China. *(Reuters: Thomas Peter/Illustration)*

Tom Sear from UNSW Canberra at the Australian Defence Force Academy, who is currently researching the news stories these Australia-based accounts post, told the ABC they frequently repurposed articles published in official Chinese state media.

"When you go and do a content comparison of Chinese domestic news — the writing from China — and what appears in the official accounts, 86 per cent of stories are identical," he said.

Not that they post much about politics or foreign policy to begin with — the business model for publishers on WeChat is based on clicks, so celebrity gossip is often a far more lucrative topic.

Mr Sear said only 0.26 per cent of the stories posted were related to Chinese politics, in the 18-month period that he and his colleagues analysed the WeChat accounts.

Professor Fitzgerald said the popularity of these accounts, combined with the apparent censorship of more robust media outlets, indicated a possible strategic element to WeChat's censorship within Australia.

"[WeChat's] a very effective instrument for curating what can and cannot be said in Australia, and chiefly among Chinese-Australians, on matters Beijing considers sensitive," he said.

"We find endless 'news' circulated on WeChat by opportunistic Chinese language media entities ... promoting China's interests in Australia and the region.

"And yet we find Australia's taxpayer-funded specialist Chinese language services such as SBS reluctant to upload news at all — for reasons we can only speculate about.

"If that's not effective state-controlled propaganda management by a foreign government, within Australia, I can't imagine what is."