JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
DAVID M. MORRELL
Deputy Assistant Attorney General
DIANE KELLEHER
Assistant Branch Director
SERENA M. ORLOFF
MICHAEL DREZNER
STUART J. ROBINSON
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
Ben Franklin Station, P.O. Box No. 883
Washington, DC 20044
Phone: (202) 305-0167
Fax: (202) 616-8470
E-mail: serena.m.orloff@usdoj.gov
*Counsel for Defendants*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| U.S. WECHAT USERS ALLIANCE, *et al.*, | Case No. 3:20-cv-05910-LB |
| Plaintiffs, | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| DONALD J. TRUMP, President of the United States, and WILBUR ROSS, Secretary of Commerce, | Date:   Sept. 17, 2020<br>Time:  9:30am<br>Place:  San Francisco, CA<br>Judge:  Hon. Laurel Beeler |
| Defendants. | |

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 4

I.      Factual Background ..................................................................................................... 4

        A.      Congress and the Executive Branch Identify Chinese Technology
               Companies as a Significant and Growing National Security Threat. ................... 4

               1.      Early Concerns Regarding Huawei and ZTE............................................ 4

               2.      Increasing Reliance on Mobile Technologies Amplifies the
                      National Security Threat. ........................................................................... 5

               3.      The National Defense Authorization Act of 2018. ................................... 7

        B.      Researchers and Government Officials Identify Tencent and WeChat as
               a Growing Threat. ................................................................................................. 8

        C.      The President Issues Executive Order 13873 and Reports to Congress
               under the NDAA. .............................................................................................. 11

        D.      The President Takes Action Relating to WeChat. ................................................. 13

II.     This Case....................................................................................................................... 14

IEEPA AND THE NEA........................................................................................................ 15

I.      The International Emergency Economic Powers Act ....................................................... 15

II.     The National Emergencies Act ....................................................................................... 15

DISCUSSION ........................................................................................................................ 16

I.      Legal Standard ................................................................................................................ 16

II.     Plaintiffs Are Unlikely To Succeed on the Merits of Their Claims. ................................ 17

        A.      Core Aspects of this Dispute Are Not Justiciable.................................................. 17

               1.      Plaintiffs' Claims Regarding the Scope of Action to Be Taken
                      Under the Executive  Order Are Not Ripe.................................................. 17

2.     Plaintiffs' Challenges to the President's National Security
       Determinations Are Not Justiciable. ........................................ 19

3.     Plaintiffs Lack a Cause of Action to Challenge the President's
       Compliance with IEEPA and the NEA. ..................................... 20

B.   Any Remaining Claims Fail Because Plaintiffs Cannot Show that the
     WeChat Order Is Unlawful in Every Conceivable Application........................... 22

     1.     Plaintiffs Are Not Likely to Succeed on Their Vagueness Claims........... 22

     2.     Plaintiffs Are Not Likely to Succeed on Their First Amendment
            Claims. ...................................................................................... 24

            a.     The Executive Order Is Content Neutral So Strict Scrutiny
                   Does Not Apply. ........................................................... 24

            b.     The Executive Order Satisfies Intermediate Scrutiny.................. 26

                   i.      The Executive Order Advances Important
                           Government Interests. ...................................... 26

                   ii.     The Executive Order Does Not Burden
                           Substantially More Speech Than Necessary.................... 27

                   iii.    Ample Avenues of Communication Remain
                           Available. .............................................................. 30

     3.     Plaintiffs Are Not Likely to Succeed on their Ultra Vires Claims. .......... 32

     4.     Plaintiffs Have Waived Any Remaining Claims in this Motion............... 35

III.   Plaintiffs Have Failed to Establish Irreparable Harm ....................................... 36

IV.    The Balance of the Equities Weighs Against a Preliminary Injunction .......................... 39

V.     Any Preliminary Relief Should Be Limited........................................................ 40

VI.    Objection and Motion to Strike the Alben and Chemerinky Declarations ...................... 40

CONCLUSION....................................................................................................... 40

1

## **TABLE OF AUTHORITIES**

2

**CASES**

3

*Al Haramain Islamic Found. v. U.S. Dep't of Treasury*,
4     686 F.3d 965 (9th Cir. 2012)................................................................. 30

5

*Alaska Right to Life PAC v. Feldman*,
6     504 F.3d 840 (9th Cir. 2007)........................................................... 18, 19

7

*Alexander v. Sandoval*,
      532 U.S. 275 (2001) ............................................................................. 20
8

9

*All. for the Wild Rockies v. Cottrell*,
      632 F.3d 1127 (9th Cir. 2011)............................................................... 17
10

11

*Am. Trucking Ass'ns v. City of Los Angeles*,
      559 F.3d 1046 (9th Cir. 2009)............................................................... 16
12

13

*Ariz. Dream Act Coal. v. Brewer*,
      855 F.3d 957 (9th Cir. 2017)................................................................. 36
14

15

*Associated Press v. Otter*,
      682 F.3d 821 (9th Cir. 2012)................................................................. 38
16

17

*Bd. of Trustees of the State Univ. of NY v. Fox*,
      492 U.S. 469 (1989) ............................................................................. 30
18

19

*Board of Airport Commissioners of City of Los Angeles v. Jews for Jesus, Inc.*,
      482 U.S. 569 (1987) ............................................................................. 29
20

21

*Brunner v. Ohio Republican Party*,
      555 U.S. 5 (2008) ................................................................................. 20
22

23

*Cal. Dep't of Educ. v. Bennett*,
      833 F.2d 827 (9th Cir. 1987)................................................................. 18
24

25

*California v. Azar*,
      911 F.3d 558 (9th Cir. 2018)................................................................. 40
26

27

*California v. Trump*,
      407 F. Supp. 3d 869 (N.D. Cal. 2019) ............................................. 19, 21
28

*Cannon v. Univ. of Chicago*,
      441 U.S. 677 (1979)............................................................................. 20

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Opposition to Motion for Preliminary Injunction
iii

*Caribbean Marine Servs. Co. v. Baldrige*,
   844 F.2d 668 (9th Cir. 1988)................................................................................ 37

*CASA de Maryland, Inc. v. Trump*,
   2020 WL 4664820 (4th Cir. 2020)...................................................................... 40

*Christian Legal Soc. v. Martinez,*
   561 U.S. 661 (2010)............................................................................................ 31

*Citizens United v. FEC*,
   558 U.S. 310 (2010)............................................................................................ 25

*City of Ladue v. Gilleo*,
   512 U.S. 43 (1994).............................................................................................. 31

*Clancy v. OFAC*,
   No. 05-C-580, 2007 WL 1051767 (E.D. Wis. Mar. 31, 2007),
   *aff'd*, 559 F.3d 595 (7th Cir. 2009) ............................................................ 20, 26

*Clark v. City of Seattle*,
   899 F.3d 802 (9th Cir. 2018).............................................................................. 17

*Clay v. Fort Wayne Cmty. Sch.*,
   76 F.3d 873 (7th Cir. 1996)................................................................................ 37

*Conte v. Transglobal Assets*,
   No. 2:12-cv-01005, 2012 WL 4092717 (D. Nev. Sept. 17, 2012)...................... 38

*CSX Transp., Inc. v. Ala. Dep't of Revenue*,
   562 U.S. 277 (2011)............................................................................................ 35

*Ctr. for Biological Diversity v. Trump*,
   No. 1:19-CV-00408 (TNM), 2020 WL 1643657 (D.D.C. Apr. 2, 2020)............... 20

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981)............................................................................................ 15

*DISH Network Corp. v. FCC*,
   653 F.3d 771 (9th Cir. 2011).............................................................................. 17

*Def. Distributed v. U.S. Dep't of State*,
   121 F. Supp. 3d 680 (W.D. Tex. 2015),
   *aff'd*, 838 F.3d 451 (5th Cir. 2016) .................................................................. 32

*Dollar Rent A Car of Wash., Inc. v. Travelers Indem. Co.*,
   774 F.2d 1371 (9th Cir. 1985)............................................................................ 36

*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (9th Cir. 2014) ................................................................. 39

*Elkins v. Am. Honda Motor Co.*,
   No. 19-818-JLS-KES, 2020 WL 4882412 (C.D. Cal. July 20, 2020) ................................ 17, 18

*Escamilla v. M2 Tech.*,
   No. 12-634, 2013 WL 4577538 (E.D. Tex. Aug. 27, 2013) ...................................... 39

*FCC v. Fox. Television Stations, Inc.*,
   567 U.S. 239 (2012) ......................................................................... 22

*Foti v. City of Menlo Park*,
   146 F.3d 629 (9th Cir. 1998) ............................................................... 32

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ......................................................................... 21

*Fulmen Co. v. Office of Foreign Assets Control*,
   No. CV 18-2949 (RJL), 2020 WL 1536341 (D.D.C. Mar. 31, 2020) ............................ 21

*G.K. Ltd. Travel v. City of Lake Oswego*,
   436 F.3d 1064 (9th Cir. 2006) ........................................................ 25, 27, 30, 31

*Gest v. Bradbury*,
   443 F.3d 1177 (9th Cir. 2006) ............................................................... 37

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ...................................................................... 40

*Goldie's Bookstore, Inc. v. Superior Court*,
   739 F.2d 466 (9th Cir. 1984) ............................................................ 37, 38

*Haig v. Agee*,
   453 U.S. 280 (1981) ......................................................................... 26

*Hohe v. Casey*,
   868 F.2d 69 (3d Cir. 1989) .................................................................. 38

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010) ...................................................................... 19, 26, 27

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
   219 F .Supp. 2d 57 (D.D.C. 2002) ........................................................... 39

*Huawei Techs. USA, Inc. v. United States*,
    440 F. Supp. 3d 607 (E.D. Tex. 2020) ................................................................. 7

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
    478 U.S. 221 (1986) ......................................................................................... 19

*King v. Burwell*,
    576 U.S. 473 (2015) ......................................................................................... 34

*Koff v. Ahern*,
    No. 14-cv-04680, 2015 WL 1050167 (N.D. Cal. Mar. 9, 2015) ............................... 36

*Kohn v. State Bar of Cal.*,
    No. 20-CV-04827-PJH, 2020 WL 4701092 (N.D. Cal. Aug. 13, 2020) ...................... 18

*Koller v. Brown*,
    224 F. Supp. 3d 871 (N.D. Cal. 2016) ................................................................. 37

*Kovacs v. Cooper*,
    336 U.S. 77 (1949) ........................................................................................... 31

*Lone Star Sec. & Video, Inc. v. City of Los Angeles*,
    827 F.3d 1192 (9th Cir. 2016).............................................................. 22, 26, 31, 32

*Lorillard Tobacco Co. v. Reilly*,
    533 U.S. 525, (2001) ....................................................................................... 27

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
    634 F.2d 1197 (9th Cir. 1980)............................................................................ 38

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ......................................................................................... 16

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012)............................................................................. 38

*Members of City Council of City of Los Angeles v. Taxpayers for Vincent*,
    466 U.S. 789 (1984) ......................................................................................... 31

*Menotti v. City of Seattle*,
    409 F.3d 1113 (9th Cir. 2005)....................................................................... 25, 30

*Metromedia, Inc. v. City of San Diego*,
    453 U.S. 490 (1981) ......................................................................................... 27

*Milena Ship Mgmt. Co. v. Newcomb*,
    804 F. Supp. 846 (E.D. La. 1992) ............................................................ 39

*Mississippi v. Johnson*,
    71 U.S. 475 (1866) ....................................................................................... 21

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982) ..................................................................................... 21

*OKKO Bus. PE v. Lew*,
    133 F. Supp. 3d 17 (D.D.C. 2015) ............................................................. 27

*One World One Family Now v. City & Cty of Honolulu*,
    76 F.3d 1009 (9th Cir. 1996) ......................................................... 25, 26, 30

*Or. State Police Officers Ass'n v. Peterson*,
    979 F.2d 776 (9th Cir. 1992) ...................................................................... 23

*Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*,
    961 F.3d 1062 (9th Cir. 2020) .................................................................... 26

*Packingham v. North Carolina*,
    137 S. Ct. 1730 (2017) ................................................................................ 28

*Pokorny v. Quixtar Inc.*,
    No. 07-00201 SC, 2007 WL 1932922 (N.D. Cal. June 29, 2007) ........... 40

*Recycle for Change v. City of Oakland*,
    856 F.3d 666 (9th Cir. 2017) ...................................................................... 36

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ............................................................................... 24, 25

*Regan v. Wald*,
    468 U.S. 222 (1984) ............................................................................... 15, 20

*Reno v. Catholic Soc. Servs., Inc.*,
    509 U.S. 43 (1993) ....................................................................................... 17

*RSI Corp. v. Int'l Bus. Machines Corp.*,
    No. C-08-03414 RMW, 2013 WL 1087468 (N.D. Cal. Mar. 13, 2013) .... 40

*Sampson v. Murray*,
    415 U.S. 61 (1974) ....................................................................................... 36

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Opposition to Motion for Preliminary Injunction
vii

*Shady Acres HOA v. Kittitas Cty.*,
    815 F. App'x 181 (9th Cir. 2020) ........................................................ 17, 18

*Sierra Club v. Trump*,
    963 F.3d 874 (9th Cir. 2020) ..................................................................... 22

