1  MICHAEL W. BIEN – 096891
   VAN SWEARINGEN – 259809
2  ALEXANDER GOURSE – 321631
   AMY XU – 330707
3  ROSEN BIEN
   GALVAN & GRUNFELD LLP
4  101 Mission Street, Sixth Floor
   San Francisco, California  94105-1738
5  Telephone:    (415) 433-6830
   Facsimile:    (415) 433-7104
6  Email:        mbien@rbgg.com
                 vswearingen@rbgg.com
7                agourse@rbgg.com
                 axu@rbgg.com
8
   KELIANG (CLAY) ZHU – 305509
9  DEHENG LAW OFFICES PC
   7901 Stoneridge Drive #208
10 Pleasanton, California  94588
   Telephone:    (925) 399-5856
11 Facsimile:    (925) 397-1976
   Email:        czhu@dehengsv.com
12
   ANGUS F. NI – Admitted *Pro Hac Vice*
13 AFN LAW PLLC
   502 Second Avenue, Suite 1400
14 Seattle, Washington  98104
   Telephone:    (773) 543-3223
15 Email:        angus@afnlegal.com

16 Attorneys for Plaintiffs

THOMAS R. BURKE – 141930
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California  94111-6533
Telephone:    (415) 276-6500
Facsimile:    (415) 276-6599
Email:        thomasburke@dwt.com

DAVID M. GOSSETT – Admitted *Pro Hac Vice*
DAVIS WRIGHT TREMAINE LLP
1301 K Street N.W., Suite 500 East
Washington, D.C.  20005-3366
Telephone:    (202) 973-4216
Facsimile:    (202) 973-4499
Email:        davidgossett@dwt.com

17                  UNITED STATES DISTRICT COURT

18          NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

19

20 U.S. WECHAT USERS ALLIANCE,
   CHIHUO INC., BRENT COULTER,
21 FANGYI DUAN, JINNENG BAO, ELAINE
   PENG, and XIAO ZHANG,
22
              Plaintiffs,
23
        v.
24
   DONALD J. TRUMP, in his official capacity
25 as President of the United States, and
   WILBUR ROSS, in his official capacity as
26 Secretary of Commerce,
27
              Defendants.

Case No. 3:20-cv-05910-LB

**REPLY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION**

Judge:   Hon. Laurel Beeler
Date:    September 17, 2020
Time:    9:30 a.m.
Crtrm.:  Remote

Trial Date:      None Set

28

[3611114.10]

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

I.    THE ISSUES IN THIS MOTION ARE JUSTICIABLE ........................................... 4

    A.    Plaintiffs' Claims Are Ripe for Review ........................................................ 4

    B.    Plaintiffs' Challenges Involving National Security Determinations Are Justiciable ................................................................................................ 6

    C.    Plaintiffs' *Ultra Vires* Claims Are Justiciable............................................... 7

II.   DEFENDANTS' OVERBROAD, CONCLUSORY, AND UNSUPPORTED NATIONAL SECURITY CLAIMS CANNOT BE RELIED ON TO JUSTIFY THE BAN ON WECHAT ....................................................................... 8

III.  A PRELIMINARY INJUNCTION IS WARRANTED IN THIS CASE ................. 11

    A.    Plaintiffs Are Likely to Succeed on the Merits .......................................... 11

        1.    Plaintiffs Are Likely to Succeed on Their Vagueness Claims........... 11

        2.    Plaintiffs Are Likely to Succeed on Their First Amendment Claims and Have Presented Serious Questions Going to Merits ....... 12

            (a)    The EO Is Not Content Neutral and Strict Scrutiny Should Apply.................................................................................. 13

            (b)    The EO Cannot Survive Intermediate Scrutiny ...................... 14

                (i)    The EO Does Not Serve Important Government Interests .......................................................................... 14

                (ii)   The EO's Ban of WeChat, *a fortiori,* Burdens Substantially More Speech Than Necessary ................ 15

                (iii)  A WeChat Ban Would Leave No Avenues of Communication Available ........................................... 15

        3.    Plaintiffs Are Likely to Succeed on Their *Ultra Vires* Claim............ 16

    B.    Preliminary Injunctive Relief Is Necessary to Avoid Further Harms .......... 17

    C.    The Balance of Hardships and the Public Interest Weigh Heavily In Plaintiffs' Favor.......................................................................................... 19

    D.    A Nationwide Injunction Is Appropriate Here ............................................ 20

CONCLUSION.............................................................................................................. 20

1

# TABLE OF AUTHORITIES

2

**Page**

3

## <u>CASES</u>

4

5

*Abbott Labs. v. Gardner,*
 387 U.S. 136 (1967) ................................................................................. 5

6

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury,*
 686 F.3d 965 (9th Cir. 2012) ................................................................... 7

7

*All. for the Wild Rockies v. Cottrell,*
 632 F.3d 1127 (9th Cir. 2011) ............................................................ 1, 12

8

*Am. Beverage Ass'n v. City & Cty. of San Francisco,*
 916 F.3d 749 (9th Cir. 2019) ................................................................. 20

9

10

*Am.-Arab Anti-Discrimination Comm. v. Reno,*
 70 F.3d 1045 (9th Cir. 1995) ................................................................... 6

11

*Arkansas Writers' Project,*
 481 U.S. 221 (1987) ............................................................................... 13

12

13

*Baker v. Carr,*
 369 U.S. 186 (1962) ................................................................................. 7

14

*Bantam Books, Inc. v. Sullivan,*
 372 U.S. 58 (1963) ................................................................................. 14

15

16

*Barahona-Gomez v. Reno,*
 167 F.3d 1228 (9th Cir. 1999), *supplemented*, 236 F.3d 1115 (9th Cir. 2001).......... 1

17

18

*Carey v. Brown,*
 447 U.S. 455 (1980) ............................................................................... 13

19

*Chamber of Comm. v. Reich,*
 57 F.3d 1099 (D.C. Cir. 1995).................................................................. 5

20

*Chamber of Comm. v. Reich,*
 74 F.3d 1322 (D.C. Cir. 1996).................................................................. 7

21

22

*Christian Legal Soc. v. Martinez,*
 561 U.S. 661 (2010) ............................................................................... 16

23

24

*City and County of San Francisco v. Trump,*
 897 F.3d 1225 (9th Cir. 2018) ................................................................. 6

25

*City of Ladue v. Gilleo,*
 512 U.S. 43 (1994) ................................................................................. 16

26

*County of Santa Clara v. Trump,*
 250 F. Supp. 3d 497 (N.D. Cal. 2017)....................................... 5, 11, 12, 18

27

28

*Dart v. United States*,
    848 F.2d 217 (D.C. Cir. 1988)............................................................................8

*Doe v. Harris*,
    772 F.3d 563 (9th Cir. 2014) ......................................................................8, 18

*E. Bay Sanctuary Covenant v. Trump*,
    950 F.3d 1242 (9th Cir. 2020)............................................................................20

*Elrod v. Burns*,
    427 U.S. 347 (1976) ............................................................................................17

*Escamilla v. M2 Tech., Inc.*,
    No. 4:12CV634, 2013 WL 4577538 (E.D. Tex. Aug. 27, 2013) ..........................20

