MICHAEL W. BIEN – 096891
VAN SWEARINGEN – 259809
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:     (415) 433-6830
Facsimile:      (415) 433-7104
Email:           mbien@rbgg.com
                      vswearingen@rbgg.com
                      agourse@rbgg.com
                      axu@rbgg.com

KELIANG (CLAY) ZHU – 305509
DEHENG LAW OFFICES PC
7901 Stoneridge Drive #208
Pleasanton, California  94588
Telephone:     (925) 399-5856
Facsimile:      (925) 397-1976
Email:           czhu@dehengsv.com

ANGUS F. NI – Admitted *Pro Hac Vice*
AFN LAW PLLC
502 Second Avenue, Suite 1400
Seattle, Washington  98104
Telephone:     (773) 543-3223
Email:           angus@afnlegal.com

Attorneys for Plaintiffs

THOMAS R. BURKE – 141930
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California  94111-6533
Telephone:     (415) 276-6500
Facsimile:      (415) 276-6599
Email:           thomasburke@dwt.com

DAVID M. GOSSETT – Admitted *Pro Hac Vice*
DAVIS WRIGHT TREMAINE LLP
1301 K Street N.W., Suite 500 East
Washington, D.C.  20005-3366
Telephone:     (202) 973-4216
Facsimile:      (202) 973-4499
Email:           davidgossett@dwt.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| U.S. WECHAT USERS ALLIANCE, CHIHUO INC., BRENT COULTER, FANGYI DUAN, JINNENG BAO, ELAINE PENG, and XIAO ZHANG,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, and WILBUR ROSS, in his official capacity as Secretary of Commerce,<br><br>Defendants. | Case No. 3:20-cv-05910-LB<br><br>**REPLY DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge:   Hon. Laurel Beeler<br>Date:     September 17, 2020<br>Time:     9:30 a.m.<br>Crtrm.:   Remote<br><br>Trial Date:      None Set |

[3611984.7]

I, Michael W. Bien, declare:

1.      I am an attorney duly admitted to practice before this Court.  I am a partner in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify.  I make this Reply Declaration in support of Plaintiffs' Motion for Preliminary Injunction.

2.      Attached hereto as **Exhibit A** is a true and correct copy of a September 8, 2020 Australian Strategic Policy Institute ("ASPI") report by Fergus Ryan, Audrey Fritz and Daria Impiombato titled "TikTok and WeChat: Curating and controlling global information flows."  This report is available for download at: https://www.aspi.org.au/report/tiktok-wechat (last accessed September 11, 2020).

3.      Attached hereto as **Exhibit B** is a true and correct copy of a September 9, 2020 news article by Maggie Haberman of the New York Times titled "Trump Admits Downplaying the Virus Knowing It Was 'Deadly Stuff,'" *available at*: https://www.nytimes.com/2020/09/09/us/politics/woodward-trump-book-virus.html (last accessed September 11, 2020).

4.      Attached hereto as **Exhibit C** is a true and correct copy of House Report No. 95-459 (June 23, 1977), titled "Trading with the Enemy Act Reform Legislation – Report of the Committee on International Relations (Including Cost Estimate of the Congressional Budget Office) on H.R. 7738, with respect to the powers of the President in time of war or national emergency."  This report was downloaded by my staff from Westlaw.com on September 11, 2020.

5.      On Friday, September 11, 2020, at 7:00pm, I searched the U.S. Department of Commerce website (https://www.commerce.gov/) for any reference to Tencent or WeChat.  There was none.  I also did an advanced Google search for the same two terms on the domain for the U.S. Department of Commerce (https://www.commerce.gov/), and the search returned no results.  I have been closely following press reports and am not aware of any announcements by the Secretary of Commerce concerning what, if anything,

1    will be issued on September 20, 2020 concerning the definition of "transactions" for the

2    implementation of the WeChat Executive Order.

3          I declare under penalty of perjury under the laws of the United States of America

4    that the foregoing is true and correct, and that this declaration is executed at San Francisco,

5    California this 11th day of September, 2020.

6

7                                        /s/ Michael W. Bien

8                                        Michael W. Bien

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

# Exhibit A

# TikTok and WeChat

Curating and controlling global
information flows

Fergus Ryan, Audrey Fritz and Daria Impiombato





Policy Brief
Report No. 37/2020

## About the authors

**Fergus Ryan** is an Analyst working with the International Cyber Policy Centre at ASPI.

**Audrey Fritz** is a Researcher working with the International Cyber Policy Centre at ASPI.

**Daria Impiombato** is an Intern working with the International Cyber Policy Centre at ASPI.

## Acknowledgements

We would like to thank Danielle Cave and Fergus Hanson for their work on this project. We would also like to thank Michael Shoebridge, Dr Samantha Hoffman, Jordan Schneider, Elliott Zaagman and Greg Walton for their feedback on this report as well as Ed Moore for his invaluable help and advice. We would also like to thank anonymous technically-focused peer reviewers.

This project began in 2019 and in early 2020 ASPI was awarded a research grant from the US State Department for US$250k, which was used towards this report. The work of ICPC would not be possible without the financial support of our partners and sponsors across governments, industry and civil society.

## What is ASPI?

The Australian Strategic Policy Institute was formed in 2001 as an independent, non-partisan think tank. Its core aim is to provide the Australian Government with fresh ideas on Australia's defence, security and strategic policy choices. ASPI is responsible for informing the public on a range of strategic issues, generating new thinking for government and harnessing strategic thinking internationally. ASPI's sources of funding are identified in our Annual Report, online at www.aspi.org.au and in the acknowledgements section of individual publications. ASPI remains independent in the content of the research and in all editorial judgements.

## ASPI International Cyber Policy Centre

ASPI's International Cyber Policy Centre (ICPC) is a leading voice in global debates on cyber, emerging and critical technologies, issues related to information and foreign interference and focuses on the impact these issues have on broader strategic policy. The centre has a growing mixture of expertise and skills with teams of researchers who concentrate on policy, technical analysis, information operations and disinformation, critical and emerging technologies, cyber capacity building, satellite analysis, surveillance and China-related issues.

The ICPC informs public debate in the Indo-Pacific region and supports public policy development by producing original, empirical, data-driven research. The ICPC enriches regional debates by collaborating with research institutes from around the world and by bringing leading global experts to Australia, including through fellowships. To develop capability in Australia and across the Indo-Pacific region, the ICPC has a capacity building team that conducts workshops, training programs and large-scale exercises for the public and private sectors.

We would like to thank all of those who support and contribute to the ICPC with their time, intellect and passion for the topics we work on. If you would like to support the work of the centre please contact: icpc@aspi.org.au

## Important disclaimer

This publication is designed to provide accurate and authoritative information in relation to the subject matter covered. It is provided with the understanding that the publisher is not engaged in rendering any form of professional or other advice or services. No person should rely on the contents of this publication without first obtaining advice from a qualified professional.

## ASPI

Tel +61 2 6270 5100

Email enquiries@aspi.org.au

www.aspi.org.au

www.aspistrategist.org.au

 facebook.com/ASPI.org

@ASPI_ICPC

© The Australian Strategic Policy Institute Limited 2020

This publication is subject to copyright. Except as permitted under the *Copyright Act 1968*, no part of it may in any form or by any means (electronic, mechanical, microcopying, photocopying, recording or otherwise) be reproduced, stored in a retrieval system or transmitted without prior written permission. Enquiries should be addressed to the publishers. Notwithstanding the above, educational institutions (including schools, independent colleges, universities and TAFEs) are granted permission to make copies of copyrighted works strictly for educational purposes without explicit permission from ASPI and free of charge.

First published September 2020.

ISSN 2209-9689 (online), ISSN 2209-9670 (print)

**Cover image:** Illustration by Wes Mountain. ASPI ICPC and Wes Mountain allow this image to be republished under the Creative Commons License Attribution-Share Alike. Users of the image should use the following sentence for image attribution: 'Illustration by Wes Mountain, commissioned by the Australian Strategic Policy Institute's International Cyber Policy Centre.'





Funding for this report was provided by the US State Department

# TikTok and WeChat

Curating and controlling global
information flows

Fergus Ryan, Audrey Fritz and Daria Impiombato

Policy Brief
Report No. 37/2020

# Contents

What's the problem?                                                                          03

What's the solution?                                                                         04

TikTok censorship                                                                            04

WeChat censorship                                                                            25

TikTok privacy concerns and data collection                                                  36

WeChat privacy concerns and data collection                                                  43

Conclusion                                                                                   47

Recommendations                                                                              48

Appendix 1: Tencent and ByteDance CCP connections                                            49

Appendix 2: TikTok data privacy and collection                                               51

Appendix 3: WeChat                                                                           59

Appendix 4: Examples of PRC-based TikTok jobs advertised by ByteDance                         61

Notes                                                                                        64

Acronyms and abbreviations                                                                   68

Policy Brief: TikTok and WeChat: Curating and controlling global information flows

# What's the problem?

While most major international social media networks remain banned from the Chinese market in the People's Republic of China (PRC), Chinese social media companies are expanding overseas and building up large global audiences. Some of those networks—including WeChat and TikTok—pose challenges, including to freedom of expression, that governments around the world are struggling to deal with.

The Chinese 'super-app' WeChat, which is indispensable in China, has approximately 1.2 billion monthly active users[1] worldwide, including 100 million installations outside of China.[2] The app has become the long arm of the Chinese regime, extending the PRC's techno-authoritarian reach into the lives of its citizens and non-citizens in the diaspora.[3] WeChat users outside of China are increasingly finding themselves trapped in a mobile extension of the Great Firewall of China through which they're subjected to surveillance, censorship and propaganda. This report also shows how Covid-19 has ushered in an expanded effort to covertly censor and control the public diplomacy communications of foreign governments on WeChat.

Newcomer TikTok, through its unparalleled growth in both Asian and Western markets, has a vastly larger and broader global audience of nearly 700 million as of July 2020.[4] This report finds that TikTok engages in censorship on a range of political and social topics, while also demoting and suppressing content. Case studies in this report show how discussions related to LGBTQ+ issues, Xinjiang and protests currently occurring in the US, for example, are being affected by censorship and the curation and control of information. Leaked content moderation documents have previously revealed that TikTok has instructed "its moderators to censor videos that mention Tiananmen Square, Tibetan independence, or the banned religious group Falun Gong," among other censorship rules.[5]

Both Tencent and ByteDance, the companies that own and operate WeChat and TikTok, respectively, are subject to China's security, intelligence, counter-espionage and cybersecurity laws. Internal Chinese Communist Party (CCP) committees at both companies are in place to ensure that the party's political goals are pursued alongside the companies' commercial goals. ByteDance CEO Zhang Yiming has stated on the record that he will ensure his products serve to promote the CCP's propaganda agenda.[6]

While most major international social media platforms have traditionally taken a cautious and public approach to content moderation, TikTok is the first globally popular social media network to take a heavy-handed approach to content moderation. Possessing and deploying the capability to covertly control information flows, across geographical regions, topics and languages, positions TikTok as a powerful political actor with a global reach.

# What's the solution?

The global expansion of Chinese social media networks continues to pose unique challenges to policymakers around the world. Thus far governments have tended to hold most major international social media networks and Chinese social media networks to different standards. It's imperative that states move to a policy position where all social media and internet companies are being held to the same set of standards, regardless of their country of origin or ownership.

This report recommends (on page 48) that governments implement transparent user data privacy and user data protection frameworks that apply to all social media networks. If companies refuse to comply with such frameworks, they shouldn't be allowed to operate. Independent audits of social media algorithms should be conducted. Social media companies should be transparent about the guidelines that human moderators use and what impact their decisions have on their algorithms. Governments should require that all social media platforms investigate and disclose information operations being conducted on their platforms by state and non-state actors. Disclosures should include publicly releasing datasets linked to those information campaigns.

Finally, all of these recommended actions would benefit from multilateral collaboration that includes participation from governments, the private sector and civil society actors. For example, independent audits of algorithms could be shared by multiple governments that are seeking the same outcomes of accountability and transparency; governments, social media companies and research institutes could share data on information operations; all stakeholders could share lessons learned on data frameworks.

# TikTok censorship

TikTok's rapid expansion around the world has been punctuated by a string of censorship controversies that it has struggled to explain away. Initial instances of censorship, documented in this report, were the result of a 'blunt approach' to content moderation that TikTok spokespeople admit they deployed in the app's 'early days'.[7] More recent examples of apparent censorship—including posts tagged with #BlackLivesMatter and #GeorgeFloyd—have been explained away by TikTok as the result of a 'technical glitch'.[8]

Our research suggests that many of these cases were most likely not aberrations, but the side effects of an approach that ByteDance, TikTok's owner and operator, has used in an attempt to avoid controversy and maintain what it considers to be an apolitical stance as it grows a worldwide audience.[9] But the very nature of TikTok's targeted global censorship isn't apolitical; in fact, it makes the app a politically powerful actor.

Our research shows, for example, that hashtags related to LGBTQ+ issues are suppressed on the platform in at least 8 languages. This blunt approach to censorship affects not only citizens of a particular country, but all users speaking those languages, no matter where in the world they live. TikTok users posting videos with these hashtags are given the impression their posts are just as searchable as posts by other users, but in fact they aren't. In practice, most of these hashtags are categorised in TikTok's code[10] in the same way that terrorist groups, illicit substances and swear words

are treated on the platform. On some occasions, hashtags are categorised as non-existent, when in fact they're tagged on videos across the platform.

TikTok spokespeople have repeatedly stated that the platform is not 'influenced by any foreign government, including the Chinese Government',[11] and that 'TikTok does not moderate content due to political sensitivities.'[12] But the censorship techniques outlined below disprove some of those claims and, instead, suggest a preference for protecting and entrenching the sensitivities, and even prejudices, of some governments, including through censoring content that might upset established social views.

On 6 and 7 September ASPI contacted TikTok and provided them with hashtags our research discovered were being shadowbanned and asked for comment on these research findings. These hashtags were:

- **#acab** – English, acronym for "all cops are bastards," use of which began during the George Floyd protests in the United States
- **#путинвор** – "Putin Is A Thief" in Russian
- **#Jokowi** – nickname for Joko Widodo, President of Indonesia
- **#GayArab** – English
- **#гей** – "Gay" in Russian
- **#مثلي_الجنس** – "Gay" in Arabic
- **#ялесбиянка** – "I am a lesbian" in Russian
- **#ягей** – "I am gay" in Russian
- **#gei** – "Gay" in Estonian
- **#gej** – "Gay" in Bosnian
- **#สมเด็จพระเจ้าลูกเธอเจ้าฟ้าสิริวัณณวรีนารีรัตนราชกัญญา** – #Princess Sirivannavari Nariratana Rajakanya in Thai
- **#กษัตริย์มีไว้ทำไม** – "Why Do We Need A King" in Thai
- **#ไม่รับปริญญาจากสถาบันกษัตริย์** – "I won't graduate with the monarchy" in Thai
- **#المتحول_جنسي** – "Transgender" in Arabic
- **#التحول_الجنسي** – "Transgender/transitioning" in Arabic

The response by a TikTok spokesperson was:

*"As part of our localised approach to moderation, some terms that the ASPI provided were partially restricted due to relevant local laws. Other terms were restricted because they were primarily used when looking for pornographic content, while the Thai phrases the ASPI supplied are either readily found when searched or do not appear to be hashtags that any TikTok users have added to their posts. We also identified, and fixed, an issue where some compound phrases in Arabic were being incorrectly moderated because part of the phrase may relate to pornography. Separately, a couple of English phrases were incorrectly moderated, and we have resolved the error. We are currently conducting a review of those terms that were moderated in error and will look for ways to improve our processes to avoid similar issues in the future. In addition, we want to be crystal clear that TikTok strongly supports our LGBTQ creators around the world and is proud that LGBTQ content is among the most popular category on the platform with billions of views."*

## World leaders and politics

Leaked content moderation guidelines seen by *The Guardian* in March 2020 barred content related to a specific list of 20 'foreign leaders or sensitive figures' including Kim Jong-il, Kim Il-sung, Mahatma Gandhi, Vladimir Putin, Donald Trump, Barack Obama, Kim Jong-un, Shinzo Abe, Park Geun-Hee, Joko Widodo and Narendra Modi (Figure 1).[13] ByteDance said those rules were retired in May 2019, but our research has found that hashtags related to criticism of the leaders continue to be censored. The censorship ranges from #путинвор ('Putin Is A Thief') to even seemingly innocuous hashtags, such as #Jokowi—the politically neutral nickname for Indonesian President Joko Widodo. These hashtags have been shadow banned by TikTok, meaning that content tagged with them has been suppressed and often totally hidden from public view; posts are made much more difficult to find on the platform though they're not necessarily deleted. It's a more insidious form of censorship in that users are being censored, but often don't know it because they can still see their own content.

**Figure 1: List of censored or shadow-banned political hashtags on TikTok**



Source: ASPI's International Cyber Policy Centre (ICPC).

In the course of our research, we regularly encountered discrepancies between the number of videos visible on a hashtag and the number of videos recorded under 'videoCount' in the code. Those discrepancies could be due to videos being in review or videos that have broken TikTok's community guidelines, which include taking down content that is disinformation or is hateful, violent or sexually explicit content. But the discrepancy could also be due to videos being shadow banned. A source from

TikTok cited by *Netzpolitik* said that videos that are tagged 'Not for Feed' in the moderation process get excluded from being featured in the platform's 'For You' feed, which can then 'disadvantage discoverability in the search function and hashtags'.[14]

On 15 August, #HồChíMinh showed 63 videos visible on the web version of TikTok, but 383 videos in the code for the hashtag. It's possible that the 320 videos missing from the hashtag were absent because their content contravened TikTok's community guidelines, but there's a real possibility at least some of them were removed due to political censorship over the late communist leader of Vietnam. As *Reuters* reported in August 2020, ByteDance sought to avoid any run-ins with the Vietnamese Government by promising to make TikTok 'non-political' in the country.[15] That censorship was even extended by ByteDance to cover 'content critical of Beijing, and anything related to tensions between the two governments'.

Around the world, TikTok content guidelines have gradually become more localised for individual countries. Country-specific and so-called 'strict' content guidelines leaked to *The Guardian* suggest that the localised approach could result in more censorship than before.[16] In Thailand, where pro-democracy protests have been ongoing since June,[17] TikTok has attempted to avoid contravening the country's strict *lèse-majesté* laws, which make it illegal to insult, defame or threaten any member of the royal family, in an overly broad way. Our research shows that hashtags related to the Thai royal family are censored on TikTok, not just for Thai citizens, but for Thai-speaking people around the world.

On TikTok, #สมเด็จพระเจ้าลูกเธอเจ้าฟ้าสิริวัณณวรีนารีรัตนราชกัญญา (#PrincessSirivannavariNariratanaRajakanya) isn't just shadow banned but completely censored from the entire platform. The hashtag is used on other platforms, such as Twitter, YouTube, Facebook and Instagram, and isn't considered controversial. It's often linked to news articles about the princess or positive messages about her. On TikTok, the hashtag isn't functional on the app even when users click on the hashtag that they've tagged on their posts. While shadow-banned hashtags can be found on the app by clicking on hashtags through a video, when censored hashtags are clicked, users are redirected to a '#(null)' page with miscellaneous content in it (Figure 2).

**Figure 2: A TikTok video featuring the hashtag #สมเด็จพระเจ้าลูกเธอเจ้าฟ้าสิริวัณณวรีนารีรัตนราชกัญญา (#PrincessSirivannavariNariratanaRajakanya), left. Clicking on the hashtag results in 'null' results, right**



Source: TikTok.

The hashtag #ไม่รับปริญญาจากสถาบันกษัตริย์ (#IWon'tGraduateWithTheMonarchy) is also censored on TikTok, in the same way as the hashtag #สมเด็จพระเจ้าลูกเธอเจ้าฟ้าสิริวัณณวรีนารีรัตนราชกัญญา (#PrincessSirivannavariNariratanaRajakanya) is. ASPI posted a test video on 25 August with this hashtag, but the hashtag search results page remained blank. When we clicked the hashtag on our post, it also redirected to a '#(null)' page with miscellaneous content in it.

Another hashtag related to the monarchy—#กษัตริย์มีไว้ทำไม (#WhyDoWeNeedAKing), —surged in popularity during the protests on other platforms like Twitter but had only 11 videos on the TikTok app on 28 August 2020. On 7 September, that number had dropped to just 7 videos. Curiously, the hashtag search results page for #กษัตริย์มีไว้ทำไม (#WhyDoWeNeedAKing) on TikTok.com on 28 August 2020 resulted in a blank search results page. On the same day, #ทรงพระเจริญ (Long live the King) had millions of views and hundreds of videos on the TikTok app. Twitter recorded more than 20,000 tweets with #กษัตริย์มีไว้ทำไม (#WhyDoWeNeedAKing) on 22 and 23 March 2020 as it trended in first place on Twitter in Thailand. The hashtag is mainly used by young Thai activists who fit TikTok's user demographics.

## Protests

TikTok's strategy of blocking certain hashtags from search results continues to be deployed in the US, where hashtag search results for #acab—an acronym for 'all cops are bastards'—were suppressed in the early days of the George Floyd protests. After a public backlash, TikTok backed down, making several hashtags related to the protest, including #acab, available on 29 May. At that stage, the hashtag had garnered 96.5 million views, according to the Atlantic Council's Digital Forensic Research Lab (DFRLab).[18] But our research shows that, three months later, as anti-racism and anti-police-brutality protests took place in Kenosha, Wisconsin, following a police shooting of black man Jacob Blake, the #acab hashtag was censored once again after media scrutiny subsided (Figure 3).

**Figure 3: A web search for #acab on TikTok.com (top left), a web search for #antiacab on TikTok.com, (bottom left) and a mobile search for #acab (right), all on 29 August**



Source: TikTok.

It's highly unlikely that #acab, having been shadow banned, unshadow banned and now shadow banned again, is continuing to undergo a rolling 'technical glitch'. The inconsistency in TikTok's content moderation is highlighted by the fact that an opposing hashtag—#antiacab—wasn't shadow banned but readily available on both the mobile and browser versions of TikTok.[19]

A source working for TikTok cited by *Netzpolitik* in September 2019 said that protests were generally not welcome on the platform. 'Often such videos did not even make it into marketing, but would be deleted beforehand when the moderator looked at them for the first time at other locations such as Barcelona,' the German outlet reported.[20] The source said that TikTok changed its moderation rules after *The Guardian* revealed its heavy-handed political censorship in September 2019. Those rules

included instructions to "censor videos that mention Tiananmen Square, Tibetan independence, or the banned religious group Falun Gong."[21]

A former content moderator for TikTok told the *New York Times* in November 2019 that 'managers in the US had instructed moderators to hide videos that included any political messages or themes, not just those related to China.' Speaking on the condition of anonymity, the informant said that the policy was to, in the newspaper's words, 'allow such political posts to remain on users' profile pages but to prevent them from being shared more widely in TikTok's main video feed.'[22]

## LGBTQ+

TikTok claims that it continues 'to see the vulnerability of LGBTQ+ rights', writing in a June 2020 blog post that 'it's important to us that the LGBTQ+ voices and stories of those who are pushing forward acceptance for all and helping to create a world where everyone has the right to be who they are and love who they love, are shared, seen and heard.'[23] Our research shows that that commitment isn't applied consistently across multiple languages.

Content moderation guidelines leaked to *The Guardian* revealed in September 2019 that LGBTQ+ content was banned on TikTok even in countries where homosexuality has never been illegal.[24] Additional reporting by *Netzpolitik* in December 2019 (also based on leaked documents from TikTok) revealed that the platform was limiting the reach of LGBTQ+ users as well as disabled and overweight people—a charge TikTok admitted to but explained away as an attempt to protect users with at high risk from bullying.[25]

According to *The Guardian*, content moderation guidelines specific to Turkey included an entire section devoted to censoring depictions of homosexuality—much of which 'went substantially further than required by law'. Censored content included 'intimate activities (holding hands, touching, kissing) between homosexual lovers', 'reports of homosexual groups, including news, characters, music, tv show, pictures', as well as 'protecting rights of homosexuals (parade, slogan, etc.)' and 'promotion of homosexuality'.

LGBTQ+ TikTok users around the world have complained about censorship of their posts, including in the UK,[26] the US[27] and Turkey.[28] Our research has found that hashtags related to LGBTQ+ issues in Russian, Arabic, Bosnian and more aren't searchable on the platform, preventing people who speak those languages all over the world from taking part in the discussion (Figure 4).

**Figure 4: List of shadow-banned LGBTQ+ hashtags on TikTok**

| Word | Language | Translation | TikTok |
|------|----------|-------------|--------|
| гей | Russian | Gay | Shadowbanned (web + app) |
| ялесбиянка | Russian | I am a lesbian | Shadowbanned (web + app) |
| ягей | Russian | I am gay | Shadowbanned (web + app) |
| مثلي_الجنس | Arabic | Gay | Shadowbanned (web + app) |
| المتحول_جنسي | Arabic | Transgender | Shadowbanned (web + app) |
| التحول_الجنسي | Arabic | Transitioning (transgender) | Shadowbanned (web + app) |
| гей | Ukranian | Gay | Shadowbanned (web + app) |
| гей | Bulgarian | Gay | Shadowbanned (web + app) |
| гей | Kazakh | Gay | Shadowbanned (web + app) |
| гей | Kyrgyz | Gay | Shadowbanned (web + app) |
| gei | Estonian | Gay | Shadowbanned (web + app) |
| gej | Bosnian | Gay | Shadowbanned (web + app) |

Source: ASPI ICPC.

LGBTQ+ content in Russian, for example, is shadow banned on TikTok. When Russian-speaking users—citizens and non-citizens alike—search the app for #гей (#Gay), they're met with a blank hashtag search result page (Figure 5).

**Figure 5: A web search for #гей (#Gay), left, and a mobile search for #гей (#Gay), right, both on 29 August**



Source: TikTok.

Users who are motivated enough can discover other posted videos using the hashtag, but only after posting their own video featuring the hashtag and then clicking through to the content there (Figure 6). Doing so directs the user to the correct page, which does exist, but is unavailable (shadow banned) from the platform's search results. Despite being invisible in search results, the hashtag is widely used and had more than 130 million views as of 30 August 2020.

**Figure 6: A test TikTok video featuring the hashtag #гей (#Gay) published on 26 August 2020 (left). The correct page (right) is revealed only after clicking on the hashtag in a posted video**



Source: TikTok.

