Pages 1 - 44

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE LAUREL BEELER, MAGISTRATE JUDGE

| | |
|---|---|
| U.S. WECHAT USERS ALLIANCE,   )<br>CHIHUO INC., BRENT COULTER,   )<br>FANGYI DUAN, JINNENG BAO,   )<br>ELAINE PENG, and XIAO ZHANG,   )<br>                         )<br>        Plaintiffs,   )<br>                         )<br>  VS.   )<br>                         )<br>DONALD J. TRUMP, in his   )<br>official capacity as President )<br>of the United States, and   )<br>WILBUR ROSS, in his official   )<br>capacity as Secretary of   )<br>Commerce,   )<br>                         )<br>        Defendants.   )<br>_____) | No. C 20-5910 LB<br><br><br><br><br><br><br><br><br><br><br><br>San Francisco, California<br>Thursday, September 17, 2020 |

**TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**:  (via Zoom Video Conferencing)

For Plaintiffs:          ROSEN BIEN GALVAN & GRUNFELD LLP
                         101 Mission Street, Sixth Floor
                         San Francisco, California 94105-1738
                    BY:  **MICHAEL W. BIEN, ESQ.**
                         **VAN SWEARINGEN, ESQ.**

(Appearances continued on next page)

Reported By:   Katherine Powell Sullivan, CSR #5812, CRR, RMR
               Official Reporter - U.S. District Court

**APPEARANCES:** (continued via Zoom Video Conferencing)

For Plaintiffs:        DEHENG LAW OFFICES PC
                       7901 Stoneridge Drive, #208
                       Pleasanton, California 94588
             BY:  **KELIANG (CLAY) ZHU, ESQ.**

                       DAVIS WRIGHT TREMAINE LLP
                       505 Montgomery Street, Suite 800
                       San Francisco, California 94111-6533
             BY:  **THOMAS R. BURKE, ESQ.**

                       DAVIS WRIGHT TREMAINE LLP
                       1301 K Street NW, Suite 500 East
                       Washington, DC 20005
             BY:  **DAVID M. GOSSETT, ESQ.**

For Defendants:        UNITED STATES DEPARTMENT OF JUSTICE
                       Civil Division, Federal Programs Branch
                       Ben Franklin Station, P.O. Box No. 883
                       Washington, DC 20044
             BY:  **MICHAEL DREZNER**
                  **SERENA M. ORLOFF**
                  **TRIAL ATTORNEYS**

**Thursday - September 17, 2020**                    **9:54 a.m.**

                    **P R O C E E D I N G S**

                        **---oOo---**

        **THE CLERK:**  Calling civil action 20-5910, U.S. WeChat

Users Alliance, et al.

    Counsel, if you could please state your appearances for

the record.

        **THE COURT:**  Mr. Bien, you're on mute.

        **MR. BIEN:**  Your Honor, Michael Bien, of Rosen Bien

Galvan & Grunfeld, on behalf of plaintiffs.  Accompanying me

are my partner Van Swearingen, Clay Zhu, Thomas Burke and David

Gossett from Davis Wright and Tremaine.

        **THE COURT:**  Great.  Good morning.

        **MR. GOSSETT:**  Good morning, Your Honor.

        **THE COURT:**  And for the Government?

    So, Mr. Drezner, you're on mute.

        **MR. DREZNER:**  I'm sorry.

        **THE COURT:**  No, it's totally fine.  Half my life --

you should see the criminal calendar.  Half my life is telling

people where the start video function is and the mute button.

So all okay.

        **MR. DREZNER:**  Appreciate it.

    Michael Drezner on behalf of defendants.  And with me is

Serena Orloff.

        **THE COURT:**  All right.  Good morning to you both.

1          Okay.  So here's -- let me -- wonder whether we can come

2     to some practical solution.  So let me -- and you will have

3     better ideas than I, I'm sure.

4          And I will say this.  And I appreciate the Government's

5     assurances.  It's not that I don't.  Obviously, it becomes hard

6     to evaluate First Amendment issues in the context of those

7     assurances.  I think they're vagueness arguments still.

8          Again, I appreciate what the Government has said, but if

9     you just literally parse out the Executive Order and even

10    though the Government has made these -- has said it's not

11    self-executing and has made these representations -- and, you

12    know, I respect the Federal Programs Branch.  I accept the

13    representations that you make.  It's not that I don't.

14         And for -- for some of the reasons advanced by the

15    plaintiffs in their reply brief -- I mean, in the reply brief

16    they sort of shifted -- this is before your concessions -- to

17    kind of on the First Amendment issues more of the, kind of,

18    sliding-scale analysis, serious questions on the merits, but

19    sort of, you know, focusing on the vagueness issues as being

20    problematic.

21         And I think that they are.  I think that's still correct.

22    I don't think this is like the *TikTok* case.  It's a different

23    kind of concession that the Government made.  Of course, we're

24    not going to -- you know, of course, getting paid is not going

25    to fall within the wheelhouse of what we think is important.

 1          And so I think this case is different.  And that doesn't

 2     mean that, and the Government's not right.  How justiciable

 3     these things end up being, what the case or controversy ends up

 4     being in the context of the First Amendment remains to be seen.

 5     But at least today, at least today, I think that the plaintiffs

 6     sort of carry the argument.

 7          And, again, not that I'm not interested in hearing your

 8     arguments to the contrary.  I'm just telling you what I think

 9     about, you know, where the landscape is.  At least today, the

10     status quo gets preserved, right.  That's the point of a

11     preliminary injunction.

12          And then what I think, you know, looking at the

13     Government's opposition and, you know, this sort of suggestion

14     that, you know, that -- and I don't know whether the Government

15     has more specific information now, but when the Secretary does

16     plan to come out with the implementation of the Executive

17     Order, given the Government's concessions -- and, really, is it

18     going to be by Sunday under the 45-day rule or not?  And we can

19     talk about that.  But it struck me that everybody's interest

20     might be advanced, assuming everyone can live with my

21     preliminary injunction, you know.

22          And, again, I'm very happy to hear your arguments about

23     why this is a terrible approach, but the idea is, sort of,

24     grant the preliminary injunction on the vagueness grounds,

25     preserve the status quo, and then have some reasonable period

1    of time after the Secretary issues the implementation of the

2    Executive Order to confer and agree on any additional briefing

3    schedule designed to reach some of the ripeness issues that --

4    and there may be standing issues at that time too.  I just --

5    but it's all pretty speculative.  And I don't think that

6    militates in favor of the *TikTok* approach in this case for the

7    reasons that the plaintiffs advance.

8         So that's -- that was my reaction to the papers.  And then

9    given -- and especially given the kind of -- yesterday's

10   landscape.  And I wonder what -- and that doesn't mean we can't

11   have a more robust discussion.  I don't want to not issue an

12   order.  I think that we should.

