1   MICHAEL W. BIEN – Cal. Bar No. 096891
    VAN SWEARINGEN – Cal. Bar No. 259809
2   ALEXANDER GOURSE – Cal. Bar No. 321631
    AMY XU – Cal. Bar No. 330707
3   ROSEN BIEN GALVAN & GRUNFELD LLP
    101 Mission Street, Sixth Floor
4   San Francisco, California  94105-1738
    Telephone:   (415) 433-6830
5   Facsimile:    (415) 433-7104
    Email:        mbien@rbgg.com
6                 vswearingen@rbgg.com
                  agourse@rbgg.com
7                 axu@rbgg.com

8   KELIANG (CLAY) ZHU – Cal. Bar No. 305509
    DEHENG LAW OFFICES PC
9   7901 Stoneridge Drive #208
    Pleasanton, California  94588
10  Telephone:   (925) 399-5856
    Facsimile:    (925) 397-1976
11  Email:        czhu@dehengsv.com

12  ANGUS F. NI – Wash. Bar No. 53828*
    AFN LAW PLLC
13  502 Second Avenue, Suite 1400
    Seattle, Washington  98104
14  Telephone:   (773) 543-3223
    Email:        angus@afnlegal.com
15  * *Pro Hac Vice* application forthcoming

16  Attorneys for Plaintiffs

17

18                   UNITED STATES DISTRICT COURT

19        NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

20  U.S. WECHAT USERS ALLIANCE,            Case No. 3:20-cv-05910
    CHIHUO INC., BRENT COULTER,
21  FANGYI DUAN, JINNENG BAO,              **AMENDED COMPLAINT FOR
    ELAINE PENG, and XIAO ZHANG,           DECLARATORY AND INJUNCTIVE
22                                          RELIEF**
                   Plaintiffs,
23
              v.
24
    DONALD J. TRUMP, in his official
25  capacity as President of the United States,
    and WILBUR ROSS, in his official
26  capacity as Secretary of Commerce,

27                 Defendants.

28

[3617547.1]
                                                         Case No. 3:20-cv-05910

# INTRODUCTION

1.     Public space in the digital age is defined by platforms and users rather than physical places with geographic boundaries.  Cyberspace, particularly social media, is one of "the most important places" to exchange views.  *Packingham v. North Carolina*, 582 U.S. —, 137 S. Ct. 1730, 1735 (2017).  Few digital public squares are as large as that found on WeChat.  Released in 2011, WeChat is now one of the world's most popular mobile telephone applications ("app"), with over 1 billion monthly active users.[1]

2.     Approximately 19 million users rely on the app in the United States, and it is the primary app Chinese-speakers in the U.S. use to participate in social life by connecting with loved ones, sharing special moments, arguing ideas, receiving up-to-the minute news, and participating in political discussions and advocacy.[2]  As a "super-app," WeChat users also rely on the app to make telephone calls, hold video conferences, upload documents, share photos, and make payments.[3]  It has become essential to the conduct of daily life for its users, many of whom regularly spend hours each day on the app.

3.     WeChat is also used for numerous societally important purposes, including by public institutions.  For example, as the coronavirus pandemic continues to separate people physically, WeChat has been used in the United States by police departments to inform the public about testing center locations, by volunteers to organize the delivery of medical supplies, and by families to stay in touch with isolated elderly relatives in nursing

---

[1] Rayna Hollander, *WeChat has hit 1 billion monthly active users*, BUSINESS INSIDER (Mar. 6, 2018, 11:59 a.m.), https://www.businessinsider.com/wechat-has-hit-1-billion-monthly-active-users-2018-3; Iris Deng and Celia Chen, *How WeChat became China's everyday mobile app*, SOUTH CHINA MORNING POST (Aug. 16, 2018), https://www.scmp.com/tech/article/2159831/how-wechat-became-chinas-everyday-mobile-app.

[2] Rick Smith, *Crackdown on WeChat could hinder millions of US users who rely on social media tool*, WRAL TECHWIRE (Aug. 19, 2020), https://www.wraltechwire.com/2020/08/19/crackdown-on-wechat-could-hinder-millions-of-us-users-who-rely-on-social-media-tool/.

[3] Bani Sapra, *This Chinese super-app is Apple's biggest threat in China and could be a blueprint for Facebook's future. Here's what it's like to use WeChat, which helps a billion users order food and hail rides*, BUSINESS INSIDER (Dec. 21, 2019), https://www.businessinsider.com/chinese-superapp-wechat-best-feature-walkthrough-2019-12.

homes. WeChat is also used by individuals and groups—including churches—for religious and cultural purposes: group prayer, organizing for holidays and events, taking care of the poor, sick and infirm, and education.

4. In the United States and across the world, national governments engage in dragnet surveillance of digital communications of ordinary people. Because governmental surveillance is all-pervasive and occurs at the network level, communications over WeChat, like communications on all other apps that run on our systematically surveilled internet infrastructure, are captured by this dragnet.

5. Despite widespread knowledge of these practices, hundreds of millions of people in this country voluntarily use surveilled devices and apps to participate in all facets of social and economic life every day. This is the case for WeChat users in the United States, where it is widespread knowledge amongst users that both the United States and Chinese governments monitor WeChat communications.[4] WeChat users in the United States continue to use and rely on the app, knowing that Big Brother is watching.

6. On August 6, 2020, the President issued Executive Order 13943 entitled "Addressing the Threat Posed by WeChat, and Taking Additional Steps To Address the National Emergency With Respect to the Information and Communications Technology and Services Supply Chain," 85 FR 48641 ("the Executive Order"). Citing national security concerns, the Executive Order bans what appears to be all uses of WeChat by anyone within the United States as well as "U.S. persons" outside the United States. Section 1(a) of the Executive Order prohibits people and property subject to U.S. jurisdiction from carrying out "transactions" with WeChat after 45 days of the Executive Order's issuance. Section 2(a) prohibits any transaction "by a United States person or

---

[4] *See* Arjun Kharpal, *Chinese tech giant Tencent reportedly surveilled foreign users of WeChat to help censorship at home*, CNBC (May 8, 2020), https://www.cnbc.com/2020/05/08/tencent-wechat-surveillance-help-censorship-in-china.html; Tim Lau, *The Government Is Expanding Its Social Media Surveillance Capabilities*, BRENNAN CENTER FOR JUSTICE (May 22, 2019). https://www.brennancenter.org/our-work/analysis-opinion/government-expanding-its-social-media-surveillance-capabilities.

within the United States" that evades, avoids, or violates the uncertain prohibition in Section 1(a). Maddeningly, the Executive Order does not define what those transactions include, leaving individuals and companies at a loss as to whether they will risk civil and/or criminal prosecution and penalties if they do not fundamentally change the way they communicate or run their businesses. The vaguely worded Executive Order was issued without further explanation or a media briefing, and states that the Secretary of Commerce shall identify what transactions are prohibited after 45 days—in effect, delaying identification of what transactions are prohibited until after such transactions are already prohibited.[5]

7.      Neither the Executive Order itself nor the White House provided concrete evidence to support the contention that using WeChat in the United States compromises national security. Notably, no other nation has implemented a comprehensive WeChat ban on the basis of any like-finding that WeChat is a threat to national security.[6] The Executive Order was, however, issued in the midst of the 2020 election cycle, during a time when President Trump has made numerous anti-Chinese statements that have contributed to and incited racial animus against persons of Chinese descent[7]—all outside of the national security context.

8.      In a stark violation of the First Amendment, the Executive Order targets and

---

[5] Ana Swanson, *Trump's Orders on WeChat and TikTok Are Uncertain. That May Be the Point.*, N.Y. TIMES (Aug. 7, 2020), https://www.nytimes.com/2020/08/07/business/economy/trump-executive-order-tiktok-wechat.html.

[6] *See* Maria Abi-Habib, *India Bans Nearly 60 Chinese Apps, Including TikTok and WeChat*, N.Y. TIMES (June 29, 2020, updated on June 30, 2020), https://www.nytimes.com/2020/06/29/world/asia/tik-tok-banned-india-china.html (stating that India's ban is "part of the tit-for-tat retaliation after the Indian and Chinese militaries clashed earlier this month.").

[7] *See, e.g.*, Nadia Kim, *Asian Americans Suffer From Trump's Racist Attacks Too*, PUBLIC SEMINAR (July 23, 2020), https://publicseminar.org/essays/asian-americans-suffer-from-trumps-racist-attacks-too/; Li Zhou, *Trump's racist references to the coronavirus are his latest effort to stoke xenophobia*, VOX (June 23, 2020), https://www.vox.com/2020/6/23/21300332/trump-coronavirus-racism-asian-americans; Matt Stevens, *How Asian-American Leaders Are Grappling With Xenophobia Amid Coronavirus*, N.Y. TIMES (Mar. 29, 2020, updated on April 10, 2020), https://www.nytimes.com/2020/03/29/us/politics/coronavirus-asian-americans.html.

silences WeChat users, the overwhelming majority of whom are members of the Chinese and Chinese-speaking communities.  It regulates constitutionally protected speech, expression, and association and is not narrowly tailored to restrict only that speech which presents national security risks to the United States.  Accordingly, it is unconstitutionally overbroad.  Indeed, banning the use of WeChat in the United States has the effect of foreclosing all meaningful access to social media for members of the Chinese-speaking community, such as Plaintiffs, who rely on it to communicate and interact with others like themselves.  The ban on WeChat, because it substantially burdens the free exercise of religion, also violates the Religious Freedom Restoration Act.

