JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
AUGUST FLENTJE
Special Counsel to the Acting
Assistant Attorney General
ALEXANDER K. HAAS
Branch Director
DIANE KELLEHER
Assistant Branch Director
SERENA M. ORLOFF
MICHAEL DREZNER
STUART J. ROBINSON
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
Ben Franklin Station, P.O. Box No. 883
Washington, DC 20044
Phone: (202) 305-0167
Fax: (202) 616-8470
E-mail: serena.m.orloff@usdoj.gov
*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| U.S. WECHAT USERS ALLIANCE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States, and WILBUR ROSS, Secretary of Commerce,<br><br>Defendants. | Case No. 3:20-cv-05910-LB<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:   Sept. 19, 2020<br>Time:  1:30 p.m.<br>Place:  San Francisco, CA<br>Judge: Hon. Laurel Beeler |

Defendants respectfully oppose Plaintiffs' Renewed Motion for Preliminary Injunction ("Renewed Mot."). As set forth below, and in more detail in Defendants' opposition to their original motion for a preliminary injunction, Plaintiffs fail to make out any of the three elements necessary for the Court to take the extraordinary step of enjoining the President's exercise of his national security powers against a foreign adversary whose hostile acts are undisputed, and whose aspirations for global dominance are undisputed, where Congress—the coequal political branch with authority in this sensitive

1

area in addition to the President's—has taken no steps indicating any disagreement with the President  Nor do their claims of injury suffice to show that they will suffer the sort of existential harm that is necessary to justify the extraordinary relief they seek.  And they cannot make out their burden regarding the public interest and balance of the equities in light of the sensitive and pressing national security interests at stake.

## LEGAL STANDARD

Requests for temporary restraining orders and preliminary injunctions are governed by the same standard. *See Mata v. U.S. Bank Nat'l Ass'n as Tr. for C-Bass Mortg. Loan Asset-Backed Certificates, Series 2006-CB1*, No. 11CV0071 (AJB), 2011 WL 13356103, at *5 (S.D. Cal. May 23, 2011). A preliminary injunction is "an extraordinary and drastic remedy" that should not be granted "unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). A plaintiff must show that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). "Likelihood of success on the merits is the most important factor" and if a plaintiff fails to meet this "threshold inquiry," the court "need not consider the other factors." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018). A plaintiff must also show more than a mere "possibility" of irreparable harm, but instead must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22–23. Alternatively, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

This Court correctly recognized that Plaintiffs have shifted somewhat in their theory of the case. Whereas initially Plaintiffs contended that they had to, and could show, a likelihood of success on the merits, in their recent reply brief they contended for the first time that they need only establish "serious questions" going to the merits. Now in their renewed motion for a preliminary injunction, Plaintiffs rely almost exclusively on this formulation. Plaintiffs raised this for the first time in this supplemental filing,

and the Government is prejudiced with its response due in three hours. This standard is flatly wrong and inconsistent with Supreme Court precedent. *Munaf v. Geren*, 533 U.S. 674, 690-91 (2008). Even if this standard applied, Plaintiffs must do more than raise general "questions" over their First Amendment claim; they must at the very least demonstrate a "reasonable probability" of success on the merits. *See S.E.C. v. Banc de Binary Ltd.*, 964 F. Supp. 2d 1229, 1233 (D. Nev. 2013) (evaluating the "serious questions" formulation and holding that "[i]f success on the merits is merely possible, but not at least reasonably probable, no set of circumstances with respect to the other prongs will justify preliminary relief").

Even if Plaintiffs' alternative "serious question" standard were erroneously applied, Plaintiffs must show not only that the balance of equities weighs in their favor, but that it weighs "sharply" in their favor. *See Klamath-Siskiyou Wildlands Ctr. v. Grantham*, 785 F. App'x 467, 468–69 (9th Cir. 2019). Where the Government is the Defendant, the balance of equities and the public interest factors of a preliminary injunction "merge." *See Habibi v. Barr*, 445 F. Supp. 3d 990, 995 (S.D. Cal. 2020). Thus, to obtain a preliminary injunction under this analysis, Plaintiffs must show that the balance of equities and the public interest tip sharply in their favor. They cannot meet this burden.

