United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| U.S. WECHAT USERS ALLIANCE, et al., | Case No. 20-cv-05910-LB |
| Plaintiffs, | |
| v. | **ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION** |
| DONALD J. TRUMP, et al., | Re: ECF No. 17 and 48 |
| Defendants. | |

## INTRODUCTION

The plaintiffs are persons in the United States who use WeChat, a messaging, social-media, and mobile-payment app.[1] In this lawsuit, they challenge the constitutionality of Executive Order 13943, which prohibits (without defining) "transactions" relating to WeChat (to protect national security), effective September 20, 2020. The Executive Order directs the Secretary of Commerce to "identify" the "transactions" that are prohibited. On September 18, 2020, the Secretary issued an "Identification of Prohibited Transactions to Implement Executive Order 13943," identifying the prohibited transactions.

---

[1] Compl. – ECF No. 1; First Am. Complaint ("FAC") – ECF No. 49. The plaintiffs are U.S. WeChat Users Alliance, a nonprofit formed to challenge the WeChat Executive Order, and individual and business users. *Id*. at 7–9 (¶¶ 19–25). Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

1    In relevant part, the Secretary's Identification generally bans (1) app stores from distributing

2    the WeChat app or updates to it, (2) internet-hosting, content-delivery, and other internet-transit

3    services that enable the functioning or optimization of the WeChat app, (3) use of the app's code,

4    functions, or services in the functioning of software or services, and (4) services from allowing the

5    transfer of funds via the app to or from parties in the United States. More colloquially, the result is

6    that consumers in the U.S. cannot download or update the WeChat app, use it to send or receive

7    money, and — because U.S. support for the app by data hosting and content caching will be

8    eliminated — the app, while perhaps technically available to existing U.S. users, likely will be

9    useless to them. In public comments on September 18th, the Secretary said that "[f]or all practical

10   purposes, [WeChat] will be shut down in the U.S. . . . . as of midnight Monday."[2]

11       The plaintiffs claim that the ban (1) violates the First Amendment to the U.S. Constitution,

12   (2) violates the Fifth Amendment, (3) violates the Religious Freedom Restoration Act, 42 U.S.C. §

13   2000bb(1)(a), (4) was not a lawful exercise of the President's and the Secretary's authority under

14   the International Economic Emergency Powers Act ("IEEPA") — which allows the President to

15   prohibit "transactions" in the interest of national security — because the IEEPA, 50 U.S.C. §

16   1702(b)(1), does not allow them to regulate personal communications, and (5) violates the

17   Administrative Procedures Act ("APA") because the Secretary exceeded his authority under the

18   IEEPA and should have promulgated the rule through the notice-and-comment rulemaking

19   procedures in 5 U.S.C. § 553(b).[3]

20       The plaintiffs moved for a preliminary injunction and contend that they are likely to succeed,

21   and have presented serious questions, on the merits of the First Amendment claim (and satisfied

22   the other elements for preliminary-injunctive relief). First, they contend, effectively banning

23   WeChat — which serves as a virtual public square for the Chinese-speaking and Chinese-

United States District Court
Northern District of California

---

[2] Ana Swanson & David McCabe, *Trump to Ban TikTok and WeChat from U.S. App. Stores,* N.Y. TIMES, Sept. 18, 2020, https://www.nytimes.com/2020/09/18/business/trump-tik-tok-wechat-ban.html (last visited Sept. 18, 2020), Ex. C to Bien Decl. – ECF No. 45-1 at 23. At the September 18 and 19, 2020 hearings, the government did not contest that the court could consider — whether as a party admission or by judicial notice — the Secretary's statement or other public officials' statements.

[3] FAC – ECF No. 49.

American community in the United States and is (as a practical matter) their only means of communication — forecloses meaningful access to communication in their community and thereby operates as a prior restraint on their right to free speech that does not survive strict scrutiny. Second, even if the prohibited transactions are content-neutral time-place-or-manner restrictions, they do not survive intermediate scrutiny because the complete ban is not narrowly tailored to address the government's significant interest in national security.[4] The plaintiffs also contend that they are likely to succeed on the merits of their claims that, by effectively shutting down U.S. users' access to the WeChat app, (1) the President and the Secretary exceeded their authority under IEEPA, (2) the Secretary violated the APA, and (3) the Executive Order is void for vagueness (in part) because the government asserts conflicting interpretations of the prohibition's effect.[5] The government counters that the plaintiffs are not likely to succeed on the merits of their claims and have not established irreparable harm or that the balance of equities tips in their favor.[6]

The court grants the motion on the ground that the plaintiffs have shown serious questions going to the merits of the First Amendment claim, the balance of hardships tips in the plaintiffs' favor, and the plaintiffs establish sufficiently the other elements for preliminary-injunctive relief.

## STATEMENT

The next sections summarize (1) the plaintiffs' (and the U.S. public's) use of WeChat, (2) the relevant Executive Orders and agency action, and the plaintiffs' contentions about the context of the action, (3) the government's additional contentions about WeChat's threat to national security, and (4) the case's procedural history.[7]

---

[4] *Id.* at 27–29 (¶¶ 78–86); *see* Mot. – ECF No. 17 at 29–39; Reply – ECF No. 28 at 18–22; Renewed Mot. – ECF No. 48 at 3–5.

