Pages 1 - 46

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE LAUREL BEELER, MAGISTRATE JUDGE

```
U.S. WECHAT USERS ALLIANCE,    )
CHIHUO INC., BRENT COULTER,    )
FANGYI DUAN, JINNENG BAO,      )
ELAINE PENG, and XIAO ZHANG,   )
                               )
          Plaintiffs,          )
                               )
  VS.                          )   No. C 20-5910 LB
                               )
DONALD J. TRUMP, in his        )
official capacity as President )
of the United States, and      )
WILBUR ROSS, in his official   )
Capacity as Secretary of       )
Commerce,                      )
                               )
          Defendants.          )
_____)   San Francisco, California
                                    Saturday, September 19, 2020
```

**TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**:  (via Zoom Video Conferencing)

For Plaintiffs:          ROSEN BIEN GALVAN & GRUNFELD LLP
                         101 Mission Street, Sixth Floor
                         San Francisco, California 94105-1738
                    BY:  **MICHAEL W. BIEN, ESQ.**
                         **VAN SWEARINGEN, ESQ.**

                         DEHENG LAW OFFICES PC
                         7901 Stoneridge Drive, #208
                         Pleasanton, California 94588
                    BY:  **KELIANG (CLAY) ZHU, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              Official Reporter, U.S. District Court

(Appearances continued, next page)

**APPEARANCES, CONTINUED**:


For Plaintiffs:
             DAVIS WRIGHT TREMAINE LLP
             505 Montgomery Street, Suite 800
             San Francisco, California 94111-6533
      BY: **THOMAS R. BURKE, ESQ.**

             DAVIS WRIGHT TREMAINE LLP
             1301 K Street NW, Suite 500 East
             Washington, DC 20005
      BY: **DAVID M. GOSSETT, ESQ.**

             AFN LAW PLLC
             506 2nd Avenue
             Suite 1400
             Seattle, Washington  98104
      BY: **ANGUS F. NI, ESQ.**


For Defendants:
             UNITED STATES DEPARTMENT OF JUSTICE
             Civil Division, Federal Programs Branch
             Ben Franklin Station, P.O. Box No. 883
             Washington, DC 20044
      BY: **MICHAEL DREZNER**
           **SERENA M. ORLOFF**
           **TRIAL ATTORNEYS**

<u>**Saturday, September 19, 2020**</u>                              <u>**1:36 p.m.**</u>

**P R O C E E D I N G S**

**---oOo---**

**THE CLERK:**  Calling Civil Action 20-5910, U.S.
WeChat Users Alliance, et al.

Counsel if you would please state your appearances for the
record.

**MR. BIEN:**  Good afternoon, Your Honor.  Michael Bein
and Van Swearingen of Rosen Bein Galvan & Grunfeld; Tom Burke,
Dave Gossett of Davis Wright & Tremaine, Clay Zhu of the
DeHeng firm, and Angus Ni of the -- is it the AFN Law Firm, on
behalf of plaintiffs.

**THE COURT:**  All right.  Good afternoon.

And for the defendants?

**MR. DREZNER:**  Michael Drezner, Your Honor.  And with
me is Serena Orloff.

**THE COURT:**  Thank you.  I hope you had a pleasant --
I hope you had a reasonably pleasant Friday evening.  And
thank you for your papers.

I'm really much happier procedurally that we went through
the exercise of an amended complaint.  I just felt much better
about having the claims established.

I thought the additional papers -- as -- as Mr. Bien told
me at yesterday's hearing that he thought the information in
the existing papers was sufficient, but I thought -- he was

1  probably correct.  And I still think it was useful to have that

2  process to allow illumination.

3       I would just -- I would say in short I think the

4  government -- I have couple of questions that I want to lead

5  with that are in the, sort of, mostly in the -- mostly

6  clarification.  And then I think we should focus on the First

7  Amendment arguments.  So we can all get back to our day and I

8  can -- I can finalize the order.

9       So here, here's my -- so this is just a question.  What is

10  the exact time that I -- I know I could look at it -- that the

11  order goes into effect?  I know it's September 20th.  But is it

12  September 20th at 12:01 a.m.?

13       Or is it -- just what is the -- what is the effective date

14  and time?

15            MR. DREZNER:  Sure.  So as I understand, it's 11:59

16   the 20th, the evening, tomorrow.

17       Serena, does that sound right?

18       Yeah, getting a nod.

19            THE COURT:  Okay.  So 11:59 Sunday night.

20            MR. DREZNER:  Correct.

21            THE COURT:  Okay, that's what I thought.  Good.  I

22   just thought I could ask you.

23       So Elena, I would actually like the people in the audience

24  not to use the chat function.  I don't know why it's enabled

25  for audience members.  It shouldn't be -- Elaine, this is just

another thing for us -- I have no problem with it being for

potential panelists, but it shouldn't be for people who are in

the audience.

When we have the criminal calendar it's a utility because

we have all sorts of issues about getting people elevated to

panelist mode.

Okay.  So, you're not allowed to speak in court.  Just

like this -- is court.  And so just as if you were in a real

courtroom, this is a real courtroom.  It just happens to be

virtual.

And so, next question.  This is just a fact question for

the government.  And I just think it's something we should make

sure that the record is clear on this point.

The Secretary identified the prohibited transactions.  And

we'll come to the due process, void for vagueness, that's my

next small question that I'm going to ask.  And I think this

matters for this.

Obviously, the Secretary did not frame this as for being

for personal users.  And, by, when you look at the -- and I've

got the identification right here.  When you look at what the

order does by banning essentially downloads and updates to the

app by eliminating the ability in the U.S. to support the app

by all the things that make internet use possible -- right?

And that is -- you know, the words are, I think, the

"functioning" or "optimization" of the app.

1          And, and they -- it's sort of if you look at it more

2     colloquially, essentially things that make things work like

3     data hosting and content caching, and this is per the

4     Secretary's comments, are -- essentially eliminate -- while it

5     may be hypothetically or technically, perhaps, available to

6     users, effectively, it is not.

7          And from the government's perspective, as a matter of

8     fact, is there any serious dispute on that point?

9          **MR. DREZNER:**  So I would say Your Honor is correct,

10     this is -- that the actual prohibitions are limited to

11     business-to-business activities.

12          I think our understanding of sort of practically how it

13     will go into effect is that certain businesses will no longer

14     be able to transact -- as you say, to provide hosting services

15     to allow it on the app store.  However, as we understand it, it

16     will remain generally available for use.

17          And so I don't believe, at least as I understand it, that

18     it will immediately not be available for people who already

19     have it on their devices.  So over time, because as Your Honor

20     notes, there may be prohibitions relating to updating or

21     optimization of the app, the app may degrade in quality over

22     time or it may lose certain functionality, but I don't believe

23     that immediately on Monday people with the application simply

24     won't be able to use it at all.

25          **THE COURT:**  But, the record, what we have -- I mean,

1    certainly -- and again, this is just an observation.  But

2    certainly, that's the way the media is reporting.  And that is

3    what the Secretary said.

