**FOR OFFICIAL USE ONLY**

<u>**APPENDIX F: Examples of Tencent Facilitating PRC Monitoring, Surveillance, and Censorship**</u>

- According to press reporting, on September 26, 2019, authorities in the eastern province of Shandong detained a user of the social media platform WeChat after he sent content to a friend in the United States. Gao Zhigang was taken away and initially held under criminal detention by police in his home district of Yingze in Shandong's Taiyuan city on suspicion of "picking quarrels and stirring up trouble." Gao told Radio Free Asia that he was detained on the basis of a single video clip he forwarded to his U.S.-based friend. Gao served a 10-month sentence for "slander" of the government and public order. Gao viewed the evidence against him, and realized that it hadn't come from his phone. "The screenshots they provided weren't mine, because I had deleted everything after sending it," he said. "The recipient was also being monitored – by a different police station."[110]

- According to press reporting, on March 16, 2019, China watcher Chenchen Zhang shared an anecdote on Twitter about a member of the Uyghur Muslim minority who was stopped at mainland China's border with Hong Kong and interrogated for three days simply because someone on his WeChat contact list had recently "checked in" with a location setting of Mecca, Saudi Arabia. The authorities apparently feared that the Uyghur man had traveled on pilgrimage to Mecca without permission, warning that such a move could yield 15 years in prison.[111]

- According to press reporting, on January 16, 2019, a Hebei court released a WeChat "map of deadbeat debtors" whereby users are given an on-screen radar that allows them to discover if there is anyone who owes money within a 500 meter radius." Individuals are then encouraged to tell authorities if they believe the person can afford to pay back what they owe.[112][113]

- In April 2018, public security authorities from multiple locations in China criminally detained 8 administrators of the National Tourism Chat Group. A group of more than 100 members hosted on social media platform WeChat that reportedly organized humanitarian support for family members of political prisoners. As of June 2018, authorities had formally arrested Guo Qingjun, one of the WeChat group's administrators.[114][115]

- According to press reporting, in March 2018, six practitioners of Falun Gong, a spiritual meditation discipline that is severely persecuted by the Chinese regime, were recently arrested and detained for posting messages on WeChat about the regime's ongoing repression of the practice. Four women and two men – Wang Hui, Wang Xin, Han Xiaoqiu, You Tingting, Wang Yong, and Wang Dengli – hailing from different cities and provinces, were arrested and subsequently detained at the Lishui City Detention Center in Zhejiang Province, according to Minghui.org, a U.S.-based website that tracks the persecution in China. Police, prosecutors, and Party agencies have since tried to coerce the

---

[110] https://www.rfa.org/english/news/china/monitor-08182020091653.html?searchterm:utf8:ustring=%20wechat
[111] https://www.japantimes.co.jp/opinion/2019/03/28/commentary/world-commentary/worried-huawei-take-closer-look-tencent/#.Xz1G0n4pCUl
[112] https://freedomhouse.org/report/china-media-bulletin/china-media-bulletin-social-credit-incentives-elite-jailings
[113] http://www.chinadaily.com.cn/a/201901/16/WS5c3edfb8a3106c65c34e4d75.html
[114] https://www.govinfo.gov/content/pkg/CHRG-115hhrg31388/html/CHRG-115hhrg31388.htm
[115] https://chinachange.org/2018/04/15/eight-detained-for-organizing-humanitarian-assistance-for-political-prisoners-and-their-families/

**AR-1165**

Case 3:20-cv-05910-LB   Document 77-1   Filed 10/01/20   Page 2 of 65

**FOR OFFICIAL USE ONLY**

six practitioners into giving up their beliefs, the Minghui report stated. They are scheduled for court hearings at Songyang County Court on March 20.[116]

- According to press reporting, in 2017, construction supervisor and Chinese national Chen Shouli reportedly told a joke in a WeChat chat group. Four days later he was telephoned by Chinese authorities and ordered him in for question. Chen was locked in a cell for five days, he says. According to the police report, his comment on the WeChat messaging app was deemed "picking quarrels and provoking trouble," a broad offense that encompasses gang fighting and destruction of public property and is punishable by detention without trial. Similarly, auto mechanic and Chinese national Yang Qingsong used an expletive in a WeChat post to question the intelligence of police for doing checks in the rain. Police detained Yang for five days, saying his post to a group with 241 people "created negative social effects."[117]

- According to 2017 press reporting, Beijing activist Hu Jia said he bought a slingshot online after a friend recommended it for relieving stress. He paid with WeChat's mobile-payment feature. Mr. Hu said he was later interrogated by a state security agent, who asked if he was planning to shoot out surveillance cameras near his apartment. A few years earlier, Mr. Hu said, he had messaged a friend headed to Taiwan with the names of activists he might want to see while traveling there. Later, he said, state security agents showed up at the friend's house and warned him against meeting Mr. Hu's acquaintances.[118]

- According to press reporting, Zhang Haitao was detained on Dec. 2, 2016 and sent to Shaya prison in Xinjiang. Zhang, an outspoken critic of the ruling Chinese Communist Party's treatment of the mostly Muslim Uyghur ethnic group, is serving a 19-year jail term for "incitement to subvert state power" and spying charges. At Zhang's trial, the prosecution cited 69 posts to the Chinese social media platform WeChat and 205 Twitter posts and retweets, as evidence of inciting subversion of state power.[119]

---

[116] http://webcache.googleusercontent.com/search?q=cache:f22KCaAorh8J:https://www.theepochtimes.com/chinese-citizens-detained-for-posts-on-social-media-platform-wechat_2462475 html&client=firefox-b-1-d&hl=en&gl=us&strip=1&vwsrc=0
[117] https://www.wsj.com/articles/jailed-for-a-text-chinas-censors-are-spying-on-mobile-chat-groups-1512665007
[118] https://www.wsj.com/articles/chinas-tech-giants-have-a-second-job-helping-the-government-see-everything-1512056284
[119] https://www.rfa.org/english/news/china/wife-07292020111256.html?searchterm:utf8:ustring=%20wechat

AR-1166



# Jailed WeChat User Says Chinese Police Monitor Overseas Accounts Too

2020-08-18



Documents show indictment and court verdict against WeChat user Gao Zhigang.
Provided by Geng Guanjun

Authorities in the eastern province of Shandong detained a user of the social media platform WeChat after he sent content to a friend in the United States, providing fresh evidence that the ruling Chinese Communist Party is monitoring communications with WeChat users.

Gao Zhigang was taken away on Sept. 26, 2019 and initially held under criminal detention by police in his home district of Yingze in Shandong's Taiyuan city, on suspicion of "picking quarrels and stirring up trouble."

Following his release, Gao told RFA that he was detained on the basis of a single video clip he forwarded to his U.S.-based friend.

**AR-1167**

"After I was detained, I was held under administrative detention for 10 days, and they interrogated me," he said. "Then, on the eighth day, I was transferred to the criminal detention center."

"Then there was a 10-month wait before I was sentenced for 'picking quarrels and stirring up trouble'," he said.

Gao's 10-month sentence for "slander" of the government and public order charges included time already served, and he was recently released after being sentenced last December.

But the twist came when Gao viewed the evidence against him, and realized that it hadn't come from his phone.

"The screenshots they provided weren't mine, because I had deleted everything after sending it," he said. "The recipient was also being monitored -- by a different police station."

"They are able to get into WeChat through a back door and target you."

**Forwarded to activist overseas**

The video, which referenced a pro-democracy campaign called "Act Together," had been forwarded to Geng Guanjun, a pro-democracy, human rights activist now living in the U.S.

The campaign followed public calls by overseas activist Li Yiping for Chinese people to take to the streets on May 1 to campaign for social justice.

The evidence against him included documents from China's Cyberspace Administration and central propaganda department indicating that these departments directly monitor WeChat conversations.

Geng told RFA that he had never even clicked on the video clip.

Later, he learned that Gao was incommunicado, but didn't find out why until after Gao's release.

"The content of the indictment confirms that the Cyberspace Administration

**AR-1168**

and propaganda department in China are monitoring WeChat users," he said.

Repeated calls to the Yingze district police department rang unanswered during office hours. Calls to the Yingze district state prosecutor's office also rang unanswered.

Attempts to contact the WeChat customer service number and the media office at WeChat's parent company Tencent were also unsuccessful.

Jin Chun, a former big data engineer at Huawei's Nanjing Research Institute, meanwhile recently told reporters that all Chinese communications companies and internet service providers companies are required to monitor users on behalf of the ruling Chinese Communist Party.

Faced with an official request for data, no company will resist, because they would cease to operate, he said.

**Growing concerns**

Concerns are growing over overseas censorship and surveillance via Tencent's WeChat social media app, with the U.S. banning business with its parent entity, and rights activists describing it as a "prison" that keeps users within reach of the Chinese Communist Party (CCP)'s censors and law enforcement operations far beyond China's borders.

Launched by Tencent in 2011, WeChat now has more than 1.1 billion users, second only to WhatsApp and Facebook, but the company keeps users behind China's complex system of blocks, filters, and human censorship known as the Great Firewall, even when they are physically in another country.

The app is also used by China's state security police to carry out surveillance and harassment of dissidents and activists in exile who speak out about human rights abuses in the country, or campaign for democratic reform.

In May 2020, researchers at CitizenLab at the Munk School of Global Affairs, University of Toronto, warned that anyone using WeChat, even if they have lived their whole lives outside China, is "subject to pervasive content surveillance that was previously thought to be exclusively reserved for China-registered accounts."

**AR-1169**

Documents and images transmitted entirely among non-China-registered accounts undergo content surveillance wherein these files are analyzed for content that is politically sensitive in China, the report, titled "We Chat, They Watch," said.

U.S. President Donald Trump has already issued a ban on U.S. transactions with Tencent and ByteDance, the Chinese parent company of video-sharing app TikTok, citing a security threat posed by the transfer of data belonging to U.S. citizens to China.

The order also highlighted reports that the app censors content China deems politically sensitive, including protests over issues of autonomy in Hong Kong and Beijing's abuses of Uyghurs and other Muslim minorities in the Xinjiang Uyghur Autonomous Region (XUAR), and said it could be used to spread disinformation to benefit the CCP.

*Reported by Wong Siu-san and Sing Man for RFA's Cantonese Service. Translated and edited by Luisetta Mudie.*

**AR-1170**

Worried about Huawei? Take a closer look at Tencent | The Japan Times        Page 1 of 5
Case 3:20-cv-05910-LB   Document 77-1   Filed 10/01/20   Page 7 of 65
WeChat Appendix F Footnote 116 - Worried About Huawei?

# the japantimes

COMMENTARY / WORLD

# Worried about Huawei? Take a closer look at Tencent

BY SARAH COOK                                                    Mar 28, 2019

**WASHINGTON –** It has long been understood that Tencent — the Chinese firm that owns WeChat and QQ, two of the world's most widely used social media applications — facilitates Chinese government censorship and surveillance. But over the past year, the scale and significance of this activity have increased and become more visible, both inside and outside China.

During the last month alone, several events have illustrated the trend and Tencent's close relationship with the Chinese authorities. On March 2, Dutch hacker Victor Gevers revealed that the content of millions of conversations on Tencent applications among users at internet cafes are being relayed, along with the users' identities, to police stations across China. Just three days later, the company's founder and chief executive, Pony Ma, took his seat among 3,000 delegates to the National People's Congress, the country's rubber-stamp parliament. Ma reportedly raised the issue of data privacy even as security agencies were using data from his company's applications to root out unauthorized religious activity.

On March 16, China watcher Chenchen Zhang shared an anecdote on Twitter about a member of the Uyghur Muslim minority who was stopped at mainland China's border with Hong Kong and interrogated for three days simply because someone on his WeChat contact list had recently "checked in" with a location setting of Mecca, Saudi Arabia. The authorities apparently feared that the Uyghur man had traveled on pilgrimage to Mecca without permission, warning that such a move could yield 15 years in prison.

As Tencent's pattern of censorship and data-sharing with China's repressive government continues and intensifies, now is the time to consider actions that might help protect the basic rights of all users, regardless of their location and nationality.

**AR-1171**

WeChat Appendix F Footnote 116 - Worried About Huawei?

## Tencent's role in China

Founded in 1998, Tencent and its popular applications have quickly emerged as ubiquitous elements of China's communications, financial and social fabric. In January, the company declared that WeChat alone had a billion active daily users. While the company has been forced since its inception to comply with strict Chinese Communist Party information controls, the combination of growing government demands and WeChat's near market saturation in China has increased the scope and impact of its complicity.

In the realm of censorship, media reports and expert research indicate that WeChat has been refining the use of artificial intelligence to identify and delete images, which netizens commonly employ to evade censorship and surveillance of text communications. The platform has also shuttered thousands of social media accounts that produced unauthorized news and analysis.

These and other forms of censorship significantly distort the information received by Chinese users on vital topics. Analysis by researchers at Hong Kong University's WeChatscope project, which tracks deletions from some 4,000 public accounts on the platform, found that among the most censored topics in 2018 were major news stories like the U.S.-China trade dispute, the arrest in Canada of Huawei chief financial officer Meng Wanzhou, the #MeToo movement and public health scandals.

Monitoring of user activity on the platform has been made simpler by enhanced enforcement of real-name registration requirements for cellphones, the electronic payment features of WeChat, large-scale police purchases of smartphone scanners and new rules facilitating public security agencies' access to data centers. As indicated above, content from Tencent applications is being directly given to police in some cases.

This surveillance is increasingly leading to legal repercussions for ordinary users. A sample of cases tracked in Freedom House's China Media Bulletin over the past year feature penalties against numerous WeChat users for mocking President Xi Jinping, criticizing judicial officials, commenting on massive floods, sharing information about human rights abuses, or expressing views related to their persecuted religion or ethnicity, be they Uyghur Muslims, Tibetan Buddhists or Falun Gong practitioners. The punishments have ranged from several days of administrative detention to many years in prison, in some cases for comments that were ostensibly shared privately with friends. These dynamics have inevitably encouraged self-censorship on the platform.

**AR-1172**

## Global expansion

Although WeChat's primary user base is in China, an estimated 100 to 200 million people outside the country use the messaging service. Among them are millions of members of the Chinese diaspora in countries like Canada, Australia and the United States, but there is also broader expansion in much of Asia. Malaysia is reportedly home to 20 million WeChat users, out of a population of 31 million. In Thailand, an estimated 17 percent of the population has a WeChat account. In Mongolia, WeChat was the second most downloaded application in 2017. Merchants in Myanmar's Shan state along the border with China have taken up the app and the number of retailers in Japan that accept WePay (mostly when serving Chinese tourists) increased 35-fold last year. Tencent recently purchased a $150 million stake in the news aggregator Reddit and is eyeing an entrance into the online video market in Taiwan, according to Taiwanese officials.

Evidence that politicized censorship and surveillance may affect Tencent users outside China has begun to emerge. A 2016 study by Citizen Lab found that conversations between an overseas user and a contact inside China were subject to certain forms of keyword censorship, and that once an account is registered with a Chinese phone number, it remains subject to Chinese controls even outside the country.

In Australia, a more recent study of news sources available to the Chinese diaspora found negligible political coverage of China on the WeChat channels of Chinese-language news providers. Incredibly, between March and August 2017, none of the WeChat channels published a single article on Chinese politics, despite the run-up to the important 19th Party Congress that fall. In Canada, WeChat censors have deleted a member of Parliament's message to constituents praising Hong Kong's Umbrella Movement protesters, manipulated dissemination of news reports related to Meng's arrest, and blocked broader media coverage of Chinese government corruption and leading officials.

Amid a crackdown in Xinjiang, Chinese police have also harnessed WeChat to connect with overseas Uyghurs, demand personal information or details about activists and insert state monitors into private groups.

## How to respond

Regardless of whether Tencent is a reluctant or an eager accomplice to the Chinese government's repressive policies, the reality is that Tencent employees can be expected to censor, monitor and report private communications and personal data, in many cases leading to innocent people's arrest and torture. This should be the starting point for anyone considering using, regulating, or investing in the company's services.

**AR-1173**

Case 3:20-cv-05910-LB   Document 77-1   Filed 10/01/20   Page 10 of 65

For those inside China, it is nearly impossible today to function without using WeChat to some extent. But users would be well advised to exercise caution, restricting the application to its most practical functions and consulting available guides on enhancing digital security and accessing information on current affairs more safely.

Users outside China, particularly those without family or friends on the mainland, should rethink whether WeChat is really essential to their daily lives. Individuals who do communicate with personal contacts in China can help protect them by directing them to more secure applications if a sensitive topic comes up, or using homonyms to replace potentially problematic terms, as some journalists have reported doing. Users in the Chinese diaspora should explore ways of expanding their sources of news and information beyond what is available on WeChat.

As governments around the world try to tackle problems related to "fake news," political manipulation and weak data protections on social media platforms like Facebook and Twitter, Chinese counterparts like WeChat should be subject to at least as much scrutiny and regulation — and be held accountable for any violations. Governments and corporations should also restrict usage of WeChat among their employees, particularly those who work with sensitive information, as the governments of Australia and India have recently done. Politicians communicating with their Chinese-speaking constituents should make sure to do so across a diversity of platforms, not just those that are subject to Chinese government control.

International civil society groups can assist users and democratic governments by maintaining up-to-date digital security guides available in Chinese, documenting the extent to which content outside China is censored or monitored on WeChat and exploring legal recourse for those whose rights may have been violated by Tencent's practices.

Lastly, investors in Tencent should consider the moral and political implications of their support for the firm. Anyone concerned about human rights, electoral interference by foreign powers or privacy violations by tech giants should divest from the firm, including retirement funds. Socially responsible investment plans should exclude Tencent from their portfolios if they have not already.

Even from a financial perspective, Tencent shares may not be a wise purchase. The price has dropped 19 percent over the past year, in part because of tighter government controls on user communications. Given that Chinese regulators are now turning their attention to the gaming industry, the firm's most profitable area of activity, its value is likely to dip further. As stock analyst Leo Sun has warned, "Investors in Chinese tech companies should never underestimate the government's ability to throttle their growth."

**AR-1174**

Worried about Huawei? Take a closer look at Tencent | The Japan Times    Page 5 of 5
Case 3:20-cv-05910-LB   Document 77-1   Filed 10/01/20   Page 11 of 65
WeChat Appendix F Footnote 116 - Worried About Huawei?

No amount of pushback from users, democratic governments, civil society groups, or investors is likely to change Tencent's complicity with the Chinese government's repressive activities. Its very survival depends on dutiful adherence to Communist Party directives. But the steps suggested above would do a great deal to limit the current and potential future damage caused by the company's practices — for individual users, for the world's open societies and for the very concept of free expression in the digital age.

