MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
VAN SWEARINGEN – 259809
BENJAMIN BIEN-KAHN – 267933
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104
Email:        mbien@rbgg.com
              egalvan@rbgg.com
              vswearingen@rbgg.com
              bbien-kahn@rbgg.com
              agourse@rbgg.com
              axu@rbgg.com

KELIANG (CLAY) ZHU – 305509
DEHENG LAW OFFICES PC
7901 Stoneridge Drive #208
Pleasanton, California 94588
Telephone:    (925) 399-5856
Facsimile:    (925) 397-1976
Email:        czhu@dehengsv.com

ANGUS F. NI – Admitted *Pro Hac Vice*
AFN LAW PLLC
502 Second Avenue, Suite 1400
Seattle, Washington 98104
Telephone:    (773) 543-3223
Email:        angus@afnlegal.com

Attorneys for Plaintiffs

THOMAS R. BURKE – 141930
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California 94111-6533
Telephone:    (415) 276-6500
Facsimile:    (415) 276-6599
Email:        thomasburke@dwt.com

DAVID M. GOSSETT – Admitted *Pro Hac Vice*
DAVIS WRIGHT TREMAINE LLP
1301 K Street N.W., Suite 500 East
Washington, D.C. 20005-3366
Telephone:    (202) 973-4216
Facsimile:    (202) 973-4499
Email:        davidgossett@dwt.com

JOHN M. BROWNING – *Pro Hac Vice*
  forthcoming
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020-1104
Telephone:    (212) 603-6410
Facsimile:    (212) 483-8340
Email:        jackbrowning@dwt.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| U.S. WECHAT USERS ALLIANCE, CHIHUO INC., BRENT COULTER, FANGYI DUAN, JINNENG BAO, ELAINE PENG, and XIAO ZHANG,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, and WILBUR ROSS, in his official capacity as Secretary of Commerce,<br><br>Defendants. | Case No. 3:20-cv-05910-LB<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STAY PENDING APPEAL OF ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:      October 15, 2020<br>Time:      9:30 a.m.<br>Crtrm.:    Remote<br><br>Judge:    Hon. Laurel Beeler<br>Trial Date:    None Set |

[3620853.13]

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 3

I.      DEFENDANTS' NEWLY SUBMITTED EVIDENCE DOES NOT
        JUSTIFY GRANTING A STAY ............................................................................ 3

II.     DEFENDANTS HAVE NOT MET THE STANDARD FOR A STAY ................... 6

        A.      Defendants Have Not Made a Strong Showing of Likelihood of
                Success on the Merits .......................................................................... 6

                1.      The WeChat Ban Is A Prior Restraint and Is Not Content
                        Neutral ..................................................................................... 7

                2.      The WeChat Ban Implicates the First Amendment ............................. 8

                3.      The WeChat Ban Cannot Survive Intermediate Scrutiny ................. 10

                4.      Plaintiffs' *Ultra Vires* Claims Warrant Relief................................... 13

        B.      Defendants Have Not Shown Irreparable Harm Caused by the
                Preliminary Injunction, Which Merely Preserves the Status Quo ............... 13

                1.      The Court Did Not Err in Stating the Standard or Balancing the
                        Equities .................................................................................. 13

                2.      The Court Properly Evaluated the Strength or Absence of
                        Evidence Supporting Defendants' Assertions of National
                        Security and Foreign Policy Justifications ......................................... 15

                3.      Defendants Will Not Be Irreparably Injured Absent a Stay ............... 17

                        (a)      Defendants' Evidence of Surveillance Is Speculative ............ 17

                        (b)      The Claimed National Security Risks Are Neither
                                 Immediate Nor Irreparable ....................................................... 19

                        (c)      Defendants' Fail to Show How Censorship Is an
                                 Irreparable Injury to National Security ................................... 21

                        (d)      Defendants Cannot Suffer Harm From an Injunction
                                 That Merely Ends an Unlawful Practice ................................. 21

        C.      A Stay Would Irreparably Harm Plaintiffs................................................... 22

        D.      The Court Correctly Concluded That the Public Interest Warrants a
                Preliminary Injunction ................................................................................ 23

III.    NO PARTIAL STAY SHOULD BE GRANTED, NOR SHOULD THE
        PRELIMINARY INJUNCTION BE MODIFIED ................................................. 24

IV.    DEFENDANTS OFFER NO RATIONALE TO NOW STAY THE
       ORDER'S NATIONWIDE EFFECT ........................................................................ 25

V.     DEFENDANTS' REQUEST FOR BOND SHOULD BE DENIED ......................... 25

CONCLUSION ............................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*A&M Records, Inc. v. Napster, Inc.*,
 284 F.3d 1091 (9th Cir. 2002) ................................................................ 24

*Al Haramain Islamic Found, Inc. v. United States Dep't of the Treasury*,
 686 F.3d 965 (9th Cir. 2012) .............................................................. 6, 16

*Am.-Arab Anti-Discrimination Comm. v. Reno*,
 70 F.3d 1045 (9th Cir. 1995) ................................................................ 17

*Apple, Inc. v. Samsung Elecs. Co.*,
 No. 11-cv-01846, 2012 WL 2527044 (N.D. Cal. July 2, 2012) ................................ 1

*Arcara v. Cloud Books, Inc.*,
 478 U.S. 697 (1986) ........................................................................ 9

*Backpage.com, LLC v. Dart*,
 807 F.3d 229 (7th Cir. 2015) ................................................................ 9

*Bullfrog Films v. Wick*,
 646 F. Supp. 492, 502 (C.D. Cal. 1986), *aff'd* 847 F.2d 502 (9th Cir. 1988) .......... 12

*Bullfrog Films, Inc. v. Wick*,
 847 F.2d 502 (9th Cir. 1988) ................................................................ 12

*City of Ladue v. Gilleo*,
 512 U.S. 43 (1994) ...................................................................... 7, 8

*City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*,
 254 F.3d 882 (9th Cir. 2001) ................................................................ 24

*Connecticut General Life Insurance Co. v. New Images of Beverly Hills*,
 321 F.3d 878 (9th Cir. 2003) ................................................................ 25

*CTIA - The Wireless Ass'n v. City of Berkeley*,
 928 F.3d 832 (9th Cir. 2019) ................................................................ 22

*Currier v. Potter*,
 379 F.3d 716 (9th Cir. 2004) ................................................................ 8

*Defense Distributed v. U.S. Dep't of State*,
 838 F.3d 451 (5th Cir. 2016) ................................................................ 14

*Doe v. Harris*,
 772 F.3d 563 (2014) ........................................................................ 10

*Drummond Co., Inc. v. Collingsworth*,
 2013 WL 6074157 (N.D. Cal. Nov. 18, 2013) .................................................. 12

*E. Bay Sanctuary Covenant v. Barr*,
　934 F.3d 1026 (9th Cir. 2019) ................................................................. 24

*Elrod v. Burns*,
　427 U.S. 347 (1976) .................................................................................. 24

*G.K. Ltd. Travel v. City of Lake Oswego*,
　436 F.3d 1064 (9th Cir. 2006) ................................................................. 12

*Hilton v. Braunskill*,
　481 U.S. 770 (1987) .................................................................................... 1

*Holder v. Humanitarian Law Project* (*HLP*),
　561 U.S. 1 (2010) ............................................................................... 14, 15

*Lamont v. Postmaster Gen. of the United States*,
　381 U.S. 301 (1965) ............................................................................. 8, 12

*Language Line Servs., Inc. v. Language Servs. Assocs., Inc.*,
　500 F. App'x 678 (9th Cir. 2012) ........................................................... 24

*Mayweathers v. Newland*,
　258 F.3d 930 (9th Cir. 2001) ..................................................................... 1

*Near v. Minnesota*,
　283 U.S. 697 (1931) .................................................................................... 7

*Nken v. Holder*,
　556 U.S. 418 (2009) ................................................................................ 1, 2

*Ramos v. Wolf*,
　No. 18-16981, 2020 WL 5509753 (9th Cir. Sept. 14, 2020) ................... 14

*Reed v. Town of Gilbert, Ariz.*,
　576 U.S. 155 (2015) .................................................................................... 7

*Rodriguez v. Robbins*,
　715 F.3d 1127 (9th Cir. 2013) ................................................................. 21

*Se. Promotions, Ltd. v. Conrad*,
　420 U.S. 546 (1975) .................................................................................... 7

