JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
JOHN V. COGHLAN
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Branch Director
DIANE KELLEHER
Assistant Branch Director
SERENA M. ORLOFF
MICHAEL DREZNER
STUART J. ROBINSON
AMY E. POWELL
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
Ben Franklin Station, P.O. Box No. 883
Washington, DC 20044
Phone: (202) 305-0167
Fax: (202) 616-8470
E-mail: serena.m.orloff@usdoj.gov
*Counsel for Defendants*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| U.S. WECHAT USERS ALLIANCE, *et al.*, | Case No. 3:20-cv-05910-LB |
| Plaintiffs, | **DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL** |
| v. | |
| DONALD J. TRUMP, President of the United States, and WILBUR ROSS, Secretary of Commerce, | Date: Oct. 15, 2020 |
| Defendants. | Time: 9:30am |
| | Judge: Hon. Laurel Beeler |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

DISCUSSION ................................................................................................................... 1

I.     Defendants Have a Strong Likelihood of Success on the Merits ....................................... 1

       A.     The WeChat Restrictions Do Not Raise First Amendment Concerns ................... 1

       B.     Any First Amendment Scrutiny Is Limited to Intermediate, Not Strict,
              Scrutiny ............................................................................................................ 4

       C.     Intermediate Scrutiny Is Satisfied ...................................................................... 5

              1.     The Restrictions Do Not Burden Substantially More Speech than
                     Necessary ................................................................................................ 5

              2.     The Restrictions Leave Open Ample Alternatives ..................................... 7

II.    The Remaining Factors Weigh Strongly in Favor of a Stay. ........................................... 10

       A.     The Government's National Security and Foreign Policy Interests Are
              Compelling ....................................................................................................... 10

       B.     Any Harm to Plaintiffs Is Minimal ................................................................... 13

       C.     The Balance Tips Strongly in Favor of Defendants ............................................ 13

III.   Alternatively, the Court Should Stay at Least Part of Its Preliminary Injunction. ........... 15

CONCLUSION ................................................................................................................ 15

# TABLE OF AUTHORITIES

**CASES**

*Al Haramain Islamic Foundation, Inc. v. U.S. Department of Treasury*,
   686 F.3d 965 (9th Cir. 2012) ................................................................. 11, 12

*Am.-Arab Anti-Discrimination Comm. v. Reno*,
   70 F.3d 1045 (9th Cir. 1995) ........................................................................ 11

*Am. Commc'ns Ass'n, C.I.O., v. Douds*,
   339 U.S. 382 (1950) ................................................................................. 2, 4

*Arcara v. Cloud Books, Inc.*,
   478 U.S. 697 (1986) ...................................................................................... 1

*Assoc. Press v. Nat'l Labor Relations Bd.*,
   301 U.S. 103 (1937) ...................................................................................... 2

*Backpage.com, LLC v. Dart*,
   807 F.3d 229 (7th Cir. 2015) ........................................................................ 3

*Boumediene v. Bush*,
   553 U.S. 723 (2008) .................................................................................... 11

*City of Ladue v. Gilleo*,
   512 U.S. 43 (1994) ................................................................................ 5, 7, 8

*City of Renton v. Playtime Theatres, Inc.*,
   475 U.S. 41 (1986) ...................................................................................... 6, 9

*Currier v. Potter*,
   379 F.3d 716 (9th Cir. 2004) ........................................................................ 3

*Defense Distributed v. U.S. Dep't of State*,
   121 F. Supp. 3d 680 (W.D. Tex. 2015) ........................................................ 14

*G.K., Ltd. Travel v. City of Lake Oswego*,
   436 F.3d 1064 (9th Cir. 2006) ...................................................................... 9

*Globe Newspaper Co. v. Beacon Hill Architectural Comm'n*,
   100 F.3d 175 (1st Cir. 1996) ........................................................................ 6

*Herndon v. Georgia*,
   295 U.S. 441 (1935) ...................................................................................... 2

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010) .................................................................................. 10, 11

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
   219 F. Supp. 2d 57 (D.D.C. 2002) ............................................................ 12

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999) ...................................................................................... 7

*Lamont v. Postmaster General*,
   381 U.S. 301 (1965) ................................................................................... 2, 3

*Lucido v. Nestle Purina Petcare Co.*,
   217 F. Supp. 3d 1098 (N.D. Cal. 2016) ...................................................... 7

*Marland v. Trump*,
   No. 20-4597, 2020 WL 5749928 (E.D. Pa. Sept. 26, 2020) ....................... 4

*Near v. State of Minnesota ex rel. Olson*,
   283 U.S. 697 (1931) ...................................................................................... 4

*New York Times v. United States*,
   403 U.S. 713 (1971) ...................................................................................... 4

*New York Times Co. v. United States*,
   328 F. Supp. 324 (S.D.N.Y. 1971) ............................................................. 12

*Nken v. Holder*,
   556 U.S. 418 (2009) .................................................................................... 10

*OKKO Bus. PE v. Lew*,
   133 F. Supp. 3d 17 (D.D.C. 2015) ............................................................. 11

*Promotions, Ltd. v. Conrad*,
   420 U.S. 546 (1975) ...................................................................................... 4

*Ramos v. Wolf*,
   No. 18-16981, 2020 WL 5509753 (9th Cir. Sept. 14, 2020) .................... 14

*Regan v. Wald*,
   468 U.S. 222 (1984) .................................................................................... 11

*Stagg P.C. v. U.S. Department of State*,
   158 F. Supp. 3d 203 (S.D.N.Y. 2016) ....................................................... 14

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ............................................................................ 7, 11

*U.S. Postal Serv. v. Council of Greenburgh Civic Ass'n*,
   453 U.S. 114 (1981) ...................................................................................... 9

