MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
VAN SWEARINGEN – 259809
BENJAMIN BIEN-KAHN – 267933
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
Email: mbien@rbgg.com
egalvan@rbgg.com
vswearingen@rbgg.com
bbien-kahn@rbgg.com
agourse@rbgg.com
axu@rbgg.com

KELIANG (CLAY) ZHU – 305509
DEHENG LAW OFFICES PC
7901 Stoneridge Drive #208
Pleasanton, California 94588
Telephone: (925) 399-5856
Facsimile: (925) 397-1976
Email: czhu@dehengsv.com

ANGUS F. NI – Admitted *Pro Hac Vice*
AFN LAW PLLC
502 Second Avenue, Suite 1400
Seattle, Washington 98104
Telephone: (773) 543-3223
Email: angus@afnlegal.com

THOMAS R. BURKE – 141930
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California 94111-6533
Telephone: (415) 276-6500
Facsimile: (415) 276-6599
Email: thomasburke@dwt.com

DAVID M. GOSSETT – Admitted *Pro Hac Vice*
DAVIS WRIGHT TREMAINE LLP
1301 K Street N.W., Suite 500 East
Washington, D.C. 20005-3366
Telephone: (202) 973-4216
Facsimile: (202) 973-4499
Email: davidgossett@dwt.com

JOHN M. BROWNING – *Pro Hac Vice*
  forthcoming
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020-1104
Telephone: (212) 603-6410
Facsimile: (212) 483-8340
Email: jackbrowning@dwt.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| U.S. WECHAT USERS ALLIANCE, CHIHUO INC., BRENT COULTER, FANGYI DUAN, JINNENG BAO, ELAINE PENG, and XIAO ZHANG,<br><br>  Plaintiffs,<br><br>  v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, and WILBUR ROSS, in his official capacity as Secretary of Commerce,<br><br>  Defendants. | Case No. 3:20-cv-05910-LB<br><br>**DECLARATION OF ADAM ROACH**<br><br>Date: October 15, 2020<br>Time: 9:30 a.m.<br>Crtrm.: Remote<br>Judge: Hon. Laurel Beeler |

DECLARATION OF ADAM ROACH

I, Adam Roach, declare:

1. I am an expert in Internet communication technologies with 25 years of experience in networking technology. I have personal knowledge of the matters stated herein and if called as a witness I would and could testify competently to them. I have worked in the Internet Engineering Task Force (IETF) – the international standards body that develops technical specifications for the Internet – for the past 23 years. During that time, I have focused on the area of Real Time Communications, which includes technologies such as instant messaging and voice and video communications. Over the same period, I have worked at several companies to design and implement both the client and network portions of large-scale Internet-based applications that employ these technologies while accounting for key factors such as privacy and security. Most recently, I worked for the past eight years at the Mozilla Corporation on the Firefox Browser, which is actively used by hundreds of millions of users on the Internet every day. I have attached as Exhibit A a true and complete copy of my curriculum vitae to this declaration.

2. In the course of my work on these technologies, I have been issued 18 related patents, and published 20 IETF specifications defining the behavior of real-time communications on the Internet. I served for three years on the technical leadership body of the IETF, the Internet Engineering Steering Group (IESG). My duties in this position included the review of approximately 1,000 pages of technical specifications each month, which required developing expertise across a broad spectrum of Internet technologies, including routing, transport, security, and operations.

3. I am providing the following testimony for the plaintiffs in this case. The following testimony is my analysis of the prohibited transactions identified in the Department of Commerce's Identification of Prohibited Transactions to Implement Executive Order 13943 and Address the Threat Posed by WeChat and

[3627694.1]

the National Emergency with Respect to the Information and Communications Technology and Services Supply Chain, published on September 17, 2020.

4. The first class of prohibited transactions bars entities subject to the jurisdiction of the United States from allowing the distribution or maintenance of the WeChat application through downloads from Apple and Google. Given that the combination of Android and iOS effectively constitute 100% of the global smartphone market[1], and that their application distribution occurs primarily through stores run by US-based Google and Apple, respectively, this action effectively prevents existing users from receiving updates of already-installed versions of WeChat and also prohibits new users from downloading the WeChat app. According to the analytics firm Apptopia, WeChat has approximately 19 million daily active users in the United States, implying at least that many currently installed versions of the WeChat app.

