Pages 1 - 48

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Laurel Beeler, Magistrate Judge

```
U.S. WECHAT USERS ALLIANCE,et   )
al.,                            )
                                )
          Plaintiffs,           )
                                )
   VS.                          )        NO. C 20-05910 LB
                                )
DONALD TRUMP, et al.,           )
                                )
          Defendants.           )
_____ )
```

San Francisco, California
Thursday, October 15, 2020

**TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**

**APPEARANCES**:  (via Zoom)

For Plaintiffs:

ROSEN, BIEN, GALVAN & GRUNFELD LLP
101 Mission Street - 6th Floor
San Francisco, California  94105
**BY:  MICHAEL W. BIEN, ATTORNEY AT LAW**
      **VAN SWEARINGEN, ATTORNEY AT LAW**

DEHENG LAW OFFICES PC
7901 Stoneridge Drive - Suite 208
Pleasanton, California  94588
**BY:  KELIANG (CLAY) ZHU, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

Reported By:        Marla F. Knox, RPR, CRR, RMR
                    United States Official Court Reporter

```
 1   APPEARANCES:   (CONT'D)

 2
     For Plaintiffs:
 3                            DAVIS WRIGHT TREMAINE LLP
                              1301 K Street NW - Suite 500 East
 4                            Washington, D.C. 20005
                       BY:   DAVID M. GOSSETT, ATTORNEY AT LAW
 5

 6                            DAVIS WRIGHT TREMAINE LLP
                              505 Montgomery Street - Suite 800
 7                            San Francisco, California  94111
                       BY:   THOMAS R. BURKE, ATTORNEY AT LAW
 8
     For Defendants:
 9                            U.S. DEPARTMENT OF JUSTICE
                              Civil Division, Federal Programs Branch
10                            1100 L Street NW - Room 12512
                              Washington, D.C.  20005
11                     BY:   SERENA M. ORLOFF, ATTORNEY AT LAW

12                            450 Golden Gate Avenue - Room 7-5354
                              San Francisco, California  94102
13                     BY:   STUART J. ROBINSON, ATTORNEY AT LAW

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **Thursday - October 15, 2020**                    **10:12 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---oOo---** |
| 4 | **THE CLERK:**  Calling civil action 20-5910, U.S. WeChat |
| 5 | Users Alliance, et al. |
| 6 | Counsel, if you can please state your appearances for the |
| 7 | record. |
| 8 | **MR. BIEN:**  Good morning, Your Honor, Michael Bien of |
| 9 | Rosen, Bien, Galvan & Rumfeld along with Van Swearingen for the |
| 10 | Plaintiffs. |
| 11 | I also have my co-counsel Clay Zhu from the DeHeng Law |
| 12 | Offices and Thomas Burke and David Gossett from Davis Wright |
| 13 | Tremaine. |
| 14 | **THE COURT:**  All right.  Good morning. |
| 15 | **MS. ORLOFF:**  And good morning, Your Honor -- or |
| 16 | afternoon from here on the East Coast -- Serena Orloff from the |
| 17 | Department of Justice Civil Division on behalf of Defendants. |
| 18 | And I'm joined today by my colleague Stuart Robinson. |
| 19 | **THE COURT:**  I do not see -- do I see Mr. Robinson?  I |
| 20 | do not.  Elaine, is he in the audience? |
| 21 | **THE CLERK:**  I'm checking right now.  Give me one |
| 22 | second. |
| 23 | **MR. ROBINSON:**  Good morning, Your Honor, I'm here, |
| 24 | Your Honor. |
| 25 | **THE COURT:**  Oh, there you are.  Sorry.  Thanks.  I |

1    don't know why I didn't see you but now I do.  All right.

2         Thanks, everybody, for being available and for your papers

3    which were quite good.

4         One, the only information I have is the information that

5    everybody has.  I don't know what is going on with the

6    classified stuff from D.C.

7         But, just so you know, I just have what I have.  I did

8    re-up my security clearance and did the fingerprints and did

9    everything that you are supposed to do, and I just haven't

10   heard anything.

11        So I think we are all operating on the same page with the

12   data that we have.  And while I really appreciate -- like, I

13   looked -- you know, I gave for this case.  I -- that's a little

14   bit of a joke -- but, you know, I really -- as I told you at

15   our last hearing, the thing I try most is to really understand

16   the facts that people put forward; to do a fair job of

17   reporting them.

18        So if someone disagrees with me, the record is clear on

19   that point.  And I definitely did that.  I did -- I'm just

20   looking at my notes.  Just give me a second.  I want to make

21   sure I have the right notes here.

22                    (Pause in proceedings.)

23        **THE COURT:**  I want to say I -- my little joke about

24   the order is I omitted a word and added an extra word in there.

25   The word I omitted -- but I certainly understand the legal

1    standard.  I did not apply the wrong legal standard even if I

2    did omit the magic word under the Ninth Circuit's sliding scale

3    test of the balance tipping sharply in the Plaintiff's favor.

4         So I'm aware of that.

5         I do not think that the Government's facts -- I understand

6    the Government's arguments on the First Amendment issues.  I

7    don't have any objection to considering the extra evidence that

8    the Government has put in.

9         The Government is quite right that it was a changing

10   landscape; that we literally had two full orders written in the

11   week that preceded our hearing.  And then the landscape changed

12   on that Friday.  And between that Friday and the next night --

13   even though there were ECF issues that precluded our filing the

14   order, I -- you know, I considered what information you gave

15   me.  And there was only so much you could.

16        And that's fine.  And I considered the additional

17   information, of course, that you provided.  And I don't think

18   it changes the outcome.

19        You know, one, I already traveled the territory about, you

20   know -- just the First Amendment analysis.  I think that even

21   assuming intermediate scrutiny, which I'm pretty much assuming

22   even though I wrote both parts of the First Amendment analysis,

23   I think that the Government's additional evidence doesn't

24   change the Court's conclusion.

25        I think that there was evidence in the first round that

1    was about the risk that China posed generally and not much

2    about the risk that WeChat posed specifically, it remains.

3        I think that there is more information that you put in on

4    that point.  I don't think it changes the Court's analysis.  I

5    think the record that the Secretary considered actually

6    supports the Court's First Amendment analysis under the

7    intermediate scrutiny standard even more because of the

8    accommodations that Tencent offered.

9        So I don't think the analysis has changed.  And under the

10   stay standard, the -- I am not inclined to grant it.  It is the

11   Government's motion, however.  So I'm interested in hearing

12   whatever else you want to tell me.

13       I'm just going to grab my notes, and we will -- I just

14   wanted to highlight what my thoughts were so, okay.  So,

15   Ms. Orloff.

16       **MS. ORLOFF:**  Thank you, Your Honor; and we certainly

17   appreciate Your Honor's preliminary thoughts.

18       I would like to just begin to get a housekeeping matter

19   out of the way.  I wanted to address the fact that last

20   Thursday after we had filed our reply on our motion to stay,

21   the Plaintiffs filed an additional declaration.  It was a

22   declaration of a man named Adam Roach with some opinion

23   regarding how the six prohibitions would function and offering

24   some sort of technical knowledge and opinions on that.

25       Your Honor, since those submissions were filed after our

1   reply, we thought they were a violation of local Rule 7-3(d).

