JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
JOHN V. COGHLAN
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Branch Director
DIANE KELLEHER
Assistant Branch Director
SERENA M. ORLOFF
MICHAEL DREZNER
STUART J. ROBINSON
AMY E. POWELL
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
Ben Franklin Station, P.O. Box No. 883
Washington, DC 20044
Phone: (202) 305-0167
Fax: (202) 616-8470
E-mail: serena.m.orloff@usdoj.gov
*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| U.S. WECHAT USERS ALLIANCE, *et al.*, | |
| | Case No. 3:20-cv-05910-LB |
| Plaintiffs, | |
| | |
| v. | **DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT** |
| DONALD J. TRUMP, President of the United States, and WILBUR ROSS, Secretary of Commerce, | |
| | Judge:     Honorable Laurel Beeler |
| Defendants. | Hearing: February 11, 2021 |
| | Place:    Zoom Webinar |

## <u>TABLE OF CONTENTS</u>

NOTICE OF MOTION ................................................................................................ 1

STATEMENT OF THE ISSUES ............................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................... 1

INTRODUCTION ...................................................................................................... 1

II.    Factual Background on the PRC, Tencent, and WeChat ................................. 5

    A.    National Security Threat from the PRC ................................................. 5

    B.    Tencent and WeChat ................................................................................ 7

III.   The Government's Response to These Growing Threats ................................. 8

IV.    This Case .......................................................................................................... 10

LEGAL STANDARD ............................................................................................... 11

DISCUSSION ............................................................................................................ 12

I.    The Claims Against the  Executive Order Should Be Dismissed (Counts 1-7)............................ 12

    A.    The Court Lacks Jurisdiction to Grant Equitable Relief Against the President ............... 12

    B.    Plaintiffs' Claims Against the President Fail as a Matter of Law and/or Are Not
    Justiciable ................................................................................................. 13

        1.    Plaintiffs Fail to State a Claim for Facial Invalidation Under the First
        Amendment (Count 1) ................................................................ 13

        2.    Plaintiffs Fail to State an Equal Protection Claim (Count 2)............................... 18

        3.    Plaintiffs Fail to State a Due Process Claim (Count 3)............................ 21

        4.    Plaintiffs Fail to State a Claim Under the Ultra Vires Doctrine
        (Counts 4-6) ................................................................................. 22

            a.    Plaintiffs Lack a Cause of Action to Challenge the Executive Order
            for Alleged Noncompliance with IEEPA and the NEA........................... 22

            b.    50 U.S.C. § 1702(b) Poses No Bar to the Executive Order
            (Count 4) .......................................................................... 24

            c.    Plaintiffs' Procedural Theories Fail (Count 5)........................................ 25

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

i

d.      Plaintiffs' Assertion that the WeChat Order Required a New Declaration of Emergency Is Not Justiciable or Plausible (Count 6) ....................................................................................... 27

5.      Plaintiffs Fail to State a Claim Under RFRA (Count 7) ....................................... 28

II.     The Challenge to the Secretary's Identification Should Be Dismissed Under Rule 12(b)(6). ................................................................................................................................... 30

A.      The Identification Is Not Ultra Vires (Count 4)..................................................... 30

B.      Plaintiffs Fail to State a Claim Under the Administrative Procedure Act (Count 8)........ 38

CONCLUSION.................................................................................................................................. 40

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

ii

1

## **TABLE OF AUTHORITIES**

2

3

**CASES**

4
*Al Haramain Islamic Foundation, Inc. v. U.S. Dep't of Treasury*,
    686 F.3d 965 (9th Cir. 2012) ................................................................................. 4

5
*Aleman v. Glickman*,
6
    217 F.3d 1191 (9th Cir. 2000) .............................................................................. 19

7
*Alexander v. Sandoval*,
    532 U.S. 275 (2001).............................................................................................. 22

8

9
*Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*,
    751 F.2d 1239 (Fed. Cir. 1985)............................................................................ 40

10
*Am. Ins. Ass'n v. Garamendi*,
11
    539 U.S. 396 (2003).............................................................................................. 38

12
*Am. Trucking Ass'n v. United States*,
13
    755 F.2d 1292 (7th Cir. 1985) .............................................................................. 25

14
*The Brig Amy Warwick (The Prize Cases)*,
    67 U.S. 635 (1862)................................................................................................ 38

15

16
*Arcara v. Cloud Books, Inc.*,
    478 U.S. 697 (1986)....................................................................................... 15, 34

17

18
*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).............................................................................................. 12

19
*Bell Atl. Corp. v. Twombly*,
20
    550 U.S. 544 (2007).............................................................................................. 12

21
*Bergerco Canada, a Div. of Conagra, Ltd. v. U.S. Treasury Dep't, Office of Foreign Assets Control*,
    129 F.3d 189 (D.C. Cir. 1997).............................................................................. 39

22

23
*Broadrick v. Oklahoma*,
    413 U.S. 601 (1973).............................................................................................. 15

24

25
*Brunner v. Ohio Republican Party*,
    555 U.S. 5 (2008).................................................................................................. 22

26
*California v. Trump*,
    407 F. Supp. 3d 869 (N.D. Cal. 2019) ........................................................... 23, 28

27

28

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

iii

*Cannon v. Univ. of Chicago*,
    441 U.S. 677 (1979)...............................................................................................................22

*Cassell v. Snyders*,
    458 F. Supp. 3d 981 (N.D. Ill. 2020) ................................................................................30

*Clancy v. OFAC*,
    No. 05-C-580, 2007 WL 1051767 (E.D. Wis. Mar. 31, 2007) .........................................28

*Emerg. Coal. To Defend Educ. Travel v. U.S. Dep't of Treasury*,
    498 F. Supp. 2d 150 (D.D.C. 2007),
    *aff'd*, 545 F.3d 4 (D.C. Cir. 2008) .......................................................................................4

*Cohen v. Cowles Media Co.*,
    501 U.S. 663 (1991)....................................................................................................15, 34

*Comm'r of Internal Rev. v. Clark*,
    489 U.S. 726 (1989).............................................................................................................33

*Ctr. for Biological Diversity v. Trump*,
    453 F. Supp. 3d 11 (D.D.C. 2020) ....................................................................................28

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981).....................................................................................................*passim*

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020).........................................................................................................20

*E. Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018) .............................................................................................41

*Fazaga v. Fed. Bureau of Investigation*,
    965 F.3d 1015 (9th Cir. 2020) ...............................................................................28, 29, 30

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012).............................................................................................................21

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000).............................................................................................................38

*Fla. Dep't of State v. Treasure Salvors, Inc.*,
    458 U.S. 670 (1982).............................................................................................................25

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992).................................................................................................12, 22, 23

*Freedom to Travel Campaign v. Newcomb*,
    82 F.3d 1431 (9th Cir. 1996) .............................................................................................34

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

iv

*Fulmen Co. v. Office of Foreign Assets Control*,
No. CV 18-2949 (RJL), 2020 WL 1536341 (D.D.C. Mar. 31, 2020) ................................. 22

*G.K. Ltd. Travel v. City of Lake Oswego*,
436 F.3d 1064 (9th Cir. 2006) ...................................................................... 16, 18

*Gero v. United States Gov't*,
No. 16-CV-04449-JSC, 2017 WL 550230 (N.D. Cal. Feb. 10, 2017) ................................. 12

*Gerritsen v. Warner Bros. Entm't Inc.*,
116 F. Supp. 3d 1104 (C.D. Cal. 2015) ............................................................ 15

*Griffith v. FLRA*,
842 F.2d 487 (D.C. Cir. 1988) .................................................................... 25

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
527 U.S. 308 (1999),
*cert. granted*, 2020 WL 6121565 (Oct. 19, 2020) ............................................. 23

*Guam v. Guerrero*,
290 F.3d 1210 (9th Cir. 2002) ................................................................ 28, 30

*Guaranty Trust Co. v. York*,
326 U.S. 99 (1945) ............................................................................. 23

*Guerrero v. Clinton*,
157 F.3d 1190 (9th Cir. 1988) .................................................................. 25

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995) ............................................................................ 37

*Haig v. Agee*,
453 U.S. 280 (1981) ............................................................................ 19

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) .............................................................................. 16

*In re Digimarc Corp. Derivative Litig.*,
549 F.3d 1223 (9th Cir. 2008) ................................................................. 12

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ................................................................. 12

*Jesner v. Arab Bank PLC*,
138 S. Ct. 1386 (2018) ......................................................................... 23

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

v

*Johnson v. Riverside Healthcare Sys.*,
   534 F.3d 1116 (9th Cir. 2008) ................................................................ 12

*June Med. Servs. L. L. C. v. Russo*,
   140 S. Ct. 2103 (2020) .......................................................................... 25

*Kalantari v. NITV, Inc.*,
   352 F.3d 1202 (9th Cir. 2003) ................................................................ 34

*Kane v. Delong*,
   No. CV 13-05021-KAW, 2014 WL 900721 (N.D. Cal. Mar. 4, 2014) ................................ 27

*Kashem v. Barr*,
   941 F.3d 358 (9th Cir. 2019) .................................................................. 16

*Klay v. Panetta*,
   758 F.3d 369 (D.C. Cir. 2014) ................................................................ 22

*Knievel v. ESPN*,
   393 F.3d 1068 (9th Cir. 2005) ................................................................ 17

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
   511 U.S. 375 (1994) ............................................................................ 11

*Lone Star Sec. & Video, Inc. v. City of Los Angeles*,
   827 F.3d 1192 (9th Cir. 2016) ........................................................ 13, 15, 16

*Los Coyotes Band of Cahuilla & Cupeno Indians v. Jewell*,
   729 F.3d 1025 (9th Cir. 2013) ............................................................ 18, 39

*Lovitky v. Trump*,
   No. 19-1454, 2019 WL 3068344 (D.D.C. July 12, 2019),
   *aff'd in part, vacated in part on other grounds*, 949 F.3d 753 (D.C. Cir. 2020) ................................. 13

*Mishewal Wappo Tribe of Alexander Valley v. Jewell*,
   84 F. Supp. 3d 930 (N.D. Cal. 2015) .......................................................... 26

*Mishewal Wappo Tribe of Alexander Valley v. Zinke*,
   688 F. App'x 480 (9th Cir. 2017) ............................................................. 26

*Mississippi v. Johnson*,
   71 U.S. 475 (1866) ........................................................................ 1, 2, 12, 23

*Navajo Nation v. U.S. Forest Service*,
   535 F.3d 1058 (9th Cir. 2008) ................................................................ 30

*Newdow v. Roberts*,
   603 F.3d 1002 (D.C. Cir. 2010) ............................................................... 12

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

vi

*NRDC, Inc. v. Hodel*,
    865 F.2d 288 (D.C. Cir. 1988) ............................................................................ 25

*Nyunt v. Chairman, Broad. Bd. of Governors*,
    589 F.3d 445 (D.C. Cir. 2009) ............................................................................ 25

*Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*,
    961 F.3d 1062 (9th Cir. 2020) ............................................................................ 16

*Pennhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89 (1984) ............................................................................................... 25

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ............................................................................................... 38

*Pilot Life Ins. Co. v. Dedeaux*,
    481 U.S. 41 (1987) ............................................................................................... 31

*Ramos v. Wolf*,
    975 F.3d 872 (9th Cir. 2020) ............................................................................ 20

*Regan v. Wald*,
    468 U.S. 222 (1984) ..................................................................................... 4, 5, 28, 32

*Russello v. United States*,
    464 U.S. 16 (1983) ............................................................................................... 32

*Safe Air for Everyone v. Meyer*,
    373 F.3d 1035 (9th Cir. 2004) ............................................................................ 11

*Sierra Club v. Trump*,
    963 F.3d 874 (9th Cir. 2020) ............................................................................ 23

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996) ...................................................................... 12, 13

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007) ............................................................................ 12

*Taylor Bay Prot. Ass'n v. EPA*,
    884 F.2d 1073 (8th Cir. 1989) ............................................................................ 25

*Trudeau v. Fed. Trade Comm'n*,
    456 F.3d 178 (D.C. Cir. 2006) ............................................................................ 25

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) .................................................................................... 18, 19

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

vii

*United States v. Amirnazmi*,
   645 F.3d 564 (3d Cir. 2011)................................................................................ 21, 33, 35

*United States v. Gonzalez*,
   692 F. App'x 483 (9th Cir. 2017) ........................................................................ 26

*United States v. Lepp*,
   No. CR 04-00317 MHP, 2008 WL 3843283 (N.D. Cal. Aug. 14, 2008) ............................ 28

*United States v. Quinn*,
   401 F. Supp. 2d 80 (D.D.C. 2005) ........................................................................ 39

*United States v. Spawr Optical Research, Inc.*,
   685 F.2d 1076 (9th Cir. 1982) ............................................................................ 27

*Vietnam v. Reg'l Comm'r of Customs*,
   459 F.2d 676 (3d Cir. 1972)................................................................................ 15

*Virginia v. Hicks*,
   539 U.S. 113 (2003)........................................................................................ 15, 34

*Walsh v. Brady*,
   927 F.2d 1229 (D.C. Cir. 1991) .......................................................................... 32, 33

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) ........................................................................................ 16

*Webster v. Doe*,
   486 U.S. 592, 600-01 (1988) .............................................................................. 39

*Whitman v. Am. Trucking,
   Assocs.*, 531 U.S. 457 (2001) ............................................................................ 34

