1   MICHAEL W. BIEN – 096891
    ERNEST GALVAN – 196065
2   VAN SWEARINGEN – 259809
    BENJAMIN BIEN-KAHN – 267933
3   ALEXANDER GOURSE – 321631
    AMY XU – 330707
4   ROSEN BIEN
    GALVAN & GRUNFELD LLP
5   101 Mission Street, Sixth Floor
    San Francisco, California 94105-1738
6   Telephone:    (415) 433-6830
    Facsimile:    (415) 433-7104
7   Email:        mbien@rbgg.com
                  egalvan@rbgg.com
8                 vswearingen@rbgg.com
                  bbien-kahn@rbgg.com
9                 agourse@rbgg.com
                  axu@rbgg.com
10
    KELIANG (CLAY) ZHU – 305509
11  DEHENG LAW OFFICES PC
    7901 Stoneridge Drive #208
12  Pleasanton, California 94588
    Telephone:    (925) 399-5856
13  Facsimile:    (925) 397-1976
    Email:        czhu@dehengsv.com
14
    ANGUS F. NI – Admitted *Pro Hac Vice*
15  AFN LAW PLLC
    502 Second Avenue, Suite 1400
16  Seattle, Washington 98104
    Telephone:    (773) 543-3223
17  Email:        angus@afnlegal.com

    THOMAS R. BURKE – 141930
    DAVIS WRIGHT TREMAINE LLP
    505 Montgomery Street, Suite 800
    San Francisco, California 94111-6533
    Telephone:    (415) 276-6500
    Facsimile:    (415) 276-6599
    Email:        thomasburke@dwt.com

    DAVID M. GOSSETT – Admitted *Pro Hac Vice*
    COURTNEY T. DETHOMAS – 294591
    DAVIS WRIGHT TREMAINE LLP
    1301 K Street N.W., Suite 500 East
    Washington, D.C. 20005-3366
    Telephone:    (202) 973-4216
    Facsimile:    (202) 973-4499
    Email:        davidgossett@dwt.com
                  courtneydethomas@dwt.com

    JOHN M. BROWNING – Admitted *Pro Hac Vice*
    DAVIS WRIGHT TREMAINE LLP
    1251 Avenue of the Americas, 21st Floor
    New York, New York 10020-1104
    Telephone:    (212) 603-6410
    Facsimile:    (212) 483-8340
    Email:        jackbrowning@dwt.com

18  Attorneys for Plaintiffs

19                     UNITED STATES DISTRICT COURT

20      NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

21  U.S. WECHAT USERS ALLIANCE,          Case No. 3:20-cv-05910
    CHIHUO INC., BRENT COULTER,
22  FANGYI DUAN, JINNENG BAO,            **SECOND AMENDED COMPLAINT
    ELAINE PENG, and XIAO ZHANG,         FOR DECLARATORY AND
23                                       INJUNCTIVE RELIEF**
                Plaintiffs,
24
         v.
25
    DONALD J. TRUMP, in his official
26  capacity as President of the United States,
    and WILBUR ROSS, in his official
27  capacity as Secretary of Commerce,

28              Defendants.

**INTRODUCTION**

1.       Public space in the digital age is defined by platforms and users rather than physical places with geographic boundaries.  Cyberspace, particularly social media, is one of "the most important places" to exchange views.  *Packingham v. North Carolina*, 582 U.S. —, 137 S. Ct. 1730, 1735 (2017).  Few digital public squares are as large as that found on WeChat.  Released in 2011, WeChat is now one of the world's most popular mobile telephone and social media applications ("app"), with over 1 billion monthly active users.[1]

2.       Approximately 19 million users rely on the app in the United States, and it is the primary app Chinese-speakers in the U.S. use to participate in social life by connecting with loved ones, sharing special moments, discussing ideas, receiving up-to-the minute news, and participating in political discussions and advocacy.[2]  As a "super-app," WeChat users also rely on the app to make telephone calls, hold video conferences, upload documents, share photos, and make payments.[3]  It has become essential to the conduct of daily life for its users, many of whom regularly spend hours each day on the app.

3.       WeChat is also used for numerous societally important purposes, including by public institutions.  For example, as the coronavirus pandemic continues to separate people physically, WeChat has been used in the United States by police departments to inform the public about testing center locations, by volunteers to organize the delivery of

---

[1] Rayna Hollander, *WeChat has hit 1 billion monthly active users*, BUSINESS INSIDER (Mar. 6, 2018, 11:59 a.m.), https://www.businessinsider.com/wechat-has-hit-1-billion-monthly-active-users-2018-3; Iris Deng and Celia Chen, *How WeChat became China's everyday mobile app*, SOUTH CHINA MORNING POST (Aug. 16, 2018), https://www.scmp.com/tech/article/2159831/how-wechat-became-chinas-everyday-mobile-app.

[2] Rick Smith, *Crackdown on WeChat could hinder millions of US users who rely on social media tool*, WRAL TECHWIRE (Aug. 19, 2020), https://www.wraltechwire.com/2020/08/19/crackdown-on-wechat-could-hinder-millions-of-us-users-who-rely-on-social-media-tool/.

[3] Bani Sapra, *This Chinese super-app is Apple's biggest threat in China and could be a blueprint for Facebook's future. Here's what it's like to use WeChat, which helps a billion users order food and hail rides*, BUSINESS INSIDER (Dec. 21, 2019), https://www.businessinsider.com/chinese-superapp-wechat-best-feature-walkthrough-2019-12.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

medical supplies, and by families to stay in touch with isolated elderly relatives in nursing homes.  WeChat is also used by individuals and groups—including churches—for religious and cultural purposes, including:  group prayer, organizing for holidays and events, taking care of the poor, sick and infirm, and education.

4.   On August 6, 2020, the President issued Executive Order 13943 entitled "Addressing the Threat Posed by WeChat, and Taking Additional Steps To Address the National Emergency With Respect to the Information and Communications Technology and Services Supply Chain," 85 Fed. Reg. 48641 ("the Executive Order").  Citing national security concerns, the Executive Order bans what appears to be all uses of WeChat by anyone within the United States as well as "U.S. persons" outside the United States. Section 1(a) of the Executive Order prohibits people and property subject to U.S. jurisdiction from carrying out "transactions" with WeChat after 45 days of the Executive Order's issuance.  Section 2(a) prohibits any transaction "by a United States person or within the United States" that evades, avoids, or violates the uncertain prohibition in Section 1(a).  Maddeningly, the Executive Order does not define what those transactions include, leaving individuals and companies at a loss as to whether they will risk civil and/or criminal prosecution and penalties if they do not fundamentally change the way they communicate or run their businesses.  The vaguely worded Executive Order was issued without further explanation or a media briefing, and states that the Secretary of Commerce shall identify what transactions are prohibited after 45 days—in effect, delaying identification of what transactions are prohibited until after such transactions are already prohibited.[4]

5.   On September 18, 2020, the Commerce Department released its "Identification of Prohibited Transactions to Implement Executive Order 13943" (the "Identification").  The Identification sets forth eleven defined terms and identifies seven

---

[4] Ana Swanson, *Trump's Orders on WeChat and TikTok Are Uncertain. That May Be the Point.*, N.Y. TIMES (Aug. 7, 2020), https://www.nytimes.com/2020/08/07/business/economy/trump-executive-order-tiktok-wechat.html.

"transactions" to be prohibited pursuant to the Executive Order.  On the same day he issued the Identification, the Secretary admitted on national television that it will "for all practical purposes" result in WeChat being "shut down in the U.S." as soon as the prohibitions take effect.[5]

6.      Neither the Executive Order nor the Identification provided concrete evidence to support the contention that using WeChat in the United States compromises national security.  Notably, no other nation has implemented a comprehensive WeChat ban on the basis of any like-finding that WeChat is a threat to national security.[6]  Both the Executive Order and the Identification, however, were issued in the midst of the 2020 election cycle, during a time when President Trump has made numerous anti-Chinese statements that have contributed to and incited racial animus against persons of Chinese descent[7]—for reasons that have nothing to do with national security.

7.      In a stark violation of the First Amendment, the Executive Order and Identification target and silence WeChat users, the overwhelming majority of whom are members of the Chinese and Chinese-speaking communities.  They regulate and prohibit constitutionally protected speech, expression, and association; in doing so, they are not narrowly tailored to restrict only that speech which presents national security risks to the United States.  Nor do they leave open ample alternative avenues of communication for

---

[5] Megan Henney, *Trump Administration to Ban Americans from Downloading TikTok, WeChat on Sunday*, FOX BUSINESS (Sept. 18, 2020), https://www.foxbusiness.com/politics/trump-administration-to-ban-americans-from-downloading-tiktok-wechat.

[6] *See* Maria Abi-Habib, *India Bans Nearly 60 Chinese Apps, Including TikTok and WeChat*, N.Y. TIMES (June 29, 2020, updated on June 30, 2020), https://www.nytimes.com/2020/06/29/world/asia/tik-tok-banned-india-china.html (stating that India's ban is "part of the tit-for-tat retaliation after the Indian and Chinese militaries clashed earlier this month.").

[7] *See, e.g.*, Nadia Kim, *Asian Americans Suffer From Trump's Racist Attacks Too*, PUBLIC SEMINAR (July 23, 2020), https://publicseminar.org/essays/asian-americans-suffer-from-trumps-racist-attacks-too/; Li Zhou, *Trump's racist references to the coronavirus are his latest effort to stoke xenophobia*, VOX (June 23, 2020), https://www.vox.com/2020/6/23/21300332/trump-coronavirus-racism-asian-americans; Matt Stevens, *How Asian-American Leaders Are Grappling With Xenophobia Amid Coronavirus*, N.Y. TIMES (Mar. 29, 2020, updated on April 10, 2020), https://www.nytimes.com/2020/03/29/us/politics/coronavirus-asian-americans.html.

WeChat users.  Indeed, banning the use of WeChat in the United States has the effect of foreclosing all meaningful access to social media for members of the Chinese-speaking community, such as Plaintiffs, who rely on the app to communicate and interact with others like themselves.  The ban on WeChat, because it substantially burdens the free exercise of religion, also violates the Religious Freedom Restoration Act.

8.      The Executive Order and Identification also run afoul of the Fifth Amendment's Due Process Clause by failing to provide notice of the specific conduct that may be identified at a future date by the Secretary.  Because of this uncertainty, businesses that use WeChat in the United States are justifiably fearful of using WeChat in any way and for any purpose—and also of losing access to WeChat.  Since the Executive Order and Identification were issued, numerous users, including Plaintiffs, have scrambled to seek alternatives without success.

9.      WeChat is the only "super-app" with a natively Chinese interface designed for Chinese speakers.  That is one reason why it is the dominant social media and e-commerce application amongst the global Chinese diaspora, which include Chinese communities in the United States.[8]  These individuals, particularly those who do not speak English, are ***completely reliant*** on WeChat to communicate, socialize, and express themselves.  As such, by prohibiting the use of only WeChat but not any similar applications (ones not made in China and without Chinese interfaces), the Executive Order and Identification single out people of Chinese and Chinese-American ancestry and subject them to disparate treatment on the basis of race, ethnicity, nationality, national origin, and alienage.  In doing so, the Executive Order violates the Equal Protection Clause.

10.     In issuing the Executive Order and Identification, Defendants acted beyond the authority provided by the International Emergency Economic Powers Act, which precludes Defendants from "***directly or indirectly***" regulating, among other things,

---

[8] Thuy Ong, *Chinese social media platform WeChat reaches 1 billion accounts worldwide*, THE VERGE (Mar. 5, 2018), https://www.theverge.com/2018/3/5/17080546/wechat-chinese-social-media-billion-users-china.

1   personal communications, donations, and the international exchange of information.

2       11.    Finally, the Secretary's Identification violates the Administrative Procedure

3   Act ("APA") because it is in excess of statutory jurisdiction, authority, or limitations, or

4   short of statutory right, within the meaning of 5 U.S.C. § 706(2)(B), and is arbitrary,

5   capricious, an abuse of discretion, or otherwise not in accordance with law, within the

6   meaning of 5 U.S.C. § 706(2)(A).

