1  ~~MICHAEL W. BIEN – Cal. Bar No. 096891~~
   ~~VAN SWEARINGEN – Cal. Bar No. 259809~~
2  ~~ALEXANDER GOURSE – Cal. Bar No. 321631~~
   ~~AMY XU – Cal. Bar No. 330707~~
3  ~~ROSEN BIEN GALVAN & GRUNFELD LLP~~
   ~~101 Mission Street, Sixth Floor~~
4  ~~San Francisco, California  94105-1738~~
   ~~Telephone:    (415) 433-6830~~
5  ~~Facsimile:    (415) 433-7104~~
   ~~Email:        mbien@rbgg.com~~
6  ~~              vswearingen@rbgg.com~~
   ~~              agourse@rbgg.com~~
7  ~~              axu@rbgg.com~~

8  ~~KELIANG (CLAY) ZHU – Cal. Bar No. 305509~~
   ~~DEHENG LAW OFFICES PC~~
9  ~~7901 Stoneridge Drive #208~~
   ~~Pleasanton, California  94588~~
10 ~~Telephone:    (925) 399-5856~~
   ~~Facsimile:    (925) 397-1976~~
11 ~~Email:        czhu@dehengsv.com~~

12 ~~ANGUS F. NI – Wash. Bar No. 53828*~~
   ~~AFN LAW PLLC~~
13 ~~502 Second Avenue, Suite 1400~~
   ~~Seattle, Washington  98104~~
14 ~~Telephone:    (773) 543-3223~~
   ~~Email:        angus@afnlegal.com~~
15 ~~* *Pro Hac Vice* application forthcoming~~

16 MICHAEL W. BIEN – 096891              THOMAS R. BURKE – 141930
   ERNEST GALVAN – 196065                DAVIS WRIGHT TREMAINE LLP
17 VAN SWEARINGEN – 259809               505 Montgomery Street, Suite 800
   BENJAMIN BIEN-KAHN – 267933           San Francisco, California  94111-6533
18 ALEXANDER GOURSE – 321631             Telephone:    (415) 276-6500
   AMY XU – 330707                       Facsimile:    (415) 276-6599
19 ROSEN BIEN                            Email:        thomasburke@dwt.com
   GALVAN & GRUNFELD LLP
20 101 Mission Street, Sixth Floor       DAVID M. GOSSETT – Admitted *Pro Hac Vice*
   San Francisco, California  94105-1738 COURTNEY T. DETHOMAS – 294591
21 Telephone:    (415) 433-6830          DAVIS WRIGHT TREMAINE LLP
   Facsimile:    (415) 433-7104          1301 K Street N.W., Suite 500 East
22 Email:        mbien@rbgg.com          Washington, D.C.  20005-3366
                 egalvan@rbgg.com        Telephone:    (202) 973-4216
23               vswearingen@rbgg.com    Facsimile:    (202) 973-4499
                 bbien-kahn@rbgg.com     Email:        davidgossett@dwt.com
24               agourse@rbgg.com                      courtneydethomas@dwt.com
                 axu@rbgg.com
25
   KELIANG (CLAY) ZHU – 305509           JOHN M. BROWNING – Admitted *Pro Hac*
26 DEHENG LAW OFFICES PC                 *Vice*
   7901 Stoneridge Drive #208            DAVIS WRIGHT TREMAINE LLP
27 Pleasanton, California  94588         1251 Avenue of the Americas, 21st Floor
   Telephone:    (925) 399-5856          New York, New York  10020-1104
28 Facsimile:    (925) 397-1976          Telephone:    (212) 603-6410

Email:          czhu@dehengsv.com

ANGUS F. NI – Admitted *Pro Hac Vice*
AFN LAW PLLC
502 Second Avenue, Suite 1400
Seattle, Washington  98104
Telephone:      (773) 543-3223
Email:          angus@afnlegal.com

Facsimile:      (212) 483-8340
Email:          jackbrowning@dwt.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| U.S. WECHAT USERS ALLIANCE, CHIHUO INC., BRENT COULTER, FANGYI DUAN, JINNENG BAO, ELAINE PENG, and XIAO ZHANG, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, and WILBUR ROSS, in his official capacity as Secretary of Commerce, <br><br> Defendants. | Case No. 3:20-cv-05910 <br><br> **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.       Public space in the digital age is defined by platforms and users rather than physical places with geographic boundaries.  Cyberspace, particularly social media, is one of "the most important places" to exchange views.  *Packingham v. North Carolina*, 582 U.S. —, 137 S. Ct. 1730, 1735 (2017).  Few digital public squares are as large as that found on WeChat.  Released in 2011, WeChat is now one of the world's most popular mobile telephone and social media applications ("app"), with over 1 billion monthly active users.[1]

2.       Approximately 19 million users rely on the app in the United States, and it is the primary app Chinese-speakers in the U.S. use to participate in social life by connecting with loved ones, sharing special moments, arguing discussing ideas, receiving up-to-the-minute news, and participating in political discussions and advocacy.[2]  As a "super-app," WeChat users also rely on the app to make telephone calls, hold video conferences, upload documents, share photos, and make payments.[3]  It has become essential to the conduct of daily life for its users, many of whom regularly spend hours each day on the app.

3.       WeChat is also used for numerous societally important purposes, including by public institutions.  For example, as the coronavirus pandemic continues to separate people physically, WeChat has been used in the United States by police departments to inform the public about testing center locations, by volunteers to organize the delivery of

---

[1] Rayna Hollander, *WeChat has hit 1 billion monthly active users*, Business Insider (Mar. 6, 2018, 11:59 a.m.), https://www.businessinsider.com/wechat-has-hit-1-billion-monthly-active-users-2018-3; Iris Deng and Celia Chen, *How WeChat became China's everyday mobile app*, South China Morning Post (Aug. 16, 2018), https://www.scmp.com/tech/article/2159831/how-wechat-became-chinas-everyday-mobile-app.

[2] Rick Smith, *Crackdown on WeChat could hinder millions of US users who rely on social media tool*, WRAL TechWire (Aug. 19, 2020), https://www.wraltechwire.com/2020/08/19/crackdown-on-wechat-could-hinder-millions-of-us-users-who-rely-on-social-media-tool/.

[3] Bani Sapra, *This Chinese super-app is Apple's biggest threat in China and could be a blueprint for Facebook's future. Here's what it's like to use WeChat, which helps a billion users order food and hail rides*, Business Insider (Dec. 21, 2019), https://www.businessinsider.com/chinese-superapp-wechat-best-feature-walkthrough-2019-12.

1   medical supplies, and by families to stay in touch with isolated elderly relatives in nursing

2   homes.  WeChat is also used by individuals and groups—including churches—for

3   religious and cultural purposes, including:  group prayer, organizing for holidays and

4   events, taking care of the poor, sick and infirm, and education.

5   ~~4.    In the United States and across the world, national governments engage in~~

6   ~~dragnet surveillance of digital communications of ordinary people.  Because governmental~~

7   ~~surveillance is all-pervasive and occurs at the network level, communications over~~

8   ~~WeChat, like communications on all other apps that run on our systematically surveilled~~

9   ~~internet infrastructure, are captured by this dragnet.~~

10   ~~5.    Despite widespread knowledge of these practices, hundreds of millions of~~

11   ~~people in this country voluntarily use surveilled devices and apps to participate in all facets~~

12   ~~of social and economic life every day.  This is the case for WeChat users in the United~~

13   ~~States, where it is widespread knowledge amongst users that both the United States and~~

14   ~~Chinese governments monitor WeChat communications.[4]  WeChat users in the United~~

15   ~~States continue to use and rely on the app, knowing that Big Brother is watching.~~

16   ~~6.~~4.    On August 6, 2020, the President issued Executive Order 13943 entitled

17   "Addressing the Threat Posed by WeChat, and Taking Additional Steps To Address the

18   National Emergency With Respect to the Information and Communications Technology

19   and Services Supply Chain," 85 ~~FR~~Fed. Reg. 48641 ("the Executive Order").  Citing

20   national security concerns, the Executive Order bans what appears to be all uses of

21   WeChat by anyone within the United States as well as "U.S. persons" outside the United

22   States.  Section 1(a) of the Executive Order prohibits people and property subject to U.S.

23   jurisdiction from carrying out "transactions" with WeChat after 45 days of the Executive

24

25   ~~[4] See Arjun Kharpal, Chinese tech giant Tencent reportedly surveilled foreign users of~~

26   ~~WeChat to help censorship at home, CNBC (May 8, 2020),~~
     ~~https://www.cnbc.com/2020/05/08/tencent-wechat-surveillance-help-censorship-in-~~

27   ~~china.html; Tim Lau, The Government Is Expanding Its Social Media Surveillance~~
     ~~Capabilities, BRENNAN CENTER FOR JUSTICE (May 22, 2019).~~

28   ~~https://www.brennancenter.org/our-work/analysis-opinion/government-expanding-its-~~
     ~~social-media-surveillance-capabilities.~~

1   Order's issuance.  Section 2(a) prohibits any transaction "by a United States person or

2   within the United States" that evades, avoids, or violates the uncertain prohibition in

3   Section 1(a).  Maddeningly, the Executive Order does not define what those transactions

4   include, leaving individuals and companies at a loss as to whether they will risk civil

5   and/or criminal prosecution and penalties if they do not fundamentally change the way

6   they communicate or run their businesses.  The vaguely worded Executive Order was

7   issued without further explanation or a media briefing, and states that the Secretary of

8   Commerce shall identify what transactions are prohibited after 45 days—in effect,

9   delaying identification of what transactions are prohibited until after such transactions are

10  already prohibited.[5]

11          5.      On September 18, 2020, the Commerce Department released its

12  "Identification of Prohibited Transactions to Implement Executive Order 13943" (the

13  "Identification").  The Identification sets forth eleven defined terms and identifies seven

14  "transactions" to be prohibited pursuant to the Executive Order.  On the same day he

15  issued the Identification, the Secretary admitted on national television that it will "for all

16  practical purposes" result in WeChat being "shut down in the U.S." as soon as the

17  prohibitions take effect.[6]

18          7.6.    Neither the Executive Order ~~itself~~ nor the ~~White House~~Identification

19  provided concrete evidence to support the contention that using WeChat in the United

20  States compromises national security.  Notably, no other nation has implemented a

21  comprehensive WeChat ban on the basis of any like-finding that WeChat is a threat to

22

23

24  _____

25  [5] Ana Swanson, *Trump's Orders on WeChat and TikTok Are Uncertain. That May Be the
    Point.*, N.Y. TIMES (Aug. 7, 2020),
26  https://www.nytimes.com/2020/08/07/business/economy/trump-executive-order-tiktok-
    wechat.html.

27  [6] Megan Henney, *Trump Administration to Ban Americans from Downloading TikTok,
    WeChat on Sunday*, FOX BUSINESS (Sept. 18, 2020),
28  https://www.foxbusiness.com/politics/trump-administration-to-ban-americans-from-
    downloading-tiktok-wechat.

1  national security.[7] ~~The~~Both the Executive Order ~~was~~and the Identification, however, were

2  issued in the midst of the 2020 election cycle, during a time when President Trump has

3  made numerous anti-Chinese statements that have contributed to and incited racial animus

4  against persons of Chinese descent[8] ~~all outside of the~~for reasons that have nothing to do

5  with national security ~~context.~~.

6        ~~8.~~7.   In a stark violation of the First Amendment, the Executive Order ~~targets and~~

7  ~~silences~~and Identification target and silence WeChat users, the overwhelming majority of

8  whom are members of the Chinese and Chinese-speaking communities.  ~~It regulates~~They

9  regulate and prohibit constitutionally protected speech, expression, and association ~~and is~~;

10  in doing so, they are not narrowly tailored to restrict only that speech which presents

11  national security risks to the United States.  ~~Accordingly, it is unconstitutionally~~

12  ~~overbroad.~~Nor do they leave open ample alternative avenues of communication for

13  WeChat users.  Indeed, banning the use of WeChat in the United States has the effect of

14  foreclosing all meaningful access to social media for members of the Chinese-speaking

15  community, such as Plaintiffs, who rely on ~~it~~the app to communicate and interact with

16  others like themselves.  The ban on WeChat, because it substantially burdens the free

17  exercise of religion, also violates the Religious Freedom Restoration Act.

18        ~~9.~~8.   The Executive Order ~~runs~~and Identification also run afoul of the Fifth

19  Amendment's Due Process Clause by failing to provide notice of the specific conduct that

20  ~~is prohibited; because~~may be identified at a future date by the Secretary.  Because of this

21

---

22  [7] See Maria Abi-Habib, *India Bans Nearly 60 Chinese Apps, Including TikTok and WeChat*, N.Y. TIMES (June 29, 2020, updated on June 30, 2020),

23  https://www.nytimes.com/2020/06/29/world/asia/tik-tok-banned-india-china.html (stating

24  that India's ban is "part of the tit-for-tat retaliation after the Indian and Chinese militaries clashed earlier this month.").

25  [8] See, e.g., Nadia Kim, *Asian Americans Suffer From Trump's Racist Attacks Too*, PUBLIC SEMINAR (July 23, 2020), https://publicseminar.org/essays/asian-americans-suffer-from-

26  trumps-racist-attacks-too/; Li Zhou, *Trump's racist references to the coronavirus are his latest effort to stoke xenophobia*, VOX (June 23, 2020),

27  https://www.vox.com/2020/6/23/21300332/trump-coronavirus-racism-asian-americans; Matt Stevens, *How Asian-American Leaders Are Grappling With Xenophobia Amid*

28  *Coronavirus*, N.Y. TIMES (Mar. 29, 2020, updated on April 10, 2020), https://www.nytimes.com/2020/03/29/us/politics/coronavirus-asian-americans.html.

uncertainty, businesses that use WeChat users in the United States are justifiably fearful of using WeChat in any way and for any purpose—and also of losing access to WeChat. Since the Executive Order and Identification were issued, numerous users, including Plaintiffs, have scrambled to seek alternatives without success. They are now afraid that by merely communicating with their families, they may violate the law and face sanctions.

