JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
JOHN V. COGHLAN
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Branch Director
DIANE KELLEHER
Assistant Branch Director
SERENA M. ORLOFF
MICHAEL DREZNER
STUART J. ROBINSON
AMY E. POWELL
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
Ben Franklin Station, P.O. Box No. 883
Washington, DC 20044
Phone: (202) 305-0167
Fax: (202) 616-8470
E-mail: serena.m.orloff@usdoj.gov
*Counsel for Defendants*

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| U.S. WECHAT USERS ALLIANCE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States, and WILBUR ROSS, Secretary of Commerce,<br><br>Defendants. | Case No. 3:20-cv-05910-LB<br><br>**DEFENDANTS' PARTIAL MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Judge:     Honorable Laurel Beeler<br>Hearing:  March 4, 2021<br>Place:     Zoom Webinar |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

NOTICE OF MOTION ................................................................................................ 1

STATEMENT OF THE ISSUES .............................................................................. 1

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 4

I.     Statutory Framework .................................................................................... 4

II.    Factual Background on the PRC, Tencent, and WeChat ............................ 4

      A.    National Security Threat from the PRC ......................................... 4

      B.    Tencent and WeChat ....................................................................... 6

III.   The Government's Response to These Growing Threats ............................ 7

IV.   This Case ....................................................................................................... 9

LEGAL STANDARD ............................................................................................... 11

DISCUSSION ............................................................................................................ 12

I.     The Claims Against the Executive Order Should Be Dismissed (Counts 1-6) Because the Court Lacks Jurisdiction to Grant Equitable Relief Against the President ................................ 12

II.    Plaintiffs Fail to State a Vagueness Claim (Count 3) ................................ 12

      A.    The Meaning of the Terms in the EO and Identification Are Clear, and Plaintiffs Themselves Use The Terms in Their Own Materials ....................................... 13

      B.    The Possibility of Future Action by the Secretary Is Not a Basis for a Vagueness Claim ....................................... 15

      C.    The Terms of the EO and the Identification Are Not Unconstitutionally Vague In Violation of the First Amendment ....................................... 16

III.   Plaintiffs Fail to State an Equal Protection Claim (Count 4) ..................... 17

IV.   Plaintiffs Fail to State a Free Exercise Claim (Count 2) ............................ 20

V.    Plaintiffs Fail to State a RFRA Claim (Count 6) ....................................... 22

CONCLUSION ........................................................................................................... 24

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

i

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Al Haramain Islamic Foundation, Inc. v. U.S. Dep't of Treasury*,
   686 F.3d 965 (9th Cir. 2012) ................................................................................. 4

4

5

*Aleman v. Glickman*,
   217 F.3d 1191 (9th Cir. 2000) ............................................................................. 19

6

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................... 11, 16

7

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................. 11

8

9

*Bishop Paiute Tribe v. Inyo Cty.*,
   863 F.3d 1144 (9th Cir. 2017) ............................................................................. 15

10

*Cal. Teachers Ass'n v. State Bd. of Educ.*,
   271 F.3d 1141 (9th Cir. 2001) ............................................................... 16, 17, 18

11

12

*Cassell v. Snyders*,
   458 F. Supp. 3d 981 (N.D. Ill. 2020) .................................................................. 24

13

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) ..................................................................................... 20, 21

14

*Coates v. City of Cincinnati*,
   402 U.S. 611 (1971) ............................................................................................. 13

15

16

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020) .................................................................................. 19, 20

17

18

*Edge v. City of Everett*,
   929 F.3d 657 (9th Cir. 2019) ........................................................................ 16, 17

19

*Emerg. Coal. To Defend Educ. Travel v. U.S. Dep't of Treasury*,
   498 F. Supp. 2d 150 (D.D.C. 2007),
   *aff'd*, 545 F.3d 4 (D.C. Cir. 2008) ....................................................................... 4

20

21

*Emp. Div., Dep't of Human Res. of Oregon v. Smith*,
   494 U.S. 872 (1990) .............................................................................. 20, 21, 22

22

*Fazaga v. Fed. Bureau of Investigation*,
   965 F.3d 1015 (9th Cir. 2020) ...................................................................... 23, 24

23

24

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012) ............................................................................................. 13

25

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ............................................................................................. 12

26

27

28

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

ii

*Gero v. United States Gov't*,
   No. 16-CV-04449-JSC, 2017 WL 550230 (N.D. Cal. Feb. 10, 2017) ................................. 12

*Guam v. Guerrero*,
   290 F.3d 1210 (9th Cir. 2002) ....................................................................................... 24

*Haig v. Agee*,
   453 U.S. 280 (1981)......................................................................................................... 18

*Hawaii v. Trump*,
   138 S. Ct. 2392 (2018).............................................................................................. 18, 19

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010)............................................................................................................. 13

*Hunt v. City of Los Angeles*,
   638 F.3d 703 (9th Cir. 2011) ......................................................................................... 14

*In re Digimarc Corp. Derivative Litig.*,
   549 F.3d 1223 (9th Cir. 2008) ....................................................................................... 11

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ....................................................................................... 11

*Johnson v. Riverside Healthcare Sys.*,
   534 F.3d 1116 (9th Cir. 2008) ....................................................................................... 12

*Kashem v. Barr*,
   941 F.3d 358 (9th Cir. 2019) ......................................................................................... 13

*Kissinger v. Bd. of Trs. of Ohio State Univ., Coll. of Veterinary, Med.*,
   5 F.3d 177 (6th Cir. 1993) ............................................................................................. 22

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
   511 U.S. 375 (1994)......................................................................................................... 11

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Forsgren*,
   309 F.3d 1181 (9th Cir. 2002) ....................................................................................... 15

*Leebaert v. Harrington*,
   332 F.3d 134 (2d Cir. 2003)........................................................................................... 22

*Los Coyotes Band of Cahuilla & Cupeno Indians v. Jewell*,
   729 F.3d 1025 (9th Cir. 2013) ....................................................................................... 18

*Lovitky v. Trump*,
   No. 19-1454, 2019 WL 3068344 (D.D.C. July 12, 2019)
   *aff'd in part, vacated in part on other grounds*, 949 F.3d 753 (D.C. Cir. 2020)................................. 12

*Lyng v. Northwest Indian Cemetery Protective Association*,
   485 U.S. 439 (1988)......................................................................................................... 21

*Mississippi v. Johnson*,
   71 U.S. 475 (1866).................................................................................................... 1, 2, 12

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

iii

1

*Navajo Nation v. U.S. Forest Serv.*,
   535 F.3d 1058 (9th Cir. 2008) ........................................................................................ 23, 25

2

3

*Newdow v. Roberts*,
   603 F.3d 1002 (D.C. Cir. 2010) ............................................................................................. 12

4

*Parents for Privacy v. Barr*,
   949 F.3d 1210 (9th Cir. 2020) ........................................................................................... 21, 22,

5

6

*Ramos v. Wolf*,
   975 F.3d 872 (9th Cir. 2020) ............................................................................................. 19, 20

7

*Regan v. Wald*,
   468 U.S. 222 (1984) ................................................................................................................. 4

8

9

*Safe Air for Everyone v. Meyer*,
   373 F.3d 1035 (9th Cir. 2004) ................................................................................................ 11

10

*Snoqualmie Indian Tribe v. F.E.R.C.*,
   545 F.3d 1207 (9th Cir. 2008) ................................................................................................ 24

11

*Swan v. Clinton*,
   100 F.3d 973 (D.C. Cir. 1996) ............................................................................................... 12

12

13

*Swartz v. KPMG LLP*,
   476 F.3d 756 (9th Cir. 2007) ................................................................................................. 11

14

*U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
   413 U.S. 548 (1973) ............................................................................................................... 13

15

16

*United States v. Amirnazmi*,
   645 F.3d 564 (3d Cir. 2011)................................................................................................... 16

17

*United States v. Bronstein*,
   849 F.3d 1101 (D.C. Cir. 2017) ............................................................................................. 14

18

19

*United States v. Hoffman*,
   436 F. Supp. 3d 1272 (D. Ariz. 2020) ................................................................................... 23

20

*United States v. Quinn*,
   401 F. Supp. 2d 80 (D.D.C. 2005) .................................................................................... 14, 15

