MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
VAN SWEARINGEN – 259809
BENJAMIN BIEN-KAHN – 267933
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:      (415) 433-6830
Facsimile:      (415) 433-7104
Email:      mbien@rbgg.com
      egalvan@rbgg.com
      vswearingen@rbgg.com
      bbien-kahn@rbgg.com
      agourse@rbgg.com
      axu@rbgg.com

KELIANG (CLAY) ZHU – 305509
DEHENG LAW OFFICES PC
7901 Stoneridge Drive #208
Pleasanton, California  94588
Telephone:      (925) 399-5856
Facsimile:      (925) 397-1976
Email:      czhu@dehengsv.com

ANGUS F. NI – Admitted *Pro Hac Vice*
AFN LAW PLLC
502 Second Avenue, Suite 1400
Seattle, Washington  98104
Telephone:      (773) 543-3223
Email:      angus@afnlegal.com

THOMAS R. BURKE – 141930
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California  94111-6533
Telephone:      (415) 276-6500
Facsimile:      (415) 276-6599
Email:      thomasburke@dwt.com

DAVID M. GOSSETT – Admitted *Pro Hac Vice*
COURTNEY T. DETHOMAS – 294591
DAVIS WRIGHT TREMAINE LLP
1301 K Street N.W., Suite 500 East
Washington, D.C.  20005-3366
Telephone:      (202) 973-4216
Facsimile:      (202) 973-4499
Email:      davidgossett@dwt.com
      courtneydethomas@dwt.com

JOHN M. BROWNING – Admitted *Pro Hac Vice*
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York  10020-1104
Telephone:      (212) 603-6410
Facsimile:      (212) 483-8340
Email:      jackbrowning@dwt.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

U.S. WECHAT USERS ALLIANCE,
CHIHUO INC., BRENT COULTER,
FANGYI DUAN, JINNENG BAO, ELAINE
PENG, and XIAO ZHANG,

        Plaintiffs,

        v.

DONALD J. TRUMP, in his official capacity
as President of the United States, and
WILBUR ROSS, in his official capacity as
Secretary of Commerce,

        Defendants.

Case No. 3:20-cv-05910-LB

**PLAINTIFFS' OPPOSITION TO
DEFENDANTS' PARTIAL MOTION TO
DISMISS SECOND AMENDED
COMPLAINT**

Judge:    Hon. Laurel Beeler
Date:     March 4, 2021
Time:     9:30 a.m.
Crtrm.:   Zoom Webinar

Trial Date:      None Set

[3657359.8]

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

LEGAL STANDARD ........................................................................................... 3

ARGUMENT........................................................................................................ 4

I.      THIS COURT HAS JURISDICTION TO GRANT EQUITABLE RELIEF AGAINST THE PRESIDENT ........................................................................ 4

II.     PLAINTIFFS ADEQUATELY STATE A VAGUENESS CLAIM.......................... 7

    A.      The SAC Sufficiently Alleges That the Terms in the EO and Identification Are Unclear and Encourage Discriminatory Enforcement ..................................................................................... 7

    B.      The Terms of the EO and Identification Are Unconstitutionally Vague In Violation of the First and Fifth Amendments. ......................................... 11

III.    PLAINTIFFS ADEQUATELY STATE AN EQUAL PROTECTION CLAIM ............................................................................................................ 12

IV.     PLAINTIFFS ADEQUATELY STATE A FREE EXERCISE CLAIM................. 17

V.      PLAINTIFFS ADEQUATELY STATE A RFRA CLAIM ................................... 21

CONCLUSION................................................................................................... 25

1

**TABLE OF AUTHORITIES**

2

**Page**

3

<u>**CASES**</u>

4

*Aleman v. Glickman*,
    217 F.3d 1191 (9th Cir. 2000) ............................................................... 10, 15

*American Family Association, Inc. v. City and County of San Francisco*,
    277 F.3d 1114 (9th Cir. 2002) ................................................................... 20

*Arce v. Douglas*,
    793 F.3d 968 (9th Cir. 2015) ..................................................................... 12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................... 12

*Ave. 6E Invs., LLC v. City of Yuma*,
    818 F.3d 493 (9th Cir. 2016) ......................................................... 12, 13, 16

*Backpage.com, LLC v. Dart*,
    807 F.3d 229 (7th Cir. 2015) ..................................................................... 24

*Braunfield v. Brown*,
    366 U.S. 599 (1961) ................................................................................... 22

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014) ....................................................................... 21, 22, 24

*Cal. Teachers Ass'n v. State Bd. of Education*,
    271 F.3d 1141 (9th Cir. 2001) ................................................................... 11

*Cantwell v. Connecticut*,
    310 U.S. 296 (1940) ................................................................................... 18

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ..................................................................................... 5

*Coates v. City of Cincinnati*,
    402 U.S. 611 (1971) ..................................................................................... 9

*Cook Cty., Ill. v. Wolf*,
    461 F. Supp. 3d 779 (N.D. Ill. 2020) ............................................... 13, 16

*Courthouse News Service v. Planet*,
    750 F.3d 776 (9th Cir. 2014) ................................................................... 4, 7

*Dep't of Homeland Security v. Regents of Univ. of California*,
    140 S. Ct. 1891 (2020) .................................................................... 15, 16, 17

*Edge v. City of Everett*,
    929 F.3d 657 (9th Cir. 2019) ..................................................................... 11

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*EEOC v. Catholic Univ. of America*,
    83 F.3d 455 (D.C. Cir. 1996) ................................................................ 20

*Elrod v. Burns*,
    427 U.S. 347 (1976) ............................................................................... 19

*Employment Div., Dep't of Human Res. of Oregon v. Smith*,
    494 U.S. 872 (1990) .......................................................................... 18, 21

*F.C.C. v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ...................................................................... 8, 9, 11

*Fazaga v. F.B.I.*,
    965 F.3d 1015 (9th Cir. 2020) .............................................................. 24

*Follett v. McCormick*,
    321 U.S. 573 (1944) ............................................................................... 18

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ................................................................................. 5

*Gero v. United States Gov't*,
    No. 16-CV-04449-JSC, 2017 WL 550230 (N.D. Cal. Feb. 10, 2017) ...................... 2

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ................................................................................. 7

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ................................................................................ 9, 10

*Hunt v. City of Los Angeles*,
    638 F.3d 703 (9th Cir. 2011) ................................................................ 10

*In re Trump*,
    958 F.3d 274 (4th Cir. 2020), *vacated as moot sub nom. Trump v. District of
    Columbia*, No. 20-331, 2021 WL 231542 (Jan. 25, 2021) ......................... 5, 6

*Johnson v. City of Shelby*,
    574 U.S. 10 (2014) ................................................................................... 4

*Kashem v. Barr*,
    941 F.3d 358 (9th Cir. 2019) .................................................................. 9

*Kissinger v. Bd. of Trustees*,
    5 F.3d 177 (6th Cir. 1993) .................................................................... 20

*Knight First Amendment Inst. v. Trump*,
    302 F. Supp. 3d 541 (S.D.N.Y. 2018), *aff'd* 928 F.3d 226 (2d Cir. 2019) ............... 6

*La Clinica de la Raza v. Trump*,
    No. 19-CV-04980-PJH, 2020 WL 6940934 (N.D. Cal. Nov. 25, 2020) .................. 7

*Lazy Y Ranch Ltd. v. Behrens*,
    546 F.3d 580 (9th Cir. 2008) .................................................................. 4

*Leebaert v. Harrington,*
    332 F.3d 134 (2d Cir. 2003) ............................................................................... 20

*Los Coyotes Band of Cahuilla & Cupeno Indians v. Jewell,*
    729 F.3d 1025 (9th Cir. 2013) ............................................................................ 15

*Lovitky v. Trump,*
    949 F.3d 753 (D.C. Cir. 2020) .............................................................................. 6

*Lovitky v. Trump,*
    No. 19-cv-1454, 2019 WL 3068344 (D.D.C. July 12, 2019)................................. 6

*Marbury v. Madison,*
    5. U.S. 137 (1803) ............................................................................................... 5

*Marland v. Trump,*
    No. 20-cv-4597, 2020 WL 6381397 (E.D. Pa. Oct. 30, 2020)............................ 15

*MHANY Mgmt., Inc. v. Cty. of Nassau,*
    819 F.3d 581 (2d Cir. 2016) ............................................................................... 13

*Miller v. Reed,*
    176 F.3d 1202 (9th Cir. 1999) ............................................................................ 20

*Mississippi v. Johnson,*
    71 U.S. 475 (1866) .......................................................................................... 5, 6