*Thomas v. Union Carbide Agr. Prod. Co.*,
    473 U.S. 568 (1985) .................................................................................. 17

*Trans Union Corp. v. FTC*,
    267 F.3d 1138 (D.C. Cir. 2001) ................................................................ 28

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ......................................................................... 27, 30

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) ............................................................................ 25, 26

*U.S. Dep't of Labor v. Triplett*,
    494 U.S. 715 (1990) .................................................................................. 19

*United States v. Amirnazmi*,
    645 F.3d 564 (3d Cir. 2011) ............................................................... 23, 35

*United States v. Elcom Ltd.*,
    203 F. Supp. 2d 1111 (N.D. Cal. 2002) ................................................... 28

*United States v. South Carolina*,
    720 F.3d 518 (4th Cir. 2013) .................................................................... 39

*United States v. Spawr Optical Research, Inc.*,
    685 F.2d 1076 (9th Cir. 1982) ............................................................. 19, 20

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) .................................................................................. 36

*Virginian Ry. Co. v. Sys. Fed'n No. 40*,
    300 U.S. 515 (1937) .................................................................................. 39

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ........................................................................... *passim*

*Warsoldier v. Woodford*,
    418 F.3d 989 (9th Cir. 2005) .................................................................... 38

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Opposition to Motion for Preliminary Injunction
viii

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008) ............................................................................ 22

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ............................................................ 38

*Winter v. NRDC*,
    555 U.S. 7 (2008) ........................................................ 16, 36, 37, 39

*Wolfson v. Brammer*,
    616 F.3d 1045 (9th Cir. 2010) ............................................................ 23

*Yates v. United States*,
    574 U.S. 528 (2015) ............................................................................ 35

*Ziglar v. Abbasi*,
    137 S. Ct. 1843 (2017) ........................................................................ 21

**STATUTES**

5 U.S.C. § 704 ...................................................................................... 21

18 U.S.C. § 793 .................................................................................... 35

18 U.S.C. § 794 .................................................................................... 35

42 U.S.C. § 2000bb .............................................................................. 14

50 U.S.C. § 1621 .................................................................................. 16

50 U.S.C. § 1622 ............................................................................ 16, 21

50 U.S.C. § 1641 .................................................................................. 16

50 U.S.C. § 1701 .................................................................................. 15

50 U.S.C. § 1702 ........................................................ 15, 21, 32, 35

50 U.S.C. § 1705 .................................................................................. 23

50 U.S.C. § 1708 .................................................................................. 34

50 U.S.C. § 4305 .................................................................................. 15

Pub. L. No. 94-412, 90 Stat. 1255 (1976) ............................................ 15

Pub. L. No. 115-232, 132 Stat. 1636, 1918 (2018) ................................................ 7

**REGULATIONS**

31 C.F.R. § 560.210 ................................................................................. 35

84 Fed Reg. 65,316 (Nov. 19, 2019) ............................................................ 12

85 Fed. Reg. 29,321 (May 13, 2020) ..................................................... 12, 13

**RULES**

Local R. 7-3 ................................................................................... 40

**UNITED STATES CONSTITUTION**

U.S. Const. Art. I, § 8 ............................................................................. 21

U.S. Const. Art. II, §§ 1-2 ....................................................................... 21

**OTHER AUTHORITIES**

Exec. Order 13,726,
    81 Fed. Reg. 23,559 (Apr. 19, 2016) ...................................................... 23

Exec. Order 13,873,
    84 Fed. Reg. 22,689 (May 15, 2019) .......................................... 2, 11, 12

Exec. Order 13,943,
    85 Fed. Reg. 48,641 (Aug. 6, 2020) ............................................... *passim*

Nat'l Emergencies Act: Hr'gs Before the Subcomm. on Admin. Law and Governmental
Relations, 94th Cong. 27 (March 6, 1975) (statement of Sen. Mathias) ..................... 16

S. Comm. on Gov't Operations & the Special Comm. on Nat'l Emergencies and Delegated
Emergency Powers, 94th Cong., 2d Sess., The NEA Source Book: Legislative History, Texts,
and Other Documents (1976) ...................................................................... 15

S. Rep. No. 94-922 (1976) ....................................................................... 15

S. Rep. No. 95-466 (1977), reprinted in 1977 U.S.C.C.A.N. 4540 ............................ 15

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
DAVID M. MORRELL
Deputy Assistant Attorney General
DIANE KELLEHER
Assistant Branch Director
SERENA M. ORLOFF
MICHAEL DREZNER
STUART J. ROBINSON
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
Ben Franklin Station, P.O. Box No. 883
Washington, DC 20044
Phone: (202) 305-0167
Fax: (202) 616-8470
E-mail: serena.m.orloff@usdoj.gov
*Counsel for Defendants*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| U.S. WECHAT USERS ALLIANCE, *et al.*, | Case No. 3:20-cv-05910-LB |
| Plaintiffs, | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| DONALD J. TRUMP, President of the United States, and WILBUR ROSS, Secretary of Commerce, | Date:   Sept. 17, 2020 Time:  9:30am Place:  San Francisco, CA Judge:  Hon. Laurel Beeler |
| Defendants. | |

## INTRODUCTION

For over a decade, it has been a core priority of both Congress and the Executive Branch to address the growing national security threat stemming from China's activities in the information technology and communications sectors.  This threat has accelerated as the Chinese Government simultaneously imposes its "Great Firewall," blocking hundreds of the most popular media and social networking sites within China, while also deliberately promoting the growth

and exportation of a select few approved Chinese technology companies with ambitions for global dominance.  There is widespread evidence that these rapidly growing Chinese technology firms are not purely private, but in fact are intertwined with the Chinese Communist Party ("CCP").  The close relationships between these firms and the CCP all but ensure the firms' market control within the Chinese diaspora, thereby allowing the Chinese Government unprecedented access to user data, increasingly sophisticated artificial intelligence built on such data, and a growing ability to surveil users, censor content, and spread disinformation.  As these Chinese Government-supported technology and communications firms extend their reach outside of China, the United States Government has determined, based on years of accumulated experience and intelligence, that they now pose a direct threat to the privacy and security of U.S. persons.

The President and Congress have taken numerous steps to respond to this rapidly growing threat.  These include numerous legislative enactments, the issuance of Executive Order 13873 in May of 2019 declaring a national emergency under the International Emergency Economic Powers Act ("IEEPA") and the National Emergency Act ("NEA"), and several initiatives to address vulnerabilities in the country's information and communications technology supply chain.  As part of these efforts, on August 6, 2020, the President issued Executive Order 13943, 85 Fed. Reg. 48,641 (the "Executive Order") to address the threat posed by one mobile application in particular: WeChat, a mobile "SuperApp" created and operated by the Chinese firm Tencent Holdings Ltd. ("Tencent"), one of the world's largest social media companies.  The WeChat app collects vast amounts of user data and permits the People's Republic of China ("PRC") nearly unmitigated ability to surveil its users and engage in disinformation campaigns.

Plaintiffs, a group of WeChat users, have brought this lawsuit challenging the Executive Order under a variety of constitutional and statutory theories.  They now move for a preliminary injunction to prevent the Order from taking effect, but their claims fail on myriad grounds, and their motion should be denied.

First, Plaintiffs cannot show a likelihood of success on the merits because key aspects of this case are not justiciable.  Plaintiffs' theories are largely predicated upon speculation regarding

the scope and likely impact of the Executive Order, but any such claims are not ripe because the Executive Order charged the Secretary of Commerce ("Secretary") with delineating the prohibited transactions by September 20, 2020, and the Secretary has not yet finalized that task. Plaintiffs therefore train their attack on the President's antecedent decision to invoke his emergency powers under IEEPA and the NEA with respect to WeChat, but—as courts have uniformly held—such claims present nonjusticiable political questions; for a court to entertain the kind of challenge Plaintiffs are making here would intrude on the core constitutional authority of the President to make determinations related to foreign policy and the national security of the United States.  And, to the extent Plaintiffs challenge compliance with the parameters set forth under IEEPA and the NEA, those claims fail for the additional reason that Congress expressly declined to confer a private right of action to bring such claims.

When those nonjusticiable claims are peeled away, what is left is Plaintiffs' facial constitutional challenge to the Executive Order itself.  But Plaintiffs have not met, and cannot meet, the exceedingly high standard applicable to such disfavored facial challenges.  Their theory that the Executive Order is unduly vague under the Fifth Amendment fails for the same reasons their claims are not ripe: the task of delineating prohibited transactions under the Order is explicitly entrusted to the Secretary, who has not yet made such determinations.  Nor do Plaintiffs' First Amendment claims hold water.  Even assuming Plaintiffs' speculation as to the potential impacts of the Executive Order were correct, the Executive Order would easily clear the requirements for a content-neutral regulation that incidentally affects the time, place, or manner of certain speech.  The Executive Order plainly serves critical Government interests— the privacy and security of U.S. persons and thus the national security of the United States— while targeting certain transactions related to a single social media application, thereby leaving numerous alternative avenues of communication available.  And Plaintiffs similarly fail to show that the Executive Order is *ultra vires* in light of the highly discretionary and broad authority entrusted to the President to address national emergencies.

Plaintiffs are equally unsuccessful in attempting to meet the final requirements of a preliminary injunction: demonstrating irreparable harm and a favorable balance of the equities.

1    Plaintiffs' allegations of injury fail to establish any non-speculative irreparable harm, as their

2    claims of worry and possible economic injury do not suffice.  The balance of equities also favors

3    the Government, given the well-recognized authority of the President to make sensitive national

4    security and foreign policy decisions.  Indeed, to hold otherwise would allow a group of social

5    media users to substitute their subjective judgment for that of the Executive Branch and enjoin

6    Presidential action on a nationwide basis, merely because they are unable to use an app that they

7    prefer, over the vast range of alternatives open to them.  The Court should accordingly deny

8    Plaintiffs' motion for a preliminary injunction.

9                                          **BACKGROUND**

10   **I.    Factual Background**

11       **A.    Congress and the Executive Branch Identify Chinese Technology Companies
                as a Significant and Growing National Security Threat.**

12           **1.    Early Concerns Regarding Huawei and ZTE**

13           For over a decade, Congress and the Executive Branch have expressed concerns about the

14   growing national security threat stemming from China's activities in the information and

15   communications technology and services sectors.  For instance, in 2010, a bipartisan group of

16   lawmakers wrote to the Chairman of the Federal Communications Commission, requesting

17   information about the security of U.S. telecommunications networks in light of a proposed deal

18   between Sprint, Cricket, Huawei and ZTE.  *See Cong. Leaders Cite Telecommunications*

19   *Concerns With Firms That Have Ties With Chinese Government* (Oct. 19, 2010), Ex. 1.  The

20   letter observed that Huawei and ZTE, two Chinese telecommunications firms with significant

21   ties to the Chinese government, were "aggressively seeking to supply sensitive equipment for

22   U.S. telecommunications infrastructure" and to service U.S. networks.  *Id.* at 1.

23           The following year, the House Permanent Select Committee on Intelligence ("HPSCI")

24   launched a related investigation that, although focused on Huawei and ZTE, was premised on the

25   broader concern that Chinese telecommunications companies with suspected ties to the Chinese

26   government could provide opportunities for espionage for a nation-state already well-known for

27   perpetrating cyber-attacks and espionage against the United States.  *See* HPSCI, Investigative

Rep. on the U.S. Nat'l Sec. Issues Posed by Chinese Telecomms. Cos. Huawei and ZTE (Oct. 8, 2012) ("HPSCI Rep."), at 2-4, Ex. 2.  Such a platform, the Committee explained, could allow China "to exert pressure or control over critical infrastructure on which the country is dependent," or give China access to sensitive governmental and proprietary information, resulting in an "unfair diplomatic or commercial advantage over the United States."  *Id.*  at 3. Moreover, the mere dominance of China-backed firms in the information supply chain presented "a national concern for the United States" in that it could lead to a "lack of market diversity" and dependence on products and platforms supplied by companies beholden to the PRC, a government "already known to be a major perpetrator of cyber espionage."  *Id.* at iv, 2.

At the same time, Congress was receiving similar information from the U.S.-China Economic and Security Review Commission ("U.S.-China Commission") and the Department of Defense ("DoD").  The U.S.-China Commission reported that "[n]ational security concerns have accompanied the dramatic growth of China's telecom sector" and that "large Chinese companies"—particularly those prominent in China's "strategy of overseas expansion—are directly subject to direction by the [CCP], to include support for PRC state policies and goals." Staff of U.S.-China Comm'n, 112th Cong., The Nat'l Sec. Implications of Invs. and Products from the People's Republic of China in the Telecomms. Sector, at 9 (2011) ("2011 USCC Telecomms. Rep."), Ex. 3.  The reports explained that, "[al]though claiming to be private, [such companies] are subject to state influence" and "enjoy favorable government policies that support their development."  U.S.-China Comm'n, 112th Cong., 2011 Rep. to Congress, at 47, Ex. 4. DoD likewise conveyed its assessment that Chinese technology companies "maintain close ties to the [People's Liberation Army]."  Office of the Sec'y of Def., Annual Rep. to Congress: Military and Sec. Devs. Involving the PRC, at 42 (2011) ("2011 DoD Annual Rep."), Ex. 5.