*F.C.C. v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ............................................................................................11

*Foti v. City of Menlo Park*,
    146 F.3d 629 (9th Cir. 1998), *as amended on denial of reh'g* (July 29, 1998)........11

*FW/PBS v. City of Dallas*,
    493 U.S. 215 (1990) ............................................................................................13

*Gentile v. State Bar of Nevada*,
    501 US 1030 (1991) ............................................................................................12

*Hedges v. Obama*,
    No. 12 CIV. 331, 2012 WL 1721124 (S.D.N.Y. May 16, 2012), *order
    clarified*, 2012 WL 2044565 (S.D.N.Y. June 6, 2012) ..........................................19

*Humanitarian Law Project v. U.S. Dep't of Treasury*,
    578 F.3d 1133 (9th Cir. 2009) ..............................................................................7

*Jacobsen v. U.S. Postal Serv.*,
    812 F.2d 1151 (9th Cir. 1987) ............................................................................19

*Kalantari v. NITV, Inc.*,
    352 F.3d 1202 (9th Cir. 2003) ............................................................................17

*Klein v. City of San Clemente*,
    584 F.3d 1196 (9th Cir. 2009) ............................................................................14

*Kolender v. Lawson*,
    461 U.S. 352 (1983) ............................................................................................11

*Lira v. Cate*,
    No. C00-0905, 2010 WL 727979 (N.D. Cal. Feb. 26, 2010)..................................4

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ............................................................................................15

*Milena Ship Mgmt. Co. v. Newcomb*,
    804 F. Supp. 846 (E.D. La. 1992) ........................................................................8

*Napa Valley Publ'g Co. v. City of Calistoga*,
   225 F. Supp. 2d 1176 (N.D. Cal. 2002).................................................................17, 18

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*,
   523 F.3d 1051 (9th Cir. 2008) ................................................................................4

*Near v. Minnesota*,
   283 U.S. 697 (1931) ................................................................................................13

*Nebraska Press Ass'n v. Stuart*,
   427 U.S. 51 (1965) ..................................................................................................13

*One World One Family Now v. City & Cty. of Honolulu*,
   76 F.3d 1009 (9th Cir. 1996) ..................................................................................13

*Packingham v. North Carolina*,
   137 S. Ct. 1730 (2017)..............................................................................................4

*Padilla v. Immigration & Customs Enf't*,
   953 F.3d 1134 (9th Cir. 2020) ................................................................................20

*Police Dep't of City of Chicago v. Mosley*,
   408 U.S. 92 (1972) ..................................................................................................13

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
   758 F.3d 296 (D.C. Cir. 2014)............................................................................7, 14

*Sammartano v. First Judicial Dist. Court*,
   303 F.3d 959 (9th Cir. 2002) ..................................................................................13

*Shuttlesworth v. Birmingham*,
   394 U.S. 147 (1969) ................................................................................................13

*Sierra Club v. Trump*,
   963 F.3d 874 (9th Cir. 2020) ....................................................................................7

*Thalheimer v. City of San Diego*,
   645 F.3d 1109 (9th Cir. 2011) ................................................................................14

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018)............................................................................................14

*Turner Broad. Sys., Inc. v. FCC*,
   512 U.S. 622 (1994) ................................................................................................13

*United States v. Arch Trading Co.*,
   987 F.2d 1087 (4th Cir. 1993) ..................................................................................5

*United States v. South Carolina*,
   840 F. Supp. 2d 898 (D.S.C. 2011), *modified in part*, 906 F. Supp. 2d 463
   (D.S.C. 2012), *aff'd*, 720 F.3d 518 (4th Cir. 2013) ..............................................20

*Veterans Peace Convoy, Inc. v. Schultz*,
   722 F. Supp. 1425 (S.D. Tex. 1988)..........................................................................8

*Viacom Int'l, Inc. v. FCC,*
    828 F. Supp. 741 (N.D. Cal. 1993)...................................................... 12, 18

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) .............................................................................. 14

*Warsoldier v. Woodford,*
    418 F.3d 989 (9th Cir. 2005) ................................................................. 18

*Washington v. Trump,*
    847 F.3d 1151 (9th Cir. 2017) ............................................................... 19

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................................. 1, 19

**STATUTES**

50 U.S.C. § 1702.................................................................................. 5, 8, 16

50 U.S.C. § 1704....................................................................................... 5

50 U.S.C. § 1705...................................................................................... 12

**OTHER AUTHORITIES**

H. Rep. 95-459......................................................................................... 17

**RULES**

Civ. L.R. 7-5 ............................................................................................. 1

1

**INTRODUCTION**

2      "A preliminary injunction is not a preliminary adjudication on the merits, but a

3  device for preserving the status quo and preventing the irreparable loss of rights before

4  judgment." *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1234 (9th Cir. 1999),

5  *supplemented*, 236 F.3d 1115 (9th Cir. 2001).  It is telling that Defendants' 40-page

6  Opposition fails to even refer to the "status quo."  In deciding this motion, it is not

7  necessary for the Court to adjudicate the merits of Plaintiffs' constitutional and statutory

8  claims raised, but instead to focus on the standards for granting preliminary injunctive

9  relief:  likelihood of success on the merits, irreparable harm in the absence of preliminary

10  relief, the balance of the equities, and the public interest.  *See Winter v. Nat. Res. Def.*

11  *Council, Inc.*, 555 U.S. 7, 20 (2008).  A preliminary injunction is appropriate here, where

12  the Plaintiffs have demonstrated "that serious questions going to the merits were raised and

13  the balance of hardships tips sharply in the plaintiff's favor."  *All. for the Wild Rockies v.*

14  *Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011).  Defendants concede that the Executive

15  Order (the "EO") implicates the First Amendment, see Opp. at 24-32, and therefore

16  Defendants have the burden of justifying the EO's restriction on constitutionally-protected

17  activities.  *See* Mot. at 15:13-24 (citing cases).  Defendants have failed to meet this burden

18  and the preliminary injunction should be granted so the status quo can be preserved.

19      While Defendants provide argument, they fail to present any admissible evidence,[1]

20  including in response to the declarations provided by each of the individual Plaintiffs and

21  their experts.  *See* Dkts. 17-1 through 17-11.  Defendants do not dispute, for example, that

22  millions of Chinese speakers in America—new immigrants, citizens, green card holders,

23  students and other visitors—are not proficient in English, and therefore rely on WeChat,

24  even more so during the pandemic, in their day-to-day activities.  Nor do Defendants

25  provide any evidence of available alternatives that can replace the functions, services, and

26

27  [1] Civil Local Rule 7-5 requires that "[f]actual contentions made in support of or in
28  opposition to any motion must be supported by an affidavit or declaration and by
    appropriate references to the record."

REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1  communication that are currently threatened by the WeChat ban.