Some LGBTQ+-related hashtags face the same level of censorship outlined above in the case of Thailand's Princess Sirivannavari Nariratana Rajakanya. Clicking on #GayArab doesn't direct users to a page featuring other shadow-banned videos, but instead redirects to a '#null' page (Figure 7). On Instagram, a search for the hashtag 'Gay Arab' on 28 August resulted in a list of 118,000 tagged images.

**Figure 7: Web search for #GayArab on Instagram (bottom left) and web search for #GayArab on TikTok (top right)**



Sources: Instagram.com and TikTok.com.

A test video posted by ASPI ICPC to #GayArab on TikTok didn't appear in the hashtag web search results, which continued to feature a 'Couldn't find this hashtag' result (Figure 8).

**Figure 8: Web search for #GayArab on TikTok.com before ASPI's test video on 26 August 2020 (top left), ASPI's test TikTok video (centre) and web search for #GayArab on TikTok after ASPI's test video (bottom right)**



Source: TikTok.com.

The words for 'gay' and 'transgender' in Arabic are also shadow banned. TikTok has often stated its willingness to adhere to local laws in its terms of service.[29] Homosexuality is illegal in several Arabic-speaking countries, but there are exceptions, such as Iraq and Jordan.[30] Implementing specific countries' rules across the platform means that Arabic-speaking people around the world, even those who live in countries where homosexuality is in fact legal, are prevented from accessing content related to these hashtags on TikTok.

TikTok's use of these censorship methods isn't consistently applied. A more casual term used to mean "gay" in Arabic, مثلي, (literally "like me") is not censored in the ways outlined above. ASPI ICPC also found inconsistencies in the content moderation regarding multiple terms that refer to "gay" and "transgender" in Arabic. One term in Arabic that can be translated as "transgender" and was not shadowbanned, المتحول جنسيا, demonstrates how even discrepancies in grammar can impact the censorship of a word despite having the same meaning. In Russian, #лесбиянство "lesbianism" is also

not censored in the ways outlined above, though it only had seven videos when checked on 5 August 2020.

In September 2019, *Netzpolitik*, citing leaked content moderation guidelines from a source inside TikTok, reported that LGTBQ+ content used to be marked as 'Islam Offence' by moderators. 'Content tagged with this keyword, such as two men kissing, triggered a geoblock for certain regions,' the German outlet reported. According to the publication, content that deals with sexual orientation is now tagged 'Risk 3.4' instead of 'Islam Offence', and is still used to prevent that content reaching Islamic countries.[31]

*Netzpolitik*'s source also revealed that the platform was not only able to slow down videos from going viral, but also entire hashtags:

> In general, TikTok seems to have a system of promoting and slowing down, in which certain content is visible and viral, while others never take off and aren't visible. Control of what people see on TikTok is mostly in the hands of the company.

An ASPI ICPC analysis of the hashtags mentioned above revealed a much blunter form of censorship. In practice, the hashtags are categorised in TikTok's code in the same way that terrorist groups, illicit substances and swear words are on the platform. This blanket shadow banning of topics related to LGBTQ+ issues shows how TikTok's 'blunt approach' to content moderation continues to this day.

The same code is assigned to hashtags related to QAnon conspiracy theories, which TikTok started blocking in late July 2020.[32] These hashtags are hidden from TikTok searches, but videos with the same tags remain on the platform[33]—much like the examples listed above, such as 'gay' in Russian and Arabic. TikTok treats these hashtags in the same way as extremist content, including #Nazi, #KKK and #ISIS.

TikTok sources cited by Chinese technology publication *Pingwest* say the platform plans to localise content moderation decisions to such a point that, for example, posts about recreational marijuana use will be visible in jurisdictions where it's legal but invisible where it isn't.[34] At time of publication, #marijuana appears to be shadow banned for all users, regardless of which country or US state they reside in.

TikTok's approach to content moderation reveals a fundamental misunderstanding about the role of free speech in democracies. TikTok users should expect to be able to freely take part in conversations about issues that they, as citizens, have a role in creating laws about.

Free speech has its limits, and TikTok, like other platforms, has attempted to take a proactive approach to combating hate speech, for example.[35] However, in countries such as Vietnam and Russia, TikTok has gone beyond complying with the letter of the law and has instead seemingly offered censorship as a service to those administrations.[36]

In Russia, the use of #путинвор ('Putin Is A Thief')—a catchcry of the political opposition—could be argued to be in contravention of a 2019 law banning online insults against the Russian Government, but the law is very much in contention.[37] When it was passed in March 2019, opposition leader Alexey Navalny immediately took to Twitter to insult President Vladimir Putin's administration.[38] Twitter remains available in Russia.

Similarly, it's likely that TikTok's widespread censorship of LGBTQ+-related topics in Russian is the result of overcompliance with a 2013 law that bans disseminating 'propaganda on non-traditional sexual relations' among young Russians.[39] According to Human Rights Watch, the law 'directly harms children by denying them access to essential information and creating a stigma against LGBT children and LGBT family members.'[40] The law hasn't stopped other platforms, such as Instagram, featuring LGBTQ+ related hashtags. There have been instances in which platforms such as Twitter[41] and Instagram[42] have buckled to pressure from the Russian Government, but TikTok's approach represents a more comprehensive overreach that sides with the Russian Government against the Russian people's right to free speech.

## #Xinjiang: curating propaganda

As ASPI ICPC's 2019 *Mapping more of China's tech giants: AI and surveillance report* revealed, TikTok owner and operator ByteDance collaborates with public security bureaus across China, including in Xinjiang, where it plays an active role in disseminating the party-state's propaganda concerning the region.[43]

In late November 2019, a search for #Xinjiang on TikTok resulted in only two videos when *VICE Germany* journalist Sebastian Meineck posted two videos featuring the hashtag. The videos were among seven videos Meineck posted to the platform with hashtags considered politically sensitive by Beijing. The videos were posted successfully but, in at least nine cases, disappeared from the platform's hashtag search results.[44]

TikTok blamed a 'bug' for causing the videos to not show up on #freexinjiang, #uiguren, #chinacables, #xinjiang, #tiktokcensorship, #uyghur, #xijinping, #culturalgenocide and #democracy, explaining to *VICE Germany* that it was 'a technical error that has nothing to do with the moderation of content'.

In the nine months following this media scrutiny, activity on #Xinjiang initially increased. By 8 August 2020, when ASPI ICPC accessed the hashtag, 444 videos were publicly visible. Through manual content analysis, it was determined that of those 444 videos, only 5.6% were critical of the CCP's policies in the region—an unusually small number, given the debate over the topic on other platforms.

Of the top 20 videos with the highest ranking on the hashtag, only one is critical of the CCP (Figure 9). Seven are either denialist videos or videos promoting conspiracy theories about Beijing's extrajudicial incarceration of more than a million Uyghurs and members of other Turkic Muslim minorities in Xinjiang. The ranking of all of the top 20 posts on the hashtag bears no discernible connection to their number of likes, comments, shares or views, based on our analysis.

**Figure 9: Content analysis of the first 100 videos on the hashtag #Xinjiang. Pro-CCP: any video that denies the persecution of Uyghurs, the camps etc. Propaganda: videos that in many cases are sourced from TikTok's PRC-based and highly censored sister app Douyin and depict Xinjiang in an exclusively idyllic way.**



Source: TikTok.com, 8 August 2020.

Among the videos found on the hashtag were five by a self-described 'vlogger' who goes only by the name of Jessica.[45] Jessica's videos featured in #Xinjiang document her trip to the western region during the Covid-19 pandemic, detailing the measures China put in place to contain the spread of the virus and trumpeting their precision and safety.[46]

Vloggers, photographers, Chinese state media reporters and online influencers are among the groups of people who have been dispatched to the region as part of an extended propaganda campaign dubbed 'Xinjiang is a good place'.[47] Since 2018, the campaign, organised by the Xinjiang Uyghur Autonomous Region Party Committee Cyberspace Office and the Xinjiang Propaganda Department, has sent more than 150 influencers and more than 150 Chinese state media reporters to the region.[48]

It isn't clear whether Jessica was part of that particular campaign, but analysis of her online presence on social media and mentions of her in the Chinese media reveal her to be Zang Shijie (臧诗洁, Jessica Zang)—an employee at state media China Central Television (CCTV)[49] and a CCP member.[50]

Another account featured on the hashtag is @guanvideo, which is a video production company headed by Pan Xiaoli (潘小璨), who is a researcher affiliated with the China Institute (a think tank at Shanghai's Fudan University). The company produces videos that it says 'adhere to positive energy guidance and provide high-quality knowledge and ideological content', including for Hu Xijin, the editor of the *Global Times* (the staunchly nationalistic CCP-run tabloid).[51]

TikTok user @aygul_uyghur has 10 videos in #Xinjiang. She describes herself as 'just a simple Uyghur girl from Xinjiang' in her bio. Views on all of her videos, which mostly feature her dancing, smiling and showing off produce such as watermelons, are in their thousands. Her most viewed video has been watched 109,700 times.

The hashtag has also been flooded with content sourced from TikTok's PRC-based sister app Douyin depicting an idealised version of the region. Uyghurs had, for a time, been able to use Douyin to shine a light on their persecution at the hands of the PRC state,[52] but, following ByteDance's formal cooperation with the Ministry of Public Security's Press and Publicity Bureau in April 2019,[53] it's now the site for organised and slick propaganda campaigns.[54]

The result, even for TikTok users perusing the topic, is a depiction of Xinjiang that glosses over the human rights tragedy unfolding there and instead provides a more politically convenient version for the CCP, replete with smiling and dancing Uyghurs.

The transformation of #Xinjiang coincided with a period of experimentation in Beijing's propaganda efforts as the PRC struggled to regain control of the narrative after the outbreak of Covid-19.[55] Non-Chinese platforms such as Twitter,[56] Facebook[57] and Google[58] have all confirmed PRC state-backed attempts to manipulate their platforms to project the CCP's political power.

In May, the Chinese Academy of Social Sciences (a prominent think tank) was one organisation proposing this strategy for Beijing's external communications. It recommended, among other things, that Beijing use WeChat, Weibo and TikTok to counterbalance Twitter, Facebook and YouTube.[59]

Leaked moderation documents obtained by The Intercept indicate that TikTok "has influenced content on its platform not just by censoring videos and disappearing users, but by padding feeds with content from "shadow accounts" operated by company employees posing as regular users."[60]

The apparent manipulation of content on #Xinjiang suggests that state-linked information campaigns are highly likely to be taking place on TikTok as well. Given the ByteDance CEO's commitment to advancing CCP propaganda and the fact that the company already works closely with PRC public security bureaus to produce and disseminate that propaganda, it's highly likely that Beijing would make such an attempt and even less likely that ByteDance would conduct any transparent investigation to stop state-actor manipulation of its platform.

Non-Chinese social media platforms are now expected to investigate and root out state-actor manipulation of their platforms, even if they are not legally forced to. Regulatory frameworks need to be strengthened to ensure all social media companies are required, by law, to prevent their platforms from being manipulated in the same way.

## An algorithm with CCP characteristics

The shadow banning and censoring of hashtags removes one of the main ways users have of finding and interacting with content on TikTok, but the main way they receive content is via the app's algorithmically curated 'For You' feed.

When users open TikTok, they're immediately served up an endless feed of short, full-screen immersive videos that quickly becomes personalised to each individual user. On other social media apps such as Facebook and Twitter, users generally only see content from accounts that they've subscribed to. On TikTok, the 'For You' page serves up videos from creators you haven't followed but that the recommendation algorithm predicts you'd be interested in. As one observer noted, 'When you gaze into TikTok, TikTok gazes into you.'[61]

Faced with criticism about its lack of transparency over how the feed works, TikTok published a blog post in June 2020 that revealed some of the more obvious inputs that determine what content is promoted.[62] Those inputs include what the platform calls '1st-party behavioral cues', such as which videos users engage with, the duration of their engagement, and their interactions with the video, such as liking, commenting and sharing. It also uses data obtained from the users' devices, such as geolocation, and data obtained from users themselves, such as their age and gender (Figure 10).

**Figure 10: A TikTok pitch deck shows that TikTok's recommendation engine is trained using data obtained from the user, their interactions and the user's device, from which TikTok can determine such things as user content preferences, demographics and geolocation**



Source: Ad Age.

There are likely many other advanced inputs that go into TikTok's core algorithm—some of them sensitive enough to cause Beijing to add content-recommendation technology to its export control rules in late August 2020.[63] Facial recognition and even sentiment analysis[64] are among some of the more advanced inputs that are potentially used, via a process known as 'deep learning', to personalise users' feeds.

Another input into ByteDance's core algorithms—mandated by PRC law—is the CCP's propaganda agenda. In December 2019, new internet censorship rules issued by the Cyberspace Administration of China bolstered restrictions on 'negative' content and encouraged posts that focus on 'Xi Jinping thought' and 'core socialist values' or content that increases the 'international influence of Chinese culture'.[65] Significantly, the new rules call on platform operators to ensure that the algorithms undergirding their apps promote CCP propaganda.

This followed guidelines released in January 2019 by the China Netcasting Services Association at the PRC Government's direction that banned 100 types of inappropriate content and called on platform operators to review every piece of content that goes online. More specifically, the guidelines called for platform operators to build content management systems that are capable of screening headlines, introductions, screen 'bullets' and comments before they're published.[66]

There's strong evidence that the guidelines have already informed TikTok's global content moderation efforts. Moderation guidelines that were in use through at least late 2019 and were leaked to *The Intercept* referred to content that harmed 'national honor' or included 'state organs such as police', 'defamed civil servants', or anything that might threaten 'national security' as being worthy of censorship.[67] Those categories line up with the China Netcasting Services Association guidelines, rule 42 of which bans 'malicious slander' of, among other things, 'national security', 'police' and 'justice and other national public servants'.[68]

ByteDance executives, including CEO Zhang Yiming, have stated on the record that they'll ensure that their products serve to promote the CCP's propaganda agenda. Crucially, key executives have made it clear that the party line should be integrated into the company's apps down to the level of the algorithm.

Zhang Yiming has made it abundantly clear that the company is more than willing to manipulate the algorithm in favour of the CCP. On 11 April 2018, after regulators suspended ByteDance's flagship news aggregator *Jinri Toutiao* (*Today's Headlines*), Zhang announced that the company was shutting down another app, on the regulators orders, because it had deviated from the party line. 'The product has gone astray, posting content that goes against socialist core values,' Zhang wrote about the joke sharing app. 'It's all on me. I accept all the punishment since it failed to direct public opinion in the right way.'

In the letter, published at 4 am on Chinese social media, Zhang apologised for failing to respect the CCP's 'socialist core values' and for 'deviating from public opinion guidance'. 'In the past, we have placed too much emphasis on the role of technology, and failed to realise that socialist core values are the prerequisite to technology,' Zhang wrote. 'We need to spread positive messages in line with the requirements of the times while respecting public order and good practice.'

Zhang's strategy for righting the ship, outlined in the letter, included the hiring of 4,000 extra censors, integrating 'socialist core values' into the company's technology and products and investing more money in developing algorithms to screen posts. Zhang explicitly stated in his apology that this ideological readjustment was necessary to 'build a global platform for creating content and exchanges', highlighting the international implications of the policy change.[69]

At an internal CCP meeting hosted by the ByteDance Party Committee in April 2018, Zhang Fuping, the secretary of the committee and editor-in-chief at the company, stressed that the committee should improve its standing in the company and 'take the lead' across 'all product lines and business lines' to ensure that the algorithm is informed by the 'correct political direction' and 'values'.[70] At the same meeting, Chen Lin, vice president of products, and the executive in charge of optimising ByteDance's algorithm recommendations across all of the company's products, said that its apps should not only serve users the content that they want, but also content that would 'spread positive energy', and 'highlight socialist core values'.[71]

The result inside China is what veteran Chinese journalist and media researcher at the University of Pennsylvania, Kecheng Fang, refers to as 'a super algorithm' that ensures that content about the CCP, and Xi Jinping in particular, is always prominently displayed on Chinese platforms.[72] While it's unlikely that ByteDance would manipulate TikTok's algorithm as blatantly as it does on its PRC-based

equivalent, Douyin, there's ample room for it to covertly tweak users' feeds, subtly nudging them towards content favoured by governments and their ruling parties—including the CCP.

ASPI ICPC's analysis of ByteDance's own career page shows that the company has continued to advertise for TikTok content monitoring positions that are based in the PRC. ByteDance's career page in Chinese also includes postings for Beijing-based TikTok positions for jobs related to other geographical markets, such as one for a data operations manager for the Middle East and a senior operations strategy manager for Latin America, *The Information* reported in late July 2020.[73] As of August 2020, ByteDance also advertised for a Shanghai-based TikTok content operations manager to cover the eastern EU, according to our analysis.

Even if ByteDance successfully ringfences TikTok from its China operations, censorship and information control can still be achieved via the app's opaque algorithm, which is developed by ByteDance's China-based engineering teams.[74] TikTok does employ engineers based in Mountain View, California, but they report to senior executives in China.[75] The company's algorithms enable TikTok and other ByteDance apps to select videos to recommend, target ads and detect content for moderation or deletion.[76] China-based researchers at ByteDance's Artificial Intelligence (AI) Lab are also developing speech recognition algorithms that are able to screen videos for illicit content for use in all ByteDance apps.[77]

A 2019 white paper produced by ByteDance outlined how the contents of users' livestream videos are fed into a social credit system, which assigns a rating to users based on the content they produce. Content that promotes 'positive energy' is boosted, including—the white paper notes—content that 'passes on the Communist Party spirit'.[78]

TikTok's algorithms continue to be controlled from the PRC, where its server code remains partially shared across other ByteDance products, according to *Reuters*. That code provides basic functionality of the apps such as 'data storage, algorithms for moderating and recommending content and the management of user profiles'.[79]

Job ads analysed by ASPI ICPC indicate that ByteDance intends to continue to develop and control its core algorithms from the PRC. The company continues to advertise for PRC-based R&D positions that work on the TikTok algorithm, including one still visible on the ByteDance recruitment site in late July for a senior software engineer who would be responsible for the app's content recommendation system (Figure 11).[80]

**Figure 11: Example of a TikTok PRC-based R&D position advertised by ByteDance as of August 2020**



Several other Beijing- and Shenzhen-based R&D positions advertise for back-end and algorithm roles with responsibilities covering ByteDance's multiple platforms TikTok, Douyin and Toutiao. Such positions include a back-end development engineer for Douyin, Toutiao and TikTok as well as an algorithm engineer for Douyin, Toutiao and TikTok.

In late August 2020, China updated its export control rules for the first time since 2008 to include content-recommendation technology.[81] The extent to which 'Xi Jinping thought' and 'core socialist values' are mixed into the secret sauce of TikTok's algorithms may never be known now that Beijing has deemed it a matter of state security.

## A politics-free zone

TikTok executives have long been upfront about their desire for the app to be a politics-free zone. In 2018, when Raj Mishra, then TikTok's head of operations in India, was asked by *Bloomberg* if TikTok would allow criticism of Indian Prime Minister Narendra Modi to be prominently featured in the app, he replied 'No'. TikTok's ambition, Mishra explained, was to be a 'one-stop entertainment platform where people come to have fun rather than creating any political strife'.[82] Blake Chandlee, Vice President Global Business Solutions, has talked about TikTok's decision not to accept political advertising on the app as a decision designed to ensure that the app's 'environment' didn't become 'a negative one'.[83] TikTok global chief security officer Roland Cloutier told *PBS Newshour* as recently as 25 August 2020 that TikTok is 'not the go-to platform for robust political debates at all'.[84]

In the US, that approach was made untenable after the killing of George Floyd galvanised Black Lives Matter protesters, some of whom flocked to TikTok to use it for their activism. Some of those users have reported that they experienced noticeable declines in viewership and engagement on their videos or even that their videos were taken down, muted or hidden from followers.[85] The director of TikTok's Creator Community, Kudzi Chikumbu, told *TIME* that TikTok 'unequivocally' doesn't engage in shadow banning. On 1 June 2020, TikTok attributed the decline in viewership and engagement with

videos of Black Lives Matter protestors to a 'technical glitch' and apologised for that glitch, pledging to better support its Black community and take steps toward a more inclusive environment.[86]

Political content from all ideological persuasions is now increasingly common on TikTok, especially in the lead-up to the 2020 US presidential elections. It is, as the *New York Times* put it in late June 2020, a place where teens 'are forming political coalitions to campaign for their chosen candidates, post news updates, and fact-check opponents'. The result is that a platform over which Beijing has enormous leverage is now in a position in which it could easily, and surreptitiously, promote or demote content about either presidential candidate.[87]

In India, ByteDance has used its ability to promote, demote and suppress content in ways that not only affect what TikTok users see, but also what content they produce.

### Ajay Barman

*Indian TikTok user who believes he was shadow banned after posting about politics.*

Indian TikTok user Ajay Barman abandoned posting about social and political topics after it appeared that the platform had shadow banned his videos. Barman told *BBC News* that his videos dropped from an average of 200,000 views down to around 8,000 views after he started posting about Hindu–Muslim unity.[88] Barman's follower count also dropped by 25,000 users, *BBC News* reported.

Barman said the drop in views and followers came around the time a backlash began against the Citizenship Amendment Act—a controversial law passed by India's Hindu nationalist government in December 2019 that offered Indian citizenship only to non-Muslims fleeing religious persecution in surrounding countries.

Fully verifying Barman's claims is difficult, given the opaque nature of TikTok's algorithm, but data we sourced from CloutMeter for Barman's TikTok account from 7 November to 31 January 2019 showed that his follower numbers were indeed declining, even as his 'likes' continued to rise (Figure 12).

**Figure 12: CloutMeter statistics for @ajaybarman.official, 7 November 2019 to 31 January 2020**



Source: ASPI ICPC.

## Saloni Gaur

*Indian TikTok user who was censored at least three times on the platform.*

Saloni Gaur is an undergraduate student of political science at Delhi University and a comedian who posts satirical videos under the *nom de guerre* 'Nazma Aapi'. She gained a sizable following on TikTok due to her videos about protests against the Citizenship Amendment Act and Delhi police's actions against protesters, but told ASPI ICPC she was censored at least three times on the platform.

On 23 April 2020, Gaur posted a satirical video about a feud between India's main opposition leader Sonia Gandhi and prominent journalist Arnab Goswami to TikTok, Instagram, Twitter and YouTube. The video uploaded to TikTok had its sound muted by the platform and its share link disabled.

Another video, posted by Gaur on 19 May 2020, in which she roundly criticised a news channel that she said was spreading hatred for Muslims, was also muted on the app before a frustrated Gaur deleted it. The comedian maintains that she never violated any of the app's community guidelines and the video remains on Instagram,[89] Twitter[90] and YouTube.[91]

On 30 May 2020, Gaur announced on Twitter that a video of hers in which she had joked about China's handling of Covid-19 as well as about the country's activities along its border with India in Ladakh had been removed by TikTok (Figure 13). Gaur's announcement caused a media storm and TikTok backed down, reinstating the video hours after it was taken down.

**Figure 13: Tweet by Saloni Gaur**



Source: Saloni Gaur. 'So @TikTok_IN has removed my last video which had jokes on China, the app is like the country, there's no freedom of speech', *Twitter*, 30 May 2020, online.

In response to Gaur's tweet, TikTok claimed that her video was 'reinstated after being flagged and a further review' that was done in the context of a 'a more rigorous review process' due to Covid-19. There was no explanation for the previous instances of apparent censorship of her account.

**Feroza Aziz**

*US TikTok user who was censored by TikTok after posting about the plight of the Uyghurs in China.*

In November 2019, TikTok found itself in a media storm for censoring the accounts of Feroza Aziz, an Afghan-American teenager who used 'make-up tutorial' videos to draw attention to the plight of Uyghurs interned in China's far-western Xinjiang region.

The three-part video series was disguised as a make-up tutorial to avoid being censored. In the videos, Aziz initially provides tips on eyelash curling as a ruse to discuss China's oppression and maltreatment of the Uyghurs. The first video was viewed more than 1.6 million times before TikTok blocked it and temporarily suspended her account.

TikTok blamed a 'human moderation error' for the removal of Aziz's video and asserted that the suspension was the result of an earlier satirical video of hers referencing Osama bin Laden being mistakenly flagged for violating the app's anti-terrorism policy.[92] Content moderation guidelines leaked to *The Guardian* two months before revealed that TikTok had been censoring 'highly controversial topics, such as separatism, religion sects conflicts, conflicts between ethnic groups', among other clauses.[93]

On 28 November 2019, Aziz confirmed on Twitter that her account had been unblocked but cast doubt on the company's explanations, writing 'Do I believe they took it away because of an unrelated satirical video that was deleted on a previously deleted account of mine? Right after I finished posting a 3-part video about the Uighurs? No.'[94]

# WeChat censorship

The distortion of social and political discussion that's taking place on TikTok would be more than familiar to members of the Chinese diaspora who use WeChat, the Tencent-owned and -operated messaging app that has long been subject to strict censorship constraints.

Previous scholarship by the University of Toronto's Citizen Lab has demonstrated that WeChat operates different censorship systems for Chinese and overseas-based users.[95] According to its groundbreaking 2016 *One app, two systems* paper, content is censored for all users registered with Chinese phone numbers on the PRC-based version of the app Weixin, even if they travel overseas or switch to an international number.

Theoretically, under this dual system only Chinese users who register with a Chinese number and therefore use the sister app Weixin are meant to be heavily censored, while less restrictive rules apply for overseas users who access the same ecosystem using WeChat. While the two versions of the app operate on different servers, in practice, WeChat users have increasingly had their messages censored and their accounts disabled.

Zhou Fengsuo, a US-based activist and former Tiananmen student leader, told *Bloomberg Businessweek* that his WeChat account has been temporarily suspended numerous times over the past seven years. 'WeChat censorship is so obvious that people are no longer sensitive about it,' he told the magazine. 'My account is dealt with in the same way as Chinese accounts, which are under surveillance all the time.'

Zhou Fengsuo was also one of four WeChat users with whom *NPR* spoke regarding surveillance on the app. Although all four users are US citizens and registered with WeChat using US phone numbers, they're still blocked from sending certain messages in WeChat groups and have all had their accounts temporarily suspended.[96]

In fact, as a more recent Citizen Lab report revealed, both PRC-based users of Weixin and overseas users of WeChat are under constant surveillance. As Citizen Lab demonstrated in May 2020, the posts of WeChat users registered abroad are systematically surveilled, scanned for politically sensitive terms and used to train WeChat's political censorship system.[97] The platforms do this by 'screening images and documents shared by accounts registered outside China after they're sent, then add the digital signature—or "hash"—of any files deemed sensitive to a blacklist. Those files then cannot be sent or received by China-registered users.'