13        I think if one's going to enter a preliminary injunction

14   one has to give some reasons why.  But I think that there are

15   going to be some reasons that are more easily said now, and

16   some reasons that might be the subject of further briefing

17   and/or a more robust order addressing some of, for example, the

18   constitutional concerns once we have the landscape of

19   implementation.

20        So those are my thoughts.  I don't know how you all would

21   like to -- I mean, obviously, it's the plaintiffs' motion but,

22   also, there's a pretty significant question for DOJ, too, about

23   what it thinks about -- about essentially kicking the can down

24   the road with a preliminary injunction order but one that is

25   built in the concept that it will be -- it will be -- it may be

1   expanded or modified pursuant to an orderly briefing schedule.

2       Okay.  Thoughts.

3       **MR. BIEN:**  Your Honor, this is Michael Bien for

4   plaintiffs.

5       We think that's a reasonable and practical way to proceed.

6   And we think it's very necessary given that we are now midday

7   Thursday.

8       We got a report this morning that the University of Kansas

9   has banned WeChat from its campus WiFi and computers.  It's

10  already having an effect on students there.  I'm sure that's

11  happening all over.

12      As something that we kind of missed, but it's kind of

13  obvious, the United States President, the most powerful man in

14  the world, has issued an order with criminal and civil

15  sanctions that goes into effect on Sunday.  And people are

16  reacting, and it's going to affect people all over the

17  United States unless this Court acts today.  And I think your

18  solution is -- is appropriate.

19      **THE COURT:**  Okay.  So from the Government's

20  perspective, again, no, I appreciate that you have the -- the

21  client perspective that gives context to the arguments that you

22  sometimes can make in the context of a preliminary injunction

23  where you have taken a position in your opposition that the

24  matter -- that there is no case or controversy.  And I wonder

25  whether -- what your view is on the solution that I've

1    proposed.

2         **MR. DREZNER:**  So thank you, Your Honor.  Michael

3    Drezner on behalf of defendants.

4         You know, I certainly appreciate your candor and your

5    suggestion.  I don't think we can agree to a preliminary

6    injunction sort of as a placeholder.

7         I mean, I apologize if I'm saying the things that you've

8    already considered but certainly, you know, the preservation of

9    the status quo, if that's what plaintiffs want, they have to

10   demonstrate they are actually entitled to a preliminary

11   injunction, that's extraordinary relief.  It's even more

12   extraordinary in the context of a presidential Executive Order

13   that directly concerns issues of national security and foreign

14   policy.

15        And so if Your Honor is wondering whether you can or

16   should grant it, even though there may be standing problems,

17   even though there may be questions of irreparable harm -- I

18   don't mean to interrupt.

19        **THE COURT:**  Oh, no, no.  I'm sorry.  And I so

20   apologize.  I had an antitrust class action, and I -- one of

21   the problems with Zoom is you can now see when I wince.  And so

22   I wasn't wincing at your argument.  I apologize.  I have only

23   the friendliest of intentions towards hearing what you have to

24   say.  But it's a good lesson for me because it happened in my

25   antitrust case.  I know the lawyers very well.  I've lived with

1    the lawyers since 2012.  And that's the parallel of Zoom.

2        What I will say -- and then, please, continue -- I will

3    say I do appreciate the argument.  I appreciate -- that's why I

4    led with are you even able to agree to something like this

5    given the -- the issues that attend, you know, the client

6    relationship and your job as advocate.  So I appreciate that.

7    And I'm happy to hear your argument.

8        I would say, you may be right on some issues, but it's

9    hard for me on the vagueness argument.  It honestly is.  You

10   know, I feel like on the First Amendment issues, with the

11   sliding scale, before the concessions, ah, you know, I didn't

12   know -- I don't think that my vagueness analysis has changed

13   based on your concessions because I think, for the reasons that

14   Mr. Bien advanced in his reply brief in particular, given the

15   representations you made in your opposition about -- about

16   whether there was -- whether the issue was ripe, I think

17   those -- that that minimally at least, and I'm not saying it's

18   a minimal argument I'm just saying my view is it does carry the

19   day today, whatever the Secretary does clearly changes the --

20   and that's true of any preliminary injunction.  Consider trade

21   secrets, for example, right.  You have an idea of what the

22   landscape looks like with the departing employee, and then the

23   forensic evaluation may show something different.  And there's

24   a reason that the *Winter* test is the -- sort of the

25   sliding-scale test.

1        So that's why I winced.  But why don't you continue with

2   your argument, because I want you to be able to make it.

3        **MR. DREZNER:**  Certainly.  Thank you.

4        I guess I would just take a step back and take a look at

5   plaintiffs' vagueness overall.  I mean, their argument on this

6   point is that the Executive Order doesn't sufficiently describe

7   what transactions are going to be prohibited.  And our

8   position, I think as plain from our briefs, that's a pretty

9   curious argument to make when the Executive Order has no force

10  and effect until those transactions are defined.

11       And they are going to be defined, as far as we are aware,

12  by the Department of Commerce on the schedule that was put

13  forth in the Executive Order.

14       And we're not aware of any Executive Order or law that was

15  found to be vague before it went into effect and before it went

16  into effect in a way that it actually defined the terms that it

17  was going to be applying.

18       So you can look to the cases that plaintiffs cite, like

19  *Santa Clara County v. Trump*.  That wasn't a question of, you

20  know, when is the order going to go into effect.  The order was

21  in effect at that moment.  And there might have been some

22  follow-on questions of how do you interpret it, how might it be

23  applied, but the questions of what did it apply to, overall

24  that was clear, and the order was in effect.  And the plaintiff

25  said, "We have to make serious decisions right now that are

1   irreparable unless you enjoin the Government's actions."

2       That's not what we have here.  We have an order that has

3   no force and effect until the Secretary of Commerce makes his

4   determinations.  At that point the vagueness argument is going

5   to be completely transformed.  And plaintiffs are going to have

6   to say either the transactions that are identified are clear

7   enough or they're not.

8       But it would be, I think, a pretty dramatic leap to say an

9   Executive Order is too vague because it didn't define a term

10  when, by the terms of that Executive Order, it says "Department

11  of Commerce, please define this term."

12      **THE COURT:**  Could I ask you a question?  And this may

13  not be a useful question, but it occurs to me.

14      So in other cases I've had, although, admittedly, not in

15  the Executive Order context, when confronted with situations

16  like this -- and I'm going to characterize it as "clarity will

17  be available shortly," but you see it in immigration cases, for

18  example.  I will just use that as an example because that's an

19  example that pops to mind.