9.      The Executive Order runs afoul of the Fifth Amendment's Due Process Clause by failing to provide notice of the specific conduct that is prohibited; because of this uncertainty, WeChat users in the United States are justifiably fearful of using WeChat in any way and for any purpose—and also of losing access to WeChat.  Since the Executive Order, numerous users, including Plaintiffs, have scrambled to seek alternatives without success.  They are now afraid that by merely communicating with their families, they may violate the law and face sanctions.

10.      WeChat is the only "super-app" with a natively Chinese interface designed for Chinese speakers.  That is why it is the dominant social media and e-commerce application amongst the global Chinese diaspora, which include Chinese communities in the United States.[8]  These individuals, particularly those who do not speak English, are *completely reliant* on WeChat to communicate, socialize, and express themselves.  As such, by prohibiting the use of only WeChat but not any similar applications (ones not made in China and without Chinese interfaces), the Executive Order singles out people of Chinese and Chinese-American ancestry and subjects them to disparate treatment on the basis of race, ethnicity, nationality, national origin, and alienage.  In doing so, the

---

[8] Thuy Ong, *Chinese social media platform WeChat reaches 1 billion accounts worldwide*, THE VERGE (Mar. 5, 2018), https://www.theverge.com/2018/3/5/17080546/wechat-chinese-social-media-billion-users-china.

Executive Order violates the Equal Protection Clause.

11. Finally, in issuing the Executive Order, the president acted beyond his authority provided by the International Emergency Economic Powers Act, which precludes the President from "***directly or indirectly***" regulating personal communications and the international exchange of information.

12. The U.S. WeChat Users Alliance ("USWUA"), Chihuo, Inc., Brent Coulter, Fangyi Duan, Jinneng Bao, Elaine Peng, and Xiao Zhang (collectively, "Plaintiffs"), bring this suit to challenge the Executive Order, which eviscerates an irreplaceable cultural bridge that connects Plaintiffs to family members, friends, business partners, customers, religious community members, and other individuals with common interests within the Chinese diaspora, located both in and outside of the United States. The Executive Order has already harmed Plaintiffs, who are plagued with fear for the loss of their beloved connections, whether it be with friends, family, community, customers, aid recipients of the charities they run, or even strangers whose ideas enrich their lives. They have been forced to divert time, energy, and money to seek alternative communication platforms, download and save irreplaceable digital histories, plan for business closures, find other sources of information, and try to obtain alternative contact information for those from whom they will soon be separated. Even if they succeed to some extent in their mitigation efforts, Plaintiffs will never be able to replace the full spectrum of the social interactivity that WeChat offers, nor will they be able to find any social networking platform with anything close to the same level of participation by the global Chinese diaspora—this is because WeChat's network effects, generated by its 1 billion-plus daily users, is irreplaceable.

13. In short, the threatened displacement of these WeChat users from their public space is an irreparable harm that requires judicial intervention.

14. For these reasons, and those discussed below, the Court should (1) declare that the Executive Order ~~is~~*and the Secretary of Commerce's September 18, 2020, Identification of Prohibited Transactions* are unlawful and unconstitutional~~,~~*; and* (2) enjoin

1   Defendants from enforcing the Executive Order ~~or the Secretary's *Identification*~~ to prohibit

2   the use of WeChat in the United States ~~by individual users, businesses and groups, and (3)~~

3   ~~stay the implementation date of any of the penalty provisions of Executive Order until a~~

4   ~~reasonable time after the Secretary of Commerce promulgates definitions of "transactions"~~

5   ~~under the Executive Order~~, directly or indirectly.

6                        **JURISDICTION AND VENUE**

7          15.    The claims asserted herein arise under and pursuant to the Constitution and

8   laws of the United States.  This Court has jurisdiction over the subject matter of this action

9   pursuant to 28 U.S.C. § 1331.

10          16.    An actual, present, and justiciable controversy exists between the parties

11   within the meaning of 28 U.S.C. § 2201(a).

12          17.    Plaintiffs' claims for declaratory and injunctive relief are authorized by 28

13   U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and

14   by the general legal and equitable powers of this Court.

15          18.    Venue is proper in this District pursuant to 28 U.S.C. §§ 2201 and 1391

16   (e)(1) because Defendant are officers of the United States acting in their official capacities

17   and (1) at least one plaintiff resides in this district; and (2) a substantial part of the events

18   or omissions giving rise to the claim occurred in this district.  For the same reason,

19   intradistrict assignment is proper in the San Francisco Division.  *See* N.D. Cal. L.R. 3-2.

20                              **PARTIES**

21          19.    Plaintiff U.S. WeChat Users Alliance ("USWUA") is a New Jersey nonprofit

22   organization that is in the process of being registered under Internal Revenue Code section

23   501(c)(3), established by individuals in the United States for the purpose of opposing the

24   Executive Order.  Plaintiff USWUA is made up of WeChat users located throughout the

25   United States who are not affiliated with WeChat, its parent company Tencent Holdings

26   Ltd. ("Tencent"), nor any political party or foreign government.  Plaintiff USWUA runs on

27   public donations from WeChat users and organizes its efforts on WeChat.  Plaintiff

28   USWUA is made up of individuals who want to continue using WeChat within the United

1  States and are currently suffering and will continue to suffer an injury based on the

2  Defendants' actions.

3        20.     Plaintiff Elaine Peng is a United States citizen residing in Castro Valley,

4  California.  Plaintiff Peng founded the Mental Health Association for Chinese

5  Communities ("MHACC") in 2013 to provide mental health education, suicide prevention,

6  assistance, and other resources to her local Chinese community that is underserved by the

7  mental health profession due to language and cultural barriers.  As president of MHACC,

8  Plaintiff Peng strives to make mental health programs available to those in need and has

9  received multiple awards for her work.  Like much of the Chinese population in the United

10  States, Plaintiff Peng uses WeChat as her exclusive means to connect with her Chinese

11  families and friends, domestic or abroad.  As most of the population MHACC serves relies

12  on WeChat to communicate, use of WeChat is also integral to MHACC's mission to

13  provide mental health services and support to its members.

14        21.     Plaintiff Brent Coulter is a United States citizen and WeChat user.  Plaintiff

15  Coulter holds a Juris Doctor from the University of California, Hastings College of the

16  Law ("Hastings"), and lives in San Francisco, California.  Plaintiff Coulter previously

17  lived in China for approximately five years, where he studied at Sichuan University and

18  worked in marketing.  While in China, Plaintiff Coulter used WeChat as his main method

19  of communication to connect with friends and professional contacts.  Now in the U.S., one

20  of Plaintiff Coulter's professional goals is to bridge the gap between China and the U.S.

21  with regard to law and business.  At Hastings, Plaintiff Coulter founded the Asian Law and

22  Business Association, through which he formed a partnership with the American Chamber

23  of Commerce ("AmCham") in Southwest China.  Each year, Plaintiff Coulter drafts two

24  chapters of AmCham's annual white paper on U.S. business in China with his colleagues

25  in both countries.  WeChat is central to Plaintiff Coulter's annual collaboration and

26  remains the only way for him to connect with many of his professional contacts and

27  friends in China.  Plaintiff Coulter relies on WeChat to build upon his professional career

28  which straddles law and business in the U.S. and China.  Without WeChat, Plaintiff

1  Coulter would lose access to many of the relationships that he has built throughout his

2  studies and career.

3      22.     Plaintiff Xiao Zhang is a Chinese citizen with a valid visa residing in

4  Houston, Texas.  She is employed as an engineer and founded a nonprofit organization

5  known as Hita Education Foundation that supports underserved students at the high school

6  in her hometown in China.  Plaintiff Zhang uses WeChat to speak with administrators,

7  teachers, parents of school children, and to help identify underserved Chinese students who

8  would benefit from the program.  Plaintiff Zhang's nonprofit organization currently sends

9  donations of 300 yuan (approximately $43 dollars) to seven students per month to pay for

10  meals and school supplies.  Plaintiff Zhang also uses WeChat to transfer the funds to each

11  individual student, and WeChat is her exclusive means to connect with her Chinese-

12  speaking family members and friends, domestic or abroad.

13      23.     Plaintiff Fangyi "Amy" Duan is a Chinese citizen with a valid visa, and

14  resides in Santa Clara, California.  Plaintiff Duan is employed as the chief executive

15  officer of Plaintiff Chihuo, Inc. ("Chihuo"), a corporation that is dually registered in both

16  California and Delaware.

17      24.     Plaintiff Chihuo is a media and online retailer that creates content regarding

18  Chinese restaurants and cuisine for people residing in the United States.  Plaintiff Chihuo

19  provides U.S. based merchants an e-commerce platform for targeting Chinese-speaking

20  consumers.  Plaintiff Chihuo serves its customers by providing targeted marketing and

21  advertising services online.  Plaintiff Chihuo delivers its targeted advertising and

22  marketing services primarily on several WeChat official accounts through its various

23  functions, including WeChat Moments.  Plaintiff Chihuo employs or contracts with

24  approximately thirty people as part of its business.  Plaintiff Chihuo's WeChat accounts

25  cover 14 major metropolitan areas in the United States and are enjoyed by more than

26  640,000 readers.