As described further below, the national security and foreign policy interests at issue here are readily apparent and compelling. Plaintiffs do not dispute that Tencent, and by extension WeChat, is intertwined with the Chinese Communist Party, subject to draconian Chinese laws which require that companies turn over data to officials with minimal judicial recourse (if any), and more critically, is well-recognized as working to advance the Chinese Government's aims over propaganda, censorship, surveillance and misinformation both inside and outside China. Nor do Plaintiffs address in any way the tremendous threat posed by such an entity when in possession of the personal and proprietary information of millions of Americans. Yet Plaintiffs take the extraordinary position that "there is no *bona fide* national security concern regarding WeChat." Renewed Mot. at 3. The Supreme Court could not be clearer about how to resolve this disagreement: where litigants contend that an executive action is "overbroad and does little to serve national security interests. . . . [W]e cannot substitute our own assessment for the Executive's predictive judgments on such matters, all of which 'are delicate, complex, and involve large elements of prophecy.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2421 (2018).

Where, as here, foreign policy and national security concerns are supported by public reporting, private policy reports, and common sense, such considerations tip the balance of the equities and public interest in the Government's favor. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008) (holding that interests in national security meant that "where the public interest lies does not strike us as a close question"). If this were not enough, significant concerns over the separation of powers would be raised by an injunction which effectively restrained the Executive in its ability to address these foreign policy goals and national security goals. The potential to tread on authority uniquely entrusted to the Executive also tips the balance of the equities in the Government's favor. *See Milena Ship Mgmt. Co. v. Newcomb*, 804 F. Supp. 846, 855 (E.D. La. 1992) (denying preliminary injunction and finding public interest weighed in Government's favor "because of the real risk that early (and consequently, somewhat uninformed) interference could limit the President's diplomatic options").

These considerations establish that the balance of equities does not tip "sharply" in Plaintiff's favor. *See Zafarmand v. Pompeo*, No. 20-CV-00803-MMC, 2020 WL 4702322, at *13 (N.D. Cal. Aug. 13, 2020) (given the "significant national security issues at stake . . . [the] Court is not convinced that . . . that the balance of equities tips in plaintiffs' favor, let alone shown the 'balance of hardships tips sharply in [their] favor.'"). Plaintiffs cannot make such a showing, rendering the "serious questions" standard inapplicable to this motion, and as noted above, Plaintiffs cannot show a clear likelihood of success on the merits.

## ARGUMENT

**I.  Plaintiffs Fail to Demonstrate Serious Questions, Much Less a Likelihood of Success on their Theories.**

**A.  Plaintiffs Fail to Meet their Burden on their First Amendment Theory**

Plaintiffs have suggested in prior briefing that the Government bears the burden on this motion. That is incorrect. "When the Government seeks to restrict speech *based on its content*, the usual presumption of constitutionality afforded [to its actions] is reversed." Playboy, 529 U.S. at 816–17, 120 S.Ct. 1878. But here, there are no content-based restrictions. There is no indication that the decision seeks to prevent WeChat users "from communicating a particular set of messages." *Berger v. City of*

4

*Seattle*, 569 F. 3d 1029, 1051 (9th Cir. 2009).  Nor is the decision content-based because the Secretary has treated TikTok differently than WeChat.  That difference—which is largely just an extension of time—flows from the fact that TikTok is currently subject to an order requiring divestment; WeChat is not.  And in any event, regulations that affect certain speakers disproportionately "demand strict scrutiny [only] when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994).  That is not the case here.  As explained in the Government's first opposition, neither the Executive Order nor the Secretary's decision target protected expression at all; they target transactions with Tencent relating to WeChat based on well-documented national security threats.  While those actions incidentally impact speech that would otherwise occur on WeChat, any such effects are neutral with respect to content, and will affect, at most, only the time, place, or manner of speech.  Plaintiffs are free to speak on alternative platforms that do not pose a national security threat.  Indeed, Plaintiffs have conceded the impacts of the decision apply "*irrespective of content or the speaker's intent*[.]"  First Mot. at 2 (emphasis added).