[5] Reply – ECF No. 28 at 17–23; *see id.* at 17–18 (narrowing the void-for-vagueness argument) (citing *Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 534–35 (N.D. Cal. 2017)); Renewed Mot. – ECF No. 48 at 3–9; *see id.* at 8–9 (narrowing the void-for-vagueness argument further).

[6] Opp'n – ECF No. 22 at 28–50; Opp'n – ECF No. 51 at 4–14.

[7] Because this is a preliminary-injunction motion, the court overrules the government's objections to the Alban and Chemerinsky declarations. Opp'n – ECF No. 22 at 51; *cf. Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm").

United States District Court
Northern District of California

1

### 1. WeChat

2

WeChat is a mobile app, developed by the Chinese company Tencent Holdings Ltd., with

3

more than 1.2 billion users worldwide (including more than 100 million users outside of China

4

and 19 million regular users in the U.S.).[8] It allows its users to send messages, make video and

5

audio calls, and send and receive money, and it also functions as a social-media platform.[9]

6

The plaintiffs' declarations establish that in the U.S., Chinese-American and Chinese-speaking

7

WeChat users rely on the WeChat platforms to communicate, socialize, and engage in business,

8

charitable, religious, medical-related, and political activities with family, friends, and colleagues

9

(here in the U.S. and around the world).[10] In the U.S., those in the Chinese-American, Chinese-

10

speaking, and other communities rely on WeChat — as opposed to other platforms — as their

11

"primary source of communication and commerce," in part because western social-media

12

platforms such as Facebook, WhatsApp, and Twitter are blocked in China, and WeChat often is

13

the only way for its users to reach their networks in China.[11] In addition, WeChat provides content

14

(such as the news) in Chinese, which is critical for the many U.S. WeChat users with limited

15

proficiency in English.[12] WeChat also resonates culturally with its U.S.-based Chinese-speaking

16

users because it integrates Chinese traditions into electronic transactions, such as sending gifts of

17

money in "red envelopes."[13] Other platforms cannot practically replace WeChat because they lack

18

the cultural relevance and practical interface with China and do not provide the integral connection

19

20

_____

21

[8] Cohen Decl. – ECF No. 17-9 at 3 (¶ 6); Sun Decl. – ECF No. 17-11 at 10 (¶ 13), 11 (¶ 16); Maya Tribbitt, *WeChat Users in the U.S. Fear Losing Family Links with Ban*, BLOOMBERG, Aug. 11, 2020,

22

https://www.bloombergquint.com/technology/wechat-users-in-the-u-s-fear-losing-family-links-with-ban, Ex. TT to Bien Decl. – ECF No. 17-12 at 351.

23

[9] Cohen Decl. – ECF No. 17-9 at 3 (¶ 6).

24

[10] Sun Decl. – ECF No. 17-11 at 11 (¶ 17); Cao Decl. – ECF No. 17-2 at 3–4 (¶¶ 11–20); Peng Decl. – ECF No. 17-5 at 2–3 (¶¶ 1–4, 7–16); Duan Decl. – ECF No. 17-4 at 2 (¶¶ 6, 9), 3 (¶¶ 14, 16).

25

[11] Cohen Decl. – ECF No. 17-9 at 4 (¶ 6); Sun Decl. – ECF No. 17-11 at 9 (¶ 12).

26

[12] Sun Decl. – ECF No. 17-11 at 10–11 (¶¶ 15, 18); Jeung Decl. – ECF No. 17-10 at 8 (¶ 25) ("Four out of ten Chinese in the United States — and six out of ten of Chinese who are foreign-born — are

27

limited English proficient. This high proportion of our community cannot access English social medial platforms and require WeChat for their communications").

28

[13] Sun Decl. – ECF No. 17-11 at 11 (¶ 16).

that WeChat provides to the Chinese community.[14] In short, WeChat is irreplaceable for its users in the U.S., particularly in the Chinese-speaking and Chinese-American community.[15]

Plaintiff Elaine Peng illustrates these points when she describes her WeChat use for personal, political, and business communications, including running her nonprofit organization Mental Health Association for Chinese Communities, which provides mental-health education and services to the local Chinese community.[16] WeChat is her primary tool for outreach and services.[17] For example, she has two WeChat groups: one for internal communications with her 110 volunteers and one with 420 members (volunteers, recipients of services, and family members).[18] Many of the Chinese community members are not fluent in English, and WeChat is the only online tool that they rely on.[19] Most of her 400-plus service recipients are elderly, deficient in English, or both.[20] They suffer from mental-health issues that include depression, schizophrenia, bipolar disorder, and post-traumatic stress disorder.[21] When she founded the nonprofit in 2013, she "went to great trouble" to teach the service recipients how to set up and use WeChat accounts, an effort that involved volunteers who expended "time, energy, and effort" to address the needs of clients who did not know how to use a smart phone.[22] If her service recipients lose access to WeChat — "the only channel for them to receive services, educational material, and treatment resources" — it will be a "humanitarian crisis."[23] In "the last month or so," she has tried to shift

[14] Cohen Decl. – ECF No. 17-9 at 7 (¶ 15); Sun Decl. – ECF No. 17-11 at 16–17 (¶¶ 32–33).

[15] Cohen Decl. – ECF No. 17-9 at 7 (¶ 15); Sun Decl. – ECF No. 17-11 at 16 (¶ 32).