4         And when I look at the pro- -- I just -- and of course, we

5    all -- well, you guys are on the East Coast, but those of us

6    out here, we're living and working in Silicon Valley, tech --

7    we live and breathe tech.  We understand the context for, you

8    know, how -- essentially how the delivery of data works for us.

9         And when I look at the specific prohibitions that to

10   prohibit -- just going to look at the specific language that's

11   excerpted (As read):

12            "Any provision of internet hosting services enabling

13            the functioning or optimization..."

14        In the U.S., of course.

15            "...contents delivery services enabling the

16            functioning or optimization, and..."

17        And, and, and so forth.  You know, those are the points,

18   you know, the initial points in the Secretary's -- and it just

19   seems to me that the colloquial understanding of those

20   prohibitions means that the ability for the app to function is

21   essentially eviscerated.

22        **MR. DREZNER:**  Again I think, you know, we've

23   discussed with our client, and our expectation is, again, the

24   app may be degraded in terms of, you know, functionality.  It

25   may take more time.

1          I think to the extent you're identifying certain

2     prohibitions, the extent to which those prohibitions directly

3     affect the application will depend on whether there are

4     U.S.-based entities this who provide those services, rather

5     than those which are overseas.

6          **THE COURT:**  Well, they can't provide them under the

7     Secretary's identification of prohibited transactions.

8     They're not allowed to.

9          **MR. DREZNER:**  So my point -- all I'm saying is to the

10    extent you're saying what's immediately going to happen, to

11    the extent that there are U.S.-based entities who are

12    providing services, once the prohibitions go into effect, they

13    won't be able to do so.  If there are entities overseas that

14    are providing these services, I don't believe they would be

15    affected by this, and so those immediate services may not be

16    as affected.

17         So, I just don't know if we can extrapolate from these

18    prohibitions that there's going to be this immediate halt to

19    all service on the application.

20         **THE COURT:**  All right.  But you do at least agree

21    that the record -- that leaving aside the Secretary's

22    comments, which were more specific than that and said

23    effectively it will be shut down as of Monday night, you do

24    concede that there will be -- you do concede that the

25    deterioration of the functionality is -- will happen.

1          **MR. DREZNER:**  I believe, over time, yes.

2          **THE COURT:**  Yeah, okay.  All right.  So -- and I do

3     -- I -- so then I'm going to ask the question to the

4     government next, and then we'll -- just because -- I think --

5     my suggestion, although I'm happy to hear whatever arguments

6     you would like to advance, my suggestion is that we focus on

7     the First Amendment.  But I wanted to ask first a question

8     about the void for vagueness argument that you advanced and

9     increasingly refined along the way.  Right?  Necessarily.

10         It was different before the Secretary issued the

11    identification of prohibited transactions.  So -- but even

12    before then, based on the government's argument, you refined it

13    in your reply brief.  The Secretary issues the identification;

14    you necessarily have to refine it further in your supplemental

15    motion.  And that's fine.  So you necessarily had to do that.

16         But how can it be void for vagueness when the -- at all,

17    what the conduct is that's prohibited, when the Secretary

18    explicitly exempts parties in business-to-business transactions

19    and especially -- and does not apply to individuals like the

20    plaintiffs in the case.

21         So how can there be -- it was a very small argument at the

22    end of your -- your renewed motion.  And the First Amendment is

23    your substantial argument.  But I just wanted to give you an

24    opportunity, because I don't see how it could be void for

25    vagueness under those circumstances.  Under the circumstances

1   of the Secretary's identification of the prohibited

2   transactions, and who was subject to the prohibited

3   transactions.

4          **MR. BIEN:**  So Your Honor, I guess I would say this.

5    That the prohibitions come from the executive order.  That's

6    -- and it remains vague and ambiguous, and -- and troubling in

7    terms of what it covers.  But the Secretary's identification

8    causes more problems.

9          As we pointed out in my -- the media, reading this, people

10   are confused already about what they can do and what they can't

11   do.  For example, one paper says monetary transactions are

12   void.  Another one says they're not.  And the Secretary says

13   both in here.

14         And number two is:  What is business to business?  Almost

15   all of our clients in this case are -- run businesses or are

16   businesses.  So what is a business-to-business transaction?

17   That -- you know, counsel just said again today that those are

18   prohibited.

19         And so -- for example, you know, one of our clients is an

20   entity that runs on WeChat.  It provides services on WeChat to

21   other businesses.  It -- it sells and buys services.  It helps

22   people place ads, it sets up discussion groups, it helps people

23   publish their opinions.  It does all these things as a

24   business.  It's a business.

25         **THE COURT:**  Right.  But if you look at the plain

1    language -- and then I'll let the government weigh in so you

2    can make a different -- perhaps a better argument than I could

3    make.

4         But when you look at the bans, they're -- they're the

5    provisions of services for the purpose of transferring funds.

6    It's not prohibiting the -- so what it's effectively doing is

7    it's -- the effect for U.S.-based consumers, it eliminates --

8    it eliminates functionality, but it's not -- so you can't do

9    it, not because they're saying you can't, but because it's not

10   capable -- you know, arguably, whether as the Secretary says

11   Monday at midnight or Sunday at midnight, or, or after some

12   period of degradation of the functionality of the app.

13        So that's fair, completely fair from your First Amendment

14   argument, right?  But from the Fifth Amendment, void for

15   vagueness, it's really geared at the service providers, not

16   your clients.

17            **MR. BIEN:**  Well --

18            **THE COURT:**  And so I think you have got a pretty good

19   First Amendment argument.  And we'll get to that in a minute.

20   But I just -- I just wanted you to make your best argument for

21   void for vagueness.  And so, that's fine.  If that's the best

22   argument, I'll think about it a little bit more, and that's

23   fine.

24            **MR. BIEN:**  Well, I think that -- again, I think that

25   -- our client provides a service.  And he provides it on

1      WeChat.  And he interacts with WeChat as a business.

2          And again, I think that the Secretary's statements and the

3      statements by Commerce officials that have been too -- off the

4      record, but on the -- actually, on the record but without their

5      names, say confusing things.  And that is part of the record

6      here.  And I think it has to be developed, you know.

7          But in terms of preserving the status quo, my clients

8      still are at risk of violating the prohibitions, civil and

9      criminal prohibitions.  And of course, the Secretary reserved

10     the right to change what "transaction" means at any time.  And

11     he also has the right, under Section 3, to do it without

12     notice.

13         So I think, again, we --

14             **THE COURT:**  Okay.

15             **MR. BIEN:**  We hope it means what you are saying,

16     Your Honor.  But we're just pointing out that the problems in

17     our mind are not solved, and they -- and they -- we're not

18     supposed to just rely on the good faith of the government when

19     there's a -- criminal sanctions at issue here, and they have

20     ambiguous vague terms, and an ambiguous vague executive order.

21             **THE COURT:**  Okay.  Thank you.