*Sarah Cook is a senior research analyst for East Asia at Freedom House and director of its China Media Bulletin.© 2019, The Diplomat; distributed by Tribune Content Agency*

### KEYWORDS

SOCIAL MEDIA (HTTPS://WWW.JAPANTIMES.CO.JP/TAG/SOCIAL-MEDIA/), TENCENT (HTTPS://WWW.JAPANTIMES.CO.JP/TAG/TENCENT/), CHINESE CENSORSHIP (HTTPS://WWW.JAPANTIMES.CO.JP/TAG/CHINESE-CENSORSHIP/)

### RELATED PHOTOS



(https://cdn.japantimes.2xx.jp/wp-content/uploads/2019/03/p7-cook-a-20190329.jpg)

Tencent's pattern of censorship and data-sharing with the …



(https://www.japantimes.co.jp/liveblogs/news/coronavirus-outbreak-updates/)

**AR-1175**

Case 3:20-cv-05910-LB   Document 77-1   Filed 10/01/20   Page 12 of 65
WeChat Appendix F Dolittle 1971 Freedom House China Media Bulletin

# China Media Bulletin: Social credit incentives, elite jailings, #MeTooUyghur (No. 133)

In this issue: How Communist Party scoring schemes incentivize repression, propaganda is going digital, and suppression of Uighurs and cultural censorship extend far beyond China's borders.

**Prize Painting**
This seemingly innocuous image of a Chinese painting was shared 990 times within three hours on Sina Weibo before being deleted by censors. Posted on February 14 by television celebrity host Cui Yongyuan to over 20 million followers, the trigger for the deletion appears to be Cui's offering it as a prize to the winner of an essay contest critical of state-run China Southern Airlines. Cui has accused the airline of leaking his personal information launched the contest to pressure the airline to improve data protections, but censors were wary of an online discussion by customers and employees of problems at the state-run firm. Credit: Weiboscope

**HEADLINES**

---

## ANALYSIS: How the Chinese Communist Party Is Incentivizing Repression

*The party's "social credit" scoring systems may be dressed up like games, but the results can be deadly serious.*

*By Sarah Cook*

As the Chinese Communist Party (CCP) moves forward with plans for a "social credit system" that would rate and impose consequences for citizens' behavior, much reporting

**AR-1176**

China Media Bulletin: Social credit incentives, elite jailings, #MeTooUyghur (No. 133) …   Page 2 of 18
Case 3:20-cv-05910-LB   Document 77-1   Filed 10/01/20   Page 13 of 65
WeChat Appendix F Footnote 1971 Freedom House China Media Bulletin

and commentary has focused on how such systems could undermine privacy, blacklist undeserving victims, and penalize the party's critics.

But there is an even more disturbing dimension to the social credit phenomenon: The ways in which it may incentivize citizens to act as enforcers for the authoritarian party-state and help to repress their own compatriots. While the nationwide system is not yet in place, examples of similar incentives can be found in a variety of existing CCP policies and practices.

## Propaganda prizes

One party-backed reward system that made headlines this month is a [new mobile phone application](#) meant to promote "Xi Jinping Thought" and other propaganda: "Study Xi, Strengthen China" (Xué Xí Qiáng Guó). Along with a steady stream of Xi quotes and state media reports, the app—which has already been downloaded tens of millions of times—incorporates quizzes and other opportunities for users to earn "Xi study points" that can be cashed in for real-world prizes. Importantly, one accumulates points not only for con-suming information, but also for sharing articles with friends.

This is not the only example of such digital incentives, nor are they limited to users inside China. An app offered by the English-language state newspaper *China Daily* via Apple's US-based iTunes store also offers users points for reading, liking, and sharing articles, and the points can be converted into virtual coins and used to make purchases from an online store.

At first glance, such user engagement may seem relatively harmless. But sharing Chinese state media content can mean promoting the coerced confessions of lawyers and journal-ists, or the whitewashing of mass detention policies in Xinjiang. Warping the infor-mation environment can do real-world damage.

## Rewarding acts of repression against minorities

Various pilot schemes and [disparate systems](#) related to the development of a national social credit mechanism include elements that effectively encourage the repression of religious and ethnic minorities. For instance, an investigation by Nectar Gan published in the *South China Morning Post* on [February 19](#) details how information is collected and points are allotted in the city of Rongcheng in Shandong Province. In one case, 10 points

**AR-1177**

China Media Bulletin: Social credit incentives, elite jailings, #MeTooUyghur (No. 133) …   Page 3 of 18

Case 3:20-cv-05910-LB   Document 77-1   Filed 10/01/20   Page 14 of 65
WeChat Appendix F Dumbile 1971   Freedom House China Media Bulletin

were granted to a couple "who have a son serving in the army in Tibet," where Chinese security forces enforce onerous constraints on the fundamental rights of ethnic Tibetans.

In another example from the same town, as reported by *Foreign Policy* in April 2018, those who receive a "city-level award" can earn 30 points. While the article states that such awards can be gained "for committing a heroic act," they have also been offered to officials who loyally repress the rights of local residents. An official 2014 document from Hefei in Anhui Province, for instance, states that street-level officials were granted an award established by the city because of the effectiveness of their efforts to force local Falun Gong practitioners to "transform," a euphemism for coercing people to renounce their beliefs, typically with the use of physical and psychological violence.

In Rongcheng, material rewards for high scores include the ability to rent bikes without a deposit, discounts on heating, and eligibility for bank loans. But incentives also exist outside of the nascent social credit system. A comprehensive 2017 Freedom House study on religion in China found that across various faiths, "monetary incentives play a direct role in the enforcement of restrictions on religious practice," and that "within the party-state system, promotions and bonuses are available to officers who effectively crack down on targeted religious groups and behaviors."

## Expanding party evaluation schemes to the general public

In many ways, Beijing's social credit plans are a digitized and expanded version of the elaborate performance evaluation system that has shaped the careers of government officials and party cadres throughout the post-Mao era.

That system's scoring tables and prioritized target categories play a crucial role in encouraging violations of human rights. For instance, one 2002 scoring table from Guangzhou, issued by the notorious 610 Office, a party-based security force leading the anti–Falun Gong campaign, provides the criteria for assessing each township and neighborhood in Tianhe District. It lists 28 indicators for point reductions, including failure to "formulate a reeducation program" or "establish a personal dossier" on local residents known to practice Falun Gong. The scorecard also lists three indicators for point gains, including five points for every local adherent successfully "transformed" and for each time an arrest prevented the dissemination of information sympathetic to Falun Gong.

With regard to target categories, the highest level are the "priority targets with veto power" (*yipiao foujue*, literally "one-ticket veto"). Failure on one such indicator automat-

**AR-1178**

China Media Bulletin: Social credit incentives, elite jailings, #MeTooUyghur (No. 133) …   Page 4 of 18

Case 3:20-cv-05910-LB   Document 77-1   Filed 10/01/20   Page 15 of 65
WeChat Appendix F Footnote 1971 - Freedom House China Media Bulletin

ically cancels out positive performance in other areas and can by itself result in a cadre being terminated or passed over for promotion. Based on a [Freedom House](#) examination in early 2014 of provincial and city-level documents, the main "veto power" areas designated by the central authorities under Xi Jinping's leadership at the time were social stability management, population and family planning, and party discipline.

The influence of these evaluation practices on the planned social credit system is clear. Most accounts of pilot programs indicate the existence of scoring tables that include both demerits and rewards. Moreover, party standards and evaluation terminology have begun to appear in regulations governing social credit scores. A set of April 2018 guidelines from the Ministry of Finance relating to accountants, published on the [Credit China](#) website on February 20, 2019, lists Xi Jinping Thought as the ideology guiding the system. It also instructs implementation of a "one-ticket veto system" (*yipiao foujue zhi*) for untrustworthy accountants, while calling for the creation of a unified national credit information platform for the accounting profession.

Given these connections, it seems reasonable to expect that accountants could be punished not just for engaging in fraud or dishonesty, but also for practicing a persecuted religion, calling on officials to declare their assets, mocking the Communist Party in an online post, or petitioning higher authorities over a grievance.

## Peer informants

Some existing incentive systems are quite explicit about encouraging private citizens to inform on one another.

In Xinjiang, monetary rewards are routinely offered to those who provide information to authorities about Uighurs' religious practices. An April 2014 notice posted on a government website in Aksu Prefecture explained that informants could receive up to 50,000 yuan ($8,000) for reporting on local residents who engage in any of 53 kinds of proscribed behavior. The list included 18 acts related to religion, such as praying in a public place, holding the Islamic Nikah wedding ceremony, or fasting during Ramadan. In Tibet, officials have offered monetary rewards of up to 200,000 yuan ($31,500) for information on monks associated with a self-immolation or other acts of dissent.

In 2012, the Sina Weibo microblogging platform introduced its own credit system, initially Dubbed "[Weibo Credit](#)" and then replaced by "[Sunshine Credit](#)" in 2016. One feature of the schemes is for users to report one another for activities ranging from harassment

**AR-1179**

China Media Bulletin: Social credit incentives, elite jailings, #MeTooUyghur (No. 133) … Page 5 of 18
Case 3:20-cv-05910-LB Document 77-1 Filed 10/01/20 Page 16 of 65
WeChat Appendix F Footnote 1971 Freedom House China Media Bulletin

to the spreading of "untrue information." Each negative report results in a lower score that can lead to a "low-credit user" badge or even the deletion of one's account. A year after implementing the Weibo Credit system, Sina reported that more than 15 million reports of harmful information had been received; many were related to spam, but at least some likely involved politically sensitive posts. In October 2017, some users complained that the credit system was being abused to delete photos of women showing bare skin, even those that were clearly not pornographic. As one user explained it, "The reason why so many posts are reported is that each supervisor has been given a specific quota every month. They have to file at least 200 reports in exchange for the RMB 200 subsidy."

In a more recent example, a Hebei court released a WeChat "map of deadbeat debtors" on January 14. According to *China Daily*, "users are given an on-screen radar, which allows them to discover if there is anyone who owes money within a 500 metre radius." Individuals are then encouraged to tell authorities if they believe the person can afford to pay back what they owe.

Such peer evaluations are being incorporated into some social credit system pilots. In Rongcheng, a team of 10 municipal representatives are tasked with manually taking note of relevant actions and assigning appropriate scores to residents. Similarly in Qingzhen, a city in Guizhou Province, a list of 1,000 indicators are reportedly used to assign a point value to citizens, including some based on peer evaluations and community monitoring.

The combination of material rewards and repressive goals is likely to intensify the pressure on local administrators and ordinary citizens to report peaceful but nonconformist behavior by their neighbors. Last month, a petitioner from Rongcheng was docked 950 credit points after sending more than 1,000 online appeal letters related to a two-decade-old medical dispute involving his mother. Members of one residential community in the city face added penalties in their score assessments for illegally spreading religion.

It is also easy to see how people could be tempted to make false reports, perhaps as an act of personal revenge over some unrelated grudge. Ironically, it is these kinds of practices—reminiscent of the Cultural Revolution—that have so thoroughly undermined societal trust in China, the very problem that the social credit systems are presumably aimed at addressing.

## Official morality versus personal conscience

**AR-1180**

China Media Bulletin: Social credit incentives, elite jailings, #MeTooUyghur (No. 133) …   Page 6 of 18

Case 3:20-cv-05910-LB   Document 77-1   Filed 10/01/20   Page 17 of 65
WeChat Appendix F Doc. No. 1871   Freedom House China Media Bulletin

To properly understand the Chinese government's various efforts to promote "good" and deter "bad" behavior, one must place them within the often counterintuitive and inhumane logic of the authoritarian political system. This is a system in which large numbers of people seeking the betterment of their society—by peacefully exposing corrupt officials, revealing rights abuses, investigating health scandals, or defending religious freedom—have been harshly punished and imprisoned. Indeed, one of the central contradictions of the social credit experiment is that many of the most credit-worthy individuals in China (in the Confucian sense of the word) are those most likely to be penalized under the CCP's distorted incentive system.

As these programs expand, Chinese users may want to think twice about what kinds of actions they are willing to perform in exchange for rewards. They should consider resisting behavior that violates fellow citizens' rights or vilifies CCP victims, even if such resistance entails some personal risk. Earning points by doing community service, putting up a basketball hoop at the local playground, or caring for elderly parents can have clear societal benefits. The same cannot be said for informing on a neighbor who fasts during Ramadan, hands out information on the torture of Falun Gong adherents, or shares a joke at Xi Jinping's expense. A truly moral society calls on its members to exercise their own judgement in distinguishing right from wrong, and to do right regardless of any short-term benefit. Virtue, after all, should be its own reward.

*Sarah Cook is a senior research analyst for East Asia at Freedom House and director of its China Media Bulletin. This article was also published by the Hong Kong Free Press on February 27, 2019.*

*[Photo caption: Screenshot of the new "Study Xi, Strengthen China" mobile phone application. Credit: What's on Weibo]*

---

# Party propaganda, modern and traditional, achieves mixed results

Under the leadership of Xi Jinping, Chinese Communist Party (CCP) propaganda efforts have gained significant momentum. On the one hand, Xi is personally promoted with slogans reminiscent of the Mao era that often appear on billboards and other traditional

**AR-1181**

China Media Bulletin: Social credit incentives, elite jailings, #MeTooUyghur (No. 133) …   Page 7 of 18

Case 3:20-cv-05910-LB   Document 77-1   Filed 10/01/20   Page 18 of 65
WeChat Appendix F Dkt No 1971 Freedom House China Media Bulletin

platforms. On the other hand, following instructions from Xi himself, state media and other party entities are continually exploring ways to make the CCP's messaging accessible and engaging for younger, more digitally oriented audiences. The results have been uneven at best.

- **CCTV Spring Gala:** The annual Spring Festival Gala program on state broadcaster China Central Television (CCTV) has aired on the eve of Chinese New Year since 1983. While it remains a national tradition and the most-watched television show in the world, ratings have slumped in the past few years. This year's edition, broadcast on February 5, was hailed as a massive success by CCTV and other domestic media, but a survey of unfavorable online reactions by Jiayun Feng at *SupChina* led her to voice skepticism about the official claims. Feng noted that while criticism of the gala was banned online last year, along with a list of sensitive social media search terms, the restrictions seem less tight this time around. Among netizens' complaints was the fact that actor Wu Xiubo, one of the planned hosts of the event, was awkwardly edited out after appearing in prerecorded footage, as he had been discredited by a series of extramarital affairs that came to light in late January. Netizens were also disgruntled to learn that, for the first time, the gala would not feature a crosstalk sketch by comic Feng Gong, reportedly because his segment did not meet strict screening requirements. Despite these minor indignities, this year's gala did manage to avoid the massive controversy that erupted last year over a blackface skit.

- **App to promote 'Xi Jinping Thought':** One of the most downloaded applications on Apple's China app store was, as of February 12, "Study Xi, Strengthen China," which was reportedly developed with the help of tech giant Alibaba. While millions of smartphone owners have reportedly downloaded the app of their own accord, CCP members must download and interact with it to avoid earning demerit points. Alongside a steady stream of Xi quotes and state media reports, the app incorporates quizzes and other opportunities to earn "Xi Study Points," which can be cashed in for real-world prizes. China Media Project and What's on Weibo offer in-depth analyses of the app and how it facilitates a level of user engagement with propaganda that has often eluded the party. One young woman reportedly complained about the app's intrusive impact on her mother, a minor official who is now spending all her free time on it because employers at her school required her to earn a certain quota of

**AR-1182**

China Media Bulletin: Social credit incentives, elite jailings, #MeTooUyghur (No. 133) …   Page 8 of 18

Case 3:20-cv-05910-LB   Document 77-1   Filed 10/01/20   Page 19 of 65
WeChat Appendix F Footnote 147   Freedom House China Media Bulletin

points daily. The app's release follows a larger trend evident under Xi, who reiterated the need to "boost integrated media development and amplify mainstream tone" through cutting-edge media technology while speaking at a January 25 study session attended by all seven members of the Politburo Standing Committee. In a February 10 article for the China Media Project, researcher David Bandurski noted that the Communist Youth League has also been assessing its own recent propaganda efforts, identifying the need to better leverage social media platforms to reach young audiences.

- **Undermining Uighur culture in the Year of the Pig:** Amid an ongoing assault on Uighur culture, most apparent in a network of "reeducation" camps where an estimated one million Uighurs and other Turkic Muslims have been detained, Central Asia scholar Darren Byler describes in a February 6 article several ways in which propaganda is being increased in the Xinjiang region to control Uighur behavior. While the Lunar New Year is not a typical staple of Uighur culture, the beginning of the Year of the Pig was given an enormous spotlight in 2019. Byler cites the broadcast of a Uighur folk dance—performed for a majority Han audience made up in part of state workers who oversee a large internment camp—on CCTV. He also notes the particular sensitivity of this year in the Chinese zodiac, given Islam's ban on eating pork and the common observance of this prohibition among Uighurs. In keeping with their effort to suppress such religious and cultural distinctions, Chinese officials appear to be taking advantage of the new lunar year to promote non-halal foods and the raising of pigs, a tactic that elderly Uighurs may recall from the years of the Cultural Revolution.

- **Anime series on Marx:** *The Leader*, an animated series on the life of German socialist philosopher Karl Marx, made its debut on the Chinese streaming website Bilibili on January 28. The first installment of the seven-part series garnered over 2.8 million views in 24 hours, but it may not be achieving its intended aim. According to *Sixth Tone*, "the show's debut has seen mixed reviews among Chinese viewers, who have paid more attention to [the animated] Marx's high cheekbones and good looks than his theories."

---

**AR-1183**

# Censorship updates: Tencent trends, foreign journalists, 'The Paper' syndication ban

- **Tencent censorship in 2018:** An [analysis of censorship](#) among public accounts on Tencent's WeChat platform in 2018, published on February 11 by researchers at the University of Hong Kong's WeChatscope project, found that far more content removals were initiated by the accounts themselves (8,092 articles) than by WeChat administrators (2,950 articles). This suggests that self-censorship has intensified in the increasingly harsh online environment, with constantly shifting "redlines" and a higher risk of account closure. Many of the most censored topics revealed by the analysis—including the [arrest](#) in Canada of Huawei chief financial officer Meng Wanzhou, the ongoing [China-US trade dispute](#), and a Chinese scientist's controversial use of [gene editing in humans](#)—were also the subjects of official censorship directives to media outlets translated by *China Digital Times*, highlighting the extent to which WeChat censors are implementing official instructions. Efforts by Freedom House and its partners to distribute this media bulletin suggest that Tencent also tightened controls on its QQ email service last year, as newsletter deliveries to QQ email account holders became increasingly unreliable in the latter months of 2018.

- **Worsening conditions for foreign journalists, sources:** The annual [members' survey](#) of the Foreign Correspondents' Club of China found that, [once again](#), reporting conditions worsened in the past year, but also that the latest results "painted the darkest picture of reporting conditions inside China in recent memory." A vast majority (91 percent) of respondents reported being concerned about their phone security; over half (55 percent) reported deteriorated conditions; and nearly half (48 percent) said they were followed or had their hotel room entered without permission. Of 27 respondents who traveled to Xinjiang, all but three reported interference while in the region, and for the first time in three years, a foreign reporter was effectively expelled from the country through a visa denial. Surveillance, detention, and other direct intimidation aimed at Chinese-national assistants and sources were also found to have [increased](#). In response to the survey, one American bureau chief

**AR-1184**

China Media Bulletin: Social credit incentives, elite jailings, #MeTooUyghur (No. 133…   Page 10 of 18
Case 3:20-cv-05910-LB   Document 77-1   Filed 10/01/20   Page 21 of 65
WeChat Appendix F Footnote 1971 Freedom House China Media Bulletin

remarked, "In the past, there were crackdowns, but you knew the reasons and expected them to end. What we're dealing with now is a new normal."