*Smith v. California*,
　361 U.S. 147 (1959) .................................................................................... 9

*Stagg P.C. v. U.S. Department of State*,
　158 F. Supp. 3d 203 (S.D.N.Y. 2016) ..................................................... 15

*TikTok, Inc. v. Trump*,
　No. 1:20-CV-02658, 2020 WL 5763634, (D.D.C. Sept. 27, 2020) ......... passim

*Trump v. Hawaii*,
　138 S. Ct. 2392 (2018) ............................................................................. 16

*United States v. Albertini*,
    472 U.S. 675 (1985) ............................................................................... 11

*United States v. New York Times Co.*,
    328 F. Supp. 324 (S.D.N.Y. 1971), *aff'd sub nom. New York Times Co. v.
    United States*, 403 U.S. 713 (1971) ................................................... 6, 7, 17

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ................................................................. 2

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................ 15

*Woodhull Freedom Found. v. United States*,
    948 F.3d 363 (D.C. Cir. 2020) ................................................................ 8

## STATUTES

50 U.S.C. § 1702 ......................................................................................... 13

50 U.S.C. § 1705 ......................................................................................... 9

## RULES

Fed. R. Civ. P. 54 ....................................................................................... 13

Fed. R. Civ. P. 7 ......................................................................................... 24

N.D. Cal. Civ. L. R. 7-2 .............................................................................. 24

## REGULATIONS

85 Fed. Reg. 48,641 (published Aug. 11, 2020) ............................................ 7, 10

1

**INTRODUCTION**

2      Defendants cannot satisfy their extraordinary burden of demonstrating that a stay of

3 this Court's Preliminary Injunction should be granted pending appeal, which would, as this

4 Court has previously found, immediately result in irreparable harm to the Plaintiffs and all

5 WeChat users in the United States.  It remains undisputed—and the new evidence provides

6 additional proof—that the Secretary's September 18, 2020 *Identification* is a ban on

7 WeChat in the United States, directly and indirectly interfering with First Amendment

8 protected activities of millions of WeChat users during a global pandemic in which their

9 app-based communications are essential to maintaining contact with one another.  None of

10 Defendants' new evidence demonstrates an imminent and irreparable threat or harm to

11 national security interests specific to WeChat that would satisfy their burden here.

12      "A stay is an 'intrusion into the ordinary processes of administration and judicial

13 review,' and accordingly 'is not a matter of right, even if irreparable injury might

14 otherwise result ....'"  *Nken v. Holder*, 556 U.S. 418, 427 (2009) (internal citations

15 omitted).  Defendants misstate the applicable legal standard, downplaying the heavy

16 burden they must meet for this Court to issue such an extraordinary remedy.  To issue a

17 stay, the Court must consider "(1) whether the stay applicant has made a ***strong showing***

18 that he is likely to succeed on the merits; (2) whether the applicant will be irreparably

19 injured absent a stay; (3) whether issuance of the stay will substantially injure the other

20 parties interested in the proceeding; and (4) where the public interest lies."  *Hilton v.*

21 *Braunskill*, 481 U.S. 770, 776 (1987) (emphasis added)).[1]  Defendants have not

22

23 ───────────────
[1] The two other cases Defendants cite for the legal standard each militate *against* a stay.
24 *See* ECF No. 68 at 10.  In *Mayweathers v. Newland*, 258 F.3d 930 (9th Cir. 2001), the
 Ninth Circuit held the district court had jurisdiction to grant a second preliminary
25 injunction while an interlocutory appeal of the first preliminary injunction was pending, on
 the ground that "[t]he district court retains jurisdiction during the pendency of an appeal to
26 act to preserve the status quo."  *Id.* at 935 (internal citation and quotation omitted).  Here,
 by contrast, Defendants are asking this Court to *alter* the status quo by staying its
27 preliminary injunction pending their (potential) appeal.  And in *Apple, Inc. v. Samsung*
 *Elecs. Co.*, No. 11-cv-01846, 2012 WL 2527044 at *8 (N.D. Cal. July 2, 2012), Judge Koh
28 applied the stay factors to deny the defendants' motion for a stay pending an appeal of the
 preliminary injunction order.

persuasively argued that they have made a strong showing of likelihood of success on the merits, and their new evidence fails to establish irreparable harm.  Those first two factors are the "most critical," and Defendants' failure to satisfy them supports denial of the motion to stay, even without consideration of the remaining factors.  *See Nken*, 556 U.S. at 434-35; *see also Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017) (denying motion to stay preliminary injunction pending appeal because "the Government has failed to clear each of the first two critical steps" and also finding "the final two factors do not militate in favor of a stay").  In granting the motion for a preliminary injunction, this Court already found that each of the stay factors favor Plaintiffs.  *See* Order Granting Preliminary Injunction ("Order"), ECF No. 59 at 3, 16, 21; *see also Nken*, 556 U.S. at 434 (noting "substantial overlap" between stay and preliminary injunction factors).

    Defendants' far-fetched argument that "First Amendment scrutiny is … inappropriate," or "simply inapplicable to the Government's challenged actions," falls far short of the mark, as does their effort to suggest in the alternative that the First Amendment might have only "some bearing here" under intermediate scrutiny. Defendants' Motion to Stay Injunction Pending Appeal ("Mot."), ECF No. 68 at 17-18. Defendants' new arguments provide no basis to change this Court's well-supported findings that "plaintiffs have shown serious questions going to the merits of their First Amendment claim that the Secretary's prohibited transactions effectively eliminate the plaintiffs' key platform for communication, slow or eliminate discourse, and are the equivalent of censorship of speech or a prior restraint on it." Order at 16.  There simply are no viable substitutes for WeChat for the Chinese-American and Chinese speaking community, and Defendants' argument to the contrary remains unsupported and is even contradicted by their new evidence.  *See* ECF No. 76-1, Ex. A ("Decision Memo") at 10 (conceding "WeChat is one of the limited options available to those who want to communicate with Chinese citizens").  Nor does Defendants' new evidence support any change to the Court's findings that "there are obvious alternatives to a complete ban," Order at 18, and that "the prohibited transactions burden substantially more speech than is

2

Case No. 3:20-cv-05910-LB

1  necessary to serve the Government's significant interest in national security, especially

2  given the lack of substitute channels for communication." *Id.*

3       At bottom, Defendants are asking this Court to reconsider the same arguments that

4  it has already considered and rejected, applying a substantially similar legal standard

5  (except one with a heavy burden on Defendants), and to reverse itself.  Defendants have

6  provided no basis for doing so, and their stay motion should be denied.

**ARGUMENT**

## I.   DEFENDANTS' NEWLY SUBMITTED EVIDENCE DOES NOT JUSTIFY GRANTING A STAY

10       In seeking an expedited stay allowing Defendants to implement an unprecedented

11  ban of an entire medium of communication, Defendants hang their hats on three pieces of

12  newly submitted evidence, including classified information denied to Plaintiffs' counsel.[2]

13       The Decision Memo, drafted after the President's WeChat executive order was

14  issued, is mostly a repackaging of old evidence and similarly fails to provide support for

15  the claim that WeChat poses a national security threat of the kind that would pose an

16  "irreparable harm" sufficient to stay the preliminary injunction.  *See* ECF No. 28 at 14-16

17  (rebutting earlier evidence presented by Defendants); Order at 20 ("specific evidence about

18  WeChat is modest").  Most of the Decision Memo refers to general concerns about

---

[2] Defendants argue that the compressed briefing schedule after issuance of the *Identification* did not allow for enough time for them "to submit the materials to the Court in the 36-hour period occurring after [Defendant Ross's] decision."  Mot. at 8 n.1.  But they ignore the fact that the rushed schedule was entirely their own choice.  They chose when to issue the *Identification*, and given its issuance so soon before the effective date, both Plaintiffs and the Court offered them more time to oppose the preliminary injunction should they be willing to adjust their self-imposed deadline of implementing the WeChat ban on September 20, 2020.  *See* 9/18 Hearing Transcript, ECF No. 66 at 9:14-25; 24:13-23; *see also* 9/17 Hearing Transcript, ECF No. 41 at 5:1-8:14.  Additionally, Defendants fail to explain why they moved to have their motion resolved by October 1.  *See* Mot. at 9; ECF No. 69.  To expedite resolution, Defendants may waive Reply.  On October 1, Defendants informed Plaintiffs' counsel that they intend to file a notice of appeal from this Court's preliminary injunction on October 2, but do not yet have the Solicitor General's authorization.  If so authorized, they "would also file in the Ninth Circuit an emergency motion to stay the preliminary injunction" on October 2, despite their present Motion still pending before this Court for hearing on shortened time.  Plaintiffs oppose.  Bien Decl. ¶ 12 & Ex. K.