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Reply in Support of their Motion to Stay Preliminary Injunction Pending Appeal
iii

*United States v. Elcom Ltd.*,
  203 F. Supp. 2d 1111 (N.D. Cal. 2002) ................................................................. 6, 7

*Universal City Studios, Inc. v. Reimerdes*,
  111 F. Supp. 2d 294 (S.D.N.Y. 2000) ...................................................................... 4

*Winter v. NRDC*,
  555 U.S. 7 (2008) ..................................................................................................... 11

*Woodhull Freedom Foundation v. United States*,
  948 F.3d 363 (D.C. Cir. 2020) ................................................................................. 3

**STATUTES**

5 U.S.C. § 1702 ............................................................................................................ 12

47 U.S.C. § 310 .............................................................................................................. 2

50 U.S.C. § 1701 ........................................................................................................... 12

**RULES**

Fed. R. Evid. 702 ........................................................................................................... 7

**OTHER AUTHORITIES**

Cong. Research Service, "Made in China 2025,"
  Industrial Policies: Issues for Congress (Aug. 11, 2020) ........................................ 6

https://line.me/en/ .......................................................................................................... 8

https://signal.org/en/ ...................................................................................................... 8

https://smallbusiness.chron.com/delete-offensive-content-facebook-31737.html ........ 8

https://t.me/setlanguage/zh-hans-beta .......................................................................... 8

https://telegram.org/blog/supergroups .......................................................................... 8

https://telegram.org/faq#q-how-do-i-create-a-group .................................................... 8

https://www.cisa.gov/about-cisa ................................................................................... 5

https://www.facebook.com/help/messenger-app/207233286525869 ............................ 8

https://www.scmp.com/abacus/tech/article/3075804/how-telegram-became-refuge-
  wechat-users-during-coronavirus-outbreak .............................................................. 9

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
JOHN V. COGHLAN
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Branch Director
DIANE KELLEHER
Assistant Branch Director
SERENA M. ORLOFF
MICHAEL DREZNER
STUART J. ROBINSON
AMY E. POWELL
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
Ben Franklin Station, P.O. Box No. 883
Washington, DC 20044
Phone: (202) 305-0167
Fax: (202) 616-8470
E-mail: serena.m.orloff@usdoj.gov
*Counsel for Defendants*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| U.S. WECHAT USERS ALLIANCE, *et al.*, | Case No. 3:20-cv-05910-LB |
| Plaintiffs, | **DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL** |
| v. | |
| DONALD J. TRUMP, President of the United States, and WILBUR ROSS, Secretary of Commerce, | Date: Oct. 15, 2020 |
| Defendants. | Time: 9:30am |
| | Judge: Hon. Laurel Beeler |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

Plaintiffs' opposition to Defendants' motion to stay is long on rhetoric but short on legal analysis or substantiated harm.  As set forth in Defendants' motion, and as further elaborated below, the national security and foreign policy rationale for the Government's WeChat restrictions amply satisfy any applicable First Amendment scrutiny.  Those same national security threats also strongly outweigh any temporary inconvenience that Plaintiffs may encounter in switching to one or more of the many non-WeChat platforms for speech while this case is being litigated.  The Government has not restricted Plaintiffs' right to express any idea that they please, nor has it limited their ability to do so through any platform that is not directly monitored by the government of the People's Republic of China ("PRC").  Moreover, the national security harms resulting from continued, unabated flow of information to Beijing and censorship of American speech while this case is litigated cannot be repaired, whereas WeChat is a global application with more than one billion users that will surely continue to be available in the event Plaintiffs prevail on the merits.  The Court should stay its preliminary injunction and permit implementation of the Secretary's prohibitions, or at least Prohibition number 1, pending Defendants' appeal to the Ninth Circuit.[1]

**DISCUSSION**

**I.     Defendants Have A Strong Likelihood Of Success On The Merits.**

**A.     The WeChat Restrictions Do Not Raise First Amendment Concerns**

Just as application of the criminal laws in *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986), did not implicate the First Amendment, neither do the WeChat restrictions, which are grounded in national security. Defs.' Mot. to Stay ("Mot.") at 17, ECF No. 68.  The PRC has conducted widespread, surreptitious, and hostile informational attacks against the United States, *see* Mot. at 9, and uses WeChat to amass data, monitor users, and control discourse.  *Id.*  These

---

[1]  On October 2, 2020, Defendants appealed the Court's preliminary injunction order to the Court of Appeals for the Ninth Circuit.  ECF No. 79.  Defendants also requested a stay of the Court's preliminary injunction order from the Ninth Circuit, but pursuant to a time frame that would still permit this Court to resolve Defendants' motion to stay.  *See* ECF No. 81.

*U.S. WeChat Users Alliance, et al. v. Trump, et al*., Case No. 3:20-cv-05910-LB
Defendants' Reply in Support of their Motion to Stay Preliminary Injunction Pending Appeal

1

acts are not protected by the First Amendment.[2]  Were Tencent to sell electricity to U.S. consumers and, in so doing, systematically collect and send payment and electrical consumption data back to the PRC for potentially adverse uses, there is little question that the President could invoke his emergency powers to shut such an effort down.  The outcome is no different because WeChat trades in the transmission of speech, rather than electricity.  *See Assoc. Press v. Nat'l Labor Relations Bd.*, 301 U.S. 103, 132-33 (1937) (First Amendment does not supply a "privilege to invade the rights and liberties of others").  The restrictions thus do not regulate any "medium[] for speech," Opp. at 8, ECF No. 78; they merely apply established national emergency powers against a single firm functioning as an arm of the PRC.