5. With modern Internet-based applications, application updates serve a number of purposes, such as deploying new features and fixing bugs. One critical role that these updates play is patching security vulnerabilities in software applications. It is common practice for security researchers all over the globe to analyze popular applications for the purpose of finding security vulnerabilities and working with vendors to fix them. The established industry process for this practice is known by the term of art "Responsible Disclosure." The core tenets of Responsible Disclosure are that (1) a vulnerability, once discovered, is shared confidentially with the software developer as soon as practically possible, and (2) once disclosed to the developer, a future date is selected, after which the details of the vulnerability are made available to the general public. These public disclosure dates typically range from 90 to 180 days after the software developer is informed,

---

[1] See https://www.statista.com/statistics/272307/market-share-forecast-for-smartphone-operating-systems/

1  and are designed to give the software developer sufficient time to develop and
2  deploy a fix for the discovered vulnerability. The public disclosures are generally
3  detailed enough that reasonably experienced practitioners skilled in the art of
4  software development can create malware to exploit the security vulnerabilities.

5      6.    Users who have applications installed with publicly disclosed security
6  vulnerabilities are subject to a variety of attacks from malicious actors on the
7  Internet. These attacks may allow for a broad variety of malicious behavior,
8  including but certainly not limited to identity theft, password exfiltration,
9  performing financial transactions on the users' behalf, encrypting users' data and
10 charging a ransom to restore it, stealing private information from users' phones, and
11 persistently monitoring users' location, microphone, camera, and screen contents.

12     7.    Taken together, these facts point to the net result of the first class of
13 prohibited transactions exposing approximately 19 million United States citizens to
14 potentially devastating results: by preventing Tencent from updating the already-
15 installed WeChat software when security researchers identify vulnerabilities, the
16 prohibition ensures that these current users become vulnerable to such attacks as
17 soon as vulnerability information becomes public.

18     8.    The second and third classes of prohibited transactions are directed at
19 internet hosting services and content delivery services, to the extent they are
20 "enabling the functioning or optimization" of WeChat in the United States. These
21 prohibitions will likely make WeChat less functional, slower, and less responsive to
22 users in the United States, but do not limit the availability of WeChat's users'
23 information to Tencent or the government of the People's Republic of China, and
24 instead only serve to eliminate US visibility into Tencent's behavior. Key WeChat
25 functions, such as voice and video calls, may be severely limited. These prohibitions
26 will force all WeChat servers to operate outside of US jurisdiction, and the US
27 government completely loses all ability to monitor WeChat's operations to
28 determine whether collection of private user data is occurring. Consequently, the net

effect of these classes of prohibited transactions will be to exacerbate, rather than address, the data security concerns expressed in the preface of the Executive Order.

9. The fourth class of prohibited transaction indicates that no provision of transit or peering services may occur that enables or optimizes WeChat. This prohibition represents an unprecedented and overbroad interference of the operation of the global internet by the U.S. government, as it fundamentally misconstrues the nature of Internet routing, peering, and transit. In general, providers of Internet-based applications, such as WeChat, contract with Internet Service Providers (ISP) to connect them to the global Internet. These ISPs then connect to what are colloquially known as "Internet Backbone Providers", who are responsible with forming peering arrangements for global routing of traffic. Notably, these peering arrangements are made on behalf of all of the customers of the backbone providers, including their customers' customers.

10. In China, the Backbone Providers consist primarily of China Unicom and China Telecom[2]. To implement this prohibition to its full extent, it prevents US backbone providers from peering with these two companies altogether, effectively ending all direct Internet traffic between the United States and China. Technically, Tencent or WeChat may choose peering with other backbone providers (e.g., those in Europe) and transitively using their networks to route traffic to and from China. However, such a maneuver can be considered as "evading or avoiding" the prohibition, which is not permitted according to Section 2(a) of the Executive Order. Therefore, a reasonable interpretation would be that WeChat will be shut down under this prohibition.

11. The fifth class of prohibition in the proposed order may limit the financial information exposed to WeChat but does not address the concerns specifically expressed in the Executive Order, such as the collection of the contents

---

[2] https://www.sciencedirect.com/science/article/pii/S1877050918305738

of users' messages.