2       And we would -- we would like to respond to them so that

3   the record is clear.  And so I think if the Court is inclined

4   to consider Mr. Roach's declaration, we would just like to

5   request here an opportunity to respond in writing just to make

6   our record on this.

7       **THE COURT:**  Okay.  And what would you propose?  I

8   mean, to be honest with you, I was focusing mostly on what you

9   said about the security concerns.  I -- you know, I'm happy for

10  you to respond to have a clean record.  What is your proposal?

11      **MS. ORLOFF:**  I think we would just propose to file

12  either just a short response or a response plus a -- responsive

13  declaration by -- you know, I think we can do it by the close

14  of business Monday.

15      **THE COURT:**  Okay.  That's fine.  You can do that.

16  That's fine.  What else would you like to tell me?

17      **MS. ORLOFF:**  So thank you.  I appreciate Your Honor's

18  preliminary thoughts.  You know, obviously we recognize that we

19  are in the position of having to persuade the Court that its

20  prior analysis on these same issues was incorrect.

21      We don't make light of that burden.  But as the Court

22  noted, the Court's prior analysis was on an extremely

23  abbreviated and expedited timeframe.

24      And so --

25      **THE COURT:**  The only thing I will say -- just so I

1 | have a clean record -- I -- although it was arduous, I felt

2 | that I had enough time to fairly consider everything that the

3 | parties submitted.

4 |     I worked really hard.  For two straight days I worked

5 | really hard.  And I felt -- I did not feel that my -- I would

6 | not have written a different order had I had two more weeks to

7 | write it.

8 |     So I just want to make my record there.  Okay, Ms. Orloff.

9 |       **MS. ORLOFF:**  Thank you.  And I appreciate that,

10 | Your Honor.

11 |     You know, personally I feel like we would have taken more

12 | time to do the legal research to present certain case law that

13 | was more on point than -- you know, than we might have

14 | initially presented.

15 |     So just from the Government and U.S. Counsel's

16 | perspective, I think, you know, we would have had more time to

17 | sort of reflect on the six prohibitions which, you know, were

18 | just issued that day and look at the Secretary's decision.  We

19 | had put a lot of material before the Court, but it wasn't the

20 | consolidated, you know, compilation of materials that the

21 | Secretary actually considered.

22 |     So, you know, I respect the Court's opinion on that.  And

23 | I think the only point I wanted to make is that the landscape

24 | has changed.  And so we now have the Secretary's full decision

25 | as well as some of the appendices to that decision memo.

1    And just as a side note there, the fact that we put

2    certain appendices before the Court and not others, I don't

3    think that means anything other than that we have been able to

4    go through those appendices so far and clear them for release.

5    It is not an indication that they were more important than

6    others.

7    I think ultimately there will be substantially a larger

8    record.  But the decision memo itself, I think, pulls together

9    the evidence in a way that when we were briefing the sort of

10   unripe issues, you know, we did throw a lot -- more voluminous

11   presentation.

12   And I think we also now, Your Honor, have evidence

13   regarding numerous other mobile applications through which the

14   Plaintiffs can communicate, especially here in the U.S. but

15   even with persons in China.

16   I will go through that a little bit.  I think the Court

17   can certainly take judicial notice of the fact that

18   applications like Facebook are available in Chinese.  All of

19   that is publicly available.  It's two clicks on a website.

20   And so I guess I would just ask the Court -- and I'm going

21   to go through a presentation here.  We would just ask the Court

22   to keep an open mind on some of these issues.  And I would like

23   to --

24   **THE COURT:**  Could I ask a question because it is

25   relevant to the point that you just made?  I'm interested in

1    everything you have to say, of course.

2         But I -- I have no problem noticing the availability of

3    other -- of means of communication.  And, perhaps -- and I'm

4    not saying -- perhaps, there would be an offramp.  You know,

5    the issue with the evidence that the Plaintiffs put in was

6    about the importance of this platform.  And the evidence was

7    really unopposed at the preliminary injunction stage about the

8    integration of this platform with every means of communication

9    for the specific community of U.S. based users that are -- that

10   are the subject of this litigation.

11        And so that -- so it's not obviously -- I have WhatsApp

12   and I have -- you know, the tech -- the regular text on my

13   iPhone that I use, and I have different means of communication.

14   I have e-mail.

15        But really the evidence was not that there weren't other

16   platforms.  It is just that this one is the one integrated into

17   the community.

18        So that leads to two questions on my part.  One, is your

19   argument a better one if there is a substantial offramp that

20   will allow people time to transition?  Let's say your evidence

21   ends up being that this particular platform -- unlike, let's

22   say, e-mail or other platforms poses unique risk -- and if so,

23   given the First Amendment issues that are raised by the

24   Plaintiff, why the immediacy?

25        And, two, the related question to that is:  Even the

1   executive order went into effect -- had 60 days.  And so one of

2   the things that I thought about at the preliminary injunction

3   hearing is literally what is the hurry.

4         MS. ORLOFF:  So thank you, Your Honor.  If I address

5   these issues, which I will now, we will be going through the

6   issues in the reverse order than I have prepared them, but I'm

7   happy to do it.

8         THE COURT:  That's fine.  If you want to just note the

9   question and deal with it in the order that you want to, I'm

10  fine with that.  I just wanted to raise that question.

11        MS. ORLOFF:  Okay.  I will flag that.  And I will

12  address that I promise, Your Honor.

13        THE COURT:  Okay.  Thanks.

14        MS. ORLOFF:  I do want to begin with some facts that I

15  think are undisputed.  I know that Plaintiffs have challenged

16  the sufficiency of our evidence, but they have not challenged

17  the evidence itself.

18      And so there is no dispute, Your Honor, that China is the

19  most persistent perpetrator of cyber espionage against the

20  United States, both traditional and economic espionage, so much

21  so that the FBI Director described it as, "the greatest

22  long-term threat to U.S. national and economic security."

23      There is no dispute that China has persistently sought

24  massive amounts of data from the American people including

25  personally identifiable information similar to the sort that

1    would also be obtained through the WeChat application.

2         Just a few examples that come to mind are the OPM data

3    breach, the Equifax hack and the Anthem hack.  Hundreds of

4    millions of Americans have had their personal information

5    purposefully stolen by the Chinese government.  The information

6    has numerous intelligence and espionage applications.  And that

7    is why China wants it.

8         At the broadest level, it feeds the development of

9    artificial intelligence with both military and non-military

10   applications.  Things like, you know, helping train censorship

11   algorithms that can be used both against the Chinese people and

12   also against users worldwide.

13        It can help develop technologies to predict and understand

14   what kind of information goes viral; what kinds of

15   disinformation are most likely to be effective forums of, say,

16   election interference.

17        It can facilitate technologies for predicting movement and

18   behavior of crowds, for facial recognition and voice

19   recognition, for psychological profiling.  There are very, very

20   powerful uses and applications to this kind of vast amounts of

21   data.

22        But at a more specific level, it can also be used for

23   things like identifying targets of espionage; recruitment of

24   assets; things like geo location data; who a person works for;

25   who they associate with; what kinds of news they consume, even

1  the debts that they know and other aspects of their behavioral

2  and psychological profile that can then be leveraged for

3  intelligence purposes.