*Wolfson v. Brammer*,
   616 F.3d 1045 (9th Cir. 2010) ............................................................................ 21

*Yassini v. Crosland*,
   618 F.2d 1356 (9th Cir. 1980) ............................................................................ 40

*Zemel v. Rusk*,
   381 U.S. 1 (1965)............................................................................................ 34

*Ziglar v. Abbasi*,
   137 S. Ct. 1843 (2017).................................................................................... 3, 22, 23

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

viii

**STATUTES**

5 U.S.C. § 551 ........................................................................................................................ 39

5 U.S.C. § 553 ....................................................................................................... 4, 38, 39, 40

5 U.S.C. § 701 *et seq.* ..................................................................................................... 1, 30, 39

5 U.S.C. § 702 ................................................................................................................... 30, 31

5 U.S.C. § 704 ........................................................................................................................ 22

42 U.S.C. § 2000bb-1 ......................................................................................................... 1, 30

50 U.S.C. § 1601 *et seq.* ............................................................................................................ 4

50 U.S.C. § 1621 .................................................................................................................... 25

50 U.S.C. § 1622 ................................................................................................... 23, 25, 26, 27

50 U.S.C. §§ 1621-22 ....................................................................................................... 24, 40

50 U.S.C. § 1701 *et seq.* ................................................................................... 2, 4, 11, 27, 40

50 U.S.C. § 1702 ............................................................................................................. *passim*

50 U.S.C. § 1703 ............................................................................................................... 11, 40

50 U.S.C. § 1705 .................................................................................................................... 21

Pub. L. No. 113-291, 128 Stat 3292 (Dec. 19, 2014) (codified at 50 U.S.C. § 1708) ............................. 37

Pub. L. No. 115-232, 132 Stat. 1636 (2018) ............................................................................. 8

**REGULATIONS**

31 C.F.R. § 560.210 ............................................................................................................... 35

54 Fed. Reg. 5229 (Feb. 2, 1989) ......................................................................................... 35

85 Fed. Reg. 13,719 (Mar. 10, 2020) ..................................................................................... 8

85 Fed. Reg. 29,321 (May 13, 2020) ................................................................................... 9, 27

**RULES**

Fed. R. Civ. P. 12 ..................................................................................................... 1, 3, 11, 15

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

ix

**UNITED STATES CONSTITUTIOIN**

U.S. Const. art. I, § 8....................................................................................................... 23

U.S. Const. art. II, § § 1-2 ............................................................................................... 23

**OTHER AUTHORITIES**

Black's Law Dictionary (11th ed. 2019)........................................................................... 31

Congressional Research Serv., Rep't No. R45898, *U.S.-China Relations* (Sept. 3, 2019) ...................... 8

Exec. Order 13,726, 81 Fed. Reg. 23,559 (Apr. 19, 2016) ....................................................... 21

Exec. Order No. 13,694, 80 Fed. Reg. 18,077 (Apr. 1, 2015) ................................................... 37

Exec. Order No. 13,873, 84 Fed. Reg. 22,689 (May 15, 2019) .............................................. 8, 9

Exec. Order No. 13,943, 85 Fed. Reg. 48,641 (Aug. 11, 2020) ........................................ *passim*

https://www.wechat.com/en/................................................................................................. 10

https://www.wechat.com/en/service_terms.html ................................................................. 35

Investigation of Competition in Digital Markets, H. Comm. on the Judiciary,
Subcomm. on Antitrust, Commercial and Admin. Law,
Maj. Staff Report and Recommendations, 116th Cong. 18 (Oct. 2020).............................. 35

Random House Unabridged Dictionary of the English Language 1295 (2d ed. 1987) ........................... 36

No TikTok on Government Devices Act, S. 3455, 116th Cong. § 2(b) (2020)......................... 37

Oxford English Dictionary 379, 1441 (1933, republished 1978) ............................................. 31

S. Rep. No. 116-250 (2020) ................................................................................................. 38

S. Rep. No. 752, 69th Cong., 1st Sess. 13 (1945)................................................................. 40

The Chicago Manual of Style ¶ 5.98 (17th ed. 2017) ........................................................... 31

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

x

1

## NOTICE OF MOTION

Please take notice that on February 11, 2021, at 9:30 a.m., before the Honorable Laurel Beeler, via Zoom webinar at 450 Golden Gate Avenue, San Francisco, California, 94102, Defendants President Donald J. Trump and Secretary of Commerce Wilbur Ross will and hereby do move this Court for an order dismissing Plaintiffs' Amended Complaint pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  This motion is based on this Notice, the accompanying Memorandum of Points and Authorities, the Court's files and records in this action, including the certified administrative record underlying the Secretary's action, and any other matter the Court may consider at oral argument or that may be judicially noticed.

## STATEMENT OF THE ISSUES

Whether Plaintiffs' claims against the President for violation of the First Amendment, the Equal Protection Clause, the Due Process Clause, and the Religious Freedom and Restoration Act (RFRA), 42 U.S.C. § 2000bb1(a), and for *ultra vires* action, should be dismissed for lack of jurisdiction under *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866), and whether any remaining claims against the President should be dismissed as nonjusticiable or for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

Whether Plaintiffs' claims against the Secretary for *ultra vires* action and violation of the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, should be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiffs are a group alleging to represent certain U.S. users of WeChat, a suite of social-media services and software operated by Tencent Holdings, Ltd. (Tencent).  Tencent is a Chinese company headquartered in Shenzhen, China that is widely known to assist the censorship and surveillance activities of the government of the People's Republic of China (PRC)  Plaintiffs bring this lawsuit to overturn the national security and foreign affairs judgment of the President and the Secretary of Commerce, both of whom concluded that the WeChat mobile app poses unacceptable national security risks to the United

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 1

States based on its bulk collection of U.S. user data and susceptibility to the control and influence of the Chinese Communist Party (CCP) and the PRC.  The President issued an Executive Order directing the Secretary to respond to these threats under the broad authority set forth in the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 *et seq.*  And the Secretary, after consultation with the U.S. Intelligence Community and the Department of Homeland Security (DHS), identified for prohibition six categories of technological services that facilitate (or could in the future facilitate) WeChat's mobile operations in the United States and thus exacerbate the national security threat these operations pose. Specifically, the Secretary restricted U.S. app stores from continuing to offer the WeChat mobile application and accompanying software updates for download by U.S. users; the provision of U.S.-based internet hosting services to the WeChat mobile application; the provision of certain internet transmission and cloud storage services to optimize the speed and functionality of the WeChat mobile application in the United States; the provision of financial services to support WeChat's mobile payment functionalities; and use of the WeChat mobile application's constituent code or functions in other software within the United States.  Importantly, these restrictions regulate only the WeChat mobile application and services that support it; they have nothing to do with user activity on the platform.  Indeed, the restrictions do not apply at all to WeChat interfaces that are not mobile and thus collect substantially less data than the mobile app, such as WeChat services accessible through an internet browser or WeChat software available for Windows and Mac.

Plaintiffs—who have already downloaded the WeChat mobile app and whose continued use of the app is not prohibited by these restrictions—brought this case seeking to invalidate the Executive Order, claiming violations of their freedom of expression, the Equal Protection Clause, the Due Process Clause, IEEPA, and RFRA.  They subsequently amended their Complaint to add two claims against the Secretary's identification of prohibited transactions (Identification) and obtained a preliminary injunction on an expedited timeline.  However, their Amended Complaint suffers from numerous deficiencies, and it should be dismissed.

First, the Court lacks jurisdiction over six of the eight claims in the Amended Complaint (counts 1-3 and 5-7), and a portion of a seventh claim (count 4), each of which challenges the President's

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 2

Executive Order delegating his IEEPA authority to the Secretary to address the threat posed by WeChat, rather than the Secretary's Identification pursuant to that delegation. Courts have "no jurisdiction . . . to enjoin the President in the performance of his official duties" at all, *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866), let alone in the national security context, *see, e.g.*, *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017) ("National-security policy is the prerogative of the Congress and President."). Application of this principle requires dismissal of all claims asserted solely against the President and the Executive Order.

Those claims should separately be dismissed because they are otherwise not justiciable, fail to state a plausible legal theory under Rule 12(b)(6), or both. Plaintiffs' First Amendment claim (count 1) should be dismissed because Plaintiffs have not shown, and cannot show, that the Executive Order could not be implemented consistent with the First Amendment, as they must to make out their claim of facial invalidity. Moreover, even if the Court were to construe this claim as applying to the Secretary's Identification (which the Amended Complaint does not assert and would therefore be improper), the First Amendment is not implicated, and any possible scrutiny it would impose is satisfied. The blocked transactions have nothing to do with the speech that occurs on the WeChat mobile app; instead, they are blocked to prevent the use of WeChat to facilitate espionage and surveillance by the PRC government. That activity is not protected by the First Amendment, even if the PRC government has cloaked its activities within a social media app. The Court should therefore reconsider its prior determination that Plaintiffs have presented "serious questions" under the First Amendment, especially since those questions extend only to a hypothetical claim against the Secretary's Identification that Plaintiffs have not pled. The Equal Protection and Due Process Clauses (counts 2 and 3) are similarly inapplicable because the President's concerns about espionage by the PRC have nothing to do with the nationality or alienage of WeChat's users, and Plaintiffs could not reasonably fear prosecution under the Executive Order, thus negating any vagueness concerns. Plaintiffs' *ultra vires* claims (counts 4-6) fail because there is no private right of action to sue the President for *ultra vires* action under IEEPA and, in any event, the Executive Order is procedurally and substantively consistent with IEEPA. The RFRA claim (count 7) likewise must be dismissed because Plaintiffs have not plausibly alleged that the Executive Order's delegation of

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 3

1   authority to the Secretary, or even the Secretary's exercise of that authority, substantially burdens their

2   religious rights.

3        Plaintiffs' two remaining claims, advanced against the Secretary's Identification of prohibited

4   transactions, are deficient as well.  The portion of count 4 that alleges *ultra vires* action against the

5   Secretary under 50 U.S.C. § 1702(b), suffers from a similar defect as the First Amendment claim.  The

6   prohibitions identified by the Secretary do not regulate personal communications or the export or import

7   of information.  They regulate only six categories of electronic services and transactions that facilitate

8   Tencent's ability to assist espionage by the PRC government.  Any reading of section 1702(b) that would

9   restrict the Executive Branch from invoking IEEPA to mitigate the national security threat posed by those

10  services and transactions is contrary to the plain text of the statute, case law interpreting section 1702(b),

11  the overall statutory scheme and congressional purpose, and longstanding Executive Branch practice.

12  Finally, judicial review of Plaintiffs' assertion in count 8 that the Secretary was required to conduct notice-

13  and-comment proceedings before issuing his Identification is precluded under 5 U.S.C. § 701 because the

14  Secretary's selection of remedial action was committed to agency discretion by law.  Moreover, Plaintiffs

15  fail to plausibly allege that the notice-and-comment requirements of the APA applied; indeed, the APA

16  expressly excepts from those requirements decisions that involve a "foreign affairs function of the United

17  States," 5 U.S.C. § 553(a)(1), such as those challenged here.

**BACKGROUND**

18  **I.      Statutory Framework**

19

20        The National Emergencies Act (NEA), 50 U.S.C. § 1601 *et seq.*, and IEEPA, 50 U.S.C. § 1701 *et*

21  *seq.*, authorize the President to declare a national emergency and provide extensive authorities to address

22  such an emergency.  Specifically, IEEPA empowers the President "to deal with any unusual and

23  extraordinary threat, which has its source in whole or substantial part outside the United States, to the

24  national security, foreign policy, or economy of the United States."  50 U.S.C. § 1701(a).  Under that

25  statute, the President may "regulate, direct and compel, nullify, void, prevent or prohibit, any . . .

26  transactions involving[] any property in which any foreign country or a national thereof has any interest

27  by any person, or with respect to any property, subject to the jurisdiction of the United States."  *Id.*

28

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 4

§ 1702(a)(1)(B).  When the Executive Branch invokes this authority, its actions are entitled to "unique deference," *Al Haramain Islamic Foundation, Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 980 (9th Cir. 2012), because they "relate to the exercise of the Executive's authority in the realm of foreign affairs." *Emerg. Coal. To Defend Educ. Travel v. U.S. Dep't of Treasury*, 498 F. Supp. 2d 150, 166 n.10 (D.D.C. 2007), *aff'd*, 545 F.3d 4 (D.C. Cir. 2008); *see also Regan v. Wald*, 468 U.S. 222, 242 (1984) ("Matters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" (citation omitted)).

Although the powers delegated to the President under IEEPA are broad, Congress has carved out certain exceptions to that delegation.  As relevant here, 50 U.S.C. § 1702(b) provides that:

> The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly --
>
> (1) any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value;
>
> (2) donations by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering[;] . . . [or]
>
> (3) the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds[.]

*Id.* § 1702(b)(1)-(3).  Thus, to the extent the President regulates these activities, he must rely on a source of authority other than IEEPA to do so.

## II.     Factual Background on the PRC, Tencent, and WeChat

### A.     National Security Threat from the PRC

The communist government of the PRC is a significant and growing national security threat. According to the U.S. Intelligence Community, "China presents a persistent cyber espionage threat and a growing attack threat to our core military and critical infrastructure systems."  AR-119.  In particular, "China remains the most active strategic competitor responsible for cyber espionage against the US Government, corporations, and allies," and "Chinese intelligence and security services [may] use Chinese information technology firms as routine and systemic espionage platforms against the United States and allies."  *Id.*  The Director of the FBI has said that this "counterintelligence and economic espionage threat

from China" is "[t]he greatest long-term threat to our nation's information and intellectual property, and to our economic vitality[.]"  AR-103.