7       12.    The U.S. WeChat Users Alliance ("USWUA"), Chihuo Inc., Brent Coulter,

8   Fangyi Duan, Jinneng Bao, Elaine Peng, and Xiao Zhang (collectively, "Plaintiffs"), bring

9   this suit to challenge the Executive Order and Identification, which eviscerate an

10  irreplaceable cultural bridge that connects Plaintiffs to family members, friends, business

11  partners, customers, religious community members, and other individuals with common

12  interests within the Chinese diaspora, located both in and outside of the United States.  The

13  Executive Order and Identification have already harmed Plaintiffs, who fear for the loss of

14  their beloved connections, whether it be with friends, family, community, customers, aid

15  recipients of the charities they run, or even strangers whose ideas enrich their lives.  They

16  have been forced to divert time, energy, and money to seek alternative communication

17  platforms, download and save irreplaceable digital histories, plan for business closures,

18  find other sources of information, and try to obtain alternative contact information for

19  those from whom they will soon be separated.

20      13.    Even if they succeed to some extent in their mitigation efforts, Plaintiffs will

21  never be able to replace the full spectrum of the social interactivity that WeChat offers, nor

22  will they be able to find any social networking platform with anything close to the same

23  level of participation by the global Chinese diaspora.  This is because WeChat's network

24  effects, generated by its 1 billion-plus daily users, are irreplaceable.

25      14.    In short, the threatened displacement of these WeChat users from their public

26  space is an irreparable harm that requires judicial intervention.

27      15.    For these reasons, and those discussed below, the Court should (1) declare

28  that the Executive Order and the Identification are unlawful and unconstitutional; and

(2) enjoin Defendants from enforcing the Executive Order or the Secretary's Identification to regulate or prohibit the use of WeChat in the United States, directly or indirectly.

### JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to the Constitution and laws of the United States.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.

17.     An actual, present, and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a).

18.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

19.     Venue is proper in this District pursuant to 28 U.S.C. §§ 2201 and 1391 (e)(1) because Defendant are officers of the United States acting in their official capacities and (1) at least one plaintiff resides in this district; and (2) a substantial part of the events or omissions giving rise to the claim occurred in this district.  For the same reason, intradistrict assignment is proper in the San Francisco Division.  *See* N.D. Cal. L.R. 3-2.

### PARTIES

20.     Plaintiff U.S. WeChat Users Alliance ("USWUA") is a New Jersey nonprofit organization that is in the process of being registered under Internal Revenue Code section 501(c)(3), established by individuals in the United States for the purpose of opposing the Executive Order.  Plaintiff USWUA is made up of WeChat users located throughout the United States who are not affiliated with WeChat, its parent company Tencent Holdings Ltd. ("Tencent"), nor any political party or foreign government.  Plaintiff USWUA runs on public donations from WeChat users and organizes its efforts on WeChat.  Plaintiff USWUA is made up of individuals who want to continue using WeChat within the United States and are currently suffering and will continue to suffer an injury based on the Defendants' actions.

21.     Plaintiff Elaine Peng is a United States citizen residing in Castro Valley,

California.  Plaintiff Peng founded the Mental Health Association for Chinese Communities ("MHACC") in 2013 to provide mental health education, suicide prevention, assistance, and other resources to her local Chinese community that is underserved by the mental health profession due to language and cultural barriers.  As president of MHACC, Plaintiff Peng strives to make mental health programs available to those in need and has received multiple awards for her work.  Like much of the Chinese population in the United States, Plaintiff Peng uses WeChat as her exclusive means to connect with her Chinese families and friends, domestic or abroad.  As most of the population MHACC serves relies on WeChat to communicate, use of WeChat is also integral to MHACC's mission to provide mental health services and support to its members.

22.     Plaintiff Brent Coulter is a United States citizen and WeChat user.  Plaintiff Coulter holds a Juris Doctor from the University of California, Hastings College of the Law ("Hastings"), and lives in San Francisco, California.  Plaintiff Coulter previously lived in China for approximately five years, where he studied at Sichuan University and worked in marketing.  While in China, Plaintiff Coulter used WeChat as his main method of communication to connect with friends and professional contacts.  Now in the U.S., one of Plaintiff Coulter's professional goals is to bridge the gap between China and the U.S. with regard to law and business.  At Hastings, Plaintiff Coulter founded the Asian Law and Business Association, through which he formed a partnership with the American Chamber of Commerce ("AmCham") in Southwest China.  Each year, Plaintiff Coulter drafts two chapters of AmCham's annual white paper on U.S. business in China with his colleagues in both countries.  WeChat is central to Plaintiff Coulter's annual collaboration and remains the only way for him to connect with many of his professional contacts and friends in China.  Plaintiff Coulter relies on WeChat to build upon his professional career which straddles law and business in the U.S. and China.  Without WeChat, Plaintiff Coulter would lose access to many of the relationships that he has built throughout his studies and career.

23.     Plaintiff Xiao Zhang is a Chinese citizen with a valid visa residing in

Houston, Texas.  She is employed as an engineer and founded a nonprofit organization known as Hita Education Foundation that supports underserved students at the high school in her hometown in China.  Plaintiff Zhang uses WeChat to speak with administrators, teachers, parents of school children, and to help identify underserved Chinese students who would benefit from the program.  Plaintiff Zhang's nonprofit organization currently sends donations of 300 yuan (approximately $43 dollars) to seven students per month to pay for meals and school supplies.  Plaintiff Zhang also uses WeChat to transfer the funds to each individual student, and WeChat is her exclusive means to connect with her Chinese-speaking family members and friends, domestic or abroad.

24.     Plaintiff Fangyi "Amy" Duan is a Chinese citizen with a valid visa, and resides in Santa Clara, California.  Plaintiff Duan is employed as the chief executive officer of Plaintiff Chihuo Inc. ("Chihuo"), a corporation that is dually registered in both California and Delaware.

25.     Plaintiff Chihuo is a media and online retailer that creates content regarding Chinese restaurants and cuisine for people residing in the United States.  Plaintiff Chihuo provides U.S. based merchants an e-commerce platform for targeting Chinese-speaking consumers.  Plaintiff Chihuo serves its customers by providing targeted marketing and advertising services online.  Plaintiff Chihuo delivers its targeted advertising and marketing services primarily on several WeChat official accounts through the app's various functions, including WeChat Moments.  Plaintiff Chihuo employs or contracts with approximately thirty people as part of its business.  Plaintiff Chihuo's WeChat accounts cover 14 major metropolitan areas in the United States and are enjoyed by more than 640,000 readers.

26.     Plaintiff Jinneng Bao is a United States permanent resident and lives in Nassau County, New York.  He is self-employed and runs several businesses including a construction company primarily serving Chinese-speaking clients in New York.  Plaintiff Bao actively attends a Chinese church in New York and participates in Bible studies regularly on WeChat.  His Bible study group consists of mostly Chinese-speaking

members.  Due to the pandemic, Plaintiff Bao's Bible study group has stopped meeting in person, and WeChat is the only way the group currently maintains communications with one another.

27.     Defendant Donald J. Trump ("President Trump") is the President of the United States.  He is sued in his official capacity.  In that capacity, he issued the Executive Order challenged in this suit and authorized the issuance of the Identification challenged in this suit.

28.     Defendant Wilbur Ross ("Secretary Ross") is the United States Secretary of Commerce.  He is sued in his official capacity.  In the Executive Order, the Secretary is authorized to take actions, including adopting rules and regulations, to implement the Executive Order.  The Secretary exercised this authority on September 18, 2020, when he issued the Identification prohibiting various transactions related to WeChat.

## FACTUAL ALLEGATIONS

### A.     WeChat Capabilities

29.     WeChat is one of the most popular messaging applications in the world, with a monthly user base of more than 1 billion people.[9]  Nearly every person in China with an online presence has at least one WeChat account, and over one-third of them spend four hours or more on the app every day—making WeChat an indispensable part of many peoples' lives and work.[10]

30.     Though WeChat began as a messaging service, it is now a "super-app" that serves a multitude of communicative needs, including making telephone calls, video conferencing, sharing photos, commenting on other users' posts, making payments, and still other purposes.[11]

---

[9] Arjun Kharpal, Everything you need to know about WeChat—China's billion-user messaging app, CNBC (Feb. 3, 2019), https://www.cnbc.com/2019/02/04/what-is-wechat-china-biggest-messaging-app.html.

[10] Li Yuan, To Cover China, There's No Substitute for WeChat, N.Y. TIMES (Jan. 9, 2019), https://www.nytimes.com/2019/01/09/technology/personaltech/china-wechat.html

[11] Bani Sapra, *This Chinese super-app is Apple's biggest threat in China and could be a*

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

31.     One of WeChat's primary uses is the app's messaging capabilities, which include both text and voice messaging.  Messaging through WeChat is the preferred method of communication in China, even when doing business.  Through the app's messaging capabilities, users can have numerous ongoing conversations at one time, and can also set up group texts within a family, a business, or among friends, to communicate with the whole group simultaneously.

32.     WeChat also has capabilities to make voice and video calls.  WeChat users often choose to make voice calls within the app rather than through their cellular telephone provider because it is more convenient.  Group voice conference calls and video chats—comparable to Zoom video group calls—can also be easily made on WeChat.

33.     WeChat includes a feature called "Moments" through which users can upload photos, videos, share news articles, and compose text.  WeChat users can comment on or like posts, similar to the capabilities of apps like Facebook or Instagram.

34.     WeChat also supports many integrated services, such as banking and ride-sharing, so that users do not need to use a separate app to get those services.  Some companies have launched "mini-programs" within WeChat instead of standalone apps, making it more convenient for WeChat users to use their services.

35.     WeChat has increasingly been adopted by older age groups in China, including a significant percentage of those over 60.[12]  Even older users in their 70s use WeChat at high levels for messaging, voice calls, reading articles, and making payments.[13]

**B.     WeChat Usage in the United States**

36.     There are approximately 19 million daily active WeChat users in the United

---

*blueprint for Facebook's future. Here's what it's like to use WeChat, which helps a billion users order food and hail rides*, BUSINESS INSIDER (Dec. 21, 2019), https://www.businessinsider.com/chinese-superapp-wechat-best-feature-walkthrough-2019-12.

[12] Clark Boyd, *The Silver Lining: WeChat and China's Over-60s*, MEDIUM (Sept. 3, 2020), https://medium.com/swlh/the-silver-lining-wechat-and-chinas-over-60s-168b193fb516.

[13] Mansoor Iqbal, *WeChat Revenue and Usage Statistics*, BUSINESS OF APPS (updated July 30, 2020),  https://www.businessofapps.com/data/wechat-statistics/.

States.[14]  WeChat is very widely used among Chinese speakers in the United States, many of whom do not own personal computers and rely on the WeChat mobile app to communicate.[15]  WeChat is the dominant method for anyone in the United States who regularly communicates with people in China because it is free, is more convenient, and has better reception than traditional telephone calls.  WeChat is used in the United States not only to keep in touch with friends and family, but also academics, professionals, and business people to discuss matters of professional importance.

37.    In the United States, the vast majority of the Chinese-speaking population uses WeChat, creating network effects that encourage others to join and participate lest they be cut off entirely from family, friends, and business circles.[16]  Almost all Chinese-speaking immigrants who have come to the United States since 2011 brought their WeChat accounts with them from China, where they built extensive networks of contacts prior to immigrating.  In order to maintain their networks among the Chinese-speaking community, these individuals need to continue using WeChat rather than mainstream Western social media platforms such as Facebook, WhatsApp, or Twitter.  This is because all of these platforms—and many others used in the United States—are not available in China.  This is also true for Chinese-speaking immigrants who came to the United States before 2011 and now depend on WeChat to maintain connections with contacts in both the United States and in China.  Simply put, WeChat is irreplaceable because no other app has anywhere near the same number of users and engagement among the Chinese-speaking community, both in the United States and abroad.  If WeChat were banned in the United States,

---

[14] Krystal Hu, *WeChat U.S. ban cuts off users link to families in China*, REUTERS (Aug. 7, 2020), https://www.reuters.com/article/us-usa-tencent-holdings-wechat-ban/wechat-us-ban-cuts-off-users-link-to-families-in-china-idUSKCN253339#:~:text=In%20the%20past%20three%20months,according%20to%20analytics%20firms%20Apptopia.