10.9.   WeChat is the only "super-app" with a natively Chinese interface designed for Chinese speakers. That is one reason why it is the dominant social media and e-commerce application amongst the global Chinese diaspora, which include Chinese communities in the United States.[9] These individuals, particularly those who do not speak English, are **completely reliant** on WeChat to communicate, socialize, and express themselves. As such, by prohibiting the use of only WeChat but not any similar applications (ones not made in China and without Chinese interfaces), the Executive Order singlesand Identification single out people of Chinese and Chinese-American ancestry and subjects them to disparate treatment on the basis of race, ethnicity, nationality, national origin, and alienage. In doing so, the Executive Order violates the Equal Protection Clause.

11.10. Finally, inIn issuing the Executive Order, the president and Identification, Defendants acted beyond histhe authority provided by the International Emergency Economic Powers Act, which precludes the PresidentDefendants from "**directly or indirectly**" regulating, among other things, personal communications, donations, and the international exchange of information.

11.    Finally, the Secretary's Identification violates the Administrative Procedure Act ("APA") because it is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, within the meaning of 5 U.S.C. § 706(2)(B), and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, within the

---

[9] Thuy Ong, *Chinese social media platform WeChat reaches 1 billion accounts worldwide*, THE VERGE (Mar. 5, 2018), https://www.theverge.com/2018/3/5/17080546/wechat-chinese-social-media-billion-users-china.

1    meaning of 5 U.S.C. § 706(2)(A).

2        12.    The U.S. WeChat Users Alliance ("USWUA"), Chihuo, Inc., Brent Coulter,

3    Fangyi Duan, Jinneng Bao, Elaine Peng, and Xiao Zhang (collectively, "Plaintiffs"), bring

4    this suit to challenge the Executive Order and Identification, which eviscerates an

5    irreplaceable cultural bridge that connects Plaintiffs to family members, friends, business

6    partners, customers, religious community members, and other individuals with common

7    interests within the Chinese diaspora, located both in and outside of the United States.  The

8    Executive Order hasand Identification have already harmed Plaintiffs, who are plagued

9    with fear for the loss of their beloved connections, whether it be with friends, family,

10   community, customers, aid recipients of the charities they run, or even strangers whose

11   ideas enrich their lives.  They have been forced to divert time, energy, and money to seek

12   alternative communication platforms, download and save irreplaceable digital histories,

13   plan for business closures, find other sources of information, and try to obtain alternative

14   contact information for those from whom they will soon be separated.

15       13.    Even if they succeed to some extent in their mitigation efforts, Plaintiffs will

16   never be able to replace the full spectrum of the social interactivity that WeChat offers, nor

17   will they be able to find any social networking platform with anything close to the same

18   level of participation by the global Chinese diaspora—this.  This is because WeChat's

19   network effects, generated by its 1 billion-plus daily users, isare irreplaceable.

20       14.    In short, the threatened displacement of these WeChat users from their public

21   space is an irreparable harm that requires judicial intervention.

22       15.    For these reasons, and those discussed below, the Court should (1) declare

23   that the Executive Order and the Secretary of Commerce's September 18, 2020,

24   Identification of Prohibited Transactions are unlawful and unconstitutional; and (2) enjoin

25   Defendants from enforcing the Executive Order or the Secretary's Identification to

26   regulate or prohibit the use of WeChat in the United States, directly or indirectly.

27                              **JURISDICTION AND VENUE**

28       16.    The claims asserted herein arise under and pursuant to the Constitution and

laws of the United States.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.

17.    An actual, present, and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a).

18.    Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

19.    Venue is proper in this District pursuant to 28 U.S.C. §§ 2201 and 1391 (e)(1) because Defendant are officers of the United States acting in their official capacities and (1) at least one plaintiff resides in this district; and (2) a substantial part of the events or omissions giving rise to the claim occurred in this district.  For the same reason, intradistrict assignment is proper in the San Francisco Division.  *See* N.D. Cal. L.R. 3-2.

## PARTIES

20.    Plaintiff U.S. WeChat Users Alliance ("USWUA") is a New Jersey nonprofit organization that is in the process of being registered under Internal Revenue Code section 501(c)(3), established by individuals in the United States for the purpose of opposing the Executive Order.  Plaintiff USWUA is made up of WeChat users located throughout the United States who are not affiliated with WeChat, its parent company Tencent Holdings Ltd. ("Tencent"), nor any political party or foreign government.  Plaintiff USWUA runs on public donations from WeChat users and organizes its efforts on WeChat.  Plaintiff USWUA is made up of individuals who want to continue using WeChat within the United States and are currently suffering and will continue to suffer an injury based on the Defendants' actions.

21.    Plaintiff Elaine Peng is a United States citizen residing in Castro Valley, California.  Plaintiff Peng founded the Mental Health Association for Chinese Communities ("MHACC") in 2013 to provide mental health education, suicide prevention, assistance, and other resources to her local Chinese community that is underserved by the mental health profession due to language and cultural barriers.  As president of MHACC,

1  Plaintiff Peng strives to make mental health programs available to those in need and has

2  received multiple awards for her work.  Like much of the Chinese population in the United

3  States, Plaintiff Peng uses WeChat as her exclusive means to connect with her Chinese

4  families and friends, domestic or abroad.  As most of the population MHACC serves relies

5  on WeChat to communicate, use of WeChat is also integral to MHACC's mission to

6  provide mental health services and support to its members.

7          22.     Plaintiff Brent Coulter is a United States citizen and WeChat user.  Plaintiff

8  Coulter holds a Juris Doctor from the University of California, Hastings College of the

9  Law ("Hastings"), and lives in San Francisco, California.  Plaintiff Coulter previously

10  lived in China for approximately five years, where he studied at Sichuan University and

11  worked in marketing.  While in China, Plaintiff Coulter used WeChat as his main method

12  of communication to connect with friends and professional contacts.  Now in the U.S., one

13  of Plaintiff Coulter's professional goals is to bridge the gap between China and the U.S.

14  with regard to law and business.  At Hastings, Plaintiff Coulter founded the Asian Law and

15  Business Association, through which he formed a partnership with the American Chamber

16  of Commerce ("AmCham") in Southwest China.  Each year, Plaintiff Coulter drafts two

17  chapters of AmCham's annual white paper on U.S. business in China with his colleagues

18  in both countries.  WeChat is central to Plaintiff Coulter's annual collaboration and

19  remains the only way for him to connect with many of his professional contacts and

20  friends in China.  Plaintiff Coulter relies on WeChat to build upon his professional career

21  which straddles law and business in the U.S. and China.  Without WeChat, Plaintiff

22  Coulter would lose access to many of the relationships that he has built throughout his

23  studies and career.

24          23.     Plaintiff Xiao Zhang is a Chinese citizen with a valid visa residing in

25  Houston, Texas.  She is employed as an engineer and founded a nonprofit organization

26  known as Hita Education Foundation that supports underserved students at the high school

27  in her hometown in China.  Plaintiff Zhang uses WeChat to speak with administrators,

28  teachers, parents of school children, and to help identify underserved Chinese students who

1   would benefit from the program.  Plaintiff Zhang's nonprofit organization currently sends

2   donations of 300 yuan (approximately $43 dollars) to seven students per month to pay for

3   meals and school supplies.  Plaintiff Zhang also uses WeChat to transfer the funds to each

4   individual student, and WeChat is her exclusive means to connect with her Chinese-

5   speaking family members and friends, domestic or abroad.

6          24.     Plaintiff Fangyi "Amy" Duan is a Chinese citizen with a valid visa, and

7   resides in Santa Clara, California.  Plaintiff Duan is employed as the chief executive

8   officer of Plaintiff Chihuo, Inc. ("Chihuo"), a corporation that is dually registered in both

9   California and Delaware.

10         25.     Plaintiff Chihuo is a media and online retailer that creates content regarding

11  Chinese restaurants and cuisine for people residing in the United States.  Plaintiff Chihuo

12  provides U.S. based merchants an e-commerce platform for targeting Chinese-speaking

13  consumers.  Plaintiff Chihuo serves its customers by providing targeted marketing and

14  advertising services online.  Plaintiff Chihuo delivers its targeted advertising and

15  marketing services primarily on several WeChat official accounts through ~~its~~the app's

16  various functions, including WeChat Moments.  Plaintiff Chihuo employs or contracts

17  with approximately thirty people as part of its business.  Plaintiff Chihuo's WeChat

18  accounts cover 14 major metropolitan areas in the United States and are enjoyed by more

19  than 640,000 readers.

20         26.     Plaintiff Jinneng Bao is a United States permanent resident and lives in

21  Nassau County, New York.  He is self-employed and runs several businesses including a

22  construction company primarily serving Chinese-speaking clients in New York.  Plaintiff

23  Bao actively attends a Chinese church in New York and participates in Bible studies

24  regularly on WeChat.  His Bible study group consists of mostly Chinese-speaking

25  members.  Due to the pandemic, Plaintiff Bao's Bible study group has stopped meeting in

26  person, and WeChat is the only way the group currently maintains communications with

27  one another.

28         27.     Defendant Donald J. Trump ("President Trump") is the President of the

United States.  He is sued in his official capacity.  In that capacity, he issued the Executive

Order challenged in this suit and authorized the issuance of the Identification challenged in

this suit.

28.     Defendant Wilbur Ross ("Secretary Ross") is the United States Secretary of

Commerce.  He is sued in his official capacity.  In the Executive Order, the Secretary is

authorized to take actions, including adopting rules and regulations, to implement the

Executive Order.  The Secretary exercised this authority on September 18, 2020, when he

issued the Identification prohibiting various transactions related to WeChat.

## FACTUAL ALLEGATIONS

### A.     WeChat and App Capabilities

29.     WeChat is one of the most popular messaging applications in the world, with

a monthly user base of more than 1 billion people.[10]  Nearly every person in China with an

online presence has at least one WeChat account, and over one-third of them spend four

hours or more on the app every day—making WeChat an indispensable part of many

peoples' lives and work.[11]

30.     Though WeChat began as a messaging service, it is now a "super-app" that

serves a multitude of communicative needs, including making telephone calls, video

conferencing, sharing photos, commenting on other users' posts, making payments, and

still other purposes.[12]

31.     One of WeChat's primary uses is the app's messaging capabilities, which

include both text and voice messaging.  Messaging through WeChat is the preferred

---

[10] Arjun Kharpal, Everything you need to know about WeChat—China's billion-user messaging app, CNBC (Feb. 3, 2019), https://www.cnbc.com/2019/02/04/what-is-wechat-china-biggest-messaging-app.html.

[11] Li Yuan, To Cover China, There's No Substitute for WeChat, N.Y. TIMES (Jan. 9, 2019), https://www.nytimes.com/2019/01/09/technology/personaltech/china-wechat.html

[12] Bani Sapra, *This Chinese super-app is Apple's biggest threat in China and could be a blueprint for Facebook's future. Here's what it's like to use WeChat, which helps a billion users order food and hail rides*, BUSINESS INSIDER (Dec. 21, 2019), https://www.businessinsider.com/chinese-superapp-wechat-best-feature-walkthrough-2019-12.

method of communication in China, even when doing business.  Through the app's messaging capabilities, users can have numerous ongoing conversations at one time, and can also set up group texts within a family, a business, or among friends, to communicate with the whole group simultaneously.

32. WeChat also has capabilities to make voice and video calls.  WeChat users often choose to make voice calls within the app rather than through their cellular telephone provider because it is more convenient.  Group voice conference calls and video chats—comparable to Zoom video group calls—can also be easily made on WeChat.

33. WeChat includes a feature called "Moments" through which users can upload photos, videos, share news articles, and compose text.  WeChat users can comment on or like ~~the post~~posts, similar to the capabilities of apps like Facebook or Instagram.

34. WeChat also supports many integrated services, such as banking and ride-sharing, so that users do not need to use a separate app to get those services.  Some companies have launched "mini-programs" within WeChat instead of standalone apps, making it more convenient for WeChat users to use their services.

35. WeChat has increasingly been adopted by older age groups in China, including a significant percentage of those over 60.[13]  Even older users in their 70s use WeChat at high levels for messaging, voice calls, reading articles, and making payments.[14]

**B.    WeChat Usage ~~Specifically~~ in the United States**

36. There are approximately 19 million daily active WeChat users in the United States.[15]  WeChat is very widely used ~~within the Chinese-American community, which is estimated to be four to five million people~~among Chinese speakers in the United States,

---

[13] Clark Boyd, *The Silver Lining: WeChat and China's Over-60s*, MEDIUM (Sept. 3, 2020), https://medium.com/swlh/the-silver-lining-wechat-and-chinas-over-60s-168b193fb516.

[14] Mansoor Iqbal, *WeChat Revenue and Usage Statistics*, BUSINESS OF APPS (updated July 30, 2020),  https://www.businessofapps.com/data/wechat-statistics/.

[15] Krystal Hu, *WeChat U.S. ban cuts off users link to families in China*, REUTERS (Aug. 7, 2020), https://www.reuters.com/article/us-usa-tencent-holdings-wechat-ban/wechat-us-ban-cuts-off-users-link-to-families-in-china-idUSKCN253339#:~:text=In%20the%20past%20three%20months,according%20to%20analytics%20firms%20Apptopia.

many of whom do not own personal computers and rely on the WeChat mobile app to communicate.[16]  WeChat is the dominant method for anyone in the United States who regularly communicates with people in China because it is free, is more convenient, and has better reception than traditional telephone calls.  WeChat is used in the United States not only to keep in touch with friends and family, but also academics, professionals, and business people to discuss matters of professional importance.

37.     In the United States, the vast majority of the Chinese-speaking population is onuses WeChat, creating network  effects that encourage others to join and participate lest they be cut off entirely from family, friends, and business circles.[17]  Almost all Chinese-speaking immigrants who have come to the United States since 2011 brought their WeChat accounts with them from China, where they built extensive networks of contacts prior to immigrating.  In order to maintain their networks among the Chinese-speaking community, these individuals need to continue using WeChat rather than mainstream Western social media platforms such as Facebook, WhatsApp, or Twitter.  This is because all of these platforms—and many others used in the United States—are not available in China.  This is also true for Chinese-speaking immigrants who came to the United States before 2011 and now depend on WeChat to maintain connections with contacts in both the United States and in China.  Simply put, WeChat is irreplaceable because no other app has anywhere near the same number of users and engagement among the Chinese-speaking community in the United States, both in the United States and abroad.  If WeChat were banned in the United States, Plaintiffs' WeChat networks would not simply migrate to another platform—they would evaporate.