21

*United States v. Szabo*,
   760 F.3d 997 (9th Cir. 2014) ................................................................................................. 13

22

23

*United States v. Williams*,
   553 U.S. 285 (2008) ............................................................................................................... 16

24

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ............................................................................................................... 18

25

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) ............................................................................................................... 16

26

27

*Wolfson v. Brammer*,
   616 F.3d 1045 (9th Cir. 2010) ............................................................................................... 15

28

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

iv

*Ziglar v. Abbasi*,
   137 S. Ct. 1843 (2017) .................................................................................. 3

**Statutes**

42 U.S.C. § 2000bb-1(b) ................................................................................ 24

National Emergencies Act,
   50 U.S.C. § 1601 *et seq.* ............................................................................ 4

International Emergency Economic Powers Act,
   50 U.S.C. § 1701 *et seq.* .................................................................... *passim*

S. McCain National Defense Authorization Act for Fiscal Year 2019,
   Pub. L. No. 115-232 §§ 1260(5), 1261, 132 Stat. 1636 (2018) ................... 7

**Regulations**

85 Fed. Reg. 13,719 (Mar. 10, 2020) ............................................................ 7

85 Fed. Reg. 29,321 (May 13, 2020) ............................................................. 8

**Executive & Administrative Materials**

Addressing the Threat Posed by WeChat, and Taking Additional Steps to Address the
National Emergency with Respect to the [ICTS] Supply Chain, Exec. Order No. 13,943,
85 Fed. Reg. 48,641 (Aug. 11, 2020) .................................................... *passim*

Blocking Property and Suspending Entry Into the United States of Persons Contributing to
   the Situation in Libya, Exec. Order No. 13726, 81 Fed. Reg. 23559 (Apr. 19, 2016) ........................ 13

Securing the Information and Communications Technology and Services Supply Chain,
   Exec. Order No. 13,873, 84 Fed. Reg. 22,689 (2019) ............................ 8

**Other Authorities**

*Business, Black's Law Dictionary* (11th ed. 2019) ....................................... 14

*Code, Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/code ................... 14

*Constituent*, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/
   constituent ................................................................................................. 14

*Utilize, Merriam-Webster Dictionary,* https://www.merriam-webster.com/dictionary/utilization .......... 14

WeChat, https://www.wechat.com/en/ (last visited Dec. 23, 2020) ........................ 9

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Motion to Dismiss Amended Complaint

v

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION**

Please take notice that on March 4, 2021, at 9:30 a.m., before the Honorable Laurel Beeler, via Zoom webinar at 450 Golden Gate Avenue, San Francisco, California, 94102, Defendants President Donald J. Trump and Secretary of Commerce Wilbur Ross will and hereby do move this Court for an order dismissing portions of Plaintiffs' Second Amended Complaint pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  This motion is based on this Notice, the accompanying Memorandum of Points and Authorities, the Court's files and records in this action, including the certified administrative record underlying the Secretary's action, and any other matter the Court may consider at oral argument or that may be judicially noticed.

**STATEMENT OF THE ISSUES**

Whether Plaintiffs' claims against the President should be dismissed for lack of jurisdiction under *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866).  Whether Plaintiffs' claims against the President and the Secretary in Counts 2, 3, 4, and 6 should be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

WeChat is a suite of social-media services and software operated by Tencent Holdings, Ltd. (Tencent) – a Chinese company headquartered in Shenzhen, China.  Tencent is widely known to assist the censorship and surveillance activities of the government of the People's Republic of China (PRC).  Plaintiffs are "U.S. WeChat Users Alliance" (a group formed in August 2020 claiming to act on behalf of some U.S. WeChat users), as well several individual users.  They bring this lawsuit, asking the Courts to overrule the national security and foreign affairs judgments of the President and the Secretary of Commerce, both of whom concluded that the WeChat mobile application poses unacceptable long term national security risks to the United States.  Defendants formed that conclusion based on WeChat's bulk collection of user data and extensive documentation regarding Tencent's susceptibility to the control and influence of the Chinese Communist Party (CCP) and the PRC.  The President issued an Executive Order directing the Secretary to respond to these threats under the broad authority set forth in the International

*U.S. WeChat Users Alliance, et al. v. Trump, et al*., Case No. 3:20-cv-05910-LB
Defendants' Partial Motion to Dismiss Second Amended Complaint

Page 1

Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 *et seq.* And the Secretary, after consultation with the U.S. Intelligence Community and the Department of Homeland Security (DHS), identified for prohibition six categories of technological services that facilitate (or could in the future facilitate), WeChat's mobile operations in the United States and thus exacerbate the national security threat these operations pose. Specifically, the Secretary restricted U.S. app stores from continuing to offer the WeChat mobile application and accompanying software updates for download by U.S. users; the provision of U.S.-based internet hosting services to the WeChat mobile application; the provision of certain internet transmission and cloud storage services to optimize the speed and functionality of the WeChat mobile application in the United States; the provision of financial services to support WeChat's mobile payment functionalities; and use of the WeChat mobile application's constituent code or functions in other software within the United States. Importantly, these restrictions regulate only the WeChat mobile application and services that support it; they have nothing to do with user activity on the platform. Indeed, the restrictions do not apply at all to WeChat interfaces that are not mobile and thus collect substantially less data than the mobile application, such as WeChat services accessible through an internet browser or WeChat software available for Windows and Mac.

Plaintiffs—who have already downloaded the WeChat mobile application and whose continued use of the app is not prohibited by these restrictions—brought this case seeking to invalidate the Executive Order, claiming violations of their freedom of expression, their free exercise of religion, the Equal Protection Clause, the Due Process Clause, IEEPA, and RFRA. They have twice amended their Complaint to add various claims against the Secretary's identification of prohibited transactions (Identification), including a claim under the Administrative Procedure Act ("APA"), and have obtained a preliminary injunction based on their freedom of expression claims. Defendants move to dismiss certain claims in Plaintiffs' Second Amended Complaint, for the reasons set out below.

First, the Court lacks jurisdiction over those claims in the Amended Complaint (including portions of Counts 1-6) that challenge the President's Executive Order delegating his IEEPA authority to the Secretary to address the threat posed by WeChat, rather than the Secretary's Identification pursuant to that delegation. Courts have "no jurisdiction . . . to enjoin the President in the performance of his official

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Partial Motion to Dismiss Second Amended Complaint

Page 2

1    duties" at all, *Johnson*, 71 U.S. at 501, let alone in the national security context, *see, e.g.*, *Ziglar v. Abbasi*,

2    137 S. Ct. 1843, 1861 (2017) ("National-security policy is the prerogative of the Congress and

3    President."). This principle requires dismissal of all claims asserted solely against the President and the

4    Executive Order.

5            Counts 2, 3, 4, and 6 as to all Defendants should separately be dismissed because they are otherwise

6    not justiciable, fail to state a plausible legal theory under Rule 12(b)(6), or both. Plaintiffs fail to raise a

7    claim regarding the free exercise of religion or Equal Protection (Counts 2 and 4) because the President's

8    concerns about espionage by the PRC have nothing to do with the nationality, alienage or religion of

9    WeChat's users. Moreover, Plaintiffs' vagueness challenge (Count 3) fails because Plaintiffs could not

10   reasonably fear prosecution under the Executive Order, and because the Order and Identification are not

11   vague. The RFRA claim (Count 6) likewise must be dismissed because Plaintiffs have not plausibly

12   alleged that the Executive Order's delegation of authority to the Secretary, or even the Secretary's exercise

13   of that authority, substantially burdens their religious rights.

14           Defendants maintain that the other claims are subject to dismissal as well, but intend to brief those

15   claims at a later date. Appellate briefing relating to the First Amendment and IEEPA claims is currently

16   pending before the Ninth Circuit in the Government's appeal of the preliminary injunction. Although the

17   Government believes those claims (Counts 1 and 5) lack merit and should be dismissed substantially for

18   the reasons stated in the briefing on the preliminary injunction, the resources of the parties and the Court

19   are best served by briefing dispositive motions after resolution of the appeal. Resolution of the issues

20   before the Ninth Circuit is likely to clarify the proper standard. Moreover, counsel for the parties have

21   had substantial correspondence about the contents of the administrative record, which Defendants have

22   agreed to supplement, and those discussions are ongoing. Because the merits of the APA claim depend

23   on the adequacy of the Government's reasons for its actions as set forth in the administrative record, at

24   this point, the merits of all of the remaining constitutional and statutory claims (Counts 1, 5, and 7) will

25   therefore be most appropriately briefed in a future motion for summary judgment.