*Murdock v. Com. of Pennsylvania,*
    319 U.S. 105 (1943) ........................................................................................... 18

*Navajo Nation v. U.S. Forest Serv.,*
    535 F.3d 1058 (9th Cir. 2008) ...................................................................... 22, 24

*New York v. U.S. Dep't of Commerce,*
    315 F. Supp. 3d. 766 (S.D.N.Y. 2018) .......................................................... 13, 16

*Newdow v. Roberts,*
    603 F.3d 1002 (D.C. Cir. 2010)............................................................................ 6

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) ............................................................................................. 5

*Pac. Shores Props., LLC v. City of Newport Beach,*
    730 F.3d 1142 (9th Cir. 2013) ...................................................................... 12, 14

*Parents for Privacy v. Barr,*
    949 F.3d 1210 (9th Cir. 2020) ...................................................................... 19, 20

*Pierce v. Society of Sisters,*
    268 U.S. 510 (1925) ........................................................................................... 18

*Ramos v. Nielsen,*
    321 F. Supp. 3d 1083 (N.D. Cal. 2018)........................................................ 13, 16

*Ramos v. Wolf,*
    975 F.3d 872 (9th Cir. 2020) ............................................................... 15, 16

*Safe Air for Everyone v. Meyer,*
    373 F.3d 1035 (9th Cir. 2004) ............................................................... 3, 4

*Saget v. Trump,*
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ................................................ 6, 7

*Sheppard v. David Evans & Associates,*
    694 F.3d 1045 (9th Cir. 2012) ................................................................ 12

*Skinner v. Switzer,*
    562 U.S. 521 (2011) ................................................................................. 4

*Snoqualmie Indian Tribe v. F.E.R.C.,*
    545 F.3d 1207 (9th Cir. 2008) ................................................................ 24

*St. Clair v. City of Chico,*
    880 F.2d 199 (9th Cir. 1989) ................................................................... 7

*Starr v. Baca,*
    652 F.3d 1202 (9th Cir. 2011) ............................................................ 4, 17

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) ................................................................. 6

*Thomas v. Anchorage Equal Rights Comm'n,*
    165 F.3d 692 (9th Cir. 1999) ................................................................. 20

*Thomas v. Anchorage Equal Rights Comm'n,*
    220 F.3d 1134 (9th Cir. 2000) ............................................................... 20

*Thomas v. Review Bd. of Indiana Employment Sec. Div.,*
    450 U.S. 707 (1981) ............................................................................... 22

*TikTok Inc. v. Trump,*
    No. 1:20-cv-02658, 2020 WL 7233557 (D.D.C. Dec. 7, 2020) ............ 15

*Trump v. District of Columbia,*
    No. 20-331, 2021 WL 231542 (Jan. 25, 2021) ........................................ 5

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) ...................................................................... 14, 15

*Trump v. Vance,*
    140 S. Ct. 2412 (2020) ............................................................................. 5

*United States v. Quinn,*
    401 F. Supp. 2d 80, 100 (D.D.C. 2005) ................................................ 10

*United States v. Stevens,*
    559 U.S. 460 (2010) ............................................................................... 11

PLAINTIFFS' OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS SECOND AMENDED COMPLAINT

*United States v. Szabo*,
    760 F.3d 997 (9th Cir. 2014) ................................................................... 9

*United States v. Williams*,
    553 U.S. 285 (2008) ................................................................................... 8

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*,
    429 U.S. 252 (1977) ................................................................................. 12

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ................................................................................. 18

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ................................................................................... 4

**STATUTES**

42 U.S.C. § 2000bb–1(a) ................................................................................. 21

42 U.S.C. § 2000bb–1(b) ......................................................................... 21, 23

50 U.S.C. § 1702 ............................................................................................ 15

**RULES**

Fed. R. Civ. P. 12 ............................................................................................ 3

Fed. R. Civ. P. 8 .............................................................................................. 4

1

**INTRODUCTION**

2          Many mobile phone apps collect sensitive private information from users in the

3 United States, and the federal government has known for years that at least some of these

4 apps—including U.S.-based apps like Airbnb—share millions of American users' private

5 data with the governments of China and other foreign adversaries.[1]  This is a complicated

6 problem, and before last summer Defendants showed little interest in addressing it.  In

7 August 2020, however, in the midst of  President Trump's faltering reelection campaign

8 and widespread criticisms of his failure to adequately address the surging pandemic,

9 President Trump decided to single out WeChat and its predominantly Chinese and

10 Chinese-American users to exploit and stoke anti-Chinese sentiment for his own political

11 gain.  Defendants sought to shut down WeChat knowing that it provides an indispensable

12 and irreplaceable means of communication for Chinese-speaking persons in the United

13 States—especially during the global pandemic—and is the only app in which Chinese

14 traditions and customs are widely celebrated and practiced.  To date this litigation has

15 focused largely on issues of free expression and the separation of powers, but it is and

16 always has been a case about racial discrimination and religious freedom as well.

17          Possessing no evidence whatsoever that WeChat shares U.S.-based users'

18 information with Chinese authorities, President Trump and Secretary Ross demanded

19 nothing less than a complete ban on the app, ostensibly to protect American national

20 security.  They continued to insist on a wholesale ban despite proposals by Tencent

21 Holdings Ltd. ("Tencent") to mitigate the government's stated concerns about national

22 security and even after their own cyber-security agency recommended a far narrower

23 prohibition on the use of the app by government employees and critical infrastructure

24 partners.  Defendants rejected these less restrictive measures—which would have

25 diminished the purported threat posed by WeChat immediately—in favor of a set of

26 prohibitions that, by the government's own estimates, will not address the alleged problem

27

28 [1] *See* Second Amended Complaint ("SAC") ¶¶ 83, 121, n.42, n.50.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS SECOND AMENDED
COMPLAINT

for one to two years.  Defendants' Partial Motion to Dismiss, ECF No. 141 (hereafter, "Mot.") now claims that the prohibitions do not apply at all to "WeChat services accessible through an internet browser or WeChat software available for Windows and Mac," Mot. at 8,[2] thereby allowing Tencent to collect from those computer-based users the very same types of "sensitive personal information" (IP addresses, chat data, search history, biometric information, etc.) that can be collected from the mobile phone app.  Defendants' prohibition on downloading updates will exacerbate the data-security risks that supposedly justify the ban on WeChat, and of course, Defendants have failed to address the widescale practice of data brokers selling Americans' sensitive personal information to the highest bidder.[3]  While the prohibitions that Defendants seek to implement neither timely nor thoroughly address their alleged national security concerns, the WeChat ban unquestionably singles out Chinese-speaking users for disparate treatment.

Defendants' Motion argues that this Court lacks jurisdiction to grant equitable relief against the President and that the Second Amended Complaint fails to state a claim for relief under the Equal Protection and Due Process Clauses of the Fifth Amendment, the Free Exercise Clause of the First Amendment, or the Religious Freedom Restoration Act.[4] But Defendants rely upon documents that are extrinsic to the SAC and argue from those documents that the merits are on their side,[5] even though their motion is brought under

---

[2] All citations to items filed on the Court's docket include ECF page numbers.

[3] Dymples Leong and Teo Yi-Ling, *Data Brokers: A Weak Link in National Security*, THE DIPLOMAT (August 21, 2020), https://thediplomat.com/2020/08/data-brokers-a-weak-link-in-national-security/ ("Banning TikTok and other Chinese apps won't solve a thing if China can simply buy the data it wants from private brokers."); *see also* Charlie Savage, *Intelligence Analysts Use U.S. Smartphone Location Data Without Warrants, Memo Says*, N.Y. TIMES (Jan. 22, 2021, updated Jan. 25, 2021), https://www.nytimes.com/2021/01/22/us/politics/dia-surveillance-data.html.

[4] Defendants do not seek dismissal of Plaintiffs' claims under the Free Speech Clause of the First Amendment, the International Emergency Economic Powers Act ("IEEPA"), or the Administrative Procedure Act.