### 2. Increasing Reliance on Mobile Technologies Amplifies the National Security Threat.

Over the following years, intelligence officials across two different administrations continuously and repeatedly concluded that China poses one of the "greatest cyber threats to the United States."  *See* Daniel R. Coats, Dir. of Nat'l Intelligence ("DNI"), Stmt. for the Record:

Worldwide Threat Assessment of the US Intelligence Cmty., at 5 (2018) ("2018 DNI Threat

Assessment"), Ex. 6.  These reports emphasized the heightened threat flowing from China's

strategic insertion and penetration of its companies and products into informational networks and

markets beyond China.  *See* Daniel R. Coats, DNI, Stmt. for the Record: Worldwide Threat

Assessment of the US Intelligence Cmty., at 1 (2017) ("2017 DNI Threat Assessment"), Ex. 7.

In a February 2015 report, the Federal Bureau of Investigations ("FBI") reported that "China

makes no secret that its cyber warfare strategy is predicated on controlling global

communications network infrastructure."  FBI, Counterintelligence Strategic P'ship Intelligence

Note, SPIN: 15-002, at 1 (Feb. 1, 2015) ("2015 FBI Note"), Ex. 8.  The U.S.-China Commission

similarly stated in its 2017 Annual Report to Congress that China's strategic approach involves

domestic companies "achiev[ing] dominant positions in China, and then . . . expanding to

overseas markets."  U.S.-China Comm'n, 115th Cong., 2017 Rep. to Congress, at 165 (Nov.

2017), Ex. 9.  And the strategy was working: "the Chinese Government's potential access to US

business communications is dramatically increasing," with China's intelligence services

"operating as an advanced persistent threat to U.S. networks."  2015 FBI Note, at 1.

Intelligence officials also stressed that U.S. vulnerabilities on this dimension were rapidly

growing due to the expanded use of, and significant advances in, information and

communications technology.  *See* James R. Clapper, DNI, Stmt. for the Record: Worldwide

Threat Assessment of the US Intelligence Ctmy., at 1-4 (Feb. 9, 2016) ("2016 DNI Threat

Assessment"), Ex. 10; 2017 DNI Threat Assessment, at 1-4; 2018 DNI Threat Assessment, at 5-

6.  For example, the 5th Generation of wireless technology, or "5G," promises to increase the

speed and responsiveness of mobile communications, while the number of Internet-connected

devices beyond conventional computers and smartphones is expected to grow exponentially,

leading to a veritable "Internet of Things" ("IoT").  *See* 2017 DNI Threat Assessment at 1-4.

Among other things, the IoT is expected to integrate cyber technologies into "critical

infrastructure in key sectors," meaning that "[c]yber threats pose also an increasing risk to public

health, safety, and prosperity."  *Id.* at 1; *see also* 2016 DNI Threat Assessment, at 1 (explaining

that the incorporation of "[s]mart devices . . . into the electric grid, vehicles—including

autonomous vehicles—and household appliances . . . can threaten data privacy, data integrity, or continuity of services").  At the same time, the inter-connected IoT will include "billions of potentially unsecured" points in our Internet infrastructure, "creat[ing] an incalculably larger exploitation space" for our adversaries.  Nat'l Counterintelligence & Sec. Ctr., Foreign Econ. Espionage in Cyberspace (2018) ("NCSC 2018 Report") at 4, Ex. 11.  In light of these persistent threats and increasing vulnerabilities, the FBI Director stated during a hearing before the Senate Select Committee on Intelligence ("SSCI") that the FBI is "deeply concerned about the risks of allowing any company or entity that is beholden to foreign governments that don't share our values to gain positions of power inside our telecommunications networks."  Open Hearing on Worldwide Threats Before the SSCI, 115th Cong., at 64-65, Ex. 12.

In 2018, DoD described these and similar threats as "the principal priorities for the Department . . . because of the magnitude of the threats they pose to U.S. security and prosperity[.]"  DoD Summary of 2018 National Defense Strategy, at 4, Ex. 13.  DoD explained that "China and Russia are now undermining the international order from within the system by exploiting its benefits while simultaneously undercutting its principles and 'rules of the road.'"  *Id.* at 2.  DoD again observed that the security environment was being "affected by rapid technological advancements" including "'big data' analytics [and] artificial intelligence" and that "[i]t is now undeniable that . . . America is a target, whether from terrorists seeking to attack our citizens; malicious cyber activity against personal, commercial, or government infrastructure; or political and information subversion" leveraging the "increasing digital connectivity of all aspects of life, business, government, and military[.]"  *Id.* at 3.

### 3.     The National Defense Authorization Act of 2018

Congress responded in part to these growing concerns in its defense appropriations bill for fiscal year 2019, which prohibited government agencies and contractors from buying, or contracting with entities that use telecommunications or video surveillance equipment or services produced by ZTE, Huawei, other identified Chinese entities, or any "entity that the Secretary of Defense . . . reasonably believes to be an entity owned or controlled by, or otherwise connected

1  to, the government of [the PRC]."  *See* S. McCain National Defense Authorization Act, Pub. L.

2  No. 115-232 § 889, 132 Stat. 1636, 1918 (2018) (the "NDAA").[1]

3        More broadly, the NDAA declared that "long-term strategic competition with China is a

4  principal priority for the United States that requires the integration of multiple elements of

5  national power . . . to protect and strengthen the national security," and directed the President to

6  assess and formulate strategies to address the threat posed by China, including the CCP's "use of

7  political influence, information operations, censorship and propaganda to undermine democratic

8  institutions," and the "use of economic tools, including market access and investment to gain

9  access to sensitive United States industries."  *Id.* § 1261.  The NDAA required defense and

10  intelligence officials to continue to study and develop procedures for limiting foreign access to

11  technology generally, *see id.* § 885, and to expand the Executive Branch's annual report on

12  military and security developments involving the PRC to specifically address, *inter alia,*

13  "[e]fforts by the [PRC] to influence the media, cultural institutions, business, and academic and

14  policy communities of the United States" and the PRC's use of other "nonmilitary tools" to

15  advance its security and military strategy objectives.  *Id.* § 1260(5).

### B.  Researchers and Government Officials Identify Tencent and WeChat as a Growing Threat.

17        Even as Congress was taking these actions, evidence was emerging that the national

18  
19  security threat from Chinese information technology companies was evolving beyond Huawei

20  and ZTE.  In 2019, the Australian Strategic Policy Initiative ("ASPI"), an independent, non-

21  partisan think tank, published a detailed report on the geostrategic considerations raised by the

22  rapid expansion of Chinese information technology and communications firms.  *See* ASPI,

23  *Mapping China's Technology Giants*, Issue Paper, Report No. 15 (April 2019) ("*Mapping

24  Giants*"), Ex. 14.  The report reiterated that "CCP has made no secret about its intentions to

25  export its vision for the global internet" by "enhancing the 'global influence of internet

26  
27  
28  

[1] *See also Huawei Techs. USA, Inc. v. United States*, 440 F. Supp. 3d 607 (E.D. Tex. 2020) (rejecting legal challenge to section 889).  Congress also enacted a parallel provision to section 889 in its defense appropriations bill for fiscal year 2018.  *See* Pub. L. No. 115-91, § 1656, 131 Stat. 1283, 1761-62 (2017).

companies like Alibaba, Tencent, [and] Baidu'" (as well as Huawei) with an eye towards "'the party's ideas . . . becom[ing] the strongest voice in cyberspace.'"  *Id.* at 3.  The report noted that these companies "are subject to China's increasingly stringent security, intelligence, counter-espionage, and cybersecurity laws," as well as "requirements . . . to host internal [CCP] committees" and "cooperate in and conceal involvement in intelligence work," *id.* at 4, and as a consequence, "[t]he CCP's influence and reach into private companies has increased sharply over the past decade."  *Id.* at 7.  The report identified Tencent as one of a handful of Chinese companies "reported to have the highest proportion of internal CCP party committees within the business sector."  *Id.* at 3.[2]

The report also explained that this increased cooperation between the CCP and private enterprise in China was the "crown jewel" of a highly strategic foreign policy that aims to build "a vast global network of infrastructure" and establish controls over that infrastructure so that "'the [CCP's] ideas always become the strongest voice in cyberspace.'"  *Id.* at 8.  Indeed, Chinese firms have consciously "developed and deployed sophisticated technologies that now underpin the CCP's ability to control and suppress segments of China's population," *id.* at 8, and are "spreading well beyond China's borders."  *Id.* at 9.  The report identified Tencent as one of these Chinese "tech giants," explaining that "WeChat poses significant risks as a channel for the dissemination of propaganda and as a tool of influence among the Chinese diaspora" outside of China.  This risk was exacerbated by the increasing "use[] [of WeChat] by politicians in liberal democracies to communicate with their ethnic Chinese voters" and WeChat's potential "to substantially grow its user base overseas."  *Id.* at 15.  The report also highlighted the app's "potential to facilitate surveillance," noting that Amnesty International gave the company "a score of 0 out of 100 on how well it . . . protect[s] online privacy," and that "[c]ontent that passes through WeChat's servers in China is accessible to Chinese authorities by law."  *Id.*

---

[2] *See also* ASPI, *Technological entanglement, cooperation, competition and the dual-use dilemma in artificial intelligence*, at 7 (June 28, 2018) ("*Technological Entanglement*"), Ex. 16 ("Just about every major tech company, including Baidu, Alibaba, Tencent, Sohu, Sina and NetEase, has a party secretary, who is often a fairly senior figure within the company, and new requirements may even require all listed companies to 'beef up party building.'").

These findings built upon a prior ASPI report, which similarly noted that "[p]rivate companies [in China] are not only sharing users' personal data with the authorities in compliance with China's regulatory environment[,] . . . but many of those companies—including the industry leaders—are building their business model predominantly around the needs of the state." ASPI, *When the winner takes it all, Big data in China and the battle for privacy*, at 3 (Jun. 22, 2018), Ex. 15. This earlier report similarly identified the WeChat "all-in-one superapp" as an example of this phenomenon, explaining that it was the result of Tencent's "open[] and ambitious[]" strategy "to become the fundamental platform for the Chinese internet: a platform 'as vital as the water and electricity resources in daily life.'" *Id.* at 4. The report cautioned that China's strategy of "informatisation"—described as "the process by which the political, social and economic interactions in a society have become networked and digitised—cannot be overstated when analysing China's big data vision, especially in the public security sector." *Id.* at 6.

Echoing these concerns, a March 2019 bulletin published in Japan Times explained that "[i]t has long been understood that Tencent . . . facilitates Chinese government censorship and surveillance," and over the prior year "the scale and significance of this activity have increased . . . both inside and outside China." *See* Sarah Cook, *Worried about Huawei? Take a Closer Look at Tencent*, Japan Times, March 29, 2019, Ex. 17. In particular, the "combination of growing government demands and WeChat's near market saturation in China has increased the scope and impact of its complicity," including through multiple forms of surveillance and "censorship [that] significantly distort the information received by Chinese users on vital topics" and also "may affect Tencent users outside China." *Id.* The author recommended that "[g]overnments and corporations . . . restrict usage of WeChat among their employees" and "[p]oliticians communicating with their Chinese-speaking constitutents should make sure to do so across a diversity of platforms, not just those that are subject to Chinese government control." *Id.*

In November 2019, the U.S.-China Commission released a nearly 600-page report that, among other things, drew similar conclusions about Tencent and WeChat. *See generally* US-China Comm'n, 2019 Report to Congress (Nov. 2019) (the "USCSR 2019 Report"), Ex. 18. The USCSR 2019 Report described WeChat's mobile platform as providing "unparalleled access to

consumer data," positioning the company for its selection by the Chinese government as one of three companies forming a "'National Team' charged with developing [artificial intelligence (AI)] in a range of subdomains." *Id.* at 216-17; *see also id.* at 234, Addendum I (identifying Tencent as one of China's "key companies" for machine learning).[3]  The Report also observed that the WeChat app is a key tool for China's disinformation campaigns, citing as one example Australia's May 2019 election, in which "fake news on WeChat was such a problem that Australia's Labor Party contacted WeChat owner Tencent to express frustration about posts spreading disinformation." *Id.* at 406-07.  The Report cautioned that "use of [WeChat] had spread beyond the Chinese Australian community, with about 3 million Australians using WeChat by 2017," *id.*, and that "almost the entire Mandarin-speaking community in Australia . . . used WeChat," allowing "Beijing [to] 'promote particular issues [as] a way of controlling public debate.'" *Id.* at 407.[4]

## C.  The President Issues Executive Order 13873 and Reports to Congress under the NDAA.

On May 15, 2019, the President issued an Executive Order finding "that foreign adversaries are increasingly creating and exploiting vulnerabilities in information and communications technology and services, which store and communicate vast amounts of sensitive information, facilitate the digital economy, and support critical infrastructure and vital emergency services, in order to commit malicious cyber-enabled actions, including economic and industrial espionage against the United States and its people."  Executive Order 13873, *Securing the Information and Communications Technology and Services Supply Chain*, 84 Fed. Reg. 22689, 22689 (the "ICTS Executive Order").  The President explained "that the unrestricted

---

[3] According to ASPI, "China seeks to take full advantage of the dual-use nature of AI technologies through a national strategy of 'military–civil fusion'" through which China "intends to ensure that advances in AI can be readily turned to dual-use applications to enhance national defence innovation." *Technological entanglement*, at 8, Ex. 16; *see also* ASPI, *An Orwellian future is taking shape in China* (Jan. 8, 2018), Ex. 19 (noting that "Beijing has made no secret of its goal to become the world leader in AI by 2030" and that "[a]lready, the beginnings of a truly Orwellian future in China are taking shape" based upon Tencent's work "with authorities to develop an 'early-warning system' for predicting the size of crowds and their movement").  *See id.* at 2-3.