2      Defendants also do not dispute that WeChat users in the United States, including

3  Plaintiffs, are highly dependent on WeChat, and regularly use the app to communicate

4  with other users in this country.  Nor do Defendants dispute that Plaintiffs and other U.S.-

5  based users rely on WeChat for multiple activities otherwise protected by the First

6  Amendment, including reading the news; sharing, publishing, and discussing social issues;

7  organizing and assembling for all purposes, including political activity; practicing religious

8  and cultural traditions;[2] engaging in business and charitable works; socializing with friends

9  and family; communicating with Chinese speakers in the United States, in China and

10  around the world, by text, voice and video; and interacting with state and local

11  governments in the United States about issues of public importance.  *See* Mot. at 6-9.

12      Defendants' attorneys, once again unsupported by any evidence, argue that

13  Plaintiffs and the numerous other WeChat users, journalists, lawyers, and commentators

14  who have read the EO, and have been unable to discern what "transactions" will be

15  prohibited on September 20, 2020 are all wrong in believing that they are at substantial

16  risk absent a preliminary injunction.  According to Defendants, "[t]he Order is not self-

17  executing:  it prohibits only those transactions that are 'identified by the [Secretary] under

18  section 1(c) of this order.'" Opp. at 23:8-10.  Thus, it is wrong for the Court to evaluate the

19  EO for clarity—even though the EO may be vague and overbroad—because any such

20  defects will be cured by the requirement (in the same vague and overbroad EO) that the

21  Secretary shall define "transactions" on September 20, 2020, the same day that the EO

22  becomes enforceable by criminal and civil penalties.

23      The absence of evidence, other than the EO itself, proves the point:  there is no

24  statement by Secretary Ross assuring that he will act on September 20, 2020, or that he

25

26  _____
  [2] While it is correct that Plaintiffs did not base this motion on their claim that the EO
  violates RFRA, *see* Opp. at 35-36, Plaintiffs included extensive evidence and argument
27  that a WeChat ban would substantially burden a range of First Amendment protected
  religious activities, including prayer, Bible study, and celebrations of religious and cultural
  holidays and events.  *See* Mot. at 8-9, 22-23.  Defendants do not dispute that a WeChat ban
28  would burden the free exercise of religion.

will address the fears and concerns raised by Plaintiffs in this action by limiting the definition of "transaction" so it does not run afoul of the constitutionally-protected interests at issue in this action.[3]  And Defendants' argument is also inconsistent with the EO itself; they fail to address Section 3 of the EO, which specifically allows the EO to be enforced with "no prior notice of an identification pursuant to section 1(c)" of the EO— that is, a definition of which transactions are prohibited.

Indeed, rather than alleviate any fears, Defendants double-down on the threat of a total ban, exacerbating Plaintiffs' fears.  Yes, the Secretary may cut off the only way to communicate with friends and family in China, but that is China's fault and so is somehow not appropriate for the Court's consideration.  Opp. at 32:4-13; *see also id.* at 33:21-25 (arguing that Plaintiffs' "obstacles and burdens in arranging charitable activities or travel plans" by a WeChat ban are actually caused by "the anticompetitive and restrictive policies of the [People's Republic of China]," not the EO).  Yes, the Secretary may ban all uses of WeChat by users in the United States, but there must be "numerous alternatives" (once again, without evidence)—even if "less preferable due to cost or functionality."  Opp. at 31:11-19.  As of September 11, 2020, more than five weeks after the EO was issued and nine days before its effective date, Defendants have nothing to say to this Court other than all options remain on the table, and get ready for a complete ban of any use of WeChat.

Defendants contend that the Court lacks the power to even address this motion and that it is inappropriate to question the President's actions or his motivations so long as they somehow implicate national security.  As demonstrated below, both contentions are wrong. But given the conceded uniqueness of the functionality provided by the WeChat super-app, its critical uses for Chinese speakers in the United States, and the vagueness of and confusion caused by the EO, no cases are directly on point as to the merits.  The Government has never before threatened to ban a social media platform that addresses such a range of communicative needs for a minority community.  *See* Chemerinsky Decl.

---

[3] *See* Reply Declaration of Michael W. Bien ("Bien Reply Decl.") ¶ 5.

1    (Dkt. 17-8) ¶ 5; Alben Decl. (Dkt. 17-7) ¶ 3.[4]  Plaintiffs raise serious and complex

2    questions under the First and Fifth Amendment, and *Packingham v. North Carolina*, 137

3    S. Ct. 1730 (2017), which concerned a much narrower restriction on speech, does control

4    even if it is China's "fault" that WeChat is "irreplaceable."  Opp. at 28:18-29:6.

5              Under these circumstances, the Court must act to preserve the status quo so that

6    Plaintiffs and all other individuals and entities in the United States can continue using

7    WeChat and avoid the irreparable harm caused by the loss of constitutionally-protected

8    rights before final adjudication on the merits.  After a self-imposed 45-day waiting

9    period—itself unexplained and seemingly inconsistent with the purported national security

10   implications to justify a ban on WeChat—Defendants have failed to offer any evidence or

11   argument that explains how the public interest is served by allowing criminal and civil

12   penalties under the EO to become effective on September 20, 2020, rather than 60 days

13   after the Secretary defines the covered "transactions," thus affording Plaintiffs and others

14   time to come into compliance or to seek judicial review of any such definition.  Plaintiffs'

15   uncontroverted evidence of real, cognizable harm that they have and are experiencing

16   would be addressed by the proposed preliminary injunction and the status quo would be

17   preserved, pending a final decision on the merits.

18   **I.      THE ISSUES IN THIS MOTION ARE JUSTICIABLE**

19           **A.      Plaintiffs' Claims Are Ripe for Review**

20              Defendants concede that Plaintiffs' claims are constitutionally ripe but nevertheless

21   argue that this Court should deny this motion on "prudential" ripeness grounds.  *See* Opp.

22   at 17:17–18:4.  To determine whether a claim is prudentially ripe, the Court must consider

23   "both the fitness of the issues for judicial decision and the hardship to the parties of

24

25   _____
     [4] The Alben and Chemerinsky declarations provide factual and historical perspectives

26   about bans on protected First Amendment activities and do not "give an opinion as to
     [their] legal conclusion, *i.e.,* an opinion on an ultimate issue of law."  *Nationwide Transp.*

27   *Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008).  Even if an expert
     declaration includes some improper legal opinion or argument—which these do not —a

28   court may choose to strike just the offending sections.  *See, e.g., Lira v. Cate*, No. C00-
     0905, 2010 WL 727979, at *4 n.4 (N.D. Cal. Feb. 26, 2010).

1   withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967).

2        Defendants contend that Plaintiffs' claims are not ripe because they "are premised

3   on speculation regarding the scope and impact of the Executive Order."  Opp. at 18:5-6.

4   But the EO itself provides all the Court needs to decide whether it is likely that its

5   prohibitions are unconstitutionally vague and overbroad and exceeds the scope of the

6   President's authority under 50 U.S.C. § 1702(b).  As Plaintiffs demonstrated in their

7   motion, Sections 1(a), 2(a), and 2(b) of the EO alter Plaintiffs' legal rights and obligations

8   on September 20, 2020, and will expose them to civil and criminal liability on that day,

9   independent of any action by the Secretary of Commerce.  *See* Mot. at 10-12:4.  Nothing in

10  the EO or in the IEEPA suggests that further action by the Secretary or anyone else is a

11  necessary precondition for the sweeping prohibitions articulated in these sections of the

12  EO to be legally binding on Plaintiffs.  *See* 50 U.S.C. §§ 1702(a)(1), 1704 (authorizing the

13  President himself to designate conduct as unlawful, without any further action by any other

14  official); *United States v. Arch Trading Co.*, 987 F.2d 1087, 1094-95 (4th Cir. 1993)

15  (affirming criminal sanctions for violation of an executive order issued pursuant to IEEPA,

16  even though implementing regulations had not yet been issued at the time of the offense).