Australian WeChat user Yan Hang believes his Australia-registered WeChat account was suspended for sharing images related to the 30th anniversary of the Tiananmen Square massacre in 2019. He can only guess, because repeated attempts to seek clarification from WeChat owner Tencent were ignored. Before Yang was suspended, his messages in group chats were hidden from other users. A message sent by Yang to a group containing an ASPI researcher with a PRC-registered version of the app on 6 June 2019 was only visible on his own phone (Figure 14). Yan Hang received no indication or notification that such filtering was taking place.

**Figure 14: A screenshot by Yan Hang of a message he posted to a WeChat group containing an ASPI researcher (left). Yan Hang's message wasn't visible on the ASPI researcher's PRC-registered version of the app (right)**



Source: WeChat.

Yan Hang's experience mirrors that of dozens of WeChat users in the US, Canada, the UK, France, Spain, Australia, Germany and Malaysia interviewed by *VICE News*, who said their WeChat contacts in China weren't seeing any of their posts in group chats at the start of the Covid-19 outbreak in February 2020.[98] The restrictions placed on their accounts prevented them from sending information to contacts in China, and some international users also had their accounts suspended or blocked. WeChat users based in the US also reportedly had posts they made in approval of pro-democracy candidates in Hong Kong's elections in November 2019 censored and their accounts disabled.[99]

A Citizen Lab report published in August 2020, *Censored Contagion II*, tracked censored keywords related to Covid-19 on WeChat and found that WeChat censored 2,174 keywords between January 18 through May 14. Instances of censorship and surveillance of overseas users during the pandemic have been so numerous that Citizen Power Initiatives for China, a not-for-profit based in Washington DC, has teamed up with a law firm to launch a class action lawsuit on behalf of US WeChat users against Tencent.[100]

Tighter censorship, including this uptick in censorship of overseas users, followed a meeting of the Politburo on 3 February to discuss the epidemic. Two days after that meeting, a notice released by the Cyberspace Administration of China admonished a number of WeChat publications for having 'illegally

carried out reporting activities' and instructed the country's biggest internet companies, including Tencent and ByteDance, to 'conduct special supervision' on epidemic-related news.[101]

Censors soon began deleting messages and suspending accounts in large numbers, causing users to complain via the microblogging platform Weibo using the hashtag 'WeChat Blocked Account', posts which in turn were censored.[102] According to China Human Rights Defenders, as of 1 April, 206 of 897 arrests related to online posts regarding the Covid-19 outbreak were for materials published on WeChat.[103]

Under normal circumstances, WeChat operates a 'one app, two systems' system of censorship that distinguishes between PRC-based users of Weixin and foreign WeChat users, but, as the above cases highlight, Tencent can and does censor foreign users if Beijing decides 'special supervision' is required.

## Harassment of dissidents and other overseas users

Several instances of the harassment of overseas Chinese—including those who aren't Chinese citizens—can be traced back to WeChat. Citizen Power Initiatives for China claims that 'the People's Armed Police uses the information provided by WeChat to harass, threaten, suppress, and prosecute the families of overseas Chinese activists.'[104]

In particular, Uyghurs living abroad face continued harassment and intimidation. The Chinese Government mobilises Chinese authorities to harass Uyghur-Americans via WeChat, often threatening to place family members in mass detention camps in Xinjiang.[105] One Uyghur-American who was previously contacted by Chinese Ministry of State Security agents told the Uyghur Human Rights Project, 'they are just telling us, "we are watching you. Wherever you go, still you are a Chinese." Even though abroad, it doesn't mean they can't do something to you. Because they have your friends, your relatives.'[106]

The severity of surveillance on Uyghurs is exemplified in the case of Erpat Eblekrem, a 24-year-old Uyghur who was sent to a 're-education' camp for using WeChat to contact his family members, who had left China.[107] In another instance, a US citizen and Uyghur activist was threatened by a man who identified himself as a 'high-ranking officer in China's security forces in the Xinjiang region'. After the activist's mother contacted him following her release from a mass detention camp, he received messages from the high-ranking officer via WeChat ordering him to quieten his reporting on the camps if he wanted his mother to be able to join him in the US.[108]

This consciousness of being watched even while abroad is also evident among Chinese university students studying outside of China. A survey conducted in 2017 by Cheryl Yu, then a graduate student in the US, found that, among 72 Chinese respondents from 31 American universities, 58% were aware of Chinese Government surveillance. One mode of government surveillance known to students abroad included the monitoring of WeChat accounts.[109]

When the *New York Times* spoke with a Chinese immigrant who had lived in Toronto before returning to China in 2018, she recounted her realisation during the 2016 US presidential election that WeChat is filled with 'gossip, conspiracy theories and lies'. Upon returning to China, however, she experienced the consequences of sharing sources from outside of WeChat on the app itself. She was taken into custody and interrogated regarding her WeChat contacts overseas.[110]

Instances such as these demonstrate the access that China's law enforcement has to WeChat and also exemplify the ways in which law enforcement collects information on overseas WeChat users tied to domestic Chinese residents.

The Chinese Government's apparent surveillance on WeChat manifests itself in self-censorship among WeChat users globally, ultimately creating a trap for many of its users. Due to WeChat's centrality in communication among Chinese diasporas, free speech implications aren't restricted to only those inside China's borders. In fact, WeChat's compliance with Chinese law enforcement enables the Chinese Government to track details of people who have left China, including details as specific as who they're meeting, at what time, and where.[111] Despite their physical location outside of China's borders, when a user is monitored on what they read, write and text and even where they go while abroad, that hinders their ability to access a free environment.

## Political interference

WeChat is a powerful vector for influence in the politics of liberal democracies with sizable Chinese diasporas because it's a major source of news for those communities. So-called 'self-media' (*zi meiti*) publications have in recent years become extremely popular and influential on WeChat. They can be avenues for critical journalism—referred to as 'edge ball' content in China—that otherwise wouldn't be found in traditional media. More often, these publications are incentivised to chase clicks with sensational clickbait headlines. WeChat's tight censorship ensures that, for the vast majority of the time, these news sources only report news that serves the CCP's strategic objectives.

Aspects of WeChat's design exacerbate the misinformation problem that's produced in these publications. For instance, publishers are banned from embedding hyperlinks in their articles, making it difficult for readers to cross-reference any of the information they're receiving. For the most part, these publications are registered with Tencent via Chinese phone numbers, and basic details such as a physical address for their operations aren't made available.[112] Wu Bofeng, an employee at one of the largest WeChat public accounts in Australia, told *Quartz* that her publication takes its cues from Chinese state media and self-censors anything considered politically sensitive by the CCP.[113]

In addition to the platform's misinformation problem, there's widespread censorship. A 2018 study of Australian Chinese-language news sources on WeChat compared the output of three prominent news publications with that of the Australian Government-funded Special Broadcasting Service and found that there's little to no political coverage in them. Strikingly, none of the news sources published a single article on Chinese politics and foreign affairs from March 2017 till 1 August 2017. Even before the outlets stopped covering politics, the content they were running was largely copy-and-paste jobs from Chinese state media.[114]

The combination of clickbait news, tight censorship and the 'walled garden' in which WeChat users consume news almost entirely within the platform creates an environment in which even the members of the Chinese diaspora find themselves trapped in a mobile extension of the Great Firewall of China under which they're subjected to the same censorship and propaganda as PRC citizens.

In liberal democracies around the world, WeChat is the primary organising platform for social and political campaigns conducted by the Chinese diaspora. In the US, the app helped propel an anti-affirmative-action movement led by conservative Chinese Americans.[115] In 2016, a demonstration

involving tens of thousands of people in more than 40 cities over the unfair prosecution of a Chinese-American police officer was largely organised on WeChat.[116]

During the 2019 Australian federal election, the WeChat publication 'Melbourne WeLife' featured a photo of then Labor opposition leader Bill Shorten with a made-up quote saying he planned to give 'green cards for all refugees'.[117] A doctored tweet purporting to come from Shorten's Twitter account stating 'Immigration of people from the Middle East is the future Australia needs' also circulated on the platform at the time. When Shorten's Australian Labor Party complained directly to Tencent about the proliferation of misinformation on the platform, the company didn't even respond.

Despite these issues, politicians in countries such as Australia, Canada, the US and New Zealand continue to flock to WeChat to communicate with their ethnic Chinese voters. In order to use official accounts with special functionality on the platform, many of these politicians use accounts set up and registered to Chinese citizens. As Chinese-registered accounts, they're subject to heavier censorship than those registered internationally. Australian Prime Minister Scott Morrison's official WeChat account is registered to an unknown Chinese citizen in Fujian Province.[118] A WeChat account for Bill Shorten, used during a crucial federal by-election in 2017 and again in the 2019 federal election, was registered to an unknown PRC national (Figure 15). Canadian Prime Minister Justin Trudeau's WeChat account is registered to an unnamed woman in Jiangsu Province.

**Figure 15: The 'Bill Shorten & Australian Labor Party' WeChat account was registered in Shandong Province. It was a group for green tea drinkers before it was rebranded in May 2017**



Source: WeChat.

Communications between politicians with their constituencies using these accounts are subject to CCP censorship by default. In September 2017, Canadian parliamentarian Jenny Kwan posted a WeChat message of support for Hong Kong's Umbrella Movement—a series of pro-democracy protests that took place in 2014—only to have it censored by WeChat.

Even if politicians' messages aren't censored, there's a real risk they could self-censor to stay on WeChat to reach key voters. In a live forum on WeChat during the 2019 federal election, Bill Shorten was asked 'a series of questions relating to Huawei, Chinese interference in Australia, the billionaire businessman and political donor Huang Xiangmo, and perceived negatives [*sic*] views of the Chinese Communist Party in Australia,' the ABC reported, adding that he didn't answer any of those questions.[119]

In addition to well-known politically sensitive topics such as the Tiananmen Square massacre and the plight of Uyghurs in so-called re-education camps in China, WeChat has censored a broad range of topics directly relevant to members of the Chinese diaspora. Those topics have included coverage of the US–China trade war, Huawei and the #MeToo movement, according to WeChatscope, which is a research project at the University of Hong Kong's Journalism and Media Studies Centre.[120]

### Censorship of foreign countries' diplomatic posts on WeChat

In the same way that Chinese government departments, spokespeople, embassies and diplomats use Twitter and Facebook to promote messaging overseas, diplomatic missions in China use platforms like WeChat to promote messaging and publish official government statements. Our research has found that WeChat posts published by the US, UK and Indian diplomatic missions to China are being censored in several ways, and that the bulk of this censorship took place after the global spread of Covid-19 (specifically, from April 2020).

We found 14 cases of censored posts on the US Embassy's account, 11 of which were published in 2020 alone. We detected three different levels of censorship of the account. The most common one is an alteration of links intended to direct to the embassy's website. The US Embassy often publishes briefs on WeChat and then adds a 'Read more' tab at the bottom of the post. While most of those links work across the embassy's account, several links related to topics sensitive to the CCP are faulty and redirect to a '404 not found' page (Figure 16).

**Figure 16: WeChat post mentioning a diplomatic joint statement on Hong Kong (left) and censored statement (right)**



Source: WeChat.

Among the censored topics are the new national security laws imposed on the city of Hong Kong, disputes in the South China Sea and China's mishandling of the coronavirus pandemic, as well as a mention of the late Dr Li Wenliang, whose death sparked public outrage and became a symbol of China's failure to address the spread of Covid-19.[121]

Another widespread method by which WeChat censors sensitive diplomatic statements is by disabling the share function on those posts. Posts that received this particular type of censorship are related to the US's China policy and the US–China trade war.

The topic that we found to be the most heavily censored is religious freedom and the CCP's persecution of the Uyghurs and other ethnic minorities (Figure 17). In fact, we found three occasions in which posts mentioning the Uyghurs are censored on the US Embassy's WeChat account. In one case, the 'Read more' tab redirects to a '404 not found' page and the sharing function is disabled. In two other cases, the censorship concerns only the sharing function.

**Figure 17: WeChat post mentioning a statement on religious freedom (left and centre) and censored statement (right)**



Source: WeChat.

We also found one instance in which the 'Read more' tab redirects to an English article, despite the embassy's posted link being to the same article, but in Chinese. In this case, the article is related to the US Government's designation of Confucius Institutes as Chinese diplomatic missions.

The number of censored posts on the US Embassy's account drastically increased during Covid-19. In fact, ASPI detected no instance of censorship between June 2019 and April 2020 and then found 11 cases of censorship between April and August 2020. The uptick in censorship frequency comes as tensions between the US and China continue to escalate, especially in relation to issues such as Covid-19, Hong Kong, human rights, trade and the South China Sea.[122]

In addition, we detected two censored posts on the British Embassy's WeChat account. On 19 June, the embassy published an article on its WeChat official account in response to Chinese media reports.[123] The article aimed to dismantle 'misinformation' about the involvement of the UK in the Hong Kong issue. It was read more 350,000 times within two hours and then censored by WeChat.[124]

On 29 June, the embassy published another article, titled 'Hong Kong response is censored',[125] that denounced the incident and further explained the UK's position on Hong Kong (Figure 18). This time, the post wasn't removed, but its sharing function was disabled.

**Figure 18: UK Embassy's WeChat post in response to censorship of Hong Kong post (left). All sharing functions are disabled (right)**



Source: Bill Birtles. 'WeChat diplomacy: British embassy statement on #HongKong gets deleted, so it reposts with headline explaining it was censored and had high user engagement. WeChat this time leaves it up but bans users from sending it to others or posting it on their moments', *Twitter*, 30 June 2020, online.

Finally, several Indian media outlets have reported that an 18 June speech by Prime Minister Narendra Modi about the clashes between the Indian and Chinese armies at the contested Ladakh border had been censored from the Embassy of India in Beijing's official WeChat account.[126] Embassy officials reported that WeChat removed the post for 'divulging state secrets and endangering national security'.[127]

We have contacted all three embassies to verify our findings. A US Embassy spokesperson confirmed that it 'did not delete or alter the WeChat links'. An official from the British Embassy said, 'the Hong Kong WeChat article was the first time that we have used this account to talk about "sensitive" topics and the first time we have been censored on this channel. The follow up article we wrote on the censorship was also censored with people stopped from sharing it.'

We didn't receive a response from the Indian Embassy in Beijing.

The censored articles on the US Embassy's WeChat account that we found are listed in Table 1, in reverse chronological order from the most to least recent.

**Table 1: Censored articles on the WeChat account of the US Embassy in Beijing**

| Title | Translation | Date | Censorship method | Source |
|---|---|---|---|---|
| 美国国务院将孔子学院美国中心认定为中华人民共和国驻外使团 | The US State Department designated the Confucius Institute US Center as a diplomatic mission of the PRC | 14 August 2020 | 'Read more' tab redirects to English article[a] | Online[b] |
| 国防部长埃斯帕出席香格里拉对话视频会议时发表讲话 | Defense Minister Esper delivered a speech during the video conference at the Shangri-La Dialogue | 25 July 2020 | 'Read more' tab redirects to a 404 error page[c] | Online[d] |
| [摘译] 常务副国务卿比根在参议院外交关系委员会的讲话 | Deputy Secretary Biegun's remarks to the Senate Foreign Relations Committee | 23 July 2020 | Sharing function disabled | Unavailable[e] |
| 蓬佩奥国务卿就联合国人权理事会发表声明 | Secretary of State Pompeo issued a statement on the UN Human Rights Council | 22 June 2020 | 'Read more' tab redirects to a 404 error page[f] | Online[g] |
| 国务卿蓬佩奥：美国在非洲做了并且会继续做许多了不起的工作 | Secretary of State Pompeo: The US has done and will continue to do a lot of great work in Africa | 13 June 2020 | 'Read more' tab redirects to a 404 error page[h] | Online[i] |
| 在出席2019年度国际宗教自由报告新闻发布会时发表的讲话 | Speech at the press conference of the 2019 International Religious Freedom Report | 11 June 2020 | Sharing function disabled | Unavailable[j] |
| 关于香港的联合声明 | Joint statement on Hong Kong | 29 May 2020 | 'Read more' tab redirects to a 404 error page[k] | Online[l] |
| 国务卿蓬佩奥声明：美国保护国家安全和5G网络的完整性 | Secretary of State Pompeo stated: The US protects national security and the integrity of 5G networks | 18 May 2020 | 'Read more' tab redirects to a 404 error page[m] | Online[n] |
| 国务卿蓬佩奥在出席记者会时发表的讲话 | Speech by Secretary of State Pompeo at press conference | 8 May 2020 | 'Read more' tab redirects to a 404 error page[o] | Online[p] |
| 布兰斯塔德大使谈世界知识产权日：为了更光明的未来，强化知识产权保护 | Ambassador Branstad on World Intellectual Property Day: Strengthening intellectual property protection for a brighter future | 25 April 2020 | 'Read more' tab redirects to a 404 error page[q] | Online[r] |
| 国务卿蓬佩奥在记者会上发表讲话 | Secretary of State Pompeo delivered a speech at press conference | 24 April 2020 | 'Read more' tab redirects to a 404 error page[s] | Online[t] |

| Title | Translation | Date | Censorship method | Source |
|-------|-------------|------|-------------------|--------|
| 布朗巴克大使在《国际宗教自由报告》发布会上的讲话 | Ambassador Brownback's speech at the press conference of the International Religious Freedom Report | 25 June 2019 | Sharing function disabled | Unavailable[u] |
| 塞缪尔•布朗克大使关于确认宗教自由表现的特别简报会（摘译） | Special briefing by Ambassador Samuel Brownback on confirming religious freedom designations (excerpt) | 13 December 2018 | Sharing function disabled | Unavailable[v] |
| 新闻秘书关于总统与中方共进工作晚宴的声明 | Press Secretary's statement on President's working dinner with China | 2 December 2018 | Sharing function disabled | Unavailable[w] |

a    Michael R Pompeo, 'Designation of the Confucius Institute US Center as a Foreign Mission of the PRC', US Embassy and Consulates in China, 13 August 2020, online.
b    US Embassy Beijing (美国驻华大使馆). 'The US State Department recognised the Confucius Institute's American Centre as a diplomatic mission of the People's Republic of China' (美国国务院将孔子学院美国中心认定为中华人民共和国驻外使团), Weixin, 13 August 2020, online.
c    Archived link, online.
d    US Embassy Beijing (美国驻华大使馆). 'Defense Minister Esper delivered a speech at the Shangri-La Dialogue Video Conference' (国防部长埃斯帕出席香格里拉对话视频会议时发表讲话), Weixin, 25 July 2020, online.
e    When the sharing function is disabled, it's impossible to retrieve the links to the WeChat post.
f    Archived link, online.
g    US Embassy Beijing (美国驻华大使馆). 'Secretary of State Pompeo issued a statement on the UN Human Rights Council' (蓬佩奥国务卿就联合国人权理事会发表声明), Weixin, 22 June 2020, online.
h    Archived link, online.
i    US Embassy Beijing (美国驻华大使馆). 'Secretary of State Pompeo: The United States has done and will continue to do a lot of great work in Africa' [国务卿蓬佩奥：美国在非洲做了并且会继续做许多了不起的工作], Weixin, 13 June 2020, online.
j    When the sharing function is disabled, it's impossible to retrieve the links to the WeChat post.
k    Archived link, online.
l    US Embassy Beijing (美国驻华大使馆). 'Joint statement on Hong Kong' (关于香港的联合声明), Weixin, 29 May 2020, online.
m    Archived link, online.
n    US Embassy Beijing (美国驻华大使馆). 'Secretary of State Pompeo stated: The United States protects national security and the integrity of 5G networks' (国务卿蓬佩奥声明：美国保护国家安全和5G网络的完整性), Weixin, 18 May 2020, online.
o    Archived link, online.
p    US Embassy Beijing (美国驻华大使馆). 'Speech by Secretary of State Pompeo at Press Conference' (国务卿蓬佩奥在出席记者会时发表的讲话), Weixin, 8 May 2020, online.
q    Archived link, online.
r    US Embassy Beijing (美国驻华大使馆). 'Ambassador Branstad on World Intellectual Property Day: Strengthening intellectual property protection for a brighter future' (布兰斯塔德大使谈世界知识产权日：为了更光明的未来·强化知识产权保护), Weixin, 25 April 2020, online.
s    Archived link, online.
t    US Embassy Beijing (美国驻华大使馆). 'Secretary of State Pompeo delivered a speech at press conference' (国务卿蓬佩奥在记者会上发表讲话), Weixin, 24 April 2020, online.
u    When the sharing function is disabled, it's impossible to retrieve the links to the WeChat post.
v    When the sharing function is disabled, it's impossible to retrieve the links to the WeChat post.
w    When the sharing function is disabled, it's impossible to retrieve the links to the WeChat post.

# TikTok privacy concerns and data collection

## China's access to TikTok data

In TikTok's early years of operation, data was sent to and processed in China–a fact the company has admitted to. [128] The extent to which TikTok user data was sent to the PRC is the subject of a class-action lawsuit, brought by a California college student in December 2019 that alleges that TikTok 'vacuumed up and transferred to servers in China vast quantities of private and personally-identifiable user data'.[129]

Despite admitting that some TikTok user data was processed in China, ByteDance also argued that:

> there's a difference between data being physically processed in China and data being processed by systems designed and operated by one of our China registered entities. As a general practice, TikTok is not a service offered in China and as a result there has not been personal and un-aggregated data physically processed there.[130]

Growing public concern over TikTok's data at the time saw the platform employ contractors from a cybersecurity firm to assess its app's source code and data storage practices.[131] The cybersecurity firm conducted analysis from July to October 2019, for which it interviewed TikTok employees and reviewed the app's source code. According to the vice president of the firm, his team 'found no way TikTok could send data to China during those months'.[132] The assessment only lasted for the duration declared by the vice president, and the statement only addresses data being sent *to* the PRC, not whether it's being accessed *from* the PRC.

In an April 2020 blog post, TikTok's Chief Information Security Officer, Roland Cloutier, said that TikTok's goal was to minimise China-employee access to TikTok user data (for example, from the US and the EU).[133] He failed to mention, however, whether TikTok intended to cease such regional data access.

It isn't clear whether or not TikTok intends to cease non-US access to the data in the near future. In a lawsuit that TikTok and ByteDance filed against the Trump administration, TikTok stated that it had erected 'software barriers' around US user data stored outside China to separate the data from other ByteDance products. However, software barriers still permit ByteDance's China-based engineers supporting TikTok to gain controlled access to decrypted US user data, which includes names, birthdays, home addresses, phone numbers, emails, passwords, PayPal account information, contact lists, private videos, direct messages and parts of the log-in history.[134]

ByteDance couldn't realistically refuse a request for TikTok user data. China has a suite of national security laws that effectively compel individuals and companies to participate in 'intelligence work'. Alibaba, which provides cloud services to TikTok in Singapore, also falls under those laws. For example, Article 7 of the National Intelligence Law states that: 'Any organisation and citizen shall, in accordance with the law, support, provide assistance, and cooperate in national intelligence work, and guard the secrecy of any national intelligence work that they are aware of. The state shall protect individuals and organisations that support, cooperate with, and collaborate in national intelligence work.'[135] In other

words, if the Chinese Government requested TikTok user data, the company would be required by law to assist the government and then would be legally prevented from speaking publicly about the matter.

Like all major Chinese tech companies, ByteDance headquarters in Beijing houses a Chinese police cybersecurity team, according to the *Wall Street Journal*.[136] That arrangement allows employees to hand over user data and other sensitive information without due process.

According to three sources cited by *Reuters*, PRC-based engineers support TikTok as well as its Chinese equivalent, Douyin. Both TikTok and Douyin share some infrastructure, making any complete separation 'nearly impossible'.[137] This is congruent with findings reported in a July 2020 article by *The Information* that says China-based engineers and researchers developed TikTok's core software code. This source code, which is shared with other ByteDance apps, is known internally as *zhongtai*, or 'central platform', and so detaching TikTok from ByteDance would be 'a time-consuming and difficult maneuver'.[138] This may help to explain TikTok's reluctance or difficulty in fully separating from its Chinese support engineers.

*The Information* also revealed that ByteDance has made efforts to remove China-based engineers' access to US-based servers on certain projects with limited success. The difficulties associated with limiting access to those engineers are exemplified in one project, conducted in early 2020, which faced technical problems that couldn't be solved by the company's overseas engineers. As a result, temporary access was reinstated to the China-based engineers. Another challenge facing engineers outside China is that the software used to manage these servers is developed in China and written mainly in Chinese, making it difficult for TikTok's non-Chinese-speaking employees to know how the servers are managed.

In line with efforts to separate TikTok's engineering team from China, a small engineering corps has been established in Mountain View, California. However, instead of reporting to the TikTok CEO in the US, the engineers report to senior executives at ByteDance in China (Yang Zhenyuan and Hong Dingkun).[139] Although TikTok's engineering team both inside and outside China previously reported to managers in China, as of May 2020 ByteDance was in the process of recruiting an executive to run the US-based engineering department.[140]

As is evident from ByteDance's efforts to separate the US and China engineering departments, the company has made a series of moves to steadily decouple TikTok from its China operations. By August 2020, only 22 PRC-based jobs were being advertised by ByteDance, of which a mere three were for content-related positions in the Middle East, Latin America and the eastern EU (Figure 19).[141] Instead, most of the remaining PRC-based TikTok positions were for R&D, such as roles for a senior software engineer responsible for the app's content recommendation system, as well as a product manager responsible for TikTok's search function.[142] Despite ByteDance continuing to advertise for those PRC-based positions, particularly for R&D, it is evident that the TikTok Careers job page has instead become the primary platform for advertising TikTok positions.

**Figure 19: Distribution of PRC-based TikTok positions advertised by ByteDance and TikTok**



Note: Several of the jobs analysed in this chart are listed in Appendix 4. Source: ASPI ICPC.