20      The Government routinely says, hey, you know, our view is

21  that this -- you know, I'm now phrasing it in your words for

22  this case as opposed to words that attach to a different legal

23  context, but they routinely say, you know, this is not

24  self-executing; we agree to maintain the status quo; we agree

25  to maintain the status quo for X period of time, for example --

```
 1   I'm just making this up -- two weeks after the Secretary issues
 2   the implementation, and to allow -- because it's -- you know,
 3   as the plaintiffs advanced in their filings, and as Mr. Bien
 4   added today with the University of Kansas example, it is not
 5   true, given the -- and I know that you're telling me that it's
 6   apparently self -- that it is not self-executing, but when you
 7   look in the context of the tension between it goes into effect
 8   in 45 days, the Secretary within 45 days, Section A, Section C,
 9   it's hard to say super practically that it doesn't create an
10   atmosphere where people act as they have demonstrably acted
11   with the University of Kansas example and some of the other
12   examples proffered by the plaintiffs in their supporting
13   declaration.
14        It's hard to say that it is not having an effect; right?
15   So that goes to the, sort of, standing arguments and even the
16   ripeness arguments, especially in the context of the vagueness
17   and a plain-language reading of the Executive Order.
18        So I'm not enthusiastic about issuing an injunction
19   unnecessarily, especially in the Executive Order context
20   involving issues of national security.  I appreciate that legal
21   context about why one ought to be cautious.
22        And this is one of those situations where I really was
23   kind of surprised that we just didn't kick the can down the
24   road, because that's a better way, and that seems like
25   everyone's interests are served.  You are not committing to a
```

1  preliminary injunction, but you're allowing the orderly airing

2  of issues and in a way that makes sense in this case for some

3  of the reasons you advance in your opposition.

4      And I just wonder why you haven't done that.  And it's

5  okay that you haven't.  I just wonder why you can't.

6      **MR. DREZNER:**  So I think you raised a lot of issues.

7  I'll try to address each of them.

8      I think, you know, in the context of looking at what are

9  plaintiffs really worried about here and, you know, why did we

10  sort of address their concerns, I mean, I think, you know, we

11  did pay very close attention to what they raised in their

12  motion, which we took as a real concern that, "Look, once this

13  goes into effect we are going to be subject to civil and

14  criminal penalties just for expressing ourselves, just for

15  using the WeChat app, potentially for downloading the

16  application."

17      So we took that to heart.  You know, we looked at, sort

18  of, what can we represent now, even before the deliberative

19  process is done?  And we thought this would go a long way to

20  putting plaintiffs' real fears to rest about, sort of,

21  liability.  And so that's how we provided, I think, these

22  fairly broad assurances of the kind of fears that they allude

23  to aren't going to come to pass.

24      So I think then we look to, well, why can't we kick the

25  can down the road?  I mean, I think -- I don't want to get into

1    the Secretary, sort of, deliberative process here, but I think

2    there are, sort of, two points.

3        One is this goes directly to the President's authority to

4    make these kind of fine-grained distinctions when you're

5    dealing with national security foreign policy.

6        You know, whether or not there's a 45-day period for the

7    Secretary of Commerce to decide on these sorts of definitions,

8    whether there's a further period after that, that delays it, I

9    don't think that's plaintiffs' prerogative to decide the timing

10   of these kinds of orders that address, you know, the degree to

11   which China may be able to engage in surveillance, censorship

12   or misinformation with the use of American data.  That's

13   uniquely the problems of the Executive.

14       And so then, I think, Your Honor brings up the sort of

15   related point of, you know, what's the harm in -- why not give

16   them advance notice essentially?

17       And I think that really does go to their argument that

18   they made in their latest filing last night, which is that they

19   should be entitled to some sort of advance notice about what

20   the Secretary's going to do.

21       And I would just say on one hand, I mean, laws and

22   Executive Orders don't generally operate that way, right.  One

23   is not entitled to a criminal prohibition, for instance, before

24   the law is issued.  Once the law is issued, then there might be

25   a questions, is the law overly vague?

And right now we sort of have an Executive Order that isn't fully in effect because it's not fully defined.  And then I think, you know, you sort of have the follow-on point of, well, you know, once it is fully out there, what can we do?

And I'd say at that point they can come back and they can say, well, these concerns remain or they've been diminished to the extent that we no longer assert them.

So I think that's sort of my best answer to your sort of multipart question there.

**THE COURT:**  Right.  And so there's no -- well, I was -- I think even the shorter version of my question is, is I don't -- I appreciate what you're saying, that the plaintiffs' motion goes to the heart of the President's Executive authority to issue Executive Orders in matters affecting national security.  Important.  Okay.  That's important.  And it's not going to be important here.  That's the concession argument. It's not going to be important to you in the way that you fear.

And so I just -- and given that the Secretary is presumably issuing the regulations on Sunday, and then the plaintiffs not necessarily saying "we want advance notice."  I mean, sure, that would be great.  But, okay, we don't need advance notice; we just want the status quo; let's meet and confer on Monday and see -- and agree to just pause the litigation.  Because you're essentially saying, you know, within the scope of the relief demanded by the plaintiffs in

 1   the action it's not going to be as you fear.

 2        And so I just -- I just-- in other cases, admittedly in

 3   different context, the Government agrees to forebear taking

 4   action, routinely, and to allow the issues to be illuminated in

 5   a sufficient way.  And, again, the classic example is the

 6   immigration context.

 7        And I just -- it just seems so impractical for everybody

 8   to sort of put us to the paces of a preliminary injunction when

 9   there's an easier solution, that's tidy and organized and

10   consistent with what you say you're going to do, which is not

11   what the plaintiffs fear.  But if you can't do it, you can't do

12   it.  And then that's fine.  It's my job to write the order that

13   I'll -- that I'll write.

14             **MR. BIEN:**  May I respond, Your Honor?

15             **THE COURT:**  Of course.  Of course.

16             **MR. BIEN:**  With all due respect for Counsel, for

17   opposing counsel who is in a difficult position, the inability

18   of the Government to make any kind of reasonable compromise is

19   exactly the point that remains uncontested in defendant's

20   opposition.

21        When I read over getting ready for today, I wanted to

22   bring to your Court's attention two things which I think are

23   important if you are going to decide the motion, because the

24   way I learned to practice, if you don't contest something, it's

25   conceded.

1          So what wasn't contested here?  First of all, the word

2     "pandemic" does not appear in defendant's opposition.

3     Plaintiffs' complaint and motion alleged and proved, through

4     the mouth of President Trump, that the real motivation for this

5     Executive Order and many of the steps that the President is

6     taking is a campaign in trouble.