27      25.     Plaintiff Jinneng Bao is a United States permanent resident and lives in

28  Nassau County, New York.  He is self-employed and runs several businesses including a

construction company primarily serving Chinese-speaking clients in New York.  Plaintiff Bao actively attends a Chinese church in New York and participates in Bible studies regularly on WeChat.  His Bible study group consists of mostly Chinese-speaking members.  Due to the pandemic, Plaintiff Bao's Bible study group has stopped meeting in person, and WeChat is the only way the group currently maintains communications with one another.

26.     Defendant Donald J. Trump ("President Trump") is the President of the United States.  He is sued in his official capacity.  In that capacity, he issued the Executive Order challenged in this suit.

27.     Defendant Wilbur Ross ("Secretary Ross") is the United States Secretary of Commerce.  He is sued in his official capacity.  In the Executive Order, the Secretary is authorized to take actions, including adopting rules and regulations, to implement the Executive Order.

## FACTUAL ALLEGATIONS

### A.       WeChat and App Capabilities

28.     WeChat is one of the most popular messaging applications in the world, with a monthly user base of more than 1 billion people.[9]  Nearly every person in China with an online presence has at least one WeChat account, and over one-third of them spend four hours or more on the app every day—making WeChat an indispensable part of many peoples' lives and work.[10]

29.     Though WeChat began as a messaging service, it is now a "super-app" that serves a multitude of communicative needs, including making telephone calls, video conferencing, sharing photos, commenting on other users' posts, making payments, and

---

[9] Arjun Kharpal, Everything you need to know about WeChat—China's billion-user messaging app, CNBC (Feb. 3, 2019), https://www.cnbc.com/2019/02/04/what-is-wechat-china-biggest-messaging-app.html.

[10] Li Yuan, To Cover China, There's No Substitute for WeChat, N.Y. TIMES (Jan. 9, 2019), https://www.nytimes.com/2019/01/09/technology/personaltech/china-wechat.html

1  still other purposes.[11]

2      30.     One of WeChat's primary uses is the app's messaging capabilities, which

3  include both text and voice messaging.  Messaging through WeChat is the preferred

4  method of communication in China, even when doing business.  Through the app's

5  messaging capabilities, users can have numerous ongoing conversations at one time, and

6  can also set up group texts within a family, a business, or among friends, to communicate

7  with the whole group simultaneously.

8      31.     WeChat also has capabilities to make voice and video calls.  WeChat users

9  often choose to make voice calls within the app rather than through their cellular telephone

10 provider because it is more convenient.  Group voice conference calls and video chats—

11 comparable to Zoom video group calls—can also be easily made on WeChat.

12     32.     WeChat includes a feature called "Moments" through which users can

13 upload photos, videos, share news articles, and compose text.  WeChat users can comment

14 or like the post, similar to the capabilities of apps like Facebook or Instagram.

15     33.     WeChat also supports many integrated services, such as banking and ride-

16 sharing, so that users do not need to use a separate app to get those services.  Some

17 companies have launched "mini-programs" within WeChat instead of standalone apps,

18 making it more convenient for WeChat users to use their services.

19     34.     WeChat has increasingly been adopted by older age groups in China,

20 including a significant percentage of those over 60.[12]  Even older users in their 70s use

21 WeChat at high levels for messaging, voice calls, reading articles, and making payments.[13]

22

23

24 [11] Bani Sapra, *This Chinese super-app is Apple's biggest threat in China and could be a blueprint for Facebook's future. Here's what it's like to use WeChat, which helps a billion users order food and hail rides*, BUSINESS INSIDER (Dec. 21, 2019), https://www.businessinsider.com/chinese-superapp-wechat-best-feature-walkthrough-2019-12.

25

26 [12] Clark Boyd, *The Silver Lining: WeChat and China's Over-60s*, MEDIUM (Sept. 3, 2020), https://medium.com/swlh/the-silver-lining-wechat-and-chinas-over-60s-168b193fb516.

27

28 [13] Mansoor Iqbal, *WeChat Revenue and Usage Statistics*, BUSINESS OF APPS (updated July 30, 2020),  https://www.businessofapps.com/data/wechat-statistics/.

## B.   WeChat Usage Specifically in the United States

35.     There are approximately 19 million daily active WeChat users in the United States.[14]  WeChat is very widely used within the Chinese-American community, which is estimated to be four to five million people.[15]  WeChat is the dominant method for anyone in the United States who regularly communicates with people in China because it is free, is more convenient, and has better reception than traditional telephone calls.  WeChat is used in the United States not only to keep in touch with friends and family, but also academics, professionals, and business people to discuss matters of professional importance.  In the United States, the vast majority of the Chinese-speaking population is on WeChat, creating network-effects that encourage others to join and participate lest they be cut off entirely from family, friends, and business circles.[16]  Simply put, WeChat is irreplaceable because no other app has anywhere near the same number of users and engagement among the Chinese-speaking community in the United States.

36.     WeChat users in the United States use the app to communicate within Chinese American communities in the United States and with Chinese speakers throughout the world.  Without access to WeChat, users in the United States will be cut off from their cultural community in the U.S. and lose the main line of communication they have with the rest of their family thousands of miles away.  Plaintiffs Peng, Zhang, Bao, and Fang all use WeChat while living in the United States to regularly communicate with their aging parents or other family members who reside in China.

37.     The importance of WeChat to Chinese Americans cannot be overstated

---

[14] Krystal Hu, *WeChat U.S. ban cuts off users link to families in China*, REUTERS (Aug. 7, 2020), https://www.reuters.com/article/us-usa-tencent-holdings-wechat-ban/wechat-us-ban-cuts-off-users-link-to-families-in-china-idUSKCN253339#:~:text=In%20the%20past%20three%20months,according%20to%20analytics%20firms%20Apptopia.

[15] Gustavio Lopez, Neil G. Ruiz, and Eileen Patten, *Key facts about Asian Americans, a diverse and growing population*, PEW RESEARCH CENTER (Sept. 8, 2017), https://www.pewresearch.org/fact-tank/2017/09/08/key-facts-about-asian-americans/.

[16] Mohit Mittal, *WeChat—The One App That Rules Them All*, HARVARD BUSINESS SCHOOL DIGITAL INITIATIVE (Aug. 25, 2017), https://digital.hbs.edu/innovation-disruption/wechat%E2%80%8A-%E2%80%8Athe-one-app-rules/.

because a significant portion of these individuals speak little or no English.  According to a study by the Pew Research Center, 41% of the Chinese population in the United States are not English proficient.[17]  Accordingly, a blanket prohibition on WeChat means that millions of individuals in the United States will be unable to find a comparable substitute on apps such as Facebook, which are designed for English-speaking users and primarily have English-speaking user networks within the United States.

38.     WeChat users in the United States use the app to engage in, organize, and publicize religious and cultural practices.  For instance, various churches with primarily Chinese congregants have WeChat profiles and stream their services online.[18]  The Church of Jesus Christ of Latter-Day Saints uses WeChat to reach Chinese-American members and potential congregants within China.[19]  WeChat users in the United States attend and participate in religious services or events, such as funerals, weddings, or other gatherings through the app.  Plaintiff Jinneng Bao relies on WeChat exclusively to attend regular Bible studies hosted by his Chinese church in New York.  WeChat users in the United States organize and celebrate various religious and cultural holidays through their activity in WeChat groups.  They post Moments about holidays such as the Chinese New Year, the Mid-Autumn Moon Festival, Ching Ming Festival (when Chinese people around the world visit the tombs of their departed loved ones), and the Duan Wu Festival (popularly known

---

[17] *English proficiency of Chinese population in the U.S.*, PEW RESEARCH CENTER (July 6, 2017), https://www.pewsocialtrends.org/chart/english-proficiency-of-chinese-population-in-the-u-s/.

[18] Feng Long, *Leveraging Tech for Chinese Evangelism*, SIERRAPACIFIC (May 15, 2020), https://www.undeniableblessing.org/blog/Leveraging-Tech-for-Chinese-Evangelism (Oakland pastor who uses WeChat); MID-HUDSON CHINESE CHRISTIAN CHURCH (NY), https://www.mhccc.org/ (last visited Aug. 20, 2020); BRENTWOOD BAPTIST CHURCH (TN) https://brentwoodbaptist.com/chinese/ (last visited Aug. 20, 2020).

[19] THE CHURCH OF JESUS CHRIST OF LATTER-DAY-SAINTS IN CHINA, https://www.churchofjesuschrist.org/China (last visited Aug. 20, 2020) (*see* Frequently Asked Questions by Church Leaders, Can Church leaders/members outside China keep in touch with Chinese members baptized in their brand/ward after those Chinese members return to China? Email? WeChat? Letters?); James Griffiths, *This US Church with Expansion in its DNA Wants to Open a Temple in China,* CNN (Hong Kong) (Jun. 11, 2020, https://www.cnn.com/2020/06/06/asia/mormon-church-latter-day-saints-china-intl-hnk/index.html.