Accordingly, the decision survives constitutional scrutiny so long as it (1) advances important governmental interests unrelated to the suppression of free speech, (2) does not burden substantially more speech than necessary to further those interests," and (3) leaves open adequate alternative opportunities for speech or expression.  *See Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1068 (9th Cir. 2020) (citation omitted); *Lone Star Sec. & Video*, 827 F.3d at 1202.  The decision need not satisfy strict scrutiny or "be the least restrictive or least intrusive means" of promoting a governmental interest; it must simply "promote[] a substantial government interest that would be achieved less effectively" in its absence.  *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989).[1]

### 2. The Government's Interests Are of the Highest Importance.

The national security interests underlying the decision are of the highest importance.  Based on years of intelligence and investigation, Executive Branch officials have concluded that China poses

---

[1] By contrast, a restriction that distinguishes based on the content of speech is subject to the demanding standard of strict scrutiny.  *See Reed v. Town of Gilbert*, 576 U.S. 155, 166 (2015).

5

poses one of the "greatest cyber threats to the United States." *See* Opp'n at 5, ECF No. 22 (and citation therein). That threat flows not just from China's overt espionage activities, but also from China's strategic penetration of informational networks and markets beyond China in order to misappropriate sensitive information, aggregate personally identifiable information, develop sophisticated artificial intelligence, repress dissent, surveil individuals, and sow misinformation that benefits the Chinese government. The threat has grown exponentially as the public increasingly relies on mobile technologies for day-to-day interactions, creating "billions of potentially unsecured" points in our Internet infrastructure and "an incalculably larger exploitation space" for our adversaries. Opp'n at 7 (and citations therein). In 2018, the Department of Defense described these threats as the "principle priorities" for the Department. *Id.* The same year, Congress concurred in the NDAA and directed the Executive Branch to develop a plan for addressing the threat. *See* Opp. at 8; NDAA §§ 885, 1260, 1261. With this backdrop, the President issued the ICTS Executive Order last year, and took further action this year against WeChat and Tencent based on Tencent's well-documented ties to the Chinese Communist Part, surveillance activities, and the vast amount of data it aggregates. *See* Opp'n at 10 (describing Tencent's "open[] and ambitious[]" strategy "to become the fundamental platform for the Chinese internet: a platform and  China's strategy of "informatisation" and coercing private companies to build products around the needs of the state). The President has taken multiple steps to address this threat, including most recently in the WeChat Executive Order.

The national security interests identified in the Executive Order and the Secretary's decision are manifestly important within the meaning of the First Amendment. Indeed, "[i]t is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation. . . . Protection of the foreign policy of the United States is a governmental interest of great importance, since foreign policy and national security considerations cannot neatly be compartmentalized." *Haig v. Agee*, 453 U.S. 280, 292 (1981). Moreover, "[m]atters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention" because they "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Id.* at 300-01 (citations omitted). And such deference should be greater still where, as here, Congress has

created a fast track mechanism expressly to check the President's exercise of his authority under IEEPA, *see* Opp. at 16, but has not invoked that mechanism. *See Haig*, 453 U.S. at 292 ("congressional acquiescence may sometimes be found from nothing more than silence in the face of an administrative policy"). Accordingly, the question for the Court is only whether it is "difficult to conclude" or "foreseeable"—*Holder*, 561 U.S. at 30-34—based on everything known about China's hostile activities and intertwinement with Tencent and with due deference to the Executive Branch—that the app poses a risk to national security. It is not.

### 3. The Secretary's Actions Do Not Burden Substantially More Speech than Necessary.

A central purpose expressed in the Executive Order is to prevent WeChat from collecting Americans' personal and proprietary information so that such information will not flow to the Chinese Government. *See* 85 Fed. Reg. at 48,641. As Plaintiffs concede, use of the app necessarily entails such collection. Compl. ¶¶ 4-5. Thus, preventing or limiting transactions relating to WeChat in an effort to address the identified national security concerns would advance the purposes expressed in the Executive Order by reducing the data collected by the application without "sweep[ing]" more "broadly [than] necessary to accomplish its goal." *Trans Union Corp. v. FTC*, 267 F.3d 1138, 1143 (D.C. Cir. 2001) (upholding restriction on disseminating certain personal information where "[a] narrower restriction would immediately lead to increased disclosure of such information"); *see also United States v. Elcom Ltd.*, 203 F. Supp. 2d 1111, 1132 (N.D. Cal. 2002) (upholding ban on electronic tools that could be used to circumvent copyright protection, and finding that "because tools that circumvent copyright protection measures for the purpose of allowing fair use can also be used to enable infringement, it is reasonably necessary to ban the sale of all circumvention tools").