[16] Peng Decl. – ECF No. 17-5 at 2–3 (¶¶ 1–4, 7–12); Peng Supp. Decl. – ECF No. 48-1 at 2 (¶ 3). The plaintiffs provide other examples too. *See supra* n.10 (collecting declarations).

[17] Peng Supp. Decl. – ECF No. 48-1 at 2 (¶ 4).

[18] *Id.*.

[19] *Id.* (¶ 5).

[20] *Id.* (¶ 6).

[21] *Id.* (¶ 7).

[22] *Id.* (¶ 6).

[23] *Id.* (¶ 7).

them to other apps, but those apps are in English, and the language barriers and lack of technical skills mean that most of the service recipients cannot be shifted to other apps.[24]

Also, the nonprofit's data — including service recipients' names, addresses, other contact information, and medical information — are stored on WeChat.[25] She sends out questionnaires to the recipients via WeChat, staff members conduct one-on-one counseling via WeChat, chat history helps staff members to evaluate and implement treatment, and she knows of no means to transfer this information — housed in WeChat's "own system" — to another platform.[26] Losing access to the platform means that she loses data and valuable information that took years to build and that forms the foundation for her nonprofit.[27] As another example of WeChat's utility, her organization used WeChat's real-time location-sharing technology to prevent a suicide.[28]

She also uses WeChat to organize teams to disseminate Chinese-language materials — educational information about the election and how to register to vote — to Chinese Americans who mostly do not speak English and use WeChat as their only messaging and social-media app.[29]

## 2. Executive Orders and Agency Action

### 2.1 Executive Order 13873 (May 15, 2019)

On May 15, 2019, the President issued an Executive Order finding that "foreign adversaries are increasingly creating and exploiting vulnerabilities in information and communications technology and services, which store and communicate vast amounts of sensitive information, facilitate the digital economy, and support critical infrastructure and vital emergency services, in order to commit malicious cyber-enabled actions, including economic and industrial espionage against the United States and its people." Executive Order 13873, *Securing the Information and*

---

[24] *Id.* (¶ 8).

[25] *Id.* at 3 (¶ 9).

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.* (¶ 10).

*United States District Court*
*Northern District of California*

*Communications Technology and Services Supply Chain*, 84 Fed. Reg. 22,689, 22,689 (the "ICTS Executive Order"). "The unrestricted acquisition or use in the United States of information and communications technology or services . . . supplied by persons owned by, controlled by, or subject to the jurisdiction or direction of foreign adversaries augments the ability of foreign adversaries to create and exploit vulnerabilities in information and communications technology or services, with potentially catastrophic effects, and thereby constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." *Id.* The President invoked his authority under the "Constitution and laws of the United States," including IEEPA and the National Emergencies Act ("NEA"), to declare a national emergency with respect to this threat. *Id.* He then prohibited transactions with foreign countries or foreign nationals that pose "an undue risk of sabotage to or subversion" of the "maintenance of information and communications technology or services in the United States" or "otherwise pose[] an unacceptable risk" to the national security. *Id.* at 22,690. He directed the Secretary of Commerce — "in consultation with" the Secretaries of the Treasury, State, Defense, and Homeland Security and the Attorney General, the U.S. Trade Representative, the Director of National Intelligence, the Chair of the FCC, and other appropriate officials — to identify transactions that pose an undue or unacceptable risk to the national security of the United States and to report to him about the threats from "foreign adversaries." *Id.* at 22,690-92. The government references reports to the President from the Department of Homeland Security (mapping the vulnerabilities of the information-and-communications-technology framework "to assist identification of vulnerabilities") and the Office of the Director of National Intelligence (in the form of a "classified initial threat assessment.")[30]

On May 13, 2020, the President renewed the declaration of emergency in the ICTS Executive Order. 85 Fed. Reg. 29,321. On May 20, 2020, he presented a report to Congress "outlining a set of broad strategies in relation to the U.S.'s foreign policy with China."[31]

---

[30] Opp'n – ECF No. 22 at 23.

[31] *Id.* at 23–24 (citing U.S. Strategic Approach to PRC (May 20, 2020), Ex. 22 to Orloff Decl. – ECF No. 22-22 at 2–17).

1   The plaintiffs do not challenge the ICTS Executive Order: "Plaintiffs are not challenging the

2   validity of Executive Order 13873, the President's May 15, 2019 declaration of a national

3   emergency that is a necessary legal basis for the President to even issue the WeChat [Executive

4   Order]; rather, Plaintiffs challenge the validity only of the *WeChat* [Executive Order]."[32]

5   **2.2   Executive Order 13943 (August 6, 2020)**

6   On August 6, 2020, President Trump issued Executive Order 13943, "Addressing the Threat

7   Posed by WeChat, and Taking Additional Steps to Address the National Emergency with Respect

8   to the Information and Communication Technology and Services Supply Chain." 85 Fed. Reg.

9   48,641 (the "WeChat Executive Order"). In it, he said that "additional steps must be taken to deal

10   with the national emergency . . . declared in [the ICTS Executive Order]" because "the spread in

11   the United States of mobile applications developed and owned by companies in the People's

12   Republic of China [] continues to threaten the national security, foreign policy, and economy of

13   the United States." *Id.* at 48,641. Further action was needed to address the threat that WeChat

14   posed to the national security, foreign policy, and economy of the U.S. because WeChat's

15   "automatically captur[ing] vast swaths of information from its [over one billion] users" through its

16   messaging, social-media, and electronic-payment applications "threatens to allow the Chinese

17   Communist Party access to Americans' personal and proprietary information." *Id.* He cited a

18   researcher's reported discovery of "a Chinese database containing billions of WeChat messages

19   sent from users in not only China but also the United States, Taiwan, South Korea, and Australia."