22         I don't know if the government wants to say anything on

23     this point.  You're welcome to, but I think -- I do want to

24     move to the First Amendment.

25         All right.  So, this is for the government.  And I'm just

1   going to look at my framing of the plaintiffs' issues, which,

2   just because I frame it this way doesn't mean that they've not

3   done it in a different and perhaps better way.

4         So the -- the idea that -- the way the -- I mean, you're

5   -- you're advancing an argument that that this isn't

6   content-based, but that is, you know, a restriction that just

7   basically gets to you the intermediate-scrutiny argument.

8   You're not really seriously contesting that there's not an

9   effect on speech.

10        I just want to make sure that I'm clear on what your

11  position is on that point.  And so, because then I want to talk

12  a little -- I want to talk about what that means in the context

13  of intermediate scrutiny, and then the narrowly-tailored -- I

14  think we should have a discussion about the national security

15  interests next.

16        So what's the government's view on the point that I just

17  raised?

18             **MR. DREZNER:**  Sure.  I think there are two ways to

19   look at it.  One is that this is an economic regulation, that

20   it's directly targeting business-to-business transactions.  We

21   know that now.  As Your Honor said, it's targeted at service

22   providers that are having precise economic transactions with

23   -- or about WeChat with Tencent.

24        And so from that perspective, to the effect that there is

25  any incidental effect on speech, that can be viewed as not

1   invocating the First Amendment, and you can look at things like

2   *Arcara Books* for that analysis.

3        To the extent that it does, you know, more directly impact

4   the ability of people to express themselves, we would say yes,

5   at most it is a time, place or manner restriction.  And then

6   yes, you only get to intermediate scrutiny.

7             **THE COURT:**  And that's really what you focus your

8    argument on, because it's the national security interest.  I

9    mean, that was the point of the argument yesterday.  So let's

10    talk about those national security interests.

11        And one of the things that I do is -- I -- I don't know if

12   you read my First Amendment order last week.  But what I do in

13   my order is I try to chew through the facts as best I can to

14   make sure I fairly capture each and every argument that you

15   make.  So when Ms. Orloff said:  It sounds like you're already

16   making up your mind, yesterday, what I was doing was I was

17   diligently transcribing things that began with the first

18   executive order in May, 2019, to identify what the President

19   said about national security issues, to make it clear that the

20   plaintiffs are not challenging that order which is the

21   necessary predicate for the WeChat executive order, to look at

22   what the President said directly about the national security

23   issues in the WeChat order, and then to move to the arguments

24   that you guys made that you made in your -- in your collective

25   briefing.

1          But mostly in your initial opposition at ECF No. 22, where

2     you summarized persuasively -- and this isn't news to any of

3     us, right, those of us who -- I used to be a prosecutor, right?

4     And so I did some of these cases.  And I -- and so you have

5     recounted the concerns that beginning -- well, as expressed in

6     the executive orders, and as summarized beginning in 2010, you

7     began with sort of the general -- the sort of description of

8     how this is iterated in different cases involving different --

9     Huawei -- probably mispronouncing that.  And you summarized a

10    sort of additional concern that the use of mobile technology

11    presents; you've cited -- and I'm just going to look at my

12    notes because I really went through all of this to make sure I

13    fully understood as a matter of fact the arguments that you

14    were advancing here.  And made sure that I captured them

15    fairly.

16         Then you talked about vulnerabilities because of that

17    mobile use.  You mentioned the 5G network, Uber, the government

18    contracting decisions that are embodied in the 2019 defense

19    appropriations bill, and which are -- and how that's manifested

20    itself in contracting processes.

21         And then you identified issues with Tencent and WeChat,

22    with the sort of blend of having lots of folks in the Chinese

23    Communist Party that affiliated with the -- I think the quote

24    was it was one of a handful of Chinese companies "reported to

25    have the highest proportion of internal CCP committees within

1  the business sector" in discussing the intended risk for

2  censorship in China, the dissemination of propaganda in the

3  Chinese diaspora, and the potential to facilitate surveillance.

4      Okay, so that's my capture of what you advanced as

5  national security interests.  And I'm not disputing -- I

6  don't -- I don't quarrel with any of that.  Right?  That seems

7  a fair reporting of concerns that have attended our discretions

8  in this landscape, at least since I started paying attention to

9  this.  And let's say that was in about 2008, or maybe before.

10  But -- you know.  So this is not -- these are familiar concepts

11  that you raise.

12      But when we move then to the context of intermediate

13  scrutiny and the resulting need to narrowly tailor the

14  restrictions, I mean, you -- the Secretary's identification

15  sort of by definition has sort of said: We are not concerned

16  about these kinds of uses that the individual plaintiffs here

17  have; we're concerned about other things.  And the order sort

18  of implements that.

19      But it -- I -- I'm -- it -- it seems to me that there's no

20  tailoring of the regulation to the -- so you considered the

21  Australian example and the other examples that the plaintiffs

22  -- and I'm not seeking to make your policy for you, but the

23  plaintiffs in their briefing talk about other ways that issues

24  of national -- the important issues of national security that

25  we all care about are addressed.  But these issues are -- they

1  -- I mean, they attend Facebook, for example.

2      So I just wonder how -- what is your best argument for how

3  this -- this identification is narrowly tailored to meet the

4  government's interests in the context?

5          **MR. DREZNER:**  So, thank you.  That was a very good

6  summary of our argument, and I appreciate that you understand,

7  and I think you understand very well the important national

8  security interests and the foreign policy interests that are

9  at stake.

10     So, how is this narrowly tailored?  Well, plaintiffs came

11 in, fearing that their communications were going to subject

12 them to criminal and civil penalties.  Right?  That was their

13 original argument in their opening brief here, that:  We are

14 afraid that if we continue to use WeChat in the way that we

15 have been, you know, hosting church groups or communicating

16 with our family, we could be at risk for these kinds of

17 penalties.

18     We represented to them and now we know, given the

19 Secretary's definition, that's not the case.  But at the same

20 time, what I would tell Your Honor is it's not that the

21 Secretary isn't concerned about those sorts of transactions.

22 Rather, I would say that the way that he tailored this order is

23 a fairly precise way in order to get at how the application is,

24 in fact, provided in the United States, without directly

25 penalizing people who simply use it on a regular basis.

1     And so it is, in fact -- one of the things that we

2  anticipate happening is the app will not be as useable over

3  time, and because of that, the users will not be

4  transmitting -- or new users will not be able to transmit any

5  data to the Chinese government which they then may be able to

6  use against them in -- in the national security interest.

7     And again, where we are here is under intermediate

8  scrutiny, as you recognize.  It isn't a least-restrictive-means

9  test.  It's not the question of:  Is there something a court or

10  a plaintiff could find that's less restrictive and that the

11  government should have adopted?

12     The question is:  Are there maybe less restrictive

13  alternatives that would have -- advance the government's

14  interests just as well?  Right?