- **Syndication ban on 'The Paper':** In an unusual move against a state-funded news outlet, central internet content regulators banned syndication of *The Paper* for 30 days beginning on January 21, according to a leaked [directive translated](#) by *China Digital Times*. [Launched in 2014](#) with state funding, *The Paper* is a digital-only news site and mobile-phone app catering to young, well-educated readers who might otherwise not follow state media coverage. Reporting by Hong Kong's [*Apple Daily*](#) suggests that this penalty was imposed for the unauthorized breaking of a story confirming the [death](#) of former State Council spokesperson Yuan Mu in December. Yuan had become notorious for comments related to the killing of prodemocracy protesters in 1989. A December 17, 2018, directive translated by *China Digital Times* demanded that only copy from Xinhua news agency and the *People's Daily* be published on the subject. This is not the first time *The Paper*'s content has been the subject of censorship orders, despite its close state affiliation. Previously leaked directives imposed restrictions on a March [2016 article](#) about illegal vaccines, a February [2017 article](#) on technology used by a fraudulent phone ring, and a February 2017 report citing a Peking University study on [air pollution](#) deaths.

---

# Party-state targets elites, intellectuals in recent free expression cases

Although victims of Chinese Communist Party repression come from all social backgrounds, a spate of disappearances, arrests, and prison sentences reported over the past two months have targeted highly educated elites and professionals. Among those detained or imprisoned are lawyers, university professors, prominent scholars, and students from the country's top universities. The rash of cases may add to pressure on foreign universities or professional groups like bar associations to reexamine their relationships with their Chinese counterparts, particularly because in at least two instances, allegations of receiving foreign funding were used to justify prison sentences.

**AR-1185**

Case 3:20-cv-05910-LB   Document 77-1   Filed 10/01/20   Page 22 of 65
WeChat Appendix F   Dombret 1971   Freedom House China Media Bulletin

- **Environmentalist:** Lawyer and environmental activist Chen Wuquan was sentenced to five years in prison by a Guangdong Province court on January 9 for "picking quarrels and stirring up trouble." Five codefendants received terms ranging from one year to 18 months. Chen and the others were detained over a year ago for aiding in a protest against a land reclamation project on Donghai Island in the city of Zhanjiang.

- **Prominent rights lawyer:** On January 28, high-profile human rights lawyer Wang Quanzhang was sentenced to 4.5 years in prison by a Tianjin court after being held in incommunicado detention for over three years. Wang's trial was held on December 26, 2018, and the lawyer became the last of the "Black Friday" detainees rounded up in 2015 to face trial or be released. A leaked censorship directive from days before the sentencing, translated by *China Digital Times*, ordered all news websites to refrain from reporting on the sentence.

- **Civil society organizer:** Liu Feiyue, founder of the well-known Civil Rights and Livelihood Watch documentation website, was sentenced to five years in prison and a fine of over RMB 1 million ($150,000) by a Hubei Province court on January 29 for "inciting subversion." Liu's mother claimed that the court broke a promise to give her son a suspended sentence in exchange for her agreement to undergo "ideological work."

- **Professor**: Zeng Hao, a 45-year-old business professor at Tianhe College, part of Guangdong Province's Polytechnical Normal University, was sentenced to 3.5 years in prison and fined RMB 10,000 ($1,500) on January 29. He had been detained in August 2017 after posting several images related to the Falun Gong spiritual group on Tencent's QQ platform. Zeng was sentenced without his lawyer or family present.

- **Australian writer:** Writer and blogger Yang Hengjun, a 53-year-old Australian citizen with a PhD from the University of Technology, Sydney, was revealed to have been detained in China for "criminal activities endangering national security" days after he went missing upon arrival at a Guangzhou airport on January 19. Yang, a former Chinese Ministry of Foreign Affairs employee who later became a spy novelist, has been critical of the Chinese Communist Party in his writings, though not in recent times. In 2011, Yang briefly detained while on a trip to China, but later called the incident a "misunderstanding."

**AR-1186**

China Media Bulletin: Social credit incentives, elite jailings, #MeTooUyghur (No. 133…   Page 12 of 18
Case 3:20-cv-05910-LB   Document 77-1   Filed 10/01/20   Page 23 of 65
WeChat Appendix F Docmate 1471 Freedom House China Media Bulletin

- **Marxist university students:** Seven Marxist students from the elite Peking University and Renmin University were detained on January 21. They were just the latest to be detained as part of a crackdown in recent months on Marxist students and graduates of top universities who became active in the labor movement.
- **Uighur intellectuals:** Amid an ongoing assault on Uighur culture in Xinjiang, a January 28 report from the Uyghur Human Rights Project details the cases of 388 intellectuals who have been detained since April 2017. They include 61 university professors and 57 media professionals.

---

# HONG KONG: Proposed legal changes could criminalize peaceful dissent

Two legal changes being considered by the Hong Kong government have raised concerns that they could lead to prison sentences for nonviolent acts of political or religious expression, or even for satire.

- **National anthem bill:** On January 23, Hong Kong's government officially introduced a bill to the legislature that would assign criminal penalties of up to three years in prison and a fine of up to HK$50,000 (US$6,400) for those who insult "The March of the Volunteers," the national anthem of the People's Republic of China. The bill, should it become law, would also require schools to follow guidelines on how they teach the anthem. The proposal came just before the nearby Special Administrative Region of Macau passed a similar law on January 26, allowing up to three years in prison and a hefty fine for the intentional disrespect of "national symbols," including the national anthem. In Hong Kong, prodemocracy lawmakers criticized ambiguous language in the bill concerning what constitutes an "insult." Meanwhile, members of the prodemocracy group Demosisto protested the proposed law outside the government headquarters, where they flew a banner reading "the freedom not to praise." In response to criticism, Hong Kong Executive Council convener Bernard Chan wrote in the *South China Morning Post* that the law would be "impossible to break without openly and deliberately doing so." But a reply

**AR-1187**

WeChat Appendix F Dcmbate 1171 Freedom House China Media Bulletin

letter to Chan's article highlighted how the legislation would criminalize a common form of satire in Hong Kong. The bill has been in the works for over a year, since Beijing cracked down on the commercial use of the anthem and then extended a mainland legal provision on respect for the song to Hong Kong, forcing the government there to try to incorporate it into local law. The move was an apparent response to a trend since 2014 of booing the anthem at Hong Kong soccer games to protest Beijing's encroachment on the city's autonomy.

- **Amending extradition rules:** Hong Kong this month began mulling amendments to the Fugitive Offenders Ordinance and the Mutual Legal Assistance in Criminal Matters Ordinance that would ease criminal extraditions involving Hong Kong, Macau, Taiwan, and mainland China. The proposed amendments came in response to murder cases in which Hong Kong authorities were unable to gain custody of suspects, including a man accused of murdering a 20-year-old Hong Kong woman during a trip to Taiwan last year. Authorities could not charge him under local Hong Kong laws, and Taiwanese authorities were unable to have him extradited to Taiwan from Hong Kong. The amended ordinances would allow Hong Kong to surrender fugitives to any region with which the city does not already have a bilateral extradition agreement; requests would be handled on a case-by-case basis. At first glance, political and religious activists from Hong Kong could not be extradited to China for peaceful dissent because the rules require the act in question to be a criminal offense in both jurisdictions. But opponents of the amendments have raised concerns on two grounds: first, that Beijing has been known to punish journalists and other activists on trumped-up charges such as fraud that are also offenses in Hong Kong, and second, that the mainland's criminal justice system suffers from a variety of basic flaws. As Civic Party lawmaker Dennis Kwok put it, "Are we really confident handing over an accused person to be tried on the mainland?" Lam Win-kee, the founder of Causeway Bay Books who went missing in 2015 and ended up on the mainland "confessing" to crimes on state television, told Citizen News that if this amendment passes, he will be leaving Hong Kong. In a February 18 blog post, prominent Chinese law expert Jerome Cohen noted that the rules would be a "major change." He warned that any "rendition" agreement with China "must not violate the human rights protections" provided under the International Covenant on Civil and Political Rights, which is legally binding in Hong Kong, if not on the mainland.

**AR-1188**

Case 3:20-cv-05910-LB   Document 77-1   Filed 10/01/20   Page 25 of 65
WeChat Appendix F Docible 1971 Freedom House China Media Bulletin

# BEYOND CHINA: Pressure on Xinjiang refugees, cultural censorship in United States and Europe

- **Xinjiang crackdown follows victims beyond China:** As a crackdown on Uighurs and other Turkic Muslims continues in Xinjiang, some who managed to escape the region are facing surveillance, intimidation, or related diplomatic tensions abroad. Ethnic Kazakh and Chinese national Sayragul Sautbay, who previously worked as an instructor at a Xinjiang reeducation camp and became an early source for reporting on the mass detention system, fled to Kazakhstan last year. But her status in Kazakhstan is uncertain, and the country is deeply dependent on Chinese investment, leading her to express fears that she may be sent back to China. Meanwhile, Qalymbek Shahman, also an ethnic Kazakh Chinese citizen, underwent an air-travel odyssey across Asia after escaping from China to Thailand on January 4. He flew from Thailand to Kazakhstan, where he was denied entry, then flew to Uzbekistan, where Chinese officials attempted to have him repatriated. Uzbek authorities ultimately sent him back to Thailand instead. Uighurs who flee further abroad are also being surveilled and intimidated by Chinese authorities. A report from the *Washington Post* describes the experiences of Australia-based Uighurs, who fear physical intimidation after Chinese authorities obtained their residential details by threatening their family members back in Xinjiang. In Canada, a speech by Uighur activist Rukiye Turdush was attended by nationalistic Chinese students who disrupted the presentation and reportedly attempted to compile information on attendees, allegedly under the supervision of the local Chinese consulate.

- **Uighur exiles and American Muslims speak out:** The overseas Uighur community and other Muslims have begun to speak out about the persecution in Xinjiang. On Twitter, a #MeTooUyghur campaign has begun to both raise awareness and unofficially campaign for assurances on the health and well-being of individual detainees. The posts typically feature photos or videos about family members who have disappeared into the camp system, and call on Chinese authorities to confirm their status. The effort was prompted in part by a video released by Chinese officials to disprove reports that a prominent Uighur musician had died in custody. Separately, in the United States, over 130

**AR-1189**

Case 3:20-cv-05910-LB Document 77-1 Filed 10/01/20 Page 26 of 65
WeChat Appendix F Dernble 1971 Freedom House China Media Bulletin

Muslim clerics, scholars, and community leaders signed an open letter calling for the release of all Uighurs from the Xinjiang camps, and calling on fellow Americans to stop buying products that may be produced in such camps.

- **Spanish theater cancels Shen Yun performance:** A series of classical Chinese dance and music performances by New York–based Shen Yun Performing Arts, scheduled for January 31 to February 2 in Madrid, were abruptly canceled under apparent pressure from Chinese officials. Many of the troupe's performers practice Falun Gong, and some of the show's pieces—in addition to scenes from imperial dynasties and literary classics—portray stories of Falun Gong adherents facing persecution in China. The Royal Theater of Madrid claimed that the cancellation was due to "technical difficulties." However, on January 22, an official from the Chinese embassy admitted to activists posing as Chinese government officials that he had pressured the theater manager to cancel the performances. In a recording of the call published in the *Epoch Times*, the official explains how he held out access to the Chinese market as part of the "International League of Theaters of the Silk Road" in exchange for cooperation on "politics." Shen Yun performances have been targeted by Chinese officials since the group's inception in 2006. Over 60 incidents—ranging from intimidating theaters and elected officials to online hacking and tire slashing—have been documented around the world, in some cases resulting in last-minute cancellations.

- **Cultural Revolution film pulled from Berlin festival:** The premiere of *One Second*, the latest work by acclaimed Chinese filmmaker Zhang Yimou, was canceled at the Berlinale film festival on February 13, two days before it was scheduled to screen. The reason cited was "technical difficulties." However, the film is set during the Cultural Revolution, and it may have failed to garner approval or an additional procedural exit visa from Chinese state censors, particularly given that the Communist Party took more direct control over the entertainment sector in a bureaucratic restructuring last March.

- **US arts center removes Xi paintings:** Organizers of an art exhibition in the town of Cary, North Carolina, showing works by US-based Chinese artist Weng Bing removed three paintings, two of which portrayed Xi Jinping in an unfavorable fashion, just prior to the exhibition's January 22 opening. According to Weng, the town's cultural arts manager told her that he personally liked the paintings very much and wanted to protect free speech, but that they

China Media Bulletin: Social credit incentives, elite jailings, #MeTooUyghur (No. 133... Page 16 of 18

Case 3:20-cv-05910-LB Document 77-1 Filed 10/01/20 Page 27 of 65
WeChat Appendix F Dumble 1971 Freedom House China Media Bulletin

were "political works" and "government departments have to take all views into account," implying a possible backlash from either Chinese diplomats or members of the diaspora who are sympathetic to Xi's rule. Weng said she was inspired to include the more political pieces in the show after learning about a Shanghai woman who was forcibly sent to a psychiatric hospital for defacing a poster of Xi last year.

---

# FEATURED PUSHBACK: Regulating Chinese state media abroad

Chinese state media have long had a presence in foreign countries, and Beijing has sought to expand their footprint in recent years. But as their growth gains momentum and international attention, host governments are stepping up enforcement of relevant laws and broadcast codes to regulate the outlets' activity.

On February 1, China Global Television Network (CGTN) America registered in the United States under the Foreign Agents Registration Act (FARA). The move followed media reports last September that the US Department of Justice had asked CGTN and Xinhua News Agency to register, closing a long-standing gap in FARA enforcement. (The distribution company for state-run newspaper *China Daily* had been registered since 1983.) In its filing, CGTN said that it operates as a division of state-owned broadcaster China Central Television (CCTV), but it also asserted that it was registering "in the spirit of cooperation with US authorities" rather than admitting that it properly fell under FARA jurisdiction. CGTN's new status will require it to submit periodic reports to the Department of Justice and increase transparency surrounding its activities in the United States.

In a similar vein, civil society activists have called on Britain's communications regulator, Ofcom, to review the operations of CCTV in the United Kingdom and assess whether the station had violated the country's broadcast code—including provisions on privacy and fairness—and the Human Rights Act by airing the forced confessions of political prisoners, at least one of whom was a British citizen. In November 2018, the regulator said it would investigate the complaints but as of late February had not yet issued any decision.

**AR-1191**

China Media Bulletin: Social credit incentives, elite jailings, #MeTooUyghur (No. 133…   Page 17 of 18

Case 3:20-cv-05910-LB   Document 77-1   Filed 10/01/20   Page 28 of 65
WeChat Appendix F Pomfilie 1971 Freedom House China Media Bulletin

A December 2018 update by Safeguard Defenders to an earlier report on the forced confession phenomenon suggests that more countries should be reviewing CGTN and CCTV programming on their airwaves. Researchers found that of 48 video confessions involving at least 106 people that were aired in China, "at least 29 of those videos aired internationally, often in stark violation and in clear breach of target countries' TV broadcast regulations." In at least 27 cases, televised confessions by foreigners were aired in the person's home country, including in Canada, the United Kingdom, Sweden, and the United States. In many but not all instances, the problematic programming is broadcast in Chinese to the Chinese diaspora via CCTV4, a subsidiary that typically operates separately and holds its own licenses. From this perspective, regulators seeking to fully enforce relevant foreign influence laws and broadcasting codes would be well advised to examine CCTV4's operations, as well as those of other Chinese-language state-owned media like China Radio International and their foreign affiliates.

*[Photo caption: Screenshot of forced confession by Swedish activist Peter Dahlin aired on CCTV in January 2016]*

---

# WHAT TO WATCH FOR

**Censorship and policy announcements during the 'Two Sessions':** The annual plenary session of the National People's Congress will open in Beijing on March 5, as will the parallel gathering of the Chinese People's Political Consultative Conference, an advisory body. During the "Two Sessions," watch for directives to media on coverage or avoidance of sensitive topics, travel restrictions on activists, and new legislation related to media and internet policy, including the contentious practice of forced technology transfers.

**Restrictions around Tibet unrest anniversary:** March 10 will mark the 60th anniversary of the Dalai Lama's flight from Tibet and serve as a reminder of popular Tibetan protests against Chinese rule in March 2008, which provoked a major crackdown. During this sensitive period, watch for increased internet censorship and restrictions on access to Tibet. Tour operators have reportedly already announced the closure of the Tibetan Autonomous Region to foreigners through April 1.

**AR-1192**

China Media Bulletin: Social credit incentives, elite jailings, #MeTooUyghur (No. 133…   Page 18 of 18

Case 3:20-cv-05910-LB   Document 77-1   Filed 10/01/20   Page 29 of 65
WeChat Appendix F Dombie 1471 Freedom House China Media Bulletin

**Huawei's foreign prospects:** Over the past month, debate has continued in countries around the world regarding the benefits and potential security risks of allowing Chinese firm Huawei to take part in the development of national telecommunications infrastructure, particularly 5G, the next generation of mobile service technology. Watch for whether individual countries or the European Union announce new bans on Huawei, how countries try to mitigate the risks of the firm's involvement in 5G projects, new evidence of past problematic behavior, and the responses of both the company and the Chinese government to their critics.

---

# TAKE ACTION

- **Subscribe to the *China Media Bulletin*:** Have the bulletin's updates and insights delivered directly to your inbox each month, free of charge. Visit here or e-mail cmb@freedomhouse.org.
- **Share the bulletin:** Help friends and colleagues better understand China's changing media and censorship landscape.
- **Access uncensored content:** Find an overview comparing popular circumvention tools and information on how to access them via GreatFire.org, here or here. Learn more about how to reach uncensored content and enhance digital security here.
- **Support a prisoner:** Learn how to take action to help journalists and free expression activists, including those featured in past issues of the *China Media Bulletin* here.
- **Visit the *China Media Bulletin* Resources section**: Learn more about how policymakers, media outlets, educators and donors can help advance free expression in China and beyond via a new resource section on the Freedom House website.

**AR-1193**

**CHINADAILY** 中国日报网
中文 (http://cn.chinadaily.com.cn/)

Home (Http://Www.chinadaily.com.cn/)

/ China (Http://Www.chinadaily.com.cn/China)

/ Society (Http://Www.chinadaily.com.cn/China/Society)

# Hebei court unveils program to expose deadbeat debtors

By Zhang Yu in Shijiazhuang | chinadaily.com.cn | Updated: 2019-01-16 15:39

AR-1194

Hebei court unveils program to expose deadbeat debtors - Chinadaily.com.cn        Page 2 of 3
Case 3:20-cv-05910-LB   Document 77-1   Filed 10/01/20   Page 31 of 65
WeChat Appendix F Footnore 118 - Hebei Court Unveils Program to Expose deadbeat debtors



Screenshot shows the mini-program.