Chinese surveillance of Americans, which it then couples with speculation about the ways in which Tencent might support such efforts—without any evidence or examples involving Americans' use of WeChat in support.[3]  The Decision Memo also discloses, for the first time, that Tencent "has presented the Department of Commerce with a proposal to mitigate the concerns identified in EO 13943."  Decision Memo at 14.  Specifically, it offered to "create a new U.S. version of the app, deploy specific security measures to protect the new app's source code, partner with a U.S. cloud provider for user data storage, and manage the new app through a U.S.-based entity with USG approved governance structure." *Id*.  The Commerce Department also "considered additional mitigations to include escrow and review of WeChat's source code, regular compliance audits and notifications, and stringent approvals over management and personnel with access to user data." *Id*.[4]  In rejecting these—and any other possible measure designed to address its concerns short of  "a complete divestiture" of WeChat by Tencent—Defendants make conclusory claims about a lack of "trust" in Tencent as a Chinese-owned company and general evidence the Court has already considered about the plans and goals of the CCP for data gathering and surveillance.  *Id*.  The Decision Memo fails to offer up *any* examples in which WeChat was used to surveil Americans—let alone in a manner that poses a national security threat.

Indeed, most amazingly, one of the primary attachments to the Decision Memo— The Department of Homeland Security Cybersecurity and Infrastructure Security Agency's Critical Infrastructure Security and Resilience Note ("CISA Note") (ECF No. 68-1 at 23, Ex. B), which was "produced … in response to a request for assistance from the Department of Commerce in implementing the [EO]" (*Id.* at 24)—recommends not a ban of WeChat but a far more narrow, tailored remedy to address the "threat" posed by WeChat:  "CISA recommends the TikTok and WeChat applications not be permitted on

---

[3] Appendix F to the Decision Memo, filed today at ECF No. 77, comprises reports of human rights violations *in China* and monitoring, surveillance and censorship *in China*.

[4] Defendants provided Tencent's mitigation proposal to Plaintiffs' counsel for attorneys' eyes' only review at 6:43 p.m. on September 30.  It will be filed under seal with the Court for its consideration upon entry of a protective order.

1   the devices of State, Local, Tribal, and Territorial (SLTT) partners and critical

2   infrastructure operators as they may provide malicious actors with access to mobile

3   devices and sensitive data."  CISA Note at 27.  As this Court noted, this is the kind of

4   "obvious alternative[] to a complete ban" that can avoid sweeping implications for free

5   speech.  Order at 18.  If the Government sees fit to present this material—which is so

6   inconsistent with its argument—to the Court, we can only speculate as to what else is in

7   the evidentiary record.  *See* ECF No. 68-1 at 2 (Costello Decl. ¶ 5) ("These materials are

8   not a complete set of all materials considered by the Secretary.").  It is clear from the face

9   of the Decision Memo, for example, that Defendants withheld at least some of the

10   appendices to that document, including Tencent's mitigation proposal.  *See id.* at 18, n.85;

11   *see also* n. 3, 4, *supra* (discussing recent filing and planned filing of two appendices).

12        To the extent the Court will consider this late evidence in this proceeding, Plaintiffs

13   file herewith the Declaration of Joe Hildebrand, an expert in data security who explains

14   best practices in mitigating data security risk and the targeted measures that were (and are)

15   available to Defendants to address those issues as to Tencent and WeChat.  The Court can

16   compare Mr. Hildebrand's suggestions to those contained in Tencent's proposal (which

17   Mr. Hildebrand has not seen).  As disclosed in the Decision Memo at page 18, these

18   suggestions are the very measures that Tencent offered, but Defendants rejected in favor of

19   a total ban—apparently because Tencent would not agree to a "complete divestiture."

20        The separate assessment of the Office of the Director of National Intelligence

21   ("ODNI") was lodged with the Court, but Plaintiffs have not seen this secret, classified

22   document.  *See* ECF No. 71.  If the Court believes that the classified materials may justify

23   the issuance of a stay, Plaintiffs' counsel request an opportunity to rebut the substance of

24   the Government's classified evidence before any decision is rendered.  When classified

25   information is used as evidence in a civil action, "the Constitution does require that the

26   government take reasonable measures to ensure basic fairness to the private party and that

27   the government follow procedures reasonably designated to protect against erroneous

28   deprivation of the private party's interests."  *Al Haramain Islamic Found. Inc. v. United*

*States Dep't of the Treasury*, 686 F.3d 965, 980 (9th Cir. 2012); *see also United States v. New York Times Co.*, 328 F. Supp. 324, 326 (S.D.N.Y. 1971) (holding an *in camera* proceeding attended by attorneys for each side to discuss national security interests implicated in the Pentagon Papers), *aff'd sub nom. New York Times Co. v. United States*, 403 U.S. 713, 714 (1971); *see also* Section II(B)(2), *infra*.  While the Government may under appropriate circumstances rely on classified evidence *ex parte*, it cannot shroud its arguments with a cloak of absolute and impenetrable secrecy.  Rather, due process requires that the Government provide its adversary with "constitutionally adequate notice and a meaningful opportunity to respond."  *Al Haramain Islamic Found., Inc.*, 686 F.3d at 1001. These due process rights are violated when the Government fails "to mitigate the use of classified information by, for example, preparing and disclosing an unclassified summary." *Id.*  Here, Plaintiffs' counsel requested a non-classified summary of the classified evidence at issue, but have not received a response and therefore cannot address this information in its brief.  *See* Declaration of Michael W. Bien In Support Of Opposition to Motion to Stay ("Bien Decl."), *filed herewith*, ¶ 2 & Ex. A.  Accordingly, Plaintiffs respectfully request—in the interests of fairness and consistent with their due process rights—an opportunity to review and respond to a non-classified summary of the classified evidence if the Court is inclined to grant the Government's motion to a stay on the basis of that evidence.

## II.  DEFENDANTS HAVE NOT MET THE STANDARD FOR A STAY

### A.  Defendants Have Not Made a Strong Showing of Likelihood of Success on the Merits

This Court found that Plaintiffs demonstrated serious questions about whether the WeChat ban "effectively eliminate[s] the plaintiffs' key platform for communication, slow[s] or eliminate[s] discourse, and [is] the equivalent of censorship of speech or a prior restraint on it."  Order at 16.  The Court also found that Defendants introduced "scant little evidence" that a complete ban of WeChat would address their stated national security concerns; that the ban burdens substantially more speech than necessary; and that "there are no viable substitute platforms or apps for the Chinese-speaking and Chinese-American

1  community." *Id.* at 17-18.  Defendants' new evidence does not change these findings.

### 1.     The WeChat Ban Is A Prior Restraint and Is Not Content Neutral

4      Defendants' attempt to preemptively and indiscriminately "foreclose an entire
medium of expression" raises "particular concern" under the First Amendment, *City of
Ladue v. Gilleo*, 512 U.S. 43, 55 (1994), and is subject to "a heavy presumption against its
constitutional validity," *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975).
Although a prior restraint like the WeChat ban "[is] not unconstitutional per se," *id.*,
Defendants must show that this is one of the rare and "exceptional cases" in which the
extraordinary burden on speech is justified—such as where the foreclosed speech would
reveal "the sailing dates of transports or the number and location of troops" during
wartime, *Near v. Minnesota*, 283 U.S. 697, 716 (1931).  Claims that the foreclosed speech
"'could,' or 'might', or 'may' prejudice the national interest" do not suffice; nor does any
other "surmise or conjecture that untoward consequences may result."  *New York Times
Co.*, 403 U.S. at 725-26 (Brennan, J., concurring).  Defendants' previous filings included
little more than "surmise and conjecture" about the harm that the public's use of WeChat
might pose to national security, and the additional evidence they have now made publicly
available does not rebut the "heavy presumption" against the validity of their attempt to
completely shut down WeChat in the United States.