Nor is the analysis different because Plaintiffs are users of WeChat, rather than Tencent itself.  Although the First Amendment protects the right to speak out and to publish, it does not guarantee the right to use a medium for communication that poses harms to national security. And it certainly does not preserve the PRC's ability to use WeChat to "strangle individual thoughts" of United States users, "invade personal privacy," or use the data from millions of Americans for hostile purposes.  *Am. Commc'ns Ass'n, C.I.O., v. Douds*, 339 U.S. 382, 443-44 (1950) (Jackson, J., concurring); *see also id.* at 391.  The WeChat restrictions appropriately stem from the combination of the hostile practices of the PRC aligned with WeChat's "position of great power" over the lives and data of millions of people in the United States.  *Id.* at 403-04; *cf. also Herndon v. Georgia*, 295 U.S. 441, 445 (1935).[3]

None of Plaintiffs' case law grapples with these unique circumstances.  *Lamont v. Postmaster General*, 381 U.S. 301 (1965), is inapposite.  It involved a statute requiring the postal

---

[2] In fact, for nearly ninety years, this country has restricted foreign entities from holding certain types of licenses related to the transmission of speech.  *See* 47 U.S.C. § 310.  Yet under Plaintiffs' view of the law, those prohibitions are now constitutionally suspect.

[3] Many other factors that led the Supreme Court to reject a First Amendment challenge in *Douds* are equally present here: the injury to national interests "would be an accomplished fact before any sanctions could be applied"; the powers enabled by WeChat—such as development of artificial intelligence regarding the movement and activities of United States users—could later be exercised "at a time of external or internal crisis" against the United States; and in light of the secrecy of Tencent's activities, it would be difficult to "detect[] illegal activities of this kind[.]" 339 U.S. at 406.

*U.S. WeChat Users Alliance, et al. v. Trump, et al*., Case No. 3:20-cv-05910-LB
Defendants' Reply in Support of their Motion to Stay Preliminary Injunction Pending Appeal

service to detain and destroy unsealed "communist political propaganda" sent from abroad, unless the addressee returned a reply card indicating a desire to receive such items. This established a content-based scheme to censor information flowing through the U.S. mail, "set[ting] administrative officials astride the flow of mail to inspect it, appraise it, write the addressee about it, and await a response before dispatching the mail." *Id.* at 306. The Court concluded this framework would deter persons who "might think they would invite disaster if they read what the Federal Government says contains the seeds of treason." *Id.* at 307. Indeed, in that respect, the law in *Lamont* created a censorship regime similar to the authority the PRC wields with respect to WeChat. *See* Decision Mem. App. F, A.R. 1165, ECF No. 77-1 (WeChat communications intercepted by PRC, followed by arrests). The economic prohibitions at issue here bear no resemblance to that law. The WeChat restrictions do not empower the Government to monitor the mail or decide whether communications may be confiscated as "propaganda." *Lamont*, 381 U.S. at 302. Nor do they restrict speech or discourse based on content. *Compare id.* at 307. Instead, they prohibit business-to-business transactions for the provision of certain technological services because the PRC exploits those services to amass personal data on millions of U.S. persons, and to surveil and censor the content of their communications.[4]

Plaintiffs' other cases are also inapposite. *See Currier v. Potter*, 379 F.3d 716 (9th Cir. 2004) (addressing restrictions on public mail system and rejecting First Amendment challenge); *Backpage.com, LLC v. Dart*, 807 F.3d 229, 233 (7th Cir. 2015) (addressing "government coercion aimed at shutting up or shutting down Backpage's adult section" based on content); *Woodhull Freedom Foundation v. United States*, 948 F.3d 363, 374 (D.C. Cir. 2020) (analyzing Article III standing). The WeChat restrictions are content-neutral and properly applied to the threat as identified by the President and the Secretary.

---

[4] Moreover, the Court in *Lamont* did not reach whether the content-based law could be justified by any compelling interest because the Government "expressly disavow[ed]" that the law was justified by any "large public interests." 381 U.S. at 309. Here, the Government has demonstrated such large public interests.

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Reply in Support of their Motion to Stay Preliminary Injunction Pending Appeal

1

### B.   Any First Amendment Scrutiny Is Limited to Intermediate, Not Strict, Scrutiny

2

Even if the First Amendment were implicated, it would impose only intermediate

3 scrutiny, as this Court has concluded.  Order at 16.  Plaintiffs advance three contrary arguments;

4 none has merit.

5 First, they suggest that the challenged restrictions are content-based, and thus subject to

6 strict scrutiny, because the Secretary noted that the PRC uses WeChat to promote propaganda

7 and disinformation.  Opp. at 13.  This argument misrepresents the foundation for the WeChat

8 restrictions.  The Government's concerns are not about any particular pro-China content or even

9 about pro-China content or propaganda as a category.  Instead, the Government is concerned

10 about a concerted effort by the PRC to concentrate all communication reaching the Chinese

11 diaspora onto the WeChat platform and then to exploit that monopoly to surveil individuals,

12 control discourse, and collect massive amounts of U.S. person data, including geolocation data

13 and other intelligence, for adverse use against U.S. interests.  Such repressive activities are

14 anathema to the First Amendment.  *Cf. Douds*, 339 U.S. at 433-34 (Jackson, J., concurring).