12. The sixth class of prohibition, as written, is over-reaching. Modern software, with extremely rare exception, is created by using existing software components – known as "libraries" – as part of the application's constituent code and functions. If put into effect as proposed, this prohibition will disallow the use of these libraries for software developed in the United States. The scope of the damage to the US software industry would be difficult to quantify; but it is my educated estimate that it would be sufficient to cause substantial portions of the US software development industry to move their development operations off shore.

13. Taking the prohibitions as a whole, it is highly likely that WeChat will suffer serious degradation of services and effectively be shut down as soon as they are fully implemented.[3] Moreover, the broad scope of these prohibitions and the Executive Order will create a chilling effect, forcing companies in the U.S. to ban or block WeChat on their computers and Wi-Fi networks. In summary, of the six prohibited transactions, none of the feasible prohibitions limit WeChat's ability to collect information about users (other than the fifth class, which may limit exposure of users' financial information). This means that these prohibitions do not address the U.S. government's concern for WeChat's data security concern. Instead, they are aimed at shutting down the WeChat service for U.S. users.

//
//
//
//

---

[3] *See* Attachment B, a true and correct copy of a September 18, 2020 CNBC article by Eamon Javers and Kevin Stankiewicz titled "TikTok deal still has a chance but WeChat 'dead' in the U.S., says senior administration official, *available at:* " https://www.cnbc.com/2020/09/18/tiktok-deal-still-has-a-chance-but-wechat-dead-in-the-us-says-senior-administration-official.html (quoting "a senior Trump administration official" stating that the Commerce Department's announcement of a ban on transactions means that WeChat is "dead in the United States."

1  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, and that this declaration is executed at Dallas, Texas this 7th day of October, 2020.

*[signature]*
Adam Roach

# EXHIBIT A

# Adam Roach

## Summary

Network engineer with 25 years' experience architecting, designing, and implementing highly available, performant, and scalable systems. I've been involved in foundational work in real-time voice, video, instant messaging, and presence technologies, and have eight years of experience working on webtech. Looking for a position to help solve your hard problems and explore your new opportunities.

## Experience

**Technical Advisor**, Caffeine                                                          September 2016 – Present

- Provide periodic WebRTC and general network engineering input for the team at Caffeine.

**Principal Engineer**, Mozilla Corporation                                    November 2012 – August 2020

- Part of the small initial team that designed, implemented, and tested Firefox's WebRTC implementation, including working heavily in the IETF and W3C to develop the specifications that allow web browsers to provide interoperable WebRTC implementations.
- Feature architect for the WebRTC-based Firefox Hello feature, including both network and software architecture. Interfaced extensively with Tokbox/Telefonica, who partnered with Mozilla to operate part of the network infrastructure. This feature allowed Mozilla to collect critical data about the quality of its underlying WebRTC implementation, while offering users a free browser-based calling service before other companies had filled that niche.
- Represented Mozilla in the W3C for the Web Payments specification, including spending time authoring the PaymentHander specification. This work was strategically important for ensuring that the standardized APIs for making payments on the web leave room for newcomers, rather than being locked to the currently incumbent payment processors.
- Performed various smaller tasks to improve Firefox. Examples include an architectural audit of several Firefox features; research into Firefox's IPC performance, resulting in an ~80% improvement in latency for the top percentile of IPC message transmission; and finalizing an implementation of a feature that automatically fills out credit card forms in Firefox.

**Area Director, Applications and Realtime**, IETF             March 2017 – March 2020

Mozilla sponsored me for a three-year term serving on the managing body for the Internet Engineering Task Force (IETF), known as the Internet Engineering Steering Group (IESG). Members of the IESG are responsible for specific technology areas within the IETF and serve as Area Directors for those areas.

- Responsible for the top-level management of 14 working groups, most of which were developing standards for real-time technologies. Given the volunteer nature of working group chairs and their authors, this task required skills for significant soft influence.
- Responsible for shepherding a significant portion of the 75 inter-related documents that form the WebRTC specification and its prerequisites through the final steps of their processing.
- As a member of the IESG, responsible for ensuring that the documents published by the IETF during my term were fit for purpose and would not cause harm to the proper functioning of the Internet. This required reading on the order of 500 pages of technical specification every two weeks and providing detailed feedback on their contents. In addition to improving the output of the IETF, this exercised the ability to learn about new technology areas very quickly.
- As part of the IESG, I was also jointly responsible for making decisions about the tri-annual in-person IETF meetings, and the general running of the IETF.