4      That kind of information can also help reverse engineer

5  passwords, and it can facilitate things like phishing attacks

6  so that an e-mail that is designed as a phishing attack appears

7  to be real.

8      Those phishing attacks, Your Honor, are a key arsenal of

9  China's economic espionage in which it targets specific private

10  companies to steal intellectual property and business data and

11  position itself as an economic competitor into the United

12  States.  We know this about China.  I think none of it is

13  disputed.

14      What do we know about Tencent?  Well, we know that China

15  is aggressively seeking to develop artificial intelligence

16  through Tencent with Tencent being one of its three,

17  quote-unquote, national champions of artificial intelligence.

18      And this strategy of naming private companies to achieve

19  governmental objectives is part of the PRC's intentional

20  campaign of what they refer to as military and civil fusion

21  through which the Chinese government is erasing traditional

22  boundaries between the government and the private sector.

23      And Tencent is a key manifestation of this same strategy.

24  It has established CCP representation for more than 15 years.

25  As of 2017, it had 89 party branches and approximately 3,400

1  CCP members.  And it actively works to promote CCP objectives

2  including through the development of artificial intelligence

3  and through crowd storage of information within China.

4      We also know that Chinese law requires companies including

5  Tencent to assist in its national intelligence efforts and to

6  store data on Chinese soil so that Tencent would be required to

7  assist the Chinese government and Chinese intelligence

8  services.  If it was ever asked for help, I think it would have

9  little recourse to refuse.

10      Moreover, I think it would be entirely antithetical to the

11  culture that promotes total obedience to the CCP.  And if

12  asked, Tencent also would be obliged not to obviously share the

13  fact that it had cooperated with the PRC in, you know, offering

14  up data on its users.

15      And even if Tencent was not asked, Your Honor, to -- to

16  transfer data directly to the PRC, it would be extremely easy

17  to intercept the data that flows through WeChat because it is

18  not end-to-end encrypted.  So it could be intercepted by the

19  Chinese government even without Tencent's corporate bubble

20  cooperation.

21      And finally, Your Honor, we know a lot about WeChat as

22  well.  We know that WeChat collects massive amounts of data

23  from its users.  It has access to the entire device.  And so

24  that means the users contacts, calendar, browsing habits, geo

25  location data, device identifier data, where they connect to

1    the internet, how they use the device, how frequently they use

2    other apps on their device and what kinds of activities they do

3    on it, what they buy through their app.

4         I mean, the amount of data is massive; and it is even more

5    massive because of the mini programs aspect of WeChat which

6    enable things like, you know, booking a doctor's appointment or

7    sharing medical information or booking a -- you know, hailing a

8    cab.

9         And as I understand it, there are more than one million

10   mini programs.  And that is just generating, Your Honor, a

11   boatload of information.  It is a digital facsimile of a

12   person's life.

13        Finally, we know that Tencent in addition to automatically

14   collecting this data, it surveils WeChat communications in that

15   those who have sent information or communication through WeChat

16   in China that the PRC doesn't like, they have been arrested.

17   They have had accounts closed and their content and their

18   communication disappear.  We know all of this.

19        I mean, I think the -- we got the Citizen Lab Report from

20   this year, May of 2020, which talks about, you know, the prior

21   belief that surveillance only extended to users within China.

22   But researchers finding that, in fact, non-China based accounts

23   were being surveilled.

24        And so I think none of this, Your Honor, is controversial,

25   honestly.  In addition to the government reports that have been

done on it, you have got NPR, Wall Street Journal, New York

Times and Washington Post.  They have all --

**THE COURT:**  There is a Frontline special on AI and

China.  I mean, this is not controversial.  I agree with you,

this is not disputed territory.

**MS. ORLOFF:**  Okay.  Thank you.  And so, Your Honor, I

think it is entirely foreseeable that the PRC will use

Tencent's data to aggregate more information on American users;

feed its artificial intelligence; aid its espionage activities

and continue to, you know, censor communications.  I think all

of that is foreseeable.  It is common sense.

And that's the kind of standard that I think a

humanitarian law project case says that is all that is

required.  When it comes to issues of national security, the

fact that it is foreseeable -- there is a foreseeable and not a

remote risk, that is the standard that the Supreme Court set

out there; that it has set forth in other types of national

security cases such as Dowd that we have cited for you.

And those cases were strict scrutiny cases, Your Honor.

So those were, I think, an even higher standard than we have

here.

But with that backdrop first -- with that backdrop, I

would like to just briefly address the likelihood of success

factors because I think they function a little bit differently

here on our motion to stay than they did on the PI stage.

1    So I think here in terms of likelihood of success, the

2    Court could find that we are likely to succeed by finding not

3    necessarily that it was wrong in its first amendment analysis,

4    but it could find that there has been a shift in its

5    understanding of, say, the irreparable harm or the balance of

6    the equities.  So any of those prongs would be a basis to hold

7    that the Government is likely to succeed.

8    But that aside, I think we would respectfully submit that

9    the Court should re-evaluate its First Amendment analysis for a

10   few reasons.

11   First, the Court assumed that heightened scrutiny applied.

12   It applied in intermediate scrutiny, as you mentioned

13   previously.  But the Supreme Court's decision in *Arcara versus*

14   *Cloud Books* teaches that mere incidental impacts on expressive

15   activities that flow from generally applicable police powers

16   that are not concerned with speech do not trigger First

17   Amendment scrutiny.

18   And so in that case the bookstore could be shut down

19   because illegal activity was occurring within it.  Even though

20   the fact that it was shut down would then incidentally burden

21   its customers who wanted to purchase books there as well as the

22   expressive rights of the bookstore owner.

23   **THE COURT:**  Let me ask you this, though, the

24   Plaintiffs' case established through their declarations at the

25   motion -- the original motions hearing -- reflect that WeChat

1   was effectively the only means for people in the community in

2   part because China bans other apps and in part because of

3   the -- sort of the -- and the evidence was uncontroverted.

4       I understand you say there are other applications that

5   exist, but the argument that the Plaintiffs advanced was that

6   this is the one that is necessarily of choice because of the

7   constraints that China puts on communications.

8       And so -- and so it is different than illegal activity

9   occurring at a bookstore.  Of course, the Government can shut

10  down something of -- but this is an entire forum -- an entire

11  platform for communication.  So it is quite different than the

12  bookstore example.

13      And then the second part of that is:  And given that --

14  and given the alternatives, what -- where is -- assuming

15  intermediate scrutiny, which, you know, I'm -- although I

16  touched on the -- on the prior restraint sort of theory in the

17  first place.  Really I went much more with intermediate

18  scrutiny -- how is the -- how is this narrowly tailored?  And

19  how does it leave open adequate channels for communication

20  given the evidence that the Plaintiffs have advanced?

21      I mean, that's -- that's really the issue.

22          **MS. ORLOFF:**  Right.  Understood, Your Honor.

23      So let me just -- turn first to the *Arcara* question of:

24  Is the analysis different because Plaintiffs purport to totally

25  rely on this particular mobile?