One of the tools that the PRC uses to further its espionage activities is bulk data collection.  *See* AR-6.  Several large-scale hacking operations to obtain the bulk personal information of Americans have been linked to China, including the hacking of Anthem, Inc. in 2015, the hacking of Equifax Inc. in 2017, and the Office of Personnel Management data breach in 2017, which collectively resulted in the theft of sensitive personal data of more than 200 million Americans.  AR-7-8.  These large data sets "can reveal patterns and trends in human behavior, providing a 'pattern of life' that can be used to facilitate intelligence and surveillance targeting, particularly when aggregated with other data sets."  AR-7.  And the PRC is "building massive databases of Americans' personal information," as part of a "tactic used by the Chinese government to further its intelligence-gathering and to understand more about who to target for espionage[.]"  AR-7; *see also* AR-6-7 ("The PRC government has engaged in data collection on a massive scale across multiple domains as a means of generating information to enhance state security— and the political security of the CCP.").  The data collected and used by the PRC for these ends "comes in many forms, including text, images, video, and audio."  AR-7.  "Once harvested, the data can be used to glean details about key government personnel and potential spy recruits, or to gain information useful for intelligence targeting and surveillance."  *Id.*

The PRC has also increasingly pursued its goals through nontraditional forms of intelligence activities, including through the purportedly private business activities of Chinese companies.  Such companies, though nominally private, are in fact instrumentalities of the Chinese state, which exercises "authority and supervision" over them through a number of mechanisms, including requirements that they perform party-building activities for, and host Party Committees of, the CCP.  *See* AR-8 ("Within private enterprises, the Party Committee implements CCP's policies" and is a pervasive "source of political pressure in the boardroom").  Technology companies in particular are increasingly organizing their business activities around the needs of the state, providing the PRC government with "access to online data" and "the cloud computing prowess to . . . crunch data from surveillance cameras, smartphones,

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 6

government databases and other sources." AR-937.  Such assistance enables PRC initiatives that human rights researchers characterize as a "massive surveillance project."  AR-939.

To ensure cooperation with these efforts, the PRC government has enacted laws that aggressively increase its influence "over all Chinese companies, and citizens," even those outside of China.  AR-8.  For example, in 2017, the PRC enacted the National Intelligence Law, which "obliges individuals, organizations, and institutions to assist Public Security and State Security officials in carrying out a wide array of intelligence work."  AR-9.  The law expressly "permits Chinese intelligence institutions to request citizens and organizations to provide necessary support, assistance, and cooperation," as well as "take control of an organization's facilities, which includes communications equipment."  *Id.*  Without an independent judiciary, there is no meaningful legal recourse for companies to challenge orders or requests for such assistance from PRC intelligence or security agencies.  *Id.*

### B.      Tencent and WeChat

WeChat is wholly owned by Tencent, a multinational conglomerate headquartered in China.  Tencent's major services include communications and social networking, online PC and mobile games, digital content and utilities, artificial intelligence (AI), cloud services, and financial technology.  AR-4.  Tencent's CEO is a member of the CCP and openly collaborates with the government of the PRC.  AR-10.  Tencent established a CCP party organization as early as 2005, and has since led the way in CCP "party building" among Internet companies.  Tencent was one of the first Chinese tech firms to publicly disclose the existence of a Party Committee, and by 2017, its Party Committee was nationally recognized, comprising nine general branches, 89 party branches and 3,386 members.  AR-8.  Tencent also maintains a party propaganda magazine and public social media presence for party building.  AR-8-9.  In 2017, Tencent was named one of a handful of members of the PRC government's AI "national team" and has focused on developing a host of AI-empowered applications as well as providing cloud-computing services to different levels of the PRC government.  AR-4.

Tencent's WeChat app, launched in 2011, is one of China's most popular social media apps.  It is also used by an estimated 100-200 million people outside of China, including 19 million daily users in the United States.  AR-5.  The WeChat app collects and transmits a wide range of sensitive personal

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 7

information, including phone numbers, names, internet protocol (IP) addresses, contact lists, geolocation data, Wi-Fi access points, internet or network activity information, device model, network type, call history, chat data, search history, biometric information, payment card information, nationality and gender. AR-11. Much of this information is collected directly from the user and stored in data centers in China and Canada, and it may be shared with a range of third parties, including "'regulatory and judicial authorities and law enforcement agencies.'" AR-11-12. Tencent is widely reported to assist the government of the PRC in surveillance activities through the WeChat app. *See* Am. Compl. ¶ 5 (there is "widespread knowledge" that the "Chinese government[] monitor[s] WeChat communications"). For example, WeChat users in China have been jailed for speech communicated through WeChat, and Tencent has reportedly worked with police to close accounts of those accused by the PRC government of "disrupting social order" through their WeChat communications. A report by an independent think tank in 2020, as well as experience of U.S. users, reveals that WeChat communications among non-China-registered accounts also are subject to pervasive, secretive content surveillance. AR-10, 11.

### III.   The Government's Response to These Growing Threats

Congress has directed the Executive Branch to investigate and respond to the growing threat from the PRC. *See* S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232 §§ 1260(5), 1261, 132 Stat. 1636 (2018) (directing the President to assess and formulate strategies to address, *inter alia*, the CCP's "information operations" and "use of economic tools" to advance its security and military objectives). The Executive Branch has done so through a holistic, multi-pronged effort that includes leveraging the President's authority under IEEPA to protect the information and communications technology and services sectors.[1] As relevant here, on May 15, 2019, the President declared a national emergency under the NEA and IEEPA, finding that "foreign adversaries are increasingly creating and exploiting vulnerabilities in information and communications technology and services, which store and

---

[1] Other measures to address threats posed by the PRC include trade initiatives, *see* Cong. Research Serv., Rep't No. R45898, *U.S.-China Relations*, at 12-14, 19-26 (Sept. 3, 2019); law enforcement initiatives against espionage, AR-7-8; AR-967-71; limitations on certain Chinese telecommunications firms seeking to supply 5G infrastructure and other products and services, *see* Pub. L. No. 115-232 § 889; and deploying the multi-agency Committee on Foreign Investment in the United States to assess the national security risks arising from Chinese acquisitions in the United States, *see, e.g.*, 85 Fed. Reg. 13,719 (Mar. 10, 2020).

*U.S. WeChat Users Alliance, et al. v. Trump, et al*., Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 8

communicate vast amounts of sensitive information, facilitate the digital economy, and support critical infrastructure and vital emergency services, in order to commit malicious cyber-enabled actions." Securing the Information and Communications Technology and Services Supply Chain, Exec. Order No. 13,873, 84 Fed. Reg. 22,689 (ICTS Order), pmbl.  In the ICTS Order, the President found that "the unrestricted acquisition or use in the United States of information and communications technology or services designed, developed, manufactured, or supplied by persons owned by, controlled by, or subject to the jurisdiction or direction of foreign adversaries augments" those risks.  *Id.*  The President has since renewed this national-emergency declaration.  *See* 85 Fed. Reg. 29,321 (May 13, 2020).

On August 6, 2020, the President issued the Executive Order at issue here concerning WeChat. *See* Addressing the Threat Posed by WeChat, and Taking Additional Steps to Address the National Emergency with Respect to the [ICTS] Supply Chain, Exec. Order No. 13,943, 85 Fed. Reg. 48,641 (Aug. 11, 2020) (WeChat Order or Executive Order).  The President found that "additional steps must be taken to deal with the national emergency" declared in the ICTS Order, as "the spread in the United States of mobile applications developed and owned by companies in [the PRC] continues to threaten the national security, foreign policy, and economy of the United States."  *Id.*, pmbl.  In particular, the President determined that WeChat "automatically captures vast swaths of information from its users," including "location data and browsing and search histories."  *Id.*  The President further found that WeChat's "data collection threatens to allow the [CCP] access to Americans' personal and proprietary information," which would allow the PRC government "to track the locations of Federal employees and contractors, build dossiers of personal information for blackmail, and conduct corporate espionage."  *Id.* Accordingly, the President directed the Secretary of Commerce to prescribe a set of prohibited WeChat-related transactions within 45 days to mitigate the threat.  *Id.* §§ 1, 4.

The Secretary did so, and on September 18, 2020, he published a list of six categories of prohibited transactions relating to the WeChat mobile app.  *See* Dep't of Commerce, *Identification of Prohibited Transactions to Implement Exec. Order No. 13,943* (*Commerce Identification*), AR-1674-80.  The Secretary prohibited online mobile app stores from providing "services to distribute or maintain the WeChat mobile application" and WeChat mobile application updates, effectively preventing most new

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 9

U.S. users from downloading the app and most existing U.S. users from receiving software updates to the app. *Commerce Identification* ¶ 1, AR-1678. The Secretary also prohibited the provision of U.S.-based internet hosting services, content delivery services, and directly contracted internet transit or peering services that "enabl[e] the functioning or optimization of the WeChat mobile application," as well as use of the WeChat mobile application's constituent code, functions, or services in other software or services within the United States. *See Commerce Identification* ¶¶ 2-6, AR-1678-79.

The Commerce Department prepared a decision memorandum in connection with the Secretary's Identification (Decision Memorandum), AR-3-19, which outlined the bases for the identified prohibitions and explained that over time, their effect would likely be to "reduce the functionality of the WeChat mobile app within . . . the United States." AR-15. However, both the Identification and the Decision Memorandum made clear that existing users were not the target of these prohibitions. *See Commerce Identification* at 6 ("These identified prohibitions do not apply to . . . [t]he exchange between or among WeChat mobile application users of personal or business information using the WeChat mobile application[.]"), AR-1679; *see also* Decision Mem. at 15-16, AR-16-17 ("the app would remain on any device where the app has been downloaded prior to the [effective date of the prohibitions]"). Moreover, while the restrictions apply to services supporting the WeChat mobile app, they do not apply to other WeChat interfaces, such as the WeChat website accessible through an internet browser or versions of the WeChat software available for Windows and Mac.[2]

**IV.   This Case**

Plaintiffs filed this case on August 21, 2020, seeking to invalidate the Executive Order. ECF No. 1. Plaintiffs moved for a preliminary injunction on August 28, 2020, ECF No. 17, and for expedited discovery on September 3, 2020, ECF No. 18. The Court denied the discovery request on September 10, 2020, holding that the "interplay between the Executive Order and final agency action . . . militate[d]" against it. ECF No. 25 at 4.

---

[2] *Compare* https://www.wechat.com/en/ (offering a mobile app, software for Windows and Mac, and a "Web WeChat") *with Commerce Identification* at 5-6, AR-1678-79 (prohibitions 1-6 applying only to the "WeChat mobile application") *and* WeChat Order pmbl. (addressing the WeChat "mobile application").

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 10

On September 18, 2020, the Secretary issued his Identification, leading Plaintiffs to amend their Complaint to add claims challenging the Secretary's Identification, ECF Nos. 49-50.[3]   Plaintiffs simultaneously renewed their motion for a preliminary injunction, ECF No. 48, which the Court granted the next day on First Amendment grounds only.  *See* Order Granting Mot. for Prelim. Inj. (Prelim. Inj. Order) at 19, ECF No. 59 (concluding that Plaintiffs had not established, or the record did not support, that Plaintiffs would likely succeed on the merits on their other theories).  The Court's injunction operates solely against the Secretary's Identification of six prohibited transactions, not the President's Executive Order.  *See id.* at 20 ("Nothing in this order prevents the Secretary from . . . identifying [for prohibition] 'any other transaction that is related to WeChat . . . under the authority delegated under Executive Order 13943.'").  The Court subsequently declined to stay its injunction pending Defendants' appeal of that order to the Court of Appeals for the Ninth Circuit.  *See* ECF Nos. 104-05 (Stay Order); *see also* ECF No. 79.[4]  On November 2, 2020, Defendants produced to Plaintiffs' counsel the unclassified and unprivileged materials comprising the administrative record for the Secretary's Identification.  *See* ECF Nos. 101, 122.  Defendants also lodged a copy of the administrative record with the Court, which included a classified assessment provided to the Secretary from the Office of the Director of National Intelligence.

**LEGAL STANDARD**

A Rule 12(b)(1) motion challenges the federal court's jurisdiction over the subject matter of the complaint.  The party invoking the court's jurisdiction bears the burden of establishing that the court has the requisite subject matter jurisdiction to grant the relief requested as to each claim asserted.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  A Rule 12(b)(1) motion will be granted when, looking at the entirety of the complaint, its allegations fail to establish jurisdiction either facially or factually.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  While in a facial

---

[3]  The Amended Complaint contends that the Executive Order is facially invalid under the First Amendment; violates the Equal Protection and the Due Process Clauses of the Fifth Amendment; is *ultra vires* under 50 U.S.C. §§ 1701, 1702(b), and 1703; and violates RFRA.  *See* Am. Compl. ¶¶ 78-124.  It also claims that the Secretary's Identification is *ultra vires* under 50 U.S.C. § 1702(b) and violates the APA because the Secretary did not undertake notice-and-comment prior to its issuance.  *See id.* ¶¶ 100-07; 125-32.