[15] Gustavio Lopez, Neil G. Ruiz, and Eileen Patten, *Key facts about Asian Americans, a diverse and growing population*, PEW RESEARCH CENTER (Sept. 8, 2017), https://www.pewresearch.org/fact-tank/2017/09/08/key-facts-about-asian-americans/.

[16] Mohit Mittal, *WeChat—The One App That Rules Them All*, HARVARD BUSINESS SCHOOL DIGITAL INITIATIVE (Aug. 25, 2017), https://digital.hbs.edu/innovation-disruption/wechat%E2%80%8A-%E2%80%8Athe-one-app-rules/.

1    Plaintiffs' WeChat networks would not simply migrate to another platform—they would

2    evaporate.

3         38.    The WeChat mobile app in particular has become an essential part of

4    Chinese and Chinese-American life in the United States.  The vast majority of WeChat

5    users in the United States use the app through their mobile phones.  Many WeChat users in

6    the United States do not own personal computers, and rely exclusively on the WeChat

7    mobile app to maintain contact with their personal, professional, political, and religious

8    communities.  Even those users who do own a personal computer depend on the

9    availability of the WeChat mobile app, because so many of the people with whom they

10   communicate—even those located in the United States—rely on their mobile phones to

11   access and use WeChat.

12        39.    WeChat users in the United States use the app to communicate within

13   Chinese-American communities in the United States and with Chinese speakers throughout

14   the world.  Without access to WeChat, users in the United States will be cut off from their

15   cultural community in the U.S. and will lose the main line of communication they have

16   with family and friends thousands of miles away.  Plaintiffs Peng, Zhang, Bao, and Fang

17   all use WeChat regularly while living in the United States to communicate with their aging

18   parents or other family members who reside in China.

19        40.    The importance of WeChat to Chinese Americans cannot be overstated

20   because a significant portion of these individuals speak little or no English.  According to a

21   study by the Pew Research Center, 41% of the Chinese population in the United States are

22   not English proficient.[17]  Accordingly, a blanket prohibition on WeChat means that

23   millions of individuals in the United States will be unable to find a comparable substitute

24   on apps such as Facebook, which are designed for English-speaking users and primarily

25   have English-speaking user networks within the United States.

26

27   _____

[17] *English proficiency of Chinese population in the U.S.*, PEW RESEARCH CENTER (July 6,
28   2017), https://www.pewsocialtrends.org/chart/english-proficiency-of-chinese-population-
     in-the-u-s/.

41.     WeChat users in the United States use the app to engage in, organize, and publicize religious and cultural practices.  For instance, various churches with primarily Chinese congregants have WeChat profiles and stream their services online.[18]  The Church of Jesus Christ of Latter-Day Saints uses WeChat to reach Chinese-American members and potential congregants within China.[19]  WeChat users in the United States attend and participate in religious services or events, such as funerals, weddings, or other gatherings through the app.  Plaintiff Jinneng Bao relies on WeChat exclusively to attend regular Bible studies hosted by his Chinese church in New York.  WeChat users in the United States organize and celebrate various religious and cultural holidays through their activity in WeChat groups.  They post Moments about holidays such as the Chinese New Year, the Mid-Autumn Moon Festival, Ching Ming Festival (when Chinese people around the world visit the tombs of their departed loved ones), and the Duan Wu Festival (popularly known in the U.S. as the day when Chinese communities host dragon boat races).  Because events, educational or celebratory, are frequently discussed and transmitted through social networks on WeChat, users rely on WeChat to learn about and celebrate religious and cultural events with their community members online.

42.     In the United States, WeChat users organize around political causes through the app.  For instance, many WeChat groups were used to organize, campaign, and raise funds in the 2016 presidential election, and users in the United States have similarly used

---

[18] Feng Long, *Leveraging Tech for Chinese Evangelism*, SIERRAPACIFIC (May 15, 2020), https://www.undeniableblessing.org/blog/Leveraging-Tech-for-Chinese-Evangelism (Oakland pastor who uses WeChat); MID-HUDSON CHINESE CHRISTIAN CHURCH (NY), https://www.mhccc.org/ (last visited Aug. 20, 2020); BRENTWOOD BAPTIST CHURCH (TN) https://brentwoodbaptist.com/chinese/ (last visited Aug. 20, 2020).

[19] THE CHURCH OF JESUS CHRIST OF LATTER-DAY-SAINTS IN CHINA, https://www.churchofjesuschrist.org/China (last visited Aug. 20, 2020) (*see* Frequently Asked Questions by Church Leaders, Can Church leaders/members outside China keep in touch with Chinese members baptized in their brand/ward after those Chinese members return to China? Email? WeChat? Letters?); James Griffiths, *This US Church with Expansion in its DNA Wants to Open a Temple in China,* CNN (Hong Kong) (Jun. 11, 2020), https://www.cnn.com/2020/06/06/asia/mormon-church-latter-day-saints-china-intl-hnk/index.html.

WeChat to support candidates in the 2020 presidential election cycle.[20]  Plaintiff Peng is an active member of several WeChat groups that discuss issues pertaining to the U.S. 2020 election and publish information on how to become a registered voter.  Asian-Americans who organized to oppose a Democrat-backed ballot initiative in California, which would have reversed the state's ban on race-conscious admissions, did so primarily through WeChat.[21]  Organizations and causes wanting to reach Chinese Americans use WeChat groups to raise awareness about demonstrations, spread voter education materials, and campaign for various candidates.

43.     WeChat is integral for the spread of current events and news within Chinese communities.  WeChat users rely on the app to read about current events and the news, including in media from the United States, China, and around the world.  Plaintiffs Zhang and Peng frequently use WeChat to read, share, receive, and respond to news items that their WeChat contacts post to their Moments.  Plaintiffs then comment, like, and share various news items that they receive from their WeChat contacts.  Journalists who cover issues pertaining to China and Chinese communities rely on WeChat to investigate issues and communicate with people to interview.  Large Chinese-language newspapers in the U.S., such as *Sing Tao Daily* and *World Journal*, publish news stories through their WeChat accounts.

44.     Government entities in areas with significant numbers of Chinese immigrants or Chinese Americans use WeChat as a method of communicating with their constituents.  For instance, the police department in Alhambra, California began using WeChat in 2015 to provide updates about local law enforcement efforts.[22]  The cities of

---

[20] *See* Wanning Sun, *Why Trump's WeChat ban does not make sense—and could actually cost him Chinese votes*, THE CONVERSATION (Aug. 10, 2020), https://theconversation.com/why-trumps-wechat-ban-does-not-make-sense-and-could-actually-cost-him-chinese-votes-144207.

[21] Alia Wong, *The App at the Heart of the Movement to End Affirmative Action*, THE ATLANTIC (Nov. 20, 2018),   https://www.theatlantic.com/education/archive/2018/11/asian-americans-wechat-war-affirmative-action/576328/.

[22] Ashley Fan, *Some San Gabriel Valley Communities Could Be Seriously Affected by*

Arcadia, San Gabriel, and Monterey Park in California have official WeChat accounts, which allow them to communicate with Chinese-speaking populations in their own language.[23]  Local governments have used WeChat messaging as a way to send emergency notifications and provide public notice for local governance proposals.

45.   During the COVID-19 pandemic, WeChat users have relied even more on the app to communicate and organize within their communities.  In February 2020, volunteers in the Bay Area used WeChat to organize and send medical supplies to Wuhan, China at the start of the worldwide pandemic.[24]  As travel restrictions emerged in the United States, WeChat users relied on the app in order to communicate with family members that they cannot visit in person in their home towns, in other areas of the United States, and around the world.  People in the United States use the app to visit with elderly loved ones in nursing homes and hospitals, as well as with COVID-19 patients who cannot be visited in person due to pandemic-related restrictions.  Information about the pandemic, including regarding COVID-19 testing, prevention methods, and government responses to the pandemic, are broadly shared and discussed in the United States through WeChat groups and posts.  For instance, a local police department in California posted information about times and locations for drive-up and walk-up COVID-19 testing on its WeChat profile.  Similarly, doctors used WeChat extensively to spread information on the

---

*Trump's WeChat Ban,* SAN GABRIEL VALLEY TRIB. (Aug. 10, 2020), https://www.sgvtribune.com/2020/08/10/how-trumps-wechat-ban-could-disrupt-life-in-the-san-gabriel-valley/; Josie Huang, *Alhambra Police Use WeChat as Bridge to Chinese Immigrants,* KPCC (Jan. 20, 2015), https://www.scpr.org/blogs/multiamerican/2015/01/20/17819/alhambra-police-join-wechat-to-chinese/.

[23] Ashley Fan, *Some San Gabriel Valley Communities Could Be Seriously Affected by Trump's WeChat Ban,* SAN GABRIEL VALLEY TRIB. (Aug. 10, 2020), https://www.sgvtribune.com/2020/08/10/how-trumps-wechat-ban-could-disrupt-life-in-the-san-gabriel-valley/; Christopher Yee, *How this 32-year-old Interpreter Became Alhambra's Weibo, WeChat Guru,* SAN GABRIEL VALLEY TRIB. (Jul. 14, 2016, updated Aug. 30, 2017), https://www.sgvtribune.com/2016/07/14/how-this-32-year-old-interpreter-became-alhambras-weibo-wechat-guru/.

[24] Devin Katayama, Ericka Cruz Guevarra & Alan Montecillo, "*'That's Where I Grew Up': The Wuhan Natives Organizing Aid from the Bay,* KQED (Feb. 19, 2020), https://www.kqed.org/news/11802206/thats-where-i-grew-up-the-wuhan-natives-organizing-aid-from-the-bay.

prevention of COVID-19 in the Chinese communities in Sacramento, California.[25]
Organizations, such as Plaintiff Peng's MHACC, make vital mental health programs
available to their communities through WeChat, in a world where people are struggling
with the long-term isolation associated with the pandemic.

**DEFENDANTS' EXECUTIVE ORDERS AND IMPLEMENTING REGULATIONS**

### A.    Executive Order 13873

46.    Prior to the issuance of the Executive Order challenged by this lawsuit, on
May 15, 2019, President Trump issued Executive Order 13873, titled "Securing the
Information and Communications Technology Services Supply Chain."  84 Fed. Reg.
22689 (May 15, 2019).  Executive Order 13873 declares a national emergency with respect
to the threat posed by unidentified "vulnerabilities in information and communications
technology and services[.]"

47.    According to this Order, these unidentified vulnerabilities constitute an
"unusual and extraordinary threat to the national security, foreign policy, and economy of
the United States," due in part to the "unrestricted acquisition or use in the United States of
information and communications technology or services designed, developed,
manufactured, or supplied by persons owned by, controlled by, or subject to the
jurisdiction of foreign adversaries[.]"  The threat, according to the May 15, 2019 Order,
"exists both in the case of individual acquisitions or uses of such technology or services,
and when acquisitions or uses of such technologies are considered as a class."  Executive
Order 13873 does not identify specific countries or companies that pose a national security
threat.

48.    Under the National Emergencies Act, this national emergency would have
terminated automatically after one year unless the President renewed it before that
termination.  *See* 50 U.S.C. § 1622(d).  President Trump extended Executive Order 13873

---

[25] Theodora Yu, *To Combat Coronavirus, These Doctors Are Helping Sacramento's Chinese Community on WeChat,* SAC. BEE (Feb. 27, 2020), https://www.sacbee.com/latest-news/article240662256.html.