38.     The WeChat mobile app in particular has become an essential part of

---

[16] Gustavio Lopez, Neil G. Ruiz, and Eileen Patten, *Key facts about Asian Americans, a diverse and growing population*, PEW RESEARCH CENTER (Sept. 8, 2017), https://www.pewresearch.org/fact-tank/2017/09/08/key-facts-about-asian-americans/.

[17] Mohit Mittal, *WeChat—The One App That Rules Them All*, HARVARD BUSINESS SCHOOL DIGITAL INITIATIVE (Aug. 25, 2017), https://digital.hbs.edu/innovation-disruption/wechat%E2%80%8A-%E2%80%8Athe-one-app-rules/.

Chinese and Chinese-American life in the United States.  The vast majority of WeChat users in the United States use the app through their mobile phones.  Many WeChat users in the United States do not own personal computers, and rely exclusively on the WeChat mobile app to maintain contact with their personal, professional, political, and religious communities.  Even those users who do own a personal computer depend on the availability of the WeChat mobile app, because so many of the people with whom they communicate—even those located in the United States—rely on their mobile phones to access and use WeChat.

38.39.  WeChat users in the United States use the app to communicate within Chinese-American communities in the United States and with Chinese speakers throughout the world.  Without access to WeChat, users in the United States will be cut off from their cultural community in the U.S. and will lose the main line of communication they have with the rest of their family and friends thousands of miles away.  Plaintiffs Peng, Zhang, Bao, and Fang all use WeChat regularly while living in the United States to regularly communicate with their aging parents or other family members who reside in China.

39.40.  The importance of WeChat to Chinese Americans cannot be overstated because a significant portion of these individuals speak little or no English.  According to a study by the Pew Research Center, 41% of the Chinese population in the United States are not English proficient.[18]  Accordingly, a blanket prohibition on WeChat means that millions of individuals in the United States will be unable to find a comparable substitute on apps such as Facebook, which are designed for English-speaking users and primarily have English-speaking user networks within the United States.

40.41.  WeChat users in the United States use the app to engage in, organize, and publicize religious and cultural practices.  For instance, various churches with primarily

---

[18] *English proficiency of Chinese population in the U.S.*, PEW RESEARCH CENTER (July 6, 2017), https://www.pewsocialtrends.org/chart/english-proficiency-of-chinese-population-in-the-u-s/.

Chinese congregants have WeChat profiles and stream their services online.[19]  The Church of Jesus Christ of Latter-Day Saints uses WeChat to reach Chinese-American members and potential congregants within China.[20]  WeChat users in the United States attend and participate in religious services or events, such as funerals, weddings, or other gatherings through the app.  Plaintiff Jinneng Bao relies on WeChat exclusively to attend regular Bible studies hosted by his Chinese church in New York.  WeChat users in the United States organize and celebrate various religious and cultural holidays through their activity in WeChat groups.  They post Moments about holidays such as the Chinese New Year, the Mid-Autumn Moon Festival, Ching Ming Festival (when Chinese people around the world visit the tombs of their departed loved ones), and the Duan Wu Festival (popularly known in the U.S. as the day when Chinese communities host dragon boat races).  Because events, educational or celebratory, are frequently discussed and transmitted through social networks on WeChat, users rely on WeChat to learn about and celebrate religious and cultural events with their community members online.

41.42.  In the United States, WeChat users organize around political causes through WeChatthe app.  For instance, many WeChat groups were used to organize, campaign, and raise funds in the 2016 presidential election, and users in the United States have similarly used WeChat to support candidates in the 2020 presidential election cycle.[21]  Plaintiff Peng

---

[19] Feng Long, *Leveraging Tech for Chinese Evangelism*, SIERRAPACIFIC (May 15, 2020), https://www.undeniableblessing.org/blog/Leveraging-Tech-for-Chinese-Evangelism (Oakland pastor who uses WeChat); MID-HUDSON CHINESE CHRISTIAN CHURCH (NY), https://www.mhccc.org/ (last visited Aug. 20, 2020); BRENTWOOD BAPTIST CHURCH (TN) https://brentwoodbaptist.com/chinese/ (last visited Aug. 20, 2020).

[20] THE CHURCH OF JESUS CHRIST OF LATTER-DAY-SAINTS IN CHINA, https://www.churchofjesuschrist.org/China (last visited Aug. 20, 2020) (*see* Frequently Asked Questions by Church Leaders, Can Church leaders/members outside China keep in touch with Chinese members baptized in their brand/ward after those Chinese members return to China? Email? WeChat? Letters?); James Griffiths, *This US Church with Expansion in its DNA Wants to Open a Temple in China,* CNN (Hong Kong) (Jun. 11, 2020, https://www.cnn.com/2020/06/06/asia/mormon-church-latter-day-saints-china-intl-hnk/index.html.

[21] *See* Wanning Sun, *Why Trump's WeChat ban does not make sense—and could actually cost him Chinese votes*, THE CONVERSATION (Aug. 10, 2020), https://theconversation.com/why-trumps-wechat-ban-does-not-make-sense-and-could-actually-cost-him-chinese-votes-144207.

1    is an active member of several WeChat groups that discuss issues pertaining to the U.S.

2    2020 election and publish information on how to become a registered voter.  Asian-

3    Americans who organized to oppose a Democrat-backed ballot initiative in California,

4    which would have reversed the state's ban on race-conscious admissions, did so primarily

5    through WeChat.[22]  Organizations and causes wanting to reach Chinese -Americans use

6    WeChat groups to raise awareness about demonstrations, spread voter education materials,

7    and campaign for various candidates.

8    ~~42.~~43.  WeChat is integral for the spread of current events and news within Chinese

9    communities.  WeChat users ~~use~~rely on the app to read about current events and the news,

10   including in media from the United States, China, and around the world.  Plaintiffs Zhang

11   and Peng frequently use WeChat to read, share, receive, and respond to news items that

12   their WeChat contacts post to their Moments.  Plaintiffs then comment, like, and share

13   various news items that they receive from their WeChat contacts.  Journalists who cover

14   issues pertaining to China and Chinese communities rely on WeChat to investigate issues

15   and communicate with people to interview.  Large Chinese-language newspapers in the

16   U.S., such as *Sing Tao Daily* and *World Journal*, publish news stories through their

17   WeChat accounts.

18   ~~43.~~44.  Government entities in areas with significant numbers of Chinese

19   immigrants or Chinese Americans use WeChat as a method of communicating with their

20   constituents.  For instance, the police department in Alhambra, California began using

21   WeChat in 2015 to provide updates about local law enforcement efforts.[23]  The cities of

22

23   _____

     [22] Alia Wong, *The App at the Heart of the Movement to End Affirmative Action*, THE
24   ATLANTIC (Nov. 20, 2018),  https://www.theatlantic.com/education/archive/2018/11/asian-
     americans-wechat-war-affirmative-action/576328/.

25   [23] Ashley Fan, *Some San Gabriel Valley Communities Could Be Seriously Affected by*
26   *Trump's WeChat Ban,* SAN GABRIEL VALLEY TRIB. (Aug. 10, 2020),
     https://www.sgvtribune.com/2020/08/10/how-trumps-wechat-ban-could-disrupt-life-in-
27   the-san-gabriel-valley/; Josie Huang, *Alhambra Police Use WeChat as Bridge to Chinese*
     *Immigrants,* KPCC (Jan. 20, 2015),
28   https://www.scpr.org/blogs/multiamerican/2015/01/20/17819/alhambra-police-join-
     wechat-to-chinese/.

Arcadia, San Gabriel, and Monterey Park in California have official WeChat accounts, which allow them to communicate with Chinese-speaking populations in their own language.[24]  Local governments have used WeChat messaging as a way to send emergency notifications and provide public notice for local governance proposals.

44.45.  During the COVID-19 pandemic, WeChat users have relied even more on the app to communicate and organize within their communities.  In February 2020, volunteers in the Bay Area used WeChat to organize and send medical supplies to Wuhan, China at the start of the worldwide pandemic.[25]  As travel restrictions emerged in the United States, WeChat users relied on the app in order to communicate with family members that they cannot visit in person in their home towns, in other areas of the United States, and around the world.  People in the United States use the app to visit with elderly loved ones in nursing homes and hospitals, as well as with COVID-19 patients, who cannot be visited in person due to pandemic-related restrictions.  Information about the pandemic, including regarding COVID-19 testing, prevention methods, and government responses to the pandemic, are broadly shared and discussed in the United States through WeChat groups and posts.  For instance, a local police department in California posted information about times and locations for drive-up and walk-up COVID-19 testing on its WeChat profile.  Similarly, doctors used WeChat extensively to spread information on the prevention of COVID-19 in the Chinese communities in Sacramento, California.[26]

---

[24] Ashley Fan, *Some San Gabriel Valley Communities Could Be Seriously Affected by Trump's WeChat Ban,* SAN GABRIEL VALLEY TRIB. (Aug. 10, 2020), https://www.sgvtribune.com/2020/08/10/how-trumps-wechat-ban-could-disrupt-life-in-the-san-gabriel-valley/; Christopher Yee, *How this 32-year-old Interpreter Became Alhambra's Weibo, WeChat Guru,* SAN GABRIEL VALLEY TRIB. (Jul. 14, 2016, updated Aug. 30, 2017), https://www.sgvtribune.com/2016/07/14/how-this-32-year-old-interpreter-became-alhambras-weibo-wechat-guru/.

[25] Devin Katayama, Ericka Cruz Guevarra & Alan Montecillo, "'*That's Where I Grew Up': The Wuhan Natives Organizing Aid from the Bay,* KQED (Feb. 19, 2020), https://www.kqed.org/news/11802206/thats-where-i-grew-up-the-wuhan-natives-organizing-aid-from-the-bay.

[26] Theodora Yu, *To Combat Coronavirus, These Doctors Are Helping Sacramento's Chinese Community on WeChat,* SAC. BEE (Feb. 27, 2020), https://www.sacbee.com/latest-news/article240662256.html.

1  Organizations, such as Plaintiff Peng's MHACC, make vital mental health programs

2  available to their communities through WeChat, in a world where people are struggling

3  with the long-term isolation associated with the pandemic.

4  **PRESIDENT TRUMP'SDEFENDANTS' EXECUTIVE ORDERS AND**

**EMERGENCY DECLARATION**

5  **IMPLEMENTING REGULATIONS**

6  **A.     Executive Order 13873**

7  45.46. Prior to the issuance of the Executive Order challenged by this lawsuit, on

8  May 15, 2019, President Trump issued Executive Order 13873, titled "Securing the

9  Information and Communications Technology Services Supply Chain."  84 FRFed. Reg.

10  22689 (May 15, 2019).  Executive Order 13873 declares a national emergency with respect

11  to the threat posed by unidentified "vulnerabilities in information and communications

12  technology and services[.]"

13  46.47. According to this Order, these unidentified vulnerabilities constitute an

14  "unusual and extraordinary threat to the national security, foreign policy, and economy of

15  the United States," due in part to the "unrestricted acquisition or use in the United States of

16  information and communications technology or services designed, developed,

17  manufactured, or supplied by persons owned by, controlled by, or subject to the

18  jurisdiction of foreign adversaries[.]"  The threat, according to the May 15, 2019 Order,

19  "exists both in the case of individual acquisitions or uses of such technology or services,

20  and when acquisitions or uses of such technologies are considered as a class."  Executive

21  Order 13873 does not identify specific countries or companies that pose a national security

22  threat.

23  48.     Under the National Emergencies Act, this national emergency would have

24  terminated automatically after one year unless the President renewed it before that

25  termination.  *See* 50 U.S.C. § 1622(d).  President Trump extended Executive Order 13873

26  for another year on May 13, 2020.  *See* 85 Fed. Reg. 29321 (May 13, 2020).  In his notice

27  of the extension, the President provided no explanation for why the national emergency

28  "must continue" other than a conclusory assertion that the threat identified in his original

1  emergency declaration "continues to pose an unusual and extraordinary threat to the
2  national security, foreign policy, and economy of the United States."  *Id.*

3  **B.  Executive Order 13943**

4  47.49.  More than fourteen months later, on August 6, 2020after the President
5  declared this national emergency, President Trump issued Executive Order 13943, titled
6  "Addressing the Threat Posed by WeChat, and Taking Additional Steps to Address the
7  National Emergency with Respect to the Information and Communications Technology
8  and Services Supply Chain."  85 FRFed. Reg. 48641 (Aug. 6, 2020).  Executive Order
9  13943 states that WeChat "automatically captures vast swaths of information from its
10  users," and that the data collected by WeChat "threatens to allow the Chinese Communist
11  Party access to Americans' personal and proprietary information."  According to thisthe
12  Executive Order, the data collected by WeChat also "captures the personal and proprietary
13  information of Chinese nationals visiting the United states, thereby allowing the Chinese
14  Communist Party a mechanism for keeping tabs on Chinese citizens who may be enjoying
15  the benefits of a free society for the first time in their lives."  The Executive Order also
16  warns that WeChat "may also be used for disinformation campaigns that benefit the
17  Chinese Communist Party."

18  48.50.  Executive Order 13943 does not declare a new national emergency.  Rather,
19  it asserts that the "threat" posed by WeChat is "similar to" the threat posed by other
20  Chinese-owned technology companies, such as TikTok, which the President took action
21  against pursuant to his purported emergency powers under the International Emergency
22  Economic Powers Act ("IEEPA").  *See* Executive Order 13942, 85 FRFed. Reg. 48637
23  (Aug. 6, 2020).  The Executive Orders regulating WeChat and TikTok—both issued on the
24  same day—rely on powers purportedly made available by the national emergency declared
25  in Executive Order 13873, issued over a year earlier on May 15, 2019.