26

27

28

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Partial Motion to Dismiss Second Amended Complaint

Page 3

# BACKGROUND

## I.    Statutory Framework

The National Emergencies Act (NEA), 50 U.S.C. § 1601 *et seq.*, and IEEPA, 50 U.S.C. § 1701 *et seq.*, authorize the President to declare a national emergency and provide extensive authorities to address such an emergency.   Specifically, IEEPA empowers the President "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States[.]"  50 U.S.C. § 1701(a).   Under that statute, the President may "regulate, direct and compel, nullify, void, prevent or prohibit, any . . . transactions involving[] any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States[.]"  *Id.* § 1702(a)(1)(B).   When the Executive Branch invokes this authority, its actions are entitled to "unique deference," *Al Haramain Islamic Foundation, Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 980 (9th Cir. 2012), because they "relate to the exercise of the Executive's authority in the realm of foreign affairs." *Emerg. Coal. To Defend Educ. Travel v. U.S. Dep't of Treasury*, 498 F. Supp. 2d 150, 166 n.10 (D.D.C. 2007), *aff'd*, 545 F.3d 4 (D.C. Cir. 2008); *see also Regan v. Wald*, 468 U.S. 222, 242 (1984) ("Matters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" (citation omitted)).   Section 1702(b) contains several exceptions to this broad authority, not relevant to the claims at issue in this partial motion to dismiss.

## II.    Factual Background on the PRC, Tencent, and WeChat

### A.  National Security Threat from the PRC

The communist government of the PRC is a significant and growing national security threat. According to the U.S. Intelligence Community, "China presents a persistent cyber espionage threat and a growing attack threat to our core military and critical infrastructure systems."  AR-119.   In particular, "China remains the most active strategic competitor responsible for cyber espionage against the US Government, corporations, and allies," and "Chinese intelligence and security services [may] use Chinese information technology firms as routine and systemic espionage platforms against the United States and

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Partial Motion to Dismiss Second Amended Complaint

Page 4

allies." *Id.*  The Director of the FBI has said that this "counterintelligence and economic espionage threat from China" is "[t]he greatest long-term threat to our nation's information and intellectual property, and to our economic vitality[.]"  AR-103.

One of the tools that the PRC uses to further its espionage activities is bulk data collection.  *See* AR-23-25.[1]  Several large-scale hacking operations to obtain the bulk personal information of Americans have been linked to China, including the hacking of Anthem, Inc. in 2015, the hacking of Equifax Inc. in 2017, and the Office of Personnel Management data breach in 2017, which collectively resulted in the theft of sensitive personal data of more than 200 million Americans.  AR-24-25.  These large data sets "can reveal patterns and trends in human behavior, providing a 'pattern of life' that can be used to facilitate intelligence and surveillance targeting, particularly when aggregated with other data sets."  *Id.*  And the PRC is "building massive databases of Americans' personal information," as part of a "tactic [used by the Chinese government] to further its intelligence-gathering and to understand more about who to target for espionage[.]"  *Id.*; *see also* AR-23-24 ("The PRC government has engaged in data collection on a massive scale across multiple domains as a means of generating information to enhance state security—and the political security of the CCP.").  The data collected and used by the PRC for these ends "comes in many forms, including text, images, video, and audio."  AR-24.  "Once harvested, the data can be used to glean details about key government personnel and potential spy recruits, or to gain information useful for intelligence targeting and surveillance."  *Id.*

The PRC has also increasingly pursued its goals through nontraditional forms of intelligence activities, including through the purportedly private business activities of Chinese companies.  Such companies, though nominally private, are in fact instrumentalities of the Chinese state, which exercises "authority and supervision" over them through a number of mechanisms, including requirements that they perform party-building activities for, and host Party Committees of, the CCP.  *See* AR-25 ("Within private enterprises, the Party Committee implements CCP's policies" and is a pervasive "source of political pressure in the boardroom").  Technology companies in particular are increasingly organizing their

---

[1] Cites to the Decision Memorandum in this brief are cites to the publicly available, redacted version in the administrative record at AR-20-36.  The corresponding pages of the unredacted version are stamped AR 3-19.

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Partial Motion to Dismiss Second Amended Complaint

Page 5

business activities around the demands of the state, providing the PRC government with "access to online data" and "the cloud computing prowess to . . . crunch data from surveillance cameras, smartphones, government databases and other sources."  AR-937.  Such assistance enables PRC initiatives that human rights researchers characterize as a "massive surveillance project."  AR-939.

To ensure cooperation with these efforts, the PRC government has enacted laws that aggressively increase its influence "over all Chinese companies, and citizens," even those outside of China.  AR-26.  For example, in 2017, the PRC enacted the National Intelligence Law, which "obliges individuals, organizations, and institutions to assist Public Security and State Security officials in carrying out a wide array of intelligence work."  *Id*.  The law expressly "permits Chinese intelligence institutions to request citizens and organizations to provide necessary support, assistance, and cooperation[,]" as well as "take control of an organization's facilities, which includes communications equipment."  *Id*.  Without an independent judiciary, there is no meaningful legal recourse for companies to challenge orders or requests for such assistance from PRC intelligence or security agencies.  *Id*.

**B. Tencent and WeChat**

WeChat is wholly owned by Tencent, a multinational conglomerate headquartered in China.  Tencent's major services include communications and social networking, online PC and mobile games, digital content and utilities, artificial intelligence (AI), cloud services, and financial technology.  AR-21.  Tencent's CEO is a member of the CCP and openly collaborates with the government of the PRC.  AR-27.  Tencent established a CCP party organization as early as 2005, and has since led the way in CCP "party building" among Internet companies.  Tencent was one of the first Chinese tech firms to publicly disclose the existence of a Party Committee, and by 2017, its Party Committee was nationally recognized, comprising nine general branches, 89 party branches and 3,386 members.  AR-25.  Tencent also maintains a party propaganda magazine and public social media presence for party building.  AR-25-26.  In 2017, Tencent was named one of a handful of members of the PRC government's AI "national team" and has focused on developing a host of AI-empowered applications as well as providing cloud-computing services to different levels of the PRC government.  AR-21.

Tencent's WeChat app, launched in 2011, is one of China's most popular social media apps.  It is also used by an estimated 100-200 million people outside of China, including 19 million daily users in the United States.  AR-22.  The WeChat app collects a wide range of sensitive personal information, including phone numbers, names, internet protocol (IP) addresses, contact lists, geolocation data, Wi-Fi access points, internet or network activity information, device model, network type, call history, chat data, search history, biometric information, payment card information, nationality and gender.  AR-28.  Much of this information is collected directly from the user and stored in data centers in China and Canada, and it may be shared with a range of third parties, including "'regulatory and judicial authorities and law enforcement agencies.'"  AR-28-29.  Tencent is widely reported to assist the government of the PRC in surveillance activities through the WeChat app.  *See* AR 25-28; *see also* Am. Compl. ¶ 5, ECF Nos. 49-50 (there is "widespread knowledge" that the "Chinese government[] monitor[s] WeChat communications").  For example, WeChat users in China have been jailed for speech communicated through WeChat, and Tencent has reportedly worked with police to close accounts of those accused by the PRC government of "disrupting social order" through their WeChat communications.  A report by an independent think tank in 2020, as well as experience of U.S. users, reveals that WeChat communications among non-China-registered accounts also are subject to pervasive, secretive content surveillance.  AR-27-28.