[5] Defendants have not sought judicial notice of the administrative record.  Even if the Court takes notice of the administrative record *sua sponte*, the Court may only notice the existence of the administrative record and cannot credit the truth of any fact recounted or matter asserted in the documents.  *See Gero v. United States Gov't*, No. 16-CV-04449-JSC, 2017 WL 550230, at *1 n.1 (N.D. Cal. Feb. 10, 2017).  Accordingly, the Court should

Rules 12(b)(1) and 12(b)(6).  In doing so, Defendants repackage many of the same flawed arguments that have already been considered by this Court.  The WeChat ban does not impose a substantial burden on Plaintiffs' exercise of religion, Defendants argue, because it targets only "business-to-business transactions."  (Never mind that counsel for Defendants admitted at oral argument before the Ninth Circuit that "the ultimate goal is to shut down the availability of WeChat—the WeChat mobile app—in the United States."[6]) Plaintiffs are merely "inconvenienced" by the WeChat ban, Defendants claim, because other social media apps exist.  (Never mind Plaintiffs' allegations (and evidence) that no viable alternatives exist for Chinese speakers in the United States.)  It would be improper to second-guess the government's stated reasons for shutting down an essential medium of communication for Chinese Americans, Defendants argue, because President Trump invoked the talisman of "national security."  (Never mind that President Trump subsequently tweeted that Section 230 of the Communications Decency Act *also* threatened "national security"—shortly before he was suspended from numerous social media platforms for violating their terms of service after he incited a violent mob's insurrection at the Capitol).

For the reasons explained below, this Court should deny Defendants' Motion in full.

## LEGAL STANDARD

Defendants have moved for dismissal under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  A motion under Rule 12(b)(1) can raise either a factual or a facial challenge to the Court's subject-matter jurisdiction.  A factual challenge "disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  A facial challenge "asserts that the allegations contained in a complaint are insufficient on

---

ignore the "Background" section of Defendants' Motion that relies upon AR citations.

[6] *See U.S. WeChat Users' Alliance v. Trump*, No. 20-16908, Audio of January 14, 2021 oral argument at 01:23 to 01:33, *available at* https://cdn.ca9.uscourts.gov/datastore/media/2021/01/15/20-16908.mp3.

their face to invoke federal jurisdiction." *Id.*  When presented with a facial challenge, the Court must "treat factual allegations in the complaint as true." *Courthouse News Service v. Planet*, 750 F.3d 776, 780 (9th Cir. 2014).

On a motion under Rule 12(b)(6), the Court's "inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff." *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).  "Federal pleading rules call for 'a short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014); *see also Skinner v. Switzer*, 562 U.S. 521, 530 (2011) ("Rule 8(a)(2) of the Federal Rules of Civil Procedure generally requires only a plausible 'short and plain' statement of the plaintiff's claim, not an exposition of his legal argument.").  "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

## ARGUMENT

## I.  THIS COURT HAS JURISDICTION TO GRANT EQUITABLE RELIEF AGAINST THE PRESIDENT

Defendants first suggest that *all* of Plaintiffs' claims against Executive Order 13943 ("EO 13943") should be dismissed, along with the President himself as a Defendant, because this Court supposedly lacks jurisdiction to grant equitable relief against the President.  Even if Defendants are right about the limits of this Court's jurisdiction as to the President himself (they are not), it does not follow that Plaintiffs' claims against EO 13943 should be dismissed.  This Court unquestionably has the authority to declare EO 13943 unlawful and enjoin the Secretary from enforcing it, regardless of whether it can grant equitable relief directly against the President.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 589 (1952) (enjoining the Secretary of Commerce from enforcing

1    an executive order that exceeded the President's statutory authority).

2          The scope and implications of Defendants' argument are breathtaking.  It is well-

3    established that the President is immune from suit for monetary damages for his official

4    conduct in office, *see Nixon v. Fitzgerald*, 457 U.S. 731, 752-53 (1982), but Defendants

5    argue that the federal judiciary *also* lacks the authority to issue any form of equitable relief

6    that involves the President in any way.  *See* Mot. at 18.  This is, in effect, an argument that

7    the President is above the law.  Thankfully, Defendants' position is *not* the law.  *See*

8    *Fitzgerald*, 457 U.S. at 753-54 ("It is settled law that the separation-of-powers doctrine

9    does not bar every exercise of jurisdiction over the President of the United States.");

10   *Trump v. Vance*, 140 S. Ct. 2412, 2431 (2020) ("[T]he President is neither absolutely

11   immune from state criminal subpoenas seeking his private papers nor entitled to a

12   heightened standard of need."); *Clinton v. City of New York*, 524 U.S. 417, 433 n.22 (1998)

13   (finding an actionable case or controversy where the plaintiff's injuries "would be

14   redressed by a declaratory judgment" directed at the President); *In re Trump*, 958 F.3d

15   274, 288 (4th Cir. 2020) (en banc) ("[T]he notion that the President is vested with

16   unreviewable power to both execute and interpret the law is foreign to our system of

17   government.") (citing *Marbury v. Madison*, 5. U.S. 137, 177 (1803)), *vacated as moot sub*

18   *nom. Trump v. District of Columbia*, No. 20-331, 2021 WL 231542 (Jan. 25, 2021).

19         None of Defendants' cases support their sweeping conception of presidential

20   immunity.  Rather, those cases stand for two much narrower principles:  (1) that courts

21   lack the authority to order or declare that the President must exercise his *discretionary*

22   authority in a specific way, see *Mississippi v. Johnson*, 71 U.S. 475, 498-99 (1866);

23   *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (explaining that *Mississippi* "left

24   open the question whether the President might be subject to a judicial injunction requiring

25   the performance of a purely 'ministerial' duty"), and (2) that courts generally should not

26   grant injunctive relief directly against the President where the plaintiff's injuries are fully

27   redressable through equitable relief against subordinate executive officials instead, see

28   *Franklin*, 505 U.S. at 803.

1    Neither of these principles creates a jurisdictional problem here.  The types of relief

2 Plaintiffs seek—a declaration that EO 13943 and the Secretary's September 18, 2020

3 "Identification of Prohibited Transactions to Implement Executive Order 13943" (hereafter

4 "Identification") are unlawful and an injunction barring Defendants from enforcing them,

5 *see* SAC, Prayer for Relief ¶¶ 1-8—do not infringe upon the President's discretionary

6 authority according to Defendants' own cases.  *See Swan v. Clinton*, 100 F.3d 973, 977

7 (D.C. Cir. 1996) (President's duty to "abide by the requirements of duly enacted and

8 otherwise constitutional statutes" is "ministerial and not discretionary"); *Newdow v.

9 Roberts*, 603 F.3d 1002, 1012 (D.C. Cir. 2010) (constitutional challenge to President's

10 exercise of his statutory authority represents "a basic case of judicial review").[7]  More

11 recent decisions from other circuits confirm that the presidential duties at issue in this case

12 are ministerial rather than discretionary.  *See In re Trump*, 958 F.3d at 288 (President's

13 duty to "obey[] the law" is ministerial); *Knight First Amendment Inst. v. Trump*, 302 F.

14 Supp. 3d 541, 578 (S.D.N.Y. 2018) ("The correction of an unlawful act 'far more closely

15 resembles the performance of 'a mere ministerial duty,' where 'nothing [is] left to

16 discretion,' than the performance of a 'purely executive and political' duty requiring the

17 exercise of discretion vested in the President" (quoting *Mississippi*, 71 U.S. at 499)), *aff'd*

18 928 F.3d 226 (2d Cir. 2019); *Saget v. Trump*, 375 F. Supp. 3d 280, 335 (E.D.N.Y. 2019)

19 (same).

20    Enjoining the Secretary alone, moreover, would not provide adequate relief in this

21 case.  It was the President who issued EO 13943 and ordered the Secretary to issue the

22 Identification, and Plaintiffs have alleged that the President or his staff further intervened

23

24 ───────────────
[7] Defendants also cite *Lovitky v. Trump*, No. 19-cv-1454, 2019 WL 3068344, at *10
25 (D.D.C. July 12, 2019), for the proposition that courts "should not" issue injunctive or
declaratory relief directed at the President's performance of his ministerial duties, either,
26 But this part of the holding in *Lovitky* is squarely at odds with caselaw from the D.C.
Circuit and other circuits alike.  Indeed, the D.C. Circuit vacated precisely that portion of
27 the district court's opinion on which Defendants rely.  *See Lovitky v. Trump*, 949 F.3d 753,
763 (D.C. Cir. 2020) (explaining that the district court should not have opined on whether
28 courts have the authority as a general matter to order the President to obey a ministerial
duty, because it correctly found that no ministerial duty existed in the case at bar).