[4] These concerns regarding WeChat have also been extensively reported in the mainstream press. *See* Ex. 20 (compiling articles of The New York Times, the Wall Street Journal, Lawfare, and National Public Radio, among others).

acquisition or use in the United States of information and communications technology or services . . . supplied by persons owned by, controlled by, or subject to the jurisdiction or direction of foreign adversaries augments the ability of foreign adversaries to create and exploit vulnerabilities in information and communications technology or services, with potentially catastrophic effects, and thereby constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." *Id.*

In light of these findings, the President invoked his authority under the Constitution and the laws of the United States, including IEEPA and the NEA, to declare a national emergency with respect to this threat, and to prohibit transactions with foreign countries or foreign nationals that pose "an undue risk of sabotage to or subversion" of, *inter alia*, the "maintenance of information and communications technology or services in the United States" or "otherwise pose[] an unacceptable risk" to the national security. *Id.* at 22,690. The President directed the Secretary of Commerce, in consultation with other officials, to identify the transactions that pose an undue or unacceptable risk to the national security of the United States, and further instructed the DNI, the Secretary of Homeland Security, and the Secretary of Commerce to continue to assess and report back to him on the threats from foreign adversaries with respect to entities, hardware, software and services, and the actions taken pursuant to the Executive Order. *See id.* at 22,690-92.

Consistent with these directives, on April 9, 2020, the Department of Homeland Security ("DHS") issued an interim report pursuant to the ICTS Executive Order, mapping out the architecture of the ICT framework to assist identification of vulnerabilities. *See* DHS, Cybersecurity and Infrastructure Agency ("CISA"), Exec. Order 13873 Response (Apr. 2020), Ex. 21. ODNI also prepared a classified initial threat assessment. *See* 84 Fed Reg. 65316 (Nov. 19, 2019).

On May 13, 2020, the President renewed the declaration of emergency set forth in the ICTS Executive Order. *See* 85 Fed. Reg. 29,321. Shortly thereafter, on May 20, 2020, he presented a report to Congress, in accordance with the NDAA, outlining a set of broad strategies in relation to the country's foreign policy with China. *See* U.S. Strategic Approach to PRC (May

20, 2020), Ex. 22.  While addressing a wide range of threats emanating from China's open acknowledgment "that it seeks to transform the international order to align with CCP interests and ideology," the report echoed prior concerns about "the PRC National Cyber Security Law, which requires companies to comply with Chinese data localization measures that enable CCP access to foreign data" and other laws that compel Chinese companies "to cooperate with Chinese security services, even when they do business abroad, creating security vulnerabilities for foreign countries and enterprises[.]"  *Id.* at 7.  The report explained that the ICTS Executive Order sought to address this threat by "prevent[ing] certain companies associated with or answering to the intelligence and security apparatus of foreign adversaries from, for example, readily accessing the private and sensitive information of the United States Government, the United States private sector, and individual Americans."  *Id.* at 10-11.

### D.    The President Takes Action Relating to WeChat.

On August 6, 2020, President Trump issued the WeChat Order.  *See* 85 Fed. Reg. 48641 (Aug. 6, 2020).  In it, he stated that "additional steps must be taken to deal with the national emergency . . . declared in [the ICTS Executive Order]" because "the spread in the United States of mobile applications developed and owned by companies in the [PRC] continues to threaten the national security, foreign policy, and economy of the United States."  *Id.* at 48,641.  He further explained that Tencent's WeChat app in particular required action: its practice of "automatically captur[ing] vast swaths of information from its [over one billion] users" through its messaging, social media and electronic payment applications "threatens to allow the [CCP] access to Americans' personal and proprietary information."  *Id.*  The Order cited one research study by the nonprofit Citizen's Lab that had uncovered "a Chinese database containing billions of WeChat messages sent from users in not only China but also the United States, Taiwan, South Korea, and Australia."  *Id.*[5]  It also explained that WeChat "reportedly censors content that the [CCP] deems politically sensitive" and may "be used for disinformation campaigns that benefit

---

[5] *See* Jeffrey Knocket, et al., Citizen's Lab, *We Chat, They Watch*, *How International Users Unwittingly Build up WeChat's Chinese Censorship Apparatus*, at 5 (May 7, 2020) ("*WeChat, They Watch*"), Ex. 23 (finding, *inter alia*, that "[d]ocuments and images transmitted entirely among non-China-registered accounts undergo content surveillance").

1    the [CCP]," factors that had already led other countries, including Australia and India, to take

2    action to limit the use of WeChat in those countries.  *Id.*  The President concluded that the United

3    States, too, "must take aggressive action against [Tencent] to protect our national security."  He

4    thus ordered that, beginning "45 days after the date of this order," *i.e.*, by September 20, 2020,

5    "any transaction that is related to WeChat by any [United States] person, or with respect to any

6    [United States] property . . . with Tencent" shall be prohibited "as identified by the [Secretary]

7    under section 1(c) of this order."  *Id.* § 1(a).  The Order provided that, by September 20, 2020,

8    "the Secretary shall identify the transactions subject to subsection (a) of this section."  *Id.* § 1(c).

9    **II.    This Case**

10          On August 21, 2020, Plaintiffs filed this lawsuit against President Trump and Secretary

11   Ross.  In their complaint, Plaintiffs acknowledge that WeChat is a tool through which the

12   Chinese government engages in "all-pervasive," "dragnet surveillance" of the American

13   population, Compl. ¶ 4, and that the Chinese government has been able to induce what Plaintiffs

14   refer to as "complete[] relian[ce]" on the app, including among state and local entities in the

15   United States.  *See id.* ¶¶ 10, 41.[6]  However, they contend that the President lacks the power to

16   address this threat because other apps are not as convenient as WeChat, lack its "network

17   effects," and cannot be used to communicate within persons in China as effectively.  *See id.* ¶ 12.

18   They claim that the President's decision to designate WeChat as a national security threat and

19   invoke his authority under IEEPA with respect to that threat therefore constitutes a "stark

20   violation of the First Amendment," *id.* ¶ 8, violates the Equal Protection clause, is void for

21   vagueness and lack of notice under the Fifth Amendment, is ultra vires, and violates the

22   Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb(1)(a).  *Id.* ¶¶ 63-108.[7]

23

24

25

26   [6] Indeed, Plaintiffs' assertion that WeChat is akin to the "air" they breathe, Mot. at 4, uncannily
     echoes Tencent's PRC-assisted vow "to become . . . a platform 'as vital as the water and
27   electricity resources in daily life.'"  Ex. 15, at 4.

28   [7] Plaintiffs' motion rests on only some of these claims, and Defendants respond accordingly.

**IEEPA and the NEA**

## I.     The International Emergency Economic Powers Act

For nearly its entire history, the United States has used economic sanctions as a critical means to protect national security and achieve foreign policy goals.  During most of the twentieth century, U.S. sanctions programs were governed by the Trading With the Enemy Act ("TWEA"), which granted the President "broad authority" to "investigate, regulate . . . prevent or prohibit . . . transactions" in times of war or declared national emergencies.  *See* 50 U.S.C. § 4305(b)(1); *see also Dames & Moore v. Regan*, 453 U.S. 654, 672 (1981).

In 1977, Congress enacted IEEPA.  *See* S. Rep. No. 95-466, at 1-2 (1977), reprinted in 1977 U.S.C.C.A.N. 4540, 4541.  IEEPA limited TWEA's application to periods of declared wars, but also extended the President's authority to periods of declared national emergencies. *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984).  Although the broad powers granted to the President under IEEPA are essentially the same as those under TWEA, IEEPA provides authority to exercise those powers during peacetime, "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States," *see* 50 U.S.C. § 1701(a).  Once a national emergency relating to such a threat is declared, IEEPA empowers the President to:

> [R]egulate, direct and compel, nullify, void, prevent or prohibit, any . . . transfer . . . of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . with respect to any property, subject to the jurisdiction of the United States[.]

*Id.* § 1702(a)(1)(B).

## II.    The National Emergencies Act

The NEA, Pub. L. No. 94-412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. §§ 1601-1651), was an effort by Congress to "establish procedural guidelines for the handling of future emergencies with provision for regular Congressional review."  S. Rep. No. 94-922, at 1 (1976).[8]  The statute prescribes rules for Presidential declarations of national emergencies with

---

[8] The NEA was the culmination of a multi-year effort by Congress to examine emergency statutes and procedures.  *See* S. Comm. on Gov't Operations & the Special Comm. on Nat'l Emergencies

respect to statutes "authorizing the exercise, during the period of a national emergency, of any special or extraordinary power." 50 U.S.C. § 1621(a). Congress did not define the term "national emergency" or place any conditions on the President's ability to declare a national emergency. Instead, Congress committed this determination to the President as "it would be wrong to try to circumscribe with words with what conditions a President might be confronted." Nat'l Emergencies Act: Hr'gs Before the Subcomm. on Admin. Law and Governmental Relations, 94th Cong. 27 (March 6, 1975) (statement of Sen. Mathias); *see also id.* at 31 ("[W]e didn't attempt to define it specifically because we were afraid we would circumscribe the President's constitutional powers."); *id.* at 27 (statement of Sen. Church) (similar).

Congress gave itself the exclusive oversight authority over a President's national emergency declaration. For instance, declarations of national emergencies must "immediately be transmitted to the Congress and published in the Federal Register." 50 U.S.C. § 1621(a). The President must comply with extensive congressional reporting requirements pertaining to that declaration. *Id.* § 1641(a)-(c). Congress may terminate a national emergency through a joint resolution that is subject to fast track procedures, and Congress must meet "[n]ot later than six months after a national emergency is declared, and [every six months thereafter]," to consider whether the emergency shall be terminated. *Id.* § 1622(a)-(c).

## DISCUSSION

### I.   Legal Standard

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted). A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (citation omitted). A "possibility" of irreparable harm is insufficient; irreparable harm

and Delegated Emergency Powers, 94th Cong., 2d Sess., The NEA Source Book: Legislative History, Texts, and Other Documents, at 3-9 (1976) (hereinafter "NEA Source Book").

1   must be *likely* absent an injunction.  *Id.*; *see also Winter v. NRDC*, 555 U.S. 7, 22 (2008).

2   Alternatively, "'serious questions going to the merits' and a balance of hardships that tips

3   sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the

4   plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the

5   public interest."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

6   Plaintiffs bear the burden of demonstrating that each of these four factors is met.  *DISH Network*

7   *Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011).  They fail to meet that burden.

8   **II.     Plaintiffs Are Unlikely To Succeed on the Merits of Their Claims.**

9              **A.     Core Aspects of this Dispute Are Not Justiciable.**

10             As a threshold matter, Plaintiffs are unlikely to succeed on the merits because their

11  claims are not justiciable.  Several claims require the Court to speculate about the likely scope

12  and implementation of the Order, and those claims are not ripe.  Others ask the Court to review

13  the propriety of the President's national emergency determinations, presenting quintessential

14  "political questions."  And to the extent Plaintiffs challenge the President's compliance with

15  IEEPA and the NEA, they lack a private right of action to do so.

16             **1.     Plaintiffs' Claims Regarding the Scope of Action to Be Taken Under the Executive Order Are Not Ripe.**

17

18             Ripeness is a justiciability requirement through which courts seek to avoid premature

19  litigation of disputes.  *See Thomas v. Union Carbide Agr. Prod. Co.*, 473 U.S. 568, 579-81

20  (1985).  The doctrine has both constitutional and prudential components, the former "drawn . . .

21  from Article III limitations on judicial power" and the latter "from prudential reasons for

22  refusing to exercise jurisdiction."  *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18

23  (1993).  The components are independent, so that a court may conclude that a claim is ripe "'in

24  the constitutional sense'" but is nevertheless prudentially unripe and unfit for review.  *Elkins v.*

25  *Am. Honda Motor Co.*, No. 19-818-JLS-KES, 2020 WL 4882412, at *5 (C.D. Cal. July 20,

26  2020) (citation omitted); *see also Shady Acres HOA v. Kittitas Cty.*, 815 F. App'x 181, 182 (9th

27  Cir. 2020) ("'prematurity and abstractness' present 'insuperable obstacles' to judicial review

28

even where "jurisdiction is technically present'" (citation omitted)).[9]  The prudential ripeness inquiry requires a court to evaluate two factors: first, "the fitness of the issues for judicial decision," and second "the hardship to the parties of withholding court consideration." *Shady Acres*, 815 F. App'x at 182 (citation omitted).  Plaintiffs' claims do not satisfy either factor.

First, Plaintiffs' claims, though nominally facial, are premised on speculation regarding the scope and impact of the Executive Order.  *See* Mot. at 17-33 (overbreadth, vagueness, and ultra vires theories).  Those claims are not fit for review because the Secretary has not yet issued any "final . . . word" on which transactions will be prohibited.  *Cal. Dep't of Educ. v. Bennett*, 833 F.2d 827, 833 (9th Cir. 1987).  Judicial review at this juncture would therefore "interfere with the [Government's] decision making process."  *Id.*  And because the Secretary has not yet acted, adjudicating Plaintiffs' claims would require speculation about how the Order will be implemented and thus entangle the court "'in abstract disagreements over administrative policies'" before a "'decision has been formalized and its effects felt in a concrete way by the challenging parties.'"  *Id.* (citation omitted).