17       The existence of "speculation" about how the Government will enforce the Order is

18  precisely why immediate review and preliminary relief is necessary.  Absent immediate

19  review, Plaintiffs' First Amendment rights will continue to be chilled.  While it may be

20  appropriate to defer review of certain executive orders that contemplate further

21  administrative action, immediate review is justified in circumstances like these, where the

22  *informal* effects of a vague and overbroad executive order cause Plaintiffs immediate and

23  irreparable harm.  *See County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 529-30 (N.D.

24  Cal. 2017) (rejecting the President's argument that the constitutionality of an executive

25  order was not ripe because other executive branch officials "must still determine what the

26  terms of the Order mean"); *Chamber of Comm. v. Reich*, 57 F.3d 1099, 1100-01 (D.C. Cir.

27  1995) (reversing district court's decision that an *ultra vires* challenge to an executive order

28  was not ripe until finalization of implementing regulations, where the order had informal

1    effects on the balance of negotiating power between employers and organized labor).

2           It would be futile to wait for the Secretary to construe the term "transaction," *see*

3    *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1058 (9th Cir. 1995), as all

4    available evidence suggests that Defendants will simply repackage the same sweeping

5    prohibition contained in the EO.  Doing so would be consistent with Defendants' prior

6    actions.  Executive Order 13873—on which the President's purported authority to issue the

7    WeChat EO depends—defines "transaction" to include any "use" of designated

8    information and communications technologies or services "by any person."  *See* Bien Decl.

9    (Dkt. 17-12) ¶ 3 & Ex. B.  And Defendants fail to provide assurances that they intend to

10   interpret the term more narrowly in the EO at issue.  Indeed, Defendants' Opposition

11   suggests that the Secretary's definition of "transactions" will cover all uses of the app.  *See*

12   Opp. at 33:3-9 (arguing that any communication through WeChat necessarily involves an

13   "exchange [of users'] personal data and content for the right to use WeChat services," and

14   thus a "transfer of value").  Plaintiffs may well choose to challenge the Secretary's

15   definition of "transaction" after September 20, 2020—via an amended complaint or

16   otherwise—but this in no way renders their challenge to the underlying EO unripe.[5]

17        **B.      Plaintiffs' Challenges Involving National Security Determinations Are
18                Justiciable**

19          Defendants cite numerous authorities for the proposition that "the President's

20   discretionary judgment as to what is and is not an emergency" represents a non-justiciable

21   political question.  Opp. at 19:20-24, 20 n.11.  But Plaintiffs are not challenging the

22   validity of Executive Order 13873, the President's May 15, 2019 declaration of a national

23   emergency that is a necessary legal basis for the President even to issue the WeChat EO;

24

25   _____
     [5] Defendants invite the Court to re-write the EO itself under the guise of applying the
26   savings clause in Section 1(b).  Opp. at 19 n.10.  The Court should decline this invitation
     to take on a role that is properly left to the elected branches of government.  *See City and*
27   *County of San Francisco v. Trump*, 897 F.3d 1225, 1239-40 (9th Cir. 2018) (rejecting the
     President's argument that a similar savings clause rescued a similarly vague and overbroad
28   executive order from unconstitutionality, despite a provision indicating that the order
     would be clarified by future administrative action).

1    rather, Plaintiffs challenge the validity only of the *WeChat* EO.  None of Defendants' cases

2    suggest that the President's *exercise* of emergency powers authorized by the IEEPA during

3    a declared national emergency are non-justiciable.  To the contrary, questions about

4    whether the President validly exercised those powers clearly are *not* political questions.

5    There is no "textually demonstrable" commitment of such questions to a branch other than

6    the judiciary, and the IEEPA and the First and Fifth Amendments set out discernible limits

7    on the President's authority that courts can apply without engaging in subjective policy

8    judgments.  *See generally Baker v. Carr*, 369 U.S. 186 (1962).  Indeed, the justiciability of

9    the President's exercise of the emergency powers granted to him by IEEPA is clear from

10   the fact that courts do consider the merits of similar challenges to executive orders

11   involving national security issues and in doing so, evaluate the sufficiency of the evidence

12   provided by the Government to substantiate its national security arguments, rather than

13   dismiss on political question grounds.  *See Al Haramain Islamic Found., Inc. v. U.S. Dep't*

14   *of Treasury*, 686 F.3d 965 (9th Cir. 2012); *see also Ralls Corp. v. Comm. on Foreign Inv.*

15   *in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014) ("Both the Supreme Court and this Court have

16   recognized that the right to know the factual basis for the action and the opportunity to

17   rebut the evidence supporting that action are essential components of due process.").

18          **C.      Plaintiffs' *Ultra Vires* Claims Are Justiciable**

19          Defendants argue that Plaintiffs lack a private right of action to enforce the

20   limitations on the President's authority in the IEEPA, Opp. at 20:6-22:6, but Plaintiffs'

21   *ultra vires* claims do not require a statutory cause of action.  Courts have long "presume[d]

22   that Congress intends the executive to obey its statutory commands and, accordingly, that

23   it expects the courts to grant relief when [the President] violates such a command."

24   *Chamber of Comm v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996).  None of Defendants'

25   cases suggest otherwise, and the Ninth Circuit reaffirmed the availability of *ultra vires*

26   claims earlier this year in *Sierra Club v. Trump*, 963 F.3d 874, 890-92 (9th Cir. 2020).

27          Defendants contend that Congress expressly precluded all judicial review of

28   executive actions taken pursuant to the IEEPA.  *See* Opp. at 21:13-15.  But the subsection

Defendants cite for this proposition—50 U.S.C. § 1702(c)—instead proves if anything the opposite; it acknowledges that there may be judicial review of IEEPA determinations under general principles of law, and merely specifies that any classified material relevant to that case may be submitted *in camera*.  By noting that "*this subsection* does not confer or imply any right to judicial review," *id.* (emphasis added), the provision acknowledges the presumption that "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority."  *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988).  Defendants' interpretation of Section 1702(c) is contradicted by a substantial body of case law deciding challenges to the scope of the President's IEEPA authority on the merits, rather than on jurisdictional grounds.  *See, e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654 (1981); *Milena Ship Mgmt. Co. v. Newcomb*, 804 F. Supp. 846, 850 (E.D. La. 1992); *Veterans Peace Convoy, Inc. v. Schultz*, 722 F. Supp. 1425 (S.D. Tex. 1988).