As a result of efforts to increase the divide between TikTok and its parent company, TikTok has been on a hiring blitz for engineers, strategists and executives around the world.[143] In the US, it tripled the number of its US-based employees in 2020 and plans to add another 10,000 jobs over the next three years, according to the company.[144] Before these changes, there was a 'free flow of colleagues from China coming into the LA office or vice versa', as described by a TikTok US content team member in 2019.[145] Meanwhile, ByteDance employees in the PRC are now required to write all TikTok-related internal documents in English.[146]

ByteDance's decision to dissolve its Beijing-based Trust and Safety (TnS) Department in March 2020 signalled another action the company was taking to separate TikTok from its Chinese operations. The TnS Department in Beijing was responsible for TikTok's content moderation system and employed approximately 100 employees, most of whom each had capabilities in three different languages.[147]

Based on the company's careers page, TikTok positions associated with the TnS Department are now located throughout the US, Dublin, London, Berlin, Singapore, Moscow and Seoul. By August 2020, only one Beijing-based TnS Department position remained, for an algorithm engineer responsible for the 'ByteDance short-video algorithm, including content understanding and user modeling'.[148] Previously in May, however, that same job ad stated that the hire would be 'responsible for the content understanding and user modeling of ByteDance's overseas products (TikTok, Vigo …)'.[149]

## User privacy – Technical observations

Our primary privacy concerns with TikTok, outside Bytedance engineers access to TikTok data, lies in the amount of data collected by TikTok as defined in their Privacy Policy, and in the data that we were not able to see during our technical analysis. This included items that were encrypted, code that was obfuscated, and the fact that we only inspected TikTok from the client-side (the Android apps and the web platform TikTok.com). We did not investigate or have access to any of TikTok's internal systems.

Over the course of a few months, we have observed TikTok's platform evolve. Of TikTok's two Android packages,[150] we conducted a time-boxed analysis on com.zhiliaoapp.musically v17.3.3 (v17), the version available in Australia, and compared it with our observations from previous versions and packages of the app as well as the web platform.

Between v15 and v17, we observed that ongoing public scrutiny of TikTok has seen TikTok's apps generally reduce their data collection types, collection frequency as well as the number of permissions they request. We also observed in v17 that code had been cleaned up to remove references to Chinese domains, IP addresses and developer comments in Chinese. We found that the US version is faster to implement and resolve privacy issues than the rest-of-world app.

These moves put TikTok more in line with collection practices of other large-data driven AI companies that partake in targeted advertising revenue. For example, TikTok collects a large amount of data from its users as is stated in the company's privacy policy. The data collected ranges from individual tracking information to messages and related metadata.

During our analysis we did not observe v17 carrying out any overtly malicious activity (akin to spyware). One questionable outlier relates to TikTok's collection of "keystroke patterns or rhythms" as per their Privacy Policy. The app has a relatively large and obfuscated code base, and some encrypted transmissions that were inaccessible to us. There are parts of the app we did not have time to cover that are worth investigating further. These have been outlined in Appendix 2 and primarily cover areas where there are potential for security vulnerabilities.

## Data collection and logging

To observe data collected by TikTok we used a HTTP web proxy to intercept and view data sent from the device with TikTok app installed on it. This allowed us to observe what kind of data was being sent, when it was being sent, and determine the pattern of data transmission.

Analysing the traffic from v17, we saw that all transmissions were encrypted. But we noticed that the data of some requests were curiously encrypted beneath this already encrypted transmission channel. It is industry best practice to encrypt the transmission with TLS so that user information is protected, however it is unusual for an app to encrypt the data beneath this secure link as well. We were unable to determine why this extra encryption was necessary and only implemented for data sent to particular servers.

The remaining TikTok servers did not encrypt their underlying data and we observed user and device identifiers sent with every request. This type of data is likely used for tracking individuals and their actions on the platform. This also occurs on the web platform. For some examples, see Appendix 2.

TikTok's Privacy Policy says that it collects "keystroke patterns or rhythms". In our analysis of the source code we identified a number of locations where KeyEvent parameters are being passed to various functions. KeyEvents are Java objects that hold keystroke information. The (KeyEvent keyEvent) format is commonly used in, but not exclusively by, keyloggers. It depends on how the KeyEvent is used. However due to the time limitations we did not investigate all instances of this parameter. Additionally, and due to the double layer of encryption of some TikTok traffic, we were not able to verify whether or not the recorded keystrokes are being transmitted out of the app, or how the keystroke data is being used.

**Figure 20: Extract from TikTok's privacy policy, 1 January 2020**

### Device Information

We collect information about the device you use to access the Platform, including your IP address, unique device identifiers, model of your device, your mobile carrier, time zone setting, screen resolution, operating system, app and file names and types, keystroke patterns or rhythms, and platform.

Source: 'Legal—Privacy Policy', TikTok, 1 January 2020, online.

In v15 of the app, although the privacy policy (depicted in the above image) was applicable, TikTok did not explicitly state it was collecting the details of the local network used by the device, including any web proxies or virtual private networks (VPNs) used in the network (see Appendix 2). This information is sensitive, as it discloses data about the network architecture in use on the device. Version 17 still collects internal internet protocol (IP) addresses and domain name system (DNS) addresses, and contains Appsflyer software development kit (SDK) code that is specifically checking for the use of a 'tun0' interface (see Appendix 2), which is often used by VPNs.

This is not the first time third-party libraries have caused privacy concerns. In March 2020, it was discovered that TikTok, along with other developers, were identified to be reading the user clipboard on iOS (the Apple operating system) - a practice that could lead to sensitive user information such as credit card details and passwords being captured by the app. In March TikTok told The Telegraph that they would disable clipboard-reading in the coming weeks,[151] but a new feature in iOS 14 showed that TikTok was still monitoring the clipboard in June.[152] Researchers discovered that TikTok read the clipboard everytime the app was opened.[153] According to a TikTok blogpost at the end of June, the issue was caused by a third-party SDK and a self-developed anti-spam feature and it has since resolved the issue.[154]

TikTok has progressively cleaned up some of its code, but only after lawsuits and continual media attention. Late last year TikTok was found to be collecting a significant amount of user information using a variety of methods. To uniquely identify users, it used audio and canvas fingerprinting (a method that combines hardware and browser characteristics)[155] and through the app, collected device MAC addresses (a unique network card hardware identifier), a method that the Wall Street Journal reports was banned by Google.[156] And, in a class action lawsuit filed in November 2019, the plaintiff alleges that TikTok used device identifiers including phone IMEI (international mobile equipment identity) and IMSI (international mobile subscriber identity) numbers,[157] and sent the data to China. As of August 2020, according to our own research, the latest iterations of both the app and the web platform, appear to have ceased all these practices.

Further trying to distance itself from China, Tiktok has removed references to domains and IPs in China in v17, which were present in v15 and v16.[158] But traffic from the app does go to servers in Singapore hosted by Alibaba's cloud and to servers in the US, hosted on ByteDance's network,[159] both with parent companies in China. TikTok's own privacy statement states that TikTok user data may be shared "with a parent, subsidiary, or other affiliate of our corporate group."[160]

## App permissions

Permissions define what an app can do or access on a device. We compared the standard Android permissions of TikTok and its short-form video competitors - Byte, Dubsmash, Triller, Instagram and Snapchat. TikTok declares slightly more permissions than its competitors (see Figure 21). But a noticeable difference is its declaration of two permissions with a "signature" level of protection level. These are higher-risk permissions, but to determine how these permissions are used would require more analysis of the application. See Appendix 2 for more detail.

**Figure 21: A comparison of the permission list of six different short video apps (Byte, Dubsmash, Triller, Instagram, Snapchat, TikTok).**



Source: ASPI ICPC. See Appendix 2 for methodology

## Protection Level

**Normal**: A lower-risk permission. The system automatically grants this type of permission to a requesting app at install time.

**Dangerous**: Permissions that could potentially affect users' privacy or device operation. The user must explicitly grant the permission to the app.

**Signature**: Higher-risk permission. Granted to an app at install time, but only when the app that attempts to use the permission is signed by the same certificate as the app that defines the permission.

**Undefined**: Permissions where we could not find official Android or developer-written documentation on protection level

TikTok has made an effort to reduce its permission list which does reduce the risk of misuse. Between version 15 and version 17, it standardised the permission list between the two packages of its app and removed permissions to obtain user locations, modify accounts and monitor the phone state.[161] The user's approximate location is still collected and still forms part of the options used for targeted

advertising to TikTok users. The information probably comes from the device details that are logged by the TikTok app, which include SIM card operator details, system region and time zone. It may be possible that the user's IP address, which is collected by TikTok,[162] could also be used for this purpose.

# WeChat privacy concerns and data collection

The primary privacy concern with WeChat stems from the amount of personal user, device and platform data it has access to through the legitimate functionality it provides. The vulnerability then becomes the ability of a third party to intercept this data due to a lack of end-to-end encryption on the app.

We conducted a time-boxed analysis of the WeChat app (v7.0.16) and its traffic targeting any privacy or security concerns. We also looked at how the Official Account Platform censorship might be occurring to aid in discovering any other cases.[163] We found its extensive list of permissions concerning, as well as code that may lead to keylogging and clipboard monitoring code both of which will require further investigation to verify. The codebase of the WeChat app is large, obfuscated and it communicates using a custom protocol. All of which contributes to the difficulty and time-intensive nature of getting a clear picture of its capabilities.

## App permissions and data collection

The WeChat Android app declares 72 permissions. This is extensive. With those permissions, the app is able to carry out actions such as recording audio, getting the Wi-Fi MAC address, identifying network operator related data, reading the device ID (for example, the IMEI), querying the phone location (GPS) and monitoring the phone (user's) physical activity. While recording audio, obtaining the user's location and activity monitoring are required for the functions offered by the app, the others serve to uniquely identify the user.

The danger with permissions is that they may be misused, if not by the app itself, the potential is there for third-party code within the app to misuse the permissions. For instance, while activity monitoring would be a required permission for WeRun (WeChat's fitness activity tracker), the permission enables an app to classify a user's physical activity, such as whether they're walking or biking but also whether they're moving in a vehicle. Once the app is granted this permission, any code within the app can use the permission.

During our technical investigations into the WeChat app, our ability to evaluate the integrity of chat data and observe what data was logged by the app was relatively low due to the implementation of WeChat's custom protocol, called 'mmtls', which we didn't decrypt.

We identified that the app was collecting the device identifiers including device model, operating system, IMEI, IMSI and contained code to retrieve network interface information. Further to this we identified 5 places in the code where the clipboard can be read by the app. Although this is a common functionality in a chat messaging application, at this time we have not been able to verify whether or not the code at these locations is being used or whether the clipboard data is being sent to WeChat servers.

The extent of data that WeChat is capable of collecting can be seen in WeChat's privacy policy under the section addressing the California Consumer Privacy Act (Figure 22). It includes user and device identifiers and other information collected from the user. Phrases such as 'electronic network activity information' and 'similar information' are ambiguous about what conduct those terms cover. Of particular concern is chat data, as the privacy policy states that WeChat doesn't permanently store

chat data on their servers, but in this section (in Figure 22) it suggests that this data is disclosed by WeChat. A curious and rather suspicious admission by WeChat is the possible collection of thermal and olfactory information from the user. While it's possible to obtain ambient temperature, device temperature, relative humidity and ambient air pressure from the device's environmental sensors, it isn't clear how or why olfactory information is obtained.

**Figure 22: WeChat's privacy policy shows the information from users in California that WeChat may collect and disclose**

**Collection and Disclosure of Personal Information**

Over the past 12 months, through your use of WeChat, we may have collected and disclosed the following categories of personal information from or about consumers, as defined in the CCPA:

Identifiers, such as phone number, name, nickname, token, username, IP address, mobile application store user ID, mailing address, emergency contact information, and contact list. This information is collected directly from the consumer or device.
Geolocation data, including geolocation information derived from GPS coordinates, Wi-Fi access points, the compass, the accelerometer, IP address, and public posts. This information is collected directly from the consumer or device.
Internet or other electronic network activity information, including your device model, network type, OS type and version, client version, call history, chat data, invitations data, call credits history, search history, log data, information linked to social media accounts linked to use of WeChat, and survey information. This information is collected directly from a device.
Biometric information, such as voiceprints and facial recognition data. This information is collected directly from the consumer or device.
Commercial information, including payment card information and transaction verification information. This information is collected directly from the consumer or device.
Audio, electronic, visual, thermal, olfactory, or similar information, including a profile picture. This information is collected directly from the consumer.

Source: WeChat privacy policy, under the heading 'Addendum for California residents'.

## Security

The findings of our technical analysis aren't comprehensive, and we have identified several areas of concern worth further investigation. During the sign-up process, for example, the WeChat app downloaded an .apk file (Android package file). While no malicious behavior was identified, and it's possible this is related to software updates, this activity is unusual and deserves further investigation as to why WeChat is downloading this file and what it is being used for.[164]

When we investigated the decompiled Android app package for WeChat, a class named "keylogger" was identified, as well as several hundred locations in the codebase that use the format of (KeyEvent keyEvent). This code is common for passing keyboard presses to a function. The act of collecting keystrokes is not necessarily malicious, but can be depending on the use of the collected keystrokes. A malicious keylogger is a tool for recording a user's keystrokes, often without their knowledge. Keyloggers are often used in malware to capture passwords and sensitive information. Further testing would be required to verify if a keylogger is in use, and if it poses any extra privacy risk. Tencent already has access to all messages sent via WeChat as they are sent via Tencent's servers, but this has the potential to capture text that was not ever intended to be sent via WeChat.

**Figure 23: Keylogger class in WeChat code**



Source: WeChat 7.0.16 Android .apk file.

## Privacy and surveillance

Although chat messages are secured with encryption, the foundation architecture of WeChat's messaging system does not adequately secure messages from sender-to-receiver, meaning that it does not restrict third party access to its content.

With messaging apps, it's reasonable for users to desire that their private conversations carried out on the app are indeed private. With WeChat, based on the messaging architecture it's built upon, as well as the well-documented censorship of the content of chat conversations, the confidentiality and integrity of communications sent over WeChat can't be guaranteed.

WeChat uses client-to-server (C2S) encryption to protect the transmission of chat messages. This protects the messages from third parties, except the service provider, Tencent. Unlike privacy-focused apps such as Signal and Wickr, WeChat doesn't use end-to-end (E2E) encryption, which would protect the message contents from sender to receiver. In a C2S architecture, anyone with physical or digital access to the central messaging server has access to the messages on the network. By running its chat service using a C2S architecture, Tencent has positioned itself between the sender and recipient, granting it full access to the data and communications. WeChat's ability to censor or filter chat content between the two communicating parties is evidence that it processes the communications unencrypted.

Victor Gevers conducted research where he revealed that WeChat filters billions of messages for review based on keyword triggers. These messages contained GPS coordinates that were not exclusively located in China. In fact, although the majority of messages that triggered for review were sent within China, around 19 million English-language messages were captured from users around the world, including people in North America, Europe, South America, Taiwan and Australia.[165]

Tencent states that it doesn't store chat histories.[166] That's somewhat misleading. The privacy policy better articulates that chat data is semi-permanently stored for 120 hours (or 72 hours for media and location data) before being permanently deleted.[167] As a positive sign that this is likely to be true, chat histories aren't transferred when you log on to the service from a new phone. But, if a user 'Favourites' a message, then those messages will be stored on WeChat's servers.[168]

Regardless of whether Tencent stores user messages, WeChat uses a C2S encryption architecture which enables messages to be intercepted. Furthermore, according to a 2016 Amnesty International survey of the privacy of messaging apps, Tencent was the 'only company which has not stated publicly that it will not grant government requests to access encrypted messages by building a "backdoor".'[169]

Tencent also states that it does not conduct automated big-data analysis of user data, such as analysis of the content of chat messages.[170] There is no reference to their treatment of metadata which is just as valuable. Chat metadata can reveal such things as whom people are communicating with, their location and the dates, times and frequency of the contact.

# Conclusion

The Chinese state has demonstrated a propensity for controlling and shaping the information environment of the Chinese diaspora—including via WeChat. The meteoric growth of TikTok has now put the CCP in a position from which it can shape the information environment on a largely non-Chinese-speaking platform—with the help of the highest valued start-up in the world and its opaque advanced AI-powered algorithm.

Chinese party-state leverage over these companies is considerable, is exercised internally via CCP committees and is enforced by a suite of cybersecurity and intelligence laws.[171] As Chinese companies, Tencent and ByteDance are not only required to participate in intelligence work, but they're also legally mandated to promote CCP propaganda.

China's censorship and propaganda apparatus is a responsibility that's pushed down to media and technology companies such as Tencent and ByteDance.[172] As Chinese companies, they're obligated to comply with strict government regulations on what content is allowed to be published on their platforms, and they both invest heavily in automated systems for content filtering and human curation.

The demands of the PRC's surveillance and propaganda apparatus on these technology companies are such that, at least in the case of WeChat, they're even prepared to surveil the foreign users of their apps in order to better train the censorship algorithms used on Chinese citizens within the PRC.

The censorship and surveillance detailed in this report most probably represent only a fraction of the total activity that's taking place on these social media platforms. At the same time as the apps compete on user growth, ad sales and investment, they're also posing a challenge to liberal democratic ideals such as freedom of political expression and free speech.

As the underlying technology used in these apps continues to advance, the ability of these companies to monitor dissent and shape narratives globally will grow exponentially.

# Recommendations

1. To the extent that the censorship practices outlined in this report represent breaches of current law in liberal democracies around the world, governments should launch legal investigations.

2. In an effort to train AI algorithms that help to curate, filter and moderate content and enable targeted advertising, users' data privacy has fallen by the wayside. Governments should introduce transparent user-data privacy and user-data protection frameworks that apply to all social media and internet companies, regardless of their country of origin and ownership.[173] If companies refuse to comply with such frameworks, they shouldn't be granted licences to operate.

3. Governments should mandate that all social media platforms publicly disclose, in detail, all the content they censor and make it an offence to censor content where that has not been publicly disclosed to users.

4. Independent audits of the algorithms of all social media companies should be conducted. Included in those assessments should be transparency about the guidelines that human moderators use and what impact their decisions have on the algorithms.

5. Governments should require that all social media platforms investigate and disclose information operations (also known as 'coordinated inauthentic behaviour') being conducted on their platforms by state and non-state actors. Disclosures should include publicly releasing datasets linked to those information campaigns

6. Finally, all of the above recommended actions would benefit from multilateral collaboration that includes participation from governments, the private sector and civil society actors. For example, independent audits of algorithms could be shared by multiple governments that are seeking the same outcomes of accountability and transparency; governments, social media companies and research institutes could share data on information operations; all stakeholders could share lessons learned on data frameworks.

# Appendix 1: Tencent and ByteDance CCP connections

## ByteDance's CCP connections

The CCP's values are at the core of ByteDance's mindset covering content control across its platforms. This is exemplified in the company's establishment of CCP branches within its corporate structure. ByteDance first established a party branch in October 2014 and later established a party committee in April 2017, with cells within its Public Affairs Department, Technical Support Unit and Compliance Operations Unit.[174]

The Constitution of the CCP clearly outlines its expectations for party units, which it refers to as 'lower Party organisations', within private enterprises. Beginning in 2001, private entities that employed at least three CCP members are required to have a party unit installed within their corporate structure[175] and to 'firmly implement the decisions of higher Party organisations'.[176]

In particular, larger scale internet companies are known for having established CCP committees within their corporate structures.[177] This move enables internet companies, which are largely apolitical, to demonstrate their loyalty to the CCP by showing their dedication to serving the party's political mission. ByteDance is certainly no exception. In June 2018, the ByteDance Party Committee jointly held Party Day activities with the Party School of the Central Committee of the CCP, at which ByteDance employees pledged their CCP membership as they 'faced the Party flag, raised their right hands, clenched their fists and renewed their Party membership pledge', vowing to 'always be ready to sacrifice everything for the Party and the people, and to never betray the Party.'

At a live viewing of the 40th anniversary of the Reform and Opening Up movement organised by the ByteDance Party Committee, CCP member employees reflected on a speech by Xi Jinping, sharing perspectives on party ideology from the viewpoint of internet practitioners. One employee stated that, 'as a Party member and internet industry practitioner, we should begin with ourselves to integrate the spirit of reform into our daily work and studies, and be a "screw" that will never rust.'[178]

ByteDance has also taken an approach to propaganda and ideology unique for an internet company. Following the National Propaganda and Ideology Work Conference in 2018, the ByteDance Party Committee organised party lessons focusing on topics from the conference. In those lessons, the company's vice-president, Zhang Fuping, emphasised that, as an internet company, ByteDance should make use of its advantages in technology and talent, actively spread positive energy, tell China's story well and do its best to promote the internet for social development.[179]

Using ByteDance's unique position as a leading internet company for improving propaganda and ideological work demonstrates how the company can leverage its platforms to prove its loyalty to the CCP while also shaping narratives. This was reflected when the Minister of the Fujian Provincial Party Committee Propaganda Department visited ByteDance facilities in Fujian. During the visit, the minister told ByteDance that he hoped the company would use its advantages in new media and new technologies to further propagate and interpret 'Xi Jinping thought'.[180] Already, ByteDance has used its platforms, particularly Douyin, to assist provinces and cities in disseminating 'authoritative and accurate propaganda'.[181]

ByteDance's connections with the CCP also extend to its collaborations with law enforcement. Like all major Chinese tech companies, ByteDance headquarters in Beijing houses a Chinese police cybersecurity team, according to the *Wall Street Journal*.[182] That arrangement allows employees to hand over user data and other sensitive information without due process.

## Tencent's CCP connections

Similarly to ByteDance, Tencent also has CCP organisations embedded within its corporate structure. As recently as April 2020, Tencent was reported to house 13 CCP general branches, more than 200 party branches and thousands of party small groups.[183] Tencent's Party Committee also became the only party committee inside internet companies to be designated as an outstanding grassroots party organisation in 2016.[184] Tencent's CCP involvement doesn't end here. Its party committee established an annual Party Day on 15 July, with the intention to both educate party members and attract non-party members to participate.[185]

Tencent's dedication to the CCP is also reflected in its compliance with public security directives. In 2015, the Deputy Minister for Public Security, Chen Zhimin, announced a plan to establish network security offices within major internet companies, including Tencent.[186] The offices are intended to provide public security entities with more direct access to illegal internet activity, enabling a quicker response to such activities. More recently, in 2017, Tencent was one of three companies that are required to assist China's government in tracking criminal suspects and silencing political dissent.[187]

Tencent's participation in the country's public security efforts stems from Chief Executive Ma Huateng's support of private companies cooperating with the government on law enforcement.[188] By 2017, Tencent had even agreed to work with the Guangzhou police to construct a cloud-based early-warning system that would enable the police to track and predict the size and movement of gatherings.[189]

Tencent's collaboration with law enforcement is also congruent with its investment in constructing smart cities. The company has plans to construct what it calls a WeCity and proposes ways in which people become 'users' within newly developed smart cities. In a WeCity, data introduces a new dimension of wealth, whereby an individual's digital behaviour becomes an asset. As a company that claims to provide continuous momentum for the government's digital transformation and smart city development, its advances in surveillance become deeply intertwined with the PRC Government's strategies.[190]

Despite its support to the government, Tencent has received criticism from the CCP pertaining to its gaming development. After Tencent released the 'Honour of Kings' game, the company was denounced by the *People's Daily*, which called the game 'poison'.[191] In contrast, Tencent's more recent release in 2019, 'Homeland Dream', was developed in collaboration with the *People's Daily* and provides patriotic references throughout the game, including slogans such as 'make army strong and prosperous', 'made in China' and 'one country, two systems'.[192] Tencent's development of what's been called 'playable propaganda' demonstrates the company's willingness to yield to the government's censorship and control.[193]

# Appendix 2: TikTok data privacy and collection

## statusCode

The hashtag 'gay' in Russian (рей) is invisible to the typical user. On the app, searching for 'рей' presents no results. But if you happen to come across a video with that hashtag and click on the hashtag, the hashtag exists and you can view the videos in that hashtag.

On the web platform, there is no functionality to search for hashtags, but if you visit the hashtag though the URL https://www.tiktok.com/tag/рей, you are presented with a "Couldn't find hashtag" error, just as one would with the hashtag 'isis'.

When we looked at the source code for the hashtag, we found that рей and isis shared the same statusCode - 10211.



## Douyin and TikTok JSON schema

TikTok and Douyin websites are by no means identical. However we did find a lot of similarities in the JSON schema used when presenting videos and, as in the example below, in tracking users. In the image below, under "user", you can see the individual tracking ids of the user that has been redacted.

Near identical JSON schema that used to track users, used on both Douyin and TikTok websites.



Source: Douyin.com, TikTok.com.

## User and Device identifiers in TikTok app request

The following images are examples of the headers of requests sent by the TikTok app containing user and device details. Every packet sent to TikTok servers has this type of information attached to it.

## Targeted advertising

The following table is sourced from TikTok Ads website. It is designed to show advertisers which targeting options they can use to pinpoint their desired audience.

| Audience | Include | Create a Lookalike or Custom Audience (Customer file, Engagement, App Activity, Website Traffic). |
|---|---|---|
| | Exclude | Exclude Lookalike or Custom Audiences |
| Demographics | Gender | Male, Female |
| | Age | 13-17, 18-24, 25-34, 35-44, 45-54, 55+ |
| | Location | country/region, state/province, or city (city targeting only available in India). |
| | Language | Delivery to users based on app language. |
| | Interest | Deliver to users based on interests. e.g. "Gaming" |
| Device | Connection Type | WIFI, 2G, 3G, 4G |
| | Operation System | iOS & Android |
| | Operation System Version | Deliver ads to users based on software version. e.g. iOS 10.0 or above, Android 4.0 or above. |
| | Device Price | Deliver ads to users based on device pricing, ranging from no limit to $1000+. |
| | Carrier | Deliver ads to users based on mobile phone carriers. |

## TikTok logging in the background

The TikTok application was tested by closing it in one instance through the Android task manager and another by force closing the process via a root shell.

In the first case, TikTok was observed to reopen with a new process ID (signifying it was a new process) and weblogs were sent from the new process (below). This is normal Android functionality for apps that run in the background, however it is not necessarily clear to users that the application is still running even after being closed.

After being closed by a root shell, the app remained closed. However we found that this wasn't the case for the "trill" v 17.2.1 package which reopened after shell close.

This is the log of transactions when the app was closed as described above

## Permissions

### Short video app permission comparison

To compare the permissions requested by comparable short-video apps, we extracted permissions using mostly MobSF (Mobile Security Framework - https://github.com/MobSF/Mobile-Security-Framework-MobSF). Drozer (https://github.com/FSecureLABS/drozer) was used for Instagram as we were not able to extract its permissions with MobSF. In order to normalise the permissions, we removed all the custom permissions from all the applications being compared. Then categorised the protection level of the permissions based on the Android Developer documentation (https://developer.android.com/reference/android/Manifest.permission). We categorised those permissions that were deprecated, by their original protection level assignment . Those Android permissions that we couldn't find, we marked as undefined.