7          And since the pandemic has hit the United States at an

8     extraordinarily high rate, 20 percent of the deaths in the

9     United States, while we have less than 5 percent of the

10     population, we are the last country, the worst country in the

11     world in facing the pandemic.

12          And our theory, which we put forward with evidence, backed

13     by evidence uncontested, is that the real reason behind this

14     Executive Order is to bolster the campaign, to bring hatred

15     and -- on China, to blame China for the pandemic, which the

16     President calls the China flu, and to distract from what

17     actually happened, admitted by the President to Bob Woodward,

18     which is that he knew about the pandemic, he knew about how

19     dangerous the virus is, and chose to downplay it.  The

20     consequences for all of us have been terrible.

21          So that's one fact that remains unrebutted.  It goes to

22     all of our theories.  It goes to the First Amendment theory.

23     It goes to the national security issues.  It goes to

24     everything, and it's unrebutted.

25          Number two is the pandemic itself.  We are meeting in a

1    virtual courtroom.   Normally we would be in front of you live.

2    Why?   We are trying to remain safe in the pandemic.   We use

3    technology just like WeChat every day to keep socially distant

4    from each other to prevent the spread of the virus, to try to

5    catch up.

6        We are blessed to have this -- these technologies

7    available and still be able to do our jobs and to function and

8    to have an important hearing like today.

9        Millions of Chinese-Americans, if this injunction does not

10   issue, will lose the ability to practice social distancing.

11   They'll lose the ability to check in on their relatives, both

12   here and in China, to communicate to each other.   This is what

13   they depend on.   That fact remains unrebutted.

14       We explained with expert testimony and direct testimony

15   why this particular app is unique, special, especially given

16   the needs of this minority population in the United States that

17   has constitutional rights.   They have the right to speak, to

18   communicate, to pray, to read the newspaper, to comment.

19       And those rights are already evaporating before our eyes.

20   They're losing that ability because the Executive Order has

21   power just by being written.   We think it has power even before

22   it went into effect, but it will be in effect on Sunday.   I

23   think that's a reasonable reading.

24       Even under the Government's position today, we believe the

25   Executive Order remains unconstitutional because it will

 1   simultaneously make things illegal at the same day it tells us

 2   what's illegal.  My view of constitutional law is that is

 3   unconstitutional.

 4          **THE COURT:**  So let me ask -- let's pause on that

 5   because I just want to write that down.

 6          So the idea is on day 45, Sunday, we learn then what's

 7   illegal.  It's illegal right then and there, and that itself is

 8   not sufficient notice.  Is that what you're -- is that the

 9   argument that you're making?

10          **MR. BIEN:**  That's one of the defects of the Executive

11   Order itself.  As we've seen, it's had a tremendous effect,

12   just a chilling effect just by being on the books.

13          And it violates various principles of -- important in our

14   system, in an area that's going to be invasive of many, many

15   First Amendment rights, being so vague and so general in

16   delegating that authority to the Secretary in a way that is

17   also, you know, too vague and general.  Vagueness has various

18   elements here.

19          **THE COURT:**  Well, so, one thing -- and, again, you

20   make your argument however you'd like to make it, because I

21   think it's important for you to walk your steps.

22          But one thing to think about is my order is going to

23   incorporate everything the Government has said.  You know, its

24   concessions.  One sort of placeholder is, you know, agreed, a

25   lot of the things that you advanced as the sort of

1   impact/effect on the people who use the app went unrebutted by

2   the Government, right.  So they didn't contest those issues.

3       And so I -- I say this very mildly.  You didn't actually

4   need all of your pages that I gave you because you put in all

5   the facts that essentially went unrebutted.  And that's okay.

6   It's fine.

7       And so I think that's important.  So the order that I will

8   write will have the Government's concessions, what they -- what

9   they've said, including their representations about what the

10   harm won't be.  Granted that's today, and one might say, well,

11   we won't know until Sunday.  But then one of the things to

12   think about in the argument you make to me today is what, then,

13   is your best argument for an injunction given the case or

14   controversy concerns that the Government is raising.

15       So I think it's important to sort of recognize the

16   landscape of concession, which wasn't part of the briefing

17   process.

18       **MR. BIEN:**  The case in controversy altogether.  So, in

19   other words, we'll -- all we've got to do is wait for something

20   that may or may not happen on Sunday.

21       **THE COURT:**  Right.  I just mean, like, that -- what

22   the Government has said goes into the order.  So I'm just

23   saying, make your best argument for what an injunction should

24   look like with that context.

25       Because I do accept the Government's representations.  I

1  do.  The Federal Programs has done a fine job in difficult

2  litigation for years.  And I do accept the representations they

3  make.

4      And I also recognize what you've said is, "That doesn't

5  address the vagueness concerns that we've raised."  But I want

6  you to make the argument, because I'm sure you will make it

7  better, your argument better than I will make it for you.

8      But if I'm going to write an injunction order, it ought to

9  be the best one I can write under the -- in the context of the

10 Government's concessions.  And, so, what's your view on that?

11 What should it look like?

12     MR. BIEN:  Well, I think that the order should, first

13 of all, provide sufficient time for -- we don't even know if

14 the Secretary is actually going to act.

15     You know, and I think that one thing is important here

16 that -- that was part of the *Santa Clara v. Trump* litigation is

17 that, with all due respect for the U.S. Attorney's Office --

18 and I have the greatest respect for them -- they do not control

19 the Executive Branch.

20     And what the Court, both the Ninth Circuit and District

21 Court found in that case was representations made by the

22 Justice Department simply did not -- could not cure defects in

23 an Executive Order or in -- even representations made by the

24 Attorney General were rejected as so inconsistent with the

25 Executive Order that they didn't cure the problem.

1    So I think that's where we are here now.  We have an

2    Executive Order which is -- which is, in our mind, flagrantly

3    unconstitutional.  It's also *ultra vires*.  The President

4    doesn't have authority to do what he says he's doing.

5    And, you know, and then we can't -- we have to wait to see

6    what happens.  Certainly, it's relevant to wait and see.  And

7    we need that time -- that's what the preliminary injunction is

8    for, as Your Honor has said -- to keep the status quo, to

9    protect people from harm.

10   **THE COURT:**  So I just wanted -- sorry.  The *ultra*

11   *vires* argument -- and, of course, your reply brief is sitting

12   right outside of my office.  I didn't haul everything in here

13   because it's taking up the whole shelf.  I just brought in my

14   notes.

15   But did you really make the *ultra vires* argument in your

16   reply brief?  I'm just going to grab the -- thank you.

17   I just want to sort of make sure I understand the scope of

18   the arguments that you've -- that you've retained because, of

19   course, you said that you weren't challenging the initial

20   Executive Order, the May 2019 Executive Order.

21   **MR. BIEN:**  That's correct, Your Honor.