1   in the U.S. as the day when Chinese communities host dragon boat races).  Because events,

2   educational or celebratory, are frequently discussed and transmitted through social

3   networks on WeChat, users rely on WeChat to learn about and celebrate religious and

4   cultural events with their community members online.

5        39.    In the United States, WeChat users organize around political causes through

6   WeChat.  For instance, many WeChat groups were used to organize, campaign, and raise

7   funds in the 2016 presidential election, and users in the United States have similarly used

8   WeChat to support candidates in the 2020 presidential election cycle.[20]  Plaintiff Peng is an

9   active member of several WeChat groups that discuss issues pertaining to the U.S. 2020

10  election and publish information on how to become a registered voter.  Asian-Americans

11  who organized to oppose a Democrat-backed ballot initiative in California, which would

12  have reversed the state's ban on race-conscious admissions, did so primarily through

13  WeChat.[21]  Organizations and causes wanting to reach Chinese-Americans use WeChat

14  groups to raise awareness about demonstrations, spread voter education materials, and

15  campaign for various candidates.

16       40.    WeChat is integral for the spread of current events and news within Chinese

17  communities.  WeChat users use the app to read about current events and the news,

18  including media from the United States, China, and around the world.  Plaintiffs Zhang

19  and Peng frequently use WeChat to read, share, and respond to news items that their

20  WeChat contacts post to their Moments.  Plaintiffs then comment, like, and share various

21  news items that they receive from their WeChat contacts.  Journalists who cover issues

22  pertaining to China and Chinese communities rely on WeChat to investigate issues and

23  communicate with people to interview.  Large Chinese-language newspapers in the U.S.,

24

---

25  [20] *See* Wanning Sun, *Why Trump's WeChat ban does not make sense—and could actually cost him Chinese votes*, THE CONVERSATION (Aug. 10, 2020),

26  https://theconversation.com/why-trumps-wechat-ban-does-not-make-sense-and-could-actually-cost-him-chinese-votes-144207.

27  [21] Alia Wong, *The App at the Heart of the Movement to End Affirmative Action*, THE ATLANTIC (Nov. 20, 2018),  https://www.theatlantic.com/education/archive/2018/11/asian-

28  americans-wechat-war-affirmative-action/576328/.

such as *Sing Tao Daily* and *World Journal*, publish news stories through their WeChat accounts.

41.     Government entities in areas with significant numbers of Chinese immigrants or Chinese Americans use WeChat as a method of communicating with their constituents.  For instance, the police department in Alhambra, California began using WeChat in 2015 to provide updates about local law enforcement efforts.[22]  The cities of Arcadia, San Gabriel, and Monterey Park in California have official WeChat accounts, which allow them to communicate with Chinese-speaking populations in their own language.[23]  Local governments have used WeChat messaging as a way to send emergency notifications and provide public notice for local governance proposals.

42.     During the COVID-19 pandemic, WeChat users have relied even more on the app to communicate and organize within their communities.  In February 2020, volunteers in the Bay Area used WeChat to organize and send medical supplies to Wuhan, China at the start of the worldwide pandemic.[24]  As travel restrictions emerged in the United States, WeChat users relied on the app in order to communicate with family members that they cannot visit in person in their home towns, in other areas of the United States, and around the world.  People in the United States use the app to visit with elderly

---

[22] Ashley Fan, *Some San Gabriel Valley Communities Could Be Seriously Affected by Trump's WeChat Ban,* SAN GABRIEL VALLEY TRIB. (Aug. 10, 2020), https://www.sgvtribune.com/2020/08/10/how-trumps-wechat-ban-could-disrupt-life-in-the-san-gabriel-valley/; Josie Huang, *Alhambra Police Use WeChat as Bridge to Chinese Immigrants,* KPCC (Jan. 20, 2015), https://www.scpr.org/blogs/multiamerican/2015/01/20/17819/alhambra-police-join-wechat-to-chinese/.

[23] Ashley Fan, *Some San Gabriel Valley Communities Could Be Seriously Affected by Trump's WeChat Ban,* SAN GABRIEL VALLEY TRIB. (Aug. 10, 2020), https://www.sgvtribune.com/2020/08/10/how-trumps-wechat-ban-could-disrupt-life-in-the-san-gabriel-valley/; Christopher Yee, *How this 32-year-old Interpreter Became Alhambra's Weibo, WeChat Guru,* SAN GABRIEL VALLEY TRIB. (Jul. 14, 2016, updated Aug. 30, 2017), https://www.sgvtribune.com/2016/07/14/how-this-32-year-old-interpreter-became-alhambras-weibo-wechat-guru/.

[24] Devin Katayama, Ericka Cruz Guevarra & Alan Montecillo, "'*That's Where I Grew Up': The Wuhan Natives Organizing Aid from the Bay,* KQED (Feb. 19, 2020), https://www.kqed.org/news/11802206/thats-where-i-grew-up-the-wuhan-natives-organizing-aid-from-the-bay.

loved ones in nursing homes and hospitals, as well as with COVID-19 patients, who cannot be visited in person due to pandemic-related restrictions.  Information about the pandemic, including regarding COVID-19 testing, prevention methods, and government responses to the pandemic, are broadly shared and discussed in the United States through WeChat groups and posts.  For instance, a local police department in California posted information about times and locations for drive-up and walk-up COVID-19 testing on its WeChat profile.  Similarly, doctors used WeChat extensively to spread information on the prevention of COVID-19 in the Chinese communities in Sacramento, California.[25] Organizations, such as Plaintiff Peng's MHACC, make vital mental health programs available to their communities through WeChat, in a world where people are struggling with the long-term isolation associated with the pandemic.

## PRESIDENT TRUMP'S EXECUTIVE ORDERS AND EMERGENCY DECLARATION

### A.     Executive Order 13873

43.     Prior to the issuance of the Executive Order challenged by this lawsuit, on May 15, 2019, President Trump issued Executive Order 13873, titled "Securing the Information and Communications Technology Services Supply Chain."  84 FR 22689 (May 15, 2019).  Executive Order 13873 declares a national emergency with respect to the threat posed by unidentified "vulnerabilities in information and communications technology and services[.]"

44.     According to this Order, these unidentified vulnerabilities constitute an "unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," due in part to the "unrestricted acquisition or use in the United States of information and communications technology or services designed, developed, manufactured, or supplied by persons owned by, controlled by, or subject to the

---

[25] Theodora Yu, *To Combat Coronavirus, These Doctors Are Helping Sacramento's Chinese Community on WeChat,* SAC. BEE (Feb. 27, 2020), https://www.sacbee.com/latest-news/article240662256.html.

jurisdiction of foreign adversaries[.]"  The threat, according to the May 15, 2019 Order, "exists both in the case of individual acquisitions or uses of such technology or services, and when acquisitions or uses of such technologies are considered as a class."  Executive Order 13873 does not identify specific countries or companies that pose a national security threat.

### B.    Executive Order 13943

45.    More than fourteen months later, on August 6, 2020, President Trump issued Executive Order 13943, titled "Addressing the Threat Posed by WeChat, and Taking Additional Steps to Address the National Emergency with Respect to the Information and Communications Technology and Services Supply Chain."  85 FR 48641 (Aug. 6, 2020).  Executive Order 13943 states that WeChat "automatically captures vast swaths of information from its users," and that the data collected by WeChat "threatens to allow the Chinese Communist Party access to Americans' personal and proprietary information."  According to this Order, the data collected by WeChat also "captures the personal and proprietary information of Chinese nationals visiting the United states, thereby allowing the Chinese Communist Party a mechanism for keeping tabs on Chinese citizens who may be enjoying the benefits of a free society for the first time in their lives."

46.    Executive Order 13943 does not declare a new national emergency.  Rather, it asserts that the "threat" posed by WeChat is "similar to" the threat posed by other Chinese-owned technology companies, such as TikTok, which the President took action against pursuant to his purported emergency powers under the International Emergency Economic Powers Act ("IEEPA").  *See* Executive Order 13942, 85 FR 48637 (Aug. 6, 2020).  The Executive Orders regulating WeChat and TikTok—both issued on the same day—rely on powers purportedly made available by the national emergency declared in Executive Order 13873, issued over a year earlier on May 15, 2019.

47.    Several sections of Executive Order 13943 purport to alter the legal rights and obligations of private parties.  Section 1(a) states that "any transaction that is related to WeChat by any person" will be "prohibited beginning 45 days after the date of this

order[.]"  Section 1(a) further prohibits, beginning 45 days from the date of the Order, transactions with Tencent, WeChat's parent company, and any subsidiaries of Tencent that are "identified by the Secretary of Commerce[.]"  Section 2(a) states that "[a]ny transaction … that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate the prohibition set forth in this order is prohibited." Section 2(b) further prohibits "[a]ny conspiracy formed to violate any of the prohibitions set forth in this order."  Section 3 purports to strip persons subject to the prohibitions in Sections 1(a) and 2 of any right to notice of the specific conduct being prohibited.