The Secretary's announcement of different timelines for the prohibited transactions involving WeChat and TikTok does not support Plaintiffs' allegations of discrimination because the two companies are not similarly situated. On August 14, 2020, the President ordered ByteDance to divest the U.S. operations and assets of TikTok, and all data on U.S. users of TikTok, including a requirement for a written certification to the Committee on Foreign Investment in the United States ("CFIUS") that ByteDance has destroyed all such data it may have). See Order of August 14, 2020 Regarding the

Acquisition of Musical.ly by ByteDance Ltd., 85 Fed. Reg. 51297 (Aug. 14, 2020).

TikTok is currently in the midst of discussions for a proposed business transaction, involving various U.S. businesses, and to the extent that transaction is completed, TikTok's U.S. business will be restructured. *See, e.g.*, Georgia Wells and Aaron Tilley, Oracle Will Review TikTok Source Code to Watch for Chinese Access, WSJ, Sept., 16, 2020 ("WSJ article"). As a result, the Secretary's action on TikTok specifically noted that "[n]othing in this Identification of Prohibited Transactions shall prohibit any transaction necessary to effectuate the divestment required by Order of August 14, 2020 (85 FR 51297) (Regarding the Acquisition of Musical.ly by ByteDance Ltd.)." The phased transactions for TikTok ensure that the government is able to evaluate if and how TikTok's ownership and control may change.

### 4. Ample Alternative Avenues Exist for Plaintiffs' Speech.

The Executive Order and its implementation by the Department of Commerce leave open ample avenues of communication. A regulation does not preclude alternative methods of communication unless it forecloses an "entire medium of public expression[.]" *G.K. Ltd. Travel*, 436 F.3d 1064, 1074 (9th Cir. 2006). Recognizing this high bar, Plaintiffs now make the extraordinary claim that WeChat itself constitutes an entire medium of communication. Pl. Mot. at 4. But Plaintiffs' own *ipse dixit* cannot alter reality. There are many other social media applications, websites, and programs which would allow Plaintiffs to participate in social media or other electronic communication. Plaintiffs themselves concede that not only are alternative avenues of communication available, but they are actively preparing to use them. *See, e.g.,* Decl. of Wanning Sun ¶ 34, ECF No. 17-11 (explaining that many users of WeChat are switching over to other social media applications such as "Line, Telegram, and WhatsApp"); Decl. of Elaine Peng ¶ 28, ECF No. 17-5 (conceding that she has "started the [process] of switching to Line"); Decl. of Xiao Zhang ¶ 22, ECF No. 17-6 (explaining that he has starting preparing a website to replace use of WeChat). Plaintiffs strongly prefer to use WeChat for various reasons, including its network, functionality, and convenience. *See* Mot. at 4. Defendants do not question this may be Plaintiffs' preference, but courts in the Ninth Circuit "will not invalidate" incidental, content-neutral laws or orders,

simply because they may restrict plaintiffs' "preferred method of communication." *Lone Star Sec. & Video, Inc.*, 827 F.3d 1192, 1202 (9th Cir. 2016).

Nothing in the First Amendment requires the U.S. government to permit continued, unfettered access to a social media application which is subject to the control of another country, where the app has been used for censorship, disinformation, propaganda and surveillance. To hold that WeChat's popularity renders it immune to regulation under the First Amendment would perversely reward the Chinese Government for its decision to ban the free exchange of information within its borders, and instead foster reliance on a its chosen applications and corporations.