20   *Id.* (The plaintiffs counter that an investigation revealed that this was a data breach.[33]) He said that

21   WeChat "reportedly censors content that the Chinese Communist Party deems politically

22   sensitive" and may "be used for disinformation campaigns that benefit the Chinese Communist

23   Party," and he noted that other countries, including Australia and India, were beginning to restrict

24   or ban the use of WeChat. *Id.* (The plaintiffs counter that Australia limited only its national-

25   defense agency's employees' use of WeChat, and India's restriction was tied to a border dispute

26

27   [32] Reply – ECF No. 28 at 12–13 (emphasis in original).

28   [33] Mot. – ECF No. 17 at 20.

United States District Court
Northern District of California

with China.[34]) As a result, "[t]he United States must take aggressive action against the owner of WeChat [Tencent] to protect our national security." *Id.*

In relevant part, the Order directed the following:

> Section 1. (a) The following actions shall be prohibited beginning 45 days after the date of this order, to the extent permitted under applicable law: any transaction that is related to WeChat by any person, or with respect to any property, subject to the jurisdiction of the United States, with Tencent Holdings Ltd. . . . or any subsidiary of that entity, as identified by the Secretary of Commerce (Secretary) under section 1(c) of this order.
>
> . . .
>
> (c) 45 days after the date of this order, the Secretary [of Commerce] shall identify the transactions subject to subsection (a) of this section.
>
> . . .
>
> Section 3. For those persons who might have a constitutional presence in the United States, I [the President] find that because of the ability to transfer funds or other assets instantaneously, prior notice to such persons of measures to be taken pursuant to section 1 of this order would render those measures ineffectual. I therefore determine that for these measures to be effective in addressing the national emergency declared in Executive Order 13873, there need be no prior notice of an identification made pursuant to section 1(c) of this order.

*Id.* at 48,641–42. Thus, under the Order, effective September 20, 2020, transactions related to WeChat — as defined by the Secretary in the Identification of Prohibited Transactions — are banned.

### 2.3  The President's Statements Before and After the WeChat Order

The plaintiffs point to the President's anti-Chinese statements around the time he issued the WeChat Order, including his remarks about China's responsibility for the COVID-19 pandemic (including calling it the "China virus," the "China flu," and similar names), his reference to China's owning the United States if he is not reelected, and other mocking conduct that the plaintiffs characterize as showing racial animist and aimed at bolstering the President's reelection campaign.[35]

---

[34] *Id.* at 21.

[35] *Id.* at 21 (citing Interviews and Comments, Exs. E–P to Bien Decl. – ECF No. 17-12 at 30–100).

### 2.4   The Secretary of Commerce's Implementation of the WeChat Executive Order

On September 18, 2020, the Secretary issued the Identification of Prohibited Transactions, which set forth the following prohibited transactions:

> 1. Any provision of services to distribute or maintain the WeChat mobile application, constituent code, or mobile application updates through an online mobile application store, or any online marketplace where mobile users within the land or maritime borders of the United States and its territories may download or update applications for use on their mobile devices;
>
> 2. Any provision of internet hosting services enabling the functioning or optimization of the WeChat mobile application, within the land and maritime borders of the United States and its territories;
>
> 3. Any provision of content delivery services enabling the functioning or optimization of the WeChat mobile application, within the land and maritime borders of the United States and its territories;
>
> 4. Any provision of directly contracted or arranged internet transit or peering services enabling the functioning or optimization of the WeChat mobile application, within the land and maritime borders of the United States and its territories;
>
> 5. Any provision of services through the WeChat mobile application for the purpose of transferring funds or processing payments to or from parties within the land or maritime borders of the United States and its territories;
>
> 6. Any utilization of the WeChat mobile application's constituent code, functions, or services in the functioning of software or services developed and/or accessible within the land and maritime borders of the United States and its territories; or
>
> 7. Any other transaction that is related to WeChat by any person, or with respect to any property, subject to the jurisdiction of the United States, with Tencent Holdings Ltd., or any subsidiary of that entity, as may be identified at a future date under the authority delegated under Executive Order 13943.
>
> The identified prohibitions herein only apply to the parties to business-to-business transactions, and apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to Executive Order 13943, and notwithstanding any contract entered into or any license or permit granted before the date of Executive Order 13943. Any other transaction with Tencent Holdings Ltd. or its subsidiaries is permitted under Executive Order 13943, as implemented by the Secretary, unless identified as prohibited or otherwise contrary to law.[36]

---

[36] Notice – ECF No. 28 at 2–3; Secretary's Identification of Prohibited Transactions, Ex. A to Bien Decl. – ECF No. 45-1 at 10–11.