15     And I don't think there's anything that plaintiffs have

16  pointed to here that would accomplish those ends.  Obviously, a

17  ban only on government phones as they've now advanced wouldn't

18  do as well.  Obviously, a voluntary awareness campaign, as

19  they've described briefly and then I think abandoned, wouldn't

20  advance the government's interests as readily.

21     And so the question under intermediate scrutiny is where

22  you have these critical interests I think you identified very

23  well, is there, you know, any sort of lesser action that the

24  government would have taken, but would have also advanced their

25  interests just as readily?

1     And clearly, I think the answer is no.  And in fact, this

2     order is very well tailored to address the threat posed by

3     WeChat, while not directly penalizing people who only speak for

4     the purpose of providing their personal or business

5     information.

6          **THE COURT:**  So you're not penalizing the people in

7      the form of civil or -- criminal penalties, but whether under

8      the -- it operates effectively as a shutdown, effective

9      immediately or through the passage of time with degradation,

10     it essentially casts a wide net over -- without -- and so the

11     question is:  How that is narrowly tailored?

12         And it seems to me that that wide net -- that there were

13     -- I'm -- it's -- I appreciate the argument that you're making,

14     but I have a tough time understanding how it's narrowly

15     tailored considering the drag -- considering the

16     representations that the plaintiffs have put in through

17     declarations, and including Ms. Peng's -- I believe that's her

18     last name -- supplemental declaration in support of the renewed

19     motion.  So that's what I think the case comes down to.  Right?

20     I think that's what the case comes down to.

21         I also know that you wanted to -- and we started to have

22     this conversation a little bit yesterday, but the -- the other

23     thing that I wanted to invite the parties to do a pro and --

24     for and against -- and I just want to make sure I have my

25     latest notes here, the piles of paper that surround me mean

1   that I almost immediately lose my notes -- is your best

2   arguments for and against narrowly -- the other *Winters*

3   factors, right?  That was something that Ms. Orloff raised

4   yesterday.

5       And so I think it's worth having the government talk about

6   those, you know, leaving aside the -- you know, likely to

7   prevail on the First Amendment, the serious questions, moving

8   on to the other *Winters* factors.

9       And I'm just -- if you could just give me a second, I

10  apologize, I want to print my notes again because I just

11  shuffled them into your brief.  So give me one second.

12      (A pause in the proceedings)

13          **THE COURT:**  I politely muted myself so you didn't

14   have to listen to me print.  Because I just want to take notes

15   on my notes.

16      So, so, why don't you, from the government's perspective,

17  make your best argument against the *Winters* factors.  And then

18  I think we should hear from the plaintiff about their best

19  arguments for the remaining factors.

20      And then maybe we should talk a little bit about -- just

21  for Mr. Bien to be thinking about this, I was looking at your

22  initial proposed order and your initial request for 60 days

23  from the Secretary's final promulgation of the identification

24  of the prohibited transactions.  And I wonder how it fits into

25  the rejigger, because there wasn't a new proposed order that

 1    was submitted with the supplemental motion.  So just from a

 2    perk value, you might think about that.

 3         All right, so, Mr. Drezner.  Why don't you make the

 4    argument that you'd like to make on the other -- that

 5    Ms. Orloff started to make yesterday about -- just hang on one

 6    second.  Just give me one second.

 7         (A pause in the proceedings)

 8              **THE COURT:**  Okay.  Sorry about that.  Okay.

 9              **MR. DREZNER:**  Sure.  If -- could I just take a step

10     back and just address one more time sort of the point that

11     Your Honor was getting at?

12         Again, you know, plaintiffs in their renewed motion, I

13    didn't see them making any concrete argument about

14    over-breadth.  They sort of said:  There is no real national

15    real security threat.  And they said:  And this doesn't leave

16    alternative avenues of communication open.

17         And I think it's especially difficult at this stage for

18    the government to have to say, you know, we -- we didn't adopt

19    some more narrowly tailored alternative that plaintiffs aren't

20    even proposing.  And you know, I apologize.  I don't think

21    Your Honor pointed to a specific thing the government could

22    have done that would have, you know, had somewhat less of an

23    impact here, but still would have prevented the wholesale

24    exfiltration of American data to the Chinese government, which

25    is what the American interest is here.

I think that Your Honor, you know, looking to that new declaration, the complaint there isn't that this is overbroad. I think what I read plaintiffs' declarant to be saying is that she didn't have a ready alternative to WeChat.  But of course, in her prior declaration, she made clear that she was in fact moving over to a different social media application.  She just didn't prefer it as much; it wasn't as functional or as convenient for her.

We certainly accept that representation.  But the bottom line, I think, is that, you know, this falls under that third prong, whether there are sufficient alternate avenues of communication.  And certainly, there are.

THE COURT:  So the one thing -- the one -- the one obser- -- plaintiffs made that argument perhaps more specifically in their opening brief.  In their reply brief, they switched to the -- they still said:  Serious question, likely to succeed, and have presented serious questions on the merits.  They still said both.  And they did specifically say -- and, you know, to Mr. Bien's point yesterday, he was like:  It's all there, we briefed it all, there's not going to be anything new.  And that was more or less what happened.  So I acknowledge that.

But they do say, essentially -- well, they talk in the context of strict scrutiny as the least restrictive -- or less, least intrusive means, because the effect of it is, at least by

1    the evidence that they've proffered in the record, that it's

2    essentially a complete shutoff.  You know, as a matter of

3    fact -- we're at the preliminary injunction stage, of course.

4    As a matter of fact, if you're correct, and that the

5    functionality exists and it would -- and as a matter of fact,

6    the utility -- they're able to use it still, that -- that that,

7    as a matter of fact, might change that analysis.

8         But we're at the irreparable-harm stage, too, in the

9    preliminary injunction analysis.  And so that's part of it I'm

10   bleeding into the other *Winters* factors by going there.  And so

11   I think that's part of it.  Because I think the irreparable

12   harm that the plaintiffs have advanced is -- is, whether by

13   virtue of intermediate scrutiny or strict scrutiny, is that the

14   -- the sort of the -- the full, you know, pull of everybody

15   into the net of cutting off of the means of communication.  But

16   maybe it is better to think in terms of the irreparable harm.

17   So you are at least -- it is, useful because I did want to talk

18   about that and the other *Winters* factors.

19        But Ms. Peng's supplemental declaration says more than

20   that.  Right?  She talks about, in more detail -- it was I

21   think raised in the initial declaration, but she provides more

22   detail about the context of her use with her nonprofit.  I

23   mean, she talks about how she uses the app, sorts of the

24   general points that the plaintiffs advance.  And then she talks

25   specifically about sort of her founding of the nonprofit, the

1    specific clients that she has, the -- and -- as a way of

2    illustrating the same points that the plaintiffs make in the

3    other context that these -- her clients are elderly, mentally

4    -- have mental-health issues, or -- and/or don't speak English,

5    or all of those things.  And that the sort of effective -- the

6    means of communication that that significant portion of her

7    client base -- and -- and she extends it to the

8    Chinese-speaking and Chinese community, including Chinese

9    American community -- means that, you know -- and she describes

10   the sort of -- you know, the lack of technological literacy in

11   this particular population, which I think is what is generally

12   what the plaintiffs -- if it were -- you were quite right.