Deadbeat debtors in North China's Hebei province will find it more difficult to abscond as the Higher People's Court of Hebei on Monday introduced a mini-program on WeChat targeting them.

**AR-1195**

Hebei court unveils program to expose deadbeat debtors - Chinadaily.com.cn     Page 3 of 3
Case 3:20-cv-05910-LB   Document 77-1   Filed 10/01/20   Page 32 of 65
WeChat Appendix F Footnore 118 - Hebei Court Unveils Program to Expose deadbeat debtors

Called "a map of deadbeat debtors", the program allows users to find out whether there are any debtors within 500 meters.

The debtor's information is available to check in the program, making it easier for people to whistle-blow on debtors capable of paying their debts.

"It's a part of our measures to enforce our rulings and create a socially credible environment," said a spokesman of the court.

 (http://cn.chinadaily.com.cn/)

Copyright 1995 - 2020 . All rights reserved. The content (including but not limited to text, photo, multimedia information, etc) published in this site belongs to China Daily Information Co (CDIC). Without written authorization from CDIC, such content shall not be republished or used in any form.

**AR-1196**

[House Hearing, 115 Congress]
[From the U.S. Government Publishing Office]


CONGRESSIONAL-EXECUTIVE COMMISSION ON CHINA


ANNUAL REPORT


2018


=======================================================================


ONE HUNDRED FIFTEENTH CONGRESS

SECOND SESSION

_____

OCTOBER 10, 2018

_____

Printed for the use of the Congressional-Executive Commission on China


[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]


Available via the World Wide Web: https://www.cecc.gov


_____

U.S. GOVERNMENT PUBLISHING OFFICE

31-388 PDF            WASHINGTON : 2018


CONGRESSIONAL-EXECUTIVE COMMISSION ON CHINA

LEGISLATIVE BRANCH COMMISSIONERS


Senate                              House

**AR-1197**

MARCO RUBIO, Florida, Chairman

JAMES LANKFORD, Oklahoma

TOM COTTON, Arkansas

STEVE DAINES, Montana

TODD YOUNG, Indiana

DIANNE FEINSTEIN, California

JEFF MERKLEY, Oregon

GARY PETERS, Michigan

ANGUS KING, Maine

CHRISTOPHER H. SMITH, New Jersey, Cochairman

ROBERT PITTENGER, North Carolina

RANDY HULTGREN, Illinois

MARCY KAPTUR, Ohio

TIMOTHY J. WALZ, Minnesota

TED LIEU, California

### EXECUTIVE BRANCH COMMISSIONERS

Department of State, To Be Appointed

Department of Labor, To Be Appointed

Department of Commerce, To Be Appointed

At-Large, To Be Appointed

At-Large, To Be Appointed

Elyse B. Anderson, Staff Director

Paul B. Protic, Deputy Staff Director

(ii)

# C O N T E N T S

----------

|                                                                  | Page |
|------------------------------------------------------------------|------|
| I. Executive Summary..............................................| 1    |
|     Statement From the Chairs....................................| 1    |
|     Introduction................................................| 3    |
|     Overview....................................................| 7    |
|     Recommendations to Congress and the Administration...........| 13   |
|     Political Prisoner Cases of Concern..........................| 19   |
|     Political Prisoner Database..................................| 22   |
|     Specific Findings and Recommendations........................| 25   |
| II. Human Rights.................................................| 66   |
|     Freedom of Expression.......................................| 66   |
|     Worker Rights...............................................| 86   |
|     Criminal Justice............................................| 101  |
|     Freedom of Religion.........................................| 121  |
|     Ethnic Minority Rights......................................| 137  |
|     Population Control..........................................| 143  |
|     Special Topic: Forced Evictions in Beijing Municipality......| 158  |
|     Status of Women.............................................| 169  |
|     Human Trafficking...........................................| 178  |
|     North Korean Refugees in China..............................| 191  |
|     Public Health...............................................| 197  |
|     The Environment.............................................| 205  |
| III. Development of the Rule of Law.............................| 214  |
|     Civil Society...............................................| 214  |
|     Institutions of Democratic Governance........................| 225  |
|     Commercial Rule of Law and Human Rights......................| 244  |
|     Access to Justice...........................................| 260  |
| IV. Xinjiang....................................................| 273  |
| V. Tibet........................................................| 292  |
| VI. Developments in Hong Kong and Macau.........................| 308  |

I. Executive Summary

**AR-1198**

- CONGRESSIONAL-EXECUTIVE COMMISSION ON CHINA ANNUAL REPOR... Page 3 of 316

Case 3:20-cv-05910-LB Document 77-1 Filed 10/01/20 Page 35 of 65
WeChat Appendix F Footnote F9 - Congressional-Executive Commission on China Annual Report 2018

Statement From the Chairs

When the Congressional-Executive Commission on China (Commission) was established in 2000, the prevailing wisdom underpinning U.S.-China relations maintained that increased trade and economic interconnectivity, as well as diplomacy and robust cultural exchange, would lead to greater openness and political liberalization within China.

In the years that followed, the Chinese economy grew dramatically, while the Chinese Communist Party became even more deeply entrenched in the political power structure and deeply committed to preserving its monopoly on power through state-sponsored repression, surveillance, and indoctrination. In the aftermath of the violent suppression of the 1989 Tiananmen protests and the fall of the Berlin Wall later that same year, the late Chinese leader Deng Xiaoping articulated a foreign policy strategy in which China would not try to assume a leadership role in international affairs, but rather ``hide its capabilities and bide its time'' (taoguang yanghui). Now, under the leadership of current Chinese President and Party General Secretary Xi Jinping, however, we see an ascendant and increasingly aggressive China, seeking to take center stage in the world, and in so doing, determined to shape new global norms on development, trade, the internet, and even human rights. All the while, the fundamental authoritarian character of China's political system remains the same.

The Chinese government's disregard for human rights and the rule of law most directly affects the Chinese people--as evidenced by the more than 1,300 active cases of political and religious prisoners contained in the Commission's far from exhaustive Political Prisoner Database. The Commission's Annual Report painstakingly documents rights violations in ethnic minority regions, religious freedom violations, harassment of rights defenders and lawyers, suppression of free speech, large-scale forced evictions, onerous restrictions on civil society and more--all of which are the markings of a repressive, one-party state.

The report that follows highlights the dire human rights situation inside China and the continued downward trajectory, by virtually every measure, since Xi Jinping became Communist Party General Secretary in 2012 and President in 2013--the latter post likely to be his beyond 2023. Of particular concern is the mass, arbitrary, internment of as many as 1 million or more Uyghurs and other Muslim ethnic minorities in ``political reeducation'' camps in western China. Reports indicate that this may be the largest incarceration of an ethnic minority population since World War II, and that it may constitute crimes against humanity. Local officials in the Xinjiang Uyghur Autonomous Region (XUAR) have used alarming political rhetoric to describe the purpose of this government policy, including ``eradicating tumors'' and ``spray[ing] chemicals'' on crops to kill the ``weeds.'' In response to these developments, an international expert described the XUAR as ``a police state to rival North Korea, with a formalized racism on the order of South African apartheid.'' \1\

China's authoritarianism at home directly threatens our freedoms as well as our most deeply held values and national interests. Inside China, American citizens are targeted with exit bans preventing them from leaving China, often in order to resolve business disputes or pressure their family members or colleagues to cooperate with Chinese courts; American citizens are detained or deported for sending private electronic messages critical of the Chinese government; American journalists are harassed and intimidated; and American business interests are threatened by rampant intellectual property theft and forced technology transfers.

Additionally, the ``long arm'' of the Chinese Communist Party extends beyond China's borders and is increasingly pervasive and multifaceted under the direction of an enhanced

**AR-1199**

United Front Work Department, a Party institution used to
influence Chinese individuals at home and abroad to neutralize
possible challenges to its ideological and policy agenda. The
Party's efforts to export its authoritarianism abroad takes a
multitude of forms, including but not limited to the following:
interference in multilateral institutions; threatening and
intimidating rights defenders and their families; imposing
censorship mechanisms on foreign publishers and social media
companies; asserting ``cyber-sovereignty'' and ``national
internets''; influencing academic institutions and critical
analysis of China's past history and present policies; and
threatening American companies who do not conform with China's
narrative on ``sensitive topics'' like Tibet, Hong Kong, and
Taiwan. So, too, Chinese government foreign investment and
development, which will likely reach record levels with its
ambitious and far-reaching Belt and Road Initiative, is
accompanied by a robust non-democratic political agenda as are
other manifestations of what some experts are calling Chinese
``sharp power.'' The Chinese government is actively seeking to
leverage its economic power to extend the influence of its
political model.

    The ever-expanding scope of domestic repression documented
in the pages that follow directly affects an increasing number
of Chinese citizens, stirring resentment, dissent, and even
activism in unlikely places. As American policymakers revisit
the assumptions that previously informed U.S.-China relations,
and seek to chart a new path forward, it is vital that our
foreign policy prioritizes the promotion of universal human
rights and the protection of basic human dignity, principles
the Chinese Communist Party is actively trying to redefine.
Such pursuits have merit on their own accord, and they are also
inextricably linked to vital U.S. national interests, including
regional stability in the Indo-Pacific, the future of young and
emerging democracies in our hemisphere, and the strength of our
own civic institutions domestically. It is in this context that
we, as Chairman and Cochairman of the Congressional-Executive
Commission on China, submit the Commission's 2018 Annual
Report.

        Senator Marco Rubio          Representative Chris Smith
        Chair                        Cochair

                        Introduction

    In recent years the Congressional-Executive Commission on
China (Commission) has reported on Chinese President and
Communist Party General Secretary Xi Jinping's consolidation
and personalization of political power--a trend which reached
new heights at the 19th National Congress of the Chinese
Communist Party in October 2017, and the March 2018 meetings
(Two Sessions) of the National People's Congress (NPC) and the
Chinese People's Political Consultative Conference in Beijing.
The political sensitivity of these events was underscored by
the control and censorship of news and online discussion, and
the implementation of ``stability maintenance'' activities to
quash citizen advocacy and petitioning. No clear successor for
Party General Secretary emerged during the 19th Party Congress
in October, an omission that presaged the passage of amendments
to the Party constitution confirming Xi Jinping's paramount
authority. The March 2018 amendments enshrining the principle
of ``Xi Jinping Thought on Socialism With Chinese
Characteristics for a New Era'' in China's Constitution and
removing the two-term limit on the presidency signaled Xi's
intention to retain leadership of China beyond the end of his
second term as president in 2023, a distinct break with China's
decades-long model of authoritarian governance grounded in
``collective leadership'' and orderly succession.
    Another key development at the Two Sessions was the
establishment of an anticorruption agency, the National
Supervisory Commission (NSC). The investigatory and supervisory
functions of the NSC appear to extend Xi Jinping's signature
anticorruption campaign against Party officials to a much

**AR-1200**

- CONGRESSIONAL-EXECUTIVE COMMISSION ON CHINA ANNUAL REPOR...    Page 5 of 316

Case 3:20-cv-05910-LB   Document 77-1   Filed 10/01/20   Page 37 of 65
WeChat Appendix F Footnote H9 - Congressional-Executive Commission on China Annual Report 2018

broader swath of public sector personnel of over 100 million people, including state-owned enterprise employees, public hospital staff, and public educators. Moreover, the NSC is authorized to use ``confinement'' (liuzhi), a new form of extrajudicial detention, for at least three months without a guarantee of access to counsel. The NSC is also authorized to place any private citizen, regardless of their profession or party membership status, under liuzhi if they are suspected of involvement in official misconduct. The structure of the NSC further blurs the line between the Party and government, as does the far-reaching reorganization of Party and government agencies approved at the Two Sessions.

These developments effectively remove many of the protections put in place in the late 1970s and during the 1980s in the wake of the violent and chaotic Cultural Revolution. Deng Xiaoping and Party leadership at that time established these institutional measures, warning China to protect against ``the excessive concentration of power . . . particularly the first secretary, who takes command and sets the tune for everything . . ..'' \2\ As Xi emerged this year with near total policymaking authority, many experts drew comparisons to the cult-of-personality era of former Party Chairman Mao Zedong. One commentator deemed it the ``end of China's 40-year-long reform era.'' \3\

While Xi consolidated his political power at central and sub-national levels, the Party and government further tightened the space for civil society and rights advocacy. Many international non-governmental organizations (NGOs) submitted reports in advance of the November 2018 session of the UN Human Rights Council's Universal Periodic Review (UPR) of the Chinese government's compliance with international human rights standards. The NGOs documented multiple violations of international legal standards and worsening conditions for civil society, rights defense, religious freedom, ethnic minority rights, and freedom of expression. Several submissions also highlighted the July 2017 death in custody of writer and Nobel Peace Prize laureate Liu Xiaobo for whom authorities failed to provide adequate medical care. Rights groups also censured the Chinese government for the illegal home confinement of his widow Liu Xia for eight years, despite the absence of any criminal charge or judicial proceeding against her. She was finally released and permitted to travel to Germany in July 2018, mere days before the one-year anniversary of her husband's death in state custody.

Authorities maintained tight restrictions in many spheres of civil society advocacy, often giving priority to the suppression of grassroots mobilization and the sharing of information online. Chinese authorities continued to severely restrict the ability of civil society organizations to work on labor issues, in keeping with a national crackdown on labor NGOs that began in 2015. Strikes continued, however, with the vast majority of strikes this reporting year relating to non-payment of wages. Additionally, the Commission observed continuing restrictions on individuals and groups working on women's rights, the environment, and public health advocacy. Civil society groups' social media accounts were censored or shut down this past year, reflecting the government's awareness of the power of online communications. Moreover, in a related regulatory development, administrators of social media groups (e.g., WeChat, QQ, and other group messaging platforms) may now be held liable for the views expressed by members of their respective chat groups.

Authorities continued to harass, abuse, and detain individuals by means including extralegal ``black jails,'' forced psychiatric commitment of individuals without mental illness, and ``political reeducation'' centers, the latter specifically used to detain members of ethnic minority groups in the Xinjiang Uyghur Autonomous Region (XUAR). Authorities apply broadly defined provisions in the PRC Criminal Law, such as crimes of ``endangering state security'' and ``picking quarrels and provoking trouble,'' for a range of activities that are protected under international human rights standards.

**AR-1201**

The government violated detainees' rights under the PRC Criminal Procedure Law, including through what appeared to be coerced confessions in the cases of Swedish citizen Gui Minhai and Taiwan NGO volunteer Lee Ming-cheh. Reports showed that authorities continued to deny or failed to provide adequate medical care to detainees, a violation of international human rights standards that may amount to torture. There were also reports of detainees being forced to ingest unknown ``medications.'' The sudden and unexpected death in February 2018 of prominent human rights lawyer Li Baiguang, just weeks after he visited Washington, D.C., led some observers to claim that he was the latest victim in Xi's sweeping crackdown on rights lawyers and advocates. In the more than three years since the July 2015 crackdown on human rights lawyers and defenders, which has affected over 300 individuals and led to 14 criminal convictions, authorities continued to target prominent rights defenders and lawyers with torture (Yu Wensheng), imprisonment (Wu Gan, Jiang Tianyong), cancellation of law licenses (Li Heping, Xie Yanyi) and other forms of harassment. Authorities stopped Li Wenzu, the wife of detained lawyer Wang Quanzhang, from completing a 100-kilometer walk from her home in Beijing municipality to Tianjin municipality, where Wang reportedly is being held, to mark Wang's 1,000th day in incommunicado detention.

The Chinese government remained one of the worst jailers of journalists, with estimates of individuals in detention or imprisoned in connection with their reporting ranging from 41 to more than 50, including the founders of human rights monitoring websites and citizen journalists. Lu Yuyu, founder of an initiative to track labor protests and strikes called ``Not-the-News,'' is serving a four-year sentence in Yunnan province. The cases of Liu Feiyue, founder of the human rights monitoring website Civil Rights & Livelihood Watch; Huang Qi, founder of another rights monitoring website, 64 Tianwang; and Zhen Jianghua, executive director of Human Rights Campaign in China, an online platform that campaigns for human rights advocates and victims of rights abuses, are pending. According to the Foreign Correspondents' Club of China's 2017 survey, working conditions for foreign reporters in China deteriorated in 2017, demonstrated by accounts of official harassment of reporters, news assistants, and sources; attempts to interfere with coverage of issues that authorities deemed ``sensitive''; restrictions on travel to areas along China's borders and ethnic minority regions; and visa renewal delays and denials.

The Party and government continued implementing repressive policies in Tibetan autonomous areas, including extensive and intrusive surveillance, strict regulations and rules to restrict Tibetans' religious and cultural rights, and pervasive displays of police and military force. The Chinese government persists in regarding Tibetans' spiritual leader, the 83-year old Dalai Lama, as a ``mastermind'' of ``separatist forces'' and maintains that only it has the right to decide the Dalai Lama's successor, attempting to exert state control over a venerated and sacred religious process. In a case that drew widespread international condemnation, in May 2018, Chinese authorities in Qinghai province sentenced Tashi Wangchug to five years in prison for ``inciting separatism'' in connection with his interview with the New York Times about his Tibetan language advocacy. In August, the Qinghai High People's Court rejected Tashi Wangchug's appeal.

Official control and scrutiny over religious activity increased as revisions to the Regulations on Religious Affairs took effect in February 2018, national state-sanctioned religious organizations announced major plans to ``sinicize'' religion in China, and the Party's United Front Work Department took over responsibility for direct oversight of religious affairs. In Henan province, authorities reportedly banned at least 100 Protestant churches from meeting after the revised regulations went into effect in February, and also destroyed religious iconography in believers' homes. In September, set against the backdrop of a broader crackdown on Chinese Christians, reports emerged that a deal was imminent between

**AR-1202**

- CONGRESSIONAL-EXECUTIVE COMMISSION ON CHINA ANNUAL REPOR...     Page 7 of 316

Case 3:20-cv-05910-LB   Document 77-1   Filed 10/01/20   Page 39 of 65
WeChat Appendix F Footnote F9 - Congressional-Executive Commission on China Annual Report 2018

the Holy See and the Chinese government. Under the reported deal, the Holy See would recognize seven ``illegitimate bishops'' approved by the government, and Chinese authorities would nominate future Chinese bishops that the Holy See would be able to veto. Both sides reportedly agreed not to publish the agreement after its signing. As of mid-September the deal was not yet finalized, but Chinese Catholics had expressed concerns in reaction to earlier reports of an impending agreement that the Holy See would make concessions that would weaken and further divide the Chinese Catholic community. Official repression of Hui Muslim believers also intensified, with local governments in some areas removing ``Arabic style'' architecture, banning children and youth from participating in religious activities, and prohibiting calls to prayer and the sale of the Quran. Authorities also persisted in their crackdown on Falun Gong practitioners, subjecting them to abusive treatment, especially when in custody.