20      Defendants' newly submitted evidence warns that WeChat and TikTok may be used
to disseminate "propaganda," to facilitate "disinformation campaigns," and to "promote
pro-Chinese government content[.]"  CISA Note at 27.  This focus on the *content* of
WeChat users' speech echoes the text of EO 13943 itself—which warns that WeChat "may
also be used for disinformation campaigns that benefit the Chinese Communist Party," 85
Fed. Reg. 48,641 (published Aug. 11, 2020)—and confirms Plaintiffs' showing that the
ban is a content-based restriction that is subject to strict scrutiny on that basis as well.  *See
Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 166 (2015) ("[S]trict scrutiny applies either
when a law is content based on its face or when the purpose and justification for the law

1   are content based[.]").  Indeed, this is not the first time the Government has unlawfully

2   attempted to limit communications to and from China due to concerns about the influence

3   of Chinese "propaganda."  In *Lamont v. Postmaster Gen. of the United States*, the Supreme

4   Court squarely held—at the height of the Cold War, no less—that the Post Office may not

5   destroy incoming mail from China simply because the U.S. government deems it

6   "communist political propaganda."  381 U.S. 301, 302 (1965).  Such brazen censorship "is

7   at war with the uninhibited, robust, and wide-open debate and discussion that are

8   contemplated by the First Amendment," *id.* at 307 (internal quotations omitted), and

9   cannot be "justified by the object of avoiding the subsidization of propaganda of foreign

10   governments which bar American propaganda," *id*. at 310 (Brennan, J., concurring).  "That

11   the governments which originate this propaganda themselves have no equivalent

12   guarantees only highlights the cherished values of our constitutional framework; it can

13   never justify emulating the practice of restrictive regimes in the name of expediency."  *Id.*

### 2.      The WeChat Ban Implicates the First Amendment

15          Defendants do not address the substantial questions Plaintiffs have raised about

16   whether the WeChat ban represents a prior restraint and a content-based restriction on

17   speech.  Incredibly, Defendants now contend, for the first time, that the WeChat ban is not

18   subject to First Amendment scrutiny at all because "the specific prohibited transactions

19   identified by the Secretary do not target expression" and "extend solely to economic

20   transactions between businesses."  Mot. at 17; *compare with id.* at 23 (requesting a "more

21   limited" ban "[b]arring new users of WeChat").  But this is preposterous—the ban

22   effectively shuts down an entire medium of communication because it is used to convey

23   messages the Government does not like.  Courts have long recognized that regulations

24   aimed at mediums for speech necessarily regulate speech itself.  *See, e.g.*, *City of Ladue*,

25   512 U.S. at 48 ("[R]egulation of a medium inevitably affects communication itself[.]");

26   *Currier v. Potter*, 379 F.3d 716, 727 (9th Cir. 2004) ("It is axiomatic that restrictions upon

27   the mail system implicate the First Amendment."); *cf. Woodhull Freedom Found. v. United*

28   *States*, 948 F.3d 363, 374 (D.C. Cir. 2020) (plaintiff who used online forum to disseminate

speech had standing to challenge regulation that caused the forum to shut down).  The fact

that Defendants seek to accomplish their impermissible ends by prohibiting third-party

services necessary for WeChat to function does not make the First Amendment

inapplicable.  As the Seventh Circuit has explained, provocatively, "[t]he analogy is to

killing a person by cutting off his oxygen supply rather than by shooting him."

*Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015) (involving sheriff who

sought to shut down online forum for speech by pressuring Visa and MasterCard to

prohibit use of their credit cards for transactions with the forum).  Similarly, Defendants

cannot escape First Amendment scrutiny by deliberately starving WeChat of the technical

support it needs to function rather than regulating WeChat or its users directly.[5]

None of Defendants' new cases suggest otherwise.  Defendants analogize this case

to *Arcara v. Cloud Books, Inc.*, in which the Supreme Court upheld a statute that

authorized local officials to temporarily close a bookstore they deemed "a place for

prostitution and lewdness."  478 U.S. 697, 698 (1986).  Neither *Arcara* nor Defendants'

other two new cases are apposite.  For one thing, none of the laws at issue in these cases

purport to single out and shut down an entire medium of communication—let alone a

medium relied on by a distinct minority group singled out by the President for racist

demagoguery.  Nor was there evidence in Defendants' cases that any of the generally

applicable regulations would *inevitably* burden speech, or that the regulations were enacted

for specific purpose of burdening or eliminating speech.  The WeChat ban is a blanket

prohibition on the services necessary for a social media platform to function and will have

---

[5] Defendants also suggest that Plaintiffs have "largely abandoned their 'chill' theory" as a
basis for First Amendment liability.  Mot. at 17.  Not so.  *See, e.g.*, Amended Complaint,
ECF No. 49 at 29, ¶ 85; Pls' Renewed Motion for Preliminary Injunction, ECF No. 48 at 2,
8-9; Pls' Reply ISO Renewed PI, ECF No. 52 at 2.  The vagueness and overbreadth of the
Secretary's *Identification* will necessarily lead targeted third-party service providers to cut
off even more speech-enabling services than may be required of them, so as to eliminate
even the remote possibility of incurring the substantial civil and criminal penalties
authorized by 50 U.S.C. § 1705.  *See Smith v. California*, 361 U.S. 147, 154 (1959)
(invalidating statute imposing strict criminal liability for possession of obscene materials
in bookstores, because the absence of a *mens rea* requirement would lead to broad self-
censorship on the part of booksellers and thereby "restrict the public's access to forms of
the printed word which the state could not constitutionally suppress directly.").

1    "the inevitable effect" of burdening users' speech.  *Doe v. Harris*, 772 F.3d 563, 574

2    (2014).  Indeed, limiting users' ability to speak and share information through WeChat is

3    the entire point of Defendants' ban.  *See* Decision Memo at 14 ("The below

4    prohibitions … deny access to and reduce the functionality of WeChat … with the

5    objective of preventing the … transmission … of user data[.]").  Finally, none of the

6    regulations in Defendants' cases were enacted for the express purpose of limiting the

7    dissemination of particular messages that the Government did not like.  Here, there is

8    considerable evidence—both in the text of the WeChat ban and in the materials

9    Defendants relied upon to justify it—that at least one of the ban's core purposes is to limit

10   the dissemination of "propaganda" and other information portraying the Chinese

11   government in a positive light.  *See* 85 Fed. Reg. 48,641; Decision Memo at 13-14; CISA

12   Note at 27.  As a result, not only is the ban subject to First Amendment scrutiny as a

13   general matter, it is subject to *strict* scrutiny because it is both a prior restraint on speech

14   and a content-based regulation of speech.

**3.      The WeChat Ban Cannot Survive Intermediate Scrutiny**

16          Defendants maintain that the WeChat ban triggers "at most, intermediate scrutiny of

17   the Secretary's actions."  Mot. at 18.  As this Court found, however, Plaintiffs have raised

18   serious questions about whether the WeChat ban fails even intermediate scrutiny, because

19   it burdens substantially more speech than necessary and does not leave open adequate

20   alternative channels for communication.  Order at 16-18.

21          Defendants maintain that anything less than a complete ban on WeChat would not

22   advance Defendants' avowed interests in limiting the Chinese government's exploitation

23   of Americans' private data.  Mot. at 19-20.  But this concern does not appear to be shared

24   by Defendants' own Cybersecurity and Infrastructure Security Agency, whose Septem-

25   ber 2, 2020 assessment of the risk posed by WeChat and TikTok recommends a *far*

26   *narrower prohibition* that burdens far less speech than the one Defendants actually

27   adopted.  *See* CISA Note at 27 (recommending that "the Tiktok and WeChat applications

28   not be permitted on the devices of State, Local, Tribal, and Territorial (SLTT) partners and

1    critical infrastructure operators").[6]

2          Defendants offer no explanation whatsoever for why the Secretary rejected this far

3    more measured recommendation in favor of a complete ban that imposes an extraordinary

4    and unprecedented burden on protected First Amendment speech.  Requiring Defendants

5    to justify this decision would not, as Defendants suggest, substitute the Court's opinion

6    about what method is "most appropriate … for promoting significant government

7    interests."  Mot. at 14 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)).

8    Rather, it would preserve cherished constitutional values by ensuring that Defendants do

9    not run roughshod over Plaintiffs' First Amendment rights for the sake of expediency.

10   There are obvious targeted measures based on industry best practices that would more

11   effectively address the issues of data security and surveillance without burdening speech.