15 Second, Plaintiffs' characterization of the WeChat restrictions as a "prior restraint" is

16 wrong.  A prior restraint involves "administrative preclearance requirements for" or "preliminary

17 injunctions against" speech based on its content.  *Universal City Studios, Inc. v. Reimerdes*, 111

18 F. Supp. 2d 294, 333-34 (S.D.N.Y. 2000); *see also Marland v. Trump*, No. 20-4597, 2020 WL

19 5749928, at *8 (E.D. Pa. Sept. 26, 2020).  Neither type of restriction is at issue here.  Plaintiffs

20 need not obtain administrative preclearance for any speech they wish to undertake, nor are they

21 enjoined from speaking on any topic whatsoever.  Any practical difficulty using WeChat does

22 not prevent Plaintiffs from taking their speech to alternative platforms, and it does not amount to

23 "censorship" of their message.  *See Marland*, 2020 5749928 at *8 (rejecting "prior restraint"

24 theory in part because the restrictions "make no distinction between favored and disfavored

25 content").  Nor are the WeChat restrictions anything like the criminalization of "malicious,

26 scandalous and defamatory" speech in *Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697,

27 701 (1931); the rejection of a license to perform *Hair* in *Se. Promotions, Ltd. v. Conrad*, 420

28

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Reply in Support of their Motion to Stay Preliminary Injunction Pending Appeal

U.S. 546 (1975); or the publication of the Pentagon Papers in *New York Times v. United States*, 403 U.S. 713 (1971)—which all involved prior restraints on speech based on its content.

Third, Plaintiffs intimate that the WeChat restrictions "single out . . . a medium relied on by a distinct minority group," which in turn was also "singled out by the President for racist demagoguery." Opp. at 9. These claims are groundless. WeChat was "single[d] out" because of its documented history assisting the PRC with censorship, surveillance, and repression, and the risk that those activities would also be wielded to the detriment of the United States. *See* Decision Mem. at 5-14, ECF No. 76-1. Plaintiffs cite no evidence indicating otherwise.[5]

## C.    Intermediate Scrutiny Is Satisfied

Because it "is common ground that governments may regulate" mediums of communication absent censorial purpose, *City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994), the Court's Order, ECF No. 59, correctly recognized that strict scrutiny was not the appropriate standard. *Id.* at 16. While Defendants believe they should prevail even under a more demanding standard, at a minimum, under intermediate scrutiny, the WeChat restrictions should be upheld.

### 1.    The Restrictions Do Not Burden Substantially More Speech than Necessary

In support of their claim of undue burden, Plaintiffs cite the assessment performed by the Critical and Infrastructure Security Agency ("CISA") which recommended that the WeChat app "not be permitted on the devices of State, Local, Tribal, and Territorial (SLTT) partners and critical infrastructure operators as they may provide malicious actors with access to mobile devices and sensitive data." *See* Decision Mem. App. B at 1 ("CISA Assessment"), ECF No. 68-1, Ex. B. But CISA, unlike the Secretary, did not purport to assess the entirety of the threat to national security and the measures necessary to mitigate it. CISA's assessment was grounded in

---

[5] Plaintiffs' note only that the President has sometimes blamed the PRC for the spread of the novel coronavirus, Compl. ¶¶ 57-58, comments that do not suggest animosity toward the Chinese people and appear irrelevant to the WeChat restrictions. Indeed, on the same day the WeChat executive order was issued, the President issued a similar order affecting TikTok, whose use is certainly not limited to a "distinct minority group."

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Reply in Support of their Motion to Stay Preliminary Injunction Pending Appeal

5

its mission, which is to "build [a] more secure and resilient *infrastructure* for the future."[6]  The

assessment thus appropriately focused on threats to digital infrastructure.  *See, e.g.*, CISA

Assessment at 1 (discussing threats to "mobile devices, connected systems and networks" and

"system integrity").  The measures that CISA recommended would not have addressed other,

similarly important national security threats documented in the Secretary's decision, such as the

PRC's ability to induce self-censorship among U.S. users or the vast amounts of data collected

through WeChat, including medical and financial records, which could be used, among other

things, to "build dossiers on millions of U.S. persons," enhance the PRC's artificial intelligence,

and identify espionage targets.  Decision Mem. at 13-14.  CISA's mission-focused assessment

therefore does not undercut the Secretary's reasonable determination that broader action was

required.[7]  Moreover, even if Defendants "could have adopted a less drastic solution," their

decision is not invalid under the First Amendment.  *Globe Newspaper Co. v. Beacon Hill

Architectural Comm'n*, 100 F.3d 175, 190 (1st Cir. 1996) (affirming restrictions because

"eliminating the newsracks altogether [ ] is the most effective solution"); *see also, e.g.*, *United

States v. Elcom Ltd.*, 203 F. Supp. 2d 1111, 1132 (N.D. Cal. 2002) (similar).

Plaintiffs also suggest that the WeChat restrictions are invalid because they do not

regulate enough speech.  Opp. at 20.  A decision not to shut down every PRC-affiliated company

does not mean that the threats posed by WeChat are not real; the Government is entitled to

address problems sequentially and as it sees fit, particularly where it must balance issues of

foreign policy, trade, and national security.  *See, e.g.*, *City of Renton v. Playtime Theatres, Inc.*,

475 U.S. 41, 52-53 (1986) (city could "cho[o]se first to address the potential problems created by

---

[6] https://www.cisa.gov/about-cisa

[7] Moreover, even as to those national security threats, CISA did not suggest that such measures
directed at SLTT and infrastructure partner would eliminate the threat; it says they would simply
"*reduce*" them.  CISA Assessment at 1 (emphasis added).  And Plaintiffs fail to explain how a
prohibition against SLTT partners and critical infrastructure partners could feasibly be enforced
through IEEPA without also affecting users outside of this industry.

*U.S. WeChat Users Alliance, et al. v. Trump, et al*., Case No. 3:20-cv-05910-LB
Defendants' Reply in Support of their Motion to Stay Preliminary Injunction Pending Appeal

one particular kind of" business).[8]  Moreover, as Plaintiffs themselves acknowledge, WeChat is uniquely situated in terms of its global reach and multi-functionality.