**Principal Engineer, Office of the CTO**, Tekelec             January 2008 – November 2012

- Served as a member of CTO team to provide strategic input to corporate product direction, including customer interaction to gather requirements and prototyping of potential solutions.
- Designed the network architecture and software architecture for Telekec's IP Front-End (IPFE) product and implemented a prototype solution that provided the basis for the product. The IPFE is the high-availability, load-balancing, and overload-handling solution used for Tekelec's (now Oracle's) Diameter server products.
- Provided support for the Sales Engineering team and interfaced directly with customers for the Diameter and SIP products in Tekelec's portfolio.

**Core Contributor**, ReSIProcate Opensource Project             October 2003 – August 2014

The ReSIProcate project was started as a commercial-grade SIP library intended to prove out protocol elements while they were under standardization in the IETF. It eventually grew to encompass other related protocols, such as MSRP (instant messaging) and ICE (media NAT traversal).

- As a member of the core project team, participated in project governance.
- Contributed design and code to the core SIP and MSRP components, and was one of the key designers of the SIP proxy implementation.
- Served as liaison to upstream patches from Firefox to the ReSIProcate ICE implementation (nICEr).

**CTO and Partner**, Estacado Systems                               July 2004 – January 2008

- One of the managing partners who grew Estacado Systems, a bootstrapped startup company working in the real-time communications equipment, from four people to a team of 21, and executed a successful exit by selling the company to Tekelec. In addition to LLC governance, I was responsible for contract review and significant portions of customer contact.
- Worked with the engineering team to design an architecture for a SIP presence and SIP proxy system based on the ReSIProcate codebase.
- Designed and prototyped a system for interoperating SIP/IMS networks directly with the cellular eNodeB "Interoperability Specification" (IOS) interface, suitable for embedding in cellular femtocells. This system allowed the deployment of high-density cellular access over standard IP networks.
- Designed, implemented, tested, and supported the OpenSigComp library, an open-source implementation of RFC 3320 "Signaling Compression" used by IMS networks to reduce signaling message size on radio links. This was one of Estacado System's licensed products that provided revenue for subsequent product development.
- Designed and implemented a high-volume component for a call center quality monitoring system to expand it from working with circuit-switched PBXes to a variety of packet-switched VoIP systems, including those from Cisco, Alcatel, and Nortel. This involved both reverse engineering the signaling protocols as well as integrating with an existing call monitoring system.

**Principal Engineer**, dynamicsoft                                February 2002 – July 2004

- Designed the network architecture and prototype for a push-to-talk system that operated over the 1xRTT CDMA network for a major US wireless carrier.
- Designed, implemented, and tested a SigComp component for integration into dynamicsoft's product line. This implementation significantly informed the IETF's specification of the SigComp standard.
- Conceptualized, designed, and implemented a component, internally called "LiveBus," that allows for cluster state management, failure detection, and state replication among a set of IM and Presence servers. This remains a key component of Cisco's Presence and IM service offering.
- Performed an architectural review of dynamicsoft's Presence Engine and re-worked presence document handing from opaque static documents to a semantic model that could have per-subscriber policy applied. Brought the Presence Engine to multiple SIP Interoperability Test (SIPit) events, serving to improve both the product and the protocol specifications under development in the IETF.

**Senior Engineer**, Ericsson, Inc.                                December 1994 – February 2002

- Software architect for Ericsson's CSCF (Call Session Control Function) set of 3GPP/IMS servers, including a design for scaling and state replication.
- Member of a cross-organizational council to design the network architecture of Ericsson's "Next Generation Network," which strongly informed the standardized 3GPP IMS network.
- Part of a small team of SIP technology researchers inside Ericsson who worked on various SIP-related projects, including the development of a SIP stack, mobile VoIP client, SIP infrastructure, and interworking between SIP and various legacy protocols, including ISUP.

# Organizations

Internet Engineering Task Force (IETF)                                    1998 - Present

In addition to the IESG role described above, I have been active in the IETF for over 22 years, predominantly in real-time communications, instant messaging, and presence.