1          And I think the answer has to be no, Your Honor, because

2     it is, like, a too big to fail kind of a theory.  Like, if

3     the -- if the bookstore in *Arcara* had been the only bookstore

4     around, I don't think that would have changed the Court's

5     analysis.

6          First of all, the market can fill -- and the Court even

7     said this:  It said this owner can open up a new bookstore.

8     The market can fill -- the fact that there may not be

9     alternatives that Plaintiffs prefer.  They may not have the

10    functions.  If the Chinese community and the United States

11    cannot access this particular application, they will -- they

12    can replace these network effects, I think, is what I'm trying

13    to say.

14         And what the Supreme Court said in *Arcara* is the First

15    Amendment is not a curtain that protects illegal activities.

16         So I don't think the Court's decision would have been

17    different there if there had been more speech involved because

18    it would put the Government in this sort of absurd position

19    that the greater its interest in preventing the illegal

20    activity, the less it would be able to do so because the First

21    Amendment would somehow preclude it.

22         And, you know, the Supreme Court has repeatedly said the

23    First Amendment is not a suicide pact.  And I think especially

24    here where these limitations that Plaintiffs allege with regard

25    to the lack of alternatives that in their community or

1    alternatives to speak with people in China, those are not areas

2    that this Government has set up.

3         Plaintiffs are free to speak on any other social media app

4    or chat app that does not directly surveil and censor speech;

5    right.  So the fact that there aren't alternatives for people

6    communicating with people in China, I think it is a very sad

7    and unfortunate fact.  I don't think that fact can be laid at

8    the blame of this Government in order to hold that the

9    Government cannot do anything about the fact that the Chinese

10   government is now surveilling American users.

11        **THE COURT:**  Well, the issue is not that the Government

12   can't do -- so, one, I would suggest that the activity here on

13   this platform is different than illegal activity.  This isn't

14   Silk Road.  It is a platform that users, basically with

15   awareness of the risk, decide to use because it's the only

16   thing they can.  So I don't think that the bookstore analogy is

17   an exact one at all.

18        And under the intermediate scrutiny standard, the

19   Government can -- can have content neutral regulations that

20   needs to survive intermediate scrutiny here.

21        And so it's -- the issue then becomes narrowly tailored.

22   I'm not sure any of the evidence that you put in establishes

23   that given the complete shutdown of the platform and the

24   national security concerns that you have addressed which are --

25   national security concerns in the context of the First

1    Amendment still require the application of the intermediate

2    scrutiny test.

3         And so how is it narrowly tailored to shut down an entire

4    platform for communication?  And what is the evidence that

5    their other -- that there are adequate channels for

6    communication and that Government evidence is -- I'm sorry.

7    The Government evidence.  You are the Government.  Sorry --

8    it's -- my old job kicked in there for a second -- the

9    Plaintiffs' evidence is essentially undisputed that there are

10   no other options.

11        And this is the only case that I'm aware of where there

12   has been a complete shutdown of a forum for speech.  And I

13   don't think there is any case that directly controls.  When you

14   look at the national security cases generally, they are not in

15   the context of speech.

16        You know, *Trump versus Hawaii*, and sure, the Government

17   gets -- the President gets to have a lot of discretion when it

18   comes to economic regulation.  But this isn't.  This is the

19   elimination of a platform.

20        So I'm not unsympathetic to the concerns that you have

21   identified, of course.  They are serious and significant.  And

22   it is the First Amendment intermediate scrutiny standard that

23   applies here.

24        I know you made the argument that it doesn't, but I'm

25   comfortable with my conclusion that it does.

1          **MS. ORLOFF:**  Okay, Your Honor, I will try to address

2     everything Your Honor just said.

3          But, first of all, I do take issue with this idea that we

4     have not -- that we didn't -- that we somehow waived the right

5     to dispute the Plaintiffs' evidence regarding --

6          **THE COURT:**  You didn't -- you didn't.  You didn't

7     waive it.  I'm not saying you waived it.  I'm just saying their

8     evidence is what it is.

9          **MS. ORLOFF:**  Right, right.

10          **THE COURT:**  And given that evidence, which is the only

11     evidence on that point, what is your evidence that it's

12     narrowly tailored and that there are adequate channels of

13     communication?

14          **MS. ORLOFF:**  Right.  And so -- and also, Your Honor,

15     you know, I do think that the *Dowd* case, that we cited for you,

16     does arise in the First Amendment context and talks about

17     the -- the different and the unique analysis that applies when

18     national security concerns -- strong national security concerns

19     are at play.

20          And so I will just raise that case to Your Honor because

21     the Court did somehow suggest that we hadn't cited any First

22     Amendment cases under national security --

23          **THE COURT:**  No, I didn't mean you hadn't cited them.

24     I'm just not aware of any that have facts approximating the

25     facts here.  That was my point.

1          **MS. ORLOFF:**  Right, right.  And so but I think it's --
2     so what the Court said earlier was that the Plaintiffs here
3     have made a choice to use this app because they don't have
4     alternatives.  I think that statement is intention -- is
5     internally inconsistent.  If the Plaintiffs were making a
6     choice not to use the app, that would suggest they have
7     alternatives; right?

8          And the notion that -- that First Amendment protects what
9     China is doing here in terms of restricting alternatives -- so
10    to funnel users onto a single platform where it can thereby
11    sensor speech, remove content, punish users who post
12    information and communications that are not friendly or are
13    somehow critical of the PRC -- the PRC can take or Tencent
14    through the PRC or PRC through Tencent can take away a user's
15    right to use WeChat -- and the idea that the First Amendment
16    would protect this monopolization of a forum through which the
17    Chinese government controls speech, through which it represses
18    speech, through which it surveils users -- likely in violation
19    of what we would consider, you know, the Fourth Amendment --
20    that idea, I think, is surprising, Your Honor.

21         And I will move in a second to alternatives.  And we are
22    not pretending that they are WeChat; that they have the current
23    network effects that WeChat has.  But there is a strong
24    interest in, you know, promoting a marketplace of apps through
25    which the Chinese diaspora and everybody else can make their

1    communications without having to self censor because the
2    Chinese government is controlling that platform.
3         That is, you know, I think the idea that -- that the First
4    Amendment would protect those circumstances here, I think is
5    just extremely surprising.
6         So let me move then to your narrow tailoring question.
7    Now, I think narrow tailoring, the analysis that the Court did
8    in its opinion was actually a strict scrutiny narrow tailoring
9    analysis in terms of requiring a least restrictive means.
10        But that is not what intermediate scrutiny requires.  All
11   that intermediate scrutiny requires is that the Government's
12   interest would not be achieved as effectively through other
13   means.  And that is what the Supreme Court said in *Ward*.  And
14   it is a much, much lower bar than the strict scrutiny bar.
15        And I don't think anybody can dispute here that the
16   Government's interest in not having China control this platform
17   in its ability to vacuum up vast amounts of data from American
18   users would be achieved as effectively by any of the proposals
19   that have put forth.  And there is only two that I'm aware of.
20        The first is the idea that there could be restrictions
21   only on the devices of Government and key infrastructure
22   personnel.