[4]  The Ninth Circuit expedited the appeal but also declined to stay the preliminary injunction during the pendency of the appeal.  *See* ECF No. 106.  The appeal is set to be heard by the Ninth Circuit in January 2021.  *See id.* at 2.

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 11

challenge, all material allegations are taken as true, the court does not assume the truthfulness of the allegations in a factual challenge and may review evidence beyond the complaint without converting the motion into one for summary judgment.  *In re Digimarc Corp. Derivative Litig.*, 549 F.3d 1223, 1235-36 (9th Cir. 2008).

To survive a Rule 12(b)(6) motion, the plaintiff's complaint must allege "enough facts to state a claim that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The "facial plausibility" standard requires the plaintiff to allege facts that, based on "judicial experience and common sense," add up to "more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).  To decide the motion without converting it into one for summary judgment, a court generally will consider only the complaint and information incorporated by reference therein, *see Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007), and it should accept as true all well-pleaded facts but not "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  The Court may also consider matters properly subject to judicial notice, including the contents of a certified administrative record.  *See, e.g.*, *Gero v. United States Gov't*, No. 16-CV-04449-JSC, 2017 WL 550230, at *1 n.1 (N.D. Cal. Feb. 10, 2017).  Dismissal may be based "on either lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1121 (9th Cir. 2008) (quotation marks and citations omitted).

## DISCUSSION

## I.      The Claims Against the  Executive Order Should Be Dismissed (Counts 1-7)

### A.      The Court Lacks Jurisdiction to Grant Equitable Relief Against the President

Seven of Plaintiffs' claims (counts 1-7) seek relief directly against the Executive Order and, by extension, the President.  These claims must be dismissed because courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties."  *Johnson*, 71 U.S. at 501; *see also Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) ("injunctive relief against the President himself is extraordinary" and should "raise[] judicial eyebrows").  Nor do courts possess jurisdiction to grant declaratory or other forms of equitable relief against the President.  *See, e.g.*, *Newdow v. Roberts*, 603

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 12

F.3d 1002, 1013 (D.C. Cir. 2010) ("courts do not have jurisdiction to enjoin [the President], and have never submitted the President to declaratory relief" (citations omitted));  *Swan v. Clinton*, 100 F.3d 973, 977-78 (D.C. Cir. 1996) (similar); *Lovitky v. Trump*, No. 19-1454, 2019 WL 3068344, at *10 (D.D.C. July 12, 2019) (courts "should not grant mandamus, injunctive, or declaratory relief against a sitting President"), *aff'd in part, vacated in part on other grounds*, 949 F.3d 753 (D.C. Cir. 2020).  The Court thus lacks jurisdiction over the equitable relief that Plaintiffs seek with respect to the President and his Executive Order.  Those claims (counts 1-3, 5-7, and the portion of count 4 asserted against the Executive Order) and the President himself should be dismissed from this lawsuit.

### B.  Plaintiffs' Claims Against the President Fail as a Matter of Law and/or Are Not Justiciable

The claims asserted against the President and the Executive Order also are defective on numerous other grounds.  Plaintiffs fail to state a claim for facial invalidation under the First Amendment, the Equal Protection Clause, or the Due Process Clause; they lack of a private right of action to press their *ultra vires* theories against the President and those theories also raise non-justiciable political questions and fail as a matter of law; and they have not plausibly alleged that the Executive Order substantially burdens their religious beliefs as required to state a claim under RFRA.

### 1.  Plaintiffs Fail to State a Claim for Facial Invalidation Under the First Amendment (Count 1)

Plaintiffs have chosen to assert their First Amendment claim solely against the President's Executive Order declaring WeChat to be part of the ICTS emergency, and not the Secretary's Identification of blocked transactions pursuant to that Executive Order.  *See* Blacklined Am. Compl. ¶¶ 83-86, 103, 125-132 (amending certain claims to add challenge to Identification but asserting First Amendment claim solely against Executive Order), ECF No. 50.  That challenge is a facial one, meaning that the Court may invalidate the Executive Order only if Plaintiffs can show that it is "'unconstitutional in every conceivable application,' or . . . 'seek[s] to prohibit such a broad range of protected conduct that [it is] unconstitutionally overbroad.'"  *Lone Star Sec. & Video, Inc. v. City of Los Angeles*, 827 F.3d 1192, 1197 (9th Cir. 2016) (citations omitted).

Plaintiffs' First Amendment allegations do not satisfy this demanding standard. Instead, they mischaracterize the Executive Order. First, they contend that it prohibits "any transaction that is related to WeChat by any person." Am. Compl. ¶ 80. It does not. The Order prohibits only those WeChat-related transactions that are "identified by the Secretary . . . under section 1(c) of this order." WeChat Order § 1(a). Plaintiffs also assert that the Order discriminates "against the ideas and viewpoints of WeChat users." Am. Compl. ¶ 82; *id.* ¶ 83. That too is incorrect. The Executive Order has nothing to do with the ideas or viewpoints expressed on WeChat. It is concerned about the "vast swaths of information" WeChat captures from its users, and the threat that this "personal and proprietary information" will be shared with the CCP. *See* WeChat Order pmbl. While the Executive Order also observes that *other* countries have taken action against WeChat based on PRC censorship, *id.*, it does not suggest that such censorship is the animating purpose behind the Executive Order itself. Moreover, it would turn the First Amendment on its head to suggest that concerns about state-sponsored censorship *by the PRC* violate the First Amendment when those are the very same concerns that underlie the First Amendment.

In any event, it would be impossible for the Court to decide whether any prohibitions satisfied First Amendment scrutiny without knowing what those prohibitions were. The Court has already implicitly recognized as much when it observed that any challenge to further implementation of the Executive Order by the Secretary was "not ripe" and held that the Secretary was free to identify other prohibitions "at a future date under the authority delegated under [the] Executive Order[.]" Prelim. Inj. Order, ECF No. 59 at 21-22. And Plaintiffs themselves have conceded that the Executive Order may constitutionally be applied under the intermediate scrutiny standard previously endorsed by the Court. They have repeatedly argued that the Secretary could (and should) have used his delegated authority under the Executive Order to target a narrower set of transactions, such as by prohibiting "unauthorized data collection or surveillance." Pls.' Mot. for Prelim. Inj. at 27, ECF No. 17; *see also* Pls.' Opp'n to Defs.' Mot. to Stay Prelim. Inj. at 11, ECF No. 78 (arguing that the Secretary should have taken more "targeted measures" to address "the issues of data security and surveillance without burdening speech"). Plaintiffs therefore cannot show that the Executive Order is "unconstitutional in every conceivable application" or necessarily "prohibit[s] such a broad range of protected conduct" that it is constitutionally overbroad.

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 14

1  *Lone Star Sec. & Video, Inc.*, 827 F.3d at 1197; *see also Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)

2  (overbreadth doctrine is "strong medicine" to be employed "sparingly and only as a last resort" when a

3  limiting construction is not available).  The Court must therefore dismiss this facial First Amendment

4  claim against the Executive Order.

5        Although the Court preliminarily enjoined the Secretary's Identification based on First

6  Amendment grounds, Plaintiffs' Amended Complaint does not assert a First Amendment claim against

7  the Secretary's Identification and the Court should therefore dismiss this claim based on the foregoing

8  analysis.  *See, e.g.*, *Gerritsen v. Warner Bros. Entm't Inc.*, 116 F. Supp. 3d 1104, 1126 (C.D. Cal. 2015)

9  (courts should "decline to consider . . . unpled theories").  But even if Plaintiffs had made a free speech

10  challenge against the Secretary's Identification, that contention would fail because the First Amendment

11  has no application here.[5]   The Identification does not restrict expression at all.  It is aimed solely at

12  eliminating the PRC's ability to use WeChat to surveil U.S. users.  Such users remain free to say anything

13  they like and share any content they please on any other platform.  Indeed, they can even continue to use

14  WeChat for such communications.  *See Commerce Identification* at 6-7 (use of the mobile app to exchange

15  personal and business information is not prohibited).  The fact that WeChat will, over time, become less

16  useful is legally irrelevant: "[n]either the basis for the . . . [restriction] . . . nor its purpose . . . has anything

17  to do with the First Amendment."  *Virginia v. Hicks*, 539 U.S. 113, 123 (2003) ("it is Hicks' nonexpressive

18  conduct . . . for which he is punished"); *see also, e.g.*, *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 705-07

19  (1986) (the First Amendment does not prevent the government from "penalizing and terminating illegal

20  uses of premises" even if premises host expressive activity); *Cohen v. Cowles Media Co.*, 501 U.S. 663,

21  669 (1991) ("It is . . . beyond dispute that '[t]he publisher of a newspaper has no special immunity from

22  the application of general laws.  He has no special privilege to invade the rights and liberties of others.'"

23  (citation omitted)).

24

25  [5] Defendants address this claim out of an abundance of caution based on the preliminary injunction order the Court previously entered, which assumed that a First Amendment claim was asserted against the Secretary when it is not.  Rather than repeating the First Amendment arguments made in Defendants' prior

26  briefing, the Government incorporates those arguments by reference and includes a summary here.  *See* ECF No. 22 at 24-32, ECF No. 68 at 11-16.  The Government recognizes the Court's prior disagreement

27  with these arguments but presents them here for purposes of permitting the Court to evaluate and rule on the issue under the standard of Rule 12(b)(6).

28

*U.S. WeChat Users Alliance, et al. v. Trump, et al*., Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 15

A hypothetical illustrates the point:  Suppose a company owned by the PRC provided overnight package-delivery services and surveilled the contents of each package delivered, maintaining a comprehensive database with sensitive personal data on the American senders and recipients, as well as the contents of each package—using that database for intelligence collection.  The President could lawfully prohibit commercial transactions with that PRC-owned company without implicating the First Amendment.  Regulation of the shipping company would be unrelated to the content of any packages sent by Americans.  And American users would remain free to use other shipping companies—such as UPS or FedEx—to communicate.  So too with WeChat: the Government does not violate "the First Amendment merely because it regulates incident to its scheme protected activities."  *Vets. & Reservists for Peace in Vietnam v. Reg'l Comm'r of Customs*, 459 F.2d 676, 681 (3d Cir. 1972).

Even if the First Amendment applied, it would impose only intermediate scrutiny, as this Court previously recognized.  Prelim. Inj. Order at 17, ECF No. 59; Stay Order at 16, ECF No. 105.  Such scrutiny requires only that a regulation (1) advance important governmental interests unrelated to the suppression of free speech, (2) not burden substantially more speech than necessary to further those interests, and (3) leave open adequate alternative opportunities for speech or expression.  *See Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1068 (9th Cir. 2020); *Lone Star Sec. & Video*, 827 F.3d at 1202.  Strict scrutiny does not apply, and the Government need not adopt "the least restrictive or least intrusive means" of promoting the national security interests; it is enough that such interests "would be achieved less effectively" by lesser measures.  *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989).

This standard is amply met.  First, the Government's interests are significant, as the Court has already held.  Stay Order at 16, ECF No. 105; *see also, e.g.*, *Kashem v. Barr*, 941 F.3d 358, 378 (9th Cir. 2019) (national security is an interest "of the highest order").  Second, the Identification does not burden substantially more speech than necessary because lesser measures would not address the Government's concerns to the same extent.  The data security "best practices" identified by the Court in its Stay Order, ECF No. 105 at 16, require a "baseline level of trust" with Tencent that is currently lacking in light of its deep relationship with the CCP and PRC, "ongoing efforts to support PRC surveillance," and the PRC's "ongoing pattern of espionage to collect U.S. person information."  AR-15.  That determination reflects

the Executive Branch's considered national security and foreign policy judgment and is entitled to substantial deference. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) ("It is vital in this context 'not to substitute . . . our own evaluation of evidence for a reasonable evaluation by [the political branches.]'" (citation omitted)). And Plaintiffs' alternate proposal that the Government restrict the use of the WeChat mobile app only on governmental devices would reach only a fraction of the data collected by Tencent, and thus "achieve[] [the Government's objectives] less effectively." *Ward*, 491 U.S. at 799; *see also G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1074 (9th Cir. 2006)  (upholding "sever[e]" limitation on signs because it "directly serves the City's purposes").