1    for another year on May 13, 2020.  *See* 85 Fed. Reg. 29321 (May 13, 2020).  In his notice

2    of the extension, the President provided no explanation for why the national emergency

3    "must continue" other than a conclusory assertion that the threat identified in his original

4    emergency declaration "continues to pose an unusual and extraordinary threat to the

5    national security, foreign policy, and economy of the United States."  *Id.*

6         **B.    Executive Order 13943**

7         49.    More than fourteen months after the President declared this national

8    emergency, President Trump issued Executive Order 13943, titled "Addressing the Threat

9    Posed by WeChat, and Taking Additional Steps to Address the National Emergency with

10   Respect to the Information and Communications Technology and Services Supply Chain."

11   85 Fed. Reg. 48641 (Aug. 6, 2020).  Executive Order 13943 states that WeChat

12   "automatically captures vast swaths of information from its users," and that the data

13   collected by WeChat "threatens to allow the Chinese Communist Party access to

14   Americans' personal and proprietary information."  According to the Executive Order, the

15   data collected by WeChat also "captures the personal and proprietary information of

16   Chinese nationals visiting the United states, thereby allowing the Chinese Communist

17   Party a mechanism for keeping tabs on Chinese citizens who may be enjoying the benefits

18   of a free society for the first time in their lives."  The Executive Order also warns that

19   WeChat "may also be used for disinformation campaigns that benefit the Chinese

20   Communist Party."

21        50.    Executive Order 13943 does not declare a new national emergency.  Rather,

22   it asserts that the "threat" posed by WeChat is "similar to" the threat posed by other

23   Chinese-owned technology companies, such as TikTok, which the President took action

24   against pursuant to his purported emergency powers under the International Emergency

25   Economic Powers Act ("IEEPA").  *See* Executive Order 13942, 85 Fed. Reg. 48637

26   (Aug. 6, 2020).  The Executive Orders regulating WeChat and TikTok—both issued on the

27   same day—rely on powers purportedly made available by the national emergency declared

28   in Executive Order 13873, issued over a year earlier on May 15, 2019.

51.     Several sections of Executive Order 13943 purport to alter the legal rights and obligations of private parties.  Section 1(a) states that "any transaction that is related to WeChat by any person" will be "prohibited beginning 45 days after the date of this order[.]"  Section 1(a) further prohibits, beginning 45 days from the date of the Order, transactions with Tencent, WeChat's parent company, and any subsidiaries of Tencent that are "identified by the Secretary of Commerce[.]"  Section 2(a) states that "[a]ny transaction… that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate the prohibition set forth in this order is prohibited."  Section 2(b) further prohibits "[a]ny conspiracy formed to violate any of the prohibitions set forth in this order."  Section 3 purports to strip persons subject to the prohibitions in Sections 1(a) and 2 of any right to notice of the specific conduct being prohibited.

52.     Executive Order 13943, by its terms, applies not only to WeChat and its parent company Tencent, but also to the millions of American individuals, groups, businesses, organizations, churches and government agencies, that use WeChat every day to communicate, learn, speak, read, publish, organize, advertise, run a business, and meet friends and family in their personal, professional and business lives.  While "transaction" is not defined in the Executive Order, it does make clear that it applies to "any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States."  *Id.* § 4(c).  And "entity" is further defined to mean a government or instrumentality of such government, partnership, association, trust, venture, corporation, group, subgroup, or other organization, including an international organization."  *Id.* § 4(b).

53.     Two other sections of Executive Order 13943 direct the Secretary of Commerce to take additional action:  Section 1(c) directs the Secretary, within 45 days of August 6, to "identify the transactions subject to subsection [1](a)."  Section 5 authorizes the Secretary to "take such actions, including adopting rules and regulations, and to employ all powers granted to me by IEEPA as may be necessary to implement this order."

The Executive Order specifically mentions the popular use of WeChat to pay for purchases or to transfer money or to accept or make payments for their businesses from or to another user, as the basis to relieve the Secretary of Commerce of any responsibility to give "prior notice" to them "of measures to be taken" because advance notice "would render those measures ineffectual." *Id.* § 3.  It is unclear whether this section permits the Secretary to freeze or seize monies belonging to WeChat users in the U.S. without notice.

54.     Under the Executive Order, WeChat users who engage in a prohibited transaction may be prosecuted under the IEEPA, which provides for civil penalties of $250,000 or twice the amount of the transaction at issue, and criminal penalties of up to $1 million plus 20 years in prison.  *See* 50 U.S.C. § 1705(b)-(c).

**C.     The Secretary of Commerce's Identification of Prohibited Transactions, and Intent to Ban WeChat**

55.     On September 18, 2020, the Commerce Department released its "Identification of Prohibited Transactions to Implement Executive Order 13943" (the "Identification").

56.     The Identification sets forth eleven defined terms and identifies seven "transactions" to be prohibited pursuant to the Executive Order.

57.     For example, the Identification defines "person" as "an individual or entity."

58.     The Identification  also defines "Transaction" to mean "any acquisition, importation, transfer, installation, dealing in, or use of any information and communications technology or service."

59.     The Identification states that the following transactions are prohibited by Executive Order 13943:

a.     "1. Any provision of services to distribute or maintain the WeChat mobile application, constituent code, or mobile application updates through an online mobile application store, or any online marketplace where mobile users within the land or maritime borders of the United States and its territories may download or update applications for use on their mobile devices;

b.      "2. Any provision of internet hosting services enabling the functioning or optimization of the WeChat mobile application, within the land and maritime borders of the United States and its territories;

c.      "3. Any provision of content delivery services enabling the functioning or optimization of the WeChat mobile application, within the land and maritime borders of the United States and its territories;

d.      "4. Any provision of directly contracted or arranged internet transit or peering services enabling the functioning or optimization of the WeChat mobile application, within the land and maritime borders of the United States and its territories;

e.      "5. Any provision of services through the WeChat mobile application for the purpose of transferring funds or processing payments to or from parties within the land or maritime borders of the United States and its territories;

f.      "6. Any utilization of the WeChat mobile application's constituent code, functions, or services in the functioning of software or services developed and/or accessible within the land and maritime borders of the United States and its territories; or

g.      "7. Any other transaction that is related to WeChat by any person, or with respect to any property, subject to the jurisdiction of the United States, with Tencent Holdings Ltd., or any subsidiary of that entity, as may be identified at a future date under the authority delegated under Executive Order 13943."

60.      In short, the Identification sets forth a de facto ban of WeChat in the United States.

61.      On September 18, 2020, multiple Administration officials confirmed the purpose and intent of the Identification as being the eventual, complete prohibition of any use of WeChat in the United States.

62.      For example, on September 18, 2020, Secretary of Commerce Wilbur Ross stated on Fox Business News that "For all practical purposes, [WeChat] will be shut down in the U.S., but only in the U.S. as of midnight on Monday by the Commerce Department

1  rule."[26]

2        63.    Mr. Ross also stated that "WeChat is essentially a funds transfer and

3  payment processing mechanism."  This is incorrect, as several of WeChat's most important

4  functions involve social networking and other communications, both in China and in the

5  United States.  The version of WeChat that is accessible in the United States does not

6  allow users to transfer funds unless both parties to the transaction already have Chinese

7  bank accounts.

8        64.    The Secretary's mischaracterization demonstrates the government's lack of

9  investigation and understanding of the software that it has now banned.

10       65.    In a televised interview on Friday, September 18, 2020, the Secretary of

11 Commerce stated that it "is our *fear"* that WeChat is "taking data from the American

12 public and sending it to China."  But the Secretary provided no examples of "data" being

13 "sen[t]… to China" or how the mere transmission of "data" to China constitutes a national

14 security threat.[27]

15       66.    Also on September 18, 2020, a separate statement from an anonymous

16 "senior Commerce official" to a reporter for the technology publication CNET appears to

17 confirm that the Administration has no evidence whatsoever of private data being

18 harvested by WeChat in the United States. "Whether we have any evidence, domestically,

19 of these particular apps taking data is missing the point," according to this official, because

20 the Administration "know[s] what the Chinese government's intent is here in the United

21 States."[28]

22       67.    On the same day, another senior Trump administration official told CNBC

23

24 ────────────────
   [26] Megan Henney, *Trump Administration to Ban Americans from Downloading TikTok,*
25 *WeChat on Sunday*, FOX BUSINESS (Sept. 18, 2020),
   https://www.foxbusiness.com/politics/trump-administration-to-ban-americans-from-
26 downloading-tiktok-wechat.
   [27] *Id.*
27 [28] September 18, 2020 CNET article titled "TikTok, WeChat downloads will be barred
   from US starting Sunday," *Available at:*  https://www.cnet.com/news/tiktok-wechat-
28 downloads-will-be-barred-from-us-starting-sunday.

1   that, as a result of Executive Order 13943 and the Identification, WeChat is "dead in the

2   United States."[29]

3       68.     In a September 17, 2020 Memorandum for the Secretary of Commerce from

4   John K. Costello, Deputy Assistant Secretary for Intelligence and Security ("Decision

5   Memo"), the Commerce Department acknowledged that the prohibitions in the

6   Identification were drafted to prevent transmission of U.S. user data by the WeChat app.

7       69.     In September 2020, after the President issued Executive Order 13943 but

8   before the Secretary issued the Identification, the Department of Homeland Security's

9   Cybersecurity and Infrastructure Agency ("CISA") recommended that Defendants issue a

10  far narrower prohibition aimed at preventing the use of WeChat on the devices of State,

11  Local, Tribal, and Territorial partners and critical infrastructure operators.  Defendants

12  rejected the advice of their own intelligence agency in favor of a sweeping ban that will

13  effectively "shut down" WeChat in the United States.[30]

14      70.     In August and September 2020, after the President issued Executive Order

15  13943 but before the Secretary issued the Identification, representatives for Tencent

16  attempted to negotiate an agreement with the Commerce Department that would obviate

17  the purported need for Defendants' WeChat ban.  Among other mitigation measures,

18  Tencent offered to create a new U.S. version of WeChat; to deploy specific security

19  measures to protect the U.S. version's source code; to partner with a U.S. cloud provider

20  for user data storage; to manage the U.S. version through a U.S.-based entity with a

21  governance structure approved by the U.S. government; and to provide the U.S.

22  government with regular compliance audits and notifications, as well as authority to

23

24  _____

25  [29] Eamon Javers and Kevin Stankiewicz, *TikTok Deal Still Has a Chance but WeChat 'Dead' in the U.S., says Senior Administration Official*, CNBC (Sept. 18, 2020), https://www.cnbc.com/2020/09/18/tiktok-deal-still-has-a-chance-but-wechat-dead-in-the-us-says-senior-administration-official.html

26

27  [30] Megan Henney, *Trump Administration to Ban Americans from Downloading TikTok, WeChat on Sunday*, FOX BUSINESS (Sept. 18, 2020), https://www.foxbusiness.com/politics/trump-administration-to-ban-americans-from-downloading-tiktok-wechat

28

approve management and personnel with access to user data.

71.     Defendants rejected Tencent's proposals to mitigate Defendants' purported concerns about data privacy and national security, opting instead to impose the prohibitions in the Secretary's Identification, which Defendant Ross himself has stated will "shut down" WeChat in the United States once implemented.[31]

72.     At least one of Defendants' rationales for rejecting Tencent's mitigation proposals and the recommendations of CISA is rooted in Defendants' disapproval of the supposed "propaganda" that WeChat users exchange on the platform, which Defendants believe benefits the Chinese Communist Party.

73.     Journalists have likewise understood the Executive Order and Identification as a complete ban on the use of WeChat.  On September 18, 2020, the New York Times reported: "Trump Administration to Ban TikTok and WeChat From U.S. App Stores."[32] The Wall Street Journal reported: "U.S. Bans Chinese Apps TikTok and WeChat, Citing Security Concerns."  CNBC reported: "Trump to block downloads of TikTok, WeChat on Sunday," and noted that "WeChat is considered dead in the U.S."[33]  And the Associated Press reported: "US bans WeChat, TikTok from app stores, threatens shutdowns," saying that the move could "effectively wreck the operation of both … services for U.S. users."[34]

**D.     Purported Authority for the Executive Order and Identification**

74.     Both Executive Order 13873 and Executive Order 13943 cite the National Emergencies Act ("NEA") and the IEEPA as providing the legal authority for the

---

[31] *Id.*

[32] Ana Swanson, David McCabe, and Jack Nicas, *Trump Administration to Ban TikTok and WeChat from U.S. App Stores*, N.Y. TIMES (Sept. 18, 2020), https://www.nytimes.com/2020/09/18/business/trump-tik-tok-wechat-ban.html..