26  49.51.  Several sections of Executive Order 13943 purport to alter the legal rights
27  and obligations of private parties.  Section 1(a) states that "any transaction that is related to
28  WeChat by any person" will be "prohibited beginning 45 days after the date of this

order[.]"  Section 1(a) further prohibits, beginning 45 days from the date of the Order, transactions with Tencent, WeChat's parent company, and any subsidiaries of Tencent that are "identified by the Secretary of Commerce[.]"  Section 2(a) states that "[a]ny transaction… that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate the prohibition set forth in this order is prohibited." Section 2(b) further prohibits "[a]ny conspiracy formed to violate any of the prohibitions set forth in this order."  Section 3 purports to strip persons subject to the prohibitions in Sections 1(a) and 2 of any right to notice of the specific conduct being prohibited.

50.52.  Executive Order 13943, by its terms, ~~may apply~~applies not only to WeChat~~, and~~ its parent company Tencent, but also to the millions of American individuals, groups, businesses, organizations, churches and government agencies, that use WeChat every day to communicate, learn, speak, read, publish, organize, advertise, run a business, and meet friends and family in their personal, professional and business lives.  While "transaction" is not defined in the Executive Order, it does make clear that it applies to "any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States."  *Id.* § 4(c).  And "entity" is further defined to mean a government or instrumentality of such government, partnership, association, trust, venture, corporation, group, subgroup, or other organization, including an international organization."  *Id.* § 4(b).

51.53.  Two other sections of Executive Order 13943 direct the Secretary of Commerce to take additional action:  Section 1(c) directs the Secretary, within 45 days of August 6, to "identify the transactions subject to subsection [1](a)."  Section 5 authorizes the Secretary to "take such actions, including adopting rules and regulations, and to employ all powers granted to me by IEEPA as may be necessary to implement this order." The Executive Order specifically mentions the popular use of WeChat to pay for purchases or to transfer money or to accept or make payments for their businesses from or to another user, as the basis to relieve the Secretary of Commerce of any responsibility to give "prior

notice" to them "of measures to be taken" because advance notice "would render those measures ineffectual." *Id.* § 3.  It is unclear whether this section permits the Secretary to freeze or seize monies belonging to WeChat users in the U.S. without notice.

~~52.~~54. Under the Executive Order, WeChat users who engage in a prohibited transaction may be prosecuted under the IEEPA, which provides for civil penalties of $250,000 or twice the amount of the transaction at issue, and criminal penalties of up to $1 million plus 20 years in prison.  *See* 50 U.S.C. § 1705(b)-(c).

**C.**     **The Secretary of** ~~Commerce Identifies the~~ **Commerce's Identification of Prohibited Transactions** ~~Prohibited by EO~~**, and Intent to Ban WeChat**

~~53.~~55. On September 18, 2020, the Commerce Department released its "Identification of Prohibited Transactions to Implement Executive Order 13943" (the "Identification").

~~54.~~56. ~~On September 18, 2020, the Commerce Department released its "Identification of Prohibited Transactions to Implement Executive Order 13943" (the "Identification").~~ The Identification sets forth eleven defined terms and identifies seven "transactions" to be prohibited pursuant to the Executive Order.

~~55.~~57. For example, the Identification defines "person" as "an individual or entity."

~~56.~~58. ~~It~~The Identification also defines "Transaction" to mean "any acquisition, importation, transfer, installation, dealing in, or use of any information and communications technology or service."

~~57.~~59. ~~It then~~The Identification states that the following transactions are prohibited by ~~EO~~Executive Order 13943 ~~include, *inter alia*~~:

a.     "1. Any provision of services to distribute or maintain the WeChat mobile application, constituent code, or mobile application updates through an online mobile application store, or any online marketplace where mobile users within the land or maritime borders of the United States and its territories may download or update applications for use on their mobile devices~~."~~;

b.     "2. Any provision of internet hosting services enabling the

functioning or optimization of the WeChat mobile application, within the land and

maritime borders of the United States and its territories.~~"~~;

      ~~c.   "Any provision of content delivery services enabling the functioning~~

~~or optimization of the WeChat mobile application, within the land and maritime borders of~~

~~the United States and its territories."~~

      ~~d.~~c.   ""3. Any provision of content delivery services enabling the

functioning or optimization of the WeChat mobile application, within the land and

maritime borders of the United States and its territories.~~"~~;

      d.   ""4. Any provision of directly contracted or arranged internet transit

or peering services enabling the functioning or optimization of the WeChat mobile

application, within the land and maritime borders of the United States and its territories;

      e.   "5. Any provision of services through the WeChat mobile application

for the purpose of transferring funds or processing payments to or from parties within the

land or maritime borders of the United States and its territories;

      f.   "6. Any utilization of the WeChat mobile application's constituent

code, functions, or services in the functioning of software or services developed and/or

accessible within the land and maritime borders of the United States and its territories; or

      ~~e.~~g.   "7. Any other transaction that is related to WeChat by any person, or

with respect to any property, subject to the jurisdiction of the United States, with Tencent

Holdings Ltd., or any subsidiary of that entity, as may be identified at a future date under

the authority delegated under Executive Order 13943."

      ~~58.~~60. In short, the Identification sets forth a de facto ban of WeChat in the United

States.

      ~~59.~~61. On September 18, 2020, multiple Administration officials confirmed the

purpose and intent of the Identification as being the eventual, complete prohibition of any

use of WeChat in the United States.

      ~~60.~~62. For example, on September 18, 2020, Secretary of Commerce Wilbur Ross

stated on Fox Business News that "~~WeChat is essentially a funds transfer and payment~~

1  processing mechanism. For all practical purposes, it[WeChat] will be shut down in the

2  U.S., but only in the U.S. as of midnight on Monday by the Commerce Department rule."[27]

3  61.63. Mr. Ross also statedt that "WeChat is essentially a funds transfer and

4  payment processing mechanism."  This is incorrect, as several of WeChat's most important

5  functions involve social networking and other communications, both in China and in the

6  United States.  The version of WeChat that is accessible in the United States does not

7  allow users to transfer funds unless both parties to the transaction already have Chinese

8  bank accounts.

9  62.64. The Secretary's mischaracterization demonstrates the government's lack of

10  investigation and understanding of the software that it has now banned.

11  63.65. In a televised interview on Friday, September 18, 2020, the Secretary of

12  Commerce stated that it "is our *fear*" that WeChat is "taking data from the American

13  public and sending it to China."  But the Secretary provided no examples of "data" being

14  "sen[t . . . ]... to China" or how the mere transmission of "data" to China constitutes a

15  national security threat.[28]

16  64.66. Also on September 18, 2020, a separate statement from an anonymous

17  "senior Commerce official" to a reporter for the technology publication CNET appears to

18  confirm that the Administration has no evidence whatsoever of private data being

19  harvested by WeChat in the United States. "Whether we have any evidence, domestically,

20  of these particular apps taking data is missing the point,," according to this official,

21  because the Administration "know[s] what the Chinese government's intent is here in the

22  United States."[29]

23

---

24  [27] *Available at*: https://video.foxbusiness.com/v/6192199311001/#sp=show-clips Megan

25  Henney, *Trump Administration to Ban Americans from Downloading TikTok, WeChat on*

26  *Sunday*, FOX BUSINESS (Sept. 18, 2020), https://www.foxbusiness.com/politics/trump-administration-to-ban-americans-from-downloading-tiktok-wechat.

27  [28] *Available at*: https://video.foxbusiness.com/v/6192199311001/#sp=show-clips. *Id.*

28  [29] September 18, 2020 CNET article titled "TiekTok, WeChat downloads will be barred from US starting Sunday," *Available at:*  https://www.cnet.com/news/tiktok-wechat-downloads-will-be-barred-from-us-starting-sunday.

1   67.   On the same day, another ~~anonymous government~~senior Trump

2   administration official ~~in~~told CNBC that, as a result of Executive Order 13943 and the

3   Identification, WeChat is "dead in the United States."[30]

4   68.   In a September 17, 2020 Memorandum for the Secretary of Commerce from

5   John K. Costello, Deputy Assistant Secretary for Intelligence and Security ("Decision

6   Memo"), the Commerce Department ~~stated~~acknowledged that the prohibitions in the

7   Identification were drafted to ~~Reuters that "The~~prevent transmission of U.S. ~~Commerce~~

8   user data by the WeChat app.

9   ~~65.~~69. In September 2020, after the President issued Executive Order 13943 but

10   before the Secretary issued the Identification, the Department~~['s] … order …~~ of Homeland

11   Security's Cybersecurity and Infrastructure Agency ("CISA") recommended that

12   Defendants issue a far narrower prohibition aimed at preventing the use of WeChat on the

13   devices of State, Local, Tribal, and Territorial partners and critical infrastructure operators.

14   Defendants rejected the advice of their own intelligence agency in favor of a sweeping ban

15   that will ~~bar people~~effectively "shut down" WeChat in the United States ~~from~~

16   ~~downloading Chinese-owned messaging app WeChat and video-sharing app TikTok~~

17   ~~starting on September 20."~~.[31]

18   ~~66.   According to the official, the Commerce Department order will "deplatform"~~

19   ~~the two apps in the United States and bar Apple Inc's app store, Alphabet Inc's Google~~

20   ~~Play and others from offering the apps on any platform "that can be reached from within~~

21

22

23   _____

24   [30] Eamon Javers and Kevin Stankiewicz, *TikTok Deal Still Has a Chance but WeChat 'Dead' in the U.S., says Senior Administration Official*, CNBC (Sept. 18, 2020), https://www.cnbc.com/2020/09/18/tiktok-deal-still-has-a-chance-but-wechat-dead-in-the-us-says-senior-administration-official.html

25

26   [31] ~~September 18, 2020 Reuters article titled "Officials: Trump to Block US Downloads of TikTok, WeChat on Sunday," *available at:* https://www.reuters.com/article/us-usa-tiktok-ban-exclusive-idUSKBN2691QO.~~ Megan Henney, *Trump Administration to Ban*

27   *Americans from Downloading TikTok, WeChat on Sunday*, FOX BUSINESS (Sept. 18, 2020), https://www.foxbusiness.com/politics/trump-administration-to-ban-americans-from-downloading-tiktok-wechat

28

1    the United States."[32]

2         70.    In August and September 2020, after the President issued Executive Order

3    13943 but before the Secretary issued the Identification, representatives for Tencent

4    attempted to negotiate an agreement with the Commerce Department that would obviate

5    the purported need for Defendants' WeChat ban.  Among other mitigation measures,

6    Tencent offered to create a new U.S. version of WeChat; to deploy specific security

7    measures to protect the U.S. version's source code; to partner with a U.S. cloud provider

8    for user data storage; to manage the U.S. version through a U.S.-based entity with a

9    governance structure approved by the U.S. government; and to provide the U.S.

10   government with regular compliance audits and notifications, as well as authority to

11   approve management and personnel with access to user data.

12        71.    Defendants rejected Tencent's proposals to mitigate Defendants' purported

13   concerns about data privacy and national security, opting instead to impose the

14   prohibitions in the Secretary's Identification, which Defendant Ross himself has stated will

15   "shut down" WeChat in the United States once implemented.[33]

16        72.    At least one of Defendants' rationales for rejecting Tencent's mitigation

17   proposals and the recommendations of CISA is rooted in Defendants' disapproval of the

18   supposed "propaganda" that WeChat users exchange on the platform, which Defendants

19   believe benefits the Chinese Communist Party.

20        67.73. Journalists have likewise understood the Executive Order and Identification

21   as a complete ban on the use of WeChat.  On September 18, 2020, the New York Times

22   reported under the headlined: "Trump Administration to Ban TikTok and WeChat From

23   U.S. App Stores."[34]  The Wall Street Journal reported: "U.S. Bans Chinese Apps TikTok

24

25   _____
     [32] September 18, 2020 CNET article titled "TickTok, WeChat downloads will be barred
26   from US starting Sunday," *Available at:*  https://www.cnet.com/news/tiktok-wechat-
     downloads-will-be-barred-from-us-starting-sunday.
27   [33] *Id.*

28   [34] September 18, 2020 New York Times article titled "Ana Swanson, David McCabe, and
     Jack Nicas, *Trump Administration to Ban TikTok and WeChat Ffrom U.S. App Stores,*"

and WeChat, Citing Security Concerns."  CNBC reported: "Trump to block downloads of TikTok, WeChat on Sunday," and noted that "WeChat is considered dead in the U.S."[35] And the Associated Press reported: "US bans WeChat, TikTok from app stores, threatens shutdowns," saying that the move could "effectively wreck the operation of both … services for U.S. users."[36]

### ~~C.~~**D.**   Purported Authority for the Executive Order and Identification

~~68.~~74.  Both Executive Order 13873 and Executive Order 13943 cite the National Emergencies Act ("NEA") and the IEEPA as providing the legal authority for the President's ~~actions.~~and the Secretary's actions.  The IEEPA and the NEA were both passed in order to *limit* the President's emergency powers.[37]

#### 1.     The National Emergencies Act

~~69.~~75.  The NEA, Pub. L. No. 94-412, 90 Stat. 1255, codified at 50 U.S.C. §§ 1601-1651, was enacted by Congress in 1976 to rein in, rather than expand, the power of the president.  The NEA was designed to "insure" that the president's "extraordinary" emergency powers would "be utilized only when emergencies actually exist, and then, only under safeguards of congressional review."  S. Rep. No. 94-1168, at 2 (1976).

~~70.~~76.  To this end, the NEA allows the President to utilize emergency powers

---

*available at:*, N.Y. Times (Sept. 18, 2020), https://www.nytimes.com/2020/09/18/business/trump-tik-tok-wechat-ban.html.,.

[35] ~~September 18, 2020 CNBC article titled "~~Steve Kovach, *Trump to* ~~block downloads~~*Block Downloads* of TikTok, WeChat on Sunday~~," *available at:*~~, CNBC (Sept. 18, 2020), https://www.cnbc.com/2020/09/18/trump-to-block-us-downloads-of-tiktok-wechat-on-sunday-officials-tell-reuters.html.

[36] ~~September 18, 2020 Associated Press article titled "~~Tali Arbel, Matt O'Brien, and Matt Ott, *US Bans WeChat, TikTok* ~~F~~*f*rom App Stores, Threatens ~~Shutdowns," *available at:*~~ *Shut Downs*, U.S. News & World Report (Sept. 18, 2020), https://www.usnews.com/news/business/articles/2020-09-18/us-banning-use-of-wechat-tiktok-for-national-security.