### III.    The Government's Response to These Growing Threats

Congress has directed the Executive Branch to investigate and respond to the growing threat from the PRC.  *See* S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232 §§ 1260(5), 1261, 132 Stat. 1636 (2018) (directing the President to assess and formulate strategies to address, *inter alia*, the CCP's "information operations" and "use of economic tools" to advance its security and military objectives).  The Executive Branch has done so through a holistic, multi-pronged effort that includes leveraging the President's authority under IEEPA to protect the information and communications technology and services sectors.[2]  As relevant here, on May 15, 2019, the President declared a national

---

[2] Other measures to address threats posed by the PRC include trade initiatives, *see* Cong. Research Serv., Rep't No. R45898, *U.S.-China Relations*, at 12-14, 19-26 (Sept. 3, 2019); law enforcement initiatives against espionage, AR-24-25; AR-967-71; limitations on certain Chinese telecommunications firms seeking to supply 5G infrastructure and other products and services, *see* Pub. L. No. 115-232 § 889; and

emergency under the NEA and IEEPA, finding that "foreign adversaries are increasingly creating and exploiting vulnerabilities in information and communications technology and services, which store and communicate vast amounts of sensitive information, facilitate the digital economy, and support critical infrastructure and vital emergency services, in order to commit malicious cyber-enabled actions." Securing the Information and Communications Technology and Services Supply Chain, Exec. Order No. 13,873, 84 Fed. Reg. 22,689 (2019) ("ICTS Order"), pmbl.  In the ICTS Order, the President found that "the unrestricted acquisition or use in the United States of information and communications technology or services designed, developed, manufactured, or supplied by persons owned by, controlled by, or subject to the jurisdiction or direction of foreign adversaries augments" those risks.  *Id.*  The President has since renewed this national-emergency declaration.  *See* 85 Fed. Reg. 29,321 (May 13, 2020).

On August 6, 2020, the President issued the Executive Order at issue here concerning WeChat. *See* Addressing the Threat Posed by WeChat, and Taking Additional Steps to Address the National Emergency with Respect to the [ICTS] Supply Chain, Exec. Order No. 13,943, 85 Fed. Reg. 48,641 (Aug. 11, 2020) (WeChat Order or Executive Order).  The President found that "additional steps must be taken to deal with the national emergency" declared in the ICTS Order, as "the spread in the United States of mobile applications developed and owned by companies in [the PRC] continues to threaten the national security, foreign policy, and economy of the United States."  *Id.*, pmbl.  In particular, the President determined that WeChat "automatically captures vast swaths of information from its users." *Id.*  The President further found that WeChat's "data collection threatens to allow the [CCP] access to Americans' personal and proprietary information."  *Id.*  Based on these considerations and "in order to protect our national security," the President directed the Secretary of Commerce to prescribe a set of prohibited WeChat-related transactions within 45 days to mitigate the threat.  *Id.* §§ 1, 4.

The Secretary did so, and on September 18, 2020, he published a list of six categories of prohibited transactions relating to the WeChat mobile app.  *See* Dep't of Commerce, *Identification of Prohibited Transactions to Implement Exec. Order No. 13,943* (*Commerce Identification*), AR-1674-80.  The

---

deploying the multi-agency Committee on Foreign Investment in the United States to assess the national security risks arising from Chinese acquisitions in the United States, *see, e.g.*, 85 Fed. Reg. 13,719 (Mar. 10, 2020).

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Partial Motion to Dismiss Second Amended Complaint

Secretary prohibited online mobile app stores from providing "services to distribute or maintain the WeChat mobile application" and WeChat mobile application updates, effectively preventing most new U.S. users from downloading the app and most existing U.S. users from receiving software updates to the app. *Commerce Identification* ¶ 1, AR-1678. The Secretary also prohibited the provision of U.S.-based internet hosting services, content delivery services, and directly contracted internet transit or peering services that "enabl[e] the functioning or optimization of the WeChat mobile application," as well as use of the WeChat mobile application's constituent code, functions, or services in other software or services within the United States. *See Commerce Identification* ¶¶ 2-6, AR-1678-79.

The Commerce Department prepared a decision memorandum in connection with the Secretary's Identification (Decision Memorandum), AR-20-36, which outlined the bases for the identified prohibitions and explained that over time, their effect would likely be to "reduce the functionality of the WeChat mobile app within . . . the United States." AR-34. However, both the Identification and the Decision Memorandum made clear that existing users were not the target of these prohibitions. *See Commerce Identification* at 6 ("These identified prohibitions do not apply to . . . [t]he exchange between or among WeChat mobile application users of personal or business information using the WeChat mobile application[.]"), AR-1679; *see also* Decision Mem. at 15-16, AR-33-34 ("the app would remain on any device where the app has been downloaded prior to the [effective date of the prohibitions]"). Moreover, while the restrictions apply to services supporting the WeChat mobile app, they do not apply to other WeChat interfaces, such as the WeChat website accessible through an internet browser or versions of the WeChat software available for Windows and Mac.[3]

**IV.   This Case**

Plaintiffs filed this case on August 21, 2020, seeking to invalidate the Executive Order. Compl. for Decl. & Inj. Relief, ECF No. 1. Plaintiffs moved for a preliminary injunction on August 28, 2020, Notice of Mot. & Mot. for Prelim. Inj.; Mem. of P. & A., ECF No. 17, and for expedited discovery on

---

[3]  *Compare* WeChat, https://www.wechat.com/en/ (last visited Dec. 23, 2020) (offering a mobile app, software for Windows and Mac, and a "Web WeChat") *with Commerce Identification* at 5-6, AR-1678-79 (prohibitions 1-6 applying only to the "WeChat mobile application") *and* WeChat Order pmbl. (addressing the WeChat "mobile application").

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Partial Motion to Dismiss Second Amended Complaint

Page 9

September 3, 2020, Joint Disc. Letter Brief, ECF No. 18.  The Court denied the discovery request on September 10, 2020, holding that the "interplay between the Executive Order and final agency action . . . militate[d]" against it.  Disc. Order at 4, ECF No. 25.

On September 18, 2020, the Secretary issued his Identification, leading Plaintiffs to amend their Complaint to add claims challenging the Secretary's Identification, Am. Compl., ECF Nos. 49-50.[4] Plaintiffs simultaneously renewed their motion for a preliminary injunction, Pls.' Renewed Mot. for Prelim. Inj., ECF No. 48, which the Court granted the next day on First Amendment grounds only.  *See* Order Granting Mot. for Prelim. Inj. (Prelim. Inj. Order) at 19, ECF No. 59 (concluding that Plaintiffs had not established, or the record did not support, that Plaintiffs would likely succeed on the merits on their other theories).  The Court's injunction operates solely against the Secretary's Identification of six prohibited transactions, not the President's Executive Order.  *See id.* at 20 ("Nothing in this order prevents the Secretary from . . . identifying [for prohibition] 'any other transaction that is related to WeChat . . . under the authority delegated under Executive Order 13943.'").  The Court subsequently declined to stay its injunction pending Defendants' appeal of that order to the Court of Appeals for the Ninth Circuit.  *See* Order Denying Mot. to Stay, ECF Nos. 104-05; *see also* Notice of Appeal, ECF No. 79.[5]

On November 2, 2020, Defendants produced to Plaintiffs' counsel the unclassified and unprivileged materials comprising the administrative record for the Secretary's Identification, and produced the same materials to the Court at its request.  *See* ECF Nos. 101, 122.  Defendants have also lodged a copy of the classified portions of the administrative record with the Court, which included an assessment provided to the Secretary from the Office of the Director of National Intelligence.  *See* ECF

---

[4]  The First Amended Complaint contends that the Executive Order is facially invalid under the First Amendment; violates the Equal Protection and the Due Process Clauses of the Fifth Amendment; is *ultra vires* under 50 U.S.C. §§ 1701, 1702(b), and 1703; and violates RFRA.  *See* Am. Compl. ¶¶ 78-124.  It also claims that the Secretary's Identification is *ultra vires* under 50 U.S.C. § 1702(b) and violates the APA because the Secretary did not undertake notice-and-comment prior to its issuance.  *See id.* ¶¶ 100-07; ¶¶ 125-32.

[5]  The Ninth Circuit expedited the appeal but also declined to stay the preliminary injunction during the pendency of the appeal.  *See* Order, ECF No. 106.  The appeal is set to be heard by the Ninth Circuit in January 2021.  *See id.* at 2.  In addition to the First Amendment issues raised by the Court's preliminary injunction, the Ninth Circuit asked for supplemental briefing on plaintiffs' claim that the President and Secretary exceeded their statutory authority under IEEPA.