───────────────
PLAINTIFFS' OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS SECOND AMENDED
COMPLAINT

1   in the Commerce Department's decision-making process in August and September 2020

2   for the purpose of ensuring that the Identification advanced the President's personal

3   political interests.  *See* SAC ¶¶ 147-48.  Accepting these allegations as true—as the Court

4   must for purposes of Defendants' facial challenge under Rule 12(b)(1), *see Courthouse*

5   *News Service*, 750 F.3d at 780—the Court has jurisdiction to hear Plaintiffs' claims for

6   equitable relief against the President.  *See Saget*, 375 F. Supp. 3d at 334-35 (jurisdiction

7   existed to preliminarily enjoin the President, where evidence of White House staff

8   involvement in formulating the challenged regulation showed that relief against

9   department secretary alone would be inadequate).[8]

10      The President should not be dismissed as a Defendant because this Court has

11   jurisdiction to grant the equitable relief Plaintiffs seek.  But regardless of whether the

12   President is a proper Defendant in this action, there is no basis for dismissing Plaintiffs'

13   claims against EO 13943 on jurisdictional grounds, as the Court unquestionably has the

14   authority to enjoin the Secretary from enforcing EO 13943.

15   **II.   PLAINTIFFS ADEQUATELY STATE A VAGUENESS CLAIM**

16       **A.   The SAC Sufficiently Alleges That the Terms in EO 13943 and**

17                 **Identification Are Unclear and Encourage Discriminatory Enforcement**

18      "It is a basic principle of due process that an enactment is void for vagueness if its

19   prohibitions are not clearly defined."  *Grayned v. City of Rockford*, 408 U.S. 104, 108

20   (1972).  A statute or regulation is impermissibly vague if it "fails to provide a person of

21   ordinary intelligence fair notice of what is prohibited, or is so standardless that it

22   authorizes or encourages seriously discriminatory enforcement."  *F.C.C. v. Fox Television*

---

[8] Even if Defendants had raised a *factual* challenge under Rule 12(b)(1)—and they have
not—it would still be premature at this stage for the Court to dismiss the President as a
Defendant because Plaintiffs have not had an opportunity to obtain discovery relating to
White House involvement in the decision-making process that led to the Identification.  *St.
Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989) (dismissal under Rule 12(b)(1)
improper prior to discovery "if it is possible that the plaintiff can demonstrate the requisite
jurisdictional facts if afforded the opportunity"); *La Clinica de la Raza v. Trump*, No. 19-
CV-04980-PJH, 2020 WL 6940934, at *20-21 (N.D. Cal. Nov. 25, 2020) (deferring
consideration of court's jurisdiction to hear claims for equitable relief against the
President).

1   *Stations, Inc.*, 567 U.S. 239, 253 (2012) (quoting *United States v. Williams*, 553 U.S. 285,

2   304 (2008)).  "When speech is involved," as it is here, "rigorous adherence to those

3   requirements is necessary to ensure that ambiguity does not chill protected speech."  *Fox*

4   *Television*, 567 U.S. at 253-54.

5         Plaintiffs sufficiently pled a void for vagueness claim by alleging that EO 13943

6   and the Identification leave crucial terms undefined and fail to provide either the requisite

7   notice of the conduct that they prohibit or the standards needed to guard against

8   discriminatory enforcement.  Plaintiffs' claim that the term "transaction" is vague is

9   supported in the SAC by allegations that law firms have been unable to advise their clients

10  on the scope of EO 13943 and Identification because the terms are so broad.  *See* SAC

11  ¶¶ 86, 88.  Defendants make the circular argument that there is nothing vague about the

12  term "transaction" because it is defined in the Identification.  Mot. at 19.  But the

13  Identification's definition of "transaction" is extremely broad, and includes "use of any

14  information and communications technology or service."  SAC ¶ 58.  As alleged in the

15  SAC, it is not clear to Plaintiff Chihuo whether its uses of such technology or services

16  relating to WeChat are prohibited by the Identification.  *Id.* ¶ 114.  Is a "business-to-

17  business transaction" implicated where Chihuo has a phone call with a business customer

18  about historical payments made through the WeChat Pay function?  When Chihuo uses its

19  WeChat Pay function history to determine if a payment was indeed made?  When Chihuo

20  tries to copy its customer information to another platform?  Plaintiff Chihuo's confusion

21  about the Identification's prohibited activities is shared by many—including law firms

22  tasked with advising their corporate clients what, exactly, is prohibited.  *Id.*  ¶ 88.  Wilson

23  Sonsini, for example, released a client advisory stating that the Identification uses "broad

24  terminology and not all terms are defined.  As such, we believe further guidance from the

25  Commerce Department regarding the precise scope of the restrictions set forth in the

26  Orders is necessary."  *Id.*

27         Plaintiffs also plausibly allege that Prohibition Six is unconstitutionally vague even

28  if the term "transactions" is adequately defined.  Prohibition Six prohibits "Any utilization

of the WeChat mobile application's constituent code, functions, or services in the functioning of software or services developed and/or accessible within the land and maritime borders of the United States and its territories[.]"  SAC ¶ 59f.  Neither EO 13943 nor the Identification define the terms "constituent code," "functions," or "services."  *Id.* ¶¶ 58-59.  Nor do they provide any clarity on what it means to "utilize" WeChat's constituent code, functions, or services "in the functioning of software or services," or what it means for software or services to be "developed and/or accessible within the land and maritime borders of the United States and its territories."  *Id.*

Defendants suggest the Identification cannot be void for vagueness unless it specifies "no standard of conduct … at all," Mot. at 19 (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)).  But that is not the standard for vagueness set out in *Coates* or any other case Defendants cite.  Rather, "[a] statute or regulation is impermissibly vague … if it 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Szabo*, 760 F.3d 997, 1003 (9th Cir. 2014) (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010)); *Kashem v. Barr*, 941 F.3d 358, 364 (9th Cir. 2019) (same).  Plaintiffs have plausibly alleged that the Identification is unconstitutionally vague under this standard.  Plaintiff Chihuo is uncertain as to whether its uses of WeChat are unlawful under Prohibition Six in the Identification, *see* SAC ¶¶ 89-90, 114, and no person of ordinary intelligence can reasonably be expected to understand what conduct is prohibited by that prohibition, *id.* ¶¶ 88, 114 & n.48.

Indeed, Prohibition Six is so broad and standardless that it "authorizes or encourages seriously discriminatory enforcement," *Fox Television*, 567 U.S. at 253.  As alleged in the SAC,  Steptoe & Johnson's International Compliance Blog described this prohibition[9] as "particularly broad," "less clear than the others," and "would benefit from

---

[9] Although Steptoe & Johnson referred to the prohibition on "[u]tilization of code, functions, or services in US software or services" as the "fifth prohibition," it is Prohibition Six in the WeChat Identification.  *See* SAC n.48 & ¶ 59f.

clarification[.]"  *Id.* ¶ 88 & n.48.  Steptoe & Johnson further noted that this provision "could potentially be intended to restrict these apps outside the US to the extent such use would relate to other types of software or services that were *developed* in the US or that are *accessible* in the US."  *See id.* n.48.  But "[g]iven that a great many types of US and non-US digital software and services are developed and/or accessible in the US," Prohibition Six "will likely be a focus of concern within industry and among other stakeholders[.]"  *Id.*

Defendants suggest that Plaintiff Chihuo's uncertainty about the meaning of the prohibitions in the Identification is disingenuous because the Second Amended Complaint describes the company's business using terms such as "media and online retailer," "e-commerce platform," and "targeted advertising and marketing services."  *See* Mot. at 20-21.  But the *company's* subjective understanding of these terms is irrelevant to the question of whether EO 13943 and the Identification are unconstitutionally vague, *see Kashem*, 941 F.3d at 371 ("Whether a provision is vague for lack of fair notice is an objective inquiry"), and Defendants do not engage with the SAC's allegations that *other* parties are unsure of what is prohibited.  *See* SAC ¶ 88.[10]  But even if Chihuo's own understanding of some of the Identification's terms were relevant here, its uncertainty about what conduct is prohibited is more than plausible.  Unlike in *United States v. Quinn*, the ambiguity in this case does not arise from "jargon" that is so technical as to provide inadequate notice to an ordinary person, *see* 401 F. Supp. 2d 80, 100 (D.D.C. 2005) (involving avowed uncertainty over the meaning of the terms "transship" and "reexport"), but rather from words such as "transactions," "services," and "functions" that are so broad

---

[10] Defendants do not seriously argue that the company's use of WeChat is so "clearly proscribed" that it "cannot complain of the vagueness of the law as applied to the conduct of others," *Hunt v. City of Los Angeles*, 638 F.3d 703, 710 (9th Cir. 2011) (quoting *Holder*, 561 U.S. at 18-19)).  Any such argument is belied by Defendants' *own* uncertainty as to the meaning of the Identification's prohibitions, as demonstrated by their contradictory suggestions (a) that some of Chihuo's uses of WeChat *may* be "plainly prohibited" by the Identification, *see* Mot. at 21 n.8, and (b) that "there is no possible basis" to conclude that the Identification will have a chilling effect on Chihuo or any other Plaintiff because the Identification "does not prohibit any communications," *id.* at 23.