Plaintiffs also have not demonstrated any hardship from awaiting a decision by the Secretary before adjudicating their claims.  The Secretary's decision is expected within three days of the Court's hearing on Plaintiffs' motion, and although Plaintiffs claim in the meantime to be searching for alternatives, those alleged efforts have already been expended, *see infra* at 37, and are unlikely to be materially increased by waiting a few days for the Secretary to issue his decision.

Finally, although Plaintiffs invoke the relaxed ripeness standard for preenforcement challenges under the First Amendment, even "a party bringing [such a] challenge must . . . present a 'concrete factual situation . . . to delineate the boundaries of what conduct the government may or may not regulate without running afoul' of the Constitution."  *Alaska Right*

---

[9] The Supreme Court has suggested that the prudential ripeness doctrine may be in tension with "a federal court's obligation to hear and decide" cases within its jurisdiction. *Clark v. City of Seattle*, 899 F.3d 802, 809 n.4 (9th Cir. 2018) (citation omitted).  However, the Court has not overruled the doctrine, *see id.*, and courts in this Circuit have continued to apply it.  *See, e.g.*, *Kohn v. State Bar of Cal.*, No. 20-CV-04827-PJH, 2020 WL 4701092, at *4 (N.D. Cal. Aug. 13, 2020) (dismissing for lack of prudential ripeness); *Elkins*, 2020 WL 4882412, at *5 (same).

*to Life PAC v. Feldman*, 504 F.3d 840, 849-50 (9th Cir. 2007).  Therefore, the Court could proceed to the merits "only upon a showing that [Plaintiffs are] '*immediately* in danger of sustaining a direct injury as a result of" the Executive Order.  *Id.* at 851-52 (emphasis added, punctuation omitted).  Yet there is no such "immediate" danger because the Secretary has not yet defined the scope of the Executive Order, and no such criminal or civil enforcement could take place until he does so.  Indeed, Plaintiffs' claims are not pre-enforcement suits at all; rather, they seek judicial intervention before the Secretary has even defined the relevant prohibitions that could give rise to enforcement.  Plaintiffs cite no case suggesting that such judicial interference with an agency's pending deliberative process is ever warranted, much less that it would be appropriate in a context "implicat[ing] [the] sensitive and weighty interests of national security and foreign affairs."  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010); *see also U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 723 (1990) (noting "the presumption of regularity and constitutionality" to which government action is entitled).[10]

###       2.       Plaintiffs' Challenges to the President's National Security Determinations Are Not Justiciable.

Because the Secretary has not yet taken action to implement the WeChat Order, Plaintiffs have focused their attack on the Executive Order itself, asserting that "there is no *bona fide* national security concern regarding WeChat," Mot. at 3; and that, if there is, invocation of IEEPA "is not a proportionate or appropriate response," *id.* at 25.  *See also id.* at 12-14, 26-29.  Those claims, however, are not justiciable: "there is no precedent for a court overriding a President's discretionary judgment as to what is and is not an emergency"; to the contrary, "the Ninth Circuit has characterized 'the declaration or continuance of a national emergency' as an 'essentially political question.'"  *California v. Trump*, 407 F. Supp. 3d 869, 890-91 (N.D. Cal. 2019) (citing *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986); *United*

---

[10] Relying on speculation to invalidate the Executive Order would be especially improper in light of the Order's statement that it applies except as "provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order."  Exec. Order § 1(b).  *Cf. Alaska Right to Life PAC*, 504 F.3d at 849-50 (claims not fit for review where state court had stated that challenged law "should be interpreted in a manner that does not infringe First Amendment rights").

States v. Spawr Optical Research, Inc., 685 F.2d 1076, 1080-81 (9th Cir. 1982)).  Thus, "whether [a] national emergency truly exists" in respect to WeChat or requires invocation of the President's powers under IEEPA are "nonjusticiable political questions."  Id.[11]  The Court should reject Plaintiffs' unsupported invitation to second guess the President's national security determinations.

### 3.   Plaintiffs Lack a Cause of Action to Challenge the President's Compliance with IEEPA and the NEA.

Similarly, insofar as Plaintiffs' arguments arise from the President's alleged lack of compliance with the NEA and IEEPA, those statutes contain no private right of action.  "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress."  Alexander v. Sandoval, 532 U.S. 275, 286 (2001).  Where the necessary intent is absent, "a cause of action does not exist and courts may not create one."  Id. at 286-87.

The NEA and IEEPA—which as noted above, confer highly discretionary authority upon the President to act quickly and decisively to address threats to the United States—have no provision creating a private right of action for individuals purportedly affected by the President's national emergency declaration.  Those statutes do not contain the sort of "rights-creating language" that courts find "critical" to imputing to Congress an intent to create a private right of action.  Id. at 288-89 (distinguishing between the rights-creating language, "[n]o person . . . shall . . . be subjected to discrimination," and its antithesis, "[e]ach Federal department and agency . . . is authorized and directed to effectuate the provisions of [the statute]"); see also Brunner v. Ohio Republican Party, 555 U.S. 5 (2008) (per curiam).  Because the NEA and IEEPA do not "explicitly confer[] [any] right directly on" individuals affected by an IEEPA Executive Order, see Cannon v. Univ. of Chicago, 441 U.S. 677, 690 n.13 (1979), but instead contain provisions

---

[11] See also, e.g., Ctr. for Biological Diversity v. Trump, No. 1:19-CV-00408 (TNM), 2020 WL 1643657, at *10 (D.D.C. Apr. 2, 2020) ("Although presidential declarations of emergencies . . . have been at issue in many cases, no court has ever reviewed the merits of such a declaration," in part because matters of "foreign policy and national security are rarely proper subjects for judicial intervention"); Clancy v. OFAC, No. 05-C-580, 2007 WL 1051767, at *6 (E.D. Wis. Mar. 31, 2007), aff'd, 559 F.3d 595 (7th Cir. 2009) (national security determinations under IEEPA are "'so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference'" (quoting Regan, 468 U.S. at 242)).

1  that are at most "phrased as a directive" to the Executive Branch, *see Sandoval*, 532 U.S. at 289,

2  no private cause of action exists to enforce the provisions cited by Plaintiffs.

3       This understanding is buttressed by the constitutional context in which Congress

4  legislated. "National-security policy is the prerogative of the Congress and President." *Ziglar v.*

5  *Abbasi*, 137 S. Ct. 1843, 1861 (2017) (citing U.S. Const. Art. I, § 8; Art. II, §§ 1-2).

6  Accordingly, "[j]udicial inquiry into the national-security realm raises 'concerns for the

7  separation of powers in trenching on matters committed to the other branches.'" *Id.* (citation

8  omitted). Nothing in the NEA or IEEPA suggests an intent by Congress to invert the

9  constitutional order by permitting an injunction of an Executive Order that addresses a national

10  security threat, based solely on a third party's complaints, particularly where Congress *itself* has

11  not exercised its authority to terminate the relevant declaration, *see* 50 U.S.C. § 1622(a)(1). *Cf.*

12  *California*, 407 F. Supp. 3d at 891 ("Congress thus has the authority to monitor and if needed,

13  reverse, the President's determination[.]"). In fact, the text of IEEPA demonstrates just the

14  opposite, making clear that a provision permitting judicial access to classified materials "does

15  not confer or imply any right to judicial review." 50 U.S.C. § 1702(c).[12]

16       Plaintiffs cannot compensate for these deficiencies by characterizing their claim as *ultra*

17  *vires* conduct by the President. *See* Mot. at 33-34. Separation-of-powers concerns mandate that

18  an "express statement by Congress" is required before even a generally available cause of action

19  may be extended specifically to challenge an action of the President. *See Franklin v.*

20  *Massachusetts*, 505 U.S. 788, 801 (1992); *Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27 (1982).

21  Indeed, no equitable relief, let alone the preliminary equitable relief at issue here, is available

22  against the President in his official capacity because federal courts have "no jurisdiction . . . to

23  enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S.

24  475, 501 (1866); *see Franklin*, 505 U.S. at 802-03, 806 (plurality op.); *id.* at 827 (Scalia, J.,

25  concurring in part and concurring in the judgment) ("apparently unbroken historical tradition

---

[12] IEEPA thus assumes that, to the extent judicial review occurs, it is premised on an independent basis, such as in criminal proceedings or when a plaintiff invokes the Administrative Procedure Act ("APA"), 5 U.S.C. § 704, to challenge an agency action blocking the plaintiff's assets. *See, e.g., Fulmen Co. v. Office of Foreign Assets Control*, No. CV 18-2949 (RJL), 2020 WL 1536341, at *6 n.2 (D.D.C. Mar. 31, 2020). NEA and IEEPA do not provide their own source of relief.

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Opposition to Motion for Preliminary Injunction

supports the view" that courts may not order the President to "perform particular executive …

acts"). Accordingly, there is no basis for the Court to conclude that the President is subject to an

implied cause of action in equity when, as here, there is neither historical precedent nor express

congressional language supporting Plaintiffs' claims. *See also Sierra Club v. Trump*, 963 F.3d

874, 891 (9th Cir. 2020) ("Whether [a plaintiff] can assert an equitable ultra vires cause of action

turns on 'whether the relief [it] request[s] . . . was traditionally accorded by courts of equity.'").

### B.   Any Remaining Claims Fail Because Plaintiffs Cannot Show that the WeChat Order Is Unlawful in Every Conceivable Application.

As to any justiciable claims, Plaintiffs are unlikely to succeed because they cannot meet

the high bar applicable to facial constitutional challenges. Such challenges are disfavored for

numerous reasons: they "often rest on speculation" and thus "raise the risk of 'premature

interpretation . . . on the basis of factually barebones records.'" *Wash. State Grange v. Wash.

State Republican Party*, 552 U.S. 442, 449-51 (2008) (citation omitted). And they "run contrary

to the fundamental principle of judicial restraint that courts should neither 'anticipate a question

of constitutional law in advance of the necessity of deciding it' nor 'formulate a rule of

constitutional law broader than is required by the precise facts to which it is to be applied.'" *Id.*

at 450 (citation omitted). Accordingly, the Court can invalidate the Executive Order only if

Plaintiffs show that it is "'unconstitutional in every conceivable application,' or . . . 'seek[s] to

prohibit such a broad range of protected conduct that [it is] unconstitutionally overbroad.'" *Lone

Star Sec. & Video, Inc. v. City of Los Angeles*, 827 F.3d 1192, 1197 (9th Cir. 2016) (citations

omitted). As set forth below, they cannot.

### 1.   Plaintiffs Are Not Likely to Succeed on Their Vagueness Claims.

Plaintiffs first contend that the Executive Order is unconstitutionally vague under the

Fifth Amendment because it does not define the prohibited "transaction[s]," Mot. at 17, so that

people "'of common intelligence must necessarily guess at its meaning.'" *Id.* at 17, 18 (citing

*FCC v. Fox. Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Plaintiffs need not guess at the

meaning of the Order, however, because under its express terms, "the *Secretary shall identify the

[prohibited] transactions*." Exec. Order § 1(c) (emphasis added). Plaintiffs or other WeChat

users thus could not reasonably fear prosecution, or be chilled from using WeChat, until he does so.  *Cf. Wolfson v. Brammer*, 616 F.3d 1045, 1062-63 (9th Cir. 2010) (plaintiff's fear must be "*plausible* and *reasonable*" and "*imminent*," not merely that a law "might [later] be construed in a particular manner"); *see also id.* at 1057 ("Without a possibility of the challenged canons being enforced, those canons will [not] have a chilling effect on speech.").[13]  Nor are Plaintiffs correct to suggest that the Court should evaluate the clarity of the Order, standing alone, because "[t]he EO will become effective on September 20, 2020 regardless of whether the Secretary . . . issues any clarifying regulations before that date."  Mot. at 19.  The Order is not self-executing: it prohibits only those transactions that are "identified by the [Secretary] under section 1(c) of this order."  Exec. Order § 1(a).[14]

Plaintiffs' related concerns about selective and discriminatory enforcement fail for the same reason: there can be no enforcement before the Secretary identifies the relevant transactions, and the Court plainly cannot assume that the Secretary's as-yet-to-be-issued decision will lack the requisite clarity.  *See Or. State Police Officers Ass'n v. Peterson*, 979 F.2d 776, 778 (9th Cir. 1992) (courts do not "assume as a matter of course that . . . units of government will violate the law" or that "other contingencies will occur" (citations omitted)).  All of Plaintiffs' cited cases regarding vague criminal statutes, city ordinances, and final agency policies involved laws and regulations that were already enforceable (and in several cases, had actually been enforced), not Executive Orders directing further administrative action before taking effect.  *See* Mot. at 18 (citing cases).  Indeed, Plaintiffs' decision to bring this lawsuit

---

[13] Plaintiffs' due process theory also fails in light of IEEPA's scienter requirements for criminal liability.  *See United States v. Amirnazmi*, 645 F.3d 564, 589-90 (3d Cir. 2011) (rejecting vagueness challenge to IEEPA regulation because "'this is a case where ignorance of the law *is* a defense'"); 50 U.S.C. § 1705(c) (restricting criminal liability to those who act "willfully").