## II.   DEFENDANTS' OVERBROAD, CONCLUSORY, AND UNSUPPORTED NATIONAL SECURITY CLAIMS CANNOT BE RELIED ON TO JUSTIFY THE BAN ON WECHAT

Defendants' Opposition relies heavily on repeated assertions that the ban on WeChat must be allowed to take effect because of national security concerns.  But notably absent from the papers is any support for their claim.  Because Plaintiffs made "a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, [ ] the burden shifts to the government to justify the restriction." *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014); *see also* Mot. at 15:13-24 (citing cases). Defendants fail to do so, and provide no credible national security justification for a ban of WeChat in the United States.  Nor do they explain why lesser, more targeted measures, would not address any legitimate issues without burdening speech.

According to Defendants, the "Government interests of paramount importance" that justify the WeChat Ban are "preventing the Chinese Government from using WeChat to surveil the American people, censor information, sow misinformation, and collect and use vast swaths of personal and proprietary information from American users to advance its

1    own interests."[6]  Opp. at 26:12-15.  But Defendants' 1,245-page submission of "evidence"

2    provides little, if anything about WeChat, its parent company, Tencent, or their activities in

3    the United States—let alone information about how they, as compared to other entities that

4    undergird the telecommunications network or are integrated with our critical infrastructure,

5    pose an actual national security threat.[7]  None of the government reports or studies

6    submitted by Defendants made findings or recommendations about how the civilian use of

7    WeChat to communicate with friends and family threatens the United States, much less

8    supports banning WeChat in this country.

9            Indeed, to substantiate WeChat's "threat," the Opposition relies almost exclusively

10   on public information from a foreign entity, the Australian Strategic Policy Initiative

11   ("ASPI").  *See* Opp. at 8-16-10:12, n.2-3; Dkts. 22-14 through 22-16, 22-19; *see also* Opp.

12   at 29-30 (arguing that less restrictive measures are unworkable).  Yet ASPI's most recent

13   and comprehensive analysis on WeChat, its September 8, 2020 report titled "TikTok and

14   WeChat: Curating and Controlling Global Information Flows," specifically recommends

15   broadly applicable data privacy and data protection frameworks, not a total ban:

16           Thus far governments have tended to hold most major international social

---

17   [6] Plaintiffs have *not* conceded that the Chinese government uses WeChat as a tool to
18   engage in "all-pervasive dragnet surveillance of the American population."  Opp. at 14:12-
     14 (internal quotations omitted).  Defendants quote sections of the Complaint out of
19   context and misrepresent its substance.  *See id.* at 14:10-22.

20   [7] *See. e.g.*, Dkts. 22-1 and 22-2 (news and congressional reports discussing ZTE and
     Huawei; no mention of WeChat); Dkts. 22-3 and 22-4 (517 pages of congressional reports
21   reviewing the Chinese telecommunications industry; no mention of WeChat); Dkt. 22-5
     (Department of Defense report naming technology companies with military ties; no
22   mention of WeChat); Dkt. 22 at 6 (sole mention of China states that "ongoing cyber
     activity from China [are now] **significantly lower** than before the bilateral US-China cyber
23   commitments of September 2015."); Dkt. 22-10 (intelligence report generally stating that
     the "Internet of Things" could bring new cyber threats; no mention of WeChat, which is
24   not an IoT app.); Dkt. 22-13 (generally discussing an "increasingly complex security
     environment … defined by rapid technological change," with no mention of WeChat);
25   Dkt. 22-17 (describing WeChat's popularity within **Australia's** Chinese diaspora, platform
     censorship, and fake news being spread on the platform, without any mention of national
26   security implications for the U.S.); Dkt. 22-19 (news article speculating as to the potential
     for misinformation transmitted **through** WeChat and an "Orwellian future **in China**" but
27   with no discussion at all about WeChat being a threat to U.S. national security); Dkt. 22-20
     (discussing TikTok, but not WeChat); Dkts. 22-23 and 22-24 (discussing China's party
28   censorship of WeChat content and China's great firewall, but not how that threatens U.S.
     national security); Dkt. 22-25 (WeChat's terms of service).

---

media networks and Chinese social media networks to different standards. **It's imperative that states move to a policy position where all social media and internet companies are being held to the same set of standards, regardless of their country of origin or ownership**. This report recommends [ ] that governments implement transparent user data privacy and user data protection frameworks that apply to all social media networks.

Bien Reply Decl. ¶ 2 & Ex. A at 7.  If the Government followed ASPI's recommendations, it would be pushing a range of user-friendly data privacy and protection requirements, including limits on how data is retained, accessed, and disseminated, rather than impose an unprecedented ban on speech.  *Id*.  It is only at end of their brief (*see* Opp. at 35:21) that Defendants raise what appears to be a credible national security concern—namely that WeChat could be relied on to transmit  "information relating to the national defense."  But that concern could be dealt with by restrictions on its use by federal government employees or on government-issued devices, for example, as it has already done with TikTok.  Bien Decl. (Dkt. 17-12) ¶ 4 & Ex. C.  It does not, however, justify a total ban on the app.

Finally, Defendants fail to rebut Plaintiffs' evidence—proven by the President's own tweets, speeches, and public statements—that the true purpose and timing of the EO was not to protect against national security threats but instead to further the President's political campaign by inciting racial animus against China and Chinese Americans, including blame for the pandemic for which he purposefully misled the country.  Mot. at 13:13-14:19; *see also* Bien Reply Decl. ¶ 3 & Ex. B  (New York Times article describing the President's admission that he intentionally disseminated false information about COVID-19 to the public earlier in the year).  Notably, Defendants point to no new event or discovery, report or recommendation relating to national security that explains or justifies the President's decision to go after WeChat on August 6, 2020.  That timing, however, is consistent with a troubled campaign that opportunistically scapegoated China.

/ / /

/ / /

1  **III.    A PRELIMINARY INJUNCTION IS WARRANTED IN THIS CASE**

2       **A.    Plaintiffs Are Likely to Succeed on the Merits**

3            **1.    Plaintiffs Are Likely to Succeed on Their Vagueness Claims[8]**

4       Defendants' argument that the Court cannot determine whether the EO is void for

5  vagueness until the Secretary issues definitions of prohibited transactions ignores the text

6  of the EO.  Section 3 provides that "there need be no prior notice of an identification made

7  pursuant to section 1(c) of this order" before initiation of an enforcement action.  *See* Bien

8  Decl. (Dkt. 17-12) ¶ 2 & Ex. A.  Due process requires that laws "define the criminal

9  offense with sufficient definiteness that ordinary people can understand what conduct is

10 prohibited …" and give "actual notice to citizens."  *Kolender v. Lawson*, 461 U.S. 352,

11 357-58 (1983); *see also F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)

12 ("[R]egulated parties should know what is required of them so they may act accordingly").

13      Defendants also ignore that the Secretary's definitions of prohibited transactions

14 will be made without the notice typically provided by the legislative or rulemaking

15 process.  Instead, those definitions will be provided on the very same day that the EO

16 authorizes enforcement—thus depriving Plaintiffs of actual and reasonable notice of what

17 actions are prohibited before they can be prosecuted.  Finally, Section 1(c) contemplates

18 the Secretary identifying "transactions" subject to the EO by September 20, 2020; but the

19 government gives no reassurance that the Secretary can, let alone will, address the

20 vagueness of other key terms in the Executive Order before it takes effect.