### Signature permissions in use

Unique to TikTok against its competitors is its use of two permissions with a "signature" level of protection. This type of permission is only granted by the system if the requesting application is signed with the same certificate as the application that declared the permission. We would need to perform further analysis to determine what it is used for within the TikTok app.

| Permission | Protection Level | Notes |
|---|---|---|
| android.permission.GET_TASKS | deprecated (signature\|privileged) | Allows application to retrieve information about currently, and recently, running tasks. May allow malicious applications to discover private information about other applications (source:Mob SF). But because this permission is deprecated, this permission may or may not work. |
| android.permission.REQUEST_INSTALL_PACKAGES | signature | Allows an application to request installing packages (Android Developer doc). |

## Comparison between TikTok packages and versions

TikTok has two packages on the Google Play store - com.ss.ugc.android.trill published by TikTok Pte Ltd (Singapore) and com.zhiliaoapp.musically published by TikTok Inc (US). The likely reason for this is the transition to integrate Bytedance's original TikTok with the acquisition of Musical.ly. A user's location will determine which Google Store they are presented with and thus which TikTok package they will download. Based on the text strings within the different packages, TikTok Inc is designed for an English speaking audience and the TikTok Pte Ltd app, the rest of the world.

In version 15 (v15) of both packages, there were differences in the servers the app sends data to. Permissions for user location were removed in the US version of the app, but remained in the other version of the app. In version 17 (v17) the permissions are identical across both packages.

### 1  Permissions

a.  Comparing the permissions requested in v15 of these packages, the com.ss.android.ugc.trill package designed for rest-of-world (excl USA) requested three more permissions.

| The additional three permissions declared by com.ss.android.ugc.trill, not in com.zhiliaoapp.musically | | |
|---|---|---|
| Permission | Protection level | Definition |
| android.permission.ACCESS_FINE_LOCATION | Dangerous | Allows an app to access precise location. |
| android.permission.ACCESS_COURSE_LOCATION | Dangerous | Allows an app to access approximate location. |
| android.permission.READ_PHONE_STATE | Dangerous | Allows read only access to phone state, including the current cellular network information, the status of any ongoing calls, and a list of any PhoneAccounts registered on the device. |

b.  In v17, the above 3 permissions have been removed from the permission list, along with 3 others, reducing the overall permissions list to 63 for both packages.

| Permissions in v15, no longer in v17 | | |
|---|---|---|
| Permission | Protection level | Definition |
| android.permission.ACCESS_FINE_LOCATION | Dangerous | Allows an app to access precise location. |
| android.permission.ACCESS_COURSE_LOCATION | Dangerous | Allows an app to access approximate location. |
| android.permission.READ_PHONE_STATE | Dangerous | Allows read only access to phone state, including the current cellular network information, the status of any ongoing calls, and a list of any PhoneAccounts registered on the device. |
| android.permission.EXPAND_STATUS_BAR | Normal | Allows application to expand or collapse the status bar. |
| android.permission.MANAGE_ACCOUNTS | Dangerous | Allows an application to perform operations like adding and removing accounts and deleting their password. |
| android.permission.USE_CREDENTIALS | Dangerous | Allows an application to request authentication tokens. |

## 2   Hosts

Comparing hosts in the AndroidManifest.xml. It is likely that t ~ tiktok, m~ musical.ly, va ~ Virginia, USA

| com.ss.android.ugc.trill | com.zhiliaoapp.com |
|---|---|
| vt.tiktok.com | vm.tiktok.com |
| t.tiktok.com | m.tiktok.com |
|  | v16.musical.ly |
|  | app-va.musical.ly |

Although some places in the code, such as the AndroidManifest file, still make reference to the musical.ly domain, actual network traffic out of the app has transitioned away from the musical.ly domain by v17.

## 3   Version 16

A French researcher looking into com.zhiliaoapp.com v16.6.52 found the following in the code.

We can see that although it is designed for a US market, there are configurations that remain in the code to send data elsewhere, including China.



```
        UrlConfig.CHINA = new UrlConfig("https://log.snssdk.com/service/2/app_log/*",
"https://rtlog.snssdk.com/service/2/app_log/", new String[]
{"https://log.snssdk.com/service/2/device_register/*",
"https://log.snssdk.com/service/2/device_register/"},
"https://ichannel.snssdk.com/service/2/app_alert_check/*",
"https://log.snssdk.com/service/2/log_settings/*", "https://log.snssdk.com/service/2/app_log/*",
"https://log.snssdk.com/service/2/log_settings/");
        UrlConfig.AMERICA = new UrlConfig("https://log.isnssdk.com/service/2/app_log/*",
"https://rtlog.isnssdk.com/service/2/app_log/", new String[]
{"https://log.isnssdk.com/service/2/device_register/*",
"https://log.isnssdk.com/service/2/device_register/"},
"https://ichannel.isnssdk.com/service/2/app_alert_check/*",
"https://log.isnssdk.com/service/2/log_settings/*", "https://log.isnssdk.com/service/2/app_log/*",
"https://log.isnssdk.com/service/2/log_settings/");
        UrlConfig.AMERICA_HTTP = new UrlConfig("https://log.isnssdk.com/service/2/app_log/*",
"https://rtlog.isnssdk.com/service/2/app_log/", new String[]
{"https://log.isnssdk.com/service/2/device_register/*",
"https://log.isnssdk.com/service/2/device_register/"},
"https://ichannel.isnssdk.com/service/2/app_alert_check/*",
"https://log.isnssdk.com/service/2/log_settings/*", "https://log.isnssdk.com/service/2/app_log/*",
"https://log.isnssdk.com/service/2/log_settings/");
        UrlConfig.SIG_AWS = new UrlConfig("https://log.sgsnssdk.com/service/2/app_log/*",
"https://rtlog.sgsnssdk.com/service/2/app_log/", new String[]
{"https://log15.byteoversea.com/service/2/device_register/*",
"https://log.sgsnssdk.com/service/2/device_register/*",
"https://log15.byteoversea.com/service/2/device_register/"},
"https://ichannel.sgsnssdk.com/service/2/app_alert_check/*",
"https://log.sgsnssdk.com/service/2/log_settings/*", "https://log.sgsnssdk.com/service/2/app_log/*",
"https://log.sgsnssdk.com/service/2/log_settings/");
        UrlConfig.SIG_ALIYUN = new UrlConfig("https://log.byteoversea.com/service/2/app_log/*",
"https://rtlog.byteoversea.com/service/2/app_log/", new String[]
{"https://log.byteoversea.com/service/2/device_register/*",
"https://log.byteoversea.com/service/2/device_register/"},
"https://i.byteoversea.com/service/2/app_alert_check/*",
"https://log.byteoversea.com/service/2/log_settings/*",
"https://log.byteoversea.com/service/2/app_log/*",
"https://log.byteoversea.com/service/2/log_settings/");
        UrlConfig.MUSICALLY = new UrlConfig("https://applog.musical.ly/service/2/app_log/*",
"https://rtlog.musical.ly/service/2/app_log/", new String[]
```

Source: https://medium.com/@fs0c131y/tiktok-logs-logs-logs-e93e8162647a

## Logging of internal network details

1   This is an extract from traffic captured from TikTok (com.ss.android.ugc.trill) v15.7.45 sending traffic to host: mon.tiktokv.com. It collected details on the VPN tunnel being used, and in another instance, the proxy being used. This did not occur in version 17. However, the internal IP and DNS settings were still captured in version 17.

```
        },
    \"ifconfig\":{
            \"interfaces\":[
                    {
                            \"addr\":\"10.█.█.2\",
                            \"name\":\"tun0\"
                    },
                    {
                            \"addr\":\"192.168.█.1█\",
                            \"name\":\"wlan0\"
                    },
                    {
                            \"addr\":\"█████:████:███:███:███:███:███:███\",
                            \"name\":\"wlan0\"
                    },
                    {
                            \"addr\":\"█████:████:███:███:███:███:███:███\",
                            \"name\":\"wlan0\"
                    }
```



2   Appsflyer code in TikTok v17 checking for a VPN.

```java
    }
} else if (Build.VERSION.SDK_INT >= 16) {
    ArrayList arrayList = new ArrayList();
    try {
        Iterator<T> it2 = Collections.list(NetworkInterface.getNetworkInterfaces()).iterator();
        while (it2.hasNext()) {
            NetworkInterface networkInterface = (NetworkInterface) it2.next();
            if (networkInterface.isUp()) {
                arrayList.add(networkInterface.getName());
            }
        }
        return arrayList.contains("tun0");
```

## App Analysis Areas Worth Further Investigation

Data logged to SD card -- There is a potential for data leak. During app usage, data was found to be logged to the SD card. This data is not deleted when the app is uninstalled. It can be easily accessed by other applications with SD card permissions.

Opaque areas of the application -- The app uses Java reflection, operating system commands and shared libraries (arm64 version). While these have legitimate uses in a standard application, they are also areas where potential security and privacy concerns may exist.Time limitations prevented us from fully investigating these areas.

Keylogging -- The KeyEvent parameter was observed being used at several points in the application. This is worth investigating further for potential keylogging, especially as the privacy policy says that TikTok collects 'keystrokes'.

# Appendix 3: WeChat

## Investigating how the censorship on Official Account Platforms is occurring

After we noticed WeChat incorrectly redirecting links on the Official Accounts Platform, we used an HTTP web proxy to analyse the webpage code to try to see if we could determine how this was occurring, so as to assist with discovering more cases. Our investigations lead us to believe that the content marking and filtering process occurs on the server-end and likely occurs upon submission of an article. This way, by the time any user requests that webpage, the way that it will function has already been determined.

### 404 error

It is possible that the redirection to a 404 page is a website coding error, but because this only occurred to articles with content sensitive to Beijing, this seems unlikely. In either case, as it currently stands, these articles are being censored.

### Share button

For some articles, the Share button was ghosted out and thus the user was not able to click the button. We found code related to the webpage that ghosted the Share button and modified it to re-enable the Share button locally on the testing mobile device. However, when we clicked the Share button, WeChat presented us with an error message "Cannot share this content". Although we enabled the functionality to click the Share button, there are likely other factors that we were not able to determine that are preventing the function. Below is an image of the error message.



## APK downloaded by WeChat during signup

During the sign-up process the WeChat app downloaded an .apk file via HTTP. Below is an image of the web request for the download that was captured by the software we used to analyse the traffic out of WeChat.



## WeChat's custom protocol mmtls

WeChat uses a custom protocol for some of its traffic. The requests are sent over plaintext but the underlying data is encrypted.

Specifications matching this format were found online here: https://gitlab.com/iamfaith/article/-/blob/master/基于TLS1.3的微信安全通信协议mmtls介绍.md



## App analysis - areas worth further investigation

Further to the items mentioned in the body of the report, we also believe these areas are worth further investigation.

Opaque areas of the application -- The app uses Java reflection, operating system commands, runtime dex loading and shared libraries (arm64 version). While these have legitimate uses in a standard application, they are also areas where potential security and privacy concerns may exist. Time limitations prevented us from fully investigating these areas.

Keylogging -- The KeyEvent parameter was observed being used at several points in the application. This is worth investigating further for potential keylogging, especially as there was a class named 'keylogger' identified in the app.

# Appendix 4: Examples of PRC-based TikTok jobs advertised by ByteDance

**Table 2: PRC-based TikTok jobs advertised by ByteDance**

| Title | Location | Category | Description |
|---|---|---|---|
| Senior software engineer—TikTok recommendation | Beijing | R&D | 1. Build industry leading recommendation system; develop highly scalable classifiers and tools leveraging machine learning.<br>2. Understand product objectives and machine learning techniques; improve model and recommendation strategy.<br>3. Understand user behaviour and apply ML algorithms to optimise content consumption and production experience.<br>4. Understand content security strategy and apply ML algorithms to improve content audit process. |
| iOS business development/ architecture—TikTok | Shanghai | R&D | 1. Responsible for TikTok's iOS app technology pre-research and architecture design.<br>2. Abstract platform technology components.<br>3. Project reconstruction, code review, performance optimisation, quality control.<br>4. Conduct research on new technology directions, overcome technical difficulties and train new employees. |
| TikTok Ads advertising system architecture (senior) engineer | Beijing | R&D | 1. Design and optimise TikTok advertising system-related services, including but not limited to advertising CTR/CVR estimation services and advertising recall services.<br>2. Design and implement flexible, extensible, stable, and high-performance computing models and frameworks.<br>3. Troubleshoot the production system; design and implement the necessary mechanisms and tools to ensure the stability and efficiency of the overall operation of the production system. |
| TikTok Ads advertising algorithm (senior) engineer | Beijing | R&D | 1. Use various strategies to improve the monetisation efficiency and user experience of international products, and design and implement an efficient strategy for mixing articles and advertisements.<br>2. Improve the prediction accuracy of the CTR/CVR advertising model, data analysis, modelling and feature engineering.<br>3. Advertisement-targeted mining to build user portraits.<br>4. Optimising a GD advertising scheduling system.<br>5. Research and implement traffic control, an advertising pacing algorithm and an advertising bidding mechanism. |
| Server leader— TikTok live stream | Beijing | R&D | 1. Responsible for TikTok live-stream-related business development.<br>2. Responsible for continuously improving existing services, optimising system weaknesses, and improving system performance and stability.<br>3. In-depth exploration and analysis of business needs, writing technical solutions and system designs.<br>4. Improve base component support, better support business iteration and introduce new technologies and solutions for the team based on business needs.<br>5. Responsible for technical team building, talent training and team management. |

| Title | Location | Category | Description |
|---|---|---|---|
| Senior server architect—TikTok | Shanghai | R&D | 1. Responsible for participating in and guiding server-side business R&D work in one or more subfields, including but not limited to TikTok's core modules such as basic business, security, user growth and service architecture.<br><br>2. Analyse and thoroughly explore the shortcomings of the existing system, locate system bottlenecks, and improve system performance and stability.<br><br>3. Think about various issues in the R&D process and promote the improvement of team work efficiency and development quality.<br><br>4. Based on actual business needs, introduce new technologies and new solutions to the team.<br><br>5. With good project management, coordination and communication skills, be responsible for the promotion of cross-team key projects. |
| Android architecture leader—Douyin/TikTok | Shenzhen | R&D | 1. Responsible for R&D and management of Douyin/TikTok's Android infrastructure.<br><br>2. Responsible for the construction and management of the Douyin/TikTok Android infrastructure team; responsible for the quality and efficiency of the team's output.<br><br>3. Responsible for architecture optimisation, performance optimisation, experience optimisation etc. of the Douyin/TikTok Android client. |
| Back-end core R&D engineer—TikTok | Shanghai | R&D | 1. Responsible for the research and development of TikTok's server, including but not limited to core modules such as basic business, security, user growth, and service architecture.<br><br>2. In-depth exploration and analysis of business requirements, writing technical solutions and system design.<br><br>3. Carry out system design and coding according to product requirements.<br><br>4. Continue to transform and optimise the system architecture. |
| Algorithm engineer—Douyin/Toutiao/TikTok Search | Beijing | R&D | 1. Participate in the R&D of the ByteDance search engine, use cutting-edge machine learning algorithms and massive data to make the most exciting technology and give users the best search experience.<br><br>2. Participate in the R&D of core products such as Toutiao / Douyin / TikTok and serve hundreds of millions of global users.<br><br>3. Participate in improving the core algorithm for search. |
| Back-end development engineer—Douyin/Toutiao/TikTok Search | Beijing | R&D | 1. Participate in Toutiao/Douyin/TikTok search service optimisation.<br><br>2. Responsible for searching online system architecture construction, optimising system stability, performance, capacity, throughput, and designing flexible strategy architecture to support rapid strategy iteration and upgrades.<br><br>3. Responsible for the construction of the offline search system architecture; optimise the stability and efficiency of offline data flow, and promote the rapid and accurate application of offline data to online.<br><br>4. Abstract and general offline search system architecture and strategy architecture, used for quickly supporting major vertical search engines. |

| Title | Location | Category | Description |
|---|---|---|---|
| Algorithm engineer—TnS | Beijing | R&D | 1. Responsible for content understanding and user modelling of ByteDance overseas products (TikTok, Vigo, …). |
| | | | 2. Have a deep understanding of content security strategies, combined with machine learning and other technologies to optimise content security business processes and efficiency. |
| | | | 3. Have a deep understanding of business and machine learning technology, optimise short video understanding and modelling, and improve recommendation results and content ecology. |
| | | | 4. Have a deep understanding of business and machine learning technology, optimise user/creator understanding and modelling, and improve recommendation results and creative ecology. |
| Senior operations strategy manager—TikTok Latin America | Beijing | Operations | 1. Assist in the formulation of localised content strategies for short videos according to product features, user portraits and development stages. |
| | | | 2. Participate in content strategy and operation target design, task disassembly, monitoring, attribution and review. |
| | | | 3. Responsible for important content analysis projects, and coordinate the team and cross-departmental implementation and project follow-up. |
| | | | 4. Through analysis and research on content, users, target market, combined with data, make recommendations on business directions. |
| TikTok operations intern—Middle East | Beijing | Operations | 1. Mine users' video content consumption needs, build a content operation library, improve video quality, and enrich the community content. |
| | | | 2. Responsible for the maintenance and management of core users in the community, as well as the mining and introduction of intelligent off-site users. |
| | | | 3. Responsible for event operations, planning online events, and evaluating the results. |
| | | | 4. Responsible for updating and maintaining official social media content, planning social media activities, and operating core user communities. |
| TikTok content operation manager—East EU | Shanghai | Operations | 1. Deep understanding of content market in Russia; familiar with most recent trending videos consumed by young audience, |
| | | | 2. Choose qualified videos and promote on social media platforms and be responsible for in-app content. |
| | | | 3. Participate in launching and operating 'hashtag', follow up the hot spots in the country and carry out innovative publicity. |
| | | | 4. Monitoring local content ecosystem, collaborate with data team to improve the diversity of in-app content, give feedback/guidelines to user operations to acquire right content needed in the community. |
| | | | 5. Possess a strong understanding of our product, our competition in the industry and position to leverage them into impactful marketing activities. |
| | | | 6. Research new market trends as well as user insights to leverage them into impactful marketing activities. |

Source: *ByteDance Referral*, online; *ByteDance*, online.

# Notes

1   Lai Lin Thomala, 'Number of active WeChat messenger accounts Q2 2011-Q2 2020', *Statista*, 20 August 2020, online.
2   Ronald Deibert, 'WeChat users outside China face surveillance while training censorship algorithms', *Washington Post*, 8 May 2020, online.
3   Paul Mozur, 'Forget TikTok. China's powerhouse app is WeChat, and its power is sweeping', *New York Times*, 4 September 2020, online.
4   Alex Sherman, 'TikTok reveals detailed user numbers for the first time', *CNBC*, 24 August 2020, online.
5   Alex Hern, 'Revealed: how TikTok censors videos that do not please Beijing', *The Guardian*, 20 August 2019, online.
6   David Bandurski, 'Tech shame in the new era', *China Media Project*, 11 April 2018, online.
7   Sam Biddle, Tatiana Dias, Paulo Victor Ribeiro, 'Invisible censorship: TikTok told moderators to suppress posts by "ugly" people and the poor to attract new users', *The Intercept*, 16 March 2020, online.
8   Vanessa Pappas, Kudzi Chikumbu, 'A message to our black community', *TikTok Newsroom*, 2 June 2020, online.
9   Fanny Potkin, 'TikTok booms in Southeast Asia as it picks path through political minefields', *Reuters*, 28 August 2020, online. Alex Hern, 'Revealed: how TikTok censors videos that do not please Beijing', *The Guardian*, 20 August 2019, online.
10  Appendix 2, 'statusCode'.
11  'Statement on TikTok's content moderation and data security practices', *TikTok Newsroom*, 25 October 2019, online.
12  Leo Kelion, 'Teen's TikTok video about China's Muslim camps goes viral', *BBC News*, 26 November 2019, online.
13  Alex Hern, 'Revealed: how TikTok censors videos that do not please Beijing', *The Guardian*, 20 August 2019, online.
14  Markus Reuter, Chris Köver, 'TikTok's criticism and competition guidelines', *Netzpolitik*, 29 November 2019, online.
15  Potkin, 'TikTok booms in Southeast Asia as it picks path through political minefields'.
16  Alex Hern, 'TikTok's local moderation guidelines ban pro-LGBT content', *The Guardian*, 26 September 2019, online.
17  Zaheena Rasheed, 'Why are Thai students protesting against King Vajiralongkorn?', *al-Jazeera*, 26 August 2020, online.
18  Alyssa Kann, 'Popular hashtag hidden from TikTok during anti-police protests in the United States', *DFRLab*, 2 June 2020, online.
19  The hashtag was available on Twitter and Instagram when ASPI ICPC checked on 29 August and remains available on both. On 7 September a TikTok spokesperson told ASPI ICPC that #acab had been "incorrectly moderated" and that they had "resolved the error". On 9 September, a reader brought to ASPI ICPC's attention that #acab was blocked on Facebook. Searching for the hashtag on the Facebook app results in a message from the platform that reads "Keeping our community safe. Posts with #ACAB are temporarily hidden here. Some content in those posts goes against our Community Standards".
20  Markus Reuter, Chris Köver, 'Cheerfulness and censorship', *Netzpolitik*, 23 November 2019, online.
21  Alex Hern, 'Revealed: how TikTok censors videos that do not please Beijing', *The Guardian*, 20 August 2019, online.
22  Jack Nicas, Mike Isaac, Ana Swanson, 'TikTok said to be under national security review', *New York Times*, 7 August 2020, online.
23  '#MyPride: Celebrating authenticity and inclusivity', *TikTok Newsroom*, 23 June 2020, online.
24  Hern, 'TikTok's local moderation guidelines ban pro-LGBT content'.
25  Chris Köver, Markus Reuter, 'TikTok curbed reach for people with disabilities', *Netzpolitik*, 2 December 2019, online.
26  Cristina Criddle, 'Transgender users accuse TikTok of censorship', *BBC*, 12 February 2020, online.
27  Lily Wakefield, 'Man "devastated" after TikTok removed video of him kissing his boyfriend because it "violated community guidelines"', *Pink News*, 8 January 2020, online.
28  Ragip Soylu, '"They delete everything": Former TikTok moderator reveals China app censorship', *Middle East Eye*, 19 December 2019, online.
29  Lavanya Mahendran, Nasser Alsherif, 'Adding clarity to our community guidelines', *TikTok Newsroom*, 8 January 2020, online.
30  'Audacity in adversity: LGBT activism in the Middle East and North Africa', *Human Rights Watch*, 16 April 2018, online.
31  Markus Reuter, Chris Köver, 'Gute Laune und Zensur' [Good mood and censorship], *Netzpolitik*, 23 November 2019, online.
32  Marianna Spring, 'QAnon: TikTok blocks QAnon conspiracy theory hashtags', *BBC News*, 24 July 2020, online.
33  Spring, 'QAnon: TikTok blocks QAnon conspiracy theory hashtags'.
34  Guang Pu, '独家] 内部员工揭秘：TikTok 竟然这么审核内容] [Exclusive: Internal staff reveals how TikTok actually reviews content], 品玩 [*Ping West*], 14 June 2020, online.
35  Eric Han. 'Countering hate on TikTok', *TikTok Newsroom*, 21 August 2020, online.
36  Potkin, 'TikTok booms in Southeast Asia as it picks path through political minefields'.
37  'Is "Putin is a thief" a (potentially illegal) insult? Putin's press secretary thinks so', *Meduza*, 31 May 2019, online.
38  'Navalny defies Russia's new law against insulting authorities online', *Radio Free Europe / Radio Liberty*, 29 March 2019, online.
39  'Russian lawmakers approve anti-gay bill in 436–0 vote', *France 24*, 12 June 2013 ,online.
40  'Online and on all fronts', *Human Rights Watch*, 18 July 2017, online.
41  Carl Schreck, 'Twitter restores suspended Putin parody account after outcry', *Radio Free Europe / Radio Liberty*, 1 June 2016, online.
42  'Instagram submits to Russia censor's demands', *BBC News*, 15 February 2018, online.
43  Danielle Cave et al., 'ByteDance', *Mapping China's tech giants*, ASPI, Canberra, 19 April 2019, online and please see Appendix 1.
44  Sebastian Meineck, 'TikTok: Ich habe China kritisiert, dann wurden meine Videos versteckt', *VICE*, 13 December 2019, online.
45  @themomentj_1018, 'Profile', *TikTok*, online.
46  @themomentj_1018, 'Vlog: Trip to Xinjiang (3)—Thanks to all the frontier workers! Full version on YouTube, #xinjiang #jessicatalks #china', *TikTok*, online.
47  Li Li [李莉], '新疆给我的感觉太好" "达人西游"全网总传播量超80亿人次' ['Xinjiang gives me such a great feeling Influencers head west campaign exceeds 8 billion views], 新疆日报 [*Xinjiang Daily*], 12 January 2020, online.
48  Li Li 'Xinjiang gives me such a great feeling" Influencers head west campaign exceeds 8 billion views'.
49  Zang Shijie (臧诗洁), 'Profile', *LinkedIn*, online.
50  Department of Foreign Language (外国语学部). 'The Department of Foreign Language's undergraduate third Party branch held a full membership admission plenary session for probationary Party members' [外国语学部本科生第三党支部预备党员转正大会举行], Beijing Language and Culture University (北京语言大学), 26 May 2015, online.
51  'Guan Video: Using academic short films to tell Chinese stories' [观视频工作室：用学术短视频讲述中国故事], *Observer Network* [观察者网], 20 June 2019, online.
52  Isobel Cockerell, 'How TikTok opened a window into China's police state', *Coda*, 25 September 2019, online.

53    'News and Propaganda Bureau of the Ministry of Public Security signed a strategic cooperation agreement with ByteDance—and also ceremony for new media of police department across the nation to arrive at Jinri Toutiao, Douyin' [公安部新闻宣传局与字节跳动战略合作签约；暨全国公安新媒体矩阵入驻今日头条抖音仪式举行], China Police Net [中国警察网], 25 Apr 2019, online.

54    Isobel Cockerell, 'Xinjiang's TikTok wipes away evidence of Uyghur persecution—Coda follows up', Coda, 24 January 2020, online.