22   **THE COURT:**  And then -- so -- yeah, I don't want to

23   derail the argument that you're making right now.  I just want

24   to make sure that we're clear on what arguments you're --

25   because, you know, you did shift on your First Amendment

arguments.  That's fine.  Not -- you know, I see Mr. Burke a

lot in litigation, too.  And I think it was a fine idea to,

like, go more on the sliding scale serious questions issue on

the First Amendment.

    But on some of the other issues, the *ultra vires*, you

know, you led with the -- you led with the vagueness on your

reply brief, and you did -- you did have an *ultra vires* claim.

I see that on page 16 of your brief.  So I --

            **MR. BIEN:**  Yes.  I mean, I think that's an important

argument to consider.  And one reason is -- and I think we've

pointed this out in our reply brief and also found some

additional legislative history that we added in the reply --

the very purpose of the IEEPA, when it was originally drafted

it included a provision that precluded the President from doing

exactly what he's doing here with the ban.

    This is simply not one of the powers that Congress gave to

the President.  It's off the table.  Communications, shutting

off people/individuals from communicating with people in other

country.

    I don't know what they're planning, but another thing

that's relevant from *Santa Clara v. Trump*, and one reason that

the courts ignored what the Justice Department said and

listened to what the politicians said, who were in charge, is

the politicians were saying "We're going to cut off all funds

for the sanctuary cities.  They're violating the law."  And the

1    Justice Department said, "Oh, no, we're just kidding; that's

2    not really what we're going to do."  And the Courts said, "We

3    have to listen.  It's a vague order.  And this is what they say

4    they're going to do.  That's what it means."

5         And the same thing here.  The word "ban" has been repeated

6    by members of this administration, including the President.

7    And that's frightening.  It's a frightening word, and it's

8    already having that effect.

9         So that's something that's just beyond the scope of his

10   powers, and it's -- and it's actually rooted in the First

11   Amendment.  In fact, Congress decided not to include a specific

12   reference to the President because they said it's just so

13   obvious that -- press freedoms, that we can't even write a

14   statute that talks about freedom of the press.  That's -- no

15   one would go that far.

16        **THE COURT:**  Okay.  All right.  So -- and, okay, that's

17   fine.

18        **MR. DREZNER:**  Your Honor, could I respond?

19        **THE COURT:**  Yes, absolutely.  You know, I -- yes.  I'm

20   interested in hearing what you're saying.

21        I was just going to say that the *ultra vires* argument, you

22   know, again, it's a little -- I'm just going to make the

23   observation that it's a little hard to know what's *ultra vires*

24   when, as the Government might put out, it's not self-executing,

25   it's -- the Secretary has got to issue the implementation.

1  And, of course, the Secretary is constrained by the

2  Constitution, so -- and by the statutory scheme.  And so it

3  gets a little complicated.

4      And I -- so that was my concern, which -- with the context

5  where we find ourselves now, but -- but if you want to add

6  something on this point, Mr. Drezner, please do.

7          **MR. DREZNER:**  I just kind of wanted to generally

8  respond to Your Honor's concerns in conjunction with what

9  plaintiffs' counsel was remarking on, if that's all right.

10         **THE COURT:**  Of course.

11     I don't know, Mr. Bien, if we want to shift to the

12  Government and come back to you?

13         **MR. BIEN:**  (Nods head.)

14         **THE COURT:**  Okay.  He says that's fine.  Okay.

15         **MR. DREZNER:**  So I take Your Honor's concern is

16  primarily vagueness here.  If Your Honor has, you know,

17  questions about First Amendment, I'm happy to address those or

18  *ultra vires*.

19     But I take from what Your Honor has said that the primary

20  basis of an injunction here could be because of vagueness.  And

21  I just wanted to highlight a couple of things.

22     To the extent that plaintiffs are complaining about not

23  having notice in advance of an order going into effect, or a

24  law going into effect, there is simply no precedent for that.

25     What I think they're trying to do is essentially shoehorn

1  a procedural due process claim into this type of vagueness

2  argument.  And by that I mean they're saying, look, this will

3  affect us in some way.  This government action is going to

4  affect us.  We should have some sort of opportunity to be

5  noticed about it and then to contest it.

6      But they haven't brought any due process claim.  Not in

7  that vein.  They're only saying what's been put out there,

8  what's in effect right now, is too vague, and we can't

9  understand it, and we could be hurt by it.  But that's a very

10  different -- sorry, go ahead.

11      **THE COURT:**  Oh, sorry.  If I think of a question, you

12  can see it on my face.

13      Is it ordinary in Executive Orders to have the

14  President's, like, 45 -- becomes effective in 45 days, the

15  Secretary's regulation's effective in 45 days, is it normal for

16  things to be that -- to be simultaneous like that?

17      I understand the argument you made in your opposition, and

18  it was made in another case that I had with your office last

19  week, the scienter requirements get rid of your concern

20  about -- about criminal prosecutions.

21      I would say conceptually that's probably correct.

22  Practically, it doesn't address the anxiety that attaches to

23  people modifying their behavior in the face of uncertain

24  implementation of regulations.  See the University of Kansas.

25      But I -- I practically understand that point, but is it

1   normal for them to be simultaneous like that?  It seems it

2   would be better to have implementation issued within a certain

3   period of time, and then a period after that when it goes into

4   effect.  I don't know.

5        **MR. DREZNER:**  I can't speak to, you know, the time

6   period in which, you know, agencies might get to define

7   something.  I'll say my personal experience, I've seen a number

8   of Executive Orders that go into effect immediately.  The

9   President considers something, he signs it, and then it's in

10   effect.

11        So, you know, what plaintiffs are essentially arguing here

12   is, you know, before you put any Executive Order into effect,

13   you know, people who are indirectly affected because, again,

14   this is not -- this is not WeChat in front of you.  These are

15   users of WeChat.  So people who are indirectly affected have

16   some sort of predeprivation notice and ability to contest under

17   a procedural due process argument.

18        That's essentially what I think they're arguing.  And this

19   dovetails directly into what we argued in the *Ryan* case, that

20   there an employee of TikTok had no procedural due process

21   rights.  And I think you can look to the *Castaneda* decision

22   that we cited there, 807 F.2d 1478.  People who are indirectly

23   affected by government actions have no inherent right to

24   predeprivation notice.  And so I think that's, you know, point

25   number one.

1    I think point number two, as Your Honor just recognized,

2 there are Executive Orders, there are laws, there are agency

3 directives that go into effect immediately without any kind of,

4 you know, explicit direction to define something over a

5 specified period of time, which there was here.