48.     Executive Order 13943, by its terms, may apply not only to WeChat, its parent company Tencent, but also to the millions of American individuals, groups, businesses, organizations, churches and government agencies, that use WeChat every day to communicate, learn, speak, read, publish, organize, advertise, run a business, and meet friends and family in their personal, professional and business lives.  While "transaction" is not defined in the Executive Order, it does make clear that it applies to "any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States."  *Id.* § 4(c).  And "entity" is further defined to mean a government or instrumentality of such government, partnership, association, trust, venture, corporation, group, subgroup, or other organization, including an international organization."  *Id.* § 4(b).

49.     Two other sections of Executive Order 13943 direct the Secretary of Commerce to take additional action:  Section 1(c) directs the Secretary, within 45 days of August 6, to "identify the transactions subject to subsection [1](a)."  Section 5 authorizes the Secretary to "take such actions, including adopting rules and regulations, and to employ all powers granted to me by IEEPA as may be necessary to implement this order." The Executive Order specifically mentions the popular use of WeChat to pay for purchases or to transfer money or to accept or make payments for their businesses from or to another user, as the basis to relieve the Secretary of Commerce of any responsibility to give "prior

1   notice" to them "of measures to be taken" because advance notice "would render those

2   measures ineffectual." *Id.* § 3.  It is unclear whether this section permits the Secretary to

3   freeze or seize monies belonging to WeChat users in the U.S. without notice.

4        50.     Under the Executive Order, WeChat users who engage in a prohibited

5   transaction may be prosecuted under the IEEPA, which provides for civil penalties of

6   $250,000 or twice the amount of transaction, and criminal penalties of up to $1 million

7   plus 20 years in prison.  *See* 50 U.S.C. § 1705(b)-(c).

8        **C.     The Secretary of Commerce Identifies the Transactions Prohibited by
         EO 13943**

9

10        51.     On September 18, 2020, the Commerce Department released its

11   "Identification of Prohibited Transactions to Implement Executive Order 13943" (the

12   "Identification").

13        52.     The Identification sets forth eleven defined terms and identifies seven

14   "transactions" to be prohibited pursuant to the Executive Order.

15        53.     For example, the Identification defines "person" as "an individual or entity."

16        54.     It also defines "Transaction" to mean "any acquisition, importation, transfer,

17   installation, dealing in, or use of any information and communications technology or

18   service."

19        55.     It then states that the transactions prohibited by EO 13943 include, *inter alia*:

20              a.     "Any provision of services to distribute or maintain the WeChat

21   mobile application, constituent code, or mobile application updates through an online

22   mobile application store, or any online marketplace where mobile users within the land or

23   maritime borders of the United States and its territories may download or update

24   applications for use on their mobile devices."

25              b.     "Any provision of internet hosting services enabling the functioning

26   or optimization of the WeChat mobile application, within the land and maritime borders of

27   the United States and its territories."

28              c.     "Any provision of content delivery services enabling the functioning

or optimization of the WeChat mobile application, within the land and maritime borders of the United States and its territories."

d.    "Any provision of content delivery services enabling the functioning or optimization of the WeChat mobile application, within the land and maritime borders of the United States and its territories."

e.    "Any other transaction that is related to WeChat by any person, or with respect to any property, subject to the jurisdiction of the United States, with Tencent Holdings Ltd., or any subsidiary of that entity, as may be identified at a future date under the authority delegated under Executive Order 13943."

56.    In short, the Identification sets forth a de facto ban of WeChat.

57.    On September 18, 2020, multiple Administration officials confirmed the purpose and intent of the Identification as being the eventual, complete prohibition of any use of WeChat in the United States.

58.    For example, on September 18, 2020, Secretary of Commerce Wilbur Ross stated on Fox Business News that "WeChat is essentially a funds transfer and payment processing mechanism. For all practical purposes, it will be shut down in the U.S., but only in the U.S. as of midnight on Monday by the Commerce Department rule."[26]

59.    Mr. Ross also statedt that "WeChat is essentially a funds transfer and payment processing mechanism."  This is incorrect, as several of WeChat's most important functions involve social networking and other communications, both in China and in the United States.

60.    The Secretary's mischaracterization demonstrates the government's lack of investigation and understanding of the software that it has now banned.

61.    In a televised interview on Friday, September 18, 2020, the Secretary of Commerce stated that it "is our *fear"* that WeChat is "taking data from the American public and sending it to China."  But the Secretary provided no examples of "data" being

---

[26] *Available at*: https://video.foxbusiness.com/v/6192199311001/#sp=show-clips

1  "sen[t] . . . to China" or how the mere transmission of "data" to China constitutes a

2  national security threat.[27]

3       62.    Also on September 18, 2020, a separate statement from an anonymous

4  "senior Commerce official" to a reporter for the technology publication CNET appears to

5  confirm that the Administration has no evidence whatsoever of private data being

6  harvested by WeChat in the United States. "Whether we have any evidence, domestically,

7  of these particular apps taking data is missing the point, according to this official, because

8  the Administration "know[s] what the Chinese government's intent is here in the United

9  States."[28]

10       63.    On the same day, another anonymous government official in the Commerce

11  Department stated to Reuters that "The U.S. Commerce Department['s] … order … will

12  bar people in the United States from downloading Chinese-owned messaging app WeChat

13  and video-sharing app TikTok starting on September 20."[29]

14       64.    According to the official, the Commerce Department order will "deplatform"

15  the two apps in the United States and bar Apple Inc's app store, Alphabet Inc's Google

16  Play and others from offering the apps on any platform "that can be reached from within

17  the United States."[30]

18       65.    Journalists have likewise understood the Identification as a complete ban on

19  the use of WeChat.On September 18, 2020, the New York Times reported under the

20  headlined: "Trump Administration to Ban TikTok and WeChat From U.S. App Stores."[31]

21

22  [27] *Available at*: https://video.foxbusiness.com/v/6192199311001/#sp=show-clips.

23  [28] September 18, 2020 CNET article titled "TickTok, WeChat downloads will be barred
from US starting Sunday," *Available at:*  https://www.cnet.com/news/tiktok-wechat-
24  downloads-will-be-barred-from-us-starting-sunday.

[29] September 18, 2020 Reuters article titled "Officials: Trump to Block US Downloads of
25  TikTok, WeChat on Sunday," *available at:*  https://www.reuters.com/article/us-usa-tiktok-
ban-exclusive-idUSKBN2691QO.

26  [30] September 18, 2020 CNET article titled "TickTok, WeChat downloads will be barred
from US starting Sunday," *Available at:*  https://www.cnet.com/news/tiktok-wechat-
27  downloads-will-be-barred-from-us-starting-sunday.

28  [31] September 18, 2020 New York Times article titled "Trump Administration to Ban

The Wall Street Journal reported: "U.S. Bans Chinese Apps TikTok and WeChat, Citing Security Concerns."  CNBC reported: "Trump to block downloads of TikTok, WeChat on Sunday," and noted that "WeChat is considered dead in the U.S."[32]  And the Associated Press reported: "US bans WeChat, TikTok from app stores, threatens shutdowns," saying that the move could "effectively wreck the operation of both … services for U.S. users."[33]

### ~~C.~~D.   Purported Authority for the Executive Order and Identification

~~51.~~66.  Both Executive Order 13873 and Executive Order 13943 cite the National Emergencies Act ("NEA") and the IEEPA as providing the legal authority for the President's actions.

### 1.   The National Emergencies Act

~~52.~~67.  The NEA, Pub. L. No. 94-412, 90 Stat. 1255, codified at 50 U.S.C. §§ 1601-1651, was enacted by Congress in 1976 to rein in, rather than expand, the power of the president.  The NEA was designed to "insure" that the president's "extraordinary" emergency powers would "be utilized only when emergencies actually exist, and then, only under safeguards of congressional review."  S. Rep. No. 94-1168, at 2 (1976).

~~53.~~68.  To this end, the NEA allows the President to utilize emergency powers authorized by Congress in other federal statutes only when there is a national emergency that has been declared in accordance with specific statutory requirements. 50 U.S.C. § 1621.

~~54.~~69.  Among other actions required by the NEA, the President must specify the statutory powers he intends to invoke upon issuing a national emergency.  50 U.S.C. § 1631.  He must also publish the declaration of a national emergency in the Federal

---

TikTok and WeChat From U.S. App Stores," *available at:* https://www.nytimes.com/2020/09/18/business/trump-tik-tok-wechat-ban.html.

[32] September 18, 2020 CNBC article titled "Trump to block downloads of TikTok, WeChat on Sunday," *available at:*  https://www.cnbc.com/2020/09/18/trump-to-block-us-downloads-of-tiktok-wechat-on-sunday-officials-tell-reuters.html.

[33] September 18, 2020 Associated Press article titled "US Bans WeChat, TikTok From App Stores, Threatens Shutdowns," *available at:* https://www.usnews.com/news/business/articles/2020-09-18/us-banning-use-of-wechat-tiktok-for-national-security.