### B. Plaintiffs Fail to Meet their Burden on their Ultra Vires Claims.

For the reasons stated in the Government's first opposition, Plaintiffs' ultra vires claim fails. See First Opp'n at 32-35.

### C. Plaintiffs Fail to Plaintiffs Fail to Meet their Burden on their APA Claims.

Plaintiff argues that the Secretary's Order implementing EO 13943 should be set aside under the Administrative Procedure Act because (1) the Berman Amendment prohibits this application of IEEPA; and (2) because the agency did not undertake notice-and-comment rulemaking proceedings to determine what transactions are subject to the Executive Order. Both arguments fail. As set forth above, Plaintiff's invocation of the Berman Amendment fails, and Plaintiffs' rulemaking argument is not applicable.

The APA establishes the procedures that agencies use for "rulemaking" generally, whereby "rules" generally must be subject to public notice and comment prior to the effective date. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95 (2015). Here, it is not at all clear that the Secretary's decision is a "rule" subject to these requirements, as opposed to an "order" applying the rule set out by the President in EO 13943, or an "interpretative rule" under 5 U.S.C. § 553(b)(A). Even if the decision were to be found a general "rule," however, it falls within a well-recognized exception to the rulemaking requirements. Rulemaking requirements do not apply to the extent there is involved "a military or foreign affairs function of the United States." 5 U.S.C. § 553(a)(2). The Secretary's action is an interpretation of the President's order under IEEPA, where the President has declared a national

emergency, found that "the spread in the United States of mobile applications developed and owned by companies in the People's Republic of China (China) continues to threaten the national security, foreign policy, and economy of the United States" and further found that WeChat is a mechanism for the Chinese government to access Americans' private information. EO 13943. The regulation of transactions with a foreign business controlled in part by the Chinese government in order to protect national security is within the heart of the Executive Branch's foreign affairs power. And providing for the Secretary's listing of prohibited transactions through notice and comment would have "provoke[d] definitely undesirable international consequences." *Zhang v. Slattery*, 55 F.3d 732, 744 (2d Cir. 1995). While Plaintiffs may have commented, so too could persons at the direction and control of the PRC, an almost certainty given the ways in which WeChat has been used for disinformation, censorship, and surveillance. *See* Opp. at 8-14. An emergency exercise of the Executive's foreign affairs power to limit foreign intelligence gathering in the United States is not subject to notice-and-comment rulemaking.[2]

Insofar as Plaintiffs attempt to challenge the Secretary's selection of particular transactions to prohibit, that action is not subject to judicial review. The APA precludes review of agency actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This provision applies to various "categories of administrative decisions that courts traditionally have regarded" as unsuitable for judicial review. *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993). Section 701(a)(2) precludes review of an agency's decision not to institute enforcement actions, *Heckler v. Chaney*, 470 U.S. 821, 831 (1985); an agency's refusal to reconsider a prior decision based on an alleged "material error," *ICC v. Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 282 (1987); and an agency's allocation of funds from a lump-sum appropriation, *Lincoln*, 508 U.S. at 192. Such exercises of discretion, the Supreme Court has explained, often require "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Chaney*, 470 U.S. at 831. Section 701(a)(2) also precludes review in "area[s] of executive action in which courts have long been hesitant to intrude." *Lincoln*, 508 U.S. at 192 (quotation marks

---

[2] Plaintiffs note that the Secretary undertook notice and comment proceedings for the Supply Chain proposed rule. However, they make no legal argument that the agency was *required* to do rulemaking for that rule. Moreover, that rule encompassed a broader set of transactions, and did not identify particular foreign adversaries; whereas in this instance, the President directly focused on WeChat and its connection to China and Chinese Communist Party authorities.

omitted). One such area is national security. *See, e.g.*, *Egan*, 484 U.S. at 528-29. Here, the President delegated broadly to the Secretary authority to prohibit transactions to further national security and foreign policy interests, and the Secretary has exercised his discretion to do so, identifying those categories of WeChat transactions which pose the greatest threat in this context. In these circumstances, there is "no meaningful standard against which to judge the agency's exercise of discretion.' " *See Weyerhaeuser Co. v. FWS*, 139 S.Ct. 361, 370, (2018).[3]