United States District Court
Northern District of California

The plaintiffs cite media reports, including the Secretary's remarks (discussed above) that the prohibitions will effectively shut down WeChat for U.S. users.[37]

### 3. The Government's Additional Contentions About National Security

The government describes the threat to national security posed by China's activities in the information-and-communications technology and services sectors.[38]

For example, in 2010, bipartisan legislators wrote to the Chairman of the FCC asking for information about the security of U.S. telecommunication networks in the context of a proposed deal involving Sprint, Cricket, Huawei, and ZTE. In the letter, they observed that Huawei and ZTE — two companies with significant ties to the Chinese government — were "aggressively seeking to supply sensitive equipment for U.S. telecommunications infrastructure" and to service U.S. networks.[39] In 2011, the House Permanent Select Committee on Intelligence launched an investigation focused on Huawei and ZTE but expressed the broader concern that Chinese telecommunication companies with suspected ties to the Chinese government could provide opportunities for "espionage for a nation-state already well-known for perpetuating cyber-attacks and espionage on the United States" and could allow China to exert pressure or control over critical infrastructure or give it access to sensitive government and proprietary information, resulting in unfair diplomatic or commercial advantage over the U.S.[40] The government cites other contemporaneous reports regarding similar national-security concerns given the close ties that the so-called private companies maintained with the Chinese government.[41]

Then, the government identifies the risk that reliance on mobile technologies poses to national security, citing reports about the threat that results from China's strategic insertion of its

---

[37] Response to Notice – ECF No. 45 at 2–3 (also characterizing the agency's remarks as inconsistent).

[38] Opp'n – ECF No. 22 at 15–22.

[39] *Id.* at 15 (citing *Congressional Leaders Cite Telecommunications Concerns With Firms That Have Ties With Chinese Government* (Oct. 19, 2010), Ex. 1 to Orloff Decl. – ECF No. 22-1 at 3).

[40] *Id.* at 15–16 (citing Investigative Rep. on the U.S. Nat'l Sec. Issues Posed by Chinese Telecomms. Cos. Huawei and ZTE (Oct. 8, 2012), Ex. 2 to Orloff Decl. – ECF No. 22-2 at 6–8).

[41] *Id.* at 16 (collecting reports).

companies and products into networks and markets outside of China.[42] The government describes the vulnerabilities that result from, for example, 5G cellular networks.[43] It points to government-contracting decisions — embodied in the 2019 defense-appropriations bill — prohibiting government agencies and contractors from using telecommunications or video-surveillance equipment or services produced by ZTE, Huawei, and "other identified Chinese entities."[44]

Finally, the government cited reports identifying Tencent and WeChat as a growing threat and citing an Australian nonpartisan think tank's report (1) discussing the Chinese government's "highly strategic foreign policy" to become "the strongest voice in cyberspace," (2) identifying Tencent as "one of a handful of Chinese companies 'reported to have the highest proportion of internal [Chinese Communist Party committees] within the business sector,'" and (3) discussing the attendant risks for censorship in China, the dissemination of propaganda in the Chinese diaspora, and the potential to facilitate surveillance.[45] It cites other reports echoing these concerns.[46]

## 4. Procedural History

The plaintiffs filed this lawsuit challenging the WeChat Executive Order on August 21, 2020, before the Secretary identified the prohibited transactions.[47] They moved for a preliminary injunction, advancing as a lead argument (refined in their reply brief) that the Executive Order was void for vagueness under the Fifth Amendment because (1) it did not define "transaction," and (2) the Secretary's definition would be issued on September 20, 2020, on the same day that the Order authorized enforcement, thereby denying them notice of prohibited criminal (and at least by

---

[42] *Id.* at 16–17 (collecting and citing reports).

[43] *Id.* at 17 (collecting and citing reports).

[44] *Id.* at 18–19 (collecting and citing reports).

[45] *Id.* at 19–20 (citing and quoting *Mapping China's Tech. Giants, Australian Strategic Policy Inst.*, Ex. 14 to Orloff Decl. – ECF No. 22-14 at 18).

[46] *Id.* at 21–22 (collecting and citing reports).

[47] Compl. – ECF No. 1.

implication, civil) conduct.[48] They then made their First Amendment and IEEPA arguments.[49] The government opposed the motion on grounds that included prudential ripeness and justiciability because the Executive Order was not self-executing (and instead required the Secretary to define prohibited acts), and the Secretary had not identified the prohibited transactions yet.[50] Then, on September 16, 2020, the day before the preliminary-injunction hearing, the government said the following:

> At present, activity involving the WeChat app is not prohibited. While the Department of Commerce continues to review a range of transactions, including those that could directly or indirectly impact use of the WeChat app, we can provide assurances that the Secretary does not intend to take actions that would target persons or groups whose only connection with WeChat is their use or downloading of the app to convey personal or business information between users, or otherwise define the relevant transactions in such a way that would impose criminal or civil liability on such users. In other words, while use of the app for such communications could be directly or indirectly impaired through measures targeted at other transactions, use and downloading of the app for this limited purpose will not be a defined transaction, and such users will not be targeted or subject to penalties.[51]

On September 18, 2020, the Secretary identified the prohibited transactions.[52] The plaintiffs filed an amended complaint to address the Secretary's definitions and to add an APA claim, and they renewed their motion for a preliminary injunction.[53]

The court held hearings on September 17, 18, and 19, 2020. All parties consented to the court's jurisdiction.[54]

---

[48] Mot. – ECF No. 17 at 25–29; Reply – ECF No. 28 at 17–18 (narrowing the vagueness argument made in the motion).