13        So if -- there are some -- there are probably some members

14   in the WeChat community who could move to different platforms,

15   completely effectively.  That's a pragmatic observation that

16   you made, and I don't think that's factually inaccurate.  The

17   plaintiffs advance more than that.  I mean, their argument, at

18   least at the preliminary-injunction stage, and based on

19   evidence that they put in the record in the forms of their

20   declarations, is that for this class of people, for lack of a

21   better word, there are people whose access to their only online

22   platform for all the activities that are described in the

23   complaint and in the motions is effectively ending.  Right?  So

24   it's a more -- that's pretty specific.

25        And so in the context of the *Winters* factors, the

1   irreparable harm, I want to you make your best -- if you were

2   going to make that argument, what you think the -- and then I

3   also -- and then I want the plaintiffs to make their best

4   argument for irreparable harm.

5         And then we can discuss anything else about the First

6   Amendment analysis that you'd like to, or anything else,

7   really.  But I think the First Amendment -- I don't -- the APA

8   is just like way too new.  I -- so we could talk about that,

9   but it's just -- the *ultra vires* exceeding the scope of the --

10  you know, I'm not confident that I have enough information on

11  the record reach that at the preliminary-injunction stage.

12  They're very interesting issues.  I started to do research last

13  night, more research.  But I think that our efforts are best

14  spent on the First Amendment.

15        So, let's hit *Winters*.

16        **MR. DREZNER:**  Sure.

17        So, on the irreparable harm point, I mean, I just wanted

18  to make sure I respond to a couple things Your Honor said.

19        Plaintiffs aren't here on behalf of a class.  They're --

20        **THE COURT:**  I know.  Yeah, I -- (Indicating quotation

21   marks)

22        **MR. DREZNER:**  No, but I just -- because that's sort

23   of what they attempt to do now.  They've sort of tried to, I

24   think, assert injury and standing now on behalf of their

25   business clients, on behalf of their friends.  But the

 1    question is whether plaintiffs, themselves, have shown that

 2    they will be imminently subject to irreparable harm.  Harm

 3    that cannot be repaired, absent an immediate injunction.

 4        So I think -- they focus on two different points, and they

 5    have throughout the briefing.  One is sort of anxiety and

 6    uncertainty, and -- and general, sort of, worry about what the

 7    impact of this will be on them or their businesses.  And I

 8    think we pointed out throughout our briefing, that's not even

 9    enough in most circumstances to establish standing, let alone

10    irreparable harm.

11        And I think they still appear to be relying on that

12    through these declarations, because they're not really saying:

13    Once this happens, here's all the harms that I think are going

14    to happen.  They're just saying: I'm worried; here's, you know,

15    the worry that I'm experiencing because this is what's happened

16    in the past.

17        But worry does not constitute irreparable harm.  So I

18    think that's point number one.

19        Point number two is they sort of lean on this:  Well, we

20    have a First Amendment injury.  And a First Amendment injury,

21    therefore, equals irreparable harm.

22        And so I think that that requires two different analyses.

23    The first is:  Will they certainly be subject to a First

24    Amendment injury, once these definitions of prohibited

25    transactions go into effect?  We certainly argue they will not.

There are ample avenues of communication open to them.  I think
Your Honor hit it on the head.  That's their primary argument.
Not that this is overbroad, or that there were no government
interests at stake here, but they just have no other ways of.

I mean, that's simply belied by the record, it's belied by
their own declarations, it's belied by a Google search right
now to look for substitutes for WeChat.  There's no basis for
their assertion they just have no other way to communicate.

And to the extent that they say:  Well, there aren't, you
know, apps with as great functionality.  This would create a
pretty absurd result.  Because that is precisely what the
Chinese government has sought to do:  Ban the use of the vast
majority of communicative apps in their country, foster
reliance and dependency on a select few that they can control
and manage and use to achieve their own geopolitical ends.  And
then, when people are dependent on them, it's more difficult
for them to switch away.  But thankfully, in the United States,
there are a plethora of other options they can use.  So there's
no basis on which to think that they have any sort of First
Amendment injury.

And I think I would just point the Court back to the cases
that we cited, the *CTIA* case, the *Goldie's Bookstore* case, that
it's simply not enough to point at a First Amendment interest.
You actually have to say there's purposeful unconstitutional
suppression of speech.  That's the irreparable injury standard

1  in the Ninth Circuit.  Plaintiffs certainly haven't met that

2  burden.

3           THE COURT:  Okay.  So I will just -- I will point out

4   as a matter of fact, though, that Mr. Bien might say because

5   he said it in his briefs a bunch:  The government has made my

6   argument for me.

7           Part of the argument is for those who are communic- --

8  because of the -- because other platforms like -- such as

9  Facebook, et cetera, are banned in China, that the only means

10 of communication with loved ones is through this app.  And as a

11 matter of record, the plaintiffs have put in evidence that

12 suggests that on this record, it allows the conclusion that it

13 will be the effect of yanking the app out from them

14 immediately, and denying them that platform.

15         Now, as a matter of fact, if that turns out not to be

16 true, then that is a reason that an injunction should not stay

17 in place.  The issue is at the preliminary stage, with the

18 information that they have put in about irreparable harm, has

19 the standard been met?  And you say:  No, it hasn't.  I have a

20 very open mind about what evidence will and won't show, and all

21 I can look at is what evidence I've been presented on the

22 record.

23         And the other observation I have, which is -- probably

24 does nothing, but the sort of TikTok, kicking it down the road

25 until November 20th might have allowed to us develop -- if such

1   a solution had been put in place here, and perhaps this is the

2   reason for Mr. Bien's suggestion of a 60-day time period, we

3   might be able to see what the effect -- you know, we might be

4   able to do a fact-based analysis of what the harm actually is.

5   But the question is:  What do we do today?

6          But I -- but I understand what your argument is.

7          Okay.  So I don't know whether Mister -- Mister --

8          **MR. DREZNER:**  Can I just briefly respond?

9          **THE COURT:**  Of course.

10         **MR. DREZNER:**  Just one final note.  I mean, again,

11  this is a requirement, an independent requirement under the

12  First Amendment analysis.  So I just cannot imagine that it is

13  the case that the First Amendment requires the United States

14  government to make available to its citizens an application,

15  foreign-owned, foreign-controlled, and designed to advance the

16  interests of a foreign government that has explicitly used it

17  in the past for things like surveillance, censorship,

18  misinformation, and suppression of dissent in its country, and

19  now has been doing it overseas.

20         **THE COURT:**  That's a good argument for no televisions

21  with smart technology, or refrigerators with smart technology.