Chinese authorities continued to implement coercive population control policies that violate international standards, despite the shift to a ``universal two-child policy.'' Now in its third consecutive year, the new policy has not been effective in spurring population growth, reportedly prompting the government to commission research on removing birth restrictions completely. Decades of coercive population control policies have exacerbated China's demographic challenges, which include a rapidly aging population, shrinking workforce, and sex ratio imbalance. A lack of economic opportunity and China's sex ratio imbalance contributed to the risk of individuals in Southeast Asian countries being trafficked into China for forced labor and forced marriage. In addition, the Chinese government continued to treat North Korean refugees as illegal economic migrants and maintained a policy of repatriating undocumented North Koreans, leaving the refugees vulnerable to human trafficking within China and imprisonment, torture, or death upon return to North Korea.

The long-term viability of Hong Kong's ``one country, two systems'' framework remained tenuous given the continued erosion of Hong Kong's autonomy, as guaranteed under the ``one country, two systems'' policy enshrined in Hong Kong's Basic Law. The ``political screening'' and ultimate disqualification prior to the March 2018 by-election of several prospective candidates for the Legislative Council based on their political beliefs, marked a significant setback for pro-democracy forces and called into question their ability to effectively use the existing political system to secure democratic reforms. Mainland officials used threats and intimidation against individuals based on their political association and beliefs; members of pro-democracy group Demosisto were reportedly detained and extensively questioned when they attempted to leave the mainland and return to Hong Kong. Also, this past year, Hong Kong and mainland officials continued negotiations and finalized ``co-location'' plans for the Hong Kong section of the Guangzhou-Shenzhen-Hong Kong Express Rail Link. Activists, politicians, and lawyers criticized the co-location plan, which permits mainland law enforcement to operate in a designated ``Mainland Port Area'' in the Hong Kong train station, in apparent violation of Hong Kong's Basic Law.

The subsequent chapters of this report document these and other human rights and rule of law developments in China during the Commission's 2018 reporting year that spans, roughly, September 2017 through September 2018. General themes and key developments covered in the body of this report are outlined below.

Overview

Over the Commission's 2018 reporting year, the following general themes and key developments emerged:

1. Unprecedented Repression of Ethnic Minorities in the Xinjiang Uyghur Autonomous Region
2. Party Control Over Government, Society, and Business

**AR-1203**

Dramatically Increases
3. Increasing Use of Technology as a Tool of Repression

Unprecedented Repression of Ethnic Minorities in the Xinjiang Uyghur
Autonomous Region

The Xinjiang Uyghur Autonomous Region (XUAR), the area in
western China that Chinese officials have promoted as an
important hub for Belt and Road Initiative development
projects, witnessed a severe deterioration with respect to
human rights. Authorities have targeted members of the region's
predominantly Muslim ethnic minority populations, including
Uyghurs, Kazakhs, Kyrgyz, and Hui, with reports of mass
internment in harsh ``political reeducation'' centers or camps
and restrictions on religious practice and ethnic cultural and
linguistic traditions. Several leading experts characterized
the region as a ``digital police'' or ``surveillance'' state,
and a potential incubator for high-tech social controls that
the government may soon employ more broadly.

Since Chen Quanguo's appointment as XUAR Party Secretary in
August 2016, reports have documented the escalation of rights
abuses against local ethnic minority populations. Chen
previously served in the same position in the Tibet Autonomous
Region (TAR), where he imposed similarly onerous restrictions.
This past year the mass surveillance and securitization of the
XUAR was starkly illustrated by the extrajudicial detention of
1 million or more individuals in ``political reeducation''
centers or camps--making it the largest mass internment of an
ethnic minority population in the world ever. Individuals may
be detained for a number of reasons, including frequency of
prayer, expression of ``politically incorrect'' views, history
of travel abroad, and connections with people outside of China.
Detentions appear to be indefinite in most cases. Regional
government authorities reportedly ordered officials in some
XUAR jurisdictions to meet detention quotas, and local
orphanages were reportedly overcrowded due to the number of
children requiring care while both parents are held in the
camps. A May 2018 Associated Press report documented
propagandistic slogans that detainees were required to chant--
``Thank the Party! Thank the Motherland! Thank President
Xi!''--before being permitted to eat.\4\ The ``political
reeducation'' centers are reportedly fortified with barbed
wire, reinforced doors, and bombproof surfaces. Security
personnel have subjected detainees to torture (including the
use of interrogation chairs called ``tiger chairs''), medical
neglect and maltreatment, solitary confinement, sleep
deprivation, lack of adequate clothing in cold temperatures,
and other forms of abuse. Reports have also emerged of a number
of deaths in the camps. Reports in May 2018 indicated that
Chinese authorities were soliciting public bids for the
construction of more camps and additional security features for
existing ones. In addition to those detained in ``political
reeducation'' centers, rights groups reported that as of June
2018, authorities may have forced an additional 2.2 million
XUAR residents to attend day or evening ``education sessions.''

Analysis of Chinese government data published by the
organization Chinese Human Rights Defenders (CHRD) in July 2018
showed that 21 percent of all criminal arrests in China in 2017
took place in the XUAR, which has 1.5 percent of China's
population. These figures do not include detentions in
``reeducation'' camps, which are carried out extrajudicially,
though authorities reportedly transferred some ``reeducation''
camp detainees to prison after a period of time. It remained
difficult for foreign journalists, NGO representatives, or
senior diplomats to travel or work freely in the region, making
precise reporting on the numbers of those detained in the camps
difficult to ascertain. Figures ranged anywhere from hundreds
of thousands to upwards of a million, according to rights
groups, scholars, and media organizations. Authorities in the
XUAR show no indication of slowing or halting the detentions,
and in fact government procurement documents indicate plans to
build additional detention facilities, underscoring the ongoing

**AR-1204**

- CONGRESSIONAL-EXECUTIVE COMMISSION ON CHINA ANNUAL REPOR...    Page 9 of 316

Case 3:20-cv-05910-LB   Document 77-1   Filed 10/01/20   Page 41 of 65
WeChat Appendix F Footnote F19 - Congressional-Executive Commission on China Annual Report 2018

nature of the crisis.

Those not subject to ``transformation through education''
in detention still faced daily intrusions in their home life,
including compulsory homestays whereby Communist Party
officials are sent to live with local Uyghur and Kazakh
families, including families with no adult male present because
the men in the family have been detained in ``reeducation''
camps. Families are required to provide information regarding
their daily prayer habits and political views and are subjected
to ``political education'' administered by the live-in Party
official.

The data-driven surveillance in the XUAR is facilitated by
iris and body scanners, voice pattern analyzers, DNA
sequencers, and facial recognition cameras in neighborhoods, on
roads, and in train stations. Two large Chinese firms,
Hikvision and Dahua Technology, have profited greatly from the
surge in security spending, reportedly winning upwards of
US$1.2 billion in government contracts for large-scale
surveillance projects in the XUAR. Authorities employ hand-held
devices to search smart phones for encrypted chat applications
(apps) and require residents to install monitoring apps on
their cell phones. More traditional security measures are also
employed, including extensive police checkpoints. The rise in
security personnel has accompanied the proliferation of
``convenience police stations,'' a dense network of street
corner, village, and neighborhood police stations that enhance
authorities' ability to closely surveil and police local
communities.

Developments in the XUAR had a direct impact on U.S.
interests, most notably the detention of dozens of family
members of at least six U.S.-based Uyghur journalists employed
by Radio Free Asia, as well as the detention of dozens of
family members of prominent U.S.-based Uyghur rights activist,
Rebiya Kadeer, in an apparent attempt by the Chinese government
to silence effective reporting on human rights conditions in
the XUAR and Uyghur rights advocacy. Additionally, reports
emerged of Chinese authorities attempting to influence,
intimidate, and otherwise harass other Uyghurs living abroad,
including in the United States, to get them to return to China,
or monitor and silence them while abroad.

    Party Control Over Government, Society, and Business Dramatically
                              Increases

This past year, the purview of the Party continued to
expand into many sectors of public life, eliminating the
tenuous separation that previously existed between the Party
and government agencies. In previous decades, the Party had
allowed experimentation and varying degrees of autonomy in
local- and provincial-level implementation of central policy
decisions. Under Party General Secretary Xi Jinping, that
modicum of autonomy continues to shrink with the Party
apparatus reasserting itself over the government. In September
2017, senior Party officials began a process of amending
China's Constitution, which was finalized in the March 2018
meeting of the National People's Congress. A new sentence was
added to Article 1 in China's Constitution after ``[t]he
socialist system is the basic system of the People's Republic
of China'' that reads, ``The defining feature of socialism with
Chinese characteristics is the leadership of the Communist
Party of China.'' More significantly for Xi Jinping's
personalization of power, ``Xi Jinping Thought on Socialism
With Chinese Characteristics for a New Era'' was added to both
the Party Constitution and China's Constitution, joining Mao
Zedong Thought and Deng Xiaoping Theory as the three principles
guiding Chinese political life. Central to the doctrine, and
Xi's aspirational promise of the ``Chinese dream,'' is the
supremacy of the Chinese Communist Party and one-party rule.

In another major move to elevate and consolidate the
Party's control over government work, at the end of March, the
Party Central Committee issued a massive restructuring plan for
Party and government agencies to be completed by the end of

AR-1205

- CONGRESSIONAL-EXECUTIVE COMMISSION ON CHINA ANNUAL REPOR... Page 10 of 316

Case 3:20-cv-05910-LB Document 77-1 Filed 10/01/20 Page 42 of 65
WeChat Appendix F Footnote F9 - Congressional-Executive Commission on China Annual Report 2018

2018. This process has been described by expert Carl Minzner as
the ``re-Partyization of the bureaucracy.'' One of the key
changes in this sweeping reorganization plan was the rise of
the United Front Work Department (UFWD), a Party institution
used to influence and neutralize possible challenges to its
ideological and policy agenda. The functions of the State
Administration for Religious Affairs (SARA), which previously
oversaw religious affairs, are now subsumed by the UFWD. Some
commentators noted that the change was evidence that the Party
views control of religious affairs as central to maintaining
its power. The stated rationale for the restructuring of SARA
was to unify and strengthen the Party's control over
``religious work.'' In addition to religious affairs work, the
UFWD has also taken over management of ethnic affairs,
including the management of regions with sizeable ethnic
minority populations like the Xinjiang Uyghur Autonomous Region
and Tibet Autonomous Region--consistent with Xi Jinping's
emphasis on the importance of ``sinicizing'' ethnic and
religious minorities. The UFWD also absorbed the Overseas
Chinese Affairs Office, giving the Party much clearer authority
to monitor and manage the affairs of Chinese citizens who are
living outside of China. One analyst voiced concern that this
was an ``unprecedented extension of Party influence abroad.''

   The reorganization plan also restructured authority and
managerial responsibilities of Party entities and Chinese
government agencies in the area of the press and media. The
plan positioned the Party's Central Propaganda Department (CPD)
in a ``leadership'' role with direct management
responsibilities for news media, publishing, and film. While
the CPD and its lower level bureaus have long coordinated
ideological messaging, the CPD's enhanced managerial role
reportedly reflects Party efforts to rein in increasingly
complex digital news, communications, and entertainment
platforms and ensure dissemination of a unified message about
China within and outside of China. Among the key provisions
addressing managerial structures and authority was the merger
of three major broadcast entities--China Central Television,
China National Radio, and China Radio International--into China
Media Group domestically and Voice of China internationally.
Official explanations of the broadcasting agency's global name
of Voice of China emphasize its role in ``telling China's story
well'' to an international audience in polished and innovative
ways.

   The Party also sought to expand its role in commercial
enterprises. In October 2017, the Party amended its
constitution to stipulate that Party committees play a
``leading role'' in the decisionmaking of state-owned
enterprises (SOEs). Multiple SOEs also reportedly proposed
granting internal Party groups a greater decisionmaking role in
joint ventures with foreign companies. The government is also
reportedly exploring purchasing stakes in major technology
firms including Alibaba and Tencent.

              Increasing Use of Technology as a Tool of Repression

   This reporting year, consistent with the trend regarding
the Party's expanding reach, the Commission observed the Party
and government re-inserting itself into the private lives of
Chinese citizens through expanded collection of biometric data,
growing surveillance networks, and continued development of the
social credit system. Reports show that social and political
management of the Chinese people was aided by smart technology
and advances in artificial intelligence (AI) in new ways this
past year, including efforts to create ``a pervasive system of
algorithmic surveillance.'' \5\ The Chinese government
continued to expand its video surveillance system this past
year, with the primary aim of ``maintaining social stability.''
Also known as Skynet, the system included over 27 million
surveillance cameras nationwide as of September 2017. The
effort was buttressed by the creation of biometric databases to
contain information gathered from saliva and blood samples from
individuals, in some cases collected without their informed

**AR-1206**

consent, amplifying privacy concerns. As of December 2017, the
government had also reportedly spent 3.1 billion yuan
(approximately US$500 million) on ``Sharp Eyes,'' considered
the rural version of China's Skynet surveillance project. By
2020, China aims to complete a nationwide facial recognition
and surveillance network, with ``100 percent surveillance and
facial recognition coverage and total unification of its
existing databases across the country.'' \6\

Chinese companies like Alibaba (and its affiliate Ant
Financial) and Tencent (which owns the popular messaging
platform WeChat) can be required to hand over data on Chinese
citizens. Ant Financial, which has pioneered the commercial
credit rating product Sesame Credit, has indicated its
intention to ``share information collected on trustworthiness
and untrustworthiness with the State Credit Information-Sharing
Platform in a timely manner.'' \7\ The PRC Cybersecurity Law,
which took effect in June 2017, requires companies to store
user data inside mainland China, resulting in growing privacy
concerns. American companies, including Apple, which
transferred operations of iCloud services for mainland Chinese
accounts to a state-owned firm in February 2018, will likely be
compelled to disclose users' information to authorities, a
particular concern for users who may be targeted because they
are perceived as a threat to the Party.

As of March 31, 2018, access to non-licensed virtual
private networks (or VPNs)--previously used to send secure
emails or data or to access websites blocked by Chinese
authorities--is no longer permitted. While most analyses of
this development centered around the far-reaching censorship
implications, a secondary impact is the strengthening of the
state's surveillance apparatus as it relates to foreign
companies whose electronic communications and data
transmissions are increasingly vulnerable.

The government continued to work with Chinese companies to
develop and implement a social credit system based on the
governing principle, ``once untrustworthy, always restricted.''
\8\ Pilot projects of the nascent social credit system have
begun to aggregate vast amounts of data on citizens, with a
view toward shaping and even engineering citizens' behavior.
The social credit system is grounded in a broader political
control framework known as ``social management'' or ``social
governance,'' which the Party views as vital to maintaining
power. The system does not simply rate financial activities,
rather it aims to reward or punish a variety of actions
pertaining to economic as well as social and political
conduct.\9\ According to media reports, at least 9 million
Chinese have been banned from travelling domestically in
connection to the social credit system, though the system is
still in its pilot stages. One observer described the Party's
plans for the social credit system as ``Orwellian'' and ``a
preemptive way of shaping the way people think and shaping the
way people act.'' \10\


Notes to Section I--Executive Summary

\1\ Rian Thum, ``What Really Happens in China's `Re-Education'
Camps,'' New York Times, 15 May 18.
\2\ Evan Osnos, ``Xi Jinping May Be President for Life. What Will
Happen to China?'' New Yorker, 26 February 18.
\3\ James Doubek, ``China Removes Presidential Term Limits,
Enabling Xi Jinping To Rule Indefinitely,'' NPR, 11 March 18.
\4\ Gerry Shih, ``China's Mass Indoctrination Camps Evoke Cultural
Revolution,'' Associated Press, 18 May 18.
\5\ Anna Mitchell and Larry Diamond, ``China's Surveillance State
Should Scare Everyone,'' Atlantic, 2 February 18.
\6\ ``China Aims for Near-Total Surveillance, Including in People's
Homes,'' Radio Free Asia, 30 March 18.
\7\ National Development and Reform Commission, ``Commission Signs
Memorandum of Understanding on Rewards and Punishments With Ant
Financial Services Group'' [Wowei yu mayi jinrong fuwu jituan lianhe
jiangcheng beiwanglu], 3 August 16.

**AR-1207**

\8\ Jamie Fullerton, ``China's `Social Credit' System Bans Millions
From Travelling,'' Telegraph, 24 March 18.
   \9\ Shazeda Ahmed, ``Who's Really Responsible for Digital Privacy
in China?'' Asia Society, ChinaFile, 30 May 18.
   \10\ Simina Mistreanu, ``Life Inside China's Social Credit
Laboratory,'' Foreign Policy, 3 April 18.

                                        Executive
                                          Summary
                               Executive
                                 Summary

        Recommendations to Congress and the Administration

     As mentioned earlier in the Executive Summary, there is a
growing consensus that U.S.-China policy is in need of a
readjustment. In December 2017, the Administration released the
``National Security Strategy of the United States of America''
(NSS), which identified the current Chinese government as a
``revisionist power'' seeking to ``shape a world antithetical
to U.S. values and interests'' and engaged in efforts to
``repress'' its society. There has long been the temptation to
view human rights and the rule of law as tangential issues in
bilateral relations, sidelined from economic and security
interests, but the NSS concluded by saying that the U.S.
Government must ``raise our competitive game'' and employ all
of the ``tools of national power'' to deal with the challenges
coming from illiberal and authoritarian states, including
China. In this vein, the Commission makes the following
recommendations for consideration by Congress and the
Administration, recognizing that, since the end of World War
II, a shared commitment to universal principles and the rule of
law are the foundation upon which cooperative alliances and
security partnerships, multilateral consultative mechanisms,
and the free flow of trade and investment depend. Any effort to
rethink U.S. Government approaches to the current Chinese
government should recognize that pressing for adherence to
universal standards and insistence on greater reciprocity
advance American economic and security interests and the
interests of Chinese citizens eager for peace, rights
protections, and genuine political reform.
     Advocate for Political Prisoners. In meetings with
Chinese government officials, Administration officials at the
highest levels and Members of Congress should raise cases of
human rights abuse and publicly articulate why China's
continued detention of political and religious prisoners harms
U.S.-China relations. Experience demonstrates that raising
individual prisoner cases, publicly and privately, can result
in improved treatment, lighter sentences or, in some cases,
release from custody, detention, or imprisonment. As
demonstrated by the case of Liu Xia, who left China in July
2018 and is now living in Germany, sustained and consistent
international advocacy on behalf of prisoners can bring
results. The Administration should consider creating a Special
Advisor for Religious and Political Prisoners to coordinate
interagency efforts on behalf of political and religious
prisoners in China and globally. Members of Congress are
encouraged to ``adopt'' individual prisoners and advocate on
their behalf, including through the Tom Lantos Human Rights
Commission's ``Defending Freedoms Project'' or the Commission's
#FreeChinasHeroes initiative.
     Embed Human Rights Throughout Bilateral Relations.
The Administration should develop a comprehensive strategy to
advance human rights through other issues on the U.S.-China
agenda. Working with Congress, the Administration should
develop an action plan and implementation guidelines to embed
human rights, rule of law, and democratic accountability goals
into the critical mission strategies of all U.S. Government
entities interacting with the Chinese government. Isolating
human rights discussions only to State Department-led bilateral
human rights dialogue implies that human rights concerns are

**AR-1208**

unconnected to other bilateral interests. The Administration
should consider creating an Interagency Policy Committee (IPC)
to coordinate human rights policy on China throughout the U.S.
Government.