12   *See* Hildebrand Decl. ¶¶ 8-13.

13         Defendants similarly fail (again) to establish that a complete ban of WeChat leaves

14   open ample alternative avenues of communication.  This Court correctly found, based on

15   careful analysis of Plaintiffs' declarations and other evidence submitted with their motion,

16   that "there are no viable substitute platforms or apps for the Chinese-speaking and

17   Chinese-American community."  Order at 17.  As the Court recognized, this is because,

18   among other reasons, other social media platforms lack WeChat's network effect within

19   the Chinese and Chinese-American communities.  *Id.* at 2-6.  Defendants' suggestion that

20   other social media platforms can provide an adequate alternative to WeChat based on little

21   more than the availability of Google-like translation services for non-English speakers

22   betrays a profound lack of understanding about the central role of WeChat in

23   contemporary Chinese-American life.  *See* Section II(C), *infra*.

24

25   _____

      [6] Nor is it the case that the Government generally will not accept mitigation agreements to
26   address concerns about Chinese access to U.S. data.  For example, the Government in 2018
      approved the acquisition of a major U.S. insurance holding company by a Chinese
27   company after the Committee on Foreign Investment in the United States (CFIUS)
      accepted a mitigation plan that in relevant part apparently required the company after its
28   acquisition "to use a U.S.-based, third-party service provider to manage and protect the
      personal data of [its] U.S. policyholders."  *See* Bien Decl. ¶ 11 & Ex. J.

1    Defendants' cases on the subject of adequate alternative means of communication

2  do not make their argument.  In quoting the Ninth Circuit's decision in *G.K. Ltd. Travel v.*

3  *City of Lake Oswego*, Defendants omit critical language: in that case, the Court "cautioned

4  against invalidating government regulations for failing to leave open ample alternative

5  channels unless the regulation foreclose[s] 'an entire medium of expression' *across the*

6  *landscape of a particular community setting*."  436 F.3d 1064, 1074 (9th Cir. 2006)

7  (emphasis added).  Even if Defendants were correct that they have not foreclosed "an

8  entire medium of expression"—they have—there would still be little doubt that their ban

9  on WeChat forecloses an entire medium of expression *in the particular setting of the*

10  *Chinese diaspora in the United States*.

11    Finally, Defendants' attempt to cast doubt on the extraterritorial application of the

12  First Amendment is misplaced.  For one thing, the Ninth Circuit has "reject[ed] the

13  suggestion that the First Amendment's protection is lessened when the expression is

14  directed abroad." *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 511 (9th Cir. 1988).[7]  And

15  the Supreme Court has long held that the First Amendment protects the right to *receive*

16  information—including from abroad.  *See Lamont*, 381 U.S. at 308 (Brennan, J.,

17  concurring).  By shutting down Plaintiffs' ability to send *or receive* communications from

18  persons abroad, the WeChat ban would impose an extraordinary and unprecedented burden

19  on their rights under the First Amendment.  Because the ban burdens substantially more

20  speech than necessary and does not leave open adequate alternative channels of

21  communication, this Court rightly concluded that Plaintiffs raised serious questions going

22

23  [7] Citing an unpublished district court decision for authority, *Drummond Co., Inc. v.*
*Collingsworth*, 2013 WL 6074157 (N.D. Cal. Nov. 18, 2013),  Defendants suggest a more

24  lenient standard applies when the Government invokes national security interests to justify
limitations on the speech of persons abroad.  But *Bullfrog Films* rejected the argument that

25  the First Amendment's protections are lessened in these circumstances.  847 F.2d at 512.
And in any event, the reference to "competing considerations" in Defendants' case does

26  not imply that vague or speculative national security concerns would suffice.  Indeed, the
sentence immediately preceding the one Defendants cite refers to "*overriding*" national

27  security interests and then repeats the holding from the district court in *Bullfrog Films* that
"the First Amendment protects communications with foreign audiences to the same extent

28  as communications within our borders." *Id.* at *14 (citing *Bullfrog Films v. Wick*, 646 F.
Supp. 492, 502 (C.D. Cal. 1986), *aff'd* 847 F.2d 502 (9th Cir. 1988)).

to the merits of their claims under the First Amendment.  Order at 16-18.

### 4.   Plaintiffs' *Ultra Vires* Claims Warrant Relief

In addition to Plaintiffs' First Amendment claims, Plaintiffs also sought a preliminary injunction on the ground that the *Identification* (and underlying EO) are *ultra vires* because the prohibitions exceed the bounds prescribed by the IEEPA.  ECF No. 48 at 5-6.  Having held that Plaintiffs had established a likelihood of success on their First Amendment claims, the Court concluded that "the record and the arguments do not allow the court to conclude at this juncture that the plaintiffs are likely to succeed on the merits" of their *ultra vires* claims.  Order at 19.  To the extent the Court accepts Defendants' invitation to revisit their views on the merits of Plaintiffs' First Amendment claims, the Court should similarly revisit this conclusion under Fed. R. Civ. P. 54(b).

As the Court is aware, there is parallel litigation ongoing addressing the Government's essentially identical prohibitions of TikTok.  In *TikTok, Inc. v. Trump*, No. 1:20-CV-02658, 2020 WL 5763634, (D.D.C. Sept. 27, 2020), Judge Nichols over the weekend granted TikTok's motion for preliminary injunction on a similar record, finding that "Plaintiffs have demonstrated that they are likely to succeed on their claim that the prohibitions constitute indirect regulations of 'personal communication[s]' or the exchange of 'information or informational materials'" under 50 U.S.C. § 1702(b).  *TikTok*, 2020 WL 5763634, at 14.  The Court should adopt Judge Nichols' well-reasoned opinion and determine that Plaintiffs are likely to succeed as to their *ultra vires* claims.[8]

### B.   Defendants Have Not Shown Irreparable Harm Caused by the Preliminary Injunction, Which Merely Preserves the Status Quo

#### 1.   The Court Did Not Err in Stating the Standard or Balancing the Equities

Defendants assert that the Court erred in balancing the equities, and that a "proper analysis" warrants a stay here.  Mot. at 11.  Not so.  Defendants first claim that the Court

---

[8] Although Judge Nichols only enjoined the first prohibition (on downloads) with respect to TikTok, this was because the remaining prohibitions for TikTok do not take effect until November.  *Id.* at 9.  The court specifically noted that the IEEPA arguments "are equally as applicable" to all of the prohibitions.  *Id.*

applied the wrong standard and "did not hold that the balance tips sharply in [Plaintiffs'] favor." This claim is unfounded. The Court set forth the "tips sharply" standard that applies when the moving party raises serious questions going to the merits of the claim, and eight lines later stated that the standard is met. Order at 15:20, 16:1.[9] Defendants' assertion amounts to a complaint about the Court's drafting of a rush order, not its substance. Applying the proper standard, the Court correctly found that the balance of hardships tipped sharply in favor of Plaintiffs who use WeChat to exercise their First Amendment rights of speech, association, and the free exercise of religion.

Defendants repeat their argument that such First Amendment rights can never outweigh any national security and foreign policy interests asserted by the Government, Mot. at 13-14, citing *Holder v. Humanitarian Law Project* (*HLP*), 561 U.S. 1 (2010). *HLP,* however, specifically rejects Defendants' contention, stating instead: "the Govern-ment's authority and expertise in [national security and foreign relations] matters do not automatically trump the Court's own obligation to secure the protection that the Constitu-tion grants to individuals." *Id.* at 34 (internal quotation marks omitted). Defendants mis-cite *Defense Distributed v. U.S. Dep't of State*, 838 F.3d 451 (5th Cir. 2016)) for their proposition that "[e]ven if Plaintiffs have established a serious question about their First Amendment claim … that serious question does not outweigh the national security and foreign policy interests at stake." Mot. at 13. *Defense Distributed* stands for no such proposition. There*,* the plaintiffs asserted a First Amendment right to distribute plans for home production of untraceable firearms. The district court denied plaintiffs' preliminary injunction motion entirely on balance of harms grounds, and the Fifth Circuit affirmed on those grounds, without reaching any of the First Amendment merits grounds. 838 F.3d 456-58. *Defense Distributed* therefore teaches nothing about a case like this one where the

---

[9] Defendants cite *Ramos v. Wolf*, No. 18-16981, 2020 WL 5509753, at *10 (9th Cir. Sept. 14, 2020) for the proposition that a preliminary injunction cannot stand where the district court does not use the word "sharply" in its findings on the balance of hardships. *Ramos* includes no such holding, but instead turns entirely on the "serious questions" on the prong. *Id.* at *18.