Finally, Plaintiffs claim that the Secretary should have adopted less-restrictive measures to protect the national security interests, citing both Tencent's mitigation proposal and a Declaration of Joe Hildebrand, an engineer for a third-party web-browsing company, who offers his opinion on "best practices in mitigating data security risk and the targeted measures . . . available to Defendants to address those issues as to Tencent and WeChat."  Opp. at 5.  These materials do not undermine the Secretary's reasonable determination, or the case for a stay.  Mr. Hildebrand has no background in national security, and even if he did, his opinion would be entitled to no weight.  *See, e.g., Trump v. Hawaii*, 138 S. Ct. 2392, 2421-22 (2018) (rejecting plaintiffs' submission of declaration by former national security officials, and cautioning that even based on those opinions, courts could not "substitute [their] own assessment for the Executive's predictive judgments").  Further, even if the Court could consider an outside opinion on national security matters, which it may not, Mr. Hildebrand is not a qualified expert in the area of cybersecurity, national security, the PRC, or even data security, nor does he appear to know specifics about WeChat or whether his suggestions for improved security are technically, legally, or practically viable for Tencent.  *See* Fed. R. Evid. 702; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999);  *cf. Lucido v. Nestle Purina Petcare Co.*, 217 F. Supp. 3d 1098, 1103 (N.D. Cal. 2016) (expert in one field not qualified to provide opinions about a different field).  Moreover, his suggestions would require a "baseline level of trust" with the PRC that the Secretary determined was lacking.  Decision Mem. at 14-15.  And even if the Secretary "could have approached the problem" differently, he was not required to do so.  *Elcom*, 203 F. Supp. 2d at 1132.

---

[8]  To the extent Plaintiffs are suggesting that the Administration is addressing threats posed by China through speech alone, they are mistaken.  *See, e.g.*, Cong. Research Service, "Made in China 2025," Industrial Policies: Issues for Congress (Aug. 11, 2020) (describing multiple actions to address threatening Chinese policies and growing "technological and military capabilities").

*U.S. WeChat Users Alliance, et al. v. Trump, et al*., Case No. 3:20-cv-05910-LB
Defendants' Reply in Support of their Motion to Stay Preliminary Injunction Pending Appeal

7

## 2.    The Restrictions Leave Open Ample Alternatives.

Plaintiffs also argue that the WeChat restrictions do not leave open sufficient channels of communication.  They rely on *City of Ladue*, where the Supreme Court invalidated an ordinance because it "foreclose[d] *an entire medium* of expression." 512 U.S. at 55 (emphasis added).  The Court concluded that no meaningful alternatives existed because signs on a person's private property carried "a message quite distinct from placing the same sign someplace else" and were "an unusually cheap and convenient form of communication" with "no practical substitute" for persons of modest means or limited mobility.  *Id.* at 43-44, 57.  In contrast, the actions here affect only business-to-business transactions on a single application with numerous practical substitutes, Mot. at 14-15, a point that Plaintiffs do not, and could not, contest.

Plaintiffs maintain that the substitutes are inferior in their present form, but their claims on this point are self-serving and legally irrelevant.  For example, the founder of Plaintiff Chihuo Inc. prefers WeChat to Telegram and Facebook Messenger because WeChat provides "[t]he host of a chat group . . . the power to admit people in and remove people," whereas "Telegram, Facebook Messenger, and other apps . . . do not offer such features[.]"  Decl. of Fangyi Duan ¶ 6, ECF No. 78-2.  But this assertion is inconsistent with guidance provided by Facebook and Telegram themselves, which specifically instruct hosts how to admit and remove people from chat groups.[9]  Ms. Duan also dislikes Facebook because it does not allow "the author . . . [to] manage comments, such as removing offensive comments[.]"  *Id.* ¶ 5.  This is incorrect, as Facebook provides instructions for deleting offensive content.[10]  Ying Cao, one of the founders of the U.S. WeChat Users Alliance, states that the Telegram app "has about a dozen language choices, but does not include Chinese."  Decl. of Ying Cao ¶ 5, ECF No. 78-1.  He fails to

---

[9] *See* https://telegram.org/faq#q-how-do-i-create-a-group; https://telegram.org/blog/supergroups ("Admins . . . have the power to remove other members from the group"); https://www.facebook.com/help/messenger-app/207233286525869 (instructions to "remove someone from a group conversation in Messenger").

[10] https://smallbusiness.chron.com/delete-offensive-content-facebook-31737.html ("How to delete offensive content on Facebook").

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Reply in Support of their Motion to Stay Preliminary Injunction Pending Appeal

8

mention that Telegram offers a Chinese language pack.[11]  Moreover, while Mr. Cao states that other apps, like Line and Signal, do not have "in-app" translation, *id.* ¶¶ 6, 8, those apps are available in a Chinese interface and thus do not need an "in-app" translation feature for Chinese speakers.[12]  His critiques about the functioning of Line in Chinese appear to be based on an English version of the app translated by the operating system of his phone, not the Chinese interface version.  *Id.* ¶ 6.  And while Mr. Cao expresses "doubt that Chinese speaking users" could use Telegram, *id.* ¶ 5, others report that Telegram has a "newfound popularity" in China, where it has become "a refuge for people seeking information outside official channels."[13]

In any event, the First Amendment does not require the Government to ensure that Plaintiffs can communicate through a mobile platform with specific features.  It "requires only that [the Government] refrain from effectively denying [them] a reasonable opportunity to" use social media generally.  *City of Renton*, 475 U.S. at 54.  Nothing in the WeChat restrictions does so, and even crediting Plaintiffs' views about the relative functionalities of WeChat versus its competitors simply proves the point that alternatives exist.  The Government has not restricted all social media applications—not even close—and the Supreme Court never suggested in *City of Ladue* that courts reviewing alternatives must engage in the kind of subjective, granular comparison of available alternatives that Plaintiffs posit.  The Supreme Court and the Ninth Circuit have repeatedly refused to invalidate restrictions simply because alternatives were different, less preferable, or impracticable.  *See U.S. Postal Serv. v. Council of Greenburgh Civic Ass'n*, 453 U.S. 114, 124 (1981); *City of Renton*, 475 U.S. at 53-54; *G.K., Ltd. Travel v. City of Lake Oswego*,  436 F.3d 1064, 1075 (9th Cir. 2006).  Moreover, although Plaintiffs repeatedly assert that the ubiquitous alternatives currently lack the "network effects" of WeChat, they cite no reason those network effects cannot be changed.  The WeChat restrictions satisfy the final

---

[11] *See* https://t.me/setlanguage/zh-hans-beta

[12] *See* https://line.me/en/ (change language on homepage); https://signal.org/en/ (same).