- Chaired the XCON, SIPCORE, and NETVC working groups, responsible for centralized conferencing, the SIP core protocol, and video codec technology, respectively.
- Active author on documents in over 13 working groups, including DIME, MARTINI, MMUSIC, PERC, ROHC, RTCWEB, SIGCOMP, SIMPLE, SIP, SIPCORE, SIPPING, XCON, and XMPP.
- Member of the RFC Series Oversight Committee (RSOC), which is the governance structure for the entity that publishes RFCs.

World Wide Web Consortium (W3C)                                            2012 - 2017

- One of Mozilla's representatives to, and actively involved in, the WebRTC working group, which defined the web browser APIs for sending and receiving voice, video, and real-time data over the network.
- One of Mozilla's representatives to, and an author in, the Web Payments working group, which developed APIs to enable semantic collection of payment information in web browsers (e.g., the mobile experience of Apple Pay and Google Pay.)

Third Generation Partnership Project (3GPP)                                2000 - 2001

- One of Ericsson's representatives to the CN1 and SA2 working groups, which designed requirements and implementation specifications for the 3GPP IMS network (which forms the basis for all commercial telecom VoIP systems today). In particular, I was the author of the contribution S2-000751, which formed the basis for the overall network architecture that forms the IMS core.

# Patents and Publications

## US Patents

| | |
|---|---|
| US 9,584,959 | Systems, methods, and computer readable media for location-sensitive called-party number translation in a telecommunications network |
| US 9,319,431 | Methods, systems, and computer readable media for providing sedation service in a telecommunications network |
| US 9,001,664 | Methods, systems, and computer readable media for providing sedation service in a telecommunications network |
| US 8,893,248 | Methods, systems, and computer readable media for media session policy compliance auditing and enforcement using a media relay and session initiation protocol (SIP) signaling |
| US 8,661,077 | Methods, systems and computer readable media for providing a failover measure using watcher information (WINFO) architecture |
| US 8,645,565 | Methods, systems, and computer readable media for throttling traffic to an internet protocol (IP) network server using alias hostname identifiers assigned to the IP network server with a domain name system (DNS) |
| US 8,499,082 | Methods, systems, and computer readable media for providing services in a telecommunications network using interoperability specification/session initiation protocol (IOS/SIP) adapter |
| US 8,499,035 | Methods, systems and computer readable media for providing session initiation protocol (SIP) event watcher entity information in a communications network |
| US 8,321,592 | Methods, systems, and computer readable media for generating and using statelessly reversible representations of session initiation protocol (SIP) information by SIP cluster entities |
| US 8,090,850 | Methods, systems, and computer readable media for regulating network address translator (NAT) and firewall pinhole preservation traffic in a session initiation protocol (SIP) network |
| US 8,046,626 | System and method for maintaining resiliency of subscriptions to an event server |
| US 7,760,639 | System and method for handling network overload |
| US 7,756,034 | System and method for handling network overload |
| US 7,607,138 | System and method for optimizing inter-domain event services |
| US 7,123,707 | Methods of controlling communications with at least two calling party devices by a user of a called party device |
| US 7,028,311 | Communications node architecture and method for providing control functions in a telecommunications network |
| US 6,343,292 | System and method for providing text descriptions to electronic databases |

## IETF Specifications

| | |
|---|---|
| RFC 3265 | Session Initiation Protocol (SIP)-Specific Event Notification |
| RFC 3266 | Support for IPv6 in Session Description Protocol (SDP) |