23        Obviously that would not address the very serious concerns
24   about everybody else's data and the development of artificial
25   intelligence through that data.  Would not address concerns

about economic espionage in terms of companies that are not affiliated with the Government.

It would not address the concern about the Chinese government being able to censor the speech of U.S. users.  And it would not address the concerns, I think, even about government recruitment because digital profiles follow an individual over time.

And so the fact that someone may not be a government official now doesn't mean that in five or ten years that person won't apply for a job with CIA or NSA and then have this sort of digital profile that is following them around.

So I think it is very clear that restricting this prohibition only to government and key infrastructure personnel would not fully address the Government interest here.

In terms of the mitigation proposal, I don't want to say too much about that because it is confidential business information.  But I will just note what I think I can which is: The main concern there is that Tencent would still sit atop the structure that was proposed; thereby, controlling access to data.  And I think there is a feasibility question too, which stems from the fact that China would need to bless the arrangement, which I think is far from clear.

Beyond that, the Secretary made the assessment that the kinds of preventative measures proposed by Tencent required a baseline level of trust that is currently lacking with the

1   Chinese government in part because of the persistent espionage

2   activities that we talked about in our papers and that I

3   recounted earlier.

4        Obviously, that proposal wouldn't do anything to change

5   the calculus of the PRC which would still have every incentive

6   to continue using the technology for its own interest.  And

7   there is already, I think, a lack of transparency in terms of

8   Tencent's cooperation with the PRC in facilitating

9   surveillance; how that surveillance occurs; how that censorship

10  occurs especially in terms of non-China accounts.

11       For instance, Tencent says it stores data on user phones.

12  But researchers have discovered databases holding massive

13  amounts of WeChat content.

14       And so I think the Secretary determined that that baseline

15  level of trust that would be necessary for the Tencent

16  mitigation proposal to address the concerns that underlie the

17  order was not there.

18       And, Your Honor, I think that is a foreign policy

19  determination that the Executive Branch is surely qualified to

20  make.

21       So, you know, in light of the fact that the two

22  alternatives that have been put forth would not address the

23  Government's concerns, I think it has to mean that these

24  prohibitions pass intermediate scrutiny.

25       As for the final prong, leaving open ample alternatives,

1    so, you know, I think maybe we have talked past each other a

2    little bit because obviously -- and I don't think the Court or

3    Plaintiffs dispute that there are alternatives.  There is

4    Facebook obviously and WhatsApp and alternative chat and social

5    media applications that may not be available in China but are

6    certainly available for people in the United States and across

7    the world other than China.

8         I mean, Facebook has, as I understand it, the biggest user

9    profile in the world.  So Facebook certainly has network

10   effects, but it may not be network effects that Plaintiffs

11   prefer or would like because of the restrictions particularly

12   within the Chinese mainland.

13        But even as to China, I think we put forth alternatives

14   that work there.  There is Skype.  There is iMessage.  There is

15   Signal.  There is Let's Talk.

16        In terms of other kinds of applications that -- I'm not

17   sure if they work in China.  I think they may work in China

18   with a virtual private network -- there is Telegram.  There is

19   WhatsApp.  There is Line.  There is obviously Facebook, all of

20   which I'm under the impression are widely used, like in Hong

21   Kong and Taiwan and in South Asia.

22        So the notion that there are no alternatives -- I mean,

23   what -- the Court said earlier that the prohibitions ban an

24   entire medium.  And, respectfully, I don't think that's the

25   case at all.

1       The prohibitions target a single mobile app among, you
2   know, what I think are a sea of other alternatives.  They are
3   not the same.  They are not exactly the same.  They don't have
4   the exact same functionalities.  But the Supreme Court has
5   clearly said that those -- that that kind of granular pros and
6   cons -- I don't think the First Amendment guarantees someone
7   the right to the app of their choice or the app that
8   prioritizes certain kinds of conduct -- content over others
9   especially where the marketplace can fill that in to the extent
10  that there is an appetite for it here in the United States.
11      And, in fact, the only case that Plaintiffs cite that, you
12  know, I think even comes close to the facts here is the *City of
13  Ladue* case, and I don't think it is on point at all.
14      I mean, first of all, it wasn't a national security
15  context.  But there the Supreme Court struck down the ordinance
16  because it, quote, totally foreclosed all kinds of signs on
17  private property except for a few exceptions which caused the
18  Court to think that there was actually some content
19  discrimination going on here.
20      But it wasn't -- *City of Ladue* never said that if the City
21  had restricted a certain brand of some kind that -- that
22  property owners in the City of Ladue preferred because it was
23  cheaper or brighter or easier to write on or it was just the
24  one they had always historically purchased, you know, they do
25  suggest anything of the sort.

1          And in part I think its -- holding was based on the fact

2     that there was this venerable tradition of using signs to

3     express messages associated with a person's home.

4          But we also know that cities can, you know, ban -- what is

5     it -- they can ban sound trucks and, like, phone signs and

6     certain kinds of billboards and things like that.

7          And so I just -- I don't think there is a single case that

8     suggests that restrictions that have -- that are not targeted

9     at anybody's speech, targeted at the content of anybody's

10    speech, that are supported by the kinds of national security

11    concerns that are present here and that act only against a

12    single company, fit into any of the case law that found a First

13    Amendment violation.

14          **THE COURT:**  There is no case because no one has ever

15    tried to do this before; right?  So there is no case because

16    there is nothing approximating it in the law books or in the

17    law corpus since we are all Westlaw now.  That's why.

18          So I think -- but you are doing a great job.  The briefs,

19    I will say, are great this time.  I mean, you did what you

20    could in the time you had the last time.  And I thought the

21    briefs were excellent this time.  But, you know, it's -- there

22    are no exact -- even in the national security context, there

23    are no exact standards to apply here because no one has done

24    this before.  So I appreciate the arguments.

25          **MS. ORLOFF:**  And I think I agree, Your Honor, but in

 1   part I think it is because this is a rapidly evolving digital

 2   landscape in which companies are acquiring tremendous amounts

 3   of power as, you know, I think, Congress is currently looking

 4   at this with respect to tech giants here in the United States,

 5   Google and Facebook.

 6        And so I agree there is nothing directly on point, but

 7   I -- I don't know if it's because, you know, nobody has ever

 8   tried to do this so much as because we haven't had situations

 9   like this where a foreign government can sort of control a

10   means of communication that is relied upon by people in another

11   country.

12        **THE COURT:**  Let me just ask you one question about the

13   mitigation -- to the extent we can talk about it -- but the

14   mitigation proposal does -- I mean, all of the issues you have

15   identified are important.  And there is a mitigation proposal

16   that addresses those concerns.

17        And it seems that the only argument you are advancing

18   against that, which I think does go to the intermediate

19   scrutiny narrowly tailored analysis, is that because it is

20   Tencent, it just by definition is no good.  And so, therefore,

21   that's not sufficient.  Is that -- am I making too much of a

22   cartoon out of your argument there?