Finally, the Secretary's restrictions leave open numerous and adequate alternative opportunities for expression. These include not only Web WeChat and WeChat for Windows and Mac, *see supra* at 10, but also many "other mobile apps such as Facebook, Facebook Messenger, Google Line, Telegram, Signal, Snapchat, Zoom, Skype, iChat, and WhatsApp" as well as iMessage, Wickr, and Xiaomi Mitalk. Stay Order at 12, ECF No. 105; *see also* Am. Compl. ¶ 30 (discussing WeChat's "messaging capabilities" which are similar to above messaging apps); *id.* ¶ 31 (WeChat's voice and video functionalities are "comparable to Zoom video group calls"); *id.* ¶ 32 (WeChat's "Moments" feature is "similar to the capabilities of apps like Facebook or Instagram"); *id.* ¶ 77 (describing "alternative social media channels on YouTube, Instagram and Facebook").[6]

Plaintiffs' only concrete theory for why those alternatives are legally inadequate is that they currently lack the "network" effects of WeChat so that, in Plaintiffs' opinion, no existing or new WeChat user will ever use any other social medial platform. *See, e.g.*, Am. Compl. ¶¶ 12, 35, 37, 38, 77. This allegation is not plausibly alleged, particularly given that Plaintiffs represent only a fraction of WeChat users; the Court has not certified a class; and the WeChat Users Alliance has been in existence for four

---

[6] In addition to the alternatives cited in the Court's Order and Plaintiffs' Amended Complaint, the Amended Complaint also incorporates by reference articles discussing some of these alternatives. *See* Am. Compl. ¶ 28 n.10 (New York Times article describing WeChat as "WhatsApp plus Facebook plus PayPal" plus non-speech apps like "Uber" and "GrubHub" and discussing alternatives such as Signal); Am. Compl. ¶ 29 n.11 (Business Insider article describing the WeChat interface as "extremely similar to WhatsApp" with functionalities that are "much like Facebook's newsfeed"). *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (under the "incorporation by reference" doctrine, court may consider on Rule 12(b)(6) motion "documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading'" (citations omitted)).

months, formed only for the purpose of challenging the WeChat Order.  *See* Am. Compl. ¶ 12.  Critically, Plaintiffs have not explained why the present but malleable configuration of social media networks is an insurmountable barrier to their communications, *i.e.*, why they and the small number of users they represent cannot move to different apps, thus creating and recreating new networks, as all users in the United States would eventually have to do.  To the extent Plaintiffs desire to communicate with persons in the PRC whose alternatives are restricted by the PRC government, any inability to do so flows from the policies of that repressive regime, not from the permissive policies of the U.S. Government, which leave open ample alternative channels of communication.  It would be absurd to prohibit the President from protecting the significant national security interests of the United States simply because a foreign adversary has eliminated numerous avenues of speech within its borders.  That outcome would permit the PRC to use the First Amendment as a sword to advance its own stifling of speech by forcing communications onto its own surveilled platform.  And even aside from that absurdity, Plaintiffs do not explain why they cannot use alternative forms of WeChat itself, such as Web WeChat or WeChat for Windows or Mac.

In light of the numerous alternatives to the WeChat mobile app, including other iterations of WeChat as well as a plethora of other mobile apps and non-app alternatives (such as the telephone, SMS text, newspapers, and email), Plaintiffs cannot plausibly claim that legally adequate alternatives to WeChat are lacking.  *See G.K. Ltd. Travel*, 436 F.3d at 1074-75 (pole sign ordinance did not violate First Amendment where it restricted "plaintiffs' preferred method of communication" but left open other forms of "communication such as handbills, radio, television, newspaper or telemarketing").  Plaintiffs' First Amendment claim should be dismissed.

### 2.     Plaintiffs Fail to State an Equal Protection Claim (Count 2)

Plaintiffs assert that the WeChat Order violates their right to equal protection because it "singles out people of Chinese and Chinese-American ancestry and subjects them and people who communicate with them to disparate treatment on the basis of race, ethnicity, nationality, national origin, and alienage." Am. Compl. ¶ 91.  Plaintiffs are mistaken.  The WeChat Order is neutral, applying equally to transactions identified by the Secretary regardless of the nationality, ancestry, or immigration status of the parties to

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 18

those transactions, none of which have protected status.  WeChat Order, 85 Fed. Reg. at 48,641-43.

The WeChat Order is also neutral with regard to any downstream effects on users.  This lawsuit proves the point: of the seven named Plaintiffs, one is a "New Jersey nonprofit organization," one is a U.S. citizen with "Chinese families [*sic*] and friends," one is a U.S. citizen with no alleged family in China, two are Chinese citizens residing in the United States, one is a "media and online retailer" incorporated in California and Delaware, and one is a lawful permanent resident.  Am. Compl. ¶¶ 19-25.  Each claims to be equally subject to any effects of the WeChat Order.

In any event, given that the Executive Order is an exercise of the President's national security and foreign affairs functions, and in light of his constitutional and statutory responsibility in tending to those interests, this claim is governed by the rational-basis standard, meaning the Court should "uphold the [Executive Order] so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds."  *See Trump v. Hawaii*, 138 S. Ct. 2392, 2420 (2018); *see also Los Coyotes Band of Cahuilla & Cupeno Indians v. Jewell*, 729 F.3d 1025, 1039 (9th Cir. 2013) (explaining that under rational-basis review, the plaintiff "bears the burden 'to negative every conceivable basis which might support'" the Government's action (citation omitted)).

That standard is amply met.  The purpose of the WeChat Order is not rooted in a "desire to harm a politically unpopular group."  *Hawaii*, 138 S. Ct. at 2420.  Rather, it is "expressly premised on legitimate purposes[,]" *id.* at 2421, as the Government is seeking to prevent the PRC from using WeChat to surveil the American people and collect the personal and proprietary information from American users to advance its own interests.  *See* WeChat Order, 85 Fed. Reg. at 48,641.  These national security and foreign policy concerns are of paramount importance.  *See, e.g.*, *Haig v. Agee*, 453 U.S. 280, 307 (1981); *see also* Prelim. Inj. Order at 3 (recognizing the Government's "significant interest").  And the WeChat Order's relationship to those interests is not only conceivable, but readily discernible, *see Hawaii*, 138 S. Ct. at 2420-21, as imposing restrictions on the functionality of the app will curtail its use and, by extension, the PRC's ability to harvest Americans' information.

Plaintiffs do not salvage their claim by alleging that the WeChat Order "prohibit[s] the use of WeChat but not other apps that are used primarily by people who are not of Chinese or Chinese-American

ancestry."  Am. Compl. ¶ 91.  It is not the demographic of WeChat's user base that gives rise to the concerns reflected in the Executive Order; it is the vast amount of data collected by WeChat *in connection with* its close proximity to and interrelationship with the government of the PRC.  WeChat Order, 85 Fed. Reg. at 48641.  Plaintiffs fail to show that any "other apps" are similarly situated to WeChat in this respect. Moreover, even if other apps may raise similar concerns (and Plaintiffs fail to identify any), "[a] classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality."  *Aleman v. Glickman*, 217 F.3d 1191, 1201 (9th Cir. 2000) (citation omitted).  That is especially true with respect to foreign threats, where the Executive Branch must assess and balance potentially competing considerations of national security, economic security, and international relations that may counsel different approaches to different threats.

Nor can Plaintiffs plausibly allege that the WeChat Order is "motivated by Defendants' animus towards people of Chinese and/or Chinese American ancestry[.]"  Am. Compl. ¶ 92.  Again, the WeChat Order confirms that the Government was motivated not by any animus but instead by a need to confront a threat posed by the PRC.  *See* 85 Fed. Reg. at 48641.  This alone is sufficient to defeat Plaintiffs' theory. *See Hawaii*, 138 S. Ct. at 2421 (constitutional claim failed where policy was not "inexplicable by anything but animus").  Moreover, Plaintiffs have failed to establish that the WeChat Order bears the hallmarks of "an 'invidious discriminatory purpose[.]'"  *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020) (plurality).  To the extent Plaintiffs assert that the WeChat Order has a disproportionate impact on persons with ties to China, that consequence flows from the fact that WeChat is the beneficiary of PRC policies that have promoted its prevalence in China and is subject to the laws of a government that practices mass surveillance, *see* AR-5-14; Am. Compl. ¶ 8, not from an invidious purpose.  *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1915-16 ("[B]ecause Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. . . .  Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds."); *accord Ramos v. Wolf*, 975 F.3d 872, 898 (9th Cir. 2020).  Nor have Plaintiffs demonstrated animus based on "[d]epartures from the normal procedural sequence" or "contemporary statements by members of the

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 20

decisionmaking body[.]"  *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1915 (citation omitted).  Indeed, the statements attributed to the President by Plaintiffs—primarily concerning the origins of the COVID-19 pandemic, Am. Compl. ¶¶ 72-74—have no apparent nexus to the WeChat Order.  *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1916 (statements that are "remote in time and made in unrelated contexts . . . do not qualify as 'contemporary statements' probative of the decision at issue'" (citation omitted)); *Ramos*, 975 F.3d at 897-98 (holding that plaintiffs failed to present an equal protection claim where President's alleged animus toward certain immigrants was untethered from challenged policy).

### 3.  Plaintiffs Fail to State a Due Process Claim (Count 3)

Plaintiffs' Due Process claim likewise fails as a matter of law.  They contend that the WeChat Order is unconstitutionally vague under the Fifth Amendment because it "provides no notice to WeChat users or anyone else of the specific conduct that is prohibited."  Am. Compl. ¶ 96.  However, Plaintiffs need not "guess at [the] meaning" of the Executive Order, *see FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012), because, under its express terms, "the Secretary shall identify"—and in fact has identified—"the [prohibited] transactions."  WeChat Order § 1(c); *see also id.* § 1(a) (explaining that the Order is not self-executing, but rather prohibits only those transactions that are "identified by the [Secretary] under section 1(c) of this order").  This framework is not unique; IEEPA orders commonly identify broad subject matter of concern while delegating the details of implementation and enforcement to one or more administrative agencies.[7]

In any event, the Secretary's Identification forecloses Plaintiffs' claim.  It expressly states that the prohibitions "only apply to the parties to business-to-business transactions" and do not apply to "exchanges between or among WeChat mobile application users of personal or business information."  AR-1679.  Plaintiffs and other WeChat users therefore cannot reasonably fear prosecution, or be chilled from using WeChat.  *See* Am. Compl. ¶¶ 97-98.  *Cf. Wolfson v. Brammer*, 616 F.3d 1045, 1062-63 (9th Cir. 2010) (plaintiff's fear must be "plausible and reasonable" and "imminent" (emphasis omitted)); *see*

---

[7] *See, e.g.*, Exec. Order No. 13726, Blocking Property and Suspending Entry Into the United States of Persons Contributing to the Situation in Libya, 81 Fed. Reg. 23559 § 1(a)(i) (Apr. 19, 2016) (charging the Secretary of the Treasury with determining which persons are "responsible for . . . actions or policies that threaten the peace, security, or stability of Libya"); *id.* § 8 (delegating further functions).

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 21

*also id.* at 1057 (absent a "possibility" that a challenged rule would be enforced against a plaintiff, the rule "will [not] have a chilling effect on speech"). Plaintiffs' due process theory also fails in light of IEEPA's scienter requirements for criminal liability. *See United States v. Amirnazmi*, 645 F.3d 564, 589-90 (3d Cir. 2011) (rejecting vagueness challenge to IEEPA regulation because "this is a case where ignorance of the law is a defense"); 50 U.S.C. § 1705(c) (restricting criminal liability to those who act "willfully").[8]

### 4.    Plaintiffs Fail to State a Claim Under the *Ultra Vires* Doctrine (Counts 4-6)

Plaintiffs advance three claims asserting that the Executive Order is an *ultra vires* exercise of presidential authority under IEEPA and the NEA. *See* Am. Compl. ¶¶ 100-119. These claims should be dismissed both because Plaintiffs lack a cause of action to sue the President for alleged *ultra vires* action and their theories independently lack merit.

#### a.    Plaintiffs Lack a Cause of Action to Challenge the Executive Order for Alleged Noncompliance with IEEPA and the NEA

 "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Where the necessary intent by Congress to authorize judicial review is absent, "a cause of action does not exist and courts may not create one." *Id.* at 286-87.

The NEA and IEEPA—which confer highly discretionary authority upon the President to act quickly and decisively to address threats to the United States—have no provision creating a private right of action for individuals purportedly affected by a President's national security pronouncements under their authority. They do not, for example, "explicitly confer[] [any] right directly on" individuals affected by an IEEPA Executive Order, *see Cannon v. Univ. of Chicago*, 441 U.S. 677, 690 n.13 (1979), or contain any "rights-creating language." *Sandoval*, 532 U.S. at 288-89; *see also Brunner v. Ohio Republican Party*, 555 U.S. 5 (2008) (per curiam). They instead contain provisions that are at most "phrased as a directive" to the Executive Branch. *Sandoval*, 532 U.S. at 289. Indeed, IEEPA expressly states that it "does *not* confer or imply any right to judicial review." 50 U.S.C. § 1702(c) (emphasis added). The statute thus

---

[8] Plaintiffs do not challenge the Identification as unconstitutionally vague, *see* Am. Compl. ¶¶ 94-99. And the Court has already concluded that "[t]he Secretary identified prohibited transactions understandably." Prelim. Inj. Order at 19.

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

assumes that if judicial review occurs, it will be premised on an independent basis, such as where IEEPA-related matters are raised in defense to criminal proceedings or when a plaintiff invokes the APA, 5 U.S.C. § 704, to challenge a reviewable agency action.  *See, e.g.*, *Fulmen Co. v. Office of Foreign Assets Control*, No. CV 18-2949 (RJL), 2020 WL 1536341, at *6 n.2 (D.D.C. Mar. 31, 2020).[9]  Congress's decision to omit a cause of action from the statutory text is thus "more than mere oversight," *Ziglar*, 137 S. Ct. at 1862, and the Court should "refrain from creating [a] remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III."  *Id.* at 1858; *see also Klay v. Panetta*, 758 F.3d 369, 373, 376 (D.C. Cir. 2014) (courts should hesitate to infer a cause of action where "Congress has been 'no idle bystander to th[e] debate'" (citation omitted)).