[33] Steve Kovach, *Trump to Block Downloads of TikTok, WeChat on Sunday*, CNBC (Sept. 18, 2020), https://www.cnbc.com/2020/09/18/trump-to-block-us-downloads-of-tiktok-wechat-on-sunday-officials-tell-reuters.html.

[34] Tali Arbel, Matt O'Brien, and Matt Ott, *US Bans WeChat, TikTok from App Stores, Threatens Shut Downs*, U.S. NEWS & WORLD REPORT (Sept. 18, 2020), https://www.usnews.com/news/business/articles/2020-09-18/us-banning-use-of-wechat-tiktok-for-national-security.

1  President's and the Secretary's actions.  The IEEPA and the NEA were both passed in

2  order to *limit* the President's emergency powers.[35]

3          **1.**      **The National Emergencies Act**

4          75.      The NEA, Pub. L. No. 94-412, 90 Stat. 1255, codified at 50 U.S.C. §§ 1601-

5  1651, was enacted by Congress in 1976 to rein in, rather than expand, the power of the

6  president.  The NEA was designed to "insure" that the president's "extraordinary"

7  emergency powers would "be utilized only when emergencies actually exist, and then,

8  only under safeguards of congressional review."  S. Rep. No. 94-1168, at 2 (1976).

9          76.      To this end, the NEA allows the President to utilize emergency powers

10  authorized by Congress in other federal statutes only when there is a national emergency

11  that has been declared in accordance with specific statutory requirements. 50 U.S.C.

12  § 1621.

13          77.      Among other actions required by the NEA, the President must specify the

14  statutory powers he intends to invoke upon issuing a national emergency.  50 U.S.C.

15  § 1631.  He must also publish the declaration of a national emergency in the Federal

16  Register and transmit it to Congress "immediately."  50 U.S.C. § 1621(a).  Every six

17  months thereafter, for as long as the emergency remains in effect, the President must

18  transmit to Congress "a report on the total expenditures incurred by the United States

19  Government during such six-month period which are directly attributable to the exercise of

20  powers and authorities conferred by such declaration."  50 U.S.C. § 1641(c).  Each House

21  of Congress, in turn, must meet at least once every six months following the declaration

22  "to consider a vote on a joint resolution to determine whether that emergency shall be

23  terminated."  50 U.S.C. § 1622(b).  Any national emergency declared by the President

24

---

25  [35] *See* IEEPA, Pub. L. 95-223, tit. III (1977) (stating that IEEPA confers "upon the

26  President a new set of authorities for use in time of national emergency which are both *more limited in scope* than [those previously allowed] and *subject to procedural*

27  *limitations*" (emphasis added)); Jules Lobel, *Emergency Power and the Decline of Liberalism*, 98 Yale L.J. 1385, 1412 (1989) (the NEA responded to "the twin disasters of

28  Vietnam and Watergate" and the sense that "the pendulum had swung too far" toward executive power).

1    automatically terminates after one year unless the President publishes in the Federal

2    Register and transmits to Congress a notice that the emergency "is to continue in effect

3    after such anniversary."  50 U.S.C. § 1622(d).

4                    **2.    The International Emergency Economic Powers Act**

5           78.    The IEEPA grants the President limited emergency powers when the

6    President has declared a national emergency, pursuant to the NEA, with regard to an

7    "unusual and extraordinary threat, which has its source in whole or in substantial part

8    outside the United States[.]"  50 U.S.C. § 1701(a).  "Any exercise" of the powers granted

9    by the IEEPA "to deal with any new threat shall be based on a new declaration of national

10   emergency which must be with respect to such threat."  50 U.S.C. § 1701(b).

11          79.    The IEEPA does not grant the President unlimited powers during national

12   emergencies.  Rather, the statute includes specific limits on the emergency powers it

13   authorizes.  Section 1702(b) of the IEEPA states that "[t]he authority granted to the

14   President by [the IEEPA] does not include the authority to regulate or prohibit, directly or

15   indirectly … (1) any postal, telegraphic, telephonic, or other personal communication,

16   which does not involve a transfer of anything of value; (2) donations, by persons subject to

17   the jurisdiction of the United States, of articles, such as food, clothing, and medicine,

18   intended to be used to relieve human suffering …; (3) the importation from any country, or

19   the exportation to any country, whether commercial or otherwise, regardless of format or

20   medium of transmission, of any information or informational materials …; [or] (4) any

21   transactions ordinarily incident to travel to or from any country[.]"  50 U.S.C.

22   § 1702(b)(1)-(4).  The IEEPA also requires that the President "consult with Congress

23   before exercising any of the authorities granted by this chapter," and that the President

24   "immediately transmit to Congress a report" containing certain additional information

25   about the President's reasons for exercising his emergency powers under the IEEPA and

26   the specific actions he and his subordinates will take in exercising those powers.  50

27   U.S.C. § 1703(a)-(b).

28

**E.** **The Executive Order's Timing Suggests That It Was Issued Not for a Bona Fide National Security Reason But Instead to Further the President's Political Campaign By Inciting Anti-Asian Sentiment**

80.   In the months before the Executive Order and Identification were issued, President Trump made numerous anti-Chinese statements outside the context of national security that commentators have described as inciting racial animus against persons of Chinese descent for political gain.  Many of these inflammatory statements have been made in the context of the President blaming the coronavirus pandemic on China.  Instead of using the official public health terms for the virus and the disease it causes, such as the "novel coronavirus" and "COVID-19," President Trump has repeatedly and intentionally referred to the virus causing the current pandemic as the "China virus," "the Wuhan virus," "China Flu," and "Kung-Flu."[36]

81.   Facing criticism that these word choices were racist and unfairly subjected Chinese people—including Chinese Americans—to anger and hatred, the White House

---

[36] *See, e.g.*, Remarks by President Trump in Press Briefing (July 23, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-press-briefing-072320/ ("We've had a tremendous week uniting the country in our fight against the **China virus**"); Donald J. Trump (@realDonaldTrump), TWITTER  (Aug. 2, 2020), https://twitter.com/realDonaldTrump/status/1289887533250351110 ("Big **China Virus** breakouts all over the World, including nations which were thought to have done a great job. The Fake News doesn't report this. USA will be stronger than ever before, and soon!"); Donald J. Trump (@realDonaldTrump), TWITTER (Aug. 11, 2020), https://twitter.com/realDonaldTrump/status/1293163704188645385 ("More Testing, which is a good thing (we have the most in the world), equals more Cases, which is Fake News Gold. They use Cases to demean the incredible job being done by the great men & women of the U.S. fighting the **China Plague**!"); Donald J. Trump (@realDonaldTrump), TWITTER (July 26, 2020), https://twitter.com/realDonaldTrump/status/1287473812733341696 ("Because of my strong focus on the **China Virus**, including scheduled meetings on Vaccines, our economy and much else, I won't be able to be in New York to throw out the opening pitch for the @Yankees on August 15th. We will make it later in the season!"); Donald J. Trump (@realDonaldTrump), TWITTER (Mar. 18, 2020), https://twitter.com/realDonaldTrump/status/1240243188708839424 ("I always treated the **Chinese Virus** very seriously, and have done a very good job from the beginning, including my very early decision to close the "borders" from China - against the wishes of almost all. Many lives were saved. The Fake News new narrative is disgraceful & false!"); Li Zhou, *Trump's Racist References to the Coronavirus Are His Latest Effort to Stoke Xenophobia*, VOX (June 23, 2020), https://www.vox.com/2020/6/23/21300332/trump-coronavirus-racism-asian-americans; Colby Itkowitz, *Trump Again Uses Racially Insensitive Term to Describe Coronavirus,* WASH. POST (Jun. 23, 2020), https://www.washingtonpost.com/politics/trump-again-uses-kung-flu-to-describe-coronavirus/2020/06/23/0ab5a8d8-b5a9-11ea-aca5-ebb63d27e1ff_story.html.

---

press secretary has defended Trump's dangerous and incendiary language.[37]  The Anti-Defamation League has reported an increasing number of hate crimes, including racial slurs, spitting on, and physical assaults against Asian-Americans in the United States following the President's use of these terms, and warned that "Statements by public officials referring to COVID-19 as the 'Chinese virus,' 'Kung Flu' or 'Wuhan Flu' may be exacerbating the scapegoating and targeting of the [Asian American and Pacific Islander] community."[38]  The incitement following the President's statements reminded many in the Asian American community of the hatred and racial violence focused on persons of Asian descent after the Japanese auto industry was blamed for major job losses in the American Rust Belt.[39]

82.    In addition to asserting that the United States' incidence of COVID-19 is China's fault, the President has exploited anti-Chinese sentiment as a rallying cry for his reelection campaign.  For example, on August 11, 2020, President Trump stated that "[i]f I don't win the election, China will own the United States.  You're going to have to learn to speak Chinese."[40]  President Trump has on numerous occasions mocked the accents of Chinese and Asian-Americans, including those of prominent Asian leaders.[41]

---

[37] Andrew Restuccia, *White House Defends Trump Comments on 'Kung Flu,' Coronavirus Testing*, WALL ST. J. (Jun. 22, 2020), https://www.wsj.com/articles/white-house-defends-trump-comments-on-kung-flu-coronavirus-testing-11592867688.

[38] *Reports of Anti-Asian Assaults, Harassment and Hate Crimes Rise as Coronavirus Spreads,* ADL BLOG (Jun. 18, 2020), https://www.adl.org/blog/reports-of-anti-asian-assaults-harassment-and-hate-crimes-rise-as-coronavirus-spreads.

[39] Ali Rogin & Amna Nawaz, *'We Have Been Through this Before.' Why Anti-Asian Hate Crimes Are Rising Amid Coronavirus,* PBS NEWS HOUR (Jun. 25, 2020), https://www.pbs.org/newshour/nation/we-have-been-through-this-before-why-anti-asian-hate-crimes-are-rising-amid-coronavirus.

[40] Kevin Liptak, *Trump Says Americans Will Have to Learn Chinese if Biden Wins, but Offers Little Condemnation of Beijing,* CNN (Aug. 11, 2020), https://www.cnn.com/2020/08/11/politics/trump-china-biden-learn-chinese/index.html

[41] *See, e.g.*, Laura Ma, *'We want deal!': Trump fakes Asian accent to mock Chinese and Japanese businessmen at US rally*, South China Morning Post (Aug. 26, 2015), https://www.scmp.com/news/world/article/1852785/we-want-deal-trump-fakes-asian-accent-mock-chinese-japanese-businessmen; Jennifer Gould and Emily Smith, *Trump cracks jokes about Equinox scandal, kamikaze pilots at Hamptons fundraiser*, N.Y. POST (Aug. 9, 2019), https://nypost.com/2019/08/09/trump-cracks-jokes-about-rent-control-

83.     Defendants' animus toward persons of Chinese and Chinese-American descent is a key reason they have chosen to ban WeChat.  Defendants have not imposed comparable restrictions on software that is not owned and used primarily by persons of Chinese and Chinese-American descent, even when that software collects similar personal and private data from users in the United States and shares that data with the Chinese government.  Defendants have not, for example, proposed a comparable ban on Airbnb, despite their knowledge that Airbnb collects a wide range of private information from American users and shares that information with the Chinese government.[42]

84.     Defendants' claim that WeChat presents a threat to national security rings hollow.  President Trump waited fifteen months after declaring a national emergency related to foreign-owned technology before targeting WeChat.  Then, in issuing the Executive Order, he provided an additional month and a half for the Secretary of Commerce to define the "transactions" banned by the Order.  Nothing in the administrative record produced in connection with the Secretary's Identification provided any evidence that WeChat has been used by China to surveil Americans—let alone in a manner that poses a national security threat.  Instead, the generalized threats about China that are identified in the administrative record have been known for years.  Moreover, the administrative record does not identify any significant event(s) in the intervening one and a half years between the national emergency identified in Executive Order 13873 and the Executive Order banning WeChat ban that would have prompted the need to ban this app in particular or that would justify immediate action.  In a December 4, 2020 letter to Plaintiffs' counsel, Defendants' counsel indicated that no additional factual materials beyond those included in the administrative record were considered by Defendant Ross or

---

kamikaze-pilots-at-hamptons-fundraiser/ (reporting on Trump "mimicking Japanese and Korean accents").