[37] *See* IEEPA, Pub. L. 95-223, tit. III (1977) (stating that IEEPA confers "upon the President a new set of authorities for use in time of national emergency which are both *more limited in scope* than [those previously allowed] and *subject to procedural limitations*" (emphasis added)); Jules Lobel, *Emergency Power and the Decline of Liberalism*, 98 Yale L.J. 1385, 1412 (1989) (the NEA responded to "the twin disasters of Vietnam and Watergate" and the sense that "the pendulum had swung too far" toward executive power).

authorized by Congress in other federal statutes only when there is a national emergency that has been declared in accordance with specific statutory requirements.  50 U.S.C. § 1621.

71.77. Among other actions required by the NEA, the President must specify the statutory powers he intends to invoke upon issuing a national emergency.  50 U.S.C. § 1631.  He must also publish the declaration of a national emergency in the Federal Register and transmit it to Congress "immediately."  50 U.S.C. § 1621(a).  Every six months thereafter, for as long as the emergency remains in effect, the President must transmit to Congress "a report on the total expenditures incurred by the United States Government during such six-month period which are directly attributable to the exercise of powers and authorities conferred by such declaration."  50 U.S.C. § 1641(c).  Each House of Congress, in turn, must meet at least once every six months following the declaration "to consider a vote on a joint resolution to determine whether that emergency shall be terminated."  50 U.S.C. § 1622(b).  Any national emergency declared by the President automatically terminates after one year unless the President publishes in the Federal Register and transmits to Congress a notice that the emergency "is to continue in effect after such anniversary."  50 U.S.C. § 1622(d).

**2.     The International ~~Economic~~ Emergency Economic Powers Act**

72.78. The IEEPA grants the President limited emergency powers when the President has declared a national emergency, pursuant to the NEA, with regard to an "unusual and extraordinary threat, which has its source in whole or in substantial part outside the United States[.]"  50 U.S.C. § 1701(a).  "Any exercise" of the powers granted by the IEEPA "to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat."  50 U.S.C. § 1701(b).

73.79. The IEEPA does not grant the President unlimited powers during national emergencies.  Rather, the statute includes specific limits on the emergency powers it authorizes.  Section 1702(b) of the IEEPA states that "[t]he authority granted to the President by [the IEEPA] does not include the authority to regulate or prohibit, directly or

1  indirectly … (1) any postal, telegraphic, telephonic, or other personal communication,

2  which does not involve a transfer of anything of value; (2) donations, by persons subject to

3  the jurisdiction of the United States, of articles, such as food, clothing, and medicine,

4  intended to be used to relieve human suffering …; (3) the importation from any country, or

5  the exportation to any country, whether commercial or otherwise, regardless of format or

6  medium of transmission, of any information or informational materials …; [or] (4) any

7  transactions ordinarily incident to travel to or from any country[.]"  50 U.S.C.

8  § 1702(b)(1)-(4).  The IEEPA also requires that the President "consult with Congress

9  before exercising any of the authorities granted by this chapter," and that the President

10  "immediately transmit to Congress a report" containing certain additional information

11  about the President's reasons for exercising his emergency powers under the IEEPA and

12  the specific actions he and his subordinates will take in exercising those powers.  50

13  U.S.C. § 1703(a)-(b).

14  **D.    ~~Immediately Preceding the Executive Order, President Trump Targeted~~**

15  **~~Denigrating Statements Against China And Chinese People~~**

16  **E.    The Executive Order's Timing Suggests That It Was Issued Not for a**

17  **Bona Fide National Security Reason But Instead to Further the**
    **President's Political Campaign By Inciting Anti-Asian Sentiment**

18  ~~74.~~80. In the months before the Executive Order ~~was~~and Identification were issued,

19  President Trump made numerous anti-Chinese statements outside the context of national

20  security that commentators have described as inciting racial animus against persons of

21  Chinese descent for political gain.  Many of these inflammatory statements have been

22  made in the context of the President blaming the coronavirus pandemic on China.  Instead

23  of using the official public health terms for the virus and the disease it causes, such as the

24  "novel coronavirus" and "COVID-19," President Trump has repeatedly and intentionally

25  referred to the virus causing the current pandemic as the "China virus," "the Wuhan virus,"

26  "China Flu," and "Kung-Flu."[38]

27  _____

28  [38] *See, e.g.*, Remarks by President Trump in Press Briefing (July 23, 2020),

1    ~~75.~~81. Facing criticism that these word choices were racist and unfairly subjected

2    Chinese people—including Chinese Americans—to anger and hatred, the White House

3    ~~spokesperson~~press secretary has defended Trump's dangerous and incendiary language.[39]

4    The Anti-Defamation League has reported an increasing number of hate crimes, including

5    racial slurs, spitting on, and physical assaults against Asian-Americans in the United States

6    following the President's use of these terms, and warned that "Statements by public

7    officials referring to COVID-19 as the 'Chinese virus,' 'Kung Flu' or 'Wuhan Flu' may be

8    exacerbating the scapegoating and targeting of the [Asian American and Pacific Islander]

9    community."[40]   The incitement following the President's statements reminded many in the

10    Asian American community of the hatred and racial violence focused on persons of Asian

---

https://www.whitehouse.gov/briefings-statements/remarks-president-trump-press-briefing-072320/ ("We've had a tremendous week uniting the country in our fight against the **China virus**"); Donald J. Trump (@realDonaldTrump), TWITTER  (Aug. 2, 2020), https://twitter.com/realDonaldTrump/status/1289887533250351110 ("Big **China Virus** breakouts all over the World, including nations which were thought to have done a great job. The Fake News doesn't report this. USA will be stronger than ever before, and soon!"); Donald J. Trump (@realDonaldTrump), TWITTER (Aug. 11, 2020), https://twitter.com/realDonaldTrump/status/1293163704188645385 ("More Testing, which is a good thing (we have the most in the world), equals more Cases, which is Fake News Gold. They use Cases to demean the incredible job being done by the great men & women of the U.S. fighting the **China Plague**!"); Donald J. Trump (@realDonaldTrump), TWITTER (July 26, 2020), https://twitter.com/realDonaldTrump/status/1287473812733341696 ("Because of my strong focus on the **China Virus**, including scheduled meetings on Vaccines, our economy and much else, I won't be able to be in New York to throw out the opening pitch for the @Yankees on August 15th. We will make it later in the season!"); Donald J. Trump (@realDonaldTrump), TWITTER (Mar. 18, 2020), https://twitter.com/realDonaldTrump/status/1240243188708839424 ("I always treated the **Chinese Virus** very seriously, and have done a very good job from the beginning, including my very early decision to close the "borders" from China - against the wishes of almost all. Many lives were saved. The Fake News new narrative is disgraceful & false!"); Li Zhou, *Trump's Racist References to the Coronavirus Are His Latest Effort to Stoke Xenophobia,* VOX (June 23, 2020), https://www.vox.com/2020/6/23/21300332/trump-coronavirus-racism-asian-americans; Colby Itkowitz, *Trump Again Uses Racially Insensitive Term to Describe Coronavirus,* WASH. POST (Jun. 23, 2020), https://www.washingtonpost.com/politics/trump-again-uses-kung-flu-to-describe-coronavirus/2020/06/23/0ab5a8d8-b5a9-11ea-aca5-ebb63d27e1ff_story.html.

[39] Andrew Restuccia, *White House Defends Trump Comments on 'Kung Flu,' Coronavirus Testing*, WALL ST. J. (Jun. 22, 2020), https://www.wsj.com/articles/white-house-defends-trump-comments-on-kung-flu-coronavirus-testing-11592867688.

[40] *Reports of Anti-Asian Assaults, Harassment and Hate Crimes Rise as Coronavirus Spreads,* ADL BLOG (Jun. 18, 2020), https://www.adl.org/blog/reports-of-anti-asian-assaults-harassment-and-hate-crimes-rise-as-coronavirus-spreads.

1   descent after the ~~success of the~~ Japanese auto industry was blamed for major job losses in

2   the American Rust Belt.[41]

3   ~~76.~~82.  In addition to asserting that the United States' incidence of COVID-19 is

4   China's fault, the President has exploited anti-Chinese sentiment as a rallying cry for his

5   re~~e~~lecti~~oral~~n campaign.  For example, on August 11, 2020, President Trump stated that

6   "[i]f I don't win the election, China will own the United States.  You're going to have to

7   learn to speak Chinese."[42]  President Trump has on numerous occasions mocked the

8   accent~~s~~ of Chinese and Asian-Americans, including those of prominent Asian leaders.[43]

9   83.     Defendants' animus toward persons of Chinese and Chinese-American

10  descent is a key reason they have chosen to ban WeChat.  Defendants have not imposed

11  comparable restrictions on software that is not owned and used primarily by persons of

12  Chinese and Chinese-American descent, even when that software collects similar personal

13  and private data from users in the United States and shares that data with the Chinese

14  government.  Defendants have not, for example, proposed a comparable ban on Airbnb,

15  despite their knowledge that Airbnb collects a wide range of private information from

16  American users and shares that information with the Chinese government.[44]

17

18

---

19  [41] Ali Rogin & Amna Nawaz, *'We Have Been Through this Before.' Why Anti-Asian Hate Crimes Are Rising Amid Coronavirus,* PBS NEWS HOUR (Jun. 25, 2020),
20  https://www.pbs.org/newshour/nation/we-have-been-through-this-before-why-anti-asian-hate-crimes-are-rising-amid-coronavirus.

21  [42] Kevin Liptak, *Trump Says Americans Will Have to Learn Chinese if Biden Wins, but Offers Little Condemnation of Beijing,* CNN (Aug. 11, 2020),
22  https://www.cnn.com/2020/08/11/politics/trump-china-biden-learn-chinese/index.html

23  [43] *See, e.g.*, Laura Ma, *'We want deal!': Trump fakes Asian accent to mock Chinese and Japanese businessmen at US rally*, South China Morning Post (Aug. 26, 2015),
        https://www.scmp.com/news/world/article/1852785/we-want-deal-trump-fakes-asian-
24      accent-mock-chinese-japanese-businessmen; Jennifer Gould and Emily Smith, *Trump cracks jokes about Equinox scandal, kamikaze pilots at Hamptons fundraiser*, N.Y. POST
25  (Aug. 9, 2019), https://nypost.com/2019/08/09/trump-cracks-jokes-about-rent-control-
        kamikaze-pilots-at-hamptons-fundraiser/ (reporting on Trump "mimicking Japanese and
26      Korean accents").

27  [44] *See* Dustin Volz and Kirsten Grind, *Airbnb Executive Resigned Last Year Over Chinese Request for More Data Sharing*, WALL ST. JOURNAL (Nov. 20, 2020),
28      https://www.wsj.com/articles/airbnb-executive-resigned-last-year-over-chinese-request-
        for-more-data-sharing-11605896753.

1      84.     Defendants' claim that WeChat presents a threat to national security rings

2  hollow.  President Trump waited fifteen months after declaring a national emergency

3  related to foreign-owned technology before targeting WeChat.  Then, in issuing the

4  Executive Order, he provided an additional month and a half for the Secretary of

5  Commerce to define the "transactions" banned by the Order.  Nothing in the administrative

6  record produced in connection with the Secretary's Identification provided any evidence

7  that WeChat has been used by China to surveil Americans—let alone in a manner that

8  poses a national security threat.  Instead, the generalized threats about China that are

9  identified in the administrative record have been known for years.  Moreover, the

10 administrative record does not identify any significant event(s) in the intervening one and a

11 half years between the national emergency identified in Executive Order 13873 and the

12 Executive Order banning WeChat ban that would have prompted the need to ban this app

13 in particular or that would justify immediate action.  In a December 4, 2020 letter to

14 Plaintiffs' counsel, Defendants' counsel indicated that no additional factual materials

15 beyond those included in the administrative record were considered by Defendant Ross or

16 his subordinates in issuing the Identification.

17      85.     President Trump's assertions of national security threats related to WeChat

18 are pretextual.  Indeed, this is not the only time that President Trump has invoked vague

19 national security threats related to social media apps for his own political gain.  For

20 example, on December 1, 2020, after Facebook and Twitter engaged in a public awareness

21 campaign notifying users that President Trump's claims about the 2020 election include

22 false claims and disinformation, President Trump stated that Section 230 of the 1996

23 Communications Decency Act "is a serious threat to our National Security…. Our Country

24 can never be safe & secure if we allow it to stand."[45]

25

26 [45] Jaclyn Diaz, *Trump Vows To Veto Defense Bill Unless Shield For Big Tech Is
   Scrapped*, NPR (Dec. 2, 2020), https://www.npr.org/2020/12/02/941019533/trump-vows-
27 to-veto-defense-bill-unless-shield-for-big-tech-is-scrapped; *see also* Cat Zakrzewski, *The
   Technology 202: Trump's misleading claims about Section 230 could last beyond his
28 showdown with Congress*, THE WASHINGTON POST (Dec. 3, 2020),

**THE EXECUTIVE ORDER AND IDENTIFICATION CAUSED MASS CONFUSION AND HASVE ALREADY HARMED AND WILL CONTINUE TO HARM PLAINTIFFS**

77.86.  American law firms have been unable to advise their clients as to the scope of "transactions" that are banned under Executive Order 13943.  Multiple prominent law firms in the United States have effectively conceded that they cannot provide guidance about the meaning of the Executive Order, and have speculated that all uses of WeChat could be prohibited.  One law firm recently informed its clients that the "extraordinary breadth and ambiguity" of the Executive Order has "left US companies and many others looking to the Trump Administration for additional clarity[.]"[46]  Another firm speculated that WeChat "could be pulled out of the app stores and off of American phones ....  Companies could be banned from interacting with the extensive interactive payment network used by WeChat."[47]

87.     The general public understands the Executive Order itself as prohibiting the use of WeChat.  The University of Kansas, for example, announced on September 15, 2020—before the Secretary issued the Identification—that it would ban the use of WeChat on all KU-owned computers and the campus network, stating that "KU's Office of Global Operations & Security, the Office of the General Counsel and KU Information Technology have determined that use of WeChat in KU's business operations and on its networks will

---

https://www.washingtonpost.com/politics/2020/12/03/technology-202-trump-misleading-claims-about-section-230-could-last-beyond-his-showdown-with-congress/ (This claim particularly was a real head-scratcher for many tech policy observers because there is not a clear link between Section 230 and national security, and Trump didn't explain why he believed it put the country at risk.").