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Partial Motion to Dismiss Second Amended Complaint

Page 10

No. 71.[6]  After Defendants moved to dismiss the Amended Complaint, ECF No. 130, Plaintiffs filed a Second Amended Complaint ("SAC"), raising claims against the President and the Secretary, arguing that the Executive Order and the Identification interfere with freedom of speech and association and the free exercise of religion, are unconstitutionally vague, violate equal protection, are *ultra vires*, and violate RFRA; and that the Identification is arbitrary and capricious in violation of the APA.  Second Am. Compl. for Decl. & Inj. Relief ("SAC"), ECF No. 136.

**LEGAL STANDARD**

A Rule 12(b)(1) motion challenges the federal court's jurisdiction over the subject matter of the complaint.  The party invoking the court's jurisdiction bears the burden of establishing that the court has the requisite subject matter jurisdiction to grant the relief requested as to each claim asserted.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  A Rule 12(b)(1) motion will be granted when, looking at the entirety of the complaint, its allegations fail to establish jurisdiction either facially or factually.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  While in a facial challenge, all material allegations are taken as true, the court does not assume the truthfulness of the allegations in a factual challenge and may review evidence beyond the complaint without converting the motion into one for summary judgment.  *In re Digimarc Corp. Derivative Litig.*, 549 F.3d 1223, 1235-36 (9th Cir. 2008).

To survive a Rule 12(b)(6) motion, the plaintiff's complaint must allege "enough facts to state a claim that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The "facial plausibility" standard requires the plaintiff to allege facts that, based on "judicial experience and common sense," add up to "more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).  To decide the motion without converting it into one for summary judgment, a court generally will consider only the complaint and information incorporated by reference therein, *see Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007), and it should accept as true all well-pleaded

---

[6] Counsel for the parties have engaged in substantial discussions regarding the content of the administrative record, and Defendants have provided some additional information to Plaintiffs. Accordingly, if appropriate, Defendants may file an amended or supplemental certification of the record when those discussions conclude, and will file those portions of the record cited by either party with Defendants' reply.

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Partial Motion to Dismiss Second Amended Complaint

facts but not "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted). The Court may also consider matters properly subject to judicial notice, including the contents of a certified administrative record. *See, e.g., Gero v. United States Gov't*, No. 16-CV-04449-JSC, 2017 WL 550230, at *1 n.1 (N.D. Cal. Feb. 10, 2017). "Dismissal may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1121 (9th Cir. 2008) (quotation marks and citations omitted).

## DISCUSSION

### I. The Claims Against the Executive Order Should Be Dismissed (Counts 1-6) Because the Court Lacks Jurisdiction to Grant Equitable Relief Against the President

Several of Plaintiffs' claims (counts 1-6) seek, *inter alia*, relief directly against the Executive Order and, by extension, the President. These claims must be dismissed because courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties[.]" *Johnson*, 71 U.S. at 501; *see also Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) ("injunctive relief against the President himself is extraordinary" and should "raise[] judicial eyebrows"). Nor do courts possess jurisdiction to grant declaratory or other forms of equitable relief against the President. *See, e.g., Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("courts do not have jurisdiction to enjoin [the President], and have never submitted the President to declaratory relief" (citations omitted)); *Swan v. Clinton*, 100 F.3d 973, 977-78 (D.C. Cir. 1996) (similar); *Lovitky v. Trump*, No. 19-1454, 2019 WL 3068344, at *10 (D.D.C. July 12, 2019) (courts "should not grant mandamus, injunctive, or declaratory relief against a sitting President"), *aff'd in part, vacated in part on other grounds*, 949 F.3d 753 (D.C. Cir. 2020). The Court thus lacks jurisdiction over the equitable relief that Plaintiffs seek with respect to the President and his Executive Order. Those claims asserted against the Executive Order and the President himself (portions of counts 1-6) should be dismissed from this lawsuit.

### II. Plaintiffs Fail to State a Vagueness Claim (Count 3)

Plaintiffs contend that the WeChat Order and Identification are unconstitutionally vague because certain terms in the Identification are undefined, and given this alleged ambiguity Plaintiff Chihuo Inc.

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Partial Motion to Dismiss Second Amended Complaint

Page 12

fears that it may be subject to civil and criminal penalties.  SAC ¶¶ 114-15.  This claim likewise fails as a matter of law.

"A statute or regulation is impermissibly vague under the Due Process Clause of the Fifth Amendment if it 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'"  *United States v. Szabo*, 760 F.3d 997, 1003 (9th Cir. 2014) (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010)); *see also Kashem v. Barr*, 941 F.3d 358, 371 (9th Cir. 2019) ("Whether a provision is vague for lack of fair notice is an objective inquiry.").  Where "[t]he general class of offenses to which . . . the provisions are directed is plainly within their terms, . . . they will not be struck down as vague, even though marginal cases could be put where doubts might arise."  *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 579 (1973) (cleaned up).

## A.     The Meaning of the Terms in the EO and Identification Are Clear, and Plaintiffs Themselves Use The Terms in Their Own Materials

At the preliminary injunction phase, this Court concluded that Plaintiffs had not shown a likelihood of success on this claim because the Secretary had defined prohibited transactions "understandably," and because any claim predicated on the Secretary's ability to identify future prohibited transactions "is not ripe."  Prelim. Inj. Order, at 19, ECF No. 59.  That conclusion was correct.  Plaintiffs need not "guess at [the] meaning" of the Executive Order, *see FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012), because, under its express terms, "the Secretary shall identify"—and in fact has identified—"the [prohibited] transactions."  WeChat Order § 1(c); *see also id.* § 1(a) (explaining that the Order is not self-executing, but rather prohibits only those transactions that are "identified by the [Secretary] under section 1(c) of this order").[7]  As this Court has recognized, rather than specifying "no standard of conduct . . . at all[,]" *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971), "[t]he Secretary identified prohibited

---

[7] This framework is not unique; IEEPA orders commonly identify broad subject matter of concern while delegating the details of implementation and enforcement to one or more administrative agencies.  *See, e.g.*, Blocking Property and Suspending Entry Into the United States of Persons Contributing to the Situation in Libya, Exec. Order No. 13726, 81 Fed. Reg. 23559 § 1(a)(i) (Apr. 19, 2016) (charging the Secretary of the Treasury with determining which persons are "responsible for . . . actions or policies that threaten the peace, security, or stability of Libya"); *id.* § 8 (delegating further functions).

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Partial Motion to Dismiss Second Amended Complaint

Page 13

transactions understandably[.]" Prelim. Inj. Order at 19.[8]

Plaintiffs' arguments to the contrary are without merit.  First, they complain that "the Identification does not define the phrase "business-to-business transactions."  SAC ¶ 114.  But the Identification defines "transaction."  AR-1677 ("*Transaction* means any acquisition, importation, transfer, installation, dealing in, or use of any information and communications technology or service.").  And the word "business" "receive[s] [its] 'plain, obvious and common sense' meaning," *United States v. Bronstein*, 849 F.3d 1101, 1108 (D.C. Cir. 2017), that is, "[a] commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain." *Black's Law Dictionary* (11th ed. 2019).  And given that Plaintiff Chihuo is a corporation registered in both California and Delaware that provides services to customers and "employs or contracts with approximately thirty people as part of its *business*," SAC ¶¶ 24-25 (emphasis added), Chihuo's claim that it cannot understand the meaning of the phrase "business-to-business transaction," *id.* ¶ 114, strains credulity.  *See United States v. Quinn*, 401 F. Supp. 2d at 100 (D.D.C. 2005) ("[T]o persons whose jobs involved international trade, the[] words [transship and reexport]—especially in the context of the statutes and regulations in which they are used—have fairly obvious meaning.").