10

PLAINTIFFS' OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS SECOND AMENDED COMPLAINT

and imprecise that they fail to provide *anyone* with fair notice and seriously encourage discriminatory enforcement.  Nor is this case like *Edge v. City of Everett*, 929 F.3d 657, 664 (9th Cir. 2019), where the "near proximity" of the allegedly ambiguous terms to other clear terms provided the needed clarity, or *Cal. Teachers Ass'n v. State Bd. of Education*, 271 F.3d 1141, 1151-52 (9th Cir. 2001), where the supposedly unclear terms ("instruction" and "curriculum") were far more specific than the broad terms at issue in this case and where the only plausible ambiguities would have arisen "at the margins" of the prohibition's core applications.

Defendants rely on material outside of the SAC to contend that the Commerce Department's September 18, 2020 Decision Memo provides adequate clarification of Prohibition Six.  *See* Mot. at 21.  And they provide no authority that supports the proposition that an internal departmental memo that has not been published or even informally distributed to the public can provide sufficient notice as to the meaning of an otherwise unconstitutionally vague regulation.  Nor do they offer any indication that the description of this prohibition in the Decision Memo somehow cabins the government's enforcement authority so as to mitigate the risk of discriminatory enforcement.  At best, any assurances about how Prohibition Six will be enforced are little more than the kind of voluntary "policy of forbearance" that the Supreme Court deemed insufficient in *Fox Television*.  *See* 567 U.S. at 255 ("Just as in the First Amendment context, the due process protection against vague regulations 'does not leave [regulated parties] … at the mercy of noblesse oblige.'" (quoting *United States v. Stevens*, 559 U.S. 460, 480 (2010)).

## B.  The Terms of EO 13943 and Identification Are Unconstitutionally Vague In Violation of the First and Fifth Amendments

Defendants also suggest that the Identification need not satisfy the heightened standard of clarity that applies to regulations that risk chilling speech, *see Fox Television*, 567 U.S. at 253-54, because the references to the First Amendment in Plaintiffs' Second Amended Complaint are somehow "conclusory."  Mot. at 22.  But the SAC is replete with allegations relating to the burden the ban will impose on protected speech, *see, e.g.*, SAC

¶¶ 20-26, 36-45, 89-92, 95-105, as well as the chilling effect that EO 13943 and the Identification will have (and have *already* had) on users and third-party service providers alike, *see id.* ¶¶ 86-91, 114-15.  Many of these allegations are directly related to the ambiguities in the Identification, and they belie Defendants' argument that the chilling effect of the WeChat ban is insufficiently "substantial" to warrant facial invalidation.  Mot. at 22-23.  Indeed, Defendants' argument for why these allegations of a chilling effect do not suffice ignores the plausible allegations in the SAC and rests largely on the same mistaken factual premise—that other social media apps provide an adequate alternative to WeChat for Chinese-speakers in the United States, *see* Mot. at 23 n.10—that Plaintiffs already rebutted with detailed evidence in the context of their Motion for Preliminary Injunction, *see* ECF No. 59 at 17.  The SAC's allegations as to a chilling effect provide more than enough "factual matter, accepted as true, to state a claim to relief that is plausible on its face," *Sheppard v. David Evans & Associates*, 694 F.3d 1045, 1048-49 (9th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  This Court should deny Defendants' motion to dismiss the third claim for relief in the Second Amended Complaint.

### III.   PLAINTIFFS ADEQUATELY STATE AN EQUAL PROTECTION CLAIM

To state an equal protection claim, Plaintiffs must plausibly allege that "invidious discriminatory purpose was a motivating factor" behind Defendants' decision to ban WeChat.  *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016) (quoting *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977)).  "A plaintiff does not have to prove that discriminatory purpose was the sole purpose of the challenged action."  *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015).  Nor must a plaintiff allege "the existence of a similarly situated entity who or which was treated better than plaintiffs," which is merely "one way" of showing disparate treatment.  *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2013).  Other factors the court may consider include "the events leading up to the challenged decision" and "whether it creates a disparate impact."  *Ave. 6E Invs.*, 818 F.3d at 504.

1        Plaintiffs' allegations are more than sufficient to state a claim under the Equal

2   Protection Clause.  Plaintiffs allege, among other things, that President Trump made

3   numerous "anti-Chinese statements" in the days and weeks immediately preceding and

4   immediately following the issuance of EO 13943, on August 6, 2020.  *See* SAC ¶¶ 80-82.

5   For example, the President repeatedly referred to the SARS-CoV-2 virus as the "China

6   Virus," the "China Plague," the "Wuhan Virus," and "Kung Flu."  *Id.* ¶ 80 & n.36.

7   Several of these references occurred within days of his decision to ban WeChat, including

8   on July 23, July 26, August 2, and August 11, 2020.  *Id.*  These and similar statements by

9   President Trump were widely criticized as racist and inflammatory, but the White House

10  Press Secretary defended the President's incendiary language and President Trump

11  continued to use it.  *Id.* ¶ 81.  While neither the President nor his staff expressly linked

12  their contemporaneous anti-Asian statements to the WeChat ban, such an express link is

13  not required at the pleading stage to draw a plausible inference of invidious discrimina-

14  tion—at least not where there are plausible allegations that the President or his staff were

15  closely involved in the formulation of the challenged regulation, as there are here.  *See*

16  *Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1131-32 (N.D. Cal. 2018) (President's racist

17  public statements were sufficient at the pleading stage to support claim of discrimination

18  by agency secretary); *New York v. U.S. Dep't of Commerce*, 315 F. Supp. 3d. 766, 809-10

19  (S.D.N.Y. 2018) (same); *Cook Cty., Ill. v. Wolf*, 461 F. Supp. 3d 779, 790-91 (N.D. Ill.

20  2020) (same).  Even if the Secretary did not personally share the President's discriminatory

21  animus, Plaintiffs have plausibly alleged that he had knowledge of it and that he issued the

22  Identification because of it.  *See* SAC ¶¶ 147-48; *cf. Ave. 6E Invs.*, 818 F.3d at 504 ("The

23  presence of community animus can support a finding of discriminatory motives by

24  government officials, even if the officials do not personally hold such views."); *MHANY*

25  *Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 608-12 (2d Cir. 2016) (municipal officials'

26  zoning decision tainted by their knowledge of constituents' discriminatory animus).

27        Plaintiffs' SAC also alleges that the WeChat ban singles out people of Chinese and

28  Chinese-American ancestry and subjects them to less favorable treatment than similarly

1  situated persons of other races or ethnicities.  *See* SAC ¶¶ 83, 121-23.  At the time

2  Defendants issued EO 13943 and the Identification, they knew that other social media apps

3  that are not predominantly used by Chinese Americans collect similar personal and private

4  data from American users and share that data with the Chinese government.  *Id.*  Indeed,

5  Defendants could only speculate that WeChat *might* share the data it collects from

6  American users, but they chose to ban WeChat instead of apps that they *knew* share

7  American users' data with the Chinese government.  *Id.*  These allegations of disparate

8  treatment are more than sufficient to draw a plausible inference of intentional

9  discrimination.  *See Pac. Shores Props.*, 730 F.3d at 1158.

10        Plaintiffs further allege that the government's explanation for the WeChat ban is a

11  pretext.  *See* SAC ¶¶ 84-85.  The President declared a national emergency related to

12  foreign-owned technology nearly fifteen months before he issued EO 13943 and more than

13  sixteen months before the Secretary issued the Identification.  *Id.* ¶ 84.  The government

14  has not identified any intervening events that would explain this lengthy delay; in fact, it

15  has offered no explanation whatsoever for the timing of the WeChat ban.  *Id.*  The

16  administrative record produced in connection with the Identification, moreover, includes

17  no evidence that WeChat has been used to surveil Americans.  *Id.*  And while the

18  administrative record does include information about generalized threats relating to China,

19  the government has known about these generalized threats for years.  *Id.*  These

20  remarkable gaps in the government's explanation for the WeChat ban are more than

21  enough to draw a plausible inference of discrimination—especially when they are

22  considered alongside the President's contemporaneous anti-Asian statements, Defendants'

23  disparate treatment of WeChat's predominantly Chinese and Chinese-American users, and

24  the President's recent track record of inventing other spurious national security threats

25  involving social media for his personal political gain, *see id.* ¶ 85.