[14] This framework is not unique; IEEPA orders commonly identify broad subject matter of concern while delegating the details of implementation and enforcement to one or more administrative agencies.  *See, e.g.*, Exec. Order 13726, *Blocking Propery and Suspending Entry Into the United States of Persons Contributing to the Situation in Libya*, 81 Fed. Reg. 23559 § 1(a)(i) (Apr. 19, 2016) (charging the Secretary of the Treasury with determing which persons are "responsible for . . . actions or policies that threaten the peace, security, or stability of Libya"); *id.* § 8 (delegating further functions).

1  before the Secretary takes final action is why they can even complain of inadequate guidance, a

2  fact that evinces not a due process violation, but an unripe claim, *see supra* at 17-19.

### 2. Plaintiffs Are Not Likely to Succeed on Their First Amendment Claims.

#### a. The Executive Order Is Content Neutral So Strict Scrutiny Does Not Apply.

The Executive Order does not target protected expression; it targets transactions with
Tencent relating to WeChat.  While the Order's implementation may incidentally impact speech
that would otherwise occur on WeChat, any such effects are neutral with respect to content, and
will affect, at most, only the time, place, or manner of speech.  Thus, the Order need not satisfy
strict scrutiny or "be the least restrictive or least intrusive means" of promoting a governmental
interest; it must simply "promote[] a substantial government interest that would be achieved less
effectively" in its absence.  *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989).[15]

Seeking to evade this more permissive standard, Plaintiffs try to pigeonhole the
Executive Order as a content-based restriction on speech.  The Court should reject this effort.  A
speech restriction is content-based if it facially "draws distinctions based on the message a
speaker conveys . . . .  [or] cannot be justified without reference to the content of the regulated
speech, or [if it was] adopted by the government because of disagreement with the message the
speech conveys[.]"  *Reed*, 576 U.S. at 163-64 (cleaned up).  None of these circumstances is
present here.  No distinctions based on content appear on the face of the Executive Order, and
the justifications of the Order have nothing to do with the content of, or disagreement with, any
speech made on WeChat, but rather are premised on the PRC's ability to use the app against core
national security interests of the United States.  Exec. Order, 85 Fed. Reg. at 48641; *see also*
U.S. Strategic Approach to PRC at 5, Ex. 22 ("Beijing has intervened in sovereign nations'
internal affairs to engineer consent for its policies.").  Indeed, Plaintiffs concede that the
Executive Order affects expression "*irrespective of content or the speaker's intent*[.]"  Mot. at 2
(emphasis added).

---

[15] By contrast, a restriction that distinguishes based on the content of speech is subject to the
demanding standard of strict scrutiny.  S*ee Reed v. Town of Gilbert*, 576 U.S. 155, 166 (2015).

1    Plaintiffs reason that any limitation on the use of WeChat may disproportionately affect

2  Chinese-Americans, and thus contend that the Order discriminates on the basis of "national

3  origin," and is a content-based curb on speech.  Mot. at 30.  But the fact that a speaker is

4  Chinese-American reveals nothing about the content of the speech.  Plaintiffs present no

5  evidence or allegations that the Executive Order was prompted by discrimination against specific

6  "ideas [the President] disfavors," *One World One Family Now v. City & Cty of Honolulu*, 76

7  F.3d 1009, 1012 n.5 (9th Cir. 1996), or otherwise aims to "single[] out specific subject matter for

8  differential treatment." *Reed*, 576 U.S. at 156.  Instead, as Plaintiffs recognize, by potentially

9  limiting the use of WeChat, the Order may incidentally affect the manner in which users may

10  speak, but these effects apply "irrespective of content or the speaker's intent[.]"  Mot. at 2.

11  Plaintiffs are free to speak on alternative platforms that do not pose a national security threat.

12  Indeed, as the President made clear in his May 2020 report to Congress setting forth the

13  Administration's strategic approach to China, "United States has a deep and abiding respect for

14  the Chinese people," confirming that speech is encouraged.  Ex. 22, U.S. Strategic Approach to

15  PRC at 1; *see also, e.g.*, *id.* ("We do not seek . . . to disengage from the Chinese people").

16    Nor is the content-neutral status of an Executive Order altered simply because it may

17  affect some speakers disproportionately.[16]  A regulation remains content neutral "even if it has

18  an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791-92;

19  *see also G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1077 (9th Cir. 2006) ("That the

20  law affects plaintiffs more than other speakers does not, in itself, make the law content based.");

21  *Menotti v. City of Seattle*, 409 F.3d 1113, 1129 (9th Cir. 2005) ("That Order No. 3 predominantly

22  affected protestors with anti-WTO views did not render it content based.").  Instead, regulations

23  that affect certain speakers disproportionately "demand strict scrutiny [only] when they reflect

24  the Government's preference for the substance of what the favored speakers have to say (or

25  aversion to what the disfavored speakers have to say)." *Turner Broad. Sys., Inc. v. FCC*, 512

---

26  [16] Plaintiffs' reliance on *Citizens United v. FEC*, 558 U.S. 310, 341 (2010) is misplaced. There,
27  the Court explained that the Government may not "identif[y] certain preferred speakers," such as
   in a statute which facially barred corporations from political speech. *See id.* at 340.  The
28  Executive Order does not identify any preferred speakers.

U.S. 622, 658 (1994).  In other words, strict scrutiny applies to speaker-based laws when they function as a proxy for content discrimination.  That is not the case here.

### b.   The Executive Order Satisfies Intermediate Scrutiny.

A content-neutral regulation survives constitutional scrutiny so long as it "advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests."  *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1068 (9th Cir. 2020) (citation omitted).  As a component of this analysis, courts also examine whether the regulation "leave[s] open adequate alternative opportunities" for speech or expression.  *See Lone Star Sec. & Video*, 827 F.3d at 1202.  The Executive Order satisfies each of these requirements.

### i.   The Executive Order Advances Important Government Interests.

The Executive Order is founded on Government interests of paramount importance: preventing the Chinese Government from using WeChat to surveil the American people, censor information, sow misinformation, and collect and use "vast swaths" of personal and proprietary information from American users to advance its own interests.  *See* 85 Fed. Reg. at 48641.  Such "sensitive and weighty interests of national security and foreign affairs" constitute critically important Government interests for purposes of a First Amendment analysis.  *Humanitarian Law Project*, 561 U.S. at 33-34; *see also Clancy*, 2007 WL 1051767, at *6 (noting that IEEPA sanctions "relate[] to national security, the most compelling governmental interest") (citing *Haig v. Agee*, 453 U.S. 280, 307 (1981)).[17]

Plaintiffs suggest that the Order does not provide sufficient "evidence" of this threat to satisfy the Constitution.  Mot. at 26.  That is incorrect.  "[W]hen the President adopts 'a preventive measure . . .  in the context of international affairs and national security,' he is 'not required to conclusively link all of the pieces in the puzzle before [courts] grant weight to [his]

---

[17] Restrictions on speech are frequently justified by far less weighty interests.  *See, e.g.*, *Turner Broad. Sys.*, 512 U.S. at 647 ("protecting noncable households from loss of regular television broadcasting service" was an "important and substantial federal interest"); *One World One Family Now*, 76 F.3d at 1013 (same as to "visual blight caused by unsightly vendor stands").

empirical conclusions.'"  *Trump v. Hawaii*, 138 S. Ct. 2392, 2409 (2018) (quoting *Humanitarian Law Project*, 561 U.S. at 35); *see also OKKO Bus. PE v. Lew,* 133 F. Supp. 3d 17, 28 (D.D.C. 2015) (whether Government action was an "effective strategy" in fulfilling certain "foreign policy objectives . . . is not a question for this Court").[18]  And Plaintiffs offer no basis to doubt the national security concerns outlined in the Executive Order, which find broad support in publicly available reporting by Congress, the Executive Branch, and private security researchers. *See supra* at 8-9 (explaining that Tencent houses multiple Communist Party "committees," creating an "obvious potential to facilitate surveillance") (quoting *Mapping Giants*); *id.* at 13 n.5 ("[d]ocuments and images transmitted entirely among non-China registered accounts undergo content surveillance") (quoting *WeChat, They Watch*); *id.* at 10 (noting how "industry leaders" like WeChat are "building their business model predominantly round the needs of the state") (quoting *Big Data in China*).

While the scope of the Secretary's actions are still unknown, it is plain that barring certain transactions related to WeChat would likely limit the company's ability to collect certain data of American users and thus reduce the risk that such data will be exploited by the Chinese government.  In light of this overwhelming evidence, and common sense, and certainly pursuant to the deferential standard of review afforded to the Government in these circumstances, the Executive Order plainly advances an important Government interest.

        ii.      **The Executive Order Does Not Burden Substantially More Speech Than Necessary.**

The Executive Order also satisfies the applicable tailoring standard by "promot[ing] a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799.  In other words, "[s]o long as the means chosen are not substantially

---

[18] Even outside of the national security context, courts "generally defer" to the Government in "determining whether the government's ends are advanced by a regulation."  *G.K. Ltd. Travel*, 436 F.3d at 1073.  Applying such deference, the Supreme Court has upheld speech restrictions when they are justified in numerous ways, such as with "studies and anecdotes[,]" and through "history, consensus, and 'simple common sense.'"  *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (quotation omitted); *see also Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 508-09 (1981) (noting that even in the face of a "meager record," the Court "hesitate[d] to disagree with the accumulated, common-sense judgments of local lawmakers").

broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 800.

Here, a central purpose expressed in the Executive Order is to prevent WeChat from collecting Americans' personal and proprietary information so that such information will not flow to the Chinese Government. *See* 85 Fed. Reg. at 48,641. As Plaintiffs concede, use of the app necessarily entails such collection. Compl. ¶¶ 4-5. Thus, preventing or limiting transactions relating to WeChat in an effort to address the identified national security concerns would advance the purposes expressed in the Executive Order by reducing the data collected by the application without "sweep[ing]" more "broadly [than] necessary to accomplish its goal." *Trans Union Corp. v. FTC*, 267 F.3d 1138, 1143 (D.C. Cir. 2001) (upholding restriction on disseminating certain personal information where "[a] narrower restriction would immediately lead to increased disclosure of such information"); *see also United States v. Elcom Ltd.*, 203 F. Supp. 2d 1111, 1132 (N.D. Cal. 2002) (upholding ban on electronic tools that could be used to circumvent copyright protection, and finding that "because tools that circumvent copyright protection measures for the purpose of allowing fair use can also be used to enable infringement, it is reasonably necessary to ban the sale of all circumvention tools").

Plaintiffs incorrectly analogize the Executive Order to the state law at issue in *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017). That law barred convicted sex offenders from accessing *any* "commercial social networking web site," which encompassed not only every "commonplace social media website" like Facebook, LinkedIn, and Twitter, *id.* at 1737, but also potentially "[m]any news websites," "health-related resources" like WebMD, and even e-commerce sites like Amazon.com. *Id.* at 1739; *see also id.* at 1741-42 (Alito, J., concurring) (remarking on the law's "staggering reach" and "extraordinary breadth"). The consequence of this broad prohibition, the Court held, was to "foreclos[e] access to social media altogether." *Id.* at 1737. The Executive Order does no such thing. It relates to a single mobile application, among a range of commonly used and available alternatives. Although Plaintiffs may not prefer these alternatives, those preferences do not transform WeChat into "the Internet," as Plaintiffs

suggest, Mot. at 16.[19]  Indeed, many of the features that cause Plaintiffs to describe WeChat as "irreplaceable," and its alternatives as inadequate, flow not from the Executive Order, but from what the *Chinese Government* has done to stringently monitor and restrict communications within the country.  *See, e.g.,* Paige Leskin, *Here are all the major US tech companies blocked behind China's 'Great Firewall'*, Business Insider (Oct. 10, 2019), Ex. 24.  The Court may not lay blame for those policies at the President's feet.

Nor is this case analogous to *Board of Airport Commissioners of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987).  The Court there found a prohibition at Los Angeles International Airport unconstitutional because it did not "merely regulate expressive activity . . . that might create problems" for the airport, "such as congestion or the disruption of . . . activities," *id.* at 574, but instead banned *all* "First Amendment activities."  *Id.* at 571.  The Executive Order, by contrast, is not targeted at expressive activities, and as explained above, a central problem identified by the Executive Order is that Americans' data will be collected by WeChat and thus subject to access and use by the Chinese Government.  The Order is thus no broader than necessary to protect Americans' privacy and security.

Plaintiffs also suggest that other, less speech-restrictive measures, such as a ban on unauthorized data transfers or a "public information campaign," should have been taken in lieu of the Executive Order.  Mot. at 27.  Entertaining this argument would require the Court either to review the President's decision to invoke his authority under IEEPA or to speculate regarding the likely implementation of the Order by the Secretary, neither of which are justiciable.  But even if the Court assumes that the transactions ultimately identified by the Secretary will prevent the use of WeChat in the United States, Plaintiffs fail to show that such an outcome would be improperly tailored to the important national security interests here.  Indeed, Plaintiffs contend that WeChat is "irreplaceable," Mot. at 24; if users believe that to be the case, voluntary measures like an awareness campaign would be unlikely to reduce reliance on the app, and thus would not address the national security threat to the same extent as any prohibitions authorized by the Executive

---

[19] In any event, it cannot be disputed that the Government would have an interest of the highest order in preventing the PRC from controlling "the Internet."