21      This is not the first time that the President has argued that the prospect of future

22 administrative clarification insulates his executive orders from vagueness challenges.  In

23 *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017), the President

24 raised the same argument against a preliminary injunction barring enforcement of

25

---

26 [8] Contrary to Defendants' arguments, Plaintiffs need not show that the EO is
   "unconstitutional in every conceivable application" for the Court to grant a preliminary
27 injunction based on a facial challenge.  Opp. at 22:18.  A law may also be found facially
   unconstitutional if "it seeks to prohibit such a broad range of protected conduct that it is
28 unconstitutionally overbroad."  *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir.
   1998), *as amended on denial of reh'g* (July 29, 1998).

1    Executive Order 13768, which sought to bar so-called "sanctuary cities" from obtaining

2    federal funds.  A vagueness challenge to that order was unripe, the President argued,

3    "because [the government] must still determine what the terms of the Order mean and how

4    it will enforce it …."  *Id*. at 529-30.  Judge Orrick rejected that excuse and enjoined

5    enforcement of Executive Order 13768 on vagueness grounds because the order did not

6    make clear what conduct might subject the plaintiff counties to a loss of federal funds, thus

7    "making it impossible for jurisdictions to determine how to modify their conduct, if at all,

8    to avoid the Order's penalties."  *Id*. at 534-35.  Similarly, this Court need not wait to

9    relieve Plaintiffs from the unconstitutionally vague EO.  Any forthcoming definitions will

10   not remedy the unavoidable due process violations within the EO, which authorizes the

11   Government to simultaneously notify Plaintiffs of what uses violate the law and

12   immediately prosecute them for such uses.[9]

13              **2.      Plaintiffs Are Likely to Succeed on Their First Amendment**
                          **Claims and Have Presented Serious Questions Going to Merits**
14

15           At this juncture, the Court need not make concrete determinations of how exactly

16   the EO violates the First Amendment, as it may grant a preliminary injunction when there

17   are "serious questions going to the merits" and the balance of hardships tips sharply in

18   Plaintiffs' favor.  *See All. for the Wild Rockies*, 632 F.3d at 1134-35.  Indeed, courts in this

19   district have granted preliminary relief without deciding what level of scrutiny should

20   apply, because so long as the "suit raises serious First Amendment questions, the Court has

21   little difficulty finding the potential for irreparable injury."  *Viacom Int'l, Inc. v. FCC*, 828

22   F. Supp. 741, 743 (N.D. Cal. 1993).  Here, Defendants concede that the EO implicates the

23   First Amendment, *see* Opp. at 24-32, and Defendants have failed to meet their burden of

24   justifying the EO's restriction on constitutionally-protected activities.  Plaintiffs are likely

25

26   ───────────────────
     [9] Defendants argue that IEEPA's scienter requirement for criminal liability defeats the due
27   process claim.  Opp. at 34:22-24, n.13.  But Plaintiffs are not required to wait and prove
     their scienter as an affirmative defense in a criminal trial, further increasing "the
     impermissible risk of discriminatory enforcement."  *Gentile v. State Bar of Nevada*, 501
28   US 1030, 1051 (1991).  And IEEPA also provides for civil penalties of $250,000 or more
     under 50 U.S.C. § 1705(b), for which there is no scienter requirement.

1   to succeed on the merits, and at the very least present "serious First Amendment questions

2   [compelling] a finding that there exists the potential for irreparable injury." *Sammartano*

3   *v. First Judicial Dist. Court*, 303 F.3d 959, 973 (9th Cir. 2002).

4              **(a)      The EO Is Not Content Neutral and Strict Scrutiny Should
                         Apply**
5

6         Defendants claim that the EO is content-neutral,[10] but this is belied by the fact that

7   the EO unnecessarily bans an entire social media platform primarily used by Chinese-

8   Americans, thereby slowing the spread of certain types of discourse.  In so doing, the EO

9   "reflect[s] the Government's preference for the substance of what the favored speakers

10  have to say (or aversion to what the disfavored speakers have to say)," *Turner Broad. Sys.,*

11  *Inc. v. FCC*, 512 U.S. 622, 658 (1994), and discriminates against specific "ideas [the

12  President] disfavors," *One World One Family Now v. City & Cty. of Honolulu*, 76 F.3d

13  1009, 1012 n.5 (9th Cir. 1996).

14        Indeed, the EO is a prior restraint.  Any governmental action that "makes the

15  peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the

16  uncontrolled will of an official … is an unconstitutional censorship or prior restraint upon

17  the enjoyment of those freedoms." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147,

18  151 (1969); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226 (1990).  Prior restraints

19  constitute "the essence of censorship," *Near v. Minnesota*, 283 U.S. 697, 713 (1931), and

20  "the most serious and the least tolerable infringement on First Amendment rights."

21  *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).  "[A]ny system of prior

22

23  _____
    [10]  Defendants' argument that the EO appears neutral on its face (despite clearly having
24  discriminatory intent and a disparate impact upon the Chinese community), *see* Opp. at
    24:5-26:2; Mot. at 21-22, should not prevent the Court from applying strict scrutiny.  Other
25  courts have invalidated laws with allegedly neutral purposes, finding that they actually
    made impermissible distinctions based on content:  *Arkansas Writers' Project v. Ragland*,
26  481 U.S. 221, 231–232 (1987) (sales tax scheme violated First Amendment's freedom of
    press guarantee by taxing general interest magazines but exempting other publications);
27  *Carey v. Brown*, 447 U.S. 455 (1980) (invalidating a ban on residential picketing that
    exempted labor picketing under the Equal Protection Clause); *Police Dep't of Chicago v.*
28  *Mosley*, 408 U.S. 92, 100 (1972) ("Far from being tailored to a substantial governmental
    interest, the discrimination among pickets is based on the content of their expression.").

1   restraints of expression … bear[s] a heavy presumption against its constitutional validity."

2   *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).

3                       **(b)      The EO Cannot Survive Intermediate Scrutiny**

4           Even if the EO is analyzed as a time, place, or manner restriction under intermediate

5   scrutiny, it still cannot pass constitutional muster because it is not "narrowly tailored to

6   serve a significant governmental interest" and fails to "leave open ample alternative

7   channels for communication."  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)

8   (citations and internal quotation marks omitted).

9                       **(i)      The EO Does Not Serve Important Government
                                  Interests**
10

11          Defendants insist that that the EO implicates "critically important Government

12  interests" involving "national security and foreign affairs."  Opp. at 37:17-18.  But generic

13  statements of national security concerns do not give the Government carte blanche to

14  infringe upon constitutional rights.  *See, e.g.*, *Ralls Corp.*, 758 F.3d at 318 ("These

15  procedural protections are required by the Due Process Clause … notwithstanding the

16  Government's 'compelling' interest in national security ….").  Defendants do not address

17  Plaintiffs' showing that the EO is motivated by anti-Chinese animus and political

18  opportunism.  *See* Mot., at 11, 21-22.  The absence of support linking WeChat to a national

19  security threat, *see* Section II and note 7, *supra*, strongly suggests that the Government's

20  explanation is a pretext.