55    Jacob Wallis et al., Retweeting through the Great Firewall, ASPI, Canberra, 12 June 2020, online.

56    Twitter Safety, 'Disclosing networks of state-linked information operations we've removed', Twitter Blog, 12 June 2020, online.

57    Nathaniel Gleicher, 'Removing coordinated inauthentic behavior from Iran', Facebook News, 19 August 2019, online.

58    Raphael Satter, 'Google pulls 2,500 China-linked YouTube channels over disinformation', Reuters, 6 August 2020, online.

59    Lin Yueqin [林跃勤], 'Focus on improving the ability to respond to external public opinion attacks against China' [着力提升因应外部对华舆论攻击能力], Chinese Social Sciences Net [中国社会科学网], 24 April 2020, online.

60    Sam Biddle, Tatiana Dias and Paulo Victor Ribeiro. 'Invisible Censorship: TikTok told moderators to suppress posts by "ugly" people and the poor to attract new users', The Intercept, 16 March 2020, online.

61    Liza Lin, Aaron Tilley, Georgia Wells, 'TikTok deal talks are snarled over fate of app's algorithms', Wall Street Journal, 2 September 2020, online.

62    'How TikTok recommends videos #ForYou', TikTok Newsroom, 19 June 2020, online.

63    'Announcement of the Ministry of Commerce and Science and Technology no. 38 of 2020 on adjusting and releasing the catalogue of China's prohibited and restricted export technologies' [商务部 科技部公告2020年第38号 关于调整发布《中国禁止出口限制出口技术目录》的公告], Ministry of Commerce of the People's Republic of China (MOFCOM), 28 August 2020, online.

64    Rebecca Heilweil, 'TikTok offered details about how its most popular feed works. Experts seem unimpressed', Recode, 23 June 2020, online.

65    'Regulations on Ecological Governance of Network Information Content' [网络信息内容生态治理规定], Cyberspace Administration of China, 15 December 2019, online.

66    'Detailed Rules for Auditing Standards of Network Short Video Content' [网络短视频内容审核标准细则], China Netcasting Services Association, 9 January 2019, online.

67    Biddle et al., 'Invisible censorship: TikTok told moderators to suppress posts by "ugly" people and the poor to attract new users'.

68    'Detailed Rules for Auditing Standards of Network Short Video Content'.

69    David Bandurski, 'Tech shame in the new era', China Media Project, 11 April 2018, online.

70    Beijing Internet Association [首都互联网协会党委], 'ByteDance Party Committee: We must give priority to stressing the correct guidance' [字节跳动党委：要把讲导向守责任放首位], Sina Finance [新浪财经], 29 April 2018, online.

71    Beijing Internet Association, 'ByteDance Party Committee: We must give priority to stressing the correct guidance'.

72    Mercy A Kuo, 'China's media market competition', The Diplomat, 5 December 2017, online.

73    Juro Osawa, Yunan Zhang, Amir Efrati, 'Breaking off TikTok will be hard to do', The Information, 29 July 2020, online.

74    Osawa et al., 'Breaking off TikTok will be hard to do'.

75    Juro Osawa, Yunan Zhang and Amir Efrati. 'Breaking Off TikTok Will Be Hard to Do' The Information, 29 July 2020, online.

76    Juro Osawa, Yunan Zhang and Amir Efrati. 'Breaking Off TikTok Will Be Hard to Do' The Information, 29 July 2020, online.

77    Osawa et al., 'Breaking off TikTok will be hard to do'.

78    '平台直播自律白皮书' [Platform live broadcast self-discipline white paper], online.

79    Echo Wang, Paresh Dave. 'Exclusive: Microsoft faces complex technical challenges in TikTok carveout', Reuters, 10 August 2020, online.

80    Osawa et al., 'Breaking off TikTok will be hard to do'.

81    Announcement of the Ministry of Commerce and Science and Technology no. 38 of 2020 on adjusting and releasing the catalogue of China's prohibited and restricted export technologies'.

82    David Ramli, Shelly Banjo, 'The kids use TikTok now because data-mined videos are so much fun', Bloomberg, 18 April 2019, online.

83    Pierre Bienaimé, 'TikTok's Blake Chandlee on working with US brands despite conflict with the White House', Digiday Podcast, 4 August 2020, online.

84    'TikTok "absolutely not" a US security risk, says top executive', PBS, 25 August 2020, online.

85    Megan Mccluskey. 'These TikTok creators say they're still being suppressed for posting Black Lives Matter content', TIME, 22 July 2020, online.

86    Pappas, 'A message to our black community'.

87    Jordan Schneider, 'What to do about TikTok and WeChat', ChinaTalk, 21 July 2020, online.

88    Nilesh Christopher, 'Censorship claims emerge as TikTok gets political in India', BBC News, 31 January 2020, online.

89    Saloni Gaur, 'Nazma Aapi on corona at Zee News', Instagram, 20 May 2020, online.

90    Saloni Gaur, 'Nazma Aapi on corona at Zee News', Twitter, 20 May 2020, online.

91    Saloni Gaur, 'Nazma Aapi on corona at Zee News', YouTube, 19 May 2020, online.

92    Eric Han, 'An update on recent content and account questions', TikTok Newsroom, 28 November 2019, online.

93    Hern, 'Revealed: how TikTok censors videos that do not please Beijing'.

94    Feroza Aziz, 'Update: tik tok has issued a public apology and gave me my account back. Do I believe they took it away because of a unrelated satirical video that was deleted on a previous deleted account of mine? Right after I finished posting a 3 part video about the Uyghurs? No.', Twitter, 28 November 2019, online.

95    Lotus Ruan et al., 'One app, two systems' Citizen Lab, 30 November 2016, online.

96    Emily Feng, 'China intercepts WeChat texts from US and abroad, researchers say', NPR, 29 August 2019, online.

97    Jeffrey Knockel et al. 'We chat, they Watch', Citizen Lab, 7 May 2020, online.

98    David Gilbert, 'Here's how China is silencing coronavirus critics in the US', VICE News, 13 February 2020, online.

99    Zoe Schiffer, 'WeChat keeps banning Chinese Americans for talking about Hong Kong', The Verge, 25 November 2019, online.

100   'Fighting for free speech: starting from WeChat', Citizen Power Initiatives for China, 19 February 2020, online.

101   Cyberspace Administration of China (CAC) [网信中国], 'The Cyber Space Administration of China guides relevant local network information offices to investigate and deal with illegal websites and accounts according to the law' [国家网信办指导有关地方网信办 依法查处违法违规网站平台及账号], Weixin, 5 February 2020, online.

102   '微信再现大规模封号' [WeChat Reproduces a Large-Scale Ban], China Digital Times, 5 February 2020, online.

103   '"A healthy society should not have just one voice"—China must end crackdown on online speech in response to COVID-10', Chinese Human Rights Defenders, 1 April 2020, online.

104   'Fighting for free speech: starting from WeChat'.

105  Greg Fay, 'Repression across borders: the CCP's illegal harassment and coercion of Uyghur Americans', *Uyghur Human Rights Project*, August 2019, online.

106  Fay, 'Repression across borders: the CCP's illegal harassment and coercion of Uyghur Americans'.

107  Joshua Lipes, 'Xinjiang authorities detain Uyghur aspiring professional footballer in "political re-education camp"', *Radio Free Asia*, 15 January 2019, online.

108  Mozur, 'Forget TikTok. China's powerhouse app is WeChat, and its power is sweeping'.

109  'China Media Bulletin 135', *Freedom House*, April 2019, online.

110  Mozur, 'Forget TikTok. China's powerhouse app is WeChat, and its power is sweeping'.

111  Yaqiu Wang, 'WeChat is a trap for China's Diaspora', *Foreign Policy*, 14 August 2020, online.

112  Isabelle Niu, 'Is WeChat a problem for democracies?', *Quartz*, 14 May 2020, online.

113  Niu, 'Is WeChat a problem for democracies?'.

114  Tom Sear, Michael Jensen, Titus C Chen, 'How digital media blur the border between Australia and China', *The Conversation*, 16 November 2018, online.

115  Alia Wong, 'The app at the heart of the movement to end affirmative action', *The Atlantic*, 20 November 2018, online.

116  Julie Makinen, 'Chinese social media platform plays a role in US rallies for NYPD officer', *Los Angeles Times*, 24 February 2016, online.

117  Rosie Lewis, Joe Kelly, 'Tampa moment looms as latest poll tightens', *The Australian*, 17 February 2019, online.

118  Steve Cannane. 'Australian politicians risk being kicked of Chinese social media', *ABC News*, 24 April 2019, online.

119  Steve Cannane, Echo Hui, 'Bill Shorten and Scott Morrison risk losing access to Chinese voters on WeChat', *ABC News*, 24 April 2019, online.

120  Marcus Wang, Stella Fan. 'Censored on WeChat: A year of content removals on China's most powerful social media platform', *Global Voices*, 11 February 2019, online.

121  'Li Wenliang: Coronavirus death of Wuhan doctor sparks anger', *BBC News*, 7 February 2020, online.

122  Ben Blanchard, 'US, China trade jibes as military tensions worsen', *Reuters*, 27 August 2020, online.

123  This is the URL of the article: online. When visited it presents an error banner stating 'Unable to view this content because it violates regulations'.

124  British Embassy Beijing, 'Hong Kong response is censored', *gov.uk*, 29 June 2020, online.

125  British Embassy Beijing, 'Hong Kong response is censored'.

126  Sutirtho Patranobis, 'India posts PM Modi's remarks on Ladakh face-off, China's WeChat app deletes it', *Hindustan Times*, 20 June 2020, online.

127  Patranobis, 'India posts PM Modi's remarks on Ladakh face-off, China's WeChat app deletes it'.

128  David Carroll, 'Is TikTok a Chinese Cambridge Analytica data bomb waiting to explode?', *Quartz*, 7 May 2019, online.

129  Katie Paul, 'Tiktok accused in California lawsuit of sending user data to China', *Reuters*, 3 December 2019, online.

130  Carroll, 'Is TikTok a Chinese Cambridge Analytica data bomb waiting to explode?'.

131  Drew Harwell, Tony Romm. 'Inside TikTok: A culture clash where US views about censorship often were overridden by the Chinese bosses', *Washington Post*, 5 November 2019, online.

132  Nicas et al., 'TikTok said to be under national security review'.

133  Roland Cloutier, 'Our approach to security', *TikTok Newsroom*, 28 April 2020, online. Full quote: 'Our goal is to minimize data access across regions so that, for example, employees in the APAC region, including China, would have very minimal access to user data from the EU and US.'

134  'TikTok Inc and Bytedance Inc vs President of the United States, Secretary of Commerce and US Department of Commerce', case2:20-cv-07672, filed 24 August 2020, online.

135  '中华人民共和国国家情报法' [The National Intelligence Law of the People's Republic of China], National People's Congress of the People's Republic of China, 27 June 2017, online.

136  Georgia Wells, Yang Jie, Yoko Kubota, 'TikTok's videos are goofy. Its strategy to dominate social media is serious', *Wall Street Journal*, 29 June 2019, online.

137  Yingzhi Yang, Echo Wang, Alexandra Alper, 'Exclusive: TikTok owner ByteDance moves to shift power out of China—sources', *Reuters*, 28 May 2020, online.

138  Osawa et al., 'Breaking off TikTok will be hard to do'.

139  Osawa et al., 'Breaking off TikTok will be hard to do'.

140  Yang et al., Exclusive: TikTok owner ByteDance moves to shift power out of China—sources'.

141  'Tiktok Content Operation manager—East EU', *ByteDance Referral*, online; 'TikTok运营实习生 — 中东', (Operations Intern—Middle East), *ByteDance*, online; '高级运营策略经理—TikTok拉美地区', (Senior Operations Strategy Manager—TikTok Latin America), *ByteDance*, online.

142  Appendix 4, 'Examples of PRC-based TikTok jobs advertised by ByteDance.

143  Harwell & Romm, 'Inside TikTok: A culture clash where US views about censorship often were overridden by the Chinese bosses'.

144  Osawa et al., 'Breaking off TikTok will be hard to do'.

145  'LinkedIn interviews ByteDance: How ByteDance builds its global employer brand', YouTube, 16 May 2019, online.

146  Osawa et al., 'Breaking off TikTok will be hard to do'.

147  '字节跳动海外解忧 TikTok与抖音加速切割' [ByteDance accelerates the process of cutting ties between TikTok and Douyin in order to tackle concerns overseas], *The Time Weekly*, 30 March 2020, online.

148  '算法工程师-TnS' [Algorithm engineer—TnS), *ByteDance*, online.

149  Appendix 4 'Examples of PRC-based TikTok jobs advertised by ByteDance.

150  TikTok has two packages on the Google Play store - com.ss.ugc.android.trill published by TikTok Pte Ltd (Singapore) and com.zhiliaoapp. musically published by TikTok Inc (US). The likely reason for this is the transition to integrate Bytedance's original TikTok with the acquisition of Musical.ly. A user's location will determine which Google Store they are presented with and thus which TikTok package they will download. Based on the text strings within the different packages, TikTok Inc is designed for an English speaking audience and the TikTok Pte Ltd app, the rest of the world.

151  Laurence Dodds. 'How popular apps can read your phone's clipboard without permission', The Telegraph, 30 March 2020, online.

152  Dan Goodin, 'Tiktok and 32 other iOS apps still snoop your sensitive clipboard data', *Ars Technica*, 28 June 2020 online; Zak Doffman, 'Apple suddenly confirms hidden problem impacting all iPhone, iPad users', *Forbes*, 23 June 2020, online; Zak Doffman, 'Warning—Apple suddenly catches TikTok secretly spying on millions of iphone users', *Forbes*, 26 June 2020, online.

153  Tommy Mysk, 'Popular iPhone and iPad apps snooping on the pasteboard', *Mysk*, 16 August 2020, online.

154   Roland Cloutier, 'Updates on our security roadmap', *TikTok Newsroom*, 30 June 2020, online.
155   Matthias Erbel, 'Privacy analysis of TikTok's app and website', *Rufposten*, 5 December 2019, online.
156   Kevin McMillan, 'Tiktok tracked user data using tactic banned by Google', *Wall Street Journal*, 11 August 2020, online.
157   'Misty Hong vs Bytedance Inc, TikTok Inc, Beijing Bytedance Technology Co. Ltd, Musical.ly', *Courthouse News*, 27 November 2019, online.
158   Elliot Alderson, 'TikTok: logs, logs, logs', *Medium*, 3 August 2020, online.
159   Bytedance manages AS396986 & AS138699 'Bytedance Peering Policy', Bytedance, online.
160   'Privacy policy: How we share your information', *TikTok Legal*, online.
161   Appendix 1, 'Comparison between v15 and v17'.
162   Mara Hvistendahl, 'Blueleaks reveals what TikTok shares with US authorities', *The Intercept*, 11 August 2020, online.
163   See Appendix 3
164   The .apk file was downloaded from Weixin, online, and doesn't appear to be a fully functional stand-alone apk.
165   China Media Bulletin 136: The survival of dissent, WeChat monitoring, smuggled videos (May 2019), *Freedom House*, online.
166   'WeChat denies "storing" chat histories', *BBC News*, 2 January 2018, online.
167   'WeChat privacy policy', *WeChat*, online.
168   'WeChat Help Centre: How secure are my chat messages and conversations on WeChat? Can third-parties snoop or read my messages?', *WeChat*, online.
169   How Private Are Your Favourite Messaging Apps?". 2016. Amnesty.Org, online.
170   'How secure are my chat messages and conversations on WeChat? Can third-parties snoop or read my messages?', WeChat Help Center, online.
171   See Appendi1 for Tencent and ByteDance CCP connections
172   Lotus Ruan, 'Internet censorship: how China does it', *The Strategist*, 9 October 2017, online.
173   This recommendation is derived from ideas expressed by Lindsay Gorman here: https://securingdemocracy.gmfus.org/qa-with-lindsay-gorman-how-does-tiktok-pose-a-national-security-risk-to-the-united-states/ and by Kara Frederick, Chris Estep and Megan Lamberth here: https://warontherocks.com/2020/08/beyond-tiktok-preparing-for-future-digital-threats/
174   不忘初心 重温入党志愿书' [Never forget the original intention, reflect upon the application for party membership], *People's Daily*, 15 June 2020, online.
175   Yi-Zheng Lian, 'China, the party–corporate complex', *New York Times*, 12 February 2017, online.
176   'Full text of Constitution of Communist Party of China', *News of the Communist Party of China*, 29 March 2013, online.
177   Zhang Lin, 'Chinese Communist Party needs to curtail its presence in private businesses', *South China Morning Post*, 25 November 2018, online.
178   '字节跳动 (ByteDance) 党委：认真学习讲话精神，努力承担社会责任' [ByteDance Party Committee: Earnestly study the spirit of the speech and work hard to assume social responsibility], *VITO*, 27 December 2018, online.
179   '字节跳动党委举办专题党课学习贯彻全国宣传思想工作会议精神' [The ByteDance Party Committee held a special party class to study and implement the spirit of the national propaganda and ideology work conference], China Federation of Internet Societies, 31 August 2018, online.
180   '省领导到福建字节跳动公司调研' [Provincial leaders visited Fujian ByteDance Company for investigation], *Southeast Net*, 11 March 2020, online.
181   '日照市首届政务头条大会暨政务号集体入驻仪式举行' [Rizhao City held its first Toutiao conference for government services and a ceremony for the launch of Toutiao accounts for government services], *Shouji Xinhua Wang*, online.
182   Wells et al., 'TikTok's videos are goofy. Its strategy to dominate social media is serious'.
183   '积极构建互联网党建工作新格局' [Actively build a new pattern of internet party building work], Cyberspace Administration of China, 16 April 2020, online.
184   '腾讯、ofo、知乎……互联网企业掀"党建潮"背后意义何在？' [Tencent, ofo, Zhihu … what is the meaning behind the 'party building wave' launched by internet companies?], *Xinhua*, 30 March 2018, online.
185   'Tencent, ofo, Zhihu… what is the meaning behind the "party building wave" launched by internet companies?'.
186   Charles Clover, 'China to tighten grip over country's internet users', *Financial Times*, 5 August 2015, online.
187   Liza Lin, Josh Chin. 'China's tech giants have a second job: helping Beijing spy on its people', *Wall Street Journal*, 30 November 2017, online.
188   Lin & Chin, 'China's tech giants have a second job: helping Beijing spy on its people'.
189   Lin & Chin, 'China's tech giants have a second job: helping Beijing spy on its people'.
190   '腾讯政务全新战略升级 发布新一代WeCity技术平台' [New strategic update of Tencent's government affairs work. A next-generation WeCity technology platform], *ZhongGuoXinWenWang*, 15 July 2020, online.
191   Sijia Jiang, 'China communist party mouthpiece slams Tencent game; shares slide', *Reuters*, 4 July 2017, online.
192   Louise Lucas, Wang Xueqiao. 'Patriotic Tencent city-building game tops China download charts', *Financial Times*, 30 September 2019, online.
193   Josh Ye, 'Chinese propaganda game Homeland Dream is disturbingly addictive', *South China Morning Post*, 2 October 2019, online.

# Acronyms and abbreviations

AI        artificial intelligence

C2S       client-to-server

CCP       Chinese Communist Party

CEO       chief executive officer

DFRLab    Digital Forensic Research Lab

DNS       domain name system

E2E       end-to-end

EU        European Union

GPS       Global Positioning System

ICPC      International Cyber Policy Centre

IMEI      international mobile equipment identity

IMSI      international mobile subscriber identity

IP        internet protocol

PRC       People's Republic of China

R&D       research and development

SDK       software development kit

TnS       trust and safety

VPN       virtual private network

Some previous ICPC publications























# Exhibit B

**The New York Times** | https://nyti.ms/3k0wKXb

# *Trump Admits Downplaying the Virus Knowing It Was 'Deadly Stuff'*

In taped interviews with the journalist Bob Woodward, the president said as early as February that the virus was more dangerous than the flu, even as he told the country otherwise.

 **By Maggie Haberman**

Sept. 9, 2020

President Trump acknowledged to the journalist Bob Woodward that he knowingly played down the coronavirus earlier this year even though he was aware it was life-threatening and vastly more serious than the seasonal flu.

"This is deadly stuff," Mr. Trump said on Feb. 7 in one of 18 interviews with Mr. Woodward for his coming book, "Rage."

"You just breathe the air and that's how it's passed," the president told Mr. Woodward in audio recordings made available on The Washington Post website. "And so that's a very tricky one. That's a very delicate one. It's also more deadly than even your strenuous flus."

But three days after those remarks, Mr. Trump told the Fox Business anchor Trish Regan: "We're in very good shape. We have 11 cases. And most of them are getting better very rapidly. I think they will all be better." A little less than two weeks later, he told reporters on the South Lawn that "we have it very much under control in this country."

By Feb. 26, the president was publicly dismissing concerns about the lethality of the virus. "It's a little like the regular flu that we have flu shots for," he said at a White House news conference. "And we'll essentially have a flu shot for this in a fairly quick manner."

And by Feb. 28, at a rally in South Carolina, Mr. Trump denounced Democrats for their concerns about the virus as "their new hoax," after the Russia investigation and his impeachment.

The audio recordings show that as Mr. Trump was absorbing in real time the information he was given by health and national security experts, he made a conscious choice not only to mislead the public but also to actively pressure governors to reopen states before his own government guidelines said they were ready.

---

**Latest Updates: The Coronavirus Outbreak** ›
Updated 8m ago

- The other way the virus will kill: hunger.

- One U.S. university showed how even the most comprehensive plan to contain the virus can break down.

- Getting prisoners in Oregon out of the path of wildfires raises the risk of spreading the virus.

More live coverage: **Markets**

---

By March, Mr. Trump was straightforward with Mr. Woodward about his tactics. "I wanted to always play it down," the president said in an audio recording of an interview on March 19. "I still like playing it down, because I don't want to create a panic."

"This is deadly stuff," the president repeated for emphasis.

Despite the president's own words in the recordings, the White House press secretary, Kayleigh McEnany, told reporters on Wednesday that Mr. Trump had never publicly played down the virus.

The Post and CNN were given advance copies of the book and published details on Wednesday. The New York Times obtained its own copy.

As part of the White House's effort at damage control, Mr. Trump told reporters that his recorded remarks to Mr. Woodward were vastly different from what he was telling the public because he was worried about frightening people.

"We don't want to instill panic," the president said on Wednesday. "We don't want to jump up and down and start shouting that we have a problem that is a tremendous problem" and "scare everybody."

But his acknowledgment that he was fully aware by early February of the perils of the virus only intensified questions about why he was so slow to respond, and why he did not tell Americans the truth to better prepare them for the worst public health crisis in the United States in more than a century.

---

**CORONAVIRUS SCHOOLS BRIEFING:** *It's back to school — or is it?*    | Sign Up |

Mr. Woodward's book also illustrated that as much as Mr. Trump tries to change the subject before the November election to law and order and a call for a crackdown on nationwide protests against police brutality, he is unable to escape scrutiny for his response to a virus that has killed nearly 190,000 people in the United States and upended the lives of millions more.

The president also told Mr. Woodward on March 19 of the virus: "Part of it is the mystery. Part it is the viciousness. You know when it attacks it attacks the lungs. And I don't know — when people get hit, when they get hit, and now it's turning out it's not just old people, Bob." He went on: "Just today and yesterday, some startling facts came out. It's not just old, older. Young people too — plenty of young people."

And yet in an interview broadcast by "Fox and Friends" on Aug. 5, Mr. Trump asserted: "If you look at children, children are almost, and I would say almost definitely, but almost immune from this disease. I don't know how you feel about it, but they've got stronger immune systems than we do somehow for this."

Two days later, the Centers for Disease Control and Prevention reported that "children are at risk for severe Covid-19."

One question swirling in Washington on Wednesday was why Mr. Trump had given Mr. Woodward such extensive access. Mr. Woodward, a longtime editor and reporter at The Washington Post who with Carl Bernstein broke the Watergate scandal that led to the resignation of President Richard M. Nixon, has written books on most of Mr. Nixon's successors, many of them critical. Karl Rove, President George W. Bush's former top political adviser, noted on Fox News on Wednesday that nearly every president who has cooperated with Mr. Woodward regretted it.

Current White House officials said that Mr. Trump opened his door to Mr. Woodward in the hope that the eventual book would be positive. Mr. Trump did not speak to Mr. Woodward for his first book on the Trump presidency, "Fear," and the president has maintained that it would have turned out better had he participated. Officials also said that Mr. Trump, who has great faith in his ability to sell people on his version of events, was eager to have Mr. Woodward's seal on his time in office.

Although Mr. Trump and his son-in-law and senior adviser, Jared Kushner, spoke extensively to Mr. Woodward, White House officials were pointing fingers at one another on Wednesday about who was responsible for giving the journalist such access.

Speaking to reporters on Wednesday afternoon, Mr. Trump repeatedly bragged about his limited ban on travel into the United States from China at the end of January, and falsely claimed that almost everyone disagreed with him at the time. Mr. Woodward's book documents that the majority of the president's advisers urged him to go ahead with the ban during a meeting in the Oval Office before he ultimately did.

When pressed on why he did not do more in February and March, knowing what he knew, Mr. Trump maintained that he had not expected the virus to spread as far and as fast as it did.

"You didn't really think it was going to be to the point that it was," he said. "All of a sudden the world was infected. The entire world was infected. Everyone was scrambling around looking where to buy face masks and all of the other things."

On Capitol Hill, several Republicans defended the president.

"I don't think he needs to go on TV and scream that we're all going to die," said Senator Lindsey Graham, Republican of South Carolina and an ally of the president who White House aides said encouraged the president to participate in the book. "But his actions of shutting the economy down were the right actions. I think the tone during that time sort of spoke for itself. People knew it was serious."

Senator Mitch McConnell of Kentucky, the majority leader, said he had not seen the book and directed questions to the White House.

Democrats were quick to slam Mr. Trump for his comments. Senator Chuck Schumer of New York, the minority leader, said that the book offered "damning proof that Donald Trump lied and people died."

Emily Cochrane contributed reporting. Kitty Bennett contributed research.