6    And so I think it's important to consider Your Honor's

7 ruling, injunction, would essentially be saying that in any law

8 or any Executive Order, regardless of how important it is to

9 national security, foreign policy, the privacy of American

10 citizens, there has to be some sort of undefined grace period

11 in there to provide notice to people so they can contest that

12 law.  There's no precedent for that whatsoever.

13    And what we'd also be saying is that in any Executive

14 Order, including those under -- that the President routinely

15 issues, where it will be broadly applicable but then he will

16 say, okay, I'm going to, you know, require this sort of

17 blockage or I'm going to require this sort of action, and then

18 it will say this term is going to be defined by the agency,

19 that is routine, but I think what Your Honor's order would

20 essentially be saying is, that's no longer acceptable.  The

21 President will now have to define specifically every term in

22 any Executive Order or risk being enjoined for being unduly

23 vague even if the order doesn't actually go into effect until a

24 definition is selected.

25    That's what's happening here.  Plaintiffs aren't under any

1  irreparable injury before the order goes into effect.  And to

2  the extent Your Honor, you know, is a little upset we're here

3  on the preliminary injunction --

4          **THE COURT:**  I'm not upset.  I don't get upset.

5          **MR. DREZNER:**  I appreciate it.  But, I mean, I would

6  just note that's not the Government's doing, right.  Plaintiffs

7  decided to bring these claims before they were fully

8  crystallized, before they have an actually concrete

9  controversy.

10      They can say, "Here's how it actually does affect our

11  First Amendment rights.  Here's how it actually is overly

12  vague."  I think what they're just saying is, "It could

13  potentially, in the future, hurt us, but we're not a hundred

14  percent sure."

15      In that context the suit is unripe.  You can look to

16  *Bennett*, where the question is, is there a genuine and imminent

17  threat of prosecution or is it simply hypothetical?

18      We point out all plaintiffs bring here is a possibility,

19  speculation.  And so that, in and of itself, their concern --

20  and I don't doubt that they're sincerely concerned, but that

21  concern does not translate to a showing on all four prongs of a

22  preliminary injunction which, again, is extraordinary, and

23  doubly so when we're dealing with these extremely sensitive

24  areas that also impinge on separation of powers.

25      So all I would add is, plaintiffs' subjective concern --

and, again, it may well be sincere -- that's not enough to displace the President's authority as to whether and when to take specific action.

    **THE COURT:**  Okay.

    **MR. BIEN:**  May I respond again, Your Honor?

    **THE COURT:**  Of course.

    **MR. BIEN:**  First, I'll take the blame for bringing a preliminary injunction before this goes into effect.  Our clients have been harmed, and this is the way we need to protect them.

    Another way of looking at our case, which we have argued and made clear, is, you know, vagueness and overbreadth.  We're making both arguments.  This is -- this statute is nothing more than a prior restraint on speech, the most inappropriate and shunned thing that a government entity can do in the United States.

    And so Your Honor need not worry about creating precedence that's going to affect how Executive Orders are issued in the future.  This is unique.  What's unprecedented here is what the President did in the Executive Order, not what this Court is about to do today.

    The Executive Order is a prior restraint on speech.  It's overbroad.  The -- the national security interests, if they have any weight, don't justify cutting off all the other speech, all the other protected activities that we have

1    identified.

2        Why not restrict government employees from using WeChat on

3    their phones?  They haven't even done that.  This is not a

4    sincere reason for this Executive Order.

5        I would also like to point out, Section 3 of the Executive

6    Order, which on its face states "No notice is required," you

7    know, it -- this is not a -- this is not about what the

8    Secretary is going to be doing down the road.  This is an

9    Executive Order that we are challenging on its face.  It's

10   unconstitutional.  That's the challenge we brought here.

11       Of course, what the Secretary does will be relevant to the

12   litigation, but our case will proceed no matter what the

13   Secretary does.  And we will be contesting the Executive Order

14   on its face.  It is unconstitutional, and it already has harmed

15   people, and it's already caused irreparable harm in the past.

16   And it's going to continue to cause harm today and tomorrow and

17   especially on Sunday.  And so that is the reason that there is

18   no problem with case or controversy or standing.  It's

19   justiciable.

20       And you needn't worry about some sort of unique precedent.

21   The strangeness and unprecedented nature here is the

22   President's actions and not what we're asking this Court to do.

23       Again, we're not asking you to decide on the merits.

24   We're trying to preserve the status quo and protect our clients

25   from harm, which is already occurring.

1      **THE COURT:**  Okay.  So when you look at Section 1, you

2  know, prohibiting a transaction as identified by the Secretary

3  of Commerce under Section 1C, and so that -- and it -- it thus

4  defines "transaction" by guidance that the Secretary -- by the

5  implementation of the -- by the definition that the Secretary

6  promulgates.  And then whether there is a violation depends on

7  the definition that the Secretary attaches to "transaction" as

8  confined by the statutory and constitutional scheme.  Right?

9      So that's the argument that the Government's making.  And

10  then the question would be -- I mean, it's obviously enormously

11  helpful to have all of the briefing in advance because then we

12  know what the issues are.  But, you know, just to sort of

13  take -- just to take the other approach to the problem, why,

14  when the Secretary issues the guidance -- the implementation on

15  Sunday, isn't there a TRO hearing on Monday with immediate

16  relief granted?

17      I mean, maybe you have more faith in the Government's

18  ability to execute -- to execute immediately on the

19  implementation of authority that it's just promulgated.  I do

20  not, as a career government person, have that confidence

21  myself, because the Government just doesn't move that agilely.

22      And so I think one of the -- you know, Mr. Drezner's

23  argument that it's not ripe until it's ripe doesn't mean that

24  you can't get immediate relief on your arguments if you're

25  right.  We could have a hearing Monday morning, for example.

1      And so I just -- you know, given the tensions with the

2  delegation -- you know, I will say, I am -- I am sympathetic to

3  the -- to the anxiety that it creates for the people who are

4  affected.  And -- and therein lines the vagueness concern,

5  which is really wrapped a little bit in a "this is the only

6  mode of communication for people."  I know that.  We all know

7  that.

8      We know who the folks are who use WeChat.  We know that

9  WeChat -- and there are a couple of other apps that if you're

10  going to do business in Asia, for example, you have to use them

11  or you cannot do business.  We know those things.  You know, we

12  all use WhatsApp, but you can't use WhatsApp.  And -- and so we

13  know how that works.