Register and transmit it to Congress "immediately."  50 U.S.C. § 1621(a).  Every six

months thereafter, for as long as the emergency remains in effect, the President must

transmit to Congress "a report on the total expenditures incurred by the United States

Government during such six-month period which are directly attributable to the exercise of

powers and authorities conferred by such declaration."  50 U.S.C. § 1641(c).  Each House

of Congress, in turn, must meet at least once every six months following the declaration

"to consider a vote on a joint resolution to determine whether that emergency shall be

terminated."  50 U.S.C. § 1622(b).  Any national emergency declared by the President

automatically terminates after one year unless the President publishes in the Federal

Register and transmits to Congress a notice that the emergency "is to continue in effect

after such anniversary."  50 U.S.C. § 1622(d).

## 2.    The International Economic Emergency Powers Act

~~55.~~70. The IEEPA grants the President limited emergency powers when the

President has declared a national emergency, pursuant to the NEA, with regard to an

"unusual and extraordinary threat, which has its source in whole or in substantial part

outside the United States[.]"  50 U.S.C. § 1701(a).  "Any exercise" of the powers granted

by the IEEPA "to deal with any new threat shall be based on a new declaration of national

emergency which must be with respect to such threat."  50 U.S.C. § 1701(b).

~~56.~~71. The IEEPA does not grant the President unlimited powers during national

emergencies.  Rather, the statute includes specific limits on the emergency powers it

authorizes.  Section 1702(b) of the IEEPA states that "[t]he authority granted to the

President by [the IEEPA] does not include the authority to regulate or prohibit, directly or

indirectly … (1) any postal, telegraphic, telephonic, or other personal communication,

which does not involve a transfer of anything of value; (2) donations, by persons subject to

the jurisdiction of the United States, of articles, such as food, clothing, and medicine,

intended to be used to relieve human suffering …; (3) the importation from any country, or

the exportation to any country, whether commercial or otherwise, regardless of format or

medium of transmission, of any information or informational materials …; [or] (4) any

1   transactions ordinarily incident to travel to or from any country[.]"  50 U.S.C.

2   § 1702(b)(1)-(4).  The IEEPA also requires that the President "consult with Congress

3   before exercising any of the authorities granted by this chapter," and that the President

4   "immediately transmit to Congress a report" containing certain additional information

5   about the President's reasons for exercising his emergency powers under the IEEPA and

6   the specific actions he and his subordinates will take in exercising those powers.  50

7   U.S.C. § 1703(a)-(b).

8   ### ~~D.~~**E.**   **Immediately Preceding the Executive Order, President Trump Targeted Denigrating Statements Against China And Chinese People**

9

10   ~~57.~~72.  In the months before the Executive Order was issued, President Trump made

11   numerous anti-Chinese statements outside the context of national security that commenta-

12   tors have described as inciting racial animus against persons of Chinese descent for

13   political gain.  Many of these inflammatory statements have been made in the context of

14   the President blaming the coronavirus pandemic on China.  Instead of using the official

15   public health terms for the virus, such as the "novel coronavirus" and "COVID-19,"

16   President Trump has repeatedly and intentionally referred to the virus causing the current

17   pandemic as the "China virus," "the Wuhan virus," "China Flu," and "Kung-Flu."[34]

18

19   [34] *See, e.g.*, Remarks by President Trump in Press Briefing (July 23, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-press-briefing-072320/ ("We've had a tremendous week uniting the country in our fight against the **China virus**"); Donald J. Trump (@realDonaldTrump), TWITTER (Aug. 2, 2020), https://twitter.com/realDonaldTrump/status/1289887533250351110 ("Big **China Virus** breakouts all over the World, including nations which were thought to have done a great job. The Fake News doesn't report this. USA will be stronger than ever before, and soon!"); Donald J. Trump (@realDonaldTrump), TWITTER (Aug. 11, 2020), https://twitter.com/realDonaldTrump/status/1293163704188645385 ("More Testing, which is a good thing (we have the most in the world), equals more Cases, which is Fake News Gold. They use Cases to demean the incredible job being done by the great men & women of the U.S. fighting the **China Plague**!"); Donald J. Trump (@realDonaldTrump), TWITTER (July 26, 2020), https://twitter.com/realDonaldTrump/status/1287473812733341696 ("Because of my strong focus on the **China Virus**, including scheduled meetings on Vaccines, our economy and much else, I won't be able to be in New York to throw out the opening pitch for the @Yankees on August 15th. We will make it later in the season!"); Donald J. Trump (@realDonaldTrump), TWITTER (Mar. 18, 2020), https://twitter.com/realDonaldTrump/status/1240243188708839424 ("I always treated the

58.73. Facing criticism that these word choices were racist and unfairly subjected Chinese people—including Chinese Americans—to anger and hatred, the White House spokesperson has defended Trump's dangerous and incendiary language.[35]  The Anti-Defamation League has reported an increasing number of hate crimes, including racial slurs, spitting on, and physical assaults against Asian-Americans in the United States following the President's use of these terms, and warned that "Statements by public officials referring to COVID-19 as the 'Chinese virus,' 'Kung Flu' or 'Wuhan Flu' may be exacerbating the scapegoating and targeting of the [Asian American and Pacific Islander] community."[36]  The incitement following the President's statements reminded many in the Asian American community of the hatred and racial violence focused on persons of Asian descent after the success of the Japanese auto industry was blamed for major job losses in the American Rust Belt.[37]

59.74. In addition to asserting that the United States' incidence of COVID-19 is China's fault, the President has exploited anti-Chinese sentiment as a rallying cry for his electoral campaign.  For example, on August 11, 2020, President Trump stated that "[i]f I don't win the election, China will own the United States.  You're going to have to learn to

---

**Chinese Virus** very seriously, and have done a very good job from the beginning, including my very early decision to close the "borders" from China - against the wishes of almost all. Many lives were saved. The Fake News new narrative is disgraceful & false!"); Li Zhou, *Trump's Racist References to the Coronavirus Are His Latest Effort to Stoke Xenophobia,* VOX (June 23, 2020), https://www.vox.com/2020/6/23/21300332/trump-coronavirus-racism-asian-americans; Colby Itkowitz, *Trump Again Uses Racially Insensitive Term to Describe Coronavirus,* WASH. POST (Jun. 23, 2020), https://www.washingtonpost.com/politics/trump-again-uses-kung-flu-to-describe-coronavirus/2020/06/23/0ab5a8d8-b5a9-11ea-aca5-ebb63d27e1ff_story.html.

[35] Andrew Restuccia, *White House Defends Trump Comments on 'Kung Flu,' Coronavirus Testing*, WALL ST. J. (Jun. 22, 2020), https://www.wsj.com/articles/white-house-defends-trump-comments-on-kung-flu-coronavirus-testing-11592867688.

[36] *Reports of Anti-Asian Assaults, Harassment and Hate Crimes Rise as Coronavirus Spreads,* ADL BLOG (Jun. 18, 2020), https://www.adl.org/blog/reports-of-anti-asian-assaults-harassment-and-hate-crimes-rise-as-coronavirus-spreads.

[37] Ali Rogin & Amna Nawaz, *'We Have Been Through this Before.' Why Anti-Asian Hate Crimes Are Rising Amid Coronavirus,* PBS NEWS HOUR (Jun. 25, 2020), https://www.pbs.org/newshour/nation/we-have-been-through-this-before-why-anti-asian-hate-crimes-are-rising-amid-coronavirus.

1  speak Chinese."[38]  President Trump has on numerous occasions mocked the accent of

2  Chinese and Asian-Americans, including those of prominent Asian leaders.[39]

3  **THE EXECUTIVE ORDER CAUSED MASS CONFUSION AND HAS ALREADY**
   **HARMED PLAINTIFFS**

4

5  ~~60.~~75.  American law firms have been unable to advise their clients as to the scope

6  of "transactions" that are banned under Executive Order 13943.  Multiple prominent law

7  firms in the United States have effectively conceded that they cannot provide guidance

8  about the meaning of the Order, and have speculated that all uses of WeChat could be

9  prohibited.  One law firm recently informed its clients that the "extraordinary breadth and

10 ambiguity" of the Executive Order has "left US companies and many others looking to the

11 Trump Administration for additional clarity[.]"[40]  Another firm speculated that WeChat

12 "could be pulled out of the app stores and off of American phones ….  Companies could

13 be banned from interacting with the extensive interactive payment network used by

14 WeChat."[41]

15 ~~61.~~76.  Each plaintiff learned of the Executive Order at or near the time it was issued

16 and has suffered harm as a result of the Executive Order's sweeping prohibition on "any

17

18 [38] Kevin Liptak, *Trump Says Americans Will Have to Learn Chinese if Biden Wins, but
   Offers Little Condemnation of Beijing,* CNN (Aug. 11, 2020),

19 https://www.cnn.com/2020/08/11/politics/trump-china-biden-learn-chinese/index.html

20 [39] *See, e.g.*, Laura Ma, *'We want deal!': Trump fakes Asian accent to mock Chinese and
   Japanese businessmen at US rally*, South China Morning Post (Aug. 26, 2015),

21 https://www.scmp.com/news/world/article/1852785/we-want-deal-trump-fakes-asian-
   accent-mock-chinese-japanese-businessmen; Jennifer Gould and Emily Smith, *Trump
   cracks jokes about Equinox scandal, kamikaze pilots at Hamptons fundraiser*, N.Y. POST

22 (Aug. 9, 2019), https://nypost.com/2019/08/09/trump-cracks-jokes-about-rent-control-
   kamikaze-pilots-at-hamptons-fundraiser/ (reporting on Trump "mimicking Japanese and

23 Korean accents").

24 [40] Ambassador Charlene Barshefsky, David S. Cohen, Ronald I. Meltzer, David M.
   Horn & Semira Nikou, *New Executive Orders Target Chinese Apps,* WILMER HALE,

25 (Aug. 10, 2020), https://www.wilmerhale.com/en/insights/client-alerts/20200810-new-
   executive-orders-target-chinese-apps.