## II.     Plaintiffs Have Not Shown Irreparable Harm Caused by the Government

Plaintiffs' supplemental brief does not cure their failure to establish irreparable injury. No longer able to claim fear of prosecution, Plaintiffs now contend they are irreparably harmed due to their "fear [of] being disconnected from families and friends in the United States and China as well as of being cut off from political discussions, campaign participation, and other social and cultural events." Supp. at 8. But as with their reply brief, ECF No. 28 at 17-19, Plaintiffs' supplemental motion fails to even attempt to distinguish the cases previously cited by Defendants holding that such purported harms are not sufficiently concrete to grant preliminary relief, *see* Defs.' Opp. at 37. Indeed, the only response offered by Plaintiffs in their reply brief is that "no executive order has previously sought to ban and criminalize the use of a single social media platform used by tens of millions to communicate, and none of the cases Defendants rely upon for this argument involve challenges to vague laws or otherwise implicate the First Amendment in evaluating irreparable harm." ECF No. 28 at 18. But neither the Executive Order nor the Secretary's action criminalizes the mere use of WeChat.

---

[3] Plaintiffs do not make any clear argument as to why the Secretary's definitions are unconstitutionally vague, or how Plaintiffs might be at risk of prosecution or other penalties from the defined transactions. For instance, Plaintiffs do not cite a single defined transaction or other term and explain why it fails to give the public adequate notice of prohibited conduct, and the conclusory arguments they make are not remotely sufficient to show that the Decision "fails to give ordinary people fair notice of the conduct it punishes, or is so standardless that it invites arbitrary enforcement.'" *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Johnson v. United States*, 135 S.Ct. 2551, 2556 (2015)). That is especially so in light of the presumption of constitutionality. See id. at 1106 ("[T]raditional rules for statutory interpretation" "'consistently favor[ ] that interpretation of legislation which supports its constitutionality.'" *See also United States v. Harriss*, 347 U.S. 612, 618 (1954)("[I]f the general class of offenses to which the statute is directed is plainly within its terms, the statute will not be struck down as vague even though marginal cases could be put where doubts might arise."). Plaintiffs do not meet their burden, and absent any specific argument on this point, they have waived any claim of vagueness at this stage.

Nor can Plaintiffs advance their argument by claiming that Plaintiff Peng "will also lose 'a critical and irreplaceable forum to reach' other Chinese Americans with whom she engages in political organizing." *See* Supp. at 2-4.  This appears to be a repackaging of Plaintiffs' prior argument that a violation of Plaintiffs' First Amendment rights constitutes per se irreparable harm.  *See* Mot. at 37-38. But for the reasons described above and in Defendants' opposition, no First Amendment violation has occurred, and Plaintiffs' have not demonstrated "purposeful unconstitutional suppression of speech [that] constitutes irreparable harm for preliminary injunction purposes."  *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019) (citation omitted).

Plaintiffs' remaining argument also fail.  For instance, they state that they are harmed because "[t]here are no effective substitutes or available alternatives to WeChat." Supp. at 8.  That assertion is incorrect for the reasons explained above.  They further assert that "a WeChat ban effectively cuts of [*sic*] Plaintiffs' primary means of communication with business and non-profit contacts."  *Id.* at 8 (citing Mot. at 35-36).  But no ban is in effect, and the cited materials demonstrate only nebulous fears or past economic injury, not concrete injury sufficient to enjoin implementation of a Presidential Executive Order grounded in national security and foreign policy concerns.  *See* Opp. at 37-38.

The supplemental declaration submitted by Plaintiff Peng does not compel a different conclusion.  Plaintiffs offer no authority to support their novel theory that Plaintiff Peng's "shock[] and fright[]" constitute irreparable harm.  *See* Supp. at 8-9.  Moreover, it is clear that Plaintiff Peng's complaints stem primarily from fear about the effect of the Order on her "service recipients."  *Id.* at 8-9 (asserting service recipients "will lose access to WeChat, the only channel for the [*sic*] them to receive services, educational materials, and treatment resources," and "the majority of her service recipients cannot be shifted to other apps").  But Plaintiff Peng has no standing to assert the rights of her service recipients.  *See Coal. of Clergy, Lawyers, & Professors v. Bush*, 310 F.3d 1153, 1163 (9th Cir. 2002). And while Plaintiff Peng may expend time looking for an alternative means of data transfer, *see* Supp. at 8, or else engage in a data-transfer process that she might find "mind-numbing[,]" Mot. at 35-36 (acknowledging that Plaintiffs, including Plaintiff Peng, may "manually search, identify, and then type out or copy and paste such data onto other applications"), such efforts are not irreparable injury for