[49] Mot. – ECF No. 17 at 29–43: Reply – ECF No. 28 at 18–23. The plaintiffs refined the First Amendment argument in the reply brief, contending that they raised serious questions on the merits and otherwise satisfied the other elements for injunctive relief. Reply – ECF No. 28 at 18–20, 23–26; Renewed Mot. – ECF No. 48 at 3–5. The government contends that the plaintiffs raised the "serious questions" argument for the first time in their renewed motion and that it is prejudiced by the short time that it had to respond. Opp'n – ECF No. 51 at 2–3. This is incorrect. The plaintiffs made the same argument in their reply brief. Reply – ECF No. 28 at 18–19.

[50] Opp'n – ECF No. 22 at 28–31.

[51] Orloff Letter – ECF No. 31-1 at 2.

[52] Order – ECF No. 39.

[53] FAC – ECF No. 49; Renewed Mot. – ECF No. 48.

[54] Consents – ECF Nos. 6, 8.

United States District Court
Northern District of California

United States District Court
Northern District of California

### STATUTORY SCHEME

Two statutes provide the authority for Executive Orders: (1) the NEA, 50 U.S.C. §§ 1601–1651, and (2) the IEEPA, 50 U.S.C. §§ 1701–08.

The NEA, enacted in 1976, authorizes the President to declare a national emergency and provides for certain oversight authority. *Sierra Club v. Trump*, 379 F. Supp. 3d 883, 898 (N.D. Cal. 2019). The IEEPA, enacted in 1977, authorizes the President to exercise his authority during peacetime "to deal with any unusual or extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). Relevantly to this case, the IEEPA limits the President's emergency powers:

> The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or directly —
>
> (1) any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value;
>
> (2) donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under section 1701 of this title, (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances;
>
> (3) the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. The exports exempted from regulation or prohibition by this paragraph do not include those which are otherwise controlled for export under section 4604 of this title, or under section 4605 of this title to the extent that such controls promote the nonproliferation or antiterrorism policies of the United States, or with respect to which acts are prohibited by chapter 37 of Title 18;
>
> (4) any transactions ordinarily incident to travel to or from any country, including importation of accompanied baggage for personal use, maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages.

*Id*. § 1702(b)(1)–(4).

United States District Court
Northern District of California

**STANDARD OF REVIEW**

The standards for a TRO and a preliminary injunction are the same. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A movant must demonstrate (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm that would result if an injunction were not issued, (3) the balance of equities tips in favor of the plaintiff, and (4) an injunction is in the public interest. *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The irreparable injury must be both likely and immediate. *Id*. at 20–22. "[A] plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Serv. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

Before *Winter*, the Ninth Circuit employed a "sliding scale" test that allowed a plaintiff to prove either "(1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) serious questions going to the merits were raised and the balance of hardships tips sharply in its favor." *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 731 (9th Cir. 1999) (cleaned up). On this continuum, "the greater the relative hardship to [a movant], the less probability of success must be shown." *Id*. After *Winter*, the Ninth Circuit held that although the Supreme Court invalidated one aspect of the sliding scale approach, the "serious questions" prong of the sliding scale survived if the plaintiff satisfied the other elements for preliminary relief. *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011). Thus, a preliminary injunction may be appropriate when a movant raises "serious questions going to the merits" of the case and the "balance of hardships tips sharply in the plaintiff's favor," provided that the other elements for relief are satisfied. *Id*. at 1134–35.

**ANALYSIS**

The plaintiffs contend that they are likely to succeed on the merits of their claims that — by effectively shutting down the WeChat app — (1) the government violated the First Amendment, and, at least, they have raised serious questions going to the merits of the claim, (2) the President and the Secretary of Commerce exceeded their authority under the IEEPA, (3) the Secretary

violated the APA, and (4) the executive action is void for vagueness.[55] The court grants the motion on the ground that the plaintiffs have shown serious questions going to the merits of the First Amendment claim, the balance of hardships tips in the plaintiffs' favor, and the plaintiffs establish sufficiently the other elements for preliminary-injunctive relief.

### 1. Likelihood of Success on the Merits: First Amendment

The plaintiffs contend that the prohibited transactions will result in shutting down WeChat, a public square for the Chinese-American and Chinese-speaking community in the U.S. that is effectively their only means of communication with their community. This, they say, is a prior restraint on their speech that does not survive strict scrutiny. Also, even if the effect of the prohibited transactions is a content-neutral time-place-or-manner restriction, it does not survive intermediate scrutiny because the effective ban on WeChat use is not narrowly tailored to address the government's significant interest in national security.[56] The government does not meaningfully contest through evidence that the effect of the prohibited transactions will be to shut down WeChat (perhaps because the Secretary conceded the point) and instead contends that its content-neutral restrictions are based on national-security concerns and survive intermediate scrutiny.[57]

On this record, the plaintiffs have shown serious questions going to the merits of their First Amendment claim that the Secretary's prohibited transactions effectively eliminate the plaintiffs' key platform for communication, slow or eliminate discourse, and are the equivalent of censorship of speech or a prior restraint on it.[58] *Cf. City of Ladue v. Gilleo*, 512 U.S. 43, 54–59 (1994) (a city's barring all signs — except for signs identifying the residence, "for sale" signs, and signs warning of safety hazards — violated the city residents' right to free speech). The government — while recognizing that foreclosing "'an entire medium of public expression'" is constitutionally

---

[55] Mot. – ECF No. 17 at 29–42; Reply – ECF No. 28 at 17–23; Renewed Mot. – ECF No. 48 at 3–9.