22  But is it a good argument in the context of a First Amendment,

23  at least with an argument I -- if there really is no way to

24  allow the speech without jeopardizing national security

25  interests, sure.  Right?  Sure.  But the issue is:  What does

1   the record show now?  And what's your reaction to that

2   observation?  I mean, you may be right, but are you right now?

3          **MR. DREZNER:**  So the question I think Your Honor is

4   asking is:  Are there alternate avenues of communication?

5   Plaintiffs haven't argued -- I don't think they could

6   cognizably argue there is no other way to communicate back

7   with people in China.

8          But if Your Honor is correct that the First Amendment

9   requires the United States to make available an app that can

10  easily be used for surveillance and exfiltration of the data of

11  American citizens, then that's a constitutional requirement,

12  and the American government could never take action against it.

13  Not through an act of Congress, not through any other action.

14  Right?  It would be forever barred from limiting an app simply

15  because it has accomplished the ends that the Chinese

16  government sought for it, to become a one-stop shop for

17  everyone in China and everyone overseas.

18         Your Honor, I would just refer you, there was a great

19  article that just came out in the *Washington Post* talking about

20  why the WeChat ban is a difficult but necessary step towards

21  openness in China.  And it notes -- I'll just quote one, one

22  prong here (As read):

23              "WeChat is a closed system that keeps 1.2 billion

24              users in a parallel universe where they're free to

25              interact where they don't cross the lines.  This

1              platform powers the apparatus of trans-national

2              repression that Beijing employs to silence its exiled

3              dissidents, intimidate overseas activists, and

4              surveil protesters."

5         Now, what plaintiffs are telling you is, you know, this is

6    probably true.  They don't dispute this.  So the only question

7    is:  Does the government have the ability to restrict use of

8    that sort of application?

9         There are a number of alternate avenues of communication

10   within the United States.  To the extent plaintiffs have rights

11   to speak to people simply overseas, I think the Ninth Circuit

12   held in the *Yahoo!* case, that's a difficult question of First

13   Amendment law, and it hasn't been definitively resolved.

14        And to the extent that there are rights to communicate

15   with people overseas, that has to be subsumed within the

16   national security analysis.  And we've certainly raised serious

17   national security concerns.

18        So it can't be that in the context where I think

19   Your Honor correctly noted that there are valid and numerous

20   critical issues of foreign policy and security at stake, that

21   the government must be permitted to allow use of this app that

22   can be used for such nefarious ends.

23             **THE COURT:**  All right.  I'm just going to look at one

24    related point that popped to mind.  I just want to look at

25    what the complaint says about the nonprofit of U.S. WeChat

1    users because that was -- that -- that -- that entity is a

2    client.

3        I mean, this never came up, everybody's been relying on

4    individual declarations.  And so this is more for my own --

5            **MR. BIEN:**  Your Honor, the declaration of Ying Cao --

6            **THE COURT:**  Okay, I'll look at that again.

7            **MR. BIEN:**  -- addresses this.  And may I speak just

8    for a sec?

9            **THE COURT:**  Yes, of course.

10           **MR. BIEN:**  On that point?

11       First, this is an evidentiary hearing.  It's a

12   preliminary-injunction hearing.  But, but you pointed out that

13   you spent a lot of time going through the government's

14   evidence.  And we've all seen what's there.

15       I'm afraid that almost everything that Mr. Drezner's

16   argued today about WeChat is not supported by evidence.  That

17   of a specific national security problem, they have not come

18   forward.  Maybe they have something, and that's -- the question

19   is for the preliminary injunction to preserve the status quo,

20   there's nothing.

21       And really, the other way I would phrase what's going on

22   here is:  Does the government have the power to shut down the

23   only app that plaintiffs have proven provides a range of

24   services -- communicative services, association services,

25   religious services -- the function of living in the pandemic --

1    we're in a pandemic.  We're having this hearing over Zoom

2    because we cannot be together.  We have proven, and government

3    has not rebutted, that this is what our plaintiffs rely on.

4        I want to point out that you'll see in a bunch of the

5    declarations, our very plaintiffs are non-English speakers.

6    They, themselves, have problems using other apps.  That's what

7    they said.  Some of -- the declarations are in English, but

8    you'll notice a paragraph saying: I was assisted in writing

9    this declaration in English because I am not literate in

10   English.  And Ms. Peng who you referred to is one of those

11   people.  So she, herself, is being harmed.  And the harm has

12   already happened.  It's irreparable.

13       To the extent that a plaintiff -- plaintiffs have already

14   lost customers.  Chihuo, our corporate plaintiff, has already

15   said that many, many customers have already left.  Those are

16   customers who publish, who speak on the web, who interact with

17   other people on the web.  We're not talking about whether or

18   not they're going to be criminally prosecuted.  That's a

19   slightly different issue.  But they're going to be shut down.

20   They're going to go out of business.  Okay.  And they're going

21   to suffer not only loss of business, but they're going to

22   suffer the -- lose the opportunity to speak to each other, to

23   communicate.  Not only -- not only with their relatives and

24   friends in China, but with relatives and friends here.

25       We established that approximately 40 percent of the

1   5 million Chinese Americans are not facile, not literate in

2   English.  They can use WeChat because it's a Chinese-designed,

3   Chinese-based platform.  It is the only one.  And there's no

4   evidence in the record of anything else.

5        And there are no alternatives.  Nothing else provides the

6   range of services, both video, talk, text, and the ability to

7   trans- -- have groups, and to do all that.  And for a Chinese

8   speaker -- as our clients pointed out, the ability to switch --

9   First Amendment law says one day of loss of First Amendment

10  freedoms is irreparable harm.  That day is going to begin in 36

11  hours.  And it's already begun, because as we introduced into

12  the record, people are acting in fear of this executive order,

13  in fear of it, and have already shut off access to WeChat.

14       You know, if I was lawyer for a university like University

15  of Kansas, as we put in the record, and I was asked by the IT

16  department what should we do, well, you better figure out how

17  to block WeChat and take it off.  You're facilitating.  You're

18  helping WeChat by keeping it on your wifi network.

19       So the First-Amendment issues are profound.  The harm is

20  profound.  And there are more targeted -- to call a complete

21  ban a targeted measure is obviously impossible.  It's anything

22  but targeted.  You can't just shut something down because you

23  have a problem with one aspect of it.

24       So for example, with TikTok, the government already

25  decided to restrict the United States government contractors

1   and employees from using it on their phones.  That's part of

2   TikTok.  They haven't -- they haven't done that with WeChat.

3   That's a less-restrictive alternative, more targeted towards

4   the problem.

5        If, in fact, the problem is data going to China, then why

6   is it that we're allowed to use -- individuals are allowed to

7   use WeChat?  Either allowed to use it, or not.  I don't -- I

8   don't know.  The --

9            **THE COURT:**  So your point is:  Why destroy its

10   functionality.  Because the answer must be -- either we'll see

11   what it is.  I mean, you've got -- put evidence in the record

12   that it destroys it entirely, as supported by an admission by

13   the Secretary, party admission.  And whether that's true as a

14   matter of fact, Mr. Drezner's allowed only for degradation.