Prioritize Reciprocity. The Administration should
seek a rules-of-the-road agreement that will correct long-
standing diplomatic, trade, investment, media, and cultural and
academic exchange imbalances in U.S.-China relations. The
Administration should take appropriate actions to ensure that
U.S.-based news and social media outlets and academic and non-
governmental organizations (NGOs) have the same freedom to
operate, publish, and broadcast afforded to a growing number of
Chinese government-sponsored and funded think tanks, academic
institutions, and media entities in the United States. The
Administration should take steps to limit the growth of Chinese
government-funded Confucius Institutes and Confucius Classrooms
on U.S. college campuses and in primary and secondary schools,
and seek greater transparency and faculty oversight over those
that continue to operate as part of U.S. academic institutions.

Focus on Commercial Rule of Law. Working with
Congress, the Administration should press the Chinese
government to discontinue harmful practices and policies that
have the effect of restricting or limiting U.S. trade and
investment in China to address the lack of reciprocity between
the United States and China and strengthen existing laws and
regulations to scrutinize Chinese investments in various U.S.
business sectors, including by bolstering the capacity of the
Committee on Foreign Investment in the United States (CFIUS) as
required by the John McCain National Defense Authorization Act
(Public Law No. 115-232). The Administration should publish
information collected from U.S. businesses about requests from
the Chinese government regarding censorship, data and forced
technology transfers, and surveillance, and work with like-
minded World Trade Organization members to pursue negotiations
on restriction of cross-border data transfers and to develop
meaningful rules to address restrictions on digital trade.

Hold Officials Accountable for Abuses. The
Administration should use the powers granted in Executive Order
13818 to hold accountable individuals complicit in ``serious
human rights abuse and corruption'' in China and also use the
list-based sanctions available in the Global Magnitsky Human
Rights Accountability Act (Global Magnitsky) (Public Law No.
114-328), the International Religious Freedom Act of 1998 (22
U.S.C. 6401 et seq.) and the Foreign Relations Authorization
Act of 2000 (Public Law No. 106-113) to levy financial
sanctions or deny U.S. entry visas to Chinese officials
complicit in torture and arbitrary detentions; severe religious
freedom restrictions; and forced abortions, sterilizations, or
human trafficking, including human trafficking for the purpose
of organ removal.

Condition Law Enforcement Cooperation. The U.S.
Government should stop all cooperation on the extradition of
Chinese nationals who have fled to avoid pending corruption
charges until a law enforcement agreement can be signed that
guarantees verifiable due process protections and an end to
torture in detention and all forms of arbitrary detention,
including the Chinese Communist Party's and National
Supervisory Commission's extrajudicial forms of detention
called shuanggui and liuzhi, respectively, and Chinese public
security officials' use of ``residential surveillance at a
designated location.''

Promote Internet Freedom and Counter Foreign
Disinformation. The Administration should view ideological
competition as a critical strategic challenge as the Chinese
government has intensified the use of disinformation,
propaganda, economic intimidation, and political influence
operations to weaken commitments to universal human rights and
promote the Chinese political-economic model globally. The
Administration should develop a comprehensive interagency
action plan to counter disinformation emanating from
authoritarian countries, including by actively opposing the
Chinese government's efforts to establish a new international

**AR-1209**

norm in ``internet sovereignty,'' expanding digital security training for civil society advocates, and prioritizing a robust internet freedom agenda that transparently uses congressionally-appropriated funds to circumvent China's ``Great Firewall'' and other ``smart technologies'' through the funding and wide distribution of effective technologies that provide the greatest possible access to the internet in China and globally. The Senate should move swiftly to consider the Administration's choice as CEO of the U.S. Agency for Global Media (formerly the Broadcasting Board of Governors or BBG) and to work with the nominee to strengthen U.S. public diplomacy efforts.

Expand Vital Global Alliances. International responses to gross violations of human rights have the greatest impact when the United States exercises leadership. The Administration should develop a multilateral strategy on China with other countries, as the Chinese government has used multilateral institutions to undermine human rights norms and close off discussion of its failures to uphold its international obligations. The Administration should also continue coordination with businesses and NGOs to develop unified messages about unfair industrial policies, digital protectionism, and about the harm to U.S. and global interests from legislation such as the PRC Law on the Management of Overseas Non-Governmental Organizations' Activities in Mainland China, the PRC Cybersecurity Law, and the recently revised Regulations on Religious Affairs.

Help Address the ``Missing Girl'' Problem. The Administration should integrate the provisions of the Girls Count Act (Public Law No. 114-24) into foreign assistance programs to help address the social and economic issues created by the Chinese government's population control policies. In addition, Congress should continue to link U.S. contributions to the UN Population Fund (UNFPA) for use in China with the end of all birth limitation and coercive population control policies in China.

Prioritize Religious Freedom Diplomacy. Religious groups continue to be the largest segment of China's civil society and there is academic research that shows that countries respecting and protecting religious freedom are often more politically stable, prosperous, and suffer from fewer incidents of domestic terrorism. Therefore, the U.S. and China share mutual interests in advancing this fundamental freedom. The Administration should issue a presidential policy directive to implement a global strategy on international religious freedom reflecting the priority placed on this issue in the ``National Security Strategy of the United States of America.'' The Administration should use all the tools available in the International Religious Freedom Act (22 U.S.C. 6401 et seq.) and the Frank Wolf International Religious Freedom Act (Public Law No. 114-281) to make targeted responses to escalating religious freedom abuses in China and hold officials accountable for abuses.

Address Abuses in the Xinjiang Uyghur Autonomous Region (XUAR). In addition to employing Global Magnitsky sanctions targeting officials responsible for or complicit in the mass detentions, severe religious restrictions, and intrusive surveillance targeting Uyghurs and other ethnic minority Muslims in the XUAR, the Administration should consider initiating a joint statement with other nations at the UN Human Rights Council or, if appropriate, consider requesting an open debate or briefing at the UN Security Council. The Administration should calibrate the nature and scope of its counterterrorism and law enforcement cooperation and, through the Office of the Director of National Intelligence and the Justice Department, create guidelines for such cooperation to ensure that the United States does not condone or assist in Chinese authorities' crackdown on domestic political dissent or restrictions on the freedoms of expression or religion.

Revamp Export Controls. The Administration should consider restarting an interagency process to determine if new technologies should be added to the United States Munitions

**AR-1210**

List (USML) at the State Department's Directorate of Defense
Trade Controls (DDTC), because of their ability to enhance
surveillance and the ability of security forces to repress
universally recognized human rights. Additionally, the End-User
Review Committee (ERC), composed of representatives of the
Departments of Commerce, State, Defense, Energy and, where
appropriate, the Treasury, should add XUAR police and
government entities to the ``Entity List'' of prohibited end-
users and the Commerce Department Bureau of Industry and
Security should increase scrutiny of any purchase of technology
or equipment that may expand efforts to deny the right to life,
liberty, or the security of person of ethnic minority
populations in the XUAR.

   Reiterate U.S. Interest in Hong Kong's Autonomy.
The Administration should continue to issue annually the report
outlined in Section 301 of the United States-Hong Kong Policy
Act of 1992 (Public Law No. 102-383), subject to congressional
directives, and provide clear assessments of the overall
trajectory in Hong Kong, as understanding threats to the city's
autonomy and the rule of law are critical for appraising
whether the special status granted to Hong Kong under U.S. law
is warranted. Members of the Administration and Congress should
express through public statements, official visits, and
resolutions the important connection between a free press, a
vibrant civil society, an independent judiciary, and expanded
democratic governance in Hong Kong and the mutual interests
shared by the United States and China in maintaining Hong Kong
as a center of business and finance in Asia.

   Expand Mandate of Foreign Agents Registration Act
(FARA). The Administration and Congress should work together to
expand the mandate of FARA to encompass individuals working for
foreign state-owned media and government-backed or Party-
affiliated think tanks or non-profit organizations operating in
the United States. Congress should consider legislation that
increases reporting requirements for universities and other
NGOs that receive financial or in-kind contributions from
entities affiliated with the Chinese Communist Party or
government.

   Protect Civil Society From Political Influence
Operations. The Administration should work with U.S.
businesses, non-governmental organizations, and academic
institutions to formulate a code of conduct for interacting
with Chinese government-affiliated entities to counter
influence operations that are manipulative, coercive, or
corrupting of democratic institutions, and to help protect
human rights and academic freedom. In addition, the State
Department should collect and disseminate information about
best practices for monitoring and controlling foreign influence
operations and provide information about the Chinese
ministries, entities, and individuals engaged in foreign
influence operations and their connections with agencies of the
Chinese Communist Party or government. As the Administration
develops new strategies to deal with existing threats, new
messaging and policies should also be created to avoid
fostering an atmosphere of suspicion of Chinese Americans and
Chinese nationals living and studying in the United States, as
they are potentially victims and targets of influence
operations.

   Promote Dialogue Regarding Tibet. The
Administration and Congress should work together to press for
unrestricted access to Tibetan autonomous areas in China,
facilitate the full implementation of the Tibetan Policy Act of
2002 (Public Law No. 107-228), and urge renewed dialogue
between Chinese government officials and the Dalai Lama's
representatives. Administration officials, including the
President, should meet with the Dalai Lama in his capacity as a
spiritual leader, and with the leaders of the Central Tibetan
Administration.

   Congressional Action To ``Raise Our Competitive
Game.'' As part of the Administration's efforts to ``raise our
competitive game'' in the face of challenges by a growing
global authoritarianism, the Congress should be seeking to

**AR-1211**

provide new authorities, resources, and ideas to counter
China's mercantilist economic policies and Belt and Road
Initiative; harden America's abilities to counter
disinformation and political subversion; prioritize internet
freedom, digital security, and circumvention of China's ``Great
Firewall''; and place reciprocity at the core of U.S.
diplomatic engagement with China, including by considering
passage of the Fair Trade with China Enforcement Act (S. 2826/
H.R. 6001, 115th Cong., 2nd Sess.); the National Economic
Security Strategy Act of 2018 (S. 2757, 115th Cong., 2nd
Sess.); the Countering the Chinese Government and Communist
Party's Political Influence Operations Act (H.R. 6010/S. 3171,
115th Cong., 2nd Sess.); the Hong Kong Human Rights and
Democracy Act of 2017 (S. 417/H.R. 3856, 115th Cong., 1st
Sess.); the Reciprocal Access to Tibet Act (S. 821/H.R.1872,
115th Cong., 1st Sess.); and the Stop Higher Education
Espionage and Theft Act (S. 2903, 115th Cong., 2nd Sess.).

------------------------

The Commission's Executive Branch members have participated
in and supported the work of the Commission. The content of
this Annual Report, including its findings, views, legal
determinations, and recommendations, does not necessarily
reflect the views of individual Executive Branch members or the
policies of the Administration.
The Commission adopted this report by a vote of 15 to
0.

Voted to adopt: Senators Rubio, Lankford, Cotton, Daines,
Young, Feinstein, Merkley, Peters, and King; Representatives Smith,
Pittenger, Hultgren, Kaptur, Walz, and Lieu.

[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

Executive
Summary
Executive
Summary

Political Prisoner Database

Recommendations

When composing correspondence advocating on behalf of a
political or religious prisoner, or preparing for official
travel to China, Members of Congress and Administration
officials are encouraged to:

Check the Political Prisoner Database (PPD) (http://
ppdcecc.gov) for reliable, up-to-date information on a
prisoner or groups of prisoners. Consult a prisoner's
database record for more detailed information about the
prisoner's case, including his or her alleged crime,
specific human rights that officials have violated,
stage in the legal process, and location of detention
or imprisonment, if known.
Advise official and private delegations traveling to
China to present Chinese officials with lists of
political and religious prisoners compiled from
database records.
Urge U.S. state and local officials and private
citizens involved in sister-state and sister-city
relationships with China to explore the database, and
to advocate for the release of political and religious
prisoners in China.

**AR-1212**

## A POWERFUL RESOURCE FOR ADVOCACY

The Commission's 2018 Annual Report provides information about Chinese political and religious prisoners\1\ in the context of specific human rights and rule-of-law abuses. Many of the abuses result from the Chinese Communist Party and government's application of policies and laws. The Commission relies on the Political Prisoner Database (PPD), a publicly available online database maintained by the Commission, for its own advocacy and research work, including the preparation of the Annual Report, and routinely uses the database to prepare summaries of information about political and religious prisoners for Members of Congress and Administration officials. The Commission invites the public to read about issue-specific Chinese political imprisonment in sections of this Annual Report, and to access and make use of the PPD at http://ppdcecc.gov. (Information about the PPD is available at https://www.cecc.gov/resources/political-prisoner-database.)

The PPD received approximately 502,900 online requests for prisoner information during the 12-month period ending July 31, 2018--a change of approximately 27.96 percent over the 393,000 requests reported in the Commission's 2017 Annual Report for the 12-month period ending July 31, 2017.\2\ During the 12-month period ending in July 2018, the United States remained the country of origin for the largest share of requests for information, with approximately 23.7 percent of such requests. India was in the second position, with approximately 5.9 percent of such requests, followed by France (3.3 percent), Brazil (3.0 percent), China (2.8 percent), Japan (2.8 percent), the Philippines (2.7 percent), Italy (2.6 percent), Germany (2.6 percent), the United Kingdom (2.1 percent), and Hong Kong (2.0 percent).

Internet Protocol addresses that do not provide information about the name of the registrant or the type of domain were the source of the largest share of online requests for information during the Commission's 2018 reporting year, accounting for approximately 37.0 percent of the 502,900 requests for information in the 12-month period ending in July 2018. The approximate number of requests from other sources are as follows: Domains ending in .net were second, with 15.5 percent of requests for PPD information. Domains ending in .com were third, with 15.4 percent of online requests for information, followed by Brazil (.br) with 2.7 percent, then by domains for Italy (.it), India (.in), and Japan (.jp) with 2.2 percent each, for Germany (.de) with 1.9 percent, for France (.fr) with 1.5 percent, for Poland (.pl) with 1.1 percent, for the European Union (.eu) with 1.0 percent, and Australia (.au) with 0.9 percent. U.S. Government (.gov) domains accounted for 0.7 percent of requests for information, educational domains ending in .edu with 0.2 percent, and domains ending in .org with 0.1 percent of requests. Domains for China (.cn) accounted for 0.1 percent of such requests.

## POLITICAL PRISONERS

The PPD seeks to provide users with prisoner information that is reliable and up-to-date. Commission staff members work to maintain and update political prisoner records based on the staff member's area of expertise. Staff seek to provide objective analysis of information about individual prisoners, and about events and trends that drive political and religious imprisonment in China.

As of September 1, 2018, the PPD contained information on 9,345 cases of political or religious imprisonment in China. Of those, 1,392 are cases of political and religious prisoners currently known or believed to be detained or imprisoned, and 7,953 are cases of prisoners who are known or believed to have been released, who were executed, who died while imprisoned or soon after release, or who escaped. The Commission notes that there are considerably more than 1,392 cases of current political and religious imprisonment in China. Commission staff

**AR-1213**

work on an ongoing basis to add cases of political and
religious imprisonment to the PPD.
    The Dui Hua Foundation, based in San Francisco, and the
former Tibet Information Network, based in London, shared their
extensive experience and data on political and religious
prisoners in China with the Commission to help establish the
database. The Dui Hua Foundation continues to do so. The
Commission also relies on its own staff research for prisoner
information, as well as on information provided by non-
governmental organizations (NGOs), other groups that specialize
in promoting human rights and opposing political and religious
imprisonment, and other public sources of information.

                    MORE POWERFUL DATABASE TECHNOLOGY

    The PPD has served since its launch in November 2004 as a
unique and powerful resource for the U.S. Congress and
Administration, other governments, NGOs, educational
institutions, and individuals who research political and
religious imprisonment in China, or who advocate on behalf of
such prisoners. The July 2010 PPD upgrade significantly
leveraged the capacity of the Commission's information and
technology resources to support such research, reporting, and
advocacy.
    In 2015, the Commission enhanced the functionality of the
PPD to empower the Commission, the U.S. Congress and
Administration, other governments, NGOs, and individuals to
strengthen reporting on political and religious imprisonment in
China and advocacy undertaken on behalf of Chinese political
prisoners. The upgrade allows the PPD full text search and the
basic search both to provide an option to return only records
that either include or do not include an image of the prisoner.
In addition, the 2015 enhancement allowed PPD record short
summaries to accommodate more text as well as greater capacity
to link to external websites.
    The PPD aims to provide a technology with sufficient power
to handle the scope and complexity of political imprisonment in
China. The most important feature of the PPD is that it is
structured as a genuine database and uses a powerful query
engine. Each prisoner's record describes the type of human
rights violation by Chinese authorities that led to his or her
detention. These types include violations of the right to
peaceful assembly, freedom of religion, freedom of association,
and freedom of expression, including the freedom to advocate
peaceful social or political change and to criticize government
policy or government officials.
    The design of the PPD allows anyone with access to the
internet to query the database and download prisoner data
without providing personal information to the Commission, and
without the PPD downloading any software or Web cookies to a
user's computer. Users have the option to create a user
account, which allows them to save, edit, and reuse queries,
but the PPD does not require a user to provide any personal
information to set up such an account. The PPD does not
download software or a Web cookie to a user's computer as the
result of setting up an account. Saved queries are not
stored on a user's computer. A user-specified ID (which can be
a nickname) and password are the only information required to
set up a user account.

    Notes to Section I--Political Prisoner Database

    \1\ The Commission treats as a political prisoner an individual
detained or imprisoned for exercising his or her human rights under
international law, such as peaceful assembly, freedom of religion,
freedom of association, and freedom of expression, including the
freedom to advocate peaceful social or political change, and to
criticize government policy or government officials. (This list is
illustrative, not exhaustive.) In most cases, prisoners in the PPD were
detained or imprisoned for attempting to exercise rights guaranteed to
them by China's Constitution and law, or by international law, or both.
Chinese security, prosecution, and judicial officials sometimes seek to

**AR-1214**

- CONGRESSIONAL-EXECUTIVE COMMISSION ON CHINA ANNUAL REPOR... Page 19 of 316

Case 3:20-cv-05910-LB Document 77-1 Filed 10/01/20 Page 51 of 65
WeChat Appendix P Footnote-H9 - Congressional-Executive Commission on China Annual Report 2018

distract attention from the political or religious nature of
imprisonment by convicting a de facto political or religious prisoner
under the pretext of having committed a generic crime. In such cases,
defendants typically deny guilt but officials may attempt to coerce
confessions using torture and other forms of abuse, and standards of
evidence are poor. If authorities permit a defendant to entrust someone
to provide him or her legal counsel and defense, as the PRC Criminal
Procedure Law guarantees in Article 32, officials may deny the counsel
adequate access to the defendant, restrict or deny the counsel's access
to evidence, and not provide the counsel adequate time to prepare a
defense.
    \2\ CECC, 2017 Annual Report, 5 October 17, 63.