1  Plaintiffs *have* raised serious questions going to the merits.  Nor did *Stagg P.C. v. U.S.*

2  *Department of State*, 158 F. Supp. 3d 203, 210 (S.D.N.Y. 2016)) (another case about

3  disseminating technical information on weapons) reach a conclusion as to the likelihood of

4  success on the First Amendment merits.  All three cases fail to support Defendants'

5  conclusory assertion that the "balance of equities therefore tips sharply in favor of the

6  United States."  Mot. at 14.

7        Here, the Court identified the appropriate standard, and two sentences later

8  concluded that "plaintiffs have shown serious questions going to the merits of the First

9  Amendment claim, the balance of hardships tips in the plaintiffs' favor, and the plaintiffs

10  establish sufficiently the other elements for preliminary-injunctive relief."  Order at 15-16.

11  The Court's decision is crystal clear in defining the (correct) standard it applied, and well

12  supported by the record showing that the balance of equities tipped sharply in favor of a

13  preliminary injunction to preserve the status quo.[10]

14        **2.      The Court Properly Evaluated the Strength or Absence of**

15  **Evidence Supporting Defendants' Assertions of National Security and Foreign Policy Justifications**

16        Defendants decry "the Court's stated need for 'specific evidence,'" and argue that

17  the Court cannot evaluate the strength of Executive Branch officials' assertions of national

18  security risks in connection with issuing a preliminary injunction.  Mot. at 11.  But the

19  cases Defendants cite make clear that courts can and do evaluate the strength of record

20  evidence in considering whether to issue an injunction.  *See HLP*, 561 U.S. at 30-34

21  (referring to affidavits in according weight to government's national security claims and

22  stating that "[o]ur precedents, old and new, make clear that concerns of national security

23  and foreign relations do not warrant abdication of the judicial role"); *Winter v. Nat. Res.*

24  *Def. Council, Inc.*, 555 U.S. 7, 24-25 (2008) (describing "declarations from some of the

25  Navy's most senior officers" and "accept[ing] these officers' assertions"); *Trump v.*

26

27  _____

    [10] At the very most, the only appropriate response to the Defendants' motion would be a

28  scrivener's edit to line 3 on page 16 and line 17 on page 21 of the order to add the word "sharply," so that the order properly memorializes what the Court actually found.

1   *Hawaii*, 138 S. Ct. 2392, 2409 (2018) (finding the level of detail in the process, agency

2   evaluations, and recommendations underlying the President's chosen restrictions "is more

3   detailed than any prior order a President has issued" under the applicable Immigration and

4   Nationality Act provision, and thus granting "weight to [his] empirical conclusions.").

5           While some deference is of course due to the Government as to national security

6   issues, courts nonetheless can and must independently assess the evidence and in so doing

7   may find the Government's assertions weak or unsupported—especially where the First

8   Amendment is implicated.  For example, in *Al Haramain Islamic Foundation, Inc. v. U.S.*

9   *Department of Treasury*, the Ninth Circuit relied upon *HLP*'s framework for evaluating a

10  challenge to the Government's designation of plaintiff as a terrorist organization and found

11  that the national security evidence was not as persuasive as that submitted in *HLP*:

> *HLP* involved wholly foreign organizations currently at war with a United
> States ally, involved specific evidence concerning the continuing terrorist
> activities of those organizations and the ability of those organizations to mis-
> use the support offered by the plaintiffs, and involved proposed training that
> had a "real, not remote" possibility of furthering terrorism.  By contrast, we
> address a domestic branch of an international organization with little
> evidence that the pure-speech activities proposed by [Plaintiff–Appellant] on
> behalf of the domestic branch will aid the larger international organization's
> sinister purposes.  In these circumstances, we hold that [the government's]
> content-based prohibitions on speech violate the First Amendment.

18  686 F.3d 965, 1001 (9th Cir. 2012) (citation omitted).  In *New York Times Co*., *supra*, the

19  district court held an *in camera* proceeding attended by only attorneys for each side,

20  witnesses for the Government, and designated representatives of The New York Times to

21  "enable the Government to present its case forcefully and without restraint so that the

22  accommodation of the national security interest with the rights of a free press could be

23  determined with no holds barred."  Thereafter, the court concluded that:

> the in camera proceedings at which representatives of the Department of
> State, Department of Defense and the Joint Chiefs of Staff testified, did not
> convince this Court that the publication of these historical documents would
> seriously breach the national security …. Without revealing the content of
> the testimony, suffice it to say that no cogent reasons were advanced as to
> why these documents except in the general framework of embarrassment
> previously mentioned, would vitally affect the security of the Nation. In the
> light of such a finding the inquiry must end.

*New York Times Co.*, 328 F. Supp. at 330.  As with national security justifications, courts "can and do review foreign policy arguments that are offered to justify legislative or executive action when constitutional rights are at stake."  *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1056, 1070 (9th Cir. 1995) (noting that although the government's *in camera* submission to the district court "indicates that the [Popular Front for the Liberation of Palestine] advocates prohibited doctrines and that the [Plaintiff–Appellant] aliens are members, it does not indicate that either alien has personally advocated those doctrines or has participated in terrorist activities").

Other than summarily claiming that the Court erred and lacks authority to impose a preliminary injunction whenever the Executive Branch asserts a national security threat, Mot. at 11-12, Defendants provide no argument why the Court's conclusion that the Government's "specific evidence about WeChat is modest" is incorrect.

### 3.     Defendants Will Not Be Irreparably Injured Absent a Stay

Defendants attempt to relitigate the Court's finding that the Government will not be irreparably injured by a preliminary injunction, Mot. 14-16, but their new evidence is not convincing and fails to demonstrate irreparable injury.

### (a)     Defendants' Evidence of Surveillance Is Speculative

After all the briefing this Court has reviewed, the key national security threat identified by Defendants—surveillance—is based on a speculative concern about how U.S. users' data *might* be used in the future.

Defendants refer to the types of data identified in WeChat's privacy policy to argue that WeChat collects "sensitive information" that will be "will be inescapably and perpetually available to the PRC."  Mot. 14; *see also* Bien Decl. ISO Preliminary Injunction, ECF No. 17-12 ¶ 31 & Ex. DD (WeChat Privacy Policy).  But the Decision Memo and DHS CISA Assessment to which they cite for this argument only speculate WeChat or Tencent *could* share the information it collects from U.S. users with the Chinese government, and provide no *actual* evidence of such sharing—let alone in a manner that causes irreparable harm to national security.  In fact, the CISA recommends a

much more tailored action than the sweeping ban the Government is now pushing—one focused only on precluding the use of WeChat by critical infrastructure operators and state, local, tribal, and territorial partners.  CISA Note at 27.

Notably, the Decision Memo's discussion of Tencent's compliance with and assistance to the PRC's surveillance efforts is focused on what happens inside China and to Chinese nationals, not to U.S. persons.  *See* ECF No. 76-1 at 8-9.  To justify the sweeping conclusion that "the WeChat or Weixin accounts of users in China are under constant surveillance by PRC authorities," the Decision Memo cites examples of (1) a Chinese national prosecuted in Hubei's Jingmen City for the content of her blogging and social media posts, and (2) local authorities in Qinghai closing Weixin chat groups that spread disinformation about the coronavirus.[11]  *Id.* at 9.  When it finally addresses U.S. users' data, the Decision Memo never states that such information is or has been made available to PRC authorities via WeChat, Tencent, or any other method.  *Id.* at 12-13.

Instead, the Decision Memo repeatedly phrases the national security threat as about the "potential" to facilitate surveillance using U.S. WeChat users' data.  *See, e.g.*, *id.* at 12 ("One of the foremost national security risks presented by the WeChat mobile application in the United States is **the possibility** that the PRC government **could** … compel Tencent to provide systemic access to U.S. user's sensitive personal information."); *id.* at 13 ("the WeChat app **could** expand the PRC's ability to conduct espionage on millions of U.S. persons.); *id.* at 12 ("intelligence operations **could ostensibly occur** without Tencent's express knowledge or awareness at a corporate level"); *id.* at 13 ("The PRC **could** combine these various types of data, which they possess, and continue to collect, in order to build dossiers on millions of U.S. persons."); *id.* ("Funneling all these various types of information into their AI apparatus **could potentially** create a platform to enhance the PRC's ability to identify espionage targets for intelligence collection purposes."); *see also*

---

[11] U.S. social media posts, including ones posted by President Trump, have been removed for spreading misinformation.  *See* Bien Decl. ¶ 3 & Ex. B (*Washington Post* article titled "Facebook, Twitter Penalize Trump For Posts Containing Coronavirus Misinformation").