[13] https://www.scmp.com/abacus/tech/article/3075804/how-telegram-became-refuge-wechat-users-during-coronavirus-outbreak

*U.S. WeChat Users Alliance, et al. v. Trump, et al*., Case No. 3:20-cv-05910-LB
Defendants' Reply in Support of their Motion to Stay Preliminary Injunction Pending Appeal

9

element of intermediate scrutiny, and for all of the above reasons, Defendants make a strong showing of likely success on the merits.[14]

## II.   The Remaining Factors Weigh Strongly in Favor of a Stay.

Plaintiffs also fail to detract from Defendants' showing that the equitable factors—which "merge" when the Government is a party, *Nken v. Holder*, 556 U.S. 418, 433-35 (2009)— strongly favor a stay of the preliminary injunction pending appeal.

### A.   The Government's National Security and Foreign Policy Interests Are Compelling

Plaintiffs do not dispute that the Government has a compelling interest in promoting U.S. national security and foreign policy.  *See* Opp. at 13-22.  Instead, they claim that the evidence relied on by the Government is "speculative" or otherwise insufficiently immediate to justify a stay.  *See id.* at 17-21.  This argument, however, finds no basis in fact, law, or logic.  Contrary to Plaintiffs' assertions, the record amply establishes that the PRC utilizes WeChat to surveil users. *See, e.g.*, Decision Mem. App. F, A.R. 1165-66.  And while Plaintiffs attempt to minimize the PRC's insidious operations as occurring solely within China, Opp. at 18, the record confirms that "anyone using WeChat, even if they have lived their whole lives outside China, is 'subject to pervasive content surveillance[.]'"  *Id.*, A.R. 1169; *see also id.*, A.R. 1167, 1173.

Supreme Court precedent also forecloses Plaintiffs' argument that the Government's actions can only be justified by "*actual* evidence" of WeChat sharing U.S. user data with the PRC.  *See* Opp. at 17 (emphasis in original).  In the context of national security and foreign policy, "[c]onclusions must often be based on informed judgment rather than concrete evidence, and that reality affects what [the Judiciary] may reasonably insist on from the Government." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34-35 (2010).  Nor should the Court take

---

[14] Plaintiffs cite another district court case in the District of Columbia involving the TikTok application to suggest that even if their First Amendment claim is not likely to succeed, they are likely to prevail on their statutory claims.  Opp. at 13.  The Government vigorously disagrees with the decision in *TikTok*, which in any event is not necessarily on all fours with the issues posed by WeChat.  The Court thus far has based its preliminary injunction solely on the First Amendment, and if the Court is inclined to consider a different basis, the Government respectfully requests an adequate opportunity (outside of a 15-page reply brief devoted to other issues and prior briefing on an unripe claim) to more fully address that issue.

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Reply in Support of their Motion to Stay Preliminary Injunction Pending Appeal

10

seriously Plaintiffs' suggestion that the Government must wait for widespread harm to materialize before taking action.  *See* Opp. at 18.  Again, as the Supreme Court has explained, "[t]he Government, when seeking to prevent imminent harms in the context of international affairs and national security, is not required to conclusively link all the pieces in the puzzle before [courts] grant weight to its empirical conclusions."  *Holder*, 561 U.S. at 35.

Plaintiffs compound their error by asserting that the Court may evaluate the "strength" of the Government's national security and foreign policy determinations and, if it disagrees with the Government's assessments, substitute its views for those of the Government.  *See* Opp. at 15-17.  "[W]hen it comes to collecting evidence and drawing inferences on questions of national security, the lack of competence on the part of the courts is marked."  *Trump v. Hawaii*, 138 S. Ct. at 2419 (quotation omitted); *see Boumediene v. Bush*, 553 U.S. 723, 797 (2008) (cautioning that "federal judges" do not "begin the day with briefings that may describe new and serious threats to our Nation and its people").  The same is true of foreign policy determinations.  *See, e.g.*, *OKKO Bus. PE v. Lew*, 133 F. Supp. 3d 17, 28 (D.D.C. 2015) ("Matters of strategy and tactics relating to the conduct of foreign policy 'are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" (quoting *Regan v. Wald*, 468 U.S. 222, 242 (1984)).[15]

The cases cited by Plaintiffs do not indicate otherwise.  For instance, in *Winter v. NRDC*, 555 U.S. 7, 27 (2008), cited in Opp. at 15, the Supreme Court criticized the lower courts for their "fail[ure] properly to defer to senior Navy officers' specific, predictive judgments[.]"  And in *Hawaii*, 138 S. Ct. at 2422, cited in Opp. at 15-16, the Supreme Court explained that "[w]hile we of course 'do not defer to the Government's *reading of the First Amendment*,' the Executive's evaluation of the underlying facts is entitled to appropriate weight, particularly in the context of . . . 'sensitive and weighty interests of national security and foreign affairs'" (emphasis added).  In *Al Haramain Islamic Foundation, Inc. v. U.S. Department of Treasury*, 686 F.3d 965 (9th Cir.