| | |
|---|---|
| RFC 3398 | Integrated Services Digital Network (ISDN) User Part (ISUP) to Session Initiation Protocol (SIP) Mapping |
| RFC 3485 | The Session Initiation Protocol (SIP) and Session Description Protocol (SDP) Static Dictionary for Signaling Compression (SigComp) |
| RFC 3578 | Mapping of Integrated Services Digital Network (ISDN) User Part (ISUP) Overlap Signalling to the Session Initiation Protocol (SIP) |
| RFC 4077 | A Negative Acknowledgement Mechanism for Signaling Compression |
| RFC 4662 | A Session Initiation Protocol (SIP) Event Notification Extension for Resource Lists |
| RFC 4896 | Signaling Compression (SigComp) Corrections and Clarifications |
| RFC 4976 | Relay Extensions for the Message Sessions Relay Protocol (MSRP) |
| RFC 5363 | Framework and Security Considerations for Session Initiation Protocol (SIP) URI-List Services |
| RFC 5367 | Subscriptions to Request-Contained Resource Lists in the Session Initiation Protocol (SIP) |
| RFC 5989 | A SIP Event Package for Subscribing to Changes to an HTTP Resource |
| RFC 6140 | Registration for Multiple Phone Numbers in the Session Initiation Protocol (SIP) |
| RFC 6544 | TCP Candidates with Interactive Connectivity Establishment (ICE) |
| RFC 6665 | SIP-Specific Event Notification |
| RFC 6873 | Format for the Session Initiation Protocol (SIP) Common Log Format (CLF) |
| RFC 6878 | IANA Registry for the Session Initiation Protocol (SIP) "Priority" Header Field |
| RFC 7621 | A Clarification on the Use of Globally Routable User Agent URIs (GRUUs) in the SIP Event Notification Framework |
| RFC 7647 | Clarifications for the Use of REFER with RFC 6665 |
| RFC 7742 | WebRTC Video Processing and Codec Requirements |
| RFC 8723 | Double Encryption Procedures for the Secure Real-Time Transport Protocol (SRTP) |

W3C Specification

https://www.w3.org/TR/payment-handler/
    Payment Handler API

# Education

| | |
|---|---|
| **Bachelor of Science, Computer Engineering**, Texas A&M University | 1990 – 1994 |

# EXHIBIT B




POLITICS

# TikTok deal still has a chance but WeChat 'dead' in the U.S., says senior administration official

PUBLISHED FRI, SEP 18 2020·12:38 PM EDT    UPDATED FRI, SEP 18 2020·2:54 PM EDT

**Eamon Javers**
@EAMONJAVERS

**Kevin Stankiewicz**
@KEVIN_STANK

SHARE

## KEY POINTS

There is still a chance for a deal that would allow TikTok to remain operating in the U.S., a senior Trump administration official told CNBC.

However, the official said WeChat, the social messaging app owned by Chinese tech giant Tencent, is "dead in the United States."

The developments come after the Commerce Department announced it was banning U.S. business transactions involving the TikTok and WeChat as of Sunday.




INVEST LIKE A PRO
START FREE TRIAL     



WeChat is dead in the United States, senior Trump administration official tells CNBC

Despite a Commerce Department announcement of a ban on transactions, a deal that would allow TikTok to remain operating in the U.S. could still happen, a senior Trump administration official told CNBC on Friday.



However, the official said WeChat, the social messaging app owned by Chinese tech giant Tencent, is "dead in the United States."

Earlier Friday, the Commerce Department announced it was banning U.S. business transactions involving the TikTok and WeChat. Beginning Sunday, American companies will no longer be able to distribute WeChat and TikTok, taking away their availability in U.S. app store libraries.

WeChat will be able to continue operating for people who have it installed on their devices, according to department officials who spoke with reporters on the condition of anonymity. But issues may arise because WeChat uses services run by U.S. firms to deliver data in the app.

More stringent restrictions on TikTok, which is owned by Beijing-based ByteDance, in the U.S. are set to go into effect Nov. 12, based on the Commerce moves Friday. The actions are the latest developments in weeks of uncertainty stemming from President Donald Trump's claims that the Chinese-owned apps present national security risks to American users.

It is still possible a deal involving Oracle and Walmart to take stakes in TikTok can happen. Oracle said earlier in the week it had a deal in place with TikTok, but Trump said days later he was not



INVEST LIKE A PRO

START FREE TRIAL





There is no appetite in the Trump administration for a separate deal involving WeChat, which is a vital app for people in the U.S. to communicate with friends and family in China.

In a statement Friday, a Tencent spokesperson said it "has always incorporated the highest standards of user privacy and data security" and called the Commerce Department's restrictions "unfortunate."

"But given our desire to provide ongoing services to our users in the U.S. — for whom WeChat is an important communication tool — we will continue to discuss with the government and other stakeholders in the U.S. ways to achieve a long-term solution," the spokesperson said.

—*CNBC's Steve Kovach contributed to this article.*

INVEST LIKE A PRO

START FREE TRIAL