23        **MS. ORLOFF:**  Well, I think I would put it a little bit

24   differently and say because we don't have a baseline level of

25   trust with the Chinese government -- and because Tencent is a

1    Chinese corporation that would be bound by the Chinese laws

2    that require it to cooperate with national intelligence

3    activities of the PRC -- that it would be very difficult to

4    provide the kind of assurance that would be necessary as long

5    as that structure remained intact; not because it is Tencent

6    alone but because of this lack of trust right now with the

7    Chinese government and the Chinese laws that would compel

8    Tencent to cooperate even if it did not want to do so.

9              **THE COURT:**  Okay.

10             **MS. ORLOFF:**  So I would like to address -- because I

11   know Your Honor asked earlier about the impact of restrictions

12   and the idea that it would just totally shut down chat all at

13   once.

14        And, you know, I know that when we addressed that issue at

15   the PI stage, there really wasn't much evidence on what would

16   occur.  And so the Court just took as an admission the

17   Secretary's statement that was reported in the news that -- it

18   was -- and I'm just going to quote here.  It was:  "For all

19   practical purposes -- "it" meaning WeChat -- will be shut down

20   in the U.S. but only in the U.S. as of midnight on Monday."

21        And so obviously that was a very rushed briefing schedule.

22   We went back and looked at that transcript, and I think that

23   statement was taken -- which was reported in the news, but I

24   think it was taken out of context a little bit.

25        So what the Secretary actually said was that WeChat was

1   essentially a funds transfer and payment processing mechanism.

2   And then he went on to say:  For all practical purposes it will

3   be shut down in the U.S., but only in the U.S. as of midnight

4   on Monday.

5        And so when the Secretary said that, she was really

6   focused on this funds transfer and payment processing mechanism

7   that was provided through WeChat.

8        It is true that under the prohibitions -- and this is

9   Prohibition Number 5 -- any possible use of WeChat -- the

10  WeChat pay functionality would be prohibited.  However, that is

11  not a change from the status quo.

12       As I understand it, WeChat Pay is not available in the

13  United States currently.  And that Prohibition Number 5 really

14  just served to -- to prevent WeChat from pursuing a WeChat Pay

15  functionality in the U.S. in the future.

16       So that Prohibition Number 5 -- which it is true does shut

17  down funds transfer and payment processing mechanisms within

18  the United States -- but really only as a future prohibition

19  since those kinds of -- those kinds of processing transactions.

20            **MR. BIEN:**  Your Honor, may I interrupt for a second?

21            **THE COURT:**  Yes.

22            **MR. BIEN:**  First of all, we have had briefing; and

23  none of this information was provided by the Government.  And I

24  also, with all due respect with Ms. Orloff, what the Secretary

25  said was on TV.  It has been widely reported and --

1          **THE COURT:**  Let me just -- I appreciate the point.

2    Here is what I would say, because honestly, what seems most

3    significant is what the prohibitions actually -- the prohibited

4    transactions actually are; right.

5          And when you look at the prohibited -- I mean, I led with

6    the Secretary's admission.  That's fine.  Ms. Orloff is sort of

7    picking apart the transcript.  That's fine.

8          I think the more important point, though, is that the

9    prohibition -- the prohibited transactions -- and I pressed

10   your colleague on this at the preliminary injunction hearing.

11   I pressed your colleague on it at that Saturday hearing.  And

12   before -- that the effect of those transactions on the app,

13   there was no serious dispute then.

14         And now so I think the important thing is less what the

15   Secretary says than what the effect of the prohibited

16   transactions actually is.

17         And when you look at the prohibited transactions, it

18   degrades -- you know, there was -- we talked about this at the

19   hearing -- it degrades the utility of the app to the point

20   where it is essentially unusable.  And you want to speak to

21   evidence to the contrary now, I think that is a fair point.  I

22   don't know that we need to sort of get into the weeds of what

23   the Secretary said.

24         **MS. ORLOFF:**  I appreciate that, Your Honor.  I think

25   we fully agree that we should be looking at the prohibitions

 1   themselves as well as what the Secretary said.

 2        **THE COURT:**  I'm less concerned with the money app

 3   anyway.  It's not -- if it doesn't exist, if it is not -- if it

 4   is not a functionality of the app, fine; but the other

 5   functionalities at issue in the case and then the effect of the

 6   prohibitions on them.  And so if there is -- yes.

 7        **MS. ORLOFF:**  So I would like to address that because I

 8   don't think that any of these prohibitions imminently or

 9   immediately shut down the app at all.  In fact, the Plaintiffs'

10   only expert -- or the person that they advanced as an expert --

11   Mr. Roach, he did not seem to think that this would shut down

12   the app at all.

13        He talked about slower processing, yes.  Somewhat limited

14   functionality.  As I understand, that -- those effects flow

15   from Prohibitions 3 and 4 only.  Prohibition 2 also is not a

16   change of the status quo.  And that is set forth in the

17   decision memorandum of the Secretary.

18        But prohibition 3 talks about provision of content

19   delivery services that optimize the WeChat mobile application.

20   And as this was explained to me, it was analogized to Amazon

21   Services and this idea that, you know, Amazon has big storage

22   centers where it stores all its goods; and then there are --

23   there are local storage centers that expedite the delivery of

24   goods through Amazon.

25        So this Prohibition Number 3 simply speeds up the sending

or transmission of data from where it is held in Tencent's

cloud servers in Hong Kong to an individual's device in the

United States.

    If Number 3 goes into affect, as I understand it, it is

true that the WeChat app will operate more slowly.  As I

understand it, that is the only -- it is the -- there could

be -- Mr. Roach said there could be effects for certain

features like voice calls.

    But this -- it is really more just of a lag time and

possibly degraded functionality.  The real force of these

prohibitions is Number 1.  It is this idea that over time the

app will age out, not immediately.  But over time it will age

out and users will be encouraged to go to alternate platforms.

It is a much more gradual and incremental effect, I think, on

speech and communications than the Court assumed.

    **THE COURT:**  So I -- one, I just went with the

information that I had in front of me including the plain

language of the prohibition -- the prohibited transactions are.

    Two, this is -- sort of seems to me a bit in the land of

suppose as opposed to be in the land of fact.  And, perhaps,

your declaration you want to submit by close of business Monday

will address the land of fact.

    I think it is less like the Amazon delivery where I can

get Fresh here but my friends in other places can't.

    I think it is more like my beloved iPhone 3, which I

1   thought was a thing of beauty that Apple stopped supporting.  I

2   would have kept it forever.  I have a work phone that they

3   constantly upgrade.  Because Apple stopped supporting it, it

4   did not function anymore.  And, I mean, I have -- I kept it for

5   text and phones until the screen actually died.  It degraded to

6   the point that it became unusable.

7       That's what we discussed at the hearing.  There was no

8   fact dispute about it at the hearing.  If you want to say there

9   are fact disputes about it now -- you know, I pushed on that

10  point.  And, again, I think it is fair to say in the -- in the

11  Secretary's comments, you know, were relevant to that point.

12  But under the plain language of the prohibited transactions and

13  with the concessions that your colleague made at the

14  preliminary injunction hearing, that was essentially

15  undisputed.

16      If it is disputed now, then that would be the -- that

17  would be an issue of fact that you can address through your

18  declaration on Monday.