This conclusion is buttressed by the constitutional context in which Congress legislated. "National-security policy is the prerogative of the Congress and President."  *Ziglar*, 137 S. Ct. at 1861 (citing U.S. Const. art. I, § 8; art. II, §§ 1-2).  Accordingly, "[j]udicial inquiry into the national-security realm raises 'concerns for the separation of powers in trenching on matters committed to the other branches.'"  *Id.* (citation omitted); *see also Jesner v. Arab Bank PLC*, 138 S. Ct. 1386, 1398 (2018) (where "litigation implicates serious separation-of-powers . . . concerns," the existence of a right to bring such litigation must be "subject to vigilant doorkeeping").  Nothing in the NEA or IEEPA suggests an intent by Congress to invert the constitutional order by permitting a court to review the merits of an Executive Order identifying a national security threat based solely on a third party's complaints, particularly where Congress has disclaimed that intent, 50 U.S.C. § 1702(c), and instead reserved to itself authority to terminate the relevant declaration.  *See* 50 U.S.C. § 1622(a)(1); *cf. California v. Trump*, 407 F. Supp. 3d 869, 891 (N.D. Cal. 2019) ("Congress . . . has the authority to monitor and if needed, reverse, the President's determination" under IEEPA).

Plaintiffs cannot compensate for the lack of a statutory cause of action by characterizing the Executive Order as *ultra vires*.  Am. Compl. ¶¶ 100-119.  While the Supreme Court has recognized a narrow right to seek nonstatutory review of allegedly *ultra vires* action, the right is confined to situations where the relief requested "'was traditionally accorded by courts of equity.'"  *Sierra Club v. Trump*, 963

---

[9] APA review does not extend to action taken by the President.  *See Franklin*, 505 U.S. at 800-01.

F.3d 874, 891 (9th Cir. 2020) (quoting *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)), *cert. granted*, 2020 WL 6121565 (Oct. 19, 2020); *see also, e.g.*, *Guaranty Trust Co. v. York*, 326 U.S. 99, 105 (1945) (scope of the federal courts' equity authority is defined by "the body of law which had been transplanted to this country from the English Court of Chancery" in 1789). The equitable authority of the English Court of Chancery was considered to be "an 'extraordinary jurisdiction'" that did not extend to actions by the Executive himself. *Hawaii*, 138 S. Ct. at 2427 (Thomas, J., concurring) ("The Chancellor could not give 'any relief against the king, or direct any act to be done by him"); *see also Franklin*, 71 U.S. at 499 ("An attempt on the part of the judicial department . . . to enforce the performance of [executive] duties by the President [is] an 'absurd and excessive extravagance.'" (quoting Chief Justice John Marshall)). Because there is no tradition at equity of enjoining the President at all, much less in relation to his national security and foreign affairs judgments, Plaintiffs lack a cause of action to press their *ultra vires* claims against the Executive Order.

### b.    50 U.S.C. § 1702(b) Poses No Bar to the Executive Order (Count 4)

The *ultra vires* claims also fail on their legal merits. In count 4, Plaintiffs contend that the Executive Order violates 50 U.S.C. § 1702(b), which excludes from the President's IEEPA powers the authority to regulate or prohibit certain personal communications, donations of articles such as food and medicine, and the import or export of information. *See* Am. Compl. ¶¶ 100-102, 104-107; 50 U.S.C. § 1702(b). As set forth in detail in part II.A below, these exceptions are inapplicable to the prohibitions at issue here. *See infra* at 30-38. However, the Court need not reach that question in connection with the Plaintiffs' challenge to the Executive Order itself, because the Executive Order does not define the prohibited transactions or have any effect absent action by the Secretary. *See* WeChat Order § 1(a), (c). It thus does not, standing alone, "regulate or prohibit" anything. 50 U.S.C. § 1702(b). Moreover, the Executive Order expressly instructs the Secretary to limit any implementation "to the extent provided by statutes." *See* WeChat Order § 1(b). The Court could not conclude that the Executive Order is contrary to statute when it expressly provides that it shall *not* be implemented contrary to statute.

c.      **Plaintiffs' Procedural Theories Fail (Count 5)**

Plaintiffs also contend that the Executive Order is *ultra vires* based on the President's and Congress's alleged lack of compliance with various procedural requirements in connection with the ICTS and WeChat Orders.  *See* Am. Compl. ¶¶ 108-114 (alleging violation of statutory requirements that the President transmit certain IEEPA actions to Congress, consult with Congress, and report IEEPA-related expenditures to Congress, and requirements that Congress meet to consider a joint resolution to terminate the national emergency, *see* 50 U.S.C. §§ 1621-22, 1641, 1703).  These theories fail for at least three reasons.

First, Plaintiffs are not the appropriate party to raise such grievances.  It is black-letter law that "a party cannot ordinarily 'rest his claim to relief on the legal rights or interests of third parties.'"  *June Med. Servs. L. L. C. v. Russo*, 140 S. Ct. 2103, 2117 (2020) (citations omitted).  The procedural provisions at issue create reporting and consultation requirements flowing to Congress or applying within Congress; not rights in favor of the public.  *See, e.g.* 50 U.S.C. § 1621(a) (requiring President to transmit declaration of national emergency to Congress); *id.* § 1641(c) (requiring President to report to Congress expenditures incurred in connection with IEEPA powers); *id.* § 1622(b) (providing that Congress shall meet at six-month intervals to consider a joint resolution to terminate a national emergency).  A failure to adhere to such requirements does not constitute "action of the sort [that is] typically subject to judicial review" because it has no "determinative or coercive effect upon the action of" any third party and no "legal consequences flow[s]" from it.  *Guerrero v. Clinton*, 157 F.3d 1190, 1195 (9th Cir. 1988) (citations omitted)); *see also, e.g.*, *NRDC, Inc. v. Hodel*, 865 F.2d 288, 319 (D.C. Cir. 1988) (rejecting private lawsuit to enforce congressional reporting requirements because Congress can "vindicate its interests" as "part of [its] ongoing relationship[]" with the Executive Branch without the assistance of the Judiciary); *Am. Trucking Ass'n v. United States*, 755 F.2d 1292, 1296 (7th Cir. 1985) (similar); *Taylor Bay Prot. Ass'n v. EPA*, 884 F.2d 1073, 1081 (8th Cir. 1989) (similar).

Second, any noncompliance with various reporting and consultation requirements would not render the Executive Order *ultra vires*.  The *ultra vires* doctrine is "of extremely limited scope," *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 190 (D.C. Cir. 2006), and applies only when a government official

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 25

"acts 'without any authority whatever.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984) (citation omitted); *see also Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (Kavanaugh, J.) (*ultra vires* doctrine is "essentially a Hail Mary pass" that "in court as in football . . . rarely succeeds"). The "error [must] be 'so extreme that one may view it as jurisdictional or nearly so.'" *Nyunt*, 589 F.3d at 449 (quoting *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988)).

Even if the President or Congress did not conform with perfect fidelity to the cited procedural provisions, that fact would not lessen the broad authority granted to the President under IEEPA or negate a declared national emergency. *See, e.g.*, *United States v. Gonzalez*, 692 F. App'x 483, 483 (9th Cir. 2017) (agency "did not act ultra vires" where it "simply failed to follow the proper procedure"); *Mishewal Wappo Tribe of Alexander Valley v. Jewell*, 84 F. Supp. 3d 930, 942 (N.D. Cal. 2015) (distinguishing between a "procedural" claim and one "asserting *ultra vires* agency action"), *aff'd*, 688 F. App'x 480 (9th Cir. 2017). In fact, it would be especially unwarranted to conclude that courts could invalidate a declared national emergency based on certain procedural defects when IEEPA expressly provides that the only way a "national emergency declared by the President . . . shall terminate" is if: (1) "there is enacted into law a joint resolution terminating the emergency"; (2) "the President issues a proclamation terminating the emergency"; or (3) the declaration terminates automatically "on [its] anniversary" (unless expressly continued). 50 U.S.C. §§ 1622(a), (d).

Third, "all of these allegations are pled on information and belief without providing the factual bases underlying [the belief], and are, therefore, violative of pleading standards." *Kane v. Delong*, No. CV 13-05021-KAW, 2014 WL 900721, at *4 (N.D. Cal. Mar. 4, 2014). Indeed some of these allegations are expressly refuted by matters of public record. *Compare* Am. Compl. ¶ 109 ("On information and belief, Defendants did not immediately transmit to Congress the President's declaration of a national emergency contained in [the ICTS Order]") *with* 165 Cong. Rec. 81, H3835-3836 (daily ed. May 15, 2019) (message from the President transmitting the ICTS Order to House of Representatives (May 15, 2019)); *compare* Am. Compl. ¶ 111 ("On information and belief, the President has not transmitted to Congress any report on the total expenditures incurred by the United States government [under the ICTS Order"), *with* 166 Cong. Rec. 91, S2450 (May 14, 2020) (transmitting report on ICTS Order to the

Committee on Banking, Housing, and Urban Affairs of the United States House of Representatives).

Count 5 should be dismissed.

### d. Plaintiffs' Assertion that the WeChat Order Required a New Declaration of Emergency Is Not Justiciable or Plausible (Count 6)

Plaintiffs' final *ultra vires* claim asserts that authority for the WeChat Order was lacking under 50 U.S.C. § 1701, which provides that the exercise of IEEPA powers "to deal with any new threat shall be based on a new declaration of national emergency[.]"  Plaintiffs first suggest that a new declaration of emergency was required because the ICTS Order "was issued more than 14 months before" the WeChat Order.  Am. Compl. ¶ 117.  The Court may quickly dispose of that contention.  Although a declared national emergency terminates automatically after one year unless continued, *see* 50 U.S.C. § 1622(d), the President published a notice continuing the declaration of national emergency set forth under the ICTS Order on May 14, 2020.  *See* 85 Fed. Reg. 29,321 (May 14, 2020).

Plaintiffs also contend that the President was required to declare a new national emergency because the threat "posed by WeChat constitutes a 'new threat' within the meaning of 50 U.S.C. § 1701(b)."  Am. Compl. ¶ 118.  The President, however, concluded otherwise.  He determined that the threat posed by WeChat *was* part of the emergency declared under the ICTS Order, *see* WeChat Order pmbl., which broadly encompasses threats "posed by the unrestricted . . . use of certain information and communications technology and services" that "store and communicate vast amounts of sensitive information" and are "designed, developed, manufactured, or supplied by persons . . . subject to the jurisdiction or direction of foreign adversaries[.]"  ICTS Order pmbl.  In particular, WeChat is a "messaging, social media, and electronic payment application owned by the Chinese company Tencent" and thus subject to the jurisdiction of the PRC, which "captures vast swaths of information from its users" and "threatens to allow the [CCP] access to Americans' personal and proprietary information."  WeChat Order pmbl. ¶ 2.  The President's determination that the threats posed by WeChat are part of the national emergency declared in the ICTS Order is amply supported by the plain text of both Executive Orders.

To the extent Plaintiffs seek to have the Court second-guess the statements in the Executive Orders and review the *merits* of the President's determination that "certain information and communications technology and services" supplied by foreign companies present a national security threat, ICTS Order

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 27

pmbl., or that the WeChat mobile app is a component of that threat, those matters are not justiciable.  *See, e.g.*, *United States v. Spawr Optical Research, Inc.*, 685 F.2d 1076, 1080-81 (9th Cir. 1982) (the propriety of a President's national security determinations presents a non-justiciable political question); *California*, 407 F. Supp. 3d at 890-91 ("there is no precedent for a court overriding a President's discretionary judgment as to what is and is not an emergency"); *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 31 (D.D.C. 2020) ("no court has ever reviewed the merits of" a President's national security determinations, in part because matters of "foreign policy and national security are rarely proper subjects for judicial intervention"); *Clancy v. OFAC*, No. 05-C-580, 2007 WL 1051767, at *6 (E.D. Wis. Mar. 31, 2007) (national security determinations under IEEPA are "'so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference'" (quoting *Regan*, 468 U.S. at 242)), *aff'd*, 559 F.3d 595 (7th Cir. 2009).

Plaintiffs' theories should be rejected.

### 5.      Plaintiffs Fail to State a Claim Under RFRA (Count 7)

Plaintiffs likewise fail to state a claim against the Executive Order under RFRA.  To establish a claim under RFRA, a plaintiff must demonstrate, *inter alia*, that the government action "'substantially burden[s]' the plaintiff's exercise of religion." *Fazaga v. Fed. Bureau of Investigation*, 965 F.3d 1015, 1061 (9th Cir. 2020) (citation and quotation marks omitted).  A governmental activity burdens the free exercise of religion only "if it 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs[.]'" *United States v. Lepp*, No. CR 04-00317 MHP, 2008 WL 3843283, at *6 (N.D. Cal. Aug. 14, 2008) (citing *Guam v. Guerrero*, 290 F.3d 1210, 1222 (9th Cir. 2002)); *see also Fazaga*, 965 F.3d at 1061 ("substantial burden" arises "only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions" (citations and punctuation omitted)).

Plaintiffs' conclusory allegations do not satisfy this standard.  First, for the reasons discussed above, the Executive Order standing alone (*i.e.*, without action by the Secretary) has *no* effect on the use of WeChat within the United States, for religious purposes or otherwise.  Moreover, the degree of any effect is entirely dependent on the Secretary's actions, which are not challenged under this count.

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 28

1    Plaintiffs' RFRA challenge thus fails for the same reason as Plaintiffs' other attempts to facially invalidate

2    the Executive Order.  *See supra* at 13-15, 21-22.

3         Even assuming the Executive Order amounted to a total ban of the WeChat mobile app, Plaintiffs

4    still would not make out a plausible RFRA claim because it is implausible that such a hypothetical ban

5    would "forc[e]" Plaintiffs "to abstain from participating in their practice of religion."  Am. Compl. ¶ 124.