[42] *See* Dustin Volz and Kirsten Grind, *Airbnb Executive Resigned Last Year Over Chinese Request for More Data Sharing*, WALL ST. JOURNAL (Nov. 20, 2020), https://www.wsj.com/articles/airbnb-executive-resigned-last-year-over-chinese-request-for-more-data-sharing-11605896753.

1   his subordinates in issuing the Identification.

2       85.    President Trump's assertions of national security threats related to WeChat

3   are pretextual.  Indeed, this is not the only time that President Trump has invoked vague

4   national security threats related to social media apps for his own political gain.  For

5   example, on December 1, 2020, after Facebook and Twitter engaged in a public awareness

6   campaign notifying users that President Trump's claims about the 2020 election include

7   false claims and disinformation, President Trump stated that Section 230 of the 1996

8   Communications Decency Act "is a serious threat to our National Security…. Our Country

9   can never be safe & secure if we allow it to stand."[43]

10  **THE EXECUTIVE ORDER AND IDENTIFICATION CAUSED MASS
    CONFUSION AND HAVE ALREADY HARMED AND WILL CONTINUE TO
11  HARM PLAINTIFFS**

12      86.    American law firms have been unable to advise their clients as to the scope

13  of "transactions" that are banned under Executive Order 13943.  Multiple prominent law

14  firms in the United States have effectively conceded that they cannot provide guidance

15  about the meaning of the Executive Order, and have speculated that all uses of WeChat

16  could be prohibited.  One law firm informed its clients that the "extraordinary breadth and

17  ambiguity" of the Executive Order has "left US companies and many others looking to the

18  Trump Administration for additional clarity[.]"[44]  Another firm speculated that WeChat

19  "could be pulled out of the app stores and off of American phones ….  Companies could

20

21  _____

22  [43] Jaclyn Diaz, *Trump Vows To Veto Defense Bill Unless Shield For Big Tech Is
    Scrapped*, NPR (Dec. 2, 2020), https://www.npr.org/2020/12/02/941019533/trump-vows-
    to-veto-defense-bill-unless-shield-for-big-tech-is-scrapped; *see also* Cat Zakrzewski, *The
23  Technology 202: Trump's misleading claims about Section 230 could last beyond his
    showdown with Congress*, THE WASHINGTON POST (Dec. 3, 2020),
24  https://www.washingtonpost.com/politics/2020/12/03/technology-202-trump-misleading-
    claims-about-section-230-could-last-beyond-his-showdown-with-congress/ (This claim
25  particularly was a real head-scratcher for many tech policy observers because there is not a
    clear link between Section 230 and national security, and Trump didn't explain why he
26  believed it put the country at risk.").

27  [44] Ambassador Charlene Barshefsky, David S. Cohen, Ronald I. Meltzer, David M.
    Horn & Semira Nikou, *New Executive Orders Target Chinese Apps*, WILMER HALE,
28  (Aug. 10, 2020), https://www.wilmerhale.com/en/insights/client-alerts/20200810-new-
    executive-orders-target-chinese-apps.

1  be banned from interacting with the extensive interactive payment network used by

2  WeChat."[45]

3        87.     The general public understands the Executive Order itself as prohibiting the

4  use of WeChat.  The University of Kansas, for example, announced on September 15,

5  2020—before the Secretary issued the Identification—that it would ban the use of WeChat

6  on all KU-owned computers and the campus network, stating that "KU's Office of Global

7  Operations & Security, the Office of the General Counsel and KU Information Technology

8  have determined that use of WeChat in KU's business operations and on its networks will

9  fall within the scope of the executive order's ban."[46]

10        88.     Even after the Commerce Department issued the Identification, law firms

11  remained confused as to what, exactly, was prohibited.  For example, Wilson Sonsini

12  issued a client alert stating that:  "The Orders use broad terminology and not all terms are

13  defined. As such, we believe further guidance from the Commerce Department regarding

14  the precise scope of the restrictions set forth in the Orders is necessary."[47]  Steptoe &

15  Johnson LLP advised its clients that the "fifth prohibition is particularly broad, and less

16  clear than the others… this provision will likely be a focus of concern within industry and

17  among other stakeholders and would benefit from clarification by the Commerce

18  Department."[48]

19

20  [45] David A. Kaufman, John Sandweg, David K. Cheng & Rachel S. Winkler, *Administration's Attempt to Delete TikTok and WeChat: Latest Trade Tiff or New Battle,* NIXON PEABODY (Aug. 7, 2020),

21  https://www.nixonpeabody.com/en/ideas/articles/2020/08/07/administrations-attempt-to-delete-tiktok-and-wechat.

22  [46] Blake Ullmann, KU-Owned Computers, Campus Wi-Fi Will Ban Use of WeChat, THE

23  UNIVERSITY DAILY KANSAN (Sept. 15, 2020), https://www.kansan.com/news/ku-owned-computers-campus-wi-fi-will-ban-use-of-wechat/article_0d3326b8-f76b-11ea-bd4c-

24  dbb1fe3ba1be.html.

25  [47] Anne E. Symour, Josephine I. Aiello LeBeau, Melissa B. Mannino, Joshua F. Gruenspecht, U.*S. Department of Commerce Publishes Transactions with ByteDance and

26  Tencent That Are Prohibited Due to National Security Concerns Raised by TikTok and WeChat*, WILSON SONSINI (Sept. 18, 2020), https://www.wsgr.com/en/insights/us-

27  department-of-commerce-publishes-transactions-with-bytedance-and-tencent-that-are-prohibited-due-to-national-security-concerns-raised-by-tiktok-and-wechat.html.

28  [48]  Peter Jeydel, Martin Willner, Wendy Wysong, Ed Krauland, Jack Hayes, Meredith

89.     Each plaintiff learned of the Executive Order and Identification at or near the time they were issued and have suffered harm as a result of the prohibitions.  Plaintiff Duan, for example, experiences fear and worry that Chihuo—the business she founded and for which she continues to serve as CEO—will not survive if it cannot provide services to customers through WeChat.  Plaintiff Peng fears that the non-profit organization she founded will not be able to continue providing services to Chinese speakers in the United States, and that she personally will be unable to maintain her social ties and communicate with other members of the Chinese community in the United States.  Plaintiff Zhang worries that she will be unable to maintain social ties and communicate with other Chinese-speaking people—both in the United States and in China.  She believes that the charity she founded—Hita Education Foundation—could not have been founded without WeChat and may not be able to survive without being able to connect with Chinese-speaking people through the app.  Each individual plaintiff fears losing connection with close friends and family members.

90.     All plaintiffs, moreover, have already been forced by the Executive Order and Identification to expend time and resources preserving their contacts and memories on WeChat and/or searching—without success—for an alternative platform that could sustain their businesses, charities, and/or social and family ties.  Plaintiff Peng has received inquiries from Chinese families through MHACC, her mental health WeChat group, about where to go if WeChat is banned, but has been unable find a comparable substitute to replace WeChat.  Plaintiff Chihuo has spent money attempting to redirect its business activities that currently depend on WeChat by establishing alternative social media channels on YouTube, Instagram and Facebook.

91.     These efforts to find a substitute for WeChat have not been and are unlikely to be successful.  A ban would be particularly harmful to Plaintiffs and other WeChat users

---

Rathbone & Brian Egan, US Commerce Department Identifies Prohibited Transactions Involving WeChat and TikTok, STEPTOE & JOHNSON LLP (Sept. 20, 2020), https://www.steptoeinternationalcomplianceblog.com/2020/09/us-commerce-department-identifies-prohibited-transactions-involving-wechat-and-tiktok/.

who are not literate in English and cannot turn to alternative options, many of which are not available in these users' native tongue, do not offer a useful Chinese-language interface or notifications, suffer from poor translation functions and inadequate customer service, and/or do not provide user or privacy policies in Chinese.  Many WeChat users do not know how to use alternative interfaces.  Other apps do not offer the features offered by WeChat, such as "official accounts" that enable users like Plaintiff Chihuo to easily and quickly publish articles embedded with pictures and videos and manage comments on the account to remove offensive comments and prioritize comments that the account-holder approves.  Other features unique to WeChat include "mini-programs" that offer a wide range of formatting tools; group chats in which the host has the power to admit and remove participants so as to prevent the chats from being flooded with unwanted advertisements or disruptive messages; and high-quality voice and video calls.  Other apps lack WeChat's language-specific development and features that make it culturally relevant to its Chinese (and Chinese-American) users.

92.    Most importantly, alternative apps also do not provide access to WeChat's vast network of Chinese-speaking users.  Plaintiffs' family members, friends, clients, contacts, news sources, and religious community are regularly on WeChat, not other apps. WeChat's enormous network effect is ***irreplaceable***, and any other platform would not provide the community that WeChat does.

93.    Implementation of the prohibitions in the Identification would further harm Plaintiffs.  John K. Costello, Deputy Assistant Secretary for Intelligence and Security, has admitted that if the Identification is implemented, the WeChat app will become slower to respond, certain features will be impaired, and the app will become unusable to the point that users in the United States will not be able to use it to communicate or transmit data. Plaintiffs and other ordinary WeChat users will be harmed if and when WeChat service is slowed or degraded.  For example, Chihuo's business model relies on speed and prompt results provided by WeChat, and it will lose clients and customers if service is slowed or degraded.  Similarly, high-quality voice and video calls are a critical function of WeChat,

1    and Plaintiffs will be harmed if their call quality degrades to the point where such calls are

2    interrupted or cannot be maintained.

3         94.    Mr. Costello has also acknowledged that the first prohibition of the

4    Identification will prevent Plaintiffs from being able to receive security updates to

5    WeChat.  Such updates and new downloads are necessary to fix security vulnerabilities in

6    apps such as WeChat.  By preventing users from downloading new versions of the app or

7    updating the app, Executive Order 13943 and the Identification make it *more* likely that

8    Plaintiffs' private data and information will be stolen by, or otherwise shared with, entities

9    such as the Chinese government.  This prohibition would ensure that Plaintiffs and other

10   current users would become vulnerable to cyber-attacks as soon as un-addressed

11   vulnerabilities become public.  Vulnerabilities requiring updates are common among social

12   media apps.[49]

13                        **FIRST CLAIM FOR RELIEF**

14                  **(First Amendment – Speech and Association)**

15        95.    Plaintiffs reallege and hereby incorporate by reference the allegations

16

17   [49] *See, e.g.*, Samuel Gibbs, "WhatsApp hack: have I been affected and what should I do?"
     *The Guardian* (May 14, 2019),
18   https://www.theguardian.com/technology/2019/may/14/whatsapp-hack-have-i-been-
     affected-and-what-should-i-do; Adam Clark Estes, "Google's Fixing the Hangouts Hack
19   With 'Biggest Software Update Ever,'" *Gizmodo* (Aug. 5, 2015),
     https://gizmodo.com/googles-fixing-the-hangouts-hack-with-biggest-software-
20   1722296396; Mike Isaac and Sheera Frenkel, "Facebook Security Breach Exposes
     Accounts of 50 Million Users," *N.Y. Times* (Sept. 28, 2018),
21   https://www.nytimes.com/2018/09/28/technology/facebook-hack-data-breach.html;
     Shannon Liao, "Facebook Messenger had a vulnerability that could let hackers see who
22   you contact," *The Verge* (Mar. 7, 2019),
     https://www.theverge.com/2019/3/7/18254788/facebook-messenger-vulnerability-attack-
23   imperva-iframe-malicious; Maya Shwayder, "Vulnerability in Signal messaging app could
     let hackers track your location," *Digital Trends* (May 20, 2020),
24   https://www.digitaltrends.com/news/signal-vulnerability-hack-location/; Brian Fung, "A
     Snapchat security breach affects 4.6 million users. Did Snapchat drag its feet on a fix?"
25   *Wash. Post* (Jan. 1, 2014), https://www.washingtonpost.com/news/the-
     switch/wp/2014/01/01/a-snapchat-security-breach-affects-4-6-million-users-did-snapchat-
26   drag-its-feet-on-a-fix/; Lee Bell, "Skype security flaw 'ignored' by Microsoft could allow
     hackers to gain access to users' computers," *ITPro* (Feb. 14, 2018),
27   https://www.itpro.co.uk/security/30539/skype-security-flaw-ignored-by-microsoft-could-
     allow-hackers-to-gain-access-to-users; Lily Hay Newman, "Hackers Can Break Into an
28   iPhone Just by Sending a Text," *Wired* (Aug. 7, 2019),
     https://www.wired.com/story/imessage-interactionless-hacks-google-project-zero/.