[46] Ambassador Charlene Barshefsky, David S. Cohen, Ronald I. Meltzer, David M. Horn & Semira Nikou, *New Executive Orders Target Chinese Apps,* WILMER HALE, (Aug. 10, 2020), https://www.wilmerhale.com/en/insights/client-alerts/20200810-new-executive-orders-target-chinese-apps.

[47] David A. Kaufman, John Sandweg, David K. Cheng & Rachel S. Winkler, *Administration's Attempt to Delete TikTok and WeChat: Latest Trade Tiff or New Battle,* NIXON PEABODY (Aug. 7, 2020), https://www.nixonpeabody.com/en/ideas/articles/2020/08/07/administrations-attempt-to-delete-tiktok-and-wechat.

fall within the scope of the executive order's ban."[48]

88.   Even after the Commerce Department issued the Identification, law firms remained confused as to what, exactly, was prohibited.  For example, Wilson Sonsini issued a client alert stating that:  "The Orders use broad terminology and not all terms are defined. As such, we believe further guidance from the Commerce Department regarding the precise scope of the restrictions set forth in the Orders is necessary."[49]  Steptoe & Johnson LLP advised its clients that the "fifth prohibition is particularly broad, and less clear than the others… this provision will likely be a focus of concern within industry and among other stakeholders and would benefit from clarification by the Commerce Department."[50]

78.89. Each plaintiff learned of the Executive Order and Identification at or near the time it wasthey were issued and hasve suffered harm as a result of the Executive Order's sweeping prohibition on "any transaction that is related to WeChat by any person, or with respect to any property." 85 FR 48641, at § 1(a).prohibitions.  Plaintiff Duan, for example, experiences fear and worry on a daily basis that Chihuo, Inc.   the business she founded and for which she continues to serve as CEO—will not survive if it cannot provide services to customers through WeChat.  Plaintiff Peng fears that the non-profit organization she founded will not be able to continue providing services to Chinese speakers in the United States, and that she personally will be unable to maintain her social

[48] Blake Ullmann, KU-Owned Computers, Campus Wi-Fi Will Ban Use of WeChat, THE UNIVERSITY DAILY KANSAN (Sept. 15, 2020), https://www.kansan.com/news/ku-owned-computers-campus-wi-fi-will-ban-use-of-wechat/article_0d3326b8-f76b-11ea-bd4c-dbb1fe3ba1be.html.

[49] Anne E. Symour, Josephine I. Aiello LeBeau, Melissa B. Mannino, Joshua F. Gruenspecht, U.S. Department of Commerce Publishes Transactions with ByteDance and Tencent That Are Prohibited Due to National Security Concerns Raised by TikTok and WeChat, WILSON SONSINI (Sept. 18, 2020), https://www.wsgr.com/en/insights/us-department-of-commerce-publishes-transactions-with-bytedance-and-tencent-that-are-prohibited-due-to-national-security-concerns-raised-by-tiktok-and-wechat.html.

[50] Peter Jeydel, Martin Willner, Wendy Wysong, Ed Krauland, Jack Hayes, Meredith Rathbone & Brian Egan, US Commerce Department Identifies Prohibited Transactions Involving WeChat and TikTok, STEPTOE & JOHNSON LLP (Sept. 20, 2020), https://www.steptoeinternationalcomplianceblog.com/2020/09/us-commerce-department-identifies-prohibited-transactions-involving-wechat-and-tiktok/.

1   ties and communicate with other members of the Chinese community in the United States.

2   Plaintiff Zhang worries that she will be unable to maintain social ties and communicate

3   with other Chinese-speaking people—both in the United States and in China.  She believes

4   that the charity she founded—Hita Education Foundation—could not have been founded

5   without WeChat and may not be able to survive without being able to connect with

6   Chinese-speaking people through the app.  Each individual plaintiff fears losing

7   connection with close friends and family members.

8       90.    All plaintiffs, moreover, have already been forced by the Executive Order

9   and Identification to expend time and resources preserving their contacts and memories on

10  WeChat and/or searching—without success—for an alternative platform that could sustain

11  their businesses, charities, and/or social and family ties.  Plaintiff Peng has received

12  inquiries from Chinese families through MHACC, her mental health WeChat group, about

13  where to go if WeChat is banned, but has been unable find a comparable substitute to

14  replace WeChat.  Plaintiff Chihuo has spent money attempting to redirect its business

15  activities that currently depend on WeChat by establishing alternative social media

16  channels on YouTube, Instagram and Facebook. These efforts to find a substitute for

17  WeChat have not been and are unlikely to be successful.  This is because alternative apps

18  often do not offer a Chinese user interface.  More

19      91.    These efforts to find a substitute for WeChat have not been and are unlikely

20  to be successful.  A ban would be particularly harmful to Plaintiffs and other WeChat users

21  who are not literate in English and cannot turn to alternative options, many of which are

22  not available in these users' native tongue, do not offer a useful Chinese-language interface

23  or notifications, suffer from poor translation functions and inadequate customer service,

24  and/or do not provide user or privacy policies in Chinese.  Many WeChat users do not

25  know how to use alternative interfaces.  Other apps do not offer the features offered by

26  WeChat, such as "official accounts" that enable users like Plaintiff Chihuo to easily and

27  quickly publish articles embedded with pictures and videos and manage comments on the

28  account to remove offensive comments and prioritize comments that the account-holder

approves.  Other features unique to WeChat include "mini-programs" that offer a wide range of formatting tools; group chats in which the host has the power to admit and remove participants so as to prevent the chats from being flooded with unwanted advertisements or disruptive messages; and high-quality voice and video calls.  Other apps lack WeChat's language-specific development and features that make it culturally relevant to its Chinese (and Chinese-American) users.

79.92. Most importantly, alternative apps also do not provide access to WeChat's vast network of Chinese-speaking users.  Without mincing words, Plaintiffs' family members, friends, clients, contacts, news sources, and religious community are regularly on WeChat, not other apps.  WeChat's enormous network effect is ***irreplaceable***, and any other platform would not provide the community that WeChat does.

93.    Implementation of the prohibitions in the Identification would further harm Plaintiffs.  John K. Costello, Deputy Assistant Secretary for Intelligence and Security, has admitted that if the Identification is implemented, the WeChat app will become slower to respond, certain features will be impaired, and the app will become unusable to the point that users in the United States will not be able to use it to communicate or transmit data. Plaintiffs and other ordinary WeChat users will be harmed if and when WeChat service is slowed or degraded.  For example, Chihuo's business model relies on speed and prompt results provided by WeChat, and it will lose clients and customers if service is slowed or degraded.  Similarly, high-quality voice and video calls are a critical function of WeChat, and Plaintiffs will be harmed if their call quality degrades to the point where such calls are interrupted or cannot be maintained.

94.    Mr. Costello has also acknowledged that the first prohibition of the Identification will prevent Plaintiffs from being able to receive security updates to WeChat.  Such updates and new downloads are necessary to fix security vulnerabilities in apps such as WeChat.  By preventing users from downloading new versions of the app or updating the app, Executive Order 13943 and the Identification make it *more* likely that Plaintiffs' private data and information will be stolen by, or otherwise shared with, entities

such as the Chinese government.  This prohibition would ensure that Plaintiffs and other current users would become vulnerable to cyber-attacks as soon as un-addressed vulnerabilities become public.  Vulnerabilities requiring updates are common among social media apps.[51]

### FIRST CLAIM FOR RELIEF

### (First Amendment ~~Freedom of~~ Speech and Association)

~~80.~~95. Plaintiffs reallege and hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

~~81.~~96. The First Amendment guarantees freedoms concerning religion, expression, the press, assembly, and petitioning the government.  ~~Plaintiffs' use of~~ Plaintiffs depend on WeChat ~~are exercises~~to exercise each of ~~all~~ these freedoms.

~~82.~~97. WeChat ~~is a mobile application that~~ is broadly used by members of the Chinese diaspora throughout the world, serving as a virtual public square where people within the Chinese and Chinese-speaking communities can connect based on shared interests.  Plaintiffs and other WeChat users ~~use~~rely on the app to express themselves and

---

[51] *See, e.g.*, Samuel Gibbs, "WhatsApp hack: have I been affected and what should I do?" *The Guardian* (May 14, 2019), https://www.theguardian.com/technology/2019/may/14/whatsapp-hack-have-i-been-affected-and-what-should-i-do; Adam Clark Estes, "Google's Fixing the Hangouts Hack With 'Biggest Software Update Ever,'" *Gizmodo* (Aug. 5, 2015), https://gizmodo.com/googles-fixing-the-hangouts-hack-with-biggest-software-1722296396; Mike Isaac and Sheera Frenkel, "Facebook Security Breach Exposes Accounts of 50 Million Users," *N.Y. Times* (Sept. 28, 2018), https://www.nytimes.com/2018/09/28/technology/facebook-hack-data-breach.html; Shannon Liao, "Facebook Messenger had a vulnerability that could let hackers see who you contact," *The Verge* (Mar. 7, 2019), https://www.theverge.com/2019/3/7/18254788/facebook-messenger-vulnerability-attack-imperva-iframe-malicious; Maya Shwayder, "Vulnerability in Signal messaging app could let hackers track your location," *Digital Trends* (May 20, 2020), https://www.digitaltrends.com/news/signal-vulnerability-hack-location/; Brian Fung, "A Snapchat security breach affects 4.6 million users. Did Snapchat drag its feet on a fix?" *Wash. Post* (Jan. 1, 2014), https://www.washingtonpost.com/news/the-switch/wp/2014/01/01/a-snapchat-security-breach-affects-4-6-million-users-did-snapchat-drag-its-feet-on-a-fix/; Lee Bell, "Skype security flaw 'ignored' by Microsoft could allow hackers to gain access to users' computers," *ITPro* (Feb. 14, 2018), https://www.itpro.co.uk/security/30539/skype-security-flaw-ignored-by-microsoft-could-allow-hackers-to-gain-access-to-users; Lily Hay Newman, "Hackers Can Break Into an iPhone Just by Sending a Text," *Wired* (Aug. 7, 2019), https://www.wired.com/story/imessage-interactionless-hacks-google-project-zero/.

communicate by text, voice, and video messaging; attend religious services and cultural events; organize political groups and causes; and read and, share, and receive news and other information in the media, among other protected First Amendment activities. These actions can reasonably be understood to be included as "any transaction that is related to WeChat by any person, or with respect to any property," as provided in the Executive Order.

83.   Executive Order 13943 and the Identification effectively ban the use of WeChat in the United States. Banning the use of WeChat in the United States has the effect of foreclosinglimiting Plaintiffs' rights to send and receive information. Executive Order 13943 and the Identification foreclose all meaningful access to social media for users, such as Plaintiffs, who wish to communicate and interactassociate with members of the Chinese and Chinese-speaking communities.

84.98. The Executive Order discriminates against the ideas and viewpoints of WeChat users.  Under the Executive Order, only content on WeChat is prohibited; the content on other comparable mobile applications is not regulated or prohibited, despite also capturing personal and proprietary information from its users.  Therefore Indeed, the Executive Order targets speech by WeChat users, the majority of whom are members of the Chinese and Chinese-speaking communities, and intends to silence viewpoints within these communitiesis a prior restraint that suppresses Plaintiffs' constitutionally protected speech, associational, and religious activities before they occur.

85.   The Executive Order is overly expansive and does not justify the supposed risks that are presented by permitting WeChat to operate in the United States.  There are less restrictive ways to regulate the collection of personal and proprietary information on the WeChat app and address potential national security concerns.  Defendants cannot proffer a justifiable reason for discriminating against the content of WeChat users, who express viewpoints within the Chinese and Chinese-speaking communities.

86.   The Executive Order is substantially overbroad in that it renders people who conduct "any transaction that is related to WeChat" subject to incarceration and monetary

1   penalties, even though "any transaction" includes a wide range of protected expressive and

2   associative rights under the First Amendment.

3         87.   Plaintiff and others similarly situated have been and will continue to be

4   chilled and burdened in the exercise of their First Amendment rights because of the threat

5   of penalties, including incarceration and other treatment, under the Executive Order that

6   arises in connection with "any transaction that is related to WeChat."

7         99.   The Executive Order singles out WeChat users because of the content of

8   their speech and treats WeChat users' speech less favorably than that of users of other

9   social media platforms.  The Executive Order does so for the purpose of silencing the

10   viewpoints of WeChat's primarily Chinese and Chinese-American users and suppressing

11   viewpoints that Defendants believe are insufficiently critical of the Chinese government.

12   The suppression of Chinese "propaganda" is one of the animating purposes of the

13   Executive Order.

14         100.   The Executive Order is substantially overbroad on its face.  By prohibiting

15   "any transaction that is related to WeChat," the Executive Order prohibits substantially

16   more speech, association, and religious activity than the Constitution allows.  The

17   deleterious effects of the Executive Order's overbreadth are compounded by the fact that

18   violators may be punished with severe civil and criminal penalties, including incarceration,

19   under 50 U.S.C. § 1705.  Such severe penalties will lead (and already have led) to broad

20   self-censorship among WeChat users and Tencent's business partners in the United

21   States—including those whose speech, association, and religious activities on WeChat may

22   not be constitutionally prohibited.  Because of its substantial overbreadth, the Executive

23   Order is unconstitutional in every conceivable application.

24         101.   The transactions prohibited by the Identification are necessary for WeChat to

25   function in the United States.  Defendant Ross and at least one senior Trump

26   administration official have publicly admitted that implementing the prohibitions in the

27   Identification will result in WeChat being "shut down" and/or "dead" in the United States.

28   Implementing these prohibitions will effectively ban WeChat in the United States.

Eliminating the ability of WeChat to function in the United States will have the effect of foreclosing all meaningful access to social media for WeChat users such as Plaintiffs, who use WeChat to communicate and associate with members of the Chinese and Chinese-speaking communities.  Whether the ban results in an immediate cessation of all activity on WeChat or chills an increasing number of people from using the app (while subjecting them to additional risk), the effect will be to curtail speech, which the First Amendment does not permit.  Without question, disabling an essential mode of communication is a prior restraint, and so violates the Constitution.  Additionally, implementation of the Identification's prohibitions would decrease user privacy, over-block access to legal content, fuel Internet fragmentation, undermine Internet freedom, and interfere with or even end direct Internet traffic between the United States and China.