Nor are the Executive Order and Identification unconstitutionally vague because the latter prohibits "[a]ny utilization of the WeChat mobile application's constituent code, functions, or services in the functioning of software or services developed and/or accessible within the land and maritime borders of the United States and its territories."  AR-1679.  Again, the terms Plaintiff Chihuo supposedly cannot understand, SAC ¶ 114, are given their ordinary meanings, *see Merriam-Webster Dictionary,* https://www.merriam-webster.com/dictionary/utilization (defining "utilize" as "to make use of: turn to practical use or account"); *id.*, https://www.merriam-webster.com/dictionary/constituent ("constituent" is "an essential part" and "serving to form, compose, or make up a unit or whole"); *id.*, https://www.merriam-webster.com/dictionary/code ("code" means "instructions for a computer (as within a piece of software").  And for "a media and online retailer" that allegedly "provides U.S. based merchants an e-commerce

---

[8] Chihuo has provided very little information about its use of WeChat, but Chihuo cannot raise a facial vagueness challenge if its conduct is plainly prohibited by the Executive Order and Identification.  *See Hunt v. City of Los Angeles*, 638 F.3d 703, 710 (9th Cir. 2011).

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Partial Motion to Dismiss Second Amended Complaint

Page 14

platform[,]" "provid[es] targeted marketing and advertising services online[,]" and "delivers its targeted advertising and marketing services primarily on several WeChat official accounts through the app's various functions," SAC ¶ 25, these terms should have "fairly obvious meaning." *Quinn*, 401 F. Supp. 2d at 100.  Yet if more were needed, Chihuo's understanding is bolstered not only by the express exclusions described in the Identification, AR-1679-80, but also by the additional information in the administrative record regarding the purpose of this prohibition:

> This prohibition serves to prevent any potential circumvention of the aforementioned prohibitions, as it would prohibit any method by which WeChat code, functions, or services could be serviced in a separately named and sold mobile app to which the aforementioned provisions would not apply.  Additionally, it prevents interoperability with third-party apps that utilize WeChat functions and services, thus reducing any U.S. user data that could be collected incidentally and made accessible to Tencent.

AR-34.  *Cf. League of Wilderness Defs./Blue Mountains Biodiversity Project v. Forsgren*, 309 F.3d 1181, 1188 n.6 (9th Cir. 2002) (considering regulation "in context and in light of the history and background of the regulation").

## B.   The Possibility of Future Action by the Secretary Is Not a Basis for a Vagueness Claim.

Also unpersuasive is Plaintiffs' assertion that "[n]o reasonable person could tell what conduct may be prohibited under the provision" prohibiting "[a]ny other transaction that is related to WeChat by any person, or with respect to any property, subject to the jurisdiction of the United States, with Tencent Holdings Ltd., or any subsidiary of that entity, as may be identified at a future date under the authority delegated under Executive Order 13943."  *See* SAC ¶ 115 (quoting AR-1679).  As the Court correctly found, "[t]o the extent that the claim is predicated on the Secretary's ability to identify future prohibited transactions (as set forth in prohibited transaction 7), the claim is not ripe."  Prelim. Inj. Order at 19 (citing *Bishop Paiute Tribe v. Inyo Cty.*, 863 F.3d 1144, 1154 (9th Cir. 2017)).  Additionally, the meaning of the seventh provision is plain: the Secretary may at a later date prohibit certain transactions not already specified.  *See* AR-1679.

Chihuo and other WeChat users therefore cannot reasonably fear prosecution, or be chilled from using WeChat based on such future prohibitions.  *See* SAC ¶¶ 114-15.  *Cf. Wolfson v. Brammer*, 616 F.3d 1045, 1062-63 (9th Cir. 2010) (plaintiff's fear must be "plausible and reasonable" and "imminent"

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Partial Motion to Dismiss Second Amended Complaint

Page 15

(emphasis omitted)); *see also id.* at 1057 (absent a "possibility" that a challenged rule would be enforced against a plaintiff, the rule "will [not] have a chilling effect on speech").  Plaintiffs' due process theory also fails in light of IEEPA's scienter requirements for criminal liability.  *See United States v. Amirnazmi*, 645 F.3d 564, 589-90 (3d Cir. 2011) (rejecting vagueness challenge to IEEPA regulation because "this is a case where ignorance of the law is a defense"); 50 U.S.C. § 1705(c) (restricting criminal liability to those who act "willfully").

### C.     The Terms of the EO and the Identification Are Not Unconstitutionally Vague In Violation of the First Amendment

Plaintiffs' new invocation of the First Amendment in connection with their vagueness claim, SAC ¶ 116, does not advance their argument.  As an initial matter the "[v]agueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment."  *United States v. Williams*, 553 U.S. 285, 304 (2008).  In the context of a Fifth Amendment vagueness challenge, where a law implicates the First Amendment, "an even greater degree of specificity and clarity of laws is required, . . . and courts ask whether language is sufficiently murky that speakers will be compelled to steer too far clear of any forbidden area[s.]"  *Edge v. City of Everett*, 929 F.3d 657, 664 (9th Cir. 2019) (cleaned up); *see also Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001).  Nonetheless, the Supreme Court has emphasized that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."  *Williams*, 553 U.S. at 304 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)); *see also Cal. Teachers Ass'n*, 271 F.3d at 1151 ("[E]ven when a law implicates First Amendment rights, the constitution must tolerate a certain amount of vagueness.").

Here, the language of the Identification is clear, and Plaintiffs' conclusory reference to the First Amendment in connection with their vagueness claim is patently insufficient to survive a Rule 12(b)(6) motion.  *See Iqbal*, 556 U.S. at 678 (conclusory allegations do not satisfy basic pleading standards).  Moreover, Plaintiffs have not plausibly alleged that any ambiguity in the Executive Order and Identification result in a chill on speech sufficiently substantial "in relation to what [they] clearly proscribe[]."  *See Cal. Teachers Ass'n*, 271 F.3d at 1151; *see also id.* ("Stated alternatively, uncertainty at a statute's margins will not warrant facial invalidation if it is clear what the statute proscribes in the vast majority of its intended applications." (cleaned up)).  The Executive Order and Identification describe in

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Partial Motion to Dismiss Second Amended Complaint

Page 16

plain, understandable language the types of business-to-business transactions that are (and are not) prohibited, and make abundantly clear that expressive user activity on the app is not prohibited.  AR-1677-80.[9]

There is no possible basis to conclude that "speakers will be compelled to steer too far clear of any forbidden area[s]," *Edge*, 929 F.3d at 664, because the Identification does not prohibit any communications.  *See Commerce Identification*, AR-1679 (specifically noting that it does not prohibit the "exchange between or among WeChat mobile application users of personal or business information using the WeChat mobile application, to include the transferring and receiving of funds").[10]  "Numerous other statutes have withstood facial vagueness challenges even though they contained language arguably more ambiguous than that contained in" the Identification.  *See Cal. Teachers Ass'n*, 271 F.3d at 1153 (collecting cases).  The Court should dismiss Count 3 of the SAC.

## III.   Plaintiffs Fail to State an Equal Protection Claim (Count 4)

Plaintiffs assert that the WeChat Order and Identification violate their right to equal protection because they "single out people of Chinese and Chinese-American ancestry and those who wish to communicate and associate with them, and subject them to disparate treatment on the basis of race, ethnicity, nationality, national origin, and alienage."  SAC ¶ 122.  Plaintiffs are mistaken.  The WeChat Order and Identification are neutral, applying equally to transactions identified by the Secretary regardless of the nationality, ancestry, or immigration status of the parties to those transactions, none of which have

---

[9] Heightened scrutiny is also not required because, as explained in previous briefing, the Executive Order and Identification do not burden First Amendment rights.  *See* ECF No. 22, at 24-32; ECF No. 51, at 4-9; ECF No. 68, at 10-16; ECF No. 83, at 1-10.  Recognizing that the Court disagrees, *see* ECF No. 59, at 16-18; ECF No. 134, even if such rights were at stake in the First Amendment claim, the "serious questions" that the Court found with respect to the First Amendment are not related to a lack of clarity.

[10] There is also no danger of chilling because WeChat users can use any of the many alternative platforms to communicate.   On the preliminary injunction briefing, the Court concluded that WeChat was "effectively" the only option, but the Secretary's restrictions leave open numerous and adequate alternative opportunities for expression, including in Chinese and in China.  These include not only Web WeChat and WeChat for Windows and Mac, *see supra* at 9, but traditional methods of communications, and many "other mobile apps such as Facebook, Facebook Messenger, Google Line, Telegram, Signal, Snapchat, Zoom, Skype, iChat, and WhatsApp" as well as iMessage, Wickr, and Xiaomi Mitalk.  Order Denying Mot. to Stay, at 12, ECF No. 105; *see also* SAC ¶¶ 31-33 (describing WeChat capabilities with comparison to other applications).