26        Relying on *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), Defendants suggest that their

27  avowed national security rationale for the WeChat ban justifies dismissal even if Plaintiffs

28  have plausibly alleged invidious discrimination under the *Arlington Heights* standard.  *See*

1   Mot. at 24 (arguing that "exercises of the President's national security and foreign affairs

2   functions" should be upheld "so long as [they] can reasonably be understood to result from

3   a justification independent of unconstitutional grounds").  But this argument is not

4   persuasive.  Both the Supreme Court and the Ninth Circuit recently declined to apply the

5   *Trump v. Hawaii* standard to equal protection claims arising in the context of national

6   security and foreign affairs.[11]  *See Dep't of Homeland Security v. Regents of Univ. of*

7   *California*, 140 S. Ct. 1891, 1915 (2020) (applying the *Arlington Heights* standard); *Ramos*

8   *v. Wolf*, 975 F.3d 872, 895-96 (9th Cir. 2020) (same).  And unlike in *Trump v. Hawaii*,

9   where the Supreme Court applied only rational-basis review to a claim under the

10  Establishment Clause because the President was acting within the scope of his broad

11  discretionary authority under the Immigration and Nationality Act, see 138 S. Ct. at 2408-

12  09, 2419, this case does not involve Defendants' plenary power over immigration and

13  Congress has *not* granted the President virtually unlimited discretion in the sphere of

14  emergency economic regulation.  IEEPA, the statute that purportedly authorizes the

15  President's actions in this case, includes strict limits on his authority.  *See* 50 U.S.C.

16  § 1702(b)(1)-(4); *TikTok Inc. v. Trump*, No. 1:20-cv-02658, 2020 WL 7233557 (D.D.C.

17  Dec. 7, 2020); *Marland v. Trump*, No. 20-cv-4597, 2020 WL 6381397 (E.D. Pa. Oct. 30,

18  2020).  Indeed, the Second Amended Complaint alleges that Defendants exceeded their

19  statutory authority by issuing the WeChat ban, see SAC ¶¶ 125-32, and Defendants have

20  not challenged that claim here.

21          It is true, as Defendants point out, that both the Ninth Circuit and the Supreme

22

23  _____

    [11] Nor do Defendants' other two cases on this issue support their argument that the
24  applicable standard is rational basis review.  The Ninth Circuit applied the rational basis
    standard in *Aleman v. Glickman* because the classification at issue discriminated "*among*
25  aliens in the distribution of welfare benefits," 217 F.3d 1191, 1197 (9th Cir. 2000)
    (emphasis added), and it did so in *Los Coyotes Band of Cahuilla & Cupeno Indians v.*
26  *Jewell* because the case involved a "challenge to the Government's allocation of funds,"
    729 F.3d 1025, 1039 (9th Cir. 2013).  Here, Plaintiffs plausibly allege that the WeChat ban
27  is a regulatory provision that intentionally discriminates against Plaintiffs on the grounds
    of race, nationality, and ethnicity, and such intentional discrimination is unquestionably
28  subject to the *Arlington Heights* standard.  *See Ramos v. Wolf*, 975 F.3d 872, 895-96 (9th
    Cir. 2020).

1   Court recently rejected equal protection claims in *Ramos*, 975 F.3d at 895-900 and

2   *Regents*, 140 S. Ct. at 1915-16.  *See* Mot. at 25-26.  But both cases are distinguishable

3   from this one.  *Ramos* involved a preliminary injunction rather than a motion to dismiss,

4   and the Ninth Circuit's decision rested on its conclusion that there was "no evidentiary

5   support" for the plaintiffs' claim that discriminatory animus motivated the decisions at

6   issue.  975 F.3d at 899.  Here, Plaintiffs only need to present allegations from which the

7   Court can draw a plausible inference of intentional discrimination.  Unlike in *Ramos*,

8   moreover, where the supposed disparate impact of the government's decisions was

9   contradicted by the evidence in the record, see 975 F.3d at 898 (finding "no indication"

10  that the decisions at issue "bear more heavily on 'non-white, non-European' countries"),

11  the government does not dispute that the WeChat ban has a disparate impact on persons of

12  Chinese or Chinese American ancestry—only that this disparate impact is sufficient,

13  standing alone, to draw an inference of discriminatory animus.  *See* Mot. at 24-25.  In fact,

14  the WeChat ban's disparate impact *is* relevant for purposes of the *Arlington Heights*

15  standard, even if it is not dispositive.  *See Ave. 6E Invs.*, 818 F.3d at 504.

16        Plaintiffs also plausibly allege that Defendants' stated rationale for the WeChat ban

17  is pretextual and that the ban subjects Plaintiffs to less favorable treatment than similarly

18  situated users of social media who are not of Chinese and Chinese-American ancestry.  *See*

19  SAC ¶¶ 83-85, 121-23.  And unlike the inflammatory remarks at issue in *Ramos*, the

20  President's anti-Asian statements have a close nexus to the WeChat ban.  The President

21  made the statements within days of issuing EO 13943, *id.* ¶¶ 80, 82 & n.36, and Plaintiffs

22  have plausibly alleged that these contemporaneous statements reveal not only the

23  President's own anti-Asian animus but also his administration's collective political

24  strategy—of which the ban on WeChat was a central component—to incite anti-Asian

25  prejudice for political gain, *id.* ¶¶ 6, 81-82, 147-48.  Where courts have considered

26  statements like these at the pleading stage, they have found them sufficient to draw an

27  inference of intentional discrimination.  *See, e.g.*, *Ramos v. Nielsen*, 321 F. Supp. 3d at

28  1131-32; *New York*, 315 F. Supp. 3d at 809-10; *Cook Cty.*, 461 F. Supp. 3d at 790-91.

1    *Regents* did involve a motion to dismiss, but the plaintiffs' allegations could not

2    plausibly support an inference of intentional discrimination because there was an *obvious*

3    alternative explanation for the challenged regulation's disparate impact.  *See* 140 S. Ct. at

4    1915 (explaining that "one would expect" the government's rescission of the Deferred

5    Action for Childhood Arrivals program to have a disparate impact on Latinos "because

6    Latinos make up a large share of the unauthorized alien population").  Here, by contrast,

7    Plaintiffs have plausibly alleged that the government's alternative explanation is a pretext

8    for intentional discrimination.  *See* SAC ¶¶ 84-85.  Even if the government's alternative

9    explanation for the disparate impact in this case is *plausible*, it is not *obvious*, as it must be

10   to justify dismissal at the pleading stage, *Starr*, 652 F.3d at 1216 (noting the absence of an

11   "obvious alternative explanation" and explaining that "Plaintiff's complaint may be

12   dismissed only when defendant's plausible alternative explanation is so convincing that

13   plaintiff's explanation is *im*-plausible").  In *Regents*, moreover, the inflammatory remarks

14   that supposedly showed racial animus were "remote in time" from the challenged policy

15   and were not attributable to the relevant policymakers.  140 S. Ct. at 1916.  Here, the

16   President's anti-Asian statements occurred within days of his decision to issue EO 13943,

17   *id.* ¶¶ 80-82 & n.36, and Plaintiffs have plausibly alleged that these statements were part of

18   the same, animus-driven political strategy as the Secretary's decision to reject Tencent's

19   mitigation proposals and CISA's recommendations and proceed with a complete ban of

20   WeChat, *id.* ¶¶ 6, 69-71, 81-82, 147-48.

21   Because Plaintiffs have plausibly alleged that invidious discrimination was a

22   motivating factor behind Defendants' decision to ban WeChat, this Court should deny

23   Defendants' Partial Motion to Dismiss the fourth claim for relief in Plaintiffs' Second

24   Amended Complaint.

25   **IV.    PLAINTIFFS ADEQUATELY STATE A FREE EXERCISE CLAIM**

26   Defendants argue that the laws at issue here are neutral and of general applicability,

27   and are therefore at most subject to rational basis review.  Mot. at 26-28.  But as

28   Defendants acknowledge in footnote 12 of their Motion, the Supreme Court has applied

heightened scrutiny in "hybrid situation[s]" where neutral, generally applicable laws implicate "not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press," *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 881-82 (1990) (collecting cases[12]).  For example, in *Murdock v. Commonwealth of Pennsylvania*, 319 U.S. 105 (1943), the Supreme Court applied heightened scrutiny to a neutral, generally applicable license tax on door-to-door solicitation as it applied to the dissemination of religious ideas, and invalidated the law because it was "not narrowly drawn to safeguard the people of the community in their homes against the evils of solicitations," *id.* at 116, and "restrain[ed] in advance those constitutional liberties of press and religion and inevitably tends to suppress their exercise," *id.* at 114.  Writing for the majority, Justice Douglas explained that:

> The constitutional rights of those spreading their religious beliefs through the spoken and printed word are not to be gauged by standards governing retailers or wholesalers of books ….  The fact that the ordinance is 'nondiscriminatory' is immaterial.  The protection afforded by the First Amendment is not so restricted.  A license tax certainly does not acquire constitutional validity because it classifies the privileges protected by the First Amendment along with the wares and merchandise of hucksters and peddlers and treats them all alike.  Such equality in treatment does not save the ordinance.  Freedom of press, freedom of speech, freedom of religion are in a preferred position.