1    Order.  *See G.K. Ltd. Travel*, 436 F.3d at 1074 (holding that enacting a "sever[e]" limitation on

2    signs in a community, "directly serves the City's purposes").  Moreover, such a campaign would

3    likely be unworkable, given the secrecy surrounding Tencent's activities and their relationship to

4    the CCP.  *See WeChat, They Watch* at 6, Ex. 23 (explaining that Tencent does not disclose their

5    surveillance practices and rationale, even though private investigation revealed that "documents

6    and images shared among non-China-registered accounts are subject to content surveillance").

7    Nor do Plaintiffs explain how a prohibition on "data transfers or surveillance" could be tailored

8    or enforced with respect to a foreign owned and operated enterprise, which not only has

9    "unparalleled access to consumer data," USCSR 2019 Report at 216, Ex. 18, but is intertwined

10   with the aims and apparatus of the Chinese Government.  *See Mapping Giants* at 9, Ex. 14.

11            Even if such alternative measures were theoretically available, "[a] reasonable time, place

12   and manner regulation . . . need not be the 'least restrictive or least intrusive' alternative."  *One*

13   *World One Family Now*, 76 F.3d at 1014; *see also Menotti*, 409 F.3d at 1137 ("the least

14   restrictive means of achieving the City's goal . . . is not what Supreme Court precedent

15   requires").  Rather, narrow tailoring in this context requires only that "the regulation not burden

16   substantially more speech than is necessary," the Government's assessment of which courts are

17   "loath to second-guess."  *See Bd. of Trustees of the State Univ. of NY v. Fox*, 492 U.S. 469, 478

18   (1989).  This deference is even greater where the President acts in furtherance of the security and

19   foreign policy goals of the United States.  *See Hawaii*, 138 S. Ct. at 2421-22 ("[W]e cannot

20   substitute our own assessment for the Executive's predictive judgments on [national security]

21   matters"); *Al Haramain Islamic Found. v. U.S. Dep't of Treasury*, 686 F.3d 965, 980 (9th Cir.

22   2012) ("We owe unique deference to the executive branch's determination that we face 'an

23   unusual and extraordinary threat to the national security' of the United States.").  Certainly under

24   this deferential standard, Plaintiffs fail to show that the Executive Order bars substantially more

25   speech than necessary to achieve the Government's important interests.

26                            iii.        **Ample Avenues of Communication Remain Available.**

27            The Executive Order easily clears the final hurdle under intermediate scrutiny, as it

28   "leave[s] open ample alternative channels for communication of the information."  *See Ward*,

491 U.S. at 790-91.  This is a low bar, as the Ninth Circuit has "cautioned against invalidating government regulations for failing to leave open ample alternative channels unless the regulation foreclose[s] 'an *entire medium* of public expression[.]'"  *G.K. Ltd. Travel*, 436 F.3d at 1074 (emphasis added).  In other words, the Executive Order should be upheld unless it completely prohibits an entire type of speech, such as: the distribution of pamphlets in a city, providing handbills on public streets, door-to-door solicitation, live entertainment, and signs outside one's home.  *See City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994) (collecting cases).  Content-neutral regulations are generally upheld unless the plaintiffs' "overall 'ability to communicate effectively is threatened.'"  *Lone Star Sec. & Video, Inc.*, 827 F.3d at 1202 (citation omitted).

Plaintiffs do not argue that the Executive Order forecloses an "entire medium" of communication, and for good reason.  WeChat is not "an entire medium" of communication; it is a single mobile application with numerous alternatives, as Plaintiffs concede.  *See, e.g.*, Decl. of Wanning Sun ¶ 34, ECF No. 17-11 (explaining that many users of WeChat are switching over to other social media applications such as "Line, Telegraph, and WhatsApp"); Decl. of Elaine Peng ¶ 28, ECF No. 17-5 (conceding that she has "started the [process] of switching to Line"); Decl. of Xiao Zhang ¶ 22, ECF No. 17-6 (explaining that he has starting preparing a website to replace use of WeChat).  To be sure, Plaintiffs aver that such alternatives may be less preferable due to cost or functionality, but "[t]he First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places."  *See Taxpayers for Vincent*, 466 U.S. at 812.  Indeed, both the Supreme Court and the Ninth Circuit have repeatedly rejected the argument advanced by Plaintiffs, that their preferred method of communication must be preserved when alternatives are available.  *See, e.g.*, *id*.; *Christian Legal Soc. v. Martinez*, 561 U.S. 661, 690 (2010) (upholding bar on "specific methods of communication," in part because "the advent of electronic media and social-networking sites reduces the importance of those [specific] channels"); *Kovacs v. Cooper*, 336 U.S. 77, 88-89 (1949) ("That more people may be more easily and cheaply reached by sound trucks . . . is not enough to call forth constitutional protection . . . when easy means of publicity are open."); *Lone Star Sec. & Video, Inc.*, 827 F.3d at 1202 ("[W]e will not invalidate the mobile billboard bans merely because they restrict

Appellants' preferred method of communication."); *Foti v. City of Menlo Park*, 146 F.3d 629, 641 (9th Cir. 1998) (upholding restrictions on picket signs, despite claim that signs at issue were "the most effective means" of certain speech).[20]

Plaintiffs' related argument, that alternatives will be less effective for communicating with persons in China, Mot. at 22-24, has no bearing on the analysis. That fact stems from the actions of the Chinese Government, not the United States. *See* Sun Decl. ¶ 14 ("Facebook, WhatsApp, and Twitter . . . and several other[ social media applications] – are banned in China."). It is that "Great Firewall" of the PRC, not the Executive Order, that limits the ability of Americans to communicate with individuals in China. The First Amendment does not require unfettered access to a social media application supported by the PRC and used against the interests of the United States, simply because China has declined to make other alternatives available for the Chinese people. Because the Executive Order leaves open ample alternative avenues of communication, it is constitutional under the First Amendment.

### 3. Plaintiffs Are Not Likely to Succeed on their Ultra Vires Claims.

Plaintiffs' final theory, that the Executive Order is *ultra vires* because it conflicts with 50 U.S.C. § 1702(b), Mot. at 31-34, is similarly lacking in merit. Even assuming the Court can reach this argument when Congress expressly disclaimed any intent to create a cause of action under section 1702, *see* supra at 20-21 & n.12, the exceptions to the President's IEEPA authority in section 1702(b) do not preclude the President's actions.

First, there is no bar under subsection (b)(1). That provision removes from the President's IEEPA authority the ability to prohibit or regulate "any personal communication, which does not involve a transfer of anything of value." As set forth above, the Executive Order does not prohibit personal communications; it prohibits (as-yet-to-be-identified) "transactions . . . *with Tencent . . . or any subsidiary*," relating to WeChat. Exec. Order § 1(a) (emphasis added).

---

[20] *See also Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 695 (W.D. Tex. 2015) (First Amendment permitted prohibition on Internet posting of firearm blueprints, as restriction "does not impose an insurmountable burden on [p]laintiffs' domestic communications[,]" and plaintiffs were "free to disseminate the computer files at issue domestically in public or private forums, including via the mail or any other medium that does not provide the ability to disseminate the information internationally"), *aff'd*, 838 F.3d 451 (5th Cir. 2016).

While such prohibitions could as a practical matter impact a user's ability to use the app to communicate, communications may continue to occur through a range of other platforms. *See supra* at 30-32. Furthermore, communications conducted through WeChat *do* involve a transfer of value: users exchange their personal data and content for the right to use WeChat services. *See* Ex. 25, WeChat Terms of Service, at 7 ("When you . . . use . . . WeChat[,] . . . you understand and agree that . . . you are giving us and our affiliate companies a perpetual, non-exclusive, transferable, sub-licensable, royalty-free, worldwide license to use Your Content (with no fees or charges payable by us to you))"; *see also* Mot. at 12 claiming that "the app's Terms and Conditions [are] agreed to by its user base"). Section 1702(b)(1) is thus inapplicable.

Sections 1702(b)(2) and (b)(4), regarding humanitarian aid and transactions incident to travel, also pose no bar to the Order because they do not regulate or prohibit these activities, either directly or indirectly. Plaintiffs' theory (to the extent discernable) appears to be that because WeChat users sometimes use the app as a mechanism to arrange these activities, or because such arrangements are allegedly more convenient when done through WeChat, any prohibition on WeChat is akin to a prohibition on the activities themselves. *See* Mot. at 33. That is incorrect. Millions of people in this country arrange travel and charitable donations every day without the use of WeChat, and Plaintiffs are free to use a panoply of other mechanisms to do the same, including through such widely available means as telephone, email, a vast number of eCommerce sites, online banking services, facsimile, credit card services, wire transfers, instant messaging, and a range of other social media apps and online services, as well as translation software if necessary[21]; they simply may not be able to use WeChat. If Plaintiffs may face obstacles or burdens in arranging charitable activities or travel plans without access to WeChat, those obstacles are not even "indirect" regulation as they flow not from the Executive Order but from the anticompetitive and restrictive policies of the PRC, which have excluded Western social media companies from operation in mainland China and promoted the spread of Tencent.

---

[21] A quick Google search for "English Mandarin translation" and "English Mandarin translation Chinese characters" immediately brings up a host of software offering these services.

Finally, section 1702(b)(3) is also inapposite.  That provision excepts from the President's authority under IEEPA the power to regulate or prohibit the importation or exportation of information or informational materials.  But WeChat itself is not "information" or "information materials"; it is a set of services through which such information can be conveyed.  *See generally* WeChat Terms of Service, Ex. 25 (repeatedly referring to the app as a suite of "services").  The regulation of a single service provider that facilitates the transmission of information to the PRC is not akin to regulating or prohibiting transmission of information or informational materials themselves, or even an entire "medium of transmission."  Any construction that would collapse that distinction between restricting the flow of information writ large, and restricting a single service provider (with ties to a foreign adversary), would amount to a wholesale truncation of the President's ability to protect the country's information supply chains in a way that Congress could not have intended.  For example, it is unfathomable that Congress intended through section 1702(b) to limit the President's ability to prevent a foreign government from setting up a parallel postal system in the United States or dominating the country's data services.  Yet that absurd conclusion would necessarily flow from interpreting subsection (b)(3) in the way Plaintiffs suggest.  There is no indication that Congress intended that outcome.  *See King v. Burwell*, 576 U.S. 473, 494 (2015) (rejecting interpretation because it was "implausible that Congress meant the Act to operate in this manner").[22]

To the extent Plaintiffs suggest that the app itself (rather than user content) is an "informational material" within the meaning of subsection (b)(3), that too is plainly incorrect.  The list of examples of "informational materials" in this subsection all pertain to distinct types of

---

[22]  There is every indication that Congress did not so intend.  The President issued the ITCS Order more than a year ago, and Congress has taken no action to suggest that he is acting outside of his authority.  Moreover, Congress has expressly authorized the President to "block and prohibit *all* transactions" with foreign persons that facilitate or benefit from the significant appropriation of certain United States information through "economic or industrial espionage *in cyberspace*," 50 U.S.C. § 1708(b)(2), thereby evincing an understanding that the President may prohibit and regulate the electronic transmission of information in cyberspace with respect to companies affiliated with China.  The many expressions of Congressional concern about PRC-related technology companies also support the President's invocation of IEEPA in these circumstances. *See supra* at 4-11.

media; *i.e.*, physical embodiments of information in *fixed* form—such as "films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks," and the like. 50 U.S.C. § 1702(b)(3).  WeChat is categorically different.  It is, by its own terms, a "diverse" set of services, that (among other things) manipulates, collects, processes, transmits, brokers, and sells information, *see* WeChat Terms of Service at 2-6, Ex. 25, thus bearing no resemblance to the list of fixed media in the statutory text.  *See Yates v. United States*, 574 U.S. 528, 546 (2015) ("Had Congress intended 'tangible object' in § 1519 to be interpreted so generically[,] . . . Congress would have had no reason to refer specifically to [the narrower examples given]"); *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 295 (2011) (invoking the canon "ejusdem generis to ensure that a general word will not render specific words meaningless").[23] Moreover, if WeChat was simply an "informational material[]," there would be no need for a Terms of Service to define the user's ongoing legal relationship with WeChat.

Finally, even if the WeChat app otherwise fell within section 1702(b)(3), it would be excluded from that carveout by the second sentence of that paragraph, which excepts from the exception "acts . . . prohibited by chapter 37 of Title 18."  Chapter 37 of Title 18, in turn, prohibits transmission of "information relating to the national defense" to any foreign government with reason to believe that it could "be used to the injury of the United States or to the advantage of a foreign nation."  18 U.S.C. § 794; *see also id.* §§ 793(e), (f) (prohibiting similar activities, whether willful or grossly negligent in violation of a duty of trust).  Because the WeChat Order takes action to prevent exactly such harms, and contemplates that the vast swaths of user information collected by WeChat is information relating to the national defense, it falls outside any limitations otherwise posed by section 1702(b)(3).