21          *Trump v. Hawaii*, in which the majority upheld the President's travel ban in light of

22  explanations "involving sensitive and weighty interests of national security and foreign

23  affairs."  138 S. Ct. 2392, 2422 (2018) (internal quotations omitted) is easily

24  distinguishable as it applied rational basis review, inapplicable here, *id.* at 2423.  *Hawaii*

25  does not mandate blanket deference to the Government in this case, where Defendants

26  have failed to meet their burden of justifying the restriction on First Amendment speech.

27  *See Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011); *Klein v. City of*

28  *San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009) ("[w]hile [the Plaintiff] has the general

1   burden of establishing the elements necessary to obtain injunctive relief, [the Government]

2   has the burden of justifying the restriction on speech.")

3                    **(ii)    The EO's Ban of WeChat, *a fortiori,* Burdens
                              Substantially More Speech Than Necessary**

4

5           Defendants make the bizarre argument that a total ban of WeChat use in the United

6   States is "narrowly tailored" to the "central purpose" of preventing WeChat "from

7   collecting Americans' personal and proprietary information so that such information will

8   not flow to the Chinese Government." Opp. at 27:20-28:6.  By this logic, a complete ban

9   on telephone calls and emails to and from China would also be "narrowly tailored."

10  Defendants' superficial rejection of all alternatives—including those recommended by

11  ASPI—demonstrates that the Government has not fulfilled its duty to seriously consider

12  less speech-restrictive measures, such as barring WeChat from government-issued devices,

13  and instead simply gravitated towards the most extreme step.  Opp. at 29-30.  However,

14  "the prime objective of the First Amendment is not efficiency." *McCullen v. Coakley*, 573

15  U.S. 464, 495 (2014) (invalidating Massachusetts law that took "the extreme step of

16  closing a substantial portion of a traditional public forum to all speakers" without

17  "seriously addressing the problem through alternatives that leave the forum open").  To

18  demonstrate that the law is narrowly tailored, "the government must demonstrate that

19  alternative measures that burden substantially less speech would fail to achieve the

20  government's interests, not simply that the chosen route is easier." *Id.*

21                   **(iii)   A WeChat Ban Would Leave No Avenues of
                              Communication Available**

22

23          Defendants' assertion that a WeChat ban satisfies the requirement that the

24  Government must leave open ample alternatives channels for communication to the

25  Chinese Americans who depend on it for so much of their lives, Opp. at 30:26-31:17, is

26  belied by Defendants' acknowledgement that Plaintiffs would have no other method to

27  communicate with their friends and family in China.  *See* Opp. at 32:4-13 (arguing that

28  China is to blame, so the President cannot be held responsible for this substantial burden

on protected speech).  Plaintiffs established that WeChat is deeply ingrained within the culture of the Chinese diaspora and is the only medium of communication within this particular community that spans continents and the Great Firewall, not only because most other apps are barred from China, but also because no other apps are usable or accessible to native Chinese speakers with limited English proficiency.  *See, e.g.*, Sun Decl. (Dkt. 17-11) ¶32.  Plaintiffs' unsuccessful efforts to find even limited alternatives to WeChat, *see* Mot. at 38:20-23, are evidence of what an incalculable loss the WeChat ban would cause, not that there are adequate replacements.  *Compare Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 690-91 (2010) (upholding bar on certain "specific methods of communication," in part because "the advent of electronic media and social-networking sites reduces the importance of those [specific] channels") *with City of Ladue v. Gilleo*, 512 U.S. 43, 54-57 (1994) (invalidating municipal ban on lawn signs because it "completely foreclosed a venerable means of communication that is both unique and important").

### 3.   Plaintiffs Are Likely to Succeed on Their *Ultra Vires* Claim

Defendants assert that 50 U.S.C. § 1702(b) does not prevent the President from regulating personal communications or the exchange of information or informational materials via WeChat.  *See* Opp. at 3214-35:22.  This argument ignores clear statutory language to the contrary.  50 U.S.C. § 1702(b)(1), (3).  Defendants speculate that adequate alternative means of personal communication are available to Plaintiffs, Opp. at 33:1-3, but there is no exception in Section 1702(b)(1) for personal communications that could conceivably be transmitted through an alternative medium.  Section 1702(b)(1) specifies that the President's authority "does not include the authority to regulate or prohibit, directly or indirectly— (1) *any* postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value." (emphasis added).  As a fallback, Defendants also suggest that *all* personal communications transmitted via WeChat "involve a transfer of value" because all WeChat users necessarily "exchange their personal data and content for the right to use WeChat services."  Opp. at 33:3-9.  But this interpretation would render Section 1702(b)(1) meaningless, as it would

justify unilateral presidential regulation of virtually any personal communications (*e.g.*, a telephone call). Nor is it what Congress intended when it enacted the limitations on presidential power in Section 1702(b). *See* H.R. Rep. No. 95-459, at 16 (June 23, 1977) ("The provisions of [Section 1702(b)(1)] are designed both to preserve First Amendment freedoms of expression, and to preclude policies that would totally isolate the people of the United States from the people of any other country.") Bien Reply Decl. ¶ 4 & Ex. C.

According to Defendants, Section 1702(b)(3)'s express limitation on the President's authority to unilaterally control the international flow of news, culture, and ideas does not apply to regulations of "a single service provider." Opp. at 34:6-18. But regulations singling out particular providers are *precisely* what Congress was worried about when it enacted and then expanded the protections for information and informational materials in Section 1702(b)(3). Such a targeted approach to controlling the flow of information triggers core First Amendment concerns about content- and viewpoint-based discrimination, and is squarely at odds with both the text and the intent of Section 1702(b)(3). *See Kalantari v. NITV, Inc.*, 352 F.3d 1202, 1205 (9th Cir. 2003).

**B.     Preliminary Injunctive Relief Is Necessary to Avoid Further Harms**

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). "Irreparable injury need not be established with certainty or even high probability; the distant possibility of such harm establishes a 'serious threat of irreparable injury' sufficient to support preliminary injunctive relief." *Napa Valley Publ'g Co. v. City of Calistoga*, 225 F. Supp. 2d 1176, 1182 (N.D. Cal. 2002). Plaintiffs' uncontroverted evidence shows that they have already lost First Amendment freedoms by changing their associational conduct as a result of the enactment of the EO, and will continue to do so. *See, e.g.*, Bao Decl. (Dkt. 17-1) ¶ 17 (using other apps but finding "very few of my WeChat contacts use" apps not designed for Chinese-speaking users); Duan Decl. (Dkt. 17-4) ¶ 25 (explaining that Chihuo Inc. has lost business relationships due to the EO); Peng Decl. (Dkt. 17-5) ¶ 28 (explaining that MHACC has begun using an alternative app but "only a small percentage

1    of [mental health services] recipients have switched [to the alternative app] so far").