# Exhibit C

| 95TH CONGRESS<br>*1st Session* | HOUSE OF REPRESENTATIVES | REPORT<br>No. 95-459 |
|---|---|---|

# TRADING WITH THE ENEMY ACT REFORM LEGISLATION

## REPORT

OF THE

## COMMITTEE ON INTERNATIONAL RELATIONS

[INCLUDING COST ESTIMATE OF THE CONGRESSIONAL BUDGET OFFICE]

ON

## H.R. 7738

WITH RESPECT TO THE POWERS OF THE PRESIDENT IN
TIME OF WAR OR NATIONAL EMERGENCY



JUNE 23, 1977.—Committed to the Committee of the Whole House on the
State of the Union and ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE

89-006                          WASHINGTON : 1977

## COMMITTEE ON INTERNATIONAL RELATIONS

### CLEMENT J. ZABLOCKI, Wisconsin, *Chairman*

L. H. FOUNTAIN, North Carolina
DANTE B. FASCELL, Florida
CHARLES C. DIGGS, Jr., Michigan
ROBERT N. C. NIX, Pennsylvania
DONALD M. FRASER, Minnesota
BENJAMIN S. ROSENTHAL, New York
LEE H. HAMILTON, Indiana
LESTER L. WOLFF, New York
JONATHAN B. BINGHAM, New York
GUS YATRON, Pennsylvania
MICHAEL HARRINGTON, Massachusetts
LEO J. RYAN, California
CARDISS COLLINS, Illinois
STEPHEN J. SOLARZ, New York
HELEN S. MEYNER, New Jersey
DON BONKER, Washington
GERRY E. STUDDS, Massachusetts
ANDY IRELAND, Florida
DONALD J. PEASE, Ohio
ANTHONY C. BEILENSON, California
WYCHE FOWLER, Jr., Georgia
E (KIKA) DE LA GARZA, Texas
GEORGE E. DANIELSON, California
JOHN J. CAVANAUGH, Nebraska

WILLIAM S. BROOMFIELD, Michigan
EDWARD J. DERWINSKI, Illinois
PAUL FINDLEY, Illinois
JOHN H. BUCHANAN, Jr., Alabama
J. HERBERT BURKE, Florida
CHARLES W. WHALEN, Jr., Ohio
LARRY WINN, Jr., Kansas
BENJAMIN A. GILMAN, New York
TENNYSON GUYER, Ohio
ROBERT J. LAGOMARSINO, California
WILLIAM F. GOODLING, Pennsylvania
SHIRLEY N. PETTIS, California

JOHN J. BRADY, Jr., *Chief of Staff*
ROBERT K. BOYER, *Staff Consultant*
GEORGE M. INGRAM, *Staff Consultant*
R. ROGER MAJAK, *Subcommittee Staff Director*
THOMAS E. POPOVICH, *Minority Staff Consultant*
VICTOR C. JOHNSON, *Subcommittee Staff Associate*
SUSAN GUSTAFSON, *Staff Assistant*

(II)

# CONTENTS

| | Page |
|---|---|
| Summary and purpose of the legislation | 1 |
| Committee action | 2 |
| Purpose of subcommittee amendments | 3 |
| Background | 3 |
| Need for the legislation | 7 |
| The approach of the bill | 9 |
| Administration position | 11 |
| Section-by-section analysis: | |
| Title I—Amendments to the Trading With the Enemy Act | 12 |
| Section 101—Removal of national emergency powers under the Trading With the Enemy Act | 12 |
| Section 102—Wartime authorities | 13 |
| Section 103—Criminal penalties | 13 |
| Title II—International emergency economic powers | 13 |
| Section 201—Short title | 14 |
| Section 202—Situations in which authorities may be exercised | 14 |
| Section 203—Grant of authorities | 14 |
| Section 204—Consultation and reports | 16 |
| Section 205—Authority to issue regulations | 16 |
| Section 206—Congressional review of regulations | 16 |
| Section 207—Penalties | 17 |
| Section 208—Savings provision | 17 |
| Title III—Amendments to the Export Administration Act of 1969: | |
| Section 301—Authority to regulate extraterritorial exports | 17 |
| Cost estimate | 17 |
| Inflationary impact statement | 18 |
| Statements required by clause 2(1) (3) of House Rule XI: | |
| (A) Oversight findings and recommendations | 18 |
| (B) Budget authority | 18 |
| (C) Committee on Government Operations summary | 18 |
| (D) Congressional Budget Office cost estimate | 18 |
| Changes in existing law made by the bill, as reported | 19 |

(III)

| 95TH CONGRESS | HOUSE OF REPRESENTATIVES | REPORT |
|---|---|---|
| 1st Session | | No. 95-459 |

# TRADING WITH THE ENEMY ACT REFORM LEGISLATION

JUNE 23, 1977.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. BINGHAM, from the Committee on International Relations, submitted the following

# REPORT

### [To accompany H.R. 7738]

### [Including cost estimate of the Congressional Budget Office]

The Committee on International Relations, to whom was referred the bill (H.R. 7738) with respect to the powers of the President in time of war or national emergency, having considered the same, report favorably thereon with amendments and recommend that the bill as amended do pass.

The amendments are as follows:

Page 2, line 4, strike out "June" and insert in lieu thereof "July".

Page 6, line 6, insert "or" immediately after the semicolon; strike out lines 7 and 8; and in line 9, strike out "(3)" and insert in lieu thereof "(2)".

## SUMMARY AND PURPOSE OF THE LEGISLATION

The purpose of the legislation is to redefine the power of the President to regulate international economic transactions in future times of war or national emergency. These powers are currently provided and defined in section 5(b) of the Trading With the Enemy Act.[1] The proposed bill, H.R. 7738, would separate war and nonwar authorities and procedures, preserving existing Presidential powers in time of war declared by Congress, and providing somewhat narrower powers subject to congressional review in times of "national emergency" short of war.

---

[1] U.S.C. 95a ; 50 U.S.C. App. 5(b).

2

As described by the Department of Justice in testimony before the Subcommittee on International Economic Policy and Trade, the existing section 5(b) "confers upon the Executive four major groups of powers" in time of war or other national emergency declared by the President:

(*a*) Regulatory powers with respect to foreign exchange, banking transfers, coin, bullion, currency, and securities;

(*b*) Regulatory powers with respect to "any property in which any foreign country or a national thereof has any interest";

(*c*) The power to vest "any property or interest of any foreign country or national thereof"; and

(*d*) The powers to hold, use, administer, liquidate, sell, or otherwise deal with "such interest or property" in the interest of and for the benefit of the United States.[2]

Title I of the bill amends section 5(b) of the Trading With the Enemy Act to remove the authority of the President to use the authorities granted thereby in time of national emergency (other than a declared war), except that current uses of those authorities pursuant to an existing declaration of national emergency may continue subject to an annual determination by the President that the continued exercise of the authorities is in the national interest. The effect of title I is to retain section 5(b) of the Trading With the Enemy Act for use during time of war declared by Congress, and also largely to "grandfather" those powers now being exercised under the act.

Title II of the bill, the "International Emergency Economic Powers Act," confers upon the President a new set of authorities for use in time of national emergency which are both more limited in scope than those of section 5(b) and subject to various procedural limitations, including those of the National Emergencies Act.[3]

Title III of the bill makes a series of conforming amendments to the Export Administration Act,[4] which transfer to that act the authority, heretofore exercised under section 5(b) of the Trading With the Enemy Act, to regulate exports of non-U.S.-origin goods and technology by foreign subsidiaries of U.S. concerns.

COMMITTEE ACTION

On March 29 and 30, April 19 and 26, and May 5, 1977, the Subcommittee on International Economic Policy and Trade held hearings, entitled "Emergency Controls on International Economic Transactions," on H.R. 1560, a bill to repeal section 5(b) of the Trading with the Enemy Act, and H.R. 2382, the Economic War Powers Act. Both bills were introduced by Hon. Jonathan B. Bingham, chairman of the subcommittee. On June 2, 8, 9, and 13, 1977, the subcommittee considered draft legislation reforming section 5(b) of the Trading with the Enemy Act, and on June 13, by voice vote, ordered the draft legislation reported favorably to the full Committee on International Relations.

---

[2] U.S. Congress. House. "Emergency Controls on International Economic Transactions," hearings before the Subcommittee on International Economic Policy and Trade of the Committee on International Relations. 95th Cong., 1st sess. (1977).
[3] 50 U.S.C. 1601.
[4] 50 U.S.C. App. 2401.

3

The draft legislation was introduced as a clean bill on June 13 by Representative Bingham and three cosponsors as H.R. 7738 and referred to the Committee on International Relations. The committee met in open session on June 16 to hear executive branch testimony on the bill from the Honorable C. Fred Bergsten, Assistant Secretary of Treasury for International Affairs, and on June 17 to consider amendments to the bill. Subsequently, on June 20, 1977, the committee met in open session and by voice vote, ordered H.R. 7738 favorably reported with two amendments.

### PURPOSE OF COMMITTEE AMENDMENTS

The first amendment changed the "grandfather" provision to apply to authorities being exercised on July 1, 1977, rather than June 1, 1977 as in the original bill. The purpose of this amendment was to exclude from the grandfather provision the continuation in force of the Export Administration Regulations [5] under the authority of section 5(b). This use of section 5(b) will be terminated by July 1, 1977, as a result of the signing into law of the Export Administration Amendments of 1977 on June 22, 1977.

The second amendment struck out a provision specifying that the authorities of title II of the bill do not include the authority to regulate news gathering and dissemination by the news media. That provision was eliminated on the assumption that news media rights are sufficiently protected under the Constitution.

### BACKGROUND

In an immediate sense, H.R. 7738 is a response to the requirement of section 502 of the National Emergencies Act that the committee with jurisdiction over section 5(b) of the Trading With the Enemy Act "make a complete study and investigation concerning that provision of law and make a report, including any recommendations and proposed revisions such committee may have, to its respective House of Congress * * *." More fundamentally, however, the bill is a response to 60 years of experience with section 5(b) since the passage of the Trading With the Enemy Act in 1917. This history is outlined below followed by a discussion of the requirements of the National Emergencies Act.

### TRADING WITH THE ENEMY ACT

This discussion of the legislative history and executive use of section 5(b) of the Trading With the Enemy Act is based principally on a memorandum prepared by the Department of Justice for the Senate Special Committee on the Termination of the National Emergency.[6] The memorandum observes that—

> section 5(b) of the act has been the statutory foundation for control of domestic as well as international financial transactions and is not restricted to "trading with the enemy." Its

---

[5] 15 CFR 368–399.2.

[6] Memorandum of the Department of Justice for the Special Committee on the Termination of the National Emergency, May 21, 1973, in Congressional Record, Senate, Oct. 7, 1974.

4

use over the years provides an interesting study in the evolution of a statute as a result of continuing interplay between the Executive nad Congress.

The Justice Department memorandum contains the following description of the original legislative intent of section 5(b):

The act was passed in 1917 to "define, regulate, and punish trading with the enemy." * * * Section 5(b) gave the President power to regulate transactions in foreign exchange, the export or hoarding of gold or silver coin or bullion or currency and transfers of credit in any form "between the United States and any foreign country." * * * Section 5(b), at that time, exempted "transactions to be executed wholly within the United States," thus appearing to limit its use as a basis for domestic controls. It did not include a provision permitting use of the act during periods of national emergency nor was its use restricted by its terms to the duration of the First World War or any specific term after the end of the war. A law passed in 1921 terminating certain war powers specifically exempted the act from termination because of the large amount of property held under the act by the Alien Property Custodian at that time.

In 1933 President Roosevelt, citing the authority of section 5(b), declared a national emergency and, under that emergency, a bank holiday to prevent hoarding of gold, despite the fact that at the time section 5(b) was explicitly limited by its terms to wartime use.[7] In the first days of its 1933 session, Congress passed the Emergency Banking Act, which retroactively approved the President's action and amended section 5(b) to provide that its authorities could be used in time of national emergency declared by the President and to remove the exclusion of domestic transactions from its scope.

As the Justice Department memorandum points out:

The legislative history of the Emergency Banking Act is short; only eight hours elapsed from the time the bill was introduced until it was signed into law. There were no committee reports. Indeed, the bill was not even in print at the time it was passed.

As the debate on that day makes clear, Congress recognized that it was conferring unusual powers on the President which were justified by the gavity of the situation which the country faced, but which should not normally be available to Presidents in peacetime.[8] The emergency banking regulations[9] issued by the President under section 5(b) of the Trading With the Enemy Act, as amended by the Emergency Banking Act, were subsequently ratified by Congress in 1934 by section 13 of the Gold Reserve Act.[10] They remain in effect, as does the 1933 declaration of national emergency.

[7] Executive Proclamation No. 2039, Mar. 6, 1933.
[8] See U.S. Congress. House. "Trading With the Enemy: Legislative and Executive Documents Concerning Regulation of International Transactions in Time of Declared National Emergency," prepared by the Subcommittee on International Trade and Commerce of the Committee on International Relations, 94th Cong., 2d sess. (1976), pp. 242ff.
[9] 31 CFR parts 120–127.
[10] 12 U.S.C. 1213.

5

The next major uses of section 5(b) occurred in connection with World War II. In 1940 and 1941 President Roosevelt issued a series of Executive orders freezing the U.S.-held assets of countries occupied by the Axis Powers in order to prevent withdrawal of the assets under duress, and finally freezing the assets of the Axis Powers themselves.[11] These freezing orders were also ratified by act of Congress on May 7, 1940.

In August 1941 the President ordered imposition by the Federal Reserve Board of consumer credit controls as a measure to fight inflation.[12] Finding the authority of section 5(b) to regulate transactions involving "banking institutions" to extend even to "a vendor of consumer durable goods" engaged in extending credit.

Although this action would appear also to be beyond the authority of section 5(b), it, too, was ratified retroactively by Congress in the First War Powers Act of 1941.

Two significant new uses for section 5(b) have been exerted since World War II. In 1968 President Johnson imposed foreign direct investment controls on U.S. investors, citing the authority of section 5(b) and the continued existence of the national emergency declared by President Truman in 1950 with respect to hostilities in Korea.[13] These controls went out of existence by legislation in 1974. And on four occasions the Export Administration Regulations have been continued in effect during lapses in the Export Administration Act, under executive orders citing the 1950 emergency and the 1971 emergency referred to below.[14]

Finally, section 5(b) came into play when, on August 15, 1971, President Nixon declared a national emergency with respect to the balance-of-payments crisis and under that emergency imposed a surcharge on imports.[15] In that case, section 5(b) was not among the statutes cited in the President's proclamation as authority for the surcharge, but was so cited later by the Government in response to a suit brought in Customs Court by Yoshida International challenging the surcharge. The court's decision then rested on whether section 5(b) authorized imposition of duties. Although the lower court held that it did not, the Appeals Court reversed on the grounds that the existence of the national emergency made section 5(b) available for purposes which would not be contemplated in normal times.[16]

Section 5(b) of the Trading With the Enemy Act is cited as the authority for four different activities now in effect. The national emergency pursuant to which all of these authorities are being exercised was declared by President Truman in 1950 at the time of the Korean

---

[11] Executive Order 8389, Apr. 10, 1940; Executive Order 8405, May 10, 1940; Executive Order 8446, June 17, 1940; Executive Order 8484, July 15, 1940; Executive Order 8565, Oct. 10, 1940; Executive Order 8701, Mar. 4, 1941; Executive Order 8711, Mar. 13, 1941; Executive Order 8721, Mar. 24, 1941; Executive Order 8746, Apr. 28, 1941; Executive Order 8785, June 14, 1941; Executive Order 8832, July 26, 1941; Executive Order 8963, Dec. 9, 1941; Executive Order 8998, Dec. 26, 1941.
[12] Executive Order 8843, Aug. 9, 1941.
[13] Executive Order 11387, Jan. 1, 1968.
[14] Executive Order 11677, Aug. 1, 1972; Executive Order 11683, Aug. 29, 1972; Executive Order 11796, July 30, 1974; Executive Order 11798, Aug. 14, 1974; Executive Order 11810, Sept. 30, 1974; Executive Order 11818, Nov. 5, 1974; Executive Order 11940, Sept. 30, 1976.
[15] Proclamation 4074, Aug. 15, 1971.
[16] *Yoshida International, Inc.,* v. *United States,* 378 F. Supp. 1155 (Cust. Ct. 1974); *United States* v. *Yoshida International, Inc.,* 526 F. 2d 560 (C.C.P.A. 1975).

6

war.[17] First, under the Foreign Assets Control Regulations, all transactions between the United States and China, North Korea, Vietnam, and Cambodia are prohibited except by license of the Department of the Treasury.[18] On May 8, 1971, the Department licensed most subsequent transactions with China, while continuing the blocking of Chinese assets in U.S. hands before that date. This had the effect of lifting the U.S. trade embargo of China. However, the embargoes of North Korea, Vietnam, Cambodia, and Cuba continue.

Second, under the Cuban Assets Control Regulations, all transactions between the United States and Cuba are similarly prohibited, with certain exceptions.[19]

Third, under the Transaction Control Regulations any "person within the United States" (defined to include foreign subsidiaries of U.S. concerns) is prohibited from purchasing from any foreign country strategic commodities destined for a Communist country.[20]

Fourth, under the Foreign Funds Control Regulations, the assets of East Germany, Czechoslovakia, Latvia, Lithuania, and Estonia, which were blocked during World War II, continue to be blocked pending settlement of claims by U.S. citizens for compensation for property confiscated by the Communist governments of those countries.[21]

Under Executive Order 11940 of September 30, 1976, the Export Administration Regulations were continued in effect notwithstanding the expiration of the Export Administration Act on that date. With reenactment of the Export Administration Act on June 22, 1977, this use of section 5(b) will be terminated.

### THE NATIONAL EMERGENCIES ACT

On September 14, 1976, the National Emergencies Act became law. Under that act, all powers and authorities possessed by the executive branch as a result of any declaration of national emergency in effect on the date of enactment are terminated 2 years from the date of enactment. Now procedures are provided for the declaration, conduct, and termination of future national emergencies, including provision for termination of a national emergency by Congress by concurrent resolution. The act requires that the President specify the provisions of law under which he proposes to act pursuant to a declaration of national emergency. The President's accountability and reporting requirements are set forth, and certain obsolete emergency power statutes are repealed.

However, certain other emergency power statutes currently in use and deemed important for the continued day-to-day functioning of the Government are exempted from the provisions of the National Emergencies Act. In view of the current uses of these statutes, the exemption was provided to allow for a careful study of how to revise them in accordance with the intent of the National Emergencies Act without disrupting policies currently in effect under their authority. Of these,

[17] Proclamation 2914, Dec. 16, 1950.
[18] 31 CFR part 500.
[19] 31 CFR part 515.
[20] 31 CFR part 505.
[21] 31 CFR part 520.

7

statutes, the most important from a policy standpoint and the most complex from a legal standpoint is section 5(b) of the Trading With the Enemy Act.

The study of how to revise section 5(b) has been the responsibility of the Committee on International Relations and its Subcommittee on International Economic Policy and Trade.

## NEED FOR THE LEGISLATION

The need for this legislation is apparent from the background discussed above. As that background shows, the legislation is necessitated by two factors. First, through usage and amendment, section 5(b) has become essentially an unlimited grant of authority for the President to exercise, at his discretion, broad powers in both the domestic and international economic arena, without congressional review. These powers may be exercised so long as there is an unterminated declaration of national emergency on the books, whether or not the situation with respect to which the emergency was declared bears any relationship to the situation with respect to which the President is using the authorities. Second, the National Emergencies Act requires that the committee take account of this situation and recommend to the House ways in which section 5(b) can be revised to conform to the intent of the National Emergencies Act.

In hearings before the Subcommittee on International Economic Policy and Trade, four distinguished legal scholars elaborated on the need for legislation reforming the Trading With the Enemy Act. Prof. Stanley D. Metzger of Georgetown University Law Center, formerly Assistant Legal Adviser for Economic Affairs in the Department of State, testified as follows:

> Section 5(b) is a very broad grant of power by Congress to the President. It has been used generally for purposes related to the national security and the conduct of the foreign relations of the United States. Available to be used in time of war or national emergency declared by the President, with no time limitation on the power granted, it authorizes the President to block the assets subject to U.S. jurisdiction of any designated foreign country or resident, and to block any transactions by any person subject to U.S. jurisdiction with any designated foreign country or resident or anyone acting for or on behalf of such country or resident * * *.
>
> Because the timing trigger—time of war or Presidentially declared emergency—is so broad and because of the circumstances of the past four decades, section 5(b) in its older (pre-World War II) form, and in its present version, has been continually available for use for the past 44 years.
>
> No statement of findings and policy, and no standards to guide its administration are set forth in section 5(b). There is no provision for congressional participation in the decisions to engage in blocking the assets of, or transactions with a foreign country or countries. There is no provision for congressional consideration of whether a particular action remains provident after it is taken, and to terminate it if

8

not. There is no provision for Presidential reporting at intervals concerning actions he has taken under section 5(b), with reasons for his actions. Above all, there is no fixed duration, such as 3 or 4 years, for the existence of the power in order that, in the course of renewal authorization hearings, detailed explanations of actions can be sought and supplied, and amendments that seem to be called for can be made.

After reviewing our historical experience with section 5(b), Professor Metzger continued:

The common denominator of all these experiences of 5(b) use is the seemingly unilateral consideration by the executive branch whether to impose the 5(b) controls. I was unaware of any congressional consultation before the decisions were made; indeed, I never heard that matter discussed. * * * It is safe to state categorically that there was no institutional, organized consultative mechanism or process for such consultation.

As a result, Professor Metzger concludes:

Since, like Ol' Man River, the controls rolled on for 25 years in the case of China, and now for 15 years in the case of Cuba, with no organized, ongoing mechanism of executive congressional consultation, for their reexamination, no organized effort has been made to examine whether there has been justification for the continued control or the level of the control if some control were thought to be justified. There has also been no reexamination until now, whether 5(b) in its present form is necessary or desirable.

Prof. Andreas F. Lowenfeld of New York University Law School echoed the same theme in his testimony before the subcommittee, noting that section 5(b) is different from other congressionally authorized controls on U.S. foreign economic policy such as import and export controls:

First, there seems to be no way under existing law to terminate a state of emergency proclaimed by the President except by another Presidential proclamation; and no practical constraint limiting actions taken under emergency authority to measures related to the emergency. The Trading With the Enemy Act itself, and particularly section 5(b), is legislation without limit of time. It has been in effect in its present form since 1941 and has had no expiration date or requirement of congressional scrutiny or review. Second, the delegated authority is not only broad: there are no criteria at all. Subject only to the existence of a national emergency, the power of the President, acting "through any agency he may designate" to affect property or transactions is virtually unlimited, provided there is at least some foreign connection in the property or transaction affected.

Successive Presidents have seized upon the open-endedness of section 5(b) to turn that section, through usage, into something quite

9

different from what was envisioned in 1917. As Prof. Harold G. Maier of Vanderbilt University Law School noted before the subcommittee:

> Section 5(b)'s effect is no longer confined to "emergency situations" in the sense of existing imminent danger. The continuing retroactive approval, either explicit or implicit, by Congress of broad executive interpretations of the scope of powers which it confers has converted the section into a general grant of legislative authority to the President permitting the executive branch by order, rule, and regulation to make laws concerning almost any subject matter which can conceivably be brought within the terms of section 5(b). Section 5(b) permits the President to define any of the terms of the section. Only an outstanding declaration of the existence of a "national emergency" as defined by the President is required to bring those powers into being.

Mr. Peter Weiss, vice president, Center for Constitutional Rights, was more emphatic:

> The Trading With the Enemy Act is a prime example of the unchecked proliferation of Presidential power for purposes totally unforeseen by the creators of that power.

In testimony before the Subcommittee on International Economic Policy and Trade, the administration admitted the need for changes in section 5(b). Assistant Secretary of the Treasury C. Fred Bergsten testified as follows:

> * * * we recognize that the 60-year history of the section has revealed the desirability of reforms in the way its non-wartime national emergency powers are exercised. Indeed, the authority of the section is so broad that this administration strongly believes that the powers should only be used on a truly emergency basis. Accordingly, the administration proposes several changes in the way the section is used.

Secretary Bergsten proposed that future use of section 5(b) be made subject to the requirements of the National Emergencies Act in several respects. First, "the President should be required * * * to proclaim a new national emergency to deal with any future crisis calling for a new application of section 5(b)," as a means of "encouraging circumspect use of the section." Second, declarations of national emergency under section 5(b) should automatically expire unless they are renewed by the President. Third, "the President could be required to transmit a report to Congress every 6 months on the activities conducted pursuant to section 5(b)."

### THE APPROACH OF THE BILL

Certain current uses of the authorities affected by H.R. 7738 are controversial—particularly the total U.S. trade embargoes of Cuba and Vietnam. The committee considered carefully whether to revise, or encourage the President to revise, such existing uses of international

10

economic transaction controls, and thereby the policies they reflect, in this legislation. The committee decided that to revise current uses, and to improve policies and procedures that will govern future uses, in a single bill would be difficult and divisive. Committee members concluded that improved procedures for future use of emergency international economic powers should take precedence over changing existing uses. By "grandfathering" existing uses of these powers, without either endorsing or disclaiming them, H.R. 7738 adheres to the committee's decision to try to assure improved future uses rather than remedy possible past abuses.

H.R. 7738 is an expression of the intent of the committee, based on extensive staff analysis, hearings, and markup sessions, that a new approach to international emergency economic powers should include the following:

First, section 5(b) of the Trading With the Enemy Act should revert to what it originally was: a set of authorities for use by the President in time of war declared by Congress, in conformity with the Trading With the Enemy Act as a whole.[22]

Second, a new set of international economic powers, more restricted than those available during time of war, should be created and conferred upon the President as standby authority for use in time of national emergency declared by the President. The committee did not adopt the approach of entirely repealing the President's international emergency economic powers, or making them routine, nonemergency powers.

Third, these new authorities should be sufficiently broad and flexible to enable the President to respond as appropriate and necessary to unforeseen contingencies. For that reason, the committee did not adopt, for example, recommendations that it place a definite time limit on the duration of any state of national emergency.

Fourth, given the breadth of the authorities and their availability at the President's discretion upon a declaration of national emergency, their exercise should be subject to various substantive restrictions. The main one stems from a recognition that emergencies are by their nature rare and brief, and are not to be equated with normal, ongoing problems. A national emergency should be declared and emergency authorities employed only with respect to a specific set of circumstances which constitute a real emergency, and for no other purpose. The emergency should be terminated in a timely manner when the factual state of emergency is over and not continued in effect for use in other circumstances. A state of national emergency should not be a normal state of affairs.