14      And so it is correct that -- and that's why the arguments

15  that the plaintiffs advance are sympathetic, because the -- the

16  concern that your only mode of communication might be cut off

17  as early as Sunday -- which is not going to happen because

18  there's no way the Government can move that quickly.  You know,

19  so therein lies the kind of tension with your true concern of

20  harm, which Mr. Drezner said the Government -- you all do not

21  doubt each other's sincerity or representations.  So he's not

22  discounting that sincerity.  He's just saying not now, but

23  Monday.

24      And why is that wrong given that we can move -- I mean,

25  that's the whole point of TROs and preliminary injunctions, we

1   can move that fast.  We can.

2        And in the context of an Executive Order that -- I mean, I

3   literally could have a hearing every morning at 9:00 a.m. for

4   the next month, if that's what you guys want, to maintain the

5   status quo.  And why isn't that an okay answer from the

6   plaintiffs' perspective?  Because then it just boils down to

7   anxiety about what the harm may actually be.

8        I mean, again, leaving aside your *ultra vires* arguments,

9   which I don't love because I do believe that the implementation

10  of the -- because everybody -- of course people are constrained

11  by the Constitution, the regulatory scheme.  And presumably --

12  and I am not discounting Mr. Bien's arguments to the contrary.

13  Let's see if that actually shakes out.  And his argument would

14  be, it hasn't shaken out so well in other contexts.  Well,

15  that's what courts are for.  Right?

16       And we can give you and immediate audience.  The courts.

17  I don't mean we as the royal we/I.  But the courts can

18  literally give you an immediate audience, even more so now in

19  Zoom; right?  If nothing else, we're more accessible to each

20  other than ever.

21       So why is the Government wrong to advance that argument?

22            **MR. BIEN:**  Your Honor, the harm --

23            **THE COURT:**  The harm perspective, from the harm

24  perspective.  The ripeness, really, is what I'm saying.

25            **MR. BIEN:**  Right.  Because we've established that

irreparable harm is already happening and is happening here.

And none -- we pointed out in our papers we filed with you last night that even these representations and assurances, again, which are not binding on the Secretary or the President in any way, do not cure those problems.  They could still require the app be turned off just like the University of Kansas did.

In other words, it doesn't cure the problem.  It's not going to -- the use of the app, they specifically excluded preserving the app's use.  That is the harm in addition to criminal and civil sanctions.

It's the loss of the speech rights, the loss of First Amendment freedoms, the ability to pray, to talk, to read the newspaper, to comment.  That can be lost.  It's already been lost at the University of Kansas right now.

**THE COURT:**  So you're just basically saying that they turn it off -- they're not going to prosecute you for anything that you've done, but it ceases to exist in the United States.

**MR. BIEN:**  Well, all they've represented is that they won't prosecute a very narrow group of people.  But we even pointed out that some of our plaintiffs would be prosecuted, okay.  They use it for storing data.

**THE COURT:**  So assume -- okay.  Storing data.  Okay.  That's fine.  Okay.  That's a good example.

But assume that your folks are not going to be anybody

1   that the Government's interested in, the class of plaintiffs

2   that you've defined.  So assume that.

3       And then -- so then the harm that you would say, or tell

4   me if this is wrong, is it's the deprivation of the forum,

5   which is the only forum of communication.

6           **MR. BIEN:**  Yes, yes.  That's what we have proven, that

7   since the Government -- what does it mean if it doesn't mean

8   turning it off?

9           **THE COURT:**  And why is it that on Monday morning, if

10  it really isn't turning it off, we issue an immediate order --

11          **MR. BIEN:**  Well, because it's already happening --

12          **THE COURT:**  -- saying you can't?

13          **MR. BIEN:**  We would have been here earlier.  The

14  Government asked for this additional time.  We tried to get in

15  earlier.  I guess we could have brought a TRO, and that's our

16  decision.

17      But the harm -- the harm is occurring now.  And nothing

18  that's been represented here or that we see -- there's still

19  been no statement from Commerce other than -- you know, we just

20  don't know what's happening other than what they're saying,

21  that they are reserving the right to limit the use of the app.

22      And that reasonable people looking at these instructions,

23  just like the University of Kansas, are going to turn it off

24  because they are going to be violating the conspiracy parts of

25  the order.  We didn't talk about those.  Evading the -- you

1   have -- you can't do anything to get around this.  Whatever it
2   means.
3       So here we are today.  And I think the University of
4   Kansas, their lawyers did what lawyers all over the world are
5   advising their clients, just like we put in evidence what major
6   firms in Washington are advising their clients, You better
7   watch out.  This is real.  We don't know what this law means.
8   It's better just to, you know, hold up on your transactions,
9   anything that could be called a transaction.
10      We don't know what he's going to call a transaction.  If
11  it doesn't mean ban, why does he keep on say ban?
12      So the only way to preserve the status quo and protect the
13  harm is to issue the preliminary injunction.  And if the -- if
14  the United States can demonstrate down the road that the --
15  what they're doing is so limited and has such a minor effect on
16  our plaintiffs, then I'm sure they will bring it to the Court's
17  attention.
18      Injunctions can always be looked at and should be.  But
19  right now the only way to stop the constitutional harm is to
20  issue the injunction as soon as possible.
21      And we -- we will -- we obviously didn't convince Your
22  Honor yet, but we think the Executive Order fits within those
23  orders.  And we -- we cited the cases in our papers that are
24  unconstitutional and will remain unconstitutional no matter
25  what the Secretary does.

1          And so we are going to maintain that challenge.  We will

2     also, of course, look to see what the Secretary does.  And

3     if -- if that, too, is violative of our clients' rights we will

4     either bring that to the Court's attention directly or, you

5     know, obviously bring it up.

6          But we maintain our challenges to the Order itself,

7     because it is -- it is what is causing the harm right now.

8          **THE COURT:**  All right.  Well, on the plus side, I've

9     noticed that our attendees somehow spiraled to 494, so somehow

10     we got the expanded use of our license.  So that's good.

11          Thank you, Elaine, for whatever you did to make that

12     happen.  That's lovely.

13          And I don't know if anyone wants to make any other

14     arguments, that you didn't have an opportunity to make, that

15     you think would be helpful for me today.

16          **MR. DREZNER:**  Can I just briefly respond, Your Honor?

17          **THE COURT:**  Of course.

18          **MR. DREZNER:**  Thank you.

19          Just to tag on to the last couple of points that I think

20     you were bringing up, I think they sort of intersected with

21     both harm and whether plaintiffs have alternate avenues of

22     communication.

23          I mean, I would just point out, plaintiffs haven't shown

24     how they would be subject to irreparable harm absent an

25     immediate injunction before the order even goes into effect.

1    I don't think they really rely anymore on this idea of

2 uncertainty or worry.  I think now they're more claiming it's

3 hurting their First Amendment rights right now, before it's

4 even gone into effect.  That's not quite clear from their

5 briefing how that's possible, whether their voluntary sort of

6 anticipatory actions could be violating their own First

7 Amendment rights.

8    I would point Your Honor to the *CTIA* case, at 928 F.3d

9 851.  It just says the mere assertion of a First Amendment

10 right doesn't automatically require the finding of irreparable

11 injury.  It's the purposeful unconstitutional suppression of

12 speech that gives rise to irreparable injury.