26 [41] David A. Kaufman, John Sandweg, David K. Cheng & Rachel S. Winkler,
   *Administration's Attempt to Delete TikTok and WeChat: Latest Trade Tiff or New Battle,*

27 NIXON PEABODY (Aug. 7, 2020),

28 https://www.nixonpeabody.com/en/ideas/articles/2020/08/07/administrations-attempt-to-
   delete-tiktok-and-wechat.

transaction that is related to WeChat by any person, or with respect to any property."  85
FR 48641, at § 1(a).  Plaintiff Duan, for example, experiences fear and worry on a daily
basis that Chihuo, Inc.—the business she founded and for which she continues to serve as
CEO—will not survive if it cannot provide services to customers through WeChat.
Plaintiff Peng fears that the non-profit organization she founded will not be able to
continue providing services to Chinese speakers in the United States, and that she
personally will be unable to maintain her social ties and communicate with other members
of the Chinese community in the United States.  Plaintiff Zhang worries that she will be
unable to maintain social ties and communicate with other Chinese-speaking people—both
in the United States and in China.  She believes that the charity she founded—Hita
Education Foundation—could not have been founded without WeChat and may not be able
to survive without being able to connect with Chinese-speaking people through the app.
Each individual plaintiff fears losing connection with close friends and family members.

62.77.  All plaintiffs, moreover, have already been forced by the Executive Order to
expend time and resources preserving their contacts and memories on WeChat and/or
searching—without success—for an alternative platform that could sustain their
businesses, charities, and/or social and family ties.  Plaintiff Peng has received inquiries
from Chinese families through MHACC, her mental health WeChat group, about where to
go if WeChat is banned, but has been unable find a comparable substitute to replace
WeChat.  Plaintiff Chihuo has spent money attempting to redirect its business activities
that currently depend on WeChat by establishing alternative social media channels on
YouTube, Instagram and Facebook.  These efforts to find a substitute for WeChat have not
been and are unlikely to be successful.  This is because alternative apps often do not offer a
Chinese user interface.  More importantly, alternative apps also do not provide access to
WeChat's vast network of Chinese-speaking users.  Without mincing words, WeChat's
enormous network effect is ***irreplaceable***, and any other platform would not provide the
community that WeChat does.

# **FIRST CLAIM FOR RELIEF**

## **(First Amendment Freedom of Speech)**

63.78. Plaintiffs reallege and hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

64.79. The First Amendment guarantees freedoms concerning religion, expression, the press, assembly, and petitioning the government.  Plaintiffs' use of WeChat are exercises of all these freedoms.

65.80. WeChat is a mobile application that is broadly used by members of the Chinese diaspora throughout the world, serving as a virtual public square where people within the Chinese and Chinese-speaking communities can connect based on shared interests.  Plaintiffs and other WeChat users use the app to express themselves and communicate by text, voice, and video messaging; attend religious services and cultural events; organize political groups and causes; read and share information in the media, among other protected First Amendment activities.  These actions can reasonably be understood to be included as "any transaction that is related to WeChat by any person, or with respect to any property," as provided in the Executive Order.

66.81. Banning the use of WeChat in the United States has the effect of foreclosing all meaningful access to social media for users, such as Plaintiffs, who wish to communicate and interact with members of the Chinese and Chinese-speaking communities.

67.82. The Executive Order discriminates against the ideas and viewpoints of WeChat users.  Under the Executive Order, only content on WeChat is prohibited; the content on other comparable mobile applications is not regulated or prohibited, despite also capturing personal and proprietary information from its users.  Therefore, the Executive Order targets speech by WeChat users, the majority of whom are members of the Chinese and Chinese-speaking communities, and intends to silence viewpoints within these communities.

68.83. The Executive Order is overly expansive and does not justify the supposed

27
AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

risks that are presented by permitting WeChat to operate in the United States.  There are less restrictive ways to regulate the collection of personal and proprietary information on the WeChat app and address potential national security concerns.  Defendants cannot proffer a justifiable reason for discriminating against the content of WeChat users, who express viewpoints within the Chinese and Chinese-speaking communities.

~~69.~~84.  The Executive Order is substantially overbroad in that it renders people who conduct "any transaction that is related to WeChat" subject to incarceration and monetary penalties, even though "any transaction" includes a wide range of protected expressive and associative rights under the First Amendment.

~~70.~~85.  Plaintiff and others similarly situated have been and will continue to be chilled and burdened in the exercise of their First Amendment rights because of the threat of penalties, including incarceration and other treatment, under the Executive Order that arises in connection with "any transaction that is related to WeChat."

~~71.~~86.  Accordingly, the Executive Order violates Plaintiffs' rights as guaranteed by the First Amendment.  Defendants' violations inflict ongoing harm upon Plaintiffs.

## SECOND CLAIM FOR RELIEF

### (Fifth Amendment – Equal Protection)

~~72.~~87.  Plaintiffs reallege and hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

~~73.~~88.  The Due Process Clause of the Fifth Amendment prohibits the Federal Government from denying equal protection of the laws, including on the basis of race, ethnicity, nationality, national origin, and alienage.

~~74.~~89.  WeChat is widely used and depended on by the Chinese community in the United States to communicate with friends, family, customers, and other persons of Chinese or Chinese American ancestry, including Chinese-language speakers.

~~75.~~90.  Plaintiffs Peng, Duan, Zhang, and Bao are members of the Chinese community in the United States.  Plaintiff Brent Coulter uses WeChat to communicate with people of Chinese and/or Chinese-American ancestry in the United States and abroad.

1  Plaintiffs USWUA and Chihuo are organizations or businesses whose members or

2  customers primarily consist of people of Chinese and/or Chinese American ancestry in the

3  United States, who use WeChat to communicate with others similar to them both in the

4  United States and abroad.

5  ~~76.~~91. By prohibiting the use of WeChat but not other apps that are used primarily

6  by people who are not of Chinese or Chinese-American ancestry, Executive Order 13943

7  singles out people of Chinese and Chinese-American ancestry and subjects them and

8  people who communicate with them to disparate treatment on the basis of race, ethnicity,

9  nationality, national origin, and alienage.

10  ~~77.~~92. This disparate treatment is motivated by Defendants' animus towards people

11  of Chinese and/or Chinese American ancestry, and has the purpose of discriminating

12  against people of Chinese and/or Chinese-American ancestry.

13  ~~78.~~93. Defendants' issuance of Executive Order 13943 therefore violates Plaintiffs'

14  rights to equal protection guaranteed by the Fifth Amendment to the United States

15  Constitution.  Defendants' violations inflict ongoing harm upon Plaintiffs.

16  **THIRD CLAIM FOR RELIEF**

17  **(Fifth Amendments – Due Process)**

18  ~~79.~~94. Plaintiffs reallege and hereby incorporate by reference the allegations

19  contained in the preceding paragraphs of this Complaint.

20  ~~80.~~95. Sections 1(a) and 2 of Executive Order 13943 alter the legal rights and

21  obligations of private parties, including Plaintiffs, independent of any action by the

22  Secretary of Commerce.

23  ~~81.~~96. These sections include only a conclusory description of prohibited

24  "transactions related to WeChat," which provides no notice to WeChat users or anyone

25  else of the specific conduct that is prohibited.

26  ~~82.~~97. In spite of the Executive Order's vagueness, violations of Sections 1(a) and 2

27  are punishable by incarceration and monetary penalties.  50 U.S.C. § 1705(b)-(c).

28  ~~83.~~98. Plaintiffs, who use WeChat to communicate and share information with

friends, family, customers, and other persons both in the United States and abroad, do not know which of their activities that involve WeChat are prohibited by the Executive Order. Because of this uncertainty, they are justifiably fearful of using WeChat in any way and for any purpose.

84.99. Sections 1(a) and 2 of Executive Order 13943 provide inadequate notice of the conduct they purport to penalize and are void for vagueness under the Fifth Amendment to the U.S. Constitution.

**FOURTH CLAIM FOR RELIEF**

**(*Ultra Vires* (50 U.S.C. § 1702(b)))**

85.100.    Plaintiffs reallege and hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

86.101.    The IEEPA includes specific limits on Defendants' authority to prohibit transactions related to WeChat.  Section 1702(b) of the IEEPA states in relevant part that "[t]he authority granted to the President by [the IEEPA] does not include the authority to regulate or prohibit, directly or indirectly … (1) any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value; (2) donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering…[or] (3) the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials[.]"  50 U.S.C. § 1702(b)(1)-(3).