purposes of this Court's inquiry. *Cf. Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 676 (9th Cir. 1988) ("mere . . . inconvenience will not support the crew members' claim of irreparable injury to their constitutional rights"); *see also* Supp. at 8-9 (citing no authority in support of their position).

### III.  The Public Interest and Balance of the Equities Favor the Government.

Plaintiffs also cannot demonstrate the balance of hardships "tips sharply" in their favor. Their interest boils down to their preference in using a particular app with a particular degree of functionality. Weighed against this minimal interest are the government's compelling national security and foreign policy concerns. Time and again courts have recognized the significance of these concerns in evaluating motions for preliminary relief. *See* Defs.' Opp. at 39 (citing cases).

Nor can Plaintiffs advance their argument by re-shifting their focus to their First Amendment claim. *See* Supp. at 2-4. Again, no First Amendment violation has occurred, and Plaintiffs' have not demonstrated "purposeful unconstitutional suppression of speech [that] constitutes irreparable harm for preliminary injunction purposes." *CTIA - The Wireless Ass'n*, 928 F.3d at 851. Moreover, Plaintiffs' constitutional claims must yield to the government's national security and foreign policy concerns at this juncture. *See, e.g.*, *Stagg P.C. v. U.S. Dep't of State*, 158 F. Supp. 3d 203, 209-10 (S.D.N.Y. 2016), ("Even assuming for the purposes of this motion that Stagg P.C. has shown a substantial likelihood of success on the merits of its First and Fifth Amendment and APA claims, the balance of the equities and the public interest both require the denial of this preliminary injunction[,]" given that "national security [is] a "public interest of the highest order'" (citation omitted)), *aff'd*, 673 F. App'x 93 (2d Cir. 2016); *Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 689-90 (W.D. Tex. 2015) ("While Plaintiffs' assertion of a public interest in protection of constitutional rights is well-taken, it fails to consider the public's keen interest in restricting the export of defense articles." (citing, *inter alia*, *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24-25 (2008), *aff'd*, 838 F.3d 451 (5th Cir. 2016) ("The fact that national security might be permanently harmed while Plaintiffs-Appellants' constitutional rights might be temporarily harmed strongly supports our conclusion that the district court did not abuse its discretion in weighing the balance in favor of national defense and national security.").

### IV. A Nationwide Injunction Is Wholly Inappropriate

Notwithstanding the Secretary's identification of prohibited transactions, Plaintiffs apparently continue to seek nationwide relief. Supp. at 9-10. Plaintiffs could not justify such sweeping relief before, *see* Opp. at 40, and they certainly cannot do so now. The record remains undeveloped as to the effect of the Order (and the Secretary's action) on non-Plaintiff WeChat users, *see California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018); *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1244-45 (9th Cir. 2018). Further, Plaintiffs have no standing to represent to the interests of other users, *see Coal. of Clergy, Lawyers, & Professors*, 310 F.3d at 1163, and Plaintiffs have not sought class certification, *see Azar*, 911 F.3d at 582-83.

Dated: September 18, 2020         Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

AUGUST FLENTJE
Special Counsel to the Acting
Assistant Attorney General

ALEXANDER K. HAAS
Branch Director

DIANE KELLEHER
Assistant Branch Director

*/s/ Serena Orloff*
SERENA M. ORLOFF
MICHAEL DREZNER
STUART J. ROBINSON
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
Ben Franklin Station, P.O. Box No. 883
Washington, DC 20044
Phone: (202) 305-0167
Fax: (202) 616-8470
E-mail: serena.m.orloff@usdoj.gov

*Counsel for Defendants*