[56] FAC – ECF No. 49 at 2–29 (¶¶ 78–86); *see* Mot. – ECF No. 17 at 29–39; Reply – ECF No. 28 at 18–22; Renewed Mot. – ECF No. 48 at 3–5.

[57] Opp'n – ECF No. 22 at 35–43; Opp'n – ECF No. 51 at 4–9.

[58] Reply – ECF No. 28 at 19.

problematic — makes the pragmatic argument that other substitute social-media apps permit communication.[59] But the plaintiffs establish through declarations that there are no viable substitute platforms or apps for the Chinese-speaking and Chinese-American community.[60] The government counters that shutting down WeChat does not foreclose communications for the plaintiffs, pointing to several declarations showing the plaintiffs' efforts to switch to new platforms or apps.[61] But the plaintiffs' evidence reflects that WeChat is effectively the only means of communication for many in the community, not only because China bans other apps, but also because Chinese speakers with limited English proficiency have no options other than WeChat.[62]

The plaintiffs also have shown serious questions going to the merits of the First Amendment claim even if — as the government contends — the Secretary's identification of prohibited transactions (1) is a content-neutral regulation, (2) does not reflect the government's preference or aversion to the speech, and (3) is subject to intermediate scrutiny. A content-neutral, time-place-or-manner restriction survives intermediate scrutiny if it (1) is narrowly tailored, (2) serves a significant governmental interest unrelated to the content of the speech, and (3) leaves open adequate channels for communication. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1068 (9th Cir. 2020). To be narrowly tailored, the restriction must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799. Unlike a content-based restriction of speech, it "need not be the least restrictive or least intrusive means of serving the governments interests. But the government still may not regulate expression in such a manner that a substantial portion of the burden on speech does not advance its goals." *McCullen v. Coakley*, 573 U.S 464, 486 (2014) (cleaned up).

---

[59] Opp'n – ECF No. 51 at 8 (quoting *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1074 (9th Cir. 2006)).

[60] *See* Statement, *supra*.

[61] Opp'n – ECF No. 22 at 42.

[62] Sun Decl. – ECF No. 17-11 at 16–17 (¶¶ 32–34).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Certainly the government's overarching national-security interest is significant. But on this

2  record — while the government has established that China's activities raise significant national-

3  security concerns — it has put in scant little evidence that its effective ban of WeChat for all U.S.

4  users addresses those concerns. And, as the plaintiffs point out, there are obvious alternatives to a

5  complete ban, such as barring WeChat from government devices, as Australia has done, or taking

6  other steps to address data security.[63]

7    The government cited two cases to support its contention that "preventing or limiting" WeChat

8  use advances the WeChat Executive Order's essential purpose to reduce WeChat's collection of

9  data from U.S. users.[64] *See Trans Union Corp. v. FTC*, 267 F.3d 1138, 1142–43 (D.C. Cir. 2001) )

10  (upholding FCC's ban on credit agency's sale of consumers' personal financial data because it was

11  the only means of preventing the harm of disseminating personal data); *United States v. Elcom*

12  *Ltd.*, 203 F. Supp. 2d 1111, 1132 (N.D. Cal. 2002) (upholding criminal charge under the Digital

13  Millennium Copyright Act for selling a tool that allowed a user to remove copying restrictions

14  from Adobe files and thereby engage in copyright infringement by duplicating eBooks; targeting

15  tool sellers and banning tool sales was reasonably necessary to avoid copyright infringement and

16  protect digital privacy). The speech interests at stake in these cases — a credit agency's sale of

17  consumer data and targeting unlawful copying — are not equivalent to the denial of speech that

18  attends the complete ban of WeChat for the Chinese-American and Chinese-speaking U.S. users.

19  On this limited record, the prohibited transactions burden substantially more speech than is

20  necessary to serve the government's significant interest in national security, especially given the

21  lack of substitute channels for communication. *Ward*, 491 U.S. at 791.

22

23  **2.   Likelihood of Success on the Merits: IEEPA**

24    The plaintiffs contend that the President and the Secretary exceeded their authority under the

25  IEEPA because the IEEPA does not give the President authority to regulate or prohibit "any

26

27  ─────────────
   [63] Reply – ECF No. 28 at 21.

28  [64] Opp'n – ECF No. 22 at 39; Opp'n – ECF No. 51 at 7.

postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value." 50 U.S.C. § 1702(b)(1)–(4). The record and the arguments do not allow the court to conclude at this juncture that the plaintiffs are likely to succeed on the merits of their claim that the elimination of support for the WeChat app — such as upgrades and throttling internet services — prohibits personal communication.

### 3. Likelihood of Success on the Merits: APA

To the extent that the APA claim rests on the argument that the Secretary of Commerce exceeded his authority under IEEPA, the plaintiffs are not likely to succeed on the merits of the claim for the reasons advanced in the last section.

To the extent that the claim rests on the Secretary's failure to engage in the APA's notice-and-comment rulemaking procedures, the briefing did not address the issue sufficiently for the court to evaluate its legal sufficiency. On this record, the court cannot conclude that the plaintiffs are likely to succeed on their claim.

### 4. Likelihood of Success on the Merits: Fifth Amendment

The plaintiffs contend that the WeChat Executive Order's prohibited transactions — as identified by the Secretary — are void for vagueness because the government has provided conflicting interpretations of the effect of the prohibitions. The Secretary identified prohibited transactions understandably, and the plaintiffs are not likely to succeed on the claim to the extent that it is predicated on the lack of clarity of the prohibited transactions based on subsequent media reports. To the extent that the claim is predicated on the Secretary's ability to identify future prohibited transactions (as set forth in prohibited transaction 7), the claim is not ripe.[65] *Bishop Paiute Tribe v. Inyo Cty.*, 863 F.3d 1144, 1154 (9th Cir. 2017).