15            **MR. BIEN:**  Right.

16            **THE COURT:**  But it hasn't disputed -- hasn't said no,

17   that's incorrect.  So, you know, the record is what it is.

18   And it is preliminary injunction.  I mean, it is for a

19   preliminary injunction.  It is not a final decision at all in

20   the case.

21        And so I -- and then sort of, just an interesting

22   observation, Mr. Drezner -- I'll read the *Washington Post*

23   article.  But the argument is you may have the First Amendment

24   on your side, but do you have other -- you know, argue on the

25   right side of the app?  But that's not a question for us to

1  decide today.

2          **MR. BIEN:**  Your Honor, if I could take the same

3   privilege that government just took?

4          **THE COURT:**  Yeah.

5          **MR. BIEN:**  And tell you that I spent two hours

6   reading newspapers and articles this morning.  Every tech

7   expert, everybody has said: WeChat will be unusable, whether

8   it's within days -- we're talking about a ban, a shutdown, an

9   absolute shutdown.

10      And I don't -- you know, I personally am not -- I mean, if

11  we have a trial on the merits, we will bring in technical

12  experts, and we can prove that point.  But, but, I think again,

13  as Your Honor's pointed out, it was conceded by a party

14  admission.  And I think it was conceded in yesterday's argument

15  by Ms. Orloff.  This is a ban.  That's what we're -- that's

16  what we're addressing.

17          **THE COURT:**  Okay.  No, I understand that.  I'm not --

18   I'm not uncomfortable with the record.

19      So, okay.  So do you want to say anything else on the

20  balance -- on the other *Winters* factors?  I just want to make

21  sure that you've said everything that you want to say to combat

22  the government's arguments.

23      I think you probably have, but I just --

24          **MR. BIEN:**  I think so.  I think that, you know, the

25   irreparable harm we've established in every which way.  And

1    the -- and of course in the First-Amendment context, was

2    this -- conceded here irreparable harm is established by that

3    very element.  This is speech.  This is press.  This is

4    association.  This is religion.  They'll all be shut down.

5        And the balance of the equities, here we have a -- you

6    know, fundamental constitutional rights for a minority that's

7    been historically discriminated against.  We haven't talked

8    about this today, but it's definitely relevant.  Again, I need

9    to bring it up.

10        It's undisputed on this record that President Trump has

11    made racist statements about Chinese Americans, he's accused

12    China of intentionally causing the pandemic, and he's blamed

13    the recession on China.

14        **THE COURT:**  I will just say, and I don't -- I'm very

15    happy for you to say anything for the record that you'd like.

16    My account of the facts fairly reports everybody's view of

17    everything.

18        So just as I -- because I wanted the government -- I

19    wanted to have the conversation with the government about --

20    you know, in the context of an analysis of intermediate

21    scrutiny, and the harms, what that looked like with the

22    countervailing national security interests.  And I also did the

23    same -- I mean, I've captured -- I've tried -- and it's not

24    100 percent.  That's the nature of preliminary injunctions.

25    You can't -- you don't have time to -- it's -- it's

1   time-sensitive.  So I don't -- it may not be 100 percent.

2       But I do acknowledge that you put in evidence, and the

3   order will reflect a summary of the evidence, just like -- it

4   doesn't, jot for jot, everybody, but it tries to capture what

5   you said, the categories.

6       **MR. BIEN:**  I have nothing else, nothing else to add.

7   I think Your Honor clearly has understood our arguments and

8   our evidence.

9       **THE COURT:**  Okay.  So the one last question I have,

10  and I -- I am very careful to rely on the parties' arguments.

11  And so one of the things I do as a mop-up device, I go through

12  and I make sure I understand each of your arguments, try to

13  capture them in my order, not take them beyond what you've

14  advanced, and to rely on your theories of the case and your

15  authorities, unless I happen to know things to the contrary.

16      But one of the things that struck me about both arguments

17  in both briefs, which is why when I had the submissions on

18  Wednesday and when I saw the government's initial opposition

19  with its argument about what an injunction should look like --

20  this, of course, before the Secretary issued his identification

21  of prohibited transactions -- there were a lot of citations to

22  broad principles.  You know, this is the -- this is the

23  analytic framework.  And, and I am a very fact-oriented

24  problem-solver.

25      And I -- and so in my last First Amendment order, for

 1  example, I thought deeply about when it's not aimed at content,

 2  and is instead -- in this case was about funding, whether the

 3  government should give crisis loans to businesses and has

 4  delegated authority in the context of the enabling statute to

 5  make decisions in the public interest about what kinds of small

 6  loans it wants to fund, there are lots of First Amendment cases

 7  to look at in analogous contexts.  And so you can consider and

 8  try to understand the difference between merely subsidizing

 9  speech or giving a subsidy that requires speech in order to get

10  a subsidy.  That's my capture of what the law is here.

11       And I thought -- and there -- and the cases and

12  Mr. Gilligan's citation to authority was very robust.  But one

13  thing that I felt a bit -- and I could imagine looking at a --

14  you know, looking at it from the government's perspective, a

15  case that's not -- that's subject to intermediate scrutiny, I

16  found myself struggling with -- in the context of the arguments

17  you were making, to consider analogous contexts that might help

18  me do a better job in my First Amendment analysis.

19       And so I -- and so the cases that the parties cited -- and

20  I read the cases that you cited in your argument last week,

21  Mr. Drezner, and there were two that weren't cited in your

22  brief.  I read them.  But they -- again they were fine for

23  principles, and factually not particularly helpful.

24       And I just don't know if anybody has a case that they

25  wanted to -- because I can't think of any analogous context,

1    myself.  And I have a limited bandwidth to take a huge spelunk

2    into the -- to consider whether there's something I could think

3    about in the context of the government advancing national

4    security interests in a First-Amendment context, just to look

5    what any court has done on the issue.  Nobody really cited me

6    any of those cases, and perhaps they don't exist.

7           You mentioned the *Yahoo!* case.  But I -- but that's -- I

8    don't know.  Does any -- that's the final point I wanted to

9    make.  I thought -- I -- I felt that was in the land of

10   principles, and not of context.

11                **MR. DREZNER:**  Should I respond, Your Honor?

12                **THE COURT:**  Sure.

13                **MR. DREZNER:**  Sure.

14          So I think probably one of the better cases to look to is

15   *Holder v. Humanitarian Law Project*.  And that was also an

16   intermediate-scrutiny First-Amendment case where the

17   government's interest in national security played a large role.

18          And then I think it's notable that the *Hawaii v. Trump*

19   decision repeatedly relied on that decision, *Holder V.*

20   *Humanitarian Law Project*, in repeatedly noting how the

21   executive gets deference both in its assembling of the evidence

22   on national security interests, and then in terms of deference

23   on whether the order goes too far or whether it sufficiently

24   addresses these interests, or whether it's overbroad.