                                        Executive
                                          Summary
                                    Executive
                                      Summary

              Specific Findings and Recommendations

    A summary of specific findings follows below for each
section of this Annual Report, covering each area that the
Commission monitors. In each area, the Commission has
identified a set of issues that merit attention over the next
year, and, in accordance with the Commission's legislative
mandate, submits for each a set of recommendations to the
President and the Congress for legislative or executive action.


                      Freedom of Expression


                            Findings

    In March 2018, the Chinese Communist Party
Central Committee issued a large-scale plan to
restructure the functional authority and managerial
responsibilities of Party entities and Chinese
government agencies, provisions of which reinforced the
Party's ideological control by assigning to the Party
Central Propaganda Department functional control of the
press, publishing, and film. The plan also brought
together China's three major broadcast news entities--
China Central Television, China National Radio, and
China Radio International--under a newly formed
``mega'' agency called China Media Group, to be known
as Voice of China internationally.
    International press freedom advocacy
organizations again ranked China as among the most
restrictive for press freedoms throughout the world.
The Chinese government continued to be one of the worst
jailers of journalists in the world, with estimates of
individuals in detention or imprisoned ranging from 41
to more than 50. Authorities detained and held a closed
trial for Zhen Jianghua, the executive director of
human rights monitoring website Human Rights Campaign
in China. Other citizen journalists in detention
included Huang Qi, Jiang Chengfen, Wang Jing, Chen
Tianmao, and Yang Xiuqiong of the website 64 Tianwang,
and Liu Feiyue and Ding Lingjie of the website Civil
Rights & Livelihood Watch.
    Working conditions for foreign reporters in
China generally deteriorated in 2017, according to the
Foreign Correspondents' Club of China (FCCC). An FCCC
survey noted official harassment of foreign reporters,
news assistants, and sources; attempts to interfere
with the coverage of issues that authorities deemed
``sensitive''; restrictions on travel to areas along
China's border and ethnic minority autonomous regions;
and visa renewal delays and denials. Chinese officials
rejected the FCCC survey findings, with one who
questioned the legitimacy of the FCCC by alleging it is

**AR-1215**

an ``unregistered, illegal organization.''

This past year, authorities continued to formulate new regulations to control and censor online news and media outlets, technology companies, and users of social media, and in the process, operationalize the PRC Cybersecurity Law.

The Commission observed reports about censorship of topics relating to areas with large ethnic minority populations, such as the Tibet Autonomous Region and the Xinjiang Uyghur Autonomous Region; Taiwan and Hong Kong; the spiritual movement Falun Gong; and anniversaries of past events and persons. Censorship of the news and social media commentary on the news was particularly intense this reporting year in connection with two major political events--the 19th National Congress of the Chinese Communist Party in October 2017 and the annual meetings of the National People's Congress and its advisory body, the Chinese People's Political Consultative Conference, in March 2018.

Despite heavy and pervasive censorship, social media platforms continued to be an everyday channel of expression for Chinese citizens to discuss concerns about a range of news events and public interest issues. This past year, these concerns included sexual harassment on Chinese university campuses; racism on television; the forced eviction of thousands of non-local residents from Beijing municipality; and the removal of presidential term limits from China's Constitution, with many posts in protest of Chinese President and Party General Secretary Xi Jinping's consolidation of power.

The Commission observed a wide range of cases that illustrated the Chinese government and Communist Party's violations of international human rights standards and provisions in China's Constitution on the right to freedom of expression, such as preventing author Jia Pingwa from traveling to an international literary scholarship conference in New York City in January 2018; detentions--and arrest in the case of Guo Qingjun--of administrators of a social media group who provided humanitarian assistance to the families of political prisoners; the announcement of a five-year prison sentence for Tibetan language rights advocate Tashi Wangchug; and the death of writer and democracy advocate Yang Tongyan (pen name Yang Tianshui) while on medical parole. Although the Chinese government permitted Liu Xia, the widow of writer and Nobel Peace Prize laureate Liu Xiaobo, to travel to Germany in July 2018 after holding her in arbitrary detention for nearly eight years, rights advocates raised concerns that her freedom of speech would be compromised since the Chinese government did not allow her brother Liu Hui to leave China with her.

Recommendations

Members of the U.S. Congress and Administration officials are encouraged to:

Give greater public expression, including at the highest levels of the U.S. Government, to the issue of press freedom in China, condemning the harassment and detention of both domestic and foreign journalists; the denial, threat of denial, or delay of visas for foreign journalists; and the censoring or blockage of foreign media websites. Consistently link press freedoms to U.S. interests, noting how censorship and restrictions on journalists and media websites prevent the free flow of information on issues of public concern, including public health and environmental crises, food safety problems, and corruption, and act as a trade barrier

**AR-1216**

for foreign media and companies attempting to access
the Chinese market. Raise these issues with Chinese
officials during bilateral dialogues. Assess the extent
to which China's treatment of foreign journalists
contravenes its World Trade Organization or other
obligations.

   Sustain, and where appropriate expand, programs that
develop and widely distribute technologies that will
assist Chinese human rights advocates and civil society
organizations in circumventing internet restrictions,
in order to access and share content protected under
international human rights standards. Continue to
maintain internet freedom programs for China at the
U.S. Department of State and the U.S. Agency for Global
Media (formerly the Broadcasting Board of Governors) to
provide digital security training and capacity-building
efforts for bloggers, journalists, civil society
organizations, and human rights and internet freedom
advocates in China.

   Raise with Chinese officials, during all appropriate
bilateral discussions, the costs to U.S.-China
relations and to the Chinese public's confidence in
government institutions that are incurred when the
Chinese government restricts political debate, advocacy
for democracy or human rights, and other forms of
peaceful political expression. Emphasize that such
restrictions violate international standards for the
restrictions on free expression, particularly those
contained in Article 19 of the International Covenant
on Civil and Political Rights and Article 19 of the
Universal Declaration of Human Rights. Emphasize that
such restrictions erode confidence in media and
government institutions. Submit questions for China's
next UN Human Rights Council Universal Periodic Review
in November 2018, asking China to explain what steps it
will take to ensure its restrictions on free expression
conform to international standards.

   Urge Chinese officials to end unlawful detention and
official harassment of Chinese rights advocates,
lawyers, and journalists subject to reprisal for
exercising their right to freedom of expression. Call
on officials to release or confirm the release of
individuals detained or imprisoned for exercising
freedom of expression, such as Zhen Jianghua, Liu
Feiyue, Huang Qi, Ding Lingjie, Jiang Chengfen, Wang
Jing, Chen Tianmao, Yang Xiuqiong, Guo Qingjun, Tashi
Wangchug, and other political prisoners raised in this
report and in the Commission's Political Prisoner
Database. Raise this issue in bilateral dialogues as
well as through multilateral institutions, such as at
China's UN Human Rights Council Universal Periodic
Review scheduled to take place in November 2018, and at
the UN Human Rights Council Working Group on Arbitrary
Detention.

                    Worker Rights


                    Findings

   The All-China Federation of Trade Unions
(ACFTU) remains the only trade union organization
permitted under Chinese law. In January 2018, the
state-run news agency Xinhua reported that the ACFTU
had 303 million members in 2017. The U.S. Government
and international observers noted that the ACFTU
typically prioritized Chinese Communist Party interests
over the interests of workers and did not effectively
represent workers.
   Workers' right to collective bargaining
remained limited in law and in practice. Observers
noted the need for workers to establish trade unions

that are truly independent from government and enterprise interests. In addition to curbing effective union representation, authorities have also restricted the ability of Chinese labor non-governmental organizations (NGOs) to train workers in collective bargaining.

During this reporting year, Chinese authorities continued to severely restrict the ability of civil society organizations to work on labor issues, including domestic organizations that received foreign funding and international civil society organizations. The situation for civil society organizations has not improved since a crackdown on labor NGOs began in December 2015, and has deteriorated further during the first year of implementation of the PRC Law on the Management of Overseas NGOs' Activities in Mainland China.

The Chinese government did not publicly report on the number of worker strikes and protests, and NGOs and citizen journalists continued to face difficulties in obtaining comprehensive information on worker actions. The Hong Kong-based NGO China Labour Bulletin (CLB), which compiles data on worker actions collected from traditional news and social media, recorded 1,257 strikes in 2017. The CLB communications director estimated that CLB was able to document between 5 and 10 percent of the total number of worker actions in China between 2013 and 2017.

Major worker actions were reported, including in March 2018, when an estimated 3,000 sanitation workers protested wage cuts in Changning district, Shanghai municipality. Also in March 2018, 6,000 workers from five factories in Zhuhai municipality, Guangdong province, protested a plan to sell the factories. In April 2018, crane operators went on strike across 19 provinces in China to protest low pay.

Against the backdrop of the ongoing, and in some sectors worsening, problem of wage arrears this past year, central authorities reiterated goals from 2016 to resolve the problem of migrant worker wage arrears. In December 2017, the State Council General Office released new measures on wage arrears, reiterating the goal of a 2016 State Council opinion to resolve the issue.

During this reporting year, government data showed a continued decline in workplace deaths, though the Commission continued to observe reports of lax enforcement of work safety laws and regulations. According to the National Bureau of Statistics of China, in 2017, a total of 37,852 people died in workplace accidents, down from 43,062 deaths in 2016, and 66,182 deaths in 2015. Coal mine deaths have reportedly declined steadily and significantly over the past fifteen years, down to 375 in 2017, compared to 7,000 in 2002.

In March 2018, as part of a sweeping government restructuring plan, central authorities announced plans to dismantle the State Administration of Work Safety, transferring responsibility for work safety to a new Ministry of Emergency Management. CLB criticized the bureaucratic changes as highlighting how ``the Chinese government is more concerned with disaster management and control rather than in preventing workplace accidents in the first place.''

## Recommendations

Members of the U.S. Congress and Administration officials are encouraged to:

Press the Chinese government to immediately release labor advocates who are in prison or detention for the

**AR-1218**

exercise of their lawful rights. Specifically raise the cases of Lu Yuyu and Fu Tianbo.

Call on the Chinese government to respect internationally recognized rights to freedom of association and collective bargaining, and allow workers to organize and establish independent labor unions. Raise concern in all appropriate trade negotiations and bilateral and multilateral dialogues about the Chinese Communist Party's role in collective bargaining and elections of trade union representatives, emphasizing that in a market economy wage rates should be determined by free bargaining between labor and management.

Promote and support bilateral and multilateral exchanges among government officials, academics, legal experts, and civil society groups to focus on labor issues such as freedom of expression, collective bargaining, employment discrimination, and occupational health and safety. Seek opportunities to support capacity-building programs to strengthen Chinese labor and legal aid organizations involved in defending the rights of workers.

When appropriate, integrate meaningful civil society participation into bilateral and multilateral dialogues, meetings, and exchanges. Invite international unions and labor NGOs as well as domestic civil society groups from all participating countries to observe relevant government-to-government dialogues.

Support China's increased engagement and cooperation with the International Labour Organization (ILO) through funding for ILO technical cooperation projects with China. Request that the ILO increase its work with China on observing core labor standards, including freedom of association and the right to organize.

Criminal Justice

Findings

During the Commission's 2018 reporting year, authorities continued to use various forms of arbitrary detention--such as extralegal ``black jails'' and forced psychiatric commitment of individuals without mental illness--to deprive individuals of their liberty, contravening international human rights standards. Authorities also continued to use administrative forms of detention that circumvented judicial oversight and protections for detainees' rights under the PRC Criminal Procedure Law (CPL).

In March 2018, the National People's Congress passed the PRC Supervision Law, authorizing the National Supervisory Commission (NSC) to investigate suspected official misconduct using methods including ``confinement'' (liuzhi), an extrajudicial form of detention that allows NSC officials to hold individuals without a guarantee of access to counsel. In May 2018, the first reported death in ``confinement'' occurred, that of Chen Yong. Chen's body reportedly showed signs of abuse, and officials said Chen ``collapsed'' during interrogation but did not specify a cause of death.

Authorities continued to detain individuals under broad provisions in the PRC Criminal Law--such as crimes of ``endangering state security'' and ``picking quarrels and provoking trouble''--to suppress rights advocacy and other activities protected under international human rights standards.

Authorities continued to abuse detainees' rights under the CPL. Some detainees gave what appeared to be scripted, coerced confessions, in some cases on camera. For example, Swedish citizen Gui Minhai gave a televised confession for allegedly cooperating with

Swedish authorities to attempt to leave China, after
Chinese authorities detained him as he traveled to
Beijing municipality with Swedish diplomats for a
medical exam. In another case, Taiwan college employee
and non-governmental organization (NGO) volunteer Lee
Ming-cheh gave what appeared to be a coerced confession
in court for ``subversion of state power.'' Officials
denied some detainees access to counsel, such as human
rights website editor Ding Lingjie and internet
commentator Chen Jieren.
  Authorities held some rights advocates,
lawyers, petitioners, and others in prolonged pretrial
detention, including under ``residential surveillance
at a designated location'' (RSDL), a form of
incommunicado detention that can last up to six months,
restricts access to counsel, and places detainees at
risk of abuse by authorities. Observers reportedly were
unable to contact rights lawyer Wang Quanzhang since
authorities detained him on July 10, 2015. Wang's wife
reported in July 2018 that another lawyer reported
seeing Wang in a Tianjin municipality detention center.
Authorities reportedly postponed the June 20, 2018,
trial of 64 Tianwang website founder Huang Qi, whom
authorities detained on November 28, 2016. According to
an August 18, 2018, Radio Free Asia report, authorities
had not set a new trial date. Authorities also placed
rights lawyer Yu Wensheng and environmental petitioner
Ji Shulong under RSDL.
  Authorities continued to torture and otherwise
abuse detainees in some cases. Officials in Shenyang
municipality, Liaoning province, reportedly detained
rights lawyer Li Yuhan and allowed other detainees to
throw her food on the floor, urinate on her food, and
throw cold water on her. Officials in Yu county,
Zhangjiakou municipality, Hebei province, reportedly
placed a hood over lawyer Wu Quan; took him to a
basement; bound him to an interrogation chair for 48
hours; and deprived him of water, sleep, and sufficient
clothing for the first 24 hours.
  Authorities continued to develop technology-
based means to help public security officials track
persons of interest--based in part on large-scale,
sometimes involuntary collection of personal data--
raising concerns about privacy and public security
officials' capacity to crack down on rights advocates
and other targeted persons. The manner in which
authorities collected personal data, including
biometric data, appeared to violate privacy protections
in international human rights instruments, and the
Commission did not observe any efforts by the Chinese
government to bring the collection or use of such
information in line with international standards.
  The Chinese government continued to claim that
it reserved the death penalty for a small number of
crimes and only the most serious offenders, while
Amnesty International estimated that China carried out
more executions than all other countries combined.
China continued to classify statistics on its use of
the death penalty as a state secret, and the Commission
did not observe official reports on overall death
penalty numbers. In December 2017, authorities in
Lufeng city, Shanwei municipality, Guangdong province,
sentenced to death 10 people variously for murder,
robbery, and drug-related crimes--in a public trial in
a stadium--and then immediately executed them. This
past year, the Commission did not observe any
rulemaking efforts to ban harvesting organs from
executed prisoners. At a trafficking conference at the
Vatican in 2018, the head of the China Organ Transplant
Response System reported that authorities made 220
arrests over the previous 10 years in connection to
illegal organ transplants and noted that authorities

**AR-1220**

- CONGRESSIONAL-EXECUTIVE COMMISSION ON CHINA ANNUAL REPOR... Page 25 of 316

Case 3:20-cv-05910-LB Document 77-1 Filed 10/01/20 Page 57 of 65
WeChat Appendix 1 Footnote H9 - Congressional-Executive Commission on China Annual Report 2016

continued to combat the practice.

### Recommendations

Members of the U.S. Congress and Administration officials are encouraged to:

Call on the Chinese government to publicly commit to a specific timetable for ratification of the International Covenant on Civil and Political Rights, which the Chinese government signed in 1998 but has not yet ratified.

Include discussion of rights protections for government critics and rights advocates in a wide range of bilateral and multilateral discussions with Chinese officials. Stress to the Chinese government the importance of procedural compliance and effective legal representation in criminal cases in relation to the goal of rule-based governance. Publicly convey support for human rights advocates whom officials have deprived of liberty on unsubstantiated criminal charges and for apparent political or religious reasons.

Urge Chinese officials to end all forms of arbitrary detention, as well as forms of extrajudicial detention that are imposed without meeting the standards for a fair trial as set forth in the International Covenant on Civil and Political Rights and other international human rights instruments.

Consult with Chinese officials regarding progress toward adopting the recommendations made in February 2016 by the UN Committee against Torture in relation to China's compliance with the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, such as the call to repeal the provisions in Chinese law allowing for ``residential surveillance at a designated location.'' Further, encourage Chinese officials to extend invitations to all UN special rapporteurs and other special procedures that have requested visits to China.

Urge Chinese officials to adopt a legal and regulatory framework for information technology-based policing practices that meets international human rights standards. Such a framework should include, for example, privacy protections, restrictions on police authority to collect personal information without consent, and protections against discriminatory practices, including profiling of ethnic and religious minorities. Encourage Chinese officials to require police who use information technology to complete appropriate human rights training, and impose strict penalties for officials who authorize or carry out preemptive detentions.

Stress to the Chinese government the need for greater transparency on the number and circumstances of executions, and urge Chinese officials to further limit the crimes for which the death penalty is applicable. Urge the Chinese government to ban explicitly in national legislation the harvesting of organs from executed prisoners.

Continue and, where appropriate, expand support for programs involving U.S. entities engaging with reform-minded Chinese organizations and individuals (both within and outside the government) that draw on comparative experience to improve the criminal justice process. For example, the experience of the United States and other jurisdictions can inform China as it charts a path toward reducing reliance on confessions, enhancing the role of witnesses at trials, and creating more reliable procedures for reviewing death penalty cases.

### Freedom of Religion

## Findings

Both Chinese and international law provide guarantees of religious freedom. Despite these guarantees, the Commission continued to observe widespread and systematic violation of the principles of religious freedom, as Chinese authorities exercised broad discretion over the religious practice of Chinese citizens.

The importance of ``religious work'' to the Chinese Communist Party agenda has undergone an ``unprecedented increase'' with ``major innovations'' under Party General Secretary Xi Jinping. Party and government officials continued to emphasize several key policy principles in religious affairs during this reporting year. These included ``guiding'' religious groups to support Party leadership and the political system; shaping religious practice in China to promote and assimilate to a Chinese cultural identity (``sinicization''); and using Chinese religious groups to facilitate connections with other countries, particularly those hosting Belt and Road Initiative projects.

In March 2018, the Party's sweeping reorganization plan for Party and government institutions included a provision directing the Party's United Front Work Department (UFWD) to take over the government agency responsible for religious affairs at the national level, making the national-level UFWD directly responsible for administering policies pertaining to religion in China.

The Chinese government's regulatory framework for religion imposed increased restrictions on religious freedom after revisions to the Regulations on Religious Affairs took effect on February 1, 2018. The revisions increased official control and scrutiny over religious activity. The revisions also established new legal responsibilities and penalties for violations of the regulations. Religious believers and academic experts predicted that the restrictions would increase official pressure on religious groups, particularly those not registered with the government. Many groups refuse to register because registration requires submitting to the direction of a state-sanctioned patriotic religious association. Other laws and Party policies also continued to restrict citizens' freedom to hold religious beliefs and practice religion.