CISA Note at 25 (WeChat "**could** be compelled to provide user and application data to the Chinese government.").  Defendants themselves explained the problem with this sort of evidence in in opposing the injunction—these sorts of claims "are entirely conjectural" and "fall short of showing 'immediate threatened injury.'"  ECF No. 22 at 47-48.

### (b)   The Claimed National Security Risks Are Neither Immediate Nor Irreparable

The key fact to the Government in Defendants' newly submitted evidence appears to be that "PRC law requires companies subject to PRC jurisdiction" to assist and comply with PRC intelligence and security services.[12]  Decision Memo at 8-9.  Defendants' articulation of their national security and foreign policy interests is that there exists a threat to the United States whenever *any* Chinese company has access to U.S. persons' data because that Chinese company *could* be compelled by the PRC to hand over that data.  *See, e.g.*, CISA Note at 25 ("**As Chinese companies**, they both [WeChat and TikTok] **may be compelled** under the 2017 China Internet Security Law to provide that information to the Chinese government."); Decision Memo at 12 ("Given the bounty of information WeChat **could** offer on foreign users, as well as the aforementioned cyber tactics employed by the PRC, the Department of Commerce assesses the PRC and PRCISS would not limit their use of WeChat to domestic concerns and would instead use it for foreign intelligence and surveillance.").

This is an incredibly broad assertion of irreparable harm that, if taken to its logical conclusion, would extend to *any* company with Chinese ownership that had access to Americans' data:  Any such company *might* be subject to surveillance authorities that *might* support Chinese espionage efforts in ways that would cause irreparable harm.  Meanwhile, the speciousness of the claimed irreparable injury is belied by Defendants'

---

[12] The United States' intelligence services also make requests to social media companies for user data.  *See, e.g.*, Bien Decl. ¶ 4 & Ex. C ("In recent months, the U.S. Justice Department has issued subpoenas against Facebook (FB) and web host DreamHost for records of thousands, perhaps millions, of citizens who expressed interest in protesting President Trump's inauguration.").

1   argument that "Plaintiffs will be able to continue using WeChat in the short-term to some

2   extent."  Mot. at 12.  If, in fact, current WeChat access poses an immediate, irreparable

3   threat, why would any such continued use be permitted?

4          Defendants fail to specifically articulate how allowing Plaintiffs and others in the

5   U.S. to use WeChat immediately and irreparably harms the national interest when the

6   United States continues to permit other Chinese companies to do business in the United

7   States and to collect U.S. persons' data.  Defendants are even willing to allow TikTok to

8   continue collecting similar data, even though the Secretary warned on September 18, 2020

9   that both public platforms:

10          collect[] vast swaths of data from users, including network activity, location
            data, and browsing and search histories.  Each is an active participant in
11          China's civil-military fusion and is subject to mandatory cooperation with
            the intelligence services of the CCP.  This combination results in the use of
12          WeChat and TikTok creating unacceptable risks to our national security.

13   Bien Decl. ¶ 5 & Ex. D.  While both WeChat and TikTok present "unacceptable risks to

14   our national security," Secretary Ross stated that the prohibitions in Executive Order

15   13943 would be applied to WeChat beginning September 20, 2020, but that the

16   prohibitions (other than app-store updates) would not go into effect as to TikTok until

17   November 12, 2020.  *Id.*  This is despite the fact that "over **100 million** Americans" use

18   TikTok, far more than use WeChat.  *See TikTok*, 2020 WL 5763634, at *2 (emphasis

19   added).  As another example, Defendants' evidence states that aside from WeChat,

20   "Tencent's most significant products are games that make up the biggest gaming franchise

21   in the world."  Decision Memo at 3.  Despite these games' similar ability to collect user

22   data from U.S. persons—reports state that Tencent games like League of Legends surveil

23   U.S. minors—the United States continues to allow *that* data collection.  Bien Decl. ¶ 6 &

24   Ex. E.  Nor does the United States Government even regulate the domestic data-broker

25   industry that gathers the same types of "sensitive" personal information from everyone

26   who uses the Internet and/or credit cards, and offers it for sale to political campaigns,

27   targeted advertisers, and, presumably, the Chinese government or its agents.  *See*

28   Hildebrand Decl. ¶ 13;  Bien Decl. ¶ 7 & Ex. F (*New York Times* article stating that

"[t]hese companies sell, use or analyze the data to cater to advertisers, retail outlets and even hedge funds seeking insights into consumer behavior.")  Defendants fail to establish that prohibitions specifically against WeChat are immediately necessary, when they allow the same threats posed by TikTok and others to continue unabated.

### (c)   Defendants' Fail to Show How Censorship Is an Irreparable Injury to National Security

Defendants also allege that WeChat's censorship will "subversively influence the views of millions of U.S. WeChat users" and that "U.S. citizens are forced to self-censor the content they share or jeopardize losing their preferred communication platform with their contacts in China."  Mot. at 15.  Censorship and stilted viewpoints may indeed be "bad," but Defendants fail to show how any of this is irreparable harm to the United States' national security.  Specifically, defendants point to the ways in which China censors critics of its regime and pushes a particularly beneficent narrative of the state— pushing a pro-China view of the world.  But there is no argument as to why that kind of censorship and propaganda poses a national security threat—let alone the kind of national security threat that poses irreparable injury.  *Cf.* Bien Decl. ¶¶ 8-10 & Exs. G-I (reports about Facebook and Twitter censoring political viewpoints including those of Roger Stone, Infowars, and the Proud Boys).  Finally, in our democracy and under our Constitution, the cure for censorship is not more censorship.  *See Lamont*, 381 U.S. at 310 (Brennan, J., concurring) (rejecting government's attempt to justify censorship of incoming mail from China as a response to China's censorship of information from the United States, and explaining that the absence of protections for free expression elsewhere in the world "can never justify emulating the practice of restrictive regimes in the name of expediency.").

### (d)   Defendants Cannot Suffer Harm From an Injunction That Merely Ends an Unlawful Practice

Finally, it is well established that the Government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *TikTok*, 2020 WL 5763634, at *9.  While

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STAY PENDING APPEAL OF ORDER
GRANTING MOTION FOR PRELIMINARY INJUNCTION

1  the Court's Order did not reach the merits of Plaintiffs' *ultra vires* claims, Order at 19, as

2  noted above the *TikTok* court granted an injunction against Defendants on TikTok's

3  identical claims that the Secretary's prohibitions "constitute indirect regulations of

4  'personal communication[s]' or the exchange of 'information or informational materials.'"

5  *TikTok*, 2020 WL 5763634, at *7-8.  Because the Secretary's prohibitions against WeChat

6  in this matter violate the First Amendment and are similarly *ultra vires*, Defendants cannot

7  as a matter of law show irreparable harm from failing to stay the injunction.

8  ### C.    A Stay Would Irreparably Harm Plaintiffs

9       Defendants first contend that the Court's finding that "[t]he immediate threat is the

10 elimination of their platform for communication" cannot constitute irreparable harm

11 because "even absent an injunction, Plaintiffs will be able to continue using WeChat in the

12 short-term to some extent, such that their 'platform for communication' will not in fact be

13 "eliminat[ed]."  Mot. at 12.  This argument is contradicted by the Secretary's admission

14 that WeChat would be shut down for all practical purposes.  *See* Order at 2 & n. 2.

15      Defendants next assert that the prohibitions at issue "do not impact First

16 Amendment rights"[13] because "they bar economic transactions" and the "impact on speech

17 is incidental."  Mot. at 12.  As explained in Section II(A)(2) above, this argument is

18 meritless; courts have long recognized that regulating a platform for communication

19 necessarily regulates speech, and Defendants' newly-submitted evidence shows that the

20 prohibitions were designed specifically to stop Plaintiffs and other WeChat users in the

21 U.S. from communicating on the app.  Defendants' reference to *CTIA - The Wireless Ass'n*

22 *v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019) is inapposite, as that case pertains to

23 the regulation of commercial speech; but nevertheless, Defendants relied on the case for a

24 quote which only further proves Plaintiffs' point:  "[i]t is the '*purposeful* unconstitutional

25 suppression of speech [that] constitutes irreparable harm for preliminary injunction

26 purposes.'"