---

[15] Although the Ninth Circuit has indicated that courts can "review foreign policy arguments," it made that observation in the context of "clear precedent for judicial recognition of selective enforcement [immigration] claims," which are not at issue here.  *See Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1056 (9th Cir. 1995).

*U.S. WeChat Users Alliance, et al. v. Trump, et al*., Case No. 3:20-cv-05910-LB
Defendants' Reply in Support of their Motion to Stay Preliminary Injunction Pending Appeal

2012), cited in Opp. at 16, the Ninth Circuit "acknowledge[d] that the unclassified record evidence is not overwhelming, but . . . reiterate[d] that [its] review—in an area at the intersection of national security, foreign policy, and administrative law—is extremely deferential." *Id.* at 979.  And as to *New York Times Co. v. United States*, 328 F. Supp. 324, 330 (S.D.N.Y. 1971), Plaintiffs are correct that, almost 50 years ago, a district court held *in camera* proceedings to allow the parties to argue over the effect of publication of historical documents on U.S. national security.  *See* Opp. at 16-17.  But considering a newspaper's publication  of Government-created historical documents is quite unlike evaluating the threat posed by a foreign adversary's ability to surveil U.S. persons.  And IEEPA expressly permits the Government to submit classified information that the opposing party never sees.  5 U.S.C. § 1702(c).

Plaintiffs' remaining arguments are equally unavailing.  First, they contend that Defendants' "assertion of irreparable harm . . . , if taken to its logical conclusion, would extend to any company with Chinese ownership that had access to Americans' data[.]"  Opp. at 19.  But not every company with Chinese ownership has the global reach of WeChat and presents the same risks, particularly given Tencent's close ties to the PRC, including a Tencent "Party Committee" that "boast[s] nine general branches, 89 party branches and 3,386 members" as of 2017.  Decision Mem. at 7-8; *see also* Costello Decl. at 2; *ASPI, Mapping China's Technology Giants*, Issue Paper, Report No. 15 at 3 (April 2019), Ex. 14 to ECF No. 22.  And contrary to Plaintiffs' assertion, Opp. at 20, the Government is reasonably addressing the different threats posed by TikTok on a different timeline and through different means.

Second, Plaintiffs argue that the Government should have responded to the threat posed by WeChat by prohibiting more transactions related to Tencent, and on a faster schedule.  *See id.*  But such IEEPA-based decisions "are complex and involve significant political ramifications" not subject to second-guessing by Plaintiffs or the Court, *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 74 n.28 (D.D.C. 2002), and if anything, the Government's decision

*U.S. WeChat Users Alliance, et al. v. Trump, et al*., Case No. 3:20-cv-05910-LB
Defendants' Reply in Support of their Motion to Stay Preliminary Injunction Pending Appeal

12

demonstrates an appropriate tailoring to the problem at hand.[16]

Third, Plaintiffs dispute the Government's conclusion that the PRC's censorship of WeChat users poses a threat to U.S. national security and foreign policy. Opp. at 21. It should be self-evident, however, that curtailing a foreign adversary's control of what information U.S. persons receive promotes the national interest. And as the Secretary explained:

> The CCP is dictating how millions of WeChat users in the U.S. handle politically sensitive information through the suspension and closure of U.S. citizens' accounts. Users outside of China, including millions of U.S. users, who share controversial material may initially receive warnings about the content they are sharing. There are many examples of U.S. citizens who continued to send material deemed to be offensive or disloyal to the CCP, resulting in their accounts being suspended. In order to continue using WeChat, U.S. citizens are forced to self-censor the content they share or jeopardize losing their preferred communication platform with their contacts in China.

Decision Mem. at 14; *see also id.* at 10. Thus, far from engaging in "more censorship," Opp. at 21, the Government is seeking to address the PRC's pernicious stifling of speech occurring within the United States. Plaintiffs' willingness to tolerate the threat posed by the PRC's actions is not a basis to overturn the Government's determination.

Finally, Plaintiffs contend that no harm can befall the Government because the Court's injunction has "merely end[ed] an unlawful practice." *Id.* This argument lacks any force, as the Government has detailed the harms that the injunction has caused and will continue to cause, and because the Government's actions are consistent with the First Amendment and IEEPA.

### B. Any Harm to Plaintiffs Is Minimal

By contrast, a stay of the injunction pending appeal would not significantly or irreparably harm Plaintiffs. Their argument that they face a "ban" on their use of WeChat or an

---

[16] Plaintiffs also suggest that the Government regulate "the domestic data-broker industry" based on their "presum[ption]" that personal data is sold by the industry to "the Chinese government or its agents." Opp. at 20. Among the many problems with this assertion is that IEEPA is meant to deal with a threat that "has its source in whole or substantial part outside the United States." 50 U.S.C. § 1701(a). Looking for other arguments, Plaintiffs cite to the existence of a confidential data mitigation agreement involving a Chinese acquirer agreed to by the Committee on Foreign Investment in the United States, Opp. at 11, n. 6.; but an agreement in one case does not indicate that a mitigation agreement would be similarly effective to resolve national security concerns arising from a transaction involving WeChat.

*U.S. WeChat Users Alliance, et al. v. Trump, et al*., Case No. 3:20-cv-05910-LB
Defendants' Reply in Support of their Motion to Stay Preliminary Injunction Pending Appeal

infringement of their First Amendment rights, Opp. at 22-23, fails for the reasons previously described by Defendants, Mot. at 6-7 and *supra* at 1-9.