19      But anyway so I just -- you know, guessing at what kind of

20  degradation of functionality might occur or not in the face of

21  those concessions and in the face of the Secretary's remarks

22  seems conjecture.

23          MS. ORLOFF:  Well, Your Honor, it is disputed.  I

24  don't recall my colleague conceding that fact over --

25          THE COURT:  He didn't really concede it but he --

1     **MS. ORLOFF:**  Right.  And with respect it was -- the

2  prohibitions had been issued the day before.  We had already

3  gone through a voluminous amount of information in the form of

4  argument from the Plaintiffs and attachments, and we had not

5  yet, I think, had time to sit down with our clients.

6     Look, I'm not a technical expert.  I don't understand how

7  these work.  And so I do think at this point probably the best

8  thing for us to do is to submit a declaration on this which

9  sets forth our understanding of the immediate impact of these.

10     **THE COURT:**  Well, but the ask was to submit a

11  declaration to counter the Plaintiffs' declaration -- late

12  submitted declaration, which is fine.  If you guys are going

13  to -- you know, the landscape may change.  The fact landscape

14  may change.  As Mr. Bien said at other hearings, you know,

15  that's what you do in litigation.  When the circumstances are

16  different than you suppose them to be, then you bring a motion

17  which is what you did.

18     So I do have another hearing.  We spent a lot of time on

19  this.  It is important.  But I think that, you know, maybe if

20  there is anything else that you want to say, Ms. Orloff, please

21  do.  And then we will move to Mr. Bien because I have other

22  matters on my calendar today.

23     **MS. ORLOFF:**  Thank you, Your Honor.  I know Your Honor

24  has been very indulgent.

25     So I will just close out by saying I think there are

1  extremely strong national security interests on the

2  Government's side of the balance of harms.

3       We do not think that the inability over time to use a

4  preferred app outweighs those harms here.  And just as the

5  Fifth Circuit said in the *Defense Distributed* case, there is a

6  harm -- there is a risk -- I think a very substantial risk --

7  that national security will be irreparably harmed permanently

8  because information that flows to the Chinese government cannot

9  be clawed back.  Whereas, if the Plaintiffs prevail at the end

10  of the day, their access to WeChat can be restored.  And that

11  would be a temporary kind of a harm.

12       And then, finally, I would just urge the Court to make the

13  injunction -- to stay any aspects of the injunction including

14  as to Prohibition 5 and Number 2, which don't really change the

15  status quo, that it doesn't find to be necessary to protect the

16  Plaintiffs here although we obviously prefer the Court to stay

17  all of its injunction.

18            **THE COURT:**  Okay.  Mr. Bien?

19       **MR. BIEN:**  Yes, Your Honor.

20       Again, we feel the Government has not in any way met the

21  standards for a stay.  Again, we are talking about status quo.

22  And how -- who is harmed between the time from now on until the

23  courts of appeal address this appeal.

24       And if the Government has more evidence to bring in or

25  other things to show as we move towards a permanent injunction,

1  obviously there is an opportunity.  But the question here is

2  the balancing of the hardships.  Has the Government made a

3  showing of irreparable harm to the Government apps in the stay.

4  And they failed again today.

5       What is the immediacy you asked and what is the hurry?

6  And, again, we have heard nothing about anything that is

7  immediate or anything that is a hurry.  Why do we have to do

8  this by today?  Why does the Ninth Circuit have to do it by

9  some day they gave the Ninth Circuit?  There is no urgency.

10          **THE COURT:**  Could I ask you a question, Mr. Bien?

11          **MR. BIEN:**  Sure.

12          **THE COURT:**  What if the Government had basically

13  said -- given a year for people to -- all the functionalities,

14  given a year to transition to something different, would your

15  First Amendment analysis be different?

16          **MR. BIEN:**  First off, I think that this is a prior

17  restraint.  And it is -- by its face it is content based.  The

18  Court -- Ms. Orloff didn't address that at all.  But right in

19  the decision memo, there are references to at least one of the

20  major purposes of the Government -- it was in the executive

21  order.  It was in the decision memo -- was to preclude a

22  certain type of information and speech to censor China; to stop

23  China's ability to provide information and to run this app.

24       Of course, they are equating the Chinese Communist Party

25  with Tencent and WeChat and those are stretches.  There is no

1    evidence that Tencent is the Communist Party.  There is no

2    evidence in the record that we are aware of that WeChat is

3    being used by the Communist Party to surveil Americans, to

4    steal their data.

5         And there is no evidence that the mitigation measures that

6    were offered by Tencent, which were extensive, or the

7    mitigation that was recommended by the government agency in

8    charge of cyber security, which would have been -- as this

9    Court noted in its PI order -- remove the app from Government

10   phones and people who have phones in sensitive positions.  That

11   is a narrowly tailored remedy.

12        And I think *City of Ladue* is -- I agree with Ms. Orloff

13   about one thing.  I think *City of Ladue*, as the Court noted, is

14   the appropriate case to look at.

15        And I think there the Court did consider the alternatives.

16   The City argued they can do handbills.  They can do all sorts

17   of other ways to getting their message out.  There is a

18   particular right to communicate to particular people, your

19   neighbors; and that is the same thing that we have demonstrated

20   through our evidence here.

21        WeChat is a super app.  It is the only way to communicate

22   to specific people; not only in the United States who are

23   dependent on Chinese, who are not able to use these other apps.

24   There is no evidence -- Defendant's -- the Government's

25   evidence did not rebut our showing by people actually trying to

1    use these other apps.  None of them are super apps.  None of

2    them have the multiple functions.  None of them are usable by

3    people who are dependent on Chinese and not able to use English

4    language.

5         So if it was a year off, I still think that there would be

6    a prior restraint.  I don't know if the balancing there, you

7    would have to take into account more of the alternatives.

8    Maybe there would be more alternatives.  The Government has

9    mentioned that it hopes that someone else would develop an app

10   that would replace WeChat.

11        Well, what if they -- if they funded such an app and they

12   developed such an app and they provided such an app, proved

13   that such an app was available, perhaps the analysis would come

14   out differently.  But these are real human beings that depend

15   on WeChat every day.

16        The Chinese American community depends on it for so many

17   functions every day, not only to communicate with family in

18   China but to communicate with each other in the United States;

19   to run their businesses; to do political activity; to pray and

20   organize and to participate in the election.  All of these

21   functions are protected by the First Amendment.  And there is

22   no evidence that those alternatives to that exist here.

23        But again, I think the Court was correct that this is a

24   prior restraint.  I think one thing we all learned from First

25   Amendment law is each new technology and the innovations of

1    people in the United States and everywhere move faster than the

2    law.  We are always -- the legal system is always quite a bit

3    behind.

4          Of course, there haven't been a lot of cases like this,

5    but the analogies are there.  I think we cited the Seventh

6    Circuit decision in *BackPage*, the attempt to shut down an app

7    by starving the app of its -- of any revenue.

8          We also think that it is also kind of bizarre for the

9    Government to be citing a case like *Dowd*, which was a 5-1

10   decision in 1950, I think, about a loyalty oath requirement for

11   union officials to swear that they were not members -- active

12   members of the Communist Party.