6    Plaintiffs cannot seriously contend (and do not contend) that a tenet of their religion is that they must use

7    WeChat.  They instead rest this claim solely on the fact that a single Plaintiff, Jinneng Bao, currently

8    "participates in Bible studies regularly on WeChat." Am. Compl. ¶ 25.[10]  But Plaintiffs do not allege that

9    Mr. Bao is *required* by his religious beliefs to use WeChat for Bible studies as they must to make out a

10   RFRA claim; indeed, Mr. Bao's use of WeChat for those activities is itself a departure from his normal

11   practice of "in-person" studies.  *See id.*  Plaintiffs thus fail to show that a ban on the WeChat app would

12   coerce Mr. Bao "to act contrary to [his] religious beliefs," *Fazaga*, 965 F.3d at 1061, as opposed to simply

13   requiring him to find a new way to congregate with the members of his Bible study group.

14        Nor do inferences drawn from Plaintiffs' other allegations support this claim.  While Mr. Bao's

15   study group "consists of mostly Chinese-speaking members," those individuals are not a party to this case,

16   and Plaintiffs do not contend that Mr. Bao—who "runs several businesses" in the United States, *id.* ¶ 25—

17   lacks English language skills.  Even if he did, it is not clear why he and his Bible study group could not

18   use alternative technologies that do not require proficiency in English (or any specific language), such as

19   Zoom, Skype, video calls, conference calls, or other chat groups, among others.  *See* Am. Compl. ¶ 31

20   (WeChat's functionality is "comparable to Zoom video group calls").  All of the members of the study

21   group appear to be located in the United States, and thus restrictions that the PRC government imposes

22   against certain Western apps pose no obstacle.  And any inconvenience that Mr. Bao might encounter in

23   transitioning to a new platform does not offend RFRA.  *See Guerrero*, 290 F.3d at 1222 ("A substantial

24   burden must be more than an inconvenience."); *cf. Fazaga*, 965 F.3d at 1061 ("An effect on an individual's

25

---

26   [10] Plaintiffs also contend that the Church of Latter-Day Saints "uses WeChat to reach Chinese-American members and potential congregants within China," Am. Compl. ¶ 38, but the Church of Latter-Day Saints

27   is not a party to this lawsuit, and none of the Plaintiffs claim to be a member of that Church.  In any event, any claim of such members would fail for similar reasons as Mr. Bao's claim: the Executive Order has no

28   effect on religious beliefs.

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

'subjective, emotional religious experience' does not constitute a substantial burden" (citing *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1070 (9th Cir. 2008)).  The RFRA claim should be dismissed.[11]

## II.   The Challenge to the Secretary's Identification Should Be Dismissed Under Rule 12(b)(6)

### A.   The Identification Is Not Ultra Vires (Count 4)

In addition to their claims against the Executive Order, Plaintiffs assert two claims challenging the Secretary's Identification.  The first is that the Identification is *ultra vires* under 50 U.S.C. § 1702(b).[12] That provision, in relevant part, precludes the President's authority under IEEPA from being used to regulate or prohibit:

> (1) any . . . personal communication, which does not involve a transfer of anything of value;
>
> (2) donations, by [United States persons], of articles, such as food, clothing and medicine, intended to be used to relieve human suffering . . . . ; or
>
> (3) the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMS, artworks, and news wire feeds.

50 U.S.C. § 1702(b).

Plaintiffs' theory in this count is that because the WeChat app may, among its myriad functionalities, be used to communicate, facilitate humanitarian donations, and transmit information, any regulation of WeChat as one possible platform for those activities is akin to a regulation of the activities themselves.  *See* Am. Compl. ¶¶ 104-106.  That logic is unsustainable.  The fact that the Secretary's regulation of Tencent will, over time, have incidental effects for WeChat users' ability to conduct certain activities *on WeChat* does not transform the business-to-business prohibitions identified by the Secretary

---

[11] Even if Plaintiffs had alleged a substantial burden under RFRA, this claim would still fail because RFRA permits the Government to impose such a burden where necessary to further a "compelling governmental interest."  *Fazaga*, 965 F.3d at 1061 (citing 42 U.S.C. § 2000bb-1(b)).  Here, the national security concerns are compelling, and regulation that minimizes the mobile app's use within the United States is the least restrictive means of addressing those concerns in light of the lack of trust with the PRC government.  *See supra* at 16-17; *see, e.g.*, *Cassell v. Snyders*, 458 F. Supp. 3d 981, 999-1001 (N.D. Ill. 2020) (upholding limit on "in-person [church] services" notwithstanding availability of lesser measures because those measures would not reduce the risk "to the same degree").

[12] Although Plaintiffs' parallel claim against the President fails for lack of a cause of action, the APA provides a cause of action for persons adversely affected by *agency* action.  *See* 5 U.S.C. § 702.

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 30

into a regulation of those activities themselves.  This conclusion is supported by the plain text of § 1702(b), precedent, IEEPA's purpose, and past Executive Branch practice.

    **a.**    The plain text of section 1702(b) confirms that an incidental or downstream effect of a regulation is not the same thing as indirect regulation.  As transitive verbs, "regulate" and "prohibit" both require a direct object to express a complete thought:  The verbs indicate "what action the subject exerts on the object."  The Chicago Manual of Style ¶ 5.98 (17th ed. 2017).  Moreover, "regulate" and "prohibit" are both active verbs with strong meanings, generally requiring a purposeful connection to a specific, definite object.  *See, e.g.*, Black's Law Dictionary (11th ed. 2019) (defining "prohibit" as "[t]o forbid by law," and "regulate" as "[t]o control (an activity or process) esp. through the implementation of rules"); Oxford English Dictionary 379, 1441 (1933, republished 1978) (defining "prohibit" as "[t]o forbid (an action or thing) by or as by a command or statute," and "regulate" as "[t]o control, govern, or direct by rule or regulations").  The exceptions in section 1702(b) are thus concerned with the intended *object* of the regulation, not the range of other possible activities that might be incidentally affected by the regulation.  *See, e.g.*, *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 50 (1987) (under a "common-sense view of the word 'regulates,'" a "law must not just have an impact on" an activity, "but must be *specifically directed* toward that" activity (emphasis added)).

    That interpretation is also consistent with section 1702(b)'s structure.  When Congress intended for section 1702(b) to extend to incidents of a regulated activity, it said so expressly.  *See* 50 U.S.C. § 1702(b)(4) (withholding authority to prohibit or regulate "any transactions *ordinarily incident to* travel to or from any country" (emphasis added)).  The omission of similar language in sections 1702(b)(1)-(3) should thus be construed to limit the scope of the exceptions to exercises of IEEPA authority that have the intended object of regulating the specified activities.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (modifications omitted)).

    That the section 1702(b) exceptions are preceded by the language "directly or indirectly" does not change the analysis.  Such language makes clear that the provision applies regardless of the *manner* in

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 31

which a regulation seeks to accomplish its objective (directly or indirectly).  The fundamental question, however, remains the same—*i.e.*, whether the relevant IEEPA restrictions have the *objective* of regulating "personal communications," humanitarian "donations," or the import or export of "information" or "informational materials."  Here, the objective of the Executive Order, as implemented by the Secretary, is to prevent espionage by the PRC, not to regulate personal communications, humanitarian donations, or the import/export of informational materials.  The Secretary's Decision Memorandum makes that plain:

> The below prohibitions on certain business-to-business transactions . . . [have] the objective of preventing collection, transmission, and aggregation of U.S. user data by the WeChat app, Tencent, and [the PRC] . . .  While these prohibitions may ultimately make the application less effective and may be challenging for U.S.- based WeChat users, [ ] they are necessary for the protection of U.S. national security.  We hope that other communications platforms may take its place.

AR-15-16.

**b.**     Focusing on the intended object of a regulation (and not its incidental effects) is consistent with the body of case law construing section 1702(b).  The D.C. Circuit's decision in *Walsh v. Brady*, 927 F.2d 1229 (D.C. Cir. 1991) is illustrative.  In describing the legislative history of section 1702(b), the D.C. Circuit provided an example of an "indirect" regulation whereby the Department of Treasury "explicitly allowed the importation of informational materials, but undermined the permission indirectly—by requiring that payment be made into a blocked bank account in the United States," essentially prohibiting the seller from receiving payment.  *Id.* at 1232.[13]  Those payment restrictions, although ostensibly allowing the importation of information, were still aimed at restricting such imports and did so indirectly.  In contrast, the D.C. Circuit held that restrictions on travel to Cuba remained valid, even though such travel was "a normal and perhaps a necessary incident . . . to arrange for" importation of posters from Cuba, and even though the plaintiff claimed that such travel was "indispensable" to such importation.  *Id.* at 1231. Notwithstanding that the "travel transactions [were] linked to importation" and might "in practice burden informational imports," the restrictions were nonetheless valid because their object was "to deprive Cuba

---

[13] The regulations in *Walsh* were promulgated pursuant to the TWEA, which contains an identical exemption for informational materials as the one under IEEPA.  *Compare* 50 U.S.C. § 1702(b)(3) *with id.* § 4305(b)(4); *see also Wald*, 468 U.S. at 228 (the authorities granted by IEEPA "are essentially the same as those" granted by TWEA).

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 32

of hard currency" and "to make a political statement against the Cuban regime," not regulate informational materials. *Id.* at 1233-34.

**c.**     This interpretation is also supported by the purposes of IEEPA.  Construing the statutory language of section 1702(b) to reach incidental burdens on personal communications and the flow of information would significantly impair the President's authority under IEEPA in a manner that Congress could not have intended. *See Amirnazmi*, 645 F.3d at 579 ("Mindful of the heightened deference accorded the Executive in this field, we decline to interpret the legislative grant of authority parsimoniously."). Indeed, the D.C. Circuit in *Walsh* rejected the argument that the language in section 1702(b) withholds authority to impose "any regulation that 'significantly burdens' trade in informational materials," observing that "[t]he potential reach of [that] view is extraordinary," and would afford a foreign government adversary "considerable power to sap" the President's authority under IEEPA to protect the national security. 927 F.2d at 1232.  Similarly here, section 1702(b) is inapplicable even if the prohibitions "in practice burden" communications, donations, or the import/export of information, or—more accurately—simply require WeChat users to move those activities to a different platform. *Id.* at 1233. Any other reading would constitute a remarkable restriction on the President's authority under IEEPA, contrary to the Supreme Court's recognition that "IEEPA delegates broad authority to the President" to act in times of national emergency. *Dames & Moore v. Regan*, 453 U.S. 654, 677 (1981); *see also Comm'r of Internal Rev. v. Clark*, 489 U.S. 726, 739 (1989) ("In construing provisions . . . in which a general statement of policy is qualified by an exception, we usually read the exception narrowly in order to preserve the primary operation of the provision.").

**d.**     Interpreting "regulate . . . indirectly" as focusing on the *object* of the prohibitions, and not potential incidental effects on third parties, would also align the scope of the exemption for informational materials with First Amendment doctrine, which the Ninth Circuit has recognized is the intended purpose of that provision. *See Kalantari v. NITV, Inc.*, 352 F.3d 1202, 1205 (9th Cir. 2003) (section 1702(b)(3) was initially intended "to prevent the executive branch from restricting the international flow of materials protected by the First Amendment").  The Supreme Court has repeatedly emphasized that even though government regulation of nonexpressive conduct may incidentally burden protected expressive activities,

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 33

those incidental burdens do not trigger First Amendment scrutiny—or here, implicate the section 1702(b) IEEPA exceptions. *See Arcara*, 478 U.S. at 706-07; *Hicks*, 539 U.S. at 123; *Cowles Media Co.*, 501 U.S. at 669. Under the same reasoning, incidental effects on expressive activity are not indirect regulations of communications or information, and thus do not implicate the IEEPA exceptions in section 1702(b). *Cf. Arcara*, 478 U.S. at 708 (O'Connor, J., concurring) (rejecting the "absurd result" that would flow from an interpretation that extended to incidental impacts, such as subjecting "the arrest of a newscaster for a traffic violation" to First Amendment scrutiny).

Indeed, any other interpretation would threaten to render toothless a hallmark of IEEPA authority: asset freezing. *See Dames & Moore*, 453 U.S. at 672-73. Freezing a party's assets significantly curtails that party's ability to produce and import various informational materials. *Cf. Arcara*, 478 U.S. at 706 ("One liable for a civil damages award has less money to spend on paid political announcements or to contribute to political causes[.]"). But a broad interpretation of "indirectly regulating" that extended to those types of incidental burdens would effectively gut the President's authority under IEEPA because "'there are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow.'" *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1441 (9th Cir. 1996) (quoting *Zemel v. Rusk*, 381 U.S. 1, 16-17 (1965)). There is no reason to believe that Congress rendered all blocking orders—the quintessential IEEPA action—vulnerable to challenge under section 1702(b) *sub silentio*. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

e.      This interpretation is consistent with certain Treasury regulations issued pursuant to IEEPA that reflect the Government's longstanding understanding of the statute. Those regulations recognize the IEEPA exception for import/export of informational materials, *see, e.g.*, 31 C.F.R. § 560.210(c)(1), but they expressly provide that the President may prohibit transactions related to information that is not fully created on the date of the prohibitions, including the "provision of services to market . . . or assist in the creation of information or informational materials." *Id*. § 560.210(c)(2); *see also Amirnazmi*, 645 F.3d at 587-88 (holding that the regulation is a reasonable construction of IEEPA); *cf. Foreign Assets Control*

*U.S. WeChat Users Alliance, et al. v. Trump, et al*., Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 34

*Regulations*, 54 Fed. Reg. 5229, 5230-31 (Feb. 2, 1989) (regulations promulgated under TWEA shortly after original enactment of section 1702(b)(3)).  Here, the prohibitions do not regulate the underlying communications or informational materials themselves—*i.e.*, the content exchanged by individual users on WeChat.  Instead, the prohibitions regulate only distinct services pertaining to WeChat technical operations, which is consistent with the interpretation reflected in those regulations.  *See Amirnazmi*, 645 F.3d at 586.  Thus, section 1702(b)'s exceptions are not implicated.