1   contained in the preceding paragraphs of this Complaint.

2          96.     The First Amendment guarantees freedoms concerning religion, expression,

3   the press, assembly, and petitioning the government.  Plaintiffs depend on WeChat to

4   exercise each of these freedoms.

5          97.     WeChat is broadly used by members of the Chinese diaspora throughout the

6   world, serving as a virtual public square where people within the Chinese and Chinese-

7   speaking communities can connect based on shared interests.  Plaintiffs and other WeChat

8   users rely on the app to express themselves and communicate by text, voice, and video

9   messaging; attend religious services and cultural events; organize political groups and

10  causes; and read, share, and receive news and other information, among other protected

11  First Amendment activities.

12         98.     Executive Order 13943 and the Identification effectively ban the use of

13  WeChat in the United States.  Banning the use of WeChat in the United States has the

14  effect of limiting Plaintiffs' rights to send and receive information.  Executive Order 13943

15  and the Identification foreclose all meaningful access to social media for users, such as

16  Plaintiffs, who wish to communicate and associate with members of the Chinese and

17  Chinese-speaking communities.  Indeed, the Executive Order is a prior restraint that

18  suppresses Plaintiffs' constitutionally protected speech, associational, and religious

19  activities before they occur.

20         99.     The Executive Order singles out WeChat users because of the content of

21  their speech and treats WeChat users' speech less favorably than that of users of other

22  social media platforms.  The Executive Order does so for the purpose of silencing the

23  viewpoints of WeChat's primarily Chinese and Chinese-American users and suppressing

24  viewpoints that Defendants believe are insufficiently critical of the Chinese government.

25  The suppression of Chinese "propaganda" is one of the animating purposes of the

26  Executive Order.

27         100.    The Executive Order is substantially overbroad on its face.  By prohibiting

28  "any transaction that is related to WeChat," the Executive Order prohibits substantially

more speech, association, and religious activity than the Constitution allows.  The

deleterious effects of the Executive Order's overbreadth are compounded by the fact that

violators may be punished with severe civil and criminal penalties, including incarceration,

under 50 U.S.C. § 1705.  Such severe penalties will lead (and already have led) to broad

self-censorship among WeChat users and Tencent's business partners in the United

States—including those whose speech, association, and religious activities on WeChat may

not be constitutionally prohibited.  Because of its substantial overbreadth, the Executive

Order is unconstitutional in every conceivable application.

101.    The transactions prohibited by the Identification are necessary for WeChat to

function in the United States.  Defendant Ross and at least one senior Trump

administration official have publicly admitted that implementing the prohibitions in the

Identification will result in WeChat being "shut down" and/or "dead" in the United States.

Implementing these prohibitions will effectively ban WeChat in the United States.

Eliminating the ability of WeChat to function in the United States will have the effect of

foreclosing all meaningful access to social media for WeChat users such as Plaintiffs, who

use WeChat to communicate and associate with members of the Chinese and Chinese-

speaking communities.  Whether the ban results in an immediate cessation of all activity

on WeChat or chills an increasing number of people from using the app (while subjecting

them to additional risk), the effect will be to curtail speech, which the First Amendment

does not permit.  Without question, disabling an essential mode of communication is a

prior restraint, and so violates the Constitution.  Additionally, implementation of the

Identification's prohibitions would decrease user privacy, over-block access to legal

content, fuel Internet fragmentation, undermine Internet freedom, and interfere with or

even end direct Internet traffic between the United States and China.

102.    The Identification singles out WeChat users because of the content of their

speech and treats WeChat users' speech less favorably than that of users of other social

media platforms.  The Identification does so for the purpose of silencing the viewpoints of

WeChat's primarily Chinese and Chinese-American users and suppressing viewpoints that

Defendants believe benefit the Chinese Communist Party.  The suppression of Chinese

"propaganda" is one of the animating purposes of the Identification.  The government

claims to be protecting its citizens and residents from material that is supportive of the

PRC, based on the Secretary's concern that China could use WeChat to "subversively

influence the views of millions of" U.S. users, in a manner that "align[s] with Chinese

government objectives."  These justifications necessarily make the WeChat ban a content-

based prohibition.

103.    The Identification is overbroad on its face.  By prohibiting transactions that

are necessary for WeChat to function in the United States, the Identification suppresses

substantially more speech than the Constitution allows.  The deleterious effects of the

Identification's overbreadth are compounded by the fact that violators may be punished

with severe civil and criminal penalties, including incarceration, under 50 U.S.C. § 1705.

Such severe penalties will lead third-party service providers targeted by the Identification

to cut off even more speech-enabling services to WeChat than the prohibitions may require

of them, so as to eliminate even the remote possibility of incurring the substantial civil and

criminal penalties authorized by Section 1705.  Because of its substantial overbreadth, the

Identification is unconstitutional in every conceivable application.

104.    Defendants lack a sufficient interest to justify either the Executive Order's or

the Identification's burden on constitutionally protected speech and associational and

religious activities.  Neither the Executive Order nor the Identification is narrowly tailored

to achieve the governments' purported interest in preventing WeChat from collecting and

sharing Plaintiffs' personal information.  And neither the Executive Order nor the

Identification leaves open ample alternative channels for the exercise of Plaintiffs'

protected First Amendment activities.

105.    Accordingly, the Executive Order and Identification violate Plaintiffs' rights

under the First Amendment and inflict ongoing harm upon Plaintiffs.

**SECOND CLAIM FOR RELIEF**

**(First Amendment – Free Exercise Clause)**

106.    Plaintiffs reallege and hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

107.    The First Amendment's Free Exercise Clause provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

108.    WeChat users in the United States depend on WeChat to participate in religious worship and other practices in accordance with the tenets and practices of their religion.  Plaintiff Bao, for example, is a member of New Life Chinese Alliance Church in New York.  Due to the ongoing COVID-19 pandemic, he and his fellow congregants do not attend church or participate in other church activities in person.  Instead, he and his fellow congregants rely on WeChat for religious activities—such as participating in Bible Study groups.  Plaintiff Bao and his fellow congregants regularly participate in a Bible Study group on WeChat.

109.    Executive Order 13943 and the Identification effectively ban WeChat in the United States.  In doing so, the Executive Order and the Identification will prevent Plaintiff Bao and his fellow congregants at the New Life Chinese Alliance Church from participating in Bible Study groups and other religious activities.  Executive Order 13943 and the Identification place a substantial burden on Bao's exercise of religion.

110.    There is no rational connection between the government's avowed interest in preventing WeChat from sharing U.S. users' private data and information with the Chinese government and the means it has chosen to advance that interest.

111.    By banning WeChat and preventing users from patching security vulnerabilities in the WeChat app without a rational basis for doing so, Defendants have deprived and will continue to deprive Plaintiff Bao of his rights under the Free Exercise Clause.

# THIRD CLAIM FOR RELIEF

## (First and Fifth Amendments – Vagueness)

112.    Plaintiffs reallege and hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

113.    Sections 1(a) and 2 of Executive Order 13943 alter the legal rights and obligations of private parties, including Plaintiffs.  Section 1(a) prohibits "any transaction that is related to WeChat by any person, or with respect to any property, subject to the jurisdiction of the United States, with Tencent Holdings Ltd. (a.k.a. Téngxùn Kònggǔ Yǒuxiàn Gōngsī), Shenzhen, China, Start Printed Page 48642or any subsidiary of that entity, as identified by the Secretary of Commerce (Secretary) under section 1(c) of this order."  Section 1(c) provides that "45 days after the date of this order, the Secretary shall identify the transactions subject to subsection (a) of this section."  Violations of Sections 1(a) and 2 are punishable by incarceration and monetary penalties.  50 U.S.C. § 1705(b)-(c).

114.    The Identification identifies certain transactions subject to section 1(a) of the Executive Order, but it provides vague and inadequate notice of the conduct it purports to prohibit.  Although the Identification states that the prohibitions apply only "to the parties to business-to-business transactions," the Identification does not define "business-to-business transactions."  Nor does the Identification define the terms in prohibition number six (prohibiting "any utilization of the WeChat mobile application's constituent code, functions, or services in the functioning of software or services").  Plaintiff Chihuo, reasonably fears that any use of WeChat by the company may qualify as "any utilization of the WeChat mobile application's constituent code," and subject the company to the criminal and civil penalties authorized by 50 U.S.C. § 1705.

115.    The Identification further prohibits "Any other transaction that is related to WeChat by any person, or with respect to any property, subject to the jurisdiction of the United States, with Tencent Holdings Ltd., or any subsidiary of that entity, as may be identified at a future date under the authority delegated under Executive Order 13943."  No

1  reasonable person could tell what conduct may be prohibited under this provision.

2  Because of this uncertainty, Plaintiff Chihuo reasonably fears that its continued use of

3  WeChat may trigger the civil and criminal penalties authorized by 50 U.S.C. § 1705.

4        116.   The Executive Order and the Identification are therefore void for vagueness

5  under the First and Fifth Amendments to the U.S. Constitution.

6                          **FOURTH CLAIM FOR RELIEF**

7                   **(Fifth Amendment – Equal Protection)**

8        117.   Plaintiffs reallege and hereby incorporate by reference the allegations

9  contained in the preceding paragraphs of this Complaint.

10        118.   The Due Process Clause of the Fifth Amendment prohibits the Federal

11  Government from denying equal protection of the laws, including on the basis of race,

12  ethnicity, nationality, national origin, and alienage.

13        119.   WeChat is widely used and depended on by the Chinese community in the

14  United States to communicate with friends, family, customers, and other persons of

15  Chinese or Chinese American ancestry, including Chinese-language speakers.

16        120.   Plaintiffs Peng, Duan, Zhang, and Bao are members of the Chinese

17  community in the United States.  Plaintiff Brent Coulter uses WeChat to communicate

18  with people of Chinese and/or Chinese-American ancestry in the United States and abroad.

19  Plaintiffs USWUA and Chihuo are organizations or businesses whose members or

20  customers primarily consist of people of Chinese and/or Chinese American ancestry in the

21  United States, who use WeChat to communicate with others similar to them both in the

22  United States and abroad.

23        121.   Defendants have not imposed comparable restrictions on software that

24  collects similar personal and private data from users in the United States and shares that

25  data with the Chinese government, but that is not owned and used primarily by persons of

26  Chinese and Chinese-American descent.  Defendants have not, for example, proposed a

27  comparable ban on Airbnb, despite their knowledge that Airbnb collects a wide range of

28  private information from American users and shares that information with the Chinese

1   government.[50]

2       122.    By prohibiting the use of WeChat but not other apps that are owned and used

3   primarily by people who are not of Chinese or Chinese-American ancestry, Executive

4   Order 13943 and the Identification single out people of Chinese and Chinese-American

5   ancestry and those who wish to communicate and associate with them, and subject them to

6   disparate treatment on the basis of race, ethnicity, nationality, national origin, and alienage.

7       123.    This disparate treatment is motivated by Defendants' animus towards people

8   of Chinese and/or Chinese American ancestry, and has the purpose of discriminating

9   against people of Chinese and/or Chinese-American ancestry.