102.   The Identification singles out WeChat users because of the content of their speech and treats WeChat users' speech less favorably than that of users of other social media platforms.  The Identification does so for the purpose of silencing the viewpoints of WeChat's primarily Chinese and Chinese-American users and suppressing viewpoints that Defendants believe benefit the Chinese Communist Party.  The suppression of Chinese "propaganda" is one of the animating purposes of the Identification.  The government claims to be protecting its citizens and residents from material that is supportive of the PRC, based on the Secretary's concern that China could use WeChat to "subversively influence the views of millions of" U.S. users, in a manner that "align[s] with Chinese government objectives."  These justifications necessarily make the WeChat ban a content-based prohibition.

103.   The Identification is overbroad on its face.  By prohibiting transactions that are necessary for WeChat to function in the United States, the Identification suppresses substantially more speech than the Constitution allows.  The deleterious effects of the Identification's overbreadth are compounded by the fact that violators may be punished with severe civil and criminal penalties, including incarceration, under 50 U.S.C. § 1705.  Such severe penalties will lead third-party service providers targeted by the Identification

1   to cut off even more speech-enabling services to WeChat than the prohibitions may require

2   of them, so as to eliminate even the remote possibility of incurring the substantial civil and

3   criminal penalties authorized by Section 1705.  Because of its substantial overbreadth, the

4   Identification is unconstitutional in every conceivable application.

5   104.   Defendants lack a sufficient interest to justify either the Executive Order's or

6   the Identification's burden on constitutionally protected speech and associational and

7   religious activities.  Neither the Executive Order nor the Identification is narrowly tailored

8   to achieve the governments' purported interest in preventing WeChat from collecting and

9   sharing Plaintiffs' personal information.  And neither the Executive Order nor the

10  Identification leaves open ample alternative channels for the exercise of Plaintiffs'

11  protected First Amendment activities.

12  88.105.   Accordingly, the Executive Order violatesand Identification violate

13  Plaintiffs' rights as guaranteed byunder the First Amendment.  Defendants' violations and

14  inflict ongoing harm upon Plaintiffs.

15  **SECOND CLAIM FOR RELIEF**

16  **(First Amendment – Free Exercise Clause)**

17  106.   Plaintiffs reallege and hereby incorporate by reference the allegations

18  contained in the preceding paragraphs of this Complaint.

19  107.   The First Amendment's Free Exercise Clause provides that "Congress shall

20  make no law respecting an establishment of religion, or prohibiting the free exercise

21  thereof."

22  108.   WeChat users in the United States depend on WeChat to participate in

23  religious worship and other practices in accordance with the tenets and practices of their

24  religion.  Plaintiff Bao, for example, is a member of New Life Chinese Alliance Church in

25  New York.  Due to the ongoing COVID-19 pandemic, he and his fellow congregants do

26  not attend church or participate in other church activities in person.  Instead, he and his

27  fellow congregants rely on WeChat for religious activities—such as participating in Bible

28  Study groups.  Plaintiff Bao and his fellow congregants regularly participate in a Bible

1    Study group on WeChat.

2         109.   Executive Order 13943 and the Identification effectively ban WeChat in the

3    United States.  In doing so, the Executive Order and the Identification will prevent Plaintiff

4    Bao and his fellow congregants at the New Life Chinese Alliance Church from

5    participating in Bible Study groups and other religious activities.  Executive Order 13943

6    and the Identification place a substantial burden on Bao's exercise of religion.

7         110.   There is no rational connection between the government's avowed interest in

8    preventing WeChat from sharing U.S. users' private data and information with the Chinese

9    government and the means it has chosen to advance that interest.

10        111.   By banning WeChat and preventing users from patching security

11   vulnerabilities in the WeChat app without a rational basis for doing so, Defendants have

12   deprived and will continue to deprive Plaintiff Bao of his rights under the Free Exercise

13   Clause.

14                         **THIRD CLAIM FOR RELIEF**

15                    **(First and Fifth Amendments – Vagueness)**

16        112.   Plaintiffs reallege and hereby incorporate by reference the allegations

17   contained in the preceding paragraphs of this Complaint.

18        113.   Sections 1(a) and 2 of Executive Order 13943 alter the legal rights and

19   obligations of private parties, including Plaintiffs.  Section 1(a) prohibits "any transaction

20   that is related to WeChat by any person, or with respect to any property, subject to the

21   jurisdiction of the United States, with Tencent Holdings Ltd. (a.k.a. Téngxùn Kònggǔ

22   Yǒuxiàn Gōngsī), Shenzhen, China, Start Printed Page 48642or any subsidiary of that

23   entity, as identified by the Secretary of Commerce (Secretary) under section 1(c) of this

24   order."  Section 1(c) provides that "45 days after the date of this order, the Secretary shall

25   identify the transactions subject to subsection (a) of this section."  Violations of Sections

26   1(a) and 2 are punishable by incarceration and monetary penalties.  50 U.S.C. § 1705(b)-

27   (c).

28        114.   The Identification identifies certain transactions subject to section 1(a) of the

Executive Order, but it provides vague and inadequate notice of the conduct it purports to prohibit.  Although the Identification states that the prohibitions apply only "to the parties to business-to-business transactions," the Identification does not define "business-to-business transactions."  Nor does the Identification define the terms in prohibition number six (prohibiting "any utilization of the WeChat mobile application's constituent code, functions, or services in the functioning of software or services").  Plaintiff Chihuo, reasonably fears that any use of WeChat by the company may qualify as "any utilization of the WeChat mobile application's constituent code," and subject the company to the criminal and civil penalties authorized by 50 U.S.C. § 1705.

115.   The Identification further prohibits "Any other transaction that is related to WeChat by any person, or with respect to any property, subject to the jurisdiction of the United States, with Tencent Holdings Ltd., or any subsidiary of that entity, as may be identified at a future date under the authority delegated under Executive Order 13943."  No reasonable person could tell what conduct may be prohibited under this provision.  Because of this uncertainty, Plaintiff Chihuo reasonably fears that its continued use of WeChat may trigger the civil and criminal penalties authorized by 50 U.S.C. § 1705.

116.   The Executive Order and the Identification are therefore void for vagueness under the First and Fifth Amendments to the U.S. Constitution.

## FOURTH CLAIM FOR RELIEF

### (Fifth Amendment – Equal Protection)

~~89.~~117.      Plaintiffs reallege and hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

~~90.~~118.      The Due Process Clause of the Fifth Amendment prohibits the Federal Government from denying equal protection of the laws, including on the basis of race, ethnicity, nationality, national origin, and alienage.

~~91.~~119.      WeChat is widely used and depended on by the Chinese community in the United States to communicate with friends, family, customers, and other persons of Chinese or Chinese American ancestry, including Chinese-language speakers.

92.120.      Plaintiffs Peng, Duan, Zhang, and Bao are members of the Chinese community in the United States.  Plaintiff Brent Coulter uses WeChat to communicate with people of Chinese and/or Chinese-American ancestry in the United States and abroad. Plaintiffs USWUA and Chihuo are organizations or businesses whose members or customers primarily consist of people of Chinese and/or Chinese American ancestry in the United States, who use WeChat to communicate with others similar to them both in the United States and abroad.

121.   Defendants have not imposed comparable restrictions on software that collects similar personal and private data from users in the United States and shares that data with the Chinese government, but that is not owned and used primarily by persons of Chinese and Chinese-American descent.  Defendants have not, for example, proposed a comparable ban on Airbnb, despite their knowledge that Airbnb collects a wide range of private information from American users and shares that information with the Chinese government.[52]

93.122.      By prohibiting the use of WeChat but not other apps that are owned and used primarily by people who are not of Chinese or Chinese-American ancestry, Executive Order 13943 singlesand the Identification single out people of Chinese and Chinese-American ancestry and subjects them and peoplethose who wish to communicate and associate with them, and subject them to disparate treatment on the basis of race, ethnicity, nationality, national origin, and alienage.

94.123.      This disparate treatment is motivated by Defendants' animus towards people of Chinese and/or Chinese American ancestry, and has the purpose of discriminating against people of Chinese and/or Chinese-American ancestry.

95.124.      Defendants' issuance of Executive Order 13943 and the Identification therefore violates Plaintiffs' rights to equal protection guaranteed by the Fifth Amendment

---

[52] *See* Dustin Volz and Kirsten Grind, *Airbnb Executive Resigned Last Year Over Chinese Request for More Data Sharing*, WALL ST. JOURNAL (Nov. 20, 2020), https://www.wsj.com/articles/airbnb-executive-resigned-last-year-over-chinese-request-for-more-data-sharing-11605896753.

1    to the United States Constitution.  Defendants' violations inflict ongoing harm upon

2    Plaintiffs.

3                        **FIFTH  CLAIM FOR RELIEF**

4                        **(Fifth Amendments — Due Process)**

5        96.1.   Plaintiffs reallege and hereby incorporate by reference the allegations

6    contained in the preceding paragraphs of this Complaint.

7        97.    Sections 1(a) and 2 of Executive Order 13943 alter the legal rights and

8    obligations of private parties, including Plaintiffs, independent of any action by the

9    Secretary of Commerce.

10       98.    These sections include only a conclusory description of prohibited

11   "transactions related to WeChat," which provides no notice to WeChat users or anyone

12   else of the specific conduct that is prohibited.

13       99.1.   In spite of the Executive Order's vagueness, violations of Sections 1(a) and 2

14   are punishable by incarceration and monetary penalties.  50 U.S.C. § 1705(b)-(c).

15       100.   Plaintiffs, who use WeChat to communicate and share information with

16   friends, family, customers, and other persons both in the United States and abroad, do not

17   know which of their activities that involve WeChat are prohibited by the Executive Order.

18   Because of this uncertainty, they are justifiably fearful of using WeChat in any way and for

19   any purpose.

20       101.   Sections 1(a) and 2 of Executive Order 13943 provide inadequate notice of

21   the conduct they purport to penalize and are void for vagueness under the Fifth

22   Amendment to the U.S. Constitution.

23                        **FOURTH CLAIM FOR RELIEF**

24                        **(*Ultra Vires* (50 U.S.C. § 1702(b)))**

25       102.125.    Plaintiffs reallege and hereby incorporate by reference the allegations

26   contained in the preceding paragraphs of this Complaint.

27       103.126.    The IEEPA includes specific limits on Defendants' authority to

28   prohibit transactions related to WeChat.  Section 1702(b) of the IEEPA states in relevant

part that "[t]he authority granted to the President by [the IEEPA] does not include the authority to regulate or prohibit, directly or indirectly… (1) any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value; (2) donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering…[or]…; (3) the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials[.]…; [or] (4) any transactions ordinarily incident to travel to or from any country[.]"  50 U.S.C. § 1702(b)(1)-(34).

127.   Plaintiffs rely on WeChat for "personal communication[s]" that "do[] not involve a transfer of anything of value," within the meaning of 50 U.S.C. § 1702(b)(1).

128.   Plaintiffs rely on WeChat to donate as well as to coordinate and arrange for donations of "articles… intended to be used to relieve human suffering," within the meaning of 50 U.S.C. § 1702(b)(2).  Neither the President nor the Secretary has issued any findings that the coordination and donation of such articles would seriously impair the President's ability to deal with any national emergency, are in response to coercion against the proposed recipient or donor, or would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances.

129.   Plaintiffs rely on WeChat to import and/or export "information or information materials," within the meaning of 50 U.S.C. § 1702(b)(3).

130.   Plaintiffs rely on WeChat to complete "transactions ordinarily incident to travel to or from any country," within the meaning of 50 U.S.C. § 1702(b)(4).

104.131.   Neither the President nor any other federal official can take an action that exceeds the scope of their constitutional and/or statutory authority.  In Executive Order 13943, however, the President has nonetheless "prohibited" Plaintiffs from using WeChat in any manner, in direct contraventionthereby exceeding each of the four specific limits on Presidentialhis authority contained in 50 U.S.C. § 1702(b).

105.   The Secretary's Identification likewise seeks to effectuate an outright ban of the WeChat platform—.  Defendant Ross has admitted that the prohibitions in his Identification will  "shut down" WeChat in the United States once those prohibitions are implemented.  By shutting down WeChat in the United States, the Identification necessarily regulates or prohibits, directly curtailing "or indirectly, personal communications" in the manner explicitly prohibited by the IEEPA.

106.   Plaintiffs use WeChat for "personal communication[s]" that " that do[] not involve a transfer of anything of value," within the meaning of 50 U.S.C. § 1702(b)(1).

107.   Plaintiffs use WeChat to coordinate, the donation and arrange for coordination of donations of "articles … intended to be used to relieve human suffering," within the meaning of 50 U.S.C. § 1702(b)(2).

108.1. Plaintiffs use,  WeChat to import and/or export "information or information materials," within the meaning of 50 U.S.C. § 1702(b)(3).

109.132.       Defendants are acting *ultra vires* in prohibiting "personal communication[s]," that "do[] not involve a transfer of anything of value," as well as the coordination of donations of "articles … intended to be used to relieve human suffering" and the importation and/or exportation of "information or information materials." exportation of information or informational materials, and transactions ordinarily incident to travel to or from any country. By regulating or prohibiting these activities, directly or indirectly, the Identification exceeds each of the four specific limits on the Secretary's authority contained in 50 U.S.C. § 1702(b).

**FIFTH CLAIM FOR RELIEF**

**(*Ultra Vires* (50 U.S.C. §§ 1621-22, 1641, 1703))**

110.   Plaintiffs reallege and hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

111.   On information and belief, Defendants did not immediately transmit to Congress the President's declaration of a national emergency contained in Executive Order 13873, as required by 50 U.S.C. § 1621(a).