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Partial Motion to Dismiss Second Amended Complaint

Page 17

protected status.  WeChat Order, 85 Fed. Reg. at 48,641-43; AR-1676-80.[11]

The purpose of the WeChat Order and Identification is not rooted in a "desire to harm a politically unpopular group."  *Hawaii*, 138 S. Ct. at 2420 (citation omitted).  Rather, it is "expressly premised on legitimate purposes[,]" *id.* at 2421, as the Government is seeking to prevent the PRC from using WeChat to surveil the American people and collect the personal and proprietary information from American users to advance its own interests.  *See* WeChat Order, 85 Fed. Reg. at 48,641.  These national security and foreign policy concerns are of paramount importance.  *See, e.g.*, *Haig v. Agee*, 453 U.S. 280, 307 (1981); *see also* Prelim. Inj. Order at 3 (recognizing the Government's "significant interest").  The Order and Identification are exercises of the President's national security and foreign affairs functions, and this Court should uphold them "so long as [they] can reasonably be understood to result from a justification independent of unconstitutional grounds."  *See Trump v. Hawaii*, 138 S. Ct. 2392, 2420 (2018); *see also Los Coyotes Band of Cahuilla & Cupeno Indians v. Jewell*, 729 F.3d 1025, 1039 (9th Cir. 2013) (explaining that under rational-basis review, the plaintiff "bears the burden 'to negative every conceivable basis which might support'" the Government's action (citation omitted)). The relationship of the WeChat Order and Identification to those interests is not only conceivable, but readily discernible, *see Hawaii*, 138 S. Ct. at 2420-21; imposing restrictions on the functionality of the app will curtail its use and, by extension, the PRC's ability to harvest Americans' information.

Plaintiffs do not salvage their claim by alleging that the WeChat Order and Identification "prohibit[] the use of WeChat but not other apps that are owned and used primarily by people who are not of Chinese or Chinese-American ancestry."  SAC ¶ 122.  Mere allegations of a disparate impact on Chinese people are insufficient to state a claim.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977).  Here, it is not the demographic of WeChat's user base that gives rise to the concerns reflected in the Executive Order and Identification.  Nor is it the mere fact that WeChat is subject

---

[11] The WeChat Order and Identification are also neutral with regard to any downstream effects on users. This lawsuit proves the point: of the seven named Plaintiffs, one is a "New Jersey nonprofit organization," one is a U.S. citizen with "Chinese families and friends," one is a U.S. citizen with no alleged family in China, two are Chinese citizens residing in the United States, one is "a media and online retailer" incorporated in California and Delaware, and one is a lawful permanent resident. SAC ¶¶ 20-26. Each claims to be equally subject to any effects of the WeChat Order.

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Partial Motion to Dismiss Second Amended Complaint

to Chinese laws.  *See id.* ¶ 121 (alleging that Airbnb "collects similar personal and private data from users in the United States and shares that data with the Chinese government").  Rather, it is the vast amount of data collected by WeChat *in connection with* its close proximity to and interrelationship with the government of the PRC.  WeChat Order, 85 Fed. Reg. at 48641.  Plaintiffs fail to show that any "other apps" are similarly situated to WeChat in this respect.  Moreover, even if other apps may raise similar concerns, "[a] classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.'"  *Aleman v. Glickman*, 217 F.3d 1191, 1201 (9th Cir. 2000) (citation omitted).  That is especially true with respect to foreign threats, where the Executive Branch must assess and balance potentially competing considerations of national security, economic security, and international relations that may counsel different approaches to different threats.

Nor can Plaintiffs plausibly allege that the WeChat Order and Identification are "motivated by Defendants' animus towards people of Chinese and/or Chinese American ancestry[.]"  SAC ¶ 123.  Again, the WeChat Order and Identification confirm that the Government was motivated not by any animus but instead by a need to confront a threat posed by the PRC.  *See* 85 Fed. Reg. at 48641; AR-1675-76.  This alone defeats Plaintiffs' claim.  *See Hawaii*, 138 S. Ct. at 2421 (constitutional claim failed where policy was not "inexplicable by anything but animus").  Moreover, Plaintiffs have failed to establish that the WeChat Order and Identification bear the hallmarks of "an 'invidious discriminatory purpose[.]'"  *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020) (plurality).  To the extent Plaintiffs assert that the WeChat Order and Identification have a disproportionate impact on persons with ties to China, that consequence flows from the fact that WeChat is the beneficiary of PRC policies that have promoted its prevalence in China and is subject to the laws of a government that practices mass surveillance, *see* AR-23-32; SAC ¶ 7, not from an invidious purpose.  *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1915-16 ("[B]ecause Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. . . .  Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds."); *accord Ramos v. Wolf*, 975 F.3d 872, 898 (9th Cir. 2020).  Nor have Plaintiffs demonstrated animus based on "[d]epartures from the normal procedural

sequence" or "contemporary statements by members of the decisionmaking body[.]"  *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1915 (citation omitted).  Indeed, the statements attributed to the President by Plaintiffs—primarily concerning the origins of the COVID-19 pandemic, SAC ¶¶ 80-85—have no apparent nexus to the WeChat Order.  *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1916 (statements that are "remote in time and made in unrelated contexts . . . do not qualify as 'contemporary statements' probative of the decision at issue'" (citation omitted)); *Ramos*, 975 F.3d at 897-98 (holding that plaintiffs failed to present an equal protection claim where President's alleged animus toward certain immigrants was untethered from challenged policy).  And Plaintiffs do not even attempt to link any statement by the Secretary to "animus towards people of Chinese and/or Chinese American ancestry[.]"  SAC ¶ 123. The Court should dismiss Count 4 of the SAC.

## IV.     Plaintiffs Fail to State a Free Exercise Claim (Count 2).

Plaintiffs' Free Exercise Claim should be dismissed because both the WeChat Order and the Identification are neutral laws with at most an incidental, temporary effect on one plaintiff's preferred method of participating in religious practices.  The Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  Accordingly, the Government may not "compel affirmation of religious belief, punish the expression of religious doctrines it believes to be false, impose special disabilities on the basis of religious views or religious status, or lend its power to one or the other side in controversies over religious authority or dogma."  *Emp. Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 877 (1990) (internal citations omitted).  Nothing in the WeChat Order or the Identification imposes any restrictions on religious practice by Plaintiffs or others.

Incidental burdens resulting from a valid and neutral law do not suffice for a Free Exercise claim. The Supreme Court has repeatedly recognized that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993); *Smith*, 494 U.S. at 879 ("the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Partial Motion to Dismiss Second Amended Complaint

Page 20

proscribes (or prescribes) conduct that his religion prescribes (or proscribes.'"); *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439, 451 (1988) (upholding prohibition of construction on certain federal land even though the Government's action "could have devastating effects on" the religious practice of several Native American Tribes that held certain sites on the tract to be sacred). The "tests for whether a law is neutral and generally applicable focus on whether a law specifically targets or singles out religion." *Parents for Privacy v. Barr*, 949 F.3d 1210, 1234–35 (9th Cir. 2020), cert. denied, No. 20-62, 2020 WL 7132263 (Dec. 7, 2020). In *Smith*, for example, the Supreme Court upheld a facially neutral law that imposed penalties on peyote use – conduct that was specifically *required* by the plaintiffs' religious beliefs. The Court explained: "The government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, 'cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development.'" 494 U.S. at 885 (citation omitted). On the other hand, the Court has applied heightened scrutiny where "the object or purpose of a law is the suppression of religion or religious conduct." *See Church of the Lukumi Babalu Aye*, 508 U.S. at 533 (striking down law intended specifically to prohibit Santeria religious rituals).

The laws at issue here are facially neutral as to religion and of general applicability. They do not compel or punish religious doctrine, do not impose penalties on religious practice, nor lend the power of the government to any religious dogma. Rather, the Identification prohibits certain business-to-business commercial transactions that facilitate the operation of the WeChat mobile application in order to inhibit the PRC's use of WeChat for intelligence collection on U.S. persons. Both the WeChat Order and the Identification are wholly disconnected from religion or religious practices, neither the E.O., the Identification, or the administrative record, contain any references to religion or religious practices, and they do not require any individualized assessment of religious practices. As in *Parents for Privacy*, Plaintiffs fail to allege that these neutral, general actions were motivated in any way by religious animus or that religious observers are treated unequally. 949 F.3d at 1235.