*Id.* at 111, 115.

Defendants make several arguments why Plaintiffs' Free Exercise claim must now fail under the hybrid rights analysis, none compelling.  First, Defendants half-heartedly argue that "[a]s set forth in Defendants' previous filings, Plaintiffs have not made a colorable free speech claim."  Mot. at 28 n.12.  The Court has already indicated otherwise.

---

[12] *See Cantwell v. Connecticut*, 310 U.S. 296 (1940) (invalidating a licensing system for religious and charitable solicitations under which the administrator had discretion to deny a license to any cause he deemed nonreligious); *Murdock v. Com. of Pennsylvania*, 319 U.S. 105 (1943) (invalidating a flat tax on solicitation as applied to the dissemination of religious ideas); *Follett v. McCormick*, 321 U.S. 573 (1944) (same); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925) (acknowledging the right of parents to direct the education of their children); *Wisconsin v. Yoder*, 406 U.S. 205 (1972) (invalidating compulsory school-attendance laws as applied to Amish parents who refused on religious grounds to send their children to school).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS SECOND AMENDED COMPLAINT

1   *See* Order Granting Motion for Preliminary Injunction, ECF No. 59 at 18 ("On this limited

2   record, the prohibited transactions burden substantially more speech than is necessary to

3   serve the government's significant interest in national security."); Order Denying Motion

4   to Stay, ECF. No. 105 at 16 ("The court's assessment of the First Amendment analysis and

5   the risks to national security—on this record—are unchanged.").  Indeed, Defendants'

6   Motion does not even challenge the sufficiency of Plaintiffs' free speech and association

7   claim.

8          Second, Defendants contend that Plaintiffs have failed to allege "a free speech

9   claim that parallels their free exercise claim, which is based on the temporary

10   circumstances of a single individual."  Mot. at 28 n.12.  However, "[t]he loss of First

11   Amendment freedoms, for even minimal periods of time, unquestionably constitutes

12   irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  Defendants' focus on "a

13   single individual" is also misguided.  Of course, the SAC contains numerous allegations

14   that the WeChat ban specifically violates Plaintiff Bao's free exercise of religion.  SAC

15   ¶¶ 26, 41, 108-09, 111.  But the SAC also frequently tethers the free exercise claim to free

16   speech and association claims regarding Plaintiff Bao and others.  *See, e.g.*, *id.* ¶ 7

17   (discussing how the WeChat ban both "has the effect of foreclosing all meaningful access

18   to social media for members of the Chinese-speaking community" and that it "substantially

19   burdens the free exercise of religion"); *see also id.* ¶¶ 3, 12, 38, 41, 92, 96-98, 100, 104,

20   107-09, 136-39, 145.

21          Finally, Defendants cite *Parents for Privacy v. Barr*, 949 F.3d 1210, 1236 (9th Cir.

22   2020), to argue that "the Ninth Circuit Court of Appeals recently expressed doubt as to

23   whether there is a 'hybrid rights exception' to the *Smith* rule."  Mot. at 28 n.12.  But

24   *Parents for Privacy* did not "express[] doubt" about the existence of the hybrid-rights

25   exception so much as it stated that there is "no binding Ninth Circuit authority deciding the

26   issue," 949 F.3d at 1237, and then (properly) declined to resolve the question because it

27   found that the district court had correctly dismissed all possible companion claims, *id.* at

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS SECOND AMENDED
COMPLAINT

1237-38.[13]  In fact, the Ninth Circuit has endorsed the hybrid-rights doctrine on multiple

occasions.  It first did so in *Thomas v. Anchorage Equal Rights Comm'n*, 165 F.3d 692,

706 (9th Cir. 1999), though it subsequently withdrew and then vacated the decision due to

ripeness concerns, see 220 F.3d 1134, 1147-48 (9th Cir. 2000) (en banc) (O'Scannlain, J.,

concurring) ("Thus we postpone, perhaps serendipitously, but ineluctably, definitive

application of [*Smith*] and its newly developed hybrid rights doctrine[.]").  The Ninth

Circuit again endorsed the doctrine in *Miller v. Reed*, 176 F.3d 1202, 1208 (9th Cir. 1999),

and *American Family Association, Inc. v. City and County of San Francisco*, 277 F.3d

1114, 1124 (9th Cir. 2002), but in both cases found the doctrine to be inapplicable because

the plaintiffs failed to state a colorable companion claim.  Here, by contrast, there is no

reason for this Court to avoid Plaintiffs' hybrid-rights claim, because unlike in *Parents for*

*Privacy*, *Miller*, and *American Family Association*, there is at least one viable companion

claim.  The Court has already found that Plaintiffs have shown serious questions going to

the merits of their First Amendment speech claim.  *See* ECF No. 59 at 16.  This is

sufficient to trigger heightened scrutiny for Plaintiffs' free exercise claim under the hybrid-

rights doctrine.  *See American Family Ass'n*, 277 F.3d at 1124 ("In this circuit, to make out

a hybrid claim, a 'free exercise plaintiff must make out a colorable claim that a companion

right has been violated.'"); *EEOC v. Catholic Univ. of America*, 83 F.3d 455, 467 (D.C.

Cir. 1996) (applying the doctrine and affirming district court's dismissal of EEOC's

enforcement action as precluded by the Free Exercise Clause).

    Even if the WeChat ban *is* neutral and generally applicable, it is undeniable that it

prohibits religiously motivated conduct—and therefore implicates free exercise concerns.

Plaintiffs have alleged that these religious restrictions will affect a distinct group of

Chinese-speaking users in the U.S.  *See, e.g.*, SAC ¶¶ 7, 12, 38, 41.  Defendants do not and

---

[13] Defendants also cite decisions from the Second Circuit and the Sixth Circuit in support
of their argument that the hybrid-rights exception is in doubt.  *See* Mot. at n.12 (citing
*Leebaert v. Harrington*, 332 F.3d 134, 143 (2d Cir. 2003) and *Kissinger v. Bd. of Trustees*,
5 F.3d 177, 180 (6th Cir. 1993)).  Neither decision is binding here, of course, and in any
event both cases are similar to *Parents for Privacy* in that there were no remaining
companion claims that could have possibly triggered the hybrid-rights doctrine.

1   cannot argue that Plaintiffs failed to allege that the ban is not narrowly tailored.  Plaintiffs

2   allege, for example, that Defendants rejected Tencent's proposals that would have

3   mitigated the purported threat posed by WeChat, as well as the comparatively less

4   burdensome prohibitions recommended by their own cyber-security experts, in favor of a

5   far broader set of prohibitions that will effectively "shut down" WeChat in the United

6   States.  *Id.* ¶¶ 69-70, 146, 149.  Plaintiffs also plausibly allege that Defendants' avowed

7   national security concerns are pretextual, *id.* ¶¶ 80-85; that Defendants lack any evidence

8   at all of WeChat being used to surveil users in the United States, *id.* ¶ 84; that at least one

9   of the prohibitions in the Identification will actually *exacerbate* the data-security risks that

10  supposedly justify the ban on WeChat, *id.* ¶¶ 94, 144; and that Defendants failed to

11  consider any evidence at all about multiple critical aspects of the problems they claim the

12  WeChat ban is intended to solve, *id.* ¶¶ 143-50.

13          The Court should reject Defendants' request to dismiss Plaintiffs' free exercise

14  claim because the Ninth Circuit has expressed approval for the hybrid-rights doctrine;

15  Plaintiffs' free exercise claim is directly tied to their free speech and association claims,

16  and the burdens on their religiously motivated exercises of constitutional rights will

17  impose costs felt throughout Chinese-speaking religious communities in the U.S.; and the

18  Court has already concluded that Plaintiffs are likely to succeed on their free speech claim.

19  **V.      PLAINTIFFS ADEQUATELY STATE A RFRA CLAIM**

20          The Religious Freedom Restoration Act ("RFRA") "prohibits the 'Government

21  [from] substantially burden[ing] a person's exercise of religion even if the burden results

22  from a rule of general applicability' unless the Government 'demonstrates that application

23  of the burden to *the person*—(1) is in furtherance of a compelling governmental interest;

24  and (2) is the least restrictive means of furthering that compelling governmental interest.'"