### 4.  Plaintiffs Have Waived Any Remaining Claims on this Motion.

In a single footnote Plaintiffs briefly allude to their claim under RFRA, but present no argument as to why they are entitled to a preliminary injunction on the basis of this claim.  *See*

---

[23] *See also* 31 C.F.R. § 560.210(c)(2) (interpreting section 1702(b)(3) not to extend to "information or informational materials not fully created . . . at the date of the transactions, or to the . . . alteration . . . of informational materials, or to the provision of [certain] services."); *Amirnazmi*, 645 F.3d at 587 (upholding that interpretation as reasonable under *Chevron*).

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Opposition to Motion for Preliminary Injunction

Mot. at 23 n. 4 (stating without explanation that "[t]he EO places a substantial burden on Plaintiffs' ability to practice their religion").  Plaintiffs have accordingly waived any argument founded on their RFRA claim at this stage.  *See, e.g.*, *Recycle for Change v. City of Oakland*, 856 F.3d 666, 673 (9th Cir. 2017) (holding that plaintiff waived an argument "because it never raised it in its briefs, other than in a terse one-sentence footnote").  Moreover, Plaintiffs' claims of inconvenience regarding certain religious activities are entirely conclusory and do not on their face suggest any substantial burden on the exercise of religious.

**III.    Plaintiffs Have Failed To Establish Irreparable Harm.**

A preliminary injunction serves the "limited purpose" of "preserv[ing] the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  Accordingly, "[a]n essential prerequisite" before granting a preliminary injunction is a showing that irreparable injury is likely in the absence of an injunction.  *See Dollar Rent A Car of Wash., Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1375 (9th Cir. 1985); *Winter*, 555 U.S. at 19-20.  "[I]rreparable harm" is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages.  *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017).  Such harm must also be "concrete and particularized."  *Koff v. Ahern*, No. 14-cv-04680, 2015 WL 1050167, at *3 (N.D. Cal. Mar. 9, 2015).  This standard is demanding: "Mere injuries, however substantial, in terms of money, time and energy . . . are not enough," and "[t]he possibility that adequate . . . relief will be available at a later date . . . weighs heavily against a claim of irreparable harm."  *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Plaintiffs contend that they have suffered a variety of injuries justifying injunctive relief, including experiencing "confusion, anxiety, fear, and . . . panic[,]" as well as devoting "time researching the possible scope of the EO."  Mot. at 35.  However, as evidenced by Plaintiffs' failure to cite a single case supporting their argument, *see id.* at 35-37, these purported injuries are insufficient to justify the extraordinary relief they demand.

First, Plaintiffs argue that "[u]ncertainty and fear of being subject to criminal prosecution and/or civil penalties for merely using WeChat has caused confusion, anxiety, and fear among Plaintiffs."  *Id*.  But these concerns are entirely conjectural given that the Secretary has not yet

defined the prohibited transactions, and as such fail to constitute an irreparable injury.  *See Koller v. Brown*, 224 F. Supp. 3d 871, 879 (N.D. Cal. 2016); *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984).  Plaintiffs similarly speculate that they will be "cut off from [their] entire social network[,]" Mot. at 35, or that the Order will "alter [their] legal rights and obligations" at all, *id.* at 37.  Such allegations fall short of showing "immediate threatened injury." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citation omitted); *accord Winter*, 555 U.S. at 22 (injury must be likely, not possible).

Plaintiffs also describe harms that are not adequately concrete.  These include Plaintiffs' feelings of "uncertainty," "fear," "confusion," "anxiety," "concern," "worr[y]," and low morale, Mot. at 35-36.  *Cf. Clay v. Fort Wayne Cmty. Sch.*, 76 F.3d 873, 877 n.4 (7th Cir. 1996) ("[A]morphous psychological injuries [are] insufficient to confer standing.").  While Plaintiffs may be frustrated that the Secretary has not yet issued regulations, Mot. at 35, or that they may have to engage in a data-transfer process that they find "mind-numbing[,]" *id.* at 35-37, these are not cognizable injuries, let alone irreparable ones.  *Cf. Gest v. Bradbury*, 443 F.3d 1177, 1182 (9th Cir. 2006) ("[F]eelings of frustration . . . are not sufficiently concrete to constitute the 'injury-in-fact' required for Article III standing." (citations omitted)); *see also Caribbean Marine Servs. Co.*, 844 F.2d at 676 ("mere . . . inconvenience will not support the crew members' claim of irreparable injury to their constitutional rights").  Moreover, to the extent these feelings flow from uncertainty regarding the final impact of the Executive Order, they will not be redressed by preliminary relief, which is time-limited and subject to review and thus uncertain itself.

Many of the other alleged harms identified by Plaintiffs pertain to events that have already occurred.  *See* Mot. at 35 ("Plaintiffs have spent an enormous amount of time researching the possible scope of coverage of the EO."); *id.* at 36 ("Some of Plaintiff Chihuo Inc.'s clients have already stopped working with the company[.]"); *id.* ("Plaintiffs have been forced to spend their limited time, energy, and resources researching other U.S. based social media platform options.").  Such past harms, even if true, are insufficient, as "[t]he purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury

that will surely result without [its] issuance." *Conte v. Transglobal Assets*, No. 2:12-cv-01005, 2012 WL 4092717, at *1 (D. Nev. Sept. 17, 2012) (citation omitted).

In addition, insofar as Plaintiffs allege that their business interests have suffered or will suffer, *see* Mot. at 36-37, such harms are not irreparable and thus are not a proper basis for a preliminary injunction. *See, e.g.*, *Los Angeles Mem'l Coliseum Comm'n*, 634 F.2d at 1202. The same is true of Plaintiffs' assertions regarding their use of "time, energy, and resources[,]" Mot. at 36; *see also id.* at 35; *Los Angeles Mem'l Coliseum Comm'n*, 634 F.2d at 1202.

Nor can Plaintiffs advance their argument by claiming that "[t]he EO . . . deprives Plaintiffs of their First and Fifth Amendment rights, and therefore constitutes irreparable harm." Mot. at 38. This *pro forma* statement is insufficient to carry Plaintiffs' burden, particularly in light of Defendants' demonstration above that Plaintiffs' rights have not been violated. Further, the cases on which Plaintiffs rely, Mot. at 37, reveal the comparative weakness of their claim of irreparable harm. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (plaintiffs threatened with detention); *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (order purportedly "separated families" and "stranded the States' residents abroad"). The First Amendment cases cited by Plaintiffs likewise found irreparable harm based on an actual deprivation of constitutional rights. *See Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012), cited in Mot. at 37 (plaintiffs harmed "by the denial of their right to observe *this* execution"); *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005), cited in Mot. at 37-38 (challenged policy "forces [the plaintiff] to choose between following his religious beliefs and suffering continual punishment, and abandoning his religious beliefs to avoid such punishment"). Here, by contrast, Plaintiffs face not a deprivation, but at most a potential and incidental burden on their ability to communicate through a medium they prefer. *See Goldie's Bookstore, Inc.*, 739 F.2d at 472 (explaining that only the "purposeful . . . suppression of speech constitutes irreparable harm for preliminary injunction purposes"); *see also Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989) ("[I]t is the 'direct penalization, as opposed to incidental inhibition, of First Amendment rights [which] constitutes irreparable injury.'" (citation omitted)).

1    **IV.     The Balance of the Equities Weighs Against A Preliminary Injunction.**

2           Plaintiffs likewise cannot show the balance of equities tips in their favor.  *Drakes Bay*

3    *Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  At stake here are significant national

4    security and foreign policy interests, that weigh strongly against an injunction.  *See Winter*, 555

5    U.S. at 24; *cf. United States v. South Carolina*, 720 F.3d 518, 533 (4th Cir. 2013); *Escamilla v.*

6    *M2 Tech.*, No. 12-634, 2013 WL 4577538, at *4 (E.D. Tex. Aug. 27, 2013).  Additionally, any

7    entry of an order that substitutes the views of WeChat users for that of the Executive Branch

8    would not serve the public interest.  *See Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515,

9    552 (1937) (statutory scheme "is in itself a declaration of public interest and policy which should

10   be persuasive" to courts).  The injunction Plaintiffs seek would frustrate and displace the

11   President's determination of how best to address threats to national security.  *Milena Ship Mgmt.*

12   *Co. v. Newcomb*, 804 F. Supp. 846, 854 (E.D. La. 1992) (holding that injunction "unblocking the

13   plaintiffs' vessels and bank accounts before a full hearing on the merits of OFAC's blocking

14   decisions would risk impermissible interference with Executive and Congressional decisions").[24]

15          By comparison, any harm that Plaintiffs may suffer—including "expend[ing] resources"

16   and harboring unfounded "worry," Mot. at 38—is minimal.  This is especially so given that the

17   Secretary will be issuing regulations delineating the identified transactions a mere *three days*

18   after Plaintiffs' motion is heard by this Court.  Nor can Plaintiffs bolster their argument by

19   misconstruing the Executive Order as a "ban on speech, association, and religion in the United

20   States," Mot. at 38, or "discrimination by a government entity on the basis of race, ethnicity,

21   nationality, national original, and alienage[,]" *id.* at 39-40.  The Executive Order is nothing of the

22   sort, and Plaintiffs have not established otherwise.  And insofar as Plaintiffs' argument is

23   premised on their theory that the Executive Order violates their constitutional rights, *see id.*, it

24   fails for the reasons discussed above.

---

25   [24] Plaintiffs suggest these concerns are not weighty in light of the Order's timing.  Mot. at 38-39.
26   But decisions regarding how to address threats from abroad "involve significant political
     ramifications[,]" and, "[a]ccordingly, the Court must defer to the Executive's discretion on the
27   timing of those . . . decisions."  *Holy Land Found.*, 219 F. Supp. 2d at 74 n.28.  And Plaintiffs
     offer no authority for the proposition that the President must disclose "evidence" to support his
28   non-reviewable determination, particularly when that evidence may be privileged or classified.

1    **V.      Any Preliminary Relief Should Be Limited.**

2          Plaintiffs seek nationwide relief, including an order enjoining the President from enforcing

3    the Executive Order to prohibit or limit *any* use of the WeChat application in the United States or

4    by "United States persons abroad[,]" as well as an order staying the effective date of the

5    prohibitions until 60 days after the Secretary of Commerce issues final regulations defining the

6    prohibited transactions.  Proposed Order at 3-4, ECF No. 17-13 (emphasis added).  But "[a]

7    plaintiff's remedy must be tailored to redress the plaintiff's particular injury[.]"  *Gill v. Whitford*,

8    138 S. Ct. 1916, 1934 (2018); *see also California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018)

9    ("nationwide relief . . . must be '*necessary* to give prevailing parties the relief to which they are

10   entitled'" (emphasis added, citation omitted)).

11         Plaintiffs do not explain why nationwide preliminary relief is necessary to protect their

12   interests.  Nor can they.  Indeed, it appears that merely staying the Order's effective date as to

13   Plaintiffs until after the Secretary issues final regulations would achieve that goal.[25]  Any

14   preliminary relief should therefore be far more limited than what Plaintiffs seek.

15   **VI.     Objection and Motion to Strike the Alben and Chemerinky Declarations**

16         Pursuant to Civil Local Rule 7-3(a), Defendants object to the Alben and Chemerinky

17   Declarations, as they are "mostly legal opinion and an unhelpful restatement of the facts as [they]

18   see[] them," *RSI Corp. v. Int'l Bus. Machines Corp.*, No. C-08-03414 RMW, 2013 WL 1087468,

19   at *4 (N.D. Cal. Mar. 13, 2013).  *See* Decl. of Alex Alben ¶¶ 4-8, ECF No. 17-7; Decl. of Erwin

20   Chemerinsky ¶¶ 5-7, ECF No. 17-8.  The Court should therefore strike the declarations in their

21   entirety.  *See RSI Corp.*, 2013 WL 1087468, at *4; *see also, e.g.*, *Pokorny v. Quixtar Inc.*, No. 07-

22   00201 SC, 2007 WL 1932922, at *3 (N.D. Cal. June 29, 2007).

23                                      **CONCLUSION**

24         Plaintiffs' motion for a preliminary injunction should be denied.

25

26

27   _____
     [25] Nationwide relief would also be inappropriate given (1) the lack of a record as to the Order's
     effect on the diverse universe of non-Plaintiff WeChat users, *see Azar*, 911 F.3d at 584; and (2)

28   Plaintiffs' failure to seek class certification, *see Azar*, 911 F.3d at 582-83 (citation omitted);
     *accord CASA*, 2020 WL 4664820, at *26.

     *U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
     Defendants' Opposition to Motion for Preliminary Injunction
                                         40

Dated: September 8, 2020                    Respectfully submitted,

                                           JEFFREY BOSSERT CLARK
                                           Acting Assistant Attorney General

                                           DAVID M. MORELL
                                           Deputy Assistant Attorney General

                                           DIANE KELLEHER
                                           Assistant Branch Director

                                           /s/  Serena M. Orloff
                                           SERENA M. ORLOFF
                                           MICHAEL DREZNER
                                           STUART J. ROBINSON
                                           Trial Attorneys
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           Ben Franklin Station, P.O. Box No. 883
                                           Washington, DC 20044
                                           Phone: (202) 305-0167
                                           Fax: (202) 616-8470
                                           E-mail: serena.m.orloff@usdoj.gov

                                           *Counsel for Defendants*