2    Plaintiffs' evidence similarly demonstrates the burdens on their protected associational,

3    speech, and religious interests will continue to occur if relief is not granted.  *See id.* ¶¶ 22-

4    23; Duan Decl. (Dkt. 17-4) ¶¶ 25-26, 28; Zhang Decl. (Dkt. 17-6) ¶¶ 7, 16, 18, 19; Coulter

5    Decl. (Dkt. 17-3) ¶¶ 9-12; Bao Decl. (Dkt 17-1) ¶ 16; Cao Decl. (Dkt. 17-2) ¶¶ 23-24.

6         Defendants' Opposition fails to rebut this evidence, or to acknowledge that under

7    controlling law Plaintiffs have *a priori* established irreparable harm by raising colorable

8    First Amendment and Due Process claims.  *See, e.g.*, *Doe v. Harris*, 772 F.3d at 583 ("A

9    colorable First Amendment claim is irreparable injury sufficient to merit the grant of relief,

10   and [i]f the underlying constitutional question is close … we should uphold the injunction

11   and remand for trial on the merits.") (internal quotation marks and citations omitted);

12   *Warsoldier v. Woodford*, 418 F.3d 989, 1001-02 (9th Cir. 2005) (concluding that where a

13   plaintiff "raised a colorable claim that the exercise of his religious beliefs has been

14   infringed, he has sufficiently established that he will suffer an irreparable injury absent an

15   injunction."); *Viacom*, 828 F. Supp. at 743-44 (finding irreparable injury without deciding

16   the applicable scrutiny level).

17        Defendants' cases are not to the contrary.  Defendants argue that Plaintiffs' fear,

18   anxiety, and confusion "are entirely conjectural" and "not adequately concrete;" but no

19   executive order has previously sought to ban and criminalize the use of a single social

20   media platform used by tens of millions to communicate, and none of the cases Defendants

21   rely upon for this argument involve challenges to vague laws or otherwise implicate the

22   First Amendment in evaluating irreparable harm.  *See* Opp. at 36:26-37:20; *cf. Napa Valley*

23   *Publ'g Co.*, 225 F. Supp. 2d at 1181 (finding irreparable harm where publisher "proffered

24   evidence it *would* lose significant readership *if* the challenged restrictions were

25   implemented pending trial.") (emphasis added).  A finding of irreparable injury is

26   appropriate where Plaintiffs' fear of harm is caused by a law's vague terms.  *See, e.g.*,

27   *County of Santa Clara v. Trump*, 250 F. Supp. 3d at 537 (finding the "substantial

28   confusion and justified fear" that counties will lose all federal grant funding amounts to

1   irreparable harm where it was caused by an executive order's "unclear terms and its broad

2   and undefined scope").  This is especially true where, as here, the government has failed to

3   assure that a law challenged for vagueness will not apply to Plaintiffs' acts.  *See Hedges v.*

4   *Obama*, No. 12 CIV. 331, 2012 WL 1721124, at *27 (S.D.N.Y. May 16, 2012), *order*

5   *clarified*, 2012 WL 2044565 (S.D.N.Y. June 6, 2012) ("the indefinite—indeed, vague—

6   nature of [the statute], coupled with the Government's inability to provide assurances that

7   the specific conduct at issue here (of which the Government had ample notice) would not

8   subject plaintiffs to prosecution and detention for their acts lays the foundation for

9   plaintiffs' reasonable fear of irreparable harm.").

10        Defendants cite to an antitrust case to argue that harms to business interests "are not

11   irreparable and thus are not a proper basis for a preliminary injunction."  Opp. at 38:3-7.

12   Yet, where the freedom to speak guaranteed by the First Amendment is at issue, "the

13   prevention of access to a public forum is, each day, an irreparable injury."  *Jacobsen v.*

14   *U.S. Postal Serv.*, 812 F.2d 1151, 1152, 1154 (9th Cir. 1987) (newspaper publisher's

15   "fledgling business suffers irreparable harm if the administrators ban his papers" from post

16   office entrances).

**C.    The Balance of Hardships and the Public Interest Weigh Heavily In Plaintiffs' Favor**

19        Defendants argue that an injunction "would frustrate and displace the President's

20   determination of how best to address threats to national security;" Opp. at 39:10-14; but

21   vague, conclusory, and unsupported assertions of "significant national security and foreign

22   policy interests," *id*. at 39:3-5, are insufficient to tip the balance in Defendants' favor.  *See,*

23   *e.g.*, *Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) ("Rather than present

24   evidence to explain the need for the Executive Order, the Government has taken the

25   position that we must not review its decision at all.  We disagree[.])"  Each of the cases

26   Defendants rely upon to support the interests they claim are "at stake" in this matter were

27   supported by evidence of an appreciable national security or foreign policy interest.  *See*

28   *Winter*, 555 U.S. at 24 ("the record contains declarations from some of the Navy's most

1  senior officers, all of whom underscored the threat posed by enemy submarines and the

2  need for extensive sonar training to counter this threat"); *United States v. South Carolina*,

3  840 F. Supp. 2d 898, 921 (D.S.C. 2011), *modified in part*, 906 F. Supp. 2d 463 (D.S.C.

4  2012), *aff'd*, 720 F.3d 518 (4th Cir. 2013) (referring to "a declaration submitted by Deputy

5  Secretary of State William Burns" stating the "harm [to] a wide range of delicate U.S.

6  foreign relations interests."); *Escamilla v. M2 Tech., Inc.*, No. 4:12CV634, 2013 WL

7  4577538, at *2 (E.D. Tex. Aug. 27, 2013) ("Both sides also offered evidence in support of

8  their respective positions.").  Defendants' showing in this case is entirely dissimilar.

9         Defendants fail to explain the significance of September 20, 2020 or how

10  maintaining the status quo during a reasonable notice period following the delineation of

11  "transactions" will in any way harm the United States' interests.  In contrast, "[t]he fact

12  that [Plaintiffs] have raised serious First Amendment questions compels a finding that …

13  the balance of hardships tips sharply in [Plaintiffs'] favor."  *Am. Beverage Ass'n v. City &*

14  *Cty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019).  And "it is always in the public

15  interest to prevent the violation of a party's constitutional rights."  *Padilla v.*

16  *Immigration & Customs Enf't*, 953 F.3d 1134, 1147 (9th Cir. 2020).

17         **D.      A Nationwide Injunction Is Appropriate Here**

18         "Adequate equitable relief must remedy [Plaintiffs'] harms."  *E. Bay Sanctuary*

19  *Covenant v. Trump*, 950 F.3d 1242, 1282 (9th Cir. 2020).  Defendants argue that any

20  preliminary relief should be limited, and that "staying the EO's effective date as to

21  Plaintiffs until after the Secretary issues final regulations would achieve that goal."  Opp.

22  at 40:12-14.  Plaintiffs include residents of four states and the USWUA is made up of

23  WeChat users throughout the United States.  Complaint Dkt. 1, ¶¶ 19-25.  Plaintiffs' uses

24  of WeChat depends on the network effects of other users; limiting an injunction to only

25  Plaintiffs would be equivalent to not issuing any injunction at all, for Plaintiffs would be

26  left with no other U.S. users with whom to communicate.

27                              **CONCLUSION**

28         Plaintiffs respectfully ask the Court to enter the Proposed Order, Dkt. 17-13.

1

DATED:  September 11, 2020          Respectfully submitted,

2                                   ROSEN BIEN GALVAN & GRUNFELD LLP

3                                   By:  */s/ Michael W. Bien*

4                                        Michael W. Bien

5                                   Attorneys for Plaintiffs

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28