As a further substantive constraint, the scope of the authorities should be clearly limited to the regulation of international economic

---

[22] The Trading With the Enemy Act, in its original 19 sections, provides general prohibitions against trading and other forms of intercourse with the enemy; authorizes the President to regulate and prohibit international economic transactions except by license; provides for submission of lists of enemy officers, directors, or shareholders of U.S. corporations; establishes the office of Alien Property Custodian to administer U.S.-held foreign property; sets up procedures for claims to such property by non-enemy persons; specifies permitted acts in the patent, trademark, and copyright area; specifies prohibited imports; and provides related regulatory authorities. Sections added subsequently deal generally with the administration of money and property seized during wartime. It should be emphasized that, except for section 5(b), the entire act applies exclusively during time of war declared by Congress.

transactions. Therefore the bill does not include authorities more appropriately lodged in other legislation, such as authority to regulate purely domestic transactions or to respond to purely domestic circumstances, or authority to control noneconomic aspects of international intercourse such as personal communications or humanitarian contributions.

Fifth, given the history of expansive use of emergency powers, the exercise of the emergency economic authorities should also be subject to strict procedural limitations, including consultation with Congress, periodic reporting requirements, and provision for termination of states of emergency by Congress and for veto by Congress of regulations promulgated under the international emergency economic powers statute. This should be accomplished at a minimum by conforming the use of the authorities to the procedural requirements of the National Emergencies Act. Where appropriate and necessary, additional procedural safeguards should be written into the new statute.

Sixth, exercises of emergency powers under section 5(b) which are currently in progress should be generally exempted from the provisions of the new statute. Since few if any of the current uses could be justified as responding to an existing emergency situation, but rather are holdovers from emergencies which are long past, to make them subject to this act would be, in effect, automatically to terminate them. The committee feels that this would violate the intent of the National Emergencies Act and would be inappropriate to legislation attempting to legislate for the future not to judge the past. Current uses of section 5(b) should be considered individually, on their merits, in separate legislation. The purpose of the new statute should be to set forth authorities and procedures for future emergency situations.

Seventh, whenever possible, authority for routine, nonemergency regulation of international economic transactions which have heretofore been conducted under section 5(b) should be transferred to other legislation.

Eighth, while it should be the purpose of the legislation to authorize tight controls in time of national emergency, these controls should not extend to the total isolation of the people of the United States from the people of any other country. Such isolation is not only unwise from a foreign policy standpoint, but enforcement of such isolation can also entail violation of First Amendment rights of freedom of expression if it includes, for example, prohibitions on exchange of printed matter, or on humanitarian contributions as an expression of religious convictions.

### ADMINISTRATION POSITION

On May 20, 1977, the administration submitted to the subcommittee, on an informal basis, a draft bill in the nature of a "technical drafting aid." This draft bill and a subcommittee staff aid." This draft bill and a subcommittee staff draft served as the basis of extensive, informal consultations between representatives of the administration and the subcommittee in the weeks preceding presentation of draft legislation to the subcommittee on June 2. While the draft presented to the subcommittee was a staff draft rather than the administration draft, it

12

incorporated many of the features of the administration draft, especially the administration's basic approach of leaving section 5(b) relatively untouched and writing a new emergency economic powers statute. The administration did not formally submit a bill until June 2, the first day of subcommittee markup. This formal draft was before the members of the subcommittee and the full committee during their consideration of the legislation, but was not introduced or marked up.

In testimony before the full committee on behalf of the administration, Assistance Secretary of the Treasury, C. Fred Bergsten generally supported H.R. 7738, with certain reservations. Citing his previous testimony before the Subcommittee on International Economic Policy and Trade, he reiterated "the belief of this administration that procedural reforms are desirable in the way section 5(b) powers are exercised". He expressed pleasure that the bill incorporated all three of the administration's recommendations to the subcommittee; that "in the future, the President be required to proclaim a new national emergency for a new application of section 5(b) powers"; that "annual review and renewal of future national emergencies would be appropriate"; and that Congress and the public should be kept "informed on the uses of section 5(b)."

Secretary Bergsten specifically supported "the approach of the bill which separates the wartime from the national emergency powers by leaving the wartime powers in section 5(b) and placing the emergency powers in a separate statute"; the "procedure for continuing existing uses of section 5(b)"; and the emphasis in the bill that emergency powers "should be available only in true emergencies." He took exception, however, to provisions in the bill which permit congressional termination of emergencies and veto of regulations by concurrent resolution, and which preclude "the regulation or prohibition under the act of uncompensated transfers of anything of value."

### Section-by-Section Analysis

#### Title I—Amendments to the Trading with the Enemy Act

Title I of the bill makes certain amendments to the Trading With the Enemy Act, but provides conditions under which current uses of section 5(b) of that act may continue notwithstanding those amendments.

*Section 101—Removal of certain emergency powers under the Trading With the Enemy Act*

Section 101(a) of the bill amends section 5(b) of the act to remove the provision making the authorities to control economic transactions available to the President in time of national emergency declared by him, but retains intact these broad authorities for use in time of war declared by Congress.

Section 101(b) of the bill provides that uses of the authorities of section 5(b) of the Act with respect to specific countries, which are in effect on July 1, 1977 (such as for the embargoes of Cuba, Vietnam, and other countries, and the freeze on assets of Czechoslovakia, the People's Republic of China, and other countries), will terminate on September 14, 1978—the date specified by the National Emergencies

13

Act for termination of all existing emergency authorities—unless extended by the President. The existing uses of the authorities of section 5(b) may be extended by the President for successive 1-year periods upon determination by the President that such extension is in the national interest. It is the intent of the committee that the President report each such determination and the reasons therefor to the Congress.

H.R. 7738 originally specified that this grandfather provision applied to uses of section 5(b) in effect on June 1, 1977. The committee amended that date to July 1, 1977. This change was made because the committee does not wish to grandfather the use of section 5(b) as authority for the continuation in force of the Export Administration Regulations. This use of section 5(b) was in effect on June 1, 1977, but will terminate as a result of the signing into law of the Export Administration Amendments of 1977 on June 22, 1977.

The committee rejected administration recommendations that it make the Export Administration Act permanent legislation, because it feels that such important regulatory legislation should be periodically reviewed. The committee expects that future lapses of the Export Administration Act can and will be avoided, if necessary, by means of continuing resolutions. Should a lapse occur, however, the authority of title II of this bill could be used to continue the Export Administration Regulations in effect if, and to the extent that, the President declared a national emergency as a result of such lapse according to the procedures of the National Emergencies Act.

Section 101(c) of the bill repeals section 502(a)(1) of the National Emergencies Act, which exempts from the provisions of that act section 5(b) of the Trading With the Enemy Act and which is superseded by this bill.

## Section 102—Wartime authorities

Section 102 of the bill amends section 5(b) of the Trading With the Enemy Act to remove two broad and unclear phrases. This is the only change made by the bill in the President's wartime authorities under section 5(b) of the act.

## Section 103—Criminal penalties

Section 103 of the bill amends section 16 of the Trading With the Enemy Act to increase the maximum criminal fine for violation of the provisions of the act from $10,000 to $50,000 and makes a conforming amendment to section 5(b)(3) of the act by striking out a duplicative penalty provision. The fines have not been increased since original passage in 1917. This amendment brings the criminal fines of the Trading With the Enemy Act into conformity with those for violation of the national security and foreign policy provisions of the Export Administration Act.

### TITLE II—INTERNATIONAL EMERGENCY ECONOMIC POWERS

Title II of the bill confers upon the President authority to exercise controls on international economic transactions during future national emergencies, and establishes policies and procedures to govern the use of those authorities.

*Section 201—Short title*

Section 201 provides that title II may be cited as the "International Emergency Economic Powers Act."

*Section 202—Situations in which authorities may be exercised*

Section 202 defines national emergency as an "unusual and extraordinary threat which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." This section provides that the authorities granted to the President by this title may be used to deal with such a threat if the President declares a national emergency with respect to the threat, that they may only be used to deal with that threat and not for any other purpose, and that the exercise of the authorities to deal with any new threat would require a new declaration of national emergency.

By its own terms, and with repeal by section 101(c) of this bill of the temporary exemption for section 5(b), the provisions of the National Emergencies Act are applicable to any exercise of authorities pursuant to any declaration of national emergency. Pertinent provisions of the National Emergencies Act provide that: (1) the President may declare a national emergency with respect to acts of Congress authorizing special or extraordinary power during time of national emergency, and that such declaration must be immediately transmitted to Congress and published in the Federal Register; (2) emergency authorities conferred by such acts of Congress are effective only when the President specifically declares a national emergency, and only if exercised in accordance with the National Emergencies Act; (3) national emergencies may be terminated by Presidential proclamation or by concurrent resolution of the Congress; (4) every 6 months that a national emergency remains in effect, each House must vote on a concurrent resolution on whether to terminate the emergency; (5) any national emergency declared by the President and not otherwise previously terminated will terminate on its anniversary date if, within 90 days prior to each anniversary date, the President does not publish in the Federal Register and transmit to Congress a notice that the emergency will continue in effect; (6) the President may not exercise any emergency power conferred by statute without specifying the statutory basis for his action; (7) the President must keep and promptly transmit to Congress adequate records of all Executive orders and proclamations, rules and regulations, issued pursuant to a declaration of war or national emergency; and (8) during time of war or national emergency the President must transmit to Congress every 6 months a report on expenditures directly attributable to the exercise of emergency authorities. Whenever a President declares a national emergency under section 202 of the bill, all of the above provisions automatically apply to the exercise of the authorities of section 203 of the bill under that declaration of national emergency.

*Section 203—Grant of authorities*

Section 203(a) of the bill defines the international emergency economic authorities available to the President in the circumstances specified in section 202. This grant of authorities basically parallels

section 5(b) of the Trading With the Enemy Act. Paragraph (1)(A) authorizes the President to regulate transactions in foreign exchange, banking transactions involving any interest of any foreign country or a national thereof, and the importing or exporting of currency or securities, and to regulate or freeze any property in which any foreign country or a national thereof has any interest. Paragraph (1)(B) authorizes the President to require any person to keep and furnish records necessary to enforce these provisions. Section 203(a) also holds harmless from suit any person carrying out or administering these authorities in good faith.

This grant of authorities does not include the following authorities which, under section 5(b) of the Trading With the Enemy Act, as amended by title I of this bill, are available to the President in time of declared war: (1) the power to vest, i.e., to take title to foreign property; (2) the power to regulate purely domestic transaction; [23] (3) the power to regulate gold or bullion; and (4) the power to seize records.

Section 203(b) of the bill states that the authority granted to the President by this section does not include the authority to regulate or prohibit, and should not be used with the effect of regulating or prohibiting, personal communications which do not involve the transfer of anything of value, or uncompensated transfers of anything of value except if the President determines that such transfers would seriously impair his ability to deal with the emergency, are in response to coercion against the recipient or donor, or would endanger U.S. Armed Forces. It is the intent of the committee by this provision to reserve title II of the bill as an authority for the regulation of international commercial and financial transactions as necessary to protect the national security, foreign policy, or economy of the United States. The authority of title II does not extend to the interruption or hindrance, direct or indirect, of private communications, which are not commercial or financial transactions, between the citizens of the United States and those of any other country, regardless of the other country's relationship to the United States. Neither does the authority of title II extend to the interruption or hindrance, direct or indirect, of free, uncompensated transfer of anything of value, such as humanitarian contributions, by U.S. citizens to any other country, regardless of that country's relationship to the United States. In the case of uncompensated transfers of anything of value, there is provision for the President to regulate or prohibit such transfers in certain exceptional circumstances. It is the intent of the committee that these exceptions be narrowly construed, and that any doubt be resolved in favor of permitting such transfer to occur.

The Committee deleted from the bill a provision that the authority of this section does not include the authority to regulate or prohibit the collection and dissemination of news by the news media. The committee does not intend by this deletion to authorize regulation or prohibition of the collection and dissemination of news. The news media have long maintained that the First Amendment to the Con-

[23] Examples of purely domestic transactions which in the past have been regulated under section 5(b) include hoarding of gold by U.S. citizens and the extension of consumer credit by U.S. businesses.

stitution provides adequate and complete protection of freedom of the press, and the committee, therefore, considered further statutory protection of that freedom unnecessary, redundant, and inappropriate.

The provisions of section 203(b) are designed both to preserve First Amendment freedoms of expression, and to preclude policies that would totally isolate the people of the United States from the people of any other country.

*Section 204—Consultation and reports*

Section 204 of the bill (*a*) requires that the President consult with Congress whenever possible before exercising any of the authorities of this title, and continue to consult regularly with Congress so long as such authorities are being exercised; (*b*) requires that the President transmit to Congress, immediately upon beginning to exercise any of the authorities of this title, a report (1) defining the circumstances which necessitate the exercise of authority; (2) stating why those circumstances constitute a national emergency within the meaning of section 202(a) of the bill; (3) specifying the authorities to be exercised and the actions to be taken; (4) justifying the necessity for such actions; and (5) designating the foreign countries toward which such actions are directed; (*c*) requires that the President update the report every 6 months; and (*d*) states that these requirements are supplemental to the reporting requirements of the National Emergencies Act. Nothing in this section should be construed as requiring submission of a report as a precondition of taking action where circumstances require prompt action prior to or simultaneously with submission of a report.

*Section 205—Authority to issue regulations*

Section 205 authorizes the President to issue regulations and prescribe definitions necessary for exercising the authorities conferred upon him by this title.

*Section 206—Congressional review of regulations*

Section 206 provides that all regulations issued under this title must be reported to Congress, and the Congress may by concurrent resolution veto any regulation in whole or in part within 30 legislative days of its report to Congress, the regulation becoming ineffective at the time of the veto. This provision is considered necessary in view of past instances in which Presidents have used the authority to issue regulations as a means of expanding the scope of section 5(b), as in President Roosevelt's inclusion of vendors of consumer durable goods within the meaning of "banking institution" in order to impose consumer credit controls. The committee recognizes that the President must have latitude and flexibility to deal by regulation with future emergency situations, and it does not favor congressional veto of routine administrative regulations as a general practice. But the regulations promulgated under the International Emergency Economic Power Act will be both infrequent and extremely important, which makes it both feasible and necessary for Congress to reserve for itself the right to veto regulations and definitions which go beyond the purposes and authorities of the act.

17

*Section 207—Penalties*

Section 207 provides a civil penalty of not more than $10,000, and a criminal penalty of not more than $50,000 and 10 years imprisonment, for violations of the provisions of this title. These penalties are comparable to those contained in the Export Administration Act, which provides related export regulation authorities, and to the criminal penalties of the Trading With the Enemy Act as amended by this bill.

*Section 208—Savings provision*

Section 208 of the bill provides that, notwithstanding the termination of a national emergency under the National Emergencies Act, the President may continue to block any assets of a foreign country that were blocked on the date of the termination of the national emergency, if he determines that the continued blocking of those assets is necessary because of U.S. claims against the country involved, unless Congress specifies in a concurrent resolution terminating a national emergency that the assets may not continue to be blocked. Under subsection (a) (2) of section 208, notwithstanding the termination of a currently existing U.S. trade embargo of another country under section 101(b) of the bill, assets of that country which are blocked on the date of the termination of the trade embargo may continue to be blocked for the same reason. The President is required to report to Congress every 6 months on the reasons for continuing to block the assets of a foreign country under this section.

Holding the assets of a foreign country is generally the most effective means of achieving settlement of U.S. claims. The need to continue to block assets has prompted Presidents to continue a legal state of emergency in effect long after the factual state of emergency has passed. It is the intent of the committee by this section to enable the timely termination of states of emergency, and a return to government under normal law, without prejudicing the ability of U.S. citizens to recover claims against foreign countries.

TITLE III—AMENDMENTS TO THE EXPORT ADMINISTRATION ACT OF 1969

*Section 301—Authority to regulate extraterritorial exports*

Title III of the bill (section 301) amends the Export Administration Act of 1969 to provide authority for control over exports of non-U.S.-origin goods and technology by foreign subsidiaries of U.S. concerns. This is in addition to the authority currently provided in the Export Administration Act for control over the export of U.S.-origin goods and technology, whether from the United States or abroad. Section 5(b) has heretofore been cited as authority for regulation of the export of non-U.S.-origin goods. However, this is neither a wartime nor an emergency authority, and it belongs in the nonemergency statutory context of the Export Administration Act.

COST ESTIMATE

H.R. 7738, with committee amendments, does not authorize the appropriation of any funds. According to the Congressional Budget

18

Office cost estimate below, the enactment of this legislation will have no budget impact. The committee agrees with the CBO assessment.

### INFLATIONARY IMPACT STATEMENT

The enactment of H.R. 7738, with committee amendments, will have no impact on inflationary forces.

### STATEMENTS REQUIRED BY CLAUSE 2(l)(3) OF HOUSE RULE XI

#### (A) OVERSIGHT FINDINGS AND RECOMMENDATIONS

Under clause 1(k)(16) of Rule X of the Rules of the House of Representatives, the Committee on International Relations is assigned jurisdiction over trading with the enemy.

In performing its responsibility with respect to such jurisdiction, the committee, under the auspices of the full committee and the Subcommittee on International Economic Policy and Trade has conducted extensive hearings and research on existing laws, regulations, and associated issues involving trading with the enemy. Based on these oversight activities, the committee recommends that the powers of the President to regulate nonwartime transactions be removed from the Trading With the Enemy Act of 1917, as amended, and redefined within the framework of a new International Economic Emergency Powers Act as provided in H.R. 7738 as amended by the committee.

#### (B) BUDGET AUTHORITY

The enactment of H.R. 7738 will create no new budget authority.

#### (C) COMMITTEE ON GOVERNMENT OPERATIONS SUMMARY

No oversight findings and recommendations relating to this measure have been received from the Committee on Government Operations.

#### (D) CONGRESSIONAL BUDGET OFFICE—COST ESTIMATE, JUNE 17, 1977

1. Bill Number: H.R. 7738

2. Bill Title: A bill to amend the Trading With the Enemy Act of 1917, as amended, and for other purposes.

3. Bill status: As ordered reported by the House Committee on International Relations on June 20, 1977.

4. Description of bill: This legislation amends the Trading With the Enemy Act of 1917, as amended, the National Emergencies Act, and the Export Administration Act of 1969, as amended, and establishes the International Economic Powers Act to redefine the powers of the President to react to external threats.

5. Budget Impact:

[Dollars in millions]

Authorization amounts and estimated costs:

Fiscal year:
- 1977 _____
- 1978 _____
- 1979 _____
- 1980 _____
- 1981 _____

19

6. Basis for estimate: This legislation would remove the powers of the President to regulate nonwartime transactions from the Trading With the Enemy Act of 1917, as amended, and would redefine those powers in an International Emergency Economic Powers Act. It would also require congressional consultation and review of the exercise of the authority contained in this legislation. This legislation is estimated to have no budget impact.

7. Estimate comparison: None.
8. Previous CBO estimate: None.
9. Estimate prepared by: Joseph Whitehill.
10. Estimate approved by:

C. G. NUCKOLS
(For JAMES L. BLUM,
Assistant Director for Budget Analysis).

CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of Rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italics, existing law in which no change is proposed is shown in roman):

TRADING WITH THE ENEMY ACT

SECTION 5 (a) * * *
(b) (1) During the time of war [or during any other period of national emergency declared by the President], the President may, through any agency that he may designate, [or otherwise,] and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise—

(A) investigate, regulate, or prohibit, any transactions in foreign exchange, transfers of credit or payments between, by, through, or to any banking institution, and the importing, exporting, hoarding, melting, or earmarking of gold or silver coin or bullion, currency or securities, and

(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest,

by any person, or with respect to any property, subject to the jurisdiction of the United States; and any property or interest of any foreign country or national thereof shall vest, when, as, and upon the terms, directed by the President in such agency or person as may be designated from time to time by the President, and upon such terms and conditions as the President may prescribe such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes; and the President shall, in the manner hereinabove provided, require any person to keep a full record of, and to furnish under oath, in the

20

form of reports or otherwise, complete information relative to any act or transaction referred to in this subdivision either before, during, or after the completion thereof, or relative to any interest in foreign property, or relative to any property in which any foreign country or any national thereof has or has had any interest, or as may be otherwise necessary to enforce the provisions of this subdivision, and in any case in which a report could be required, the President may, in the manner hereinabove provided, require the production, or if necessary to the national security or defense, the seizure, of any books of account, records, contracts, letters, memoranda, or other papers, in the custody or control of such person **[** ; and the President may, in the manner hereinabove provided, take other and further measures not inconsistent herewith for the enforcement of this subdivision**]**.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

(3) As used in this subdivision the term "United States" means the United States and any place subject to the jurisdiction thereof:[1] *Provided, however,* That the foregoing shall not be construed as a limitation upon the power of the President, which is hereby conferred, to prescribe from time to time, definitions, not inconsistent with the purposes of this subdivision, for any or all of the terms used in this subdivision. **[**Whoever willfully violates any of the provisions of this subdivision or of any license, order, rule or regulation issued thereunder, shall, upon conviction, be fined not more than $10,000, or, if a natural person, may be imprisoned for not more than ten years, or both; and any officer, director, or agent of any corporation who knowingly participates in such violation may be punished by a like fine, imprisonment, or both.**]** As used in this subdivision the term "person" means an individual, partnership, association, or corporation.

SEC. 16. That whoever shall willfully violate any of the provisions of this Act or of any license, rule, or regulation issued thereunder, and whoever shall willfully violate, neglect, or refuse to comply with any order of the President issued in compliance with the provisions of this Act shall, upon conviction, be fined not more than **[**$10,000**]** *$50,000*, or, if a natural person, imprisoned for not more than ten years, or both; and the officer, director, or agent of any corporation who knowingly participates in such violation shall be punished by a like fine, imprisonment, or both, and any property, funds, securities, papers, or other articles or documents, or any vessel, together with her tackle, apparel, furniture, and equipment, concerned in such violation shall be forfeited to the United States.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

---

[1] Words "including the Philippine Islands, and the several courts of first instance of the Commonwealth of the Philippine Islands shall have jurisdiction in all cases, civil or criminal, arising under this subdivision in the Philippine Islands and concurrent jurisdiction with the district courts of the United States of all cases, civil or criminal, arising upon the high seas" immediately preceding the proviso in subsection (b)(3), of this section, have been omitted on the authority of 1946 Proclamation No. 2695, which is set out as a note under section 1394 of Title 22, Foreign Relations and Intercourse, and in which the President proclaimed the independence of the Philippines.

SECTION 502 OF THE NATIONAL EMERGENCIES ACT

SEC. 502. (a) The provisions of this Act shall not apply to the following provisions of law, the powers and authorities conferred thereby, and actions taken thereunder:

[(1) Section 5(b) of the Act of October 6, 1917, as amended (12 U.S.C. 95a; 50 U.S.C. App. 5(b));]

(2) Act of April 28, 1942 (40 U.S.C. 278b);

(3) Act of June 30, 1949 (41 U.S.C. 252);

(4) Section 3477 of the Revised Statutes, as amended (31 U.S.C. 203);

(5) Section 3737 of the Revised Statutes, as amended (41 U.S.C. 15);

(6) Public Law 85–804 (Act of Aug. 28, 1958, 72 Stat. 972; 50 U.S.C. 1431–1435);

(7) Section 2304(a)(1) of title 10, United States Code;

(8) Sections 3313, 6386(c), and 8313 of title 10, United States Code.

\*　\*　\*　\*　\*　\*　\*

---

**EXPORT ADMINISTRATION ACT OF 1969**

\*　\*　\*　\*　\*　\*　\*

**AUTHORITY**

SEC. 4. (a) \* \* \*

(b)(1) To effectuate the policies set forth in section 3 of this Act, the President may prohibit or curtail the exportation [from the United States, its territories and possessions, of any articles, materials, or supplies, including technical data or any other information], except under such rules and regulations as he shall prescribe, *of any articles, materials, or supplies, including technical data or any other information, subject to the jurisdiction of the United States or exported by any person subject to the jurisdiction of the United States.*

\*　\*　\*　\*　\*　\*　\*

(2)(A) In administering export controls for national security purposes as prescribed in section 3(2)(C) of this Act, United States policy toward individual countries shall not be determined exclusively on the basis of a country's Communist status but shall take into account such factors as the country's present and potential relationship to the United States, its present and potential relationship to countries friendly or hostile to the United States, its ability and willingness to control retransfers of United States exports in accordance with United States policy, and such other factors as the President may deem appropriate. The President shall periodically review United States policy toward individual countries to determine whether such policy is appropriate in light of the factors specified in the preceding sen-

tence. The results of such review, together with the justification for United States policy in light of such factors, shall be reported to Congress not later than December 31, 1978, in the semiannual report of the Secretary of Commerce required by section 10 of this Act, and in every second such report thereafter.

(B) Rules and regulations under this subsection may provide for denial of any request or application for authority to export articles, materials, or supplies, including technical data or any other information, [from the United States, its territories and possessions,] to any nation or combination of nations threatening the national security of the United States if the President determines that their export would prove detrimental to the national security of the United States. The President shall not impose export controls for national security purposes on the export [from the United States] of articles, materials, or supplies, including technical data or other information, which he determines are available without restriction from sources outside the United States in significant quantities and comparable in quality to those [produced in the United States,] *which would be subject to such controls*, unless the President determines that adequate evidence has been presented to him demonstrating that the absence of such controls would prove detrimental to the national security of the United States. The nature of such evidence shall be included in the semiannual report required by section 10 of this Act. Where, in accordance with this paragraph, export controls are imposed for national security purposes notwithstanding foreign availability, the President shall take steps to initiate negotiations with the governments of the appropriate foreign countries for the purpose of eliminating such availability.".

VIOLATIONS

Sec. 6. (a) (1) * * *

\* \* \* \* \* \* \*

(2) (A) The authority of this Act is to suspend or revoke the authority of any United States person to export articles, materials, supplies, or technical data or other information, [from the United States, its territories or possessions,] may be used with respect to any violation of the rules and regulations issued pursuant to section 4A(a) of this Act.

(B) Any administrative sanction (including any civil penalty or any suspension or revocation of authority to export) imposed under this Act for a violation of the rules and regulations issued pursuant to section 4A(a) of this Act may be imposed only after notice and opportunity for an agency hearing on the record in accordance with sections 554 through 557 of title 5, United States Code.

(C) Any charging letter or other document initiating administrative proceedings for the imposition of sanctions for violations of the rules and regulations issued pursuant to section 4A(a) of this Act shall be made available for public inspection and copying.

\* \* \* \* \* \* \*

O