13    Plaintiffs certainly haven't shown how that's occurring

14 now, let alone how it would occur when the order goes into

15 effect.

16    I'll just conclude with the last point.  Your Honor and

17 plaintiffs have repeatedly said during this hearing and in the

18 briefing that plaintiffs have no alternative avenues of

19 communication.  I'd just say at the outset, that's prong three

20 of the First Amendment analysis.

21    So skipping over the Government has important interests

22 here, that it does not substantially burden more speech than

23 necessary, this third prong of what else is available to

24 plaintiffs, the Ninth Circuit has repeatedly said courts should

25 not invalidate regulations on this basis unless they shut down

an entire medium of communication.  That's *G.K. Ltd*.

And I think although plaintiffs go pretty far and say, you know, this is the Internet to us, they don't actually substantiate that.  Their own expert says that many WeChat users are switching over to other social media apps.  Multiple declarants from themselves say they're getting ready to use other methods of communication.

So not only do they not argue that we're actually shutting down an entire medium of communication, they then don't argue or, I would say, substantiate this claim they have no alternative avenues of communication.

What they do say is, we strongly prefer to use this app. It's more convenient; it's less costly; we're used to having it; it's, you know, our preferred method of communication.  And again, I don't doubt that.  I don't think the Government would doubt that.

But the question is, is that sufficient to invalidate an Executive Order?  Again, one that advances serious concerns about Americans' personal and proprietary data in the hands of a company that is subject to laws in the PRC and has been known to have Chinese Communist parties within its corporate structure.  Is that enough?  I think it's clearly not.

I think you look to precedent within the Ninth Circuit, and it finds, "We are not going to invalidate speech restrictions simply because they may impinge on applicants'

1   preferred method of communication."  That's the *Lone Star* case.

2       So to the extent that might play a role in your decision,

3   I wanted to get those points out.

4       **THE COURT:**  Okay.

5       **MR. BIEN:**  Your Honor, may I respond?

6       **THE COURT:**  Yes.

7       **MR. BIEN:**  I just think the Government's made our case

8   once again.

9       The evidence shows exactly to the contrary.  They

10  introduced nothing about our clients.  They introduced very

11  little, if anything, about national security.

12      On a key national security point that goes to the First

13  Amendment, are there more targeted measures of addressing a

14  legitimate government interest?  You need to look at their

15  opposition.  You need to look at their opposition.  They said,

16  Your Honor, none; "Only a ban can achieve our interests."

17      And they also said, and there's no -- you can't blame

18  President Trump for the fact that that would cut off people in

19  the United States from communicating to all their friends and

20  relatives in China.  That's not his fault.  That's China's

21  fault that it bars the other apps.

22      That's what their position is.  And I think that makes our

23  case.  They have admitted that is way -- the only way anyone

24  can communicate with their friends and family in China.

25      And they said that that's not President Trump's fault.

1   But the Executive Order is an act by President Trump.  It's an

2   illegal act because he doesn't have the power to do what he's

3   doing.  But it's his act.  He's responsible for it.  And it's

4   something that you can enjoin.  And it viciates their national

5   security argument, I mean, as to First Amendment issues.  You

6   can't do what he's doing.

7        **THE COURT:**  So the problem, and I'm not -- you know,

8   recognizing your concerns and sort of the wrapping the harm in

9   the First Amendment issues, the problem is not that the

10  President -- your *ultra vires* argument in your reply brief is

11  really just it can't exceed the scope of authority under the

12  statute.

13       And -- and -- and the problem is we don't know today

14  whether it will because the implementation of it comes through

15  the Secretary of Commerce.  So that's the kind of rub.

16       There may be a completely -- and you're not challenging

17  the earlier Executive Order.  You're challenging,

18  essentially -- this is not a perfect way of describing it --

19  the ambiguity of the interplay with the word "transaction" in

20  Section A, and the Secretary's ultimate definition of it in

21  sections -- through Section C.  And there may -- you know,

22  taking the Government's argument there may be an issue, but we

23  don't know.

24       And the harm then, you say, under the sort of sliding

25  scale, going back to the, sort of, First Amendment *Winter*

sliding scale, is, well, we don't get there yet because we
can't essentially.  But when you look at the sliding scale and
the substantial issues and the balance of equities and all of
the, sort of, issues that go into granting injunctive relief,
that goes in our favor.

     But, you know, going back to the Executive Order context
it's really hard in the context of an Executive Order that is
not complete because it depends on a definition to be -- to
be -- to be provided by somebody else.  It's just a tricky --
it's a tricky context; right?

     And so it -- I think the Government's right to say, you
know, it's problematic to enjoin something that you don't even
know what's being prohibited.

          **MR. BIEN:**  That's exactly -- Your Honor, if I may.
          **THE COURT:**  Yes.
          **MR. BIEN:**  That's exactly the point here.  The problem
is in the vagueness and overbreadth of the -- the possible
vagueness.  Its vagueness is in the Executive Order.  It only
can be cured by something the Secretary does.

     And we hope that -- there are probably things that the
Secretary could do, lots of things that he could do under this
order that -- that may not be anywhere near the kinds of harms
we're talking about.

     But status quo, that's what this is about, we're bringing
a preliminary injunction because we want to maintain the status

1    quo so that our clients and -- and the millions of others who

2    they represent here are not harmed in the interim.  And so we

3    can preserve people's rights and -- and see what happens.

4         We hope that the U.S. Attorney's Office will go back to

5    the Secretary and have some influence over what actually

6    happens, but that's something that can only happen if the Court

7    issues its order.  Without that, we're tremendously at risk.

8         **THE COURT:**  Okay.  All right.  Anything else anyone

9    wants to add?  If not, I'll take the matter under submission.

10        **MR. BIEN:**  Thank you, Your Honor.

11        **THE COURT:**  All right.  Thank you.

12        **MR. BURKE:**  Thank you.

13        **THE COURT:**  Nice to see everybody.

14    (Counsel thank the Court.)

15    (At 10:57 a.m. the proceedings were adjourned.)

16                      - - - - -

17              **CERTIFICATE OF REPORTER**

18         I certify that the foregoing is a correct transcript

19    from the record of proceedings in the above-entitled matter.

20    DATE: Friday, September 18, 2020

21

22

23                _Katherine Sullivan_

24    _____

25         Katherine Powell Sullivan, CSR #5812, RMR, CRR
                   U.S. Court Reporter