87.102.    Neither the President nor any other federal official can take an action that exceeds the scope of their constitutional and/or statutory authority.  In Executive Order 13943, however, the President has nonetheless "prohibited" Plaintiffs from using WeChat in any manner, in direct contravention of the specific limits on Presidential authority contained in 50 U.S.C. § 1702(b).

103.    The Secretary's Identification likewise seeks to effectuate an outright ban of the WeChat platform—directly curtailing "communications" in the manner explicitly

1  prohibited by the IEEPA.

2  ~~88.~~104.      Plaintiffs use WeChat for "personal communication[s]" that "do[] not

3  involve a transfer of anything of value," within the meaning of 50 U.S.C. § 1702(b)(1).

4  ~~89.~~105.      Plaintiffs use WeChat to coordinate and arrange for donations of

5  "articles … intended to be used to relieve human suffering," within the meaning of 50

6  U.S.C. § 1702(b)(2).

7  ~~90.~~106.      Plaintiffs use WeChat to import and/or export "information or

8  information materials," within the meaning of 50 U.S.C. § 1702(b)(3).

9  ~~91.~~107.      Defendants are acting *ultra vires* in prohibiting "personal

10  communication[s]," that "do[] not involve a transfer of anything of value," as well as the

11  coordination of donations of "articles … intended to be used to relieve human suffering"

12  and the importation and/or exportation of "information or information materials."

### **FIFTH CLAIM FOR RELIEF**

### (*Ultra Vires* **(50 U.S.C. §§ 1621-22, 1641, 1703)**)

15  ~~92.~~108.      Plaintiffs reallege and hereby incorporate by reference the allegations

16  contained in the preceding paragraphs of this Complaint.

17  ~~93.~~109.      On information and belief, Defendants did not immediately transmit

18  to Congress the President's declaration of a national emergency contained in Executive

19  Order 13873, as required by 50 U.S.C. § 1621(a).

20  ~~94.~~110.      On information and belief, neither house of Congress has met, at the

21  required six month intervals or otherwise, to consider a vote on a joint resolution to

22  determine whether that emergency shall be terminated, as required by 50 U.S.C. § 1622(b).

23  ~~95.~~111.      On information and belief, the President has not transmitted to

24  Congress any report on the total expenditures incurred by the United States government

25  which are directly attributable to the exercise of powers and authorities conferred by the

26  declaration of a national emergency in Executive Order 13873, as required by 50 U.S.C.

27  § 1641(c).

28  ~~96.~~112.      On information and belief, the President did not consult with

Congress, on the threat posed by WeChat or otherwise, before issuing Executive Order 13943, as required by 50 U.S.C. § 1703(a).

97.113.     On information and belief, the President did not immediately transmit to the Congress a report specifying, among other information required in 50 U.S.C. § 1703(b), "the circumstances which necessitate such exercise of authority" and "the actions to be taken in the exercise of those authorities[.]"  Although the President did transmit a letter to the Speaker of the House of Representatives and the President of the Senate on the same day he issued Executive Order 13943, this letter merely repeats—often verbatim—the vague and conclusory language contained in the Executive Order.  This limited information does not provide the Congress with sufficient information to exercise the kind of ongoing oversight of the President required by both the IEEPA and the NEA.

98.114.     The President has acted *ultra vires* by exercising emergency powers purportedly authorized by the IEEPA without consulting with and reporting to Congress in the manner prescribed by 50 U.S.C. §§ 1621-22, 1641(c), and 1703.

## SIXTH CLAIM FOR RELIEF

### (*Ultra Vires* (50 U.S.C. § 1701))

99.115.     Plaintiffs reallege and hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

100.116.     50 U.S.C. § 1701 conditions the President's exercise of the emergency powers listed in Section 1702(a) on the President's declaration of a national emergency with respect to an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States[.]"  Section 1701 further requires that "[a]ny exercise" of the powers granted in Section 1702(a) "to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat."

101.117.     Executive Order 13943 cites the President's declaration of a national emergency in Executive Order 13873 as the basis for his exercise of emergency powers purportedly granted by the IEEPA.  Executive Order 13873, which was issued more than

14 months before Executive Order 13943, does not mention WeChat and does not identify the app as a potential threat to the national security of the United States.

102.118.    The threat purportedly posed by WeChat constitutes a "new threat" within the meaning of 50 U.S.C. § 1701(b), and thus requires a new declaration of national emergency before the President exercises any presidential powers authorized by the IEEPA.  The President has not issued such a new declaration of a national emergency with respect to the threat posed by WeChat.

103.119.    The President has acted *ultra vires* by exercising emergency powers purportedly authorized by IEEPA that depend on the President having declared a national emergency with respect to the threat posed by WeChat, in direct contravention of 50 U.S.C. § 1701(b).

## SEVENTH CLAIM FOR RELIEF

### (Religious Freedom Restoration Act – 42 USC § 2000bb(1)(a))

104.120.    Plaintiffs reallege and hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

105.121.    In 1993, Congress enacted the Religious Freedom Restoration Act ("RFRA), Pub. L. No. 103-31 (1993) (codified at 42 U.S.C. §§ 2000bb–2000bb-4).

106.122.    RFRA prohibits the government from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability" unless the government can demonstrate that the application of the burden to the person is: (1) in furtherance of a compelling governmental interest; and (2) the least restrictive means of furthering that compelling governmental interest.  42 U.S.C. § 2000bb-1.

107.123.    WeChat users in the United States use WeChat to participate in the conduct of religious worship and other practices in accordance with the tenets and practices of various religions.  WeChat users in the United States use WeChat to organize and participate in religious activities with other members who similarly use WeChat regularly in order to worship and/or practice their religion.

108.124.    The Executive Order will result in substantial burdens upon the

practice of religion of WeChat users in the United States by forcing them to abstain from participating in their practice of religion with other WeChat users or risk the threat of civil or criminal sanctions and violates RFRA.

## EIGHTH CLAIM FOR RELIEF

### (Violation of the Administrative Procedure Act)

125.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

126.   The Secretary of Commerce published a document in the Federal Register on September 18, 2020 that identifies certain transactions related to WeChat" that are prohibited by EO 13943.   The Secretary's action constitutes "final agency action" within the meaning of 5 U.S.C. § 704.

127.   . Under the Secretary's definitions, the Executive Order prohibits, *inter alia*, "Any provision of services to distribute or maintain the WeChat mobile application, constituent code, or mobile application updates"; "Any provision of internet hosting services enabling the functioning or hosting of the WeChat mobile application"; and "Any utilization of the WeChat mobile application's constituent code. functions, or services in the functioning of software or services developed and/or accessible within . . . the United States and its territories."

128.   On September 18, 2020, the Secretary admitted , on national television, that his definitions of EO 13943 will "for all practical purposes" result in WeChat being "shut down in the U.S." as soon as the President's prohibition takes effect on September 20.

129.   The Secretary's definitions of the transactions prohibited by EO 13943 directly contravene Section 1702(b) by directly or indirectly regulating or prohibiting "personal communication[s]," that "do[] not involve a transfer of anything of value," as well as the coordination of donations of "articles … intended to be used to relieve human suffering" and the importation and/or exportation of "information or information materials."

130.   The definitions are therefore arbitrary, capricious, an abuse of discretion, or

1   otherwise not in accordance with law, and in excess of statutory jurisdiction, authority, or

2   limitations, or short of statutory right, within the meaning of 5 U.S.C. § 706(2).

3       131.   Furthermore, the Identification was promulgated without notice and

4   comment rulemaking as required by the APA. 5 U.S.C. § 553(b), (c).

5       132.   The Identification is therefore in direct contravention of the APA and must

6   be vacated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray for relief and judgment as follows:

1.    Declaring that Executive Order 13943 is unconstitutional under the First Amendment;

2.    Declaring that Executive Order 13943 is unconstitutional under the Fifth Amendment;

3.    Declaring that Executive Order 13943 doesand the Identification do not comply with the limitations on presidential power in the National Emergency Act and the International Economic Emergency Powers Act, and is thus *ultra vires*;

4.    Declaring that Executive Order 13943 violates the Religious Freedom Restoration Act;

5.    Declaring that the Secretary's September 18, 2020 Identification of Prohibited Transactions violated the APA;

5.6.   Preliminarily and permanently enjoining Defendants from enforcing the Executive Order and the Identification to prohibit the use of WeChat in the United States by individual users, businesses and groups;

6.7.   Preliminarily and permanently staying the implementation date of any of the penalty provisions of Executive Order until a reasonable time after the Secretary of Commerce promulgates definitions of "transactions" under the Executive Orderand the Identification; and

7.8.   Granting such other and further relief as this Court may deem just and proper, including an award to Plaintiffs of the costs of this suit and reasonable attorneys'

1  fees and litigation expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

2  DATED:   September 18, August 21, 2020

Respectfully submitted,

3  ROSEN BIEN GALVAN & GRUNFELD LLP

4  By:  */s/ Michael W. Bien*

5  Michael W. Bien

6  Attorneys for Plaintiffs U.S. WECHAT USERS
7  ALLIANCE, CHIHUO INC., BRENT COULTER,
   FANGYI DUAN, JINNENG BAO, ELAINE
8  PENG, and XIAO ZHANG

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28