---

[65] Opp'n – ECF No. 22 at 28–30 (discussing prudential ripeness).

United States District Court
Northern District of California

1

### 5. Remaining *Winter* Elements

2      The remaining elements are a likelihood of irreparable harm if an injunction does not issue, the

3  balance of equities tips in the plaintiff's favor, and an injunction is in the public interest. *Winte*r,

4  555 U.S. at 20.

5      First, the plaintiffs have established irreparable harm. The immediate threat is the elimination

6  of their platform for communication, which results in irreparable injury absent an injunction.

7  *California v. Azar,* 911 F.3d 558, 581 (9th Cir. 2018); *see Elrod v. Burns*, 427 U.S. 347, 373

8  (1976) ("The loss of First Amendment freedoms, even for minimal periods of time,

9  unquestionably constitutes irreparable injury.").

10     Second, the remaining elements — the balance of equities and whether an injunction is in the

11  public interest — merge where the government is a party. *Azar*, 911 F.3d at 575. The balance of

12  equities favors the plaintiffs: a stay maintains the status quo. Without a stay, at least on this record,

13  a ban of WeChat eliminates all meaningful access to communication in the plaintiffs' community.

14  The public interest favors the protection of the plaintiffs' constitutional rights. *Am. Beverage Ass'n*

15  *v. City & Cty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) ("it is always in the public

16  interest to prevent the violation of a party's constitutional rights") (cleaned up).

17     The government contends that an injunction would "frustrate and displace the President's

18  determination of how best to address threats to national security."[66] This is an important point, and

19  the threats that the government has identified generally are significant. But while the general

20  evidence about the threat to national security related to China (regarding technology and mobile

21  technology) is considerable, the specific evidence about WeChat is modest. Also, on this record,

22  the regulation — which eliminates a channel of communication without any apparent substitutes

23  — burdens substantially more speech than is necessary to further the government's significant

24  interest. *Ward*, 491 U.S. at 799. This affects the assessment of the public interest.

25     Finally, at the hearing, the government cited a *Washington Post* article contending that a ban

26  of WeChat is a net positive for human rights: "WeChat it is a closed system that keeps its 1.2

27

28  _____

[66] *Id*. at 50.

United States District Court
Northern District of California

United States District Court
Northern District of California

billion users in a parallel universe where they can communicate as long as they don't cross the lines, and banning it might eventually strengthen the voices of the Chinese diaspora."[67] This is another important point: the federal government — based on its foreign-policy and national-security interests —may not want to countenance (or reward) the Chinese government's banning apps outside of the Chinese government's control and, more generally, censoring or punishing free speech in China or abroad. But as the President said recently in Executive Order 13925,

> Free speech is the bedrock of American democracy. Our Founding Fathers protected this sacred right with the First Amendment to the Constitution. The freedom to express and debate ideas is the foundation for all of our rights as a free people.
>
> ...
>
> The growth of online platforms in recent years raises important questions about applying the ideals of the First Amendment to modern communications technology. Today, many Americans [including the plaintiffs and others in the U.S. WeChat community] follow the news, stay in touch with friends and family, and share their views on current events through social media and other online platforms. As a result, these platforms function in many ways as a 21st century equivalent of the public square.

85 Fed. Reg. 34,079 (May 28, 2020).

At this preliminary-injunction stage in the legal process, there are serious questions going to the merits of the First Amendment claim (even in the context of the significant national-security and foreign-policy concerns). In sum, the remaining *Winters* elements favor the plaintiffs.

## 6.  Scope of Relief

The injunctive relief must remedy the harm. *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1282 (9th Cir. 2020). The plaintiffs live in four states, and the U.S. WeChat Users Alliance is comprised of WeChat Users throughout the United States.[68] WeChat is a network: limiting it to something less than the United States would not remedy the harm.

---

[67] Tenzin Dorjee, *The WeChat ban is a difficult but necessary step toward openness in China*, WASH. POST, Sept. 18, 2020, https://www.washingtonpost.com/opinions/2020/09/18/wechat-ban-is-difficult-necessary-step-toward-openness-china/ (last visited Sept. 19, 2020).

[68] FAC – ECF No. 49 at 7–10 (¶¶ 19–25).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## CONCLUSION

The court grants the plaintiffs' motion for a nationwide injunction against the implementation of Executive Order 13,943 (limited to the Secretary of Commerce's Identification of Prohibited Transactions 1 through 6).[69]

Nothing in this order prevents the Secretary from reconsidering his decisions or from identifying "any other transaction that is related to WeChat by any person, or with respect to any property, subject to the jurisdiction of the United States, with Tencent Holdings Ltd., or any subsidiary of that entity, as may be identified at a future date under the authority delegated under Executive Order 13943."[70]

This disposes of ECF Nos. 17 and 48.

**IT IS SO ORDERED.**

Dated: September 19, 2020.

_____
LAUREL BEELER
United States Magistrate Judge

---

[69] Secretary's Identification of Prohibited Transactions, Ex. A to Bien Decl. – ECF No. 45-1 at 10–11.
[70] *Id.* at 11.