25          And so where plaintiffs say:  No, that's a rational-basis

1    case, in fact, it goes back to this intermediate-scrutiny

2    analysis.  So this sort of deference I think applies across the

3    board.

4            **THE COURT:**  But those weren't First Amendment cases.

5            **MR. DREZNER:**  *Holder* was, Your Honor.

6            **THE COURT:**  Okay.  Okay.

7            **MR. DREZNER:**  And then -- sorry.

8            **THE COURT:**  I'll look at it.

9            **MR. DREZNER:**  Okay.

10           **MR. BIEN:**  Your Honor --

11           **MR. DREZNER:**  And then I would just add that

12   certainly while the, you know, technological realm is unique,

13   I think as a practical matter, you know, this is just another

14   time, place and manner restriction.  It's telling people, you

15   know:  You can still communicate on whatever topic you want

16   to; you just might not be able to do it in the ways or in the

17   manners that the government restricts.

18       And so you can look to things like *Taxpayers v. Vincent*,

19   you can look to *Metro Media*, you can look to *GK Limited* or *Lone*

20   *Star*.  All of these decisions generally address time, place and

21   manner.  And so the analysis is the same across all of them.

22       And I think the only difference from those cases to things

23   like *Holder* is you have got, I think, this extra layer of

24   context and deference, where then you layer on these sort of

25   national security determinations as well.

1            THE COURT:  Okay.  And Mr. Bien might say in the

2    context of a complete denial of access to an app that's the

3    means of communication for this particular set of plaintiffs.

4            MR. BIEN:  Right.

5            THE COURT:  Okay.  So I don't know -- anything else

6    you want to add, Mr. Bien?  If not, I want to =--  need to get

7    out an order this afternoon.

8            MR. BIEN:  Yes.  I point out to, again, *Packingham*.

9    And it's not national security but it certainly --

10           THE COURT:  That's the child porn case, right?

11           MR. BIEN:  -- addressed this area.

12           THE COURT:  Yeah.

13           MR. BIEN:  But what about *Hedges v. Obama*?  Those are

14   reporters raising a national security -- you know, threatened

15   with prosecution for national security terrorism issues

16   because they feared interviewing people who might be accused

17   of being involved with terrorists.  They won, by the way,

18   multiple times.  And it was not reversed in the Second Circuit

19   on the merits, it was reversed based on the government --

20   government's representations that they would not proceed

21   against these reporters.

22       So again, I think the point here is there needs to be

23   evidence.  There needs to be -- we need to have this injunction

24   issue, and then if there's -- if the government can come up

25   with something, but I think there's a very -- this is a unique

 1   circumstance.  We don't know of any other situation where the

 2   government has attempted to shut down a critical super app -- a

 3   critical form of communication for a particular community

 4   within America, a minority that relies heavily on this,

 5   especially during a pandemic.

 6        And that's the reason we don't have a lot of precedents,

 7   is no one has ever gone anywhere near this.  Of course, it's

 8   also prohibited by the very law the government acted on, but

 9   that's another point.

10        THE COURT:  All right.  Well, thank you very much for

11    being available on a Saturday.  I appreciate the good work

12    that everybody's put into the case.  I'll get -- I'll get out

13    an order today.

14        Relieved to know that's it's not 12:01 a.m. on Sunday

15   morning, not that --

16        MR. BIEN:  Your Honor, I wanted to mention one other

17    thing -- one other thing that you mentioned.

18        THE COURT:  Yes.

19        MR. BIEN:  In the conclusion of our --

20        THE COURT:  Oh, right, exactly.  Your proposed order.

21        MR. BIEN:  In the conclusion, we included some

22   additional language for the proposed order.  If -- you know,

23   it's -- I don't know if you've already drafted something.  But

24   really --

25        THE COURT:  I still -- I've got to cite-check all my

1   things, I've got to read a couple more cases.  I have to check

2   my record cites and all of that stuff.  So it's going to be --

3   it's a tedious job, finalizing an order.  And I still have to

4   work a little bit on my other *Winters* factors.  I've not

5   chewed through all of that yet.  But I --

6       MR. BIEN:  Would you like us to submit a revised

7   proposed order?

8       THE COURT:  You know, I don't -- sure.  I don't

9   really -- I do it just as a check, because I want to look at

10  what the scope of the relief is that you're requesting.  And

11  because I -- and I just happened to notice that 60-day period,

12  and wondered what that looks like in the context of your

13  renewed motion and the Secretary's identification.  I mean

14  that's what I look at.  I just look at it to make sure I'm not

15  overlooking something, or overreaching something you're asking

16  for.

17      MR. BIEN:  The reason in my mind that's still

18  relevant, Your Honor, is that the Secretary and the --

19  reserves his right to issue additional definitions of

20  "transaction."  And that's in this --

21      THE COURT:  Right, I'm --  it's in Paragraph 7 or

22  whatever.

23      MR. BIEN:  And there's no notice -- again, no notice

24  included.  In fact, there's a -- Section 3 of the executive

25  order says he doesn't have to give any notice.

1      **THE COURT:**  Yeah.  And I took Section 3 out -- I

2  mean, my order has gone through so many iterations, thanks to

3  your many useful admissions.  But Section 3 was in, Section 3

4  came out.  Maybe Section 3 needs to go back in.  But I'm not

5  sure I'm going to get there, I'm not sure that I need to get

6  there.  And so -- but I -- I just need to think about that.

7      Okay.  So that's fine.  Yeah.  Okay.

8      **MR. DREZNER:**  Your Honor, can I just --

9      **THE COURT:**  Yes, Mr. Drezner.

10     **MR. DREZNER:**  I just -- I have been asked to make a

11 brief request for a bond in the event that Your Honor does --

12     **THE COURT:**  Right.

13     **MR. DREZNER:**  -- call for an injunction.  I think

14 while we didn't brief this, we disagree that no bond is

15 needed.

16     I think if Your Honor was to enjoin this, the obvious

17 effect would be that additional information would continue to

18 flow to Tencent, and therefore, to the Chinese government.  And

19 there's obvious harms that attend that, and so a bond should be

20 posted to reflect that harm.

21     **THE COURT:**  All right.  The only issue -- and again,

22 I -- I really appreciate what a great job you've done.

23 Everybody's done a great job.  But I -- I always enjoy these

24 arguments, and you guys did a very fair job advancing the

25 interests of the agencies and the -- the executive branch.

1    But you guys didn't brief it, so I didn't even pay attention

2    to it.  So that's problematic, because we do -- we do like to

3    rely -- "we" collectively, not "we" the royal -- like to rely

4    on the arguments that people make in writing, and use argument

5    as a way to illuminating them.

6        Okay.  So I think with that, I'll take the matter under

7    submission.

8            **MR. BIEN:**  Thank Your Honor.

9            **MR. DREZNER:**  Thank you, Your Honor.

10       (Proceedings concluded)

### CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States

Court, Northern District of California, hereby certify that the

foregoing is a correct transcript from the record of

proceedings in the above-entitled matter.


_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Saturday, September 19, 2020