While government and Party officials rarely targeted Chinese Buddhist and Taoist communities with direct suppression, they nonetheless continued to subject these religions to extensive regulation and control. Official regulation also included restrictions aimed at stemming the perception of commercialization of Buddhist and Taoist religious practices.

The government maintained measures that impede the freedom of Chinese Catholic congregations to be led by clergy who are selected and who conduct their ministry according to the standards called for by Catholic religious beliefs. The government also continued to harass, detain, or hold incommunicado certain leading Catholic clergy. In May 2018, the national religious organizations for Catholics passed a five-year plan for the ``sinicization'' of Catholicism in China.

Party and government officials maintained restrictions on the religious activities of Chinese Protestants, with some believers facing harassment, surveillance, detention, imprisonment, and other abuse because of their religious activities. A U.S.-based organization that advocates for religious freedom,

**AR-1222**

ChinaAid Association, reported that both instances of
official persecution and the number of believers
affected had increased in 2017 from the prior year.
Academic experts on Chinese religion and society stated
that the continued escalation of repression was due in
part to Party officials' concern that Christian
communities pose a challenge to the Party's monopoly on
political power. In several instances, authorities
detained house church members on the charge of
``organizing and using a cult to undermine
implementation of the law'' under Article 300 of the
PRC Criminal Law.

 The Commission noted reports of continued
repression of Falun Gong practitioners, by means of
harassment, arbitrary detention, and prosecution.
International organizations continued to express
concern over reports that organs of detained prisoners
have been used in numerous organ transplant operations
in China, including those of Falun Gong practitioners.
Medical professionals and international advocacy
organizations disputed Chinese health officials' claims
that organ procurement systems have been reformed in
compliance with international standards, citing ethical
concerns about organ sourcing raised by short wait
times for organ transplants and discrepancies in data
on organ transplants.

 During this reporting year, official
restrictions on the religious freedom of Hui Muslim
believers increased. The local government in Ningxia
Hui Autonomous Region, a region in which Hui Muslims
are concentrated, launched a ``rectification campaign''
that included the removal of ``Arabic style'' domes and
decor from mosques and other buildings, prohibitions on
calls to prayer, removal of the Quran and books on
Islam from retail shops, and the closure of schools
teaching Arabic. Hui Muslim believers in the Xinjiang
Uyghur Autonomous Region have also been sentenced for
``cult'' or other offenses for ``privately preaching
the Quran.''

 Religious communities outside of the five
religions that are the main objects of official
regulation continued to exist in China, with some
continuing to enjoy tacit recognition and support,
while others faced suppression from authorities.


                    Recommendations


    Members of the U.S. Congress and Administration officials
are encouraged to:


        Call on the Chinese government to guarantee to all
citizens freedom of religion in accordance with its
international human rights obligations. Stress to
Chinese authorities that freedom of religion includes
the right to freely adopt beliefs and practice
religious activities without government interference,
particularly those based on political goals.

 Stress to the Chinese government that the right to
freedom of religion includes: the right of Buddhists
and Taoists to carry out activities in temples and
select monastic teachers independent of state controls;
the right of Catholics to be led by clergy who are
selected and who conduct their ministry according to
the standard called for by Catholic religious beliefs;
the right of Falun Gong practitioners to freely
practice Falun Gong inside China; the right of Muslims
to freely preach, undertake overseas pilgrimage, select
and train religious leaders, and wear clothing with
religious significance; the right of Protestants to
exercise their faith free from state controls over
doctrine and worship, and free from harassment,
detention, and other abuses for public and private

                                              **AR-1223**

manifestations of their faith, including the display of crosses; and the right of members of other religious communities to be free from state control and harassment.

    Call for the release of persons confined, detained, or imprisoned for peacefully pursuing their religious beliefs, as well as those confined, detained, or imprisoned in connection to their association with them. The Administration should use existing laws to hold accountable Chinese government officials and others complicit in severe religious freedom restrictions, including by using the sanctions available in the Global Magnitsky Human Rights Accountability Act (Public Law No. 114-328) and the International Religious Freedom Act of 1998. Ensure that conditions related to religious freedom are taken into account when negotiating any applicable trade agreement as mandated by the Bipartisan Congressional Trade Priorities and Accountability Act of 2015 (Public Law No. 114-26).

    Publicly and privately advocate on behalf of persons whom Chinese authorities continue to severely harass or have detained for exercising their freedom of religion or belief. Some of the many cases in need of legal, humanitarian, and other forms of advocacy include Catholic clergy pressured by Chinese authorities to join the Catholic Patriotic Association, such as Coadjutor Bishop Augustine Cui Tai of Xuanhua district, Zhangjiakou municipality, Hebei province; Bishop James Su Zhimin of Baoding municipality, Hebei province; Father Lu Danhua of Qingtian county, Zhejiang province; and Bishop Thaddeus Ma Daqin of Shanghai municipality, whose movement reportedly remains restricted within Sheshan Seminary in Shanghai. A number of leaders of officially sanctioned Protestant groups have been prosecuted and sentenced after protesting official measures against their churches in recent years, including Zhang Shaojie of Nanle county, Puyang municipality, Henan province, as well as Bao Guohua and Xing Wenxiang, both of Jinhua municipality, Zhejiang province. Members of unofficial Protestant groups (``house churches''), including 27 Protestant believers across six different localities within Yunnan province, have received criminal sentences for ``organizing and using a cult to undermine implementation of the law'' under Article 300 of the PRC Criminal Law. The U.S.-based non-governmental organization Dui Hua Foundation reportedly found 800 official records of persons sentenced in 2017 under Article 300 in Chinese judicial databases, a majority of whom apparently are Falun Gong practitioners. Representative cases of Falun Gong practitioners in the Commission's Political Prisoner Database include Deng Cuiping of Yuxi municipality, Yunnan, who is currently serving a six-year prison sentence; Bian Lichao of Tangshan municipality, Hebei, who is serving a 12-year prison sentence; and Zhang Ming and Li Quanchen of Dandong municipality, Liaoning province. Members of Congress and Administration officials are encouraged to consult the Commission's Political Prisoner Database for information on political and religious prisoners.

    Encourage U.S. political leaders to visit religious sites in China to raise awareness of and promote freedom of religion.


                    Ethnic Minority Rights



                          Findings


    At the March 2018 meetings of the National People's Congress and the Chinese People's Political

- CONGRESSIONAL-EXECUTIVE COMMISSION ON CHINA ANNUAL REPOR... Page 29 of 316

Case 3:20-cv-05910-LB Document 77-1 Filed 10/01/20 Page 61 of 65
WeChat Appendix F Footnote-F9 - Congressional-Executive Commission on China Annual Report 2018

Consultative Conference in Beijing (Two Sessions),
Chinese Communist Party and government authorities
changed the mechanisms they use to implement policies
toward ethnic minorities, as the Party's United Front
Work Department (UFWD) assumed control of the work of
the government departments overseeing ethnic affairs
(the State Ethnic Affairs Commission) and religion (the
State Administration for Religious Affairs). A number
of observers expressed the view that the UFWD's newly
expanded powers represented an official move toward
tighter Party control over ethnic affairs and policies
promoting ethnic assimilation over ethnic pluralism.
 Authorities targeted ethnic Hui communities
with policies and restrictions limiting Hui Muslims'
religious practices. During the Two Sessions, Yang
Faming, Chairman of the China Islamic Association,
stressed that Muslims in China should incorporate
Chinese characteristics into Islamic religious rituals,
culture, and architecture, avoid the expansion of the
concept of ``halal'' into secular life, and adhere to
``socialist core values.'' According to an American
historian, Yang's speech reflected a formal declaration
of a policy trend that officials had begun implementing
in regions with significant Hui populations beginning
in fall 2016.
 Government and Party officials implemented
policies limiting ethnic minorities' freedom to engage
in cultural practices and speak or learn their
languages. In December 2017, international media and
rights advocates reported that in a policy implemented
in September, Xinjiang Uyghur Autonomous Region (XUAR)
education authorities had ended the use of Mongolian as
a language of instruction in elementary and lower
middle schools in Bayangol (Bayinguoleng) Mongol
Autonomous Prefecture, XUAR.
 Mongol herders in the Inner Mongolia
Autonomous Region (IMAR) demonstrated and petitioned
authorities over the government's role in the loss of
their traditional grazing lands, the harmful ecological
effect of state development on grassland and livestock,
and the government's failure to provide herders with
adequate compensation for their land. As in past
reporting years, authorities detained some of the
Mongol herders who peacefully protested.

                    Recommendations

    Members of the U.S. Congress and Administration officials
are encouraged to:

        Continue to build the capacity of Mongol, Uyghur, and
    Tibetan groups working to advance human rights,
    environmental protection, economic development, and
    rule of law in China through U.S. foreign assistance
    funding and by encouraging additional support from both
    UN and non-governmental sources.
     Convey to the Chinese government the importance of
    respecting and protecting ethnic minority cultures and
    languages. Urge Chinese officials to provide ethnic
    minority students and parents a choice of what language
    or languages of instruction should be used at schools
    they attend in accordance with the PRC Regional Ethnic
    Autonomy Law and the UN Declaration on the Rights of
    Persons Belonging to National or Ethnic, Religious and
    Linguistic Minorities. Call on Chinese officials to
    establish mechanisms that preserve and expand existing
    instruction in ethnic minority languages from preschool
    through the university level.
     Call on the Chinese government to allow Mongol
    herders to exercise their fundamental rights of freedom
    of expression, association, and peaceful assembly, as
    well as the right to be free from arbitrary detention.

**AR-1225**

Convey to Chinese officials the importance of consulting with ethnic minority communities regarding the impact of proposed development on their traditional grazing lands.

Urge Chinese authorities to allow Hui and other predominantly Muslim ethnic minority populations to freely engage in Islamic religious rituals, as a matter of the right of religious freedom, and in accordance with the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights, as well as China's Constitution, which prohibits discrimination based on religion.

## Population Control

### Findings

During the Commission's 2018 reporting year, Chinese government authorities continued to promote and implement coercive population control policies that violate international standards, including the 1995 Beijing Declaration, the 1994 Programme of Action of the Cairo International Conference on Population and Development, and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. The amended PRC Population and Family Planning Law and provincial-level regulations limit couples' freedom to build their families as they see fit.

The Chinese Communist Party and government implemented the ``universal two-child policy'' for a third consecutive year in 2018, and government statistics showed that the policy was not effective in spurring population growth. The National Bureau of Statistics of China (NBS) reported that the number of total births in 2017 was 17.23 million, 630,000 less than the 2016 NBS figure. The National Health and Family Planning Commission (NHFPC) had predicted in 2016 that the universal two-child policy would result in 3 million additional births per year.

During this reporting year, central Party and government officials pledged to strengthen supporting policies that facilitate implementation of family planning policies. Some local governments introduced supporting policies--including longer paid maternity leave, financial incentives and subsidies, and other benefits--to encourage couples to have a second child.

During this reporting year, central authorities issued a plan to restructure Party and government agencies, including merging the NHFPC and several other agencies to create a new National Health Commission (NHC) under the State Council. The NHC will assume oversight of responsibilities related to family planning management and services, in addition to managing an aging population and other health-related matters. Some observers saw the restructuring plan as an indication that authorities plan to eventually eliminate birth limit policies. Experts from academic institutions affiliated with the Party and government, as well as a provincial government report on population development, called for ending the birth limit policies. The NHC reportedly stated that authorities were considering ending the two-child birth limit.

According to a May 2018 Bloomberg News report, central government authorities reportedly were considering and may have reached a decision to end birth limit policies due to demographic concerns, such as the declining birth rate, aging population, and shrinking workforce. The report also cited international criticism of the policies as a factor in the decision.

**AR-1226**

The amended PRC Population and Family Planning Law contains provisions that prohibit officials from infringing upon the ``legitimate rights and interests'' of citizens while implementing family planning policies. Some provincial population planning regulations and local government authorities, however, continued to explicitly instruct officials to carry out abortions, often referred to as ``remedial measures,'' for illegal pregnancies. Local authorities continued to promote the implementation of harsh and invasive family planning measures. Officials imposed or threatened various punishments to enforce family planning policies, including heavy fines, job termination, detention, and abortion.

Decades of population control policies have exacerbated China's demographic challenges, which include a rapidly aging population, shrinking workforce, and sex ratio imbalance. China's total fertility rate has dropped from approximately 3 births per woman in the late 1970s to an estimated 1.6 births per woman in 2017, below the replacement rate of 2.1 births per woman necessary to maintain a stable population. The National Bureau of Statistics of China reported that from 2016 to 2017, China's working-age population (persons between the ages of 16 and 59) declined by 5.48 million people to 901.99 million, while the elderly population (persons aged 60 or older) increased by 10.04 million in 2017 to 240.90 million people, or 17.3 percent of the total population. The overall sex ratio in 2017 was 104.81 males to 100 females, and there were approximately 32.66 million more males than females in China.

International media reports continued to suggest a link between China's sex ratio imbalance and the trafficking of foreign women into China for forced marriage or commercial sexual exploitation. Reports also indicated that decades of birth limits under China's population control policies combined with a traditional preference for sons may have encouraged a black market for illegal adoptions.

Recommendations

Members of the U.S. Congress and Administration officials are encouraged to:

Press Chinese government officials to bring the PRC Population and Family Planning Law into conformance with international standards set forth in international agreements, including the 1995 Beijing Declaration, the 1994 Programme of Action of the Cairo International Conference on Population and Development, the Convention on the Rights of the Child, and the International Covenant on Economic, Social and Cultural Rights.

Highlight the looming demographic challenges currently facing China in bilateral meetings with Chinese government officials--including a rapidly aging population, shrinking workforce, and sex ratio imbalance. As the universal two-child policy may not adequately address these demographic challenges, urge the Chinese government to heed the recommendations of domestic and international demographic experts by ending, as soon as possible, all birth restrictions on families and abolishing ``social compensation fees.''

Use authorities provided in the Foreign Relations Authorization Act of 2000 (Public Law No. 106-113) and the Global Magnitsky Human Rights Accountability Act (Public Law No. 114-328) to deny entry into the United States of and impose sanctions against Chinese officials who have been directly involved in the formulation, implementation, or enforcement of China's

**AR-1227**

coercive family planning policies, including those who
have forced men and women to undergo sterilizations and
abortions.

Call on China's central and local governments to
vigorously enforce provisions of Chinese laws that
provide for punishment of officials and other
individuals who engage in these abuses.

Publicly link, with supporting evidence, the sex
ratio imbalance exacerbated by China's population
control policies with potential regional humanitarian
and security concerns--human trafficking, crime,
increased internal and external migration, and other
possible serious social, economic, and political
problems--and discuss and address these issues in
bilateral and multilateral dialogues.

Special Topic: Forced Evictions in Beijing Municipality

Findings

In November 2017, Beijing municipal
authorities responded to a fire in a migrant
neighborhood with a campaign of forced
evictions. On
November 18, a fire broke out in an apartment building,
killing 19 people. Of the 19 victims, 17 were migrants,
meaning they were registered in localities outside of
Beijing under the Chinese government's household
registration (hukou) system.

Following the fire, the Beijing government
launched a campaign to inspect buildings for fire
hazards, which resulted in large-scale forced evictions
and demolitions in migrant neighborhoods across
Beijing. Some affected residents reported being forced
to leave their homes within three days, with some given
a few hours' notice or less. The Commission did not
observe official reports on the number of people
evicted in Beijing, but international media estimated
that tens of thousands were affected. The number of
migrants in Beijing reportedly fell by 132,000 from the
end of 2016 to the end of 2017.

As events unfolded, some migrants and locals
attempted to confront government officials over their
evictions. Non-governmental organizations, companies,
and individuals offered assistance to displaced
migrants. Internet users engaged in online debates and
criticized the eviction campaign as videos showing
evictions, demolitions, and displaced migrant workers
spread quickly on Chinese social media.

The government responded by restricting
domestic reporting on the evictions, and censoring
online discussion and civil society groups. Authorities
also detained an artist for sharing videos of the
evictions and detained six others, reportedly for
helping the artist flee. Authorities released the seven
on bail and forced the artist to leave Beijing and
return to his hometown in another province.

Some observers viewed the eviction campaign
that began in November 2017 as part of the Beijing
government's long-term plan to limit the population of
Beijing. In September 2017, central authorities
approved Beijing municipal authorities' plan to cap
Beijing's population at 23 million by 2020. In December
2017, central authorities also approved a plan to cap
Shanghai's population at 25 million by 2035.

Actions taken by Chinese government officials
enforcing the eviction campaign in Beijing contravene
both international standards and Chinese law, and
restrictions arising from the hukou system contravene
international human rights standards guaranteeing
freedom of residence.

**AR-1228**

### Recommendations

Members of the U.S. Congress and Administration officials are encouraged to:

> Call on Chinese authorities to end forced evictions across China, and to follow both international and Chinese law in providing adequate notice, compensation, and assistance to residents when public safety requires demolishing dangerous structures.
>
> Encourage the Chinese government to expand both the rights of migrant workers in China, and the space for civil society organizations that provide social services and legal assistance to migrant workers, rather than cracking down on such organizations. Note that improving the rights of migrant workers and expanding their access to social services is likely to lower the chances of spontaneous, large-scale protests, while large-scale forced evictions could increase the likelihood of such protests.
>
> Call on Chinese authorities to accelerate reforms to the hukou system, including lowering restrictions on migration to major cities and centers of economic opportunity; equalizing the level and quality of public benefits and services tied to local hukou and residence permits; and implementing laws and regulations to provide equal treatment for all Chinese citizens, regardless of place of birth, residence, or hukou status.
>
> Support programs, organizations, and exchanges with Chinese policymakers and academic institutions engaged in research and outreach to migrants, in order to advance legal and anti-discrimination assistance for migrants and their families, and to encourage policy debates aimed at eliminating inequality and discrimination connected to residence policies, including the hukou system.

### Status of Women

### Findings

Employment discrimination against women continued to be a serious problem this past year. Employers routinely discriminate against women in hiring, wages, and promotion. Discriminatory and sexualized views of women were pervasive in job recruitment advertisements. Gender inequality in employment has increased during the period of market liberalization, and much of the disparity is attributed to the shifting of responsibility for child care from the state system (via publicly funded maternity leave and nursery schools) to the private sector, with the resulting burden falling disproportionately to individual women and employer-funded maternity leave. Employers viewed women as more costly than male employees, and such discrimination has worsened with the implementation of the ``universal two-child policy.''

Women in China continued to face challenges with domestic and sexual violence. While there were improvements in implementation of the PRC Anti-Domestic Violence Law evidenced by increased awareness and the publishing of local implementing regulations, other challenges remained. Chinese courts maintained an evidentiary standard for proving domestic violence that was difficult for victims to meet, and victims escaping abusive domestic situations received inadequate support in seeking shelters.

Women in China continued to lack secure rights to property due to a combination of discriminatory

**AR-1229**