27

28 [13] Defendants concede at page 23 of their Motion that a WeChat ban does have an "impact on Plaintiffs' expressive activities."

1    Finally, Defendants suggest that Plaintiffs will not be harmed by a stay because

2  "numerous other mobile applications and news sources *are* available in Chinese … a point

3  the Government did not have the opportunity to develop."[14]  Mot. at 13.  Defendants'

4  argument fails to acknowledge that these "alternatives" are not workable substitutes

5  because they lack the network effects of WeChat.  *See* Declaration of Fangyi Duan ("Duan

6  Decl."), *filed herewith*, ¶ 7; Declaration of Ying Cao ("Cao Decl."), *filed herewith*, ¶ 13.

7  Defendants continue to make no effort to address the irreparable harm that Plaintiffs would

8  experience by being cut-off from their families, friends, and other contacts in China,

9  especially during the COVID-19 pandemic—nor can they.  *See* Decision Memo at 10

10 (admitting the lack of alternatives to communicate with persons in China).  Additionally,

11 some apps identified by Defendants lack the same functions as WeChat (Duan Decl. ¶¶ 5-

12 6; Cao Decl. ¶¶ 5-12); lack the ability to sign-up in Chinese (Duan Decl. ¶ 9; Cao Decl.

13 ¶ 5); lack Chinese interfaces and/or navigation menus (Cao Decl. ¶ 6; Duan Decl. ¶ 9); and

14 lack privacy and/or user policies in Chinese (Cao Decl. ¶¶ 5-6, 8-9).  Plaintiffs will suffer

15 irreparable harm if the partial or "limited" stay requested by Defendants (Mot. at 23) is

16 granted, as that will result in the degraded and/or inoperable use of WeChat, ensuring that

17 "a majority of the [users] will simply exit."  Duan Decl. ¶ 8; Cao Decl. ¶ 14.

18    **D.    The Court Correctly Concluded That the Public Interest Warrants
              a Preliminary Injunction**

19

20    In explaining the applicable legal standard, Defendants confusingly write that the

21 third and fourth factors "for 'assessing the harm to the opposing party and weighing the

22 public interest … merge when the Government is the opposing party.'"  Mot. at 10.  While

23 true in principle, the Government is *not* the opposing party here, but rather the party

24 seeking the stay.  The third and fourth factors thus do not merge, and the Court should

25 consider both the substantial harm to Plaintiffs and the harm to the public interest.

26    Defendants provide no reason to revisit the Court's conclusion that "[t]he public

27

28 ───────────────
[14] Plaintiffs identified the lack of alternatives in their Complaint.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STAY PENDING APPEAL OF ORDER
GRANTING MOTION FOR PRELIMINARY INJUNCTION

1    interest favors the protection of the plaintiffs' constitutional rights."  Order at 20.

2    **III.   NO PARTIAL STAY SHOULD BE GRANTED, NOR SHOULD THE PRELIMINARY INJUNCTION BE MODIFIED**

3

4    Defendants ask the Court to modify or reconsider its preliminary injunction, see

5    Mot. at 8, 10, 22, but they have not so moved with a duly noticed motion and briefing

6    under the applicable Federal Rules of Procedure standard.  *See* Fed. R. Civ. P. 7(b); N.D.

7    Cal. Civ. L. R. 7-2; *Alto v. Black*, 738 F.3d 1111, 1120 (9th Cir. 2013) (party seeking to

8    modify preliminary injunction "bears the burden of establishing that a significant change in

9    facts or law warrants revision or dissolution of the injunction"); *see also* Section II(B)(1),

10   *supra*.  Regardless of the Court's authority to do so, there is no basis for doing so here.[15]

11   Arguing that the "injunction must be narrowly tailored to remedy the specific harm

12   shown," Defendants' request that the Court "limit or stay the injunction at least insofar as

13   it applies to Paragraph 1 of the Identification of Prohibited Transactions," thus "[b]arring

14   new users from WeChat."  Mot. at 23.  (citing *E. Bay Sanctuary Covenant v. Barr*, 934

15   F.3d 1026, 1029 (9th Cir. 2019)).  But they fail to show how blocking tens or hundreds of

16   thousands of new users from participating in WeChat discussions and frustrating WeChat

17   capabilities for its millions of current users meets this goal.  Doing so would mean Plaintiff

18   Bao could not communicate with new church members, Plaintiff Chihou would be

19   deprived of new customers, and Plaintiff Peng could not carry out MHACC's mission to

20   provide mental health services to new recipients of care.  *See* EDF 17 (Pls' Mot.) at 43-44;

21   *TikTok*, 2020 WL 5763634, at *8 (finding such a bar on new users and updates to

22   constitute irreparable harm); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss

23

---

24   [15] None of Defendants' cases support the Court *sua sponte* "set[ting] aside all or any part of its injunction,"  Mot. at 16.  *See Language Line Servs., Inc. v. Language Servs. Assocs., Inc.*, 500 F. App'x 678, 681 (9th Cir. 2012) (affirming district court's refusal to modify

25   injunction); *A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1096 (9th Cir. 2002) (modification of preliminary injunction warranted because "[a]fter three months of moni-

26   toring, the district court determined that Napster was not in satisfactory compliance with the [previously] modified preliminary injunction"); *City of Los Angeles, Harbor Div. v.*

27   *Santa Monica Baykeeper*, 254 F.3d 882, 884, 886 (9th Cir. 2001) (holding that district court's rescission order was proper where district court issued a final order on Decem-

28   ber 28 "realizing the inconsistency between his October 28 and November 10 orders").

1  of First Amendment freedoms, for even minimal periods of time, unquestionably

2  constitutes irreparable injury.").  Moreover, prohibiting updates would necessarily render

3  present WeChat users' data *less* secure and prone to data breaches, a result at odds with the

4  U.S. interests Defendants assert are at stake.  *See* Hildebrand Decl. ¶ 12.

5        Having determined that Plaintiffs demonstrated serious questions going to the

6  merits of their First Amendment claim that the Secretary's prohibited transactions

7  "effectively eliminate the plaintiffs' key platform for communication, slow or eliminate

8  discourse, and are the equivalent of censorship of speech or a prior restraint on it," Order at

9  16, this Court should not summarily reverse course as Defendants' insist.

10 **IV.  DEFENDANTS OFFER NO RATIONALE TO NOW STAY THE**
**     ORDER'S NATIONWIDE EFFECT**

11

12       Defendants make no new showing or argument to support their request to stay the

13 injunction's nationwide effect.  Mot. at 14, n. 2.  Nor have they addressed the obvious

14 point that limiting the injunction to only Plaintiffs would fail to provide complete relief

15 and instead serve to dissolve the injunction.  *See* ECF No. 28 at 20; ECF No. 52 at 8.

16 **V.   DEFENDANTS' REQUEST FOR BOND SHOULD BE DENIED**

17       Defendants waived any argument for a bond having never briefed a response to

18 Plaintiffs' request that the Court waive bond.  *See* ECF No. 17 at 48; 9/19 Transcript, ECF

19 No. 65 at 45:8-46:5.  Defendants rely on *Connecticut General Life Insurance Co. v. New*

20 *Images of Beverley Hills*, but that case held that the district court did not err in declining to

21 set any bond where, as here, the party failed to request a bond or submit evidence that a

22 bond is needed.  *Connecticut General Life Insurance Co. v. New Images of Beverly Hills*,

23 321 F.3d 878, 882 (9th Cir. 2003).  A bond is inappropriate here because Plaintiffs "seek to

24 vindicate important interests, and there is no risk that Defendants will suffer monetary

25 harm." *TikTok*, 2020 WL 5763634, at \*9 n.4.

26                           **CONCLUSION**

27       Defendants failed to meet their burden and the injunction should remain in place.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED:  October 1, 2020

Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By:   */s/ Michael W. Bien*
Michael W. Bien

Attorneys for Plaintiffs

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STAY PENDING APPEAL OF ORDER
GRANTING MOTION FOR PRELIMINARY INJUNCTION