### C.    The Balance Tips Strongly in Favor of Defendants

Rather than engage with Defendants' arguments regarding the balance of the equities, Plaintiffs advance a strawman, claiming that "Defendants repeat their argument that such First Amendment rights can never outweigh any national security and foreign policy interests asserted by the Government[.]"  Opp. at 14.  But Defendants have never made such a sweeping assertion; and instead have argued that "[e]ven if Plaintiffs have established a serious question about their First Amendment claim—which they have not—that serious question does not outweigh the national security and foreign policy interests at stake."  Mot. at 7.

Plaintiffs similarly offer (at best) incomplete descriptions of the case law relied upon by Defendants, which also involved allegations of First Amendment harm.  For instance, Plaintiffs claim that "[t]he district court [in *Defense Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 696 (W.D. Tex. 2015)] denied plaintiffs' preliminary injunction motion entirely on balance of harms grounds[.]"  Opp. at 14.  But the district court in that case considered the plaintiffs' First Amendment challenge at length before concluding that they had "not shown a substantial likelihood of success on the merits" of that claim, *Def. Distributed*, 121 F. Supp. 3d at 691-96—the same conclusion the Court should draw here.  Likewise, Plaintiffs attempt to distinguish *Stagg P.C. v. U.S. Department of State*, 158 F. Supp. 3d 203, 209-10 (S.D.N.Y. 2016), because the court did not "reach a conclusion as to the likelihood of success on the First Amendment merits."  Opp. at 15.  Plaintiffs fail to mention, however, that the court found the balance of equities favored the Government "[e]ven assuming for the purposes of this motion that Stagg P.C. has shown a substantial likelihood of success on the merits of its First and Fifth Amendment and APA claims[.]"  *Stagg P.C.*, 158 F. Supp. 3d at 210.

Try as they might, *see* Opp. at 14 n.9, Plaintiffs cannot dispute that the Court can issue a preliminary injunction on the basis of a serious question only if it also finds that "'the balance of hardships tips *sharply* in the plaintiff's favor' and the other two factors are satisfied."  *Ramos v. Wolf*, No. 18-16981, 2020 WL 5509753, at *10 (9th Cir. Sept. 14, 2020) (citation omitted).  If

*U.S. WeChat Users Alliance, et al. v. Trump, et al*., Case No. 3:20-cv-05910-LB
Defendants' Reply in Support of their Motion to Stay Preliminary Injunction Pending Appeal

14

Plaintiffs are correct that the Court did not make the requisite finding due to "the Court's drafting of a rush order," Opp. at 14, Defendants respectfully request that the Court amend its opinion and explain its finding to aid appellate review.

### III.   Alternatively, The Court Should Stay at Least Part of Its Preliminary Injunction.

At a minimum, the Court should stay or modify the injunction insofar as it relates to Paragraph 1 of the Identification of the Prohibited Transactions, which prevents the download and update of WeChat from an online application store.  *See* Mot. at 16-18; Decision Mem. at 15.  This would effectively preserve the status quo while preventing the PRC from expanding the pool of Americans it can surveil and target through WeChat.  Plaintiffs, who are all existing WeChat users, would retain access to the app and could communicate with existing users.

Plaintiffs speculate that Prohibition 1 will "block[] tens or hundreds of thousands of new users" and that particular Plaintiffs may not be able to reach additional audiences.  *Id*.  But they have submitted no evidence about the extent, if any, to which they communicate with such new WeChat users, or that these theoretical new users are unreachable on other platforms.[17]  Plaintiffs also suggest in a single sentence that "prohibiting updates" might decrease their data security or expose them to a data breach.  *See* Opp. at 25.  But the U.S. interests at stake derive from the PRC's authorized access to the data; there is no reason to believe that prompt application updates will address that problem.  Nor have Plaintiffs submitted evidence that access to updates is otherwise essential to their use of WeChat during the duration of this case.

### CONCLUSION

The Court should grant Defendants' motion.[18]

---

[17] This seems at odds with Plaintiffs' conjecture that "the vast majority of Chinese-speaking people are on WeChat and not any other apps."  *See, e.g*., Decl. of Fangyi Duan ¶ 7.

[18] Plaintiffs suggest that Defendants have "withheld" some of the appendices to the Decision Memorandum, "including Tencent's mitigation proposal."  Opp. at 5.  This is incorrect. Defendants offered to provide the mitigation proposal to Plaintiffs' counsel  on condition of Tencent's consent, and then provided it on September 30.  *See* Ex. A (emails among counsel); ECF No. 77.  As to Plaintiffs' request for a proffer regarding the classified assessment, Opp. at 6, Defendants responded on October 2, explaining that the Secretary's 16-page decision memorandum is itself an unclassified explanation.  *See* Ex. B.

*U.S. WeChat Users Alliance, et al. v. Trump, et al*., Case No. 3:20-cv-05910-LB
Defendants' Reply in Support of their Motion to Stay Preliminary Injunction Pending Appeal

15

Dated: October 6, 2020                     Respectfully submitted,

                                           JEFFREY BOSSERT CLARK
                                           Acting Assistant Attorney General

                                           JOHN V. COGHLAN
                                           Deputy Assistant Attorney General

                                           ALEXANDER K. HAAS
                                           Branch Director

                                           DIANE KELLEHER
                                           Assistant Branch Director

                                           */s/  Serena M. Orloff*
                                           SERENA M. ORLOFF
                                           MICHAEL DREZNER
                                           STUART J. ROBINSON
                                           Trial Attorneys
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           Ben Franklin Station, P.O. Box No. 883
                                           Washington, DC 20044
                                           Phone: (202) 305-0167
                                           Fax: (202) 616-8470
                                           E-mail: serena.m.orloff@usdoj.gov

                                           *Counsel for Defendants*

*U.S. WeChat Users Alliance, et al. v. Trump, et al*., Case No. 3:20-cv-05910-LB
Defendants' Reply in Support of their Motion to Stay Preliminary Injunction Pending Appeal

16