13         *Dowd* has been -- I guess it technically hasn't been

14   overruled.  We couldn't find it, but, boy, has it been avoided.

15   I don't think that's the law.  I don't think that's the way it

16   would come out.

17         But even in that situation, what was going on -- you know,

18   the Government wasn't restricting speech.  It was saying that

19   we have a right to stop people who are -- will not disavow

20   membership in the Communist Party from being union officials.

21         And, again, it didn't -- it was a -- again, I don't think

22   that case would come out this way, and there are many cases

23   that would say it's different; but to the extent that this is

24   a -- the place that the Government is going for support for

25   this kind of banning of a social media app that is a super app

that the Chinese American community is so dependent on is
extreme.

I would also say that the Court is correct; that you must
evaluate the evidence for national security.  Obviously, you
need to give the Government great deference.  And I think the
cases counsel that.

I think *Al Haramain Islamic Foundation*, the Ninth Circuit
Case, 2012, is an example of where even where there isn't
national security interest was the prevention of terrorism, the
Court looked at the evidence as to this particular Defendant
and found it lacking.

Particularly it cost the Defendant in that case -- I guess
it was the Plaintiff trying to get out from under the
restriction -- was doing First Amendment protected activities
in the United States, speech activities.  And, again, this is
the same thing here.

The people being deprived of their First Amendment rights,
by the way, are not -- there is no evidence that they have done
anything wrong; that there is any reason for the Government to
take away any of their rights.  There is no evidence that
WeChat is being used for criminal purposes; for terrorism.

And there is no actual evidence other than supposition
that, you know, bringing together a whole slew of conjecture
that WeChat could be used to sway.  We even heard the
conjecture that, you know, maybe 5-year-olds will use WeChat

1    and then 20, 30, years from now, they might become government

2    officials and then they will have a dossier on them.

3        That is simply insufficient evidence for this Court to

4    reverse its well-reasoned PI.

5            THE COURT:  Okay.  All right.  So thank you-all for

6    your -- yes, Ms. Orloff?

7            MR. BIEN:  I am sorry.  Could I just respond to just a

8    few points?  I will make this as quickly as I can.

9            THE COURT:  Okay.

10           MS. ORLOFF:  So just quickly on the Plaintiffs'

11   argument that this is a content-based restriction, Your Honor,

12   I think Plaintiffs completely misunderstand what is said in the

13   Secretary's decision memo.

14       First of all, the primary and motivating objective -- and

15   this is on page 15 -- is the objective of preventing China from

16   accumulating vast amounts of American user data.

17       There is a concern about the fact that the Chinese

18   government is censoring communications that flow through

19   WeChat.  It is not about any particular information or even

20   about the Chinese government's ability to express itself even

21   though it has no First Amendment right to do so, as the Supreme

22   Court held just this year in *USAID versus Alliance For Open*

23   *Society*.  That is 140 Supreme Court 2082.

24       But what is the concern is China controlling other

25   people's communications; right.  That is -- that kind of

1  control by a coercive government by the speech of individuals

2  is exactly what the First Amendment seeks to prevent.

3      And so the concern in the Secretary's decision memo about

4  China censoring information is not -- is not content based.  It

5  is about China using this platform to advance its own interest

6  and its interest at the expense of United States users.

7      With respect to the CISA assessment, Your Honor, all I

8  will say there is that CISA was asked for its opinion with

9  regard to its own expertise, which is protecting infrastructure

10 within the United States.  And I think that is why CISA's

11 assessment focused on the kinds of mitigation measures that

12 could be taken to protect what it is concerned with, which is

13 infrastructure.

14     So, therefore, it recommended that the app not be used on

15 state, local and tribal government apps and devices as well as

16 companies with critical infrastructure.

17     It did not purport to assess the entirety of the harm to

18 national security.  And I talked about why that kind of a

19 lesser proposal would not address the Secretary's broader

20 concerns.

21     In terms of *City of Ladue*, Your Honor, I think if the

22 Court is going to look at that case, it then also has to look

23 at the binding Ninth Circuit opinion in *City of Lake Oswego*,

24 which came after, in which the Ninth Circuit held that -- let

25 me find it -- that handbills, advertisements, city signs -- you

know, a broad variety of city signs and numerous other kinds of
alternatives types of communication media were amply available
and satisfied intermediate scrutiny.

And in terms of the evidence of alternatives, Your Honor,
which Plaintiffs say there is no evidence, with respect, I
think the evidence in part is in Plaintiffs' own declarations
where they talk about trying different kinds of applications
such as Telegram and Line and iMessage and successfully did so.
But then they talk about why they don't like them as much.

The fact that they are even having that discussion about
features that they don't like as much, I think proves a point
that there are alternatives.  And it has never been explained
why Plaintiffs here in the United States who seek to use WeChat
to conduct their religious activities and meet with, you know,
prayer groups and stuff like that cannot use alternative
mechanisms such as Zoom, like we are all doing here.

So, finally, Your Honor, on *Dowd*, I just -- you know, we
acknowledge that there are some obvious differences.  And I
think the Supreme Court in *Dowd* acknowledged -- especially the
concurrences acknowledged that if the concerns from the foreign
government in that case had been different, the First Amendment
analysis would have come out differently.

But that case concerned controlling speech of union
officials within the United States; controlling the kind of
associations they could have.  And even there, the Court upheld

1  it because of the national security concerns.

2     But if the Court would like other cases in the national

3  security realm, I guess I would just invite the Court's

4  attention to *Kleindienst versus Mandel*, which is 408 U.S. 753.

5  It is a 1972 case in which the Court held that there was no --

6  First Amendment right of academic to hear foreign speech from a

7  professor who had been denied entry into the United States.

8     And then also *Regan versus Wald*, which is 468 U.S. 222.

9  It involved an individual that wanted to travel to Cuba to hear

10 speech of people in Cuba.  And the Court also held that there

11 was no First Amendment right in that context.

12    Understood that they are not directly on point here, but I

13 think several of the things that are discussed there are quite

14 relevant here.

15    With respect to *Al Haramain*, Your Honor, that was a

16 content-based restriction that the Court was evaluating.  And

17 the Court held that the Government's interest was not -- or

18 that the threat was not sufficient to justify the content based

19 restriction because the domestic organization that was

20 speaking, was speaking with a terrorist organization that had

21 already had its assets frozen.  And so there was going to be no

22 assistance to that organization because that organization was

23 already effectively defunct.  Obviously, that is not the case

24 here.

25    So with that, Your Honor, I will close unless the Court

1    has any further questions.

2              **THE COURT:**  No.  That's fine.  We will do the

3    declaration -- you will submit your supplemental filing on

4    Monday.  And thank everybody for their arguments today.

5              **MR. BIEN:**  Thank you, Your Honor.

6              **MS. ORLOFF:**  Thank you, Your Honor.

7                           ---oOo---

8

9                    **CERTIFICATE OF REPORTER**

10             We certify that the foregoing is a correct transcript

11   from the record of proceedings in the above-entitled matter.

12

13   DATE:    Sunday, October 18, 2020

14

15

16

17   _____

18             Marla F. Knox, RPR, CRR
                 U.S. Court Reporter

19

20

21

22

23

24

25