        **f.**        Plaintiffs' invocation of section 1702(b) also fails for reasons unique to each subsection.

        *First,* subsection (b)(1) is inapplicable because it applies only to "personal communications" that do "*not involve a transfer of anything of value*."  50 U.S.C. § 1702(b)(1) (emphasis added).  Communications on WeChat *do* involve an exchange of value: users enter into a contract with Tencent through which they exchange their personal data and content for the right to use WeChat services.  *See* WeChat Terms of Service ("When you . . . use . . . WeChat[,] . . . you understand and agree that . . . you are giving us and our affiliate companies a perpetual, non-exclusive, transferable, sub-licensable, royalty-free, worldwide license to use Your Content (with no fees or charges payable by us to you)"); *see also id.* ("You agree that . . . we may use targeted advertising to make advertising more relevant and valuable to you").[14]  Indeed, if user data and content were not a "thing of value," WeChat and other free mobile apps would have no business model.  *See* Investigation of Competition in Digital Markets, H. Comm. on the Judiciary, Subcomm. on Antitrust, Commercial and Admin. Law, Maj. Staff Report and Recommendations, 116th Cong. 18 (Oct. 2020) ("Online platforms . . . appear to be 'free' but are monetized through people's attention or with their data.").  Because this ongoing transfer of value between Tencent and WeChat users is inextricably intertwined with every transaction and communication conducted through WeChat, section 1702(b)(1) does not apply.

        *Second*, subsection (b)(2) is not implicated because the Identification does not plausibly regulate donations of "*articles*," such as "food, clothing, and medicine," none of which could be conveyed through WeChat's digital platform.  *See* 50 U.S.C. § 1702(b)(2) (emphasis added).

---

[14] https://www.wechat.com/en/service_terms.html

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 35

*Third*, subsection (b)(3) is inapplicable because the Identification does not regulate the import/export of the information or "informational materials" on WeChat.  50 U.S.C. § 1702(b)(3).  To the extent the prohibitions regulate WeChat as a platform at all, they only do so as a "*medium* of transmission*,*" which the statute recognizes as distinct from the underlying informational materials.  *Id.* (emphasis added).  WeChat itself distinguishes between the digital "services" it provides (which the prohibitions seek to regulate) and the underlying content that users generate and exchange through those services (which the prohibitions do not affect).  *See* WeChat Terms of Service ("We offer a diverse range of services and features within WeChat"); *see also id.* ("We are not responsible for and we do not endorse, support or guarantee . . . any content submitted to, transmitted or displayed by or linked by WeChat").  Plaintiffs' allegations support that distinction as well.  *See* Am. Compl. ¶¶ 30-33 (describing the app in terms of "capabilities," "feature[s]," and "integrated services," not particular information or informational materials).

WeChat therefore is not analogous to the examples of informational materials encompassed by section 1702(b)(3), such as "films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds," 50 U.S.C. § 1702(b)(3), each of which refers to particular information embodied in a fixed form.  Congress's decision to include "news wire feeds" in the list is illustrative.  A news *wire* is essentially a medium of transmission, *i.e.*, a service that transmits news coverage.  *See, e.g.*, *Newswire*, Random House Unabridged Dictionary of the English Language 1295 (2d ed. 1987) ("a service transmitted . . . and providing late-breaking news stories . . . or other up-to-the minute information").  But Congress's use of the term "news wire *feed*" rather than "news wire" suggests an intent to exempt from IEEPA only the underlying *information* transmitted on the news wire as part of the feed (that is, news stories), rather than the services through which they are transmitted.  The other examples of "information and informational materials" identified in the statute—publications, films, CD ROMs, and artworks—confirm that Congress intended to circumscribe the President's authority to regulate information itself, or materials fixing that information, but not the mechanism through which the information or informational materials are transmitted from point A to point B.  *See Gustafson v.*

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 36

*Alloyd Co.*, 513 U.S. 561, 575 (1995) (describing the principle that "a word is known by the company it keeps (the doctrine of *noscitur a sociis*)").

IEEPA thus permits the President to regulate the means by which information is imported or exported when the means itself poses a national security risk, even if those means may be used to transmit otherwise-excepted "informational materials." For example, shutting down an import-export business that smuggles illegal drugs alongside foreign movies would not amount to a ban on importing and exporting the movies. That is especially true where, as here, the IEEPA prohibition does not foreclose any informational material from entering or leaving the country—users may still access WeChat's website, and may still transmit the same content on numerous other platforms.

Subsequent legislative action underscores that Congress must have intended for IEEPA to permit the President to regulate internet companies and data platforms like WeChat, as well as the mediums by which informational materials are imported/exported. In 2014, Congress specifically made clear that IEEPA may be used to "block and prohibit all transactions in all property and interests" of persons and entities who knowingly "engage[] in . . . economic or industrial espionage in cyberspace, of technologies or proprietary information developed by United States persons." Pub. L. No. 113-291, § 1637 (Dec. 19, 2014) (*codified at* 50 U.S.C. § 1708(b)(1), (b)(2)). Congress thus ostensibly afforded the President authority under IEEPA to regulate software applications and platforms that otherwise facilitate the exchange of information and informational materials. *See, e.g.*, Exec. Order No. 13,694, 80 Fed. Reg. 18,077 (Apr. 1, 2015). And section 1708 is "highly relevant in the looser sense of indicating congressional acceptance of a broad scope for executive action in circumstances such as those presented in this case." *Dames & Moore*, 453 U.S. at 677; *see also* No TikTok on Government Devices Act, S. 3455, 116th Cong. § 2(b) (2020) (pending legislation that prohibits the TikTok mobile application from being installed on federal government devices); S. Rep. No. 116-250, at 2 (2020). It beggars understanding why Congress would specifically afford the President authority under IEEPA to take action against foreign criminals operating in cyberspace if IEEPA also precluded the President from taking action against the means by which those individuals engage in their crimes—that is, through the software and computer networks that serve as mediums of international transmission for informational materials. *See FDA v. Brown &*

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 37

*Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand."). Plaintiffs *ultra vires* claim against the Secretary should be dismissed.[15]

## B. Plaintiffs Fail to State a Claim Under the Administrative Procedure Act (Count 8)

Plaintiffs' last claim is that the Identification is invalid under the APA because the Secretary did not undertake notice-and-comment rulemaking proceedings prior to issuing it. Am. Compl. ¶ 131.[16] When agencies conduct rulemaking outside of the national security context, they, as a general rule, must publish their intention to do so in the Federal Register and provide "interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments." 5 U.S.C. § 553(b)-(d). The agency must then consider "the relevant matter presented" prior to finalizing the rule, and publish the final rule at least 30 days before the rule takes effect. *See* 5 U.S.C. § 553(b)-(c). Plaintiffs, however, fail to state a claim under these provisions.

First, Plaintiffs do not demonstrate that the Secretary's identification of prohibited transactions—which closely tracks and implements the President's specific determination that WeChat poses "an unusual and extraordinary" threat to national security—is even reviewable under the APA. The APA precludes judicial review of actions that are "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), including those that require the "balancing of a number of factors which are peculiarly within [the agency's] expertise." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). The selection of powers conferred under section 1702(a) to respond to an identified national security threat is precisely such an action. *See Dames & Moore*, 453 U.S. at 671 ("The language of IEEPA is sweeping and unqualified."); *Webster v. Doe*, 486 U.S. 592, 600-01 (1988) (judicial review is precluded if the "court would have no meaningful standard against which to judge the agency's exercise of discretion'" (citation omitted)).

---

[15] Even if section 1702(b) applied, it would simply mean that *IEEPA* does not provide authority here, not that the President's actions are *ultra vires*. *See* WeChat Order pmbl. (invoking authority under "the Constitution and the laws of the United States"); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (recognizing "the President's 'vast share of responsibility for the conduct of our foreign relations'" under the Constitution); *The Brig Amy Warwick (The Prize Cases)*, 67 U.S. 635, 670 (1862) (President's "duties[] as Commander-in-chief" require him to "determine what degree of force the crisis demands").

[16] Plaintiffs also repeat the theory asserted in count 4 that the Identification is contrary to law under 50 U.S.C. § 1702(b). Am. Compl. ¶ 129. That theory fails for the reasons set forth above at section II.A.

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 38

Second, even if the Secretary's selection of prohibited transactions were reviewable, Plaintiffs have not shown that the Identification constituted rulemaking action otherwise subject to the APA's notice-and-comment requirements.  *Compare* 5 U.S.C. § 551(4) *and* 5 U.S.C. § 551(6).  In any event, those requirements do not apply "to the extent that there is involved . . . [a] foreign affairs function of the United States[.]"  5 U.S.C. § 553(a)(1).  Courts and the Government have thus long recognized that rules implementing IEEPA are not required to undergo notice-and-comment.  *See Bergerco Canada v. U.S. Dep't of Treasury*, 129 F.3d 189, 191 (D.C. Cir. 1997) (IEEPA regulations adopted without notice and comment); *United States v. Quinn*, 401 F. Supp. 2d 80, 94 n.12 (D.D.C. 2005) ("IEEPA-based regulations are likely to be exempt from the notice-and-comment requirements of the [APA]").

The same conclusion follows here.  The Identification indisputably involves a "foreign affairs function of the United States."  It implements the President's powers and findings under IEEPA and the NEA, which by their express terms involve assessments about foreign threats and international relations. *See* 50 U.S.C. § 1701(a) (economic powers conferred under IEEPA extend to threats that originate "in whole or substantial part outside the United States"); *id.* § 1702(a)(1)(A) (IEEPA powers apply to "foreign exchange" and a "foreign country or national thereof"); *Dames & Moore*, 453 U.S. at 673 (IEEPA powers "serve as a 'bargaining chip' to be used by the President when dealing with a hostile country").  Moreover, the Executive Orders and decisional materials prepared by the Secretary are, in fact, responding to actions of foreign adversaries (here, the PRC government).  *See, e.g.*, WeChat Order pmbl. (noting that threats posed by WeChat affect "foreign policy" and discussing impacts to, and measures taken by, other countries and relations with the government of the PRC); ICTS Order pmbl. (describing same threat to "foreign policy" and need to balance "maintaining an open investment climate in information and communications technology" against "the need to protect our country against critical national security threats"); *see generally* Decision Memorandum, AR-5-17 (discussing various foreign policy and national security considerations).

Indeed, notice-and-comment procedures are fundamentally incompatible with the highly discretionary and sensitive foreign policy and national security determinations the President must exercise under IEEPA.  *See Am. Ass'n of Exp. & Imp.-Textile & Apparel Grp. v. United States*, 751 F.2d 1239,

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 39

1249 (Fed. Cir. 1985) (purpose of foreign affairs exception was "to allow more cautious and sensitive consideration of those matters which 'so affect relations with other Governments that . . . public rule-making provisions would provoke definitely undesirable international consequences'" (citation omitted)); *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1278-79 (9th Cir. 2020) (describing application of the foreign affairs exception in the immigration context).  The sensitivity of those determinations will always prevent an open airing of the Secretary's considerations, and the public therefore could not be fully informed of the bases for a proposed decision or the alternatives under consideration without impairing foreign policy objectives.  *Cf.* 50 U.S.C. § 1703(d) (recognizing that decisions under IEEPA will likely involve classified information); *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980) (conducting notice-and-comment regarding emergency immigration directive would "provoke definitely undesirable international consequences").  Furthermore, the sheer length of time that notice and comment proceedings require—typically consuming many months (if not years)—is incompatible with the nature of decisionmaking under IEEPA, which must afford the Executive Branch flexibility to respond quickly to emerging threats.  *See, e.g.*, *United States v. McKeeve*, 131 F.3d 1, 10 (1st Cir. 1997) ("IEEPA codifies Congress's intent to confer broad and flexible power upon the President to impose and enforce economic sanctions against nations that the President deems a threat to national security interests.").  An emergency exercise of the Executive's foreign affairs power to limit foreign intelligence gathering in the United States is not subject to notice-and-comment rulemaking.  The Court should dismiss this claim.

## CONCLUSION

The Court should dismiss the Amended Complaint.

Dated:  November 16, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

JOHN V. COGHLAN
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Branch Director

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 40

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DIANE KELLEHER
Assistant Branch Director

DANIEL SCHWEI
Special Counsel

 /s/ *Serena M. Orloff*
SERENA M. ORLOFF
MICHAEL DREZNER
AMY E. POWELL
STUART J. ROBINSON
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel: (202) 305-0167
Fax: (202) 616-8470
Email: serena.m.orloff@usdoj.gov

*Attorney for Defendants*

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

Page 41