10      124.    Defendants' issuance of Executive Order 13943 and the Identification

11  therefore violate Plaintiffs' rights to equal protection guaranteed by the Fifth Amendment

12  to the United States Constitution.  Defendants' violations inflict ongoing harm upon

13  Plaintiffs.

14                    **FIFTH CLAIM FOR RELIEF**

15                  (***Ultra Vires*** **(50 U.S.C. § 1702(b)))**

16      125.    Plaintiffs reallege and hereby incorporate by reference the allegations

17  contained in the preceding paragraphs of this Complaint.

18      126.    The IEEPA includes specific limits on Defendants' authority to prohibit

19  transactions related to WeChat.  Section 1702(b) of the IEEPA states in relevant part that

20  "[t]he authority granted to the President by [the IEEPA] does not include the authority to

21  regulate or prohibit, directly or indirectly… (1) any postal, telegraphic, telephonic, or other

22  personal communication, which does not involve a transfer of anything of value;

23  (2) donations, by persons subject to the jurisdiction of the United States, of articles, such as

24  food, clothing, and medicine, intended to be used to relieve human suffering…; (3) the

25  importation from any country, or the exportation to any country, whether commercial or

26

27  [50] *See* Dustin Volz and Kirsten Grind, *Airbnb Executive Resigned Last Year Over Chinese Request for More Data Sharing*, WALL ST. JOURNAL (Nov. 20, 2020),

28  https://www.wsj.com/articles/airbnb-executive-resigned-last-year-over-chinese-request-for-more-data-sharing-11605896753.

1    otherwise, regardless of format or medium of transmission, of any information or

2    informational materials…; [or] (4) any transactions ordinarily incident to travel to or from

3    any country[.]"  50 U.S.C. § 1702(b)(1)-(4).

4         127.    Plaintiffs rely on WeChat for "personal communication[s]" that "do[] not

5    involve a transfer of anything of value," within the meaning of 50 U.S.C. § 1702(b)(1).

6         128.    Plaintiffs rely on WeChat to donate as well as to coordinate and arrange for

7    donations of "articles… intended to be used to relieve human suffering," within the

8    meaning of 50 U.S.C. § 1702(b)(2).  Neither the President nor the Secretary has issued any

9    findings that the coordination and donation of such articles would seriously impair the

10   President's ability to deal with any national emergency, are in response to coercion against

11   the proposed recipient or donor, or would endanger Armed Forces of the United States

12   which are engaged in hostilities or are in a situation where imminent involvement in

13   hostilities is clearly indicated by the circumstances.

14        129.    Plaintiffs rely on WeChat to import and/or export "information or

15   information materials," within the meaning of 50 U.S.C. § 1702(b)(3).

16        130.    Plaintiffs rely on WeChat to complete "transactions ordinarily incident to

17   travel to or from any country," within the meaning of 50 U.S.C. § 1702(b)(4).

18        131.    Neither the President nor any other federal official can take an action that

19   exceeds the scope of their constitutional and/or statutory authority.  In Executive Order

20   13943, however, the President has nonetheless "prohibited" Plaintiffs from using WeChat

21   in any manner, thereby exceeding each of the four specific limits on his authority

22   contained in 50 U.S.C. § 1702(b).

23        132.    The Secretary's Identification likewise seeks to effectuate an outright ban of

24   the WeChat platform.  Defendant Ross has admitted that the prohibitions in his

25   Identification will  "shut down" WeChat in the United States once those prohibitions are

26   implemented.  By shutting down WeChat in the United States, the Identification

27   necessarily regulates or prohibits, directly or indirectly, personal communications that do

28   not involve a transfer of value, the donation and coordination of donations of articles

1   intended to relieve human suffering, the importation and exportation of information or

2   informational materials, and transactions ordinarily incident to travel to or from any

3   country.  By regulating or prohibiting these activities, directly or indirectly, the

4   Identification exceeds each of the four specific limits on the Secretary's authority

5   contained in 50 U.S.C. § 1702(b).

6                                  **SIXTH CLAIM FOR RELIEF**

7                **(Religious Freedom Restoration Act – 42 U.S.C. § 2000bb(1)(a))**

8          133.    Plaintiffs reallege and hereby incorporate by reference the allegations

9   contained in the preceding paragraphs of this Complaint.

10         134.    In 1993, Congress enacted the Religious Freedom Restoration Act ("RFRA),

11  Pub. L. No. 103-31 (1993) (codified at 42 U.S.C. §§ 2000bb–2000bb-4).

12         135.    RFRA prohibits the government from "substantially burden[ing] a person's

13  exercise of religion even if the burden results from a rule of general applicability" unless

14  the government can demonstrate that the application of the burden to the person is:  (1) in

15  furtherance of a compelling governmental interest; and (2) the least restrictive means of

16  furthering that compelling governmental interest.  42 U.S.C. § 2000bb-1.

17         136.    WeChat users in the United States depend on WeChat to participate in

18  religious worship and other practices in accordance with the tenets and practices of various

19  religions.  Plaintiff Bao, for example, is a member of New Life Chinese Alliance Church in

20  New York.  Due to the ongoing COVID-19 pandemic, he and his fellow congregants do

21  not attend church or participate in other church activities in person.  Instead, he and his

22  fellow congregants rely on WeChat for religious activities —such as participating in Bible

23  Study groups.  Plaintiff Bao and his fellow congregants regularly participate in a Bible

24  Study group on WeChat.

25         137.    Executive Order 13943 and the Identification effectively ban WeChat in the

26  United States.  As a result, Plaintiff Bao and his fellow congregants at the New Life

27  Chinese Alliance Church will no longer be able to participate in religious activities using

28  WeChat.

138.    Executive Order 13943 and the Identification place a substantial burden on Bao's exercise of religion.  This burden is not justified by a compelling governmental interest, and less restrictive alternatives exist for achieving the government's avowed interests in protecting national security.  For example, the government could impose a narrow prohibition on the use of WeChat by employees of the federal government and/or employees of the federal government's state, local, tribal, and territorial partners.

139.    Because Executive Order 13943 and the Identification place a substantial burden on Plaintiff Bao's exercise of religion and is neither justified by a compelling governmental interest nor the least restrictive means of achieving the government's avowed interest in protecting national security, the Executive Order and Identification violate Plaintiff Bao's rights protected by the Religious Freedom Restoration Act.

## SEVENTH CLAIM FOR RELIEF

### (Administrative Procedure Act – 5 U.S.C. § 706)

140.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

141.    The Secretary's Identification constitutes "final agency action" within the meaning of 5 U.S.C. § 704.

142.    Under the Secretary's Identification, Executive Order 13943 prohibits, *inter alia*, "Any provision of services to distribute or maintain the WeChat mobile application, constituent code, or mobile application updates"; "Any provision of internet hosting services enabling the functioning or hosting of the WeChat mobile application"; and "Any utilization of the WeChat mobile application's constituent code. functions, or services in the functioning of software or services developed and/or accessible within . . . the United States and its territories."

143.    In issuing the Identification, Defendant Ross failed to consider relevant data relating to the likely technological effects of each of the prohibitions on the functionality of WeChat in the United States or the ability of WeChat users to use the app in the United States.  Defendant Ross and his staff did not articulate satisfactory explanations that

connect the facts relating to the likely technological effects of each of the prohibitions to the conclusion recommending each prohibition.  The technological effects of these prohibitions are important aspects of the problem the Identification was purportedly intended to address.

144.   In issuing the Identification, Defendant Ross failed to consider a wealth of available evidence indicating that a prohibition on new downloads of the WeChat app would *exacerbate* rather than mitigate threats to the security of WeChat users' private data. Defendant Ross and his staff did not articulate satisfactory explanations that connect the facts relating to the risks associated with unpatched security vulnerabilities to the conclusion recommending the prohibition on app updates.  The risk of exacerbating cyber threats to the security of users' private data represents an important aspect of the issue the Identification was purportedly intended to address.

145.   In issuing the Identification, Defendant Ross failed to consider a wealth of available evidence demonstrating that WeChat users in the United States depend on WeChat to communicate and share information with family, friends, and professional, political, and religious contacts located both in the United States and abroad.  Defendant Ross and his staff did not articulate satisfactory explanations that connect the facts relating to the widespread use of WeChat users' dependence on the app to the conclusion recommending the wholesale ban of the app.  WeChat users' dependence on the app for personal communications and information represents an important aspect of the issue the Identification was purportedly intended to address.

146.   In issuing the Identification, Defendant Ross failed to consider whether Tencent's three separate mitigation proposals, either individually or in concert, would eliminate or mitigate the purported need for regulations of or prohibitions on transactions related to WeChat.

147.   On information and belief, the President and/or staff associated with the Executive Office of the President intervened in the Commerce Department's negotiations with Tencent in August and September 2020 for the purpose of preventing the parties to

these negotiations from reaching an agreement that would eliminate or mitigate the purported need for regulations of or prohibitions on transactions related to WeChat.  The President and/or staff associated with the Executive Office of the President did so for reasons unrelated to the purported security threat posed by WeChat, including but not limited to: (a) their disapproval of the content of communications and information shared on WeChat, and (b) their expectation that prohibiting transactions related to WeChat would benefit the President's reelection campaign by further encouraging animus among the American electorate towards people of Chinese or Chinese-American ancestry.

148.   Such reasons are not among the factors that Congress intended for executive-branch officials to consider when issuing regulations under the authority of the IEEPA.  The President and/or staff associated with the Executive Office of the President communicated their reasons for disapproving Tencent's mitigation proposals to Defendant Ross and/or his subordinates, and Defendant Ross's consideration of these reasons played a substantial role in his decision to issue the Identification.

149.   In issuing the Identification, Defendant Ross failed to consider CISA's recommendation that Defendants issue a far narrower prohibition aimed at preventing the use of WeChat on the devices of State, Local, Tribal, and Territorial partners and critical infrastructure operators.

150.   In issuing the Identification, Defendant Ross has not adequately explained the rationales for the Identification's prohibitions, and has failed to consider regulatory alternatives.  Defendant Ross has also failed to consider the prohibitions' collateral effects, including how the prohibitions will reconfigure affected Internet infrastructure in ways that will decrease user privacy, over-block access to legal content, fuel Internet fragmentation, undermine Internet freedom, and interfere with or even end direct Internet traffic between the United States and China.

151.   The Identification is therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance of law, within the meaning of 5 U.S.C. § 706(2)(A).

152.   Furthermore, the Secretary's Identification directly contravenes 50 U.S.C.

§ 1702(b) by directly or indirectly regulating or prohibiting "personal communication[s]" that "do[] not involve a transfer of anything of value," as well as the donation and coordination of donations of "articles… intended to be used to relieve human suffering," the importation and/or exportation of "information or information materials," and "transactions ordinarily incident to travel to or from any country."

153.   The Identification is therefore in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, within the meaning of 5 U.S.C. § 706(2)(B), and arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, within the meaning of 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

1.   Declaring that Executive Order 13943 and the Identification are unconstitutional under the First Amendment;

2.   Declaring that Executive Order 13943 and the Identification are unconstitutional under the Fifth Amendment;

3.   Declaring that Executive Order 13943 and the Identification do not comply with the limitations on presidential power in the National Emergency Act and the International Emergency Economic Powers Act, and are thus *ultra vires*;

4.   Declaring that Executive Order 13943 and the Identification violate the Religious Freedom Restoration Act;

5.   Declaring that the Identification violates the APA;

6.   Preliminarily and permanently enjoining Defendants from enforcing the Executive Order and the Identification;

7.   Preliminarily and permanently staying the implementation date of any of the penalty provisions applicable to the Executive Order and the Identification; and

/ / /

/ / /

/ / /

8.     Granting such other and further relief as this Court may deem just and proper, including an award to Plaintiffs of the costs of this suit and reasonable attorneys' fees and litigation expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

DATED:  December 7, 2020               Respectfully submitted,

                                       ROSEN BIEN GALVAN & GRUNFELD LLP

                                       By:  */s/ Michael W. Bien*
                                            Michael W. Bien

                                       Attorneys for Plaintiffs U.S. WECHAT USERS ALLIANCE, CHIHUO INC., BRENT COULTER, FANGYI DUAN, JINNENG BAO, ELAINE PENG, and XIAO ZHANG