112.   On information and belief, neither house of Congress has met, at the required six month intervals or otherwise, to consider a vote on a joint resolution to determine whether that emergency shall be terminated, as required by 50 U.S.C. § 1622(b).

113.   On information and belief, the President has not transmitted to Congress any report on the total expenditures incurred by the United States government which are directly attributable to the exercise of powers and authorities conferred by the declaration of a national emergency in Executive Order 13873, as required by 50 U.S.C. § 1641(c).

114.   On information and belief, the President did not consult with Congress, on the threat posed by WeChat or otherwise, before issuing Executive Order 13943, as required by 50 U.S.C. § 1703(a).

115.   On information and belief, the President did not immediately transmit to the Congress a report specifying, among other information required in 50 U.S.C. § 1703(b), "the circumstances which necessitate such exercise of authority" and "the actions to be taken in the exercise of those authorities[.]"  Although the President did transmit a letter to the Speaker of the House of Representatives and the President of the Senate on the same day he issued Executive Order 13943, this letter merely repeats—often verbatim—the vague and conclusory language contained in the Executive Order.  This limited information does not provide the Congress with sufficient information to exercise the kind of ongoing oversight of the President required by both the IEEPA and the NEA.

116.   The President has acted *ultra vires* by exercising emergency powers purportedly authorized by the IEEPA without consulting with and reporting to Congress in the manner prescribed by 50 U.S.C. §§ 1621-22, 1641(c), and 1703.

## **SIXTH CLAIM FOR RELIEF**

### (*Ultra Vires* **(50 U.S.C. § 1701))**

117.1.  Plaintiffs reallege and hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

118.   50 U.S.C. § 1701 conditions the President's exercise of the emergency powers listed in Section 1702(a) on the President's declaration of a national emergency

1  ~~with respect to an "unusual and extraordinary threat, which has its source in whole or~~
2  ~~substantial part outside the United States[.]"  Section 1701 further requires that "[a]ny~~
3  ~~exercise" of the powers granted in Section 1702(a) "to deal with any new threat shall be~~
4  ~~based on a new declaration of national emergency which must be with respect to such~~
5  ~~threat."~~

6  ~~119.   Executive Order 13943 cites the President's declaration of a national~~
7  ~~emergency in Executive Order 13873 as the basis for his exercise of emergency powers~~
8  ~~purportedly granted by the IEEPA.  Executive Order 13873, which was issued more than~~
9  ~~14 months before Executive Order 13943, does not mention WeChat and does not identify~~
10  ~~the app as a potential threat to the national security of the United States.~~

11  ~~120.   The threat purportedly posed by WeChat constitutes a "new threat" within~~
12  ~~the meaning of 50 U.S.C. § 1701(b), and thus requires a new declaration of national~~
13  ~~emergency before the President exercises any presidential powers authorized by the~~
14  ~~IEEPA.  The President has not issued such a new declaration of a national emergency with~~
15  ~~respect to the threat posed by WeChat.~~

16  ~~121.   The President has acted *ultra vires* by exercising emergency powers~~
17  ~~purportedly authorized by IEEPA that depend on the President having declared a national~~
18  ~~emergency with respect to the threat posed by WeChat, in direct contravention of 50~~
19  ~~U.S.C. § 1701(b).~~

20  ~~**SEVENTH CLAIM FOR RELIEF**~~

21  **(Religious Freedom Restoration Act – 42 ~~USC §~~ U.S.C. § 2000bb(1)(a))**

22  ~~122.~~133.     Plaintiffs reallege and hereby incorporate by reference the allegations
23  contained in the preceding paragraphs of this Complaint.

24  ~~123.~~134.     In 1993, Congress enacted the Religious Freedom Restoration Act
25  ("RFRA), Pub. L. No. 103-31 (1993) (codified at 42 U.S.C. §§ 2000bb–2000bb-4).

26  ~~124.~~135.     RFRA prohibits the government from "substantially burden[ing] a
27  person's exercise of religion even if the burden results from a rule of general applicability"
28  unless the government can demonstrate that the application of the burden to the person

1   is:  (1) in furtherance of a compelling governmental interest; and (2) the least restrictive

2   means of furthering that compelling governmental interest.  42 U.S.C. § 2000bb-1.

3         125.136.      WeChat users in the United States usedepend on WeChat to

4   participate in the conduct of religious worship and other practices in accordance with the

5   tenets and practices of various religions.  WeChat users in the United States use WeChat to

6   organize and participate in religious activities with other members who similarly use

7   WeChat regularly in order to worship and/or practice their religionPlaintiff Bao, for

8   example, is a member of New Life Chinese Alliance Church in New York.  Due to the

9   ongoing COVID-19 pandemic, he and his fellow congregants do not attend church or

10  participate in other church activities in person.  Instead, he and his fellow congregants rely

11  on WeChat for religious activities —such as participating in Bible Study groups.  Plaintiff

12  Bao and his fellow congregants regularly participate in a Bible Study group on WeChat.

13        137.   The Executive Order will 13943 and the Identification effectively ban

14  WeChat in the United States.  As a result in, Plaintiff Bao and his fellow congregants at the

15  New Life Chinese Alliance Church will no longer be able to participate in religious

16  activities using WeChat.

17        138.   Executive Order 13943 and the Identification place a substantial burdens

18  upon the practiceburden on Bao's exercise of religion.  This burden is not justified by a

19  compelling governmental interest, and less restrictive alternatives exist for achieving the

20  government's avowed interests in protecting national security.  For example, the

21  government could impose a narrow prohibition on the use of WeChat users in the United

22  States by forcing them to abstain from participating in their practiceby employees of the

23  federal government and/or employees of the federal government's state, local, tribal, and

24  territorial partners.

25        126.139.     Because Executive Order 13943 and the Identification place a

26  substantial burden on Plaintiff Bao's exercise of religion with other WeChat users or risk

27  the threat of civil or criminal sanctions and violates RFRAand is neither justified by a

28  compelling governmental interest nor the least restrictive means of achieving the

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  government's avowed interest in protecting national security, the Executive Order and

2  Identification violate Plaintiff Bao's rights protected by the Religious Freedom Restoration

3  Act.

4  ## SEVENTH CLAIM FOR RELIEF

5  ### (~~Violation of the~~ Administrative Procedure Act – 5 U.S.C. § 706)

6  ~~127.~~140.     Plaintiffs hereby incorporate by reference the allegations contained in

7  the preceding paragraphs of this Complaint.

8  ~~128.~~141.     ~~The Secretary of Commerce published a document in the Federal~~

9  ~~Register on September 18, 2020 that identifies certain transactions related to WeChat" that~~

10  ~~are prohibited by EO 13943.~~   The Secretary's ~~action~~Identification constitutes "final

11  agency action" within the meaning of 5 U.S.C. § 704.

12  ~~129.~~142.     ~~.~~ Under the Secretary's ~~definitions, the~~Identification, Executive Order

13  13943 prohibits, *inter alia*, "Any provision of services to distribute or maintain the

14  WeChat mobile application, constituent code, or mobile application updates"; "Any

15  provision of internet hosting services enabling the functioning or hosting of the WeChat

16  mobile application"; and "Any utilization of the WeChat mobile application's constituent

17  code. functions, or services in the functioning of software or services developed and/or

18  accessible within . . . the United States and its territories."

19  ~~130.   On September 18, 2020, the Secretary admitted , on national television, that~~

20  ~~his definitions of EO 13943 will "for all practical purposes" result in WeChat being "shut~~

21  ~~down in the U.S." as soon as the President's prohibition takes effect on September 20.~~

22  143.   ~~The~~ In issuing the Identification, Defendant Ross failed to consider relevant

23  data relating to the likely technological effects of each of the prohibitions on the

24  functionality of WeChat in the United States or the ability of WeChat users to use the app

25  in the United States.  Defendant Ross and his staff did not articulate satisfactory

26  explanations that connect the facts relating to the likely technological effects of each of the

27  prohibitions to the conclusion recommending each prohibition.  The technological effects

28  of these prohibitions are important aspects of the problem the Identification was

purportedly intended to address.

144.   In issuing the Identification, Defendant Ross failed to consider a wealth of available evidence indicating that a prohibition on new downloads of the WeChat app would *exacerbate* rather than mitigate threats to the security of WeChat users' private data. Defendant Ross and his staff did not articulate satisfactory explanations that connect the facts relating to the risks associated with unpatched security vulnerabilities to the conclusion recommending the prohibition on app updates.  The risk of exacerbating cyber threats to the security of users' private data represents an important aspect of the issue the Identification was purportedly intended to address.

145.   In issuing the Identification, Defendant Ross failed to consider a wealth of available evidence demonstrating that WeChat users in the United States depend on WeChat to communicate and share information with family, friends, and professional, political, and religious contacts located both in the United States and abroad.  Defendant Ross and his staff did not articulate satisfactory explanations that connect the facts relating to the widespread use of WeChat users' dependence on the app to the conclusion recommending the wholesale ban of the app.  WeChat users' dependence on the app for personal communications and information represents an important aspect of the issue the Identification was purportedly intended to address.

146.   In issuing the Identification, Defendant Ross failed to consider whether Tencent's three separate mitigation proposals, either individually or in concert, would eliminate or mitigate the purported need for regulations of or prohibitions on transactions related to WeChat.

147.   On information and belief, the President and/or staff associated with the Executive Office of the President intervened in the Commerce Department's negotiations with Tencent in August and September 2020 for the purpose of preventing the parties to these negotiations from reaching an agreement that would eliminate or mitigate the purported need for regulations of or prohibitions on transactions related to WeChat.  The President and/or staff associated with the Executive Office of the President did so for

reasons unrelated to the purported security threat posed by WeChat, including but not limited to: (a) their disapproval of the content of communications and information shared on WeChat, and (b) their expectation that prohibiting transactions related to WeChat would benefit the President's reelection campaign by further encouraging animus among the American electorate towards people of Chinese or Chinese-American ancestry.

148.   Such reasons are not among the factors that Congress intended for executive-branch officials to consider when issuing regulations under the authority of the IEEPA. The President and/or staff associated with the Executive Office of the President communicated their reasons for disapproving Tencent's mitigation proposals to Defendant Ross and/or his subordinates, and Defendant Ross's consideration of these reasons played a substantial role in his decision to issue the Identification.

149.   In issuing the Identification, Defendant Ross failed to consider CISA's recommendation that Defendants issue a far narrower prohibition aimed at preventing the use of WeChat on the devices of State, Local, Tribal, and Territorial partners and critical infrastructure operators.

150.   In issuing the Identification, Defendant Ross has not adequately explained the rationales for the Identification's prohibitions, and has failed to consider regulatory alternatives.  Defendant Ross has also failed to consider the prohibitions' collateral effects, including how the prohibitions will reconfigure affected Internet infrastructure in ways that will decrease user privacy, over-block access to legal content, fuel Internet fragmentation, undermine Internet freedom, and interfere with or even end direct Internet traffic between the United States and China.

151.   The Identification is therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance of law, within the meaning of 5 U.S.C. § 706(2)(A).

131.152.     Furthermore, the Secretary's ~~definitions of the transactions prohibited by EO 13943~~Identification directly ~~contravene Section~~ contravenes 50 U.S.C. § 1702(b) by directly or indirectly regulating or prohibiting "personal communication[s~~],~~"]" that "do[] not involve a transfer of anything of value," as well as the donation and coordination of

1 donations of "articles… intended to be used to relieve human suffering~~" and,~~" the

2 importation and/or exportation of "information or information materials~~," and~~

3 ~~"transactions ordinarily incident to travel to or from any country~~."

4 ~~132.~~153.     The ~~definitions are~~Identification is therefore ~~arbitrary, capricious, an~~

5 ~~abuse of discretion, or otherwise not in accordance with law, and~~ in excess of statutory

6 jurisdiction, authority, or limitations, or short of statutory right, within the meaning of 5

7 U.S.C. § ~~706(2).~~ 706(2)(B), and arbitrary, capricious, an abuse of discretion, or otherwise

8 not in accordance with law, within the meaning of 5 U.S.C. § 706(2)(A).

9 ~~133.   Furthermore, the Identification was promulgated without notice and~~

10 ~~comment rulemaking as required by the APA. 5 U.S.C. § 553(b), (c).~~

11 ~~134.   The Identification is therefore in direct contravention of the APA and must~~

12 ~~be vacated.~~

13 **PRAYER FOR RELIEF**

14 WHEREFORE, Plaintiffs ~~and the Class~~ pray for relief and judgment as follows:

15 1.     Declaring that Executive Order 13943 ~~is~~and the Identification are

16 unconstitutional under the First Amendment;

17 2.     Declaring that Executive Order 13943 ~~is~~and the Identification are

18 unconstitutional under the Fifth Amendment;

19 3.     Declaring that Executive Order 13943 and the Identification do not comply

20 with the limitations on presidential power in the National Emergency Act and the

21 International ~~Economic~~ Emergency Economic Powers Act, and ~~is~~are thus *ultra vires*;

22 4.     Declaring that Executive Order 13943 ~~violates~~and the Identification violate

23 the Religious Freedom Restoration Act;

24 5.     Declaring that the ~~Secretary's September 18, 2020~~ Identification ~~of~~

25 ~~Prohibited Transactions violated~~violates the APA;

26 6.     Preliminarily and permanently enjoining Defendants from enforcing the

27 Executive Order and the Identification ~~to prohibit the use of WeChat in the United States~~

28 ~~by individual users, businesses and groups~~;

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

7.     Preliminarily and permanently staying the implementation date of any of the penalty provisions ~~of~~ applicable to the Executive Order and the Identification; and

/ / /

/ / /

/ / /

8.     Granting such other and further relief as this Court may deem just and proper, including an award to Plaintiffs of the costs of this suit and reasonable attorneys' fees and litigation expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

DATED:   ~~September 18~~December 7, 2020

Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By:  */s/ Michael W. Bien*
     Michael W. Bien

Attorneys for Plaintiffs U.S. WECHAT USERS ALLIANCE, CHIHUO INC., BRENT COULTER, FANGYI DUAN, JINNENG BAO, ELAINE PENG, and XIAO ZHANG