At most then, the WeChat Order and Identification could be subject to rational basis review, which means that the policy "must be upheld if it is rationally related to a legitimate governmental purpose." *Id.*

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Partial Motion to Dismiss Second Amended Complaint

Page 21

at 1238.  Here, both the E.O and Identification are rationally related to the goal of preventing the PRC's hostile use of American user data.  *See generally* WeChat Order; Decision Memo, at AR-20-36.  The SAC states "there is no rational connection between the government's avowed interest in preventing WeChat from sharing U.S. users' private data and information with the Chinese government and the means it has chosen to advance that interest."  SAC ¶ 110.  But this argument is not remotely plausible; Defendants have explained repeatedly in the WeChat Order and in the record that the PRC is using and intends to use massive collection of user data through the WeChat mobile application for intelligence purposes, as well as other purposes (such as targeting domestic dissent).  *See generally* AR-23-32.  The Secretary reasonably determined that this activity poses a threat to national security.  *Id.*  Degrading or shutting down the mobile application furthers the government's efforts to limit this data collection by a foreign adversary.  *Id.*  This explanation is more than sufficient to survive rational basis review.[12]

Moreover, as discussed in further detail in Part V, Plaintiffs have not adequately alleged a "substantial burden" on the free exercise of religion.  On its face, the allegation that one plaintiff currently chooses to use WeChat for religious practices during the pandemic is not an allegation that the WeChat Order or Identification substantially burdens the free exercise of religion.  *See* SAC ¶¶ 26, 106-11.  The Court should dismiss Count 2 of the SAC.

## V.   Plaintiffs Fail to State a RFRA Claim (Count 6).

Plaintiffs likewise fail to state a claim against the Executive Order under RFRA.  To establish a claim under RFRA, a plaintiff must demonstrate, *inter alia*, that the government action "'substantially

---

[12] Plaintiffs may argue that heightened scrutiny is appropriate in light of their supposedly related free speech claim.  In *Smith*, the Supreme Court acknowledged that heightened scrutiny had been applied in the past in certain "hybrid situation[s]" in which a law "involve[s] not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections," but found that the case before it did not involve such hybrid rights and did not explain how the exception would apply.  494 U.S. at 881–82.  As set forth in Defendants' previous filings, Plaintiffs have not made a colorable free speech claim, *See* ECF No. 22, at 24-32; ECF No. 51, at 4-9; ECF No. 68, at 10-16; ECF No. 83, at 1-10, much less a free speech claim that parallels their free exercise claim, which is based on the temporary circumstances of a single individual.  In any event, the Ninth Circuit Court of Appeals recently expressed doubt as to whether there is a "hybrid rights exception" to the *Smith* rule.  *Parents for Privacy*, 949 F.3d at 1236-37 ("The extent to which the hybrid rights exception truly exists, and what standard applies to it, is unclear."); *see also Leebaert v. Harrington*, 332 F.3d 134, 143 (2d Cir. 2003); *Kissinger v. Bd. of Trs. of Ohio State Univ., Coll. of Veterinary Med.*, 5 F.3d 177, 180 (6th Cir. 1993).

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Partial Motion to Dismiss Second Amended Complaint

Page 22

burden[s]' the plaintiff's exercise of religion." *Fazaga v. Fed. Bureau of Investigation*, 965 F.3d 1015, 1061 (9th Cir. 2020) (citation omitted). "Under RFRA, a 'substantial burden' is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1069–70 (9th Cir. 2008) (*en banc*) (internal citations omitted); *see also Fazaga*, 965 F.3d at 1061 (same). "Any burden imposed on the exercise of religion short of that . . . is not a 'substantial burden' within the meaning of RFRA." *See Navajo Nation*, 535 F.3d at 1070.

Here, there is no government benefit at issue, and it is undisputed that individual Plaintiffs cannot be subject to any civil or criminal sanctions through the continued exchange of "personal or business information using the WeChat mobile application[.]" *See* AR-1679. Indeed, Plaintiffs assert only that they use WeChat to participate in religious activities, and the Identification may prevent them from doing so in the future. *See* SAC ¶ 41 (alleging that Plaintiff Bao "relies on WeChat exclusively to attend regular Bible studies"); *id.* ¶ 137. But even assuming that Plaintiffs' personal use of WeChat may become more challenging, or even impossible, their inability to use a particular social media application for religious activities does not work a "substantial burden" on their exercise of religion under RFRA; they are neither deprived of a government benefit nor subject to civil or criminal penalties on account of their religious practices. *Compare Snoqualmie Indian Tribe v. F.E.R.C.*, 545 F.3d 1207, 1214–15 (9th Cir. 2008) (holding "irrelevant" plaintiffs arguments that "[a] dam interferes with the ability of tribal members to practice religion," as neither government benefit nor sanction was at issue) *with United States v. Hoffman*, 436 F. Supp. 3d 1272, 1286 (D. Ariz. 2020) (finding substantial burden because "Defendants face criminal sanctions for exercising their religious beliefs").

Further, the Second Amended Complaint fails to allege even that Plaintiffs could be significantly impeded from taking part in religious activities, only that "Plaintiff Bao and his fellow congregants at the New Life Chinese Alliance Church will no longer be able to participate in religious activities *using WeChat*." SAC ¶ 137 (emphasis added).[13] While the Court need not even consider this alleged "burden"

---

[13] Plaintiffs do not allege that Mr. Bao is *required* by his religious beliefs to use WeChat for Bible studies. Mr. Bao's use of WeChat for those activities is itself a departure from his normal practice of "in person"

for the reasons set forth above, Plaintiffs provide no reason why they, or their fellow congregants, could not utilize any number of other alternative technologies to participate in religious activities, such as Zoom, Skype, video calls, conference calls, or other chat groups, among others.  Any inconvenience that Mr. Bao might encounter in transitioning to a new platform does not offend RFRA.  *See Guam v. Guerrero*, 290 F.3d 1210, 1222 (9th Cir. 2002) ("A substantial burden must be more than an inconvenience."); *cf. Fazaga*, 965 F.3d at 1061 ("An effect on an individual's 'subjective, emotional religious experience' does not constitute a substantial burden" (citing *Navajo Nation*, 535 F.3d at 1070)).[14]  The Court should dismiss Count 6.

## CONCLUSION

The Court should dismiss at least Counts 2, 3, 4, and 6 of the Second Amended Complaint.

Dated:  December 23, 2020                    Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

JOHN V. COGHLAN
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Branch Director

DIANE KELLEHER
Assistant Branch Director

DANIEL SCHWEI
Special Counsel

---

activities.  *See* SAC ¶ 136.  Plaintiffs thus fail to show that a ban on the WeChat app would coerce Mr. Bao "to act contrary to [his] religious beliefs," *Fazaga*, 965 F.3d at 1061.

[14] Even if Plaintiffs had alleged a substantial burden under RFRA, this claim would still fail because RFRA permits the Government to impose such a burden where necessary to further a "compelling governmental interest." *Fazaga*, 965 F.3d at 1061 (citing 42 U.S.C. § 2000bb-1(b)).  Here, the national security concerns are compelling, and regulation that minimizes the mobile app's use within the United States is the least restrictive means of addressing those concerns in light of the lack of trust with the PRC government. *See supra* at 16-17; *see, e.g.*, *Cassell v. Snyders*, 458 F. Supp. 3d 981, 999-1001 (N.D. Ill. 2020) (upholding limit on "in-person [church] services" notwithstanding availability of lesser measures because those measures would not reduce the risk "to the same degree").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

  /s/ *Amy E. Powell*
SERENA M. ORLOFF
MICHAEL DREZNER
AMY E. POWELL
STUART J. ROBINSON
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel: (919) 856-4013
Email: amy.powell@usdoj.gov

*Attorney for Defendants*

*U.S. WeChat Users Alliance, et al. v. Trump, et al.*, Case No. 3:20-cv-05910-LB
Defendants' Partial Motion to Dismiss Second Amended Complaint

Page 25