25  *Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682, 705 (2014) (quoting 42 U.S.C.

26  §§ 2000bb–1(a), (b)).  An "exercise of religion" includes "'not only belief and profession

27  but the performance of (or abstention from) physical acts' that are 'engaged in for religious

28  reasons.'"  *Hobby Lobby*, 573 U.S. at 710 (quoting *Smith*, 494 U.S. at 877).  A law that

"operates so as to make the practice of … religious beliefs more expensive" imposes a burden on the exercise of religion, *Hobby Lobby*, 573 U.S. at 710 (quoting *Braunfield v. Brown*, 366 U.S. 599, 605 (1961)), and even such an "indirect" burden on the exercise of religion can qualify as "substantial," *Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 718 (1981).

Defendants contend that the phrase "substantial burden" refers only to burdens that are created by either the imposition of a penalty or the denial of a government benefit. Mot. at 29. But "[t]he text of RFRA does not describe a particular *mechanism* by which religion cannot be burdened. Rather, RFRA prohibits government action with a particular *effect* on religious exercise." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1086 (9th Cir. 2008) (Fletcher, J., dissenting) (emphasis in the original) (stating that "RFRA prohibits government action that 'hinders or oppresses' the exercise of religion 'to a considerable degree.'"). Here, the Second Amended Complaint plausibly alleges that the WeChat ban substantially burdens Plaintiffs' exercise of religion. For example, the SAC explains that WeChat is "used by individuals and groups—including churches—for religious and cultural purposes, including: group prayer, organizing for holidays and events, taking care of the poor, sick and infirm, and education." SAC ¶ 3. Plaintiff Bao and other Chinese-speaking WeChat users also rely on WeChat to participate in Bible study groups and other church gatherings. *Id.* ¶¶ 26, 41, 108-09, 111. Indeed, because of the ongoing coronavirus pandemic, WeChat "is the only way" that Plaintiff Bao and many other Chinese-speaking congregants in the United States participate in religious gatherings, and if WeChat is shut down or otherwise rendered unusable in the United States they will be prevented from participating in activities that their religion requires. *Id.* The SAC further alleges that WeChat provides Chinese-speaking users in the United States with a means of organizing and celebrating religious and cultural holidays[14] such as the Chinese

---

[14] China is and for over seventy years has been governed by the Communist Party of China, which officially espouses state atheism. During parts of this rule—especially during the Cultural Revolution—the Chinese government destroyed and forced religious

1   New Year, the Mid-Autumn Moon Festival, Ching Ming Festival, and the Duan Wu

2   festival, and that Plaintiff Bao and other WeChat users rely on WeChat to learn about and

3   celebrate these and other religious and cultural events.  *Id.* ¶ 41; *see also* ECF No. 17-11

4   ¶¶ 16, 18 (explaining that WeChat includes "many features that resonate with traditional

5   Chinese practices, such as sending monetary gifts ('red envelopes') to friends

6   electronically," and that WeChat is pivotal to the cultural lives of Chinses-American

7   citizens).  This is sufficient at the pleading stage to state a plausible claim under RFRA.

8        Defendants argue that Plaintiffs have not plausibly alleged a "substantial burden"

9   on their exercise of religion because they cannot *personally* be the target of an enforcement

10  action under the Identification, which expressly prohibits only "business-to-business"

11  transactions.  *See* Mot. at 29.  This is essentially the same argument that Defendants raised

12  in their request for a stay of this Court's preliminary injunction, *see* ECF No. 68 at 17-18.

13  *Id.*  Both this Court and the Ninth Circuit properly rejected Defendants' argument that the

14  "business-to-business transaction" limitation insulates the WeChat ban from First

15  Amendment scrutiny, and the same logic applies to RFRA.  If WeChat shuts down or is

16  rendered unusable in the United States because third-party businesses are prohibited from

17  providing WeChat with the technical services it needs to function, Plaintiff Bao's ability to

18  practice his religion will be burdened to the exact same extent as it would be if the

19  government simply prohibited Bao himself from using WeChat.

20       Neither the text of RFRA nor any of Defendants' cases stand for the proposition

21  that the government can deliberately evade RFRA by making it impossible for WeChat to

22  function in the United States, rather than by directly regulating Plaintiffs' use of the app.

23  RFRA refers to government actions that "substantially burden a person's exercise of

24  religion," 42 U.S.C. § 2000bb-1(a), not to government actions that substantially burden a

25  person's exercise of religion by a particular means.  And Defendants' cases exempt from

26  _____

27  practices underground.  Persons of Chinese heritage, including the Chinese diaspora,
    engage in a diversity of religious practices that for some may include attending church and

28  participating in group prayer, while for others may include observance of Chinese
    traditions and celebrating cultural holidays.

[3657359.8]                                              23                    Case No. 3:20-cv-05910-LB

PLAINTIFFS' OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS SECOND AMENDED
COMPLAINT

1    RFRA's purview only those government actions that burden "an individual's 'subjective,

2    emotional religious experience" or "that decrease[] the spirituality, the fervor, or the

3    satisfaction with which a believer practices his religion." *Fazaga v. F.B.I.*, 965 F.3d 1015,

4    1061 (9th Cir. 2020) (quoting *Navajo Nation* 535 F.3d at 1063, 1070).[15]  Here, Plaintiffs'

5    claim is not that the WeChat ban merely detracts from their subjective religious

6    experience.  Nor do Plaintiffs claim, as Defendants suggest, that the WeChat ban subjects

7    their exercise of religion to a mere "inconvenience."  Mot. at 29-30.  Rather, Plaintiffs

8    have plausibly alleged that WeChat "is irreplaceable" for Chinese-speaking users in the

9    United States, see SAC ¶¶ 20-26, 36-45, 89-92, and that EO 13943 and the Identification

10   will *entirely foreclose* Plaintiff Bao and other WeChat users' ability to practice their

11   religion by making it impossible for them to participate in religious gatherings, *id.* ¶ 109.

12        The Supreme Court recently held that government actions with such a drastic effect

13   on individuals' exercise of religion are inherently suspect, *see Roman Catholic Diocese of*

14   *Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) (invalidating indoor capacity limitations

15   ostensibly justified by the ongoing coronavirus pandemic).  The Court has also made it

16   clear that a formalistic distinction between *direct* prohibitions on religious exercise and

17   *indirect* burdens on religious exercise are untenable under RFRA.  *See, e.g.*, *Hobby Lobby*,

18   573 U.S. at 709-10 (involving RFRA claim premised on substantial burden on individual

19   corporate owners' exercise of religion, where the owners were not themselves subject to

20   penalties under the challenged regulation).  In the free-speech context, Judge Posner has

21   likened such a formalistic distinction to one that makes it permissible to "kill[] a person by

22   cutting off his oxygen supply rather than by shooting him."  *Backpage.com, LLC v. Dart*,

23   807 F.3d 229, 231 (7th Cir. 2015).  This Court should not allow Defendants to evade

24

25   ---

     [15] Defendants also cite *Snoqualmie Indian Tribe v. F.E.R.C.*, 545 F.3d 1207, 1214-15 (9th

26   Cir. 2008), but *Snoqualmie* did not reach the court of appeals on a motion to dismiss under
     Rule 12(b)(6).  Rather, the Court rejected the plaintiffs' claim after "reviewing the

27   voluminous record" and rested its decision on the absence of "any evidence"
     demonstrating a substantial burden under the standard from *Navajo Nation*.  *Snoqualmie*,

28   545 F.3d at 1214-15.  Here, Plaintiffs need only plausibly allege such a substantial burden,
     and they have done so.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS SECOND AMENDED
COMPLAINT

1  RFRA by cutting off WeChat's oxygen supply rather than directly regulating Plaintiffs'

2  use of the app.

### CONCLUSION

4        The Court should deny Defendants' Partial Motion to Dismiss in full, and reject

5  Defendants' suggestion in their Proposed Order that the case be dismissed in its entirety.

6

7  DATED:  February 1, 2021              Respectfully submitted,

8                                        ROSEN BIEN GALVAN & GRUNFELD LLP

9                                        By:  */s/ Alexander Gourse*

10                                            Alexander Gourse

11                                       Attorneys for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28